Nos. 2021-1412, -1413, -1414, -1416, -1417, -1418,
-1419, -1420, -1421, -1422, -1423, -1424, -1440, -1442

# United States Court of Appeals for the Federal Circuit

MICROSOFT CORPORATION,
*Appellant*,
v.
IPA TECHNOLOGIES INC.,
*Cross-Appellant*

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2019-00810, -00811, -00812, -00813, -00814, -00835, -00836, and -00837.

## PRINCIPAL BRIEF OF MICROSOFT CORPORATION

Richard A. Cederoth
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000

Joseph A. Micallef
Scott M. Border
Samuel A. Dillon
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005

*Counsel for Appellant*

May 3, 2021

# CLAIMS AT ISSUE IN U.S. PATENT NOS. 6,851,115 AND 7,069,560

## Issue 1

115 Patent, Claim 8.

> A computer-implemented method as recited in claim 5 wherein the agent registry data structure includes at least one trigger declaration for one active agent.

115 Patent, Claim 9.

> A computer-implemented method as recited in claim 5 wherein the agent registry data structure includes at least one task declaration, and process characteristics for each active agent.

115 Patent, Claim 10.

> A computer-implemented method as recited in claim 5 wherein the agent registry data structure includes at least one process characteristic for each active agent.

115 Patent, Claim 63.

> A facilitator agent as recited in claim 61 wherein the agent registry includes a symbolic name, a unique address, data declarations, trigger declarations, task declarations, and process characteristics for each active agent.

560 Patent, Claim 28.

> A facilitator agent as recited in claim 26 wherein the agent registry includes a symbolic name, a unique address, data declarations, trigger declarations, task declarations, and process characteristics for each active agent.

## Issue 2

115 Patent, Claim 29.

A computer program stored on a computer readable medium, the computer program executable to facilitate cooperative task completion within a distributed computing environment, the distributed computing environment including a plurality of autonomous electronic agents, the distributed computing environment supporting an Interagent Communication Language, the computer program comprising computer executable instructions for:

providing an agent registry that declares capabilities of service-providing electronic agents currently active within the distributed computing environment;

interpreting a service request in order to determine a base goal that may be a compound, arbitrarily complex base goal, the service request adhering to an Interagent Communication Language (ICL), where in the ICL includes:

a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events; and

a content layer comprising one or more of goals, triggers and data elements associated with the events;

the act of interpreting including the sub-acts of:

determining any task completion advice provided by the base goal, and determining any task completion constraints provided by the base goal;

constructing a base goal satisfaction plan including the sub-acts of:

determining whether the request service is available,

determining sub-goals required in completing the base goal by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms,

selecting service-providing electronic agents from the agent registry suitable for performing the determined sub-goals, and

ordering a delegation of sub-goal requests complete the requested service; and

implementing the base goal satisfaction plan.

**Issue 3**

115 Patent, Claim 86.

A data wave carrier providing a transport mechanism for information communication in a distributed computing environment having at least one facilitator agent and at least one active client agent, and an Interagent Communication Language (ICL), wherein the ICL includes:

…

wherein said at least one facilitator agent is operable to construct a goal satisfaction plan by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms for satisfying one or more requests for service from said at least one active client agent, the data wave carrier comprising a signal representation of an inter-agent language description of an active client agent's functional capabilities.

## Issue 4

560 Patent, Claim 10.

> A computer architecture as recited in claim 8 wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions.

560 Patent, Claim 11.

> A computer architecture as recited in claim 5 wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions.

## Issue 5

560 Patent, Claim 50.

> A computer-implemented method … comprising the acts of:
>
> providing a plurality of synchronized agent registries each declaring capabilities of service-providing electronic agents currently active within the distributed computing environment, the plurality of synchronized agent registries each resident within a separate computer process; ….

560 Patent, Claim 53.

> A computer-implemented method … comprising the acts of:
>
> providing a plurality of synchronized agent registries each declaring a set of functional capabilities for one or more of the autonomous service-providing electronic agents, each of the synchronized agent registries being resident within a separate computer process; ….

## CERTIFICATE OF INTEREST

Counsel for Appellant Microsoft Corporation certifies the following:

1. The full name of the party represented by me is:

   Microsoft Corporation.

2. The name of real party in interest represented by me is:

   Microsoft Corporation.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

   None.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the agency or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

   None.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

   *IPA Technologies Inc. v. Microsoft Corporation*, C.A. No. 18-cv-01-RGA (D. Del.);

   *IPA Technologies Inc. v. Amazon.com, Inc. et al.*, C.A. No. 16-cv-1266-RGA (D. Del.);

   *IPA Technologies Inc. v. Google LLC*, C.A. No. 18-cv-318-RGA (D. Del.); and

*Google LLC v. IPA Technologies Inc.*, Nos. 21-1179, 21-1180, 21-1185 (Fed. Cir.).

6. Information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases.

Not Applicable.

Dated: May 3, 2021

/s/ Richard A. Cederoth

Richard A. Cederoth

SIDLEY AUSTIN LLP

*Counsel for Appellant*

# TABLE OF CONTENTS

**STATEMENT OF RELATED CASES**......vi

**INTRODUCTION**......1

**JURISDICTIONAL STATEMENT**......3

**STATEMENT OF THE ISSUES**......4

**STATEMENT OF THE CASE**......6

**I. Factual Background**......6

A. The 115 and 560 Patents......6

B. The Prior Art......9

1. Kiss......9

2. FIPA97......13

**II. The Proceedings Below**......17

A. Microsoft's Petitions and the Kiss/FIPA97 Combination......17

B. Institution and the Board's Unpatentability Determinations......20

C. The Board's Patentability Determinations......22

1. Claims 8-10 and 63 of the 115 Patent and Claim 28 of the 560 Patent (IPR2019-00810, -814, -835)......23

2. Claims 29-47 of the 115 Patent (IPR2019-00810, -811, -812)......27

3. Claims 86-89 of the 115 Patent (IPR2019-00811)......34

4. Claims 10 and 11 of the 560 Patent (IPR2019-00836)......37

5. Claims 50, 51, and 53-55 of the 560 Patent (IPR2019-00836)......40

**SUMMARY OF ARGUMENT**......44

**ARGUMENT**......47

**I. Standard of Review**......47

**II. The Board Erred in Failing to Find Claims 8-10 and 63 of the 115 Patent and Claim 28 of the 560 Patent Unpatentable as Obvious ..........49**

A. The Board Failed to Provide Adequate Reasoning for its Conclusions........................................................................50

B. The Petitions Expressly Demonstrated the "How" and "Why" of the Cited Combination ........................................................52

C. The Board Found the Petitions Demonstrated the "How" and "Why" of the Cited Combination..........................................55

**III. The Board Erred By Refusing To Consider Petitioner's Arguments Regarding the Obviousness of Claim 29 of the 115 Patent and its Dependents Claims 30-47.........................................................................57**

**IV. The Board Erred in Failing to Find Claim 86 of the 115 Patent and its Dependents Unpatentable as Obvious ........................................................64**

**V. The Board Erred in Failing to Find Claims 10 and 11 of the 560 Patent Unpatentable as Obvious ...........................................................................67**

**VI. The Board Erred in Failing to Find Claims 50, 51, and 53-55 of the 560 Patent Unpatentable as Obvious ..................................................................72**

A. The Board's Construction of "Computer Process" was Legally Erroneous ........................................................................... 72

B. The Petitions Demonstrated the Claims Were Satisfied ..... 76

**CONCLUSION...........................................................................................79**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Andrea Elecs. Corp.*,
949 F.3d 697 (Fed. Cir. 2020) .......... 64

*Bilstad v. Wakalopulos*,
386 F.3d 1116 (Fed. Cir. 2004) .......... 49

*Consol. Edison Co. of N.Y., Inc. v. NLRB*,
305 U.S. 197 (1938) .......... 48

*Ericsson Inc. v. Intellectual Ventures I LLC*,
901 F.3d 1374 (Fed. Cir. 2018) .......... 49, 64, 65, 67

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) .......... 49

*Knowles Elecs. LLC v. Iancu*,
886 F.3d 1369 (Fed. Cir. 2018) .......... 48

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 49

*Mycogen Plant Sci. v. Monsanto Co.*,
243 F.3d 1316 (Fed. Cir. 2001) .......... 71

*Owens Corning v. Fast Felt Corp.*,
873 F.3d 896 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 2633 (2018) .......... 48

*Phigenix, Inc. v. Immunogen, Inc.*,
845 F.3d 1168 (Fed. Cir. 2017) .......... 4

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......... 48

*Robert Bosch, LLC v. Iancu*,
No. 2017-2122, 2019 U.S. App. LEXIS 19889 (Fed. Cir. July 3, 2019) .......... 57, 67

*In re Sang-Su Lee*,
277 F.3d 1338 (Fed. Cir. 2002) .......... 51

*SAS Inst. Inc. v. Iancu*,
138 S. Ct. 1348 (2018) .......... 58, 61

*Schucker v. F.D.I.C.*,
401 F.3d 1347 (Fed. Cir. 2005) .......... 57, 67

*Tandon Corp. v. US Int'l Trade Comm'n*,
831 F.2d 1017 (Fed. Cir. 1987) .......... 59

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015) .......... 48

*TQ DELTA, LLC v. Cisco Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019) .......... 74

*TQ Delta, LLC v. DISH Network LLC*,
929 F.3d 1350 (Fed. Cir. 2019) .......... 48

*Transactive Corp. v. United States*,
91 F.3d 232 (D.C. Cir. 1996) .......... 49

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) .......... 70

*In re Warsaw Orthopedic, Inc.*,
832 F.3d 1327 (Fed. Cir. 2016) .......... 51, 59, 74

*Western Digital Corp. v. Spex Tech. Inc.*,
IPR2018-00084, Paper 14 (P.T.A.B. Apr. 25, 2018) .......... 61

**Statutes**

5 U.S.C. § 554(b)(3), (c) .......... 63

5 U.S.C. § 557(c)(3)(A) .......... 51, 59, 61, 75

28 U.S.C. § 1295(a)(4) .......... 4

35 U.S.C. § 141(c) .......... 4

35 U.S.C. §§ 311-319 .......... 3

35 U.S.C. § 312(a)(3) .......... 59

35 U.S.C. § 318(a) .......... 57, 58, 59, 61

**Regulations**

37 C.F.R. § 42.1–80 & 42.100–123 .......... 3

37 C.F.R. § 42.23 .......... 63

37 C.F.R. § 42.23(b) .......... 62

37 C.F.R. § 42.104(b) .......... 61

37 C.F.R. § 42.104(b)(4) .......... 59

**STATEMENT OF RELATED CASES**

Pursuant to Fed. Cir. R. 47.5, Appellant Microsoft Corporation ("Microsoft") states the following:

There have been no previous appeals from Case Nos. IPR2019-00810, IPR2019-00811, IPR2019-00812, IPR2019-00813, and IPR2019-00814 involving U.S. Patent No. 6,851,115 (" 115 Patent"), or from IPR2019-00835, IPR2019-00836, and IPR2019-00837 involving U.S. 7,069,560 ("560 Patent"), before this or any other appellate court.

Additionally, *Google LLC v. IPA Technologies Inc.*, Nos. 21-1179, 21-1180, 21-1185 (Fed. Cir.) ("*Google* appeals"), also involving the '115 and 560 Patents, are pending before this Court and may be directly affected by this Court's decision in the pending appeals. Likewise, any decision in the *Google* appeals may directly affect the outcome of the pending Microsoft appeals.

The district court cases that will be directly affected by this Court's decision in the pending appeals are: *IPA Technologies Inc. v. Microsoft Corporation*, C.A. No. 18-cv-01-RGA (D. Del.); *IPA Technologies Inc. v. Amazon.com, Inc. et al.*, C.A. No. 16-cv-1266-RGA (D. Del.); and *IPA Technologies Inc. v. Google LLC*, C.A. No. 18-cv-318-

RGA (D. Del.). On January 10, 2020, the district court entered orders staying both the Microsoft and Google cases pending the outcome of their respective *inter partes* review proceedings and any resulting appeals before this Court. The Amazon case has been ongoing and is presently in the expert discovery phase.

## INTRODUCTION

U.S. Patent Nos. 6,851,115 ("115 Patent") and 7,069,560 ("560 Patent"), assigned to IPA Technologies Inc. ("IPA"), are directed to systems and methods for collective task completion among distributed software agents. The basic technology disclosed and claimed in these now-expired patents is not very complex. The system includes multiple software agents, each having different capabilities. A specialized agent called a "facilitator" receives a request for some task to be performed, also called a "goal." The facilitator divides the goal into sub-goals, references an agent registry that lists the capabilities of each active agent in the system in order to match each sub-goal with an agent capable of carrying out the sub-goal, and dispatches the sub-goals to the respective selected agents.

Such agent systems and functionality were well-known in the prior art. U.S. Patent No. 6,484,155 to Kiss ("Kiss"), for example, discloses a multi-agent system including a "meta-agent" that receives a request for service, divides it into sub-requests, and dispatches the sub-requests to various specialized agents based on their capabilities listed in an agent registry.

During prosecution, the claims at issue here were rejected over Kiss, most several times, and only allowed to issue when amended to include certain very specific details concerning an "interagent communication language," *i.e.*, a communications protocol employed between agents. Appx6323-6324; Appx9402-9403.

Appellant Microsoft Corporation ("Microsoft") challenged the collective 144 claims of the 115 and 560 Patents across a total of eight *inter partes* review (IPR) petitions. The petitions were all based on the same basic prior art combination — Kiss combined with "FIPA97," a prior art industry standard directed to agent technologies and published by the Foundation for Intelligent Physical Agents in 1997. FIPA97, which was not before the examiner, includes an extensive description of an interagent communication language, as well as of numerous other agent technologies useful in a system such as Kiss.

The Patent Trial and Appeal Board ("Board") agreed with the several pages of analysis in Microsoft's petitions demonstrating that it would have been obvious to combine Kiss and FIPA97 and correctly determined that most of the challenged claims were unpatentable over that combination. Indeed, the Board correctly agreed with Microsoft on

the vast majority of the many dozens of issues raised in the proceedings below.

On five narrow issues, however, the Board disagreed with Microsoft and, in Microsoft's view, erroneously upheld the patentability of claims 8-10, 29-47, 63, and 86-89 of the 115 Patent and claims 10, 11, 28, 50, 51, and 53-55 of the 560 Patent. For the reasons described below, this Court should reverse or vacate the Board's findings as to those claims, and at minimum remand for further consideration of Microsoft's unpatentability challenges.

## JURISDICTIONAL STATEMENT

On March 19, 2019, Microsoft filed five IPR petitions against the 115 Patent (IPR2019-00810, -00811, -00812, -00813, and -00814) and three IPR petitions against the 560 Patent (IPR2019-00835, -00836, and -00837) pursuant to 35 U.S.C. §§ 311-319 and 37 C.F.R. § 42.1–80 & 42.100–123. Between October 15 and November 5, 2020, the Board issued final written decisions in all eight proceedings. Appx1-1293. Microsoft timely filed notices of appeal in IPR2019-00810, -00811, -00812, -00814, -00835, and -00836. Appx2461-2463; Appx2950-2952; Appx3413-3415; Appx4200-4202; Appx5439-5441; Appx5878-5880. This

Court has jurisdiction under 35 U.S.C. § 141(c) and 28 U.S.C. § 1295(a)(4). Microsoft has standing to pursue these appeals due to IPA's stayed infringement case, C.A. No. 18-cv-01-RGA (D. Del.). *See Phigenix, Inc. v. Immunogen, Inc.*, 845 F.3d 1168, 1173 (Fed. Cir. 2017).

## STATEMENT OF THE ISSUES

1. Whether the Board erred in finding that the petitions had not shown "how or why" the agent registries of the cited prior art would be combined, for purposes of claims 8-10 and 63 of the 115 Patent and claim 28 of the 560 Patent, where the petitions included pages of detailed analysis explaining how the prior art, including their agent registries, would be combined and why a person of ordinary skill in the art ("Skilled Artisan") would have been motivated to do so?

2. Whether the Board erred in failing to address Microsoft's patentability arguments against Claim 29 of the 115 Patent and its dependents simply because the petitions cross-referenced their Claim 29 analysis to analogous-but-not-identical claim limitations in Claim 1, where the Board identified no claim element not satisfied by the prior art and refused to consider Microsoft's reply arguments explaining that

any differences in claim language were not material to the petitions' patentability challenges?

3. Whether the Board erred in finding that the petition had not shown how the cited prior art satisfied the requirement of a "facilitator agent" constructing a "goal satisfaction plan" in the context of claim 86 of the 115 Patent, where the Board had simultaneously found nearly word-for-word identical analysis persuasively showed that the same prior art functionality satisfied the same requirement of a facilitator agent constructing a goal satisfaction plan in the context of claim 61 of the 115 Patent?

4. Whether the Board erred in finding that the petition failed to show the "explicit task completion advisory suggestions" of claims 10 and 11 of the 560 Patent were satisfied by the cited prior art "Constraint+" parameters, where the only support in the patent specification for that claim language expressly encompasses "constraints"?

5. Whether the Board erred in failing to find claims 50, 51, and 53-55 of the 560 Patent unpatentable based on a claim interpretation

neither party requested and which is unsupported by both the intrinsic and extrinsic evidence?

## STATEMENT OF THE CASE

### I. Factual Background

#### A. The 115 and 560 Patents[1]

The 115 Patent, and its continuation the 560 Patent, discloses a system for collective task completion among distributed software agents using an inter-agent communication language ("ICL") to provide a common communications protocol. Appx1312(1:25-33). The system includes multiple specialized agents, a facilitator agent, and an agent registry listing the capabilities of each agent active in the system. Appx1299; Appx1302; Appx1319(16:47-17:21). The agents communicate using the ICL, as shown in Figure 4:

[1] The 115 and 560 Patents share a common specification. Appx1331. Microsoft's citations to the 115 Patent are exemplary of both patents.




Fig. 4

Appx1299.

The facilitator agent facilitates cooperative task completion by dividing portions of each task among other specialized agents. Appx1306; Appx1313-1314(4:58-5:16). More specifically, the facilitator agent may receive from an agent in the system a request for service, also called a "goal," requesting that some task be completed. Appx1320(18:29-34). The facilitator creates a "goal satisfaction plan" by dividing the goal into a number of "sub-goals" and delegating each sub-

goal to an agent in the system having a specialized capability to accomplish that sub-goal. Appx1320(18:34-48). The facilitator selects an agent for each sub-goal by referencing the agent registry, which lists the capabilities and potentially other information about active agents, and dispatches the relevant sub-goal to the selected agent. Appx1319(16:47-17:21); Appx1319(18:36-48). An example agent registry is depicted in Figure 7:




Fig. 7

Appx1302; Appx1319(16:47-61).

B. The Prior Art

Microsoft's petitions[2] relied on two principal prior art references: (1) United States Patent No. 6,484,155 to Kiss ("Kiss") and (2) the 1997 FIPA v. 1.0 Specification ("FIPA97"). *E.g.*, Appx1398-1399. For certain dependent claims, Microsoft additionally relied on several prior art papers published by the inventors of the 115 and 560 Patents, or their colleagues. *E.g.*, Appx1399. Only Kiss and FIPA97 are relevant to Microsoft's appeals.

1. Kiss

Kiss discloses a "knowledge management system that supports inquiries of distributed knowledge resources" in which "[i]nteraction between a user and the knowledge resources is mediated by a collection of cooperative intelligent agents." Appx7494. The "cooperative intelligent agents incorporate generalized automated negotiation and distributed inference (*i.e.*, problem-solving) processes." Appx7494. The agents are organized in a "hierarchical knowledge management system" with multiple layers, each layer containing "intelligent agents

[2] Unless otherwise noted, citations to IPR2019-00810 are representative of the record below.

responsible for one portion of the distributed problem-solving inferencing process." Appx7496; Appx7510(3:21-36).

In addition to the intelligent agents, sometimes referred to as "knowledge agents," Kiss also includes one or more "meta-agents" and an agent registry listing the capabilities of each agent active in the system. Appx7511(5:20-31); Appx7511(6:66-7:20). A conceptual overview of Kiss including these elements is shown in Figure 1:




*Fig. 1*

Appx7496; Appx7511(5:1-9).

Kiss explains that an agent service layer "provides services for maintaining a registry of agents in the system, as well as supporting the distributed problem solving." Appx7510(3:38-40). The agent registry "identifies each agent's capabilities and interests, and contains knowledge about the relationships between them." Appx7510(3:40-42). The other agent layers "confer with the agent service layer to identify those other resources capable of furthering the problem-solving process." Appx7510(3:43-45). The agent service layer includes a matchmaking facility for "notifying agents interested in a capability of other agents that provide the capability." Appx7510(3:46-47).

This matchmaking is carried out by the meta-agent referencing the agent registry. Appx7512(7:13-39). Kiss explains, with respect to its Table 1 (below), that "[e]ach of the knowledge agents in the system 700 registers with the agent service layer 735 these capabilities and interests." Appx7514(12:18-20).

TABLE 1

Interests and Capabilities of Knowledge Modules

| Knowledge Module | Capabilities | Interests |
|---|---|---|
| Sales 711 | Number of units<br>Price per unit<br>Total revenue | Market price<br>Cost per unit |
| Production 715 | Cost per unit | Number of units<br>Cost of production lines<br>Material costs<br>Labor costs |
| Marketing 719 | Market price | Number of units |
| Materials 723 | Material cost | Material type |
| Facilities 727 | Cost of production lines | Number of production lines |
| Labor 731 | Cost of labor | Number of workers |

Appx7514(11:51-12:16)

As Kiss explains, "[t]he meta agent 119 receives from the user agent 117 the formulated question" and "analyzes the formulated question to formulate a solution plan." Appx7513(10:12-15). "By interacting with the agent service layer 113," which includes the agent registry, "the meta agent 119 allocates and assigns tasks to knowledge agents 121 based on the interests and capabilities of those knowledge agents 121." Appx7513(10:12-18); Appx7511(6:66-7:20).

While Kiss discloses a system for cooperative task completion among distributed software agents, it does not describe an inter-agent

communication language used by the agents. Appx1423. For such features, the petitions relied on FIPA97.

2. FIPA97

FIPA97 is the 1997 FIPA v. 1.0 Specification created by the Foundation for Intelligent Physical Agents. Appx7519-7525. FIPA97 comprises seven "parts" organized around the construction and management of multi-agent systems. Appx7524-7525.[3] Parts 1-3 are normative specifications that describe administrative functionality such as the details of an Agent Management System (Part 1), an Agent Communication Language (Part 2), and Agent/Software Integration (Part 3). Appx7524. Parts 4-7 are informative application descriptions that describe exemplary practices relating to Personal Travel Assistance (Part 4), Personal Assistant (Part 5), Audio/Video Entertainment and Broadcasting (Part 6), and Network Management and Provisioning (Part 7). Appx7524.

---

[3] FIPA97's Parts 1-7 were filed in the record below, respectively, as Exhibits 1006-1012. The petitions argued, and the Board agreed, that those seven exhibits are properly considered a single prior art reference. Appx30-57.

FIPA97 provides a "specification of basic agent technologies that can be integrated by agent systems developers to make complex systems with a high degree of interoperability." Appx7572. The goal of FIPA97 was to promote "emerging agent-based applications, services and equipment" by "making available in a timely manner, internationally agreed specifications that maximize interoperability across agent-based applications, services and equipment." Appx7571.

Part 1 of FIPA97, the Agent Management Specification ("FIPA AMS"), "provides a normative framework within which FIPA compliant agents can exist, operate and be managed." Appx7524. The FIPA AMS model is defined through the intersection of "Agent Platforms" ("AP") and "Agent Domains" ("AD"), as shown in Figure 2 below:



**Figure 2 — Agent Platform Reference Model Fragment**

Appx7536.

Each AD is defined by an "Directory Facilitator" ("DF"), which maintains an agent registry. Appx7532-7533. For an agent to be part of an AD it must register with the appropriate DF. Appx7532-7533. The AMS manages "creation, deletion, suspension, resumption, authentication and migration of agents on the agent platform ***and provides a 'white pages' directory service for all agents resident on an agent platform***." Appx7528.[4]

[4] In this brief, all emphasis has been added unless otherwise specified.

Part 2 of FIPA97 describes an inter-agent communication language to be used with FIPA agents ("FIPA ACL"). Appx7524. FIPA ACL utilizes "performatives" and speech act theory to provide a common communication protocol between agents. Appx7575; Appx7653. As shown below, each message may include (i) a performative (*i.e.*, a request to perform a task) that defines the intended purpose of the message (such as "inform"), Appx7575, (ii) parameters indicating how the receiving agent should interact with the message, and (iii) content:




**Figure 1 — Components of a message**

Appx7585-7586. One example of a use of this communications protocol is the Contract Net Protocol, which allows agents to issue a "call for proposals" to other agents to perform a task. Appx7620.

Part 6 of FIPA97 provides examples of how FIPA97 can be applied to the Audio/Video Entertainment & Broadcast (AVEB) context.

Appx7523; Appx7525; Appx7765. Specific types of agents such as Guide Agents (GA) are used to provide user functionality in the AV context. Appx7768. FIPA97 explains that certain use cases can involve updating program schedules based on special news or overtime sport events, and that such implementations use the Contract Net Protocol described in Part 2 of FIPA97 combined with preconditions, *e.g.*, "precondition2." Appx7780; Appx7620.

## II. The Proceedings Below

### A. Microsoft's Petitions and the Kiss/FIPA97 Combination

To challenge the collective 144 claims of the 115 and 560 Patents and their 4,000 words within the applicable word limits for IPR petitions, Microsoft filed five IPR petitions against the 115 Patent and three IPR petitions against the 560 Patent. Appx1596-1601; Appx1733-1734; Appx4693-4694. Each petition challenged a different set of claims based on the obvious combination of Kiss and FIPA97 ("Kiss/FIPA97") (*see infra* §II.B), supported by, among other evidence, declarations from Microsoft's expert, Dr. Henry A. Lieberman. *E.g.*, Appx7092; Appx8605.

In the Kiss/FIPA97 combination, the system and functionality of Kiss would be supplemented by the techniques and features disclosed in

FIPA97, such as the agent communication language of FIPA97 "as well as other administrative functionality (*i.e.*, Parts 1-3) and exemplary practices (*i.e.*, Parts 4-7)." *E.g.*, Appx1423. The petitions explained that "FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss" and "adds its administrative functionality and exemplary practices …." Appx1423. In the proposed combination, FIPA97's techniques would be "used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging …." Appx1423. The petitions explained:

> Where the two systems disclose analogous functionality, ***such as facilitating cooperation and agent registry***, their techniques are combined, ***as a Skilled Artisan would understand that to be an efficient and common sense way to implement the combined system in order to obtain the benefits of both, and therefore be motivated to do so.***

Appx1423.

The petitions explained that this combination would have been obvious for several additional reasons, including that Kiss, FIPA97, and the 115 Patent are analogous art, Appx1423-1424, and that the

Kiss/FIPA97 combination would arrange old elements to perform their known function to yield no more than what one would expect, Appx1424. The petitions also demonstrated numerous prior art motivations to combine Kiss with FIPA97, Appx1424-1426, including that FIPA97 was an industry standard designed to provide a "specification of basic agent technologies that can be integrated by agent systems developers to make complex systems with a high degree of interoperability." Appx7572. Adding FIPA97's agent functionalities and practices to Kiss would have advantageously used "a common communications protocol, *i.e.*, an inter-agent communication language, ***and related management functionality*** " as "a convenient and efficient way ***to facilitate effective communication between agents***." Appx1424-1425. Because "agent systems that complied with" a standard such as FIPA97 "would be ***more likely to be interoperable with other systems and would likely have more resources available***," a Skilled Artisan would have been further motivated to make the combination. Appx1426.

The petition also demonstrated the obviousness of employing FIPA97's interagent communication language (FIPA ACL) in Kiss for

several reasons, including because of the recognized advantages of employing a common communications protocol among software agents. Appx1426. The use of this ACL functionality would have further motivated a Skilled Artisan "to include the ***administrative functionality and exemplary practices*** described in FIPA97 with Kiss" because "FIPA97 suggests that their use with the FIPA ACL would be advantageous and workable," and would provide "***the full benefit of using FIPA ACL.***" Appx1426.

B. Institution and the Board's Unpatentability Determinations

The Board instituted review on all petitioned grounds in all eight proceedings. Appx1617; Appx2862; Appx3336; Appx3826; Appx4132; Appx4595; Appx5816; Appx6246. The Board consolidated the 5 IPRs against the 115 Patent and separately consolidated the 3 IPRs against the 560 Patent, Appx1733-1736; Appx4693-4696, and, after merits briefing, held oral hearings in the two consolidated proceedings. Appx2326-2327. Between October 15 and November 5, 2020, the Board issued separate final written decisions in all eight proceedings, finding 108 of the 144 challenged claims across both patents to be unpatentable, but that the remaining 36 claims had not been shown to

be unpatentable. Appx167-168; Appx320-321; Appx494-495; Appx664-665; Appx837-838; Appx992; Appx1136; Appx1291-1292.

In finding that Microsoft had demonstrated the unpatentability of the majority of the challenged claims, the Board made a variety of threshold findings. It addressed the level of ordinary skill in the art (Appx9-12), and construed various terms of the claims (*e.g.*, Appx12-26). It determined, based on the extensive factual record, that (1) Kiss was entitled to the priority date of its provisional application, and thus prior art under Section 102(e) (Appx57-60), and (2) FIPA97's seven parts were made publicly available in 1997 as a single prior art reference, and was thus prior art under Section 102(a) (Appx30-57).[5]

Regarding Microsoft's core obviousness arguments, the Board agreed that Kiss teaches electronic agents and their general functions and operations, including agent collaboration, agent registry, and inter-agent messaging. Appx83, Appx92. It also agreed that Microsoft had demonstrated the obviousness of combining FIPA97 with the teachings

[5] Despite finding that FIPA97 was publicly available in late 1997, more than a year before the 115 and 560 Patent's January 5, 1999 priority date, the Board did not address Microsoft's argument that FIPA97 was also prior art under Section 102(b). Appx1420.

of Kiss, finding that the petition "provides persuasive evidence that a person of ordinary skill in the art at the time of the invention would have been motivated to combine FIPA97's communications protocol and inter-agent communication language (FIPA ACL) between the agents of Kiss, ***adding its administrative functionality and practices to the Kiss system.***" Appx94. In doing so, the Board made detailed findings based on an extensive record that there were multiple reasons to combine Kiss and FIPA97, Appx84-94, and considered, and dismissed, IPA's putative evidence of non-obviousness, Appx61-83.

Finally, the Board determined, after extensively considering Microsoft and IPA's arguments, that the Kiss/FIPA97 combination demonstrated the obviousness of the majority of the challenged claims of the 115 and 560 Patents. *E.g.*, Appx95-137 (claim 1 of 115 Patent).

C. The Board's Patentability Determinations

Despite the Board's extensive unpatentability findings, the Board concluded that Microsoft had not demonstrated the unpatentability of five separate sets of claims.

1. Claims 8-10 and 63 of the 115 Patent and Claim 28 of the 560 Patent (IPR2019-00810, -814, -835)

Certain claims of the 115 and 560 Patents recite "registering" agents or an "agent registry," and also recite certain information to be included in such a registry. Claim 8 recites that such a registry "includes at least one ***trigger declaration*** for one active agent." Appx1326(30:10-12). Claim 9 recites that the registry "includes … ***process characteristics*** for each active agent." Appx1326(30:14-17). Claim 10 recites that the registry "includes at least one ***process characteristic*** for each active agent." Appx1326(30:18-20). Similarly, claim 63 of the 115 Patent and claim 28 of the 560 Patent each recite a registry that "includes … ***trigger declarations, … and process characteristics*** for each active agent." Appx1329(35:35-38); Appx1364(32:58-61).

Microsoft's petitions relied on aspects of FIPA97 incorporated into the combined registry of the Kiss/FIPA97 combination. *See* Appx1423 ("In that combination, FIPA97 discloses … other administrative functionality (*i.e.*, Parts 1-3) and exemplary practices (*i.e.*, Parts 4-7)."). Similar to Kiss's agent registry, Appx1416, FIPA97 includes an Agent Management Specification ("AMS") that requires agents to "register"

with a Directory Facilitator. Appx1421. In the Kiss/FIPA97 combination proposed in the petitions, these two registries would be combined: "[w]here the two systems disclose analogous functionality, ***such as … agent registry***, their techniques are combined …." Appx1423. The petitions then explained how the Kiss/FIPA97 combination satisfied the "trigger declaration" and "process characteristic" limitations.

For the claimed "trigger declarations," the petitions relied on FIPA97's "preconditions2" trigger conditions, described in FIPA97 Part 6. Appx1455-1456 (citing Appx7780); Appx3963 (same); Appx7758. In that portion of FIPA97, specific types of agents such as Guide Agents (GA) provide user functionality in the AV context, Appx7768, such as updating program schedules based on special news or overtime sport events, and such functionality relies on trigger conditions known as preconditions, *e.g.*, "precondition2." Appx7780; Appx7620.

For the claimed "process characteristics," Microsoft's petitions pointed to FIPA97's "interaction protocols" parameter, which is described in FIPA97's Part 1 and refines how the interactions with a

given agent are conducted. Appx1457 (citing Appx7559); Appx3963-3964 (same); Appx7519.

After institution, IPA disputed whether Microsoft had offered any "explanation whatsoever as to why a person of ordinary skill in the art would be motivated to incorporate" these specific features "of FIPA97 into a data structure which Petitioner alleges to be disclosed in Kiss." Appx1865-1867; Appx4846.

Microsoft's reply explained that the petitions had provided such explanation through their argument that, in the cited combination, FIPA97's "administrative functionality (*i.e.,* Parts 1-3) and exemplary practices (*i.e.,* Parts 4-7)" would be combined with Kiss, and the numerous motivations for such a combination analyzed in the petitions. Appx2029-2035; Appx4999.

The Board's final written decisions found that Microsoft had demonstrated the obviousness of "combin[ing] the teachings of FIPA97 and Kiss in the manner proffered by Petitioner." Appx94. Indeed, the Board specifically found that "Petitioner provides persuasive evidence that a person of ordinary skill in the art at the time of the invention would have been motivated to combine FIPA97's communications

protocol and inter-agent communication language (FIPA ACL) between the agents of Kiss, ***adding its administrative functionality and practices to the Kiss system***." *Id.*

As the petitions explained, that meant that, "[w]here the two systems disclose analogous functionality, such as … agent registry, their techniques are combined," and that a "Skilled Artisan would have been … motivated to include the administrative functionality" (*i.e.*, Parts 1-3) "and exemplary practices" (*i.e.*, Parts 4-7) "described in FIPA97 with Kiss" for the reasons provided. *E.g.*, Appx89 (quoting Appx1423); Appx92 (quoting Appx1426).

With respect to the dependent claims at issue here, however, the Board stated that Microsoft was "proposing a different (or additional) combination—***that is, combining the registry of Kiss with the registry of FIPA97***," and faulted Microsoft for not identifying "*how* or *why* Kiss's agent registry data structure would have been combined with" the registry elements from FIPA97's Parts 1 and 6 relied on for these claims. Appx144-149; Appx801; *see* Appx945-946; Appx984-985.

2. Claims 29-47 of the 115 Patent (IPR2019-00810, -811, -812)

Independent claims 1 and 29 of the 115 Patent are similar in scope and each seek to claim the basic algorithm described in the patents. For example, both claims recite performing "cooperative task completion" among "a plurality of distributed electronic agents" by constructing a "goal satisfaction plan" to satisfy a request for service constituting a "base goal." Appx1326(29:25-33); Appx1327(31:59-32:30). To construct such a "goal satisfaction plan," both claims divide the "base goal" into "sub-goals," select agents capable of satisfying each sub-goal by referencing an agent registry, and delegate each sub-goal to the appropriate agent so identified. Appx1326(29:30-43); Appx1327(32:11-21).

Because of these parallel requirements and near identical disclosure of the prior art, Microsoft's petitions challenged both claims on substantially the same theories and evidence; for many of the elements of claim 29, the petitions referred to the analogous analysis provided for claim 1 as demonstrating the satisfaction of that claim 29

element by the Kiss/FIPA97 system.[6] *E.g.*, Appx1427-1449; Appx1460-1464. On this issue, three key limitations became a focus during the proceedings below.

1. "Goal Satisfaction Plan": While both claims 1 and 29 refer to receiving a request for service constituting a "base goal," claim 1 recites "constructing a goal satisfaction plan" that includes delegation of a number of sub-goal requests, Appx1326(29:30-43), and claim 29 recites "constructing a ***base*** goal satisfaction plan" that includes ordering the delegation of a number of sub-goal requests. Appx1327(32:11-21). The 115 Patent does not use the phrase "***base*** goal satisfaction plan," or even "***base*** goal," outside of the claims. It discloses only a "goal satisfaction plan."

The petitions therefore argued both of these claim elements were satisfied by the prior art in the same manner, *i.e.*, by the meta-agent of Kiss, as modified in the combined system, that "formulates a goal statement for the problem-solving phase of the process," then

[6] For word-count reasons, Microsoft challenged the patentability of independent claim 29 in three proceedings, each involving both independent claims 1 and 29 and a different subset of claims that depend from claim 29.

"formulates a solution plan for the problem," where the disclosed "solution plan" included delegating various sub-goals to several different agents, respectively. Appx1445-1446; Appx1464. This analysis was set forth in detail in the section analyzing the "constructing a goal satisfaction plan" language of claim 1, Appx1445-1446, and cited to under the section of claim 29 analyzing the "constructing a ***base*** goal satisfaction plan" of that claim, Appx1464.

2. Delegating "Sub-Goals": Claim 1 also recites that the "goal satisfaction plan" includes "a suitable delegation of sub-goal requests to best complete the requested service request" by using certain "reasoning" techniques. Appx1326(29:34-39). Claim 29 similarly requires "determining whether the request[ed] service is available, [and] determining sub-goals required in completing the base goal" by using the exact same "reasoning" techniques. Appx1327(32:11-16).

The petitions argued that both of these claim elements were satisfied by the disclosure in Kiss of the meta-agent identifying and querying various other agents to determine which would best respond to sub-requests of the service request. Appx1446; Appx1464. The petitions argued that the "reasoning" limitations were satisfied by

operations disclosed in Kiss, or alternatively by operations disclosed in FIPA97 that would have been included in the obvious Kiss/FIPA97 combination. Appx1446-1449; Appx1463. This analysis was set forth in the petitions under the relevant sub-section of claim 1, Appx1446-1449, and was cited back to under the analogous section of claim 29, Appx1464.

3. "Dispatching"/"Delegat[ing]": Claim 1 of the 115 Patent also requires "dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent." Appx1326(29:40-43). Claim 29 likewise requires "selecting service-providing electronic agents from the agent registry suitable for performing the determined sub-goals, and ordering a delegation of sub-goal requests complete the requested service." Appx1327(32:18-21). The petitions argued that both of these claim elements were satisfied by the disclosure in Kiss of the meta-agent sending queries ("sub-goals") to various specialized agents of the system based on a determination that the targeted agent possesses an appropriate capability, determined from an agent registry. Appx1449; Appx1464.

IPA's preliminary responses did not dispute that the patentability of claim 29 rose and fell with claim 1, including with respect to the claimed requirements summarized above. *E.g.*, Appx1572; Appx1574-1575; Appx1580-1581.

In its institution decisions, the Board agreed that Microsoft had demonstrated a reasonable likelihood of prevailing on its challenge to claim 1, but not on its challenge to claim 29. *E.g.*, Appx1691, Appx1693-1695. The Board concluded that there were "material differences" between the language of claims 1 and 29. Appx1693-1694. However, its analysis merely quoted the different language from each claim, stated that it was "apparent" there were material differences, but never sought to explain why any differences were "material." *Id.* Nor did the Board address whether the patentability analysis of claim 1 cited in the analysis of claim 29 would satisfy claim 29. *See* Appx1694-1695. Instead, the Board concluded that because "Petitioner does not address the claim language of claim 29 or explain why its analysis for claim 1 is sufficient to demonstrate a reasonable likelihood of prevailing with respect to claim 29," it had not shown a reasonable likelihood of prevailing as to claim 29. Appx1694-1695.

IPA latched onto this finding and in its Patent Owner Response urged the Board to maintain it. Appx1757-1758. IPA also block quoted large portions of claims 1 and 29 to argue that other "material differences" existed, including the elements discussed above. Appx1845-1847. IPA's Patent Owner Response did not explain how any of these differences in language were "material" to Microsoft's patentability challenge, and did not advance any other claim 29-specific arguments. *See* Appx1757-1758; Appx1845-1847.[7]

In reply, Microsoft explained that there were no ***material*** differences in claim scope because (1) although different words were used, the respective language of the two claims effectively meant the same thing, and (2) the specific portions of Kiss/FIPA97 cited by the petitions satisfied the language of both claims despite any differences in claim language. Appx2019-2027. For example, Microsoft explained that both claims 1 and 29 refer to "base goals" as the object of their

[7] IPA's post-institution argument that Microsoft should have provided redundant analysis for claims 1 and 29 stands in contrast to its pre-institution argument that Microsoft's five petitions against the 115 Patent should have been denied under Section 314(a) because Microsoft "could have just as easily, and far more efficiently, addressed all the claims in one or two petitions." Appx4127.

"goal satisfaction plans,"[8] and explained in detail how any differences in language were not material to whether the Kiss/FIPA97 combination satisfied both claims in the same way. Appx2019-2027.

IPA's sur-reply argued that Microsoft's reply arguments were improper, but again did not advance any distinction between claim 29 and the Kiss/FIPA97 combination relied on by Microsoft for both claims 1 and 29. *See* Appx2132-2136.

In its final written decision, the Board refused to consider Microsoft's reply arguments, but also failed to consider whether the analysis cited ***in the petition*** for claim 29 satisfied the language of that claim. Specifically, the Board first found that there were "material differences" between claims 1 and 29, but again did so without ever explaining why any differences in claim language were material. Instead, it again merely quoted the language of the two claims, and stated that the materiality of the differences was "apparent." Appx152-153.

---

[8] Microsoft also pointed out that in the parallel district court proceedings, IPA argued that the claim phrase "base goal" should be construed to mean a "goal for which a goal satisfaction plan is constructed." Appx2021; Appx10304; *see* Appx10310.

Next, the Board found Microsoft's Reply arguments to be "new arguments presented for the first time in reply." Appx154. It stated it was unpersuaded with Microsoft's arguments that there were no differences material to patentability because "Petitioner does not discuss claim construction of these limitations or explain why the differences in the claim language on the face of these limitations are not material to the patentability of the claims 1 and 29." Appx154-155. Finally, and without ever comparing the analysis cited in the petitions for claim 29 to the actual language of that claim, the Board concluded that Microsoft had not met its burden as to claim 29 and "decline[d] to consider Petitioner's arguments and evidence relating to claim 29 presented belatedly in the Petitioner Reply." Appx156.

3. Claims 86-89 of the 115 Patent (IPR2019-00811)

Claim 86 of the 115 Patent recites "[a] data wave carrier providing a transport mechanism for information communication in a distributed computing environment ***having at least one facilitator agent*** and at least one active client agent." Appx1330(37:10-13). Microsoft's IPR2019-00811 petition explained how the Kiss/FIPA97 combination satisfied this requirement, including by explaining that ***Kiss's meta-***

***agent*** as combined with FIPA97's agent service layer satisfied the claimed "facilitator agent." Appx2706-2708.

Claim 86 further recites "wherein said at least one facilitator agent is operable to construct a goal satisfaction plan …." Appx1330(37:21-38:7). For this limitation, Microsoft's petition pointed to its prior analysis for claim 1, which likewise recites constructing a "goal satisfaction plan." Appx2708 (citing Appx2693-2697). In that claim 1 analysis, Microsoft pointed to the disclosure of ***Kiss's meta-agent*** as the entity that constructs the "goal satisfaction plan." Appx2693-2694. This meta-agent "formulates a goal statement for the problem-solving phase of the process," then "formulates a solution plan for the problem," where the disclosed "solution plan" included delegating various sub-goals to several different agents, respectively. Appx2693-2697.

IPA's preliminary response did not dispute that claim 86 rose and fell with claim 1, Appx2817; Appx2825, and the Board's institution decision found that Microsoft had demonstrated a reasonable likelihood of prevailing with respect to claim 86, Appx2939-2943. IPA's Response disputed that the Kiss/FIPA97 combination disclosed a "facilitator

agent" or "goal satisfaction plan," but did not separately argue whether Microsoft had demonstrated that the identified "facilitator agent" was the one that constructed the identified "goal satisfaction plan." *See* Appx1824-1825; Appx1841.

In the final decision in IPR2019-00811, the Board determined that Microsoft had not demonstrated the unpatentability of claim 86 or its dependent claims 87-89. Appx307-309. The Board based this determination on the petition's reliance on analysis for claim 1 to show claim 86's "wherein said at least one *facilitator agent* is operable to construct a goal satisfaction plan" limitation. Appx308. The Board noted that claim 1 did not recite a "facilitator agent," so the petition's analysis for claim 1 did not explain "how the combination of Kiss and FIPA97 teaches 'at least one *facilitator agent* is operable to construct a goal satisfaction plan.'" Appx308.

In the final decision in IPR2019-00814, however, the Board determined that Microsoft *had* demonstrated the unpatentability of claim 61, which similarly recites a "facilitator agent," one component of which is "further operable to construct a goal satisfaction plan." Appx789-790. The analysis in Microsoft's IPR2019-00814 petition

demonstrating how the Kiss/FIPA97 combination satisfied the "facilitator agent … operable to construct a goal satisfaction plan" of claim 61 is almost word-for-word identical to the claim 1 analysis relied on in the IPR2019-00811 petition to show how that combination satisfied the "at least one facilitator agent is operable to construct a goal satisfaction plan" language of claim 86. *Compare* Appx3957-3958 (claim 61) *with* Appx2693-2694 (claim 1); Appx2708.

4. Claims 10 and 11 of the 560 Patent (IPR2019-00836)

Claims 10 and 11 of the 560 Patent claims require that the interagent communication language ("ICL") support "explicit task completion advisory suggestions." Appx1364(31:10-15). The 560 Patent does not use this phrase outside the claims, but does discuss certain "advice parameters," which both parties and the Board below cited as the relevant disclosure supporting this claim language. As to those advice parameters, the patent explains that "[a]dvice parameters ***preferably give constraints or guidance*** to the facilitator in completing and interpreting the goal." Appx1356(16:23-25).

Microsoft's IPR2019-00836 petition pointed to the disclosure in FIPA97 of certain limitations (*i.e.*, constraints) that can be placed on a

"search" request using parameters called "Directory Facilitator Depth" and "Required Number of Records," respectively. Appx5668-5669. FIPA97 refers to these limitations as "Constraints+," Appx7547-7548, and the petition explained, based on the testimony of Dr. Lieberman, that the cited parameters had "[t]he effect of constraining a directory search," Appx5669; Appx8840(¶¶433-434), and that "[t]he Directory Facilitator Depth constraint is similar to the level_limit 'Advice Parameter' disclosed in the" patent as an example of an "advise parameter." Appx5668-5669; Appx8839(¶¶430-431).

After institution, IPA argued that the 560 Patent distinguishes between "constraints" and "guidance," with only "guidance" falling within the "advisory suggestions" claim term, and argued that because the cited FIPA97 parameters are constraints they cannot be the claimed "advisory suggestions." Appx4844-4846.

Microsoft's reply explained that the specification does not limit the term "advisory suggestions" to "guidance" instead of "constraints," and that whether FIPA97's parameters could be considered a constraint did not mean they failed to satisfy the claimed "advisory suggestions." Appx4997-4998.

In the final decision in IPR2019-00836, the Board agreed with IPA and concluded that Microsoft had not demonstrated the unpatentability of claims 10 and 11. Appx1097-1100. The Board noted that the claim phrase "advisory suggestions" does not appear in the 560 Patent outside of claims 10 and 11, but pointed to the 560 Patent's statement that "[a]dvice parameters preferably give constraints or guidance." Appx1097-1098 (citing Appx1356(16:23-25)). The Board reasoned that some of the "advice parameters" disclosed in the 560 Patent (in particular, solution_limit, time_limit, and level_limit) were "quantitative in nature" while others were not, and that those parameters that required "numerical values" were "more likely than the other parameters to be considered 'constraints' rather than 'guidance.'" Appx1099.

The Board then concluded, confusingly, that "Petitioner asserts that FIPA97 teaches solution_limit, time_limit, and level_limit parameters, but Petitioner does not attempt to explain why these are disclosed examples of 'advisory suggestions' ***rather than 'constraints***.'" Appx1099-1100. This conclusion was confused, first, because the parameters "solution_limit, time_limit, and level_limit

parameters" are disclosed in the 560 Patent, not in FIPA97. Nor did the petition "assert that FIPA97 teaches solution_limit, time_limit, and level_limit parameters." At most, the petition argued that the FIPA97 parameter Directory Facilitator Depth was "similar" to the level_limit parameter. The petition never mentioned either of the solution_limit or time_limit parameters. *See* Appx5668-5669.

The Board did not expressly address whether the FIPA97 parameters cited in the petition — "Directory Facilitator Depth" and "Required Number of Records" — satisfied the claimed "advisory suggestions." *See* Appx1097-1100; Appx5668-5669.

5. Claims 50, 51, and 53-55 of the 560 Patent (IPR2019-00836)

Claims 50, 51, and 53-55 of the 560 Patent each require providing "a plurality of synchronized agent registries … ***each resident within a separate computer process***." Appx1365-1366(34:47-35:15, 36:1-37). Microsoft's IPR2019-00836 petition explained, based on a computer dictionary, that the ordinary meaning of "computer process" was "a program, a part of a program, or a list of steps to be completed by the computer." Appx5640; Appx8743(¶232). For the above noted claims, the petition then pointed to FIPA97's disclosure of a plurality of

Directory Facilitators (DF) distributed across multiple, physically separate agent platforms. Appx5683-5686. The petition explained that, as shown in Figure 2, "[e]ach DF ***contains a directory*** that 'lists all Agents in the DF domain and is used to advertise agent existence, services, capabilities, protocols, etc.'" Appx5685 (citing Appx7544).




**Figure 2 — Agent Platform Reference Model Fragment**

Appx5685. The petition explained that, based on testimony from its expert and the description in FIPA97, that "a Skilled Artisan would understand the Agent Platforms shown in Figure 2 ***to be separate computer processes*** because each agent platform 'provides the physical infrastructure in which agents can be deployed,' and therefore

represents a distinct program, or part of a program." Appx5686-5687 (quoting Appx7536); Appx8937(¶697).

IPA's preliminary response treated claims 50, 51, and 53-55 as rising and falling with independent claim 1, Appx5796, as did the Board's institution decision, Appx5874.

After institution, IPA disputed Microsoft's proposed construction of "computer process," and instead proposed that it means "an operating system process within a computer's architecture that represents one or more running programs and their activities." Appx4756-4760. IPA argued that various claims did not disclose distributed facilitator agents on multiple "computer processes," but did not rely on its claim construction and did not contest that the Kiss/FIPA97 combination discloses "a plurality of synchronized agent registries … each resident within a separate computer process" under either parties construction of "computer process." *See* Appx4812-4815.

In reply, Microsoft explained that the plain meaning of "computer process" was not so narrow, but noted that IPA had not relied on its construction for any of its arguments as to these claims, so no resolution of the claim construction dispute was necessary. Appx4939-4940. IPA's

sur-reply disputed that its construction was irrelevant, but did not identify any relevance to claims 50, 51, and 53-55. *See* Appx5067-5068.

The Board's final decision in IPR2019-00836 construed "computer process" in a way proposed by neither party: "a process that runs or executes one or more computer programs." Appx1013-1016. The Board then applied this construction to an issue neither party had raised: whether the Kiss/FIPA97 system disclosed "a plurality of synchronized agent registries … each resident within a separate *computer process*," as recited by claim 50. Appx1108-1109; Appx1365-1366(34:47-35:15, 36:1-37). The Board first determined that Microsoft's argument depended on its construction of "computer process," which it had rejected, but stated that "[e]ven under [Microsoft's] proposed construction, … the Petition fails to address the language of claim 50, which recites '*the plurality of agent registries* each resident within a separate process.'" Appx1109 (emphasis in original). The Board stated that because the petition did not provide a "detailed explanation tying its argument to the claim language," it did not demonstrate the unpatentability of claim 50. Appx1109. The Board then found claims

51 and 53-55 not unpatentable for the same reasons as claim 50. Appx1109-1111.

## SUMMARY OF ARGUMENT

1. The Board erred in concluding that the petitions had not shown "how or why" the agent registry of Kiss would be combined with the agent registry information of FIPA97 in a way that would satisfy claims 8-10 and 63 of the 115 Patent and claim 28 of the 560 Patent. The petitions included a detailed analysis of that combination. The analysis expressly explained "how" FIPA97's administrative functionality and exemplary practices, which included the "trigger declarations" and "process characteristics" of FIPA97's agent registry, would be included in the system of Kiss, and also that "[w]here the two systems disclose analogous functionality, such as facilitating cooperation ***and agent registry***, their techniques are combined." The petitions also demonstrated "why" the combination was obvious, setting forth and proving numerous reasons to combine the references as described in the petitions.

The Board's analysis of these claims failed to provide any reasoning, let alone adequate reasoning, to reject Microsoft's showing.

Indeed, in an earlier and more detailed portion of its final decision, the Board expressly agreed that it would have been obvious to combine FIPA97 — including the administrative functionality and exemplary practices relied on for these claims — with Kiss as described in the petitions.

2. The Board also erred in refusing to consider Microsoft's arguments as to claim 29 of the 115 Patent — in both the petitions and the reply — simply because the petitions cross-referenced their analysis for certain limitations from claim 1. Whether there are differences in the language of claims 1 and 29 is not dispositive of whether the petitions' evidence and analysis demonstrates the unpatentability of both claims. The differing language of claims 1 and 29 are drawn to the same functionality: satisfying a goal by dividing it into sub-goals and matching agents to sub-goals using an agent registry. That is the exact functionality disclosed in the cited prior art and relied on in the petitions' analysis of both claims 1 and 29. There is, therefore, no difference between the relevant claim language that is material to the petitions' patentability arguments, and the same prior art disclosure satisfies the relevant language of each claim.

The Board compounded this error by declining to consider Microsoft's Reply arguments explaining these issues. Those arguments advanced no new theory, relied on no new prior art, and cited no new disclosures in the prior art, but instead responded directly to arguments raised by the Board in its Institution Decisions and advanced in the Patent Owner Response.

3. The Board also erred in concluding that the petition had not adequately explained how the facilitator agent of claim 86 "constructs a goal satisfaction plan." The analysis of claim 86 identified the "meta-agent" of Kiss as corresponding to the claimed "facilitator agent," and then cited the analysis of claim 1 describing how that meta-agent "constructs a goal satisfaction plan." Indeed, the Board found this same analysis, presented nearly word-for-word identically, persuasively satisfied the identical claim language of claim 61.

4. The Board also erred in finding that "explicit task completion advisory suggestions" as recited by claims 10 and 11 of the 560 Patent were not satisfied by the cited "Constraint+" parameters of FIPA97. The only arguable specification support for the "***advisory*** suggestion" claim language is the disclosure of "***advice*** parameters," and the 560

Patent plainly states that "[a]dvice parameters preferably give constraints." The Board's implicit interpretation of this claim language as excluding "constraints," and thereby excluding the only embodiment of the invention recited in these claims, was legal error.

5. The Board further erred by construing the phrase "computer process," as recited by claims 50, 51, and 53-55 of the 560 Patent, to mean "a process that runs or executes one or more computer programs." Nothing in the intrinsic or extrinsic evidence supports that interpretation. The Board also erred by not construing this claim phrase as proposed in the petitions based on a computer dictionary definition of "process," an interpretation that is fully consistent with the patent specification. Finally, the Board also erred in finding the petition "fails to address the language of claim 50" under Microsoft's proposed construction where the petition expressly addressed that claim language under Microsoft's construction.

## ARGUMENT

### I. Standard of Review

This Court reviews de novo the "ultimate construction of [a] claim," as well as any claim construction relying solely on intrinsic

evidence. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 320 (2015). Subsidiary factual findings beyond the intrinsic record, if any, are reviewed for substantial evidence. *Knowles Elecs. LLC v. Iancu*, 886 F.3d 1369, 1374 (Fed. Cir. 2018). Claim terms in an expired patent, as here, are given their plain and ordinary meaning, as would be understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

Obviousness is a question of law, reviewed de novo, based on underlying factual issues, reviewed for substantial evidence. *Owens Corning v. Fast Felt Corp.*, 873 F.3d 896, 902 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 2633 (2018). A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding. *Consol. Edison Co. of N.Y., Inc. v. NLRB*, 305 U.S. 197, 229 (1938).

Pursuant to the APA, the Court must "set aside a PTAB decision that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *TQ Delta, LLC v. DISH Network LLC*, 929 F.3d 1350, 1354 (Fed. Cir. 2019) (quoting 5 U.S.C. § 706(2)(A)). Agency

action is arbitrary and capricious if, for example, the agency "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), or failed to "identif[y] and explain[] the reasoned basis for its decision," *Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996).

The Board's determination that a party exceeded the scope of a proper reply is reviewed for abuse of discretion. *See Ericsson Inc. v. Intellectual Ventures I LLC*, 901 F.3d 1374, 1379 (Fed. Cir. 2018); *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359 (Fed. Cir. 2016). An abuse of discretion is found if the decision: "(1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact finding; or (4) involves a record that contains no evidence on which the Board could rationally base its decision." *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1121 (Fed. Cir. 2004).

## II. The Board Erred in Failing to Find Claims 8-10 and 63 of the 115 Patent and Claim 28 of the 560 Patent Unpatentable as Obvious

As demonstrated above, these claims require "trigger declarations" and "process characteristics" to be included in an agent

registry. The petitions cited the "preconditions2" parameter (a "trigger declaration") and the "interaction-protocols" parameter ("process characteristics") stored in the agent registry of FIPA97 as satisfying these claim requirements.

The Board never addressed whether these claim requirements were satisfied by the cited FIPA97 disclosures. Instead, the Board found that the petitions proposed "a different (or additional) combination—***that is, combining the registry of Kiss with the registry of FIPA97***," and had not shown "how or why" the agent registry of Kiss would be combined with the cited information from the FIPA97 agent registry. Appx146-147. The Board's findings, however, were unexplained, unsupported by the record, and arbitrary because they were inconsistent with the Board's own previous, detailed findings.

### A. The Board Failed to Provide Adequate Reasoning for its Conclusions

As this Court has held several times, "the PTAB maintains the independent 'obligation ... to make the necessary findings and to provide an administrative record showing the evidence on which the findings are based, ***accompanied by the agency's reasoning in reaching its conclusions***.' As for its reasoning, the PTAB '***must***

***articulate 'logical and rational' reasons for [its] decisions*.'" *In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1335 (Fed. Cir. 2016) (citation omitted); *see also* 5 U.S.C. § 557(c)(3)(A).

The Board's analysis fails this standard because it never offered any reasoning why the detailed description of the Kiss/FIPA97 combination included in the petitions — spanning four pages supported by detailed expert testimony and citations to documentary evidence and expressly explaining that the FIPA97 techniques would be "used to implement the functionality described in Kiss, including … agent registry," and that "[w]here the two systems disclose analogous functionality, such as facilitating cooperation and agent registry, their techniques are combined," Appx1423-1426 — did not adequately explain "how or why" the combination would be implemented. Such conclusory assertions do not constitute substantial evidence supporting the Board's findings. *See In re Sang-Su Lee*, 277 F.3d 1338, 1345 (Fed. Cir. 2002) ("The board cannot rely on conclusory statements when dealing with particular combinations of prior art and specific claims, but must set forth the rationale on which it relies."). For this reason alone, the Board's findings as to these claims should at least be vacated.

B. The Petitions Expressly Demonstrated the "How" and "Why" of the Cited Combination

The Board also erred by concluding the petition's analysis proposed "a different (or additional) combination — that is, combining the registry of Kiss with the registry of FIPA97" but failed to explain "how" the registries would have been combined. Appx149.

For example, the petitions argued that the "administrative functionality and exemplary practices" of FIPA97 would be combined with the system of Kiss:

> In that combination, FIPA97 discloses the inter-agent communication language requirements of the claims not expressly disclosed in Kiss, **as well as other administrative functionality (*i.e.,* Parts 1-3) and exemplary practices (*i.e.,* Parts 4-7).** In particular, FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds **its administrative functionality and exemplary practices to the Kiss system.**

Appx1423. As shown in the quote above, the petitions defined the "administrative functionality" of FIPA97 as the information in Parts 1-3 of FIPA97. The FIPA97 disclosure the petitions argued satisfied the

claimed "process characteristics" is found in Part 1 of FIPA97. Appx1457 (citing Appx7559).

Similarly, the petitions defined the "exemplary practices" of FIPA97 as the information in Parts 4-7 of FIPA97. Appx1423. The FIPA97 disclosure the petitions argued satisfied the claimed "trigger declarations" is found in Part 6 of FIPA97. Appx1455-1456 (citing Appx7780).

The petitions went further, however, specifically explaining that the details of the agent registries from each references would be combined:

> These techniques [*i.e.*, administrative functionality and exemplary practices] are **used to implement the functionality described in Kiss**, **including** facilitating agent collaboration, **agent registry**, and inter-agent messaging, as well adding functionality that is disclosed in FIPA97. **Where the two systems disclose analogous functionality, such as** facilitating cooperation and **agent registry, their techniques are combined**, ....

Appx1423 (citations omitted). The petitions thus plainly explained that the basic combination included combined registries and "how" the combination of these references would have been implemented.

The petition also set forth numerous reasons "why" a Skilled Artisan would have been motivated to make the combination of Kiss and FIPA97 described in the petition — including the addition of FIPA97 administrative functionality (*i.e.*, Parts 1-3) and exemplary practices (*i.e.*, Parts 4-7) to the system of Kiss. Those reasons included because the combination

> (i) would have been the arrangement of old elements with each performing the same function it had been known to perform and yielding no more than what one would expect from such an arrangement, Appx1424;
>
> (ii) was "an efficient and common sense way to implement the combined system in order to obtain the benefits of both" prior art systems, Appx1423;
>
> (iii) was "a convenient and efficient way to facilitate effective communication between agents," Appx1424-1425;
>
> (iv) was motivated by "an industry standard designed to encourage interoperability and uniformity amongst agent systems" which would have made the Kiss system "more likely to be interoperable with other systems and would likely have more resources available," Appx1426; and

(v) would have advantageously permitted "the full benefit of using FIPA ACL," Appx1426.

Indeed, the petitions specifically argued that the analogous agent registry functionality would be combined because "a Skilled Artisan would understand that to be an efficient and common sense way to implement the combined system in order to obtain the benefits of both, and therefore be motivated to do so." Appx1423.

No reasonable mind reviewing the record below could accept that the petition failed to identify the "*how* or *why* Kiss's agent registry data structure would have been combined with" the registry elements from FIPA97's Parts 1 and 6. The Board's conclusion otherwise is simply not supported by substantial evidence.

C. The Board Found the Petitions Demonstrated the "How" and "Why" of the Cited Combination

Indeed, in a more detailed analysis set forth in a different section of the Board's final decision, the Board itself found that the petition *had* persuasively shown that the combination described in the petition — including the addition of FIPA97 administrative functionality and exemplary practices to the system of Kiss — would have been obvious.

For example, in a detailed analysis of the record, spanning eleven pages, Appx83-94, the Board concluded as follows:

> This evidence support's Petitioner's position that a person of ordinary skill in the art at the time of the claimed invention ***would have combined FIPA97 and Kiss <u>in the manner described in the Petition</u>*** to provide a flexible, fault-tolerant, distributed problem solving system using agent-based technologies. .... Here, Petitioner provides ***persuasive evidence*** that a person of ordinary skill in the art at the time of the invention would have been motivated to combine FIPA97's communications protocol and inter-agent communication language (FIPA ACL) between the agents of Kiss, ***<u>adding its administrative functionality and practices to the Kiss system</u>***. .... Based on the complete record, we find that Petitioner ***has shown persuasively*** by a preponderance of the evidence that one of ordinary skill in the art at the time of the invention would have been motivated to combine the teachings of FIPA97 and Kiss ***<u>in the manner proffered by Petitioner</u>.***

Appx93-94. Indeed, during the course of that analysis the Board expressly noted that the petitions' proposed combination includes combining the analogous "agent registry" techniques of the two references. *See* Appx83-84.

The Board therefore understood exactly "how" and "why" the petition argued the references would be combined — including the combination of agent registry functionality that satisfies claims 8-10 and 63 of the 115 Patent and claim 28 of the 560 Patent — and expressly accepted that analysis as persuasive. The Board's later, unexplained finding to the contrary was utterly arbitrary. *See Schucker v. F.D.I.C.*, 401 F.3d 1347, 1356 (Fed. Cir. 2005) (inconsistent positions "is not reasoned decision-making and is arbitrary"); *Robert Bosch, LLC v. Iancu*, No. 2017-2122, 2019 U.S. App. LEXIS 19889, at *6 (Fed. Cir. July 3, 2019) (non-precedential) ("Nothing could better evidence an arbitrary and capricious decision than the very same panel reaching exactly the opposite conclusion … on an identical issue."). It's findings as to these claims should be reversed.

## III. The Board Erred By Refusing To Consider Petitioner's Arguments Regarding the Obviousness of Claim 29 of the 115 Patent and its Dependents Claims 30-47

The Board erred by failing to consider Microsoft's patentability challenge against independent claim 29 of the 115 Patent. *See* 35 U.S.C. § 318(a). As demonstrated above, for several elements of claim 29, the Petition cited to the prior analysis of analogous language in

claim 1. *E.g.*, Appx1427-1449; Appx1460-1464. The Board's conclusion that Microsoft's cross-reference to claim 1 for those elements was fatal is unsupportable. *See* Appx152-157. And its failure to even compare the analysis cited in the petitions for claim 29 to the language of that claim was an abuse of discretion, as was its further refusal to consider Microsoft's reply arguments, which replied directly to arguments advanced in the Patent Owner Response and by the Board.

The Board had an obligation to address the patentability of each claim challenged in the petition. 35 U.S.C. § 318(a); *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348 (2018). It failed to address claim 29 simply because Microsoft cross-cited to its analysis of analogous claim elements of claim 1 phrased in slightly different language.

Nothing in the Board's governing statutes or rules prohibits challenging, as Microsoft did, different claim elements based on the same evidence and argument. Microsoft's petitions undisputedly identified, "in writing and with particularity, each claim challenged" (including claim 29), "the grounds on which the challenge to each claim is based" (obviousness over Kiss/FIPA97), "and the evidence that supports the grounds for the challenge to each claim," specifically the

evidence and argument expressly identified in the petition for claims 1 and 29. 35 U.S.C. § 312(a)(3); Appx1427-1449; Appx1460-1464. That analysis demonstrated how claim 29 "is unpatentable under the statutory grounds identified," including by specifying "where each element of the claim is found in the prior art patents or printed publications relied upon": the evidence and argument identified in the petition for claims 1 and 29. 37 C.F.R. § 42.104(b)(4). The Board had an obligation to address the substance of that analysis. 35 U.S.C. § 318(a); *Warsaw Orthopedic, Inc.*, 832 F.3d at 1335; 5 U.S.C. § 557(c)(3)(A).

The Board's failure to do so was premised on its conclusion that "there exist material differences" between the language of claims 1 and 29, but that conclusion rested on nothing more than the assertion that different words were used in each claim. Appx152-157. That was an error of law, for as this Court explained decades ago "two claims which read differently can cover the same subject matter." *Tandon Corp. v. US Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987).

Nor was the issue one of claim construction, as the Board seemed to think. Rather, the question was whether the language of claim 29

was satisfied by the analysis identified in the petition as relevant to that claim. The only "materiality" that matters in such an analysis is whether any differences in claim language are material *to the petition's patentability analysis.*

Indeed, as Microsoft's reply explained, here, any differences in claim language were not material to patentability. Appx2019-2027.[9] The 115 Patent disclosed a system in which a facilitator receives a request/goal, divides it into sub-goals and dispatches the sub-goals to specialized agents identified by reference to a registry of agent capabilities. Appx1320(18:29-48). Kiss discloses the same functionality, though it may call its facilitator a "meta-agent" and its "goal satisfaction plan" a "solution plan." Appx1999-2002; Appx2020-2021. And while claims 1 and 29 recite this functionality in slightly differently language, the petition's analysis read both claims on the disclosure in Kiss of the meta-agent receiving a request, dividing it into sub-requests and dispatching the sub-requests to specialized agents

---

[9] Neither IPA's Preliminary Response nor Patent Owner's Response identified any difference that is "material" to patentability. Appx1572; Appx1845-1847.

identified by reference to a registry of agent capabilities. Appx1427-1449; Appx1460-1464.

Microsoft had a right to have the arguments in its petition addressed, *see* 35 U.S.C. § 318(a); *SAS Inst., supra*, including by providing an explanation of its findings compliant with the Administrative Procedures Act, 5 U.S.C. § 557(c)(3)(A). It is certainly the case that the Board can be unpersuaded by the analysis in a petition. But that is not what happened here because the Board never compared the petition's claim 29 arguments to the language of that claim.[10]

---

[10] The Board also erroneously suggested Microsoft was required to make a showing in the petition as to the lack of material differences between claims 1 and 29 pursuant to 37 C.F.R. § 42.104(b), which in relevant part requires the petition to explain "[h]ow the challenged claim is to be construed." Appx154 n.38. As the Board itself has construed it, however, that rule does not require every claim term, or even every claim, to be construed in the petition, but instead requires only the identification of claim constructions proposed as the basis for requesting review. *Western Digital Corp. v. Spex Tech. Inc.*, IPR2018-00084, Paper 14 at 11 (P.T.A.B. Apr. 25, 2018) ("Petitioner complies with our rules by identifying claim constructions it proposes as the basis for requesting review of the challenged claims."). There are no differences between these claims that are material to Microsoft's patentability analysis, and the evidence cited in the petition satisfies both claims 1 and 29, so Rule 104(b) did not require Microsoft to construe the claims further.

The Board further erred by misreading Microsoft's reply arguments as an attempt to supplement the petition. Appx153-157. Microsoft was permitted to rebut the Board's preliminary conclusion that "material" differences existed between claims 1 and 29 by showing, in its reply, that any differences between claims 1 and 29 were not "material" to its patentability challenge. 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in," *e.g.*, the "decision on institution."). And that is exactly what Microsoft did: it argued that "despite some differences in claim language identified by the Board—which are [] analyzed in detail below—the differences are not material, and the evidence relied on in the Petition discloses each and every limitation of Claim 29." Appx2019-2020 (citing Appx1693).

Microsoft's reply arguments were also directly responsive to IPA's arguments in its Patent Owner Response. There, IPA asserted the petitions "failed to set forth any argument or evidence as to how the limitations of Claim 29 were shown in the asserted prior art combination, instead merely referring back to Claim 1." Appx1845-1847

(also citing Appx1693).[11] Microsoft had a right to reply to those assertions, as the Board's rules expressly provide for a Petitioner reply to the Patent Owner's response, 37 C.F.R. § 42.23, as did the Board's Scheduling Order, Appx1720 ("Petitioner may file a reply to the Patent Owner's response."). Indeed, not only did Microsoft have a right to submit a reply to the issues raised by both the Board and IPA, it had a right to have the Board fairly consider the arguments in that reply. *See* 5 U.S.C. § 554(b)(3), (c) (requiring a party be given an "opportunity … for the ***submission*** ***and consideration*** of facts [and] arguments").

Nor were Microsoft's reply arguments improper in any way. Those arguments advanced no new theory, relied on no new prior art, and cited no new disclosures in Kiss or FIPA97. Instead, the arguments merely explained how the analysis for claim 1 set forth in the petition and cited in the petition's analysis of claim 29 satisfied the language of claim 29. Those arguments properly rebutted the Board's initial "material differences" finding as well as IPA's argument. The Board

[11] The Board's complaint that Microsoft's reply "does not cite to the Patent Owner Response" is misplaced, Appx154, as no rule required Microsoft to supply such a citation and Microsoft's reply arguments were directly responsive to both the Board's Institution Decision and the arguments included in IPA's Response.

abused its discretion by not considering them. *See Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 705-707 (Fed. Cir. 2020); *Ericsson Inc. v. Intellectual Ventures I LLC*, 901 F.3d 1374, 1379-81 (Fed. Cir. 2018).

Microsoft therefore respectfully requests that the Court vacate the Board conclusions as to claim 29 and remand with instructions for the Board to determine whether the analysis in the petition, when considered with the additional arguments in Microsoft's Reply, satisfies the elements of claim 29.

## IV. The Board Erred in Failing to Find Claim 86 of the 115 Patent and its Dependents Unpatentable as Obvious

As demonstrated above, the Board found that, while claims 1 and 86 are similar, the petition's citation to the analysis of claim 1 did not adequately explain how the facilitator agent of claim 86 "constructs a goal satisfaction plan." Appx307-308. The Board's conclusion was both unsupported by substantial evidence and arbitrary.

Claim 86 recites "at least one facilitator agent." Appx1330(37:10-14). In its analysis of this claim language, the petition argued that "**the agent service layer, which combined with <u>the meta-agent of Kiss</u> constitutes '*a facilitator agent*'** because it facilitates the cooperation in resolving requests by bi-directionally communicating

with knowledge agents and assigning tasks (sub-goals) to them in order to coordinate the cooperative completion of tasks." Appx2706-2707. The petition therefore argued that the Kiss meta-agent constituted a part of the "*facilitator agent*" of claim 86.

Claim 86 further requires "wherein said at least one facilitator agent ***is operable to construct a goal satisfaction plan***." Appx1330(37:21-22). For this claim language, the petition cited to the analysis of the analogous language of claim 1, requiring "constructing a goal satisfaction plan." Appx2708 (citing Appx2693-2694). In that analysis, the petition explained that, in Kiss, "***the meta-agent*** 'formulates a goal statement for the problem-solving phase of the process,' then 'formulates a solution plan for the problem.'" Appx2693-2694. The petition also cited to and explained a specific example of the meta-agent formulating such a solution plan that is described in Kiss with respect to Figures 8-20. *See id.*

Thus, the analysis of claim 86, first, argued that the Kiss meta-agent was part of the claimed "*facilitator agent*" and, second, showed how that meta-agent formulated a solution plan and therefore satisfied the "*constructing a goal satisfaction plan*" as claimed. The Board's

conclusion that the petition had not made this showing is thus not supported by substantial evidence.

The Board never disagreed with that analysis, nor offered any explanation as to why it might be unpersuasive. Indeed, the Board expressly found this analysis to be persuasive in one of the related proceedings. In particular, claim 61 of the 115 Patent is drawn to "*[a] facilitator agent*," Appx1329(35:4-28), and Microsoft's IPR2019-00814 petition provided the same analysis as claim 86 as to why the Kiss/FIPA97 combination disclosed a "*facilitator agent*," *i.e.*, that the agent service layer and meta-agent of Kiss together constituted a "*facilitator agent*" as claimed. *Compare* Appx3943-3944 *with* Appx2706-2707. In its IPR2019-00814 final decision, the Board agreed with that analysis: "With this understanding of a facilitator agent, Petitioner's proposed 'agent service layer, combined with the meta-agent of Kiss,' amounts to 'a facilitator agent' because the proposed combination coordinates communications with agents and the cooperative completion of tasks." Appx766-768.

Claim 61 also requires that a portion of the "facilitator agent" be "operable to construct a goal satisfaction plan." Appx1329(35:23-28).

The petition argued this language was satisfied for the same reasons the nearly identical language of claim 86 was satisfied, *i.e.*, that in Kiss "the meta-agent 'formulates a goal statement for the problem-solving phase of the process,' then 'formulates a solution plan for the problem.'" Appx3957-3958. It also cited to and explained the same specific example of formulating such a solution plan described in Kiss with respect to Figures 8-20. *Id.* The Board agreed with this analysis too: "Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches 'constructing a goal satisfaction plan,' as recited in claim 61." Appx789-790.

Thus, the Board's conclusion that the petition had not shown how Kiss satisfied the requirement of a facilitator agent constructing a goal satisfaction plan in the context of claim 86 was arbitrary because it also found exactly the opposite in the context of claim 61. *Schucker*, 401 F.3d at 1356; *Robert Bosch*, at *6. The Board's conclusion as to claim 86 and its dependents should therefore be reversed.

## V. The Board Erred in Failing to Find Claims 10 and 11 of the 560 Patent Unpatentable as Obvious

Claims 10 and 11 of the 560 Patent require that the interagent communication language ("ICL") support certain "advisory suggestions,"

Appx1364(31:10-15), a phrase that does not appear in the patent outside of the claims. Neither side sought to construe this language, but both parties and the Board cited to a passage in the 560 Patent stating that "***[a]dvice parameters preferably give constraints or guidance*** to the facilitator in completing and interpreting the goal," and thereafter providing several examples of such "advice parameters." Appx1356(16:22-23); Appx5668-5669; Appx1097-1098; Appx4844-4846. Thus, while the claim phrase "advisory suggestions" was not construed below, both sides agreed that the disclosed "advice parameters" constituted specification support for that phrase, and the specification described those "advice parameters" as including constraints.

To satisfy this claim element, Microsoft's IPR2019-00836 petition pointed to the disclosure in FIPA97 of certain parameters — called "Directory Facilitator Depth" and "Required Number of Records," respectively — used to place limitations on a "search" request. Appx5668-5669. FIPA97 refers to these parameters as "Constraints+" and discloses that they constrain the system's response to a search request. Appx7546-7548.

The Board rejected this argument, apparently concluding that constraints cannot satisfy the claimed "advisory suggestions," and confusingly finding that "***Petitioner asserts that FIPA97 teaches solution_limit, time_limit, and level_limit parameters***, but Petitioner does not attempt to explain why these are disclosed examples of 'advisory suggestions' rather than 'constraints.'" Appx1099-1100.

That latter finding is clearly confused. The "solution_limit, time_limit, and level_limit parameters" are disclosed in the 560 Patent, *see* Appx1356(16:22-33), but are not recited in the claims. There was, therefore, no need to show that FIPA97 "teaches" them, and in fact Microsoft never asserted that it did. *See* Appx5668-5669. Thus, no reasonable mind could conclude that such an analysis supports a finding that the actual FIPA97 parameters cited in the petition fail to satisfy the claims.

But the implicit interpretation underlying the Board's analysis — *i.e.*, that numerical constraints cannot constitute "advisory suggestions" — is legally erroneous. The only disclosure in the specification that even arguably supports the claimed "***advisory*** suggestions" is the disclosed "***advice*** parameters." Indeed, the phrase "advisory

suggestions" is arguably a synonym for the phrase "advice parameters." And this specification passage that both parties cited below explicitly states that advice parameters preferably give constraints: "***[a]dvice parameters preferably give constraints or guidance*** to the facilitator in completing and interpreting the goal." Appx1356(16:22-24). Thus, the intrinsic record confirms that the claimed "advisory suggestions" must cover, at least, "parameters [that] give constraints or guidance." The Board's implicit interpretation of this claim language thus excludes the only specification disclosure that could even arguably provide written description support for these claims. "Such an interpretation is rarely, if ever, correct and would require highly persuasive evidentiary support, which is wholly absent in this case." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

Similarly, the Board's "quantitative nature" limitation is unsupported by the intrinsic record and contradicted by that record. The patent lists several examples of advice parameters, but it never divides them into those that are quantitative and those that are not, or even into those that are constraints and those that are guidance. *See*

Appx1356(16:22-41). They are all just set forth as examples of "advice parameters." The artificial distinction the Board drew among them contradicts that clear disclosure that they are all in the same category. It was error to make up such a limitation out of whole cloth. *Mycogen Plant Sci. v. Monsanto Co.*, 243 F.3d 1316, 1328 (Fed. Cir. 2001).

The Board's conclusion as to the patentability of these claims must be, at least, vacated, as based on an utterly confused analysis and a legally erroneous understanding of claim scope.

But this Court should go further and simply reverse. The only plausible specification support for the claimed "advisory suggestions" are the disclosed "advice parameters," which the patent plainly states "preferably give constraints." The petition cited parameters that expressly provide constraints on how requests are responded to. IPA never disputed that the cited "Directory Facilitator Depth" and "Required Number of Records" parameters provided constraints; indeed, it argued they *were* constraints. Appx4845-4846. Thus, under any proper interpretation of the claims, the claimed "advisory suggestions" cover (at least) parameters that provide constraints, and the only conclusion supported by the evidence of record is that the cited

"Directory Facilitator Depth" and "Required Number of Records" parameters used with the "search" request of FIPA97 provide such constraints. The Court should therefore reverse, and hold claims 10 and 11 of the 560 Patent unpatentable as obvious over the Kiss/FIPA97.

## VI. The Board Erred in Failing to Find Claims 50, 51, and 53-55 of the 560 Patent Unpatentable as Obvious

### A. The Board's Construction of "Computer Process" was Legally Erroneous

Independent claims 50 and 53 each require a "plurality of synchronized agent registries," each of which is "***resident within a separate computer process***." Appx1365-1366(34:54-59, 36:8-12). The petition argued, based on a computer dictionary definition of the word "process," that "[t]he ordinary meaning of a '*computer process*' is a program, a part of a program, or a list of steps to be completed by the computer." Appx5640. The Board rejected that construction and instead construed the phrase to have a meaning neither party requested: "a process that runs or executes one or more computer programs." Appx1013-1016. That interpretation is utterly unsupported by the record, and legally erroneous.

First, nothing in the intrinsic record supports the notion that a "computer process" must be "a process ***that runs or executes*** one or more computer programs." While the patent does refer to various "programs," *e.g.*, Appx1349(1:53-56, 2:62-66),[12] nowhere does the specification disclose what "runs or executes" them. The patent also refers to various "processes," but in context those references are clearly to programs, or parts of programs, not to what "runs or executes" a computer program. *See* Appx1350(3:66-4:11).[13]

Nor does the extrinsic evidence of record support the Board's interpretation. The Board stated it found the testimony of IPA's expert, Dr. Medvidovic, "more persuasive" than Microsoft's computer dictionary. Appx1016. But that testimony is not substantial evidence for the Board's conclusion for several reasons.

First, Dr. Medvidovic never testified that a "computer process" is a process that runs or executes one or more computer programs. Rather,

[12] The 560 Patent does not use the phrase "computer program."
[13] Indeed, the Board found that nothing in the intrinsic record was relevant to the interpretation of this claim phrase other than the actual claim phrase "computer process" itself, Appx1016, which of course also says nothing about what run or executes one or more computer programs.

he testified that "[a] process is not [a] program," Appx12810(¶71), that "[a] process is also not a part of a program," Appx12810-12811(¶72), and, ambiguously, that "a process is what actually occurs in a computer when a program is executed" without explaining that statement further, AppxAppx12810(¶71). None of that testimony supports a conclusion that a computer process is "a process that runs or executes one or more computer programs."

Second, the paragraphs of Dr. Medvidovic's testimony cited by the Board are entirely *ipse dixit*. Appx1016 (citing Appx12810-12811(¶¶71-72). He provides no basis for his assertions regarding what a process is or is not, or why a Skilled Artisan might hold the same view. Such *ipse dixit* testimony cannot support the fact finding of the Board. *TQ DELTA, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1362-63 (Fed. Cir. 2019).

Third, the Board never explained why it rejected Microsoft's computer dictionary defining "process" to mean "[a] program or part of a program; a coherent sequence of steps undertaken by a program." *See* Appx1015-1016. The Board, of course, was obligated to articulate its reasoning in a manner that could provide for adequate review. *Warsaw*

*Orthopedic,* 832 F.3d at 1335; 5 U.S.C. § 557(c)(3)(A). It failed to do so here.

The Board's claim construction relied solely on its interpretation of the extrinsic evidence. Appx1016 (Board basing its analysis solely on Dr. Medvidovic's testimony). But the reliance on *ipse dixit* testimony of an expert that does not support the Board's construction, and the unexplained rejection of the objective evidence from a technical dictionary, is not substantial evidence because no reasonable mind could accept it as supporting the Board's conclusion. The Board's interpretation should be overruled.

Instead, on this record, the Court should construe "computer process," as urged in the petition below, to mean a program, a part of a program, or a list of steps to be completed by the computer. Appx5640. There is only one cogent, objective piece of evidence in the record addressing that issue: Microsoft's computer dictionary that defines "process" to mean "[a] program or part of a program; a coherent sequence of steps undertaken by a program." Appx8300.

This definition is entirely consistent with the patent specification. For example, in its "Prior Related Art" section, the patent states that

"[e]xisting approaches and technologies ***for distributed computing*** include ... ***blackboard-style architectures*** ...." Appx1349(2:35-39). And when further describing such "blackboard architectures," the 560 Patent notes that

> Blackboard architectures typically allow ***multiple processes*** to communicate by reading and writing tuples from a global data store. ***Each process can*** watch for items of interest, ***perform computations*** based on the state of the blackboard, and then add partial results or queries that other processes can consider.

Appx1350(3:64-4:11). Thus, according to the specification, a blackboard architecture is a technology for *distributed computing* made up of processes that *perform calculations*. Clearly those processes are programs, or parts of a program, which is exactly what Microsoft's dictionary says the word "process" means.

Thus, the Court should adopt Microsoft's interpretation.

B. The Petitions Demonstrated the Claims Were Satisfied

For these claims, the Board rejected the analysis of the petition because it found that "the Petition ***fails to address the language of claim 50***, which recites 'the plurality of agent registries each resident within a separate computer process." Appx1109. That finding was

unsupported by substantial evidence because the petition expressly addressed "the plurality of agent registries" claim language.

For example, citing the Directory Facilitators (or "DFs") of FIPA97, the petition argued that "***FIPA97 discloses multiple agent registries*** within a 'distributed computing environment.' For example in the figure below '***a plurality of synchronized agent registries***' is distributed over multiple agent domains and platforms. … ***Each DF contains a directory*** that 'lists all Agents in the DF domain and is used to advertise agent existence, services, capabilities, protocols, etc.'" Appx5684-5685. Figure 2 discloses each DF within an Agent Platform ("AP"):




**Figure 2 — Agent Platform Reference Model Fragment**

Appx5684-5686.

The petition then argued that,

> As demonstrated in the example above, ***the 'plurality of synchronized agent registries***' is spread over the "*distributed computing environment.* In particular, a Skilled Artisan would understand the Agent Platforms shown in Figure 2 ***to be separate computer processes <u>because</u>*** each agent platform 'provides the physical infrastructure in which agents can be deployed,' ***and therefore represents a distinct program, or a part of a program***.

Appx5686-5687.

Thus the petition argued that each DF contained an agent registry and represented a separate computer process because each was located on a physically separate platform and constituted a separate program. That analysis plainly addresses the "plurality of synchronized agent registries" limitation under Microsoft's interpretation. The Board's finding otherwise is not supported by substantial evidence.

Moreover, under the proper interpretation, these claim elements are satisfied by the analysis in the petitions. As properly construed, this claim language requires multiple agent registries, which are software-based structures, Appx1357(17:3-5), resident in separate

programs, or parts of programs. FIPA97 disclosed such agent registries resident on physically separate computing platforms, which would necessarily require the registries to be resident in separate programs, as Dr. Lieberman, relying on FIPA97, explained. Appx8937(¶697). Indeed, in the proceedings below, IPA never contested that this analysis was correct under Microsoft's interpretation.

Accordingly, the Board's findings as to claims 50, 51, and 53-55 of the 560 Patent should be vacated as unsupported by substantial evidence, and reversed as the only conclusion one could draw on the record below is that Kiss/FIPA97 satisfies the claims under Microsoft's interpretation of "computer process."

## CONCLUSION

For the foregoing reasons, this Court should reverse or vacate the Board's findings as to Claims 8-10, 29-47, 63, and 86-89 of the 115 Patent and Claims 10, 11, 28, 50, 51, and 53-55 of the 560 Patent.

Dated: May 3, 2021

/s/ Richard A. Cederoth
Richard A. Cederoth
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000

Joseph A. Micallef
Scott M. Border
Samuel A. Dillon
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Circuit Rule 32(b)(1). This brief contains 13,965 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word Office 365 in 14-point Century Schoolbook font.

Dated: May 3, 2021

/s/ Richard A. Cederoth
Richard A. Cederoth
SIDLEY AUSTIN LLP
*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of May, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the Court's CM/ECF system, which will send notifications to all counsel registered to receive electronic notices.

/s/ Richard A. Cederoth
Richard A. Cederoth
SIDLEY AUSTIN LLP
*Counsel for Appellant*

# ADDENDUM

Trials@uspto.gov
571-272-7822

Paper 44
Entered: October 15, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MICROSOFT CORPORATION,
Petitioner,

v.

IPA TECHNOLOGIES INC.,
Patent Owner.

---

Case IPR2019-00810
Patent 6,851,115 B1

---

Before LYNNE E. PETTIGREW, MINN CHUNG, and KEVIN C. TROCK, *Administrative Patent Judges*.

CHUNG, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

In this *inter partes* review, instituted pursuant to 35 U.S.C. § 314, Microsoft Corporation ("Petitioner") challenges the patentability of claims 1, 4–10, 15, 16, 29–32, 38, and 39 (the "challenged claims") of U.S. Patent No. 6,851,115 B1 (Ex. 1001, "the '115 patent"), owned by IPA Technologies Inc. ("Patent Owner"). This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed below, we determine Petitioner has shown by a preponderance of the evidence that claims 1, 4–7, 15, and 16 of the '115 patent are unpatentable, but has not proven by a preponderance of the evidence that claims 8–10, 29–32, 38, and 39 of the '115 patent are unpatentable.

# II. BACKGROUND

## *A. Procedural History*

On March 19, 2019, Petitioner filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of the challenged claims of the '115 patent. Patent Owner filed a Preliminary Response (Paper 6, "Prelim. Resp.").

On October 16, 2019, applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we instituted an *inter partes* review of the challenged claims. Paper 12 ("Inst. Dec."). In the Institution Decision, we determined Petitioner demonstrated a reasonable likelihood that it would prevail as to at least one challenged claim, and we instituted trial on all claims and all grounds in the Petition. Inst. Dec. 83–84.

After institution, pursuant to our order consolidating briefing (Paper 19), the parties filed consolidated papers in in IPR2019-00810, IPR2019-00811, IPR2019-00812, IPR2019-00813, and IPR2019-00814. Patent Owner filed a Patent Owner Response (Paper 22, "PO Resp."), Petitioner filed a Reply to Patent Owner Response (Paper 30, "Pet. Reply"), and Patent Owner filed a Corrected Sur-reply (Paper 40, "PO Sur-reply"). In addition, in IPR2019-00810, Patent Owner moved to exclude (Paper 35) a portion of Exhibit 1129, as well as related testimony relied on by Petitioner; Petitioner opposed (Paper 36); and Patent Owner replied (Paper 38).

A consolidated oral hearing in IPR2019-00810, IPR2019-00811, IPR2019-00812, IPR2019-00813, IPR2019-00814, IPR2019-00835, IPR2019-00836, and IPR2019-00837 was held on July 27, 2020 and July 28, 2020, and a copy of the hearing transcript has been entered into the record. Paper 43 ("Tr.").

*B. Related Matters*

According to the parties, the '115 patent is the subject of the following district court litigation: *IPA Techs. Inc. v. Google LLC*, No. 1:18-cv-00318 (D. Del.); *IPA Techs. Inc. v. Microsoft Corp.*, No. 1:18-cv-00001 (D. Del.); and *IPA Techs. Inc. v. Amazon.com, Inc.*, No. 1:16-cv-01266 (D. Del.). Pet. 2–3; Paper 3, 2. The '115 patent is also the subject of co-pending petitions for *inter partes* review filed by Petitioner in Cases IPR2019-00811, IPR2019-00812, IPR2019-00813, and IPR2019-00814. Paper 3, 2.

*C. The ’115 Patent*

The ’115 patent describes “software-based architectures for communication and cooperation among distributed electronic agents.” Ex. 1001, 1:27–29. Figure 4 of the ’115 patent is reproduced below.




Fig. 4

Figure 4 depicts the structure of an exemplary distributed agent system of the ’115 patent. *Id.* at 6:25–32. As shown in Figure 4, system 400 includes facilitator agent 402, user interface agents 408, application agents 404, and meta-agents 406. *Id.* at 6:25–28. The ’115 patent describes that system 400 is organized “as a community of peers by their common relationship” to facilitator agent 402 (*id.* at 6:28–30), which is “a specialized server agent

that is responsible for coordinating agent communications and cooperative problem-solving” (*id.* at 6:32–35).

According to the ’115 patent, cooperation among agents is structured around a three-part approach as follows: (1) providers of services register their capabilities specifications with a facilitator; (2) requesters of services construct goals and relay them to the facilitator; and (3) the facilitator coordinates the efforts of the appropriate service providers in satisfying these goals. *Id.* at 10:42–47. The ’115 patent describes that cooperation among agents is achieved via messages expressed in a common language, called the Interagent Communication Language (“ICL”). *Id.* at 10:40–48.

Referencing Figure 3 (not reproduced herein) and Figure 4, the ’115 patent describes the operation of a distributed agent system in a preferred embodiment. *Id.* at 7:13–39. The ’115 patent describes that, when invoked, a client agent makes a connection to a facilitator, e.g., facilitator agent 402, and registers with the facilitator a specification of the capabilities and services it can provide. *Id.* at 7:15–21. For example, a natural language agent may register the characteristics of its available natural language vocabulary. *Id.* at 7:21–23. When facilitator agent 402 receives a service request and determines that registered services 416 of one of its client agents will help satisfy a goal of the request, the facilitator sends that client a request expressed in ICL 418. *Id.* at 7:25–29. The client agent parses this request, processes it, and returns answers or status reports to the facilitator. *Id.* at 7:30–32.

Referencing Figures 5 and 6 (not reproduced herein), the ’115 patent describes an exemplary embodiment where user interface agent 408 runs on

a user's laptop, accepting user input, sending requests to facilitator agent 402 for delegation to appropriate agents, and displaying the results of the distributed computation. *Id.* at 7:53–63. As illustration, the '115 patent describes that, when the question "What is my schedule?" is entered on user interface (UI) 408, UI 408 sends the request to facilitator agent 402, which in turn asks natural language (NL) agent 426 to translate the query into ICL. *Id.* at 8:4–8. The translated ICL expression is then routed by facilitator agent 402 to appropriate agents, e.g., calendar agent 434, to execute the request. *Id.* at 8:13–15. Finally, results are sent back to UI agent 408 for display. *Id.* at 8:15–16.

### *D. Illustrative Claim*

Of the challenged claims, claims 1 and 29 are independent. Claim 1 is illustrative of the challenged claims and is reproduced below.

> 1. A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents, comprising the acts of:
>
> registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language, wherein the inter-agent language includes:
>
> a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events;
>
> a content layer comprising one or more of goals, triggers and data elements associated with the events;
>
> receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression; and

> dynamically interpreting the arbitrarily complex goal expression, said act of interpreting further comprising:
>
> generating one or more sub-goals expressed in the inter-agent language;
>
> constructing a goal satisfaction plan wherein the goal satisfaction plan includes:
>
> a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and
>
> dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent.

Ex. 1001, 29:10–44.

### *E. Applied References and Declarations*

Petitioner relies upon the following references in its challenges to patentability.

| Reference and Relevant Date(s) | Designation | Exhibit No. |
|---|---|---|
| U.S. Patent No. 6,484,155 B1 (filed July 21, 1999; provisional filed July 21, 1998) | Kiss[1] | Ex. 1005 |

[1] For clarity and ease of reference, we only list the first named inventor.

| Reference and Relevant Date(s) | Designation | Exhibit No. |
|---|---|---|
| FIPA 97 Version 1.0 Specification (Oct. 10, 1997)[2] | FIPA97 | Exs. 1006–1012[3] |
| Adam Cheyer, *MVIEWS: Multimodal Tools for the Video Analyst*, PROCEEDINGS OF 1998 INTERNATIONAL CONFERENCE ON INTELLIGENT USER INTERFACES 55 (1998)[4] | Cheyer | Ex. 1015 |

Petitioner also cites the Declaration of Dr. Henry Lieberman, HDR (Ex. 1003, "Lieberman Declaration" or "Lieberman Decl.") in support of its unpatentability contentions. In addition, Petitioner relies on the Declaration of Dr. Timothy Finin, Ph.D. (Ex. 1049, "Finin Declaration" or "Finin

[2] Petitioner asserts that FIPA97 was accessible to the public by October 1997 and submits various evidence in support of its contention. *See* Pet. 23–25. Patent Owner contends that Petitioner has not shown sufficiently that FIPA97 was accessible to the public before the priority date of the '115 patent. PO Resp. 45–65. As discussed below in Section III.D., we determine that Petitioner has shown by a preponderance of the evidence that FIPA97 was accessible to the public by October 1997.

[3] Petitioner asserts that FIPA97 was made publicly available as a single document. Pet. 23 (citing Ex. 1055). Petitioner explains that, due to its size, the reference was broken up into 7 parts and filed as Exhibits 1006 through 1012. *Id.* Patent Owner does not dispute that FIPA97 is one reference for purposes of §§ 102 and 103. *See* PO Resp. 117–120. As discussed below in Section III.C.2., we agree with Petitioner that FIPA97 constitutes a single prior art reference, and we treat it as such for purposes of our unpatentability analysis.

[4] Petitioner contends that Cheyer was published in 1998. Pet. 27. Patent Owner does not dispute the publication date of Cheyer. *See* PO Resp. 44–45. For the reasons explained below, we determine that Petitioner has shown sufficiently that Cheyer was accessible to the public in 1998.

Decl."). Patent Owner relies on the Declaration of Nenad Medvidovic, Ph.D. (Ex. 2032, "Medvidovic Declaration" or "Medvidovic Decl.") and the Declaration of Philip R. Cohen, Ph.D. (Ex. 2033, "Cohen Declaration" or "Cohen Decl.") in support of its Patent Owner Response.

### *F. Instituted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability:

| Claims Challenged | 35 U.S.C. § | Basis |
|---|---|---|
| 1, 4–10, 15, 29–32, 38 | § 103(a)[5] | Kiss and FIPA97 |
| 7, 16, 39 | § 103(a) | Kiss, FIPA97, and Cheyer |

Pet. 3–4. We instituted an *inter partes* review on all challenged claims and all grounds set forth in the Petition. Inst. Dec. 83–84.

## III. ANALYSIS

### *A. Level of Ordinary Skill in the Art*

We begin our analysis by addressing the level of ordinary skill in the art. Petitioner's declarant, Dr. Lieberman, opines that a person of ordinary skill in the art at the time of the invention of the '115 patent would have been someone familiar with the principles and conventions of computer science and computer networking, and also with multi-agent systems and inter-agent communication languages as documented in agent-centered

[5] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. §§ 102 and 103. Because the '115 patent has an effective filing date prior to the effective date of the applicable AIA amendments, we refer to the pre-AIA versions of §§ 102 and 103.

literature by 1999. Ex. 1003 ¶ 34; *see* Pet. 4–5 (citing Ex. 1003 ¶ 34). Dr. Lieberman also testifies that a person of ordinary skill in the art may have been a graduate student in mathematics, engineering, or computer science, and may have had an advanced degree in one of these disciplines, and would also have had at least two years of experience working in the field of computer science, or a related field, and may have worked in academia, either as a professor or a graduate student, for a technology company, or for a government. *Id.*

Citing the testimony of its declarant, Dr. Medvidovic, Patent Owner asserts that a person of ordinary skill in the art at the time of the '115 patent's filing date would have had "a Bachelor's degree in Computer Science or equivalent field and at least two years of work experience in design and development of distributed systems, software specification languages, or a related area." PO Resp. 23 (citing Ex. 2032 ¶ 37). Patent Owner criticizes Petitioner's articulation of the level of ordinary skill in the art as being "vague and uncertain" due to Petitioner's and Dr. Lieberman's use of the word "may" in their proposed definition. *Id.* at 23–24. Patent Owner contends that Petitioner's proposed definition "leav[es] every aspect of the level of skill 'fluid,'" which is "particularly problematic here, where Petitioner claims that it would have been obvious to create an agent system that is very complex and advanced in its facilitation, goal processing, and inter-agent communication capacities." *Id.* at 24 (citing Ex. 2032 ¶ 40).

Petitioner responds that its proposal "simply (and realistically) expresses alternatives—*i.e.*, that a Skilled Artisan would have been at least a graduate student in several relevant fields (*e.g*, 'mathematics, engineering, or

computer science'), and would have had at least two years of work experience in those fields." Pet. Reply 13–14 (citing Pet. 4–5). Petitioner also argues that Patent Owner does not articulate how any differences between the parties' proposals that would alter or even affect the outcome of this proceeding. *Id.* at 14.

Patent Owner asserts that it has "identified how the difference between the proposals would affect this proceeding" because Patent Owner has pointed out that "it is Petitioner's burden under the law to address each Graham factor and Petitioner has failed to proffer a coherent level of ordinary skill in the art, Petitioner's obviousness assertion fails for that reason alone." PO Sur-reply 15 (citing PO Resp. 24).

But Patent Owner does not identify any "meaningful differences" between the parties' proposed definitions or how "the outcome of [this proceeding] would have been different" if we adopted Patent Owner's proposed definition, as opposed Petitioner's proposal. *See ESIP Series 2, LLC v. Puzhen Life USA, LLC*, 958 F.3d 1378, 1385 (Fed. Cir. 2020) (citing *Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1371–72 (Fed. Cir. 2016)). For example, Patent Owner does not argue the challenged claims are not unpatentable under Patent Owner's proposed definition of the level of ordinary skill in the art, nor does it identify any claim limitation that would have been taught by the asserted prior art under Petitioner's proposed definition, but *not* under Patent Owner's proposal. *See* PO Resp. 23–24; PO Sur-reply 14–16.

In our view, the parties' proposals are not materially different despite the differences in wording between them (e.g., the education level of a

Bachelor's degree in Computer Science or equivalent field under Patent Owner's proposal, as opposed to a graduate student's level of education with or without a Bachelor's degree under Petitioner's proposed definition). *See* Pet. 4–5; Pet. Reply 13–14; PO Resp. 23. For purposes of this Final Written Decision, we find no meaningful differences between the parties' respective definitions that would materially alter the outcome of this Decision. These proposals are similar for all purposes relevant to this Final Written Decision, and both are consistent with the level of ordinary skill in the art reflected in the disclosure of the '115 patent and the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

Nonetheless, for this Final Written Decision, we adopt Patent Owner's definition of a person of ordinary skill in the art at the time of the claimed invention. That is, a person of ordinary skill in the art at the time of the claimed invention would have had "a Bachelor's degree in Computer Science or equivalent field and at least two years of work experience in design and development of distributed systems, software specification languages, or a related area." Our analysis and conclusions in this Final Written Decision would be the same regardless of whether Petitioner's or Patent Owner's definition of the level of ordinary skill in the art is adopted.

### *B. Claim Construction*

In an *inter partes* review, we apply the same claim construction standard that would be used in a civil action under 35 U.S.C. § 282(b), following the standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. § 42.100(b) (2019). In applying such

standard, claim terms are generally given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art, at the time of the invention and in the context of the entire patent disclosure. *Phillips*, 415 F.3d at 1312–13. "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips,* 415 F.3d at 1312–17).

In our Decision on Institution, we preliminarily interpreted five claim terms as follows.

| Term | Construction |
|---|---|
| "event" | "a message or goal communicated between agents" |
| "event type" | "a type of an event" |
| "goal" | "a request for service" |
| "arbitrarily complex goal expression" | "a goal expressed in a language or syntax that allows an expression, when appropriate or when desired, that expresses multiple sub-goals and can potentially include more than one type of logical connector (e.g., AND, OR, NOT), and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent, although not every goal is itself necessarily complex" |
| "compound goal" | "a single goal expression that specifies multiple sub-goals to be performed" |

Dec. on Inst. 29–38.

The parties do not dispute the constructions of these five terms in their Patent Owner Response or Petitioner Reply. *See* PO Resp. 25–27; Pet. Reply 1. Upon considering the complete record, we discern no reason to deviate from our preliminary constructions and, therefore, adopt the constructions of the claim terms "event," "event type," "goal," "arbitrarily complex goal expression," and "compound goal" as set forth above for this Final Written Decision.

In the Petition, Petitioner discusses constructions for six additional claim terms, including "goal satisfaction plan," "layer of conversational protocol," "content layer," "trigger," "symbolic name," and "parameter lists further refine the one or more events." Pet. 8–16. In addition, in the Petitioner Reply, Petitioner discusses construction of the claim term "process characteristics." Pet. Reply 12–13. Patent Owner disputes constructions for two terms, "goal satisfaction plan" and "process characteristics." *See* PO Resp. 24–38; PO Sur-reply 13–14. We discuss constructions for each of the two disputed terms in turn below.

Patent Owner does not discuss Petitioner's proposed construction for the claim term "parameter lists further refine the one or more events" or propose its own construction for the term. *See* PO Resp. 24–38. Nonetheless, Patent Owner discusses meaning of this term in the context of Patent Owner's arguments that FIAP97 does not teach an "expandable . . . inter-agent language" and "parameter lists" that "further refine the one or more events," as recited in claim 1. *See id.* at 97–106. Although Patent Owner's arguments raise an issue of claim construction, Patent Owner's arguments are closely related to and interspersed with Patent Owner's

arguments that FIPA97 does not teach an "inter-agent language" recited in claim 1. Thus, for efficiency and completeness, we address this issue in the context of the patentability discussion below.

No other claim terms, beyond those terms noted above, need to be construed expressly for purposes of this Final Written Decision. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that only terms that are in controversy need to be construed, and "only to the extent necessary to resolve the controversy"); *see also Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (applying *Vivid Techs.* in the context of an *inter partes* review).

*1. "goal satisfaction plan"*

The claim term "goal satisfaction plan" is recited in all but one of independent claims of the '115 patent—claims 1, 29, 61, 71, and 86, the one exception being claim 48. *See* Ex. 1001, 29:33–40 (claim 1), 32:9–21 (claim 29), 35:24–29 (claim 61), 36:17–23 (claim 71), 37:22–38:5 (claim 86). "[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning." *Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 904 (Fed. Cir. 2018) (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003). The parties do not contend that the term "goal satisfaction plan" has different meanings in different claims of the '115 patent. *See* Pet. 10; PO Resp. 27–38; Pet. Reply 1–12; PO Sur-reply 2–13.

Petitioner contends that a "goal satisfaction plan" is a "procedure for sending one or more requests for service to one or more agents in order to

satisfy a goal." Pet. 10. Patent Owner disagrees and asserts that the claim term "goal satisfaction plan" should be construed to mean "a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints." PO Resp. 28.

*a. Claim Language*

We begin our claim construction analysis by considering the language of the claims themselves. *Phillips*, 415 F.3d at 1314. Addressing the claim language of the disputed term, we note that the claim language "a goal satisfaction plan" indicates that the term's plain meaning is "a plan for satisfying a goal."

In the challenged independent claims 1 and 29, the term "goal satisfaction plan" is further limited (in different ways) by specific limitations recited in the claims. For example, claim 1 recites:

> constructing a goal satisfaction plan wherein *the goal satisfaction plan includes*:
>
> a suitable delegation of sub-goal requests to *best complete* the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms;

Ex. 1001, 23:33–40 (emphases added). In contrast, claim 29 recites:

> constructing a base *goal satisfaction plan including the sub-acts of*:
>
> determining whether the request service is available,
>
> determining sub-goals required in completing the base goal by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific

> reasoning, and application-specific reasoning comprising rules and learning algorithms,
>
> selecting service-providing electronic agents from the agent registry suitable for performing the determined sub-goals, and
>
> ordering a delegation of sub-goal requests complete the requested service;

*Id.* at 32:9–21 (emphasis added).

As shown above, the "optimal or near-optimal"[6] limiting feature argued by Patent Owner is recited in claim 1 ("a suitable delegation of sub-goal requests to *best complete* the requested service request"), but not in claim 29. This shows that the patentee knew how to restrict the "goal satisfaction plan" to "best complete the requested service request," i.e., satisfy a goal "in an optimal or near-optimal manner." If the patentee had intended to similarly restrict the "goal satisfaction plan" in claim 29, it could have done so using the language of claim 1, but did not. *See Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1379 (Fed. Cir. 2018) (citing *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1359 (Fed. Cir. 2016)).

Thus, Patent Owner's proposed construction that generally requires a "goal satisfaction plan" to satisfy a goal "in an optimal or near-optimal

[6] Patent Owner asserts that the term "optimal" and "near optimal" has a well-established meaning in the context of computer engineering, citing a technical dictionary, which defines optimization as "[t]he process of finding *the best solution* to some problem, where 'best' accords to prestated criteria." PO Sur-reply 6 (emphasis added) (citing Ex. 2078, 3).

manner" would have the effect of obfuscating the material differences in the claim language of claim 1 and claim 29 discussed above.

In addition, for claim 1, Patent Owner's proposed construction would render the limitation "suitable delegation of sub-goal requests to best complete the requested service request" recited in claim 1 superfluous. Such a construction is presumed improper. *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1274–75 (Fed. Cir. 2012) (rejecting the district court's construction narrowing a term by a superfluous limitation when the claims explicitly recited the narrowing limitation, and discussing the "well-established rule that claims are interpreted with an eye toward giving effect to all terms in the claim") (quoting *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)) (internal quotation marks omitted); *LSI Indus., Inc. v. ImagePoint, Inc.*, 279 F. App'x 964, 972 (Fed. Cir. 2008) (nonprecedential) (rejecting the district court's construction of "display device" as necessarily including the superfluous limitation of "internal illumination" because other claim terms specifically recited an "illuminated display device"); *but cf. ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1286 (Fed. Cir. 2010) ("no canon of [claim] construction is absolute in its application") (citation omitted).

Considering next the Patent Owner-argued limiting feature of satisfying a goal "consistent with any advice parameters or constraints," this feature is recited in claim 29, but not in claim 1. Claim 29 recites "the act of interpreting including the sub-acts of: determining any task completion *advice* provided by the base goal, and determining any task completion *constraints* provided by the base goal" (Ex. 1001, 32:4–8 (emphases

added)), whereas claim 1 does not recite "advice" or "constraint" (*see id.* at 29:10–44). Thus, Patent Owner's proposed construction is disfavored because it would blur the material differences in the claim language of claim 1 and claim 29 discussed above.

Finally, Patent Owner's proposed construction replaces "goal" with "complex goal expression." Again, this feature is recited in claim 1, but not in claim 29. Claim 1 recites "receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression; and dynamically interpreting the arbitrarily complex goal expression" (Ex. 1001, 29:25–30), whereas claim 29 recites "interpreting a service request in order to determine a base goal that *may be* a compound, arbitrarily complex base goal" (*id.* at 31:59–61) (emphasis added). Because of the permissive language "may be" used in claim 29, a "goal" is not necessarily required to be in the form of an arbitrarily complex goal expression in claim 29. Again, Patent Owner's proposed construction is disfavored because it would blur the material differences in the claim language of claim 1 and claim 29 discussed above.

Thus, at least based on the claim language, it is not appropriate to limit "goal satisfaction plan" as Patent Owner contends. As discussed above, the meaning and the scope of "goal satisfaction plan" is clear on the face of each claim because claims 1 and 29 each recite specifically what a "goal satisfaction plan" includes or comprises in different claims. Therefore, absent compelling evidence to the contrary, it is neither necessary nor appropriate to limit the meaning of the term "goal satisfaction plan"

beyond the plain meaning indicated by the claim language—i.e., "a plan for satisfying a goal."

*b. Written Description*

Turning to the Specification, Patent Owner cites the following statement in the "Summary of the Invention" section:

> [e]xtreme flexibility is achieved through an architecture organized around the declaration of capabilities by service-providing agents, the construction of arbitrarily complex goals by users and service-requesting agents, and the **role of facilitators in delegating and coordinating the satisfaction of these goals, subject to advice and constraints** that may accompany them.

PO Resp. 31 (quoting Ex. 1001, 5:3–9). The very first sentence of the paragraph cited by Patent Owner states, however, "[a] first *embodiment* of the present invention discloses a highly flexible, Software-based architecture for constructing distributed systems." Ex. 1001, 4:58–60 (emphasis added). Indeed, all of the portions of the Specification cited by Patent Owner, including the passage reproduced above, describe various embodiments of the '115 patent. *See* PO Resp. 30–33 (citing Ex. 1001, 5:3–9, 5:48–49, 15:37–39, 15:66–16:1, 16:11–21, 16:38–46, 18:35–48, 28:47–54, Fig. 11).

In general, "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (citation omitted). As discussed above, the challenged independent claims 1 and 29 do not recite all of the limiting features required by Patent Owner's proposed construction of "goal satisfaction plan." Thus, unless one of the established exceptions, such as

lexicography or disavowal, applies, the challenged claims are not restricted as Patent Owner contends. *See, e.g.*, *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("the specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal") (citation omitted). Here, Patent Owner does not argue lexicography or disavowal. Nor does Patent Owner explain any other reason why the Specification limits "goal satisfaction plan" as it contends. Thus, claim construction in this case is governed by the general principle that "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." *SuperGuide*, 358 F.3d at 875; *see also WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1323–24 (Fed. Cir. 2018) ("It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise." (citing *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) ("[T]his court has repeatedly cautioned against limiting claims to a preferred embodiment."))). Accordingly, none of the embodiments in the Specification cited by Patent Owner limits "goal satisfaction plan" as Patent Owner contends.

*c. Prosecution History*

Turning next to the prosecution history, Patent Owner asserts that "examples in the file history confirm the elements of 'goal satisfaction plan' reflected in Patent Owner's proposed construction." PO Resp. 35–36. Patent Owner argues, during the prosecution of the application for the '115 patent,

> Applicant further stated that "the facilitating engine is able to use reasoning to delegate the sub-goals to service providing agents in such a way as '**to best complete the requested service request**.'…The facilitating engine is able to use reasoning to delegate the sub-goal task of roasting coffee to the service-providing agent that can roast beans in the least amount of time because the facilitating engine has reasoned that the least amount of time taken to make coffee is the best way to accomplish the base goal of making coffee." Applicant concluded that "the base goal is carried out **not by merely parsing the request into sub-goals**" but rather "the facilitating engine used reasoning to decide upon using **competing** message transfer agents to reminding Bob of lunch, in lieu of delegating the task to just one message transfer agent."

*Id.* at 35 (citing Ex. 1002, 172–173). As discussed above, however, the limiting feature argued by Patent Owner is recited in claim 1 ("a suitable delegation of sub-goal requests to *best complete* the requested service request"), but not in claim 29. Thus, Patent Owner's argument is unpersuasive for the same reasons discussed above.

*d. Extrinsic Evidence*

Patent Owner also cites the testimony of its declarant, Dr. Medvidovic, in support of Patent Owner's proposed construction of "goal satisfaction plan." PO Resp. 36–37 (citing Ex. 2032 ¶¶ 51–52, 54–59, 129). We have reviewed the cited testimony from Dr. Medvidovic, but do not find anything in his testimony that would change our analysis based on intrinsic record discussed above. *See Phillips*, 415 F.3d at 1318 (authorizing the consideration of extrinsic evidence in determining the meaning of claims but noting that it is "in general . . . less reliable than the patent and its prosecution history in determining how to read claim terms").

*e. Other Arguments*

The parties dispute whether Petitioner's use of "procedure" (in place of a "plan") and "sending one or more requests for service" in Petitioner's proposed construction is appropriate. *See* PO Resp. 37–38; Pet. Reply 2–4, 11–12; PO Sur-reply 3, 13. We need not address these arguments in detail because, for the reasons discussed above, we see no reason to depart from the plain meaning of the term "goal satisfaction plan."

*f. Conclusion*

Based on the complete record and after examining the claims as a whole, the Specification, and the prosecution history, we construe the term "a goal satisfaction plan" according to its plain meaning—"a plan for satisfying a goal."

*2. "process characteristics"*

The claim term "process characteristics" is recited in dependent claim 9, which depends from claim 5 and further recites "wherein the agent registry data structure includes at least one task declaration, and process characteristics for each active agent." Ex. 1001, 30:13–16.

Citing the testimony of Dr. Lieberman, Petitioner asserts that the ordinary meaning of "process characteristics" is "additional information that may refine how a process is conducted." Pet. 62 (citing Ex. 1003 ¶ 380). In the Institution Decision, we found that Petitioner did not explain the basis for this construction or cite any supporting evidence in the Petition. Inst. Dec. 77 (citing Pet. 62). We noted that Petitioner's proposed "ordinary meaning" of "process characteristics" does not appear to track the plain language of the claim term. *Id.* at 78. For example, it is not apparent from

the words "process" and "characteristics" why "process characteristics" require "additional information" or "refin[ing]" how a process is conducted. We found that, without explanations or citations to record evidence from Petitioner why the term "process characteristics" should be construed as Petitioner proposes, we were unable to determine if the proposed "ordinary meaning" construction is correct. *Id.*

In the Petitioner Reply, Petitioner argues the Specification describes that process characteristics "may include one or more of the following: Machine Type (specifying what type of computer may run the agent), Language (both computer and human interface)." Pet. Reply 12 (citing Ex. 1001, 17:12–21). Citing the testimony of Dr. Lieberman, Petitioner further asserts that the process characteristic "Language (both computer and human interface)" refines the process because an "interface" is the "point at which a connection is made between two elements so that they can work with each other" and the process may refine its implementation based on these points of "connection"—for example, by routing requests to agents which have a registered interface with one another, thus allowing them to more effectively "work with each other." *Id.* at 13 (citing Ex. 1003 ¶ 625).

Patent Owner disagrees with Petitioner's proposed construction and argues that the term "process characteristics" instead should be construed to mean "characteristics of the computer process that may run an agent." PO Sur-reply 13–14. In particular, Patent Owner asserts that the use of "refine" in Petitioner's proposed definition is inappropriate because the two examples of process characteristics in the Specification cited by Petitioner—"Machine Type (specifying what type of computer may run the agent),

Language (both computer and human interface)"—do not provide any indication that they refine the process. *Id.* at 14 (citing Ex. 1001, 17:17–21).

We note, as an initial matter, that it was Petitioner's affirmative duty to explain in the Petition how the challenged claims should be construed and how, as so construed, they are unpatentable. *See* 37 C.F.R. § 42.104(b)(3)–(4). Even if we were to accept Petitioner's belated argument and explanation on its proposed construction of "process characteristics" presented for the first time in the Petitioner Reply, we are not persuaded that the term should be given a meaning beyond its plain meaning indicated by the claim language.

The portion of the Specification relied upon by Petitioner is reproduced below.

> Each registered agent *may be optionally* associated with one or more Process Characteristics, which *preferably* could be referenced through their associated Process Characteristics Declaration fields 716 in the parent facilitator Agent Registry 702. Note that these characteristics in certain *preferred embodiments* of the present invention *may include* one or more of the following: Machine Type (Specifying what type of computer may run the agent), Language (both computer and human interface).

Ex. 1001, 17:12–21 (emphases added). As shown above, the portion of the Specification relied upon by Petitioner describes optional or exemplary embodiments. Petitioner, however, does not explain adequately why these embodiments described in the Specification restrict the type of "process" recited in the claim. *See SuperGuide*, 358 F.3d at 875 ("a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment");

*WesternGeco*, 889 F.3d at 1323–24 ("It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise.").

We are also not persuaded by Patent Owner's argument that the term "process characteristics" means "characteristics of the computer *process* that may run an agent" (*see* PO Sur-reply 13–14 (emphasis added) (citing Ex. 1001, 17:17–21)) because the cited passage of the Specification states that "Machine Type" specifies "what type of computer may run the agent," not "what type of computer *process* may run the agent" (*see* Ex. 1001, 17:19–20).

As noted above, claim 9 recites "the agent registry data structure includes at least one task declaration, and process characteristics for each active agent." Ex. 1001, 30:13–16. Accordingly, we construe "process characteristics" according to its plain meaning indicated by the claim language—"characteristics of a process for an agent."

### *C. Prior Art Overview*

Before discussing the obviousness challenges presented in the Petition, we provide an overview of Kiss and FIPA97, the main prior art references asserted against the challenged claims, to provide context for the discussion that follows.

#### *1. Overview of Kiss (Ex. 1005)*

Kiss describes "a knowledge management system that supports inquiries of distributed knowledge resources," as illustrated in Figure 1. Ex. 1005, 2:44–45.

Figure 1 of Kiss is reproduced below.




*Fig. 1*

Kiss's Figure 1 shows a conceptual overview of one embodiment of a knowledge management system. *Id.* at 5:1–2. Kiss's knowledge management system 100 includes a presentation layer 103, a user interface layer 105, a meta agent layer 107, a knowledge agent layer 109, a knowledge module layer 111, and an agent service layer 113. *Id.* at 5:3–7.

The meta agent layer 107 includes one or more meta agents 119 that are responsible for analyzing queries or problem formulations provided by

the user interface layer 105 and constructing a plan for finding a solution to the problem. *Id.* at 5:20–24. More specifically, "meta agent 119 is responsible for formulating a dynamic 'solution plan' for the distributed inferencing to be performed by the system 100, and allocates tasks to the knowledge agent layer 109 in furtherance of the solution plan." Ex. 1005, 5:33–37. "The meta agent solution plan attempts to employ all elements of information contained in the parsed inquiry in the development of search-space constraints." *Id.* at 8:34–37.

The knowledge agent layer 109 includes multiple knowledge agents 121, each of which may be associated with one or more knowledge modules 123 in the knowledge module layer 111. Ex. 1005, 6:31–35. The knowledge agent 121 is configured to accept from a meta agent 119 a problem statement and convert that problem statement into a format appropriate for the knowledge module 123 associated with the knowledge agent 121. *Id.* at 6:35–38.

### *2. Overview of FIPA97 (Exs. 1006–1012)*

FIPA97 (Exs. 1006–1012) is a specification created by the Foundation for Intelligent Physical Agents (FIPA) beginning in 1996 with an official release date in October 1997. Ex. 1006, Cover, iv (identifying specification as FIPA 97 Version 1.0 issued on October 10, 1997). FIPA97 is a "specification of basic agent technologies that can be integrated by agent systems developers to make complex systems with a high degree of interoperability." *Id.* at v. The specification comprises seven parts: three parts for basic agent technologies (Parts 1–3 relating to agent management, agent communication language, and agent/software integration) and four

informative applications providing examples of how the technologies can be applied (Parts 4–7 describing personal travel assistance, personal assistant, audio-visual entertainment, and broadcasting and network management and provisioning applications). *Id.* at v–vii; *see generally* Exs. 1006–1008 (Parts 1–3); Exs. 1009–1012 (Parts 4–7).

Part 1 of FIPA97 "provides a normative framework within which FIPA compliant agents can exist, operate and be managed." Ex. 1006, vi. Part 2 of FIPA97 describes an "Agent Communication Language (ACL)" that "is based on speech act theory: messages are actions, or communicative acts, as they are intended to perform some action by virtue of being sent." *Id.* The ACL specification "consists of a set of message types and the description of their pragmatics, [i.e.,] the effects on the mental attitudes of the sender and receiver agents." *Id.* The ACL specification "also provides the normative description of a set of high-level interaction protocols, including requesting an action, contract net and several kinds of auctions." *Id.*

Part 2 of FIPA97 discloses a "simple abstract model of inter-agent communication" including ACL messages having components as illustrated in Figure 1 below. Ex. 1007, 7, 12.




**Figure 1 — Components of a message**

Figure 1, above, illustrates the main structural elements of an ACL message in FIPA97. *Id.* at 12. "The first element of the message is a word which identifies the communicative act being communicated, which defines the principal meaning of the message." *Id.* Each ACL message contains a set of one or more parameters, including a mandatory "*:receiver*" parameter that identifies the intended recipient of the message. *Id.* at 13.

Petitioner asserts that FIPA97 was made publicly available as a single document and relies on FIPA97 as a single printed publication for purposes of 35 U.S.C. § 102(a). *See* Pet. 23; Pet. Reply 34–35. As discussed below in the section addressing the status of FIPA97 as a printed publication, FIPA approved and released FIPA 97 Version 1.0 as a single specification. *See infra* § III.D.; Ex. 1026, 5; Ex. 1050 ¶ 165. Thus, although sometimes the seven parts are referred to as "documents," a person of ordinary skill in the art would have considered FIPA97 to be a single reference. *See* Ex. 1003 ¶¶ 143–148. Patent Owner does not dispute that FIPA97 is one reference for purposes of §§ 102 and 103. *See* PO Resp. 117–120.[7] Because FIPA and skilled artisans considered FIPA97 to be a single specification, we agree that FIPA97 constitutes a single prior art reference, and we treat it as such for purposes of our unpatentability analysis.

[7] Contrary to Patent Owner's argument (PO Resp. 117–120), Petitioner did not argue in another case, and the Board did not find, that FIPA97 is seven separate prior art references. *See Microsoft Corp. v. IPA Techs. Inc.*, IPR2019-00838, Paper 13 at 3–5 (PTAB Apr. 3, 2020) (Decision Denying Petitioner Request for Rehearing), Paper 10 at 4–9 (Petitioner's Request for Rehearing, filed Dec. 6, 2019).

*D. Status of FIPA97 as a Prior Art Printed Publication*

Before reaching the merits of Petitioner's obviousness contentions, all of which are based in part on FIPA97 (Exhibits 1006–1012), we must determine as a threshold matter whether FIPA97 is a prior art printed publication under 35 U.S.C. § 102(a) or § 102(b). *See* Pet. 23–25. Petitioner bears the burden of establishing by a preponderance of the evidence that FIPA97 is a printed publication. *See* 35 U.S.C. § 316(e); *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1375 (Fed. Cir. 2018); *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29 at 11 (PTAB Dec. 20, 2019) (precedential) (citing *Nobel Biocare*, 903 F.3d at 1375). For purposes of instituting an *inter partes* review we accepted Petitioner's contention, unchallenged in Patent Owner's Preliminary Response, that FIPA97 was available as prior art as of October 1997, more than one year before January 5, 1999, the filing date of the '115 patent. Inst. Dec. 43–45 (citing Pet. 23–25 (citing Ex. 1049 ¶¶ 3, 6, 11, 12, 20–34; Ex. 1003 ¶¶ 121, 122, 125–128, 143–148)). Patent Owner, however, challenges that contention in its Patent Owner Response, and the parties further address the issue in Petitioner's Reply and Patent Owner's Sur-reply. *See* PO Resp. 45–65; Pet. Reply 17–29; PO Sur-reply 20–35.

The determination of whether a document is a "printed publication" under 35 U.S.C. § 102 "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in

determining whether a reference constitutes a 'printed publication' . . . ." *Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1355 (Fed. Cir. 2018) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). A reference is considered publicly accessible if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it.'" *Id.* at 1355–56 (quoting *In re Wyer*, 655 F.2d 221, 226 (CCPA 1981)).

In the discussion below, we begin with background information regarding FIPA and an overview of the evidence submitted by Petitioner in support of its contention that FIPA97 was publicly accessible in October 1997. The evidence includes extensive testimony from Dr. Finin, a professor who has personal knowledge of FIPA's activities and the development process of FIPA97. *See* Ex. 1049 ¶¶ 1–55 (Finin Decl.). Dr. Finin was one of the first two FIPA Fellows invited to provide "high quality and independent advice to FIPA." *Id.* ¶ 18 (quoting Ex. 1076, 1); Ex. 1025, 1; Ex. 1062, 1. The evidence also includes testimony from Petitioner's expert witness, Dr. Lieberman, and more than sixty documentary exhibits on which Petitioner relies to show that FIPA97 was publicly accessible in late 1997 and early 1998. *See* Ex. 1003 ¶¶ 121–128, 143–148; Exs. 1021–33, 1047, 1051–1105.

After providing an overview of the evidence, we consider the parties' arguments as to whether FIPA97 was publicly accessible before the January 5, 1999, critical date. For the reasons explained below, we

determine that Petitioner has met its burden to show that FIPA97 was publicly accessible before the critical date.

*1. FIPA*

FIPA was a non-profit association based in Geneva, Switzerland, created to promote agent-based technology and develop open standards. Ex. 1006, iv (FIPA 97 Specification Version 1.0, Part 1, Foreword); Ex. 1049 ¶ 3. Founded in 1996, FIPA's membership included numerous technology companies, educational institutions, and governmental entities. Ex. 1049 ¶ 3. As of October 1997, FIPA had thirty-five corporate members representing twelve countries.[8] Ex. 1006, iv. According to FIPA documentation, membership was "open to any corporation and individual firm, partnership, governmental body or international organi[z]ation without restriction." *Id.* FIPA stated its intent "to make the results of its activities available to all interested parties." *Id.* Throughout its tenure, FIPA produced standards designed to promote and advance agent-based technology. Ex. 1049 ¶ 3. In 2005, FIPA was incorporated into the Institute of Electrical and Electronics Engineers (IEEE) as one of its standards committees. *Id.*

*2. Development of FIPA97*

The process of drafting the FIPA 97 specification began with FIPA's first meeting in London in April 1996. Ex. 1049 ¶ 6; Ex. 1058 (Main results

---

[8] The corporate members included Alcatel, British Telecommunications, Deutsche Telekom, France Telecom, Hitachi, Hewlett-Packard, IBM, NEC, NTT, Nortel, Siemens, and Toshiba. *See* Ex. 1095, 22.

of London meeting); Ex. 1066 (Resolutions of London meeting). Representatives from twenty-six companies and organizations attended. Ex. 1066, 1. At the meeting, the members agreed on FIPA's mission, drafted statutes and operational principles, and produced a work plan for a specification that would become FIPA 97. Ex. 1058, 1; Ex. 1066, 1–3; Ex. 1049 ¶ 6. The work plan set a December 1997 target for producing a first completed specification. Ex. 1066, 2–3; Ex. 1049 ¶ 7.

FIPA subsequently held several meetings in 1996 and 1997. At the second meeting in June 1996 in Yorktown Heights, NY, FIPA approved several documents, including a framework for FIPA activity and a list of requirements for FIPA-specified agent capabilities. Ex. 1067, 1 (Resolutions of Yorktown meeting); Ex. 1060, 1 (Results of Yorktown meeting); Ex. 1049 ¶ 9. At the third meeting in October 1996 in Tokyo, FIPA approved a final work plan calling for production of a FIPA specification in October 1997. Ex. 1049 ¶ 11; Ex. 1070, 1 (work plan); Ex. 1023 (Results of Tokyo meeting). Also at the Tokyo meeting, FIPA produced its First Call for Proposals, which outlined in detail three technology parts (corresponding to Parts 1–3 of FIPA 97) and four application parts (corresponding to Parts 4–7 of FIPA 97). Ex. 1069, 1–27 (First Call for Proposals); Ex. 1049 ¶ 12.

In 1997, FIPA began to produce draft specifications. At the fourth meeting in January 1997 in Turin, Italy, FIPA publicly released drafts of Parts 1–4 and posted them on the FIPA home page (http://drogo.cselt.stet.it/fipa). Ex. 1021, 1 (Results of Turin meeting); Ex. 1049 ¶ 13. Additionally, FIPA released a Second Call for Proposals at

the Turin meeting. Ex. 1071, 1–3 (Second Call for Proposals); Ex. 1049 ¶ 13. At the fifth meeting in April 1997 in Reston, VA, FIPA produced drafts of Parts 1–7, which were publicly released and posted on the FIPA home page. Ex. 1024 (Results of Reston meeting); Ex. 1061 (Resolutions of Reston meeting); Ex. 1049 ¶ 17. At the sixth meeting in June 1997 in Cheju Island, South Korea, FIPA publicly released revised drafts of Parts 1–7 and posted them on the FIPA home page. Ex. 1025, 1 (Results of Cheju meeting); Ex. 1062, 5 (Resolutions of Cheju meeting); Ex. 1049 ¶ 19. According to Dr. Finin, the Reston Draft and Cheju Draft were substantially complete versions of what would become FIPA 97. Ex. 1049 ¶¶ 17, 19.

Dr. Finin testifies that news of FIPA and its standardization efforts "spread quickly throughout the relatively small community of software agent researchers." Ex. 1049 ¶ 8. For instance, the AgentWeb website, "a meeting place for researchers in agent-based technology from 1995–2000," was home to a "Software Agents" mailing list and a newsletter that had more than 1,300 subscribers in 1996. *Id.*; Ex. 1089, 5. Dr. Finin was "the founder, author, and a subscriber" of the AgentWeb newsletter. Ex. 1049 ¶ 8. The widely distributed AgentWeb newsletters announced upcoming FIPA meetings, reported results of previous meetings, including calls for proposals, and provided links to the specification drafts posted on the FIPA home page. *See id.* ¶¶ 8, 10, 12, 14, 17, 19.

For example, the AgentWeb newsletter dated May 11, 1996, announced the upcoming FIPA June 1996 Yorktown meeting, described as the "FIPA Opening Forum." Ex. 1090, 5; Ex. 1049 ¶ 8. The purpose of the meeting, as stated in the newsletter, was to "refine the list of basic agent

capabilities candidate for FIPA specification; compile a first list of agent capabilities intended for specification by end 1997; and establish the first working groups." Ex. 1090, 5. Likewise, the AgentWeb newsletter dated August 12, 1996, advertised the FIPA October 1996 Tokyo meeting. Ex. 1088, 1; Ex. 1049 ¶ 10. Thereafter, the AgentWeb newsletter dated October 14, 1996, publicized the Call for Proposals issued at the October 1996 Tokyo meeting and provided the deadline for submission of proposals to be considered at the Turin meeting in January 1997. Ex. 1087, 1; Ex. 1049 ¶ 12. FIPA had decided that respondents who submitted proposals would be invited to the January 1997 meeting to present their proposals even if they were not FIPA members. Ex. 1023, 1; *see* Ex. 1069, 27.

Once FIPA began to produce drafts of the specification, AgentWeb newsletters announced those drafts and provided links to access them. The AgentWeb newsletter dated February 2, 1997, reported that "[i]nitial specifications for three technology parts (Agent Management, Agent Communication and Agent/Software Interaction) and one application part (Personal Travel Assistance) have been produced" at the recent Turin meeting. Ex. 1091, 1; Ex. 1049 ¶ 14. The newsletter included a freely accessible and public link to access the draft. Ex. 1049 ¶ 14 (citing Ex. 1091, 1–2). It also indicated that drafts of the remaining three specification parts would be generated at the FIPA meeting to be held in April 1997 in Reston. Ex. 1091, 1–2. A subsequent AgentWeb newsletter dated April 13, 1997, advertised the upcoming Reston meeting and

contained links to information about the meeting on the FIPA website. Ex. 1092, 3; Ex. 1049 ¶ 17.

On May 5, 1997, following the Reston meeting, an AgentWeb newsletter reported that attendees of that meeting produced a revised draft including all seven parts of the specification. Ex. 1093, 2; Ex. 1049 ¶ 17. The newsletter contained individual public links to the seven parts and invited "both members and non-members" to comment, providing an email address for submission. *Id.*; Ex. 1049 ¶ 17. Additionally, the newsletter announced the dates and locations of the next two meetings—the June 1997 Cheju meeting and the seventh meeting to take place in Munich on October 6–10, 1997. *Id.* Similarly, the AgentWeb newsletter dated June 30, 1997, announced that the Cheju meeting resulted in revised versions of the FIPA specification documents and provided direct links to the seven parts. Ex. 1094, 1–2; Ex. 1049 ¶ 19. Again, the newsletter stated that FIPA invited comments and that non-members making substantial comments would be invited to attend the October 1997 Munich meeting. Ex. 1094, 2. Dr. Finin was among those who submitted comments on the Cheju draft. Ex. 1073; Ex. 1049 ¶ 20.

Meanwhile, the AgentWeb Software Agents mailing list also provided information regarding FIPA's efforts to the community of software agent researchers. *See* Ex. 1049 ¶ 8. Dr. Finin was an organizer of and contributor to the Software Agents mailing list. *Id.* On May 2, 1996, a posting to the mailing list referenced the upcoming June 1996 FIPA meeting in Yorktown Heights, New York. Ex. 1079, 1; Ex. 1049 ¶ 8. Members of the Software Agents mailing list posted comments regarding the Turin draft

after it was released publicly. Exs. 1078, 1081, 1082; *see* Ex. 1049 ¶¶ 14–15. Dr. Finin was among those who shared their thoughts. *See* Ex. 1082; Ex. 1049 ¶ 15. A posting after the Reston meeting included a public and open link to access the Reston draft and invited comments from the mailing list. Ex. 1083, 1; Ex. 1049 ¶ 17.

*3. Public Release of FIPA97*

FIPA's seventh meeting took place in Munich on October 6–10, 1997. Ex. 1026 (Resolution of Munich meeting); Ex. 1049 ¶ 20. At this meeting, FIPA incorporated final edits and comments and approved the FIPA 97 specification for publication. Ex. 1026, 1, 5; Ex. 1049 ¶ 20. The specification as approved at the meeting was called "FIPA 97 ver. 1.0," or FIPA 97 Version 1.0. Ex. 1026, 5. Working groups for various parts of the specification were given about one month to check for consistency and make minor edits. *Id.* at 2; Ex. 1049 ¶ 20.

An "initial" version of FIPA 97 Version 1.0, approved at the Munich meeting and dated October 10, 1997, was posted to the FIPA website, housed at the time at http://drogo.cselt.stet.it/fipa. Ex. 1049 ¶¶ 20–21. According to Dr. Finin, the specification documents were available online and free for anybody to access by sometime in October 1997. *Id.* ¶ 21. On November 18, 1997, an AgentWeb newsletter announced completion of FIPA 97 Version 1.0 and its publication on the FIPA website. Ex. 1086, 1–2; Ex. 1049 ¶ 21. The newsletter provided individual, direct links to the seven parts of the specification on the FIPA website. Ex. 1086, 1–2. The links were not password protected and were open to the public without a requirement for secrecy or confidentiality. Ex. 1049 ¶ 21. As with the

earlier AgentWeb newsletters, the newsletter containing links to FIPA 97 Version 1.0 was sent to more than 1,300 subscribers. *Id.*

Dr. Finin testifies that in late 1997, "a few weeks after the Munich meeting," he accessed the approved FIPA 97 Version 1.0 posted on the FIPA website. *Id.* ¶¶ 20–21. He specifically recalls accessing the documents in late 1997 to review the first major work product of FIPA and to prepare for FIPA's upcoming January 1998 meeting in Palo Alto, which he attended. *Id.* ¶ 21 (citing Ex. 1074). Dr. Lieberman also testifies that he recalls FIPA 97 Version 1.0 being publicly available on the FIPA website throughout late 1997 and early 1998 and that he accessed it in late 1997 as a member of the interested public. Ex. 1003 ¶ 125.

The release of FIPA 97 Version 1.0 was well publicized in the weeks after the Munich meeting. Ex. 1049 ¶ 22. For example, on October 20, 1997, the EETimes featured an article reporting FIPA's approval of the FIPA 97 specification. Ex. 1095, 22; *see* Ex. 1049 ¶ 22. The article was based on an interview with Leonardo Chiariglione, the president of FIPA. Ex. 1095, 22. The article described the seven parts of the specification: "The first three parts cover different aspects of agent behavior: agent management; agent communication; and agent-software interaction. The four remaining parts, which cover application areas, . . . are: personal travel assistance; personal assistant; audio-visual entertainment and broadcast; and network provision and management." *Id.* After describing FIPA's plans for 1998, including testing of FIPA 97 Version 1.0 to provide input for a further round of standardization, the article referred readers to the FIPA website for

information regarding the released specification: "CSELT[9] maintains extensive information on FIPA's activities at www.cselt.stet.it/fipa."[10] *Id.* (emphasis omitted). It concluded with a quote from Dr. Chiariglione regarding the specification's public availability: "'It is our policy to make the standard freely available over the Internet,' Chiariglione said. 'FIPA will retain the copyright but it will be free for others to use.'" *Id.*

The November-December 1997 issue of IEEE Internet Computing also announced the release of the FIPA 97 specification: "The Foundation for Intelligent Physical Agents, a non-profit organization established to promote emerging agent-based applications, has released its first specification. Named FIPA 97, the specification will provide a benchmark for interoperable products." Ex. 1096, 93; Ex. 1049 ¶ 22. The news brief directed readers to the FIPA website for the text of the specification. Ex. 1096, 93 ("The text is available at http://drogo.cselt.stet.it.fipa/."[11]); Ex. 1049 ¶ 22.

Sometime after the Munich meeting, FIPA also produced a hardcopy book version of the FIPA 97 Version 1.0 specification to be sent to FIPA members and various institutions and standards groups. Ex. 1049 ¶ 24; *see* Ex. 1026, 1; Ex. 1063, 1 (Resolution of the Palo Alto meeting, Jan. 29,

---

[9] Centro Studi e Laboratori Telecommunicazioni, Dr. Chiariglione's employer at the time. *See* Ex. 1095, 22.

[10] The record suggests this website (http://www.cselt.stet.it/fipa) was a mirror of the FIPA website (http://drogo.cselt.stet.it/fipa) in 1997. *See* Ex. 1049 ¶ 22; Ex. 1095, 22; Tr. 94:11–14.

[11] The URL provided in the article contains a typographical error. *See* Ex. 1049 ¶ 22 (correcting the URL to http://drogo.cselt.stet.it[/]fipa/).

1998). At least two copies of the book were available in libraries in January 2019. Ex. 1049 ¶ 24; Ex. 1057, 1 (WorldCat catalog entry for "Fipa specification : Version 1.0"); Ex. 1055 (cover page and table of contents of each part in copy at library in Italy); Ex. 1056 (cover page and table of contents of Part 1 in copy at library in Switzerland). Dr. Finin testifies that the books contain the November 28, 1997, edited version of FIPA 97 Version 1.0, which "only made minor edits (mostly spelling and formatting) over the October 10, 1997 version." Ex. 1049 ¶ 25 (citing Ex. 1055, 5 (Part 2 "publication date" of November 28, 1997); Ex. 1056).

*4. Publications and Patents Referring to FIPA97 and FIPA Activities*

In late 1997 and 1998, several papers reviewing and outlining the FIPA 97 specification were published and presented at meetings. *See* Ex. 1049 ¶¶ 26–30. A paper dated December 1997 memorializes a presentation made to a meeting on Intelligent Agent Technology organized by the EPSRC[12] Community Club in Advanced Computing Techniques. Ex. 1097, Cover ("Dickinson");[13] *see* Ex. 1049 ¶ 26. This paper outlines the background and rationale for the creation of an agent interoperability standard. Ex. 1097, 1–3. It also describes the development history of the FIPA 97 specification, noting that FIPA's work program "culminated in the publication of an initial draft standard, FIPA 97, at the Munich meeting on

---

[12] "The Engineering and Physical Sciences Research Council (EPSRC) is the main funding body for engineering and physical sciences research in the UK." Engineering and Physical Sciences Research Council, epsrc.ukri.org/about (last visited Sept. 28, 2020).

[13] Ian J. Dickinson, *Agent Standards*, HP Laboratories Bristol, HPL-97-156 (Dec. 1997).

October 1997." *Id.* at 3. Dickinson further provides that "[a]ll FIPA documents and meeting outputs are publicly available on the web" at "http://drogo.cselt.stet.it/fipa/," and "comments and review have been sought at each stage of the process." *Id.* at 3, 7 n.9. The paper then describes the features of the specification's three substantive technical sections, Parts 1–3. *Id.* at 3–6.

Similarly, a 1998 paper titled "Industrial Applications of Multi-Agent Technology" summarizes FIPA's background and presents an overview of the three technical parts (i.e., Parts 1–3) of FIPA 97 Version 1.0 released in October 1997. Ex. 1099, 12–13 ("Steiner");[14] *see* Ex. 1049 ¶ 28. The Steiner paper provides the FIPA website address and explains that the four application parts (i.e., Parts 4–7) will be used in field trials to gather information to be incorporated into a revised version of FIPA 97. Ex. 1099, 13 & n.1.

Likewise, a paper titled "FIPA — towards a standard for software agents" appearing in the July 1998 issue of the BT Technology Journal explains the motivation for an agent standard and provides an overview of FIPA's background and activities. Ex. 1100, 51–52 ("O'Brien");[15] *see* Ex. 1049 ¶ 29. It then describes the different parts of the FIPA 97 Version 1.0 specification issued in October 1997. Ex. 1100, 51–52.[16]

---

[14] Donald Steiner, Siemens AG, *Industrial Applications of Multi-Agent Technology* (IEEE 1998).

[15] P.D. O'Brien & R.C. Nicol, *FIPA — towards a standard for software agents*, BT Tech. J. Vol. 16, No. 3 (July 1998).

[16] Dr. Finin testifies that O'Brien provides public links to FIPA97. Ex. 1049 ¶ 29. The copy of O'Brien entered into the record, however, appears to be

Dr. Finin cites several other publications that reference FIPA's development of an agent communication standard in the 1997–98 timeframe. Ex. 1049 ¶ 31 (citing Exs. 1027–29). Dr. Finin also identifies several patent applications in the same timeframe that refer to FIPA's agent communication language. *Id.* ¶ 32 (citing Exs. 1030–33).

*5. The FIPA Website and Exhibits 1006–1012*

Sometime in 1998, the FIPA website migrated from its original site (http://drogo.cselt.stet.it/fipa) to fipa.org. Ex. 1049 ¶ 23; *see also* Ex. 1026 (Resolution of Munich meeting indicating FIPA's plans for the "redesign of a new FIPA home page"); Ex. 1065, 4 (Resolutions of the Durham meeting in October 1998 indicating the website will be transferred to www.fipa.org). The fipa.org website still exists today even though FIPA is no longer active as a standalone organization. *See* Ex. 1049 ¶¶ 23, 48–49. The current FIPA website maintains a repository of past FIPA documents, including meeting notes, press releases, FIPA resolutions, and different versions of the FIPA specification. *Id.* ¶ 49.

Dr. Finin testifies that the "initial" version of FIPA 97 Version 1.0 (i.e., the specification posted on the FIPA website on October 10, 1997) "remained publicly accessible during all of FIPA's future activities and is still available on FIPA's home page today." *Id.* ¶ 21. According to Dr. Finin, Exhibits 1006–1012 (collectively referred to as FIPA97) are Parts 1–7 of FIPA 97 Version 1.0 as found on the current fipa.org website.

---

missing several pages, including one containing endnotes 10–12 that might provide links to the FIPA website. *See* Ex. 1100, 52 ("FIPA97 (issued in October 1997) [10–12] is the first output from FIPA covering part of the requirements for an agent standard.").

*Id.* Based on his personal knowledge, Dr. Finin further testifies that Exhibits 1006–1012 are the "same version" and contain "the same disclosures, content and information" as Parts 1–7 of FIPA 97 Version 1.0 that were publicly available on the FIPA website (http://drogo.cselt.stet.it/fipa) on October 10, 1997, and which Dr. Finin himself accessed in late 1997. *Id.* ¶¶ 21, 34. He also notes that although Exhibit 1006 has a typographical error relating to the version number in the header of its odd pages,[17] Exhibit 1006 is identical to the version of Part 1 of FIPA 97 Version 1.0 that was released on October 10, 1007. *Id.* ¶ 21. Additionally, as evidence that FIPA 97 Version 1.0 has been continuously available on fipa.org since the website migration, Dr. Finin cites a set of Internet Archive records beginning in 2000 showing where each part of that version of the specification could be accessed. *Id.* (citing Ex. 1054).

Dr. Finin testifies that the original FIPA website, http://drogo.cselt.stet.it/fipa, remained live for several years after the website transitioned to fipa.org. Ex. 1049 ¶ 23. The Internet Archive Wayback Machine contains an archived screen capture of the website http://drogo.cselt.stet.it/fipa from December 1, 1998. *See* Ex. 1051; Ex. 1049 ¶¶ 23, 54. According to Dr. Finin, the archived page shows that the FIPA 97 specification was live and freely available on the FIPA website home page at that time. Ex. 1049 ¶ 23; Ex. 1051, 1 ("FIPA has already developed a seven-part specification called <u>FIPA 97</u>. Implementations of <u>FIPA 97</u> are undergoing field trials that will last until October 1998 when

---

[17] The header on odd pages reads "FIPA 1997 Part 1: Version 2.4." *E.g.*, Ex. 1006, 3.

version 2 of FIPA 97 will be produced.”); Ex. 1049 ¶ 23. The home page provided links (i.e., “FIPA 97”) to actual specification documents, but those links have not been maintained in the archive. Ex. 1049 ¶ 23. Dr. Finin testifies that the screen capture from the Internet Archive is consistent with the mirror of the former FIPA site hosted by Leonardo Chiariglione. *Id.* ¶ 51 (citing Ex. 1103 (http://leonardo.chiariglione.or/standards/fipa/)). Dr. Chiariglione’s mirror is still available, and documents hosted on the mirror are “accurate and complete copies of FIPA documents that were available to FIPA members.” *Id.*

*6. Analysis*

Petitioner argues that FIPA97 was a publicly accessible printed publication as of October 10, 1997, when it was posted on the FIPA website. Pet. 23; Pet. Reply 15–21. More specifically, Petitioner argues that (1) FIPA 97 Version 1.0 was publicly accessible on October 10, 1997, and (2) the version of the FIPA specification found in Exhibits 1006–1012, referred to herein as FIPA97, is the same specification that was posted on the FIPA website on October 10, 1997, and named FIPA 97 Version 1.0. *See, e.g.*, Pet. 24 (arguing FIPA 97 Version 1.0 was publicly accessible in late 1997); Pet. Reply 17–20 (arguing that Exhibits 1006–1012 are the same documents that were made public as FIPA 97 Version 1.0). Patent Owner addresses the first contention when it argues the evidence does not show any version of FIPA 97 Version 1.0 was available on the FIPA website. *See, e.g.*, PO Resp. 47–48. It also challenges the second contention when it argues Petitioner has failed to show that Exhibits 1006–1012 are identical to the version of the FIPA specification that allegedly was publicly accessible

before the critical date. *See, e.g.*, *id.* at 48. In our analysis below, we address the two questions in turn.

Considering all the facts and circumstances surrounding the development of FIPA 97 Version 1.0 and its publication on the FIPA website, we find that FIPA 97 Version 1.0 was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the art, exercising reasonable diligence, could locate it. *See Jazz Pharm.*, 895 F.3d at 1355–56. First, the uncontested evidence shows that members of the relevant public (i.e., persons of ordinary skill in the field of software agent-based technology) knew of the release of FIPA 97 Version 1.0 in late 1997, prior to the critical date. As detailed above, FIPA was open to corporations and educational and governmental organizations without restriction. Ex. 1006, iv. FIPA's members included many industry leaders whose employees attended FIPA meetings, including the October 1997 meeting in Munich where FIPA 97 Version 1.0 was approved for publication. *See id.*; Ex. 1095, 22. FIPA meetings and activities were publicized among the larger community of software agent researchers via the AgentWeb website and its associated Software Agents mailing list and AgentWeb newsletter, which had more than 1,300 subscribers. Ex. 1090, 5; Ex. 1088, 1; Ex. 1087, 1; Ex. 1091, 1–2; Ex. 1092, 3; Ex. 1093, 2; Ex. 1094, 1–2; Ex. 1086, 1–2; *see* Ex. 1049 ¶¶ 8, 10, 12, 14, 17, 19. The newsletter in particular informed subscribers of the development of the FIPA specification during 1996 and 1997 and provided detailed information regarding the release of FIPA 97 Version 1.0 in a November issue. Ex. 1086, 1–2. News articles in periodicals published in late 1997 also announced that FIPA had

released and published FIPA 97 Version 1.0. Ex. 1095, 22; Ex. 1096, 93; *see* Ex. 1049 ¶ 22. In addition, the record contains several papers published in late 1997 and 1998, prior to the critical date, describing FIPA 97 Version 1.0 and its release in October 1997. *See* Ex. 1097, 1–7; Ex. 1099, 12–13; Ex. 1100, 51–52; Ex. 1049 ¶¶ 26–30; *see also* Ex. 1049 ¶¶ 31–32 (citing Exs. 1027–33 (other publications and patents referring to FIPA specification)).

The evidence of record also demonstrates that members of the relevant public, exercising reasonable diligence, could have located FIPA 97 Version 1.0 in late 1997 on the FIPA website, housed at the time at http://drogo.cselt.stet.it/fipa. FIPA published FIPA 97 Version 1.0 on its website at the conclusion of the Munich meeting on October 10, 1997, or shortly thereafter. *See* Ex. 1049 ¶ 20. In the several months leading up to the Munich meeting, persons of ordinary skill in the art would have known about the FIPA website through the widely distributed AgentWeb newsletters and the Software Agents mailing list, which provided website information or direct links to drafts of the specification and meeting announcements and reports. *See* Ex. 1091, 1–2; Ex. 1092, 3; Ex. 1093, 2; Ex. 1094; Ex. 1082, 1; Ex. 1083, 1. Therefore, people working in the field would have been sufficiently familiar with FIPA's activities and its website to look for FIPA 97 Version 1.0 on the FIPA website when it was posted after the Munich meeting. Indeed, both Dr. Finin, who was affiliated with FIPA, and Dr. Lieberman, who worked in the software agent field, testify that they accessed FIPA 97 Version 1.0 on the FIPA website in late 1997. Ex. 1049 ¶ 21; Ex. 1003 ¶ 125.

Moreover, the AgentWeb newsletter dated November 18, 1997, provided a link to the FIPA website and individual links to the seven parts of FIPA 97 Version 1.0 published on the website. Ex. 1086, 1–2; *see* Ex. 1049 ¶ 21. Thus, that issue of the newsletter provided more than 1,300 interested members of the public with direct access to FIPA 97 Version 1.0 at least as of November 18, 1997.

News articles and papers published in late 1997 also provided readers with the website address where FIPA 97 Version 1.0 could be found. *See* Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9. The news articles in particular likely reached a very wide audience because they appeared in publications directed to subject matter broader than agent-based technology. *See* Ex. 1095 (EETimes); Ex. 1096 (IEEE Internet Computing). The EETimes article was dated October 20, 1997, suggesting that FIPA 97 Version 1.0 was available on the FIPA website at least as of that date.

The undisputed evidence also demonstrates that FIPA 97 Version 1.0 was freely available on the FIPA website without a password or any other restrictions and access was not subject to any requirement or expectation of secrecy or confidentiality. *See* Ex. 1049 ¶ 21; Ex. 1095, 22; *see also* Ex. 1006, iv (stating FIPA intended to make its results available to all interested parties). This evidence further supports our finding that FIPA 97 Version 1.0 was publicly accessible in late 1997. *See Jazz Pharm.*, 895 F.3d at 1358–59; *Voter Verified, Inc. v. Premier Election Solutions, Inc.*, 698 F.3d 1374, 1380–81 (Fed. Cir. 2012); *MIT v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985).

Patent Owner's arguments, many of which attack pieces of evidence individually, do not persuade us that Petitioner has failed to show that FIPA 97 Version 1.0 was publicly accessible. First, Patent Owner argues that no evidence shows the original FIPA website (http://drogo.cselt.stet.it/fipa) existed prior to a December 1, 1998, Internet Archive capture. PO Resp. 55 (citing Ex. 1051). To the contrary, much of the documentary evidence from late 1997 and testimonial evidence identifies that website or its mirror as the FIPA website during the relevant time period. *See* Ex. 1049 ¶ ¶ 20–23; Ex. 1092, 3; Ex. 1093, 2; Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9. Notwithstanding the absence of an Internet Archive capture for the website from a date prior to December 1998, we find that, based on the totality of evidence in the record, the original FIPA website existed in late 1997.

Patent Owner also argues that none of the documents cited by Petitioner provide active links to FIPA 97 Version 1.0 and therefore are insufficient proof of public accessibility. PO Resp. 54; PO Sur-reply 21–22. Again, based on the totality of evidence in the record, including but not limited to the testimony of Dr. Finin that he accessed FIPA 97 Version 1.0 on the FIPA website in late 1997, we find that FIPA 97 Version 1.0 was available on the FIPA website at that time, notwithstanding the lack of active links today, more than twenty years later. Patent Owner finds fault with Dr. Finin's testimony on this point because he does not claim to have used any of the links in the AgentWeb newsletters to access FIPA 97 Version 1.0. PO Sur-reply 35 (citing Ex. 1049 ¶ 21). Patent Owner, however, overlooks Dr. Finin's testimony that he was the founder and author of the AgentWeb

newsletter, implying that he created the links in the newsletter. *See* Ex. 1049 ¶ 8. Therefore, based on Dr. Finin's personal knowledge regarding the links in the AgentWeb newsletter dated November 18, 1997, and the other evidence corroborating his testimony, we find that FIPA 97 Version 1.0 was available on the FIPA website in late 1997.

Patent Owner further asserts that, to the extent the Internet Archive capture from December 1998 provides an operable download link, it links to Version 2.0 of the FIPA 97 specification. PO Resp. 55–56 (citing Ex. 1051). It is not surprising, however, that FIPA's website in December 1998 provided links to FIPA 97 Version 2.0, which FIPA released in October 1998 to provide minor updates to two parts of the specification. *See* Ex. 1049 ¶ 35; Ex. 1053, vi. In any event, the December 1998 Internet Archive capture at least shows that the FIPA website was live at that time, which was prior to the critical date. *See* Ex. 1049 ¶ 23 (citing Ex. 1051, 1).

In its Sur-reply, Patent Owner argues for the first time that Petitioner has not demonstrated that a person of ordinary skill in the art in 1997 could have found FIPA 97 Version 1.0 using search tools or that the FIPA website was indexed so the specification could be located. PO Sur-reply 31. Further, Patent Owner argues that the existence of different FIPA websites at various times would have made it even more difficult to find the correct version of the FIPA specification without sufficient indexing or search tools. *Id.* at 33.

Even if we consider this late argument, we find it unpersuasive. As detailed above, the uncontested evidence shows that the address of the FIPA website itself was widely known among those skilled in the art and that

FIPA routinely provided links to the FIPA specification on the website's home page. *See* Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9; Ex. 1051, 1; Ex. 1021, 1; Ex. 1025, 1. The November 1997 AgentWeb newsletter also provided direct links to FIPA 97 Version 1.0. Ex. 1086, 1–2. Under these circumstances, we find that a member of the interested public could have found FIPA 97 Version 1.0 without search tools or indexing by using the links in the AgentWeb newsletter or navigating to the well-known FIPA website home page. We also find that the record, including Dr. Finin's testimony, satisfactorily explains the various FIPA websites and website addresses over time and clearly identifies the FIPA website that was being used in late 1997. *See* Ex. 1049 ¶¶ 22–23, 48–49, 51.

Having determined that FIPA 97 Version 1.0 was publicly accessible on the FIPA website in late 1997, as early as October 10 and no later than November 18, we turn to whether Exhibits 1006–1012 (collectively referred to as FIPA97) contain the same version of the FIPA specification that was available on the FIPA website during that timeframe. Dr. Finin testifies that Exhibits 1006–1012, documents available on the current FIPA website (fipa.org) and identified as FIPA 97 Version 1.0, are the same version with the same content as Parts 1–7 of FIPA 97 Version 1.0 that were released at the FIPA Munich meeting on October 10, 1997, and were publicly available on the FIPA website (http://drogo.cselt.stet.it/fipa) in late 1997. Ex. 1049 ¶¶ 21, 34.

As an initial matter, the October 10, 1997, date on the cover pages of several parts of FIPA97 supports Dr. Finin's testimony that FIPA97 is the same as FIPA 97 Version 1.0 as published on the FIPA website in late 1997.

*See* Ex. 1006, Cover; Ex. 1007, Cover; Ex. 1008, Cover; Ex. 1010, Cover; Ex. 1012, Cover; *see also* Ex. 1009, Cover (Part 4 identifying a 1997 copyright date); Ex. 1011, Cover (Part 6 identifying a 1997 copyright date). Patent Owner contends that Petitioner cannot rely on the date stamps or copyright notices on Exhibits 1006–1012 to establish public accessibility because they are hearsay. PO Resp. 47; PO Sur-reply 23–25. We agree with Petitioner that Patent Owner has waived this argument because it did not raise an objection on evidentiary grounds pursuant to 37 C.F.R. § 42.64(b)(1). *See* Pet. Reply 18. Furthermore, we agree with Petitioner that the dates on the cover pages are not hearsay because they are evidence tending to show that FIPA97 is identical to FIPA 97 Version 1.0, not statements offered to show Exhibits 1006–1012 were published on a certain date. *See id.* (citing *Apple Inc. v. VirnetX Inc.*, IPR2016-01585, Paper 32 at 58 (PTAB Feb. 20, 2018)).

Patent Owner also argues that Petitioner cannot rely on the cover page dates alone as proof of the documents' public accessibility. PO Sur-reply 23. The date stamps, however, are only part of the totality of evidence offered by Petitioner to establish public accessibility. As such, they are relevant evidence supporting a finding that FIPA97 was publicly accessible. *See Hulu*, Paper 29 at 17–18 (citing *Nobel Biocare*, 903 F.3d at 1377).

Patent Owner argues that the existence of multiple versions of FIPA 97 Version 1.0 undercuts Petitioner's position and Dr. Finin's testimony that Exhibits 1006–1012 are the version of FIPA 97 Version 1.0 that was publicly accessible in late 1997. *See* PO Resp. 48–53; PO Sur-reply 27. For example, Patent Owner points to Dr. Finin's description of the

version released on October 10, 1997, as an "initial" version, after which final minor edits were to be made. PO Resp. 50 (citing Ex. 2068, 86:11–15, 88:9–89:25); *see* Ex. 1049 ¶ 21. Patent Owner cites an Internet Archive capture in the record referring to "FIPA 97 specification ver. 1.0 (Reston meeting)." PO Resp. 50–51 (citing Ex. 1105, 27). Patent Owner also cites evidence, including Dr. Finin's testimony, that a different version of FIPA 97 Version 1.0 was published in hardcopy books. *Id.* at 51 (citing Exs. 1055, 1056; Ex. 1049 ¶ 25 (stating that "FIPA printed the November 28, 1997, edited version of the specification" in the books)).

Patent Owner argues that because these various versions of FIPA 97 Version 1.0 have not been substantively introduced into evidence so that the differences can be ascertained, Petitioner has not shown that Exhibits 1006–1012 are the version that was publicly accessible on the FIPA website in late 1997. *See* PO Resp. 52–53. We disagree. Dr. Finin testifies that Exhibits 1006–1012 are the same documents that were released at the conclusion of the FIPA meeting in Munich on October 10, 1997, and were made publicly available at the time. Ex. 1049 ¶¶ 21, 34. Other evidence of record corroborates Dr. Finin's testimony and adequately explains the multiple versions of the specification. *See* Pet. Reply 17. As set forth in detail above, FIPA released a version of FIPA 97 Version 1.0 on October 10, 1997, and made it available on the FIPA website soon thereafter. *See* Ex. 1049 ¶ 21; Ex. 1086, 1–2; Ex. 1095, 22; Ex. 1096, 93. It is clear from the record that any earlier versions of the specification, such as the version made available after the Reston meeting six months before FIPA 97

Version 1.0, were drafts made available for public comment. *See* Pet. Reply 20–21; Ex. 1049 ¶¶ 16–18; Ex. 1024; Ex. 1061.

The record also shows that the version published in book form is a later version, dated November 28, 1997, containing minor formatting and clerical edits. *See* Ex. 1049 ¶ 25; Ex. 1055, 5. Petitioner does not rely on the book version as a prior art reference or assert that it was publicly accessible. *See* Pet. 23–24; Pet. Reply 21. The hardcopy book excerpts in the record merely corroborate Dr. Finin's testimony that FIPA's activities and release of the FIPA specification were known in the art. *See* Ex. 1049 ¶ 24.

Patent Owner also points to the erroneous header on odd pages in Exhibit 1006 as calling into question which version of the specification is in Exhibits 1006–1012. PO Resp. 52. We credit Dr. Finin's unrebutted testimony that the header on some pages in Exhibit 1006 is a typographical error. *See* Ex. 1049 ¶ 21. Patent Owner has not cited, nor do we see, evidence in the record suggesting a FIPA 97 Version 2.4 was made publicly available. *See* PO Resp. 52.

Patent Owner finds fault with Exhibits 1006–1012 because they were obtained after the critical date and could not have been obtained from a website prior to the critical date. *See* PO Resp. 61–62; PO Sur-reply 21. In his Declaration, Dr. Finin testifies that Exhibits 1006–1012 are available on the FIPA website today (i.e., fipa.org), and the earliest Internet Archive record of the relevant website pages shows the documents were posted in 2000. Ex. 1049 ¶ 21 (citing Ex. 1054). Patent Owner contends that in his deposition Dr. Finin acknowledged that Exhibits 1006–1012 could have

been obtained from files saved in the Internet Archive between 2003 and 2004. PO Resp. 47–48 (citing Ex. 2013, 93:12–94:2, 96:7–20). In either case, Patent Owner argues, the dates are after the critical date of the ’115 patent. *Id.* at 48; PO Sur-reply 22. We agree with Petitioner, however, that the date Exhibits 1006–1012 were obtained is immaterial if they are digital copies of documents that are shown to have been publicly accessible before the critical date. *See* Pet. Reply 19 (citing *In re Wyer*, 655 F.2d at 226–27).

Finally, Patent Owner argues that the testimony of Dr. Finin and Dr. Lieberman is conclusory, unreliable, and uncorroborated and therefore insufficient to establish public accessibility. PO Resp. 57–60; PO Sur-reply 20–23. “[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest.” *Nobel Biocare*, 903 F.3d at 1377–78 (quoting *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1369 (Fed. Cir. 1999)). This corroboration requirement applies when relying on witness testimony to establish public accessibility of a prior art reference. *See id.* at 1377–81; *Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158–60 (Fed. Cir. 2004). Corroborating evidence may include documentary or testimonial evidence, and circumstantial evidence may provide sufficient corroboration. *Nobel Biocare*, 903 F.3d at 1378. Determining whether testimony has been corroborated “involves an assessment of the totality of the circumstances including an evaluation of all pertinent evidence.” *Id.*

We are not persuaded by Patent Owner’s argument regarding the testimony of Dr. Finin and Dr. Lieberman. Dr. Finin’s testimony is based on

his personal knowledge as someone who was directly involved in FIPA's activities by submitting comments on draft specifications and attending meetings, for example, and providing independent advice as a FIPA Fellow. His testimony that FIPA approved FIPA 97 Version 1.0 at the Munich meeting on October 10, 1997, and posted it to the FIPA website so that it was publicly accessible is corroborated by the evidence in the record of the facts and circumstances surrounding the development and release of the specification as analyzed above. Dr. Lieberman's testimony that as a member of the interested public he accessed FIPA 97 Version 1.0 in late 1997 is corroborated by the same evidence.

As for Dr. Finin's testimony, based on his personal knowledge, that Exhibits 1006–1012 are the same as the version of FIPA 97 Version 1.0 that was publicly accessible on the FIPA website in late 1997, we find it to be credible and corroborated by other evidence of record. We are not persuaded that Dr. Finin's inability to recall many of the details of a 300-page specification more than twenty years after it was created undermines his testimony. *See* PO Resp. 58–60. Furthermore, we find that the evidence discussed above, including the identification of Exhibits 1006–1012 on their cover pages or elsewhere as FIPA 97 Version 1.0 with a date of October 10, 1997, corroborates Dr. Finin's testimony that the version of the specification in Exhibits 1006–1012 is the version that was publicly accessible on the FIPA website in late 1997, and not some other version of the FIPA specification.

For these reasons, we find that a preponderance of the evidence shows that Exhibits 1006–1012 are the version of FIPA 97 Version 1.0 released on

October 10, 1997, and posted on the FIPA website in late 1997. As discussed above, a preponderance of the evidence shows that the October 10, 1997 version of FIPA 97 Version 1.0 was publicly accessible in late 1997. Accordingly, we find that Petitioner has met is burden to show that FIPA97, submitted as Exhibits 1006–1012 and relied on by Petitioner in its unpatentability challenges, was publicly accessible prior to the critical date of January 5, 1999, and therefore is available as prior art to the ’115 patent under 35 U.S.C. § 102(a).

### *E. Prior Art Status of Kiss*

We next address the threshold issue of whether Kiss (Ex. 1005) qualifies as prior art in this proceeding. As indicated above, Petitioner relies on Kiss as a prior art reference in all of the asserted grounds of unpatentability presented in the Petition. *See* Pet. 3–4.

Petitioner has the burden of persuasion to prove unpatentability by a preponderance of the evidence. *Dynamic Drinkware, LLC v. Nat’l Graphics, Inc.*, 800 F.3d 1375, 1379 (Fed. Cir. 2015). Petitioner also has the initial burden of production to show that a reference is prior art to the challenged claims under a relevant section of 35 U.S.C. § 102. *See id.* Once Petitioner has met that initial burden, the burden of production shifts to Patent Owner to argue or produce evidence that the asserted reference is not prior art to the claims. *Id.* at 1380. Once Patent Owner has met that burden of production, the burden of production returns to Petitioner. *Id.*

The filing date of the ’115 patent is January 5, 1999. Ex. 1001, code (22). As noted above, Kiss is a United States patent that arose from an

application filed July 21, 1999, claiming the benefit of priority to a provisional application filed July 21, 1998. Ex. 1005, codes (22), (60).

Petitioner asserts that Kiss is prior art to the '115 patent under 35 U.S.C. § 102(e) because Kiss is entitled to the benefit of priority to the filing date of its provisional application (Ex. 1036, "Kiss Provisional Application"). Pet. 16–20. "A reference patent is only entitled to claim the benefit of the filing date of its provisional application if the disclosure of the provisional application provides support for the claims in the reference patent in compliance with § 112, ¶ 1." *Dynamic Drinkware*, 800 F.3d at 1381.

In *Ex parte Mann,* the Board held that "under *Dynamic Drinkware,* a non-provisional child can be entitled to the benefit of a provisional application's filing date if the provisional application provides sufficient support for *at least one claim* in the child." 2016 WL 7487271, at *6 (PTAB Dec. 21, 2016) (emphasis added) (discussing whether *Dynamic Drinkware* requires "support in the provisional . . . for all claims, any claim, or something in between"). In addition, the Board held that a "subject matter test" is also required—that is, "the [party claiming priority] also must show that the subject matter relied upon in the non-provisional is sufficiently supported in the provisional application [and that t]his subject matter test is in addition to the comparison of claims required by *Dynamic Drinkware*." *Id*. at *5.

Recognizing these requirements, Petitioner asserts that "each element of [claim 1 of Kiss] has written description support in the Kiss Provisional," providing detailed citations to the supporting disclosures from the Kiss

Provisional Application for each limitation of claim 1 of Kiss. Pet. 16–18. Addressing the "subject matter test," Petitioner asserts that "the teachings that Petitioner relies upon were carried forward from the Kiss Provisional to Kiss" and provides a detailed mapping of the relied-upon portions of Kiss to the corresponding portions of the Kiss Provisional Application. *Id.* at 18–20.

In the Institution Decision, we determined, based on the preliminary record, that Petitioner has presented sufficient argument and evidence to meet its initial burden of production on the issue of whether Kiss is entitled to the benefit of the filing date of the Kiss Provisional Application so as to shift the burden of production to Patent Owner to argue or produce evidence that Kiss is not prior art to the challenged claims. Inst. Dec. 25.

In its Preliminary Response, Patent Owner asserted that Kiss is not entitled to the priority date of its provisional application. Prelim. Resp. 66–67. In the Institution Decision, we determined, based on the preliminary record, the argument and evidence presented by Patent Owner was insufficient to shift the burden of production back to Petitioner. Inst. Dec. 25–27. We noted, however, a final determination on this particular issue will be made based on a full record developed during the course of trial. *Id.* at 27.

During the trial, Patent Owner did not present any argument or evidence on this issue, nor did it dispute Kiss qualifies as prior art in this proceeding. *See generally* PO Resp.

Based on the complete record, we determine that Petitioner has established by a preponderance of the evidence that Kiss is prior art to the

’115 patent under 35 U.S.C. § 102(e) because Kiss is entitled to the benefit of priority to the filing date of its provisional application.

### *F. Relevant Principles of Law*

To prevail in challenging Patent Owner’s claims, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). “In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable.” *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring inter partes review petitions to identify “with particularity . . . the evidence that supports the grounds for the challenge to each claim”)). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat’l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. *KSR Int’l Co. v. Teleflex Inc*., 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016). We analyze Petitioner's asserted grounds based on obviousness with the principles identified above in mind.

### *G. Objective Indicia of Nonobviousness*

Before determining whether a claim is obvious in light of the prior art, we consider any relevant evidence of secondary considerations of non-obviousness. *See Graham*, 383 U.S. at 17. Notwithstanding what the teachings of the prior art would have suggested to one of ordinary skill in the art at the time of the invention, the totality of the evidence submitted, including objective evidence of non-obviousness, may lead to a conclusion that the challenged claims would not have been obvious to one of ordinary skill. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984). Patent Owner presents evidence of two such considerations: (1) industry praise (PO Resp. 120–141) and (2) long-felt but unresolved need (*id.* at 141–145), both involving the software product called "Siri" from Apple Inc. For the reasons explained below, we determine that Patent Owner's proffered evidence of secondary considerations is not entitled much weight because Patent Owner does not establish a sufficient nexus between the evidence of non-obviousness and the challenged claims of the '115 patent.

"In order to accord substantial weight to secondary considerations in an obviousness analysis, the evidence of secondary considerations must have a nexus to the claims, i.e., there must be a legally and factually sufficient connection between the evidence and the patented invention." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (internal

quotations omitted). For instance, commercial success is relevant if it flows from the merits of the claimed invention. *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988).

A nexus is presumed when "the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). If the product is not coextensive with the claims at issue—for example, if the patented invention is only a component of the product—the patentee is not entitled to a presumption of nexus. *See id.* (citing *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). The burden of showing nexus is on Patent Owner. *See In re Huang*, 100 F.3d 135, 139–40 (Fed. Cir. 1996).

Patent Owner contends that objective indicia of nonobviousness confirm the nonobviousness of the '115 patent. PO Resp. 119–145. Patent Owner argues that industry praise for a software application known as "Siri," "which was first made available for download to iPhone users on Apple, Inc.'s App Store on February 4, 2010" (*id.* at 121), "bears a nexus to the claims of the '156 Patent" (*id.* at 141).[18] Patent Owner argues that industry praise for the "personal context awareness and service delegation 'technical components' of the Siri application are made possible by the [] claim limitations of independent claim 1 of the '115 Patent." *Id.* at 136.

---

[18] Although Patent Owner refers to the '156 Patent here, we assume this is a mistake and that Patent Owner actually meant to refer to the patent at issue in this proceeding, the '115 patent.

Patent Owner asserts that "[t]he '115 Patent was based on SRI International's development of version 2 of the Open Agent Architecture ('OAA')." *Id.* at 135 (citing Ex. 2032; Ex. 1001). For support, Patent Owner relies on Exhibit 2054, an SRI web page, which states, "SRI developed OAA® software, which is designed with intelligent 'agents' that track human interactions and work processes to streamline electronic and computer interchange." *Id.* (quoting Ex. 2054). Patent Owner further asserts that "[a]fter version 2 of OAA was developed, SRI International spun out Siri, Inc. as an SRI venture, where the Siri application was created based on an OAA groundwork." *Id.* (quoting Ex. 2054 ("OAA laid the groundwork for the DARPA-funded CALO project, from which Siri, the first virtual personal assistant, was born. Siri was spun out into an SRI venture that Apple acquired from SRI.")). Apple Inc. apparently acquired Siri, Inc. in April 2010, approximately two months after the Siri application's initial release.[19] *Id.* at 10, 121, 135.

Patent Owner asserts that "Petitioner proposed a combination of *Kiss* with *FIPA97*, which relies on *FIPA97* as teaching a common communications and protocol language that is combined with *Kiss*'s teachings of electronic agents and their general functions and operations." PO Resp. 134 (citing Paper 12, 45). Patent Owner argues a "nexus between the evidence of industry praise of the Siri application [] and the Challenged Claims can be shown if the industry praise has a nexus to the combination of these (allegedly) prior art features, *i.e.*, the teachings of electronic agents and

---

[19] We note for the record that the filing date for the '115 patent is Jan. 5, 1999, approximately ten years prior to the Siri application's initial release.

their general functions and operations in *Kiss* and the common communications protocol and language of *FIPA97*." *Id.* Patent Owner argues that its "evidence of industry praise [] satisfies the nexus requirement, as it shows praise for the Siri application's integration of personal context awareness into a service-delegating virtual personal assistant." *Id.* at 136; *see also id.* at 122–133. Patent Owner also argues that "industry journalists recognized that the Siri application filled an unmet need for a true virtual personal assistant." *Id.* at 141; *see also id.* at 141–145.

To establish a nexus between claim 1 of the '115 patent and the Siri application, Patent Owner provides the following chart. *Id.* at 136–138. Patent Owner relies, in significant part, on the opinion of its declarant, Dr. Medvidovic, to establish a nexus between the Siri application and the claims of the '115 patent. *See* Ex. 2032 ¶¶ 205–229, App. A, 1–32.

| **Siri's Description of Technology Feature** | **Claim 1 of the '115 Patent** |
|---|---|
| **Personal Context Awareness**<br>A virtual assistant gives different answers depending on individual preferences and personal context (place, time, history), and if you give it permission, learns more about you so that it can shorten your time-to-task. Information you teach Siri in one domain (e.g. movies) is applied automatically to opportunities rising from other domains. Any personal | "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language, wherein the inter-agent language includes:<br>a layer of conversational protocol defined by event types and parameter lists associated with one or more of the |

| | |
|---|---|
| information you provide Siri is stored in a highly secure, PCI-compliant co-location center, and used only with your explicit permission to accelerate your task completion. | events, wherein the parameter lists further refine the one or more events; a content layer comprising one or more of goals, triggers and data elements associated with the events;" |
| **Service Delegation** An assistant can reason about what specific set of resources or services would best be combined to help you accomplish a particular task. Siri's patented service delegation algorithms combine numerous attributes about each service provider, including quality scores, fine-grained ratings for specific capabilities, speed measures, and geographic constraints, to plan and execute an optimized strategy for handling your request. Live data is pulled fresh from source sites and world-changing actions are handled in a transaction-safe manner. For example, in a restaurant selection task, Siri integrates information from many sources (local business directories, geospatial databases, restaurant guides, restaurant review sources, | "A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents, comprising the acts of: . . . receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrary complex goal expression; dynamically interpreting the arbitrarily complex goal expression, said act of interpreting further comprising: generating one or more sub-goals expressed in the inter-agent language; constructing a goal satisfaction plan wherein the goal satisfaction plan includes: a suitable delegation of sub-goal requests to best complete the requested |

| | |
|---|---|
| menu sites, online reservation services and the user's own favorites) to show results that meet the user's natural language request. | service request-by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and<br>dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent." |

Patent Owner argues that "the Siri application's integration of personal context awareness is made possible because of the claimed inter-agent language limitations." PO Resp. 138 (citing Ex. 2032 ¶ 222). Patent Owner explains that "[b]y having a layer of conversational protocol that has parameter lists, the '115 Patent describes how agents can then use the parameters in the parameter lists to provide feedback or advice to agents who directly, or indirectly through the facilitating agent, receive the service request." Resp. 138. For example, Patent Owner explains that a "requesting agent can utilize such a parameter to provide context on a user's preference to the facilitator agent and/or the tasking agents. *Id.* at 139 (citing Ex. 2032 ¶ 224). Patent Owner argues that "[t]his same functionality of being able to include individual preferences, for example, was described by Siri, Inc. as representing personal context awareness." *Id.* at 140 (citing Ex. 2040, 2).

Patent Owner also argues that:

> the Siri application's service delegation corresponds to the claimed dynamic interpretation limitations. Siri, Inc. described the service delegation feature of the Siri application as including "an assistant [that] can reason about what specific set of resources or services would best be combined to help you accomplish a particular task." This is precisely what is claimed in the dynamic interpretation limitations, e.g., "constructing a goal satisfaction plan . . . [including] a suitable delegation of sub-goal requests to best complete the requested service request-by using reasoning."

*Id.* (citing Ex. 2032 ¶ 221).

Petitioner argues that Patent Owner's "secondary considerations position rests primarily on an unsubstantiated, conclusory opinion that certain aspects of the '115 Patent are embodied in the Apple product 'Siri.'" Pet. Reply 82. Petitioner argues that as "Dr. Medvidovic conceded, the evidence he relied on is 'circumstantial,' or a 'suggestion.'" *Id.* (citing Ex. 1129, 147:12–15). Petitioner argues that Dr. Medvidovic "never reviewed the Siri source code, (Ex. 1129, 146:20–147:6), and indeed never even asked to review that source code (Ex. 1129, 147:22–148:9)." Pet. Reply 82–83. Petitioner argues,

> [t]he failure to review the code is fatal, because [Dr. Medvidovic] further testified that an "agent"—an element in every claim—is a "piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer **a clearly identifiable body of code,"** and that to distinguish an "agent" from any other software he "**would have to look inside the code**."

*Id.* at 83 (quoting Ex. 1129, 9:14–11:8).

Petitioner faults Patent Owner for not "not seek[ing] that code through a motion for additional discovery or other means, nor did [Petitioner] seek

any other objective evidence (such as specifications) to support its assertions." Pet. Reply 83. Petitioner also faults Patent Owner for not seeking the testimony of Mr. Adam Cheyer, one of the named co-inventor's on the '115 patent and a co-founder of Siri, Inc., on this topic, even though Mr. Cheyer's testimony was apparently obtained in a related proceeding. *Id.* at 83–84 (citing Ex. 2034, 58:15–63:16; Ex. 1127); *see also id.* at 121. During the Oral Hearing in this proceeding, counsel for Patent Owner was asked about this potential source of evidence:

> JUDGE TROCK: Counsel, this is Judge Trock again. Do you have any evidence from Mr. Cheyer that this Siri version that you're discussing right now incorporated the claim limitations of the '115 patent?
>
> MS. ABDULLAH: Your Honor, we do not have any direct evidence from Mr. Cheyer. And the reason is because he was never deposed in this proceeding and he is also not a consultant or anybody that's working with IPA at the moment. I know --
>
> JUDGE TROCK: Wasn't he deposed -- sorry. Wasn't he deposed in the Google proceeding?
>
> MS. ABDULLAH: He was, your Honor. And that was pursuant to a subpoena that we had to get permission to serve from the Board because he

refused to simply cooperate with us voluntarily.

JUDGE TROCK: Was there a reason why you didn't approach the Board in this case for a subpoena?

MS. ABDULLAH: Your Honor, because we don't believe that his testimony is as probative as the expert testimony that we presented drawing the direct connection as well as the actual industry praise and long-felt need evidence that we --

JUDGE TROCK: But wouldn't he be a witness with personal knowledge of whether or not that original Siri version incorporated the claim limitations of the '115 patent?

MS. ABDULLAH: Your Honor, respectfully, I believe that that was not -- that would not be a question of personal knowledge but rather of expert testimony. And also, your Honor, I would note that I don't believe that we would have the requisite showing under the Garmin factors that he would be able to testify to those aspects.

JUDGE TROCK: But he is the inventor, right? You've told us that.

MS. ABDULLAH: Yes, your Honor, he is the inventor.

TROCK: All right. So he might be a

person -- a witness with personal knowledge; isn't that right?
MS. ABDULLAH: Absolutely. And were this a district court case, you know, I'm sure we would have pursued his deposition. I'm sure Microsoft would have as well. But given the high burden for us to obtain additional discovery, your Honor, we determined that the probative value of his testimony was not such that it would meet the Garmin factors here.
JUDGE TROCK: But you did pursue that in the Google case though?
MS. ABDULLAH: Your Honor, the Google case was a different issue. The question there had to do with authorship of a prior art reference that Mr. Cheyer was an author of. And it had to do with whether that could be considered the work of another versus the inventor. So inventorship was front and center in the Google proceedings where it is not here. Here this is a 103 analysis for which, you know, obviously I can't pretend to say what the Board would have done. But I think the evidence that we have, that we have been able to present demonstrates that link better than Mr. Cheyer's testimony would be able to.

Tr. 114:12–116:26.

Petitioner also points to evidence that potentially undermines a nexus between the challenged claims of the ’115 patent and the Siri application. For example, Petitioner argues that “Adam Cheyer testified that ‘Siri’ did not implement the agent registry functionality described in the ’115 Patent.” Pet. Reply 84 (citing Ex. 2034, 46:12-47:5). Likewise, Petitioner argues, “an email authored by Adam Cheyer indicates that as of August 2005 OAAv2 had only been adapted to run on ‘Windows CE’ mobile devices—there is no mention of iOS, Apple, or any other mobile platforms.” *Id.* (citing Ex. 1137).

Petitioner also argues that Patent Owner’s “evidence credits the CALO project with being the progenitor of the ideas that led to Siri—not any version of OAA.” Pet. Reply 84 (citing Ex. 2042, 1 (“Siri traces its origins to a military-funded artificial-intelligence project called CALO”); Ex. 2044, 1; Ex. 2047, 2; Ex. 2054, 1; Ex. 2001, 2). “Nor is there any evidence in the record,” Petitioner argues, “that OAA was ultimately utilized in SRI’s CALO project other than that the original OAA (*i.e.,* the version first created in 1994 prior to the ’115 Patent work) laid ‘groundwork’ for what would ultimately become CALO.” *Id.* (citing Ex. 2054). Petitioner argues that “substantial evidence shows that a later agent system named “SPARK” (SRI Procedural Agent Realization Kit) was used as the basis of CALO,” but that Patent Owner “ignores this intervening SPARK system and makes no attempt to show it practices the claims, nor does it meaningfully address the CALO project.” *Id.* at 85 (citing Ex. 1136 §7).

Petitioner argues that Patent Owner "failed to provide evidence 'that the industry praised a claimed invention or a product that embodies the patent claims.'" Pet. Reply 85 (quoting *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016) (emphasis omitted). In particular, Petitioner argues, Patent Owner "failed to 'establish that the evidence relied upon traces its basis to a novel element in the claim and not to something in the prior art.'" *Id.* (quoting *BioMarin Pharm. Inc. v. Genzyme Therapeutic Prods. LP*, IPR2013-00537, Paper 79, 22 (PTAB Feb. 23, 2015) (emphasis omitted).

"Furthermore," Petitioner argues, Patent Owner "has provided no showing that the Siri App 'embodies the claimed features and is co-extensive with them,' and accordingly can gain no presumption from any Siri success." Pet. Reply 85–86 (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018) (emphasis omitted). "Even assuming portions of Siri embodied the claims," Petitioner argues, "the record is undisputed that Siri provides significant functionality well beyond anything covered by the claims—voice recognition, for example." *Id.* at 86.

Petitioner further argues "the table provided by [Patent Owner] merely lists unrelated claim language and 'examples' of 'personal context awareness' with no further analysis." Pet. Reply 87. "For example," Petitioner argues, Patent Owner "provides no explanation about how the alleged 'Personal Context Awareness' feature in Siri practices 'a layer of conversational protocol.'" *Id.* Moreover, Petitioner argues, "despite claiming that 'the Siri application's integration of personal context awareness is made possible because of the claimed inter-agent language

limitations,' [Patent Owner] provides no evidence. [Patent Owner] cites only to a single paragraph of the Medvidovic Declaration, which is itself bare *ipse dixit* and further undermined by his failure to examine the source code or any other descriptive technical materials for Siri." *Id.* at 88 (citing Ex. 2032 ¶ 222).

Petitioner argues that Patent Owner's evidence that Siri embodies the ICL limitations of claim 1 "is no better." Pet. Reply 88 (citing PO Resp. 140). Petitioner argues Patent Owner:

> does not discuss the actual limitations of claim 1 nor explain how giving different answers depending on individual preferences embodies the claims. For example, [Patent Owner] does not even attempt to articulate how Siri has a conversational layer, or event types, or how those event types are refined by parameters. Nor does [Patent Owner] address how Siri embodies the claimed agent registry limitation, particularly when the testimony of the inventor Mr. Cheyer indicates that it does not.

*Id.* (citing Ex. 2034, 46:12–47:5).

Petitioner argues that Dr. Medvidovic's testimony should be given no weight. Pet. Reply 89. Petitioner argues that:

> Dr. Medvidovic admitted that he would be unable to determine whether a piece of software was an "agent" without examining the source code for that software, and further admitted that he had not reviewed the Siri source code nor ever asked to review such source code. Ex. 1129, 11:9–16. Yet, Dr. Medvidovic opines at length that Siri must embody the claims of the '115 Patent because, for example, "personal context awareness and service delegations are made possible by the functionality claimed in the independent claims of the '115 Patent"—an opinion without any evidentiary support. Ex. 2032 ¶ 220. Indeed, by Dr. Medvidovic's own admission, he lacks the necessary personal knowledge to opine on the architecture of Siri.

*Id.*

In its Sur-reply, Patent Owner argues that there is "no prohibition against the use of circumstantial evidence in IPR proceedings." PO Sur-reply 66. Patent Owner argues, "Dr. Medvidovic provided unrebutted testimony, including a lengthy appendix, supported by this evidence, which must be credited. *Id.* at 68 (citing Ex. 2032, §§ 205-229, App. A). Patent Owner also points out that "Dr. Medvidovic testified that looking at the code is not the exclusive means of identifying an agent – other available information can be utilized." *Id.* at 69; *see* Ex. 1129, 10:14–11:16. Moreover, Patent Owner argues, "under the *Garmin* factors, Patent Owner was unable to seek Apple's highly confidential source code in connection with these proceedings." *Id.* at 70 (citing *Garmin Int'l, Inc. v. Cuozzo Speed Techs., LLC,* IPR2012-00001, Paper 26 at 6–7 (PTAB Mar. 5, 2013). With respect to Mr. Cheyer's testimony, Patent Owner explains that "Patent Owner was only able to depose Mr. Cheyer after the Board granted Patent Owner's motion under 37 C.F.R. § 42.52(a) for leave to serve a subpoena to compel Mr. Cheyer to testify" in a related proceeding. *Id.* at 71.

We agree with Petitioner that Patent Owner does not to provide persuasive evidence that the Siri application is reasonably commensurate with the scope of the challenged claims. Patent Owner's cited evidence attempting to tie the Siri application to the limitations of claim 1 relies substantially on the testimony of Dr. Medvidovic (Ex. 2032) and a web.archive.org Internet page (Ex. 2040) Patent Owner identifies as "Siri, Inc., Technology – "About Siri – Your Virtual Personal Assistant." *See* PO Resp. 136–140 (citing Ex. 2032 ¶¶ 216–222, 224; Ex. 2040).

We note at the outset that Dr. Medvidovic's opinion does not rely on an examination of the Siri application's source code. During his deposition, Dr. Medvidovic testified as follows:

> [Q] Let me ask you, have you ever reviewed the Siri source code?
>
> [A] I have not.
>
> [Q] So you don't know the details of how Siri is implemented?
>
> [A] Not beyond what I'm stating in the declaration as my sources of information that I'm drawing on.

Ex. 1129, 146:10–17. This is significant because Dr. Medvidovic testified at his deposition that an "agent"—an element in every claim—is a "piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer a clearly identifiable body of code," and that "if there is no accompanying specification language, then we would have to look inside the code [to determine] what kinds of facilities the agent provides." *See* Ex. 1129, 9:13–11:8). As far as we can determine, neither party has provided "accompanying specification language" for the Siri application source code. Instead, Dr. Medvidovic testified, the evidence he relied upon to form his opinion is "circumstantial," or a "suggestion." *See* Ex. 1129, 147:7–148:9.

In Section XI.B of his Declaration, "Nexus of Industry Praise to the Independent Claims of the '115 Patent," Dr. Medvidovic cites to Exhibit 2040 as support for his understanding of how the Siri application works. *See e.g.,* Ex. 2032 ¶¶ 215–216, 218, 226, 229.

Exhibit 2040 describes "Siri" as:

> the first mainstream consumer application of a Virtual Personal Assistant. Siri is an intelligent software agent designed to have

> a back-and-forth conversational interaction with you as it helps you get tasks done. The three main technical components behind Siri's differentiation correspond to the essential qualities of an assistant: a conversational interface, personal context awareness and service delegation.

Ex. 2040, 1.

In his Declaration, Dr. Medvidovic discusses the "personal context awareness" and "service delegation" aspects of Siri in some detail (s*ee, e.g.,* Ex. 2032 ¶¶ 216–220, 222–229). Dr. Medvidovic, however, only mentions Siri's "conversational interface" in passing, even though Exhibit 2040 describes Siri as an intelligent software agent "designed to have a back-and-forth conversational interaction with you as it helps you get tasks done," and lists Siri's "conversational interface" as the first of Siri's "three main technical components." *See* Ex. 2032 ¶ 215; Ex. 2040, 1.

In his Declaration, Dr. Medvidovic attempts to link the Siri application and the limitations of the independent claims of the '115 patent. *See* Ex. 2032 ¶¶ 205–229, App. A, 1–32. Dr. Medvidovic does this by first separating the limitations of independent claims 1 and 29 into two categories, an "Inter-agent Communication Layer" (ICL) and "Service Request Planning and Execution." *See* Ex. 2032, 70–71. Dr. Medvidovic then states that "[i]t is my opinion that the Siri application's integration of personal context awareness is made possible because of the claimed ICL." *Id.* ¶ 222. Dr. Medvidovic explains that "within the conversational protocol layer of the ICL, there are further claimed "parameter lists" that may "further refine the one or more events." *Id.* ¶ 223. Dr. Medvidovic concludes that "[t]he claimed parameter lists are what allows the Siri application to provide 'different answers' depending on the context, as they

are able to refine the meaning of a service request." *Id.* ¶ 226. Dr. Medvidovic, however, provides no citation or further support for this conclusion nor does he point to any evidence to show that the Siri application utilizes the claimed parameter lists. *See id.*

In his Declaration, Dr. Medvidovic also states that "[i]t is further my opinion that the Siri application's integration of service delegation is made possible because of the claimed service request planning and execution claim limitations." *Id.* ¶ 227. Dr. Medvidovic attempts to support this opinion by comparing the language of claim 1 relating to a goal satisfaction plan that includes "a suitable delegation of sub-goal requests to best complete the requested service request by using reasoning" to language used in Exhibit 2040 to describe the service delegation feature of the Siri application, "Service Delegation. An assistant can reason about what specific sets of resources of services would best be combined to help you accomplish a particular task." *See id.* ¶ 229; Ex. 2040, 2.

In our view, such a comparison is speculative at best to demonstrate that the Siri application utilizes claim 1's "service request planning and execution limitations," as Dr. Medvidovic opines. The limitations of claim 1 that Dr. Medvidovic puts in this category include:

> A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents, comprising the acts of:
>
> registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities,
>
> receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrary complex goal expression;

> dynamically interpreting the arbitrarily complex goal expression, said act of interpreting further comprising:
>
> generating one or more sub-goals expressed in the inter-agent language;
>
> constructing a goal satisfaction plan wherein the goal satisfaction plan includes:
>
> a suitable delegation of sub-goal requests to best complete the requested service request-by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and
>
> dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent.

Ex. 2032, 70. Yet, Dr. Medvidovic does not persuasively show that the Siri application "register[s] a description of each active client agent's functional capabilities," "receiv[es] a request for service . . . in the form of an arbitrary complex goal expression," "generat[es] one or more sub-goals expressed in the inter-agent language," "construct[s] a goal satisfaction plan," or "dispatch[es] each of the sub-goals to a selected client agent . . . based on a match between the sub-goal . . . and the registered functional capabilities of the selected client agent." *See id.* ¶¶ 227–229.

In fact, as Petitioner points out, there is evidence of record that the Siri application did not utilize the claimed agent registry functionality as Dr. Medvidovic opines. According to Petitioner, Mr. Cheyer, the named co-inventor on the '115 patent and the co-founder of Siri, Inc., "testified that 'Siri' did not implement the agent registry functionality described in the

’115 Patent.” Pet. Reply 84 (citing Ex. 2034, 46:12-47:5). At a deposition in a related proceeding, Mr. Cheyer testified as follows:

> [Q] So you say "it's likely." Are there features in OAA that you think have yet to be implemented in systems today?
>
> [A] Yes.
>
> [Q] Could you describe those?
>
> [A] Every system is different, but one feature of the original OAA 1 demo was that independent agents -- today we would call them more like web services -- could connect dynamically to the -- to the platform, register new capabilities with that platform, and without knowing about other services on the network, explicitly, the user could make a single request that would be -- that would involve a collaboration, and sometimes competition, among those network ecosystem of services. And so one user request would be delegated to many services which were independently developed, and none of those services knew precisely about each other. And that when I look at Siri and Google Assistant and Alexa and Bixby, that is not a capability that I have seen in any of the services today.

Ex. 2034, 45:25–46:2, 46:12–47:5.

Petitioner also points out, and we agree, that there is evidence of record that credits the CALO project with being the progenitor of the ideas that led to Siri. *See, e.g.*, Ex. 2042, 1 (“Siri traces its origins to a military-funded artificial-intelligence project called CALO”); *see also* Ex. 2044, 1; Ex. 2047, 2; Ex. 2054, 1; Ex. 2001, 2). Opus Research explains that “Siri is

set apart because it applies the depth of knowledge its founders and software specialists have built at SRI and elsewhere in creating a "cognitive assistant that learns and organizes" (CALO). Ex. 2044, 1. Petitioner points out that there is also evidence of record that indicates a later agent system named "SPARK" (SRI Procedural Agent Realization Kit) was used as the basis of CALO. *See* Ex. 1136 § 7. The SPARK-based Personal Assistant is described as follows:

> SPARK provides general-purpose agent technology for a range of domains that require reactive task execution. To date, the driving application for SPARK has been the development of an intelligent personal assistant for a high-level knowledge worker. This assistant, called CALO, will be able to perform routine tasks on behalf of its user (e.g., arrange meetings, complete online forms, file email), as well as undertake open-ended processes (e.g., purchasing a computer online), and anticipate future needs of its user.

Ex. 1136 § 7. This evidence, however, does not appear to have been considered or addressed by Dr. Medvidovic. *See* Ex. 2032 ¶¶ 205–229.

We are mindful that objective evidence of nonobviousness need only be "reasonably commensurate with the scope of the claims." *Rambus Inc. v. Rea,* 731 F.3d 1248, 1257 (Fed. Cir. 2013). We also bear in mind that "[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process—the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold." *Demaco Corp.*, 851 F.2d at 1392.

Here, Patent Owner relies on industry praise for the Siri application and evidence of an unmet need to establish a nexus between the Siri

application and the claimed invention. However, we are concerned that Patent Owner and its declarant, Dr. Medvidovic, pay little attention to one of the "three main technical components behind Siri's differentiation," the "conversational interface," when evaluating the basis for the proffered "industry praise." *See* Ex. 2040, 1.

Petitioner argues, and we agree, that "[e]ven assuming portions of Siri embodied the claims, the record is undisputed that Siri provides significant functionality well beyond anything covered by the claims—voice recognition, for example." Pet. Reply 86. The impact of Siri's "conversational interface" on Siri's reviewers is notable. For example, MIT Technology Review explains that with Siri, "[u]sers can type or speak commands in casual sentences, and the software deciphers their intent from the context." Ex. 2042, 1. Opus Research reports that "I've had [Siri] for a couple of days and here are my initial reactions. My overall experience has been quite positive. The quality of voice recognition (powered by the same 'engine' that supports Dragon Dictation and Dragon Search on the iPhone) is quite good." Ex. 2044, 1. Fast Company.Com reports, "Siri, which launches today as a free iPhone app, is a virtual personal assistant that amazingly resembles . . . an actual personal assistant. It understands plain English commands, which can be spoken or typed (e.g. 'Get me tickets to that Matt Damon movie')." Ex. 2045, 2.

Further, The Chronicle of Higher Education explains that Siri "takes a multi-step search process and turns it into one, simple, voice-driven request." Ex. 2046, 2. USA Today reported that "[t]here were occasional mistakes in speech recognition, but the overall accuracy [of Siri] was

impressive, at least when I spoke slowly and clearly in a quiet environment." Ex. 2047, 2. Spatial Computing Strategy & Research reports that, with Siri, "You ask it to do stuff like 'find me a pizza place near me' or 'tell me the weather in Chicago this weekend,' [w]ith your voice or by typing commands." Ex. 2048, 2. Search Engine Land explains that Siri is "intended to enable you to do more with your voice and your phone in fewer clicks or moves." "[O]ne can speak to Siri in a more natural way. Rather than speaking like a robot and saying 'Open Table' to minimize error, you can say something more elaborate and 'conversational' such as, 'I'd like a reservation tonight around 7:30 at Le Cheval.'" Ex. 2050.

Each of these reported examples indicate that the reviews Patent Owner relies upon to demonstrate "industry praise" for the Siri application considered Siri's conversational interface to be a significant part of its functionality. Patent Owner and Dr. Medvidovic, however, give Siri's "conversational interface" little, if any, consideration when evaluating the reasons for the "industry praise" used to try and establish a nexus between the Siri application and the claimed invention. *See, e.g.,* Ex. 2032 ¶ 215. Even if the Siri application incorporated some of the functionality of the claimed invention, the evidence of record relied on by Patent Owner shows that the Siri application, and its attendant "industry praise," is not reasonably commensurate with the scope of the claimed invention. Patent Owner does not argue that the Siri application's "conversational interface" is claimed by the '115 patent.

For these reasons and based on the complete record, we determine that Patent Owner's proffered evidence of industry praise for the Siri application

and evidence of a long felt unresolved need does not establish a sufficient nexus between the Siri application and the challenged claims of the ’115 patent. In the absence of an established nexus with the claimed invention, secondary consideration factors are not entitled to much, if any, weight and generally have little bearing on the legal issue of obviousness. *See In re Vamco Mach. & Tool, Inc.*, 752 F.2d 1564, 1577 (Fed. Cir. 1985).

### *H. Obviousness over Kiss and FIPA97*

In this asserted ground of obviousness, Petitioner contends that claims 1, 4–10, 15, 29–32, and 38 of the ’115 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss and FIPA97. Pet. 32–75.

#### *1. Proposed Combination of Kiss and FIPA97; Reason to Combine*

In its proposed combination of Kiss with FIPA97, Petitioner relies on Kiss as teaching electronic agents and their general functions and operations, including agent collaboration, agent registry, and inter-agent messaging. Pet. 28. Petitioner acknowledges, however, Kiss does not disclose an inter-agent communication language and relies on FIPA97 to teach a common communications protocol and language (FIPA ACL), which is combined with the teachings of Kiss to provide a communication language for inter-agent communication between the agents of Kiss. *Id.* Petitioner explains that “[FIPA97’s] techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging.” *Id.* (citing Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1). Petitioner asserts that “[w]here the two systems disclose analogous

functionality, such as facilitating cooperation and agent registry, their techniques are combined, as a Skilled Artisan would understand that to be an efficient and common sense way to implement the combined system in order to obtain the benefits of both, and therefore be motivated to do so." *Id.* (citing Ex. 1003 ¶¶ 217–219).

Petitioner argues the proposed combination of Kiss and FIPA97 would have been obvious for several reasons. Petitioner argues Kiss, FIPA97, and the '115 patent are analogous art, because "each is directed to the same field of endeavor, *i.e.*, distributed computing environments generally and architectures for communication and cooperation among distributed electronic agents specifically." Pet. 28–29 (citing *e.g.*, Ex. 1001, 1:25–29; Ex. 1005, Abstract; Ex. 1007, Foreword, 1; Ex. 1003 ¶ 220). Petitioner also argues, "FIPA97 and Kiss are reasonably pertinent to the problem addressed by the '115 Patent—*e.g.*, the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 29 (citing Ex. 1001, 4:34–40; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1003 ¶ 221).

Petitioner argues,

> [i]t would have been obvious to make this combination because to do so would have been the arrangement of old elements (*i.e.*, the functionality of FIPA97, and the system of Kiss) with each performing the same function it had been known to perform (communication between distributed agents (FIPA97v1)); cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate to conduct cooperative task completion and problem solving).

Pet. 29 (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1003 ¶ 222).

Petitioner also argues it

> would have been obvious because a Skilled Artisan would have known that agents, such as in Kiss, must use a common communications protocol, i.e., an inter-agent communication language, and related management functionality, and therefore would have been motivated to consider and employ one of the available inter-agent communications languages and its related functionality, and because doing so would have been a convenient and efficient way to facilitate effective communication between agents.

Pet. 29–30 (citing Ex. 1003 ¶ 223; Ex. 1020, 2; Ex. 1046, 50).

Petitioner further argues,

> [a] Skilled Artisan would also have been motivated based on earlier descriptions of KQML's similar use of an inter-agent communication language, their disclosure that '[t]here are several levels at which agent-based systems must agree, at least in their interfaces, in order to successfully interoperate: Transport … Language … Policy … Architecture,' and their disclosure of the necessity of a robust inter-agent communication language in a system like Kiss.

Pet. 30 (citing Ex. 1016, Abstract, 4, 29, 30; Ex. 1006, 7; Ex. 1007, 40–42; Ex. 1005, Abstract; Ex. 1003 ¶¶ 224–226).

Petitioner argues it "would also have been obvious to try this combination because the necessity of a common inter-agent communication language was a known design need in a system such as Kiss, and there were only a small number of identified, predictable solutions to that need, such as FIPA ACL." Pet. 30 (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1035, 1; Ex. 1003 ¶ 227).

Petitioner also argues,

> [a] Skilled Artisan would have been further motivated to make the combination because of the known advantages of FIPA97,

> including that it specifies, "key agents necessary for the management of an agent system, the ontology necessary for the interaction between systems, and it defines also the transport level of the protocols."

*Id.* at 30–31 (citing Ex. 1035, 1; Ex. 1003 ¶ 229).

Further, Petitioner argues:

> a Skilled Artisan would have been motivated to make the combination because FIPA97 represented a substantial attempt to formulate an industry standard designed to encourage interoperability and uniformity amongst agent systems. A Skilled Artisan would have understood that agent systems that complied with such a standard would be more likely to be interoperable with other systems and would likely have more resources available.

*Id.* at 31 (citing Ex. 1007, vii; Ex. 1047; Ex. 1003 ¶ 230).

Petitioner argues, "[a] Skilled Artisan would have been further motivated to include the administrative functionality and exemplary practices described in FIPA97 with Kiss because the description of such functionality and practices in FIPA97 suggests that their use with the FIPA ACL would be advantageous and workable." Pet. 31. Petitioner also argues, "[a] Skilled Artisan would also have been motivated to employ such additional functionality and practices in the combined system in order to obtain the full benefit of using FIPA ACL." *Id.* (citing Ex. 1003 ¶ 231).

Finally, Petitioner argues, "a Skilled Artisan could have made the combination cited above without undue experimentation including because by January 1999 the components parts of this combination were well-known, conventional technology and because others had combined FIPA97v1 technology with agent systems." Pet. 31 (citing Ex. 1007; Ex. 1016; Ex. 1030; Ex. 1003 ¶ 228).

Patent Owner asserts that "Petitioner utterly defaults in offering any reason to combine *Kiss* and *FIPA97*." PO Resp. 116. Patent Owner argues that Petitioner's motivation to combine Kiss and FIPA97 suffers from "hindsight bias" and that Petitioner "offers no reason or explanation that a person of skill in the art looking at *Kiss* would be motivated to find a particular language with the characteristics of *FIPA97's* ACL." *Id.* Patent Owner also argues that Petitioner does not "explain what 'efficiencies' a person of ordinary skill in the art would be looking for" and "fails to identify how the combination could be achieved." *Id.* at 116–117.[20]

In the Reply, Petitioner argues that Patent Owner "ignores the several pages of analysis supported by expert testimony (including citations to evidence in the prior art) articulating the rational underpinning of the combination" of Kiss and FIPA97. Pet. Reply 30 (citing Pet. 28–32). Petitioner argues that "while there was no requirement to show that a Skilled Artisan would search for 'a particular language with the characteristics of FIPA97's ACL,'" (PO Resp. 116), the Petition does explain that "agents, such as in Kiss, must use a common communications protocol," so a Skilled Artisan "would have been motivated to 'employ one of the available inter-agent communications languages . . . because doing so would have been a convenient and efficient way to facilitate effective communication between agents.'" Pet. Reply 30–31 (citing Pet. 29–30; Ex. 1003 ¶ 223).

---

[20] We need not address the parties' dispute over the motivation to combine Kiss's meta-agent and FIPA97 directory facilitator (*see, e.g.*, PO Resp. 79–85; Pet. Reply 40–46) because whether the combination of Kiss and FIPA97 teaches the claimed "facilitator agent" is not at issue for this Final Written Decision.

Petitioner also argues that Patent Owner's criticism that "Petitioner fails to identify how the combination could be achieved," (PO Resp. 117), is "legally irrelevant" (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981), and "also ignores the detailed description in the Petition (supported by Dr. Lieberman) that demonstrates how the combination would work." Pet. Reply 31 (citing Pet. 28–32; Ex. 1003 ¶¶ 217–219; Ex. 1005, Figs. 4–6, 21 (annotated)). Petitioner points out that:

> [t]he Petition explains, for example, that FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system, as described with specificity below. These techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging, (Ex. 1005, 3:32–36, 3:67-4:1, 6:67–7:1), as well adding functionality that is disclosed in FIPA97.

Pet. Reply 34.

In its Sur-reply, Patent Owner argues that Petitioner's evidence of a motivation to combine are simply "[p]ages of boilerplate language" or exhibit "*ex post* reasoning colored by hindsight." PO Sur-reply 58, 62. Patent Owner argues that the FIPA97 and Kiss protocols are "different" and "mutually exclusive" and that "Petitioner offers no argument or evidence relating to how these completely different components would be reconciled." *Id.* at 59–61. Patent Owner argues that FIPA97 "discouraged interoperability between different and incompatible systems." *Id.* at 61.

Patent Owner also argues that "[t]he Board must disregard" portions of Petitioner's Reply, which discuss "a series of four figures from Dr. Lieberman's declaration," "because it constitutes new argument." *Id.* at 63.

Patent Owner argues that "the Petition must contain a 'full statement of the reasons for the relief requested'" and "cannot simply incorporate by reference its expert's declaration." *Id.* (citing 37 C.F.R § 42.6(a)(3)).

In identifying a reason that would have prompted a person of ordinary skill in the relevant field to combine the prior art teachings, the Petitioner "must show some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). A reason to combine teachings from the prior art "may be found in explicit or implicit teachings within the references themselves, from the ordinary knowledge of those skilled in the art, or from the nature of the problem to be solved." *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (*citing In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998)).

Here, Petitioner explains that:

> FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system, as described with specificity below. These techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging, Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1, as well adding functionality that is disclosed in FIPA97. Where the two systems disclose analogous functionality, such as facilitating cooperation and agent registry, their techniques are combined, as a Skilled Artisan would understand that to be an efficient and common sense way to implement the combined system in order to obtain the benefits of both, and therefore be motivated to do so.

Pet. 28 (citing Ex. 1003 ¶¶ 217–219).

Petitioner provides persuasive evidence that Kiss and FIPA97 are analogous art because "each is directed to the same field of endeavor, *i.e.*, distributed computing environments generally and architectures for communication and cooperation among distributed electronic agents specifically." Pet. 29 (citing Ex. 1001, 1:25–29; Ex. 1005, Abstract; Ex. 1007, Foreword, 1; Ex. 1003 ¶ 220). Petitioner also provides persuasive evidence that FIPA97 and Kiss "are reasonably pertinent to the problem addressed by the 115 Patent—*e.g.*, the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 29 (citing Ex. 1001, 4:34–40; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1003 ¶ 221).

Petitioner argues persuasively that

> [i]t would have been obvious to make this combination because to do so would have been the arrangement of old elements (*i.e.*, the functionality of FIPA97, and the system of Kiss) with each performing the same function it had been known to perform (communication between distributed agents (FIPA97v1)); cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate to conduct cooperative task completion and problem solving).

Pet. 29 (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1003 ¶ 222).

Petitioner also argues, and we agree, that it

> would have been obvious because a Skilled Artisan would have known that agents, such as in Kiss, must use a common communications protocol, i.e., an inter-agent communication language, and related management functionality, Ex. 1020, 2; Ex. 1046, 50, and therefore would have been motivated to consider and employ one of the available inter-agent communications languages and its related functionality, and

> because doing so would have been a convenient and efficient way to facilitate effective communication between agents.

Pet. 29–30 (citing Ex. 1003 ¶ 223).

Petitioner goes on to argue that "a Skilled Artisan would also have been motivated based on earlier descriptions of KQML's similar use of an inter-agent communication language," (citing Ex. 1016, Abstract) and their disclosure that "[t]here are several levels at which agent-based systems must agree, at least in their interfaces, in order to successfully interoperate: Transport … Language … Policy … Architecture," (citing Ex. 1016, 4, 29, 30) as well as their disclosure of "the necessity of a robust inter-agent communication language in a system like Kiss." Pet. 30 (citing Ex. 1006, 7; Ex. 1007, 41, 4-–42; Ex. 1005, Abstract; Ex. 1003 ¶¶ 224–226).

Petitioner further argues that "[s]uch a combination would also have been obvious to try this combination because the necessity of a common inter-agent communication language was a known design need in a system such as Kiss," (citing Ex. 1020, 2; Ex. 1046, 50) and there were only a small number of identified, predictable solutions to that need, such as FIPA ACL." Pet. 30 (citing Ex. 1035, 1; Ex. 1003 ¶ 227).

Petitioner goes on to argue that a "Skilled Artisan" would also have been motivated to combine FIPA97 and Kiss in the manner described in the Petition "because of the known advantages of FIPA97, including that it specifies, 'key agents necessary for the management of an agent system, the ontology necessary for the interaction between systems, and it defines also the transport level of the protocols'" (citing Ex. 1035, 1; Ex. 1003 ¶ 229), and "because FIPA97 represented a substantial attempt to formulate an

industry standard designed to encourage interoperability and uniformity amongst agent systems." Pet. 30–31 (citing Ex. 1007, vii; Ex. 1047).

Petitioner also explains that:

> [a] Skilled Artisan would have been further motivated to include the administrative functionality and exemplary practices described in FIPA97 with Kiss because the description of such functionality and practices in FIPA97 suggests that their use with the FIPA ACL would be advantageous and workable. A Skilled Artisan would also have been motivated to employ such additional functionality and practices in the combined system in order to obtain the full benefit of using FIPA ACL.

Pet. 31 (citing Ex. 1003 ¶ 231).

In light of the reasons and the explanations Petitioner provides that would have motivated a person of ordinary skill in the art to combine the teachings of FIPA97 and Kiss in the manner Petitioner describes, Patent Owner's argument that "Petitioner utterly defaults in offering *any reason* to combine *Kiss* and *FIPA97*" (*see* PO Resp. 116) (emphasis added), is directly contrary to the evidence of record and is unpersuasive.

Patent Owner also argues that Petitioner "offers no reason or explanation that a person of skill in the art looking at *Kiss* would be motivated to find a particular language with the characteristics of FIPA97's ACL." *Id.* at 116. Patent Owner's argument, however, is misplaced. The test for obviousness is not whether a person of ordinary skill in the art "looking at *Kiss* would be motivated to find a particular language with the characteristics of FIPA97's ACL." Rather, "[u]nder the correct [obviousness] analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for

combining the elements in the manner claimed." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007).

Here, Petitioner provides persuasive evidence and argument that FIPA97 and Kiss "are reasonably pertinent to the problem addressed by the 115 Patent—*e.g.,* the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 29 (citing Ex. 1001, 4:34–40; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1003 ¶ 221). This evidence includes the '115 patent's observation that:

> [a]gent-based systems have shown much promise for flexible, fault-tolerant, distributed problem solving. Several agent-based projects have helped to evolve the notion of facilitation. However, existing agent-based technologies and architectures are typically very limited in the extent to which agents can specify complex goals or influence the strategies used by the facilitator.

Ex. 1001, 4:34–40, as well as Kiss' observation that "a need exists for a knowledge management system for dynamic, distributed problem-solving systems. Ex. 1005, 2:39–40. Indeed, Dr. Lieberman notes that the FIPA97 specification "defines a language and supporting tools, such as protocols, to be used by intelligent software agents to communicate with each other," and that "the terms used and the mechanisms used [by FIPA97] support such a higher-level, often *task based*, view of interaction and communication." Ex. 1003 ¶ 221. This evidence support's Petitioner's position that a person of ordinary skill in the art at the time of the claimed invention would have combined FIPA97 and Kiss in the manner described in the Petition to provide a flexible, fault-tolerant, distributed problem solving system using agent-based technologies.

Finally, addressing Patent Owner argument that Petitioner's motivation to combine Kiss and FIPA97 suffers from "hindsight bias" (PO Resp. 116), we note that "[a]ny judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper." *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971).

Here, Petitioner provides persuasive evidence that a person of ordinary skill in the art at the time of the invention would have been motivated to combine FIPA97's communications protocol and inter-agent communication language (FIPA ACL) between the agents of Kiss, adding its administrative functionality and practices to the Kiss system. *See, e.g.*, Pet. 28–32; Ex. 1003 ¶¶ 217–232. This is not evidence of hindsight bias. Patent Owner does not identify, and we do discern, any particular knowledge used by Petitioner in its combination of FIPA97 and Kiss that was gleaned from the '115 patent's disclosure and was not within the level of ordinary skill in the art at the time of the invention.

Based on the complete record, we find that Petitioner has shown persuasively by a preponderance of the evidence that one of ordinary skill in the art at the time of the invention would have been motivated to combine the teachings of FIPA97 and Kiss in the manner proffered by Petitioner.

*2. Discussion of Independent Claim 1 —
Differences Between the Claimed Subject Matter and the Prior Art*

Claim 1 is directed to a method for communication and cooperative task completion among distributed electronic agents comprising the steps of registering a description of each active client agent's functional capabilities using an inter-agent language, receiving a request for service as a base goal in the form of an arbitrarily complex goal expression in the inter-agent language, and dynamically interpreting the arbitrarily complex goal expression. Ex. 1001, 29:10–43. Claim 1 also recites that the "inter-agent language" includes a "layer of conversational protocol" and a "content layer." *Id.* at 29:16–24. In addition, claim 1 recites that the step of "dynamically interpreting the arbitrarily complex goal expression" comprises "generating sub-goals" and "constructing a goal satisfaction plan." *Id.* at 29:28–32. The recited "goal satisfaction plan" in turn includes "a suitable delegation of sub-goal requests" and "dispatching each of the sub-goals to a selected client agent for performance." *Id.* at 29:32–41.

As discussed above, in its proposed combination of Kiss with FIPA97, Petitioner relies on Kiss to teach electronic agents and their general communication and collaboration functions, including the steps recited in claim 1, whereas FIPA97 is relied upon to teach the recited "inter-agent language" and the limitations relating to the inter-agent language, such as "layer of conversational protocol," a "content layer," an "arbitrarily complex goal expression," and "sub-goals expressed in the inter-agent language." Pet. 28, 32–54. Patent Owner argues that the proposed combination of Kiss and FIPA97 does not teach the "goal satisfaction plan" recited in the claim. PO Resp. 85–92. Patent Owner also asserts that FIPA97 does not teach the

"inter-agent language" (or Interagent Communication Language (ICL)) and related limitations. *Id.* at 95–108. In what follows, we analyze the recitations of claim 1 in more detail, addressing Petitioner's contentions and, where applicable, Patent Owner's responsive arguments.

*a. Preamble*

Claim 1 recites a preamble as follows: "A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents."[21] Petitioner asserts that Kiss teaches the recited "distributed electronic agents" because Kiss describes that "[i]nteraction between a user and the knowledge resources is mediated by a collection of cooperative intelligent agents" (Pet. 32 (citing Ex. 1005, 2:43–49, Fig. 1)), where the agents are "distributed" in a "hierarchical architecture." *Id.* (citing Ex. 1005, Abstract, 2:50–55, 4:57–59).

Petitioner contends that Kiss also teaches the recited "communication and cooperative task completion" among the electronic agents because Kiss describes that "cooperative intelligent agents [that] incorporate generalized automated negotiation and distributed inference (i.e. problem-solving) processes," analyze "problem statements," and reorganize them as "sets of tasks." Pet. 33 (citing Ex. 1005, 2:50–55).

Patent Owner does not specifically dispute that Kiss teaches the preamble of claim 1. *See generally* PO Resp. Based on the complete record

[21] Because Petitioner has shown that the recitations in the preamble is satisfied by Kiss, we need not determine whether the preamble is limiting. *See Vivid Techs.*, 200 F.3d at 803.

and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches the preamble of claim 1.[22]

*b. Registering a Description*

The first step recited in claim 1 is "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities." Ex. 1001, 29:13–15. Petitioner asserts that Kiss teaches this limitation because Kiss describes a "registry of agents," which is constructed through "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities." Pet. 34 (citing Ex. 1005, 3:37–45, 6:66–7:19, 8:41–48, 10:32–35, 12:18–20, Fig. 1).

Patent Owner does not specifically dispute that Kiss teaches this "registering a description" limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities," as recited in claim 1.[23]

---

[22] We also find that Patent Owner has waived any argument directed to the preamble of claim 1. *See* Paper 16 (Scheduling Order), 7 ("Patent Owner is cautioned that any arguments for patentability not raised in the response may be deemed waived.").

[23] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

*c. An Inter-agent Language Including a Layer of Conversational Protocol and a Content Layer*

Claim 1 recites that "registering a description of each active client agent's functional capabilities" is performed using an "expandable, platform-independent, inter-agent language" (Ex. 1001, 29:13–16) and that the "inter-agent language" includes:

> a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events;
>
> a content layer comprising one or more of goals, triggers and data elements associated with the events.

*Id.* at 29:16–24. Petitioner asserts that FIPA97's ACL teaches each of these limitations relating to an "inter-agent language." Pet. 34–43.

Patent Owner asserts that FIPA97 does not teach "refin[ing] . . . events" and "triggers" recited in the claim. PO Resp. 97–108. In addition, Patent Owner argues that FIPA ACL is not "expandable" because, among other reasons, FIPA ACL does not have the capability of refining events. *Id.* at 105–106. Patent Owner does not dispute FIPA97 teaches the rest of the limitations relating to an "inter-agent language" recited in clam 1, as set forth above. *See id.* at 95–108.

*(i) Inter-agent Language*

Petitioner relies on Agent Communication Language of FIPA97 (FIPA ACL) as teaching the "inter-agent language" recited in claim 1. Pet. 28 (citing Exs. 1006, 1007, 1008), 35. In particular, Petitioner contends that FIPA97 discloses Agent Communication Language (ACL) "with

precisely defined syntax, semantics and pragmatics" for "communication between independently designed and developed software agents." *Id.* at 35 (citing Ex. 1007, 3).

*(ii) Platform-independent, Expandable Inter-agent Language*

Petitioner asserts that FIPA ACL is "platform-independent," as recited in claim 1, because it is designed to "maximise interoperability across agent-based applications, services and equipment," and to facilitate the "construction and management of an agent system composed of different agents," even when those systems are "built by different developers." Pet. 35 (citing Ex. 1007, vii, ix). Patent Owner does not dispute that FIPA ACL is "platform-independent," as recited in the claim. *See* PO Resp. 95–108.

Petitioner also contends that FIPA ACL is "expandable," as recited in claim 1, because in FIPA97 "[a]gents may use communicative acts with other names, not defined" in the specification (Pet. 35 (citing Ex. 1007, 12)) and agents "may choose to implement any subset (including all, though this is unlikely) of the pre-defined message types and protocols" (*id.* (citing Ex. 1007, 12)). In addition, Petitioner asserts that in FIPA97 the "formal basis" of the language is "supplemented with pragmatic extensions" that help "ease the practical implementation of effective inter-agent communications." *Id.* (citing Ex. 1007, 11). Petitioner argues that FIPA97 also discloses possible extensions to the inter-agent communication language, such as MIME header support. *Id.* (citing Ex. 1007, 82).

Patent Owner asserts that FIPA ACL is not "expandable" basically for two reasons. PO Resp. 105–106. First, citing the prosecution history, Patent

Owner argues that "the concept of expandability" relates to the feature of "refin[ing] . . . events" recited in the claim and that FIPA ACL is not "expandable" because FIPA ACL does not have the capability of refining events. *Id.* Second, Patent Owner contends that FIPA ACL is not "expandable" in a general sense, citing various criticism of FIPA ACL from "[r]esearchers in the field" regarding FIPA ACL's alleged rigidity and inflexibility in certain aspects. *Id.* at 106. We address each of these arguments in turn.

Addressing first Patent Owner's argument about "the concept of expandability" as it relates to the feature of "refin[ing] . . . events" recited in the claim, Patent Owner cites the following statement by the Examiner in the Notice of Allowability:

> The disclosed agent communication language [KQML] does not read upon the cited agent language because the layer does not define an event type as well as the parameter lists that further *refines the event*. Nwana's language at best has separate layers for the event and the parameters associated with the event. By Applicant providing these parameters in the same layer as the event such that they further *refine the event*, a standard set of events are *dynamically extensible* based upon the parameter list which is not possible with the teachings of Nwana. Therefore, the claims are allowable over the prior art of record.

Ex. 1002, 14 (emphases added); PO Resp. 105 (citing Ex. 1002, 14). As indicated in the Amendment submitted before the allowance of the claims, claim 1 was amended to recite "wherein the parameter lists further refine the one or more events" to distinguish the claim from the combination of Nwana/KQML and Kiss cited by the Examiner. *See* Ex. 1002, 13–14, 18, 28, 51. Patent Owner argues, therefore, that the limitation "expandable"

recited in claim 1 relates to the feature of the parameter lists that "refine . . . events," as recited in the claim. PO Resp. 105. Patent Owner asserts that FIPA ACL is not "expandable," as recited, because FIPA ACL does not teach parameters that further refine events. *Id.*

In response, Petitioner asserts that the claim language "*using an **expandable**, platform-independent, inter-agent language*" was part of the originally filed claims, which were rejected by the Examiner over the combination of Nwana/KQML and Kiss. Pet. Reply 59–60 (citing Ex. 1002, 763). Petitioner argues that, therefore, the Examiner's discussion of "dynamically extensible" events resulting from the "refin[ing] . . . events" feature added in the Amendment is unrelated to the "expandable" language that was present in the claim as originally filed. *Id.* at 60. Petitioner also asserts that, even if the "expandable" language relates to the "refin[ing] . . . events" feature, FIPA ACL is "expandable" because FIPA ACL teaches parameter lists that refine events. *Id.*

We need not determine whether the "expandable" language relates to the "refin[ing] . . . events" feature added in the Amendment because, as discussed below, we agree with Petitioner that FIPA ACL teaches "parameter lists" that "further refine the one or more events," as recited in claim 1. Thus, to the extent Patent Owner asserts that the limitation "expandable" recited in claim 1 relates to the feature of the parameter lists "refin[ing] . . . events," Petitioner demonstrates sufficiently that FIPA ACL teaches an "expandable . . . inter-agent language."

Turning to the Specification, the '115 patent describes that "[a]s new agents connect to the facilitator, *registering* capability specifications and

natural language vocabulary, what the user can say and do *dynamically changes*; in other words, the ICL is dynamically *expandable*." Ex. 1001, 8:41–44 (emphases added). That is, the '115 patent suggests that the expandability of the ICL (or "inter-agent language," as recited in claim 1) results from or flows from the ICL's feature of "registering capability specifications and natural language vocabulary."[24] *Id.* As noted in the Institution Decision, this portion of the Specification appears to describe an exemplary embodiment. Inst. Dec. 54 (citing Ex. 1001, 8:40–49).

As discussed above, Petitioner demonstrates sufficiently Kiss teaches "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities," as recited in claim 1. Thus, to the extent the portion of the Specification discussed above describes an embodiment of an "expandable . . . inter-agent language," we are persuaded that the combination of Kiss and FIPA97 teaches "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language," as recited in claim 1 (*see* Pet. 33–35).

Next, Patent Owner asserts that FIPA ACL is not "expandable" in a more general sense, citing various "criticisms" from "[r]esearchers in the field" about FIPA ACL's alleged "rigidity and lack of expandability." PO Resp. 106 (citing Ex. 2031, 2 ("[i]t is unlikely that a single set of axioms

---

[24] As described in the Specification, agents connecting to the facilitator is part of the operation of the system of the '115 patent, not a feature of the ICL. *See* Ex. 1001, 6:24–44; 7:13–32.

will cover all eventualities because communication is inherently context dependent"); Ex. 1081, 2 ("[T]he current FIPA-ACL spec tends to unnecessarily over-constrain the feasibility of communication acts . . . ."). Patent Owner also contends that Petitioner's declarants, Dr. Finin and Dr. Lieberman, made allegedly similar statements. *Id.* (citing Ex. 1082, 2 ("The FIPA proposal only covers the most rudimentary message types."); Ex. 2014, 207:5–20 ("FIPA is a standard, like a miles-per-gallon standard . . . So that doesn't say how you're going to build a car; it just says a car has to get . . . 50 miles a gallon.")).

We are not persuaded by Patent Owner's argument and evidence because Patent Owner does not explain adequately why the cited extrinsic evidence regarding FIPA ACL's alleged "rigidity" or inflexibility in certain aspects shows that FIPA ACL is not "expandable" as recited in the claim. In the Institution Decision, based on the preliminary record, we did not find anything in the intrinsic record that justifies deviating from the plain meaning of the claim term "expandable." Inst. Dec. 54–55. Upon considering the complete record, we discern no reason to depart from our preliminary assessment.[25]

We may "at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing

---

[25] In the Patent Owner Response, Patent Owner does not discuss the Specification or argue that the meaning of "expandable" recited in the claim can be discerned from the Specification, although we invited the parties in the Institution Decision to address the term "expandable" further in their papers during trial. *See* PO Resp. 105–107 (citing Inst. Dec. 55–56). Thus, Patent Owner has waived its argument regarding the meaning of "expandable" based on any disclosures in the Specification. *See* Paper 16, 7.

claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Phillips*, 415 F.3d at 1322–23 (citation omitted). Accordingly, in the Institution Decision, finding no readily discernable meaning of "expandable" in the intrinsic record, we consulted a technical dictionary, the 7th edition of the IEEE Dictionary (Ex. 3001).[26] The IEEE Dictionary defines "expandability" as follows: "**expandability (1) (supervisory control, data acquisition, and automatic control)** The capability of a system to be increased in capacity or provided with additional functions. **(2)** *See also:* extendability." Ex. 3001, 3.[27] The same dictionary defines "extensible language" as follows.

> A computer language that can be altered or can alter itself to provide a programmer with additional user-specified functions or capabilities. Examples include Ada, ALGOL, FORTH, and LOGO, because each can be used in a building block fashion to construct increasingly complex functions.

*Id.* at 4. Upon considering the complete record, we determine that these dictionary definitions are consistent with the intrinsic record, including the description of an embodiment in the Specification regarding "the ICL [being] dynamically expandable." *See* Ex. 1001, 8:41–44.

In the Institution Decision, based on the preliminary record, we found that the characteristics of FIPA ACL argued by Petitioner—such as the

---

[26] IEEE 100 THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS (7th ed. 2000) (Ex. 3001).

[27] The page numbers for Exhibit 3001 refer to the page numbers inserted in the bottom, right-hand corner of each page.

ability to use communicative acts with other names not defined in the language specification, the pragmatic extensions, and the MIME extension—appear to fall within the plain meaning of the term "expandable," as defined in the IEEE Dictionary. Inst. Dec. 55; *see* Pet. 35 (citing Ex. 1007, 11, 12, 82). Patent Owner does not argue otherwise. *See* PO Resp. 105–107. Based on the complete record and for the reasons discussed above, we determine that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language," as recited in claim 1.

*(iii) A Layer of Conversational Protocol Defined by Event Types and Parameter Lists Associated With the Events*

Claim 1 recites that the "inter-agent language" includes "a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events." Ex. 1001, 29:16–21. Petitioner contends that FIPA97 teaches each of these limitations. Pet. 36–41. Patent Owner asserts that FIPA97 does not teach "the parameter lists further refine the one or more events," as recited in claim 1. PO Resp. 97–107.

(1) A Layer of Conversational Protocol

Petitioner asserts that FIPA97 teaches "a layer of conversational protocol" recited in claim 1 because FIPA ACL "defines the semantics of *messages* between agents as including a communicative act, followed by various parameters and parameter expressions," as shown in Figure 1 of

Part 2 of FIPA97 reproduced above in the Overview of FIPA97 section (§ III.C.2.). Pet. 36 (emphasis added) (citing Ex. 1007, 2; Ex. 1003 ¶ 235). Petitioner also argues that FIPA97 "discloses a number of different performatives and rules governing FIPA ACL messages and the meaning of the different parts" and, therefore, discloses "a layer of conversational protocol." *Id.* at 36–37 (citing Ex. 1007, 11–22; Ex. 1003 ¶¶ 236–239).

(2) Events and Event Types

As discussed above in Section III.B. (Claim Construction), we construe "event" to mean "a message or goal communicated between agents" and "event type" to mean "a type of an event" for this Final Written Decision.

Petitioner maps the "event" of claim 1 to FIPA ACL's "message" and asserts that FIPA ACL's "message type" teaches an "event type" recited in claim 1. Pet. 37–38 (citing Ex. 1007, 3, 4, 11–13, 18; Ex. 1003 ¶¶ 243, 246, 247). Petitioner argues that FIPA ACL's "message" is an "event" recited in claim 1 because the FIPA ACL communicative acts "are performed by an agent sending a *message* to another agent." *Id.* at 37 (emphasis added) (citing Ex. 1007, 3, 4, 11; Ex. 1003 ¶ 243).

Referencing Figure 1 of Part 2 of FIPA97 reproduced above, Petitioner asserts that in FIPA ACL, "[t]he first element of the message is a word which identifies the communicative act being communicated, which defines the principal meaning of the message," and "the message's communicative act *type* corresponds to that which in KQML is called the performative." Pet. 37 (emphasis added) (citing Ex. 1007, 12, 13; Ex. 1007 ¶ 244). Petitioner argues that FIPA97 further defines "message type" as

corresponding to the "communicative acts/performatives of the FIPA ACL." *Id.* at 38 (citing Ex. 1007, 18; Ex. 1003 ¶ 246).

As discussed above, Petitioner asserts that FIPA97 teaches "a layer of conversational protocol" because FIPA ACL "defines the *semantics of messages* between agents as including a communicative act." Pet. 36 (emphasis added) (citing Ex. 1007, 12). Petitioner contends that FIPA97 teaches the layer of conversational protocol in FIPA ACL is "defined by event types," as recited in claim 1, because in FIPA97, "**[t]he <u>message types</u> are a reference to <u>the semantic acts</u> defined in this specification**." *Id.* at 37–38 (underlined emphases added) (citing Ex. 1007, 11).

(3) <u>Parameter Lists</u>

Claim 1 recites that "a layer of conversational protocol" is also "defined by . . . parameter lists associated with one or more of the events." Petitioner asserts that in FIPA97, FIPA ACL messages may include multiple different parameters ("parameter lists associated with one or more of the events") that can "help the message transport service to deliver the message correctly" or "the receiver to interpret the meaning of the message," or "to respond co-operatively," as shown in Figure 1 of Part 2 of FIPA97 (reproduced above). Pet. 38–39 (citing Ex. 1007, 12, 14, Fig. 1). Petitioner contends that FIPA97 discloses additional parameters in Table 1. *Id.* at 39 (citing Ex. 1007, 13–14).

(4) <u>Refining Events</u>

Claim 1 recites that "the parameter lists further refine the one or more events." Petitioner asserts that this phrase should be construed to mean that

"a list of parameters associated with an event can refine the event by affecting the meaning of the event." Pet. 13. Petitioner discusses the disclosures in the Specification and the prosecution history of the '115 patent in support of its proposed construction. *Id.* at 13–16 (citing Ex. 1001, 11:2–37; Ex. 1002, 13–14, 51, 55; Ex. 1020, 5, 6; Ex. 1003 ¶¶ 90, 91, 93–98).

Although Patent Owner discusses constructions for six terms in the Patent Owner Response, Patent Owner does not discuss Petitioner's proposed construction for the claim term "refine . . . events" or propose its own construction. *See* PO Resp. 24–38. Instead, Patent Owner argues that FIPA97 does not teach parameters that "refine . . . events" under Petitioner's proposed construction. *See* PO Resp. 97–98 ("the cited parameters in FIPA97 do not, contrary to Petitioner's assertion, affect the meaning of the message"), 100 ("this parameter **does not** affect the **meaning** of the message"), 102 ("In contrast, the FIPA97 "receiver" parameter **does not affect the meaning of the "inform" communicative act**."). Based on the arguments and evidence presented by Patent Owner, we understand Patent Owner not to dispute Petitioner's proposed construction for the term "the parameter lists further refine the one or more events."[28]

Upon considering the complete record, we agree with Petitioner that the claim term "refine . . . events" encompasses "affecting the meaning of the events." As discussed above, during prosecution, the limitation "wherein the parameter lists further refine the one or more events" was added to

[28] We also find that Patent Owner has waived any argument regarding claim construction of this term. *See* Paper 16, 7.

claim 1 in an amendment to distinguish the claim from the combination of Nwana/KQML and Kiss cited by the Examiner. *See* Ex. 1002, 13–14, 18, 28, 51; Pet. 14–16 (citing Ex. 1002, 13–14, 51); PO Resp. 105 (citing Ex. 1002, 14). Citing the disclosures of Nwana/KQML discussed by the Examiner, Petitioner persuasively argues that the parameters of Nwana's KQML message (i.e., the claimed "event") "tell" do not change the meaning of the message, whereas the parameters of an event of the '115 patent's change the meaning of the event by "refin[ing] the event." Pet. 14–16 (citing Ex. 1002, 13–14, 51, 55; Ex. 1020, 5, 6). In support of its argument, Petitioner cites the following passage from the Specification that distinguishes the '115 patent's ICL (i.e., the recited "inter-agent language") from KQML.

> For example, in KQML, a request to satisfy a query can employ either of the performatives ask_all or ask_one. In ICL, on the other hand, this type of request preferably is expressed **by the event type evost solve, together with the solution_limit(N) parameter--where N can be any positive integer**. (A request for all solutions is indicated by the omission of the solution limit parameter.) [The request can also be accompanied by other parameters, which combine to <u>further refine</u> its semantics.] In KQML, then, this example forces one to choose between two possible conversational options, neither of which may be precisely what is desired. In either case, the performative chosen is a single value that must capture the entire conversational characterization of the communication.

Pet. 13 (alteration and underlined emphasis added) (quoting Ex. 1001, 11:21–37). Petitioner argues that a message having the KQML performative "ask_all" always has the same meaning, requesting all solutions to the request, just as the KQML performative "ask_one" always requests one

solution. *Id.* at 14. According to Petitioner, in contrast, the meaning of the '115 patent's event "evost_solve" depends on the value of its parameter "solution_limit(N)"—e.g., an agent may request the identity of three agents capable of translating a document by including "solution_limit(N)" in the message and setting the value of N to 3. *Id.* Thus, Petitioner argues that the parameters of an event of the '115 patent affect the meaning of the event. *Id.* at 13–16.

We are persuaded by Petitioner's argument and evidence that the "parameterized approach" of the '115 patent (Ex. 1001, 11:16–21) can refine an event by changing the meaning of the event. As discussed above in Section III.B., we construe "event" to mean "a message or goal communicated between agents" and "goal" to mean "a request for service." The '115 patent describes that "[i]n one embodiment, a request for one of an agent's services normally arrives in the form of an *event* from the agent's facilitator." *Id.* at 12:44–46 (emphasis added). In a section titled "Refining Service Requests," the '115 patent describes as follows:

> In a preferred embodiment of the present invention, *parameters* associated with a goal (or sub-goal) can draw on useful features to *refine the request's meaning*. For example, it is frequently preferred to be able to specify whether or not solutions are to be returned synchronously; this is done using the reply parameter, which can take any of the values synchronous, asynchronous, or none. As another example, when the goal is a non-compound query of a data solvable, the cache parameter may preferably be used to request local caching of the facts associated with that solvable.

*Id.* at 15:49–58 (emphases added). Thus, the ’115 patent describes that in an embodiment, parameters of a request for service, i.e., an event, can refine the “meaning” of the request or event.

Nonetheless, we note that this passage and all of the disclosures of the ’115 patent cited by Petitioner describe exemplary embodiments. *See id.* at 11:25–28 (“In ICL . . . this type of request *preferably* is expressed by the event type evost solve, together with the solution_limit(N) parameter--where N can be any positive integer.” (emphasis added)), 15:49–51 (“In a *preferred embodiment* of the present invention, *parameters* associated with a goal (or sub-goal) can draw on useful features to *refine the request’s meaning*.” (emphases added)). Thus, the term “refine . . . events” recited in claim 1 may encompass but is not necessarily limited to “affecting the meaning of events.” *See SuperGuide*, 358 F.3d at 875 (“a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment”); *WesternGeco*, 889 F.3d at 1323–24 (“It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise.”). Indeed, Petitioner’s proposed construction of the term “the parameter lists further refine the one or more events” expresses the meaning of the term in a permissive fashion—“an event *can* refine the event by affecting the meaning of the event.” Pet. 13 (emphasis added).

Based on the complete record, we determine that the term “the parameter lists further refine the one or more events” encompasses parameters “affecting the meaning of the events.”

Petitioner asserts that FIPA97 teaches the limitation "the parameter lists further refine the one or more events" because several of the conversational layer parameters disclosed in FIPA97 affect the meaning of the performative included within the message, and therefore affect the meaning of the message, or event. Pet. 40. According to Petitioner, FIPA97 discloses a parameter ":receiver," which "can alter the meaning [of] an event, such as 'inform,' to be 'inform one'" or "inform a number' of agents, depending on the value of the parameter." *Id.* (citing Ex. 1007, 13). Citing the testimony of Dr. Lieberman, Petitioner asserts that naming a tuple "corresponds to the action of multicasting the message" such that "semantics of this multicast" is refined so that "the message is sent to each agent named in the tuple." *Id.* (citing Ex. 1007, 13; Ex. 1003 ¶ 258). Petitioner also argues, "[t]his 'tuple naming' functionality is analogous to the example provided in the '115 Patent of 'solution_limit(N),' in which 'N' modifies how many solutions are requested, and is not found in the KQML Nwana reference that was before the examiner." *Id.* (citing Ex. 1001, 11:16–42; Ex. 1020; Ex. 1003 ¶ 258). Petitioner also asserts that FIPA97 discloses two other parameters—":protocol" when used with the "call for proposals" performative and ":conversation-id"—that affect the meaning of a message. *Id.* at 40–41 (citing Ex. 1007, 13–14, 46–49; Ex. 1003 ¶¶ 261–265).

Patent Owner asserts that FIPA97 does not teach parameters "refin[ing] . . . events," as recited in the claim, because the parameters of FIPA97 cited by Petitioner does not affect the meaning of the message. PO Resp. 97–98. In particular, Patent Owner contends that FIPA97's ":receiver" parameter of the FIPA97 "inform" message relied upon by

Petitioner is no different from KQML's ":receiver" parameter for the KQML "tell" message in that both modify the message but do not affect the meaning of the message. *Id.* at 98–99 (citing Ex. 1007, 12; Ex. 1020, 5). Patent Owner asserts that FIPA97's ":receiver" parameter does not affect the meaning of the FIPA97 "inform" message because "the result of this parameter is only that the message is multicast; i.e., it is 'sent to each agent named in the tuple.'" *Id.* at 100. According to Patent Owner, "the content of the message is unchanged; the only thing that changes is who (as in, recipient) receives the message." *Id.* at 101.

The portion of FIPA97 cited by Petitioner is reproduced below.

| **Message Parameter:** | **Meaning:** |
|---|---|
| :sender | Denotes the identity of the sender of the message, i.e. the name of the agent of the communicative act. |
| :receiver | Denotes the identity of the intended recipient of the message.<br><br>Note that the recipient may be a single agent name, or a tuple of agent names. This corresponds to the action of multicasting the message. Pragmatically, the semantics of this multicast is that the message is sent to each agent named in the tuple, and that the sender intends each of them to be recipient of the CA encoded in the message. For example, if an agent performs an inform act with a tuple of three agents as receiver, it denotes that the sender intends each of these agent to come to believe the content of the message. |

Ex. 1007, 13. Pointing to this disclosure in FIPA97, Petitioner asserts that the "receiver" parameter affects the meaning of the event by affecting "whether the performative communicates the message to a single agent, a selection of agents, or if [the message is] broadcast to every agent." Pet. Reply 56 (citing Ex. 1007, 13). According to Petitioner, "in FIPA97, an

event using 'inform' can *mean three or more different things* (i.e., inform (1) one person, (2) a select group of people, (3) everybody) depending on the value of just that parameter." *Id.*

We agree with Petitioner's argument and disagree with Patent Owner's argument. As shown above in the portion of FIPA97 relied on by Petitioner, FIPA97 describes the "meaning" of the message affected by the ":receiver" parameter (under the column heading "Meaning:") as follows:

> Note that the recipient may be a single agent name, or a tuple of agent names. This corresponds to the action of multicasting the message. Pragmatically, the semantics of this multicast is that the message is sent to each agent named in the tuple, and that the sender *intends* each of them to be recipient of the CA encoded in the message. For example, if an agent performs an inform act with a tuple of three agents as receiver, it denotes that the sender *intends* each of these agent to come to believe the content of the message.

Ex. 1007, 13 (emphases added). We agree with Petitioner this passage describes, under the column heading "Meaning," the meaning of the message modified or affected by the ":receiver" parameter.

Patent Owner argues that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." PO Resp. 101. Patent Owner contends that, in contrast, the solution_limit(N) parameter of the '115 patent "modifies the actual request/communicative act/performative itself—i.e., **evost solve**, because it imposes a modification on the limits of **solutions** presented in response to a request." *Id.* at 102 (citing Ex. 2032 ¶161).

We are not persuaded by Patent Owner's argument. First, we disagree with Patent Owner that the FIPA97 ":receiver" parameter changes only

"who (as in, recipient) receives the message." As described in FIPA97, the ":receiver" parameter does not merely specify "who receives the message," e.g., agent A as opposed agent B. Rather, as persuasively explained by Petitioner, the ":receiver" parameter affects the qualitative aspect of the message—i.e., whether to inform (1) one agent, (2) a select group of agents, or (3) every known agent. *See* Pet. Reply 56.

In addition, Patent Owner does not explain adequately why the solution_limit(N) parameter of the '115 patent specifying the number of agents to be queried "modifies the actual request/communicative act/performative itself" but the ":receiver" parameter of FIPA97 specifying the number of agents to which to send a message does not. *See* PO Resp. 100–101. We agree with Petitioner that Patent Owner does not identify "a practical distinction between limiting the number of agents to be queried (solution_limit(N)), and querying a selection of agents (:receiver)." Pet. Reply 57.

Next, Patent Owner contends that FIPA97 does not teach parameters "refin[ing] . . . events," as recited in the claim, because FIPA97's ":receiver" parameter is the same as or similar to the KQML ":receiver" parameter, which does not modify the meaning of a message. PO Resp. 98–99 (citing Ex. 1007, 12; Ex. 1020, 5). In support of its argument, Patent Owner cites a page from Dr. Finin's presentation slides at an unidentified meeting or class, which compares "KQML tell and FIPA ACL inform." *Id.* 99–100 (citing Ex. 2019, 15; Ex. 2013, 132:6–22.). Patent Owner also cites the testimony from Dr. Finin at his deposition that "the general idea of agent

communication language that was embodied in KQML is similar to the one that is embodied in FIPA." *Id.* at 100 (citing Ex. 2012, 32:10–17).

Patent Owner, however, does not discuss the disclosure of KQML/Nwana (Ex. 1020) sufficiently (other than pointing to the similarity of the format between the ":receiver" parameter of KQML and FIPA97) or explain adequately why KQML's ":receiver" parameter is similar to the FIPA97 ":receiver" parameter. *See* PO Resp. 98–100. For example, Patent Owner does not explain whether KQML's ":receiver" parameter specifies, similar to FIPA97, that "the recipient may be a single agent name, or a tuple of agent names," that "the message is sent to each agent named in the tuple," and that "the sender *intends* each of them to be recipient of the message." *See id.*; Ex. 1007, 13 (emphasis added). The general statements from Dr. Finin (or a slide purportedly from his unidentified presentation) cited by Patent Owner (PO Resp. 99–100 (citing Ex. 2019, 15; Ex. 2013, 132:6–22, 32:10–17)) regarding the alleged similarity between KQML and FIPA97 at a general level are simply insufficient to override the specific disclosures in FIPA97 cited by Petitioner regarding the meaning of the message modified or affected by the FIPA97 ":receiver" parameter.

Patent Owner also cites testimony from Petitioner's declarant, Dr. Lieberman, as "confirm[ing]" that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." PO Resp. 101 (citing Ex. 2014, 110:14–111:16, 168:5–12). The cited testimony of Dr. Lieberman, however, discusses FIPA97's messages and multicasting in general (responding to general questions from Patent Owner's counsel) and

does not discuss the specific disclosure in FIPA97 cited by Petitioner regarding the meaning of the message modified or affected by the FIPA97 ":receiver" parameter. *See* Ex. 2104, 108:4–111:16, 168:5–12. Thus, we find Patent Owner's citation to the testimony of Dr. Lieberman to be unpersuasive (if not misleading) to "confirm" that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." *See* PO Resp. 101.

Next, Patent Owner cites 9 paragraphs from the Declaration of Dr. Cohen (Ex. 2033) to argue that "FIPA97 does not contain any conversational layer parameters that affect the semantics of FIPA97 messages." PO Resp. 103 (citing Ex. 2033 ¶¶ 80–89).[29] Patent Owner, however, does not discuss Dr. Cohen's testimony in the Patent Owner Response or explain how Dr. Cohen's testimony supports its contention. *See id.* Thus, to the extent Petitioner purports to rely on Dr. Cohen's testimony, this amounts to improper incorporation by reference in violation of 37 C.F.R. § 42.6(a)(3). Accordingly, we decline to consider the cited paragraphs from the Cohen Declaration. We note, nonetheless, that Dr. Cohen's testimony appears to dwell in generalities, e.g., citing the works of logicians/philosophers Tarski and Frege (*see* Ex. 2033 ¶¶ 80–81), and discusses tuples and multicasting in general terms (*see id.* ¶¶ 85–88).

Lastly, Patent Owner contends that the limitation "the parameter lists further refine the one or more events" requires "the parameters of an event

[29] Patent Owner's citation to the Cohen Declaration appears to be mistaken since the last paragraph of Cohen Declaration is paragraph 88.

(or message) can refine the message or goal itself" (PO Resp. 97) or "change the nature of the communicative act itself" (*id.* at 102). Although it is not entirely clear what Patent Owner argues,[30] to the extent Patent Owner argues "refin[ing]" a messages or goal requires changing the message or goal itself, we disagree with Patent Owner's argument. As discussed above, in a section titled "Refining Service Requests," the '115 patent describes examples of "parameters" associated with a request or goal that "refine the request's meaning," including the "reply parameter" that specifies whether solutions are to be returned synchronously or asynchronously, and the "cache parameter" that specifies local caching of facts related to the request. *See* Ex. 1001, 15:49–58. These parameters do not appear to change the request itself but, rather, specify how the request should be handled—e.g., synchronous response, local caching, etc. Thus, we are not persuaded by Patent Owner's argument that the claim requires the recited "parameters" "refine the message or goal itself" (PO Resp. 97) or "change the nature of the communicative act itself" (*id.* at 102). Such an interpretation, which "excludes a [disclosed] embodiment from the scope of the claim is rarely, if ever, correct." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) (quoting *Accent Pkg., Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013)) (citing *Phillips*, 415 F.3d at 1312–13).

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that FIPA97 teaches

---

[30] As discussed above, Patent Owner does not dispute Petitioner's proposed construction of the term "the parameter lists further refine the one or more events." *See* PO Resp. 24–38.

"wherein the parameter lists further refine the one or more events," as recited in claim 1. Based on the complete record and for the reasons explained by Petitioner, we determine that Petitioner has shown sufficiently that FIPA97 teaches "a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events," as recited in claim 1.

*(vi) Content Layer Comprising Goals and Triggers*

Claim 1 recites that the "inter-agent language" includes "a content layer comprising one or more of goals, triggers and data elements associated with the events." Petitioner asserts that FIPA97 teaches the recited "content layer" because FIPA97 describes various rules and standards governing the content that may be embedded within messages ("a content layer"). Pet. 42 (citing Ex. 1007, 3, 9, 14–16). Petitioner argues that the '115 patent consistently explains that the "content layer" of the disclosed ICL "consists of the specific goals, triggers, and data elements that may be *embedded* within various events." *Id.* at 9 (Ex. 1001, 11:13–15).

Petitioner also contends that FIPA97 teaches "a content layer comprising one or more of goals . . . associated with the events" because in FIPA97 "*goals* can be communicated among agents through the use of an achieve domain-language primitive." Pet. 42 (emphasis added) (citing Ex. 1007, 81).

Petitioner asserts that FIPA97 also teaches "data elements associated with the events" because FIPA ACL supports content expression through

objects and other data ("data elements") associated with various performatives. Pet. 43 (citing Ex. 1007, 14).

(1) Triggers

Petitioner asserts that a "trigger" recited in claim 1 is "a general mechanism for requesting some action be taken when one or more conditions is met." Pet. 11 (citing Ex. 1001, 21:21–22:31; Ex. 1003 ¶¶ 80–81). Patent Owner does not dispute Petitioner's proposed meaning of "trigger" (*see* PO Resp. 24–38) and argues that FIPA97 does not teach triggers under Petitioner's interpretation of the term (*see id.* at 107–108). We adopt this undisputed interpretation of "trigger" for this Final Written Decision because the construction is consistent with the disclosure in the Specification. *See* Ex. 1001, 21:22–24 ("triggers [provide] a general mechanism for requesting some action be taken when a set of conditions is met").

Petitioner asserts that FIPA97 discloses "triggers" for various performative actions within the content layer, including for use with the performative "accept-proposal" which "informs the receiver that it intends that (at some point in the future) the receiving agent will perform the action, once the given *precondition* is, or becomes, true." Pet. 43 (emphasis added) (citing Ex. 1007, 23). Petitioner argues that FIPA97 also discloses that the performative "propose" can be used "to make a proposal or respond to an existing proposal during a negotiation process by proposing to perform a given action subject to certain *conditions* being true." *Id.* (emphasis added) (citing Ex. 1007, 34; Ex. 1003 ¶¶ 277–279).

Petitioner argues that the ’115 patent describes “triggers” as “providing a general mechanism for requesting some action be taken when a set of *conditions* is met,” and that such triggers “preferably specif[y] at least a *condition* and an action . . . [t]he *condition indicates under what circumstances the trigger should fire,* and the action indicates what should happen when it fires.” Pet. 11 (emphases added) (citing Ex. 1001, 21:21–34).

Patent Owner contends that the portions of FIPA97 cited by Petitioner do not describe “a settable trigger that kicks in when a specified event takes place.” PO Resp. 108. Patent Owner asserts that the communicative acts (or performative actions) cited by Petitioner instead are “performatives that contain parameters dictating what the associated action is.” *Id.* at 107 (citing Ex. 2032 ¶¶ 168–169).

Patent Owner also cites 35 paragraphs from the Cohen Declaration in support of its argument. *Id.* at 108 (citing Ex. 2033 ¶¶ 30–64). Patent Owner, however, does not discuss Dr. Cohen’s testimony in the Patent Owner Response or explain how Dr. Cohen’s testimony supports its contention. *See id.* at 107–108. Thus, to the extent Petitioner purports to rely on Dr. Cohen’s testimony, this amounts to improper incorporation by reference in violation of 37 C.F.R. § 42.6(a)(3). Accordingly, we decline to consider the cited paragraphs from the Cohen Declaration.

Petitioner argues that the performative “accept-proposal” “informs the receiver that it intends that (**at some point in the future**) the receiving agent will perform the action, once the given precondition is, **or becomes**, true.”

Pet. Reply 63 (citing Ex. 1007, 23). Petitioner cites the following testimony from Dr. Lieberman:

> [T]he "precondition" is sent to an agent through the "*content layer*," then at some future point when that "precondition" is met the receiving agent will "*trigger*" and take an action based upon the information encoded in the "*content layer*" of the message. **EX1007, 23**.

*Id.* (citing Ex. 1003 ¶ 276). Pointing to the description in the cited portion of FIPA97, Petitioner argues

> [A]s explained by Dr. Lieberman, and shown in FIPA97, the performative "accept-proposal" ("[a] general mechanism for requesting") will take an action—in this example, streaming a multimedia channel ("some action be taken")—when "the customer is ready" ("when one or more conditions is met"). Further, the example above shows how this trigger information is stored within the "*content layer*."

*Id.* at 64 (reproducing the description of the performative "accept-proposal" in Ex. 1007, 23).

Petitioner contends that Dr. Lieberman and the Petition describe many other possible triggers, including the "propose" performative and the "request-when" performative. *Id.* at 65. Petitioner asserts that the "propose" performative "informs the receiver that the proposer will adopt the intention to **perform the action once the given precondition is met**" (*id.* (citing Ex. 1007, 34; Ex. 1003 ¶¶ 277–279; Pet. 43)) and that the "request-when" performative is used when "[t]he sender wants the receiver to perform some action **when some given proposition becomes true**" (*id.* (citing Ex. 1007, 40; Ex. 1003 ¶ 414; Pet. 63–64)). Petitioner points to the description of the "request-when" performative in FIPA97 and argues that the performative

"request-when" ("[a] general mechanism for requesting") will take an action—in this example, sending a message ("some action be taken")—when "an alarm occurs" ("when one or more conditions is met"). *Id.* at 66. Petitioner concludes that FIPA97, therefore, discloses multiple "triggers" recited in claim 1. *Id.*

Patent Owner does not dispute Petitioner's responsive arguments in the Reply, but instead contends that Petitioner's arguments are presented "too late" and that "Petitioner cannot fix the deficiencies of its Petition on Reply." PO Sur-reply 54. To the extent Patent Owner argues that Petitioner's arguments in the Reply are improper new arguments outside the scope of a proper reply, we disagree. As discussed above, Petitioner's arguments in the Petitioner Reply on whether FIPA97 teaches the "triggers" recited in the claim are directly responsive to Patent Owner's arguments raised in the Patent Owner Response. *See Belden Inc. v. Berk-Tek LLC*, 804 F.3d 1064, 1078–80 (Fed. Cir. 2015) (explaining that the Board may rely on new evidence submitted with a reply because that evidence was responsive to the arguments in patent owner's response).

Based on the complete record, we determine that Petitioner has shown sufficiently that FIPA97 teaches "triggers" recited in claim 1.

In sum, based on the complete record, we determine that Petitioner has demonstrated sufficiently that FIPA97 teaches the claimed "expandable, platform-independent, inter-agent language" including "a layer of conversational protocol" and "a content layer," notwithstanding these arguments from Patent Owner.

*d. Receiving a Request for Service in an Arbitrarily Complex Goal Expression*

The second step of claim 1 recites "receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression." Ex. 1001, 29:25–27. Petitioner relies on Kiss to teach the "receiving a request for service" step and combines Kiss's teaching with FIPA97's ACL to teach "a request for service . . . in the form of an arbitrarily complex goal expression." Pet. 43–47.

*(i) Receiving a Request for Service*

Petitioner asserts that Kiss teaches "receiving a request for service" because the reference describes that a "user agent" receives a "query" from a user, and then "parses the user inquiry and directs the parsed inquiry to a metaagent 119 for action." Pet. 44 (citing Ex. 1005, 8:28–34). Petitioner points to the example process depicted in Figures 8–20 of Kiss as showing how a "problem presented by a user is solved through distributed inferencing." *Id.* (citing Ex. 1005, 12:21–22). Petitioner asserts that the initial request illustrated in Figure 8 (not reproduced herein) "when the user asks of the user agent 705 'what is the effect of increasing sales by 20%'? (FIG.8)" is a "base goal" because it is the basic request initiated by the user that inspires a number of additional, more particular requests in order to be satisfied. *Id.* at 44–45 (citing Ex. 1005, 12:23–26, Fig. 8).

*(ii) Arbitrarily Complex Goal Expression*

As discussed above in Section III.B. and the Institution Decision, based on the definitions provided in the '115 patent, we construe "arbitrarily complex goal expression" to mean "a goal expressed in a language or syntax

that allows an expression, when appropriate or when desired, that expresses multiple sub-goals and can potentially include more than one type of logical connector (e.g., AND, OR, NOT), and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent, although not every goal is itself necessarily complex." Inst. Dec. 35–37. Petitioner argues that this definition of "arbitrarily complex goal expression" does not require multiple sub-goals to be expressed within the request, but instead requires only that the goal be expressed in a language "that *allows* the expression of multiple sub-goals . . . ." Pet. 45.

Petitioner asserts that FIPA ACL allows the expression of multiple sub-goals, which can potentially include more than one type of logical connector and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent, because FIPA97 "allows the construction of s-expressions of arbitrary depth and complexity." *Id.* (citing Ex. 1007, 15). Petitioner argues that FIPA97 also discloses complex "goal expressions" that "express multiple sub-goals" and which may also include "logical nesting" using parentheses. *Id.* at 46 (citing Ex. 1007, 40, 41).

Petitioner contends that, in the combined system of Kiss and FIPA97, the request discussed above— "What is the effect of increasing sales by 20%?"—is an "arbitrary complex goal expression" because it is a goal expressed in FIPA ACL. *Id.*

Patent Owner does not specifically dispute that Kiss teaches this "receiving a request for service" limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches

"receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression," as recited in claim 1.[31]

*e. Dynamically Interpreting the Arbitrarily Complex Goal Expression*

Claim 1 recites "dynamically interpreting the arbitrarily complex goal expression," the act of interpreting comprising "generating one or more sub-goals expressed in the inter-agent language," "constructing a goal satisfaction plan," and "dispatching each of the sub-goals to a selected client agent for performance." Ex. 1001, 29:28–44.

Petitioner contends that Kiss teaches "dynamically interpreting the arbitrarily complex goal expression," as recited in claim 1. Pet. 47–49. Petitioner argues

> Kiss discloses that, in response to a request for service, the "meta agent 119 formulates a goal statement for the problem-solving phase of the process, then formulates a solution plan for the problem" and "*dynamically* assesses the problem and its solution states (between users and the knowledge agents 121), divides the problem, and assigns the appropriate knowledge agents 121 to work on the solution."

*Id.* at 47–48 (emphasis added) (citing Ex. 1005, 8:32–48).

In addition, Petitioner explains how Kiss interprets the exemplary "arbitrary complex goal expression" discussed above—"What is the effect of increasing sales by 20%?"—including the meta agent formulating a plan to respond to the request, identifying other agents and knowledge modules that could assist in the response, and doing both dynamically as additional

[31] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

information is obtained. *Id.* at 48 (citing Ex. 1005, 12:21–14:29, Figs. 8–20). Petitioner further provides a detailed description of how this example goal expression is dynamically interpreted in Kiss. *Id.* at 48–49 (citing Ex. 1005, 12:29–14:30, Figs. 9–11, 13–20).

Patent Owner does not specifically dispute that Kiss teaches this "dynamically interpreting the arbitrarily complex goal expression" limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches "dynamically interpreting the arbitrarily complex goal expression," as recited in claim 1.[32]

*f. Generating One or More Sub Goals Expressed in the Inter-agent Language*

Petitioner contends that Kiss teaches "generating one or more sub-goals expressed in the inter-agent language," as recited in claim 1, because Kiss discloses, in the example "What is the effect of increasing sales by 20%?" discussed above, that the process of responding to the user's request includes several additional requests for service ("sub-goals") to various agents, including two sub-requests each from the sales agent and the meta agent, and three sub-requests from the production agent, where each of the sub-requests is made in FIPA ACL. Pet. 49–50 (citing Ex. 1005, 12:54–56, 13:25–27, 13:37–39, 13:56–57, 14:3–5). According Petitioner, each of these sub-requests is a "sub-goal" because each is a subset of the process of

[32] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

responding to the user's base request—"base goal"—of "what is the effect of increasing sales by 20%?" *Id.* at 50. Petitioner also argues that Kiss's meta-agent is capable of "formulating a sub-problem query." *Id.* (citing Ex. 1005, 11:15–16).

Patent Owner does not specifically dispute that Kiss teaches this "generating one or more sub-goals expressed in the inter-agent language" limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches "generating one or more sub-goals expressed in the inter-agent language," as recited in claim 1.[33]

*g. Constructing a Goal Satisfaction Plan Including Delegation of Sub-goal Requests*

Claim 1 recites "constructing a goal satisfaction plan," the goal satisfaction plan including "a suitable delegation of sub-goal requests" and "dispatching each of the sub-goals to a selected client agent for performance." Ex. 1001, 29:32–43. Petitioner contends that Kiss teaches each of these limitations. Pet. 50–54.

*(i) Goal Satisfaction Plan*

As discussed above in Section III.B.1., we construe the term "a goal satisfaction plan" to mean "a plan for satisfying a goal" for this Final Written Decision.

[33] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

Petitioner asserts that Kiss teaches “constructing a goal satisfaction plan” because Kiss describes that the meta-agent “formulates a goal statement for the problem-solving phase of the process,” then “formulates a solution plan for the problem.” Pet. 50 (citing Ex. 1005, 8:33–34, 5:30–64, 12:25–40, Figs. 8–20). Petitioner contends that Figures 8–20 of Kiss illustrate adding tasks to an agenda, i.e., constructing a plan, to satisfy the user request (i.e., a “goal”) “what is the effect of increasing sales by 20%?” *Id.* at 50–51 (citing Ex. 1005, 13:27–29, Figs. 8–20).

Patent Owner contends that Kiss does not teach the claim “goal satisfaction plan” because Kiss does not disclose “the use of any reasoning, optimization, or taking into account any advice parameters or constraints.” PO Resp. 89. Patent Owner also argues that Kiss “does not have the capability of formulating an ‘optimal or near-optimal’ ‘goal satisfaction plan’ utilizing reasoning as described in the ‘115 patent.” *Id.* at 91 (citing Ex. 2032 ¶ 141). These arguments are predicated on Patent Owner’s proposed construction of “goal satisfaction plan” to mean “a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints.” *See id.* at 28. As discussed above in Section III.B.1., we disagree with Patent Owner that the claim term “goal satisfaction plan” is limited as Patent Owner contends. Thus, for the reasons explained above in Section III.B.1., we disagree with Patent Owner’s argument that Kiss does not disclose the “goal satisfaction plan” recited in claim 1.

Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches "constructing a goal satisfaction plan," as recited in claim 1.

*(ii) Delegation of Sub-goal Requests Using Reasoning*

Claim 1 recites that "the goal satisfaction includes: a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms." Ex. 1001, 29:32–39.

(1) Delegation of Sub-goal Requests

Petitioner asserts that Kiss teaches a meta-agent that makes "a suitable delegation of sub-goal requests to best complete the requested service request," as recited in claim 1, because Kiss identifies and queries various agents (e.g., sales agent, production agent) "who best to respond" to new sub-requests for specific information as they arrive. Pet. 51 (citing Ex. 1005, 12:21–14:30, Figs. 8–20). Petitioner contends that in Kiss, the meta-agent "contains knowledge of problem solving methodologies and distributed inferencing procedures" and is further responsible for allocating "tasks to the knowledge agent layer." *Id.* (citing Ex. 1005, 5:24–27, 3:26–27). Petitioner asserts that Kiss's meta-agent uses these methodologies in conjunction with the agent registry "to dynamically bring available knowledge resources together" ("suitable delegation") by identifying "those

other resources capable of furthering the problem-solving process" ("best complete the requested service request"). *Id.* (citing Ex. 1005, 5:27–29).

Patent Owner contends that Kiss does not teach "optimization of any kind." PO Resp. 89. Patent Owner asserts that Kiss's meta agent employs a trial and error method—it jumps into "executing the solution plan even before the plan is complete" and when errors are encountered, it backtracks or takes a new action. *Id.* at 90–91 (citing Ex. 1005 5:39–46). Patent Owner argues that Kiss is "forced" to go through this trial-and-error process because it does not have the capability of formulating an "optimal or near-optimal" "goal satisfaction plan." *Id.* at 91.

As discussed above in Section III.B., claim 1 does not recite an "optimal or near-optimal" "goal satisfaction plan." Instead, claim 1 recites "a suitable delegation of sub-goal requests to *best complete* the requested service request," which may relate to the "optimal or near-optimal" limiting feature argued by Patent Owner. As discussed in the same section, Patent Owner asserts that the term "optimal" and "near optimal" has a well-established meaning in the context of computer engineering, citing a technical dictionary, which defines "optimization" as "[t]he process of finding *the best solution* to some problem, where 'best' accords to prestated criteria." PO Sur-reply 6 (emphasis added) (citing Ex. 2078, 3). Thus, contrary to Patent Owner's argument, the trial and error process of Kiss is a "process of finding *the best solution*" to a problem under Patent Owner's definition of "optimization." *See* Ex. 1005, 5:21–29 ("The meta agent 119 contains knowledge of how to dynamically bring available knowledge resources together as and when needed to provide a response to the

inquiry.”), 5:32–45 (“The meta agent 119 is responsible for formulating a *dynamic “solution plan”* for the distributed inferencing to be performed by the system 100, and *allocates tasks* to the knowledge agent layer 109 in furtherance of the solution plan. The planning capability of the meta agent 119 includes the ability to formulate parallel *sub-plans* and perform *iterative and recursive procedures*. . . . The meta agent 119 is capable of backtracking or replanning to permit escape during plan execution from dead-end or *otherwise unproductive search paths*.” (emphases added)); Pet. 51 (citing Ex. 1005, 5:24–29).

We note that claim 1 does *not* recite “to *best complete* the requested service request *at the very first try*.” Thus, Kiss’s formulation of a dynamic “solution plan” (and allocation of tasks) that includes “sub-plans” to perform the trial and error process for finding the best solution to a problem satisfies “delegation of sub-goal requests to *best complete* the requested service request,” as recited in claim 1.

Patent Owner also argues that it explained during prosecution how the facilitating engine is able to use reasoning to delegate the sub-goals to service providing agents in such a way as “to best complete the requested service request,” as follows:

> For example, assume that several agents are able to roast coffee. The facilitating engine is able to use reasoning to delegate the sub-goal task of roasting coffee to the service-providing agent that can roast beans in the least amount of time because the facilitating engine has reasoned that *the least amount of time* taken to make coffee is *the best way* to accomplish the base goal of making coffee.

PO Resp. 90 (citing Ex. 1002, 173).

In response, Petitioner argues that Kiss similarly optimizes its solution plan based on time. Pet. Reply 49–50. Petitioner asserts that Kiss explains that as part of its matchmaking functionality (which is utilized in the solution plan), the agent service layer will create "mappings for each knowledge module 123 relating the capabilities to interests" and that these mappings are used "to optimize problem solutions." *Id.* at 49 (citing Ex. 1005, 7:8–11). According to Petitioner, Kiss describes that when utilizing "real time" inferencing, the meta-agent "may deactivate the knowledge agent whose responses do not meet time delay" or prioritize "knowledge agents that have a history of rapid response or that can tailor their problem solving to real time." *Id.* at 49–50 (citing Ex. 1005, 7:65–84). We agree with Petitioner that Kiss's delegation and prioritization of agents based on their speed of response satisfies "delegation of sub-goal requests to best complete the requested service request," as recited in claim 1.

(2) Using Reasoning

Claim 1 recites that "a suitable delegation of sub-goal requests" is accomplished "by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms." Petitioner asserts that the '115 patent describes speech recognition, natural language processing, and email as "domain-independent technologies," and travel planning and reservations agents as "domain specific." Pet. 52 (citing Ex. 1001, 6:51–55).

Citing the testimony of Dr. Lieberman, Petitioner argues that the operations disclosed in Kiss with respect to Figures 8–20 represent

"reasoning that includes one or more of domain-independent coordination strategies" because the meta agent, by identifying and querying several different specialized (i.e., domain-specific) agents, is carrying out a strategy that is domain independent (i.e., is not limited to a particular area of knowledge but instead seeks information regarding sales, production, marketing, facilities, and materials) and coordinates the action of those different domain-specific agents across several domains. Pet. 52 (citing Ex. 1003 ¶¶ 331–332). Petitioner argues that Kiss's meta-agent can employ a distributed inferencing scheme that "assembles a problem-specific rule network as a distributed object under control by a meta agent." *Id.* at 52–53 (citing Ex. 1005, 7:21–26). Petitioner contends that application of such a problem-specific set of rules to a request constitutes both "domain-specific reasoning" (because the problem is the domain) and "application-specific reasoning" (because the problem is the application). *Id.* at 53 (citing Ex. 1003 ¶ 333).

We note that the portion of Kiss cited by Petitioner describes that distributed inferencing schemes are based on the use of "first-order logic." Ex. 1005, 7:21–23. The same paragraph also describes using a "theorem-proving engine." *Id.* at 7:26–28. We note that both "first-order logic" and "theorem-proving engine" may be considered "domain-independent technologies," similar to speech recognition and natural language processing technologies described in the '115 patent.

Patent Owner contends that the "solution plan" of Kiss is not constructed by "using reasoning" because Kiss's inferencing schemes are used only "[a]fter the solution plan is formulated . . . to perform the search

and execution phases." PO Resp. 89 (citing Ex. 1005, 8:58–60). In response, Petitioner asserts that in the Petition it argued that it would have been obvious to utilize inferencing strategies when constructing the goal satisfaction plan. Pet. Reply 48 (citing Pet. 53). Thus, Patent Owner's argument is inapposite because it does not address the combination proposed by Petitioner. *See ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1219 (Fed. Cir. 2016) ("*KSR* does not require that a combination only unite old elements without changing their respective functions.").

As Petitioner also persuasively argues, Petitioner in the Petition additionally relies on several other ways in which Kiss utilizes reasoning to construct its solution plan, such as "problem solving methodologies and distributed inferencing procedures," how the meta-agent "assigns the **appropriate** knowledge agents 121 to work on the solution," and how the meta-agent "executes the solution plan by maintaining an agenda, commitment table, task queue, knowledge manager or **equivalent dynamic control service**." Pet. Reply 48 (citing Pet. 50–51; Ex. 1003 ¶¶ 322–325, 331–335). Petitioner further argues that Kiss's "iterative and recursive" planning is another example of how reasoning is used to construct the solution plan of Kiss. *Id.* (citing Pet. 50; Ex. 1003 ¶ 322).

Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches "a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising

rules and learning algorithms," as recited in claim 1, notwithstanding the arguments by Patent Owner.

*h. Dispatching Each of the Sub-goals*

Claim 1 recites "dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent." Ex. 1001, 29:32–43.

Petitioner asserts that in Kiss

> the meta agent dispatches queries ("*sub-goals*") to various specialized agents based on a determination that the targeted agent possesses a knowledge module appropriate for the query ("*based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent*.")

Pet. 54 (citing Ex. 1005, 12:21–14:29, Figs. 8–20). Petitioner argues that Kiss's specialized agents are not facilitators (and, therefore, are "client agents") because they are not responsible for matching requests, from users and agents, with descriptions of the capabilities of other agents. *Id.* (citing Ex. 1001, 4:64–66, 6:41–43).

Patent Owner does not specifically dispute that Kiss teaches this "dispatching each of the sub-goals" limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches "dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and

the registered functional capabilities of the selected client agent," as recited in claim 1.[34]

*i. Conclusion*

In consideration of the foregoing and based on the complete record, we are persuaded by Petitioner's arguments and evidence, notwithstanding Patent Owner's arguments, addressed above. Having weighed each of the *Graham* factors, including the scope and content of the prior art, the differences between the prior art and the challenged claim, and the objective evidence of nonobviousness, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss and FIPA97.

*3. Dependent Clam 4*

Claim 4 depends form claim 1 and further recites "further including the act of deactivating a specific client agent no longer available to provide services by deleting the registration of the specific client agent." Ex. 1001, 29:64–67. Petitioner asserts that the combination of Kiss and FIPA97 teaches the additionally recited limitation of claim 4. Pet. 54–55. In addition, Petitioner contends that the subject matter of claim 4 would have been obvious over the combination of Kiss and FIPA97. *Id.* at 54–56.

Specifically, Petitioner asserts that Kiss discloses that the meta-agent "may deactivate the knowledge agent **whose responses do not meet time**

---

[34] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

**delay** and gather partial information from the **incomplete knowledge agent**." *Id.* at 54–55 (citing Ex. 1005, 7:67–8:2). According to Petitioner, Kiss also discloses an "agent service layer [that] provides services for **maintaining a registry of agents** in the system . . . [that] . . . identifies each agent's capabilities and interests." *Id.* at 55 (citing Ex. 1005, 3:36–42). Citing the testimony of Dr. Lieberman, Petitioner asserts that a person of ordinary skill in the art would understand "maintaining" the registry of Kiss included the ability to ensure the registry accurately reflects the agent population in the system. *Id.* (citing Ex. 1003 ¶ 353).

In addition, Petition contends that FIPA97 also discloses deactivating agents, such as by removing them from an Agent Domain in which they are Active, and that such deactivation comprises deregistering the agent, which includes the deletion of that agent's entry in the Directory Facilitator. *Id.* (citing Ex. 1006, 19–20, Fig. 5; Ex. 1003 ¶ 354).

Citing the testimony of Dr. Lieberman, Petitioner argues that the proposed combination of Kiss and FIPA97 teaches "the act of deactivating a specific client agent no longer available to provide services," such as time delay-based services, "by deleting the registration of the specific client agent," as recited in claim 4. *Id.* (citing Ex. 1003 ¶ 355).

Petitioner also argues that the subject matter of claim 4 would have been obvious over the combination of Kiss and FIPA97 because Kiss discloses both the maintenance of an agent registry and the deactivation of unsatisfactory agents, and FIPA97 discloses deleting the registry information of agents removed from a particular domain. *Id.* at 55–56. Citing the testimony of Dr. Lieberman, Petitioner argues that a person of ordinary skill

in the art would have been motivated to combine these teachings of Kiss and FIPA97 to obtain the subject matter of "deactivating a specific client agent no longer available to provide services by deleting the registration of the specific client agent," as recited in claim 4, to ensure the system includes only those agents able to provide a satisfactory level of operability so that the system would operate in an efficient and useful manner. *Id.* at 56 (citing Ex. 1003 ¶ 356). Petitioner additionally argues the fact that Kiss discloses deactivating agents operating in a sub-optimal manner would also have suggested including this functionality because agents unable to provide services are not useful in the system, unnecessary and potentially wasteful of system resources. *Id.* (citing Ex. 1003 ¶ 357).

Patent Owner does not respond separately to Petitioner's challenge to dependent claim 4 beyond Patent Owner's arguments advanced with respect to claim 1 discussed above. *See* PO Resp. 108–114.

Based on the complete record and for the reasons explained by Petitioner, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 4 is unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss and FIPA97.[35]

*4. Dependent Clam 5*

Claim 5 depends form claim 1 and further recites "further comprising the act of providing an agent registry data structure." Ex. 1001, 30:1–3.

---

[35] We also find that Patent Owner has waived any argument directed to claim 4 aside from contesting the unpatentability of claim 1, from which claim 4 depends, over the combination of Kiss and FIPA97. *See* Paper 16, 7.

Petitioner asserts that Kiss teaches an "agent registry" which contains information about the capabilities of each registered agent. Pet. 56 (citing Ex. 1005, 6:66–7:2). According to Petitioner, the agent service layer of Kiss contains "semantics" where each agent registers its "capabilities and interests." *Id.* (citing Ex. 1005, 11:65–12:20).

Table 1 of Kiss is reproduced below.

TABLE 1

Interests and Capabilities of Knowledge Modules

| Knowledge Module | Capabilities | Interests |
|---|---|---|
| Sales 711 | Number of units<br>Price per unit<br>Total revenue | Market price<br>Cost per unit |
| Production 715 | Cost per unit | Number of units<br>Cost of production lines<br>Material costs<br>Labor costs |
| Marketing 719 | Market price | Number of units |
| Materials 723 | Material cost | Material type |
| Facilities 727 | Cost of production lines | Number of production lines |
| Labor 731 | Cost of labor | Number of workers |

Ex. 1005, 12:1–18. Table 1 of Kiss illustrates the capabilities and interests of each of the knowledge modules listed in the first column of the table. *Id.* at 11:65–67.

Petitioner asserts that an agent's capabilities and interest are stored and organized in the manner depicted in Table 1 of Kiss. Pet. 56 (citing Ex. 1005, 11:65–12:20). Citing the testimony of Dr. Lieberman, Petitioner contends that a person of ordinary skill in the art would have understood that

the agent registry of Kiss is stored in a data structure because Kiss discloses a computerized system. *Id.* (citing Ex. 1003 ¶¶ 359–360).

In addition, Petitioner asserts that it would have been obvious to include such a structure in the system of Kiss because Kiss discloses that the registry maintains information about the capabilities, interests, and attributes associated with agents in the system (*id.* at 57–58 (citing Ex. 1005, 6:66–7:2)) and because Kiss also discloses that other information used in the system is stored in various types of data structures, such as a data base, software library, or software object (*id.* at 58 (citing Ex. 1005, 6:55–61)). Citing a technical encyclopedia, Petitioner argues that a person of ordinary skill in the art would have understood that registry information would efficiently be stored in a known type of data structure such as a database, software library, or software object. *Id.* (citing Ex. 1034, 133).

Citing the testimony of Dr. Lieberman, Petitioner asserts that a person of ordinary skill in the art would have been motivated to employ such a conventional structure because they were well-understood and believed to be reliable. *Id.* (citing Ex. 1003 ¶ 361). Petitioner also argues that "it would have been common sense to store the agent capability information in an orderly manner that permitted ease of access, which would necessarily mean storing the information in a data structure, such as a database, software library, or software object." *Id.* (citing Ex. 1003 ¶ 361).

In the Patent Owner Response, Patent Owner asserts that the disclosures of Kiss cited by Petitioner, including Table 1, do not show a data structure. PO Resp. 108–109. Patent Owner also argues that Petitioner does

not identify any reason why a person of ordinary skill in the art would have added memory required for data storage to Kiss's system. *Id.* at 110.

In its Reply, Petitioner asserts that Kiss explains that "the agent service layer 735 **accesses the information stored in Table l** to identity the agent that has registered the capability of providing that information" and, therefore, Table 1 is part of the "agent registry" of Kiss. Pet. Reply 75 (citing Ex. 1005, 13:29–32). Petitioner also argues that a data structure was a well-known and conventional technology, citing a technical encyclopedia, as well as the deposition testimony of Patent Owner's declarant, Dr. Medvidovic. *Id.* (citing Ex. 1129, 136:13–17 ("A data structure . . . a structure within a program that contains and organizes some set of data in a particular way."), 136:13–137:6; Ex. 1133, 459 (defining a "table" as a "data structure")). Petitioner asserts that a person of ordinary skill in the art would have employed a conventional data structure in part because they were well-understood and reliable; and because it would have been common sense to "store the agent capability information in an orderly manner." *Id.* (citing Pet. 58; Ex. 1003 ¶ 361; Ex. 1129, 136:13–137:6 (explaining that data structures were conventional and well-known for these types of implementations)).

In the Patent Owner Sur-reply, Patent Owner does not dispute Petitioner's argument and evidence in the Reply, but instead argues that "Petitioner seeks to fix its lack of argument in the Petition by introducing new arguments on Reply," which should be rejected as improper new material. PO Sur-reply 65. We disagree with Patent Owner's argument because, as discussed above, Petitioner's argument and evidence presented

in the Reply are directly responsive to Patent Owner's arguments raised in the Patent Owner Response. *See Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 706–07 (Fed. Cir. 2020) ("[T]he petitioner in an inter partes review proceeding may introduce new evidence after the petition stage if the evidence is a legitimate reply to evidence introduced by the patent owner." (quoting *Anacor Pharm., Inc. v. Iancu*, 889 F.3d 1372, 1380–81 (Fed. Cir. 2018)); *Belden Inc. v. Berk-Tek LLC*, 804 F.3d 1064, 1078–80 (Fed. Cir. 2015) (explaining that the Board may rely on new evidence submitted with a reply because that evidence was responsive to the arguments in patent owner's response).

Based on the complete record and for the reasons explained by Petitioner, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 5 is unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss and FIPA97.

*5. Dependent Clams 6–10*

Claims 6–10 each depend from claim 5 and further recite that the recited "agent registry data structure" includes various items, such as "at least one symbolic name for each active agent" (claim 6), "at least one data declaration for each active agent" (claim 7), "at least one trigger declaration for one active agent" (claim 8), "at least one task declaration, and process characteristics for each active agent" (claim 9), and "at least one process characteristic for each active agent" (claim 10). Ex. 1001, 30:4–19.

*a. Claims 6 and 7*

Similar to its analysis of claim 5, Petitioner relies on Table 1 and related disclosures of Kiss to teach the additionally recited limitations of dependent claims 6 and 7. *See* Pet. 58–60. For example, regarding claim 6, Petitioner contends that Kiss teaches "at least one symbolic name for each active agent" recited in claim 6 because Kiss's Table 1 shows a "data structure associated" with the agent registry, which includes a "symbolic name," such as "Labor" or "Marketing." *Id.* at 58 (citing Ex. 1005, 3:40–43, 12:1–18). With respect to claim 7, Petitioner asserts that Kiss's agent registry includes a "data declaration" in the form of the "Interests" column shown in Table 1 of Kiss. *Id.* at 59 (citing Ex. 1005, 12:1–18).

Patent Owner disputes Petitioner's argument and evidence in the Patent Owner Response (PO Resp. 110–111) and Petitioner in its Reply essentially repeats its arguments presented in the Petition (Pet. Reply 75–76). No new evidence is introduced in the Reply with respect to claims 6 and 7. *See id.*

Based on the complete record and for the reasons explained by Petitioner, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 6 and 7 are unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss and FIPA97.

*b. Claims 9 and 10*

With respect to claims 9 and 10, Petitioner relies on the combination of Kiss and FIPA97. Petitioner argues that Kiss's agent registry includes a "task declaration for each active agent," as shown in the "Capabilities" column of Kiss's Table 1, with each entry characterizing the tasks agents are

capable of performing. Pet. 61 (citing Ex. 1005, 12:1–18 (e.g., showing "Marketing" agent is capable of providing "Market Price"); Ex. 1003 ¶ 379).

Petitioner further asserts that FIPA97 teaches "process characteristic(s) for each active agent" recited in claims 9 and 10 because when registering an agent in FIPA97, various "process characteristics" may be included in the registration—e.g., FIPA97 discloses the Agent Management Object "fipa-man-df-agent-description" which contains a registry parameter "interactionprotocols" which "[c]haracterises the protocols supported by the agent [which] can include both standardized and/or non-standard protocols." *Id.* at 62 (citing Ex. 1006, 33). Citing the testimony of Dr. Lieberman, Petitioner argues that the "protocols" refine how the interactions with a given agent are conducted and that in the combined system the features of both agent registries would be combined. *Id.* (citing Ex. 1003 ¶¶ 217–219, 380).

In the Patent Owner Response, Patent Owner asserts that Petitioner does not explain adequately why a person of ordinary skill in the art would have been motivated to incorporate this alleged feature of FIPA97 into a data structure, which Petitioner alleges to be disclosed in Kiss. PO Resp. 113. We agree with Patent Owner's argument.

As discussed above, Petitioner relies on Kiss's agent registry to teach the "agent registry data structure" recited in claims 5, 9, and 10. For claims 9 and 10, Petitioner proposes to combine FIPA97's Agent Management Object with Kiss's agent registry data structure or combine the registry of FIPA97 with the registry of Kiss. *See* Pet. 62. In Section III.H.1. above, we discussed Petitioner's proposed combination of Kiss's electronic agents and

their general functions and operations, including agent collaboration, agent registry, and inter-agent messaging, with FIPA97's ACL. But, here, Petitioner is proposing a different (or additional) combination—that is, combining the registry of Kiss with the registry of FIPA97, or more specifically, combining Kiss's agent registry data structure with FIPA97's Agent Management Object.

An obviousness determination requires finding "both 'that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016) (citation omitted); *see KSR*, 550 U.S. at 418 (for an obviousness analysis, "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does"). Further, an assertion of obviousness "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)); *accord In re NuVasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016) (stating that "'conclusory statements'" amount to an "insufficient articulation[] of motivation to combine"; "instead, the finding must be supported by a 'reasoned explanation'" (citation omitted)); *Magnum Oil Tools Int'l*, 829 F.3d at 1380 ("To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific

reasoning, based on evidence of record, to support the legal conclusion of obviousness.”).

Here, with respect to claims 9 and 10, Petitioner does not discuss in the Petition *how* or *why* Kiss’s agent registry data structure would have been combined with FIPA97’s Agent Management Object to obtain the subject matter of claims 9 and 10. *See* Pet. 61–12; *see also TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1066 (Fed. Cir. 2016) (“Although the *KSR* test is flexible, the Board ‘must still be careful not to allow hindsight reconstruction of references . . . without any explanation as to *how* or *why* the references would be combined to produce the claimed invention.’”). In the Reply, Petitioner also does not discuss the reasons to combine Kiss and FIPA97 in the manner proposed for claims 9 and 10. *See* Pet. Reply 77–78.

Accordingly, based on the complete record, we determine Petitioner does not demonstrate by a preponderance of the evidence that the subject matter of claims 9 and 10 would have been obvious over the proposed combination of Kiss and FIPA97.

*c. Claim 8*

For claim 8, Petitioner argues that FIPA97 teaches “at least one trigger declaration for one active agent” because FIPA97 discloses a FIPA-AVEB-Request-Notification contract-net used to get notifications about the status and services of a specific program, and will automatically terminate after the program’s end time. Pet. 60 (citing Ex. 1011, 10, 11, 21; EX1007, 46). According to Petitioner, FIPA97 also discloses that the Control Agent of that contract-net will set a trigger with a precondition (“preconditions2”) within the GA (“agent registry”) and that the GA will then monitor for

changes over a given time period ("Deadline") and inform the CA of any changes that conform to the precondition within that period. *Id.* at 60–61 (citing Ex. 1011, 21). Petitioner argues that FIPA97, therefore, teaches a "trigger declaration" ("preconditions2") set within the "agent registry" ("GA") that relates to the status of "one active agent." *Id.* at 61.

In the Patent Owner Response, Patent Owner contends that "Petitioner offers no explanation whatsoever as to why a person of ordinary skill in the art would be motivated to incorporate this alleged feature of *FIPA97* into a data structure which Petitioner alleges to be disclosed in *Kiss* (since Claim 8 depends on Claim 5)." PO Resp. 112.

In the Petitioner Reply, Petitioner asserts that the Petition explains that the "administrative functionality" and "exemplary practices" of FIPA97 would be combined with Kiss (Pet. Reply 76 (citing Pet. 28)) and further explains that "[a] Skilled Artisan would also have been motivated" to make this combination due to a myriad of reasons, including that:

> Kiss, must use a <u>common communications protocol</u> . . . **and related management functionality**, EX1020, 2; EX1046, 50, and therefore would have been motivated to consider and employ one of the available <u>inter-agent communications languages</u> **and its related functionality**, and because doing so would have been a convenient and efficient way to <u>facilitate effective communication</u> between agents. EX1003,¶223.

(*id.* at 77 (underlined emphases added) (citing Pet. 29–30)).

The reasons to combine cited in the Petitioner Reply, however, are directed to Petitioner's proposed combination of Kiss's electronic agents and their general functions and operations, including agent collaboration, agent registry, and inter-agent messaging, with

FIPA97's ACL and related functionality "because doing so would have been a convenient and efficient way to facilitate effective communication between agents." *See* Pet. 29–30; *see also* § III.H.1. *supra*. But, here, with respect to claim 8, Petitioner is proposing a different (or additional) combination—that is, combining the registry of Kiss with the registry of FIPA97, or more specifically, combining Kiss's agent registry data structure with the "trigger declaration" ("preconditions2") set within FIPA97's "agent registry" ("GA"). Petitioner does not discuss adequately in the Petition (or the Petitioner Reply) *how* or *why* Kiss's agent registry data structure would have been combined with FIPA97's "trigger declaration" set within its "agent registry" ("GA") to obtain the subject matter of claim 8. *See TriVascular,* 812 F.3d at 1066.

Accordingly, based on the complete record, we determine Petitioner does not demonstrate by a preponderance of the evidence that the subject matter of claim 8 would have been obvious over the proposed combination of Kiss and FIPA97.

*6. Dependent Clam 15*

Claim 15 depends from claim 1 and further recites "wherein the base goal requires setting a trigger having conditional functionality and consequential functionality." Ex. 1001, 30:43–45. Citing a technical dictionary, Petitioner asserts that the ordinary meaning of "conditional functionality" is taking an action based on a conditional determination that an action should take place as the result of the occurrence of a given precondition. Pet. 62 (citing Ex. 1034, 112, 244). As discussed above in

Section III.H.2(vi)(1)., we construe "trigger" to mean a general mechanism for requesting some action be taken when one or more conditions is met" for this Final Written Decision.

Petitioner asserts that Kiss illustrates in Figures 9–20 how the "base goal" in that example—"What is the effect of increasing sales by 20%" – requires "setting a trigger having conditional functionality and consequential functionality." Pet. 63. According to Petitioner, in that example, the production agent is asked to verify that the cost per unit does not exceed a certain level, and the production agent responds by asking the meta-agent to provide production line cost information, which causes the meta-agent to create a task on the agenda and to relay the request to the facilities agent. *Id.* (citing Ex. 1005, 13:22–47). Once the facilities agent responds with the request information, the meta-agent clears the task from the agenda and passes the requested information to the production agent. *Id.* (citing Ex. 1005, 13:48–55).

Petitioner argues that this functionality includes setting a "trigger" having "conditional functionality and consequential functionality." *Id.* According to Petitioner, the triggering event is the return of production line cost information from the facilities agent and that trigger has "conditional functionality" because a person of ordinary skill in the art would have understood that the meta-agent would not remove the task from the agenda until that triggering event occurs. *Id.* Petitioner further argues, that trigger also has "consequential functionality" because it will cause the meta-agent to pass the production line cost information to the production agent. *Id.* (citing Ex. 1003 ¶ 413).

In addition, Petitioner asserts FIPA97 also teaches the additionally recited limitation of claim 15 because FIPA97 discloses several performatives that have "trigger" functionality: Accept-proposal, Agree, Cfp, Propose, Request-when, Request-whenever, and Subscribe. *Id.* at 63–64 (citing Ex. 1007, 23–41). Petitioner contends that FIPA97 further discloses that each trigger may have "conditional functionality and consequential functionality"—e.g., the performative "request-whenever" shows a condition ("whenever the price of widgets rises from less than 50 to more than 50") triggering a consequence (agent j notifies agent i). *Id.* at 64 (citing Ex. 1007, 41). Citing the testimony of Dr. Lieberman, Petitioner argues that when the price of widgets changes the agent makes a "determination" that a specific action should or should not occur, in this case depending on whether the price has risen above 50, and, if the price is greater than 50, the agent takes a consequential action based off that determination and notifies Agent-I about the price change. *Id.* (citing Ex. 1003 ¶ 416).

Patent Owner does not respond separately to Petitioner's challenge to dependent claim 15 beyond Patent Owner's arguments advanced with respect to claim 1 discussed above. *See* PO Resp. 108–114.

Based on the complete record and for the reasons explained by Petitioner, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 15 is unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss and FIPA97.[36]

---

[36] We also find that Patent Owner has waived any argument directed to claim 15 aside from contesting the unpatentability of claim 1, from which

*7. Independent Claim 29*

Claims 1 and 29 are the only independent claims among the challenged claims. Although many of the limitations recited in claims 1 and 29 are similar, there exist material differences in the claim language of these claims. For example, claim 1 recites

> constructing a goal satisfaction plan wherein the goal satisfaction plan includes:
>
> a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and
>
> dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent,

whereas claim 29 recites

> constructing a base goal satisfaction plan including the sub-acts of:
>
> determining whether the request service is available,
>
> determining sub-goals required in completing the base goal by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms,
>
> selecting service-providing electronic agents from the agent registry suitable for performing the determined sub-goals, and,

---

claim 15 depends, over the combination of Kiss and FIPA97. *See* Paper 16, 7.

ordering a delegation of sub-goal requests complete the requested service.

Ex. 1001, 29:32–43 (claim 1), 32:9–22 (claim 29). As apparent in the claim language reproduced above, there exist material differences between these limitations on the face of the claims.

When addressing the "constructing a base goal satisfaction plan" limitation and its elements recited in claim 29, however, Petitioner's analysis consists of a single sentence pointing to its analysis for similar but materially different limitations from claim 1. *See* Pet. 69 ("Kiss/FIPA97 satisfies this claim for the reasons stated in §§VI.A.1.h."). Petitioner does not address the claim language of claim 29 or explain why its analysis for claim 1 is sufficient to demonstrate that the combination of Kiss and FIPA97 teaches the limitations of claim 29. Accordingly, in the Institution Decision, we determined that the information presented in the Petition did not demonstrate a reasonable likelihood of Petitioner prevailing in its challenge to claim 29 under 35 U.S.C. § 103(a) as obvious over the combination of Kiss and FIPA97. Inst. Dec. 79–80.

In the Petitioner Reply, Petitioner contends that "there are no 'material differences' between claim 1 and claim 29" and, therefore, "the evidence relied on in the Petition discloses each and every limitation of Claim 29." Pet. Reply 67. Asserting that "Patent Owner does not argue that there are ['material differences' between claim 1 and claim 29]," Petitioner goes on to present comparisons of the claim language of claim 1 and claim 29 and argues the combination of Kiss and FIPA97 teaches the limitations of claim 29. *Id.* at 67–74.

Patent Owner disputes Petitioner's contention in the Reply and asserts that Petitioner's arguments relating to claim 29 are new arguments presented for the first time in the Reply, and, therefore, should not be considered. PO Sur-reply 54–58.[37]

We agree with Patent Owner. Petitioner does not explain why its arguments relating to claim 29 in the Reply could not be presented in the first instance in the Petition or how the arguments in the Reply are responsive to Patent Owner's arguments in the Patent Owner Response. Indeed, the claim 29 section in the Petitioner Reply does not cite to the Patent Owner Response at all. *See* Pet. Reply 66–74.

Further, we are not persuaded by Petitioner's argument that "there are no 'material differences' between claim 1 and claim 29." Pet. Reply 67. Whether the claim language of a recitation in a claim is material to the patentability of the claim raises an issue of claim construction.[38] *See Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373–76 (Fed. Cir. 2019) (discussing claim construction of a "wherein" clause to determine

---

[37] Patent Owner also argues that, because Petitioner makes these arguments for the first time in the Reply, Patent Owner was unable to depose Petitioner's expert regarding Patent Owner's assertions and Patent Owner's expert did not have the ability to respond to them. PO Sur-reply 57.

[38] We note that it was Petitioner's affirmative duty to explain in the Petition how the challenged claims should be construed and how, as so construed, they are unpatentable. *See* 37 C.F.R. § 42.104(b)(3)–(4). Thus, had Petitioner intended to argue claim construction of claims 1 and 29 such that "there are no 'material differences' between claim 1 and claim 29," such an analysis should have been set forth explicitly in the Petition. As discussed below, even if we were to consider Petitioner's claim construction argument presented belatedly in the Reply, we are not persuaded that "there are no 'material differences' between claim 1 and claim 29," as Petitioner contends.

whether the "wherein" clause is material to patentability); *see also SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 429 (Fed. Cir. 2016) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so" (quoting *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005)); "The preference for giving meaning to all terms, however, is not an inflexible rule that supersedes all other principles of claim construction" (citing *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004)). Petitioner, however, does not present sufficient claim construction analysis to show why "there are no 'material differences' between claim 1 and claim 29." For example, Petitioner equates "determining whether the request service is available" recited in claim 29 to "a suitable delegation" recited in claim 1. Pet. Reply 69 ("*determining whether the request service is available*," (*i.e*, "*a* ***suitable*** *delegation*,")). Petitioner also equates "determining sub-goals required in completing the base goal" recited in claim 29 to "to best complete the requested service request" recited in claim 1. *Id.* ("*determining sub-goals required in completing the base goal*," (*i.e.*, "*to best* ***complete the requested service request***.")). But Petitioner does not discuss claim construction of these limitations or explain why the differences in the claim language on the face of these limitations are not material to the patentability of the claims 1 and 29. *See id.* at 69–71.

Instead, Petitioner in the Reply discusses how Kiss teaches the limitations recited in claim 29. *See id.* Thus, rather than persuasively explaining why "there are no 'material differences' between claim 1 and

claim 29," the Reply presents arguments and evidence on how Kiss teaches the limitations recited in claim 29.

Such arguments and evidence are the type of material that should have been included in the Petition in the first instance to present a *prima facie* case of unpatentability, and, therefore, are improperly introduced for the first time in the Petitioner Reply. *See* Patent Trial and Appeal Board Consolidated Trial Practice Guide 73–75 (Nov. 2019) ("Consolidated Trial Practice Guide"), *available at* https://www.uspto.gov/TrialPracticeGuideConsolidated (discussing the appropriate scope for a reply); *id.* at 73 ("Petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g. to make out a prima facie case of unpatentability."). It was Petitioner's burden to demonstrate sufficiently in the Petition that the cited prior art renders the challenged claims unpatentable, including showing that the Petition's contentions are supported by evidence. *See* 35 U.S.C. § 314(a); *see also Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) ("In an IPR, the petitioner has the burden *from the onset* to show *with particularity* why the patent it challenges is unpatentable." (emphases added)) (citing 35 U.S.C. § 312(a)(3)); *Intelligent Bio-Systems*, 821 F.3d at 1369 (requiring "*the initial petition* identify '*with particularity*' the 'evidence that supports the grounds for the challenge to each claim.'" (emphases added)). Based on the complete record, we determine that the Petition did not meet this burden required on Petitioner with respect to claim 29. Thus, under the particular facts and circumstances in this case, we decline to consider Petitioner's arguments and evidence relating to claim 29 presented belatedly in the Petitioner Reply.

Accordingly, based on the complete record, we determine that Petitioner does not demonstrate by a preponderance of evidence that claim 29 is unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss and FIPA97.

*8. Dependent Claims 30–32 and 38*

Claims 30–32 and 38 depend directly or indirectly from claim 29. Petitioner's arguments and evidence presented with respect to dependent claims 30–32 and 38 only address the additionally recited limitations of these claims, and, therefore, do not remedy the deficiencies in Petitioner's analysis of independent claim 29 discussed above. *See* Pet. 69–75.

Therefore, for the same reasons discussed above with respect to claim 29, Petitioner does not demonstrate by a preponderance of evidence that claims 30–32 and 38 are unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss and FIPA97.

*I. Claims 7, 16, and 39 as Obvious over Kiss, FIPA97, and Cheyer*

Claims 7, 16, and 39 depend directly or indirectly from claims 1 or 29. Petitioner adds the teachings of Cheyer (Ex. 1015) to the basic combination of Kiss and FIPA97 in an asserted ground of obviousness as to these dependent claims. Pet. 75–79.

*1. Cheyer (Ex. 1015)*

Cheyer describes an implementation of SRI International's Open Agent Architecture (OAA), which is mentioned in the '115 patent as a

starting point for the subject matter described in the patent. Ex. 1015, 55[39] (Abstract); Ex. 1001, 4:44–55. Cheyer describes a system called MVIEWS (Multimodal Video Imagery Exploitation WorkStation) which uses a distributed multiagent framework that enables rapid integration of component technologies, such as pen and voice recognition and interpretation, image processing and object tracking, geo-referenced interactive maps, multimedia databases, and human collaborative tools. Ex. 1015, 55. The implementation disclosed in Cheyer is designed to support "[m]ilitary and intelligence analysts," by "annotating, indexing, extracting, and disseminating information from video streams for surveillance and intelligence applications." *Id.*

Cheyer uses the Interagent Communication Language (ICL), which provides the means for interaction among agents. *Id.* at 58. Cheyer describes that agents declare descriptions of data they manage. *Id.* According to Cheyer, data declarations and functions also make use of the notion of parameter lists, where parameters specify information about permissions, scoping, persistence, whether duplicate values are allowed, and so forth. *Id.* at 59. Cheyer also describes "triggers," which allow an agent, or set of agents, to monitor some potentially complex state in the world, performing an action if the trigger's test conditions become true. *Id.*

Petitioner asserts that Cheyer was published in 1998 in conjunction with the 1998 International Conference on Intelligent User Interfaces ("IUI98") that took place on January 6–9, 1998. Pet. 27 (citing Ex. 1015, ii

---

[39] The page numbers for Exhibit 1036 refer to the page numbers inserted by Petitioner in the bottom, right-hand corner of each page.

(evidencing receipt by libraries on March 17, 1998)). Petitioner contends that Cheyer, therefore, is prior art to the ’115 patent under 35 U.S.C. § 102(a). *Id.*

Patent Owner does not contest the applicability of Cheyer as prior art in this proceeding. *See generally* PO Resp.

We note that Cheyer was published by Association for Computing Machinery (ACM) and bears the Copyright date of 1998 from ACM. Ex. 1015, ii. Like IEEE publications, ACM publications, such as the one in which Cheyer appeared, are distributed widely and intended to be accessible to the public. The wide distribution of publications from IEEE and ACM distinguishes them from academic papers such as masters and doctoral theses, which in some cases may not be well catalogued or indexed. The Board has accepted the copyright date of an IEEE publication as evidence of its public availability. *Ericsson, Inc. v. Intellectual Ventures I LLC*, Case IPR2014-00527, Paper 41 at 10 (PTAB May 18, 2015). In view of the reliability of ACM publications and their wide distribution, as well as the evidence provided by Petitioner that the publication containing the Cheyer article was provided to libraries for circulation to the public, in the Institution Decision, we found that Petitioner demonstrated sufficiently that Cheyer qualifies as applicable prior art. Inst. Dec. 81–82.

During the trial, the parties did not dispute Cheyer qualifies as prior art in this case. Based on the complete record, we determine that Petitioner has established by a preponderance of the evidence that Cheyer is a prior art printed publication to the ’115 patent under 35 U.S.C. § 102(a).

### *2. Motivation to Combine*

Petitioner asserts that it would have been obvious to use Cheyer's data declarations in the combined Kiss/FIPA97 system because to do so would have been simply the arrangement of old elements (the Kiss system, the FIPA ACL and the Cheyer data declarations) with each performing the same function it had been known to perform and yielding no more than what one would expect from such an arrangement (i.e., the declaration of data characteristics in a distributed agent system using an inter-agent communication language. Pet. 76 (citing Ex. 1003¶ 368). Petitioner further argues that a Skilled Artisan would have been motivated to use the techniques of Cheyer to provide more information as to the type or characteristics of data a particular agent would be able to handle because such additional specific information would permit the meta-agent, or facilitator, to more readily identify an client agent who could best satisfy a sub-goal. *Id.* (citing Ex. 1003 ¶ 369).

Patent Owner does not dispute Petitioner's articulation of the reasons to combine Kiss, FIPA97, and Cheyer. *See generally* PO Resp.

Based on the complete record, we determine Petitioner has provided sufficient reasons why a person of ordinary skill in the art would have combined Kiss, FIPA97, and Cheyer.

### *3. Claim 7*

Claim 7 depends from claim 5 and further recites "wherein the agent registry data structure includes at least one data declaration for each active agent." Ex. 1001, 30:7–9. As discussed above in Section III.H.4., Petitioner

has shown by a preponderance of the evidence that the subject matter of claim 5 would have been obvious over the combination of Kiss and FIPA97. Petitioner contends that the subject matter of claim 7 would have been obvious over the combination of Kiss, FIPA97, and Cheyer. Pet. 75–76.

Petitioner asserts that Cheyer discloses use of data declarations in its agent registry. *Id.* at 76 (citing Ex. 1015, 58). Citing the testimony of Dr. Lieberman, Petitioner contends that it would have been obvious to use Cheyer's data declarations in the combined Kiss/FIPA97 system because to do so would have been simply the arrangement of old elements (the Kiss system, the FIPA ACL and the Cheyer data declarations) with each performing the same function it had been known to perform and yielding no more than what one would expect from such an arrangement (i.e., the declaration of data characteristics in a distributed agent system using an inter-agent communication language). *Id.* (citing Ex. 1003 ¶ 368). Petitioner further argues that a person of ordinary skill in the art would have been motivated to use the techniques of Cheyer to provide more information as to the type or characteristics of data a particular agent would be able to handle. *Id.* (citing Ex. 1003 ¶ 368). Petitioner asserts that such additional specific information would permit the meta-agent, or facilitator, to more readily identify a client agent who could best satisfy a sub-goal. *Id.* (citing Ex. 1003 ¶ 368).

Patent Owner does not respond separately to Petitioner's challenge to dependent claim 7 beyond Patent Owner's arguments advanced with respect to claims 1 and 5 discussed above. *See* PO Resp. 108–114.

Based on the complete record and for the reasons explained by Petitioner, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 7 is unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss, FIPA97, and Cheyer.[40]

*4. Claim 16*

Claim 16, which depends from claim 15, recites as follows:

> 16. A compute-implemented method as recited in claim 15 wherein the trigger is an outgoing communications trigger, the computer implemented method further including the acts of:
>
> monitoring all outgoing communication events in order to determine whether a specific outgoing communication event has occurred; and
>
> in response to the occurrence of the specific outgoing communication event, performing the particular action defined by the trigger.

Ex. 1001, 30:46–49.

*a. “outgoing communications trigger”*

Petitioner asserts that Cheyer teaches “an outgoing communications trigger” in the form of a trigger that fires “[i]f any agent sends” a message. Pet. 77 (citing Ex. 1015, 59). According to Petitioner, triggers in Cheyer “monitor some potentially complex state in the world, performing an action if the trigger’s test conditions become true.” *Id.* (citing Ex. 1015, 59). Petitioner further asserts that Cheyer discloses four types of triggers; data, time, communication, and task triggers. *Id.* (citing Ex. 1015, 59). Petitioner

[40] We also find that Patent Owner has waived any argument directed to claim 7 aside from contesting the unpatentability of claims 1 and 5 over the combination of Kiss and FIPA97. *See* Paper 16, 7.

argues that the "communication trigger" in Cheyer can therefore be set to fire "if any agent sends" a message—that is, the precondition of the trigger is defined in terms of an agent sending a message (i.e., a communications trigger). *Id.* (citing Ex. 1015, 59). Petitioner asserts that, therefore, Cheyer teaches an "outgoing communications trigger" recited in claim 16. *Id.* at 78.

Patent Owner does not specifically dispute that Cheyer teaches this "outgoing communications trigger" limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Cheyer teaches "an outgoing communications trigger" recited in claim 16.[41]

*b. "monitoring all outgoing communication events in order to determine whether a specific outgoing communication event has occurred"*

Addressing the next limitation of claim 16, Petitioner asserts that Cheyer discloses that the triggers in OAA "monitor some potentially complex state in the world, performing an action if the trigger's test conditions become true." Pet. 78 (citing Ex. 1015, 59). Petitioner argues that because Cheyer's trigger can be set so that it fires when "any agent sends" a message (*id.* (citing Ex. 1015, 59)), the trigger will "monitor" the system to determine "if **any agent sends**" a message ("all outgoing communication events") that matches the "trigger's test conditions" ("to determine whether a specific outgoing communication event has occurred") (*id.* (citing Ex. 1015, 59)).

[41] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

Patent Owner does not specifically dispute that Cheyer teaches this "monitoring all outgoing communication events" limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Cheyer teaches "monitoring all outgoing communication events in order to determine whether a specific outgoing communication event has occurred," as recited in claim 16.[42]

*c. "in response to the occurrence of the specific outgoing communication event, performing the particular action defined by the trigger"*

Petitioner asserts that Cheyer discloses that triggers "monitor some potentially complex state in the world, performing an action if the trigger's test conditions become true." Pet. 78 (citing Ex. 1015, 59). Petitioner further contends that the trigger in OAA may define "the action part of a trigger" and it "may be any compound task executable by the dynamic community of agents." *Id.* (citing Ex. 1015, 59). According to Petitioner, Cheyer describes "[f]or instance, . . . the user can now say or write 'If email arrives ... , fax it to Bill.'" *Id.* at 78–79 (citing Ex. 1015, 59). Petitioner argues that in Cheyer, both the precondition (i.e., "If email arrives . . . ,") and the action (i.e., "fax it to Bill") are defined inside of the trigger definition. *Id.* at 79 (citing Ex. 1015, 59).

Petitioner asserts that Cheyer, therefore, discloses a trigger that performs "an action if the trigger's test conditions become true" ("in

---

[42] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

response to the occurrence of the specific outgoing communication event performing the particular action"), and where the trigger's "action [is] defined by the trigger" (i.e., "fax it to Bill"). *Id.* (citing Ex. 1003 ¶ 424).

Patent Owner does not specifically dispute that Cheyer teaches this "performing the particular action defined by the trigger" limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Cheyer teaches "in response to the occurrence of the specific outgoing communication event, performing the particular action defined by the trigger," as recited in claim 16.[43]

*d. Conclusion*

Based on the complete record and for the reasons explained by Petitioner, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 16 is unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss, FIPA97, and Cheyer.

*5. Claim 39*

Claim 39 depends indirectly from claim 29. Petitioner's arguments and evidence presented with respect to dependent claim 39 only address the additionally recited limitation of the claim, and, therefore, do not remedy the deficiencies in Petitioner's analysis of independent claim 29 discussed above. *See* Pet. 76–79.

---

[43] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

Therefore, for the same reasons discussed above with respect to claim 29, Petitioner does not demonstrate by a preponderance of evidence that claim 39 is unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss, FIPA97, and Cheyer.

### *J. Patent Owner's Motion to Exclude*

Patent Owner filed a Motion to Exclude (Paper 35) "a portion of Exhibit 1129, as well as related testimony relied on by [Petitioner]." Paper 35, 1. Exhibit 1129 is the deposition transcript of Patent Owner's declarant Dr. Medvidovic, taken on May 19, 2020. In particular, Patent Owner seeks to exclude lines 53:19–54:21 of Exhibit 1129, which contain certain deposition testimony of Dr. Medvidovic regarding the "facilitator" of the '115 patent. We, however, do not rely on lines 53:19–54:21 of Exhibit 1129 or related testimony of Dr. Medvidovic for this Final Written Decision because whether the prior art teaches the claimed "facilitator agent" is not at issue for this Decision. Accordingly, we dismiss Patent Owner's Motion to Exclude as moot.

### *K. Patent Owner's Constitutional Challenges*

Patent Owner raises two constitutional challenges. First, Patent Owner argues that subjecting a pre-AIA patent, such as the '115 patent, retroactively to *inter partes* review violates the Takings and Due Process Clauses of the Fifth Amendment. PO Resp. 146. Second, Patent Owner asserts that *inter partes* reviews violate the Appointments Clause of the U.S. Constitution when conducted by administrative patent judges not nominated by the President and confirmed by the Senate. *Id.*

Addressing first Patent Owner's Appointments Clause challenge, we are bound by the Federal Circuit's decision in *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019) (*cert. granted sub nom. United States v. Arthrex, Inc.*, 2020 WL 6037206 (Oct. 13, 2020)), which addressed this issue. *See* 941 F.3d at 1337 ("This as-applied severance . . . cures the constitutional violation."); *see also Arthrex, Inc. v. Smith & Nephew, Inc.*, 953 F.3d 760, 764 (Fed. Cir. 2020) (Moore, J., concurring in denial of rehearing) ("Because the APJs were constitutionally appointed as of the implementation of the severance, *inter partes* review decisions going forward were no longer rendered by unconstitutional panels."). Accordingly, we do not consider this issue any further.

With regard to the Takings and Due Process Clause challenge, we note that challenges to retroactive application of IPRs to pre-AIA patents have been addressed by the Federal Circuit in *Celgene Corp. v. Peter*, 931 F.3d 1342, 1357–1363 (Fed. Cir. 2019), *cert. denied* 2020 WL 3405867 (June 22, 2020) (Takings Clause) and *Sound View Innovations, LLC v. Hulu, LLC*, Nos. 2019-1865, 2019-1867, 2020 WL 3583556, *3 (Fed. Cir. July 2, 2020) (non-precedential) (Due Process Clause). Accordingly, we do not consider this issue any further.

## IV. CONCLUSION

For the foregoing reasons, we conclude that Petitioner has met its burden of proof, by a preponderance of the evidence, in showing that claims 1, 4–7, 15, and 16 of the '115 patent are unpatentable. For the reasons discussed above, Petitioner has not demonstrated, by a preponderance of the

evidence, claims 8–10, 29–32, 38, and 39 of the ’115 patent are unpatentable. The chart below summarizes our conclusions.

| Claims | 35 U.S.C. § | References/ Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 4–10, 15, 29–32, 38 | 103(a) | Kiss and FIPA97 | 1, 4–7, 15 | 8–10, 29–32, 38 |
| 7, 16, 39 | 103(a) | Kiss, FIPA97, and Cheyer | 7, 16 | 39 |
| Overall Outcome | | | 1, 4–7, 15, 16 | 8–10, 29–32, 38, 39 |

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 4–7, 15, and 16 of the ’115 patent are determined to be unpatentable;

FURTHER ORDERED that claims 8–10, 29–32, 38, and 39 of the ’115 patent are not determined to be unpatentable;

FURTHER ORDERED that Patent Owner’s Motion to Exclude is dismissed as moot; and

FURTHER ORDERED that, because this is a Final Written Decision, a party to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Joseph Micallef
Scott Border
jmicallef@sidley.com
sborder@sidley.com

PATENT OWNER:

Steven Hartsell
Alexander Gasser
Sarah Spires
shartsell@skiermontderby.com
agasser@skiermontderby.com
sspires@skiermontderby.com

Trials@uspto.gov
571-272-7822

Paper 44
Entered: October 15, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MICROSOFT CORPORATION,
Petitioner,

v.

IPA TECHNOLOGIES INC.,
Patent Owner.

---

Case IPR2019-00811
Patent 6,851,115 B1

---

Before LYNNE E. PETTIGREW, MINN CHUNG, and KEVIN C. TROCK, *Administrative Patent Judges*.

CHUNG, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

In this *inter partes* review, instituted pursuant to 35 U.S.C. § 314, Microsoft Corporation ("Petitioner") challenges the patentability of claims 1, 12–14, 26–29, 33, 35–37, 45–47, and 86–89 (the "challenged claims") of U.S. Patent No. 6,851,115 B1 (Ex. 1001, "the '115 patent"), owned by IPA Technologies Inc. ("Patent Owner"). This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed below, we determine Petitioner has shown by a preponderance of the evidence that claims 1, 12–14, and 26–28 of the '115 patent are unpatentable, but has not proven by a preponderance of the evidence that claims 29, 33, 35–37, 45–47, and 86–89 of the '115 patent are unpatentable.

# II. BACKGROUND

## *A. Procedural History*

On March 19, 2019, Petitioner filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of the challenged claims of the '115 patent. Patent Owner filed a Preliminary Response (Paper 6, "Prelim. Resp.").

On October 16, 2019, applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we instituted an *inter partes* review of the challenged claims. Paper 12 ("Inst. Dec."). In the Institution Decision, we determined Petitioner demonstrated a reasonable likelihood that it would prevail as to at least one challenged claim, and we instituted trial on all claims and all grounds in the Petition. Inst. Dec. 87–88.

After institution, pursuant to our order consolidating briefing (Paper 19), the parties filed consolidated papers in in IPR2019-00810, IPR2019-00811, IPR2019-00812, IPR2019-00813, and IPR2019-00814. Patent Owner filed a Patent Owner Response (Paper 22, "PO Resp."), Petitioner filed a Reply to Patent Owner Response (Paper 30, "Pet. Reply"), and Patent Owner filed a Corrected Sur-reply (Paper 40, "PO Sur-reply"). In addition, in IPR2019-00810, Patent Owner moved to exclude (Paper 35) a portion of Exhibit 1129, as well as related testimony relied on by Petitioner; Petitioner opposed (Paper 36); and Patent Owner replied (Paper 38).

A consolidated oral hearing in IPR2019-00810, IPR2019-00811, IPR2019-00812, IPR2019-00813, IPR2019-00814, IPR2019-00835, IPR2019-00836, and IPR2019-00837 was held on July 27, 2020 and July 28, 2020, and a copy of the hearing transcript has been entered into the record. Paper 43 ("Tr.").

*B. Related Matters*

According to the parties, the '115 patent is the subject of the following district court litigation: *IPA Techs. Inc. v. Google LLC*, No. 1:18-cv-00318 (D. Del.); *IPA Techs. Inc. v. Microsoft Corp.*, No. 1:18-cv-00001 (D. Del.); and *IPA Techs. Inc. v. Amazon.com, Inc.*, No. 1:16-cv-01266 (D. Del.). Pet. 2–3; Paper 3, 2. The '115 patent is also the subject of co-pending petitions for *inter partes* review filed by Petitioner in Cases IPR2019-00810, IPR2019-00812, IPR2019-00813, and IPR2019-00814. Paper 3, 2.

*C. The ’115 Patent*

The ’115 patent describes “software-based architectures for communication and cooperation among distributed electronic agents.” Ex. 1001, 1:27–29. Figure 4 of the ’115 patent is reproduced below.




Fig. 4

Figure 4 depicts the structure of an exemplary distributed agent system of the ’115 patent. *Id.* at 6:25–32. As shown in Figure 4, system 400 includes facilitator agent 402, user interface agents 408, application agents 404, and meta-agents 406. *Id.* at 6:25–28. The ’115 patent describes that system 400 is organized “as a community of peers by their common relationship” to facilitator agent 402 (*id.* at 6:28–30), which is “a specialized server agent

that is responsible for coordinating agent communications and cooperative problem-solving" (*id.* at 6:32–35).

According to the '115 patent, cooperation among agents is structured around a three-part approach as follows: (1) providers of services register their capabilities specifications with a facilitator; (2) requesters of services construct goals and relay them to the facilitator; and (3) the facilitator coordinates the efforts of the appropriate service providers in satisfying these goals. *Id.* at 10:42–47. The '115 patent describes that cooperation among agents is achieved via messages expressed in a common language, called the Interagent Communication Language ("ICL"). *Id.* at 10:40–48.

Referencing Figure 3 (not reproduced herein) and Figure 4, the '115 patent describes the operation of a distributed agent system in a preferred embodiment. *Id.* at 7:13–39. The '115 patent describes that, when invoked, a client agent makes a connection to a facilitator, e.g., facilitator agent 402, and registers with the facilitator a specification of the capabilities and services it can provide. *Id.* at 7:15–21. For example, a natural language agent may register the characteristics of its available natural language vocabulary. *Id.* at 7:21–23. When facilitator agent 402 receives a service request and determines that registered services 416 of one of its client agents will help satisfy a goal of the request, the facilitator sends that client a request expressed in ICL 418. *Id.* at 7:25–29. The client agent parses this request, processes it, and returns answers or status reports to the facilitator. *Id.* at 7:30–32.

Referencing Figures 5 and 6 (not reproduced herein), the '115 patent describes an exemplary embodiment where user interface agent 408 runs on

a user's laptop, accepting user input, sending requests to facilitator agent 402 for delegation to appropriate agents, and displaying the results of the distributed computation. *Id.* at 7:53–63. As illustration, the '115 patent describes that, when the question "What is my schedule?" is entered on user interface (UI) 408, UI 408 sends the request to facilitator agent 402, which in turn asks natural language (NL) agent 426 to translate the query into ICL. *Id.* at 8:4–8. The translated ICL expression is then routed by facilitator agent 402 to appropriate agents, e.g., calendar agent 434, to execute the request. *Id.* at 8:13–15. Finally, results are sent back to UI agent 408 for display. *Id.* at 8:15–16.

*D. Illustrative Claim*

Of the challenged claims, claims 1, 29, and 86 are independent. Claim 1 is illustrative of the challenged claims and is reproduced below.

> 1. A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents, comprising the acts of:
>
> registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language, wherein the inter-agent language includes:
>
> a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events;
>
> a content layer comprising one or more of goals, triggers and data elements associated with the events;
>
> receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression; and

dynamically interpreting the arbitrarily complex goal expression, said act of interpreting further comprising:

generating one or more sub-goals expressed in the inter-agent language;

constructing a goal satisfaction plan wherein the goal satisfaction plan includes:

a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and

dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent.

Ex. 1001, 29:10–44.

*E. Applied References and Declarations*

Petitioner relies upon the following references in its challenges to patentability.

| Reference and Relevant Date(s) | Designation | Exhibit No. |
|---|---|---|
| U.S. Patent No. 6,484,155 B1 (filed July 21, 1999; provisional filed July 21, 1998) | Kiss[1] | Ex. 1005 |

[1] For clarity and ease of reference, we only list the first named inventor.

| Reference and Relevant Date(s) | Designation | Exhibit No. |
|---|---|---|
| FIPA 97 Version 1.0 Specification (Oct. 10, 1997)[2] | FIPA97 | Exs. 1006–1012[3] |
| Douglas B. Moran, et al., *Multimodal User Interfaces in the Open Agent Architecture,* PROCEEDINGS OF 1997 INTERNATIONAL CONFERENCE ON INTELLIGENT USER INTERFACES 61 (1997)[4] | Moran | Ex. 1013 |

Petitioner also cites the Declaration of Dr. Henry Lieberman, HDR (Ex. 1003, "Lieberman Declaration" or "Lieberman Decl.") in support of its unpatentability contentions. In addition, Petitioner relies on the Declaration of Dr. Timothy Finin, Ph.D. (Ex. 1049, "Finin Declaration" or "Finin

[2] Petitioner asserts that FIPA97 was accessible to the public by October 1997 and submits various evidence in support of its contention. *See* Pet. 23–25. Patent Owner contends that Petitioner has not shown sufficiently that FIPA97 was accessible to the public before the priority date of the '115 patent. PO Resp. 45–65. As discussed below in Section III.D., we determine that Petitioner has shown by a preponderance of the evidence that FIPA97 was accessible to the public by October 1997.

[3] Petitioner asserts that FIPA97 was made publicly available as a single document. Pet. 23 (citing Ex. 1055). Petitioner explains that, due to its size, the reference was broken up into 7 parts and filed as Exhibits 1006 through 1012. *Id.* Patent Owner does not dispute that FIPA97 is one reference for purposes of §§ 102 and 103. *See* PO Resp. 117–120. As discussed below in Section III.C.2., we agree with Petitioner that FIPA97 constitutes a single prior art reference, and we treat it as such for purposes of our unpatentability analysis.

[4] Petitioner contends that Moran was published in 1997. Pet. 27. Patent Owner does not dispute the publication date of Moran. For the reasons explained below, we determine that Petitioner has shown sufficiently that Moran was accessible to the public in 1997.

Decl.”). Patent Owner relies on the Declaration of Nenad Medvidovic, Ph.D. (Ex. 2032, “Medvidovic Declaration” or “Medvidovic Decl.”) and the Declaration of Philip R. Cohen, Ph.D. (Ex. 2033, “Cohen Declaration” or “Cohen Decl.”) in support of its Patent Owner Response.

### *F. Instituted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability:

| Claims Challenged | 35 U.S.C. § | Basis |
|---|---|---|
| 1, 26–29, 33, 45–47, 86–89 | § 103(a)[5] | Kiss and FIPA97 |
| 12–14, 35–37 | § 103(a) | Kiss, FIPA97, and Moran |

Pet. 3–4.

## III. ANALYSIS

### *A. Level of Ordinary Skill in the Art*

We begin our analysis by addressing the level of ordinary skill in the art. Petitioner’s declarant, Dr. Lieberman, opines that a person of ordinary skill in the art at the time of the invention of the ’115 patent would have been someone familiar with the principles and conventions of computer science and computer networking, and also with multi-agent systems and

[5] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) (“AIA”), amended 35 U.S.C. §§ 102 and 103. Because the ’115 patent has an effective filing date prior to the effective date of the applicable AIA amendments, we refer to the pre-AIA versions of §§ 102 and 103.

inter-agent communication languages as documented in agent-centered literature by 1999. Ex. 1003 ¶ 34; *see* Pet. 4–5 (citing Ex. 1003 ¶ 34). Dr. Lieberman also testifies that a person of ordinary skill in the art may have been a graduate student in mathematics, engineering, or computer science, and may have had an advanced degree in one of these disciplines, and would also have had at least two years of experience working in the field of computer science, or a related field, and may have worked in academia, either as a professor or a graduate student, for a technology company, or for a government. *Id.*

Citing the testimony of its declarant, Dr. Medvidovic, Patent Owner asserts that a person of ordinary skill in the art at the time of the ’115 patent’s filing date would have had “a Bachelor’s degree in Computer Science or equivalent field and at least two years of work experience in design and development of distributed systems, software specification languages, or a related area.” PO Resp. 23 (citing Ex. 2032 ¶ 37). Patent Owner criticizes Petitioner’s articulation of the level of ordinary skill in the art as being “vague and uncertain” due to Petitioner’s and Dr. Lieberman’s use of the word “may” in their proposed definition. *Id.* at 23–24. Patent Owner contends that Petitioner’s proposed definition “leav[es] every aspect of the level of skill ‘fluid,’” which is “particularly problematic here, where Petitioner claims that it would have been obvious to create an agent system that is very complex and advanced in its facilitation, goal processing, and inter-agent communication capacities.” *Id.* at 24 (citing Ex. 2032 ¶ 40).

Petitioner responds that its proposal “simply (and realistically) expresses alternatives—*i.e.*, that a Skilled Artisan would have been at least a

graduate student in several relevant fields (*e.g*, 'mathematics, engineering, or computer science'), and would have had at least two years of work experience in those fields." Pet. Reply 13–14 (citing Pet. 4–5). Petitioner also argues that Patent Owner does not articulate how any differences between the parties' proposals that would alter or even affect the outcome of this proceeding. *Id.* at 14.

Patent Owner asserts that it has "identified how the difference between the proposals would affect this proceeding" because Patent Owner has pointed out that "it is Petitioner's burden under the law to address each Graham factor and Petitioner has failed to proffer a coherent level of ordinary skill in the art, Petitioner's obviousness assertion fails for that reason alone." PO Sur-reply 15 (citing PO Resp. 24).

But Patent Owner does not identify any "meaningful differences" between the parties' proposed definitions or how "the outcome of [this proceeding] would have been different" if we adopted Patent Owner's proposed definition, as opposed Petitioner's proposal. *See ESIP Series 2, LLC v. Puzhen Life USA, LLC,* 958 F.3d 1378, 1385 (Fed. Cir. 2020) (citing *Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1371–72 (Fed. Cir. 2016)). For example, Patent Owner does not argue the challenged claims are not unpatentable under Patent Owner's proposed definition of the level of ordinary skill in the art, nor does it identify any claim limitation that would have been taught by the asserted prior art under Petitioner's proposed definition, but *not* under Patent Owner's proposal. *See* PO Resp. 23–24; PO Sur-reply 14–16.

In our view, the parties' proposals are not materially different despite the differences in wording between them (e.g., the education level of a Bachelor's degree in Computer Science or equivalent field under Patent Owner's proposal, as opposed to a graduate student's level of education with or without a Bachelor's degree under Petitioner's proposed definition). *See* Pet. 4–5; Pet. Reply 13–14; PO Resp. 23. For purposes of this Final Written Decision, we find no meaningful differences between the parties' respective definitions that would materially alter the outcome of this Decision. These proposals are similar for all purposes relevant to this Final Written Decision, and both are consistent with the level of ordinary skill in the art reflected in the disclosure of the '115 patent and the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

Nonetheless, for this Final Written Decision, we adopt Patent Owner's definition of a person of ordinary skill in the art at the time of the claimed invention. That is, a person of ordinary skill in the art at the time of the claimed invention would have had "a Bachelor's degree in Computer Science or equivalent field and at least two years of work experience in design and development of distributed systems, software specification languages, or a related area." Our analysis and conclusions in this Final Written Decision would be the same regardless of whether Petitioner's or Patent Owner's definition of the level of ordinary skill in the art is adopted.

### *B. Claim Construction*

In an *inter partes* review, we apply the same claim construction standard that would be used in a civil action under 35 U.S.C. § 282(b),

following the standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. § 42.100(b) (2019). In applying such standard, claim terms are generally given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art, at the time of the invention and in the context of the entire patent disclosure. *Phillips*, 415 F.3d at 1312–13. "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

In our Decision on Institution, we preliminarily interpreted five claim terms as follows.

| Term | Construction |
|---|---|
| "event" | "a message or goal communicated between agents" |
| "event type" | "a type of an event" |
| "goal" | "a request for service" |
| "arbitrarily complex goal expression" | "a goal expressed in a language or syntax that allows an expression, when appropriate or when desired, that expresses multiple sub-goals and can potentially include more than one type of logical connector (e.g., AND, OR, NOT), and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent, although not every goal is itself necessarily complex" |

| Term | Construction |
| --- | --- |
| "compound goal" | "a single goal expression that specifies multiple sub-goals to be performed" |

Inst. Dec. 29–38.

The parties do not dispute the constructions of these five terms in their Patent Owner Response or Petitioner Reply. *See* PO Resp. 25–27; Pet. Reply 1. Upon considering the complete record, we discern no reason to deviate from our preliminary constructions and, therefore, adopt the constructions of the claim terms "event," "event type," "goal," "arbitrarily complex goal expression," and "compound goal" as set forth above for this Final Written Decision.

In the Petition, Petitioner discusses constructions for six additional claim terms, including "goal satisfaction plan," "layer of conversational protocol," "content layer," "trigger," "symbolic name," and "parameter lists further refine the one or more events." Pet. 8–16. In addition, in the Petitioner Reply, Petitioner discusses construction of the claim term "process characteristics." Pet. Reply 12–13. Patent Owner disputes constructions for two terms, "goal satisfaction plan" and "process characteristics." *See* PO Resp. 24–38; PO Sur-reply 13–14. For this Final Written Decision, we need only to construe the term "goal satisfaction plan."

Patent Owner does not discuss Petitioner's proposed construction for the claim term "parameter lists further refine the one or more events" or propose its own construction for the term. *See* PO Resp. 24–38. Nonetheless, Patent Owner discusses meaning of this term in the context of Patent Owner's arguments that FIAP97 does not teach an "expandable . . .

inter-agent language" and "parameter lists" that "further refine the one or more events," as recited in claim 1. *See id.* at 97–106. Although Patent Owner's arguments raise an issue of claim construction, Patent Owner's arguments are closely related to and interspersed with Patent Owner's arguments that FIPA97 does not teach an "inter-agent language" recited in claim 1. Thus, for efficiency and completeness, we address this issue in the context of the patentability discussion below.

No other claim terms need to be construed expressly for purposes of this Final Written Decision. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that only terms that are in controversy need to be construed, and "only to the extent necessary to resolve the controversy"); *see also Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (applying *Vivid Techs.* in the context of an *inter partes* review).

*1. "goal satisfaction plan"*

The claim term "goal satisfaction plan" is recited in all but one of independent claims of the '115 patent—claims 1, 29, 61, 71, and 86, the one exception being claim 48. *See* Ex. 1001, 29:33–40 (claim 1), 32:9–21 (claim 29), 35:24–29 (claim 61), 36:17–23 (claim 71), 37:22–38:5 (claim 86). "[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning." *Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 904 (Fed. Cir. 2018) (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003). The parties do not contend that the term "goal satisfaction

plan" has different meanings in different claims of the '115 patent. *See* Pet. 10; PO Resp. 27–38; Pet. Reply 1–12; PO Sur-reply 2–13.

Petitioner contends that a "goal satisfaction plan" is a "procedure for sending one or more requests for service to one or more agents in order to satisfy a goal." Pet. 10. Patent Owner disagrees and asserts that the claim term "goal satisfaction plan" should be construed to mean "a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints." PO Resp. 28.

*a. Claim Language*

We begin our claim construction analysis by considering the language of the claims themselves. *Phillips*, 415 F.3d at 1314. Addressing the claim language of the disputed term, we note that the claim language "a goal satisfaction plan" indicates that the term's plain meaning is "a plan for satisfying a goal."

In the challenged independent claims 1 and 29, the term "goal satisfaction plan" is further limited (in different ways) by specific limitations recited in the claims. For example, claim 1 recites:

> constructing a goal satisfaction plan wherein *the goal satisfaction plan includes*:
>
> a suitable delegation of sub-goal requests to *best complete* the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms;

Ex. 1001, 23:33–40 (emphases added). In contrast, claim 29 recites:

> constructing a base *goal satisfaction plan including the sub-acts of*:
>
> determining whether the request service is available,
>
> determining sub-goals required in completing the base goal by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms,
>
> selecting service-providing electronic agents from the agent registry suitable for performing the determined sub-goals, and
>
> ordering a delegation of sub-goal requests complete the requested service;

*Id.* at 32:9–21 (emphasis added).

As shown above, the "optimal or near-optimal"[6] limiting feature argued by Patent Owner is recited in claim 1 ("a suitable delegation of sub-goal requests to *best complete* the requested service request"), but not in claim 29. This shows that the patentee knew how to restrict the "goal satisfaction plan" to "best complete the requested service request," i.e., satisfy a goal "in an optimal or near-optimal manner." If the patentee had intended to similarly restrict the "goal satisfaction plan" in claim 29, it could have done so using the language of claim 1, but did not. *See Intellectual*

---

[6] Patent Owner asserts that the term "optimal" and "near optimal" has a well-established meaning in the context of computer engineering, citing a technical dictionary, which defines optimization as "[t]he process of finding *the best solution* to some problem, where 'best' accords to prestated criteria." PO Sur-reply 6 (emphasis added) (citing Ex. 2078, 3).

*Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1379 (Fed. Cir. 2018) (citing *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1359 (Fed. Cir. 2016)).

Thus, Patent Owner's proposed construction that generally requires a "goal satisfaction plan" to satisfy a goal "in an optimal or near-optimal manner" would have the effect of obfuscating the material differences in the claim language of claim 1 and claim 29 discussed above.

In addition, for claim 1, Patent Owner's proposed construction would render the limitation "suitable delegation of sub-goal requests to best complete the requested service request" recited in claim 1 superfluous. Such a construction is presumed improper. *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1274–75 (Fed. Cir. 2012) (rejecting the district court's construction narrowing a term by a superfluous limitation when the claims explicitly recited the narrowing limitation, and discussing the "well-established rule that claims are interpreted with an eye toward giving effect to all terms in the claim") (quoting *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)) (internal quotation marks omitted); *LSI Indus., Inc. v. ImagePoint, Inc.*, 279 F. App'x 964, 972 (Fed. Cir. 2008) (nonprecedential) (rejecting the district court's construction of "display device" as necessarily including the superfluous limitation of "internal illumination" because other claim terms specifically recited an "illuminated display device"); *but cf. ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1286 (Fed. Cir. 2010) ("no canon of [claim] construction is absolute in its application") (citation omitted).

Considering next the Patent Owner-argued limiting feature of satisfying a goal "consistent with any advice parameters or constraints," this feature is recited in claim 29, but not in claim 1. Claim 29 recites "the act of interpreting including the sub-acts of: determining any task completion *advice* provided by the base goal, and determining any task completion *constraints* provided by the base goal" (Ex. 1001, 32:4–8 (emphases added)), whereas claim 1 does not recite "advice" or "constraint" (*see id.* at 29:10–44). Thus, Patent Owner's proposed construction is disfavored because it would blur the material differences in the claim language of claim 1 and claim 29 discussed above.

Finally, Patent Owner's proposed construction replaces "goal" with "complex goal expression." Again, this feature is recited in claim 1, but not in claim 29. Claim 1 recites "receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression; and dynamically interpreting the arbitrarily complex goal expression" (Ex. 1001, 29:25–30), whereas claim 29 recites "interpreting a service request in order to determine a base goal that *may be* a compound, arbitrarily complex base goal" (*id.* at 31:59–61) (emphasis added). Because of the permissive language "may be" used in claim 29, a "goal" is not necessarily required to be in the form of an arbitrarily complex goal expression in claim 29. Again, Patent Owner's proposed construction is disfavored because it would blur the material differences in the claim language of claim 1 and claim 29 discussed above.

Thus, at least based on the claim language, it is not appropriate to limit "goal satisfaction plan" as Patent Owner contends. As discussed

above, the meaning and the scope of "goal satisfaction plan" is clear on the face of each claim because claims 1 and 29 each recite specifically what a "goal satisfaction plan" includes or comprises in different claims. Therefore, absent compelling evidence to the contrary, it is neither necessary nor appropriate to limit the meaning of the term "goal satisfaction plan" beyond the plain meaning indicated by the claim language—i.e., "a plan for satisfying a goal."

*b. Written Description*

Turning to the Specification, Patent Owner cites the following statement in the "Summary of the Invention" section:

> [e]xtreme flexibility is achieved through an architecture organized around the declaration of capabilities by service-providing agents, the construction of arbitrarily complex goals by users and service-requesting agents, and the **role of facilitators in delegating and coordinating the satisfaction of these goals, subject to advice and constraints** that may accompany them.

PO Resp. 31 (quoting Ex. 1001, 5:3–9). The very first sentence of the paragraph cited by Patent Owner states, however, "[a] first *embodiment* of the present invention discloses a highly flexible, Software-based architecture for constructing distributed systems." Ex. 1001, 4:58–60 (emphasis added). Indeed, all of the portions of the Specification cited by Patent Owner, including the passage reproduced above, describe various embodiments of the '115 patent. *See* PO Resp. 30–33 (citing Ex. 1001, 5:3–9, 5:48–49, 15:37–39, 15:66–16:1, 16:11–21, 16:38–46, 18:35–48, 28:47–54, Fig. 11).

In general, "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader

than the embodiment." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (citation omitted). As discussed above, the challenged independent claims 1 and 29 do not recite all of the limiting features required by Patent Owner's proposed construction of "goal satisfaction plan." Thus, unless one of the established exceptions, such as lexicography or disavowal, applies, the challenged claims are not restricted as Patent Owner contends. *See, e.g., GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("the specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal") (citation omitted). Here, Patent Owner does not argue lexicography or disavowal. Nor does Patent Owner explain any other reason why the Specification limits "goal satisfaction plan" as it contends. Thus, claim construction in this case is governed by the general principle that "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." *SuperGuide*, 358 F.3d at 875; *see also WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1323–24 (Fed. Cir. 2018) ("It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise." (citing *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) ("[T]his court has repeatedly cautioned against limiting claims to a preferred embodiment."))). Accordingly, none of the embodiments in the Specification cited by Patent Owner limits "goal satisfaction plan" as Patent Owner contends.

*c.* *Prosecution History*

Turning next to the prosecution history, Patent Owner asserts that "examples in the file history confirm the elements of 'goal satisfaction plan' reflected in Patent Owner's proposed construction." PO Resp. 35–36. Patent Owner argues, during the prosecution of the application for the '115 patent,

> Applicant further stated that "the facilitating engine is able to use reasoning to delegate the sub-goals to service providing agents in such a way as '**to best complete the requested service request**.'…The facilitating engine is able to use reasoning to delegate the sub-goal task of roasting coffee to the service-providing agent that can roast beans in the least amount of time because the facilitating engine has reasoned that the least amount of time taken to make coffee is the best way to accomplish the base goal of making coffee." Applicant concluded that "the base goal is carried out **not by merely parsing the request into sub-goals**" but rather "the facilitating engine used reasoning to decide upon using **competing** message transfer agents to reminding Bob of lunch, in lieu of delegating the task to just one message transfer agent."

*Id.* at 35 (citing Ex. 1002, 172–173). As discussed above, however, the limiting feature argued by Patent Owner is recited in claim 1 ("a suitable delegation of sub-goal requests to *best complete* the requested service request"), but not in claim 29. Thus, Patent Owner's argument is unpersuasive for the same reasons discussed above.

*d.* *Extrinsic Evidence*

Patent Owner also cites the testimony of its declarant, Dr. Medvidovic, in support of Patent Owner's proposed construction of "goal satisfaction plan." PO Resp. 36–37 (citing Ex. 2032 ¶¶ 51–52, 54–59,

129). We have reviewed the cited testimony from Dr. Medvidovic, but do not find anything in his testimony that would change our analysis based on intrinsic record discussed above. *See Phillips*, 415 F.3d at 1318 (authorizing the consideration of extrinsic evidence in determining the meaning of claims but noting that it is "in general . . . less reliable than the patent and its prosecution history in determining how to read claim terms").

*e. Other Arguments*

The parties dispute whether Petitioner's use of "procedure" (in place of a "plan") and "sending one or more requests for service" in Petitioner's proposed construction is appropriate. *See* PO Resp. 37–38; Pet. Reply 2–4, 11–12; PO Sur-reply 3, 13. We need not address these arguments in detail because, for the reasons discussed above, we see no reason to depart from the plain meaning of the term "goal satisfaction plan."

*f. Conclusion*

Based on the complete record and after examining the claims as a whole, the Specification, and the prosecution history, we construe the term "a goal satisfaction plan" according to its plain meaning—"a plan for satisfying a goal."

### *C. Prior Art Overview*

Before discussing the obviousness challenges presented in the Petition, we provide an overview of Kiss and FIPA97, the main prior art references asserted against the challenged claims, to provide context for the discussion that follows.

### *1. Overview of Kiss (Ex. 1005)*

Kiss describes "a knowledge management system that supports inquiries of distributed knowledge resources," as illustrated in Figure 1. Ex. 1005, 2:44–45.

Figure 1 of Kiss is reproduced below.




*Fig. 1*

Kiss's Figure 1 shows a conceptual overview of one embodiment of a knowledge management system. *Id.* at 5:1–2. Kiss's knowledge management system 100 includes a presentation layer 103, a user interface layer 105, a meta agent layer 107, a knowledge agent layer 109, a knowledge module layer 111, and an agent service layer 113. *Id.* at 5:3–7.

The meta agent layer 107 includes one or more meta agents 119 that are responsible for analyzing queries or problem formulations provided by the user interface layer 105 and constructing a plan for finding a solution to the problem. *Id.* at 5:20–24. More specifically, "meta agent 119 is responsible for formulating a dynamic 'solution plan' for the distributed

inferencing to be performed by the system 100, and allocates tasks to the knowledge agent layer 109 in furtherance of the solution plan." Ex. 1005, 5:33–37. "The meta agent solution plan attempts to employ all elements of information contained in the parsed inquiry in the development of search-space constraints." *Id.* at 8:34–37.

The knowledge agent layer 109 includes multiple knowledge agents 121, each of which may be associated with one or more knowledge modules 123 in the knowledge module layer 111. Ex. 1005, 6:31–35. The knowledge agent 121 is configured to accept from a meta agent 119 a problem statement and convert that problem statement into a format appropriate for the knowledge module 123 associated with the knowledge agent 121. *Id.* at 6:35–38.

*2. Overview of FIPA97 (Exs. 1006–1012)*

FIPA97 (Exs. 1006–1012) is a specification created by the Foundation for Intelligent Physical Agents (FIPA) beginning in 1996 with an official release date in October 1997. Ex. 1006, Cover, iv (identifying specification as FIPA 97 Version 1.0 issued on October 10, 1997). FIPA97 is a "specification of basic agent technologies that can be integrated by agent systems developers to make complex systems with a high degree of interoperability." *Id.* at v. The specification comprises seven parts: three parts for basic agent technologies (Parts 1–3 relating to agent management, agent communication language, and agent/software integration) and four informative applications providing examples of how the technologies can be applied (Parts 4–7 describing personal travel assistance, personal assistant, audio-visual entertainment, and broadcasting and network management and

provisioning applications). *Id.* at v–vii; *see generally* Exs. 1006–1008 (Parts 1–3); Exs. 1009–1012 (Parts 4–7).

Part 1 of FIPA97 "provides a normative framework within which FIPA compliant agents can exist, operate and be managed." Ex. 1006, vi. Part 2 of FIPA97 describes an "Agent Communication Language (ACL)" that "is based on speech act theory: messages are actions, or communicative acts, as they are intended to perform some action by virtue of being sent." *Id.* The ACL specification "consists of a set of message types and the description of their pragmatics, [i.e.,] the effects on the mental attitudes of the sender and receiver agents." *Id.* The ACL specification "also provides the normative description of a set of high-level interaction protocols, including requesting an action, contract net and several kinds of auctions." *Id.*

Part 2 of FIPA97 discloses a "simple abstract model of inter-agent communication" including ACL messages having components as illustrated in Figure 1 below. Ex. 1007, 7, 12.




**Figure 1 — Components of a message**

Figure 1, above, illustrates the main structural elements of an ACL message in FIPA97. *Id.* at 12. "The first element of the message is a word which identifies the communicative act being communicated, which defines the

principal meaning of the message." *Id.* Each ACL message contains a set of one or more parameters, including a mandatory "*:receiver*" parameter that identifies the intended recipient of the message. *Id.* at 13.

Petitioner asserts that FIPA97 was made publicly available as a single document and relies on FIPA97 as a single printed publication for purposes of 35 U.S.C. § 102(a). *See* Pet. 23; Pet. Reply 34–35. As discussed below in the section addressing the status of FIPA97 as a printed publication, FIPA approved and released FIPA 97 Version 1.0 as a single specification. *See infra* § III.D.; Ex. 1026, 5; Ex. 1050 ¶ 165. Thus, although sometimes the seven parts are referred to as "documents," a person of ordinary skill in the art would have considered FIPA97 to be a single reference. *See* Ex. 1003 ¶¶ 143–148. Patent Owner does not dispute that FIPA97 is one reference for purposes of §§ 102 and 103. *See* PO Resp. 117–120.[7] Because FIPA and skilled artisans considered FIPA97 to be a single specification, we agree that FIPA97 constitutes a single prior art reference, and we treat it as such for purposes of our unpatentability analysis.

---

[7] Contrary to Patent Owner's argument (PO Resp. 117–120), Petitioner did not argue in another case, and the Board did not find, that FIPA97 is seven separate prior art references. *See Microsoft Corp. v. IPA Techs. Inc.*, IPR2019-00838, Paper 13 at 3–5 (PTAB Apr. 3, 2020) (Decision Denying Petitioner Request for Rehearing), Paper 10 at 4–9 (Petitioner's Request for Rehearing, filed Dec. 6, 2019).

*D. Status of FIPA97 as a Prior Art Printed Publication*

Before reaching the merits of Petitioner's obviousness contentions, all of which are based in part on FIPA97 (Exhibits 1006–1012), we must determine as a threshold matter whether FIPA97 is a prior art printed publication under 35 U.S.C. § 102(a) or § 102(b). *See* Pet. 23–25. Petitioner bears the burden of establishing by a preponderance of the evidence that FIPA97 is a printed publication. *See* 35 U.S.C. § 316(e); *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1375 (Fed. Cir. 2018); *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29 at 11 (PTAB Dec. 20, 2019) (precedential) (citing *Nobel Biocare*, 903 F.3d at 1375). For purposes of instituting an *inter partes* review we accepted Petitioner's contention, unchallenged in Patent Owner's Preliminary Response, that FIPA97 was available as prior art as of October 1997, more than one year before January 5, 1999, the filing date of the '115 patent. Inst. Dec. 43–45 (citing Pet. 23–25 (citing Ex. 1049 ¶¶ 3, 6, 11, 12, 20–34; Ex. 1003 ¶¶ 121, 122, 125–128, 143–148)). Patent Owner, however, challenges that contention in its Patent Owner Response, and the parties further address the issue in Petitioner's Reply and Patent Owner's Sur-reply. *See* PO Resp. 45–65; Pet. Reply 17–29; PO Sur-reply 20–35.

The determination of whether a document is a "printed publication" under 35 U.S.C. § 102 "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in

determining whether a reference constitutes a 'printed publication' . . . ." *Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1355 (Fed. Cir. 2018) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). A reference is considered publicly accessible if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it.'" *Id.* at 1355–56 (quoting *In re Wyer*, 655 F.2d 221, 226 (CCPA 1981)).

In the discussion below, we begin with background information regarding FIPA and an overview of the evidence submitted by Petitioner in support of its contention that FIPA97 was publicly accessible in October 1997. The evidence includes extensive testimony from Dr. Finin, a professor who has personal knowledge of FIPA's activities and the development process of FIPA97. *See* Ex. 1049 ¶¶ 1–55 (Finin Decl.). Dr. Finin was one of the first two FIPA Fellows invited to provide "high quality and independent advice to FIPA." *Id.* ¶ 18 (quoting Ex. 1076, 1); Ex. 1025, 1; Ex. 1062, 1. The evidence also includes testimony from Petitioner's expert witness, Dr. Lieberman, and more than sixty documentary exhibits on which Petitioner relies to show that FIPA97 was publicly accessible in late 1997 and early 1998. *See* Ex. 1003 ¶¶ 121–128, 143–148; Exs. 1021–33, 1047, 1051–1105.

After providing an overview of the evidence, we consider the parties' arguments as to whether FIPA97 was publicly accessible before the January 5, 1999, critical date. For the reasons explained below, we

determine that Petitioner has met its burden to show that FIPA97 was publicly accessible before the critical date.

*1. FIPA*

FIPA was a non-profit association based in Geneva, Switzerland, created to promote agent-based technology and develop open standards. Ex. 1006, iv (FIPA 97 Specification Version 1.0, Part 1, Foreword); Ex. 1049 ¶ 3. Founded in 1996, FIPA's membership included numerous technology companies, educational institutions, and governmental entities. Ex. 1049 ¶ 3. As of October 1997, FIPA had thirty-five corporate members representing twelve countries.[8] Ex. 1006, iv. According to FIPA documentation, membership was "open to any corporation and individual firm, partnership, governmental body or international organi[z]ation without restriction." *Id.* FIPA stated its intent "to make the results of its activities available to all interested parties." *Id.* Throughout its tenure, FIPA produced standards designed to promote and advance agent-based technology. Ex. 1049 ¶ 3. In 2005, FIPA was incorporated into the Institute of Electrical and Electronics Engineers (IEEE) as one of its standards committees. *Id.*

*2. Development of FIPA97*

The process of drafting the FIPA 97 specification began with FIPA's first meeting in London in April 1996. Ex. 1049 ¶ 6; Ex. 1058 (Main results

---

[8] The corporate members included Alcatel, British Telecommunications, Deutsche Telekom, France Telecom, Hitachi, Hewlett-Packard, IBM, NEC, NTT, Nortel, Siemens, and Toshiba. *See* Ex. 1095, 22.

of London meeting); Ex. 1066 (Resolutions of London meeting). Representatives from twenty-six companies and organizations attended. Ex. 1066, 1. At the meeting, the members agreed on FIPA's mission, drafted statutes and operational principles, and produced a work plan for a specification that would become FIPA 97. Ex. 1058, 1; Ex. 1066, 1–3; Ex. 1049 ¶ 6. The work plan set a December 1997 target for producing a first completed specification. Ex. 1066, 2–3; Ex. 1049 ¶ 7.

FIPA subsequently held several meetings in 1996 and 1997. At the second meeting in June 1996 in Yorktown Heights, NY, FIPA approved several documents, including a framework for FIPA activity and a list of requirements for FIPA-specified agent capabilities. Ex. 1067, 1 (Resolutions of Yorktown meeting); Ex. 1060, 1 (Results of Yorktown meeting); Ex. 1049 ¶ 9. At the third meeting in October 1996 in Tokyo, FIPA approved a final work plan calling for production of a FIPA specification in October 1997. Ex. 1049 ¶ 11; Ex. 1070, 1 (work plan); Ex. 1023 (Results of Tokyo meeting). Also at the Tokyo meeting, FIPA produced its First Call for Proposals, which outlined in detail three technology parts (corresponding to Parts 1–3 of FIPA 97) and four application parts (corresponding to Parts 4–7 of FIPA 97). Ex. 1069, 1–27 (First Call for Proposals); Ex. 1049 ¶ 12.

In 1997, FIPA began to produce draft specifications. At the fourth meeting in January 1997 in Turin, Italy, FIPA publicly released drafts of Parts 1–4 and posted them on the FIPA home page (http://drogo.cselt.stet.it/fipa). Ex. 1021, 1 (Results of Turin meeting); Ex. 1049 ¶ 13. Additionally, FIPA released a Second Call for Proposals at

the Turin meeting. Ex. 1071, 1–3 (Second Call for Proposals); Ex. 1049 ¶ 13. At the fifth meeting in April 1997 in Reston, VA, FIPA produced drafts of Parts 1–7, which were publicly released and posted on the FIPA home page. Ex. 1024 (Results of Reston meeting); Ex. 1061 (Resolutions of Reston meeting); Ex. 1049 ¶ 17. At the sixth meeting in June 1997 in Cheju Island, South Korea, FIPA publicly released revised drafts of Parts 1–7 and posted them on the FIPA home page. Ex. 1025, 1 (Results of Cheju meeting); Ex. 1062, 5 (Resolutions of Cheju meeting); Ex. 1049 ¶ 19. According to Dr. Finin, the Reston Draft and Cheju Draft were substantially complete versions of what would become FIPA 97. Ex. 1049 ¶¶ 17, 19.

Dr. Finin testifies that news of FIPA and its standardization efforts "spread quickly throughout the relatively small community of software agent researchers." Ex. 1049 ¶ 8. For instance, the AgentWeb website, "a meeting place for researchers in agent-based technology from 1995–2000," was home to a "Software Agents" mailing list and a newsletter that had more than 1,300 subscribers in 1996. *Id.*; Ex. 1089, 5. Dr. Finin was "the founder, author, and a subscriber" of the AgentWeb newsletter. Ex. 1049 ¶ 8. The widely distributed AgentWeb newsletters announced upcoming FIPA meetings, reported results of previous meetings, including calls for proposals, and provided links to the specification drafts posted on the FIPA home page. *See id.* ¶¶ 8, 10, 12, 14, 17, 19.

For example, the AgentWeb newsletter dated May 11, 1996, announced the upcoming FIPA June 1996 Yorktown meeting, described as the "FIPA Opening Forum." Ex. 1090, 5; Ex. 1049 ¶ 8. The purpose of the meeting, as stated in the newsletter, was to "refine the list of basic agent

capabilities candidate for FIPA specification; compile a first list of agent capabilities intended for specification by end 1997; and establish the first working groups." Ex. 1090, 5. Likewise, the AgentWeb newsletter dated August 12, 1996, advertised the FIPA October 1996 Tokyo meeting. Ex. 1088, 1; Ex. 1049 ¶ 10. Thereafter, the AgentWeb newsletter dated October 14, 1996, publicized the Call for Proposals issued at the October 1996 Tokyo meeting and provided the deadline for submission of proposals to be considered at the Turin meeting in January 1997. Ex. 1087, 1; Ex. 1049 ¶ 12. FIPA had decided that respondents who submitted proposals would be invited to the January 1997 meeting to present their proposals even if they were not FIPA members. Ex. 1023, 1; *see* Ex. 1069, 27.

Once FIPA began to produce drafts of the specification, AgentWeb newsletters announced those drafts and provided links to access them. The AgentWeb newsletter dated February 2, 1997, reported that "[i]nitial specifications for three technology parts (Agent Management, Agent Communication and Agent/Software Interaction) and one application part (Personal Travel Assistance) have been produced" at the recent Turin meeting. Ex. 1091, 1; Ex. 1049 ¶ 14. The newsletter included a freely accessible and public link to access the draft. Ex. 1049 ¶ 14 (citing Ex. 1091, 1–2). It also indicated that drafts of the remaining three specification parts would be generated at the FIPA meeting to be held in April 1997 in Reston. Ex. 1091, 1–2. A subsequent AgentWeb newsletter dated April 13, 1997, advertised the upcoming Reston meeting and

contained links to information about the meeting on the FIPA website. Ex. 1092, 3; Ex. 1049 ¶ 17.

On May 5, 1997, following the Reston meeting, an AgentWeb newsletter reported that attendees of that meeting produced a revised draft including all seven parts of the specification. Ex. 1093, 2; Ex. 1049 ¶ 17. The newsletter contained individual public links to the seven parts and invited "both members and non-members" to comment, providing an email address for submission. *Id.*; Ex. 1049 ¶ 17. Additionally, the newsletter announced the dates and locations of the next two meetings—the June 1997 Cheju meeting and the seventh meeting to take place in Munich on October 6–10, 1997. *Id.* Similarly, the AgentWeb newsletter dated June 30, 1997, announced that the Cheju meeting resulted in revised versions of the FIPA specification documents and provided direct links to the seven parts. Ex. 1094, 1–2; Ex. 1049 ¶ 19. Again, the newsletter stated that FIPA invited comments and that non-members making substantial comments would be invited to attend the October 1997 Munich meeting. Ex. 1094, 2. Dr. Finin was among those who submitted comments on the Cheju draft. Ex. 1073; Ex. 1049 ¶ 20.

Meanwhile, the AgentWeb Software Agents mailing list also provided information regarding FIPA's efforts to the community of software agent researchers. *See* Ex. 1049 ¶ 8. Dr. Finin was an organizer of and contributor to the Software Agents mailing list. *Id.* On May 2, 1996, a posting to the mailing list referenced the upcoming June 1996 FIPA meeting in Yorktown Heights, New York. Ex. 1079, 1; Ex. 1049 ¶ 8. Members of the Software Agents mailing list posted comments regarding the Turin draft

after it was released publicly. Exs. 1078, 1081, 1082; *see* Ex. 1049 ¶¶ 14–15. Dr. Finin was among those who shared their thoughts. *See* Ex. 1082; Ex. 1049 ¶ 15. A posting after the Reston meeting included a public and open link to access the Reston draft and invited comments from the mailing list. Ex. 1083, 1; Ex. 1049 ¶ 17.

*3. Public Release of FIPA97*

FIPA's seventh meeting took place in Munich on October 6–10, 1997. Ex. 1026 (Resolution of Munich meeting); Ex. 1049 ¶ 20. At this meeting, FIPA incorporated final edits and comments and approved the FIPA 97 specification for publication. Ex. 1026, 1, 5; Ex. 1049 ¶ 20. The specification as approved at the meeting was called "FIPA 97 ver. 1.0," or FIPA 97 Version 1.0. Ex. 1026, 5. Working groups for various parts of the specification were given about one month to check for consistency and make minor edits. *Id.* at 2; Ex. 1049 ¶ 20.

An "initial" version of FIPA 97 Version 1.0, approved at the Munich meeting and dated October 10, 1997, was posted to the FIPA website, housed at the time at http://drogo.cselt.stet.it/fipa. Ex. 1049 ¶¶ 20–21. According to Dr. Finin, the specification documents were available online and free for anybody to access by sometime in October 1997. *Id.* ¶ 21. On November 18, 1997, an AgentWeb newsletter announced completion of FIPA 97 Version 1.0 and its publication on the FIPA website. Ex. 1086, 1–2; Ex. 1049 ¶ 21. The newsletter provided individual, direct links to the seven parts of the specification on the FIPA website. Ex. 1086, 1–2. The links were not password protected and were open to the public without a requirement for secrecy or confidentiality. Ex. 1049 ¶ 21. As with the

earlier AgentWeb newsletters, the newsletter containing links to FIPA 97 Version 1.0 was sent to more than 1,300 subscribers. *Id.*

Dr. Finin testifies that in late 1997, "a few weeks after the Munich meeting," he accessed the approved FIPA 97 Version 1.0 posted on the FIPA website. *Id.* ¶¶ 20–21. He specifically recalls accessing the documents in late 1997 to review the first major work product of FIPA and to prepare for FIPA's upcoming January 1998 meeting in Palo Alto, which he attended. *Id.* ¶ 21 (citing Ex. 1074). Dr. Lieberman also testifies that he recalls FIPA 97 Version 1.0 being publicly available on the FIPA website throughout late 1997 and early 1998 and that he accessed it in late 1997 as a member of the interested public. Ex. 1003 ¶ 125.

The release of FIPA 97 Version 1.0 was well publicized in the weeks after the Munich meeting. Ex. 1049 ¶ 22. For example, on October 20, 1997, the EETimes featured an article reporting FIPA's approval of the FIPA 97 specification. Ex. 1095, 22; *see* Ex. 1049 ¶ 22. The article was based on an interview with Leonardo Chiariglione, the president of FIPA. Ex. 1095, 22. The article described the seven parts of the specification: "The first three parts cover different aspects of agent behavior: agent management; agent communication; and agent-software interaction. The four remaining parts, which cover application areas, . . . are: personal travel assistance; personal assistant; audio-visual entertainment and broadcast; and network provision and management." *Id.* After describing FIPA's plans for 1998, including testing of FIPA 97 Version 1.0 to provide input for a further round of standardization, the article referred readers to the FIPA website for

information regarding the released specification: "CSELT[9] maintains extensive information on FIPA's activities at www.cselt.stet.it/fipa."[10] *Id.* (emphasis omitted). It concluded with a quote from Dr. Chiariglione regarding the specification's public availability: "'It is our policy to make the standard freely available over the Internet,' Chiariglione said. 'FIPA will retain the copyright but it will be free for others to use.'" *Id.*

The November-December 1997 issue of IEEE Internet Computing also announced the release of the FIPA 97 specification: "The Foundation for Intelligent Physical Agents, a non-profit organization established to promote emerging agent-based applications, has released its first specification. Named FIPA 97, the specification will provide a benchmark for interoperable products." Ex. 1096, 93; Ex. 1049 ¶ 22. The news brief directed readers to the FIPA website for the text of the specification. Ex. 1096, 93 ("The text is available at http://drogo.cselt.stet.it.fipa/."[11]); Ex. 1049 ¶ 22.

Sometime after the Munich meeting, FIPA also produced a hardcopy book version of the FIPA 97 Version 1.0 specification to be sent to FIPA members and various institutions and standards groups. Ex. 1049 ¶ 24; *see*

---

[9] Centro Studi e Laboratori Telecommunicazioni, Dr. Chiariglione's employer at the time. *See* Ex. 1095, 22.

[10] The record suggests this website (http://www.cselt.stet.it/fipa) was a mirror of the FIPA website (http://drogo.cselt.stet.it/fipa) in 1997. *See* Ex. 1049 ¶ 22; Ex. 1095, 22; Tr. 94:11–14.

[11] The URL provided in the article contains a typographical error. *See* Ex. 1049 ¶ 22 (correcting the URL to http://drogo.cselt.stet.it[/]fipa/).

Ex. 1026, 1; Ex. 1063, 1 (Resolution of the Palo Alto meeting, Jan. 29, 1998). At least two copies of the book were available in libraries in January 2019. Ex. 1049 ¶ 24; Ex. 1057, 1 (WorldCat catalog entry for "Fipa specification : Version 1.0"); Ex. 1055 (cover page and table of contents of each part in copy at library in Italy); Ex. 1056 (cover page and table of contents of Part 1 in copy at library in Switzerland). Dr. Finin testifies that the books contain the November 28, 1997, edited version of FIPA 97 Version 1.0, which "only made minor edits (mostly spelling and formatting) over the October 10, 1997 version." Ex. 1049 ¶ 25 (citing Ex. 1055, 5 (Part 2 "publication date" of November 28, 1997); Ex. 1056).

*4. Publications and Patents Referring to FIPA97 and FIPA Activities*

In late 1997 and 1998, several papers reviewing and outlining the FIPA 97 specification were published and presented at meetings. *See* Ex. 1049 ¶¶ 26–30. A paper dated December 1997 memorializes a presentation made to a meeting on Intelligent Agent Technology organized by the EPSRC[12] Community Club in Advanced Computing Techniques. Ex. 1097, Cover ("Dickinson");[13] *see* Ex. 1049 ¶ 26. This paper outlines the background and rationale for the creation of an agent interoperability standard. Ex. 1097, 1–3. It also describes the development history of the FIPA 97 specification, noting that FIPA's work program "culminated in the publication of an initial draft standard, FIPA 97, at the Munich meeting on

---

[12] "The Engineering and Physical Sciences Research Council (EPSRC) is the main funding body for engineering and physical sciences research in the UK." Engineering and Physical Sciences Research Council, epsrc.ukri.org/about (last visited Sept. 28, 2020).
[13] Ian J. Dickinson, *Agent Standards*, HP Laboratories Bristol, HPL-97-156 (Dec. 1997).

October 1997." *Id.* at 3. Dickinson further provides that "[a]ll FIPA documents and meeting outputs are publicly available on the web" at "http://drogo.cselt.stet.it/fipa/," and "comments and review have been sought at each stage of the process." *Id.* at 3, 7 n.9. The paper then describes the features of the specification's three substantive technical sections, Parts 1–3. *Id.* at 3–6.

Similarly, a 1998 paper titled "Industrial Applications of Multi-Agent Technology" summarizes FIPA's background and presents an overview of the three technical parts (i.e., Parts 1–3) of FIPA 97 Version 1.0 released in October 1997. Ex. 1099, 12–13 ("Steiner");[14] *see* Ex. 1049 ¶ 28. The Steiner paper provides the FIPA website address and explains that the four application parts (i.e., Parts 4–7) will be used in field trials to gather information to be incorporated into a revised version of FIPA 97. Ex. 1099, 13 & n.1.

Likewise, a paper titled "FIPA — towards a standard for software agents" appearing in the July 1998 issue of the BT Technology Journal explains the motivation for an agent standard and provides an overview of FIPA's background and activities. Ex. 1100, 51–52 ("O'Brien");[15] *see* Ex. 1049 ¶ 29. It then describes the different parts of the FIPA 97 Version 1.0 specification issued in October 1997. Ex. 1100, 51–52.[16]

---

[14] Donald Steiner, Siemens AG, *Industrial Applications of Multi-Agent Technology* (IEEE 1998).

[15] P.D. O'Brien & R.C. Nicol, *FIPA — towards a standard for software agents*, BT Tech. J. Vol. 16, No. 3 (July 1998).

[16] Dr. Finin testifies that O'Brien provides public links to FIPA97. Ex. 1049 ¶ 29. The copy of O'Brien entered into the record, however, appears to be missing several pages, including one containing endnotes 10–12 that might

Dr. Finin cites several other publications that reference FIPA's development of an agent communication standard in the 1997–98 timeframe. Ex. 1049 ¶ 31 (citing Exs. 1027–29). Dr. Finin also identifies several patent applications in the same timeframe that refer to FIPA's agent communication language. *Id.* ¶ 32 (citing Exs. 1030–33).

*5. The FIPA Website and Exhibits 1006–1012*

Sometime in 1998, the FIPA website migrated from its original site (http://drogo.cselt.stet.it/fipa) to fipa.org. Ex. 1049 ¶ 23; *see also* Ex. 1026 (Resolution of Munich meeting indicating FIPA's plans for the "redesign of a new FIPA home page"); Ex. 1065, 4 (Resolutions of the Durham meeting in October 1998 indicating the website will be transferred to www.fipa.org). The fipa.org website still exists today even though FIPA is no longer active as a standalone organization. *See* Ex. 1049 ¶¶ 23, 48–49. The current FIPA website maintains a repository of past FIPA documents, including meeting notes, press releases, FIPA resolutions, and different versions of the FIPA specification. *Id.* ¶ 49.

Dr. Finin testifies that the "initial" version of FIPA 97 Version 1.0 (i.e., the specification posted on the FIPA website on October 10, 1997) "remained publicly accessible during all of FIPA's future activities and is still available on FIPA's home page today." *Id.* ¶ 21. According to Dr. Finin, Exhibits 1006–1012 (collectively referred to as FIPA97) are Parts 1–7 of FIPA 97 Version 1.0 as found on the current fipa.org website. *Id.* Based on his personal knowledge, Dr. Finin further testifies that

---

provide links to the FIPA website. *See* Ex. 1100, 52 ("FIPA97 (issued in October 1997) [10–12] is the first output from FIPA covering part of the requirements for an agent standard.").

Exhibits 1006–1012 are the "same version" and contain "the same disclosures, content and information" as Parts 1–7 of FIPA 97 Version 1.0 that were publicly available on the FIPA website (http://drogo.cselt.stet.it/fipa) on October 10, 1997, and which Dr. Finin himself accessed in late 1997. *Id.* ¶¶ 21, 34. He also notes that although Exhibit 1006 has a typographical error relating to the version number in the header of its odd pages,[17] Exhibit 1006 is identical to the version of Part 1 of FIPA 97 Version 1.0 that was released on October 10, 1007. *Id.* ¶ 21. Additionally, as evidence that FIPA 97 Version 1.0 has been continuously available on fipa.org since the website migration, Dr. Finin cites a set of Internet Archive records beginning in 2000 showing where each part of that version of the specification could be accessed. *Id.* (citing Ex. 1054).

Dr. Finin testifies that the original FIPA website, http://drogo.cselt.stet.it/fipa, remained live for several years after the website transitioned to fipa.org. Ex. 1049 ¶ 23. The Internet Archive Wayback Machine contains an archived screen capture of the website http://drogo.cselt.stet.it/fipa from December 1, 1998. *See* Ex. 1051; Ex. 1049 ¶¶ 23, 54. According to Dr. Finin, the archived page shows that the FIPA 97 specification was live and freely available on the FIPA website home page at that time. Ex. 1049 ¶ 23; Ex. 1051, 1 ("FIPA has already developed a seven-part specification called FIPA 97. Implementations of FIPA 97 are undergoing field trials that will last until October 1998 when version 2 of FIPA 97 will be produced."); Ex. 1049 ¶ 23. The home page

[17] The header on odd pages reads "FIPA 1997 Part 1: Version 2.4." *E.g.*, Ex. 1006, 3.

provided links (i.e., "FIPA 97") to actual specification documents, but those links have not been maintained in the archive. Ex. 1049 ¶ 23. Dr. Finin testifies that the screen capture from the Internet Archive is consistent with the mirror of the former FIPA site hosted by Leonardo Chiariglione. *Id.* ¶ 51 (citing Ex. 1103 (http://leonardo.chiariglione.or/standards/fipa/)). Dr. Chiariglione's mirror is still available, and documents hosted on the mirror are "accurate and complete copies of FIPA documents that were available to FIPA members." *Id.*

*6. Analysis*

Petitioner argues that FIPA97 was a publicly accessible printed publication as of October 10, 1997, when it was posted on the FIPA website. Pet. 23; Pet. Reply 15–21. More specifically, Petitioner argues that (1) FIPA 97 Version 1.0 was publicly accessible on October 10, 1997, and (2) the version of the FIPA specification found in Exhibits 1006–1012, referred to herein as FIPA97, is the same specification that was posted on the FIPA website on October 10, 1997, and named FIPA 97 Version 1.0. *See, e.g.*, Pet. 24 (arguing FIPA 97 Version 1.0 was publicly accessible in late 1997); Pet. Reply 17–20 (arguing that Exhibits 1006–1012 are the same documents that were made public as FIPA 97 Version 1.0). Patent Owner addresses the first contention when it argues the evidence does not show any version of FIPA 97 Version 1.0 was available on the FIPA website. *See, e.g.*, PO Resp. 47–48. It also challenges the second contention when it argues Petitioner has failed to show that Exhibits 1006–1012 are identical to the version of the FIPA specification that allegedly was publicly accessible before the critical date. *See, e.g.*, *id.* at 48. In our analysis below, we address the two questions in turn.

Considering all the facts and circumstances surrounding the development of FIPA 97 Version 1.0 and its publication on the FIPA website, we find that FIPA 97 Version 1.0 was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the art, exercising reasonable diligence, could locate it. *See Jazz Pharm.*, 895 F.3d at 1355–56. First, the uncontested evidence shows that members of the relevant public (i.e., persons of ordinary skill in the field of software agent-based technology) knew of the release of FIPA 97 Version 1.0 in late 1997, prior to the critical date. As detailed above, FIPA was open to corporations and educational and governmental organizations without restriction. Ex. 1006, iv. FIPA's members included many industry leaders whose employees attended FIPA meetings, including the October 1997 meeting in Munich where FIPA 97 Version 1.0 was approved for publication. *See id.*; Ex. 1095, 22. FIPA meetings and activities were publicized among the larger community of software agent researchers via the AgentWeb website and its associated Software Agents mailing list and AgentWeb newsletter, which had more than 1,300 subscribers. Ex. 1090, 5; Ex. 1088, 1; Ex. 1087, 1; Ex. 1091, 1–2; Ex. 1092, 3; Ex. 1093, 2; Ex. 1094, 1–2; Ex. 1086, 1–2; *see* Ex. 1049 ¶¶ 8, 10, 12, 14, 17, 19. The newsletter in particular informed subscribers of the development of the FIPA specification during 1996 and 1997 and provided detailed information regarding the release of FIPA 97 Version 1.0 in a November issue. Ex. 1086, 1–2. News articles in periodicals published in late 1997 also announced that FIPA had released and published FIPA 97 Version 1.0. Ex. 1095, 22; Ex. 1096, 93; *see* Ex. 1049 ¶ 22. In addition, the record contains several papers published

in late 1997 and 1998, prior to the critical date, describing FIPA 97 Version 1.0 and its release in October 1997. *See* Ex. 1097, 1–7; Ex. 1099, 12–13; Ex. 1100, 51–52; Ex. 1049 ¶¶ 26–30; *see also* Ex. 1049 ¶¶ 31–32 (citing Exs. 1027–33 (other publications and patents referring to FIPA specification)).

The evidence of record also demonstrates that members of the relevant public, exercising reasonable diligence, could have located FIPA 97 Version 1.0 in late 1997 on the FIPA website, housed at the time at http://drogo.cselt.stet.it/fipa. FIPA published FIPA 97 Version 1.0 on its website at the conclusion of the Munich meeting on October 10, 1997, or shortly thereafter. *See* Ex. 1049 ¶ 20. In the several months leading up to the Munich meeting, persons of ordinary skill in the art would have known about the FIPA website through the widely distributed AgentWeb newsletters and the Software Agents mailing list, which provided website information or direct links to drafts of the specification and meeting announcements and reports. *See* Ex. 1091, 1–2; Ex. 1092, 3; Ex. 1093, 2; Ex. 1094; Ex. 1082, 1; Ex. 1083, 1. Therefore, people working in the field would have been sufficiently familiar with FIPA's activities and its website to look for FIPA 97 Version 1.0 on the FIPA website when it was posted after the Munich meeting. Indeed, both Dr. Finin, who was affiliated with FIPA, and Dr. Lieberman, who worked in the software agent field, testify that they accessed FIPA 97 Version 1.0 on the FIPA website in late 1997. Ex. 1049 ¶ 21; Ex. 1003 ¶ 125.

Moreover, the AgentWeb newsletter dated November 18, 1997, provided a link to the FIPA website and individual links to the seven parts of

FIPA 97 Version 1.0 published on the website. Ex. 1086, 1–2; *see* Ex. 1049 ¶ 21. Thus, that issue of the newsletter provided more than 1,300 interested members of the public with direct access to FIPA 97 Version 1.0 at least as of November 18, 1997.

News articles and papers published in late 1997 also provided readers with the website address where FIPA 97 Version 1.0 could be found. *See* Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9. The news articles in particular likely reached a very wide audience because they appeared in publications directed to subject matter broader than agent-based technology. *See* Ex. 1095 (EETimes); Ex. 1096 (IEEE Internet Computing). The EETimes article was dated October 20, 1997, suggesting that FIPA 97 Version 1.0 was available on the FIPA website at least as of that date.

The undisputed evidence also demonstrates that FIPA 97 Version 1.0 was freely available on the FIPA website without a password or any other restrictions and access was not subject to any requirement or expectation of secrecy or confidentiality. *See* Ex. 1049 ¶ 21; Ex. 1095, 22; *see also* Ex. 1006, iv (stating FIPA intended to make its results available to all interested parties). This evidence further supports our finding that FIPA 97 Version 1.0 was publicly accessible in late 1997. *See Jazz Pharm.*, 895 F.3d at 1358–59; *Voter Verified, Inc. v. Premier Election Solutions, Inc.*, 698 F.3d 1374, 1380–81 (Fed. Cir. 2012); *MIT v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985).

Patent Owner's arguments, many of which attack pieces of evidence individually, do not persuade us that Petitioner has failed to show that FIPA 97 Version 1.0 was publicly accessible. First, Patent Owner argues

that no evidence shows the original FIPA website (http://drogo.cselt.stet.it/fipa) existed prior to a December 1, 1998, Internet Archive capture. PO Resp. 55 (citing Ex. 1051). To the contrary, much of the documentary evidence from late 1997 and testimonial evidence identifies that website or its mirror as the FIPA website during the relevant time period. *See* Ex. 1049 ¶ ¶ 20–23; Ex. 1092, 3; Ex. 1093, 2; Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9. Notwithstanding the absence of an Internet Archive capture for the website from a date prior to December 1998, we find that, based on the totality of evidence in the record, the original FIPA website existed in late 1997.

Patent Owner also argues that none of the documents cited by Petitioner provide active links to FIPA 97 Version 1.0 and therefore are insufficient proof of public accessibility. PO Resp. 54; PO Sur-reply 21–22. Again, based on the totality of evidence in the record, including but not limited to the testimony of Dr. Finin that he accessed FIPA 97 Version 1.0 on the FIPA website in late 1997, we find that FIPA 97 Version 1.0 was available on the FIPA website at that time, notwithstanding the lack of active links today, more than twenty years later. Patent Owner finds fault with Dr. Finin's testimony on this point because he does not claim to have used any of the links in the AgentWeb newsletters to access FIPA 97 Version 1.0. PO Sur-reply 35 (citing Ex. 1049 ¶ 21). Patent Owner, however, overlooks Dr. Finin's testimony that he was the founder and author of the AgentWeb newsletter, implying that he created the links in the newsletter. *See* Ex. 1049 ¶ 8. Therefore, based on Dr. Finin's personal knowledge regarding the links in the AgentWeb newsletter dated November 18, 1997, and the other

evidence corroborating his testimony, we find that FIPA 97 Version 1.0 was available on the FIPA website in late 1997.

Patent Owner further asserts that, to the extent the Internet Archive capture from December 1998 provides an operable download link, it links to Version 2.0 of the FIPA 97 specification. PO Resp. 55–56 (citing Ex. 1051). It is not surprising, however, that FIPA's website in December 1998 provided links to FIPA 97 Version 2.0, which FIPA released in October 1998 to provide minor updates to two parts of the specification. *See* Ex. 1049 ¶ 35; Ex. 1053, vi. In any event, the December 1998 Internet Archive capture at least shows that the FIPA website was live at that time, which was prior to the critical date. *See* Ex. 1049 ¶ 23 (citing Ex. 1051, 1).

In its Sur-reply, Patent Owner argues for the first time that Petitioner has not demonstrated that a person of ordinary skill in the art in 1997 could have found FIPA 97 Version 1.0 using search tools or that the FIPA website was indexed so the specification could be located. PO Sur-reply 31. Further, Patent Owner argues that the existence of different FIPA websites at various times would have made it even more difficult to find the correct version of the FIPA specification without sufficient indexing or search tools. *Id.* at 33.

Even if we consider this late argument, we find it unpersuasive. As detailed above, the uncontested evidence shows that the address of the FIPA website itself was widely known among those skilled in the art and that FIPA routinely provided links to the FIPA specification on the website's home page. *See* Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9; Ex. 1051, 1; Ex. 1021, 1; Ex. 1025, 1. The November 1997 AgentWeb newsletter also

provided direct links to FIPA 97 Version 1.0. Ex. 1086, 1–2. Under these circumstances, we find that a member of the interested public could have found FIPA 97 Version 1.0 without search tools or indexing by using the links in the AgentWeb newsletter or navigating to the well-known FIPA website home page. We also find that the record, including Dr. Finin's testimony, satisfactorily explains the various FIPA websites and website addresses over time and clearly identifies the FIPA website that was being used in late 1997. *See* Ex. 1049 ¶¶ 22–23, 48–49, 51.

Having determined that FIPA 97 Version 1.0 was publicly accessible on the FIPA website in late 1997, as early as October 10 and no later than November 18, we turn to whether Exhibits 1006–1012 (collectively referred to as FIPA97) contain the same version of the FIPA specification that was available on the FIPA website during that timeframe. Dr. Finin testifies that Exhibits 1006–1012, documents available on the current FIPA website (fipa.org) and identified as FIPA 97 Version 1.0, are the same version with the same content as Parts 1–7 of FIPA 97 Version 1.0 that were released at the FIPA Munich meeting on October 10, 1997, and were publicly available on the FIPA website (http://drogo.cselt.stet.it/fipa) in late 1997. Ex. 1049 ¶¶ 21, 34.

As an initial matter, the October 10, 1997, date on the cover pages of several parts of FIPA97 supports Dr. Finin's testimony that FIPA97 is the same as FIPA 97 Version 1.0 as published on the FIPA website in late 1997. *See* Ex. 1006, Cover; Ex. 1007, Cover; Ex. 1008, Cover; Ex. 1010, Cover; Ex. 1012, Cover; *see also* Ex. 1009, Cover (Part 4 identifying a 1997 copyright date); Ex. 1011, Cover (Part 6 identifying a 1997 copyright date).

Patent Owner contends that Petitioner cannot rely on the date stamps or copyright notices on Exhibits 1006–1012 to establish public accessibility because they are hearsay. PO Resp. 47; PO Sur-reply 23–25. We agree with Petitioner that Patent Owner has waived this argument because it did not raise an objection on evidentiary grounds pursuant to 37 C.F.R. § 42.64(b)(1). *See* Pet. Reply 18. Furthermore, we agree with Petitioner that the dates on the cover pages are not hearsay because they are evidence tending to show that FIPA97 is identical to FIPA 97 Version 1.0, not statements offered to show Exhibits 1006–1012 were published on a certain date. *See id.* (citing *Apple Inc. v. VirnetX Inc.*, IPR2016-01585, Paper 32 at 58 (PTAB Feb. 20, 2018)).

Patent Owner also argues that Petitioner cannot rely on the cover page dates alone as proof of the documents' public accessibility. PO Sur-reply 23. The date stamps, however, are only part of the totality of evidence offered by Petitioner to establish public accessibility. As such, they are relevant evidence supporting a finding that FIPA97 was publicly accessible. *See Hulu*, Paper 29 at 17–18 (citing *Nobel Biocare*, 903 F.3d at 1377).

Patent Owner argues that the existence of multiple versions of FIPA 97 Version 1.0 undercuts Petitioner's position and Dr. Finin's testimony that Exhibits 1006–1012 are the version of FIPA 97 Version 1.0 that was publicly accessible in late 1997. *See* PO Resp. 48–53; PO Sur-reply 27. For example, Patent Owner points to Dr. Finin's description of the version released on October 10, 1997, as an "initial" version, after which final minor edits were to be made. PO Resp. 50 (citing Ex. 2068, 86:11–15, 88:9–89:25); *see* Ex. 1049 ¶ 21. Patent Owner cites an Internet Archive

capture in the record referring to "FIPA 97 specification ver. 1.0 (Reston meeting)." PO Resp. 50–51 (citing Ex. 1105, 27). Patent Owner also cites evidence, including Dr. Finin's testimony, that a different version of FIPA 97 Version 1.0 was published in hardcopy books. *Id.* at 51 (citing Exs. 1055, 1056; Ex. 1049 ¶ 25 (stating that "FIPA printed the November 28, 1997, edited version of the specification" in the books)).

Patent Owner argues that because these various versions of FIPA 97 Version 1.0 have not been substantively introduced into evidence so that the differences can be ascertained, Petitioner has not shown that Exhibits 1006–1012 are the version that was publicly accessible on the FIPA website in late 1997. *See* PO Resp. 52–53. We disagree. Dr. Finin testifies that Exhibits 1006–1012 are the same documents that were released at the conclusion of the FIPA meeting in Munich on October 10, 1997, and were made publicly available at the time. Ex. 1049 ¶¶ 21, 34. Other evidence of record corroborates Dr. Finin's testimony and adequately explains the multiple versions of the specification. *See* Pet. Reply 17. As set forth in detail above, FIPA released a version of FIPA 97 Version 1.0 on October 10, 1997, and made it available on the FIPA website soon thereafter. *See* Ex. 1049 ¶ 21; Ex. 1086, 1–2; Ex. 1095, 22; Ex. 1096, 93. It is clear from the record that any earlier versions of the specification, such as the version made available after the Reston meeting six months before FIPA 97 Version 1.0, were drafts made available for public comment. *See* Pet. Reply 20–21; Ex. 1049 ¶¶ 16–18; Ex. 1024; Ex. 1061.

The record also shows that the version published in book form is a later version, dated November 28, 1997, containing minor formatting and

clerical edits. *See* Ex. 1049 ¶ 25; Ex. 1055, 5. Petitioner does not rely on the book version as a prior art reference or assert that it was publicly accessible. *See* Pet. 23–24; Pet. Reply 21. The hardcopy book excerpts in the record merely corroborate Dr. Finin's testimony that FIPA's activities and release of the FIPA specification were known in the art. *See* Ex. 1049 ¶ 24.

Patent Owner also points to the erroneous header on odd pages in Exhibit 1006 as calling into question which version of the specification is in Exhibits 1006–1012. PO Resp. 52. We credit Dr. Finin's unrebutted testimony that the header on some pages in Exhibit 1006 is a typographical error. *See* Ex. 1049 ¶ 21. Patent Owner has not cited, nor do we see, evidence in the record suggesting a FIPA 97 Version 2.4 was made publicly available. *See* PO Resp. 52.

Patent Owner finds fault with Exhibits 1006–1012 because they were obtained after the critical date and could not have been obtained from a website prior to the critical date. *See* PO Resp. 61–62; PO Sur-reply 21. In his declaration, Dr. Finin testifies that Exhibits 1006–1012 are available on the FIPA website today (i.e., fipa.org), and the earliest Internet Archive record of the relevant website pages shows the documents were posted in 2000. Ex. 1049 ¶ 21 (citing Ex. 1054). Patent Owner contends that in his deposition Dr. Finin acknowledged that Exhibits 1006–1012 could have been obtained from files saved in the Internet Archive between 2003 and 2004. PO Resp. 47–48 (citing Ex. 2013, 93:12–94:2, 96:7–20). In either case, Patent Owner argues, the dates are after the critical date of the '115 patent. *Id.* at 48; PO Sur-reply 22. We agree with Petitioner, however,

that the date Exhibits 1006–1012 were obtained is immaterial if they are digital copies of documents that are shown to have been publicly accessible before the critical date. *See* Pet. Reply 19 (citing *In re Wyer*, 655 F.2d at 226–27).

Finally, Patent Owner argues that the testimony of Dr. Finin and Dr. Lieberman is conclusory, unreliable, and uncorroborated and therefore insufficient to establish public accessibility. PO Resp. 57–60; PO Sur-reply 20–23. "[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest." *Nobel Biocare*, 903 F.3d at 1377–78 (quoting *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1369 (Fed. Cir. 1999)). This corroboration requirement applies when relying on witness testimony to establish public accessibility of a prior art reference. *See id.* at 1377–81; *Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158–60 (Fed. Cir. 2004). Corroborating evidence may include documentary or testimonial evidence, and circumstantial evidence may provide sufficient corroboration. *Nobel Biocare*, 903 F.3d at 1378. Determining whether testimony has been corroborated "involves an assessment of the totality of the circumstances including an evaluation of all pertinent evidence." *Id.*

We are not persuaded by Patent Owner's argument regarding the testimony of Dr. Finin and Dr. Lieberman. Dr. Finin's testimony is based on his personal knowledge as someone who was directly involved in FIPA's activities by submitting comments on draft specifications and attending meetings, for example, and providing independent advice as a FIPA Fellow. His testimony that FIPA approved FIPA 97 Version 1.0 at the Munich

meeting on October 10, 1997, and posted it to the FIPA website so that it was publicly accessible is corroborated by the evidence in the record of the facts and circumstances surrounding the development and release of the specification as analyzed above. Dr. Lieberman's testimony that as a member of the interested public he accessed FIPA 97 Version 1.0 in late 1997 is corroborated by the same evidence.

As for Dr. Finin's testimony, based on his personal knowledge, that Exhibits 1006–1012 are the same as the version of FIPA 97 Version 1.0 that was publicly accessible on the FIPA website in late 1997, we find it to be credible and corroborated by other evidence of record. We are not persuaded that Dr. Finin's inability to recall many of the details of a 300-page specification more than twenty years after it was created undermines his testimony. *See* PO Resp. 58–60. Furthermore, we find that the evidence discussed above, including the identification of Exhibits 1006–1012 on their cover pages or elsewhere as FIPA 97 Version 1.0 with a date of October 10, 1997, corroborates Dr. Finin's testimony that the version of the specification in Exhibits 1006–1012 is the version that was publicly accessible on the FIPA website in late 1997, and not some other version of the FIPA specification.

For these reasons, we find that a preponderance of the evidence shows that Exhibits 1006–1012 are the version of FIPA 97 Version 1.0 released on October 10, 1997, and posted on the FIPA website in late 1997. As discussed above, a preponderance of the evidence shows that the October 10, 1997 version of FIPA 97 Version 1.0 was publicly accessible in late 1997. Accordingly, we find that Petitioner has met is burden to show that FIPA97,

submitted as Exhibits 1006–1012 and relied on by Petitioner in its unpatentability challenges, was publicly accessible prior to the critical date of January 5, 1999, and therefore is available as prior art to the ’115 patent under 35 U.S.C. § 102(a).

*E. Prior Art Status of Kiss*

We next address the threshold issue of whether Kiss (Ex. 1005) qualifies as prior art in this proceeding. As indicated above, Petitioner relies on Kiss as a prior art reference in all of the asserted grounds of unpatentability presented in the Petition. *See* Pet. 3–4.

Petitioner has the burden of persuasion to prove unpatentability by a preponderance of the evidence. *Dynamic Drinkware, LLC v. Nat’l Graphics, Inc.*, 800 F.3d 1375, 1379 (Fed. Cir. 2015). Petitioner also has the initial burden of production to show that a reference is prior art to the challenged claims under a relevant section of 35 U.S.C. § 102. *See id.* Once Petitioner has met that initial burden, the burden of production shifts to Patent Owner to argue or produce evidence that the asserted reference is not prior art to the claims. *Id.* at 1380. Once Patent Owner has met that burden of production, the burden of production returns to Petitioner. *Id.*

The filing date of the ’115 patent is January 5, 1999. Ex. 1001, code (22). As noted above, Kiss is a United States patent that arose from an application filed July 21, 1999, claiming the benefit of priority to a provisional application filed July 21, 1998. Ex. 1005, codes (22), (60).

Petitioner asserts that Kiss is prior art to the ’115 patent under 35 U.S.C. § 102(e) because Kiss is entitled to the benefit of priority to the filing date of its provisional application (Ex. 1036, “Kiss Provisional

Application"). Pet. 16–20. "A reference patent is only entitled to claim the benefit of the filing date of its provisional application if the disclosure of the provisional application provides support for the claims in the reference patent in compliance with § 112, ¶ 1." *Dynamic Drinkware*, 800 F.3d at 1381.

In *Ex parte Mann*, the Board held that "under *Dynamic Drinkware,* a non-provisional child can be entitled to the benefit of a provisional application's filing date if the provisional application provides sufficient support for *at least one claim* in the child." 2016 WL 7487271, at *6 (PTAB Dec. 21, 2016) (emphasis added) (discussing whether *Dynamic Drinkware* requires "support in the provisional . . . for all claims, any claim, or something in between"). In addition, the Board held that a "subject matter test" is also required—that is, "the [party claiming priority] also must show that the subject matter relied upon in the non-provisional is sufficiently supported in the provisional application [and that t]his subject matter test is in addition to the comparison of claims required by *Dynamic Drinkware*." *Id*. at *5.

Recognizing these requirements, Petitioner asserts that "each element of [claim 1 of Kiss] has written description support in the Kiss Provisional," providing detailed citations to the supporting disclosures from the Kiss Provisional Application for each limitation of claim 1 of Kiss. Pet. 16–18. Addressing the "subject matter test," Petitioner asserts that "the teachings that Petitioner relies upon were carried forward from the Kiss Provisional to Kiss" and provides a detailed mapping of the relied-upon portions of Kiss to

the corresponding portions of the Kiss Provisional Application. *Id.* at 18–20.

In the Institution Decision, we determined, based on the preliminary record, that Petitioner has presented sufficient argument and evidence to meet its initial burden of production on the issue of whether Kiss is entitled to the benefit of the filing date of the Kiss Provisional Application so as to shift the burden of production to Patent Owner to argue or produce evidence that Kiss is not prior art to the challenged claims. Inst. Dec. 25.

In its Preliminary Response, Patent Owner asserted that Kiss is not entitled to the priority date of its provisional application. Prelim. Resp. 67–68. In the Institution Decision, we determined, based on the preliminary record, the argument and evidence presented by Patent Owner was insufficient to shift the burden of production back to Petitioner. Inst. Dec. 25–27. We noted, however, a final determination on this particular issue will be made based on a full record developed during the course of trial. *Id.* at 27.

During the trial, Patent Owner did not present any argument or evidence on this issue, nor did it dispute Kiss qualifies as prior art in this proceeding. *See generally* PO Resp.

Based on the complete record, we determine that Petitioner has established by a preponderance of the evidence that Kiss is prior art to the ’115 patent under 35 U.S.C. § 102(e) because Kiss is entitled to the benefit of priority to the filing date of its provisional application.

*F. Relevant Principles of Law*

To prevail in challenging Patent Owner's claims, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring inter partes review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d

1364, 1380 (Fed. Cir. 2016). We analyze Petitioner's asserted grounds based on obviousness with the principles identified above in mind.

### *G. Objective Indicia of Nonobviousness*

Before determining whether a claim is obvious in light of the prior art, we consider any relevant evidence of secondary considerations of non-obviousness. *See Graham*, 383 U.S. at 17. Notwithstanding what the teachings of the prior art would have suggested to one of ordinary skill in the art at the time of the invention, the totality of the evidence submitted, including objective evidence of non-obviousness, may lead to a conclusion that the challenged claims would not have been obvious to one of ordinary skill. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984). Patent Owner presents evidence of two such considerations: (1) industry praise (PO Resp. 120–141) and (2) long-felt but unresolved need (*id.* at 141–145).

"In order to accord substantial weight to secondary considerations in an obviousness analysis, the evidence of secondary considerations must have a nexus to the claims, i.e., there must be a legally and factually sufficient connection between the evidence and the patented invention." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (internal quotations omitted). For instance, commercial success is relevant if it flows from the merits of the claimed invention. *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988).

A nexus is presumed when "the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). If the

product is not coextensive with the claims at issue—for example, if the patented invention is only a component of the product—the patentee is not entitled to a presumption of nexus. *See id.* (citing *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). The burden of showing nexus is on the patent owner. *In re Huang*, 100 F.3d 135, 139–40 (Fed. Cir. 1996).

Patent Owner contends that objective indicia of nonobviousness confirm the nonobviousness of the ’115 patent. PO Resp. 119–145. Patent Owner argues that industry praise for a software application known as “Siri,” “which was first made available for download to iPhone users on Apple, Inc.’s App Store on February 4, 2010” (*id.* at 121), “bears a nexus to the claims of the ’156 Patent” (*id.* at 141).[18] Patent Owner argues that industry praise for the “personal context awareness and service delegation ‘technical components’ of the Siri application are made possible by the [] claim limitations of independent claim 1 of the ’115 Patent.” *Id.* at 136.

Patent Owner asserts that “[t]he ’115 Patent was based on SRI International’s development of version 2 of the Open Agent Architecture (‘OAA’).” *Id.* at 135 (citing Ex. 2032; Ex. 1001). For support, Patent Owner relies on Exhibit 2054, an SRI web page, which states, “SRI developed OAA® software, which is designed with intelligent ‘agents’ that track human interactions and work processes to streamline electronic and computer interchange.” *Id.* (quoting Ex. 2054). Patent Owner further

[18] Although Patent Owner refers to the ’156 Patent here, we assume this is a mistake and that Patent Owner actually meant to refer to the patent at issue in this proceeding, the ’115 patent.

asserts that "[a]fter version 2 of OAA was developed, SRI International spun out Siri, Inc. as an SRI venture, where the Siri application was created based on an OAA groundwork." *Id.* (quoting Ex. 2054 ("OAA laid the groundwork for the DARPA-funded CALO project, from which Siri, the first virtual personal assistant, was born. Siri was spun out into an SRI venture that Apple acquired from SRI."). Apple Inc. apparently acquired Siri, Inc. in April 2010, approximately two months after the Siri application's initial release.[19] *Id.* at 10, 121, 135.

Patent Owner asserts that "Petitioner proposed a combination of *Kiss* with *FIPA97*, which relies on *FIPA97* as teaching a common communications and protocol language that is combined with *Kiss*'s teachings of electronic agents and their general functions and operations." PO Resp. 134 (citing Paper 12, 45). Patent Owner argues a "nexus between the evidence of industry praise of the Siri application [] and the Challenged Claims can be shown if the industry praise has a nexus to the combination of these (allegedly) prior art features, *i.e.*, the teachings of electronic agents and their general functions and operations in *Kiss* and the common communications protocol and language of *FIPA97*." *Id.* Patent Owner argues that its "evidence of industry praise [] satisfies the nexus requirement, as it shows praise for the Siri application's integration of personal context awareness into a service-delegating virtual personal assistant." *Id.* at 136; *see also id.* at 122–133. Patent Owner also argues that "industry journalists

[19] We note for the record that the filing date for the '115 patent is Jan. 5, 1999, approximately ten years prior to the Siri application's initial release.

recognized that the Siri application filled an unmet need for a true virtual personal assistant." *Id.* at 141; *see also id.* at 141–145.

To establish a nexus between claim 1 of the '115 patent and the Siri application, Patent Owner provides the following chart. *Id.* at 136–138. Patent Owner relies, in significant part, on the opinion of its declarant, Dr. Medvidovic, to establish a nexus between the Siri application and the claims of the '115 patent. *See* Ex. 2032 ¶¶ 205–229, App. A, 1–32.

| **Siri's Description of Technology Feature** | **Claim 1 of the '115 Patent** |
|---|---|
| **Personal Context Awareness**<br>A virtual assistant gives different answers depending on individual preferences and personal context (place, time, history), and if you give it permission, learns more about you so that it can shorten your time-to-task. Information you teach Siri in one domain (e.g. movies) is applied automatically to opportunities rising from other domains. Any personal | "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language, wherein the inter-agent language includes:<br>a layer of conversational protocol defined by event types and parameter lists associated with one or more of the |

| | |
|---|---|
| information you provide Siri is stored in a highly secure, PCI-compliant co-location center, and used only with your explicit permission to accelerate your task completion. | events, wherein the parameter lists further refine the one or more events;<br>a content layer comprising one or more of goals, triggers and data elements associated with the events;" |
| **Service Delegation**<br>An assistant can reason about what specific set of resources or services would best be combined to help you accomplish a particular task. Siri's patented service delegation algorithms combine numerous attributes about each service provider, including quality scores, fine-grained ratings for specific capabilities, speed measures, and geographic constraints, to plan and execute an optimized strategy for handling your request. Live data is pulled fresh from source sites and world-changing actions are handled in a transaction-safe manner. For example, in a restaurant selection task, Siri integrates information from many sources (local business directories, geospatial databases, restaurant guides, restaurant review sources, | "A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents, comprising the acts of:<br>. . .<br>receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrary complex goal expression;<br>dynamically interpreting the arbitrarily complex goal expression, said act of interpreting further comprising:<br>generating one or more sub-goals expressed in the inter-agent language;<br>constructing a goal satisfaction plan wherein the goal satisfaction plan includes:<br>a suitable delegation of sub-goal requests to best complete the requested |

| | |
|---|---|
| menu sites, online reservation services and the user's own favorites) to show results that meet the user's natural language request. | service request-by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and<br>dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent." |

Patent Owner argues that "the Siri application's integration of personal context awareness is made possible because of the claimed inter-agent language limitations." PO Resp. 138 (citing Ex. 2032 ¶ 222). Patent Owner explains that "[b]y having a layer of conversational protocol that has parameter lists, the '115 Patent describes how agents can then use the parameters in the parameter lists to provide feedback or advice to agents who directly, or indirectly through the facilitating agent, receive the service request." Resp. 138. For example, Patent Owner explains that a "requesting agent can utilize such a parameter to provide context on a user's preference to the facilitator agent and/or the tasking agents. *Id.* at 139 (citing Ex. 2032 ¶ 224). Patent Owner argues that "[t]his same functionality of being able to include individual preferences, for example, was described by Siri, Inc. as representing personal context awareness." *Id.* at 140 (citing Ex. 2040, 2).

Patent Owner also argues that:

> the Siri application's service delegation corresponds to the claimed dynamic interpretation limitations. Siri, Inc. described the service delegation feature of the Siri application as including "an assistant [that] can reason about what specific set of resources or services would best be combined to help you accomplish a particular task." This is precisely what is claimed in the dynamic interpretation limitations, e.g., "constructing a goal satisfaction plan . . . [including] a suitable delegation of sub-goal requests to best complete the requested service request-by using reasoning."

*Id.* (citing Ex. 2032 ¶ 221).

Petitioner argues that Patent Owner's "secondary considerations position rests primarily on an unsubstantiated, conclusory opinion that certain aspects of the '115 Patent are embodied in the Apple product 'Siri.'" Pet. Reply 82. Petitioner argues that as "Dr. Medvidovic conceded, the evidence he relied on is 'circumstantial,' or a 'suggestion.'" *Id.* (citing Ex. 1129, 147:12–15). Petitioner argues that Dr. Medvidovic "never reviewed the Siri source code, (Ex. 1129, 146:20–147:6), and indeed never even asked to review that source code (Ex. 1129, 147:22–148:9)." Pet. Reply 82–83. Petitioner argues,

> [t]he failure to review the code is fatal, because [Dr. Medvidovic] further testified that an "agent"—an element in every claim—is a "piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer **a clearly identifiable body of code,"** and that to distinguish an "agent" from any other software he "**would have to look inside the code**."

*Id.* at 83 (quoting Ex. 1129, 9:14–11:8).

Petitioner faults Patent Owner for not "not seek[ing] that code through a motion for additional discovery or other means, nor did [Petitioner] seek

any other objective evidence (such as specifications) to support its assertions." Pet. Reply 83. Petitioner also faults Patent Owner for not seeking the testimony of Mr. Adam Cheyer, one of the named co-inventor's on the '115 patent and a co-founder of Siri, Inc., on this topic, even though Mr. Cheyer's testimony was apparently obtained in a related proceeding. *Id.* at 83–84 (citing Ex. 2034, 58:15–63:16; Ex. 1127); *see also id.* at 121. During the Oral Hearing in this proceeding, counsel for Patent Owner was asked about this potential source of evidence:

> JUDGE TROCK: Counsel, this is Judge Trock
> again.
> Do you have any evidence from Mr. Cheyer
> that this Siri version that you're discussing right
> now incorporated the claim limitations of the '115
> patent?
> MS. ABDULLAH: Your Honor, we do not have
> any direct evidence from Mr. Cheyer. And the reason
> is because he was never deposed in this
> proceeding and he is also not a consultant or
> anybody that's working with IPA at the moment. I
> know --
> JUDGE TROCK: Wasn't he deposed -- sorry.
> Wasn't he deposed in the Google proceeding?
> MS. ABDULLAH: He was, your Honor. And that
> was pursuant to a subpoena that we had to get
> permission to serve from the Board because he

refused to simply cooperate with us voluntarily.

JUDGE TROCK: Was there a reason why you didn't approach the Board in this case for a subpoena?

MS. ABDULLAH: Your Honor, because we don't believe that his testimony is as probative as the expert testimony that we presented drawing the direct connection as well as the actual industry praise and long-felt need evidence that we --

JUDGE TROCK: But wouldn't he be a witness with personal knowledge of whether or not that original Siri version incorporated the claim limitations of the '115 patent?

MS. ABDULLAH: Your Honor, respectfully, I believe that that was not -- that would not be a question of personal knowledge but rather of expert testimony. And also, your Honor, I would note that I don't believe that we would have the requisite showing under the Garmin factors that he would be able to testify to those aspects.

JUDGE TROCK: But he is the inventor, right? You've told us that.

MS. ABDULLAH: Yes, your Honor, he is the inventor.

TROCK: All right. So he might be a

person -- a witness with personal knowledge; isn't that right?

MS. ABDULLAH: Absolutely. And were this a district court case, you know, I'm sure we would have pursued his deposition. I'm sure Microsoft would have as well. But given the high burden for us to obtain additional discovery, your Honor, we determined that the probative value of his testimony was not such that it would meet the Garmin factors here.

JUDGE TROCK: But you did pursue that in the Google case though?

MS. ABDULLAH: Your Honor, the Google case was a different issue. The question there had to do with authorship of a prior art reference that Mr. Cheyer was an author of. And it had to do with whether that could be considered the work of another versus the inventor. So inventorship was front and center in the Google proceedings where it is not here. Here this is a 103 analysis for which, you know, obviously I can't pretend to say what the Board would have done. But I think the evidence that we have, that we have been able to present demonstrates that link better than Mr. Cheyer's testimony would be able to.

Tr. 114:12–116:26.

Petitioner also points to evidence that potentially undermines a nexus between the challenged claims of the ’115 patent and the Siri application. For example, Petitioner argues that “Adam Cheyer testified that ‘Siri’ did not implement the agent registry functionality described in the ’115 Patent.” Pet. Reply 84 (citing Ex. 2034, 46:12-47:5). Likewise, Petitioner argues, “an email authored by Adam Cheyer indicates that as of August 2005 OAAv2 had only been adapted to run on ‘Windows CE’ mobile devices—there is no mention of iOS, Apple, or any other mobile platforms.” *Id.* (citing Ex. 1137).

Petitioner also argues that Patent Owner’s “evidence credits the CALO project with being the progenitor of the ideas that led to Siri—not any version of OAA.” Pet. Reply 84 (citing Ex. 2042, 1 (“Siri traces its origins to a military-funded artificial-intelligence project called CALO”); Ex. 2044, 1; Ex. 2047, 2; Ex. 2054, 1; Ex. 2001, 2). “Nor is there any evidence in the record,” Petitioner argues, “that OAA was ultimately utilized in SRI’s CALO project other than that the original OAA (*i.e.,* the version first created in 1994 prior to the ’115 Patent work) laid ‘groundwork’ for what would ultimately become CALO.” *Id.* (citing Ex. 2054). Petitioner argues that “substantial evidence shows that a later agent system named “SPARK” (SRI Procedural Agent Realization Kit) was used as the basis of CALO,” but that Patent Owner “ignores this intervening SPARK system and makes no attempt to show it practices the claims, nor does it meaningfully address the CALO project.” *Id.* at 85 (citing Ex. 1136 §7).

Petitioner argues that Patent Owner "failed to provide evidence 'that the industry praised a claimed invention or a product that embodies the patent claims.'" Pet. Reply 85 (quoting *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016) (emphasis omitted). In particular, Petitioner argues, Patent Owner "failed to 'establish that the evidence relied upon traces its basis to a novel element in the claim and not to something in the prior art.'" *Id.* (quoting *BioMarin Pharm. Inc. v. Genzyme Therapeutic Prods. LP*, IPR2013-00537, Paper 79, 22 (PTAB Feb. 23, 2015) (emphasis omitted).

"Furthermore," Petitioner argues, Patent Owner "has provided no showing that the Siri App 'embodies the claimed features and is co-extensive with them,' and accordingly can gain no presumption from any Siri success." Pet. Reply 85–86 (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018) (emphasis omitted). "Even assuming portions of Siri embodied the claims," Petitioner argues, "the record is undisputed that Siri provides significant functionality well beyond anything covered by the claims—voice recognition, for example." *Id.* at 86.

Petitioner further argues "the table provided by [Patent Owner] merely lists unrelated claim language and 'examples' of 'personal context awareness' with no further analysis." Pet. Reply 87. "For example," Petitioner argues, Patent Owner "provides no explanation about how the alleged 'Personal Context Awareness' feature in Siri practices 'a layer of conversational protocol.'" *Id.* Moreover, Petitioner argues, "despite claiming that 'the Siri application's integration of personal context awareness is made possible because of the claimed inter-agent language

limitations,' [Patent Owner] provides no evidence. [Patent Owner] cites only to a single paragraph of Dr. Medvidovic's declaration, which is itself bare *ipse dixit* and further undermined by his failure to examine the source code or any other descriptive technical materials for Siri." *Id.* at 88 (citing Ex. 2032 ¶ 222).

Petitioner argues that Patent Owner's evidence that Siri embodies the ICL limitations of claim 1 "is no better." Pet. Reply 88 (citing PO Resp. 140). Petitioner argues Patent Owner:

> does not discuss the actual limitations of claim 1 nor explain how giving different answers depending on individual preferences embodies the claims. For example, [Patent Owner] does not even attempt to articulate how Siri has a conversational layer, or event types, or how those event types are refined by parameters. Nor does [Patent Owner] address how Siri embodies the claimed agent registry limitation, particularly when the testimony of the inventor Mr. Cheyer indicates that it does not.

*Id.* (citing Ex. 2034, 46:12–47:5).

Petitioner argues that Dr. Medvidovic's testimony should be given no weight. Pet. Reply 89. Petitioner argues that:

> Dr. Medvidovic admitted that he would be unable to determine whether a piece of software was an "agent" without examining the source code for that software, and further admitted that he had not reviewed the Siri source code nor ever asked to review such source code. Ex. 1129, 11:9–16. Yet, Dr. Medvidovic opines at length that Siri must embody the claims of the '115 Patent because, for example, "personal context awareness and service delegations are made possible by the functionality claimed in the independent claims of the '115 Patent"—an opinion without any evidentiary support. Ex. 2032 ¶ 220. Indeed, by Dr. Medvidovic's own admission, he lacks the necessary personal knowledge to opine on the architecture of Siri.

*Id.*

In its Sur-reply, Patent Owner argues that there is "no prohibition against the use of circumstantial evidence in IPR proceedings." PO Sur-reply 66. Patent Owner argues, "Dr. Medvidovic provided unrebutted testimony, including a lengthy appendix, supported by this evidence, which must be credited. *Id.* at 68 (citing Ex. 2032, §§ 205-229, App. A). Patent Owner also points out that "Dr. Medvidovic testified that looking at the code is not the exclusive means of identifying an agent – other available information can be utilized." *Id.* at 69; *see* Ex. 1129, 10:14–11:16. Moreover, Patent Owner argues, "under the *Garmin* factors, Patent Owner was unable to seek Apple's highly confidential source code in connection with these proceedings." *Id.* at 70 (citing *Garmin Int'l, Inc. v. Cuozzo Speed Techs., LLC,* IPR2012-00001, Paper 26 at 6–7 (PTAB Mar. 5, 2013). With respect to Mr. Cheyer's testimony, Patent Owner explains that "Patent Owner was only able to depose Mr. Cheyer after the Board granted Patent Owner's motion under 37 C.F.R. § 42.52(a) for leave to serve a subpoena to compel Mr. Cheyer to testify" in a related proceeding. *Id.* at 71.

We agree with Petitioner that Patent Owner does not to provide persuasive evidence that the Siri application is reasonably commensurate with the scope of the challenged claims. Patent Owner's cited evidence attempting to tie the Siri application to the limitations of claim 1 relies substantially on the testimony of Dr. Medvidovic (Ex. 2032) and a web.archive.org Internet page (Ex. 2040) Patent Owner identifies as "Siri, Inc., Technology – "About Siri – Your Virtual Personal Assistant." *See* PO Resp. 136–140 (citing Ex. 2032 ¶¶ 216–222, 224; Ex. 2040).

We note at the outset that Dr. Medvidovic's opinion does not rely on an examination of the Siri application's source code. During his deposition, Dr. Medvidovic testified as follows:

> [Q] Let me ask you, have you ever reviewed the Siri source code?
>
> [A] I have not.
>
> [Q] So you don't know the details of how Siri is implemented?
>
> [A] Not beyond what I'm stating in the declaration as my sources of information that I'm drawing on.

Ex. 1129, 146:10–17. This is significant because Dr. Medvidovic testified at his deposition that an "agent"—an element in every claim—is a "piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer a clearly identifiable body of code," and that "if there is no accompanying specification language, then we would have to look inside the code [to determine] what kinds of facilities the agent provides." *See* Ex. 1129, 9:13–11:8). As far as we can determine, neither party has provided "accompanying specification language" for the Siri application source code. Instead, Dr. Medvidovic testified, the evidence he relied upon to form his opinion is "circumstantial," or a "suggestion." *See* Ex. 1129, 147:7–148:9.

In Section XI.B of his declaration, "Nexus of Industry Praise to the Independent Claims of the '115 Patent," Dr. Medvidovic cites to Exhibit 2040 as support for his understanding of how the Siri application works. *See e.g.,* Ex. 2032 ¶¶ 215–216, 218, 226, 229.

Exhibit 2040 describes "Siri" as:

> the first mainstream consumer application of a Virtual Personal Assistant. Siri is an intelligent software agent designed to have

> a back-and-forth conversational interaction with you as it helps you get tasks done. The three main technical components behind Siri's differentiation correspond to the essential qualities of an assistant: a conversational interface, personal context awareness and service delegation.

Ex. 2040, 1.

In his declaration, Dr. Medvidovic discusses the "personal context awareness" and "service delegation" aspects of Siri in some detail (s*ee, e.g.*, Ex. 2032 ¶¶ 216–220, 222–229). Dr. Medvidovic, however, only mentions Siri's "conversational interface" in passing, even though Exhibit 2040 describes Siri as an intelligent software agent "designed to have a back-and-forth conversational interaction with you as it helps you get tasks done," and lists Siri's "conversational interface" as the first of Siri's "three main technical components." *See* Ex. 2032 ¶ 215; Ex. 2040, 1.

In his declaration, Dr. Medvidovic attempts to link the Siri application and the limitations of the independent claims of the '115 patent. *See* Ex. 2032 ¶¶ 205–229, App. A, 1–32. Dr. Medvidovic does this by first separating the limitations of independent claims 1 and 29 into two categories, an "Inter-agent Communication Layer" (ICL) and "Service Request Planning and Execution." *See* Ex. 2032, 70–71. Dr. Medvidovic then states that "[i]t is my opinion that the Siri application's integration of personal context awareness is made possible because of the claimed ICL." *Id.* ¶ 222. Dr. Medvidovic explains that "within the conversational protocol layer of the ICL, there are further claimed "parameter lists" that may "further refine the one or more events." *Id.* ¶ 223. Dr. Medvidovic concludes that "[t]he claimed parameter lists are what allows the Siri application to provide 'different answers' depending on the context, as they

are able to refine the meaning of a service request." *Id.* ¶ 226. Dr. Medvidovic, however, provides no citation or further support for this conclusion nor does he point to any evidence to show that the Siri application utilizes the claimed parameter lists. *See id.*

In his declaration, Dr. Medvidovic also states that "[i]t is further my opinion that the Siri application's integration of service delegation is made possible because of the claimed service request planning and execution claim limitations." *Id.* ¶ 227. Dr. Medvidovic attempts to support this opinion by comparing the language of claim 1 relating to a goal satisfaction plan that includes "a suitable delegation of sub-goal requests to best complete the requested service request by using reasoning" to language used in Exhibit 2040 to describe the service delegation feature of the Siri application, "Service Delegation. An assistant can reason about what specific sets of resources of services would best be combined to help you accomplish a particular task." *See id.* ¶ 229; Ex. 2040, 2.

In our view, such a comparison is speculative at best to demonstrate that the Siri application utilizes claim 1's "service request planning and execution limitations," as Dr. Medvidovic opines. The limitations of claim 1 that Dr. Medvidovic puts in this category include:

> A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents, comprising the acts of:
>
> registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities,
>
> receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrary complex goal expression;

> dynamically interpreting the arbitrarily complex goal expression, said act of interpreting further comprising:
>
> generating one or more sub-goals expressed in the inter-agent language;
>
> constructing a goal satisfaction plan wherein the goal satisfaction plan includes:
>
> a suitable delegation of sub-goal requests to best complete the requested service request-by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and
>
> dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent.

Ex. 2032, 70. Yet, Dr. Medvidovic does not persuasively show that the Siri application "register[s] a description of each active client agent's functional capabilities," "receiv[es] a request for service . . . in the form of an arbitrary complex goal expression," "generat[es] one or more sub-goals expressed in the inter-agent language," "construct[s] a goal satisfaction plan," or "dispatch[es] each of the sub-goals to a selected client agent . . . based on a match between the sub-goal . . . and the registered functional capabilities of the selected client agent." *See id.* ¶¶ 227–229.

In fact, as Petitioner points out, there is evidence of record that the Siri application did not utilize the claimed agent registry functionality as Dr. Medvidovic opines. According to Petitioner, Mr. Cheyer, the named co-inventor on the '115 patent and the co-founder of Siri, Inc., "testified that 'Siri' did not implement the agent registry functionality described in the

’115 Patent.” Pet. Reply 84 (citing Ex. 2034, 46:12-47:5). At a deposition in a related proceeding, Mr. Cheyer testified as follows:

> [Q] So you say "it's likely." Are there features in OAA that you think have yet to be implemented in systems today?
>
> [A] Yes.
>
> [Q] Could you describe those?
>
> [A] Every system is different, but one feature of the original OAA 1 demo was that independent agents -- today we would call them more like web services -- could connect dynamically to the -- to the platform, register new capabilities with that platform, and without knowing about other services on the network, explicitly, the user could make a single request that would be -- that would involve a collaboration, and sometimes competition, among those network ecosystem of services. And so one user request would be delegated to many services which were independently developed, and none of those services knew precisely about each other. And that when I look at Siri and Google Assistant and Alexa and Bixby, that is not a capability that I have seen in any of the services today.

Ex. 2034, 45:25–46:2, 46:12–47:5.

Petitioner also points out, and we agree, that there is evidence of record that credits the CALO project with being the progenitor of the ideas that led to Siri. *See, e.g.*, Ex. 2042, 1 (“Siri traces its origins to a military-funded artificial-intelligence project called CALO”); *see also* Ex. 2044, 1; Ex. 2047, 2; Ex. 2054, 1; Ex. 2001, 2). Opus Research explains that “Siri is

set apart because it applies the depth of knowledge its founders and software specialists have built at SRI and elsewhere in creating a "cognitive assistant that learns and organizes" (CALO). Ex. 2044, 1. Petitioner points out that there is also evidence of record that indicates a later agent system named "SPARK" (SRI Procedural Agent Realization Kit) was used as the basis of CALO. *See* Ex. 1136 § 7. The SPARK-based Personal Assistant is described as follows:

> SPARK provides general-purpose agent technology for a range of domains that require reactive task execution. To date, the driving application for SPARK has been the development of an intelligent personal assistant for a high-level knowledge worker. This assistant, called CALO, will be able to perform routine tasks on behalf of its user (e.g., arrange meetings, complete online forms, file email), as well as undertake open-ended processes (e.g., purchasing a computer online), and anticipate future needs of its user.

Ex. 1136 § 7. This evidence, however, does not appear to have been considered or addressed by Dr. Medvidovic. *See* Ex. 2032 ¶¶ 205–229.

We are mindful that objective evidence of nonobviousness need only be "reasonably commensurate with the scope of the claims." *Rambus Inc. v. Rea,* 731 F.3d 1248, 1257 (Fed. Cir. 2013). We also bear in mind that "[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process—the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold." *Demaco Corp.*, 851 F.2d at 1392.

Here, Patent Owner relies on industry praise for the Siri application and evidence of an unmet need to establish a nexus between the Siri

application and the claimed invention. However, we are concerned that Patent Owner and its declarant, Dr. Medvidovic, pay little attention to one of the "three main technical components behind Siri's differentiation," the "conversational interface," when evaluating the basis for the proffered "industry praise." *See* Ex. 2040, 1.

Petitioner argues, and we agree, that "[e]ven assuming portions of Siri embodied the claims, the record is undisputed that Siri provides significant functionality well beyond anything covered by the claims—voice recognition, for example." Pet. Reply 86. The impact of Siri's "conversational interface" on Siri's reviewers is notable. For example, MIT Technology Review explains that with Siri, "[u]sers can type or speak commands in casual sentences, and the software deciphers their intent from the context." Ex. 2042, 1. Opus Research reports that "I've had [Siri] for a couple of days and here are my initial reactions. My overall experience has been quite positive. The quality of voice recognition (powered by the same 'engine' that supports Dragon Dictation and Dragon Search on the iPhone) is quite good." Ex. 2044, 1. Fast Company.Com reports, "Siri, which launches today as a free iPhone app, is a virtual personal assistant that amazingly resembles . . . an actual personal assistant. It understands plain English commands, which can be spoken or typed (e.g. 'Get me tickets to that Matt Damon movie')." Ex. 2045, 2.

Further, The Chronicle of Higher Education explains that Siri "takes a multi-step search process and turns it into one, simple, voice-driven request." Ex. 2046, 2. USA Today reported that "[t]here were occasional mistakes in speech recognition, but the overall accuracy [of Siri] was

impressive, at least when I spoke slowly and clearly in a quiet environment." Ex. 2047, 2. Spatial Computing Strategy & Research reports that, with Siri, "You ask it to do stuff like 'find me a pizza place near me' or 'tell me the weather in Chicago this weekend,' [w]ith your voice or by typing commands." Ex. 2048, 2. Search Engine Land explains that Siri is "intended to enable you to do more with your voice and your phone in fewer clicks or moves." "[O]ne can speak to Siri in a more natural way. Rather than speaking like a robot and saying 'Open Table' to minimize error, you can say something more elaborate and 'conversational' such as, 'I'd like a reservation tonight around 7:30 at Le Cheval.'" Ex. 2050.

Each of these reported examples indicate that the reviews Patent Owner relies upon to demonstrate "industry praise" for the Siri application considered Siri's conversational interface to be a significant part of its functionality. Patent Owner and Dr. Medvidovic, however, give Siri's "conversational interface" little, if any, consideration when evaluating the reasons for the "industry praise" used to try and establish a nexus between the Siri application and the claimed invention. *See, e.g.,* Ex. 2032 ¶ 215. Even if the Siri application incorporated some of the functionality of the claimed invention, the evidence of record relied on by Patent Owner shows that the Siri application, and its attendant "industry praise," is not reasonably commensurate with the scope of the claimed invention. Patent Owner does not argue that the Siri application's "conversational interface" is claimed by the '115 patent.

For these reasons and based on the complete record, we determine that Patent Owner's proffered evidence of industry praise for the Siri application

and evidence of a long felt unresolved need does not establish a sufficient nexus between the Siri application and the challenged claims of the ’115 patent. In the absence of an established nexus with the claimed invention, secondary consideration factors are not entitled to much, if any, weight and generally have no bearing on the legal issue of obviousness. *See In re Vamco Mach. & Tool, Inc.*, 752 F.2d 1564, 1577 (Fed. Cir. 1985).

### *H. Obviousness over Kiss and FIPA97*

In this asserted ground of obviousness, Petitioner contends that claims 1, 26–29, 33, 45–47, and 86–89 of the ’115 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss and FIPA97. Pet. 32–68.

#### *1. Proposed Combination of Kiss and FIPA97; Reason to Combine*

In its proposed combination of Kiss with FIPA97, Petitioner relies on Kiss as teaching electronic agents and their general functions and operations, including agent collaboration, agent registry, and inter-agent messaging. Pet. 28. Petitioner acknowledges, however, Kiss does not disclose an inter-agent communication language and relies on FIPA97 to teach a common communications protocol and language (FIPA ACL), which is combined with the teachings of Kiss to provide a communication language for inter-agent communication between the agents of Kiss. *Id.* Petitioner explains that “[FIPA97’s] techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging.” *Id.* (citing Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1). Petitioner asserts that “[w]here the two systems disclose analogous

functionality, such as facilitating cooperation and agent registry, their techniques are combined, as a Skilled Artisan would understand that to be an efficient and common sense way to implement the combined system in order to obtain the benefits of both, and therefore be motivated to do so." *Id.* (citing Ex. 1003 ¶¶ 217–219).

Petitioner argues the proposed combination of Kiss and FIPA97 would have been obvious for several reasons. Petitioner argues Kiss, FIPA97, and the '115 patent are analogous art, because "each is directed to the same field of endeavor, *i.e.*, distributed computing environments generally and architectures for communication and cooperation among distributed electronic agents specifically." Pet. 29 (citing, e.g., Ex. 1001, 1:25–29; Ex. 1005, Abstract; Ex. 1007, Foreword, 1; Ex. 1003 ¶ 220). Petitioner also argues, "FIPA97 and Kiss are reasonably pertinent to the problem addressed by the '115 patent—*e.g.*, the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" *Id.* (citing Ex. 1001, 4:34–40; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1003 ¶ 221).

Petitioner argues,

> [i]t would have been obvious to make this combination because to do so would have been the arrangement of old elements (*i.e.*, the functionality of FIPA97, and the system of Kiss) with each performing the same function it had been known to perform (communication between distributed agents (FIPA97v1)); cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate to conduct cooperative task completion and problem solving).

*Id.* (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1003 ¶ 222).

Petitioner also argues the combination

> would have been obvious because a Skilled Artisan would have known that agents, such as in Kiss, must use a common communications protocol, i.e., an inter-agent communication language, and related management functionality, and therefore would have been motivated to consider and employ one of the available inter-agent communications languages and its related functionality, and because doing so would have been a convenient and efficient way to facilitate effective communication between agents.

*Id.* at 29–30 (citing Ex. 1003 ¶ 223; Ex. 1020, 2; Ex. 1046, 50).

Petitioner further argues,

> [a] Skilled Artisan would also have been motivated based on earlier descriptions of KQML's similar use of an inter-agent communication language, their disclosure that '[t]here are several levels at which agent-based systems must agree, at least in their interfaces, in order to successfully interoperate: Transport … Language … Policy … Architecture,' and their disclosure of the necessity of a robust inter-agent communication language in a system like Kiss.

*Id.* at 30 (citing Ex. 1016, Abstract, 4, 29, 30; Ex. 1006, 7; Ex. 1007, 41, 40–42; Ex. 1005, Abstract; Ex. 1003 ¶¶ 224–226).

Petitioner argues it "would also have been obvious to try this combination because the necessity of a common inter-agent communication language was a known design need in a system such as Kiss, and there were only a small number of identified, predictable solutions to that need, such as FIPA ACL." *Id.* (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1035, 1; Ex. 1003 ¶ 227).

Petitioner argues, "[a] Skilled Artisan would have been further motivated to make the combination because of the known advantages of FIPA97, including that it specifies, 'key agents necessary for the

management of an agent system, the ontology necessary for the interaction between systems, and it defines also the transport level of the protocols.'" *Id.* at 30–31 (citing Ex. 1035, 1; Ex. 1003 ¶ 229).

Further, Petitioner argues,

> a Skilled Artisan would have been motivated to make the combination because FIPA97 represented a substantial attempt to formulate an industry standard designed to encourage interoperability and uniformity amongst agent systems. A Skilled Artisan would have understood that agent systems that complied with such a standard would be more likely to be interoperable with other systems and would likely have more resources available.

*Id.* at 31 (citing Ex. 1007, vii; Ex. 1047; Ex. 1003 ¶ 230).

Petitioner argues, "[a] Skilled Artisan would have been further motivated to include the administrative functionality and exemplary practices described in FIPA97 with Kiss because the description of such functionality and practices in FIPA97 suggests that their use with the FIPA ACL would be advantageous and workable." *Id.* Petitioner also argues, "[a] Skilled Artisan would also have been motivated to employ such additional functionality and practices in the combined system in order to obtain the full benefit of using FIPA ACL." *Id.* (citing Ex. 1003 ¶ 231).

Finally, Petitioner argues, "a Skilled Artisan could have made the combination cited above without undue experimentation including because by January 1999 the components parts of this combination were well-known, conventional technology and because others had combined FIPA97v1 technology with agent systems." *Id.* at 31–32 (citing Ex. 1007; Ex. 1016; Ex. 1030; Ex. 1003 ¶ 228).

Patent Owner asserts that "Petitioner utterly defaults in offering any reason to combine *Kiss* and *FIPA97*." PO Resp. 116. Patent Owner argues that Petitioner's motivation to combine Kiss and FIPA97 suffers from "hindsight bias" and that Petitioner "offers no reason or explanation that a person of skill in the art looking at *Kiss* would be motivated to find a particular language with the characteristics of *FIPA97's* ACL." *Id.* Patent Owner also argues that Petitioner does not "explain what 'efficiencies' a person of ordinary skill in the art would be looking for" and "fails to identify how the combination could be achieved." *Id.* at 116–117.[20]

In the Reply, Petitioner argues that Patent Owner "ignores the several pages of analysis supported by expert testimony (including citations to evidence in the prior art) articulating the rational underpinning of the combination" of Kiss and FIPA97. Pet. Reply 30 (citing Pet. 28–32). Petitioner argues that "while there was no requirement to show that a Skilled Artisan would search for 'a particular language with the characteristics of FIPA97's ACL,'" (PO Resp. 116), the Petition does explain that "agents, such as in Kiss, must use a common communications protocol," so a Skilled Artisan "would have been motivated to 'employ one of the available inter-agent communications languages . . . because doing so would have been a convenient and efficient way to facilitate effective communication between agents.'" Pet. Reply 30–31 (citing Pet. 29–30; Ex. 1003 ¶ 223).

---

[20] We need not address the parties' dispute over the motivation to combine Kiss's meta-agent and FIPA97 directory facilitator (*see, e.g.*, PO Resp. 79–85; Pet. Reply 40–46) because whether the combination of Kiss and FIPA97 teaches the claimed "facilitator agent" is not at issue for this Final Written Decision.

Petitioner also argues that Patent Owner's criticism that "Petitioner fails to identify how the combination could be achieved," (PO Resp. 117), is "legally irrelevant" (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981), and "also ignores the detailed description in the Petition (supported by Dr. Lieberman) that demonstrates how the combination would work." Pet. Reply 31 (citing Pet. 28–32; Ex. 1003 ¶¶ 217–219; Ex. 1005, Figs. 4–6, 21 (annotated)). Petitioner points out that:

> [t]he Petition explains, for example, that FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system, as described with specificity below. These techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging, (Ex. 1005, 3:32–36, 3:67-4:1, 6:67–7:1), as well adding functionality that is disclosed in FIPA97.

Pet. Reply 34.

In its Sur-reply, Patent Owner argues that Petitioner's evidence of a motivation to combine are simply "[p]ages of boilerplate language" or exhibit "*ex post* reasoning colored by hindsight." PO Sur-reply 58, 62. Patent Owner argues that the FIPA97 and Kiss protocols are "different" and "mutually exclusive" and that "Petitioner offers no argument or evidence relating to how these completely different components would be reconciled." *Id.* at 59–61. Patent Owner argues that FIPA97 "discouraged interoperability between different and incompatible systems." *Id.* at 61.

Patent Owner also argues that "[t]he Board must disregard" portions of Petitioner's Reply, which discuss "a series of four figures from Dr. Lieberman's declaration," "because it constitutes new argument." *Id.* at 63.

Patent Owner argues that "the Petition must contain a 'full statement of the reasons for the relief requested'" and "cannot simply incorporate by reference its expert's declaration." *Id.* (citing 37 C.F.R § 42.6(a)(3)).

In identifying a reason that would have prompted a person of ordinary skill in the relevant field to combine the prior art teachings, the Petitioner "must show some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418. A reason to combine teachings from the prior art "may be found in explicit or implicit teachings within the references themselves, from the ordinary knowledge of those skilled in the art, or from the nature of the problem to be solved." *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (*citing In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998)).

Here, Petitioner explains that:

> FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system, as described with specificity below. These techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging, Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1, as well adding functionality that is disclosed in FIPA97. Where the two systems disclose analogous functionality, such as facilitating cooperation and agent registry, their techniques are combined, as a Skilled Artisan would understand that to be an efficient and common sense way to implement the combined system in order to obtain the benefits of both, and therefore be motivated to do so.

Pet. 28 (citing Ex. 1003 ¶¶ 217–219).

Petitioner provides persuasive evidence that Kiss and FIPA97 are analogous art because "each is directed to the same field of endeavor, *i.e.*,

distributed computing environments generally and architectures for communication and cooperation among distributed electronic agents specifically." Pet. 29 (citing Ex. 1001, 1:25–29; Ex. 1005, Abstract; Ex. 1007, Foreword, 1; Ex. 1003 ¶ 220). Petitioner also provides persuasive evidence that FIPA97 and Kiss "are reasonably pertinent to the problem addressed by the 115 Patent—*e.g.,* the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 29 (citing Ex. 1001, 4:34–40; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1003 ¶ 221).

Petitioner argues persuasively that

> [i]t would have been obvious to make this combination because to do so would have been the arrangement of old elements (*i.e.*, the functionality of FIPA97, and the system of Kiss) with each performing the same function it had been known to perform (communication between distributed agents (FIPA97v1)); cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate to conduct cooperative task completion and problem solving).

Pet. 29 (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1003 ¶ 222).

Petitioner also argues, and we agree, that it

> would have been obvious because a Skilled Artisan would have known that agents, such as in Kiss, must use a common communications protocol, i.e., an inter-agent communication language, and related management functionality, Ex. 1020, 2; Ex. 1046, 50, and therefore would have been motivated to consider and employ one of the available inter-agent communications languages and its related functionality, and because doing so would have been a convenient and efficient way to facilitate effective communication between agents.

Pet. 29–30 (citing Ex. 1003 ¶ 223).

Petitioner goes on to argue that "a Skilled Artisan would also have been motivated based on earlier descriptions of KQML's similar use of an inter-agent communication language," (citing Ex. 1016, Abstract) and their disclosure that "[t]here are several levels at which agent-based systems must agree, at least in their interfaces, in order to successfully interoperate: Transport … Language … Policy … Architecture," (citing Ex. 1016, 4, 29, 30) as well as their disclosure of "the necessity of a robust inter-agent communication language in a system like Kiss." Pet. 30 (citing Ex. 1006, 7; Ex. 1007, 41, 4––42; Ex. 1005, Abstract; Ex. 1003 ¶¶ 224–226).

Petitioner further argues that "[s]uch a combination would also have been obvious to try this combination because the necessity of a common inter-agent communication language was a known design need in a system such as Kiss," (citing Ex. 1020, 2; Ex. 1046, 50) and there were only a small number of identified, predictable solutions to that need, such as FIPA ACL." Pet. 30 (citing Ex. 1035, 1; Ex. 1003 ¶ 227).

Petitioner goes on to argue that a "Skilled Artisan" would also have been motivated to combine FIPA97 and Kiss in the manner described in the Petition "because of the known advantages of FIPA97, including that it specifies, 'key agents necessary for the management of an agent system, the ontology necessary for the interaction between systems, and it defines also the transport level of the protocols'" (citing Ex. 1035, 1; Ex. 1003 ¶ 229), and "because FIPA97 represented a substantial attempt to formulate an industry standard designed to encourage interoperability and uniformity amongst agent systems." Pet. 30–31 (citing Ex. 1007, vii; Ex. 1047).

Petitioner also explains that:

> [a] Skilled Artisan would have been further motivated to include the administrative functionality and exemplary practices described in FIPA97 with Kiss because the description of such functionality and practices in FIPA97 suggests that their use with the FIPA ACL would be advantageous and workable. A Skilled Artisan would also have been motivated to employ such additional functionality and practices in the combined system in order to obtain the full benefit of using FIPA ACL.

Pet. 31 (citing Ex. 1003 ¶ 231).

In light of the reasons and the explanations Petitioner provides that would have motivated a person of ordinary skill in the art to combine the teachings of FIPA97 and Kiss in the manner Petitioner describes, Patent Owner's argument that "Petitioner utterly defaults in offering *any reason* to combine *Kiss* and *FIPA97*" (*see* PO Resp. 116) (emphasis added), is directly contrary to the evidence of record and is unpersuasive.

Patent Owner also argues that Petitioner "offers no reason or explanation that a person of skill in the art looking at *Kiss* would be motivated to find a particular language with the characteristics of FIPA97's ACL." *Id.* at 116. Patent Owner's argument, however, is misplaced. The test for obviousness is not whether a person of ordinary skill in the art "looking at *Kiss* would be motivated to find a particular language with the characteristics of FIPA97's ACL." Rather, "[u]nder the correct [obviousness] analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420.

Here, Petitioner provides persuasive evidence and argument that FIPA97 and Kiss "are reasonably pertinent to the problem addressed by the

115 Patent—*e.g.,* the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 29 (citing Ex. 1001, 4:34–40; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1003 ¶ 221). This evidence includes the '115 patent's observation that:

> [a]gent-based systems have shown much promise for flexible, fault-tolerant, distributed problem solving. Several agent-based projects have helped to evolve the notion of facilitation. However, existing agent-based technologies and architectures are typically very limited in the extent to which agents can specify complex goals or influence the strategies used by the facilitator.

Ex. 1001, 4:34–40, as well as Kiss' observation that "a need exists for a knowledge management system for dynamic, distributed problem-solving systems. Ex. 1005, 2:39–40. Indeed, Dr. Lieberman notes that the FIPA97 specification "defines a language and supporting tools, such as protocols, to be used by intelligent software agents to communicate with each other," and that "the terms used and the mechanisms used [by FIPA97] support such a higher-level, often *task based*, view of interaction and communication." Ex. 1003 ¶ 221. This evidence support's Petitioner's position that a person of ordinary skill in the art at the time of the claimed invention would have combined FIPA97 and Kiss in the manner described in the Petition to provide a flexible, fault-tolerant, distributed problem solving system using agent-based technologies.

Finally, addressing Patent Owner argument that Petitioner's motivation to combine Kiss and FIPA97 suffers from "hindsight bias" (PO Resp. 116), we note that "[a]ny judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary

skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper." *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971).

Here, Petitioner provides persuasive evidence that a person of ordinary skill in the art at the time of the invention would have been motivated to combine FIPA97's communications protocol and inter-agent communication language (FIPA ACL) between the agents of Kiss, adding its administrative functionality and practices to the Kiss system. *See, e.g.*, Pet. 28–32; Ex. 1003 ¶¶ 217–232. This is not evidence of hindsight bias. Patent Owner does not identify, and we do discern, any particular knowledge used by Petitioner in its combination of FIPA97 and Kiss that was gleaned from the '115 patent's disclosure and was not within the level of ordinary skill in the art at the time of the invention.

Based on the complete record, we find that Petitioner has shown persuasively by a preponderance of the evidence that one of ordinary skill in the art at the time of the invention would have been motivated to combine the teachings of FIPA97 and Kiss in the manner proffered by Petitioner.

### *2. Discussion of Independent Claim 1 — Differences Between the Claimed Subject Matter and the Prior Art*

Claim 1 is directed to a method for communication and cooperative task completion among distributed electronic agents comprising the steps of registering a description of each active client agent's functional capabilities using an inter-agent language, receiving a request for service as a base goal in the form of an arbitrarily complex goal expression in the inter-agent language, and dynamically interpreting the arbitrarily complex goal

expression. Ex. 1001, 29:10–43. Claim 1 also recites that the "inter-agent language" includes a "layer of conversational protocol" and a "content layer." *Id.* at 29:16–24. In addition, claim 1 recites that the step of "dynamically interpreting the arbitrarily complex goal expression" comprises "generating sub-goals" and "constructing a goal satisfaction plan." *Id.* at 29:28–32. The recited "goal satisfaction plan" in turn includes "a suitable delegation of sub-goal requests" and "dispatching each of the sub-goals to a selected client agent for performance." *Id.* at 29:32–41.

In its proposed combination of Kiss with FIPA97, Petitioner relies on Kiss to teach electronic agents and their general communication and collaboration functions, including the steps recited in claim 1, whereas FIPA97 is relied upon to teach the recited "inter-agent language" and the limitations relating to the inter-agent language, such as "layer of conversational protocol," a "content layer," an "arbitrarily complex goal expression," and "sub-goals expressed in the inter-agent language." Pet. 28, 32–54. Patent Owner argues that the proposed combination of Kiss and FIPA97 does not teach the "goal satisfaction plan" recited in the claim. PO Resp. 85–92. Patent Owner also asserts that FIPA97 does not teach the "inter-agent language" (or Interagent Communication Language (ICL)) and related limitations. *Id.* at 95–108. In what follows, we analyze the recitations of claim 1 in more detail, addressing Petitioner's contentions and, where applicable, Patent Owner's responsive arguments.

*a. Preamble*

Claim 1 recites a preamble as follows: "A computer-implemented method for communication and cooperative task completion among a

plurality of distributed electronic agents."[21] Petitioner asserts that Kiss teaches the recited "distributed electronic agents" because Kiss describes that "[i]nteraction between a user and the knowledge resources is mediated by a collection of cooperative intelligent agents" (Pet. 32 (citing Ex. 1005, 2:43–49, Fig. 1)), where the agents are "distributed" in a "hierarchical architecture" (*id.* at 33 (citing Ex. 1005, Abstract, 2:50–55, 4:57–59)).

Petitioner contends that Kiss also teaches the recited "communication and cooperative task completion" among the electronic agents because Kiss describes that "cooperative intelligent agents [that] incorporate generalized automated negotiation and distributed inference (i.e. problem-solving) processes," analyze "problem statements," and reorganize them as "sets of tasks." Pet. 33 (citing Ex. 1005, 2:50–55).

Patent Owner does not specifically dispute that Kiss teaches the preamble of claim 1. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches the preamble of claim 1.[22]

*b. Registering a Description*

The first step recited in claim 1 is "registering a description of each active client agent's functional capabilities as corresponding registered

[21] Because Petitioner has shown that the recitations in the preamble is satisfied by Kiss, we need not determine whether the preamble is limiting. *See Vivid Techs.*, 200 F.3d at 803.

[22] We also find that Patent Owner has waived any argument directed to the preamble of claim 1. *See* Paper 16 (Scheduling Order), 7 ("Patent Owner is cautioned that any arguments for patentability not raised in the response may be deemed waived.").

functional capabilities." Ex. 1001, 29:13–15. Petitioner asserts that Kiss teaches this limitation because Kiss describes a "registry of agents," which is constructed through "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities." Pet. 34 (citing Ex. 1005, 3:37–45, 6:66–7:19, 8:41–48, 10:32–35, 12:18–20, Fig. 1).

Patent Owner does not specifically dispute that Kiss teaches this "registering a description" limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities," as recited in claim 1.[23]

*c. An Inter-agent Language Including a Layer of Conversational Protocol and a Content Layer*

Claim 1 recites that "registering a description of each active client agent's functional capabilities" is performed using an "expandable, platform-independent, inter-agent language" (Ex. 1001, 29:13–16) and that the "inter-agent language" includes:

> a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events;

[23] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

> a content layer comprising one or more of goals, triggers and data elements associated with the events.

*Id.* at 29:16–24. Petitioner asserts that FIPA97 teaches each of these limitations relating to an "inter-agent language." Pet. 34–43.

Patent Owner asserts that FIPA97 does not teach "refin[ing] . . . events" and "triggers" recited in the claim. PO Resp. 97–108. In addition, Patent Owner argues that FIPA ACL is not "expandable" because, among other reasons, FIPA ACL does not have the capability of refining events. *Id.* at 105–106. Patent Owner does not dispute FIPA97 teaches the rest of the limitations relating to an "inter-agent language" recited in clam 1, as set forth above. *See id.* at 95–108.

*(i) Inter-agent Language*

Petitioner relies on Agent Communication Language of FIPA97 (FIPA ACL) as teaching the "inter-agent language" recited in claim 1. Pet. 28 (citing Exs. 1006, 1007, 1008), 35. In particular, Petitioner contends that FIPA97 discloses Agent Communication Language (ACL) "with precisely defined syntax, semantics and pragmatics" for "communication between independently designed and developed software agents." *Id.* at 35 (citing Ex. 1007, 3).

*(ii) Platform-independent, Expandable Inter-agent Language*

Petitioner asserts that FIPA ACL is "platform-independent," as recited in claim 1, because it is designed to "maximise interoperability across agent-based applications, services and equipment," and to facilitate the "construction and management of an agent system composed of different agents," even when those systems are "built by different developers."

Pet. 35 (citing Ex. 1007, vii, ix). Patent Owner does not dispute that FIPA ACL is "platform-independent," as recited in the claim. *See* PO Resp. 95–108.

Petitioner also contends that FIPA ACL is "expandable," as recited in claim 1, because in FIPA97 "[a]gents may use communicative acts with other names, not defined" in the specification (Pet. 35 (citing Ex. 1007, 12)) and agents "may choose to implement any subset (including all, though this is unlikely) of the pre-defined message types and protocols" (*id.* at 35–36 (citing Ex. 1007, 12)). In addition, Petitioner asserts that in FIPA97 the "formal basis" of the language is "supplemented with pragmatic extensions" that help "ease the practical implementation of effective inter-agent communications." *Id.* at 36 (citing Ex. 1007, 11). Petitioner argues that FIPA97 also discloses possible extensions to the inter-agent communication language, such as MIME header support. *Id.* (citing Ex. 1007, 82).

Patent Owner asserts that FIPA ACL is not "expandable" basically for two reasons. PO Resp. 105–106. First, citing the prosecution history, Patent Owner argues that "the concept of expandability" relates to the feature of "refin[ing] . . . events" recited in the claim and that FIPA ACL is not "expandable" because FIPA ACL does not have the capability of refining events. *Id.* Second, Patent Owner contends that FIPA ACL is not "expandable" in a general sense, citing various criticism of FIPA ACL from "[r]esearchers in the field" regarding FIPA ACL's alleged rigidity and inflexibility in certain aspects. *Id.* at 106. We address each of these arguments in turn.

Addressing first Patent Owner's argument about "the concept of expandability" as it relates to the feature of "refin[ing] . . . events" recited in the claim, Patent Owner cites the following statement by the Examiner in the Notice of Allowability:

> The disclosed agent communication language [KQML] does not read upon the cited agent language because the layer does not define an event type as well as the parameter lists that further *refines the event*. Nwana's language at best has separate layers for the event and the parameters associated with the event. By Applicant providing these parameters in the same layer as the event such that they further *refine the event*, a standard set of events are *dynamically extensible* based upon the parameter list which is not possible with the teachings of Nwana. Therefore, the claims are allowable over the prior art of record.

Ex. 1002, 14 (emphases added); PO Resp. 105 (citing Ex. 1002, 14). As indicated in the Amendment submitted before the allowance of the claims, claim 1 was amended to recite "wherein the parameter lists further refine the one or more events" to distinguish the claim from the combination of Nwana/KQML and Kiss cited by the Examiner. *See* Ex. 1002, 13–14, 18, 28, 51. Patent Owner argues, therefore, that the limitation "expandable" recited in claim 1 relates to the feature of the parameter lists that "refine . . . events," as recited in the claim. PO Resp. 105. Patent Owner asserts that FIPA ACL is not "expandable," as recited, because FIPA ACL does not teach parameters that further refine events. *Id.*

In response, Petitioner asserts that the claim language "*using an* ***expandable****, platform-independent, inter-agent language*" was part of the originally filed claims, which were rejected by the Examiner over the combination of Nwana/KQML and Kiss. Pet. Reply 59–60 (citing Ex. 1002,

763). Petitioner argues that, therefore, the Examiner's discussion of "dynamically extensible" events resulting from the "refin[ing] . . . events" feature added in the Amendment is unrelated to the "expandable" language that was present in the claim as originally filed. *Id.* at 60. Petitioner also asserts that, even if the "expandable" language relates to the "refin[ing] . . . events" feature, FIPA ACL is "expandable" because FIPA ACL teaches parameter lists that refine events. *Id.*

We need not determine whether the "expandable" language relates to the "refin[ing] . . . events" feature added in the Amendment because, as discussed below, we agree with Petitioner that FIPA ACL teaches "parameter lists" that "further refine the one or more events," as recited in claim 1. Thus, to the extent Patent Owner asserts that the limitation "expandable" recited in claim 1 relates to the feature of the parameter lists "refin[ing] . . . events," Petitioner demonstrates sufficiently that FIPA ACL teaches an "expandable . . . inter-agent language."

Turning to the Specification, the '115 patent describes that "[a]s new agents connect to the facilitator, *registering* capability specifications and natural language vocabulary, what the user can say and do *dynamically changes*; in other words, the ICL is dynamically *expandable*." Ex. 1001, 8:41–44 (emphases added). That is, the '115 patent suggests that the expandability of the ICL (or "inter-agent language," as recited in claim 1) results from or flows from the ICL's feature of "registering capability

specifications and natural language vocabulary."[24] *Id.* As noted in the Institution Decision, this portion of the Specification appears to describe an exemplary embodiment. Inst. Dec. 54 (citing Ex. 1001, 8:40–49).

As discussed above, Petitioner demonstrates sufficiently Kiss teaches "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities," as recited in claim 1. Thus, to the extent the portion of the Specification discussed above describes an embodiment of an "expandable . . . inter-agent language," we are persuaded that the combination of Kiss and FIPA97 teaches "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language," as recited in claim 1 (*see* Pet. 34–36).

Next, Patent Owner asserts that FIPA ACL is not "expandable" in a more general sense, citing various "criticisms" from "[r]esearchers in the field" about FIPA ACL's alleged "rigidity and lack of expandability." PO Resp. 106 (citing Ex. 2031, 2 ("[i]t is unlikely that a single set of axioms will cover all eventualities because communication is inherently context dependent"); Ex. 1081, 2 ("[T]he current FIPA-ACL spec tends to unnecessarily over-constrain the feasibility of communication acts . . . ."). Patent Owner also contends that Petitioner's declarants, Dr. Finin and Dr. Lieberman, made allegedly similar statements. *Id.* (citing Ex. 1082, 2

---

[24] As described in the Specification, agents connecting to the facilitator is part of the operation of the system of the '115 patent, not a feature of the ICL. *See* Ex. 1001, 6:24–44; 7:13–32.

(“The FIPA proposal only covers the most rudimentary message types.”); Ex. 2014, 207:5–20 (“FIPA is a standard, like a miles-per-gallon standard . . . So that doesn’t say how you’re going to build a car; it just says a car has to get . . . 50 miles a gallon.”)).

We are not persuaded by Patent Owner’s argument and evidence because Patent Owner does not explain adequately why the cited extrinsic evidence regarding FIPA ACL’s alleged “rigidity” or inflexibility in certain aspects shows that FIPA ACL is not “expandable” as recited in the claim. In the Institution Decision, based on the preliminary record, we did not find anything in the intrinsic record that justifies deviating from the plain meaning of the claim term “expandable.” Inst. Dec. 54–55. Upon considering the complete record, we discern no reason to depart from our preliminary assessment.[25]

We may “at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.” *Phillips*, 415 F.3d at 1322–23 (citation omitted). Accordingly, in the Institution Decision, finding no readily discernable meaning of “expandable” in the intrinsic record, we consulted a technical dictionary, the 7th edition of

[25] In the Patent Owner Response, Patent Owner does not discuss the Specification or argue that the meaning of “expandable” recited in the claim can be discerned from the Specification, although we invited the parties in the Institution Decision to address the term “expandable” further in their papers during trial. *See* PO Resp. 105–107 (citing Inst. Dec. 55–56). Thus, Patent Owner has waived its argument regarding the meaning of “expandable” based on any disclosures in the Specification. *See* Paper 16, 7.

the IEEE Dictionary (Ex. 3001).[26] The IEEE Dictionary defines "expandability" as follows: "**expandability (1) (supervisory control, data acquisition, and automatic control)** The capability of a system to be increased in capacity or provided with additional functions. **(2)** *See also:* extendability." Ex. 3001, 3.[27] The same dictionary defines "extensible language" as follows.

> A computer language that can be altered or can alter itself to provide a programmer with additional user-specified functions or capabilities. Examples include Ada, ALGOL, FORTH, and LOGO, because each can be used in a building block fashion to construct increasingly complex functions.

*Id.* at 4. Upon considering the complete record, we determine that these dictionary definitions are consistent with the intrinsic record, including the description of an embodiment in the Specification regarding "the ICL [being] dynamically expandable." *See* Ex. 1001, 8:41–44.

In the Institution Decision, based on the preliminary record, we found that the characteristics of FIPA ACL argued by Petitioner—such as the ability to use communicative acts with other names not defined in the language specification, the pragmatic extensions, and the MIME extension—appear to fall within the plain meaning of the term "expandable," as defined in the IEEE Dictionary. Inst. Dec. 55; *see* Pet. 35–36 (citing Ex. 1007, 11, 12, 82). Patent Owner does not argue otherwise.

---

[26] IEEE 100 THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS (7th ed. 2000) (Ex. 3001).

[27] The page numbers for Exhibit 3001 refer to the page numbers inserted in the bottom, right-hand corner of each page.

*See* PO Resp. 105–107. Based on the complete record and for the reasons discussed above, we determine that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches “registering a description of each active client agent’s functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language,” as recited in claim 1.

*(iii) A Layer of Conversational Protocol Defined by Event Types and Parameter Lists Associated With the Events*

Claim 1 recites that the “inter-agent language” includes “a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events.” Ex. 1001, 29:16–21. Petitioner contends that FIPA97 teaches each of these limitations. Pet. 36–42.

(1) <u>A Layer of Conversational Protocol</u>

Petitioner asserts that FIPA97 teaches “a layer of conversational protocol” recited in claim 1 because FIPA ACL “defines the semantics of *messages* between agents as including a communicative act, followed by various parameters and parameter expressions,” as shown in Figure 1 of Part 2 of FIPA97 reproduced above in the Overview of FIPA97 section (§ III.E.3.). Pet. 36–37 (emphasis added) (citing Ex. 1007, 2; Ex. 1003 ¶ 235). Petitioner also argues that FIPA97 “discloses a number of different performatives and rules governing FIPA ACL messages and the meaning of the different parts” and, therefore, discloses “a layer of conversational protocol.” *Id.* at 37 (citing Ex. 1007, 11–22; Ex. 1003 ¶¶ 236–239).

(2) Events and Event Types

Petitioner maps the "event" of claim 1 to FIPA ACL's "message" and asserts that FIPA ACL's "message type" teaches an "event type" recited in claim 1. *Id.* at 37–38 (citing Ex. 1007, 3, 4, 11–13, 18). Petitioner argues that FIPA ACL's "message" is an "event" recited in claim 1 because the FIPA ACL communicative acts "are performed by an agent sending a *message* to another agent." *Id.* at 37 (emphasis added) (citing Ex. 1007, 3, 4, 11).

Referencing Figure 1 of Part 2 of FIPA97 reproduced above, Petitioner asserts that in FIPA ACL, "[t]he first element of the message is a word which identifies the communicative act being communicated, which defines the principal meaning of the message," and "the message's communicative act *type* corresponds to that which in KQML is called the performative." Pet. 37 (emphasis added) (citing Ex. 1007, 12, 13). Petitioner argues that FIPA97 further defines "message type" as corresponding to the "communicative acts/performatives of the FIPA ACL." *Id.* at 38 (citing Ex. 1007, 18).

As discussed above, Petitioner asserts that FIPA97 teaches "a layer of conversational protocol" because FIPA ACL "defines the *semantics of messages* between agents as including a communicative act." Pet. 36 (emphasis added) (citing Ex. 1007, 2). Petitioner contends that FIPA97 teaches the layer of conversational protocol in FIPA ACL is "defined by event types," as recited in claim 1, because in FIPA97, "**[t]he message types are a reference to the semantic acts defined in this specification**." *Id.* at 37–38 (underlined emphases added) (citing Ex. 1007, 11).

(3) Parameter Lists

Claim 1 recites that "a layer of conversational protocol" is also "defined by . . . parameter lists associated with one or more of the events." Petitioner asserts that in FIPA97, FIPA ACL messages may include multiple different parameters ("parameter lists associated with one or more of the events") that can "help the message transport service to deliver the message correctly" or "the receiver to interpret the meaning of the message," or "to respond co-operatively," as shown in Figure 1 of Part 2 of FIPA97 (reproduced above). Pet. 38–39 (citing Ex. 1007, 12, 14, Fig. 1). Petitioner contends that FIPA97 discloses additional parameters in Table 1. *Id.* at 39 (citing Ex. 1007, 13–14).

(4) Refining Events

Claim 1 recites that "the parameter lists further refine the one or more events." Petitioner asserts that this phrase should be construed to mean that "a list of parameters associated with an event can refine the event by affecting the meaning of the event." Pet. 13. Petitioner discusses the disclosures in the Specification and the prosecution history of the '115 patent in support of its proposed construction. *Id.* at 13–16 (citing Ex. 1001, 11:2–37; Ex. 1002, 13–14, 51, 55; Ex. 1020, 5, 6; Ex. 1003 ¶¶ 90, 91, 94–98).

Although Patent Owner discusses constructions for six terms in the Patent Owner Response, Patent Owner does not discuss Petitioner's proposed construction for the claim term "refine . . . events" or propose its own construction. *See* PO Resp. 24–38. Instead, Patent Owner argues that FIPA97 does not teach parameters that "refine . . . events" under Petitioner's

proposed construction. *See* PO Resp. 97–98 ("the cited parameters in FIPA97 do not, contrary to Petitioner's assertion, affect the meaning of the message"), 100 ("this parameter **does not** affect the **meaning** of the message"), 102 ("In contrast, the FIPA97 "receiver" parameter **does not affect the meaning of the "inform" communicative act**."). Based on the arguments and evidence presented by Patent Owner, we understand Patent Owner not to dispute Petitioner's proposed construction for the term "the parameter lists further refine the one or more events."[28]

Upon considering the complete record, we agree with Petitioner that the claim term "refine . . . events" encompasses "affecting the meaning of the events." As discussed above, during prosecution, the limitation "wherein the parameter lists further refine the one or more events" was added to claim 1 in an amendment to distinguish the claim from the combination of Nwana/KQML and Kiss cited by the Examiner. *See* Ex. 1002, 13–14, 18, 28, 51; Pet. 14–16 (citing Ex. 1002, 13–14, 51); PO Resp. 105 (citing Ex. 1002, 14). Citing the disclosures of Nwana/KQML discussed by the Examiner, Petitioner persuasively argues that the parameters of Nwana's KQML message (i.e., the claimed "event") "tell" do not change the meaning of the message, whereas the parameters of an event of the '115 patent's change the meaning of the event by "refin[ing] the event." Pet. 14–16 (citing Ex. 1002, 13–14, 51, 55; Ex. 1020, 5, 6). In support of its argument, Petitioner cites the following passage from the Specification that

[28] We also find that Patent Owner has waived any argument regarding claim construction of this term. *See* Paper 16, 7.

distinguishes the ’115 patent’s ICL (i.e., the recited “inter-agent language”) from KQML.

> For example, in KQML, a request to satisfy a query can employ either of the performatives ask_all or ask_one. In ICL, on the other hand, this type of request preferably is expressed **by the event type evost solve, together with the solution_limit(N) parameter--where N can be any positive integer**. (A request for all solutions is indicated by the omission of the solution limit parameter.) [The request can also be accompanied by other parameters, which combine to <u>further refine</u> its semantics.] In KQML, then, this example forces one to choose between two possible conversational options, neither of which may be precisely what is desired. In either case, the performative chosen is a single value that must capture the entire conversational characterization of the communication.

Pet. 13 (alteration and underlined emphasis added) (quoting Ex. 1001, 11:21–37). Petitioner argues that a message having the KQML performative “ask_all” always has the same meaning, requesting all solutions to the request, just as the KQML performative “ask_one” always requests one solution. *Id.* at 14. According to Petitioner, in contrast, the meaning of the ’115 patent’s event “evost_solve” depends on the value of its parameter “solution_limit(N)”—e.g., an agent may request the identity of three agents capable of translating a document by including “solution_limit(N)” in the message and setting the value of N to 3. *Id.* Thus, Petitioner argues that the parameters of an event of the ’115 patent affect the meaning of the event. *Id.* at 13–16.

We are persuaded by Petitioner’s argument and evidence that the “parameterized approach” of the ’115 patent (Ex. 1001, 11:16–21) can refine an event by changing the meaning of the event. As discussed above in

Section III.B., we construe "event" to mean "a message or goal communicated between agents" and "goal" to mean "a request for service." The '115 patent describes that "[i]n one embodiment, a request for one of an agent's services normally arrives in the form of an *event* from the agent's facilitator." *Id.* at 12:44–46 (emphasis added). In a section titled "Refining Service Requests," the '115 patent describes as follows:

> In a preferred embodiment of the present invention, *parameters* associated with a goal (or sub-goal) can draw on useful features to *refine the request's meaning*. For example, it is frequently preferred to be able to specify whether or not solutions are to be returned synchronously; this is done using the reply parameter, which can take any of the values synchronous, asynchronous, or none. As another example, when the goal is a non-compound query of a data solvable, the cache parameter may preferably be used to request local caching of the facts associated with that solvable.

*Id.* at 15:49–58 (emphases added). Thus, the '115 patent describes that in an embodiment, parameters of a request for service, i.e., an event, can refine the "meaning" of the request or event.

Nonetheless, we note that this passage and all of the disclosures of the '115 patent cited by Petitioner describe exemplary embodiments. *See id.* at 11:25–28 ("In ICL . . . this type of request *preferably* is expressed by the event type evost solve, together with the solution_limit(N) parameter--where N can be any positive integer." (emphasis added)), 15:49–51 ("In a *preferred embodiment* of the present invention, *parameters* associated with a goal (or sub-goal) can draw on useful features to *refine the request's meaning*." (emphases added)). Thus, the term "refine . . . events" recited in claim 1 may encompass but is not necessarily limited to "affecting the meaning of

events." *See SuperGuide*, 358 F.3d at 875 ("a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment"); *WesternGeco*, 889 F.3d at 1323–24 ("It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise."). Indeed, Petitioner's proposed construction of the term "the parameter lists further refine the one or more events" expresses the meaning of the term in a permissive fashion—"an event *can* refine the event by affecting the meaning of the event." Pet. 13 (emphasis added).

Based on the complete record, we determine that the term "the parameter lists further refine the one or more events" encompasses parameters "affecting the meaning of the events."

Petitioner asserts that FIPA97 teaches this limitation "the parameter lists further refine the one or more events" because several of the conversational layer parameters disclosed in FIPA97 affect the meaning of the performative included within the message, and therefore affect the meaning of the message, or event. Pet. 40. According to Petitioner, FIPA97 discloses a parameter ":receiver," which "can alter the meaning [of] an event, such as 'inform,' to be 'inform one'" or "inform a number' of agents, depending on the value of the parameter." *Id.* (citing Ex. 1007, 13). Citing the testimony of Dr. Lieberman, Petitioner asserts that naming a tuple "corresponds to the action of multicasting the message" such that "semantics of this multicast" is refined so that "the message is sent to each agent named in the tuple." *Id.* (citing Ex. 1007, 13; Ex. 1003 ¶ 258). Petitioner also argues, "[t]his 'tuple naming' functionality is analogous to the example

provided in the ’115 Patent of ‘solution_limit(N),’ in which ‘N’ modifies how many solutions are requested, and is not found in the KQML Nwana reference that was before the examiner.” *Id.* (citing Ex. 1001, 11:16–42; Ex. 1020; Ex. 1003 ¶ 258). Petitioner also asserts that FIPA97 discloses two other parameters—“:protocol” when used with the “call for proposals” performative and “:conversation-id”—that affect the meaning of a message. *Id.* at 41–42 (citing Ex. 1007, 13–14, 46–49; Ex. 1003 ¶¶ 261–265).

Patent Owner asserts that FIPA97 does not teach parameters “refin[ing] . . . events,” as recited in the claim, because the parameters of FIPA97 cited by Petitioner does not affect the meaning of the message. PO Resp. 97–98. In particular, Patent Owner contends that FIPA97’s “:receiver” parameter of the FIPA97 “inform” message relied upon by Petitioner is no different from KQML’s “:receiver” parameter for the KQML “tell” message in that both modify the message but do not affect the meaning of the message. *Id.* at 98–99 (citing Ex. 1007, 12; Ex. 1020, 5). Patent Owner asserts that FIPA97’s “:receiver” parameter does not affect the meaning of the FIPA97 “inform” message because “the result of this parameter is only that the message is multicast; i.e., it is ‘sent to each agent named in the tuple.’” *Id.* at 100. According to Patent Owner, “the content of the message is unchanged; the only thing that changes is who (as in, recipient) receives the message.” *Id.* at 101.

The portion of FIPA97 cited by Petitioner is reproduced below.

| Message Parameter: | Meaning: |
|---|---|
| `:sender` | Denotes the identity of the sender of the message, i.e. the name of the agent of the communicative act. |
| `:receiver` | Denotes the identity of the intended recipient of the message.<br><br>Note that the recipient may be a single agent name, or a tuple of agent names. This corresponds to the action of multicasting the message. Pragmatically, the semantics of this multicast is that the message is sent to each agent named in the tuple, and that the sender intends each of them to be recipient of the CA encoded in the message. For example, if an agent performs an inform act with a tuple of three agents as receiver, it denotes that the sender intends each of these agent to come to believe the content of the message. |

Ex. 1007, 13. Pointing to this disclosure in FIPA97, Petitioner asserts that the "receiver" parameter affects the meaning of the event by affecting "whether the performative communicates the message to a single agent, a selection of agents, or if [the message is] broadcast to every agent." Pet. Reply 56 (citing Ex. 1007, 13). According to Petitioner, "in FIPA97, an event using 'inform' can *mean three or more different things* (i.e., inform (1) one person, (2) a select group of people, (3) everybody) depending on the value of just that parameter." *Id.*

We agree with Petitioner's argument and disagree with Paten Owner's argument. As shown above in the portion of FIPA97 relied on by Petitioner, FIPA97 describes the "meaning" of the message affected by the ":receiver" parameter (under the column heading "Meaning:") as follows:

> Note that the recipient may be a single agent name, or a tuple of agent names. This corresponds to the action of multicasting the

> message. Pragmatically, the semantics of this multicast is that the message is sent to each agent named in the tuple, and that the sender *intends* each of them to be recipient of the CA encoded in the message. For example, if an agent performs an inform act with a tuple of three agents as receiver, it denotes that the sender *intends* each of these agent to come to believe the content of the message.

Ex. 1007, 13 (emphases added). We agree with Petitioner this passage describes, under the column heading "Meaning," the meaning of the message modified or affected by the ":receiver" parameter.

Patent Owner argues that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." PO Resp. 101. Patent Owner contends that, in contrast, the solution_limit(N) parameter of the '115 patent "modifies the actual request/communicative act/performative itself—i.e., **evost solve**, because it imposes a modification on the limits of **solutions** presented in response to a request." *Id.* at 102 (citing Ex. 2032 ¶161).

We are not persuaded by Patent Owner's argument. First, we disagree with Patent Owner that the FIPA97 ":receiver" parameter changes only "who (as in, recipient) receives the message." As described in FIPA97, the ":receiver" parameter does not merely specify "who receives the message," e.g., agent A as opposed agent B. Rather, as persuasively explained by Petitioner, the ":receiver" parameter affects the qualitative aspect of the message—i.e., whether to inform (1) one agent, (2) a select group of agents, or (3) every known agent. *See* Pet. Reply 56.

In addition, Patent Owner does not explain adequately why the solution_limit(N) parameter of the '115 patent specifying the number of

agents to be queried "modifies the actual request/communicative act/performative itself" but the ":receiver" parameter of FIPA97 specifying the number of agents to which to send a message does not. *See* PO Resp. 100–101. We agree with Petitioner that Patent Owner does not identify "a practical distinction between limiting the number of agents to be queried (solution_limit(N)), and querying a selection of agents (:receiver)." Pet. Reply 57.

Next, Patent Owner contends that FIPA97 does not teach parameters "refin[ing] . . . events," as recited in the claim, because FIPA97's ":receiver" parameter is the same as or similar to the KQML ":receiver" parameter, which does not modify the meaning of a message. PO Resp. 98–99 (citing Ex. 1007, 12; Ex. 1020, 5). In support of its argument, Patent Owner cites a page from Dr. Finin's presentation slides at an unidentified meeting or class, which compares "KQML tell and FIPA ACL inform." *Id.* 99–100 (citing Ex. 2019, 15; Ex. 2013, 132:6–22.). Patent Owner also cites the testimony from Dr. Finin at his deposition that "the general idea of agent communication language that was embodied in KQML is similar to the one that is embodied in FIPA." *Id.* at 100 (citing Ex. 2012, 32:10–17).

Patent Owner, however, does not discuss the disclosure of KQML/Nwana (Ex. 1020) sufficiently (other than pointing to the similarity of the format between the ":receiver" parameter of KQML and FIPA97) or explain adequately why KQML's ":receiver" parameter is similar to the FIPA97 ":receiver" parameter. *See* PO Resp. 98–100. For example, Patent Owner does not explain whether KQML's ":receiver" parameter specifies, similar to FIPA97, that "the recipient may be a single agent name, or a tuple

of agent names," that "the message is sent to each agent named in the tuple," and that "the sender *intends* each of them to be recipient of the message." *See id.*; Ex. 1007, 13 (emphasis added). The general statements from Dr. Finin (or a slide purportedly from his unidentified presentation) cited by Patent Owner (PO Resp. 99–100 (citing Ex. 2019, 15; Ex. 2013, 132:6–22, 32:10–17) regarding the alleged similarity between KQML and FIPA97 at a general level are simply insufficient to override the specific disclosures in FIPA97 cited by Petitioner regarding the meaning of the message modified or affected by the FIPA97 ":receiver" parameter.

Patent Owner also cites testimony from Petitioner's declarant, Dr. Lieberman, as "confirm[ing]" that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." PO Resp. 101 (citing Ex. 2014, 110:14–111:16, 168:5–12). The cited testimony of Dr. Lieberman, however, discusses FIPA97's messages and multicasting in general (responding to general questions from Patent Owner's counsel) and does not discuss the specific disclosure in FIPA97 cited by Petitioner regarding the meaning of the message modified or affected by the FIPA97 ":receiver" parameter. *See* Ex. 2104, 108:4–111:16, 168:5–12. Thus, we find Patent Owner's citation to the testimony of Dr. Lieberman to be unpersuasive (if not misleading) to "confirm" that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." *See* PO Resp. 101.

Next, Patent Owner cites 9 paragraphs from the Declaration of Dr. Cohen (Ex. 2033) to argue that "FIPA97 does not contain any conversational layer parameters that affect the semantics of FIPA97 messages." PO Resp. 103 (citing Ex. 2033 ¶¶ 80–89).[29] Patent Owner, however, does not discuss Dr. Cohen's testimony in the Patent Owner Response or explain how Dr. Cohen's testimony supports its contention. *See id.* Thus, to the extent Petitioner purports to rely on Dr. Cohen's testimony, this amounts to improper incorporation by reference in violation of 37 C.F.R. § 42.6(a)(3). Accordingly, we decline to consider the cited paragraphs from the Cohen Declaration. We note, nonetheless, that Dr. Cohen's testimony appears to dwell in generalities, e.g., citing the works of logicians/philosophers Tarski and Frege (*see* Ex. 2033 ¶¶ 80–81), and discusses tuples and multicasting in general terms (*see id.* ¶¶ 85–88).

Lastly, Patent Owner contends that the limitation "the parameter lists further refine the one or more events" requires "the parameters of an event (or message) can refine the message or goal itself" (PO Resp. 97) or "change the nature of the communicative act itself" (*id.* at 102). Although it is not entirely clear what Patent Owner argues,[30] to the extent Patent Owner argues "refin[ing]" a messages or goal requires changing the message or goal itself, we disagree with Patent Owner's argument. As discussed above, in a section titled "Refining Service Requests," the '115 patent describes

---

[29] Patent Owner's citation to the Cohen Declaration appears to be mistaken since the last paragraph of Cohen Declaration is paragraph 88.

[30] As discussed above, Patent Owner does not dispute Petitioner's proposed construction of the term "the parameter lists further refine the one or more events." *See* PO Resp. 24–38.

examples of "parameters" associated with a request or goal that "refine the request's meaning," including the "reply parameter" that specifies whether solutions are to be returned synchronously or asynchronously, and the "cache parameter" that specifies local caching of facts related to the request. *See* Ex. 1001, 15:49–58. These parameters do not appear to change the request itself but, rather, specify how the request should be handled—e.g., synchronous response, local caching, etc. Thus, we are not persuaded by Patent Owner's argument that the claim requires the recited "parameters" "refine the message or goal itself" (PO Resp. 97) or "change the nature of the communicative act itself" (*id.* at 102). Such an interpretation, which "excludes a [disclosed] embodiment from the scope of the claim is rarely, if ever, correct." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) (quoting *Accent Pkg., Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013)) (citing *Phillips*, 415 F.3d at 1312–13).

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that FIPA97 teaches "wherein the parameter lists further refine the one or more events," as recited in claim 1. Based on the complete record and for the reasons explained by Petitioner, we determine that Petitioner has shown sufficiently that FIPA97 teaches "a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events," as recited in claim 1.

*(vi) Content Layer Comprising Goals and Triggers*

Claim 1 recites "a content layer comprising one or more of goals, triggers and data elements associated with the events." Petitioner asserts that FIPA97 teaches the recited "content layer" because FIPA97 describes various rules and standards governing the content that may be embedded within messages ("a content layer"). Pet. 42 (citing Ex. 1007, 3, 9, 14–16). Petitioner argues that the '115 patent consistently explains that the "content layer" of the disclosed ICL "consists of the specific goals, triggers, and data elements that may be *embedded* within various events." *Id.* at 9 (Ex. 1001, 11:13–15).

Petitioner also contends that FIPA97 teaches "a content layer comprising one or more of goals . . . associated with the events" because in FIPA97 "*goals* can be communicated among agents through the use of an achieve domain-language primitive." Pet. 42 (emphasis added) (citing Ex. 1007, 81).

Petitioner asserts that FIPA97 also teaches "data elements associated with the events" because FIPA ACL supports content expression through objects and other data ("data elements") associated with various performatives. Pet. 43 (citing Ex. 1007, 14).

(1) <u>Triggers</u>

Petitioner asserts that a "trigger" recited in claim 1 is "a general mechanism for requesting some action be taken when one or more conditions is met." Pet. 11–12 (citing Ex. 1001, 21:21–22:31; Ex. 1003 ¶¶ 80–81). Patent Owner does not dispute Petitioner's proposed meaning of "trigger" (*see* PO Resp. 24–38) and argues that FIPA97 does not teach

triggers under Petitioner's interpretation of the term (*see id.* at 107–108). We adopt this undisputed interpretation of "trigger" for this Final Written Decision because the construction is consistent with the disclosure in the Specification. *See* Ex. 1001, 21:22–24 ("triggers [provide] a general mechanism for requesting some action be taken when a set of conditions is met").

Petitioner asserts that FIPA97 discloses "triggers" for various performative actions within the content layer, including for use with the performative "accept-proposal" which "informs the receiver that it intends that (at some point in the future) the receiving agent will perform the action, once the given *precondition* is, or becomes, true." Pet. 43 (emphasis added) (citing Ex. 1007, 23). Petitioner argues that FIPA97 also discloses that the performative "propose" can be used "to make a proposal or respond to an existing proposal during a negotiation process by proposing to perform a given action subject to certain *conditions* being true." *Id.* (emphasis added) (citing Ex. 1007, 34).

Petitioner argues that the '115 patent describes "triggers" as "providing a general mechanism for requesting some action be taken when a set of *conditions* is met," and that such triggers "preferably specif[y] at least a *condition* and an action . . . [t]he *condition indicates under what circumstances the trigger should fire,* and the action indicates what should happen when it fires." Pet. 11–12 (emphases added) (citing Ex. 1001, 21:21–34).

Patent Owner contends that the portions of FIPA97 cited by Petitioner do not describe "a settable trigger that kicks in when a specified event takes

place." PO Resp. 108. Patent Owner asserts that the communicative acts (or performative actions) cited by Petitioner instead are "performatives that contain parameters dictating what the associated action is." *Id.* at 107 (citing Ex. 2032 ¶¶ 168–169).

Patent Owner also cites 35 paragraphs from the Cohen Declaration in support of its argument. *Id.* at 108 (citing Ex. 2033 ¶¶ 30–64). Patent Owner, however, does not discuss Dr. Cohen's testimony in the Patent Owner Response or explain how Dr. Cohen's testimony supports its contention. *See id.* at 107–108. Thus, to the extent Petitioner purports to rely on Dr. Cohen's testimony, this amounts to improper incorporation by reference in violation of 37 C.F.R. § 42.6(a)(3). Accordingly, we decline to consider the cited paragraphs from the Cohen Declaration.

Petitioner argues that the performative "accept-proposal" "informs the receiver that it intends that (**at some point in the future**) the receiving agent will perform the action, once the given precondition is, **or becomes**, true." Pet. Reply 63 (citing Ex. 1007, 23). Petitioner cites the following testimony from Dr. Lieberman:

> [T]he "precondition" is sent to an agent through the "*content layer*," then at some future point when that "precondition" is met the receiving agent will "*trigger*" and take an action based upon the information encoded in the "*content layer*" of the message. **EX1007, 23**.

*Id.* (citing Ex. 1003 ¶ 276). Pointing to the description in the cited portion of FIPA97, Petitioner argues

> [A]s explained by Dr. Lieberman, and shown in FIPA97, the performative "accept-proposal" ("[a] general mechanism for requesting") will take an action—in this example, streaming a multimedia channel ("some action be taken")—when "the

> customer is ready" ("when one or more conditions is met"). Further, the example above shows how this trigger information is stored within the "*content layer*."

*Id.* at 64 (reproducing the description of the performative "accept-proposal" in Ex. 1007, 23).

Petitioner contends that Dr. Lieberman and the Petition describe many other possible triggers, including the "propose" performative and the "request-when" performative. *Id.* at 65. Petitioner asserts that the "propose" performative "informs the receiver that the proposer will adopt the intention to **perform the action once the given precondition is met**" (*id.* (citing Ex. 1007, 34; Ex. 1003 ¶¶ 277–279; Pet. 43)) and that the "request-when" performative is used when "[t]he sender wants the receiver to perform some action **when some given proposition becomes true**" (*id.* (citing Ex. 1007, 40; Ex. 1003 ¶ 414; Pet. 63–64)). Petitioner points to the description of the "request-when" performative in FIPA97 and argues that the performative "request-when" ("[a] general mechanism for requesting") will take an action—in this example, sending a message ("some action be taken")—when "an alarm occurs" ("when one or more conditions is met"). *Id.* at 66. Petitioner concludes that FIPA97, therefore, discloses multiple "triggers" recited in claim 1. *Id.*

Patent Owner does not dispute Petitioner's responsive arguments in the Reply, but instead contends that Petitioner's arguments are presented "too late" and that "Petitioner cannot fix the deficiencies of its Petition on Reply." PO Sur-reply 54. To the extent Patent Owner argues that Petitioner's arguments in the Reply is improper new arguments outside the scope of a proper reply, we disagree. As discussed above, Petitioner's

arguments in the Petitioner Reply on whether FIPA97 teaches the "triggers" recited in the claim are directly responsive to Patent Owner's arguments raised in the Patent Owner Response. *See Belden Inc. v. Berk-Tek LLC*, 804 F.3d 1064, 1078–80 (Fed. Cir. 2015) (explaining that the Board may rely on new evidence submitted with a reply because that evidence was responsive to the arguments in patent owner's response).

Based on the complete record, we determine that Petitioner has shown sufficiently that FIPA97 teaches "triggers" recited in claim 1.

In sum, based on the complete record, we determine that Petitioner has demonstrated sufficiently that FIPA97 teaches the claimed "expandable, platform-independent, inter-agent language" including "a layer of conversational protocol" and "a content layer," notwithstanding these arguments from Patent Owner.

*d. Receiving a Request for Service in an Arbitrarily Complex Goal Expression*

The second step of claim 1 recites "receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression." Ex. 1001, 29:25–27. Petitioner relies on Kiss to teach the "receiving a request for service" step and combines Kiss's teaching with FIPA97's ACL to teach "a request for service . . . in the form of an arbitrarily complex goal expression." Pet. 43–47.

*(i) Receiving a Request for Service*

Petitioner asserts that Kiss teaches "receiving a request for service" because the reference describes that a "user agent" receives a "query" from a user, and then "parses the user inquiry and directs the parsed inquiry to a

metaagent 119 for action." Pet. 44 (citing Ex. 1005, 8:28–34). Petitioner points to the example process depicted in Figures 8–20 of Kiss as showing how a "problem presented by a user is solved through distributed inferencing." *Id.* (citing Ex. 1005, 12:21–22). Petitioner asserts that the initial request illustrated in Figure 8 (not reproduced herein) "when the user asks of the user agent 705 'what is the effect of increasing sales by 20%'? (FIG.8)" is a "base goal" because it is the basic request initiated by the user that inspires a number of additional, more particular requests in order to be satisfied. *Id.* at 44–45 (citing Ex. 1005, 12:23–26, Fig. 8).

*(ii) Arbitrarily Complex Goal Expression*

As discussed above in Section III.B. and the Institution Decision, based on the definitions provided in the '115 patent, we construe "arbitrarily complex goal expression" to mean "a goal expressed in a language or syntax that allows an expression, when appropriate or when desired, that expresses multiple sub-goals and can potentially include more than one type of logical connector (e.g., AND, OR, NOT), and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent, although not every goal is itself necessarily complex." Inst. Dec. 35–37. Petitioner argues that this definition of "arbitrarily complex goal expression" does not require multiple sub-goals to be expressed within the request, but instead requires only that the goal be expressed in a language "that *allows* the expression of multiple sub-goals . . . ." Pet. 45.

Petitioner asserts that FIPA ACL allows the expression of multiple sub-goals, which can potentially include more than one type of logical connector and/or more than one level of logical nesting (e.g., use of

parentheses), or the substantive equivalent, because FIPA97 "allows the construction of s-expressions of arbitrary depth and complexity." *Id.* (citing Ex. 1007, 15). Petitioner argues that FIPA97 also discloses complex "goal expressions" that "express multiple sub-goals" and which may also include "logical nesting" using parentheses. *Id.* at 46 (citing Ex. 1007, 40, 41).

Petitioner contends that, in the combined system of Kiss and FIPA97, the request discussed above— "What is the effect of increasing sales by 20%?"—is an "arbitrary complex goal expression" because it is a goal expressed in FIPA ACL. *Id.*

Patent Owner does not specifically dispute that Kiss teaches this "receiving a request for service" limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches "receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression," as recited in claim 1.[31]

*e. Dynamically Interpreting the Arbitrarily Complex Goal Expression*

Claim 1 recites "dynamically interpreting the arbitrarily complex goal expression," the act of interpreting comprising "generating one or more sub-goals expressed in the inter-agent language," "constructing a goal satisfaction plan," and "dispatching each of the sub-goals to a selected client agent for performance." Ex. 1001, 29:28–44.

[31] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

Petitioner contends that Kiss teaches "dynamically interpreting the arbitrarily complex goal expression," as recited in claim 1. Pet. 47–49. Petitioner argues

> Kiss discloses that, in response to a request for service, the "meta agent 119 formulates a goal statement for the problem-solving phase of the process, then formulates a solution plan for the problem" and "*dynamically* assesses the problem and its solution states (between users and the knowledge agents 121), divides the problem, and assigns the appropriate knowledge agents 121 to work on the solution."

*Id.* at 47–48 (emphasis added) (citing Ex. 1005, 8:32–48).

In addition, Petitioner explains how Kiss interprets the exemplary "arbitrary complex goal expression" discussed above—"What is the effect of increasing sales by 20%?"—including the meta agent formulating a plan to respond to the request, identifying other agents and knowledge modules that could assist in the response, and doing both dynamically as additional information is obtained. *Id.* at 48 (citing Ex. 1005, 12:21–14:29, Figs. 8–20). Petitioner further provides a detailed description of how this example goal expression is dynamically interpreted in Kiss. *Id.* at 48–49 (citing Ex. 1005, 12:29–14:30, Figs. 9–11, 13–20).

Patent Owner does not specifically dispute that Kiss teaches this "dynamically interpreting the arbitrarily complex goal expression" limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has

demonstrated sufficiently that Kiss teaches "dynamically interpreting the arbitrarily complex goal expression," as recited in claim 1.[32]

*f. Generating One or More Sub Goals Expressed in the Inter-agent Language*

Petitioner contends that Kiss teaches "generating one or more sub-goals expressed in the inter-agent language," as recited in claim 1, because Kiss discloses, in the example "What is the effect of increasing sales by 20%?" discussed above, that the process of responding to the user's request includes several additional requests for service ("sub-goals") to various agents, including two sub-requests each from the sales agent and the meta agent, and three sub-requests from the production agent, where each of the sub-requests is made in FIPA ACL. Pet. 49–50 (citing Ex. 1005, 12:54–56, 13:25–27, 13:37–39, 13:56–57, 14:3–5). According Petitioner, each of these sub-requests is a "sub-goal" because each is a subset of the process of responding to the user's base request—"base goal"—of "what is the effect of increasing sales by 20%?" *Id.* at 50. Petitioner also argues that Kiss's meta-agent is capable of "formulating a sub-problem query." *Id.* (citing Ex. 1005, 11:15–16).

Patent Owner does not specifically dispute that Kiss teaches this "generating one or more sub-goals expressed in the inter-agent language" limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has

---

[32] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

demonstrated sufficiently that Kiss teaches "generating one or more sub-goals expressed in the inter-agent language," as recited in claim 1.[33]

*g. Constructing a Goal Satisfaction Plan Including Delegation of Sub-goal Requests*

Claim 1 recites "constructing a goal satisfaction plan," the goal satisfaction plan including "a suitable delegation of sub-goal requests" and "dispatching each of the sub-goals to a selected client agent for performance." Ex. 1001, 29:32–43. Petitioner contends that Kiss teaches each of these limitations. Pet. 50–54.

*(i) Goal Satisfaction Plan*

Petitioner asserts that Kiss teaches "constructing a goal satisfaction plan" because Kiss describes that the meta-agent "formulates a goal statement for the problem-solving phase of the process," then "formulates a solution plan for the problem." Pet. 50 (citing Ex. 1005, 8:33–34, 5:30–64, 12:25–40, Figs. 8–20). Petitioner contends that Figures 8–20 of Kiss illustrate adding tasks to an agenda, i.e., constructing a plan, to satisfy the user request (i.e., a "goal") "what is the effect of increasing sales by 20%?" *Id.* at 50–51 (citing Ex. 1005, 13:27–29, Figs. 8–20).

Patent Owner contends that Kiss does not teach the claim "goal satisfaction plan" because Kiss does not disclose "the use of any reasoning, optimization, or taking into account any advice parameters or constraints." PO Resp. 89. Patent Owner also argues that Kiss "does not have the

---

[33] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

capability of formulating an 'optimal or near-optimal' 'goal satisfaction plan' utilizing reasoning as described in the '115 patent." *Id.* at 91 (citing Ex. 2032 ¶ 141). These arguments are predicated on Patent Owner's proposed construction of "goal satisfaction plan" to mean "a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints." *See* PO Resp. 28. As discussed above in Section III.B.1., we disagree with Patent Owner that the claim term "goal satisfaction plan" is limited as Patent Owner contends. Thus, for the reasons explained above in Section III.B.1., we disagree with Patent Owner's argument that Kiss does not disclose the "goal satisfaction plan" recited in claim 1.

Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches "constructing a goal satisfaction plan," as recited in claim 1.

*(ii) Delegation of Sub-goal Requests Using Reasoning*

Claim 1 recites "a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms." Ex. 1001, 29:32–39.

(1) Delegation of Sub-goal Requests

Petitioner asserts that Kiss teaches a meta-agent that makes "a suitable delegation of sub-goal requests to best complete the requested service request," as recited in claim 1, because Kiss identifies and queries various

agents (e.g., sales agent, production agent) who best to respond to new sub-requests for specific information as they arrive. Pet. 51 (citing Ex. 1005, 12:21–14:30, Figs. 8–20). Petitioner contends that in Kiss, the meta-agent "contains knowledge of problem solving methodologies and distributed inferencing procedures" and is further responsible for allocating "tasks to the knowledge agent layer." *Id.* (citing Ex. 1005, 5:24–27, 3:26–27). Petitioner asserts that Kiss's meta-agent uses these methodologies in conjunction with the agent registry "to dynamically bring available knowledge resources together" ("suitable delegation") by identifying "those other resources capable of furthering the problem-solving process" ("best complete the requested service request"). *Id.* (citing Ex. 1005, 5:27–29).

Patent Owner contends that Kiss does not teach "optimization of any kind." PO Resp. 89. Patent Owner asserts that Kiss's meta agent employs a trial and error method—it jumps into "executing the solution plan even before the plan is complete" and when errors are encountered, it backtracks or takes a new action. *Id.* at 90–91 (citing Ex. 1005 5:39–46). Patent Owner argues that Kiss is "forced" to go through this trial-and-error process because it does not have the capability of formulating an "optimal or near-optimal" "goal satisfaction plan." *Id.* at 91.

As discussed above in Section III.B., claim 1 does not recite an "optimal or near-optimal" "goal satisfaction plan." Instead, claim 1 recites "a suitable delegation of sub-goal requests to *best complete* the requested service request," which may relate to the "optimal or near-optimal" limiting feature argued by Patent Owner. As discussed in the same section, Patent Owner asserts that the term "optimal" and "near optimal" has a

well-established meaning in the context of computer engineering, citing a technical dictionary, which defines "optimization" as "[t]he process of finding *the best solution* to some problem, where 'best' accords to prestated criteria." PO Sur-reply 6 (emphasis added) (citing Ex. 2078, 3). Thus, contrary to Patent Owner's argument, the trial and error process of Kiss is a "process of finding *the best solution*" to a problem under Patent Owner's definition of "optimization." *See* Ex. 1005, 5:21–29 ("The meta agent 119 contains knowledge of how to dynamically bring available knowledge resources together as and when needed to provide a response to the inquiry."), 5:32–45 ("The meta agent 119 is responsible for formulating a *dynamic "solution plan"* for the distributed inferencing to be performed by the system 100, and *allocates tasks* to the knowledge agent layer 109 in furtherance of the solution plan. The planning capability of the meta agent 119 includes the ability to formulate parallel *sub-plans* and perform *iterative and recursive procedures*. . . . The meta agent 119 is capable of backtracking or replanning to permit escape during plan execution from dead-end or *otherwise unproductive search paths*." (emphases added)); Pet. 51 (citing Ex. 1005, 5:24–29).

We note that claim 1 does *not* recite "to *best complete* the requested service request *at the very first try*." Thus, Kiss's formulation of a dynamic "solution plan" (and allocation of tasks) that includes "sub-plans" to perform the trial and error process for finding the best solution to a problem satisfies "delegation of sub-goal requests to *best complete* the requested service request," as recited in claim 1.

Patent Owner also argues that it explained during prosecution how the facilitating engine is able to use reasoning to delegate the sub-goals to service providing agents in such a way as "to best complete the requested service request," as follows:

> For example, assume that several agents are able to roast coffee. The facilitating engine is able to use reasoning to delegate the sub-goal task of roasting coffee to the service-providing agent that can roast beans in the least amount of time because the facilitating engine has reasoned that *the least amount of time* taken to make coffee is *the best way* to accomplish the base goal of making coffee.

PO Resp. 90 (citing Ex. 1002, 173).

In response, Petitioner argues that Kiss similarly optimizes its solution plan based on time. Pet. Reply 49–50. Petitioner asserts that Kiss explains that as part of its matchmaking functionality (which is utilized in the solution plan), the agent service layer will create "mappings for each knowledge module 123 relating the capabilities to interests" and that these mappings are used "to optimize problem solutions." *Id.* at 49 (citing Ex. 1005, 7:8–11). According to Petitioner, Kiss describes that when utilizing "real time" inferencing, the meta-agent "may deactivate the knowledge agent whose responses do not meet time delay" or prioritize "knowledge agents that have a history of rapid response or that can tailor their problem solving to real time." *Id.* at 49–50 (citing Ex. 1005, 7:65–84). We agree with Petitioner that Kiss's delegation and prioritization of agents based on their speed of response satisfies "delegation of sub-goal requests to best complete the requested service request," as recited in claim 1.

(2) Using Reasoning

Claim 1 recites that "a suitable delegation of sub-goal requests" is accomplished "by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms." Petitioner asserts that the '115 patent describes speech recognition, natural language processing, and email as "domain-independent technologies," and travel planning and reservations agents as "domain specific." Pet. 52 (citing Ex. 1001, 6:51–55).

Citing the testimony of Dr. Lieberman, Petitioner argues that the operations disclosed in Kiss with respect to Figures 8–20 represent "reasoning that includes one or more of domain-independent coordination strategies" because the meta agent, by identifying and querying several different specialized (i.e., domain-specific) agents, is carrying out a strategy that is domain independent (i.e., is not limited to a particular area of knowledge but instead seeks information regarding sales, production, marketing, facilities, and materials) and coordinates the action of those different domain-specific agents across several domains. Pet. 52 (citing Ex. 1003 ¶¶ 331–332). Petitioner argues that Kiss's meta-agent can employ a distributed inferencing scheme that "assembles a problem-specific rule network as a distributed object under control by a meta agent." *Id.* at 52–53 (citing Ex. 1005, 7:21–26). Petitioner contends that application of such a problem-specific set of rules to a request constitutes both "domain-specific reasoning" (because the problem is the domain) and "application-specific

reasoning" (because the problem is the application). *Id.* at 53 (citing Ex. 1003 ¶ 333).

We additionally note that the portion of Kiss cited by Petitioner describes that distributed inferencing schemes are based on the use of "first-order logic." Ex. 1005, 7:21–23. The same paragraph also describes using a "theorem-proving engine." *Id.* at 7:26–28. We note that both "first-order logic" and "theorem-proving engine" may be considered "domain-independent technologies," similar to speech recognition and natural language processing technologies described in the '115 patent.

Patent Owner contends that the "solution plan" of Kiss is not constructed by "using reasoning" because Kiss's inferencing schemes are used only "[a]fter the solution plan is formulated . . . to perform the search and execution phases." PO Resp. 89 (citing Ex. 1005, 8:58–60). In response, Petitioner asserts that in the Petition it argued that it would have been obvious to utilize inferencing strategies when constructing the goal satisfaction plan. Pet. Reply 48 (citing Pet. 53). Thus, Patent Owner's argument is inapposite because it does not address the combination proposed by Petitioner. *See ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1219 (Fed. Cir. 2016) ("*KSR* does not require that a combination only unite old elements without changing their respective functions.").

As Petitioner also persuasively argues, Petitioner in the Petition additionally relies on several other ways in which Kiss utilizes reasoning to construct its solution plan, such as "problem solving methodologies and distributed inferencing procedures," how the meta-agent "assigns the **appropriate** knowledge agents 121 to work on the solution," and how the

meta-agent "executes the solution plan by maintaining an agenda, commitment table, task queue, knowledge manager or **equivalent dynamic control service**." Pet. Reply 48 (citing Pet. 50–51; Ex. 1003 ¶¶ 322–325, 331–335). Petitioner further argues that Kiss's "iterative and recursive" planning is another example of how reasoning is used to construct the solution plan of Kiss. *Id.* (citing Pet. 50; Ex. 1003 ¶ 322).

Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches "a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms," as recited in claim 1, notwithstanding the arguments by Patent Owner.

*h. Dispatching Each of the Sub-goals*

Claim 1 recites "dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent." Ex. 1001, 29:32–43.

Petitioner asserts that in Kiss

> the meta agent dispatches queries ("*sub-goals*") to various specialized agents based on a determination that the targeted agent possesses a knowledge module appropriate for the query ("*based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent*.")

Pet. 54 (citing Ex. 1005, 12:21–14:29, Figs. 8–20). Petitioner argues that Kiss's specialized agents are not facilitators (and, therefore, are "client agents") because they are not responsible for matching requests, from users and agents, with descriptions of the capabilities of other agents. *Id.* (citing Ex. 1001, 4:64–66, 6:41–43).

Patent Owner does not specifically dispute that Kiss teaches this "dispatching each of the sub-goals" limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches "dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent," as recited in claim 1.[34]

*i. Conclusion*

In consideration of the foregoing and based on the complete record, we are persuaded by Petitioner's arguments and evidence, notwithstanding Patent Owner's arguments, addressed above. Having weighed each of the *Graham* factors, including the scope and content of the prior art, the differences between the prior art and the challenged claim, and the objective evidence of nonobviousness, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss and FIPA97.

[34] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

### *3. Dependent Clams 26–28*

Claims 26–28 depends directly or indirectly from claim 1. Petitioner asserts that FIPA97 teaches all of the additionally recited limitations of these dependent claims. Pet. 54–57. Petitioner provides detailed explanations and specific citations to FIPA97 indicating where in the reference each of the additionally recited limitations of claims 26–28 is disclosed. *Id.* Petitioner also relies on the testimony of Dr. Lieberman to support its position. *Id.*

Addressing claim 26, Petitioner asserts that FIPA97v1 discloses base goals expressed as "a compound goal having sub-goals separated by operators" and that it would have been obvious to include a base goal that "is a compound goal having sub-goals separated by operators" in the system of Kiss and FIPA97 based on the teachings of FIPA97 and, alternatively, on the teachings of Kiss. Pet. 54–55 (citing Ex. 1003 ¶¶ 306–313, 477–479).

With respect to claim 27, Petitioner contends that FIPA97 discloses operators for composing base goals including a "conjunction operator" and the operator formula "(and <SLWff0> <SLWff1>)" which in FIPA97 is defined as a "Conjunction." Pet. 55 (citing Ex. 1007, 73; Ex. 1034, 112–113; Ex. 1003 ¶¶ 481–483). Petitioner further asserts that FIPA97 discloses a "disjunction operator" and the operator formula "(or <SLWff0> <SLWff1>)," which in FIPA97 is defined as "Disjunction." *Id.* (citing Ex. 1007, 73; Ex. 1003 ¶¶ 484–485).

Regarding claim 28, Petitioner asserts as follows:

> FIPA97 discloses a "parallel disjunction operator" in the form of an operator that is able to query multiple disjunct agents in a single expression. FIPA97's disclosed content language (SL2) supports grammars for "quantifying-in inside modal operators". EX1007, 78. In the disclosed example, an agent is asking for all

> x1's that are true within agent "i" or agent "j." EX1007, 78. For example, if one wanted to know if (x1) was a train or Metro station in D.C.; and agent "i" had a list of train stations in D.C., and agent "j" had a list of Metro stations in D.C., the above query would cause both agents to query their internal databases. The result of each query would be true or false depending on whether x1 appeared each respective list. Therefore, agent "i" and "j" ("by different agents") are considering "disjunct goals" (i.e., goal "(p ?x1)" versus "(q ?x1)") within the context of a "disjunction operator" (i.e., "or"). Thus, FIPA97v1 discloses "a parallel disjunction operator that indicates that disjunct goals are to be performed by different agents."

Pet. 56–57.

Patent Owner does not respond specifically to Petitioner's challenge to claims 26–28 beyond Patent Owner's arguments advanced with respect to claim 1 discussed above.

Based on the complete record and for the reasons explained by Petitioner, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 26–28 are unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss and FIPA97.[35]

### *4. Independent Claim 29*

Although many of the limitations recited in claims 1 and 29 are similar, there exist material differences in the claim language of these claims. For example, claim 1 recites

> constructing a goal satisfaction plan wherein the goal satisfaction plan includes:

[35] We also find that Patent Owner has waived any argument directed to claims 26–28, aside from contesting the unpatentability of claim 1, over the combination of Kiss and FIPA97. *See* Paper 16, 7.

> a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and
>
> dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent,

whereas claim 29 recites

> constructing a base goal satisfaction plan including the sub-acts of:
>
> determining whether the request service is available,
>
> determining sub-goals required in completing the base goal by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms,
>
> selecting service-providing electronic agents from the agent registry suitable for performing the determined sub-goals, and,
>
> ordering a delegation of sub-goal requests complete the requested service.

Ex. 1001, 29:32–43 (claim 1), 32:9–22 (claim 29). As apparent in the claim language reproduced above, there exist material differences between these limitations on the face of the claims.

When addressing the "constructing a base goal satisfaction plan" limitation and its elements recited in claim 29, however, Petitioner's analysis consists of pointing to its analysis for similar but materially different limitations from claim 1. *See* Pet. 61. Petitioner does not address the claim language of claim 29 or explain why its analysis for claim 1 is sufficient to

demonstrate a reasonable likelihood of prevailing with respect to claim 29. Accordingly, in the Institution Decision, we determined that the information presented in the Petition did not demonstrate a reasonable likelihood of Petitioner prevailing in its challenge to claim 29 under 35 U.S.C. § 103(a) as obvious over the combination of Kiss and FIPA97. Inst. Dec. 78–79.

In the Petitioner Reply, Petitioner presents comparisons of the claim language of claim 1 and claim 29 and argues the combination of Kiss and FIPA97 teaches the limitations of claim 29. Pet. Reply 66–74.

Patent Owner asserts that Petitioner's arguments relating to claim 29 are new arguments presented for the first time in the Reply, and, therefore, should not be considered. PO Resp. 54–58.

We agree with Patent Owner. It was Petitioner's burden to demonstrate sufficiently in the Petition that the cited prior art renders the challenged claims unpatentable, including showing that the Petition's contentions are supported by evidence. *See* 35 U.S.C. § 314(a); *see also* *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) ("In an IPR, the petitioner has the burden *from the onset* to show *with particularity* why the patent it challenges is unpatentable." (emphases added)) (citing 35 U.S.C. § 312(a)(3)); *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016) (requiring "*the initial petition* identify '*with particularity*' the 'evidence that supports the grounds for the challenge to each claim.'" (emphases added)). It is improper to present new arguments or evidence in a reply that should have been presented and developed in the first instance in the Petition. Under the

particular facts and circumstances in this case, we decline to consider Petitioner's argument in the Reply that was not present in the Petition.

Accordingly, Petitioner does not demonstrate by a preponderance of evidence that claim 29 is unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss and FIPA97.

*5. Dependent Claims 33 and 45–47*

Claims 33 and 45–47 depend directly or indirectly from claim 29. Petitioner's arguments and evidence presented with respect to dependent claims 33 and 45–47 only address the additionally recited limitations of these claims, and, therefore, do not remedy the deficiencies in Petitioner's analysis of independent claim 29 discussed above. *See* Pet. 54–57, 61–63.

Therefore, for the same reasons discussed above with respect to claim 29, Petitioner does not demonstrate by a preponderance of evidence that claims 33 and 45–47 are unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss and FIPA97.

*6. Independent Claim 86*

Claim 86 recites a preamble as follows: "A data wave carrier providing a transport mechanism for information communication in a distributed computing environment having at least one facilitator agent and at least one active client agent, and an Interagent Communication Language (ICL)." Ex. 1001, 37:10–14. In the body of the claim, claim 86 recites substantially the same limitations as claim 1, such as the limitations that recite that the ICL includes a "layer of conversational protocol" and a "content layer" (*id.* at 37:14–20) and that the facilitator agent constructs "a goal satisfaction plan by using reasoning" (*id.* at 37:21–38:5). In addition,

claims 86 recites that the data wave carrier comprises "a signal representation of an inter-agent language description of an active client agent's functional capabilities." *Id.* at 38:5–7.

Claim 86 recites "wherein said at least one *facilitator agent* is operable to construct a goal satisfaction plan." *Id.* at 37:21–22 (emphasis added). Petitioner's analysis of this limitation consists of a single sentence—"This claim element is satisfied for the same reasons described above in §VI.1.h.," which refers to Petitioner's analysis of the limitation of claim 1 that recites "constructing a goal satisfaction plan." Claim 1, however, does not recite "facilitator agent," nor does Petitioner explain in the context of its analysis of claim 1 how the combination of Kiss and FIPA97 teaches "at least one *facilitator agent* is operable to construct a goal satisfaction plan." *See* Pet. 32–54.

As discussed above with respect to claim 29, it was Petitioner's burden to demonstrate sufficiently in the Petition that the cited prior art renders the challenged claims unpatentable, including showing that the Petition's contentions are supported by evidence. *See* 35 U.S.C. § 314(a); *see also Harmonic*, 815 F.3d at 1363 (requiring "*the initial petition* identify '*with particularity*' the 'evidence that supports the grounds for the challenge to each claim.'" (emphases added); *Intelligent Bio-Systems*, 821 F.3d at 1369 (requiring "*the initial petition* identify '*with particularity*' the 'evidence that supports the grounds for the challenge to each claim.'" (emphases added)).

Accordingly, Petitioner does not demonstrate by a preponderance of evidence that claim 86 is unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss and FIPA97.

*7. Dependent Claims 87–89*

Claims 87–89 depend directly or indirectly from claim 86. Petitioner's arguments and evidence presented with respect to dependent claims 87–89 only address the additionally recited limitations of these claims, and, therefore, do not remedy the deficiencies in Petitioner's analysis of independent claim 86 discussed above. *See* Pet. 66–68.

Therefore, for the same reasons discussed above with respect to claim 86, Petitioner does not demonstrate by a preponderance of evidence that claims 87–89 are unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss and FIPA97.

*I. Obviousness over Kiss, FIPA97, and Moran*

Claims 12–14 and 35–37 depend from claims 1 or 29. Petitioner adds the teachings of Moran (Ex. 1013) to the basic combination of Kiss and FIPA97 in an asserted ground of obviousness as to these dependent claims. Pet. 68–76.

*1. Moran (Ex. 1013)*

Moran is titled "Multimodal User Interfaces in the Open Agent Architecture" and describes "multimodal agent-based user interfaces" implemented under SRI International's Open Agent Architecture (OAA), which is mentioned in the '115 patent as a starting point for the subject matter described in the patent. Ex. 1013, 61[36] (Abstract); Ex. 1001, 4:44–55.

---

[36] The page numbers for Exhibit 1013 refer to the page numbers inserted by Petitioner in the bottom, right-hand corner of each page.

In Moran, users can "enter commands with a mix of modalities, for example, a spoken command in which the object to be acted on is identified by a pen gesture (or other graphical pointing operation)," because the system "supports speech, handwriting and pen-based gestures in addition to the conventional keyboard and mouse inputs." Ex. 1013, 62. Moran discloses that existing speech recognition systems can be used with its agent-based applications, once an agent has been created to interface with the system. *Id.* Moran also discloses that "[a] major advantage of using an agent-based architecture is that it provides simple mix-and-match for the components," and describes existing natural language systems that can be used interchangeably. *Id.* Moran discloses a User Interface (UI) Agent, which "manages the various modalities and applies additional interpretation to those inputs as needed," along with a speech recognition agent and a natural language understanding agent. *Id.*

Petitioner asserts that Moran was published in 1997 in conjunction with the International Conference on Intelligent User Interfaces that took place on January 6–9, 1997. Pet. 27 (citing Ex. 1013, Cover-2 (evidencing receipt by libraries on March 1997)). Petitioner asserts that Moran was republished later in March 1998 in Volume 10, Issue 5 of a journal titled "Knowledge-Based Systems." *Id.* at 27–28 (citing Ex. 1111, cover (evidencing receipt by libraries by March 1998)). Petitioner contends that Moran, therefore, is prior art to the '115 patent under 35 U.S.C. §§ 102(a) and (b). *Id.* at 28.

Patent Owner does not contest the applicability of Moran as prior art in this proceeding. *See generally* PO Resp.

We note that Moran was published by the Association for Computing Machinery (ACM) and bears the Copyright date of 1997 from ACM. Ex. 1013, Cover-2. Like IEEE publications, ACM publications, such as the one in which Moran appeared, are distributed widely and intended to be accessible to the public. The wide distribution of publications from IEEE and ACM distinguishes them from academic papers such as masters and doctoral theses, which in some cases may not be well catalogued or indexed. The Board has accepted the copyright date of an IEEE publication as evidence of its public availability. *Ericsson, Inc. v. Intellectual Ventures I LLC*, Case IPR2014-00527, Paper 41 at 10 (PTAB May 18, 2015). In view of the reliability of ACM publications and their wide distribution, as well as the evidence provided by Petitioner that the publication containing the Moran article was provided to libraries for circulation to the public, Petitioner has demonstrated sufficiently that Moran qualifies as applicable prior art.

*2. Motivation to Combine*

Petitioner contends that a person of ordinary skill in the art would have been motivated to add the teachings of Moran to the basic combination of Kiss and FIPA97 because Moran is analogous art to Kiss, FIPA97, and the ’115 patent and is also reasonably pertinent to the problem addressed by Kiss, FIPA97 and the 115 Patent—e.g., the need for “flexible, fault-tolerant, distributed problem solving” using “agent-based technologies.” Pet. 68 (citing Ex. 1003 ¶¶ 221, 391).

Petitioner asserts that

> It would have been obvious to combine the language processing functionality of Moran in the system of Kiss/FIPA97, because to do so would have been the arrangement of old elements (i.e., the multimodal agent-based language processing of Moran, the functionality of FIPA97, and the system of distributed cooperative agents of Kiss) with each performing the same function it had been known to perform (multimodal interface supporting non-ICL requests (Moran); implementing communication between distributed agents (FIPA97V1); distributed agents conducting cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate to conduct cooperative task completion and problem solving, including multimodal user interface support), as Kiss demonstrates.

Pet. 67 (citing Ex. 1020, 2; Ex. 1027, 50; Ex. 1003 ¶ 392).

Patent Owner does not dispute Petitioner's articulation of the reasons to combine Kiss, FIPA97, and Moran. *See generally* PO Resp.

Based on the complete record, we determine Petitioner has provided sufficient reasons why a person of ordinary skill in the art would have combined Kiss, FIPA97, and Moran.

### *3. Dependent Claims 12–14*

Claims 12–14 depend directly or indirectly from claims 1. Petitioner asserts that Moran teaches all of the additionally recited limitations of dependent claims 12–14. Pet. 71–75. Petitioner provides detailed explanations and specific citations to Moran indicating where in the reference each of the additionally recited limitations of claims 12–14 are

disclosed. *Id.* Petitioner also relies on the testimony of Dr. Lieberman to support its position. *Id.*

*a. Claim 12*

Claim 12 recites "receiving a request for service in a second language differing from the inter-agent language." Petitioner relies on "UI Agent" of Moran to teach this limitation. Pet. 71–72. Petitioner contends that

> The UI Agent receives "speech or pen-based input" which is then routed to a "recognition" agent that produce raw text ("second language differing from the inter-agent language"). Once the raw text is produced it is then sent to a "natural language understanding agent" that is able to produce a "logical form representation" of the request. Therefore, an agent receives "a request for service" ("user's request") in a "second language differing from the inter-agent language" ("speech or pen-based input"; raw "text").

*Id.* (citing Ex. 1013, 62; Ex. 1003 ¶ 388).

Addressing "selecting a registered agent capable of converting the second language into the inter-agent language," as recited in claim 12, Petitioner asserts that

> Moran, further discloses "delegation of the request to the appropriate agents" based off that agent's registered capabilities. When an agent is added to the system in Moran, that agent "registers its capabilities with the Facilitator." As part of that registration the agent also registers any "natural language vocabulary that can be used to talk about the tasks that the agent can perform." ("registered agent capable of converting the second language into the inter-agent language"). As with the cited combination of Kiss and FIPA ACL, when an agent needs a task completed "it sends a request to the Facilitator, which then delegates it to an agent, or agents, that have registered that they can handle the needed tasks." For example, a user might query,

> "Where will I be at 2:00 this afternoon?" EX1013, 66 (emphasis in original). In order to resolve this request the "UI Agent" will work "in concert with a Facilitator agent" to invoke a "speech recognition agent or handwriting recognition agent" and thus delegate the task to the "appropriate agents" based off their registered capabilities. Therefore, an agent is "selected" to convert a "second language into the inter-agent language" based off that agent's registered capabilities.

Pet. 72–73 (citing Ex. 1013, 62–66).

Next, addressing "selecting a registered agent capable of converting the second language into the inter-agent language," as recited in claim 12, Petitioner contends as follows:

> Moran, further discloses "delegation of the request to the appropriate agents" based off that agent's registered capabilities. EX1013, 66. When an agent is added to the system in Moran, that agent "registers its capabilities with the Facilitator." EX1013, 64. As part of that registration the agent also registers any "natural language vocabulary that can be used to talk about the tasks that the agent can perform." ("registered agent capable of converting the second language into the inter-agent language") EX1013, 64. As with the cited combination of Kiss and FIPA ACL, when an agent needs a task completed "it sends a request to the Facilitator, which then delegates it to an agent, or agents, that have registered that they can handle the needed tasks." EX1013, 64. For example, a user might query, "Where will I be at 2:00 this afternoon?" EX1013, 66 (emphasis in original). In order to resolve this request the "UI Agent" will work "in concert with a Facilitator agent" to invoke a "speech recognition agent or handwriting recognition agent" and thus delegate the task to the "appropriate agents" based off their registered capabilities. EX1013, 62-66. Therefore, an agent is "selected" to convert a "second language into the inter-agent language" based off that agent's registered capabilities. EX1003,¶399.

Pet. 72–73.

Turning next to claim 12's limitation that recites "forwarding the request for service in a second language to the registered agent capable of converting the second language into the inter-agent language," Petitioner asserts that Moran also discloses that when a "UI Agent" detects "speech input" it will "sends a command to the Speech Recognition agent to process the audio input and to return the corresponding text." Pet. 73. Petitioner further contends that

> As disclosed above the delegation of the task to a specific "Speech Recognition agent" is based on that agent's registered capabilities. After the "UI Agent" determines that translation is necessary and "selects" an appropriate agent the task is then "forwarded" to the appropriate agent. The "UI Agent sends a command" ("forwarding") to the translation agent ("registered agent capable of converting the second language into the inter-agent language"), then the "audio input" ("request for service in a second language") is processed and the text is returned to the "UI Agent.

Pet. 73 (citing Ex. 1013, 62.).

Addressing next claim 12's limitation that recites "implicitly requesting that such a conversion be performed and the results returned," Petitioner asserts as follows:

> Moran discloses a UI Agent "implicitly" requesting a "conversion be performed and the results returned." When the "UI Agent" detects "speech or pen-based input" the UI Agent "invokes a speech recognition agent or handwriting recognition agent." The corresponding text is then sent to a "natural language understanding agent" this agent "produces a logical form representation of the user's request" ("conversion be performed and the results returned."). (emphasis in original). Moran, further shows that the user interface agents can work "in concert with a Facilitator agent" to delegate task to an

> "appropriate agent" in a "less direct and more anonymous" manner ("implicitly").

Pet. 74 (citing Ex. 1013, 62, 66).

Patent Owner does not respond specifically to Petitioner's challenge to claim 12 beyond Patent Owner's arguments advanced with respect to claim 1 discussed above. *See generally* PO Resp.

Based on the complete record and for the reasons explained by Petitioner, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 12 is unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss, FIPA97, Moran.[37]

*b. Claims 13 and 14*

Petitioner contends that Moran discloses a request that includes "a natural language query" because

> Moran shows a UI Agent which receives a request for service in the form of a natural language question; "Where will I be at 2:00 this afternoon?" EX1013, 66 (emphasis in original). The UI Agent is then able to work with the Facilitator Agent to delegate the request to the "appropriate agents." EX1013, 66. Therefore, the UI Agent is capable of receiving and processing "a natural language query." EX1003,¶406.

Pet. 74. According to Petitioner, Moran further discloses that when the UI Agent receives natural language text, such as through "speech or pen-based input" it may invoke a "natural language understanding agent" ("natural language agent") that "produces a logical form representation of the user's

[37] We also find that Patent Owner has waived any argument directed to claim 12, aside from contesting the unpatentability of claim 1, over the combination of Kiss, FIPA97, and Moran. *See* Paper 16, 7.

request." ("second registered agent capable of converting the second language into the inter-agent language"). Pet. 75 (citing Ex. 1013, 62; Ex. 1003 ¶ 407).

Turning next to claim 14, Petitioner asserts that

> Moran discloses a "user interface agent" that generates a "natural language query" in the form of a UI agent that can accept "spoken and pen-based inputs." The "spoken or handwritten inputs" can be treated as raw text or it may be "interpreted by a natural language understanding agent." For example, a user can ask "Where will I be at 2:00 this afternoon?" ("natural language query") this question can then be treated as raw text or processed by a "natural language understanding agent" to produce "a logical form representation of the user's request." Therefore, a "user interface agent" generates a "natural language query" when it accepts the user's question, which is phrased in simple English.

Pet. 75 (citing Ex. 1013, 62).

Patent Owner does not respond specifically to Petitioner's challenge to claims 13 and 14 beyond Patent Owner's arguments advanced with respect to claim 1 discussed above. *See generally* PO Resp.

Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that claims 13 and 14 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss, FIPA97, and Moran.[38]

---

[38] We also find that Patent Owner has waived any argument directed to claims 13 and 14, aside from contesting the unpatentability of claim 1, over the combination of Kiss, FIPA97, and Moran. *See* Paper 16, 7.

*4. Dependent Claims 35–37*

Claims 35–37 depend directly or indirectly from claim 29. Petitioner's arguments and evidence presented with respect to these dependent claims only address the additionally recited limitations of the claims, and, therefore, do not remedy the deficiencies in Petitioner's analysis of independent claim 29 discussed above. *See* Pet. 75–76.

Therefore, for the same reasons discussed above with respect to claim 29, the information presented in the Petition does not demonstrate by a preponderance of the evidence that claims 35–37 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss, FIPA97, and Moran.

*J. Patent Owner's Motion to Exclude*

Patent Owner filed a Motion to Exclude (Paper 35) certain "a portion of Exhibit 1129, as well as related testimony relied on by [Petitioner]." Paper 35, 1. Exhibit 1129 is the deposition transcript of Patent Owner's declarant Dr. Medvidovic, taken on May 19, 2020. In particular, Patent Owner seeks to exclude lines 53:19–54:21 of Exhibit 1129, which contain certain deposition testimony of Dr. Medvidovic regarding the "facilitator" of the '115 patent. We, however, do not rely on lines 53:19–54:21 of Exhibit 1129 or related testimony of Dr. Medvidovic for this Final Written Decision because whether the prior art teaches the claimed "facilitator agent" is not at issue for this Final Written Decision. Accordingly, we dismiss Patent Owner's Motion to Exclude as moot.

*K. Patent Owner's Constitutional Challenges*

Patent Owner raises two constitutional challenges. First, Patent Owner argues that subjecting a pre-AIA patent, such as the '115 patent, retroactively to *inter partes* review violates the Takings and Due Process Clauses of the Fifth Amendment. PO Resp. 146. Second, Patent Owner asserts that *inter partes* reviews violate the Appointments Clause of the U.S. Constitution when conducted by administrative patent judges not nominated by the President and confirmed by the Senate. *Id.*

Addressing first Patent Owner's Appointments Clause challenge, we are bound by the Federal Circuit's decision in *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019), which resolved this issue. *See* 941 F.3d at 1337 ("This as-applied severance . . . cures the constitutional violation."); *see also Arthrex, Inc. v. Smith & Nephew, Inc.*, 953 F.3d 760, 764 (Fed. Cir. 2020) (Moore, J., concurring in denial of rehearing) ("Because the APJs were constitutionally appointed as of the implementation of the severance, *inter partes* review decisions going forward were no longer rendered by unconstitutional panels."). Accordingly, we do not consider this issue any further.

With regard to the Takings and Due Process Clause challenge, we note that challenges to retroactive application of IPRs to pre-AIA patents have been addressed by the Federal Circuit in *Celgene Corp. v. Peter*, 931 F.3d 1342, 1357–1363 (Fed. Cir. 2019), *cert. denied* 2020 WL 3405867 (June 22, 2020) (Takings Clause) and *Sound View Innovations, LLC v. Hulu, LLC*, Nos. 2019-1865, 2019-1867, 2020 WL 3583556, *3 (Fed. Cir. July 2,

2020) (non-precedential) (Due Process Clause). Accordingly, we do not consider this issue any further.

## IV. CONCLUSION

For the foregoing reasons, we conclude that Petitioner has met its burden of proof, by a preponderance of the evidence, in showing that claims 1, 12–14, and 26–28 of the ’115 patent are unpatentable. For the reasons discussed above, Petitioner has not demonstrated, by a preponderance of the evidence, claims 29, 33, 35–37, 45–47, and 86–89 of the ’115 patent are unpatentable. The chart below summarizes our conclusions.

| **Claims** | **35 U.S.C. §** | **References/ Basis** | **Claim(s) Shown Unpatentable** | **Claim(s) Not Shown Unpatentable** |
|---|---|---|---|---|
| 1, 26–29, 33, 45–47, 86–89 | 103(a) | Kiss and FIPA97 | 1, 26–28 | 29, 33, 45–47, 86–89 |
| 12–14, 35–37 | 103(a) | Kiss, FIPA97, and Moran | 12–14 | 35–37 |
| Overall Outcome | | | 1, 12–14, 26–28 | 29, 33, 35–37, 45–47, 86–89 |

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 12–14, and 26–28 of the ’115 patent are determined to be unpatentable;

FURTHER ORDERED that claims 29, 33, 35–37, 45–47, and 86–89 of the ’115 patent are not determined to be unpatentable;

FURTHER ORDERED that Patent Owner’s Motion to Exclude is dismissed as moot; and

FURTHER ORDERED that, because this is a Final Written Decision, a party to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Joseph Micallef
Scott Border
jmicallef@sidley.com
sborder@sidley.com

PATENT OWNER:

Steven Hartsell
Alexander Gasser
Sarah Spires
shartsell@skiermontderby.com
agasser@skiermontderby.com
sspires@skiermontderby.com

Trials@uspto.gov
571.272.7822

Paper No. 44
Entered: October 15, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MICROSOFT CORPORATION,
Petitioner,

v.

IPA TECHNOLOGIES, INC.,
Patent Owner.

---

Case IPR2019-00812
Patent 6,851,115 B1

---

Before LYNNE E. PETTIGREW, MINN CHUNG, and KEVIN C. TROCK, *Administrative Patent Judges.*

TROCK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Claims Some Challenged Claims Unpatentable
Denying Patent Owner's Motion to Exclude
*35 U.S.C. § 318(a); 37 C.F.R. § 42.64*

# I. INTRODUCTION

We have authority to hear this *inter partes* review under 35 U.S.C. § 6. This Final Written Decision issues pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed herein, we determine that Microsoft Corporation ("Petitioner") has shown, by a preponderance of the evidence, that claims 1, 15, and 17–25 of U.S. Patent No. 6,851,115 B1 (Ex. 1001, "the '115 patent") are unpatentable. *See* 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

## *A. Procedural History*

Petitioner filed a request for *inter partes* review of claims 1, 15, 17–25, 29, 34, 38 and 40–44 (the "challenged claims") of the '115 patent. Paper 1 ("Pet." or "Petition"). IPA Technologies, Inc. ("Patent Owner") filed a Preliminary Response, Paper 6 ("Prelim. Resp."), contending the Petition should be denied as to all challenged claims.

On October 17, 2019, the Board entered a decision instituting an *inter partes* review of all claims and all grounds presented in the Petition. Paper 12 ("Inst. Dec.").

After institution, Patent Owner filed a Response to the Petition. Paper 22 ("Resp."). Petitioner thereafter filed a Reply to Patent Owner's Response. Paper 30 ("Reply"). Patent Owner filed a corrected Sur-reply to Petitioner's Reply. Paper 40 ("Sur-reply"). An oral hearing was held on July 27 and 28, 2020. A transcript of the hearing is included in the record. Paper 43 ("Tr.").

## *B. Related Proceedings*

Petitioner states that the '115 patent is the subject of the following actions: *IPA Technologies Inc. v. Google LLC*, 1-18-cv-00318 (D. Del.) filed

February 26, 2018; *IPA Technologies Inc. v. Microsoft Corporation*, 1-18-cv-00001 (D. Del.) filed January 2, 2018; and *IPA Technologies Inc. v. Amazon.com, Inc. et al.*, 1-16-cv-01266 (D. Del.) filed December 19, 2016. Pet. 2–3.

Petitioner lists four other petitions (IPR2019-00810, IPR2019-00811, IPR2019-00813, IPR2019-00814) filed by Petitioner against the ’115 patent. *Id.* at 2–3.

Petitioner also lists IPR petitions it has filed against other family members of the ’115 patent (IPR2019-00835, IPR2019-00836, and IPR2019-00837 (U.S. Patent No. 7,069,560 B1); IPR2019-00838, IPR2019-00839, and IPR2019-00840 (U.S. Patent No. 7,036,128 B1)). *Id.* at 3.

Petitioner also identifies numerous IPR petitions filed by Google against the ’115 patent and family members of the ’115 patent (IPR2019-00728, IPR2019-00729, IPR2019-00730, IPR2019-00731, IPR2019-00732, IPR2019-00733, IPR2019-00734, IPR2019-00735, IPR2019-00736). *Id.* at 2–3.

*C. The ’115 Patent (Ex. 1001)*

The ’115 patent describes software-based architectures for communication and cooperation among distributed electronic agents. Ex. 1001, 1:28–29. The ’115 patent describes an architecture that supports cooperative task completion by flexible, dynamic configurations of autonomous electronic agents. *Id.* at 4:60–62. Service-providing agents declare their capabilities, and facilitator’s broker communication and cooperation between the agents, such as by matching requests with descriptions of capabilities. *Id.* at 4:63–66, 5:6–7.

Figure 3 of the ’115 patent, shown below, depicts a distributed agent system in accordance with one embodiment.




Fig. 3

Figure 3, above, shows a distributed agent system 300 that includes a plurality of agents 320 based around a facilitator agent 310. *Id.* at 6:3–6. “The agents 320 forward service requests to the facilitator agent 310,” which “interprets these requests, organizing a set of goals which are then delegated to appropriate agents for task completion.” *Id.* at 6:10–13.

Figure 4 of the ’115 patent is reproduced below.




Fig. 4

Figure 4, above, depicts the structure of a small system 400 including user interface agents 408, several application agents 404 and meta-agents 406, organized as a community of peers by their common relationship to a facilitator agent 402. *Id.* at 6:25–30. The facilitator 402 is a specialized server agent that is responsible for coordinating agent communications and cooperative problem-solving and may also provide a global data store for its client agents, allowing them to adopt a blackboard style of interaction. *Id.* at 6:32–37. Agents register with a parent facilitator a specification of the capabilities and services that the agent can provide. *Id.* at 7:18–20. During task completion, when a facilitator determines that the registered services 416 of one of its client agents will help satisfy a goal, the facilitator sends that client a request expressed in the Interagent Communication Language (ICL) 418. *Id.* at 7:25–30. The agent parses the request, processes it, and returns answers or status reports to the facilitator. *Id.* at 7:30–32.

The Specification provides an express definition for "Interagent Communication Language": "Interagent Communication Language ('ICL') 418 refers to an interface, communication, and task coordination language

preferably shared by all agents, regardless of what platform they run on or what computer language they are programmed in." *Id.* at 10:48–53.

Figure 7 of the '115 patent is reproduced below.




Fig. 7

Figure 7, above, shows data structures 700 internal to a facilitator including an agent registry 702. Each registered agent may be optionally associated with one or more capabilities, which have associated Capability Declaration fields 708. The '115 patent discloses that "[t]hese capabilities may define not just functionality, but may further provide a utility parameter indicating, in some manner (e.g., speed, accuracy, etc.), how effective the agent is at providing the declared capability." *Id.* at 16:65–17:2.

*D. Challenged Claims*

Petitioner challenges claims 1, 15, 17–25, 29, 34, 38, and 40–44 of the '115 patent. Pet. 3. Claims 1 and 29 are independent. Claim 1 is illustrative.

> 1. [(a)] A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents, comprising the acts of:

[(b)(i)] registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities,
[(b)(ii)] using an expandable, platform-independent, inter-agent language,
[(c)(i)] wherein the inter-agent language includes: a layer of conversational protocol
[(c)(ii)] defined by event types
[(c)(iii)] and parameter lists associated with one or more of the events,
[(c)(iv)] wherein the parameter lists further refine the one or more events;
[(d)] a content layer comprising one or more of goals, triggers and data elements associated with the events;
[(e)(i)] receiving a request for service as a base goal in the inter-agent language,
[(e)(ii)] in the form of an arbitrarily complex goal expression;
[(f)] and dynamically interpreting the arbitrarily complex goal expression,
[(g)] said act of interpreting further comprising: generating one or more sub-goals expressed in the inter-agent language;
[(h)(i)] constructing a goal satisfaction plan wherein the goal satisfaction plan includes:
[(h)(ii)] a suitable delegation of sub-goal requests to best complete the requested service request
[(h)(iii)] by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms;
[(i)] and dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent.

Ex. 1001, 29:10–44 (numbering and formatting designated by Petitioner; *see* Pet. Att. C).

*E. Prior Art References*

Petitioner relies upon the following prior art references:

(1) U.S. Patent No. 6,484,155, issued Nov. 19, 2002 ("Kiss") (Ex. 1005);

(2) 1997 FIPA v. 1.0 Specification ("FIPA97") (Ex. 1006–1012);

(3) Cohen et al., *An Open Agent Architecture*, 1994 Association for the Advancement of Artificial Intelligence Spring Symposia on March 21-23, 1994. ("Cohen") (Ex. 1014).

*F. Asserted Grounds of Unpatentability*

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1, 15, 18, 19, 29, 34, 38, 41, 42 | 103 | Kiss/FIPA97 |
| 17, 20–25, 40, 43, 44 | 103 | Kiss/FIPA97/Cohen |

## II. ANALYSIS

*A. Level of Ordinary Skill*

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham v. John Deere Co.,* 383 U.S. 1, 17 (1966). "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).

Petitioner describes a person of ordinary skill in the art as "someone familiar with the principles and conventions of computer science and computer networking, and also with multi-agent systems and inter-agent communication languages as documented in agent-centered literature by 1999." Pet. 4. Petitioner also explains that a person of ordinary skill in the art "may have been a graduate student in mathematics, engineering, or

computer science, and may have had an advanced degree in one of these disciplines, and would also have had at least two years of experience working in the field of computer science, or a related field, and may have worked in academia, either as a professor or a graduate student, for a technology company, or for a government." Pet. 4–5 (citing Ex. 1003 ¶ 34).

In its Response, Patent Owner asserts that a person of ordinary skill in the art at the time of the '115 patent's filing date would have had "a Bachelor's degree in Computer Science or equivalent field and at least two years of work experience in design and development of distributed systems, software specification languages, or a related area." Resp. 23 (citing Ex. 2032 ¶ 37). Patent Owner criticizes Petitioner's description of the level of ordinary skill in the art as being "vague and uncertain" as to render it "meaningless" because of the use of the word "may" in its description. *Id.* Patent Owner contends that Petitioner's proposed description is "particularly problematic here, where Petitioner claims that it would have been obvious to create an agent system that is very complex and advanced in its facilitation, goal processing, and inter-agent communication capacities." *Id.* at 24 (citing Ex. 2032 ¶ 40).

In its Reply, Petitioner argues that its proposal "simply (and realistically) expresses alternatives—*i.e.*, that a Skilled Artisan would have been at least a graduate student in several relevant fields (*e.g*, 'mathematics, engineering, or computer science'), and would have had at least two years of work experience in those fields." Reply 13–14 (citing Pet. 4–5). Petitioner also argues that Patent Owner does not articulate how any differences between the parties' proposals that would alter or even affect the outcome of this proceeding. Reply 14.

In its Sur-reply, Patent Owner argues that it has "identified how the difference between the proposals would affect this proceeding" because Patent Owner has pointed out that "it is Petitioner's burden under the law to address each *Graham* factor and Petitioner has failed to proffer a coherent level of ordinary skill in the art, Petitioner's obviousness assertion fails for that reason alone." Sur-reply 15 (citing Resp. 24).

Patent Owner, however, does not identify any "meaningful differences" between the parties' proposed definitions or how "the outcome of [this proceeding] would have been different" if we adopted Patent Owner's proposed description, as opposed to Petitioner's proposal. *See ESIP Series 2, LLC v. Puzhen Life USA, LLC*, 958 F.3d 1378, 1385 (Fed. Cir. 2020) (citing *Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1371–72 (Fed. Cir. 2016)). For example, Patent Owner does not argue the challenged claims are not unpatentable under Patent Owner's proposed description of the level of ordinary skill in the art, nor does Patent Owner identify any claim limitation that would have been taught by the asserted prior art under Petitioner's proposal, but *not* under Patent Owner's proposal. *See* Resp. 23–24; Sur-reply 14–16.

In our view, the parties' proposals are not materially different despite the differences in wording between them (e.g., the education level of a Bachelor's degree in Computer Science or equivalent field under Patent Owner's proposal, as opposed to a graduate student's level of education with or without a Bachelor's degree under Petitioner's proposal). For purposes of this Final Written Decision, we find no meaningful differences between the parties' respective proposals that would materially alter the outcome of this Decision. These proposals are similar for all purposes relevant to this Final Written Decision, and both are consistent with the level of ordinary skill in

the art reflected in the disclosure of the ’115 patent and the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

Nonetheless, for this Final Written Decision, we adopt Patent Owner’s description of a person of ordinary skill in the art at the time of the claimed invention. That is, a person of ordinary skill in the art at the time of the claimed invention would have had “a Bachelor’s degree in Computer Science or equivalent field and at least two years of work experience in design and development of distributed systems, software specification languages, or a related area.” Resp. 23. Our analysis and conclusions in this Final Written Decision would be the same regardless of whether Petitioner’s or Patent Owner’s description of the level of ordinary skill in the art is adopted.

*B. Claim Construction*

In an *inter partes* review, we apply the same claim construction standard that would be used in a civil action under 35 U.S.C. § 282(b), following the standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. § 42.100(b) (2019). In applying such standard, claim terms are generally given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art, at the time of the invention and in the context of the entire patent disclosure. *Phillips*, 415 F.3d at 1312–13. “In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence.” *DePuy Spine, Inc. v. Medtronic*

*Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

In our Decision on Institution, we preliminarily interpreted certain claim terms as follows.

| Term | Construction |
|---|---|
| "event" | "a message or goal communicated between agents" |
| "event type" | "a type of an event" |
| "goal" | "a request for service" |
| "arbitrarily complex goal expression" | "a goal expressed in a language or syntax that allows an expression, when appropriate or when desired, that expresses multiple sub-goals and can potentially include more than one type of logical connector (e.g., AND, OR, NOT), and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent, although not every goal is itself necessarily complex" |
| "compound goal" | "a single goal expression that specifies multiple sub-goals to be performed" |

Dec. on Inst. 26–37.

The parties do not dispute the constructions of these terms in the Patent Owner Response or Petitioner Reply. *See* Resp. 25–27; Reply 1. Upon considering the complete record, we discern no reason to deviate from our preliminary constructions and, therefore, adopt the constructions of the claim terms "event," "event type," "goal," "arbitrarily complex goal expression," and "compound goal" as set forth above for this Final Written Decision.

In the Petition, Petitioner discusses constructions for additional claim terms, including "goal satisfaction plan," "layer of conversational protocol," "content layer," "trigger," "symbolic name," and "parameter lists further refine the one or more events." Pet. 8–16. In addition, in the Petitioner Reply, Petitioner discusses construction of the claim term "process characteristics." Reply 12–13. Patent Owner disputes constructions for two terms, "goal satisfaction plan" and "process characteristics." *See* Resp. 24–38; Sur-reply 13–14. We discuss constructions for each of the two disputed terms in turn below.

Patent Owner does not discuss Petitioner's proposed construction for the claim term "parameter lists further refine the one or more events" or proposes its own construction for the term. *See* Resp. 24–38. Nonetheless, Patent Owner discusses meaning of this term in the context of Patent Owner's arguments that FIAP97 does not teach an "expandable . . . inter-agent language" and "parameter lists" that "further refine the one or more events," as recited in claim 1. *See id.* at 97–106. Although Patent Owner's arguments raise an issue of claim construction, Patent Owner's arguments are closely related to and interspersed with Patent Owner's arguments that FIPA97 does not teach an "inter-agent language" recited in claim 1. Thus, for efficiency and completeness, we address this issue in the context of the patentability discussion below.

No other claim terms need to be construed expressly for purposes of this Final Written Decision. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that only terms that are in controversy need to be construed, and "only to the extent necessary to resolve the controversy"); *see also Nidec Motor Corp. v. Zhongshan Broad*

*Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (applying *Vivid Techs.* in the context of an *inter partes* review).

*1. "goal satisfaction plan"*

The claim term "goal satisfaction plan" is recited in all but one of independent claims of the '115 patent—claims 1, 29, 61, 71, and 86, the one exception being claim 48. *See* Ex. 1001, 29:33–40 (claim 1), 32:9–21 (claim 29), 35:24–29 (claim 61), 36:17–23 (claim 71), 37:22–38:5 (claim 86). "[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning." *Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 904 (Fed. Cir. 2018) (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003). The parties do not contend that the term "goal satisfaction plan" has different meanings in different claims of the '115 patent. *See* Pet. 10; Resp. 27–38; Reply 1–12; Sur-reply 2–13.

Petitioner contends that a "goal satisfaction plan" is a "procedure for sending one or more requests for service to one or more agents in order to satisfy a goal." Pet. 10. Patent Owner disagrees and asserts that the claim term "goal satisfaction plan" should be construed to mean "a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints." Resp. 28.

*a. Claim Language*

We begin our claim construction analysis by considering the language of the claims themselves. *Phillips*, 415 F.3d at 1314. Addressing the claim language of the disputed term, we note that the claim language "a goal

satisfaction plan" indicates that the term's plain meaning is "a plan for satisfying a goal."

In the challenged independent claims 1 and 29, the term "goal satisfaction plan" is further limited (in different ways) by specific limitations recited in the claims. For example, claim 1 recites:

> constructing a goal satisfaction plan wherein *the goal satisfaction plan includes*:
>
> a suitable delegation of sub-goal requests to *best complete* the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms;

Ex. 1001, 29:32–39 (emphases added). In contrast, claim 29 recites:

> constructing a base *goal satisfaction plan including the sub-acts of*:
>
> determining whether the request service is available,
>
> determining sub-goals required in completing the base goal by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms,
>
> selecting service-providing electronic agents from the agent registry suitable for performing the determined sub-goals, and
>
> ordering a delegation of sub-goal requests complete the requested service;

*Id.* at 32:9–21 (emphasis added).

As shown above, the "optimal or near-optimal"[1] limiting feature argued by Patent Owner is recited in claim 1 ("a suitable delegation of

[1] Patent Owner asserts that the term "optimal" and "near optimal" has a well-established meaning in the context of computer engineering, citing a

sub-goal requests to *best complete* the requested service request"), but not in claim 29. This shows that the patentee knew how to restrict the "goal satisfaction plan" to "best complete the requested service request," i.e., satisfy a goal "in an optimal or near-optimal manner." If the patentee had intended to similarly restrict the "goal satisfaction plan" in claim 29, it could have done so using the language of claim 1, but did not. *See Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1379 (Fed. Cir. 2018) (citing *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1359 (Fed. Cir. 2016)).

Thus, Patent Owner's proposed construction that generally requires a "goal satisfaction plan" to satisfy a goal "in an optimal or near-optimal manner" would have the effect of obfuscating the material differences in the claim language of claim 1 and claim 29 discussed above.

In addition, for claim 1, Patent Owner's proposed construction would render the limitation "suitable delegation of sub-goal requests to best complete the requested service request" recited in claim 1 superfluous. Such a construction is presumed improper. *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1274–75 (Fed. Cir. 2012) (rejecting the district court's construction narrowing a term by a superfluous limitation when the claims explicitly recited the narrowing limitation, and discussing the "well-established rule that claims are interpreted with an eye toward giving effect to all terms in the claim") (quoting *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)) (internal quotation marks omitted);

---

technical dictionary, which defines optimization as "[t]he process of finding *the best solution* to some problem, where 'best' accords to prestated criteria." Sur-reply 6 (emphasis added) (citing Ex. 2078, 3).

*LSI Indus., Inc. v. ImagePoint, Inc.*, 279 F. App'x 964, 972 (Fed. Cir. 2008) (nonprecedential) (rejecting the district court's construction of "display device" as necessarily including the superfluous limitation of "internal illumination" because other claim terms specifically recited an "illuminated display device"); *but cf. ERBE Elektromedizin GmbH v. Canady Tech. LLC,* 629 F.3d 1278, 1286 (Fed. Cir. 2010) ("no canon of [claim] construction is absolute in its application") (citation omitted).

Considering next the Patent Owner-argued the limiting feature of satisfying a goal "consistent with any advice parameters or constraints," this feature is recited in claim 29, but not in claim 1. Claim 29 recites "the act of interpreting including the sub-acts of: determining any task completion *advice* provided by the base goal, and determining any task completion *constraints* provided by the base goal" (Ex. 1001, 32:4–8 (emphases added)), whereas claim 1 does not recite "advice" or "constraint" (*see id.* at 29:10–44). Thus, Patent Owner's proposed construction is disfavored because it would blur the material differences in the claim language of claim 1 and claim 29 discussed above.

Finally, Patent Owner's proposed construction replaces "goal" with "complex goal expression." Again, this feature is recited in claim 1, but not in claim 29. Claim 1 recites "receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression; and dynamically interpreting the arbitrarily complex goal expression" (Ex. 1001, 29:25–30), whereas claim 29 recites "interpreting a service request in order to determine a base goal that *may be* a compound, arbitrarily complex base goal" (*id.* at 31:59–61) (emphasis added). Because of the permissive language "may be" used in claim 29, a "goal" is not necessarily required to be in the form of an arbitrarily complex goal

expression in claim 29. Again, Patent Owner's proposed construction is disfavored because it would blur the material differences in the claim language of claim 1 and claim 29 discussed above.

Thus, at least based on the claim language, it is not appropriate to limit "goal satisfaction plan" as Patent Owner contends. As discussed above, the meaning and the scope of "goal satisfaction plan" is clear on the face of each claim because claims 1 and 29 each recite specifically what a "goal satisfaction plan" includes or comprises in different claims. Therefore, absent compelling evidence to the contrary, it is neither necessary nor appropriate to limit the meaning of the term "goal satisfaction plan" beyond the plain meaning indicated by the claim language—i.e., "a plan for satisfying a goal."

*b. Written Description*

Turning to the Specification, Patent Owner cites the following statement in the "Summary of the Invention" section:

> [e]xtreme flexibility is achieved through an architecture organized around the declaration of capabilities by service-providing agents, the construction of arbitrarily complex goals by users and service-requesting agents, and the **role of facilitators in delegating and coordinating the satisfaction of these goals, subject to advice and constraints** that may accompany them.

Resp. 31 (quoting Ex. 1001, 5:3–9). The very first sentence of the paragraph cited by Patent Owner states, however, "[a] first *embodiment* of the present invention discloses a highly flexible, software-based architecture for constructing distributed systems." Ex. 1001, 4:58–60 (emphasis added). Indeed, all of the portions of the Specification cited by Patent Owner, including the passage reproduced above, describe various embodiments of

the ’115 patent. *See* Resp. 30–33 (citing Ex. 1001, 5:3–9, 5:48–49, 15:37–39, 15:66–16:1, 16:11–21, 16:38–46, 18:35–48, 28:47–54, Fig. 11).

In general, “a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment.” *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (citation omitted). As discussed above, the challenged independent claims 1 and 29 do not recite all of the limiting features required by Patent Owner’s proposed construction of “goal satisfaction plan.” Thus, unless one of the established exceptions, such as lexicography or disavowal, applies, the challenged claims are not restricted as Patent Owner contends. *See, e.g., GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (“the specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal”) (citation omitted). Here, Patent Owner does not argue lexicography or disavowal. Nor does Patent Owner explain any other reason why the Specification limits “goal satisfaction plan” as it contends. Thus, claim construction in this case is governed by the general principle that “a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment.” *SuperGuide*, 358 F.3d at 875; *see also WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1323–24 (Fed. Cir. 2018) (“It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise.” (citing *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) (“[T]his court has repeatedly cautioned against limiting claims to a preferred embodiment.”))). Accordingly, none of the embodiments in the Specification cited by Patent Owner limits “goal satisfaction plan” as Patent Owner contends.

*c. Prosecution History*

Turning next to the prosecution history, Patent Owner asserts that "examples in the file history confirm the elements of 'goal satisfaction plan' reflected in Patent Owner's proposed construction." Resp. 35–36. Patent Owner argues, during the prosecution of the application for the '115 patent,

> Applicant further stated that "the facilitating engine is able to use reasoning to delegate the sub-goals to service providing agents in such a way as '**to best complete the requested service request**.'…The facilitating engine is able to use reasoning to delegate the sub-goal task of roasting coffee to the service-providing agent that can roast beans in the least amount of time because the facilitating engine has reasoned that the least amount of time taken to make coffee is the best way to accomplish the base goal of making coffee." Applicant concluded that "the base goal is carried out **not by merely parsing the request into sub-goals**" but rather "the facilitating engine used reasoning to decide upon using **competing** message transfer agents to reminding Bob of lunch, in lieu of delegating the task to just one message transfer agent."

*Id.* at 35 (citing Ex. 1002, 172–173). As discussed above, however, the limiting feature argued by Patent Owner is recited in claim 1 ("a suitable delegation of sub-goal requests to *best complete* the requested service request"), but not in claim 29. Thus, Patent Owner's argument is unpersuasive for the same reasons discussed above.

*d. Extrinsic Evidence*

Patent Owner also cites the testimony of its declarant, Dr. Medvidovic, in support of Patent Owner's proposed construction of "goal satisfaction plan." Resp. 36–37 (citing Ex. 2032 ¶¶ 51–52, 54–59, 129). We have reviewed the cited testimony from Dr. Medvidovic, but do not find anything in his testimony that would change our analysis based on

intrinsic record discussed above. *See Phillips*, 415 F.3d at 1318 (authorizing the consideration of extrinsic evidence in determining the meaning of claims but noting that it is "in general . . . less reliable than the patent and its prosecution history in determining how to read claim terms").

*e. Other Arguments*

The parties dispute whether Petitioner's use of "procedure" (in place of a "plan") and "sending one or more requests for service" in Petitioner's proposed construction is appropriate. *See* Resp. 37–38; Reply 2–4, 11–12; Sur-reply 3, 13. We need not address these arguments in detail because, for the reasons discussed above, we see no reason to depart from the plain meaning of the term "goal satisfaction plan."

*f. Conclusion*

Based on the complete record and after examining the claims as a whole, the Specification, and the prosecution history, we construe the term "a goal satisfaction plan" according to its plain meaning—"a plan for satisfying a goal."

*C. Patentability Challenges*

Petitioner presents two grounds challenging the patentability of the '115 patent claims under 35 U.S.C. §103. First, Petitioner challenges the patentability of claims 1, 15, 18, 19, 29, 34, 38, 41, 42 as obvious over the combined teachings of Kiss and FIPA97. Second, Petitioner challenges the patentability of claims 17, 20–25, 40, 43, and 44 as obvious over the combined teachings of Kiss, FIPA97, and Cohen.

1. *Principles of Law on Obviousness*

To prevail in challenging Patent Owner's claims, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring inter partes review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

Section 103(a) forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Obviousness is a question of law based on underlying factual findings, including: (1) the level of ordinary skill in the art; (2) the scope and content of the prior art; (3) the differences between the claims and the prior art; and (4) secondary considerations of nonobviousness, such as commercial success, long-felt but unmet needs, failure of others, and unexpected results. *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007); *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966).

The Supreme Court has made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR Int'l Co. v. Teleflex,*

*Inc.*, 550 U.S. 398, 415 (2007). Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *KSR*, 550 U.S. at 417. Reaching this conclusion, however, requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention. *Id.*

### 2. *Prior Art*

#### a. *Kiss (Ex. 1005)*

Kiss describes "a knowledge management system that supports inquiries of distributed knowledge resources," as illustrated in Figure 1 below. Ex. 1005, 2:44–45.




*Fig. 1*

Kiss' Figure 1, above, is a conceptual overview of one embodiment of a knowledge management system. *Id.* at 5:1–2. Kiss' knowledge management system 100 includes a presentation layer 103, a user interface layer 105, a meta agent layer 107, a knowledge agent layer 109, a knowledge module layer 111, and an agent service layer 113. *Id.* at 5:3–7.

The meta agent layer 107 includes one or more meta agents 119 that are responsible for analyzing queries or problem formulations provided by the user interface layer 105 and constructing a plan for finding a solution to the problem. *Id.* at 5:20–24. More specifically, "meta agent 119 is responsible for formulating a dynamic 'solution plan' for the distributed inferencing to be performed by the system 100, and allocates tasks to the knowledge agent layer 109 in furtherance of the solution plan." *Id.* at 5:33–37. "The meta agent solution plan attempts to employ all elements of

information contained in the parsed inquiry in the development of search-space constraints." *Id.* at 8:34–37.

The knowledge agent layer 109 includes multiple knowledge agents 121, each of which may be associated with one or more knowledge modules 123 in the knowledge module layer 111. *Id.* at 6:31–35. The knowledge agent 121 is configured to accept from a meta agent 119 a problem statement and convert that problem statement into a format appropriate for the knowledge module 123 associated with the knowledge agent 121. *Id.* at 6:35–38.

*b. FIPA97 (Ex. 1006–1012)*

FIPA97 (Exs. 1006–1012) is a specification created by the Foundation for Intelligent Physical Agents (FIPA) beginning in 1996 with an official release date in October 1997. Ex. 1006, Cover, iv (identifying specification as FIPA 97 Version 1.0 issued on October 10, 1997). FIPA97 is a "specification of basic agent technologies that can be integrated by agent systems developers to make complex systems with a high degree of interoperability." *Id.* at v. The specification comprises seven parts: three parts for basic agent technologies (Parts 1–3 relating to agent management, agent communication language, and agent/software integration) and four informative applications providing examples of how the technologies can be applied (Parts 4–7 describing personal travel assistance, personal assistant, audio-visual entertainment, and broadcasting and network management and provisioning applications). *Id.* at v–vii; *see generally* Exs. 1006–1008 (Parts 1–3); Exs. 1009–1012 (Parts 4–7).

Part 1 of FIPA97 "provides a normative framework within which FIPA compliant agents can exist, operate and be managed." Ex. 1006, vi.

Part 2 of FIPA97 describes an "Agent Communication Language (ACL)" that "is based on speech act theory: messages are actions, or communicative acts, as they are intended to perform some action by virtue of being sent." *Id.* The ACL specification "consists of a set of message types and the description of their pragmatics, [i.e.,] the effects on the mental attitudes of the sender and receiver agents." *Id.* The ACL specification "also provides the normative description of a set of high-level interaction protocols, including requesting an action, contract net and several kinds of auctions." *Id.*

Part 2 of FIPA97 discloses a "simple abstract model of inter-agent communication" including ACL messages having components as illustrated in Figure 1 below. Ex. 1007, 7, 12.




**Figure 1 — Components of a message**

Figure 1, above, illustrates the main structural elements of an ACL message in FIPA97. *Id.* at 12. "The first element of the message is a word which identifies the communicative act being communicated, which defines the principal meaning of the message." *Id.* Each ACL message contains a set of one or more parameters, including a mandatory "*:receiver*" parameter that identifies the intended recipient of the message. *Id.* at 13.

Petitioner asserts that FIPA97 was made publicly available as a single document and relies on FIPA97 as a single printed publication for purposes of 35 U.S.C. § 102(a). *See* Pet. 22; Reply 26. As discussed below in the section addressing the status of FIPA97 as a printed publication, FIPA approved and released FIPA 97 Version 1.0 as a single specification. *See infra* § II.E; Ex. 1026, 5; Ex. 1050 ¶ 165. Thus, although sometimes the seven parts are referred to as "documents," a person of ordinary skill in the art would have considered FIPA97 to be a single reference. *See* Ex. 1050 ¶¶ 164–165. Patent Owner does not dispute that FIPA97 is one reference for purposes of §§ 102 and 103. *See* Resp. 138–40.[2] Because FIPA and skilled artisans considered FIPA97 to be a single specification, we agree that FIPA97 constitutes a single prior art reference, and we treat it as such for purposes of our unpatentability analysis.

*c. Cohen (Ex. 1014)*

Cohen describes an "open agent architecture and accompanying user interface for networked desktop and handheld machines." Ex. 1014, Abst. Cohen discloses that "the Open Agent Architecture is a blackboard-based framework allowing individual software 'client' agents to communicate by means of goals posted on a blackboard controlled by a 'Server' process." *Id.* at 2. "The Server is responsible both for storing data that is global to the agents, for identifying agents that can achieve various goals, and for

---

[2] Contrary to Patent Owner's argument (Resp. 138–40), Petitioner did not argue in another case, and the Board did not find, that FIPA97 is seven separate prior art references. *See Microsoft Corp. v. IPA Techs. Inc.*, IPR2019-00838, Paper 13 at 3–5 (PTAB Apr. 3, 2020) (Decision Denying Petitioner Request for Rehearing), Paper 10 at 4–9 (Petitioner's Request for Rehearing, filed Dec. 6, 2019).

scheduling and maintaining the flow of communication during distributed computation." *Id.* Cohen also discloses a distributed blackboard architecture as depicted in Figure 1 below. *Id.* at 3.




Figure 1: Hierarchy of Blackboard Servers

Cohen's Figure 1, above, shows "an architecture in which a server may itself be a client in a hierarchy of servers; if none of its client agents can solve a particular goal, this goal may be passed further along in the hierarchy." *Id.*

3. *Prior Art Status Issues*

Patent Owner challenges the prior art status of both Kiss and FIPA97.

a. *Status of Kiss*

Petitioner relies on Kiss as a prior art reference in all of the asserted grounds of unpatentability presented in the Petition. *See* Pet. 3–4. Petitioner has the burden of persuasion to prove unpatentability by a preponderance of the evidence. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d

1375, 1379 (Fed. Cir. 2015). Petitioner also has the initial burden of production to show that a reference is prior art to the challenged claims under a relevant section of 35 U.S.C. § 102. *See id.* Once Petitioner has met that initial burden, the burden of production shifts to Patent Owner to argue or produce evidence that the asserted reference is not prior art to the claims. *Id.* at 1380. Once Patent Owner has met that burden of production, the burden of production returns to Petitioner. *Id.*

The filing date of the '115 patent is January 5, 1999. Ex. 1001, code (22). As noted above, Kiss is a United States patent that arose from an application filed July 21, 1999, claiming the benefit of priority to a provisional application filed July 21, 1998. Ex. 1005, codes (22), (60).

Petitioner asserts that Kiss is prior art to the '115 patent under 35 U.S.C. § 102(e) because Kiss is entitled to the benefit of priority to the filing date of its provisional application (Ex. 1036, "Kiss Provisional Application"). Pet. 16–20. "A reference patent is only entitled to claim the benefit of the filing date of its provisional application if the disclosure of the provisional application provides support for the claims in the reference patent in compliance with § 112, ¶ 1." *Dynamic Drinkware*, 800 F.3d at 1381.

In *Ex parte Mann*, the Board held that "under *Dynamic Drinkware*, a non-provisional child can be entitled to the benefit of a provisional application's filing date if the provisional application provides sufficient support for *at least one claim* in the child." 2016 WL 7487271, at *6 (PTAB Dec. 21, 2016) (emphasis added) (discussing whether *Dynamic Drinkware* requires "support in the provisional . . . for *all* claims, *any* claim, or something in between"). In addition, the Board held that a "subject matter test" is also required—that is, "the [party claiming priority] also must show

that the subject matter relied upon in the non-provisional is sufficiently supported in the provisional application [and that t]his subject matter test is in addition to the comparison of claims required by *Dynamic Drinkware*." *Id*. at *5.

Recognizing these requirements, Petitioner asserts that "each element of [claim 1 of Kiss] has written description support in the Kiss Provisional," providing detailed citations to the supporting disclosures from the Kiss Provisional Application for each limitation of claim 1 of Kiss. Pet. 16–18. Addressing the "subject matter test," Petitioner asserts that "the teachings that Petitioner relies upon were carried forward from the Kiss Provisional to Kiss" and provides a detailed mapping of the relied-upon portions of Kiss to the corresponding portions of the Kiss Provisional Application. *Id.* at 18–20.

In the Institution Decision, we determined, based on the preliminary record, that Petitioner has presented sufficient argument and evidence to meet its initial burden of production on the issue of whether Kiss is entitled to the benefit of the filing date of the Kiss Provisional Application so as to shift the burden of production to Patent Owner to argue or produce evidence that Kiss is not prior art to the challenged claims. Inst. Dec. 25.

In its Preliminary Response, Patent Owner asserted that Kiss is not entitled to the priority date of its provisional application. Prelim. Resp. 66–67. In the Institution Decision, we determined, based on the preliminary record, the argument and evidence presented by Patent Owner was insufficient to shift the burden of production back to Petitioner. Inst. Dec. 25–27. We noted, however, a final determination on this particular issue will be made based on a full record developed during the course of trial. *Id.* at 27.

During the trial, Patent Owner did not present any argument or evidence on this issue, nor did it dispute Kiss qualifies as prior art in this proceeding. *See generally* Resp.

Based on the complete record, we determine that Petitioner has established by a preponderance of the evidence that Kiss is prior art to the ’115 patent under 35 U.S.C. § 102(e) because Kiss is entitled to the benefit of priority to the filing date of its provisional application.

*b. Status of FIPA97*

Before reaching the merits of Petitioner’s obviousness contentions, all of which are based in part on FIPA97 (Exhibits 1006–1012), we must determine as a threshold matter whether FIPA97 is a prior art printed publication under 35 U.S.C. § 102(a) or § 102(b). *See* Pet. 22–24. Petitioner bears the burden of establishing by a preponderance of the evidence that FIPA97 is a printed publication. *See* 35 U.S.C. § 316(e); *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1375 (Fed. Cir. 2018); *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29 at 11 (PTAB Dec. 20, 2019) (precedential) (citing *Nobel Biocare*, 903 F.3d at 1375). For purposes of instituting an *inter partes* review we accepted Petitioner’s contention, unchallenged in Patent Owner’s Preliminary Response, that FIPA97 was available as prior art as of October 1997, more than one year before January 5, 1999, the effective filing date of the ’560 patent. Dec. 41–42. Patent Owner, however, challenges that contention in its Patent Owner Response, and the parties further address the issue in Petitioner’s Reply and Patent Owner’s Sur-reply. *See* Resp. 45–65; Reply 17–29; Sur-reply 20–35.

The determination of whether a document is a "printed publication" under 35 U.S.C. § 102 "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' . . . ." *Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1355 (Fed. Cir. 2018) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). A reference is considered publicly accessible if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it.'" *Id.* at 1355–56 (quoting *In re Wyer*, 655 F.2d 221, 226 (CCPA 1981)).

In the discussion below, we begin with background information regarding FIPA and an overview of the evidence submitted by Petitioner in support of its contention that FIPA97 was publicly accessible in October 1997. The evidence includes extensive testimony from Dr. Finin, a professor who has personal knowledge of FIPA's activities and the development process of FIPA97. *See* Ex. 1049 ¶¶ 1–55 (Finin Decl.). Dr. Finin was one of the first two FIPA Fellows invited to provide "high quality and independent advice to FIPA." *Id.* ¶ 18 (quoting Ex. 1076, 1); Ex. 1025, 1; Ex. 1062, 1. The evidence also includes testimony from Petitioner's expert witness, Dr. Lieberman, and more than sixty documentary exhibits on which Petitioner relies to show that FIPA97 was

publicly accessible in late 1997 and early 1998. *See* Ex. 1050 ¶¶ 142–149 (Lieberman Decl.); Exs. 1021–33, 1047, 1051–1105.

After providing an overview of the evidence, we consider the parties' arguments as to whether FIPA97 was publicly accessible before the January 5, 1999, critical date. For the reasons explained below, we determine that Petitioner has met its burden to show that FIPA97 was publicly accessible before the critical date.

*i. FIPA*

FIPA was a non-profit association based in Geneva, Switzerland, created to promote agent-based technology and develop open standards. Ex. 1006, iv (FIPA 97 Specification Version 1.0, Part 1, Foreword); Ex. 1049 ¶ 3. Founded in 1996, FIPA's membership included numerous technology companies, educational institutions, and governmental entities. Ex. 1049 ¶ 3. As of October 1997, FIPA had thirty-five corporate members representing twelve countries.[3] Ex. 1006, iv. According to FIPA documentation, membership was "open to any corporation and individual firm, partnership, governmental body or international organi[z]ation without restriction." *Id.* FIPA stated its intent "to make the results of its activities available to all interested parties." *Id.* Throughout its tenure, FIPA produced standards designed to promote and advance agent-based technology. Ex. 1049 ¶ 3. In 2005, FIPA was incorporated into the Institute of Electrical and Electronics Engineers (IEEE) as one of its standards committees. *Id.*

[3] The corporate members included Alcatel, British Telecommunications, Deutsche Telekom, France Telecom, Hitachi, Hewlett-Packard, IBM, NEC, NTT, Nortel, Siemens, and Toshiba. *See* Ex. 1095, 22.

*ii. Development of FIPA97*

The process of drafting the FIPA 97 specification began with FIPA's first meeting in London in April 1996. Ex. 1049 ¶ 6; Ex. 1058 (Main results of London meeting); Ex. 1066 (Resolutions of London meeting). Representatives from twenty-six companies and organizations attended. Ex. 1066, 1. At the meeting, the members agreed on FIPA's mission, drafted statutes and operational principles, and produced a work plan for a specification that would become FIPA 97. Ex. 1058, 1; Ex. 1066, 1–3; Ex. 1049 ¶ 6. The work plan set a December 1997 target for producing a first completed specification. Ex. 1066, 2–3; Ex. 1049 ¶ 7.

FIPA subsequently held several meetings in 1996 and 1997. At the second meeting in June 1996 in Yorktown Heights, NY, FIPA approved several documents, including a framework for FIPA activity and a list of requirements for FIPA-specified agent capabilities. Ex. 1067, 1 (Resolutions of Yorktown meeting); Ex. 1060, 1 (Results of Yorktown meeting); Ex. 1049 ¶ 9. At the third meeting in October 1996 in Tokyo, FIPA approved a final work plan calling for production of a FIPA specification in October 1997. Ex. 1049 ¶ 11; Ex. 1070, 1 (work plan); Ex. 1023 (Results of Tokyo meeting). Also at the Tokyo meeting, FIPA produced its First Call for Proposals, which outlined in detail three technology parts (corresponding to Parts 1–3 of FIPA 97) and four application parts (corresponding to Parts 4–7 of FIPA 97). Ex. 1069, 1–27 (First Call for Proposals); Ex. 1049 ¶ 12.

In 1997, FIPA began to produce draft specifications. At the fourth meeting in January 1997 in Turin, Italy, FIPA publicly released drafts of Parts 1–4 and posted them on the FIPA home page

(http://drogo.cselt.stet.it/fipa). Ex. 1021, 1 (Results of Turin meeting); Ex. 1049 ¶ 13. Additionally, FIPA released a Second Call for Proposals at the Turin meeting. Ex. 1071, 1–3 (Second Call for Proposals); Ex. 1049 ¶ 13. At the fifth meeting in April 1997 in Reston, VA, FIPA produced drafts of Parts 1–7, which were publicly released and posted on the FIPA home page. Ex. 1024 (Results of Reston meeting); Ex. 1061 (Resolutions of Reston meeting); Ex. 1049 ¶ 17. At the sixth meeting in June 1997 in Cheju Island, South Korea, FIPA publicly released revised drafts of Parts 1–7 and posted them on the FIPA home page. Ex. 1025, 1 (Results of Cheju meeting); Ex. 1062, 5 (Resolutions of Cheju meeting); Ex. 1049 ¶ 19. According to Dr. Finin, the Reston Draft and Cheju Draft were substantially complete versions of what would become FIPA 97. Ex. 1049 ¶¶ 17, 19.

Dr. Finin testifies that news of FIPA and its standardization efforts "spread quickly throughout the relatively small community of software agent researchers." Ex. 1049 ¶ 8. For instance, the AgentWeb website, "a meeting place for researchers in agent-based technology from 1995–2000," was home to a "Software Agents" mailing list and a newsletter that had more than 1,300 subscribers in 1996. *Id.*; Ex. 1089, 5. Dr. Finin was "the founder, author, and a subscriber" of the AgentWeb newsletter. Ex. 1049 ¶ 8. The widely distributed AgentWeb newsletters announced upcoming FIPA meetings, reported results of previous meetings, including calls for proposals, and provided links to the specification drafts posted on the FIPA home page. *See id.* ¶¶ 8, 10, 12, 14, 17, 19.

For example, the AgentWeb newsletter dated May 11, 1996, announced the upcoming FIPA June 1996 Yorktown meeting, described as the "FIPA Opening Forum." Ex. 1090, 5; Ex. 1049 ¶ 8. The purpose of the

meeting, as stated in the newsletter, was to "refine the list of basic agent capabilities candidate for FIPA specification; compile a first list of agent capabilities intended for specification by end 1997; and establish the first working groups." Ex. 1090, 5. Likewise, the AgentWeb newsletter dated August 12, 1996, advertised the FIPA October 1996 Tokyo meeting. Ex. 1088, 1; Ex. 1049 ¶ 10. Thereafter, the AgentWeb newsletter dated October 14, 1996, publicized the Call for Proposals issued at the October 1996 Tokyo meeting and provided the deadline for submission of proposals to be considered at the Turin meeting in January 1997. Ex. 1087, 1; Ex. 1049 ¶ 12. FIPA had decided that respondents who submitted proposals would be invited to the January 1997 meeting to present their proposals even if they were not FIPA members. Ex. 1023, 1; *see* Ex. 1069, 27.

Once FIPA began to produce drafts of the specification, AgentWeb newsletters announced those drafts and provided links to access them. The AgentWeb newsletter dated February 2, 1997, reported that "[i]nitial specifications for three technology parts (Agent Management, Agent Communication and Agent/Software Interaction) and one application part (Personal Travel Assistance) have been produced" at the recent Turin meeting. Ex. 1091, 1; Ex. 1049 ¶ 14. The newsletter included a freely accessible and public link to access the draft. Ex. 1049 ¶ 14 (citing Ex. 1091, 1–2). It also indicated that drafts of the remaining three specification parts would be generated at the FIPA meeting to be held in April 1997 in Reston. Ex. 1091, 1–2. A subsequent AgentWeb newsletter dated April 13, 1997, advertised the upcoming Reston meeting and

contained links to information about the meeting on the FIPA website. Ex. 1092, 3; Ex. 1049 ¶ 17.

On May 5, 1997, following the Reston meeting, an AgentWeb newsletter reported that attendees of that meeting produced a revised draft including all seven parts of the specification. Ex. 1093, 2; Ex. 1049 ¶ 17. The newsletter contained individual public links to the seven parts and invited "both members and non-members" to comment, providing an email address for submission. *Id.*; Ex. 1049 ¶ 17. Additionally, the newsletter announced the dates and locations of the next two meetings—the June 1997 Cheju meeting and the seventh meeting to take place in Munich on October 6–10, 1997. *Id.* Similarly, the AgentWeb newsletter dated June 30, 1997, announced that the Cheju meeting resulted in revised versions of the FIPA specification documents and provided direct links to the seven parts. Ex. 1094, 1–2; Ex. 1049 ¶ 19. Again, the newsletter stated that FIPA invited comments and that non-members making substantial comments would be invited to attend the October 1997 Munich meeting. Ex. 1094, 2. Dr. Finin was among those who submitted comments on the Cheju draft. Ex. 1073; Ex. 1049 ¶ 20.

Meanwhile, the AgentWeb Software Agents mailing list also provided information regarding FIPA's efforts to the community of software agent researchers. *See* Ex. 1049 ¶ 8. Dr. Finin was an organizer of and contributor to the Software Agents mailing list. *Id.* On May 2, 1996, a posting to the mailing list referenced the upcoming June 1996 FIPA meeting in Yorktown Heights, New York. Ex. 1079, 1; Ex. 1049 ¶ 8. Members of the Software Agents mailing list posted comments regarding the Turin draft after it was released publicly. Exs. 1078, 1081, 1082; *see* Ex. 1049 ¶¶ 14–

15. Dr. Finin was among those who shared their thoughts. *See* Ex. 1082; Ex. 1049 ¶ 15. A posting after the Reston meeting included a public and open link to access the Reston draft and invited comments from the mailing list. Ex. 1083, 1; Ex. 1049 ¶ 17.

*iii. Public Release of FIPA97*

FIPA's seventh meeting took place in Munich on October 6–10, 1997. Ex. 1026 (Resolution of Munich meeting); Ex. 1049 ¶ 20. At this meeting, FIPA incorporated final edits and comments and approved the FIPA 97 specification for publication. Ex. 1026, 1, 5; Ex. 1049 ¶ 20. The specification as approved at the meeting was called "FIPA 97 ver. 1.0," or FIPA 97 Version 1.0. Ex. 1026, 5. Working groups for various parts of the specification were given about one month to check for consistency and make minor edits. *Id.* at 2; Ex. 1049 ¶ 20.

An "initial" version of FIPA 97 Version 1.0, approved at the Munich meeting and dated October 10, 1997, was posted to the FIPA website, housed at the time at http://drogo.cselt.stet.it/fipa. Ex. 1049 ¶¶ 20–21. According to Dr. Finin, the specification documents were available online and free for anybody to access by sometime in October 1997. *Id.* ¶ 21. On November 18, 1997, an AgentWeb newsletter announced completion of FIPA 97 Version 1.0 and its publication on the FIPA website. Ex. 1086, 1–2; Ex. 1049 ¶ 21. The newsletter provided individual, direct links to the seven parts of the specification on the FIPA website. Ex. 1086, 1–2. The links were not password protected and were open to the public without a requirement for secrecy or confidentiality. Ex. 1049 ¶ 21. As with the earlier AgentWeb newsletters, the newsletter containing links to FIPA 97 Version 1.0 was sent to more than 1,300 subscribers. *Id.*

Dr. Finin testifies that in late 1997, "a few weeks after the Munich meeting," he accessed the approved FIPA 97 Version 1.0 posted on the FIPA website. *Id.* ¶¶ 20–21. He specifically recalls accessing the documents in late 1997 to review the first major work product of FIPA and to prepare for FIPA's upcoming January 1998 meeting in Palo Alto, which he attended. *Id.* ¶ 21 (citing Ex. 1074). Dr. Lieberman also testifies that he recalls FIPA 97 Version 1.0 being publicly available on the FIPA website throughout late 1997 and early 1998 and that he accessed it in late 1997 as a member of the interested public. Ex. 1050 ¶ 146.

The release of FIPA 97 Version 1.0 was well publicized in the weeks after the Munich meeting. Ex. 1049 ¶ 22. For example, on October 20, 1997, the EETimes featured an article reporting FIPA's approval of the FIPA 97 specification. Ex. 1095, 22; *see* Ex. 1049 ¶ 22. The article was based on an interview with Leonardo Chiariglione, the president of FIPA. Ex. 1095, 22. The article described the seven parts of the specification: "The first three parts cover different aspects of agent behavior: agent management; agent communication; and agent-software interaction. The four remaining parts, which cover application areas, . . . are: personal travel assistance; personal assistant; audio-visual entertainment and broadcast; and network provision and management." *Id.* After describing FIPA's plans for 1998, including testing of FIPA 97 Version 1.0 to provide input for a further round of standardization, the article referred readers to the FIPA website for information regarding the released specification: "CSELT[4] maintains

---

[4] Centro Studi e Laboratori Telecommunicazioni, Dr. Chiariglione's employer at the time. *See* Ex. 1095, 22.

extensive information on FIPA's activities at www.cselt.stet.it/fipa."[5] *Id.* (emphasis omitted). It concluded with a quote from Dr. Chiariglione regarding the specification's public availability: "'It is our policy to make the standard freely available over the Internet,' Chiariglione said. 'FIPA will retain the copyright but it will be free for others to use.'" *Id.*

The November-December 1997 issue of IEEE Internet Computing also announced the release of the FIPA 97 specification: "The Foundation for Intelligent Physical Agents, a non-profit organization established to promote emerging agent-based applications, has released its first specification. Named FIPA 97, the specification will provide a benchmark for interoperable products." Ex. 1096, 93; Ex. 1049 ¶ 22. The news brief directed readers to the FIPA website for the text of the specification. Ex. 1096, 93 ("The text is available at http://drogo.cselt.stet.it.fipa/."[6]); Ex. 1049 ¶ 22.

Sometime after the Munich meeting, FIPA also produced a hardcopy book version of the FIPA 97 Version 1.0 specification to be sent to FIPA members and various institutions and standards groups. Ex. 1049 ¶ 24; *see* Ex. 1026, 1; Ex. 1063, 1 (Resolution of the Palo Alto meeting, Jan. 29, 1998). At least two copies of the book were available in libraries in January 2019. Ex. 1049 ¶ 24; Ex. 1057, 1 (WorldCat catalog entry for "Fipa specification : Version 1.0"); Ex. 1055 (cover page and table of contents of each part in copy at library in Italy); Ex. 1056 (cover page and table of

---

[5] The record suggests this website (http://www.cselt.stet.it/fipa) was a mirror of the FIPA website (http://drogo.cselt.stet.it/fipa) in 1997. *See* Ex. 1049 ¶ 22; Ex. 1095, 22; Tr. 94:11–14.

[6] The URL provided in the article contains a typographical error. *See* Ex. 1049 ¶ 22 (correcting the URL to http://drogo.cselt.stet.it[/]fipa/).

contents of Part 1 in copy at library in Switzerland). Dr. Finin testifies that the books contain the November 28, 1997, edited version of FIPA 97 Version 1.0, which "only made minor edits (mostly spelling and formatting) over the October 10, 1997 version." Ex. 1049 ¶ 25 (citing Ex. 1055, 5 (Part 2 "Publication date" of November 28, 1997); Ex. 1056).

*iv. Publications and Patents*

In late 1997 and 1998, several papers reviewing and outlining the FIPA 97 specification were published and presented at meetings. *See* Ex. 1049 ¶¶ 26–30. A paper dated December 1997 memorializes a presentation made to a meeting on Intelligent Agent Technology organized by the EPSRC[7] Community Club in Advanced Computing Techniques. Ex. 1097, Cover ("Dickinson");[8] *see* Ex. 1049 ¶ 26. This paper outlines the background and rationale for the creation of an agent interoperability standard. Ex. 1097, 1–3. It also describes the development history of the FIPA 97 specification, noting that FIPA's work program "culminated in the publication of an initial draft standard, FIPA 97, at the Munich meeting in October 1997." *Id.* at 3. Dickinson further provides that "[a]ll FIPA documents and meeting outputs are publicly available on the web" at "http://drogo.cselt.stet.it/fipa/," and "comments and review have been sought at each stage of the process." *Id.* at 3, 7 n.9. The paper then describes the

---

[7] "The Engineering and Physical Sciences Research Council (EPSRC) is the main funding body for engineering and physical sciences research in the UK." Engineering and Physical Sciences Research Council, epsrc.ukri.org/about (last visited Sept. 28, 2020).
[8] Ian J. Dickinson, *Agent Standards*, HP Laboratories Bristol, HPL-97-156 (Dec. 1997).

features of the specification's three substantive technical sections, Parts 1–3. *Id.* at 3–6.

Similarly, a 1998 paper titled "Industrial Applications of Multi-Agent Technology" summarizes FIPA's background and presents an overview of the three technical parts (i.e., Parts 1–3) of FIPA 97 Version 1.0 released in October 1997. Ex. 1099, 12–13 ("Steiner");[9] *see* Ex. 1049 ¶ 28. The Steiner paper provides the FIPA website address and explains that the four application parts (i.e., Parts 4–7) will be used in field trials to gather information to be incorporated into a revised version of FIPA 97. Ex. 1099, 13 & n.1.

Likewise, a paper titled "FIPA — towards a standard for software agents" appearing in the July 1998 issue of the BT Technology Journal explains the motivation for an agent standard and provides an overview of FIPA's background and activities. Ex. 1100, 51–52 ("O'Brien");[10] *see* Ex. 1049 ¶ 29. It then describes the different parts of the FIPA 97 Version 1.0 specification issued in October 1997. Ex. 1100, 51–52.[11]

Dr. Finin cites several other publications that reference FIPA's development of an agent communication standard in the 1997–98 timeframe.

---

[9] Donald Steiner, Siemens AG, *Industrial Applications of Multi-Agent Technology* (IEEE 1998).
[10] P.D. O'Brien & R.C. Nicol, *FIPA — towards a standard for software agents*, BT Tech. J. Vol. 16, No. 3 (July 1998).
[11] Dr. Finin testifies that O'Brien provides public links to FIPA97. Ex. 1049 ¶ 29. The copy of O'Brien entered into the record, however, appears to be missing several pages, including one containing endnotes 10–12 that might provide links to the FIPA website. *See* Ex. 1100, 52 ("FIPA97 (issued in October 1997) [10–12] is the first output from FIPA covering part of the requirements for an agent standard.").

Ex. 1049 ¶ 31 (citing Exs. 1027–29). Dr. Finin also identifies several patent applications in the same timeframe that refer to FIPA's agent communication language. *Id.* ¶ 32 (citing Exs. 1030–33).

*v. FIPA97 Website*

Sometime in 1998, the FIPA website migrated from its original site (http://drogo.cselt.stet.it/fipa) to fipa.org. Ex. 1049 ¶ 23; *see also* Ex. 1026 (Resolution of Munich meeting indicating FIPA's plans for the "redesign of a new FIPA home page"); Ex. 1065, 4 (Resolutions of the Durham meeting in October 1998 indicating the website will be transferred to www.fipa.org). The fipa.org website still exists today even though FIPA is no longer active as a standalone organization. *See* Ex. 1049 ¶¶ 23, 48–49. The current FIPA website maintains a repository of past FIPA documents, including meeting notes, press releases, FIPA resolutions, and different versions of the FIPA specification. *Id.* ¶ 49.

Dr. Finin testifies that the "initial" version of FIPA 97 Version 1.0 (i.e., the specification posted on the FIPA website on October 10, 1997) "remained publicly accessible during all of FIPA's future activities and is still available on FIPA's home page today." *Id.* ¶ 21. According to Dr. Finin, Exhibits 1006–1012 (collectively referred to as FIPA97) are Parts 1–7 of FIPA 97 Version 1.0 as found on the current fipa.org website. *Id.* Based on his personal knowledge, Dr. Finin further testifies that Exhibits 1006–1012 are the "same version" and contain "the same disclosures, content and information" as Parts 1–7 of FIPA 97 Version 1.0 that were publicly available on the FIPA website (http://drogo.cselt.stet.it/fipa) on October 10, 1997, and which Dr. Finin himself accessed in late 1997. *Id.* ¶¶ 21, 34. He also notes that although Exhibit 1006 has a typographical error relating to the version number in the

header of its odd pages,[12] Exhibit 1006 is identical to the version of Part 1 of FIPA 97 Version 1.0 that was released on October 10, 1007. *Id.* ¶ 21. Additionally, as evidence that FIPA 97 Version 1.0 has been continuously available on fipa.org since the website migration, Dr. Finin cites a set of Internet Archive records beginning in 2000 showing where each part of that version of the specification could be accessed. *Id.* (citing Ex. 1054).

Dr. Finin testifies that the original FIPA website, http://drogo.cselt.stet.it/fipa, remained live for several years after the website transitioned to fipa.org. Ex. 1049 ¶ 23. The Internet Archive Wayback Machine contains an archived screen capture of the website http://drogo.cselt.stet.it/fipa from December 1, 1998. *See* Ex. 1051; Ex. 1049 ¶¶ 23, 54. According to Dr. Finin, the archived page shows that the FIPA 97 specification was live and freely available on the FIPA website home page at that time. Ex. 1049 ¶ 23; Ex. 1051, 1 ("FIPA has already developed a seven-part specification called FIPA 97. Implementations of FIPA 97 are undergoing field trials that will last until October 1998 when version 2 of FIPA 97 will be produced."); Ex. 1049 ¶ 23. The home page provided links (i.e., "FIPA 97") to actual specification documents, but those links have not been maintained in the archive. Ex. 1049 ¶ 23. Dr. Finin testifies that the screen capture from the Internet Archive is consistent with the mirror of the former FIPA site hosted by Leonardo Chiariglione. *Id.* ¶ 51 (citing Ex. 1103 (http://leonardo.chiariglione.or/standards/fipa/)). Dr. Chiariglione's mirror is still available, and documents hosted on the

[12] The header on odd pages reads "FIPA 1997 Part 1: Version 2.4." *E.g.*, Ex. 1006, 3.

mirror are "accurate and complete copies of FIPA documents that were available to FIPA members." *Id.*

*vi. Analysis*

Petitioner argues that FIPA97 was a publicly accessible printed publication as of October 10, 1997, when it was posted on the FIPA website. Pet. 23; Reply 15–21. More specifically, Petitioner argues that (1) FIPA 97 Version 1.0 was publicly accessible on October 10, 1997, and (2) the version of the FIPA specification found in Exhibits 1006–1012, referred to herein as FIPA97, is the same specification that was posted on the FIPA website on October 10, 1997, and named FIPA 97 Version 1.0. *See, e.g.*, Pet. 23 (arguing FIPA 97 Version 1.0 was publicly accessible in late 1997); Reply 15–17 (arguing that Exhibits 1006–1012 are the same documents that were made public as FIPA 97 Version 1.0). Patent Owner addresses the first contention when it argues the evidence does not show any version of FIPA 97 Version 1.0 was available on the FIPA website. *See, e.g.*, Resp. 69. It also challenges the second contention when it argues Petitioner has failed to show that Exhibits 1006–1012 are identical to the version of the FIPA specification that allegedly was publicly accessible before the critical date. *See, e.g.*, *id.* at 62–63. In our analysis below, we address the two questions in turn.

Considering all the facts and circumstances surrounding the development of FIPA 97 Version 1.0 and its publication on the FIPA website, we find that FIPA 97 Version 1.0 was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the art, exercising reasonable diligence, could locate it. *See Jazz Pharm.*, 895 F.3d at 1355–56. First, the uncontested evidence shows that members of the relevant public (i.e., persons of ordinary skill in the field of software

agent-based technology) knew of the release of FIPA 97 Version 1.0 in late 1997, prior to the critical date. As detailed above, FIPA was open to corporations and educational and governmental organizations without restriction. Ex. 1006, iv. FIPA's members included many industry leaders whose employees attended FIPA meetings, including the October 1997 meeting in Munich where FIPA 97 Version 1.0 was approved for publication. *See id.*; Ex. 1095, 22. FIPA meetings and activities were publicized among the larger community of software agent researchers via the AgentWeb website and its associated Software Agents mailing list and AgentWeb newsletter, which had more than 1,300 subscribers. Ex. 1090, 5; Ex. 1088, 1; Ex. 1087, 1; Ex. 1091, 1–2; Ex. 1092, 3; Ex. 1093, 2; Ex. 1094, 1–2; Ex. 1086, 1–2; *see* Ex. 1049 ¶¶ 8, 10, 12, 14, 17, 19. The newsletter in particular informed subscribers of the development of the FIPA specification during 1996 and 1997 and provided detailed information regarding the release of FIPA 97 Version 1.0 in a November issue. Ex. 1086, 1–2. News articles in periodicals published in late 1997 also announced that FIPA had released and published FIPA 97 Version 1.0. Ex. 1095, 22; Ex. 1096, 93; *see* Ex. 1049 ¶ 22. In addition, the record contains several papers published in late 1997 and 1998, prior to the critical date, describing FIPA 97 Version 1.0 and its release in October 1997. *See* Ex. 1097, 1–7; Ex. 1099, 12–13; Ex. 1100, 51–52; Ex. 1049 ¶¶ 26–30; *see also* Ex. 1049 ¶¶ 31–32 (citing Exs. 1027–33 (other publications and patents referring to FIPA specification)).

The evidence of record also demonstrates that members of the relevant public, exercising reasonable diligence, could have located FIPA 97 Version 1.0 in late 1997 on the FIPA website, housed at the time at

http://drogo.cselt.stet.it/fipa. FIPA published FIPA 97 Version 1.0 on its website at the conclusion of the Munich meeting on October 10, 1997, or shortly thereafter. *See* Ex. 1049 ¶ 20. In the several months leading up to the Munich meeting, persons of ordinary skill in the art would have known about the FIPA website through the widely distributed AgentWeb newsletters and the Software Agents mailing list, which provided website information or direct links to drafts of the specification and meeting announcements and reports. *See* Ex. 1091, 1–2; Ex. 1092, 3; Ex. 1093, 2; Ex. 1094; Ex. 1082, 1; Ex. 1083, 1. Therefore, people working in the field would have been sufficiently familiar with FIPA's activities and its website to look for FIPA 97 Version 1.0 on the FIPA website when it was posted after the Munich meeting. Indeed, both Dr. Finin, who was affiliated with FIPA, and Dr. Lieberman, who worked in the software agent field, testify that they accessed FIPA 97 Version 1.0 on the FIPA website in late 1997. *Id.* ¶ 21; Ex. 1050 ¶ 146.

Moreover, the AgentWeb newsletter dated November 18, 1997, provided a link to the FIPA website and individual links to the seven parts of FIPA 97 Version 1.0 published on the website. Ex. 1086, 1–2; *see* Ex. 1049 ¶ 21. Thus, that issue of the newsletter provided more than 1,300 interested members of the public with direct access to FIPA 97 Version 1.0 at least as of November 18, 1997.

News articles and papers published in late 1997 also provided readers with the website address where FIPA 97 Version 1.0 could be found. *See* Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9. The news articles in particular likely reached a very wide audience because they appeared in publications directed to subject matter broader than agent-based technology. *See*

Ex. 1095 (EETimes); Ex. 1096 (IEEE Internet Computing). The EETimes article was dated October 20, 1997, suggesting that FIPA 97 Version 1.0 was available on the FIPA website at least as of that date.

The undisputed evidence also demonstrates that FIPA 97 Version 1.0 was freely available on the FIPA website without a password or any other restrictions and access was not subject to any requirement or expectation of secrecy or confidentiality. *See* Ex. 1049 ¶ 21; Ex. 1095, 22; *see also* Ex. 1006, iv (stating FIPA intended to make its results available to all interested parties). This evidence further supports our finding that FIPA 97 Version 1.0 was publicly accessible in late 1997. *See Jazz Pharm.*, 895 F.3d at 1358–59; *Voter Verified, Inc. v. Premier Election Solutions, Inc.*, 698 F.3d 1374, 1380–81 (Fed. Cir. 2012); *MIT v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985).

Patent Owner's arguments, many of which attack pieces of evidence individually, do not persuade us that Petitioner has failed to show that FIPA 97 Version 1.0 was publicly accessible. First, Patent Owner argues that no evidence shows the original FIPA website (http://drogo.cselt.stet.it/fipa) existed prior to a December 1, 1998, Internet Archive capture. Resp. 68 (citing Ex. 1051). To the contrary, much of the documentary evidence from late 1997 and testimonial evidence identifies that website or its mirror as the FIPA website during the relevant time period. *See* Ex. 1049 ¶ ¶ 20–23; Ex. 1092, 3; Ex. 1093, 2; Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9. Notwithstanding the absence of an Internet Archive capture for the website from a date prior to December 1998, we find that, based on the totality of evidence in the record, the original FIPA website existed in late 1997.

Patent Owner also argues that none of the documents cited by Petitioner provide active links to FIPA 97 Version 1.0 and therefore are insufficient proof of public accessibility. Resp. 69; Sur-reply 30. Again, based on the totality of evidence in the record, including but not limited to the testimony of Dr. Finin that he accessed FIPA 97 Version 1.0 on the FIPA website in late 1997, we find that FIPA 97 Version 1.0 was available on the FIPA website at that time, notwithstanding the lack of active links today, more than twenty years later. Patent Owner finds fault with Dr. Finin's testimony on this point because he does not claim to have used any of the links in the AgentWeb newsletters to access FIPA 97 Version 1.0. Sur-reply 30 (citing Ex. 1049 ¶ 21). Patent Owner, however, overlooks Dr. Finin's testimony that he was the founder and author of the AgentWeb newsletter, implying that he created the links in the newsletter. *See* Ex. 1049 ¶ 8. Therefore, based on Dr. Finin's personal knowledge regarding the links in the AgentWeb newsletter dated November 18, 1997, and the other evidence corroborating his testimony, we find that FIPA 97 Version 1.0 was available on the FIPA website in late 1997.

Patent Owner further asserts that, to the extent the Internet Archive capture from December 1998 provides an operable download link, it links to Version 2.0 of the FIPA 97 specification. Resp. 69 (citing Ex. 1051). It is not surprising, however, that FIPA's website in December 1998 provided links to FIPA 97 Version 2.0, which FIPA released in October 1998 to provide minor updates to two parts of the specification. *See* Ex. 1049 ¶ 35; Ex. 1053, vi. In any event, the December 1998 Internet Archive capture at least shows that the FIPA website was live at that time, which was prior to the critical date. *See* Ex. 1049 ¶ 23 (citing Ex. 1051, 1).

In its Sur-reply, Patent Owner argues for the first time that Petitioner has not demonstrated that a person of ordinary skill in the art in 1997 could have found FIPA 97 Version 1.0 using search tools or that the FIPA website was indexed so the specification could be located. Sur-reply 27–28. Further, Patent Owner argues that the existence of different FIPA websites at various times would have made it even more difficult to find the correct version of the FIPA specification without sufficient indexing or search tools. *Id.* at 29.

Even if we consider this late argument, we find it unpersuasive. As detailed above, the uncontested evidence shows that the address of the FIPA website itself was widely known among those skilled in the art and that FIPA routinely provided links to the FIPA specification on the website's home page. *See* Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9; Ex. 1051, 1; Ex. 1021, 1; Ex. 1025, 1. The November 1997 AgentWeb newsletter also provided direct links to FIPA 97 Version 1.0. Ex. 1086, 1–2. Under these circumstances, we find that a member of the interested public could have found FIPA 97 Version 1.0 without search tools or indexing by using the links in the AgentWeb newsletter or navigating to the well-known FIPA website home page. We also find that the record, including Dr. Finin's testimony, satisfactorily explains the various FIPA websites and website addresses over time and clearly identifies the FIPA website that was being used in late 1997. *See* Ex. 1049 ¶¶ 22–23, 48–49, 51.

Having determined that FIPA 97 Version 1.0 was publicly accessible on the FIPA website in late 1997, as early as October 10 and no later than November 18, we turn to whether Exhibits 1006–1012 (collectively referred to as FIPA97) contain the same version of the FIPA specification that was

available on the FIPA website during that timeframe. Dr. Finin testifies that Exhibits 1006–1012, documents available on the current FIPA website (fipa.org) and identified as FIPA 97 Version 1.0, are the same version with the same content as Parts 1–7 of FIPA 97 Version 1.0 that were released at the FIPA Munich meeting on October 10, 1997, and were publicly available on the FIPA website (http://drogo.cselt.stet.it/fipa) in late 1997. Ex. 1049 ¶¶ 21, 34.

As an initial matter, the October 10, 1997, date on the cover pages of several parts of FIPA97 supports Dr. Finin's testimony that FIPA97 is the same as FIPA 97 Version 1.0 as published on the FIPA website in late 1997. *See* Ex. 1006, Cover; Ex. 1007, Cover; Ex. 1008, Cover; Ex. 1010, Cover; Ex. 1012, Cover; *see also* Ex. 1009, Cover (Part 4 identifying a 1997 copyright date); Ex. 1011, Cover (Part 6 identifying a 1997 copyright date). Patent Owner contends that Petitioner cannot rely on the date stamps or copyright notices on Exhibits 1006–1012 to establish public accessibility because they are hearsay. Resp. 61; Sur-reply 22–24. We agree with Petitioner that Patent Owner has waived this argument because it did not raise an objection on evidentiary grounds pursuant to 37 C.F.R. § 42.64(b)(1). *See* Reply 15–16. Furthermore, we agree with Petitioner that the dates on the cover pages are not hearsay because they are evidence tending to show that FIPA97 is identical to FIPA 97 Version 1.0, not statements offered to show Exhibits 1006–1012 were published on a certain date. *See id.* at 16 (citing *Apple Inc. v. VirnetX Inc.*, IPR2016-01585, Paper 32 at 58 (PTAB Feb. 20, 2018)).

Patent Owner also argues that Petitioner cannot rely on the cover page dates alone as proof of the documents' public accessibility. Sur-reply 23.

The date stamps, however, are only part of the totality of evidence offered by Petitioner to establish public accessibility. As such, they are relevant evidence supporting a finding that FIPA97 was publicly accessible. *See Hulu,* Paper 29 at 17–18 (citing *Nobel Biocare*, 903 F.3d at 1377).

Patent Owner argues that the existence of multiple versions of FIPA 97 Version 1.0 undercuts Petitioner's position and Dr. Finin's testimony that Exhibits 1006–1012 are the version of FIPA 97 Version 1.0 that was publicly accessible in late 1997. *See* Resp. 62–65; Sur-reply 25. For example, Patent Owner points to Dr. Finin's description of the version released on October 10, 1997, as an "initial" version, after which final minor edits were to be made. Resp. 63–64 (citing Ex. 2068, 86:11–15, 88:9–89:25); *see* Ex. 1049 ¶ 21. Patent Owner cites an Internet Archive capture in the record referring to "FIPA 97 specification ver. 1.0 (Reston meeting)." Resp. 64–65 (citing Ex. 1105, 27). Patent Owner also cites evidence, including Dr. Finin's testimony, that a different version of FIPA 97 Version 1.0 was published in hardcopy books. *Id.* at 65 (citing Exs. 1055, 1056; Ex. 1049 ¶ 25 (stating that "FIPA printed the November 28, 1997, edited version of the specification" in the books)).

Patent Owner argues that because these various versions of FIPA 97 Version 1.0 have not been substantively introduced into evidence so that the differences can be ascertained, Petitioner has not shown that Exhibits 1006–1012 are the version that was publicly accessible on the FIPA website in late 1997. *See* Resp. 66–67. We disagree. Dr. Finin testifies that Exhibits 1006–1012 are the same documents that were released at the conclusion of the FIPA meeting in Munich on October 10, 1997, and were made publicly available at the time. Ex. 1049 ¶¶ 21, 34. Other evidence of

record corroborates Dr. Finin's testimony and adequately explains the multiple versions of the specification. *See* Reply 17–18. As set forth in detail above, FIPA released a version of FIPA 97 Version 1.0 on October 10, 1997, and made it available on the FIPA website soon thereafter. *See* Ex. 1049 ¶ 21; Ex. 1086, 1–2; Ex. 1095, 22; Ex. 1096, 93. It is clear from the record that any earlier versions of the specification, such as the version made available after the Reston meeting six months before FIPA 97 Version 1.0, were drafts made available for public comment. *See* Reply 17; Ex. 1049 ¶¶ 16–18; Ex. 1024; Ex. 1061.

The record also shows that the version published in book form is a later version, dated November 28, 1997, containing minor formatting and clerical edits. *See* Ex. 1049 ¶ 25; Ex. 1055, 5. Petitioner does not rely on the book version as a prior art reference or assert that it was publicly accessible. *See* Pet. 23–24; Reply 17–18. The hardcopy book excerpts in the record merely corroborate Dr. Finin's testimony that FIPA's activities and release of the FIPA specification were known in the art. *See* Ex. 1049 ¶ 24.

Patent Owner also points to the erroneous header on odd pages in Exhibit 1006 as calling into question which version of the specification is in Exhibits 1006–1012. Resp. 66. We credit Dr. Finin's unrebutted testimony that the header on some pages in Exhibit 1006 is a typographical error. *See* Ex. 1049 ¶ 21. Patent Owner has not cited, nor do we see, evidence in the record suggesting a FIPA 97 Version 2.4 was made publicly available. *See* Resp. 66.

Patent Owner finds fault with Exhibits 1006–1012 because they were obtained after the critical date and could not have been obtained from a

website prior to the critical date. *See* Resp. 61–62; Sur-reply 21. In his declaration, Dr. Finin testifies that Exhibits 1006–1012 are available on the FIPA website today (i.e., fipa.org), and the earliest Internet Archive record of the relevant website pages shows the documents were posted in 2000. Ex. 1049 ¶ 21 (citing Ex. 1054). Patent Owner contends that in his deposition Dr. Finin acknowledged that Exhibits 1006–1012 could have been obtained from files saved in the Internet Archive between 2003 and 2004. Resp. 61–62 (citing Ex. 2068, 93:12–94:2, 96:7–20). In either case, Patent Owner argues, the dates are after the critical date of the '560 patent. *Id.* at 62; Sur-reply 21. We agree with Petitioner, however, that the date Exhibits 1006–1012 were obtained is immaterial if they are digital copies of documents that are shown to have been publicly accessible before the critical date. *See* Reply 16 (citing *In re Wyer*, 655 F.2d at 226–27).

Finally, Patent Owner argues that the testimony of Dr. Finin and Dr. Lieberman is conclusory, unreliable, and uncorroborated and therefore insufficient to establish public accessibility. Resp. 71–74; Sur-reply 20–22. "[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest." *Nobel Biocare*, 903 F.3d at 1377–78 (quoting *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1369 (Fed. Cir. 1999)). This corroboration requirement applies when relying on witness testimony to establish public accessibility of a prior art reference. *See id.* at 1377–81; *Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158–60 (Fed. Cir. 2004). Corroborating evidence may include documentary or testimonial evidence, and circumstantial evidence may provide sufficient corroboration. *Nobel Biocare*, 903 F.3d at 1378. Determining whether testimony has been corroborated "involves an

assessment of the totality of the circumstances including an evaluation of all pertinent evidence." *Id.*

We are not persuaded by Patent Owner's argument regarding the testimony of Dr. Finin and Dr. Lieberman. Dr. Finin's testimony is based on his personal knowledge as someone who was directly involved in FIPA's activities by submitting comments on draft specifications and attending meetings, for example, and providing independent advice as a FIPA Fellow. His testimony that FIPA approved FIPA 97 Version 1.0 at the Munich meeting on October 10, 1997, and posted it to the FIPA website so that it was publicly accessible is corroborated by the evidence in the record of the facts and circumstances surrounding the development and release of the specification as analyzed above. Dr. Lieberman's testimony that as a member of the interested public he accessed FIPA 97 Version 1.0 in late 1997 is corroborated by the same evidence.

As for Dr. Finin's testimony, based on his personal knowledge, that Exhibits 1006–1012 are the same as the version of FIPA 97 Version 1.0 that was publicly accessible on the FIPA website in late 1997, we find it to be credible and corroborated by other evidence of record. We are not persuaded that Dr. Finin's inability to recall many of the details of a 300-page specification more than twenty years after it was created undermines his testimony. *See* Resp. 72–73. Furthermore, we find that the evidence discussed above, including the identification of Exhibits 1006–1012 on their cover pages or elsewhere as FIPA 97 Version 1.0 with a date of October 10, 1997, corroborates Dr. Finin's testimony that the version of the specification in Exhibits 1006–1012 is the version that was publicly

accessible on the FIPA website in late 1997, and not some other version of the FIPA specification.

For these reasons, we find that a preponderance of the evidence shows that Exhibits 1006–1012 are the version of FIPA 97 Version 1.0 released on October 10, 1997, and posted on the FIPA website in late 1997. As discussed above, a preponderance of the evidence shows that the October 10, 1997 version of FIPA 97 Version 1.0 was publicly accessible in late 1997. Accordingly, we find that Petitioner has met is burden to show that FIPA97, submitted as Exhibits 1006–1012 and relied on by Petitioner in its unpatentability challenges, was publicly accessible prior to the critical date of January 5, 1999, and therefore is available as prior art to the ’560 patent under 35 U.S.C. § 102(a).

4. *Obviousness over Kiss and FIPA97*

Petitioner asserts claims 1, 15, 18, 19, 29, 34, 38, 41, and 42 are unpatentable as obvious under 35 U.S.C. § 103 over the combination of Kiss and FIPA97. Pet. 32–67. Petitioner argues, "FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system." Pet. 28. Petitioner explains, "[t]hese techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging." *Id.* (citing Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1). Petitioner asserts, "[w]here the two systems disclose analogous functionality, such as facilitating cooperation and agent registry, their techniques are combined, as a Skilled Artisan would understand that to be an efficient and common sense way to implement the

combined system in order to obtain the benefits of both, and therefore be motivated to do so." *Id.* (citing Ex. 1003 ¶¶ 217–219).

*5. Motivation to Combine Kiss and FIPA97*

Petitioner argues the proposed combination of Kiss and FIPA97 would have been obvious for several reasons. Petitioner argues Kiss, FIPA97, and the '115 Patent are analogous art, because "each is directed to the same field of endeavor, *i.e.*, distributed computing environments generally and architectures for communication and cooperation among distributed electronic agents specifically." Pet. 29 (citing *e.g.*, Ex. 1001, 1:25–29; Ex. 1005, Abstract; Ex. 1007, Foreword, 1; Ex. 1003 ¶ 220). Petitioner also argues, "FIPA97 and Kiss are reasonably pertinent to the problem addressed by the '115 Patent—*e.g.,* the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 29 (citing Ex. 1001, 4:34–40; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1003 ¶ 221).

Petitioner argues,

> [i]t would have been obvious to make this combination because to do so would have been the arrangement of old elements (*i.e.*, the functionality of FIPA97, and the system of Kiss) with each performing the same function it had been known to perform (communication between distributed agents (FIPA97v1)); cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate to conduct cooperative task completion and problem solving).

Pet. 29 (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1003 ¶ 222).

Petitioner also argues it

> would have been obvious because a Skilled Artisan would have known that agents, such as in Kiss, must use a common

> communications protocol, i.e., an inter-agent communication language, and related management functionality, and therefore would have been motivated to consider and employ one of the available inter-agent communications languages and its related functionality, and because doing so would have been a convenient and efficient way to facilitate effective communication between agents.

Pet. 29–30 (citing Ex. 1003 ¶ 223; Ex. 1020, 2; Ex. 1046, 50).

Petitioner further argues,

> a Skilled Artisan would also have been motivated based on earlier descriptions of KQML's similar use of an inter-agent communication language, their disclosure that '[t]here are several levels at which agent-based systems must agree, at least in their interfaces, in order to successfully interoperate: Transport … Language … Policy … Architecture,' and their disclosure of the necessity of a robust inter-agent communication language in a system like Kiss.

Pet. 30 (citing Ex. 1016, Abstract, 4, 29, 30; Ex. 1006, 7; Ex. 1007, 40–42; Ex. 1005, Abstract; Ex. 1003 ¶¶ 224–226).

Petitioner argues it "would also have been obvious to try this combination because the necessity of a common inter-agent communication language was a known design need in a system such as Kiss, and there were only a small number of identified, predictable solutions to that need, such as FIPA ACL." Pet. 30 (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1035, 1; Ex. 1003 ¶ 227).

Petitioner also argues,

> [a] Skilled Artisan would have been further motivated to make the combination because of the known advantages of FIPA97, including that it specifies, 'key agents necessary for the management of an agent system, the ontology necessary for the interaction between systems, and it defines also the transport level of the protocols.'

*Id.* at 30–31 (citing Ex. 1035, 1; Ex. 1003 ¶ 229).

Further, Petitioner argues:

> a Skilled Artisan would have been motivated to make the combination because FIPA97 represented a substantial attempt to formulate an industry standard designed to encourage interoperability and uniformity amongst agent systems. A Skilled Artisan would have understood that agent systems that complied with such a standard would be more likely to be interoperable with other systems and would likely have more resources available.

*Id.* at 31 (citing Ex. 1007, vii; Ex. 1047; Ex. 1003 ¶ 230).

Petitioner argues, "[a] Skilled Artisan would have been further motivated to include the administrative functionality and exemplary practices described in FIPA97 with Kiss because the description of such functionality and practices in FIPA97 suggests that their use with the FIPA ACL would be advantageous and workable." Pet. 31. Petitioner also argues, "[a] Skilled Artisan would also have been motivated to employ such additional functionality and practices in the combined system in order to obtain the full benefit of using FIPA ACL." *Id.* (citing Ex. 1003 ¶ 231).

Finally, Petitioner argues, "a Skilled Artisan could have made the combination cited above without undue experimentation including because by January 1999 the components parts of this combination were well-known, conventional technology and because others had combined FIPA97v1 technology with agent systems." Pet. 31–32 (citing Ex. 1007; Ex. 1016; Ex. 1030; Ex. 1003 ¶ 228).

Patent Owner asserts that "Petitioner utterly defaults in offering any reason to combine *Kiss* and *FIPA97*." Resp. 116. Patent Owner argues that Petitioner's motivation to combine Kiss and FIPA97 suffers from "hindsight bias" and that Petitioner "offers no reason or explanation that a person of skill in the art looking at *Kiss* would be motivated to find a particular

language with the characteristics of *FIPA97's* ACL." *Id.* Patent Owner also argues that Petitioner does not "explain what 'efficiencies' a person of ordinary skill in the art would be looking for" and "fails to identify **how** the combination could be achieved." *Id.* at 116–117.

Patent Owner argues that "[e]ven if the combination of the *Kiss* meta-agent and the *FIPA97* Directory Facilitator had disclosed the claimed facilitator agent (it did not), Petitioner fails to offer any reason that a person of ordinary skill in the art would have been motivated to do so." *Id.* at 79. Patent Owner argues, "Petitioner offers no reason that the meta-agent of *Kiss* would need any capability offered by *FIPA97*." *Id.* "Indeed," Patent Owner argues, "*Kiss* itself already includes a registry." *Id.*

Patent Owner also argues that the "Petition says nothing" about how to combine FIPA97's Directory Facilitator and Kiss' meta-agent. *Id.* at 80. Patent Owner argues the "two architectures look quite different," and that "Petitioner offers no articulation of how to add [FIPA Directory Facilitators] to any of the *Kiss* layers." *Id.* at 81.

Patent Owner argues:

> If *Kiss's* meta agents were replaced by or combined with *FIPA's* [Directory Facilitators] in some way, like the Petition suggests, the directory service provided by the [Directory Facilitators] would clash with the duplicate and potentially conflicting services provided by the existing agent service layer. Other agents in *Kiss* would either be unable to obtain the registry services or would receive duplicate and/or contradictory answers, resulting in an inoperative device.

*Id.* at 82 (citations omitted).

Patent Owner also argues that Petitioner's combination of FIPA97, Kiss and Cohen "is emblematic of hindsight bias" because Dr. Lieberman "picks and chooses elements" and "superimposes them into one figure in an

attempt to 'show' the combination." *Id.* at 84. Patent Owner argues that "simply drawing in block diagrams with terminology from other references into one cobbled diagram is insufficient as a matter of law without any explanation of how such a combination could be achieved or, indeed, why." *Id.* at 84–85.

In Reply, Petitioner argues that Patent Owner "ignores the several pages of analysis supported by expert testimony (including citations to evidence in the prior art) articulating the rational underpinning of the combination" of Kiss and FIPA97. Reply 30 (citing Pet. 28–32). Petitioner argues that "while there was no requirement to show that a Skilled Artisan would search for 'a particular language with the characteristics of FIPA97's ACL,'" (Resp. 116), the Petition does explain that "agents, such as in Kiss, must use a common communications protocol," so a Skilled Artisan "would have been motivated to 'employ one of the available inter-agent communications languages . . . because doing so would have been a convenient and efficient way to facilitate effective communication between agents.'" Reply 30–31 (citing Pet. 29–30; Ex. 1003 ¶ 223).

Petitioner also argues that Patent Owner's criticism that "Petitioner fails to identify **how** the combination could be achieved," (Resp. 117), is "legally irrelevant" (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981), and "also ignores the detailed description in the Petition (supported by Dr. Lieberman) that demonstrates how the combination would work." Reply 31 (citing Pet. 28–32; Ex. 1003 ¶¶ 217–219; Ex. 1005, Figs. 4–6, 21 (annotated)). Petitioner points out that:

> [t]he Petition explains, for example, that FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system, as

> described with specificity below. These techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging, (Ex. 1005, 3:32–36, 3:67-4:1, 6:67–7:1), as well adding functionality that is disclosed in FIPA97.

Reply 34.

In its Sur-reply, Patent Owner argues that Petitioner's evidence of a motivation to combine are simply "[p]ages of boilerplate language" or exhibit "*ex post* reasoning colored by hindsight." Sur-reply 58, 62. Patent Owner argues that the FIPA97 and Kiss protocols are "different" and "mutually exclusive" and that "Petitioner offers no argument or evidence relating to how these completely different components would be reconciled." *Id.* at 59–61. Patent Owner argues that FIPA97 "discouraged interoperability between different and incompatible systems." *Id.* at 61.

Patent Owner also argues that "[t]he Board must disregard" portions of Petitioner's Reply, which discuss "a series of four figures from Dr. Lieberman's declaration," "because it constitutes new argument." *Id.* at 63. Patent Owner argues that "the Petition must contain a 'full statement of the reasons for the relief requested'" and "cannot simply incorporate by reference its expert's declaration." *Id.* (citing 37 C.F.R § 42.6(a)(3)).

In identifying a reason that would have prompted a person of ordinary skill in the relevant field to combine the prior art teachings, the Petitioner must show "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). A reason to combine teachings from the prior art "may be found in explicit or implicit teachings within the references themselves, from the ordinary knowledge of those skilled in the art, or from the nature of the problem to be solved." *WMS Gaming Inc. v. Int'l Game*

*Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (*citing In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998)).

Here, Petitioner explains that:

> FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system, as described with specificity below. These techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging, Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1, as well adding functionality that is disclosed in FIPA97. Where the two systems disclose analogous functionality, such as facilitating cooperation and agent registry, their techniques are combined, as a Skilled Artisan would understand that to be an efficient and common sense way to implement the combined system in order to obtain the benefits of both, and therefore be motivated to do so.

Pet. 28 (citing Ex. 1003 ¶¶ 217–219).

Petitioner provides persuasive evidence that Kiss and FIPA97 are analogous art because "each is directed to the same field of endeavor, *i.e.*, distributed computing environments generally and architectures for communication and cooperation among distributed electronic agents specifically." Pet. 29 (citing Ex. 1001, 1:25–29; Ex. 1005, Abstract; Ex. 1007, Foreword, 1; Ex. 1003 ¶ 220). Petitioner also provides persuasive evidence that FIPA97 and Kiss "are reasonably pertinent to the problem addressed by the 115 Patent—*e.g.,* the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 29 (citing Ex. 1001, 4:34–40; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1003 ¶ 221).

Petitioner argues persuasively that

> [i]t would have been obvious to make this combination because to do so would have been the arrangement of old elements (*i.e.*, the functionality of FIPA97, and the system of Kiss) with each

> performing the same function it had been known to perform (communication between distributed agents (FIPA97v1)); cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate to conduct cooperative task completion and problem solving).

Pet. 29 (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1003 ¶ 222).

Petitioner also argues, and we agree, that it

> would have been obvious because a Skilled Artisan would have known that agents, such as in Kiss, must use a common communications protocol, i.e., an inter-agent communication language, and related management functionality, Ex. 1020, 2; Ex. 1046, 50, and therefore would have been motivated to consider and employ one of the available inter-agent communications languages and its related functionality, and because doing so would have been a convenient and efficient way to facilitate effective communication between agents.

Pet. 29–30 (citing Ex. 1003 ¶ 223).

Petitioner goes on to argue that "a Skilled Artisan would also have been motivated based on earlier descriptions of KQML's similar use of an inter-agent communication language," (citing Ex. 1016, Abstract) and their disclosure that "[t]here are several levels at which agent-based systems must agree, at least in their interfaces, in order to successfully interoperate: Transport … Language … Policy … Architecture," (citing Ex. 1016, 4, 29, 30) as well as their disclosure of "the necessity of a robust inter-agent communication language in a system like Kiss." Pet. 30 (citing Ex. 1006, 7; Ex. 1007, 41, 4–-42; Ex. 1005, Abstract; Ex. 1003 ¶¶ 224–226).

Petitioner further argues that "[s]uch a combination would also have been obvious to try this combination because the necessity of a common inter-agent communication language was a known design need in a system such as Kiss," (citing Ex. 1020, 2; Ex. 1046, 50) and there were only a small

number of identified, predictable solutions to that need, such as FIPA ACL." Pet. 30 (citing Ex. 1035, 1; Ex. 1003 ¶ 227).

Petitioner goes on to argue that a "Skilled Artisan" would also have been motivated to combine FIPA97 and Kiss in the manner described in the Petition "because of the known advantages of FIPA97, including that it specifies, 'key agents necessary for the management of an agent system, the ontology necessary for the interaction between systems, and it defines also the transport level of the protocols'" (citing Ex. 1035, 1; Ex. 1003 ¶ 229), and "because FIPA97 represented a substantial attempt to formulate an industry standard designed to encourage interoperability and uniformity amongst agent systems." Pet. 30–31 (citing Ex. 1007, vii; Ex. 1047).

Petitioner also explains that:

> [a] Skilled Artisan would have been further motivated to include the administrative functionality and exemplary practices described in FIPA97 with Kiss because the description of such functionality and practices in FIPA97 suggests that their use with the FIPA ACL would be advantageous and workable. A Skilled Artisan would also have been motivated to employ such additional functionality and practices in the combined system in order to obtain the full benefit of using FIPA ACL.

Pet. 31 (citing Ex. 1003 ¶ 231).

In light of the reasons and the explanations Petitioner provides that would have motivated a person of ordinary skill in the art to combine the teachings of FIPA97 and Kiss in the manner Petitioner describes, Patent Owner's argument that "Petitioner utterly defaults in offering *any reason* to combine *Kiss* and *FIPA97*" (*see* Resp. 116) (emphasis added), is directly contrary to the evidence of record and is unpersuasive. So too is Patent Owner's argument that "Petitioner fails to offer *any reason* that a person of ordinary skill in the art would have been motivated" to combine "the *Kiss*

meta-agent and the *FIPA97* Directory Facilitator." *See* Resp. 79 (emphasis added).

Patent Owner also argues that Petitioner "offers no reason or explanation that a person of skill in the art looking at *Kiss* would be motivated to find a particular language with the characteristics of *FIPA97's* ACL." *Id.* at 116. Patent Owner's argument, however, is misplaced. The test for obviousness is not whether a person of ordinary skill in the art "looking at *Kiss* would be motivated to find a particular language with the characteristics of *FIPA97's* ACL." Rather, "[u]nder the correct [obviousness] analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007).

Here, Petitioner provides persuasive evidence and argument that FIPA97 and Kiss "are reasonably pertinent to the problem addressed by the 115 Patent—*e.g.*, the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 29 (citing Ex. 1001, 4:34–40; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1003 ¶ 221). This evidence includes the '115 patent's observation that:

> [a]gent-based systems have shown much promise for flexible, fault-tolerant, distributed problem solving. Several agent-based projects have helped to evolve the notion of facilitation. However, existing agent-based technologies and architectures are typically very limited in the extent to which agents can specify complex goals or influence the strategies used by the facilitator.

Ex. 1001, 4:34–40, as well as Kiss' observation that "a need exists for a knowledge management system for dynamic, distributed problem-solving systems." Ex. 1005, 2:39–40. Indeed, Dr. Lieberman notes that the FIPA97

specification "defines a language and supporting tools, such as protocols, to be used by *intelligent software agents* to communicate with each other," and that "the terms used and the mechanisms used [by FIPA97] support such a higher-level, often *task based*, view of interaction and communication." Ex. 1003 ¶ 221. This evidence support's Petitioner's position that a person of ordinary skill in the art at the time of the claimed invention would have combined FIPA97 and Kiss in the manner described in the Petition to provide a flexible, fault-tolerant, distributed problem solving system using agent-based technologies.

Patent Owner further argues that "Petitioner offers no reason that the meta-agent of *Kiss* would need any capability offered by *FIPA97*." Resp. 79. Patent Owner argues that the "Petition says nothing" about how to combine FIPA97's Directory Facilitator and Kiss' meta-agent. *Id.* at 80. Patent Owner makes the observation that the "two architectures look quite different," and that "Petitioner offers no articulation of how to add [FIPA Directory Facilitators] to any of the *Kiss* layers." *Id.* at 81. Patent Owner argues:

> If *Kiss's* meta agents were replaced by or combined with FIPA's [Directory Facilitators] in some way, like the Petition suggests, the directory service provided by the [Directory Facilitators] would clash with the **duplicate** and potentially conflicting services provided by the existing agent service layer. Other agents in *Kiss* would either be unable to obtain the registry services or would receive duplicate and/or contradictory answers, resulting in an inoperative device.

*Id.* at 82 (citations omitted).

We note that, "the [obviousness] analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of

ordinary skill in the art would employ." *KSR*, 550 U.S. at 418 (2007). The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references. Rather, the test is what *the combined teachings* of the references *would have suggested* to those of ordinary skill in the art. *In re Keller*, 642 F.2d 413, 425 (CCPA 1981).

Here, contrary to Patent Owner's arguments, Petitioner provides a description in the Petition (supported by Dr. Lieberman's Declaration) that explains how a person of ordinary skill in the art would combine FIPA97 and Kiss. *See, e.g.*, Pet. 28–32; Ex. 1003 ¶¶ 217–219. For example, the Petition explains that "FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system." Pet. 28. The Petition also explains that "[t]hese techniques are used to implement the functionality described in Kiss, including *facilitating agent collaboration*, agent registry, and inter-agent messaging . . . as well adding functionality that is disclosed in FIPA97." *Id.* (citing Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1) (*italicized* emphasis added).

Petitioner's proffered combination of FIPA97 and Kiss is amply supported by Dr. Lieberman's testimony. For example, Dr. Lieberman explains that:

> in the combination of Kiss with FIPA97, the "interagent abstract communications facilities" of Kiss, EX1005, 3:32-36, would use the inter-agent communication language of FIPA97 to, for example, "negotiate with each other, conduct joint planning, and to collaborate in the execution of planned tasks," EX1005, 3:32-36. Additionally, *the Agent Service Layer and meta-agent of Kiss would be implemented using* the FIPA97 Agent Management

> System ("FIPA AMS") and *the functionality of the FIPA Directory Facilitator*, described in EX1006. Thus, *the "capabilities, interests, and attributes for the knowledge modules*" EX1005, 6:67-7:1, as stored in the agent registry of Kiss, and the meta agent of Kiss, *would be implemented with the directory facilitator functionality of FIPA97*. Therefore, FIPA AMS would be used to provide a "scalable and modular," EX1005, 3:67-4:1, inter-agent management system and agent registry for the distributed agents of Kiss. Further, the combination of FIPA97 and Kiss would be informed by and include the exemplary practices described in the informative sections of FIPA97 (i.e, Parts 4-7). The following are further annotated figures from Kiss representing exemplary depictions of the combined Kiss/FIPA97 system.

Ex. 1003 ¶ 219 (citing Ex. 1005, Figs. 4–5, 6, 21) (*italicized* emphasis added).

Dr. Lieberman provides an annotated version of Kiss' Figure 21, shown below, illustrating how FIPA97's Directory Facilitator (DF) and Facilitating Agent (FA) would be incorporated into Kiss' Knowledge Management System.




*Fig. 21*

Petitioner's annotated version of Kiss' Figure 21, shown above, depicts how FIPA97's Directory Facilitator (DF) and Facilitating Agent (FA) would be incorporated into the User Interface Layer, Meta-Agent Layer, and Knowledge Agent Layer of Kiss' Knowledge Management System connected to a distributed environment such as the Internet. *See* Ex. 1003, ¶¶ 217–219, pgs. 132–135; Ex. 1005, 10:55–12:28, 14:31–36, Figs. 4–6, 8, 21. Patent Owner's arguments that the Petition "says nothing" about how to combine FIPA97's Directory Facilitator and Kiss' meta-agent and offers "no articulation" of how to add a Directory Facilitator to any of the Kiss layers is simply contrary to the evidence of record. Similarly, Patent Owner's arguments that the FIPA97 and Kiss protocols are "mutually exclusive" and that FIPA97 "discouraged interoperability" between systems

is not adequately supported by the record and is unpersuasive. *See* Sur-reply 59–61.

Patent Owner's argument in its Sur-reply that we must "disregard" portions of Petitioner's Reply discussing Dr. Lieberman's annotated illustrations because it constitutes "new argument" is also unpersuasive. *See* Sur-reply 63. The identified portions of Petitioner's Reply (pgs. 32–33) respond directly to Patent Owner's argument in its Response that "Petitioner fails to identify **how** the combination could be achieved," and do not constitute new argument. *See* Reply 31 (citing Response 117). Similarly, Patent Owner's argument that Dr. Lieberman's annotated illustrations should be disregarded because they do not appear directly in the Petition is misplaced. *See* Sur-reply 63. 37 C.F.R § 42.6(a)(3), cited by Patent Owner, prohibits "arguments" from being incorporated by reference from one document into another document. Dr. Lieberman's Declaration (Ex. 1003) is *testimonial evidence* provided by a witness in support of the Petition—it is not "argument."

Finally, Patent Owner argues Petitioner's motivation to combine Kiss and FIPA97 suffers from "hindsight bias" (Resp. 116) and that Petitioner's combination of FIPA97, Kiss and Cohen "is emblematic of hindsight bias" because Dr. Lieberman "picks and chooses elements" and "superimposes them into one figure in an attempt to 'show' the combination." *Id.* at 84. In particular, Patent Owner argues that "simply drawing in block diagrams with terminology from other references into one cobbled diagram is insufficient as a matter of law without any explanation of how such a combination could be achieved or, indeed, why." *Id.* at 84–85.

We note that "[a]ny judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into

account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper." *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971).

Here, Petitioner provides persuasive evidence that a person of ordinary skill in the art at the time of the invention would have been motivated to combine FIPA97's communications protocol and inter-agent communication language (FIPA ACL) between the agents of Kiss, adding its administrative functionality and practices to the Kiss system. *See, e.g.*, Pet. 28–32; Ex. 1003 ¶¶ 217–232. This is not evidence of hindsight bias. Patent Owner does not identify, and we do discern, any particular knowledge used by Petitioner in its combination of FIPA97 and Kiss that was gleaned from the '115 patent's disclosure and was not within the level of ordinary skill in the art at the time of the invention.

Patent Owner's criticism of Dr. Lieberman's annotation of Kiss' Figure 8 (*see* Resp. 84–85; Ex. 1003, 130) is also misplaced. As Dr. Lieberman explains, the annotated illustration shows *how* a person of ordinary skill in the art at the time of the invention would have combined FIPA97's ACL messaging, Directory Facilitator, and Facilitator Agent with Kiss' Agent Service Layer. *See* Ex. 1003, 130, Fig. 8. Moreover, Dr. Lieberman persuasively explains *why* a person of ordinary skill in the art would have been motivated to combine the teachings of FIPA97 and Kiss in the manner described. *See* Ex. 1003 ¶¶ 217–231.

We find that Petitioner has shown persuasively by a preponderance of the evidence that one of ordinary skill in the art at the time of the invention would have been motivated to combine the teachings of FIPA97 and Kiss in the manner proffered by Petitioner.

*6. Nonobviousness*

Before determining whether a claim is obvious in light of the prior art, we consider any relevant evidence of secondary considerations of non-obviousness. *See Graham*, 383 U.S. at 17. Notwithstanding what the teachings of the prior art would have suggested to one of ordinary skill in the art at the time of the invention, the totality of the evidence submitted, including objective evidence of non-obviousness, may lead to a conclusion that the challenged claims would not have been obvious to one of ordinary skill. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984). Patent Owner presents evidence of two such considerations: (1) industry praise (Resp. 120–141) and (2) long-felt but unresolved need (*id.* at 141–145), both involving the software product called "Siri" from Apple Inc. For the reasons explained below, we determine that Patent Owner's proffered evidence of secondary considerations is not entitled much weight because Patent Owner does not establish a sufficient nexus between the evidence of non-obviousness and the challenged claims of the '115 patent.

A nexus is required between the merits of the claimed invention and any objective evidence of nonobviousness if that evidence is to be given substantial weight in reaching a conclusion on obviousness. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983). Evidence of secondary considerations is only significant if there is a nexus with respect to the claimed invention. *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006).

Nexus is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in the determination of nonobviousness. *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392

(Fed. Cir. 1988). For instance, commercial success is relevant if it flows from the merits of the claimed invention. *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988). The burden of showing nexus is on the patent owner. *In re Huang*, 100 F.3d 135, 139–40 (Fed. Cir. 1996). Objective evidence of nonobviousness also must be commensurate in scope with the claims for which the evidence is offered to support. *In re Kulling*, 897 F.2d 1147, 1149 (Fed. Cir. 1990).

Patent Owner contends that objective indicia of nonobviousness confirms the novelty of the '115 patent. Resp. 119–145. Patent Owner argues that industry praise for a software application known as "Siri," "which was first made available for download to iPhone users on Apple, Inc.'s App Store on February 4, 2010" (*id.* at 121), "bears a nexus to the claims of the '156 Patent" (*id.* at 141).[13] Patent Owner argues that industry praise for the "personal context awareness and service delegation 'technical components' of the Siri application are made possible by the [] claim limitations of independent claim 1 of the '115 Patent." *Id.* at 136.

Patent Owner asserts that "[t]he '115 Patent was based on SRI International's development of version 2 of the Open Agent Architecture ('OAA')." *Id.* at 135 (citing Ex. 2032; Ex. 1001). For support, Patent Owner relies on Exhibit 2054, an SRI web page, which states, "SRI developed OAA® software, which is designed with intelligent 'agents' that track human interactions and work processes to streamline electronic and computer interchange." Resp. 135 (quoting Ex. 2054). Patent Owner

---

13 Although Patent Owner refers to the '156 Patent here, we assume this is a mistake and that Patent Owner actually meant to refer to the patent at issue in this proceeding, the '115 patent.

further asserts that "[a]fter version 2 of OAA was developed, SRI International spun out Siri, Inc. as an SRI venture, where the Siri application was created based on an OAA groundwork." Resp. 135 (quoting Ex. 2054 ("OAA laid the groundwork for the DARPA-funded CALO project, from which Siri, the first virtual personal assistant, was born. Siri was spun out into an SRI venture that Apple acquired from SRI."). Apple Inc. apparently acquired Siri, Inc. in April 2010, approximately two months after the Siri application's initial release.[14] Resp. 10, 121, 135.

Patent Owner asserts that "Petitioner proposed a combination of *Kiss* with *FIPA97,* which relies on *FIPA97* as teaching a common communications and protocol language that is combined with *Kiss*'s teachings of electronic agents and their general functions and operations." Resp. 134 (citing Paper 12, 45). To support this assertion, Patent Owner supposedly quotes from the Decision on Institution in this proceeding as follows:

> In its proposed combination of *Kiss* with *FIPA97,* Petitioner relies on *Kiss* as teaching electronic agents and their general functions and operations, including agent collaboration, agent registry, and interagent messaging. Pet. 28. Petitioner acknowledges, however, *Kiss* does not disclose an inter-agent communication language and relies on *FIPA97* to teach a common communications protocol and language (FIPA ACL), which is combined with the teachings of *Kiss* to provide a communication language for inter-agent communication between the agents of *Kiss*. *Id.*

[14] We note for the record that the filing date for the '115 patent is Jan. 5, 1999, approximately ten years prior to the Siri application's initial release.

Resp. 134 (citing Paper 12, 45). However, we cannot locate this supposed quotation from the Decision on Institution in this proceeding on page 45, or on any other page of the Decision, for that matter. *See* Paper 12, 45.

Nonetheless, Patent Owner argues a "nexus between the evidence of industry praise of the Siri application [] and the Challenged Claims can be shown if the industry praise has a nexus to the combination of these (allegedly) prior art features, *i.e.*, the teachings of electronic agents and their general functions and operations in *Kiss* and the common communications protocol and language of *FIPA97*." Resp. 134. Patent Owner argues that its "evidence of industry praise [] satisfies the nexus requirement, as it shows praise for the Siri application's integration of personal context awareness into a service-delegating virtual personal assistant." Resp. 136; *see also id.* at 122–133. Patent Owner also argues that "industry journalists recognized that the Siri application filled an unmet need for a true virtual personal assistant." *Id.* at 141; *see also id.* at 141–145.

To establish a nexus between claim 1 of the '115 patent and the Siri application, Patent Owner provides the following chart. *Id.* at 136–138. Patent Owner relies, in significant part, on the opinion of its declarant, Dr. Medvidovic, to establish a nexus between the Siri application and the claims of the '115 patent. *See* Ex. 2032 ¶¶ 205–229, App. A, 1–32.

| **Siri's Description of Technology Feature** | **Claim 1 of the '115 Patent** |
|---|---|
| **Personal Context Awareness** A virtual assistant gives different answers depending on individual preferences and personal context (place, time, history), and if you give it permission, learns more about you so that it can shorten your time-to-task. Information you teach Siri in one domain (e.g. movies) is applied automatically to opportunities rising from other domains. Any personal | "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language, wherein the inter-agent language includes: a layer of conversational protocol defined by event types and parameter lists associated with one or more of the |

| | |
|---|---|
| information you provide Siri is stored in a highly secure, PCI-compliant co-location center, and used only with your explicit permission to accelerate your task completion. | events, wherein the parameter lists further refine the one or more events;<br>a content layer comprising one or more of goals, triggers and data elements associated with the events;" |
| **Service Delegation**<br>An assistant can reason about what specific set of resources or services would best be combined to help you accomplish a particular task. Siri's patented service delegation algorithms combine numerous attributes about each service provider, including quality scores, fine-grained ratings for specific capabilities, speed measures, and geographic constraints, to plan and execute an optimized strategy for handling your request. Live data is pulled fresh from source sites and world-changing actions are handled in a transaction-safe manner. For example, in a restaurant selection task, Siri integrates information from many sources (local business directories, geospatial databases, restaurant guides, restaurant review sources, | "A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents, comprising the acts of:<br>. . .<br>receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrary complex goal expression;<br>dynamically interpreting the arbitrarily complex goal expression, said act of interpreting further comprising:<br>generating one or more sub-goals expressed in the inter-agent language;<br>constructing a goal satisfaction plan wherein the goal satisfaction plan includes:<br>a suitable delegation of sub-goal requests to best complete the requested |

| | |
|---|---|
| menu sites, online reservation services and the user's own favorites) to show results that meet the user's natural language request. | service request-by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and<br>dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent." |

Patent Owner argues that "the Siri application's integration of personal context awareness is made possible because of the claimed inter-agent language limitations." Resp. 138 (citing Ex. 2032 ¶ 222). Patent Owner explains that "[b]y having a layer of conversational protocol that has parameter lists, the '115 Patent describes how agents can then use the parameters in the parameter lists to provide feedback or advice to agents who directly, or indirectly through the facilitating agent, receive the service request." Resp. 138. For example, Patent Owner explains that a "requesting agent can utilize such a parameter to provide context on a user's preference to the facilitator agent and/or the tasking agents. *Id.* at 139 (citing Ex. 2032 ¶ 224). Patent Owner argues that "[t]his same functionality of being able to include individual preferences, for example, was described by Siri, Inc. as representing personal context awareness." Resp. 140 (citing Ex. 2040, 2).

Patent Owner also argues that:

> the Siri application's service delegation corresponds to the claimed dynamic interpretation limitations. Siri, Inc. described the service delegation feature of the Siri application as including "an assistant [that] can reason about what specific set of resources or services would best be combined to help you accomplish a particular task." This is precisely what is claimed in the dynamic interpretation limitations, e.g., "constructing a goal satisfaction plan . . . [including] a suitable delegation of sub-goal requests to best complete the requested service request-by using reasoning."

Resp. 140 (citing Ex. 2032 ¶ 221).

Petitioner argues that Patent Owner's "secondary considerations position rests primarily on an unsubstantiated, conclusory opinion that certain aspects of the '115 Patent are embodied in the Apple product 'Siri.'" Reply 82. Petitioner argues that as "Dr. Medvidovic conceded, the evidence he relied on is 'circumstantial,' or a 'suggestion.'" *Id.* (citing Ex. 1129, 147:12-15). Petitioner argues that Dr. Medvidovic "never reviewed the Siri source code, (Ex. 1129, 146:20-147:6), and indeed never even asked to review that source code (Ex. 1129, 147:22-148:9)." Reply 82–83. Petitioner argues,

> [t]he failure to review the code is fatal, because [Dr. Medvidovic] further testified that an "agent"—an element in every claim—is a "piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer **a clearly identifiable body of code,"** and that to distinguish an "agent" from any other software he "**would have to look inside the code**."

*Id.* at 83 (quoting Ex. 1129, 9:14-11:8).

Petitioner faults Patent Owner for not "not seek[ing] that code through a motion for additional discovery or other means, nor did [Petitioner] seek any other objective evidence (such as specifications) to support its assertions." Reply 83. Petitioner also faults Patent Owner for not seeking

the testimony of Mr. Adam Cheyer, one of the named co-inventor's on the '115 patent and a co-founder of Siri, Inc., on this topic, even though Mr. Cheyer's testimony was apparently obtained in a related proceeding. *Id.* at 83–84 (citing Ex. 2034, 58:15-63:16; Ex. 1127); *see also* Resp. 121. During the Oral Hearing in this proceeding, counsel for Patent Owner was asked about this potential source of evidence:

> 12 JUDGE TROCK: Counsel, this is Judge Trock
> 13 again.
> 14 Do you have any evidence from Mr. Cheyer
> 15 that this Siri version that you're discussing right
> 16 now incorporated the claim limitations of the '115
> 17 patent?
> 18 MS. ABDULLAH: Your Honor, we do not have
> 19 any direct evidence from Mr. Cheyer. And the reason
> 20 is because he was never deposed in this
> 21 proceeding and he is also not a consultant or
> 22 anybody that's working with IPA at the moment. I
> 23 know --
> 24 JUDGE TROCK: Wasn't he deposed -- sorry.
> 25 Wasn't he deposed in the Google proceeding?
> 26 MS. ABDULLAH: He was, your Honor. And that
> 1 was pursuant to a subpoena that we had to get
> 2 permission to serve from the Board because he
> 3 refused to simply cooperate with us voluntarily.
> 4 JUDGE TROCK: Was there a reason why you
> 5 didn't approach the Board in this case for a
> 6 subpoena?

MS. ABDULLAH: Your Honor, because we don't believe that his testimony is as probative as the expert testimony that we presented drawing the direct connection as well as the actual industry praise and long-felt need evidence that we --

JUDGE TROCK: But wouldn't he be a witness with personal knowledge of whether or not that original Siri version incorporated the claim limitations of the '115 patent?

MS. ABDULLAH: Your Honor, respectfully, I believe that that was not -- that would not be a question of personal knowledge but rather of expert testimony. And also, your Honor, I would note that I don't believe that we would have the requisite showing under the Garmin factors that he would be able to testify to those aspects.

JUDGE TROCK: But he is the inventor, right? You've told us that.

MS. ABDULLAH: Yes, your Honor, he is the inventor.

TROCK: All right. So he might be a person -- a witness with personal knowledge; isn't that right?

MS. ABDULLAH: Absolutely. And were this a district court case, you know, I'm sure we would have pursued his deposition. I'm sure Microsoft would have as well. But given the high burden for

us to obtain additional discovery, your Honor, we determined that the probative value of his testimony was not such that it would meet the Garmin factors here.

JUDGE TROCK: But you did pursue that in the Google case though?

MS. ABDULLAH: Your Honor, the Google case was a different issue. The question there had to do with authorship of a prior art reference that Mr. Cheyer was an author of. And it had to do with whether that could be considered the work of another versus the inventor. So inventorship was front and center in the Google proceedings where it is not here. Here this is a 103 analysis for which, you know, obviously I can't pretend to say what the Board would have done. But I think the evidence that we have, that we have been able to present demonstrates that link better than Mr. Cheyer's testimony would be able to.

Paper 43, 114:12–116:26.

Petitioner also points to evidence that potentially undermines a nexus between the challenged claims of the ’115 patent and the Siri application. For example, Petitioner argues that “Adam Cheyer testified that ‘Siri’ did not implement the agent registry functionality described in the ’115 Patent.” Reply 84 (citing Ex. 2034, 46:12-47:5). Likewise, Petitioner argues, “an email authored by Adam Cheyer indicates that as of August 2005 OAAv2 had only been adapted to run on ‘Windows CE’ mobile devices—there is no

mention of iOS, Apple, or any other mobile platforms." Reply 84 (citing Ex. 1137).

Petitioner also argues that Patent Owner's "evidence credits the CALO project with being the progenitor of the ideas that led to Siri—not any version of OAA." Reply 84 (citing Ex. 2042, 1 ("Siri traces its origins to a military-funded artificial-intelligence project called CALO"); Ex. 2044, 1; Ex. 2047, 2; Ex. 2054, 1; Ex. 2001, 2). "Nor is there any evidence in the record," Petitioner argues, "that OAA was ultimately utilized in SRI's CALO project other than that the original OAA (*i.e.*, the version first created in 1994 prior to the '115 Patent work) laid 'groundwork' for what would ultimately become CALO." Reply 84 (citing Ex. 2054). Petitioner argues that "substantial evidence shows that a later agent system named "SPARK" (SRI Procedural Agent Realization Kit) was used as the basis of CALO," but that Patent Owner "ignores this intervening SPARK system and makes no attempt to show it practices the claims, nor does it meaningfully address the CALO project." Reply 85 (citing Ex. 1136 §7).

Petitioner argues that Patent Owner "failed to provide evidence 'that the industry praised a claimed invention or a product that embodies the patent claims.'" Reply 85 (quoting *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016) (emphasis omitted). In particular, Petitioner argues, Patent Owner "failed to 'establish that the evidence relied upon traces its basis to a novel element in the claim and not to something in the prior art.'" Reply 85 (quoting *BioMarin Pharm. Inc. v. Genzyme Therapeutic Prods. LP*, IPR2013-00537, Paper 79, 22 (PTAB Feb. 23, 2015) (emphasis omitted).

"Furthermore," Petitioner argues, Patent Owner "has provided no showing that the Siri App 'embodies the claimed features and is co-

extensive with them,' and accordingly can gain no presumption from any Siri success." Reply 85–86 (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018) (emphasis omitted). "Even assuming portions of Siri embodied the claims," Petitioner argues, "the record is undisputed that Siri provides significant functionality well beyond anything covered by the claims—voice recognition, for example." Reply 86.

Petitioner further argues "the table provided by [Patent Owner] merely lists unrelated claim language and 'examples' of 'personal context awareness' with no further analysis." *Id.* at 87. "For example," Petitioner argues, Patent Owner "provides no explanation about how the alleged 'Personal Context Awareness' feature in Siri practices 'a layer of conversational protocol.'" *Id.* Moreover, Petitioner argues, "despite claiming that 'the Siri application's integration of personal context awareness is made possible because of the claimed inter-agent language limitations,' [Patent Owner] provides no evidence. [Patent Owner] cites only to a single paragraph of Dr. Medvidovic's declaration, which is itself bare *ipse dixit* and further undermined by his failure to examine the source code or any other descriptive technical materials for Siri." *Id.* at 88 (citing Ex. 2032 ¶ 222).

Petitioner argues that Patent Owner's evidence that Siri embodies the ICL limitations of claim 1 "is no better." Reply 88 (citing Resp. 140). Petitioner argues Patent Owner:

> does not discuss the actual limitations of claim 1 nor explain how giving different answers depending on individual preferences embodies the claims. For example, [Patent Owner] does not even attempt to articulate how Siri has a conversational layer, or event types, or how those event types are refined by parameters. Nor does [Patent Owner] address how Siri embodies the claimed

> agent registry limitation, particularly when the testimony of the inventor Mr. Cheyer indicates that it does not.

Reply 88 (citing Ex. 2034, 46:12–47:5).

Petitioner argues that Dr. Medvidovic's testimony should be given no weight. Reply 89. Petitioner argues that:

> Dr. Medvidovic admitted that he would be unable to determine whether a piece of software was an "agent" without examining the source code for that software, and further admitted that he had not reviewed the Siri source code nor ever asked to review such source code. Ex. 1129, 11:9–16. Yet, Dr. Medvidovic opines at length that Siri must embody the claims of the '115 Patent because, for example, "personal context awareness and service delegations are made possible by the functionality claimed in the independent claims of the '115 Patent"—an opinion without any evidentiary support. Ex. 2032 ¶ 220. Indeed, by Dr. Medvidovic's own admission, he lacks the necessary personal knowledge to opine on the architecture of Siri.

Reply 89.

In its Sur-reply, Patent Owner argues that there is "no prohibition against the use of circumstantial evidence in IPR proceedings." Sur-reply 66. Patent Owner argues, "Dr. Medvidovic provided unrebutted testimony, including a lengthy appendix, supported by this evidence, which must be credited. *Id.* at 68 (citing Ex. 2032, §§ 205-229, App. A). Patent Owner also points out that "Dr. Medvidovic testified that looking at the code is not the exclusive means of identifying an agent – other available information can be utilized." Sur-reply 69; *See* Ex. 1129, 10:14–11:16. Moreover, Patent Owner argues, "under the *Garmin* factors, Patent Owner was unable to seek Apple's highly confidential source code in connection with these proceedings." Sur-reply 70 (citing *Garmin Int'l, Inc. v. Cuozzo Speed Techs., LLC,* IPR2012-00001, Paper 26 at 6–7 (PTAB Mar. 5, 2013). With respect to Mr. Cheyer's testimony, Patent Owner explains that "Patent

Owner was only able to depose Mr. Cheyer after the Board granted Patent Owner's motion under 37 C.F.R. § 42.52(a) for leave to serve a subpoena to compel Mr. Cheyer to testify" in a related proceeding. Sur-reply 71.

We agree with Petitioner that Patent Owner does not to provide persuasive evidence that the Siri application is reasonably commensurate with the scope of the challenged claims. Patent Owner's cited evidence attempting to tie the Siri application to the limitations of claim 1 relies substantially on the testimony of Dr. Medvidovic (Ex. 2032) and a web.archive .org Internet page (Ex. 2040) Patent Owner identifies as "Siri, Inc., Technology – "About Siri – Your Virtual Personal Assistant." *See* Resp. 136–140 (citing Ex. 2032 ¶¶ 216–222, 224; Ex. 2040).

We note at the outset that Dr. Medvidovic's opinion does not rely on an examination of the Siri application's source code. During his deposition, Dr. Medvidovic testified as follows:

> [Q] Let me ask you, have you ever reviewed the Siri source code?
>
> [A] I have not.
>
> [Q] So you don't know the details of how Siri is implemented?
>
> [A] Not beyond what I'm stating in the declaration as my sources of information that I'm drawing on.

Ex. 1129, 146:10–17. This is significant because Dr. Medvidovic testified at his deposition that an "agent"—an element in every claim—is a "piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer a clearly identifiable body of code," and that "if there is no accompanying specification language, then we would have to look inside the code [to determine] what kinds of facilities the agent provides." *See* Ex. 1129, 9:13–11:8. As far as we can determine, neither party has provided "accompanying specification language" for the Siri

application source code. Instead, Dr. Medvidovic testified, the evidence he relied upon to form his opinion is "circumstantial," or a "suggestion." *See* Ex. 1129, 147:7–148:9.

In Section XI.B of his declaration, "Nexus of Industry Praise to the Independent Claims of the '115 Patent," Dr. Medvidovic cites to Exhibit 2040 as support for his understanding of how the Siri application works. *See e.g.*, Ex. 2032 ¶¶ 215–216, 218, 226, 229.

Exhibit 2040 describes "Siri" as:

> the first mainstream consumer application of a Virtual Personal Assistant. Siri is an intelligent software agent designed to have a back-and-forth conversational interaction with you as it helps you get tasks done. The three main technical components behind Siri's differentiation correspond to the essential qualities of an assistant: a conversational interface, personal context awareness and service delegation.

Ex. 2040, 1.

In his declaration, Dr. Medvidovic discusses the "personal context awareness" and "service delegation" aspects of Siri in some detail (s*ee, e.g.*, Ex. 2032 ¶¶ 216–220, 222–229). Dr. Medvidovic, however, only mentions Siri's "conversational interface" in passing, even though Exhibit 2040 describes Siri as an intelligent software agent "designed to have a back-and-forth conversational interaction with you as it helps you get tasks done," and lists Siri's "conversational interface" as the first of Siri's "three main technical components." *See* Ex. 2032 ¶ 215; Ex. 2040, 1.

In his declaration, Dr. Medvidovic attempts to link the Siri application and the limitations of the independent claims of the '115 patent. *See* Ex. 2032 ¶¶ 205–229, App. A, 1–32. Dr. Medvidovic does this by first separating the limitations of independent claims 1 and 29 into two categories, an "Inter-agent Communication Layer" (ICL) and "Service

Request Planning and Execution." *See* Ex. 2032, 70–71. Dr. Medvidovic then states that "[i]t is my opinion that the Siri application's integration of personal context awareness is made possible because of the claimed ICL." *Id.* ¶ 222. Dr. Medvidovic explains that "[w]ithin the conversational protocol layer of the ICL, there are further claimed "parameter lists" that may "further refine the one or more events." *Id.* ¶ 223. Dr. Medvidovic concludes that "[t]he claimed parameter lists are what allows the Siri application to provide 'different answers' depending on [the] context, as they are able to refine the meaning of a service request." *Id.* ¶ 226. Dr. Medvidovic, however, provides no citation or further support for this conclusion nor does he point to any evidence to show that the Siri application utilizes the claimed parameter lists. *See id.*

In his declaration, Dr. Medvidovic also states that "[i]t is further my opinion that the Siri application's integration of service delegation is made possible because of the claimed service request planning and execution claim limitations." *Id.* ¶ 227. Dr. Medvidovic attempts to support this opinion by comparing the language of claim 1 relating to a goal satisfaction plan that includes "a suitable <u>delegation</u> of sub-goal requests to <u>best complete</u> the requested service request by using <u>reasoning</u>" to language used in Exhibit 2040 to describe the service delegation feature of the Siri application, "Service <u>Delegation</u>. An assistant can <u>reason</u> about what specific sets of resources of <u>services</u> would <u>best</u> be combined to help you <u>accomplish</u> a particular task." *See id.* ¶ 229; Ex. 2040, 2.

In our view, such a comparison is speculative at best to demonstrate that the Siri application utilizes claim 1's "service request planning and execution limitations," as Dr. Medvidovic opines. The limitations of claim 1 that Dr. Medvidovic puts in this category include:

> A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents, comprising the acts of:
>
> registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities,
>
> receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrary complex goal expression;
>
> dynamically interpreting the arbitrarily complex goal expression, said act of interpreting further comprising:
>
> generating one or more sub-goals expressed in the inter-agent language;
>
> constructing a goal satisfaction plan wherein the goal satisfaction plan includes:
>
> a suitable delegation of sub-goal requests to best complete the requested service request-by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and
>
> dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent.

Ex. 2032, 70. Yet, Dr. Medvidovic does not persuasively show that the Siri application "register[s] a description of each active client agent's functional capabilities," "receiv[es] a request for service . . . in the form of an arbitrary complex goal expression," "generat[es] one or more sub-goals expressed in the inter-agent language," "construct[s] a goal satisfaction plan," or "dispatch[es] each of the sub-goals to a selected client agent . . . based on a match between the sub-goal . . . and the registered functional capabilities of the selected client agent." *See id.* ¶¶ 227–229.

In fact, as Petitioner points out, there is evidence of record that the Siri application did not utilize the claimed agent registry functionality as Dr.

Medvidovic opines. According to Petitioner, Mr. Cheyer, the named co-inventor on the ’115 patent and the co-founder of Siri, Inc., “testified that ‘Siri’ did not implement the agent registry functionality described in the ’115 Patent.” Reply 84 (citing Ex. 2034, 46:12-47:5). At a deposition in a related proceeding, Mr. Cheyer testified as follows:

> BY MR. HENDERSHOT:
> Q. So you say "it's likely." Are there features in OAA that you think have yet to be implemented in systems today?
> MR. HARTSELL: Objection; form.
> BY MR. HENDERSHOT:
> Q. Commercial voice-assistance systems.
> MR. HARTSELL: Objection; form --
> THE WITNESS: Yes.
> MR. HARTSELL: -- relevance, outside the scope of direct.
> THE WITNESS: Yes.
> BY MR. HENDERSHOT:
> Q. Could you describe those?
> MR. HARTSELL: Same objections.
> THE WITNESS: Every system is different, but one feature of the original OAA 1 demo was that independent agents -- today we would call them more like web services -- could connect dynamically to the -- to the platform, register new capabilities with that platform, and without knowing about other services on the network, explicitly, the user could

> make a single request that would be -- that would
> involve a collaboration, and sometimes competition,
> among those network ecosystem of services.
> And so one user request would be delegated
> to many services which were independently developed,
> and none of those services knew precisely about each
> other. And that when I look at Siri and Google
> Assistant and Alexa and Bixby, that is not a
> capability that I have seen in any of the services
> today.

Ex. 2034, 45:24–46:2, 46:12–47:5

Petitioner also points out, and we agree, that there is evidence of record that credits the CALO project with being the progenitor of the ideas that led to Siri. *See, e.g.*, Ex. 2042, 1 ("Siri traces its origins to a military-funded artificial-intelligence project called CALO"); *see also* Ex. 2044, 1; Ex. 2047, 2; Ex. 2054, 1; Ex. 2001, 2). Opus Research explains that "Siri is set apart because it applies the depth of knowledge its founders and software specialists have built at SRI and elsewhere in creating a "cognitive assistant that learns and organizes" (CALO). Ex. 2044, 1. Petitioner points out that there is also evidence of record that indicates a later agent system named "SPARK" (SRI Procedural Agent Realization Kit) was used as the basis of CALO. *See* Ex. 1136 § 7. The SPARK-based Personal Assistant is described as follows:

> SPARK provides general-purpose agent technology for a range of domains that require reactive task execution. To date, the driving application for SPARK has been the development of an intelligent personal assistant for a high-level knowledge worker. This assistant, called CALO, will be able to perform routine tasks

> on behalf of its user (e.g., arrange meetings, complete online forms, file email), as well as undertake open-ended processes (e.g., purchasing a computer online), and anticipate future needs of its user.

Ex. 1136 § 7. This evidence, however, does not appear to have been considered or addressed by Dr. Medvidovic. *See* Ex. 2032 ¶¶ 205–229.

We are mindful that objective evidence of nonobviousness need only be "reasonably commensurate with the scope of the claims." *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013). We also bear in mind that "[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process—the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).

Here, Patent Owner relies on industry praise for the Siri application and evidence of an unmet need to establish a nexus between the Siri application and the claimed invention. However, we are concerned that Patent Owner and its declarant, Dr. Medvidovic, pay little attention to one of the "three main technical components behind Siri's differentiation," the "conversational interface," when evaluating the basis for the proffered "industry praise." *See* Ex. 2040, 1.

Petitioner argues, and we agree, that "[e]ven assuming portions of Siri embodied the claims, the record is undisputed that Siri provides significant functionality well beyond anything covered by the claims—voice recognition, for example." Reply 86. The impact of Siri's "conversational interface" on Siri's reviewers is notable. For example, MIT Technology Review explains that with Siri, "[u]sers can type or speak commands in

casual sentences, and the software deciphers their intent from the context." Ex. 2042, 1. Opus Research reports that "I've had [Siri] for a couple of days and here are my initial reactions. My overall experience has been quite positive. The quality of voice recognition (powered by the same "engine" that supports Dragon Dictation and Dragon Search on the iPhone) is quite good." Ex. 2044, 1. Fast Company.Com reports, "Siri, which launches today as a free iPhone app, is a virtual personal assistant that amazingly resembles . . . an actual personal assistant. It understands plain English commands, which can be spoken or typed (e.g. "Get me tickets to that Matt Damon movie"). Ex. 2045, 2.

Further, The Chronicle of Higher Education explains that Siri "takes a multi-step search process and turns it into one, simple, voice-driven request." Ex. 2046, 2. USA Today reported that "[t]here were occasional mistakes in speech recognition, but the overall accuracy [of Siri] was impressive, at least when I spoke slowly and clearly in a quiet environment." Ex. 2047, 2. Spatial Computing Strategy & Research reports that, with Siri, "You ask it to do stuff like 'find me a pizza place near me' or 'tell me the weather in Chicago this weekend,' [w]ith your voice or by typing commands." Ex. 2048, 2. Search Engine Land explains that Siri is "intended to enable you to do more with your voice and your phone in fewer clicks or moves." "[O]ne can speak to Siri in a more natural way. Rather than speaking like a robot and saying 'Open Table' to minimize error, you can say something more elaborate and 'conversational' such as, 'I'd like a reservation tonight around 7:30 at Le Cheval.'" Ex. 2050, 2.

Each of these reported examples indicate that the reviews Patent Owner relies upon to demonstrate "industry praise" for the Siri application considered Siri's conversational interface to be a significant part of its

functionality. Unfortunately, Patent Owner and Dr. Medvidovic give Siri's "conversational interface" little, if any, consideration when evaluating the reasons for the "industry praise" used to try and establish a nexus between the Siri application and the claimed invention. *See, e.g.,* Ex. 2032 ¶ 215. Even if the Siri application incorporated some of the functionality of the claimed invention, the evidence of record relied on by Patent Owner shows that the Siri application, and its attendant "industry praise," is not reasonably commensurate with the scope of the claimed invention. Patent Owner does not argue that the Siri application's "conversational interface" is claimed by the '115 patent.

For these reasons, we are not persuaded that Patent Owner's evidence of industry praise for the Siri application, and evidence of an unresolved need, establishes a sufficient nexus between the Siri application and the challenged claims of the '115 patent. If anything, the evidence of record establishes only a weak or vague connection between the Siri application and the claimed invention.

7. *Independent Claim 1*

Claim 1 is directed to a method for communication and cooperative task completion among distributed electronic agents comprising the steps of registering a description of each active client agent's functional capabilities using an inter-agent language, receiving a request for service as a base goal in the form of an arbitrarily complex goal expression in the inter-agent language, and dynamically interpreting the arbitrarily complex goal expression. Ex. 1001, 29:10–43. Claim 1 also recites that the "inter-agent language" includes a "layer of conversational protocol" and a "content layer." *Id.* at 29:16–24. In addition, claim 1 recites that the step of "dynamically interpreting the arbitrarily complex goal expression"

comprises "generating sub-goals" and "constructing a goal satisfaction plan." *Id.* at 29:28–32. The recited "goal satisfaction plan" in turn includes "a suitable delegation of sub-goal requests" and "dispatching each of the sub-goals to a selected client agent for performance." *Id.* at 29:32–41.

In its proposed combination of Kiss with FIPA97, Petitioner relies on Kiss to teach electronic agents and their general communication and collaboration functions, including the steps recited in claim 1, whereas FIPA97 is relied upon to teach the recited "inter-agent language" and the limitations relating to the inter-agent language, such as "layer of conversational protocol," a "content layer," an "arbitrarily complex goal expression," and "sub-goals expressed in the inter-agent language." Pet. 28, 32–54.

*a. Preamble*

Claim 1 recites a preamble as follows: "A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents."[15] Petitioner asserts that Kiss teaches the recited "distributed electronic agents" because Kiss describes that "[i]nteraction between a user and the knowledge resources is mediated by a collection of cooperative intelligent agents" (Pet. 32 (citing Ex. 1005, 2:43–49, Fig. 1)), where the agents are "distributed" in a "hierarchical architecture." *Id.* (citing Ex. 1005, Abstract, 2:50–55, 4:57–59).

Petitioner contends that Kiss also teaches the recited "communication and cooperative task completion" among the electronic agents because Kiss

---

[15] Because Petitioner shows that the recitations in the preamble are satisfied by Kiss, we need not determine whether the preamble is limiting. *See Vivid Techs.*, 200 F.3d at 803.

describes that "cooperative intelligent agents [that] incorporate generalized automated negotiation and distributed inference (i.e. problem-solving) processes," analyze "problem statements," and reorganize them as "sets of tasks." Pet. 33 (citing Ex. 1005, 2:50–55).

Patent Owner does not specifically dispute that Kiss teaches the preamble of claim 1. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches the preamble of claim 1.[16]

*b. Registering a Description*

The first step recited in claim 1 is "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities." Ex. 1001, 29:13–15. Petitioner asserts that Kiss teaches this limitation because Kiss describes a "registry of agents," which is constructed through "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities." Pet. 34 (citing Ex. 1005, 3:37–45, 6:66–7:19, 8:41–48, 10:32–35, 12:18–20, Fig. 1).

Patent Owner does not specifically dispute that Kiss teaches this "registering a description" limitation. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches

---

[16] We also find that Patent Owner has waived any argument directed to the preamble of claim 1. *See* Paper 16 (Scheduling Order), 7 ("Patent Owner is cautioned that any arguments for patentability not raised in the response may be deemed waived.").

"registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities," as recited in claim 1.[17]

*c. An Inter-agent Language Including a Layer of Conversational Protocol and a Content Layer*

Claim 1 recites that "registering a description of each active client agent's functional capabilities" is performed using an "expandable, platform-independent, inter-agent language" (Ex. 1001, 29:13–16) and that the "inter-agent language" includes:

> a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events;
>
> a content layer comprising one or more of goals, triggers and data elements associated with the events.

*Id.* at 29:16–24. Petitioner asserts that FIPA97's ACL teaches each of these limitations relating to an "inter-agent language." Pet. 34–43.

Patent Owner asserts that FIPA97 does not teach "refin[ing] . . . events" and "triggers" recited in the claim. Resp. 97–108. In addition, Patent Owner argues that FIPA ACL is not "expandable" because, among other reasons, FIPA ACL does not have the capability of refining events. *Id.* at 105–106. Patent Owner does not dispute FIPA97 teaches the rest of the limitations relating to an "inter-agent language" recited in clam 1, as set forth above. *See id.* at 95–108.

---

[17] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

*i. Inter-agent Language*

Petitioner relies on Agent Communication Language of FIPA97 (FIPA ACL) as teaching the "inter-agent language" recited in claim 1. Pet. 28 (citing Exs. 1006, 1007, 1008), 35. In particular, Petitioner contends that FIPA97 discloses Agent Communication Language (ACL) "with precisely defined syntax, semantics and pragmatics" for "communication between independently designed and developed software agents." *Id.* at 35 (citing Ex. 1007, 3).

*ii. Platform-independent, Expandable Inter-agent Language*

Petitioner asserts that FIPA ACL is "platform-independent," as recited in claim 1, because it is designed to "maximise interoperability across agent-based applications, services and equipment," and to facilitate the "construction and management of an agent system composed of different agents," even when those systems are "built by different developers." Pet. 35 (citing Ex. 1007, vii, ix). Patent Owner does not dispute that FIPA ACL is "platform-independent," as recited in the claim. *See* Resp. 95–108.

Petitioner also contends that FIPA ACL is "expandable," as recited in claim 1, because in FIPA97 "[a]gents may use communicative acts with other names, not defined" in the specification (Pet. 35 (citing Ex. 1007, 12)) and agents "may choose to implement any subset (including all, though this is unlikely) of the pre-defined message types and protocols" (*id.* (citing Ex. 1007, 12)). In addition, Petitioner asserts that in FIPA97 the "formal basis" of the language is "supplemented with pragmatic extensions" that help "ease the practical implementation of effective inter-agent communications." *Id.* (citing Ex. 1007, 11). Petitioner argues that FIPA97

also discloses possible extensions to the inter-agent communication language, such as MIME header support. *Id.* (citing Ex. 1007, 82).

Patent Owner asserts that FIPA ACL is not "expandable" basically for two reasons. Resp. 105–106. First, citing the prosecution history, Patent Owner argues that "the concept of expandability" relates to the feature of "refin[ing] . . . events" recited in the claim and that FIPA ACL is not "expandable" because FIPA ACL does not have the capability of refining events. *Id.* Second, Patent Owner contends that FIPA ACL is not "expandable" in a general sense, citing various criticism of FIPA ACL from "[r]esearchers in the field" regarding FIPA ACL's alleged rigidity and inflexibility in certain aspects. *Id.* at 106. We address each of these arguments in turn.

Addressing first Patent Owner's argument about "the concept of expandability" as it relates to the feature of "refin[ing] . . . events" recited in the claim, Patent Owner cites the following statement by the Examiner in the Notice of Allowability:

> The disclosed agent communication language [KQML] does not read upon the cited agent language because the layer does not define an event type as well as the parameter lists that further *refines the event*. Nwana's language at best has separate layers for the event and the parameters associated with the event. By Applicant providing these parameters in the same layer as the event such that they further *refine the event*, a standard set of events are *dynamically extensible* based upon the parameter list which is not possible with the teachings of Nwana. Therefore, the claims are allowable over the prior art of record.

Ex. 1002, 14 (emphases added); Resp. 105 (citing Ex. 1002, 14). As indicated in the Amendment submitted before the allowance of the claims, claim 1 was amended to recite "wherein the parameter lists further refine the one or more events" to distinguish the claim from the combination of

Nwana/KQML and Kiss cited by the Examiner. *See* Ex. 1002, 13–14, 18, 28, 51. Patent Owner argues, therefore, that the limitation "expandable" recited in claim 1 relates to the feature of the parameter lists that "refine . . . events," as recited in the claim. Resp. 105. Patent Owner asserts that FIPA ACL is not "expandable," as recited, because FIPA ACL does not teach parameters that further refine events. *Id.*

In response, Petitioner asserts that the claim language "*using an **expandable**, platform-independent, inter-agent language*" was part of the originally filed claims, which were rejected by the Examiner over the combination of Nwana/KQML and Kiss. Reply 59–60 (citing Ex. 1002, 763). Petitioner argues that, therefore, the Examiner's discussion of "dynamically extensible" events resulting from the "refin[ing] . . . events" feature added in the Amendment is unrelated to the "expandable" language that was present in the claim as originally filed. *Id.* at 60. Petitioner also asserts that, even if the "expandable" language relates to the "refin[ing] . . . events" feature, FIPA ACL is "expandable" because FIPA ACL teaches parameter lists that refine events. *Id.*

We need not determine whether the "expandable" language relates to the "refin[ing] . . . events" feature added in the Amendment because, as discussed below, we agree with Petitioner that FIPA ACL teaches "parameter lists" that "further refine the one or more events," as recited in claim 1. Thus, to the extent Patent Owner asserts that the limitation "expandable" recited in claim 1 relates to the feature of the parameter lists "refin[ing] . . . events," Petitioner demonstrates sufficiently that FIPA ACL teaches an "expandable . . . inter-agent language."

Turning to the Specification, the '115 patent describes that "[a]s new agents connect to the facilitator, *registering* capability specifications and

natural language vocabulary, what the user can say and do *dynamically changes*; in other words, the ICL is dynamically *expandable*." Ex. 1001, 8:41–44 (emphases added). That is, the '115 patent suggests that the expandability of the ICL (or "inter-agent language," as recited in claim 1) results from or flows from the ICL's feature of "registering capability specifications and natural language vocabulary."[18] *Id.* As noted in the Institution Decision, this portion of the Specification appears to describe an exemplary embodiment. Inst. Dec. 54 (citing Ex. 1001, 8:40–49).

As discussed above, Petitioner demonstrates sufficiently Kiss teaches "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities," as recited in claim 1. Thus, to the extent the portion of the Specification discussed above describes an embodiment of an "expandable . . . inter-agent language," we are persuaded that the combination of Kiss and FIPA97 teaches "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language," as recited in claim 1 (*see* Pet. 33–35).

Next, Patent Owner asserts that FIPA ACL is not "expandable" in a more general sense, citing various "criticisms" from "[r]esearchers in the field" about FIPA ACL's alleged "rigidity and lack of expandability." Resp. 106 (citing Ex. 2031, 2 ("[i]t is unlikely that a single set of axioms will cover all eventualities because communication is inherently context dependent");

---

[18] As described in the Specification, agents connecting to the facilitator is part of the operation of the system of the '115 patent, not a feature of the ICL. *See* Ex. 1001, 6:24–44; 7:13–32.

Ex. 1081, 2 ("[T]he current FIPA-ACL spec tends to unnecessarily over-constrain the feasibility of communication acts . . . ."). Patent Owner also contends that Petitioner's declarants, Dr. Finin and Dr. Lieberman, made allegedly similar statements. *Id.* (citing Ex. 1082, 2 ("The FIPA proposal only covers the most rudimentary message types."); Ex. 2014, 207:5–20 ("FIPA is a standard, like a miles-per-gallon standard . . . So that doesn't say how you're going to build a car; it just says a car has to get . . . 50 miles a gallon.")).

We are not persuaded by Patent Owner's argument and evidence because Patent Owner does not explain adequately why the cited extrinsic evidence regarding FIPA ACL's alleged "rigidity" or inflexibility in certain aspects shows that FIPA ACL is not "expandable" as recited in the claim. In the Institution Decision, based on the preliminary record, we did not find anything in the intrinsic record that justifies deviating from the plain meaning of the claim term "expandable." Inst. Dec. 54–55. Upon considering the complete record, we discern no reason to depart from our preliminary assessment.[19]

We may "at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any

---

[19] In the Patent Owner Response, Patent Owner does not discuss the Specification or argue that the meaning of "expandable" recited in the claim can be discerned from the Specification, although we invited the parties in the Institution Decision to address the term "expandable" further in their papers during trial. *See* Resp. 105–107 (citing Inst. Dec. 55–56). Thus, Patent Owner has waived its argument regarding the meaning of "expandable" based on any disclosures in the Specification. *See* Paper 16, 7.

definition found in or ascertained by a reading of the patent documents." *Phillips*, 415 F.3d at 1322–23 (citation omitted). Accordingly, in the Institution Decision, finding no readily discernable meaning of "expandable" in the intrinsic record, we consulted a technical dictionary, the 7th edition of the IEEE Dictionary (Ex. 3001).[20] The IEEE Dictionary defines "expandability" as follows: "**expandability (1) (supervisory control, data acquisition, and automatic control)** The capability of a system to be increased in capacity or provided with additional functions. **(2)** *See also:* extendability." Ex. 3001, 3.[21] The same dictionary defines "extensible language" as follows.

> A computer language that can be altered or can alter itself to provide a programmer with additional user-specified functions or capabilities. Examples include Ada, ALGOL, FORTH, and LOGO, because each can be used in a building block fashion to construct increasingly complex functions.

*Id.* at 4. Upon considering the complete record, we determine that these dictionary definitions are consistent with the intrinsic record, including the description of an embodiment in the Specification regarding "the ICL [being] dynamically expandable." *See* Ex. 1001, 8:41–44.

In the Institution Decision, based on the preliminary record, we found that the characteristics of FIPA ACL argued by Petitioner—such as the ability to use communicative acts with other names not defined in the language specification, the pragmatic extensions, and the MIME

---

[20] IEEE 100 THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS (7th ed. 2000) (Ex. 3001).

[21] The page numbers for Exhibit 3001 refer to the page numbers inserted in the bottom, right-hand corner of each page.

extension—appear to fall within the plain meaning of the term "expandable," as defined in the IEEE Dictionary. Inst. Dec. 55; *see* Pet. 35 (citing Ex. 1007, 11, 12, 82). Patent Owner does not argue otherwise. *See* Resp. 105–107. Based on the complete record and for the reasons discussed above, we determine that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language," as recited in claim 1.

*iii. A Layer of Conversational Protocol Defined by Event Types and Parameter Lists Associated With the Events*

Claim 1 recites that the "inter-agent language" includes "a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events." Ex. 1001, 29:16–21. Petitioner contends that FIPA97 teaches each of these limitations. Pet. 36–41. Patent Owner asserts that FIPA97 does not teach "the parameter lists further refine the one or more events," as recited in claim 1. Resp. 97–107.

(1) <u>A Layer of Conversational Protocol</u>

Petitioner asserts that FIPA97 teaches "a layer of conversational protocol" recited in claim 1 because FIPA ACL "defines the semantics of *messages* between agents as including a communicative act, followed by various parameters and parameter expressions," as shown in Figure 1 of Part 2 of FIPA97 reproduced above in the Overview of FIPA97 section (§ III.C.2.). Pet. 36 (emphasis added) (citing Ex. 1007, 2; Ex. 1003 ¶ 235). Petitioner also argues that FIPA97 "discloses a number of different

performatives and rules governing FIPA ACL messages and the meaning of the different parts" and, therefore, discloses "a layer of conversational protocol." *Id.* at 36–37 (citing Ex. 1007, 11–22; Ex. 1003 ¶¶ 236–239).

(2) Events and Event Types

As discussed above in Section III.B. (Claim Construction), we construe "event" to mean "a message or goal communicated between agents" and "event type" to mean "a type of an event" for this Final Written Decision.

Petitioner maps the "event" of claim 1 to FIPA ACL's "message" and asserts that FIPA ACL's "message type" teaches an "event type" recited in claim 1. Pet. 37–38 (citing Ex. 1007, 3, 4, 11–13, 18; Ex. 1003 ¶¶ 243, 246, 247). Petitioner argues that FIPA ACL's "message" is an "event" recited in claim 1 because the FIPA ACL communicative acts "are performed by an agent sending a *message* to another agent." *Id.* at 37 (emphasis added) (citing Ex. 1007, 3, 4, 11; Ex. 1003 ¶ 243).

Referencing Figure 1 of Part 2 of FIPA97 reproduced above, Petitioner asserts that in FIPA ACL, "[t]he first element of the message is a word which identifies the communicative act being communicated, which defines the principal meaning of the message," and "the message's communicative act *type* corresponds to that which in KQML is called the performative." Pet. 37 (emphasis added) (citing Ex. 1007, 12, 13; Ex. 1007 ¶ 244). Petitioner argues that FIPA97 further defines "message type" as corresponding to the "communicative acts/performatives of the FIPA ACL." *Id.* at 38 (citing Ex. 1007, 18; Ex. 1003 ¶ 246).

As discussed above, Petitioner asserts that FIPA97 teaches "a layer of conversational protocol" because FIPA ACL "defines the *semantics of*

*messages* between agents as including a communicative act." Pet. 36 (emphasis added) (citing Ex. 1007, 12). Petitioner contends that FIPA97 teaches the layer of conversational protocol in FIPA ACL is "defined by event types," as recited in claim 1, because in FIPA97, "**[t]he <u>message types</u> are a reference to <u>the semantic acts</u> defined in this specification**." *Id.* at 37–38 (underlined emphases added) (citing Ex. 1007, 11).

(3) <u>Parameter Lists</u>

Claim 1 recites that "a layer of conversational protocol" is also "defined by . . . parameter lists associated with one or more of the events." Petitioner asserts that in FIPA97, FIPA ACL messages may include multiple different parameters ("parameter lists associated with one or more of the events") that can "help the message transport service to deliver the message correctly" or "the receiver to interpret the meaning of the message," or "to respond co-operatively," as shown in Figure 1 of Part 2 of FIPA97 (reproduced above). Pet. 38–39 (citing Ex. 1007, 12, 14, Fig. 1). Petitioner contends that FIPA97 discloses additional parameters in Table 1. *Id.* at 39 (citing Ex. 1007, 13–14).

(4) <u>Refining Events</u>

Claim 1 recites that "the parameter lists further refine the one or more events." Petitioner asserts that this phrase should be construed to mean that "a list of parameters associated with an event can refine the event by affecting the meaning of the event." Pet. 13. Petitioner discusses the disclosures in the Specification and the prosecution history of the '115 patent in support of its proposed construction. *Id.* at 13–16 (citing Ex. 1001, 11:2–37; Ex. 1002, 13–14, 51, 55; Ex. 1020, 5, 6; Ex. 1003 ¶¶ 90, 91, 93–98).

Although Patent Owner discusses constructions for six terms in the Patent Owner Response, Patent Owner does not discuss Petitioner's proposed construction for the claim term "refine . . . events" or proposes its own construction. *See* Resp. 24–38. Instead, Patent Owner argues that FIPA97 does not teach parameters that "refine . . . events" under Petitioner's proposed construction. *See* Resp. 97–98 ("the cited parameters in FIPA97 do not, contrary to Petitioner's assertion, affect the meaning of the message"), 100 ("this parameter **does not** affect the **meaning** of the message"), 102 ("In contrast, the FIPA97 "receiver" parameter **does not affect the meaning of the "inform" communicative act**."). Based on the arguments and evidence presented by Patent Owner, we understand Patent Owner not to dispute Petitioner's proposed construction for the term "the parameter lists further refine the one or more events."[22]

Upon considering the complete record, we agree with Petitioner that the claim term "refine . . . events" encompasses "affecting the meaning of the events." As discussed above, during prosecution, the limitation "wherein the parameter lists further refine the one or more events" was added to claim 1 in an amendment to distinguish the claim from the combination of Nwana/KQML and Kiss cited by the Examiner. *See* Ex. 1002, 13–14, 18, 28, 51; Pet. 14–16 (citing Ex. 1002, 13–14, 51); Resp. 105 (citing Ex. 1002, 14). Citing the disclosures of Nwana/KQML discussed by the Examiner, Petitioner persuasively argues that the parameters of Nwana's KQML message (i.e., the claimed "event") "tell" do not change the meaning of the message, whereas the parameters of an event of the '115 patent's change the

---

[22] We also find that Patent Owner has waived any argument regarding claim construction of this term. *See* Paper 16, 7.

meaning of the event by "refin[ing] the event." Pet. 14–16 (citing Ex. 1002, 13–14, 51, 55; Ex. 1020, 5, 6). In support of its argument, Petitioner cites the following passage from the Specification that distinguishes the '115 patent's ICL (i.e., the recited "inter-agent language") from KQML.

> For example, in KQML, a request to satisfy a query can employ either of the performatives ask_all or ask_one. In ICL, on the other hand, this type of request preferably is expressed **by the event type evost solve, together with the solution_limit(N) parameter--where N can be any positive integer**. (A request for all solutions is indicated by the omission of the solution limit parameter.) [The request can also be accompanied by other parameters, which combine to further refine its semantics.] In KQML, then, this example forces one to choose between two possible conversational options, neither of which may be precisely what is desired. In either case, the performative chosen is a single value that must capture the entire conversational characterization of the communication.

Pet. 13 (alteration and underlined emphasis added) (quoting Ex. 1001, 11:21–37). Petitioner argues that a message having the KQML performative "ask_all" always has the same meaning, requesting all solutions to the request, just as the KQML performative "ask_one" always requests one solution. *Id.* at 14. According to Petitioner, in contrast, the meaning of the '115 patent's event "evost_solve" depends on the value of its parameter "solution_limit(N)"—e.g., an agent may request the identity of three agents capable of translating a document by including "solution_limit(N)" in the message and setting the value of N to 3. *Id.* Thus, Petitioner argues that the parameters of an event of the '115 patent affect the meaning of the event. *Id.* at 13–16.

We are persuaded by Petitioner's argument and evidence that the "parameterized approach" of the '115 patent (Ex. 1001, 11:16–21) can refine an event by changing the meaning of the event. As discussed above in

Section III.B., we construe "event" to mean "a message or goal communicated between agents" and "goal" to mean "a request for service." The '115 patent describes that "[i]n one embodiment, a request for one of an agent's services normally arrives in the form of an *event* from the agent's facilitator." *Id.* at 12:44–46 (emphasis added). In a section titled "Refining Service Requests," the '115 patent describes as follows:

> In a preferred embodiment of the present invention, *parameters* associated with a goal (or sub-goal) can draw on useful features to *refine the request's meaning*. For example, it is frequently preferred to be able to specify whether or not solutions are to be returned synchronously; this is done using the reply parameter, which can take any of the values synchronous, asynchronous, or none. As another example, when the goal is a non-compound query of a data solvable, the cache parameter may preferably be used to request local caching of the facts associated with that solvable.

*Id.* at 15:49–58 (emphases added). Thus, the '115 patent describes that in an embodiment, parameters of a request for service, i.e., an event, can refine the "meaning" of the request or event.

Nonetheless, we note that this passage and all of the disclosures of the '115 patent cited by Petitioner describe exemplary embodiments. *See id.* at 11:25–28 ("In ICL . . . this type of request *preferably* is expressed by the event type evost solve, together with the solution_limit(N) parameter--where N can be any positive integer." (emphasis added)), 15:49–51 ("In a *preferred embodiment* of the present invention, *parameters* associated with a goal (or sub-goal) can draw on useful features to *refine the request's meaning*." (emphases added)). Thus, the term "refine . . . events" recited in claim 1 may encompass but is not necessarily limited to "affecting the meaning of events." *See SuperGuide*, 358 F.3d at 875 ("a particular embodiment appearing in the written description may not be read into a claim when the

claim language is broader than the embodiment"); *WesternGeco*, 889 F.3d at 1323–24 ("It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise."). Indeed, Petitioner's proposed construction of the term "the parameter lists further refine the one or more events" expresses the meaning of the term in a permissive fashion—"an event *can* refine the event by affecting the meaning of the event." Pet. 13 (emphasis added).

Based on the complete record, we determine that the term "the parameter lists further refine the one or more events" encompasses parameters "affecting the meaning of the events."

Petitioner asserts that FIPA97 teaches the limitation "the parameter lists further refine the one or more events" because several of the conversational layer parameters disclosed in FIPA97 affect the meaning of the performative included within the message, and therefore affect the meaning of the message, or event. Pet. 40. According to Petitioner, FIPA97 discloses a parameter ":receiver," which "can alter the meaning [of] an event, such as 'inform,' to be 'inform one'" or "inform a number' of agents, depending on the value of the parameter." *Id.* (citing Ex. 1007, 13). Citing the testimony of Dr. Lieberman, Petitioner asserts that naming a tuple "corresponds to the action of multicasting the message" such that "semantics of this multicast" is refined so that "the message is sent to each agent named in the tuple." *Id.* (citing Ex. 1007, 13; Ex. 1003 ¶ 258). Petitioner also argues, "[t]his 'tuple naming' functionality is analogous to the example provided in the '115 Patent of 'solution_limit(N),' in which 'N' modifies how many solutions are requested, and is not found in the KQML Nwana reference that was before the examiner." *Id.* (citing Ex. 1001, 11:16–42; Ex. 1020; Ex. 1003 ¶ 258). Petitioner also asserts that FIPA97 discloses two

other parameters—":protocol" when used with the "call for proposals" performative and ":conversation-id"—that affect the meaning of a message. *Id.* at 40–41 (citing Ex. 1007, 13–14, 46–49; Ex. 1003 ¶¶ 261–265).

Patent Owner asserts that FIPA97 does not teach parameters "refin[ing] . . . events," as recited in the claim, because the parameters of FIPA97 cited by Petitioner does not affect the meaning of the message. Resp. 97–98. In particular, Patent Owner contends that FIPA97's ":receiver" parameter of the FIPA97 "inform" message relied upon by Petitioner is no different from KQML's ":receiver" parameter for the KQML "tell" message in that both modify the message but do not affect the meaning of the message. *Id.* at 98–99 (citing Ex. 1007, 12; Ex. 1020, 5). Patent Owner asserts that FIPA97's ":receiver" parameter does not affect the meaning of the FIPA97 "inform" message because "the result of this parameter is only that the message is multicast; i.e., it is 'sent to each agent named in the tuple.'" *Id.* at 100. According to Patent Owner, "the content of the message is unchanged; the only thing that changes is who (as in, recipient) receives the message." *Id.* at 101.

The portion of FIPA97 cited by Petitioner is reproduced below.

| Message Parameter: | Meaning: |
|---|---|
| :sender | Denotes the identity of the sender of the message, i.e. the name of the agent of the communicative act. |
| :receiver | Denotes the identity of the intended recipient of the message.<br><br>Note that the recipient may be a single agent name, or a tuple of agent names. This corresponds to the action of multicasting the message. Pragmatically, the semantics of this multicast is that the message is sent to each agent named in the tuple, and that the sender intends each of them to be recipient of the CA encoded in the message. For example, if an agent performs an inform act with a tuple of three agents as receiver, it denotes that the sender intends each of these agent to come to believe the content of the message. |

Ex. 1007, 13. Pointing to this disclosure in FIPA97, Petitioner asserts that the "receiver" parameter affects the meaning of the event by affecting "whether the performative communicates the message to a single agent, a selection of agents, or if [the message is] broadcast to every agent." Reply 56 (citing Ex. 1007, 13). According to Petitioner, "in FIPA97, an event using 'inform' can *mean three or more different things* (i.e., inform (1) one person, (2) a select group of people, (3) everybody) depending on the value of just that parameter." *Id.*

We agree with Petitioner's argument and disagree with Paten Owner's argument. As shown above in the portion of FIPA97 relied on by Petitioner, FIPA97 describes the "meaning" of the message affected by the ":receiver" parameter (under the column heading "Meaning:") as follows:

> Note that the recipient may be a single agent name, or a tuple of agent names. This corresponds to the action of multicasting the message. Pragmatically, the semantics of this multicast is that the message is sent to each agent named in the tuple, and that the sender *intends* each of them to be recipient of the CA encoded in the message. For example, if an agent performs an inform act

> with a tuple of three agents as receiver, it denotes that the sender *intends* each of these agent to come to believe the content of the message.

Ex. 1007, 13 (emphases added). We agree with Petitioner this passage describes, under the column heading "Meaning," the meaning of the message modified or affected by the ":receiver" parameter.

Patent Owner argues that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." Resp. 101. Patent Owner contends that, in contrast, the solution_limit(N) parameter of the '115 patent "modifies the actual request/communicative act/performative itself—i.e., **evost solve**, because it imposes a modification on the limits of **solutions** presented in response to a request." *Id.* at 102 (citing Ex. 2032 ¶161).

We are not persuaded by Patent Owner's argument. First, we disagree with Patent Owner that the FIPA97 ":receiver" parameter changes only "who (as in, recipient) receives the message." As described in FIPA97, the ":receiver" parameter does not merely specify "who receives the message," e.g., agent A as opposed agent B. Rather, as persuasively explained by Petitioner, the ":receiver" parameter affects the qualitative aspect of the message—i.e., whether to inform (1) one agent, (2) a select group of agents, or (3) every known agent. *See* Reply 56.

In addition, Patent Owner does not explain adequately why the solution_limit(N) parameter of the '115 patent specifying the number of agents to be queried "modifies the actual request/communicative act/performative itself" but the ":receiver" parameter of FIPA97 specifying the number of agents to which to send a message does not. *See* Resp. 100–101. We agree with Petitioner that Patent Owner does not identify "a

practical distinction between limiting the number of agents to be queried (solution_limit(N)), and querying a selection of agents (:receiver).” Reply 57.

Next, Patent Owner contends that FIPA97 does not teach parameters "refin[ing] . . . events," as recited in the claim, because FIPA97's ":receiver" parameter is the same as or similar to the KQML ":receiver" parameter, which does not modify the meaning of a message. Resp. 98–99 (citing Ex. 1007, 12; Ex. 1020, 5). In support of its argument, Patent Owner cites a page from Dr. Finin's presentation slides at an unidentified meeting or class, which compares "KQML tell and FIPA ACL inform." *Id.* 99–100 (citing Ex. 2019, 15; Ex. 2013, 132:6–22.). Patent Owner also cites the testimony from Dr. Finin at his deposition that "the general idea of agent communication language that was embodied in KQML is similar to the one that is embodied in FIPA." *Id.* at 100 (citing Ex. 2012, 32:10–17).

Patent Owner, however, does not discuss the disclosure of KQML/Nwana (Ex. 1020) sufficiently (other than pointing to the similarity of the format between the ":receiver" parameter of KQML and FIPA97) or explain adequately why KQML's ":receiver" parameter is similar to the FIPA97 ":receiver" parameter. *See* Resp. 98–100. For example, Patent Owner does not explain whether KQML's ":receiver" parameter specifies, similar to FIPA97, that "the recipient may be a single agent name, or a tuple of agent names," that "the message is sent to each agent named in the tuple," and that "the sender *intends* each of them to be recipient of the message." *See id.*; Ex. 1007, 13 (emphasis added). The general statements from Dr. Finin (or a slide purportedly from his unidentified presentation) cited by Patent Owner (Resp. 99–100 (citing Ex. 2019, 15; Ex. 2013, 132:6–22, 32:10–17) regarding the alleged similarity between KQML and FIPA97 at a

general level are simply insufficient to override the specific disclosures in FIPA97 cited by Petitioner regarding the meaning of the message modified or affected by the FIPA97 ":receiver" parameter.

Patent Owner also cites testimony from Petitioner's declarant, Dr. Lieberman, as "confirm[ing]" that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." Resp. 101 (citing Ex. 2014, 110:14–111:16, 168:5–12). The cited testimony of Dr. Lieberman, however, discusses FIPA97's messages and multicasting in general (responding to general questions from Patent Owner's counsel) and does not discuss the specific disclosure in FIPA97 cited by Petitioner regarding the meaning of the message modified or affected by the FIPA97 ":receiver" parameter. *See* Ex. 2104, 108:4–111:16, 168:5–12. Thus, we find the testimony of Dr. Lieberman cited by Patent Owner to be unpersuasive (if not misleading) to "confirm" that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." *See* Resp. 101.

Next, Patent Owner cites 9 paragraphs from the Declaration of Dr. Cohen (Ex. 2033) to argue that "FIPA97 does not contain any conversational layer parameters that affect the semantics of FIPA97 messages." Resp. 103 (citing Ex. 2033 ¶¶ 80–89).[23] Patent Owner, however, does not discuss Dr. Cohen's testimony in the Patent Owner Response or explain how Dr. Cohen's testimony supports its contention. *See*

[23] Patent Owner's citation to the Cohen Declaration appears to be mistaken since the last paragraph of Cohen Declaration is paragraph 88.

*id.* Thus, to the extent Petitioner purports to rely on Dr. Cohen's testimony, this amounts to improper incorporation by reference in violation of 37 C.F.R. § 42.6(a)(3). Accordingly, we decline to consider the cited paragraphs from the Cohen Declaration. We note, nonetheless, that Dr. Cohen's testimony appears to dwell in generalities, e.g., citing the works of logicians/philosophers Tarski and Frege (*see* Ex. 2033 ¶¶ 80–81), and discusses tuples and multicasting in general terms (*see id.* ¶¶ 85–88).

Lastly, Patent Owner contends that the limitation "the parameter lists further refine the one or more events" requires "the parameters of an event (or message) can refine the message or goal itself" (Resp. 97) or "change the nature of the communicative act itself" (*id.* at 102). Although it is not entirely clear what Patent Owner argues,[24] to the extent Patent Owner argues "refin[ing]" a messages or goal requires changing the message or goal itself, we disagree with Patent Owner's argument. As discussed above, in a section titled "Refining Service Requests," the '115 patent describes examples of "parameters" associated with a request or goal that "refine the request's meaning," including the "reply parameter" that specifies whether solutions are to be returned synchronously or asynchronously, and the "cache parameter" that specifies local caching of facts related to the request. *See* Ex. 1001, 15:49–58. These parameters do not appear to change the request itself but, rather, specify how the request should be handled—e.g., synchronous response, local caching, etc. Thus, we are not persuaded by Patent Owner's argument that the claim requires the recited "parameters"

[24] As discussed above, Patent Owner does not dispute Petitioner's proposed construction of the term "the parameter lists further refine the one or more events." *See* Resp. 24–38.

"refine the message or goal itself" (Resp. 97) or "change the nature of the communicative act itself" (*id.* at 102). Such an interpretation, which "excludes a [disclosed] embodiment from the scope of the claim is rarely, if ever, correct." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) (quoting *Accent Pkg., Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013)) (citing *Phillips*, 415 F.3d at 1312–13).

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that FIPA97 teaches "wherein the parameter lists further refine the one or more events," as recited in claim 1. Based on the complete record and for the reasons explained by Petitioner, we determine that Petitioner has shown sufficiently that FIPA97 teaches "a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events," as recited in claim 1.

*iv. Content Layer Comprising Goals and Triggers*

Claim 1 recites that the "inter-agent language" includes "a content layer comprising one or more of goals, triggers and data elements associated with the events." Petitioner asserts that FIPA97 teaches the recited "content layer" because FIPA97 describes various rules and standards governing the content that may be embedded within messages ("a content layer"). Pet. 42 (citing Ex. 1007, 3, 9, 14–16). Petitioner argues that the '115 patent consistently explains that the "content layer" of the disclosed ICL "consists of the specific goals, triggers, and data elements that may be *embedded* within various events." *Id.* at 9 (Ex. 1001, 11:13–15).

Petitioner also contends that FIPA97 teaches "a content layer comprising one or more of goals . . . associated with the events" because in

FIPA97 "*goals* can be communicated among agents through the use of an achieve domain-language primitive." Pet. 42 (emphasis added) (citing Ex. 1007, 81).

Petitioner asserts that FIPA97 also teaches "data elements associated with the events" because FIPA ACL supports content expression through objects and other data ("data elements") associated with various performatives. Pet. 43 (citing Ex. 1007, 14).

(1) Triggers

Petitioner asserts that a "trigger" recited in claim 1 is "a general mechanism for requesting some action be taken when one or more conditions is met." Pet. 11 (citing Ex. 1001, 21:21–22:31; Ex. 1003 ¶¶ 80–81). Patent Owner does not dispute Petitioner's proposed meaning of "trigger" (*see* Resp. 24–38) and argues that FIPA97 does not teach triggers under Petitioner's interpretation of the term (*see id.* at 107–108). We adopt this undisputed interpretation of "trigger" for this Final Written Decision because the construction is consistent with the disclosure in the Specification. *See* Ex. 1001, 21:22–24 ("triggers [provide] a general mechanism for requesting some action be taken when a set of conditions is met").

Petitioner asserts that FIPA97 discloses "triggers" for various performative actions within the content layer, including for use with the performative "accept-proposal" which "informs the receiver that it intends that (at some point in the future) the receiving agent will perform the action, once the given *precondition* is, or becomes, true." Pet. 43 (emphasis added) (citing Ex. 1007, 23). Petitioner argues that FIPA97 also discloses that the performative "propose" can be used "to make a proposal or respond to an

existing proposal during a negotiation process by proposing to perform a given action subject to certain *conditions* being true." *Id.* (emphasis added) (citing Ex. 1007, 34; Ex. 1003 ¶¶ 277–279).

Petitioner argues that the '115 patent describes "triggers" as "providing a general mechanism for requesting some action be taken when a set of *conditions* is met," and that such triggers "preferably specif[y] at least a *condition* and an action . . . [t]he *condition indicates under what circumstances the trigger should fire*, and the action indicates what should happen when it fires." Pet. 11 (emphases added) (citing Ex. 1001, 21:21–34).

Patent Owner contends that the portions of FIPA97 cited by Petitioner do not describe "a settable trigger that kicks in when a specified event takes place." Resp. 108. Patent Owner asserts that the communicative acts (or performative actions) cited by Petitioner instead are "performatives that contain parameters dictating what the associated action is." *Id.* at 107 (citing Ex. 2032 ¶¶ 168–169).

Patent Owner also cites 35 paragraphs from the Cohen Declaration in support of its argument. *Id.* at 108 (citing Ex. 2033 ¶¶ 30–64). Patent Owner, however, does not discuss Dr. Cohen's testimony in the Patent Owner Response or explain how Dr. Cohen's testimony supports its contention. *See id.* at 107–108. Thus, to the extent Petitioner purports to rely on Dr. Cohen's testimony, this amounts to improper incorporation by reference in violation of 37 C.F.R. § 42.6(a)(3). Accordingly, we decline to consider the cited paragraphs from the Cohen Declaration.

Petitioner argues that the performative "accept-proposal" "informs the receiver that it intends that (**at some point in the future**) the receiving agent will perform the action, once the given precondition is, **or becomes**, true."

Reply 63 (citing Ex. 1007, 23). Petitioner cites the following testimony from Dr. Lieberman:

> [T]he "precondition" is sent to an agent through the "*content layer*," then at some future point when that "precondition" is met the receiving agent will "*trigger*" and take an action based upon the information encoded in the "*content layer*" of the message. **EX1007, 23**.

*Id.* (citing Ex. 1003 ¶ 276). Pointing to the description in the cited portion of FIPA97, Petitioner argues

> [A]s explained by Dr. Lieberman, and shown in FIPA97, the performative "accept-proposal" ("[a] general mechanism for requesting") will take an action—in this example, streaming a multimedia channel ("some action be taken")—when "the customer is ready" ("when one or more conditions is met"). Further, the example above shows how this trigger information is stored within the "*content layer*."

*Id.* at 64 (reproducing the description of the performative "accept-proposal" in Ex. 1007, 23).

Petitioner contends that Dr. Lieberman and the Petition describe many other possible triggers, including the "propose" performative and the "request-when" performative. *Id.* at 65. Petitioner asserts that the "propose" performative "informs the receiver that the proposer will adopt the intention to **perform the action once the given precondition is met**" (*id.* (citing Ex. 1007, 34; Ex. 1003 ¶¶ 277–279; Pet. 43)) and that the "request-when" performative is used when "[t]he sender wants the receiver to perform some action **when some given proposition becomes true**" (*id.* (citing Ex. 1007, 40; Ex. 1003 ¶ 414; Pet. 63–64)). Petitioner points to the description of the "request-when" performative in FIPA97 and argues that the performative "request-when" ("[a] general mechanism for requesting") will take an action—in this example, sending a message ("some action be taken")—

when "an alarm occurs" ("when one or more conditions is met"). *Id*. at 66. Petitioner concludes that FIPA97, therefore, discloses multiple "triggers" recited in claim 1. *Id.*

Patent Owner does not dispute Petitioner's responsive arguments in the Reply, but instead contends that Petitioner's arguments are presented "too late" and that "Petitioner cannot fix the deficiencies of its Petition on Reply." Sur-reply 54. To the extent Patent Owner argues that Petitioner's arguments in the Reply is improper new arguments outside the scope of a proper reply, we disagree. As discussed above, Petitioner's arguments in the Petitioner's Reply on whether FIPA97 teaches the "triggers" recited in the claim are directly responsive to Patent Owner's arguments raised in the Patent Owner Response.

Based on the complete record, we determine that Petitioner has shown sufficiently that FIPA97 teaches "triggers" recited in claim 1.

In sum, based on the complete record, we determine that Petitioner has demonstrated sufficiently that FIPA97 teaches the claimed "expandable, platform-independent, inter-agent language" including "a layer of conversational protocol" and "a content layer," notwithstanding these arguments from Patent Owner.

*d. Receiving a Request for Service in an Arbitrarily Complex Goal Expression*

The second step of claim 1 recites "receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression." Ex. 1001, 29:25–27. Petitioner relies on Kiss to teach the "receiving a request for service" step and combines Kiss's teaching with FIPA97's ACL to teach "a request for service . . . in the form of an arbitrarily complex goal expression." Pet. 43–47.

*i. Receiving a Request for Service*

Petitioner asserts that Kiss teaches "receiving a request for service" because the reference describes that a "user agent" receives a "query" from a user, and then "parses the user inquiry and directs the parsed inquiry to a metaagent 119 for action." Pet. 44 (citing Ex. 1005, 8:28–34). Petitioner points to the example process depicted in Figures 8–20 of Kiss as showing how a "problem presented by a user is solved through distributed inferencing." *Id.* (citing Ex. 1005, 12:21–22). Petitioner asserts that the initial request illustrated in Figure 8 (not reproduced herein) "when the user asks of the user agent 705 'what is the effect of increasing sales by 20%'? (FIG.8)" is a "base goal" because it is the basic request initiated by the user that inspires a number of additional, more particular requests in order to be satisfied. *Id.* at 44–45 (citing Ex. 1005, 12:23–26, Fig. 8).

*ii. Arbitrarily Complex Goal Expression*

As discussed above in Section III.B. and the Institution Decision, based on the definitions provided in the '115 patent, we construe "arbitrarily complex goal expression" to mean "a goal expressed in a language or syntax that allows an expression, when appropriate or when desired, that expresses multiple sub-goals and can potentially include more than one type of logical connector (e.g., AND, OR, NOT), and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent, although not every goal is itself necessarily complex." Inst. Dec. 35–37. Petitioner argues that this definition of "arbitrarily complex goal expression" does not require multiple sub-goals to be expressed within the request, but instead requires only that the goal be expressed in a language "that *allows* the expression of multiple sub-goals . . . ." Pet. 45.

Petitioner asserts that FIPA ACL allows the expression of multiple sub-goals, which can potentially include more than one type of logical connector and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent, because FIPA97 "allows the construction of s-expressions of arbitrary depth and complexity." *Id.* (citing Ex. 1007, 15). Petitioner argues that FIPA97 also discloses complex "goal expressions" that "express multiple sub-goals" and which may also include "logical nesting" using parentheses. *Id.* at 46 (citing Ex. 1007, 40, 41).

Petitioner contends that, in the combined system of Kiss and FIPA97, the request discussed above— "What is the effect of increasing sales by 20%?"—is an "arbitrary complex goal expression" because it is a goal expressed in FIPA ACL. *Id.*

Patent Owner does not specifically dispute that Kiss teaches this "receiving a request for service" limitation. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches "receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression," as recited in claim 1.[25]

*e. Dynamically Interpreting the Arbitrarily Complex Goal Expression*

Claim 1 recites "dynamically interpreting the arbitrarily complex goal expression," the act of interpreting comprising "generating one or more sub-goals expressed in the inter-agent language," "constructing a goal

---

[25] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

satisfaction plan," and "dispatching each of the sub-goals to a selected client agent for performance." Ex. 1001, 29:28–44.

Petitioner contends that Kiss teaches "dynamically interpreting the arbitrarily complex goal expression," as recited in claim 1. Pet. 47–49. Petitioner argues

> Kiss discloses that, in response to a request for service, the "meta agent 119 formulates a goal statement for the problem-solving phase of the process, then formulates a solution plan for the problem" and "*dynamically* assesses the problem and its solution states (between users and the knowledge agents 121), divides the problem, and assigns the appropriate knowledge agents 121 to work on the solution."

*Id.* at 47–48 (emphasis added) (citing Ex. 1005, 8:32–48).

In addition, Petitioner explains how Kiss interprets the exemplary "arbitrary complex goal expression" discussed above—"What is the effect of increasing sales by 20%?"—including the meta agent formulating a plan to respond to the request, identifying other agents and knowledge modules that could assist in the response, and doing both dynamically as additional information is obtained. *Id.* at 48 (citing Ex. 1005, 12:21–14:29, Figs. 8–20). Petitioner further provides a detailed description of how this example goal expression is dynamically interpreted in Kiss. *Id.* at 48–49 (citing Ex. 1005, 12:29–14:30, Figs. 9–11, 13–20).

Patent Owner does not specifically dispute that Kiss teaches this "dynamically interpreting the arbitrarily complex goal expression" limitation. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has

demonstrated sufficiently that Kiss teaches "dynamically interpreting the arbitrarily complex goal expression," as recited in claim 1.[26]

#### *f. Generating One or More Sub Goals Expressed in the Inter-agent Language*

Petitioner contends that Kiss teaches "generating one or more sub-goals expressed in the inter-agent language," as recited in claim 1, because Kiss discloses, in the example "What is the effect of increasing sales by 20%?" discussed above, that the process of responding to the user's request includes several additional requests for service ("sub-goals") to various agents, including two sub-requests each from the sales agent and the meta agent, and three sub-requests from the production agent, where each of the sub-requests is made in FIPA ACL. Pet. 49–50 (citing Ex. 1005, 12:54–56, 13:25–27, 13:37–39, 13:56–57, 14:3–5). According Petitioner, each of these sub-requests is a "sub-goal" because each is a subset of the process of responding to the user's base request—"base goal"—of "what is the effect of increasing sales by 20%?" *Id.* at 50. Petitioner also argues that Kiss's meta-agent is capable of "formulating a sub-problem query." *Id.* (citing Ex. 1005, 11:15–16).

Patent Owner does not specifically dispute that Kiss teaches this "generating one or more sub-goals expressed in the inter-agent language" limitation. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has

---

[26] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

demonstrated sufficiently that Kiss teaches "generating one or more sub-goals expressed in the inter-agent language," as recited in claim 1.[27]

*g. Constructing a Goal Satisfaction Plan Including Delegation of Sub-goal Requests*

Claim 1 recites "constructing a goal satisfaction plan," the goal satisfaction plan including "a suitable delegation of sub-goal requests" and "dispatching each of the sub-goals to a selected client agent for performance." Ex. 1001, 29:32–43. Petitioner contends that Kiss teaches each of these limitations. Pet. 50–54.

*i. Goal Satisfaction Plan*

As discussed above in Section III.B.1., we construe the term "a goal satisfaction plan" to mean "a plan for satisfying a goal" for this Final Written Decision.

Petitioner asserts that Kiss teaches "constructing a goal satisfaction plan" because Kiss describes that the meta-agent "formulates a goal statement for the problem-solving phase of the process," then "formulates a solution plan for the problem." Pet. 50 (citing Ex. 1005, 8:33–34, 5:30–64, 12:25–40, Figs. 8–20). Petitioner contends that Figures 8–20 of Kiss illustrate adding tasks to an agenda, i.e., constructing a plan, to satisfy the user request (i.e., a "goal") "what is the effect of increasing sales by 20%?" *Id.* at 50–51 (citing Ex. 1005, 13:27–29, Figs. 8–20).

Patent Owner contends that Kiss does not teach the claim "goal satisfaction plan" because Kiss does not disclose "the use of any reasoning, optimization, or taking into account any advice parameters or constraints."

---

[27] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

Resp. 89. Patent Owner also argues that Kiss "does not have the capability of formulating an 'optimal or near-optimal' 'goal satisfaction plan' utilizing reasoning as described in the '115 patent." *Id.* at 91 (citing Ex. 2032 ¶ 141). These arguments are predicated on Patent Owner's proposed construction of "goal satisfaction plan" to mean "a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints." *See id.* at 28. As discussed above in Section III.B.1., we disagree with Patent Owner that the claim term "goal satisfaction plan" is limited as Patent Owner contends. Thus, for the reasons explained above in Section III.B.1., we disagree with Patent Owner's argument that Kiss does not disclose the "goal satisfaction plan" recited in claim 1.

Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches "constructing a goal satisfaction plan," as recited in claim 1.

*ii. Delegation of Sub-goal Requests Using Reasoning*

Claim 1 recites that "the goal satisfaction includes: a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms." Ex. 1001, 29:32–39.

(1) <u>Delegation of Sub-goal Requests</u>

Petitioner asserts that Kiss teaches a meta-agent that makes "a suitable delegation of sub-goal requests to best complete the requested service request," as recited in claim 1, because Kiss identifies and queries various

agents (e.g., sales agent, production agent) "who best to respond" to new sub-requests for specific information as they arrive. Pet. 51 (citing Ex. 1005, 12:21–14:30, Figs. 8–20). Petitioner contends that in Kiss, the meta-agent "contains knowledge of problem solving methodologies and distributed inferencing procedures" and is further responsible for allocating "tasks to the knowledge agent layer." *Id.* (citing Ex. 1005, 5:24–27, 3:26–27). Petitioner asserts that Kiss's meta-agent uses these methodologies in conjunction with the agent registry "to dynamically bring available knowledge resources together" ("suitable delegation") by identifying "those other resources capable of furthering the problem-solving process" ("best complete the requested service request"). *Id.* (citing Ex. 1005, 5:27–29).

Patent Owner contends that Kiss does not teach "optimization of any kind." Resp. 89. Patent Owner asserts that Kiss's meta agent employs a trial and error method—it jumps into "executing the solution plan even before the plan is complete" and when errors are encountered, it backtracks or takes a new action. *Id.* at 90–91 (citing Ex. 1005 5:39–46). Patent Owner argues that Kiss is "forced" to go through this trial-and-error process because it does not have the capability of formulating an "optimal or near-optimal" "goal satisfaction plan." *Id.* at 91.

As discussed above in Section III.B., claim 1 does not recite an "optimal or near-optimal" "goal satisfaction plan." Instead, claim 1 recites "a suitable delegation of sub-goal requests to *best complete* the requested service request," which may relate to the "optimal or near-optimal" limiting feature argued by Patent Owner. As discussed in the same section, Patent Owner asserts that the term "optimal" and "near optimal" has a well-established meaning in the context of computer engineering, citing a technical dictionary, which defines "optimization" as "[t]he process of

finding *the best solution* to some problem, where 'best' accords to prestated criteria." Sur-reply 6 (emphasis added) (citing Ex. 2078, 3). Thus, contrary to Patent Owner's argument, the trial and error process of Kiss is a "process of finding *the best solution*" to a problem under Patent Owner's definition of "optimization." *See* Ex. 1005, 5:21–29 ("The meta agent 119 contains knowledge of how to dynamically bring available knowledge resources together as and when needed to provide a response to the inquiry."), 5:32–45 ("The meta agent 119 is responsible for formulating a *dynamic "solution plan"* for the distributed inferencing to be performed by the system 100, and *allocates tasks* to the knowledge agent layer 109 in furtherance of the solution plan. The planning capability of the meta agent 119 includes the ability to formulate parallel *sub-plans* and perform *iterative and recursive procedures*. . . . The meta agent 119 is capable of backtracking or replanning to permit escape during plan execution from dead-end or *otherwise unproductive search paths*." (emphases added)); Pet. 51 (citing Ex. 1005, 5:24–29).

We note that claim 1 does *not* recite "to *best complete* the requested service request *at the very first try*." Thus, Kiss's formulation of a dynamic "solution plan" (and allocation of tasks) that includes "sub-plans" to perform the trial and error process for finding the best solution to a problem satisfies "delegation of sub-goal requests to *best complete* the requested service request," as recited in claim 1.

Patent Owner also argues that it explained during prosecution how the facilitating engine is able to use reasoning to delegate the sub-goals to service providing agents in such a way as "to best complete the requested service request," as follows:

> For example, assume that several agents are able to roast coffee. The facilitating engine is able to use reasoning to delegate the sub-goal task of roasting coffee to the service-providing agent that can roast beans in the least amount of time because the facilitating engine has reasoned that *the least amount of time* taken to make coffee is *the best way* to accomplish the base goal of making coffee.

Resp. 90 (citing Ex. 1002, 173).

In response, Petitioner argues that Kiss similarly optimizes its solution plan based on time. Reply 49–50. Petitioner asserts that Kiss explains that as part of its matchmaking functionality (which is utilized in the solution plan), the agent service layer will create "mappings for each knowledge module 123 relating the capabilities to interests" and that these mappings are used "to optimize problem solutions." *Id.* at 49 (citing Ex. 1005, 7:8–11). According to Petitioner, Kiss describes that when utilizing "real time" inferencing, the meta-agent "may deactivate the knowledge agent whose responses do not meet time delay" or prioritize "knowledge agents that have a history of rapid response or that can tailor their problem solving to real time." *Id.* at 49–50 (citing Ex. 1005, 7:65–84). We agree with Petitioner that Kiss's delegation and prioritization of agents based on their speed of response satisfies "delegation of sub-goal requests to best complete the requested service request," as recited in claim 1.

(2) Using Reasoning

Claim 1 recites that "a suitable delegation of sub-goal requests" is accomplished "by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms." Petitioner asserts that the '115 patent describes speech recognition, natural

language processing, and email as "domain-independent technologies," and travel planning and reservations agents as "domain specific." Pet. 52 (citing Ex. 1001, 6:51–55).

Citing the testimony of Dr. Lieberman, Petitioner argues that the operations disclosed in Kiss with respect to Figures 8–20 represent "reasoning that includes one or more of domain-independent coordination strategies" because the meta agent, by identifying and querying several different specialized (i.e., domain-specific) agents, is carrying out a strategy that is domain independent (i.e., is not limited to a particular area of knowledge but instead seeks information regarding sales, production, marketing, facilities, and materials) and coordinates the action of those different domain-specific agents across several domains. Pet. 52 (citing Ex. 1003 ¶¶ 331–332). Petitioner argues that Kiss's meta-agent can employ a distributed inferencing scheme that "assembles a problem-specific rule network as a distributed object under control by a meta agent." *Id.* at 52–53 (citing Ex. 1005, 7:21–26). Petitioner contends that application of such a problem-specific set of rules to a request constitutes both "domain-specific reasoning" (because the problem is the domain) and "application-specific reasoning" (because the problem is the application). *Id.* at 53 (citing Ex. 1003 ¶ 333).

As noted above, claim 1 recites that "the goal satisfaction plan includes: a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning . . . ." In view of this claim language, Kiss's inference process using inferencing schemes may be considered part of a "suitable delegation" which is a recited element of the claimed "goal satisfaction plan."

We additionally note that the portion of Kiss cited by Petitioner describes that distributed inferencing schemes are based on the use of "first-order logic." Ex. 1005, 7:21–23. The same paragraph also describes using a "theorem-proving engine." *Id.* at 7:26–28. We note that both "first-order logic" and "theorem-proving engine" may be considered "domain-independent technologies," similar to speech recognition and natural language processing technologies described in the '115 patent.

Patent Owner contends that the "solution plan" of Kiss is not constructed by "using reasoning" because Kiss's inferencing schemes is used only "[a]fter the solution plan is formulated . . . to perform the search and execution phases." Resp. 89 (citing Ex. 1005, 8:58–60). In response, Petitioner asserts that in the Petition it argued that it would have been obvious to utilize inferencing strategies when constructing the goal satisfaction plan. Reply 48 (citing Pet. 53). Thus, Patent Owner's argument is inapposite because it does not address the combination proposed by Petitioner. *See ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1219 (Fed. Cir. 2016) ("*KSR* does not require that a combination only unite old elements without changing their respective functions.").

As Petitioner also persuasively argues, Petitioner in the Petition additionally relies on several other ways in which Kiss utilizes reasoning to construct its solution plan, such as "problem solving methodologies and distributed inferencing procedures," how the meta-agent "assigns the **appropriate** knowledge agents 121 to work on the solution," and how the meta-agent "executes the solution plan by maintaining an agenda, commitment table, task queue, knowledge manager or **equivalent dynamic control service**." Reply 48 (citing Pet. 50–51; Ex. 1003 ¶¶ 322–325, 331–335). Petitioner further argues that Kiss's "iterative and recursive" planning

is another example of how reasoning is used to construct the solution plan of Kiss. *Id.* (citing Pet. 50; Ex. 1003 ¶ 322).

Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches "a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms," as recited in claim 1, notwithstanding the arguments by Patent Owner.

*h. Dispatching Each of the Sub-goals*

Claim 1 recites "dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent." Ex. 1001, 29:32–43.

Petitioner asserts that in Kiss

> the meta agent dispatches queries ("*sub-goals*") to various specialized agents based on a determination that the targeted agent possesses a knowledge module appropriate for the query ("*based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent.*")

Pet. 54 (citing Ex. 1005, 12:21–14:29, Figs. 8–20). Petitioner argues that Kiss's specialized agents are not facilitators (and, therefore, are "client agents") because they are not responsible for matching requests, from users and agents, with descriptions of the capabilities of other agents. *Id.* (citing Ex. 1001, 4:64–66, 6:41–43).

Patent Owner does not specifically dispute that Kiss teaches this "dispatching each of the sub-goals" limitation. *See generally* Resp. Based

on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches "dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent," as recited in claim 1.[28]

*i. Conclusion*

In consideration of the foregoing and based on the complete record, we are persuaded by Petitioner's arguments and evidence, notwithstanding Patent Owner's arguments, addressed above. Having weighed each of the *Graham* factors, including the scope and content of the prior art, the differences between the prior art and the challenged claim, and the objective evidence of nonobviousness, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss and FIPA97.

*8. Independent Claim 29*

Claims 1 and 29 are the only independent claims among the challenged claims. Although many of the limitations recited in claims 1 and 29 are similar, there exist material differences in the claim language of these claims. For example, claim 1 recites

> constructing a goal satisfaction plan wherein the goal satisfaction plan includes:
>
> a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and

---

[28] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent,

whereas claim 29 recites

constructing a base goal satisfaction plan including the sub-acts of:

determining whether the request service is available,

determining sub-goals required in completing the base goal by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms,

selecting service-providing electronic agents from the agent registry suitable for performing the determined sub-goals, and,

ordering a delegation of sub-goal requests complete the requested service.

Ex. 1001, 29:32–43 (claim 1), 32:9–22 (claim 29). As apparent in the claim language reproduced above, there exist material differences between these limitations on the face of the claims.

When addressing the "constructing a base goal satisfaction plan" limitation and its elements recited in claim 29, however, Petitioner's analysis consists of a single sentence pointing to its analysis for similar but materially different limitations from claim 1. *See* Pet. 65 ("Kiss/FIPA97 satisfies this claim for the reasons stated in §§VI.A.1.h."). Petitioner does not address the claim language of claim 29 or explain why its analysis for claim 1 is sufficient to demonstrate that the combination of Kiss and FIPA97 teaches the limitations of claim 29. Accordingly, in the Institution Decision, we determined that the information presented in the Petition did not demonstrate a reasonable likelihood of Petitioner prevailing in its challenge to claim 29

under 35 U.S.C. § 103(a) as obvious over the combination of Kiss and FIPA97. Inst. Dec. 79–80.

In its Reply, Petitioner contends that "there are no 'material differences' between claim 1 and claim 29" and, therefore, "the evidence relied on in the Petition discloses each and every limitation of Claim 29." Reply 67. Asserting that "Patent Owner does not argue that there are ['material differences' between claim 1 and claim 29]," Petitioner goes on to present comparisons of the claim language of claim 1 and claim 29 and argues the combination of Kiss and FIPA97 teaches the limitations of claim 29. *Id.* at 67–74.

Patent Owner disputes Petitioner's contention in the Reply and asserts that Petitioner's arguments relating to claim 29 are new arguments presented for the first time in the Reply, and, therefore, should not be considered. Sur-reply 54–58.[29]

We agree with Patent Owner. Petitioner does not explain why its arguments relating to claim 29 in the Reply could not be presented in the first instance in the Petition or how the arguments in the Reply are responsive to Patent Owner's arguments in the Patent Owner Response. Indeed, the claim 29 section in the Petitioner Reply does not cite to the Patent Owner Response at all. *See* Reply 66–74.

Further, we are not persuaded by Petitioner's argument that "there are no 'material differences' between claim 1 and claim 29." Reply 67.

---

[29] Patent Owner also argues that, because Petitioner makes these arguments for the first time in the Reply, Patent Owner was unable to depose Petitioner's expert regarding Patent Owner's assertions and Patent Owner's expert did not have the ability to respond to them. Sur-reply 57.

Whether the claim language of a recitation in a claim is material to the patentability of the claim raises an issue of claim construction.[30] *See Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373–76 (Fed. Cir. 2019) (discussing claim construction of a "wherein" clause to determine whether the "wherein" clause is material to patentability); *see also SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 429 (Fed. Cir. 2016) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so" (quoting *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005)); "The preference for giving meaning to all terms, however, is not an inflexible rule that supersedes all other principles of claim construction" (citing *Power Mosfet Techs., L.L.C. v. Siemens AG,* 378 F.3d 1396, 1410 (Fed. Cir. 2004)). Petitioner, however, does not present sufficient claim construction analysis to show why "there are no 'material differences' between claim 1 and claim 29." For example, Petitioner equates "determining whether the request service is available" recited in claim 29 to "a suitable delegation" recited in claim 1. Reply 69 ("*determining whether the request service is available*," (*i.e*, "*a **suitable** delegation*,")). Petitioner also equates "determining sub-goals required in completing the base goal" recited in claim 29 to "to best

---

[30] We note that it was Petitioner's affirmative duty to explain in the Petition how the challenged claims should be construed and how, as so construed, they are unpatentable. *See* 37 C.F.R. § 42.104(b)(3)–(4). Thus, had Petitioner intended to argue claim construction of claims 1 and 29 such that "there are no 'material differences' between claim 1 and claim 29," such an analysis should have been set forth explicitly in the Petition. As discussed below, even if we were to consider Petitioner's claim construction argument presented belatedly in the Reply, we are not persuaded that "there are no 'material differences' between claim 1 and claim 29," as Petitioner contends.

complete the requested service request" recited in claim 1. *Id.* ("*determining sub-goals required in completing the base goal*," (*i.e.*, "*to best* ***complete the requested service request***.")). But Petitioner does not discuss claim construction of these limitations or explain why the differences in the claim language on the face of these limitations are not material to the patentability of the claims 1 and 29. *See id.* at 69–71.

Instead, Petitioner in the Reply discusses how Kiss teaches the limitations recited in claim 29. *See id.* Thus, rather than persuasively explaining why "there are no 'material differences' between claim 1 and claim 29," the Reply presents arguments and evidence on how Kiss teaches the limitations recited in claim 29.

Such arguments and evidence are the type of material that should have been included in the Petition in the first instance to present a *prima facie* case of unpatentability, and, therefore, are improperly introduced for the first time in the Petitioner's Reply. *See* Patent Trial and Appeal Board Consolidated Trial Practice Guide 73–75 (Nov. 2019) ("Consolidated Trial Practice Guide"), *available at* https://www.uspto.gov/TrialPracticeGuideConsolidated (discussing the appropriate scope for a reply); *id.* at 73 ("Petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g. to make out a prima facie case of unpatentability."). It was Petitioner's burden to demonstrate sufficiently in the Petition that the cited prior art renders the challenged claims unpatentable, including showing that the Petition's contentions are supported by evidence. *See* 35 U.S.C. § 314(a); *see also Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) ("In an IPR, the petitioner has the burden *from the onset* to show *with particularity* why the patent it challenges is unpatentable." (emphases added)) (citing 35 U.S.C. § 312(a)(3));

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016) (requiring "*the initial petition* identify '*with particularity*' the 'evidence that supports the grounds for the challenge to each claim.'" (emphases added)). Based on the complete record, we determine that the Petition did not meet this burden required on Petitioner with respect to claim 29. Thus, under the particular facts and circumstances in this case, we decline to consider Petitioner's arguments and evidence relating to claim 29 presented belatedly in the Reply.

Accordingly, based on the complete record, we determine that Petitioner does not demonstrate by a preponderance of evidence that claim 29 is unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss and FIPA97.

9. *Dependent Claims 15, 18, 19, 34, 38, 41, and 42*

Petitioner argues the combination of Kiss and FIPA97 teaches or suggests the recited limitations of dependent claims 15, 18, 19, 34, 38, 41, and 42. Pet. 54–67. Claims 15, 18, and 19 depend, directly or indirectly, from independent claim 1.

a. *Claim 15*

Claim 15 recites, "[a] computer-implemented method as recited in claim 1, wherein the base goal requires setting a trigger having conditional functionality and consequential functionality."

Petitioner argues that "[t]he ordinary meaning of "*conditional functionality*" is the determination that an action should take place as the result of the occurrence of a given precondition." Pet. 54–55 (citing Ex. 1034, 112). Similarly, Petitioner argues that "'[c]*onsequential functionality*' is taking an action based on that conditional determination" (citing Ex. 1034, 244), and "[a] '*trigger'* is the general mechanism for requesting some action

be taken when one or more conditions is met." Pet. 55 (citing i*d.* § IV.D.7; Ex. 1003 ¶ 411).

Petitioner argues, "Kiss illustrates in figures 9-20 how the '*base goal*' in that example – 'What is the effect of increasing sales by 20%' – requires '*setting a trigger having conditional functionality and consequential functionality*.'" Pet. 55. "In that example," Petitioner explains, "the production agent is asked to verify that the cost per unit does not exceed a certain level." *Id.* (citing Ex. 1005, 13:22–35. "The production agent," Petitioner points out, "responds by asking the meta-agent to provide production line cost information (Ex. 1005, 13:36–39), which causes the meta agent to create a task on the agenda and to relay the request to the facilities agent" (*id.*, 13:40–47). Pet. 55. "Once the facilities agent responds with the request information," Petitioner explains, "the meta-agent clears the task from the agenda and passes the requested information to the production agent." Pet. 55 (citing Ex. 1005, 13:48–55; Ex. 1003 ¶ 412).

This functionality, Petitioner argues, includes setting a "trigger" having "*conditional functionality and consequential functionality*." Pet. 55. In particular, Petitioner points out, "the triggering event is the return of production line cost information from the facilities agent. That trigger has '*conditional functionality'* because a Skilled Artisan would understand that the meta-agent would not remove the task from the agenda until that triggering event occurs." *Id.* Petitioner argues, "[t]hat trigger also has '*consequential functionality*' because it will cause the meta-agent to pass the production line cost information to the production agent. *Id.* at 55–56 (citing Ex. 1003 ¶ 413).

Petitioner argues, "[t]his claim language is alternatively satisfied by FIPA97, which discloses several performatives that have 'trigger'

functionality: Accept-proposal, Agree, Cfp, Propose, Request-when, Request-whenever, and Subscribe." Pet. 56 (citing Ex. 1007, 23–41; Ex. 1003 ¶ 414). FIPA97, Petitioner argues, "further discloses that each trigger may have '*conditional functionality and consequential functionality.*'" Pet. 56. "For example," Petitioner argues, "the performative 'request-whenever' shows a condition ('whenever the price of widgets rises from less than 50 to more than 50') triggering a consequence (agent j notifies agent i)." *Id.* (citing Ex. 1007, 41; Ex. 1003 ¶ 415). "Therefore," Petitioner argues, "when the price of widgets changes the agent makes a 'determination' that a specific action should or should not occur, in this case depending on whether the price has risen above 50. Then, if the price is greater than 50 the agent takes a consequential action based off that determination and notifies Agent-I about the price change." Pet. 56–57 (citing Ex. 1003 ¶ 416).

"Further," Petitioner argues "the 'request-whenever' performative in FIPA97 also discloses a '*base goal'* that requires the setting of a trigger." Pet. 57. Petitioner argues, "FIPA97 shows the above performative is used to set a trigger to notify an agent when 'the price of widgets rises.'" *Id.* (citing Ex. 1007, 41). "In this case," Petitioner argues, "the request (i.e., 'Agent i tells agent j to notify it whenever the price of widgets rises from less than 50 to more than 50.') is the '*base goal'* as it is the basic request that inspires a number of additional, more particular requests in order to be satisfied." Pet. 57 (citing Ex. 1007, 41). "Further," Petitioner argues, "the 'base goal' requires that a trigger be set in order to be satisfied. (i.e., '**notify it whenever** the price of widgets rises')." Pet. 57 (citing Ex. 1007, 41).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 15. *See, e.g.,* Resp. 65–118.

Petitioner has shown persuasively that the combination of Kiss/FIPA97 teaches or suggests the recited limitations of dependent claim 15 because Kiss shows a triggering event in the return of production line cost information from a facilities agent. That trigger has '*conditional functionality'* because the meta-agent would not remove the task from the agenda until that triggering event occurs. The trigger also has '*consequential functionality*' because it will cause the meta-agent to pass the production line cost information to the production agent. *See* Ex. 1005, 13:22–55, Figs. 9–20. Petitioner's evidence is supported by the declaration of Dr. Lieberman. *See, e.g.,* Ex. 1003 ¶¶ 410–418.

Petitioner has also shown persuasively that the combination of Kiss/FIPA97 teaches or suggests the limitations of dependent claim 15 because FIPA97 shows a trigger with "*conditional functionality and consequential functionality*." For example, the FIPA97 performative 'request-whenever' shows a condition ('whenever the price of widgets rises from less than 50 to more than 50') triggering a consequence (agent j notifies agent i), so that when the price of widgets changes the agent makes a "determination" that a specific action should or should not occur, in this case depending on whether the price has risen above 50. Then, if the price is greater than 50 the agent takes a consequential action based off that determination and notifies Agent-I about the price change. *See* Ex. 1007, 41; Ex. 1003 ¶¶ 415–416.

For these reasons we find Petitioner has demonstrated, by a preponderance of the evidence, that dependent claim 15 is unpatentable under § 103 over the combined teachings of Kiss and FIPA97.

*b. Claim 18*

Claim 18 recites, "[a] computer-implemented method as recited in claim 15 wherein the trigger is a data trigger, the computer implemented method further including the acts of: monitoring a state of a data repository; and in response to a particular state event satisfying the trigger conditional functionality, performing the particular consequential functionality defined by the trigger."

Petitioner argues "FIPA97 discloses a '*data trigger'* in the form of the performative "requestwhenever." Pet. 57. Petitioner argues, "[t]he request-whenever action is used when an agents needs to be informed every time a precondition becomes true." *Id.* (citing Ex. 1007, 41; Ex. 1003 ¶¶ 442–443). Petitioner argues that Kiss/FIPA97 further discloses, "*monitoring a state of a data repository*." Pet. 57. Petitioner points out that "FIPA97 explains that the 'request-whenever' performative 'represents a persistent commitment to re-evaluate the given proposition and take action when its value changes.'" *Id.* at 57–58 (citing Ex. 1007, 41). Petitioner argues that when "combined with Kiss, such 'data' would be contained in the 'knowledge modules' (*i.e.*, *'data depository'*) associated with each of the distributed agents 'capabilities (e.g., inferencing, database management, algorithms, etc.).'" Pet. 58 (citing Ex. 1005, 3:4–6, 12:44–50; Ex. 1003 ¶ 444).

Petitioner argues that "FIPA97 also discloses determining whether '*a particular state event satisfying the trigger conditional functionality'* has occurred." Pet. 58. Petitioner argues that "[t]he "requestwhenever" performative 'represents a persistent commitment to re-evaluate the given proposition and take action when its value changes.'" Pet. 58 (citing Ex. 1007, 41). "Therefore," Petitioner argues, "the agent must evaluate the proposition ('*conditional functionality'*), in this case whether the price of the

widget has changed, to determine whether the precondition has become true." Pet. 58 (citing Ex. 1007, 41). Petitioner argues, "once the value of the widget has changed ('*a particular state event'*), the agent will evaluate the data repository to determine whether the new value satisfies the precondition ('*satisfying the trigger conditional functionality'*), and then whether an action should be taken based off that determination." Pet. 58 (citing Ex. 1003 ¶ 445).

Petitioner argues that "FIPA97 further discloses '*performing the particular consequential functionality defined by the trigger.*'" Pet. 58. Petitioner argues that in the disclosed example, "the receiving agent is asked to 'inform' ('*particular consequential functionality defined by the trigger*') the sending agent when the value of a widget changes." *Id.* (citing Ex. 1007, 41). Petitioner argues, "[t]he receiving agent will repeat the action ('inform') every time the precondition becomes true." Pet. 58–59 (citing Ex. 1007, 41). "Therefore," Petitioner argues, "the receiving agent will perform '*the particular consequential functionality defined by the trigger'* in response to '*a particular state event.'* Pet. 59 (citing Ex. 1003 ¶ 446).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 18. *See, e.g.,* Resp. 65–118.

Petitioner has also shown persuasively that the combination of Kiss/FIPA97 teaches or suggests the limitations of dependent claim 18 because FIPA97 shows a '*data trigger'* in the form of the performative "requestwhenever." The request-whenever action is used when an agent needs to be informed every time a precondition becomes true. *See* Ex. 1007, 41; Ex. 1003 ¶¶ 442–443. The combination of Kiss/FIPA97 also shows "*monitoring a state of a data repository*" where FIPA97 explains that the "request-whenever" performative represents a persistent commitment to re-

evaluate a given proposition and take action when its value changes. *See* Ex. 1007, 41. In the proposed Kiss/FIPA97 combination such "data" would be contained in the "knowledge modules" (*i.e., 'data depository'*) associated with each of the distributed agents' capabilities (e.g., inferencing, database management, algorithms, etc.). *See* Ex. 1005, 3:4–6, 12:44–50; Ex. 1003 ¶ 444.

FIPA97 also shows persuasively "*a particular state event satisfying the trigger conditional functionality"* because the "requestwhenever" performative represents a persistent commitment to re-evaluate the given proposition and take action when its value changes. *See* Ex. 1007, 41. The agent must evaluate the proposition ("*conditional functionality"*), in this case whether the price of the widget has changed, to determine whether the precondition has become true. *See* Ex. 1007, 41. Once the value of the widget has changed ("*a particular state event"*), the agent will evaluate the data repository to determine whether the new value satisfies the precondition ("*satisfying the trigger conditional functionality"*), and then whether an action should be taken based off that determination. *See* Ex. 1003 ¶ 445.

FIPA97 also shows persuasively "*performing the particular consequential functionality defined by the trigger*" when the receiving agent is asked to "inform" ("*particular consequential functionality defined by the trigger*") the sending agent when the value of a widget changes. *See* Ex. 1007, 41. The receiving agent will repeat the action ("inform") every time the precondition becomes true. *See id.* The receiving agent will perform "*the particular consequential functionality defined by the trigger"* in response to "*a particular state event."* *See* Ex. 1003 ¶ 446. Petitioner's evidence is supported by the declaration of Dr. Lieberman. *See, e.g.,* Ex. 1003 ¶¶ 441–446.

For these reasons we find Petitioner has demonstrated, by a preponderance of the evidence, that dependent claim 18 is unpatentable under § 103 over the combined teachings of Kiss and FIPA97.

*c. Claim 19*

Claim 19 recites, "[a] computer-implemented method as recited in claim 15 wherein the trigger is a time trigger, the computer implemented method further including the acts of: monitoring for the occurrence of a particular time condition; and in response to the occurrence of a particular time condition satisfying the trigger conditional functionality performing the particular consequential functionality defined by the trigger."

Petitioner argues "FIPA97 discloses a '*time trigger'* in the form the performative 'requestwhen,' which allows an agent to request some action be taken when some given precondition becomes true. Pet. 59 (citing Ex. 1007, 40). Petitioner argues "FIPA97 shows the precondition for the trigger is defined in terms of an alarm or timer." Pet. 59 (citing Ex. 1003 ¶ 448). "In this example," Petitioner points out, "agent i will inform agent j when a specific alarm occurs. Pet. 59 (citing Ex. 1007, 40). "Therefore," Petitioner concludes, "the agent will take an action ('notify') based on a precondition ('as soon as an alarm occurs') and this precondition is defined in terms of time ('alarm'). Pet. 59–60 (citing Ex. 1007, 40; Ex. 1003 ¶ 449).

Petitioner argues that "FIPA97 further discloses, '*monitoring for the occurrence of a particular time condition'* as explained above with respect to claim 18." Petitioner argues that "an agent that receives a 'request-when' performative 'should either refuse to take on the commitment, or should arrange to ensure that the action will be performed when the condition becomes true ('*monitoring'*)." Pet. 60 (citing Ex. 1007, 40). "Moreover,"

Petitioner argues, "the proposition may relate to time (i.e. the time at which the alarm goes off)." Pet. 60 (citing Ex. 1007, 40; Ex. 1003 ¶ 450).

Petitioner argues "FIPA97 also discloses determining whether '*a particular time condition satisfying the trigger conditional functionality'* has occurred." Petitioner explains that "[t]he 'request-when' performative 'will persist until such time as it is discharged by the condition becoming true.'" Pet. 60 (citing Ex. 1007, 40). "Therefore," Petitioner argues, "the agent must evaluate the proposition ('*conditional functionality'*), in this case whether the alarm has fired, to determine whether the precondition has become true." Pet. 60 (citing Ex. 1007, 40). Petitioner argues, "once the alarm has fired ('*a particular time condition'*), the agent will evaluate and determine that the alarm satisfies the precondition ('*satisfying the trigger conditional functionality'*), and then determines which action should be taken based off that determination." Pet. 60 (citing Ex. 1003 ¶ 451).

Petitioner argues, "FIPA97 further discloses "*performing the particular consequential functionality defined by the trigger*." Pet. 61. Petitioner argues, "[i]n the disclosed example, the receiving agent is asked to 'inform' ('*particular consequential functionality defined by the trigger'*) the sending agent that the alarm has fired." *Id.* (citing Ex. 1007, 40). "Therefore," Petitioner argues, "the receiving agent will perform '*the particular consequential functionality defined by the trigger'* in response to *a particular state event.*" Pet. 61 (citing Ex. 1003 ¶ 452). Petitioner also argues "the '*time trigger'* disclosed in FIPA97 likewise discloses a '*base goal that requires setting a trigger'* (i.e., 'Agent i tells agent j to notify it as soon as an alarm occurs'), with '*conditional functionality'* (i.e., 'as soon as an alarm occurs'), and '*consequential functionality'* (i.e., agent j to notify [agent i]')." Pet. 61 (citing Ex. 1007, 40).

Petitioner argues, "the steps of '*monitoring*' for the occurrence of the condition (i.e., '*conditional functionality*') and then '*in response*' taking a defined action (i.e., '*consequential functionality*') as required in claim 19 are wholly inclusive of the noted limitations of claim 15." Pet. 61. "Therefore," Petitioner argues, "any '*outgoing communications trigger*' that discloses the limitations of claim 19 would likewise, and necessarily, disclose any possible antecedent limitations imported from claim 15." *Id.* (citing Ex. 1003 ¶ 453).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 19. *See, e.g.*, Resp. 65–118.

Petitioner has also shown persuasively that the combination of Kiss/FIPA97 teaches or suggests the limitations of dependent claim 19 because FIPA97 discloses a '*time trigger*' in the form of the performative 'requestwhen,' that allows an agent to request an action be taken when a given precondition becomes true. *See* Ex. 1007, 40. FIPA97 shows the precondition for the trigger is an alarm or timer. *See* Ex. 1003 ¶ 448. In the FIPA97 example agent i will inform agent j when a specific alarm occurs. *See* Ex. 1007, 40. The agent will take an action ("notify") based on a precondition ("as soon as an alarm occurs") where the precondition is defined in terms of time (an "alarm"). *Id.*; *see also* Ex. 1003 ¶ 449.

Petitioner has also demonstrated that FIPA97 shows "*monitoring for the occurrence of a particular time condition*" because the agent that receives a "request-when" performative should either refuse to take on the commitment, or should arrange to ensure that the action will be performed when the condition becomes true ("*monitoring*"). *See* Ex. 1007, 40). The proposition may relate to time (i.e. the time at which the alarm goes off). *Id.*; *see also* Ex. 1003 ¶ 450.

Petitioner has demonstrated that FIPA97 shows determining whether "*a particular time condition satisfying the trigger conditional functionality*" has occurred, because the "request-when" performative will persist until such time as it is discharged by the condition becoming true. *See* Ex. 1007, 40. The agent must evaluate the proposition ("*conditional functionality*"), in this case whether the alarm has fired, to determine whether the precondition has become true. *See id.* Once the alarm has fired ("*a particular time condition*"), the agent will evaluate and determine that the alarm satisfies the precondition ("*satisfying the trigger conditional functionality*"), and then determine which action should be taken." *See* Ex. 1003 ¶ 451.

Petitioner has also demonstrated that FIPA97 discloses "*performing the particular consequential functionality defined by the trigger*," because in the FIPA97 example, the receiving agent is asked to "inform" ("*particular consequential functionality defined by the trigger*") the sending agent that the alarm has fired. *See* Ex. 1007, 40. The receiving agent will perform "*the particular consequential functionality defined by the trigger*" in response to "*a particular state event.*" *See* Ex. 1003 ¶ 452. The "*time trigger*" also shows a "*base goal that requires setting a trigger*" (i.e., "[a]gent i tells agent j to notify it as soon as an alarm occurs"), with "*conditional functionality*" (i.e., "as soon as an alarm occurs"), and "*consequential functionality*" (i.e., agent j to notify agent i). *See* Ex. 1007, 40. Petitioner's evidence is supported by the declaration of Dr. Lieberman. *See, e.g.*, Ex. 1003 ¶¶ 447–453.

For these reasons we find Petitioner has demonstrated, by a preponderance of the evidence, that dependent claim 19 is unpatentable under § 103 over the combined teachings of Kiss and FIPA97.

*d. Claims 34, 38, 41, 42*

Claims 34, 38, 41, and 42 depend directly or indirectly from claim 29. Petitioner's arguments and evidence presented with respect to these dependent claims either address the additionally recited limitations of these claims or rely on the same arguments and evidence presented for claims 15, 18, and 19, and, therefore, do not remedy the deficiencies in Petitioner's analysis of independent claim 29 discussed above. *See* Pet. 66–67.

For the same reasons discussed above with respect to claim 29, Petitioner does not demonstrate by a preponderance of evidence that claims 34, 38, 41, and 42 are unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss and FIPA97.

*10. Obviousness over Kiss, FIPA97, and Cohen*

Petitioner argues the combination of Kiss, FIPA97, and Cohen, teaches or suggests the recited limitations of dependent claims 17, 20–25, 40, 43, and 44. Pet. 67–77. Petitioner argues that Cohen discloses facilitator agent functionality relating to its Blackboard server that, when combined with the teachings of Kiss and FIPA97, satisfies the requirements of those claims. *Id.* at 67. Petitioner argues that in combination with Kiss and FIPA97, "Cohen's Blackboard server functionality would be added to the meta server/agent registry of Kiss/FIPA97." *Id.* at 68.

Petitioner asserts Cohen describes the same OAA architecture as the '115 patent, so it is analogous art to Kiss, FIPA97 and the '115 Patent. *Id.* (citing Ex. 1003 ¶¶ 220–221, 437–438; Ex. 1014, 1). The combination of Cohen, Kiss, and FIPA97, Petitioner argues:

> would have been the arrangement of old elements (i.e., Blackboard server functionality of Cohen, the functionality of FIPA97, and the system of Kiss) with each performing the same function it had been known to perform (e.g., methods of complex

> trigger implementation (Cohen); implementing communication between distributed agents (FIPA97V1); distributed agents conducting cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate and set triggers to conduct cooperative task completion and problem solving).

Pet. 68 (citing Ex. 1003 ¶ 439).

Petitioner also argues:

> A Skilled Artisan would have been motivated to combine Cohen with Kiss/FIPA97 in this manner because Cohen encourages the incorporation of components from other systems and seeks to 'support distributed execution of a user's requests' (Ex. 1014, 1), as does FIPA97 (Ex. 1007, vii), and Kiss (Ex. 1005, 3:1–4), which would have a led a Skilled Artisan to consider these agents-based technologies in combination. Ex. 1003 ¶ 440. Moreover, the Cohen Blackboard server operates as a 'facilitator agent,' (Ex. 1014, 2; Ex. 1003 ¶¶ 456, 652, 686), as does the meta-agent/agent registry of Kiss/FIPA97 (Ex. 1005, 12:21–14:30, Figs. 8–20; Ex. 1006, 6–7; Ex. 1003 ¶¶ 348–351), providing additional motivation to combine such similar functionality of these systems in order to achieve the benefits of each.

Pet. 68–69.

Petitioner further argues, "Cohen discloses several characteristics of his disclosed agents that would have motivated a Skilled Artisan to adopt his teachings." *Id.* at 69 (citing Ex. 1014, 1).

Patent Owner argues "[t]he '115 Patent [] distinguishes between the facilitator and prior art 'blackboard architectures.'" Resp. 83. According to Patent Owner, "[t]he specification then points out the major disadvantage of the blackboard system – one that introduction of the '115 Patent's facilitation directly solves: 'the [blackboard] framework does not provide

programmatic control for doing so in cases where this would be practical.'" *Id.* at 84 (citing Ex. 1001, 4:14–16).

Patent Owner argues:

> it is clear that blackboard architecture does not embody the claimed facilitation of the '115 Patent. (Ex. 2032 ¶¶ 120–122.) As Dr. Medvidovic explains, a blackboard system is simply a way for multiple agents to share knowledge about what tasks need completion. It is completely devoid of any kind of centralized control or planning aspects that are critical to the facilitator agent limitations of the '115 Patent.

Resp. 84 (citing Ex. 2032 ¶¶ 123–124).

In its Reply, Petitioner points out that Patent Owner "attacks Cohen individually, but does not address the combination [of Kiss/FIPA97] including Cohen," even though the Petition "[n]ever argue[d] that the Blackboard by itself discloses the claimed facilitator agent. Reply 46. Petitioner argues that the Petition "shows how a Skilled Artisan would borrow some functionality from previously known Blackboard systems, such as Cohen. Specifically, trigger management and other distributed server techniques that are calculated to improve the system." *Id.* (citing Pet. 72–74).

In its Sur-reply, Patent Owner points out that "Petitioner does not argue that *Cohen* discloses any functionality associated with the facilitator agent, except that a Skilled Artisan 'may borrow' some concepts, such as 'trigger management' or 'distributed server techniques.'" Sur-reply 46 (citing Reply 46). These statements, Patent Owner argues, "fail to tie the reference to any particular claim elements." Sur-reply at 46–47.

We agree with Petitioner. "[One] cannot show non-obviousness by attacking references individually where . . . the rejections are based on combinations of references." *Boundary Solns. Inc. v. Corelogic, Inc.*, 711

Fed. Appx. 627, 631–632 (Fed. Cir. 2017) (quoting *In re Keller*, 642 F.2d 413, 425 (CCPA 1981).

Petitioner makes clear that in combination with Kiss and FIPA97, "Cohen's Blackboard server functionality would be *added* to the meta server/agent registry of Kiss/FIPA97." Pet. 68 (emphasis added). Petitioner explains that the proposed combination may include "methods of complex trigger implementation (Cohen); implementing communication between distributed agents (FIPA97V1); [and] distributed agents conducting cooperative task competition and problem solving (Kiss)" to yield "a system of distributed agents, able to communicate and set triggers to conduct cooperative task completion and problem solving." Pet. 68 (citing Ex. 1003 ¶ 439). Petitioner's position is supported by Dr. Lieberman's declaration. *See, e.g.*, Ex. 1003 ¶¶ 428–440.

Given Petitioner's proposed combination of Kiss/FIPA97/Cohen, Patent Owner's arguments that Cohen's "blackboard architecture is simply a way for agents to share communication and contains no disclosure of facilitation," and "that blackboard architecture does not embody the claimed facilitation of the '115 Patent," are nonresponsive to the proposed combination, and therefore, unavailing. *See* Resp. 83–84.

*11. Dependent Claims 17, 20–25, 40, 43, and 44*

Petitioner argues the combination of Kiss, FIPA97, and Cohen teaches or suggests the recited limitations of dependent claims 17, 20–25, 40, 43, and 44. Pet. 67–77. Claims 17 and 20–25 depend, directly or indirectly, from independent claim 1. Claims 40, 43, and 44 depend, directly or indirectly, from independent claim 29.

*a. Claim 17*

Claim 17 recites "A computer-implemented method as recited in claim 15 wherein the trigger is an incoming communications trigger, the computer implemented method further including the acts of: monitoring all incoming communication events in order to determine whether a specific incoming communication event has occurred; and in response to the occurrence of a specific incoming communication event satisfying the trigger conditional functionality, performing the particular consequential functionality defined by the trigger."

Petitioner concedes that the combination of Kiss/FIPA97 does not expressly disclose the "*incoming communications trigger"* as recited in claim 17. Pet. 69. Petitioner argues, however, that Cohen discloses an "*incoming communications trigger." Id.* (citing Ex. 1014, 5, Fig. 2; Ex. 1003 ¶ 428). Petitioner argues Cohen's trigger is an *incoming communication trigger"* because the precondition ("when mail arrives for me about security") is designed to monitor incoming messages. Ex. 1003 ¶ 429.

Petitioner argues "Cohen further discloses '*monitoring all incoming communication events'* by causing the trigger to be installed on the mail agent, which continuously 'poll' the mail database '*to determine whether a specific incoming communication event has occurred,*' such as a security message." Pet. 70 (citing Ex. 1014, 4; Ex. 1003 ¶¶ 430–431).

Petitioner argues:

> Cohen also discloses *"in response to the occurrence of a specific incoming communication event satisfying the trigger conditional functionality, performing the particular consequential functionality defined by the trigger,"* because once the mail agent has determined that a security message has arrived, it will with the help of other agents locate, telephonically contact, verify and communicate the message to the user.

Pet. 70 (citing Ex. 1014, 4, 5 Fig. 2; Ex. 1003 ¶¶ 432–433).

Further, Petitioner argues:

> the *"incoming communications trigger"* disclosed in Cohen likewise discloses a *"base goal that requires setting a trigger"* (i.e., "When mail arrives for me about a security break, get it to me"), Ex. 1014, 4, with *"conditional functionality"* (i.e., "Once the mail agent has determined that a message matching the requested topic has arrived for the user,"), *Id.*, and *"consequential functionality"* (i.e., "it posts a query to find out the user's current location."), *Id*. Additionally the steps of *"monitoring"* for the occurrence of the condition (i.e., *"conditional functionality"*) and then *"in response"* taking a defined action (i.e., *"consequential functionality"*) as required in claim 17 are wholly inclusive of the noted limitations of claim 15. Therefore, any *"incoming communications trigger"* that discloses the limitations of claim 17 would likewise, and necessarily, disclose any possible antecedent limitations imported from claim 15.

Pet. 70 (citing Ex. 1003 ¶ 435).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 17. *See, e.g.*, Resp. 83–84.

Petitioner has shown persuasively that the combination of Kiss/FIPA97/Cohen teaches or suggests the recited limitations of dependent claim 17 because Cohen's trigger ("when mail arrives for me about security, get it to me") monitors incoming messages ("incoming communication trigger"). *See* Ex. 1015, 5. Cohen's trigger is an *incoming communication trigger"* because the precondition ("when mail arrives for me about security") is designed to monitor incoming messages. *See* Ex. 1003 ¶ 429. Cohen's trigger is installed on the mail agent, which continuously polls the mail database ("monitoring all incoming mail events") in order "*to determine whether a specific incoming communication event has occurred*," such as a security message. *See* Ex. 1014, 4; Ex. 1003 ¶¶ 430–431. Once

the mail agent has determined, for example, that a security message has arrived (“*in response to the occurrence of a specific incoming communication event”*), it will communicate the message to the user (“*performing the particular consequential functionality defined by the trigger*). *See* Ex. 1014, 4–5; Ex. 1003 ¶¶ 432–433. Petitioner’s evidence is supported by the declaration of Dr. Lieberman. *See, e.g.,* Ex. 1003 ¶¶ 175–184, 427–440.

For these reasons we find Petitioner has demonstrated, by a preponderance of the evidence, that dependent claim 17 is unpatentable under § 103 over the combined teachings of Kiss/FIPA/Cohen.

*b. Claim 20*

Claim 20 recites “[a] computer-implemented method as recited in claim 15 wherein the trigger is installed and executed within the facilitator agent.”[31]

Petitioner argues Cohen teaches a *“trigger”* that is *“installed and executed within the facilitator agent”* in the form of a message trigger installed in the blackboard agent. Pet. 71. In the Cohen system, Petitioner argues, there is a “database agent” which stores files global to all agents. *Id.* (citing Ex. 1014, 3). According to Petitioner, “Cohen explains that not all facts posted to the blackboard server are stored in this database, and that specific facts are stored ‘**by placing a trigger on the blackboard** asking to be notified of certain changes in certain predicates.’” Pet. 71 (citing Ex. 1014, 3). Therefore, Petitioner argues, a *“trigger”* is *“installed”* on the blackboard server. Moreover, Petitioner argues, the trigger is *“executed”* by

[31] For claims 20–25, we consider aspects of Petitioner’s evidence and arguments with respect to the recited “facilitator agent” in §§ II.C.10 *supra*.

the blackboard server, as the blackboard is asked to notify an agent when "certain changes in certain predicates" occur. Pet. 71 (citing Ex. 1014, 3; Ex. 1003 ¶ 457).

Moreover, Petitioner argues, "it would have been obvious in the combined system to implement this blackboard functionality with the [Directory Facilitator] of FIPA and the meta-agent of Kiss because each is '*a facilitator agent*' in that it facilitates the cooperation in resolving requests by, for example, assigning tasks (sub-goals) to the various specialized agents of the system) and managing the flow of communication during distributed computation.'" Pet. 71–72 (citing Ex. 1005, 8:32–44, 12:21–14:29; Ex. 1006, 6–7; Ex. 1014, 2; Ex. 1003 ¶ 235).

Petitioner also argues this *"trigger"* discloses a *"base goal that requires setting a trigger"* (i.e., "asking to be notified of certain changes in certain predicates"), with *"conditional functionality"* (i.e., "certain changes in certain predicates"), and *"consequential functionality"* (i.e., "asking to be notified"). Pet 72 (citing Ex. 1014, 3). Therefore, Petitioner argues, the disclosed trigger satisfies any antecedent basis imported from claim 15. Pet. 72 (citing Ex. 1003 ¶ 459).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 20. *See, e.g.,* Resp. 83–84.

Petitioner has shown persuasively that the combination of Kiss/FIPA97/Cohen teaches or suggests the recited limitations of dependent claim 20 because Cohen, in combination with Kiss/FIPA97, describes a message trigger installed in a blackboard agent wherein specific facts are stored by placing a trigger on the blackboard asking to be notified of certain changes in certain predicates ("a trigger is installed within the facilitator agent"). *See* Ex. 1014, 3. Cohen teaches that the trigger is *"executed"* by

the blackboard server, as the blackboard is asked to notify an agent when "certain changes in certain predicates" occur. *Id.* Petitioner's position is supported by the declaration of Dr. Lieberman. *See, e.g.,* Ex. 1003 ¶¶ 454–459.

For these reasons we find Petitioner has demonstrated, by a preponderance of the evidence, that dependent claim 20 is unpatentable under § 103 over the combined teachings of Kiss/FIPA/Cohen.

*c. Claim 21*

Claim 21 recites "[a] computer-implemented method as recited in claim 15 wherein the trigger is installed and executed, within a first service-providing agent."

Petitioner argues that in the context of the '115 Patent a "*service-providing agent"* is a client agent that provides some service. Pet. 72 (citing Ex. 1001, 5:3–8; Ex. 1003 ¶ 461). Petitioner argues that Cohen describes a trigger that is "*is installed and executed, within a first service-providing agent"* in the form of a communications trigger installed and executed in a mail agent. Pet. 72 (citing Ex. 1014, Fig. 2; Ex. 1003 ¶ 462). Petitioner argues "the trigger is designed to forward a message to the user; '[w]hen mail arrives . . . about a security break.'" Pet. 72 (citing Ex. 1014, 4; Ex. 1003 ¶ 463).

Petitioner argues that the *"trigger"* teaches a *"base goal that requires setting a trigger"* (i.e., "When mail arrives for me about a security break, get it to me"), with *"conditional functionality"* (i.e., "Once the mail agent has determined that a message matching the requested topic has arrived for the user,"), and *"consequential functionality"* (i.e., "it posts a query to find out the user's current location."). Pet. 72–73 (citing Ex. 1014, 4). Therefore,

Petitioner argues, the disclosed trigger satisfies any antecedent basis imported from claim 15. Pet. 72–73 (citing Ex. 1003 ¶ 464).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 21. *See, e.g.*, Resp. 83–84.

Petitioner has shown persuasively that the combination of Kiss/FIPA97/Cohen teaches or suggests the recited limitations of dependent claim 21 because Cohen, in combination with Kiss/FIPA97, describes a trigger in the form of a communications trigger installed and executed in a mail agent trigger ("*installed and executed, within a first service-providing agent"*). *See* Ex. 1014, Fig. 2; Ex. 1003 ¶ 462. Cohen's trigger is designed to forward a message to the user (e.g. "[w]hen mail arrives . . . about a security break"). *See* Ex. 1014, 4; Ex. 1003 ¶ 463. Petitioner's position is supported by the declaration of Dr. Lieberman. *See, e.g.*, Ex. 1003 ¶¶ 460–464.

For these reasons we find Petitioner has demonstrated, by a preponderance of the evidence, that dependent claim 21 is unpatentable under § 103 over the combined teachings of Kiss/FIPA/Cohen.

*d. Claim 22*

Claim 22 recites "[a] computer-implemented method as recited in claim 15 wherein the conditional functionality of the trigger is installed on a facilitator agent."

Petitioner argues, "<u>Cohen</u> discloses a trigger where it's '*conditional functionality . . . is installed on a facilitator agent'* in the form of a monitor trigger installed on a blackboard server that acts as a 'facilitator agent.'" Pet. 73 (citing Ex. 1001, 6:32–37; Ex. 1014, 2; Ex. 1003 ¶¶ 456, 466). Cohen, Petitioner points out, "explains that a trigger can be placed on the blackboard asking the blackboard to notify certain agents when there are

'certain changes in certain predicates.'" Pet. 73 (citing Ex. 1014, 3). Therefore, Petitioner argues, "when a fact is posted to the blackboard, the blackboard decides whether there has been any change in the predicate that would warrant notifying the appropriate agents." Pet. 73 (citing Ex. 1014, 3; Ex. 1003 ¶ 466).

This *"trigger,"* Petitioner argues, likewise discloses a *"base goal that requires setting a trigger"* (i.e., "asking to be notified of certain changes in certain predicates"), with *"conditional functionality"* (i.e., "certain changes in certain predicates"), and *"consequential functionality"* (i.e., "asking to be notified"). Pet. 73–74. Therefore, Petitioner argues, the disclosed trigger satisfies any antecedent basis imported from claim 15. Pet. 74 (citing Ex. 1003 ¶ 467).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 22. *See, e.g.,* Resp. 83–84.

Petitioner has shown persuasively that the combination of Kiss/FIPA97/Cohen teaches or suggests the recited limitations of dependent claim 22 because Cohen, in combination with Kiss/FIPA97, describes a trigger in the form of a monitor trigger installed on a blackboard server that acts as a facilitator agent ("*installed on a facilitator agent").* Cohen explains that such a trigger can be placed on the blackboard asking the blackboard to notify certain agents when there are certain changes in certain predicates ("*conditional functionality").* *See* Ex. 1001, 6:32–37; Ex. 1014, 2, 3; Ex. 1003 ¶¶ 456, 466. Petitioner's position is supported by the declaration of Dr. Lieberman. *See, e.g.,* Ex. 1003 ¶¶ 465–467.

For these reasons we find Petitioner has demonstrated, by a preponderance of the evidence, that dependent claim 22 is unpatentable under § 103 over the combined teachings of Kiss/FIPA/Cohen.

*e. Claim 23*

Claim 23 recites "[a] computer-implemented method as recited in claim 22 wherein the consequential functionality is installed on a specific service-providing agent other than a facilitator agent."

Petitioner argues Cohen discloses having the *"consequential functionality"* of a trigger *"installed on a specific service-providing agent other than a facilitator agent."* Petitioner argues Cohen shows a "database agent" which stores files global to all agents. Pet. 74 (citing Ex. 1014, 3). Petitioner points out, however, that not all facts posted to the blackboard server are stored in this database, and certain facts are stored and updated "**by placing a trigger on the blackboard** asking to be notified of certain changes in certain predicates." Pet. 74 (citing Ex. 1014, 3). The blackboard server (*"facilitator agent"*), Petitioner argues, notifies the "database agent" (*"specific service-providing agent"*) to take the *"consequential"* action of updating its internal state. Pet. 74 (citing Ex. 1014, 3; Ex. 1003 ¶ 469).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 23. *See, e.g.*, Resp. 83–84.

Petitioner has shown persuasively that the combination of Kiss/FIPA97/Cohen teaches or suggests the recited limitations of dependent claim 23 because Cohen, in combination with Kiss/FIPA97, describes a "database agent" which stores files related to all agents. *See* Ex. 1014, 3. In Cohen, certain facts are stored and updated "by placing a trigger on the blackboard asking to be notified of certain changes in certain predicates." *See* Ex. 1014, 3. The blackboard server (*"facilitator agent"*), notifies the "database agent" (*"specific service-providing agent"*) to take the *"consequential"* action of updating its internal state. *See* Ex. 1014, 3; Ex.

1003 ¶ 469. Petitioner's position is supported by the declaration of Dr. Lieberman. *See, e.g.,* Ex. 1003 ¶¶ 468–469.

For these reasons we find Petitioner has demonstrated, by a preponderance of the evidence, that dependent claim 23 is unpatentable under § 103 over the combined teachings of Kiss/FIPA/Cohen.

*f. Claim 24*

Claim 24 recites "[a] computer-implemented method as recited in claim 15 wherein the conditional functionality of the trigger is installed on specific service providing agent other than a facilitator agent."

Petitioner argues Cohen discloses a trigger with *"conditional functionality"* installed on a mail agent. Pet. 74. Petitioner points out that Cohen shows the operational flow of setting a trigger for the query "When mail arrives for me about a security break, get it to me." Pet. 74–76 (citing Ex. 1014, 4, Fig. 2; Ex. 1003 ¶ 471). In processing the request, Petitioner explains, the blackboard server determines that the "trigger should be installed on the mail agent." Pet. 75 (citing Ex. 1014, 4). Petitioner points out the *"conditional functionality"* is also installed on the mail agent. Pet. 75 (citing Ex. 1014, 4). Petitioner argues "[t]he mail agent polls the user's mail database to determine when a 'message matching the requested topic has arrived for the user.'" Pet. 75 (citing Ex. 1014, 4). Therefore, Petitioner argues, the *"conditional functionality"* part of the trigger is installed on the mail agent (*"specific service providing agent other than a facilitator agent."*). Pet. 75 (citing Ex. 1014, 4; Ex. 1003 ¶ 472).

Petitioner argues this *"trigger" also* discloses a *"base goal that requires setting a trigger"* (i.e., "When mail arrives for me about a security break, get it to me"), with *"conditional functionality"* (i.e., "Once the mail agent has determined that a message matching the requested topic has

arrived for the user,"), and *"consequential functionality"* (i.e., "it posts a query to find out the user's current location."). Pet. 75 (Ex. 1014, 4). Therefore, Petitioner argues, the disclosed trigger satisfies any antecedent basis imported from claim 15. Pet. 75 (citing Ex. 1003 ¶ 473).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 24. *See, e.g.*, Resp. 83–84.

Petitioner has shown persuasively that the combination of Kiss/FIPA97/Cohen teaches or suggests the recited limitations of dependent claim 24 because Cohen, in combination with Kiss/FIPA97, describes a trigger with *"conditional functionality"* installed on a mail agent. Cohen shows the operational flow of setting a trigger for the query "When mail arrives for me about a security break, get it to me." *See* Ex. 1014, 4, Fig. 2; Ex. 1003 ¶ 471. In processing the request, Cohen's blackboard server determines that the "trigger should be installed on the mail agent." *See* Ex. 1014, 4. The *"conditional functionality"* is also installed on the mail agent. *See* Ex. 1014, 4. The mail agent polls the user's mail database to determine when a "message matching the requested topic has arrived for the user." *See* Ex. 1014, 4. Petitioner's position is supported by the declaration of Dr. Lieberman. *See, e.g.*, Ex. 1003 ¶¶ 470–473.

For these reasons we find Petitioner has demonstrated, by a preponderance of the evidence, that dependent claim 24 is unpatentable under § 103 over the combined teachings of Kiss/FIPA/Cohen.

*g. Claim 25*

Claim 25 recites "[a] computer-implemented method as recited in claim 15 wherein the consequential functionality of the trigger is installed on a facilitator agent.

Petitioner argues Cohen discloses the "*consequential functionality of the trigger"* installed on the blackboard server agent. Pet. 75–76 (citing Ex. 1014, 2). Cohen, Petitioner points out, explains that agents "can either post a request of a specific agent for the information, or it may post a general request on the blackboard." Pet. 76 (citing Ex. 1014, 2). Petitioner argues, "[w]hen the agent utilizes the blackboard 'all agents who can contribute to the search will send solutions to the blackboard for routing to the originator of the request.'" Pet. 76 (citing Ex. 1014, 2). The agent, Petitioner argues, may choose to either "wait until all answers return before continuing processing" or it may "set a trigger indicating that when the remote computation is finished, a notification should interrupt local work in progress." Pet. 76. The *"consequential functionality"* of the trigger (i.e., notification that interrupts the local work) is installed to control the "remote computation" (*"installed on a facilitator agent"*). Pet. 76 (citing Ex. 1003 ¶¶ 435–440, 456–458, 475).

Petitioner also argues that this *"trigger"* discloses a *"base goal that requires setting a trigger"* (i.e., "When mail arrives for me about a security break, get it to me"), with *"conditional functionality"* (i.e., "Once the mail agent has determined that a message matching the requested topic has arrived for the user,"), and *"consequential functionality"* (i.e., "it posts a query to find out the user's current location."). Pet. 75 (citing Ex. 1014, 4). Therefore, Petitioner argues, the disclosed trigger satisfies any antecedent basis imported from claim 15. Pet. 76 (citing Ex. 1003 ¶ 476).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 25. *See, e.g.*, Resp. 83–84.

Petitioner has shown persuasively that the combination of Kiss/FIPA97/Cohen teaches or suggests the recited limitations of dependent

claim 22 because Cohen, in combination with Kiss/FIPA97, describes agents that “can either post a request of a specific agent for the information, or it may post a general request on the blackboard.” *See* Ex. 1014, 2. When Cohen’s agent utilizes the blackboard “all agents who can contribute to the search will send solutions to the blackboard for routing to the originator of the request.” *See* Ex. 1014, 2. The agent may choose to either “wait until all answers return before continuing processing” or it may “set a trigger indicating that when the remote computation is finished, a notification should interrupt local work in progress.” The *“consequential functionality”* of the trigger (i.e., notification that interrupts the local work) is installed to control the “remote computation” (*“installed on a facilitator agent”*). *See* Ex. 1003 ¶¶ 435–440, 456–458, 475. Petitioner’s position is supported by the declaration of Dr. Lieberman. *See, e.g.,* Ex. 1003 ¶¶ 474–476.

For these reasons we find Petitioner has demonstrated, by a preponderance of the evidence, that dependent claim 25 is unpatentable under § 103 over the combined teachings of Kiss/FIPA/Cohen.

*h. Dependent Claims 40, 43, 44*

Claims 40, 43, and 44 depend directly or indirectly from claim 29. Petitioner’s arguments and evidence presented with respect to these dependent claims either address the additionally recited limitations of these claims or rely on the same arguments and evidence presented for claims 17, 20, and 21, and, therefore, do not remedy the deficiencies in Petitioner’s analysis of independent claim 29 discussed above. *See* Pet. 77.

For the same reasons discussed above with respect to claim 29, Petitioner does not demonstrate by a preponderance of evidence that claims 40, 43, and 44 are unpatentable under 35 U.S.C. § 103(a) over the combination of Kiss and FIPA97.

*D. Motion to Exclude*

Patent Owner filed a Motion to Exclude (Paper 35, "Motion") certain "a portion of Exhibit 1129, as well as related testimony relied on by [Petitioner]." Paper 35, 1. Exhibit 1129 is the deposition transcript of Patent Owner's expert Dr. Medvidovic, taken on May 19, 2020. Patent Owner seeks to exclude Petitioner's reliance "on portions of Dr. Medvidovic's deposition testimony that should be excluded because the question on which the testimony is based is vague, ambiguous, confusing, lacks foundation and calls for a legal conclusion. And any testimony elicited from this improper question is irrelevant, prejudicial, and misleading." *Id.*

In particular, Patent Owner seeks to exclude lines 53:19–54:21 of Exhibit 1129, which reads as follows:

> Q: If that's true, then it's your opinion these three things, these three types of processing are required to teach '115's facilitator, correct?
>
> MS. ABDULLAH: Objection.
>
> BY THE WITNESS:
>
> A: I think that the authors of the patent, the inventors were very careful to specify that this is is an embodiment. It's a preferred embodiment. There are other embodiments that they discuss. For this particular embodiment that deals with compound goals, delegation, optimization and interpretation are preferably involved. So this is the preferred embodiment. This is a legal thing, not a technical thing. What a preferred embodiment is, that's something that appears in patents, pretty much every patent I've ever read, software patent, anyway. It is something that has a particular meaning. So if you want to handle compound goals, you need to have three types of processing preferably, delegation, optimization and interpretation. So it is my opinion that anybody who tries or, sorry, anybody who is claiming, purporting to be solving the same kinds of problems needs to show an embodiment that matches those three.

Ex. 1129, 53:19–54:21.

Patent Owner argues that Petitioner "attempts to use this improper testimony to support its incorrect conclusion that 'delegation, optimization, and interpretation' are 'functionalities [] limited to a preferred embodiment, (EX1001, 19:1-4), so they are not relevant to the claims.' Paper 35, 3 (citing Reply 37). Patent Owner argues that Petitioner's "Microsoft's question was vague, ambiguous, confusing, lacked foundation and called for a legal conclusion." Paper 35, 3–4. Patent Owner also argues "the testimony is irrelevant, prejudicial, and misleading. *Id.* at 4.

Petitioner opposes the motion (Paper 36), arguing that the testimony is admissible and that Petitioner's counsel "failed to object to this question with sufficient specificity at the appropriate time." Paper 36, 1 (citing PTAB Consolidated Trial Practice Guide, pg. 128 (November 2019) ("An objection must be stated concisely in a non-argumentative and non-suggestive manner."). Petitioner points out that Patent Owner's counsel "only said 'Objection' but failed to indicate what type of objection—*i.e.*, form, relevance, etc." Paper 36, 1. Petitioner argues that for the first time, Patent Owner "now attempts to assert multiple grounds for exclusion which were not previously raised—objections which it has waived." *Id.* "Furthermore," Petitioner argues, Patent Owner "does not explain how the question is "vague, ambiguous, and confusing," and that "summarily saying it is without more is insufficient to challenge admissibility." *Id.* at 1–2 (citing 37 CFR § 42.20 (c); *Samsung Electronics America, Inc. v. Uniloc 2017 LLC,* IPR2017-01798, Paper 32, 103 (PTAB Jan. 31, 2019)).

Petitioner also points out that:

> the party proffering a witness for cross-examination has the opportunity to conduct redirect examination of the witness

> immediately following the cross-examination to cure any perceived deficiency or to provide a more complete answer. *See* 37 CFR § 42.53(c)(2); *CBS Interactive Inc. v. Helferich Patent Licensing, LLC*, IPR2013-00033, Paper 101 (Oct. 7, 2013); *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, IPR2012-00001, Paper 50 (July 18, 2013). Here, IPA did not avail themselves of this opportunity. Ex. 1129, 164:15-16 ("MS. ABDULLAH: IPA does not have any redirect").

Paper 36, 2.

In its Reply (Paper 38), Patent Owner argues "[t]he vague, ambiguous, confusing, lack of foundation, and legal conclusion nature of questions asked by Microsoft's counsel in Exhibit 1129 is clear both on its face and by Dr. Medvidovic's deposition response," and that "[Patent Owner's] counsel properly and timely objected." Paper 38, 1.

We are not persuaded by Patent Owner's arguments that Dr. Medvidovic's testimony should be excluded from evidence in this proceeding. Although Patent Owner's counsel did state the word "Objection" in response to Petitioner's question to Dr. Medvidovic, Patent Owner's counsel did not state the nature of objection, thus depriving Petitioner's counsel of the opportunity to cure the objection by rephrasing the question.

In its Motion to Exclude, Patent Owner now takes the position that the question is "vague, ambiguous, confusing, lacks foundation and calls for a legal conclusion." Paper 35, 1. Patent Owner, however, does not explain adequately how the question is vague, ambiguous or confusing, other than to state that "Dr. Medvidovic['s] testimony highlights the vague, ambiguous, and confusing nature of Microsoft's question." *Id.* at 2. Nor does Patent Owner explain adequately how the question lacks foundation or calls for a legal conclusion aside from pointing to Dr. Medvidovic's response that

"[t]his is a legal thing, not a technical thing" in reference to the term "preferred embodiment." *Id.*

Patent Owner also argues that Dr. Medvidovic's response to the question is "irrelevant, prejudicial, and misleading." *Id.* at 4. Dr. Medvidovic's testimony, however, concerns his understanding of a preferred embodiment described in the '115 patent and his opinion of whether the prior art, in particular, Kiss, teaches a "facilitator." *See, e.g.,* Ex. 1129, 52:15–54:21. We find it difficult to see how Dr. Medvidovic's testimony is "irrelevant," since it goes to his understanding of the '115 patent, the asserted prior art, and the nature of his opinion in this proceeding.

It is also relevant to note, as Petitioner points out, that Patent Owner's counsel had "the opportunity to conduct redirect examination of the witness immediately following the cross-examination to cure any perceived deficiency or to provide a more complete answer." Paper 36, 2 (citing 37 CFR § 42.53(c)(2); *CBS Interactive Inc. v. Helferich Patent Licensing, LLC,* IPR2013-00033, Paper 101 (Oct. 7, 2013); *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, IPR2012-00001, Paper 50 (July 18, 2013). Patent Owner's counsel, however, declined to redirect any questions to Dr. Medvidovic. *See* Ex. 1129, 164:15–16.

As for Dr. Medvidovic's testimony being prejudicial or misleading, the Board, sitting as a non-jury tribunal with particular administrative and technical expertise, is not as vulnerable to being misled or prejudiced as a jury might, and is well-positioned to determine and assign appropriate credibility and weight to the evidence presented at trial, without resorting to a formal exclusion of evidence that might later be held to be reversible error. *See, e.g., Liberty Mutual Insurance Co. v Progressive Casualty Insurance Co.*, Case CBM2012- 00002, slip op. at 70 (PTAB, Jan, 23, 2014) (Paper

66), *Gnosis S.P.A., et al. v S. Alabama Medical Science Foundation,* Case IPR2013-00118, slip op. at 43 (PTAB June 20, 2014) (Paper 64).

For these reasons, we deny Patent Owner's Motion.

## III. CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 15, and 17–25 of the ’115 patent are unpatentable on the bases set forth in the following table.[32]

| **Claims** | **35 U.S.C. §** | **References** | **Claims Shown Unpatentable** | **Claims Not shown Unpatentable** |
|---|---|---|---|---|
| 1, 15, 18, 19, 29, 34, 38, 41, 42 | 103 | Kiss, FIPA97 | 1, 15, 18, 19 | 29, 34, 38, 41, 42 |
| 17, 20–25, 40, 43, 44 | 103 | Kiss, FIPA97, Cohen | 17, 20–25 | 40, 43, 44 |
| **Overall Outcome** | | | 1, 15, 17–25 | 29, 34, 38, 40–44 |

[32] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Final Decision, we draw Patent Owner’s attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

## IV. ORDER

In consideration of the foregoing, it is hereby

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 15, and 17–25 of U.S. Patent No. Patent 6,851,115 B1 are *unpatentable*; and

FURTHER ORDERED that Patent Owner's Motion to Exclude is *denied*; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Joseph Micallef
Scott Border
Ethan Plail
SIDLEY AUSTIN LLP
jmicallef@sidley.com
sborder@sidley.com
eplail@sidley.com

PATENT OWNER:

Steven Hartsell
Sadaf Abdullah
Alexander Gasser
Sarah Spires
SKIERMONT DERBY LLP
shartsell@skiermontderby.com
sabdullah@skiermontderby.com
agasser@skiermontderby.com
sspires@skiermontderby.com

Trials@uspto.gov
571.272.7822

Paper No. 44
Entered: October 15, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

MICROSOFT CORPORATION,
Petitioner,

v.

IPA TECHNOLOGIES, INC.,
Patent Owner.

Case IPR2019-00813
Patent 6,851,115 B1

Before LYNNE E. PETTIGREW, MINN CHUNG, and KEVIN C. TROCK, *Administrative Patent Judges.*

TROCK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Denying Patent Owner's Motion to Exclude
*35 U.S.C. § 318(a); 37 C.F.R. § 42.64*

# I. INTRODUCTION

We have authority to hear this *inter partes* review under 35 U.S.C. § 6. This Final Written Decision issues pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed herein, we determine that Microsoft Corporation ("Petitioner") has shown, by a preponderance of the evidence, that claims 1–3, 11, and 48–60 (the "challenged claims") of U.S. Patent No. 6,851,115 B1 (Ex. 1001, "the '115 patent") are unpatentable. *See* 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

## *A. Procedural History*

Petitioner filed a request for *inter partes* review of the challenged claims of the '115 patent. Paper 1 ("Pet." or "Petition"). IPA Technologies, Inc. ("Patent Owner") filed a Preliminary Response, Paper 6 ("Prelim. Resp."), contending the Petition should be denied as to all challenged claims.

On October 17, 2019, the Board entered a decision instituting an *inter partes* review of all claims and all grounds presented in the Petition. Paper 12 ("Inst. Dec.").

After institution, Patent Owner filed a Response to the Petition. Paper 22 ("Resp."). Petitioner thereafter filed a Reply to Patent Owner's Response. Paper 30 ("Reply"). Patent Owner filed a corrected Sur-reply to Petitioner's Reply. Paper 40 ("Sur-reply"). An oral hearing was held on July 27 and 28, 2020. A transcript of the hearing is included in the record. Paper 43 ("Tr.").

## *B. Related Proceedings*

Petitioner states that the '115 patent is the subject of the following actions: *IPA Technologies Inc. v. Google LLC*, 1-18-cv-00318 (D. Del.) filed

February 26, 2018; *IPA Technologies Inc. v. Microsoft Corporation*, 1-18-cv-00001 (D. Del.) filed January 2, 2018; and *IPA Technologies Inc. v. Amazon.com, Inc. et al.*, 1-16-cv-01266 (D. Del.) filed December 19, 2016. Pet. 3.

Petitioner lists four other petitions (IPR2019-00810, IPR2019-00811, IPR2019-00812, IPR2019-00814) filed by Petitioner against the ’115 patent. *Id.* at 2–3.

Petitioner also lists IPR petitions it has filed against other family members of the ’115 patent (IPR2019-00835, IPR2019-00836, and IPR2019-00837 (U.S. Patent No. 7,069,560 B1); IPR2019-00838, IPR2019-00839, and IPR2019-00840 (U.S. Patent No. 7,036,128 B1)). *Id.* at 2–3.

Petitioner also identifies numerous IPR petitions filed by Google against the ’115 patent and family members of the ’115 patent (IPR2019-00728, IPR2019-00729, IPR2019-00730, IPR2019-00731, IPR2019-00732, IPR2019-00733, IPR2019-00734, IPR2019-00735, IPR2019-00736). *Id.* at 2.

### *C. The ’115 Patent (Ex. 1001)*

The ’115 patent describes software-based architectures for communication and cooperation among distributed electronic agents. Ex. 1001, 1:28–29. The ’115 patent describes an architecture that supports cooperative task completion by flexible, dynamic configurations of autonomous electronic agents. *Id.* at 4:60–62. Service-providing agents declare their capabilities, and facilitator’s broker communication and cooperation between the agents, such as by matching requests with descriptions of capabilities. *Id.* at 4:63–66, 5:6–7.

Figure 3 of the ’115 patent, shown below, depicts a distributed agent system in accordance with one embodiment.




Fig. 3

Figure 3, above, shows a distributed agent system 300 that includes a plurality of agents 320 based around a facilitator agent 310. *Id.* at 6:3–6. “The agents 320 forward service requests to the facilitator agent 310,” which “interprets these requests, organizing a set of goals which are then delegated to appropriate agents for task completion.” *Id.* at 6:10–13.

Figure 4 of the ’115 patent is reproduced below.




Fig. 4

Figure 4, above, depicts the structure of a small system 400 including user interface agents 408, several application agents 404 and meta-agents 406, organized as a community of peers by their common relationship to a facilitator agent 402. *Id.* at 6:25–30. The facilitator 402 is a specialized server agent that is responsible for coordinating agent communications and cooperative problem-solving and may also provide a global data store for its client agents, allowing them to adopt a blackboard style of interaction. *Id.* at 6:32–37. Agents register with a parent facilitator a specification of the capabilities and services that the agent can provide. *Id.* at 7:18–20. During task completion, when a facilitator determines that the registered services 416 of one of its client agents will help satisfy a goal, the facilitator sends that client a request expressed in the Interagent Communication Language (ICL) 418. *Id.* at 7:25–30. The agent parses the request, processes it, and returns answers or status reports to the facilitator. *Id.* at 7:30–32.

The Specification provides an express definition for "Interagent Communication Language": "Interagent Communication Language ('ICL') 418 refers to an interface, communication, and task coordination language

preferably shared by all agents, regardless of what platform they run on or what computer language they are programmed in." *Id.* at 10:48–53.

Figure 7 of the '115 patent is reproduced below.



Fig. 7

Figure 7, above, shows data structures 700 internal to a facilitator including an agent registry 702. Each registered agent may be optionally associated with one or more capabilities, which have associated Capability Declaration fields 708. The '115 patent discloses that "[t]hese capabilities may define not just functionality, but may further provide a utility parameter indicating, in some manner (e.g., speed, accuracy, etc.), how effective the agent is at providing the declared capability." *Id.* at 16:65–17:2.

### *D. Challenged Claims*

Petitioner challenges claims 1–3, 11, and 48–60 of the '115 patent. Pet. 3. Claims 1 and 48 are independent. Claim 1 reads as follows.

> 1. [(a)] A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents, comprising the acts of:

> [(b)(i)] registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities,
> [(b)(ii)] using an expandable, platform-independent, inter-agent language,
> [(c)(i)] wherein the inter-agent language includes: a layer of conversational protocol
> [(c)(ii)] defined by event types
> [(c)(iii)] and parameter lists associated with one or more of the events,
> [(c)(iv)] wherein the parameter lists further refine the one or more events;
> [(d)] a content layer comprising one or more of goals, triggers and data elements associated with the events;
> [(e)(i)] receiving a request for service as a base goal in the inter-agent language,
> [(e)(ii)] in the form of an arbitrarily complex goal expression;
> [(f)] and dynamically interpreting the arbitrarily complex goal expression,
> [(g)] said act of interpreting further comprising: generating one or more sub-goals expressed in the inter-agent language;
> [(h)(i)] constructing a goal satisfaction plan wherein the goal satisfaction plan includes:
> [(h)(ii)] a suitable delegation of sub-goal requests to best complete the requested service request
> [(h)(iii)] by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms;
> [(i)] and dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent.

Ex. 1001, 29:10–44 (numbering and formatting designated by Petitioner; *see* Pet. Att. C).

### *E. Prior Art References*

Petitioner relies upon the following prior art references:

(1) U.S. Patent No. 6,484,155, issued Nov. 19, 2002 ("Kiss") (Ex. 1005);

(2) 1997 FIPA v. 1.0 Specification ("FIPA97") (Ex. 1006–1012);

Petitioner also relies on the Declaration of Dr. Henry Lieberman. Ex. 1003.

### *F. Asserted Ground of Unpatentability*

| **Ground** | **Reference(s)** | **Basis** | **Claims Challenged** |
|---|---|---|---|
| 1 | Kiss/FIPA97 | § 103 | 1–3, 11, 48–60 |

## II. ANALYSIS

### *A. Level of Ordinary Skill*

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).

Petitioner describes a person of ordinary skill in the art as "someone familiar with the principles and conventions of computer science and computer networking, and also with multi-agent systems and inter-agent communication languages as documented in agent-centered literature by 1999." Pet. 4. Petitioner also explains that a person of ordinary skill in the art "may have been a graduate student in mathematics, engineering, or computer science, and may have had an advanced degree in one of these

disciplines, and would also have had at least two years of experience working in the field of computer science, or a related field, and may have worked in academia, either as a professor or a graduate student, for a technology company, or for a government." Pet. 4–5 (citing Ex. 1003 ¶ 34).

In its Response, Patent Owner asserts that a person of ordinary skill in the art at the time of the '115 patent's filing date would have had "a Bachelor's degree in Computer Science or equivalent field and at least two years of work experience in design and development of distributed systems, software specification languages, or a related area." Resp. 23 (citing Ex. 2032 ¶ 37). Patent Owner criticizes Petitioner's description of the level of ordinary skill in the art as being "vague and uncertain" as to render it "meaningless" because of the use of the word "may" in its description. *Id.* Patent Owner contends that Petitioner's proposed description is "particularly problematic here, where Petitioner claims that it would have been obvious to create an agent system that is very complex and advanced in its facilitation, goal processing, and inter-agent communication capacities." *Id.* at 24 (citing Ex. 2032 ¶ 40).

In its Reply, Petitioner argues that its proposal "simply (and realistically) expresses alternatives—*i.e.*, that a Skilled Artisan would have been at least a graduate student in several relevant fields (*e.g*, 'mathematics, engineering, or computer science'), and would have had at least two years of work experience in those fields." Reply 13–14 (citing Pet. 4–5). Petitioner also argues that Patent Owner does not articulate how any differences between the parties' proposals that would alter or even affect the outcome of this proceeding. Reply 14.

In its Sur-reply, Patent Owner argues that it has "identified how the difference between the proposals would affect this proceeding" because

Patent Owner has pointed out that "it is Petitioner's burden under the law to address each *Graham* factor and Petitioner has failed to proffer a coherent level of ordinary skill in the art, Petitioner's obviousness assertion fails for that reason alone." Sur-reply 15 (citing Resp. 24).

Patent Owner, however, does not identify any "meaningful differences" between the parties' proposed definitions or how "the outcome of [this proceeding] would have been different" if we adopted Patent Owner's proposed description, as opposed to Petitioner's proposal. *See ESIP Series 2, LLC v. Puzhen Life USA, LLC*, 958 F.3d 1378, 1385 (Fed. Cir. 2020) (citing *Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1371–72 (Fed. Cir. 2016)). For example, Patent Owner does not argue the challenged claims are not unpatentable under Patent Owner's proposed description of the level of ordinary skill in the art, nor does Patent Owner identify any claim limitation that would have been taught by the asserted prior art under Petitioner's proposal, but *not* under Patent Owner's proposal. *See* Resp. 23–24; Sur-reply 14–16.

In our view, the parties' proposals are not materially different despite the differences in wording between them (e.g., the education level of a Bachelor's degree in Computer Science or equivalent field under Patent Owner's proposal, as opposed to a graduate student's level of education with or without a Bachelor's degree under Petitioner's proposal). For purposes of this Final Written Decision, we find no meaningful differences between the parties' respective proposals that would materially alter the outcome of this Decision. These proposals are similar for all purposes relevant to this Final Written Decision, and both are consistent with the level of ordinary skill in the art reflected in the disclosure of the '115 patent and the prior art of

record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

Nonetheless, for this Final Written Decision, we adopt Patent Owner's description of a person of ordinary skill in the art at the time of the claimed invention. That is, a person of ordinary skill in the art at the time of the claimed invention would have had "a Bachelor's degree in Computer Science or equivalent field and at least two years of work experience in design and development of distributed systems, software specification languages, or a related area." Our analysis and conclusions in this Final Written Decision would be the same regardless of whether Petitioner's or Patent Owner's description of the level of ordinary skill in the art is adopted.

*B. Claim Construction*

In an *inter partes* review, we apply the same claim construction standard that would be used in a civil action under 35 U.S.C. § 282(b), following the standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. § 42.100(b) (2019). In applying such standard, claim terms are generally given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art, at the time of the invention and in the context of the entire patent disclosure. *Phillips*, 415 F.3d at 1312–13. "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

In our Decision on Institution, we preliminarily interpreted certain claim terms as follows.

| Term | Construction |
|---|---|
| “event” | “a message or goal communicated between agents” |
| “event type” | “a type of an event” |
| “goal” | “a request for service” |
| “arbitrarily complex goal expression” | “a goal expressed in a language or syntax that allows an expression, when appropriate or when desired, that expresses multiple sub-goals and can potentially include more than one type of logical connector (e.g., AND, OR, NOT), and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent, although not every goal is itself necessarily complex” |
| “compound goal” | “a single goal expression that specifies multiple sub-goals to be performed” |

Dec. on Inst. 27–36.

The parties do not dispute the constructions of these terms in the Patent Owner Response or Petitioner Reply. *See* Resp. 25–27; Reply 1. Upon considering the complete record, we discern no reason to deviate from our preliminary constructions and, therefore, adopt the constructions of the claim terms “event,” “event type,” “goal,” “arbitrarily complex goal expression,” and “compound goal” as set forth above for this Final Written Decision.

In the Petition, Petitioner discusses constructions for additional claim terms, including “goal satisfaction plan,” “layer of conversational protocol,” “content layer,” “trigger,” and “parameter lists further refine the one or more

events." Pet. 8–16. In addition, in the Petitioner Reply, Petitioner discusses construction of the claim term "process characteristics." Reply 12–13. Patent Owner disputes constructions for two terms, "goal satisfaction plan" and "process characteristics." *See* Resp. 24–38; Sur-reply 13–14. We discuss constructions for each of the two disputed terms in turn below.

Patent Owner does not discuss Petitioner's proposed construction for the claim term "parameter lists further refine the one or more events" or proposes its own construction for the term. *See* Resp. 24–38. Nonetheless, Patent Owner discusses meaning of this term in the context of Patent Owner's arguments that FIAP97 does not teach an "expandable . . . inter-agent language" and "parameter lists" that "further refine the one or more events," as recited in claim 1. *See id.* at 97–106. Although Patent Owner's arguments raise an issue of claim construction, Patent Owner's arguments are closely related to and interspersed with Patent Owner's arguments that FIPA97 does not teach an "inter-agent language" recited in claim 1. Thus, for efficiency and completeness, we address this issue in the context of the patentability discussion below.

No other claim terms need to be construed expressly for purposes of this Final Written Decision. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that only terms that are in controversy need to be construed, and "only to the extent necessary to resolve the controversy"); *see also Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (applying *Vivid Techs.* in the context of an *inter partes* review).

*1. "goal satisfaction plan"*

The claim term "goal satisfaction plan" is recited in all but one of independent claims of the '115 patent—claims 1, 29, 61, 71, and 86, the one exception being claim 48. *See* Ex. 1001, 29:33–40 (claim 1), 32:9–21 (claim 29), 35:24–29 (claim 61), 36:17–23 (claim 71), 37:22–38:5 (claim 86). "[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning." *Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 904 (Fed. Cir. 2018) (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003). The parties do not contend that the term "goal satisfaction plan" has different meanings in different claims of the '115 patent. *See* Pet. 10; Resp. 27–38; Reply 1–12; Sur-reply 2–13.

Petitioner contends that a "goal satisfaction plan" is a "procedure for sending one or more requests for service to one or more agents in order to satisfy a goal." Pet. 10. Patent Owner disagrees and asserts that the claim term "goal satisfaction plan" should be construed to mean "a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints." Resp. 28.

*a. Claim Language*

We begin our claim construction analysis by considering the language of the claims themselves. *Phillips*, 415 F.3d at 1314. Addressing the claim language of the disputed term, we note that the claim language "a goal satisfaction plan" indicates that the term's plain meaning is "a plan for satisfying a goal."

In the challenged independent claims 1 and 29, the term "goal satisfaction plan" is further limited (in different ways) by specific limitations recited in the claims. For example, claim 1 recites:

constructing a goal satisfaction plan wherein *the goal satisfaction plan includes*:

a suitable delegation of sub-goal requests to *best complete* the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms;

Ex. 1001, 29:32–39 (emphases added). In contrast, claim 29 recites:

constructing a base *goal satisfaction plan including the sub-acts of*:

determining whether the request service is available,

determining sub-goals required in completing the base goal by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms,

selecting service-providing electronic agents from the agent registry suitable for performing the determined sub-goals, and

ordering a delegation of sub-goal requests complete the requested service;

*Id.* at 32:9–21 (emphasis added).

As shown above, the "optimal or near-optimal"[1] limiting feature argued by Patent Owner is recited in claim 1 ("a suitable delegation of

---

[1] Patent Owner asserts that the term "optimal" and "near optimal" has a well-established meaning in the context of computer engineering, citing a technical dictionary, which defines optimization as "[t]he process of finding

sub-goal requests to *best complete* the requested service request"), but not in claim 29. This shows that the patentee knew how to restrict the "goal satisfaction plan" to "best complete the requested service request," i.e., satisfy a goal "in an optimal or near-optimal manner." If the patentee had intended to similarly restrict the "goal satisfaction plan" in claim 29, it could have done so using the language of claim 1, but did not. *See Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1379 (Fed. Cir. 2018) (citing *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1359 (Fed. Cir. 2016)).

Thus, Patent Owner's proposed construction that generally requires a "goal satisfaction plan" to satisfy a goal "in an optimal or near-optimal manner" would have the effect of obfuscating the material differences in the claim language of claim 1 and claim 29 discussed above.

In addition, for claim 1, Patent Owner's proposed construction would render the limitation "suitable delegation of sub-goal requests to best complete the requested service request" recited in claim 1 superfluous. Such a construction is presumed improper. *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1274–75 (Fed. Cir. 2012) (rejecting the district court's construction narrowing a term by a superfluous limitation when the claims explicitly recited the narrowing limitation, and discussing the "well-established rule that claims are interpreted with an eye toward giving effect to all terms in the claim") (quoting *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)) (internal quotation marks omitted); *LSI Indus., Inc. v. ImagePoint, Inc.*, 279 F. App'x 964, 972 (Fed. Cir. 2008)

---

*the best solution* to some problem, where 'best' accords to prestated criteria." Sur-reply 6 (emphasis added) (citing Ex. 2078, 3).

(nonprecedential) (rejecting the district court's construction of "display device" as necessarily including the superfluous limitation of "internal illumination" because other claim terms specifically recited an "illuminated display device"); *but cf. ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1286 (Fed. Cir. 2010) ("no canon of [claim] construction is absolute in its application") (citation omitted).

Considering next the Patent Owner-argued the limiting feature of satisfying a goal "consistent with any advice parameters or constraints," this feature is recited in claim 29, but not in claim 1. Claim 29 recites "the act of interpreting including the sub-acts of: determining any task completion *advice* provided by the base goal, and determining any task completion *constraints* provided by the base goal" (Ex. 1001, 32:4–8 (emphases added)), whereas claim 1 does not recite "advice" or "constraint" (*see id.* at 29:10–44). Thus, Patent Owner's proposed construction is disfavored because it would blur the material differences in the claim language of claim 1 and claim 29 discussed above.

Finally, Patent Owner's proposed construction replaces "goal" with "complex goal expression." Again, this feature is recited in claim 1, but not in claim 29. Claim 1 recites "receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression; and dynamically interpreting the arbitrarily complex goal expression" (Ex. 1001, 29:25–30), whereas claim 29 recites "interpreting a service request in order to determine a base goal that *may be* a compound, arbitrarily complex base goal" (*id.* at 31:59–61) (emphasis added). Because of the permissive language "may be" used in claim 29, a "goal" is not necessarily required to be in the form of an arbitrarily complex goal expression in claim 29. Again, Patent Owner's proposed construction is

disfavored because it would blur the material differences in the claim language of claim 1 and claim 29 discussed above.

Thus, at least based on the claim language, it is not appropriate to limit "goal satisfaction plan" as Patent Owner contends. As discussed above, the meaning and the scope of "goal satisfaction plan" is clear on the face of each claim because claims 1 and 29 each recite specifically what a "goal satisfaction plan" includes or comprises in different claims. Therefore, absent compelling evidence to the contrary, it is neither necessary nor appropriate to limit the meaning of the term "goal satisfaction plan" beyond the plain meaning indicated by the claim language—i.e., "a plan for satisfying a goal."

*b. Written Description*

Turning to the Specification, Patent Owner cites the following statement in the "Summary of the Invention" section:

> [e]xtreme flexibility is achieved through an architecture organized around the declaration of capabilities by service-providing agents, the construction of arbitrarily complex goals by users and service-requesting agents, and the **role of facilitators in delegating and coordinating the satisfaction of these goals, subject to advice and constraints** that may accompany them.

Resp. 31 (quoting Ex. 1001, 5:3–9). The very first sentence of the paragraph cited by Patent Owner states, however, "[a] first *embodiment* of the present invention discloses a highly flexible, Software-based architecture for constructing distributed systems." Ex. 1001, 4:58–60 (emphasis added). Indeed, all of the portions of the Specification cited by Patent Owner, including the passage reproduced above, describe various embodiments of

the ’115 patent. *See* Resp. 30–33 (citing Ex. 1001, 5:3–9, 5:48–49, 15:37–39, 15:66–16:1, 16:11–21, 16:38–46, 18:35–48, 28:47–54, Fig. 11).

In general, “a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment.” *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (citation omitted). As discussed above, the challenged independent claims 1 and 29 do not recite all of the limiting features required by Patent Owner’s proposed construction of “goal satisfaction plan.” Thus, unless one of the established exceptions, such as lexicography or disavowal, applies, the challenged claims are not restricted as Patent Owner contends. *See, e.g., GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (“the specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal”) (citation omitted). Here, Patent Owner does not argue lexicography or disavowal. Nor does Patent Owner explain any other reason why the Specification limits “goal satisfaction plan” as it contends. Thus, claim construction in this case is governed by the general principle that “a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment.” *SuperGuide*, 358 F.3d at 875; *see also WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1323–24 (Fed. Cir. 2018) (“It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise.” (citing *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) (“[T]his court has repeatedly cautioned against limiting claims to a preferred embodiment.”))). Accordingly, none of the embodiments in the Specification cited by Patent Owner limits “goal satisfaction plan” as Patent Owner contends.

*c. Prosecution History*

Turning next to the prosecution history, Patent Owner asserts that "examples in the file history confirm the elements of 'goal satisfaction plan' reflected in Patent Owner's proposed construction." Resp. 35–36. Patent Owner argues, during the prosecution of the application for the '115 patent,

> Applicant further stated that "the facilitating engine is able to use reasoning to delegate the sub-goals to service providing agents in such a way as '**to best complete the requested service request**.'…The facilitating engine is able to use reasoning to delegate the sub-goal task of roasting coffee to the service-providing agent that can roast beans in the least amount of time because the facilitating engine has reasoned that the least amount of time taken to make coffee is the best way to accomplish the base goal of making coffee." Applicant concluded that "the base goal is carried out **not by merely parsing the request into sub-goals**" but rather "the facilitating engine used reasoning to decide upon using **competing** message transfer agents to reminding Bob of lunch, in lieu of delegating the task to just one message transfer agent."

*Id.* at 35 (citing Ex. 1002, 172–173). As discussed above, however, the limiting feature argued by Patent Owner is recited in claim 1 ("a suitable delegation of sub-goal requests to *best complete* the requested service request"), but not in claim 29. Thus, Patent Owner's argument is unpersuasive for the same reasons discussed above.

*d. Extrinsic Evidence*

Patent Owner also cites the testimony of its declarant, Dr. Medvidovic, in support of Patent Owner's proposed construction of "goal satisfaction plan." Resp. 36–37 (citing Ex. 2032 ¶¶ 51–52, 54–59,

129). We have reviewed the cited testimony from Dr. Medvidovic, but do not find anything in his testimony that would change our analysis based on intrinsic record discussed above. *See Phillips*, 415 F.3d at 1318 (authorizing the consideration of extrinsic evidence in determining the meaning of claims but noting that it is "in general . . . less reliable than the patent and its prosecution history in determining how to read claim terms").

*e. Other Arguments*

The parties dispute whether Petitioner's use of "procedure" (in place of a "plan") and "sending one or more requests for service" in Petitioner's proposed construction is appropriate. *See* Resp. 37–38; Reply 2–4, 11–12; Sur-reply 3, 13. We need not address these arguments in detail because, for the reasons discussed above, we see no reason to depart from the plain meaning of the term "goal satisfaction plan."

*f. Conclusion*

Based on the complete record and after examining the claims as a whole, the Specification, and the prosecution history, we construe the term "a goal satisfaction plan" according to its plain meaning—"a plan for satisfying a goal."

*C. Patentability Challenges*

Petitioner asserts claims 1–3, 11 and 48–60 are unpatentable as obvious under 35 U.S.C. § 103 over the combination of Kiss and FIPA97. Pet. 32–85. Claims 1 and 48 are independent.

Petitioner argues that FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss

system. Pet. 28–29. Petitioner explains, "[t]hese techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging." *Id.* at 28 (citing Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1). Petitioner asserts, "[w]here the two systems disclose analogous functionality, such as facilitating cooperation and agent registry, their techniques are combined, as a Skilled Artisan would understand that to be an efficient and common sense way to implement the combined system in order to obtain the benefits of both, and therefore be motivated to do so." *Id.* (citing Ex. 1003 ¶¶ 217–219).

*1. Principles of Law on Obviousness*

To prevail in challenging Patent Owner's claims, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring inter partes review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

Section 103(a) forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Obviousness is a question of law based on

underlying factual findings, including: (1) the level of ordinary skill in the art; (2) the scope and content of the prior art; (3) the differences between the claims and the prior art; and (4) secondary considerations of nonobviousness, such as commercial success, long-felt but unmet needs, failure of others, and unexpected results. *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007); *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966).

The Supreme Court has made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 415 (2007). Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *KSR*, 550 U.S. at 417. Reaching this conclusion, however, requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention. *Id.*

### 2. *Prior Art*

#### a. *Kiss (Ex. 1005)*

Kiss describes "a knowledge management system that supports inquiries of distributed knowledge resources," as illustrated in Figure 1 below. Ex. 1005, 2:44–45.




*Fig. 1*

Kiss' Figure 1, above, is a conceptual overview of one embodiment of a knowledge management system. *Id.* at 5:1–2. Kiss' knowledge management system 100 includes a presentation layer 103, a user interface layer 105, a meta agent layer 107, a knowledge agent layer 109, a knowledge module layer 111, and an agent service layer 113. *Id.* at 5:3–7.

The meta agent layer 107 includes one or more meta agents 119 that are responsible for analyzing queries or problem formulations provided by the user interface layer 105 and constructing a plan for finding a solution to the problem. *Id.* at 5:20–24. More specifically, "meta agent 119 is responsible for formulating a dynamic 'solution plan' for the distributed inferencing to be performed by the system 100, and allocates tasks to the knowledge agent layer 109 in furtherance of the solution plan." *Id.* at 5:33–37. "The meta agent solution plan attempts to employ all elements of

information contained in the parsed inquiry in the development of search-space constraints." *Id.* at 8:34–37.

The knowledge agent layer 109 includes multiple knowledge agents 121, each of which may be associated with one or more knowledge modules 123 in the knowledge module layer 111. *Id.* at 6:31–35. The knowledge agent 121 is configured to accept from a meta agent 119 a problem statement and convert that problem statement into a format appropriate for the knowledge module 123 associated with the knowledge agent 121. *Id.* at 6:35–38.

*b. FIPA97 (Ex. 1006–1012)*

FIPA97 (Exs. 1006–1012) is a specification created by the Foundation for Intelligent Physical Agents (FIPA) beginning in 1996 with an official release date in October 1997. Ex. 1006, Cover, iv (identifying specification as FIPA 97 Version 1.0 issued on October 10, 1997). FIPA97 is a "specification of basic agent technologies that can be integrated by agent systems developers to make complex systems with a high degree of interoperability." *Id.* at v. The specification comprises seven parts: three parts for basic agent technologies (Parts 1–3 relating to agent management, agent communication language, and agent/software integration) and four informative applications providing examples of how the technologies can be applied (Parts 4–7 describing personal travel assistance, personal assistant, audio-visual entertainment, and broadcasting and network management and provisioning applications). *Id.* at v–vii; *see generally* Exs. 1006–1008 (Parts 1–3); Exs. 1009–1012 (Parts 4–7).

Part 1 of FIPA97 "provides a normative framework within which FIPA compliant agents can exist, operate and be managed." Ex. 1006, vi.

Part 2 of FIPA97 describes an "Agent Communication Language (ACL)" that "is based on speech act theory: messages are actions, or communicative acts, as they are intended to perform some action by virtue of being sent." *Id.* The ACL specification "consists of a set of message types and the description of their pragmatics, [i.e.,] the effects on the mental attitudes of the sender and receiver agents." *Id.* The ACL specification "also provides the normative description of a set of high-level interaction protocols, including requesting an action, contract net and several kinds of auctions." *Id.*

Part 2 of FIPA97 discloses a "simple abstract model of inter-agent communication" including ACL messages having components as illustrated in Figure 1 below. Ex. 1007, 7, 12.




**Figure 1 — Components of a message**

Figure 1, above, illustrates the main structural elements of an ACL message in FIPA97. *Id.* at 12. "The first element of the message is a word which identifies the communicative act being communicated, which defines the principal meaning of the message." *Id.* Each ACL message contains a set of one or more parameters, including a mandatory "*:receiver*" parameter that identifies the intended recipient of the message. *Id.* at 13.

Petitioner asserts that FIPA97 was made publicly available as a single document and relies on FIPA97 as a single printed publication for purposes of 35 U.S.C. § 102(a). *See* Pet. 22; Pet. Reply 26. As discussed below in the section addressing the status of FIPA97 as a printed publication, FIPA approved and released FIPA 97 Version 1.0 as a single specification. *See infra* § II.E; Ex. 1026, 5; Ex. 1050 ¶ 165. Thus, although sometimes the seven parts are referred to as "documents," a person of ordinary skill in the art would have considered FIPA97 to be a single reference. *See* Ex. 1050 ¶¶ 164–165. Patent Owner does not dispute that FIPA97 is one reference for purposes of §§ 102 and 103. *See* Resp. 138–40.[2] Because FIPA and skilled artisans considered FIPA97 to be a single specification, we agree that FIPA97 constitutes a single prior art reference, and we treat it as such for purposes of our unpatentability analysis.

*3. Prior Art Status Issues*

Patent Owner challenges the prior art status of both Kiss and FIPA97.

*c. Status of Kiss*

Petitioner relies on Kiss as a prior art reference in all of the asserted grounds of unpatentability presented in the Petition. *See* Pet. 3–4. Petitioner has the burden of persuasion to prove unpatentability by a preponderance of the evidence. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1379 (Fed. Cir. 2015). Petitioner also has the initial burden of

---

[2] Contrary to Patent Owner's argument (Resp. 138–40), Petitioner did not argue in another case, and the Board did not find, that FIPA97 is seven separate prior art references. *See Microsoft Corp. v. IPA Techs. Inc.*, IPR2019-00838, Paper 13 at 3–5 (PTAB Apr. 3, 2020) (Decision Denying Petitioner Request for Rehearing), Paper 10 at 4–9 (Petitioner's Request for Rehearing, filed Dec. 6, 2019).

production to show that a reference is prior art to the challenged claims under a relevant section of 35 U.S.C. § 102. *See id.* Once Petitioner has met that initial burden, the burden of production shifts to Patent Owner to argue or produce evidence that the asserted reference is not prior art to the claims. *Id.* at 1380. Once Patent Owner has met that burden of production, the burden of production returns to Petitioner. *Id.*

The filing date of the ’115 patent is January 5, 1999. Ex. 1001, code (22). As noted above, Kiss is a United States patent that arose from an application filed July 21, 1999, claiming the benefit of priority to a provisional application filed July 21, 1998. Ex. 1005, codes (22), (60).

Petitioner asserts that Kiss is prior art to the ’115 patent under 35 U.S.C. § 102(e) because Kiss is entitled to the benefit of priority to the filing date of its provisional application (Ex. 1036, “Kiss Provisional Application”). Pet. 16–20. “A reference patent is only entitled to claim the benefit of the filing date of its provisional application if the disclosure of the provisional application provides support for the claims in the reference patent in compliance with § 112, ¶ 1.” *Dynamic Drinkware*, 800 F.3d at 1381.

In *Ex parte Mann*, the Board held that “under *Dynamic Drinkware*, a non-provisional child can be entitled to the benefit of a provisional application’s filing date if the provisional application provides sufficient support for *at least one claim* in the child.” 2016 WL 7487271, at *6 (PTAB Dec. 21, 2016) (emphasis added) (discussing whether *Dynamic Drinkware* requires “support in the provisional . . . for all claims, any claim, or something in between”). In addition, the Board held that a “subject matter test” is also required—that is, “the [party claiming priority] also must show that the subject matter relied upon in the non-provisional is sufficiently

supported in the provisional application [and that t]his subject matter test is in addition to the comparison of claims required by *Dynamic Drinkware*." *Id*. at *5.

Recognizing these requirements, Petitioner asserts that "each element of [claim 1 of Kiss] has written description support in the Kiss Provisional," providing detailed citations to the supporting disclosures from the Kiss Provisional Application for each limitation of claim 1 of Kiss. Pet. 16–18. Addressing the "subject matter test," Petitioner asserts that "the teachings that Petitioner relies upon were carried forward from the Kiss Provisional to Kiss" and provides a detailed mapping of the relied-upon portions of Kiss to the corresponding portions of the Kiss Provisional Application. *Id.* at 18–20.

In the Institution Decision, we determined, based on the preliminary record, that Petitioner has presented sufficient argument and evidence to meet its initial burden of production on the issue of whether Kiss is entitled to the benefit of the filing date of the Kiss Provisional Application so as to shift the burden of production to Patent Owner to argue or produce evidence that Kiss is not prior art to the challenged claims. Inst. Dec. 25.

In its Preliminary Response, Patent Owner asserted that Kiss is not entitled to the priority date of its provisional application. Prelim. Resp. 66–67. In the Institution Decision, we determined, based on the preliminary record, the argument and evidence presented by Patent Owner was insufficient to shift the burden of production back to Petitioner. Inst. Dec. 25–27. We noted, however, a final determination on this particular issue will be made based on a full record developed during the course of trial. *Id.* at 27.

During the trial, Patent Owner did not present any argument or evidence on this issue, nor did it dispute Kiss qualifies as prior art in this proceeding. *See generally* Resp.

Based on the complete record, we determine that Petitioner has established by a preponderance of the evidence that Kiss is prior art to the '115 patent under 35 U.S.C. § 102(e) because Kiss is entitled to the benefit of priority to the filing date of its provisional application.

*d. Status of FIPA97*

Before reaching the merits of Petitioner's obviousness contentions, all of which are based in part on FIPA97 (Exhibits 1006–1012), we must determine as a threshold matter whether FIPA97 is a prior art printed publication under 35 U.S.C. § 102(a) or § 102(b). *See* Pet. 22–24. Petitioner bears the burden of establishing by a preponderance of the evidence that FIPA97 is a printed publication. *See* 35 U.S.C. § 316(e); *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1375 (Fed. Cir. 2018); *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29 at 11 (PTAB Dec. 20, 2019) (precedential) (citing *Nobel Biocare*, 903 F.3d at 1375). For purposes of instituting an *inter partes* review we accepted Petitioner's contention, unchallenged in Patent Owner's Preliminary Response, that FIPA97 was available as prior art as of October 1997, more than one year before January 5, 1999, the effective filing date of the '560 patent. Dec. 40–42. Patent Owner, however, challenges that contention in its Patent Owner Response, and the parties further address the issue in Petitioner's Reply and Patent Owner's Sur-reply. *See* Resp. 45–65; Pet. Reply 17–29; Sur-reply 20–35.

The determination of whether a document is a "printed publication" under 35 U.S.C. § 102 "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' . . . ." *Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1355 (Fed. Cir. 2018) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). A reference is considered publicly accessible if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it.'" *Id.* at 1355–56 (quoting *In re Wyer*, 655 F.2d 221, 226 (CCPA 1981)).

In the discussion below, we begin with background information regarding FIPA and an overview of the evidence submitted by Petitioner in support of its contention that FIPA97 was publicly accessible in October 1997. The evidence includes extensive testimony from Dr. Finin, a professor who has personal knowledge of FIPA's activities and the development process of FIPA97. *See* Ex. 1049 ¶¶ 1–55 (Finin Decl.). Dr. Finin was one of the first two FIPA Fellows invited to provide "high quality and independent advice to FIPA." *Id.* ¶ 18 (quoting Ex. 1076, 1); Ex. 1025, 1; Ex. 1062, 1. The evidence also includes testimony from Petitioner's expert witness, Dr. Lieberman, and more than sixty documentary exhibits on which Petitioner relies to show that FIPA97 was

publicly accessible in late 1997 and early 1998. *See* Ex. 1050 ¶¶ 142–149 (Lieberman Decl.); Exs. 1021–33, 1047, 1051–1105.

After providing an overview of the evidence, we consider the parties' arguments as to whether FIPA97 was publicly accessible before the January 5, 1999, critical date. For the reasons explained below, we determine that Petitioner has met its burden to show that FIPA97 was publicly accessible before the critical date.

*i. FIPA*

FIPA was a non-profit association based in Geneva, Switzerland, created to promote agent-based technology and develop open standards. Ex. 1006, iv (FIPA 97 Specification Version 1.0, Part 1, Foreword); Ex. 1049 ¶ 3. Founded in 1996, FIPA's membership included numerous technology companies, educational institutions, and governmental entities. Ex. 1049 ¶ 3. As of October 1997, FIPA had thirty-five corporate members representing twelve countries.[3] Ex. 1006, iv. According to FIPA documentation, membership was "open to any corporation and individual firm, partnership, governmental body or international organi[z]ation without restriction." *Id.* FIPA stated its intent "to make the results of its activities available to all interested parties." *Id.* Throughout its tenure, FIPA produced standards designed to promote and advance agent-based technology. Ex. 1049 ¶ 3. In 2005, FIPA was incorporated into the Institute of Electrical and Electronics Engineers (IEEE) as one of its standards committees. *Id.*

---

[3] The corporate members included Alcatel, British Telecommunications, Deutsche Telekom, France Telecom, Hitachi, Hewlett-Packard, IBM, NEC, NTT, Nortel, Siemens, and Toshiba. *See* Ex. 1095, 22.

*ii. Development of FIPA97*

The process of drafting the FIPA 97 specification began with FIPA's first meeting in London in April 1996. Ex. 1049 ¶ 6; Ex. 1058 (Main results of London meeting); Ex. 1066 (Resolutions of London meeting). Representatives from twenty-six companies and organizations attended. Ex. 1066, 1. At the meeting, the members agreed on FIPA's mission, drafted statutes and operational principles, and produced a work plan for a specification that would become FIPA 97. Ex. 1058, 1; Ex. 1066, 1–3; Ex. 1049 ¶ 6. The work plan set a December 1997 target for producing a first completed specification. Ex. 1066, 2–3; Ex. 1049 ¶ 7.

FIPA subsequently held several meetings in 1996 and 1997. At the second meeting in June 1996 in Yorktown Heights, NY, FIPA approved several documents, including a framework for FIPA activity and a list of requirements for FIPA-specified agent capabilities. Ex. 1067, 1 (Resolutions of Yorktown meeting); Ex. 1060, 1 (Results of Yorktown meeting); Ex. 1049 ¶ 9. At the third meeting in October 1996 in Tokyo, FIPA approved a final work plan calling for production of a FIPA specification in October 1997. Ex. 1049 ¶ 11; Ex. 1070, 1 (work plan); Ex. 1023 (Results of Tokyo meeting). Also at the Tokyo meeting, FIPA produced its First Call for Proposals, which outlined in detail three technology parts (corresponding to Parts 1–3 of FIPA 97) and four application parts (corresponding to Parts 4–7 of FIPA 97). Ex. 1069, 1–27 (First Call for Proposals); Ex. 1049 ¶ 12.

In 1997, FIPA began to produce draft specifications. At the fourth meeting in January 1997 in Turin, Italy, FIPA publicly released drafts of Parts 1–4 and posted them on the FIPA home page

(http://drogo.cselt.stet.it/fipa). Ex. 1021, 1 (Results of Turin meeting); Ex. 1049 ¶ 13. Additionally, FIPA released a Second Call for Proposals at the Turin meeting. Ex. 1071, 1–3 (Second Call for Proposals); Ex. 1049 ¶ 13. At the fifth meeting in April 1997 in Reston, VA, FIPA produced drafts of Parts 1–7, which were publicly released and posted on the FIPA home page. Ex. 1024 (Results of Reston meeting); Ex. 1061 (Resolutions of Reston meeting); Ex. 1049 ¶ 17. At the sixth meeting in June 1997 in Cheju Island, South Korea, FIPA publicly released revised drafts of Parts 1–7 and posted them on the FIPA home page. Ex. 1025, 1 (Results of Cheju meeting); Ex. 1062, 5 (Resolutions of Cheju meeting); Ex. 1049 ¶ 19. According to Dr. Finin, the Reston Draft and Cheju Draft were substantially complete versions of what would become FIPA 97. Ex. 1049 ¶¶ 17, 19.

Dr. Finin testifies that news of FIPA and its standardization efforts "spread quickly throughout the relatively small community of software agent researchers." Ex. 1049 ¶ 8. For instance, the AgentWeb website, "a meeting place for researchers in agent-based technology from 1995–2000," was home to a "Software Agents" mailing list and a newsletter that had more than 1,300 subscribers in 1996. *Id.*; Ex. 1089, 5. Dr. Finin was "the founder, author, and a subscriber" of the AgentWeb newsletter. Ex. 1049 ¶ 8. The widely distributed AgentWeb newsletters announced upcoming FIPA meetings, reported results of previous meetings, including calls for proposals, and provided links to the specification drafts posted on the FIPA home page. *See id.* ¶¶ 8, 10, 12, 14, 17, 19.

For example, the AgentWeb newsletter dated May 11, 1996, announced the upcoming FIPA June 1996 Yorktown meeting, described as the "FIPA Opening Forum." Ex. 1090, 5; Ex. 1049 ¶ 8. The purpose of the

meeting, as stated in the newsletter, was to "refine the list of basic agent capabilities candidate for FIPA specification; compile a first list of agent capabilities intended for specification by end 1997; and establish the first working groups." Ex. 1090, 5. Likewise, the AgentWeb newsletter dated August 12, 1996, advertised the FIPA October 1996 Tokyo meeting. Ex. 1088, 1; Ex. 1049 ¶ 10. Thereafter, the AgentWeb newsletter dated October 14, 1996, publicized the Call for Proposals issued at the October 1996 Tokyo meeting and provided the deadline for submission of proposals to be considered at the Turin meeting in January 1997. Ex. 1087, 1; Ex. 1049 ¶ 12. FIPA had decided that respondents who submitted proposals would be invited to the January 1997 meeting to present their proposals even if they were not FIPA members. Ex. 1023, 1; *see* Ex. 1069, 27.

Once FIPA began to produce drafts of the specification, AgentWeb newsletters announced those drafts and provided links to access them. The AgentWeb newsletter dated February 2, 1997, reported that "[i]nitial specifications for three technology parts (Agent Management, Agent Communication and Agent/Software Interaction) and one application part (Personal Travel Assistance) have been produced" at the recent Turin meeting. Ex. 1091, 1; Ex. 1049 ¶ 14. The newsletter included a freely accessible and public link to access the draft. Ex. 1049 ¶ 14 (citing Ex. 1091, 1–2). It also indicated that drafts of the remaining three specification parts would be generated at the FIPA meeting to be held in April 1997 in Reston. Ex. 1091, 1–2. A subsequent AgentWeb newsletter dated April 13, 1997, advertised the upcoming Reston meeting and

contained links to information about the meeting on the FIPA website. Ex. 1092, 3; Ex. 1049 ¶ 17.

On May 5, 1997, following the Reston meeting, an AgentWeb newsletter reported that attendees of that meeting produced a revised draft including all seven parts of the specification. Ex. 1093, 2; Ex. 1049 ¶ 17. The newsletter contained individual public links to the seven parts and invited "both members and non-members" to comment, providing an email address for submission. *Id.*; Ex. 1049 ¶ 17. Additionally, the newsletter announced the dates and locations of the next two meetings—the June 1997 Cheju meeting and the seventh meeting to take place in Munich on October 6–10, 1997. *Id.* Similarly, the AgentWeb newsletter dated June 30, 1997, announced that the Cheju meeting resulted in revised versions of the FIPA specification documents and provided direct links to the seven parts. Ex. 1094, 1–2; Ex. 1049 ¶ 19. Again, the newsletter stated that FIPA invited comments and that non-members making substantial comments would be invited to attend the October 1997 Munich meeting. Ex. 1094, 2. Dr. Finin was among those who submitted comments on the Cheju draft. Ex. 1073; Ex. 1049 ¶ 20.

Meanwhile, the AgentWeb Software Agents mailing list also provided information regarding FIPA's efforts to the community of software agent researchers. *See* Ex. 1049 ¶ 8. Dr. Finin was an organizer of and contributor to the Software Agents mailing list. *Id.* On May 2, 1996, a posting to the mailing list referenced the upcoming June 1996 FIPA meeting in Yorktown Heights, New York. Ex. 1079, 1; Ex. 1049 ¶ 8. Members of the Software Agents mailing list posted comments regarding the Turin draft after it was released publicly. Exs. 1078, 1081, 1082; *see* Ex. 1049 ¶¶ 14–

15. Dr. Finin was among those who shared their thoughts. *See* Ex. 1082; Ex. 1049 ¶ 15. A posting after the Reston meeting included a public and open link to access the Reston draft and invited comments from the mailing list. Ex. 1083, 1; Ex. 1049 ¶ 17.

*iii. Public Release of FIPA97*

FIPA's seventh meeting took place in Munich on October 6–10, 1997. Ex. 1026 (Resolution of Munich meeting); Ex. 1049 ¶ 20. At this meeting, FIPA incorporated final edits and comments and approved the FIPA 97 specification for publication. Ex. 1026, 1, 5; Ex. 1049 ¶ 20. The specification as approved at the meeting was called "FIPA 97 ver. 1.0," or FIPA 97 Version 1.0. Ex. 1026, 5. Working groups for various parts of the specification were given about one month to check for consistency and make minor edits. *Id.* at 2; Ex. 1049 ¶ 20.

An "initial" version of FIPA 97 Version 1.0, approved at the Munich meeting and dated October 10, 1997, was posted to the FIPA website, housed at the time at http://drogo.cselt.stet.it/fipa. Ex. 1049 ¶¶ 20–21. According to Dr. Finin, the specification documents were available online and free for anybody to access by sometime in October 1997. *Id.* ¶ 21. On November 18, 1997, an AgentWeb newsletter announced completion of FIPA 97 Version 1.0 and its publication on the FIPA website. Ex. 1086, 1–2; Ex. 1049 ¶ 21. The newsletter provided individual, direct links to the seven parts of the specification on the FIPA website. Ex. 1086, 1–2. The links were not password protected and were open to the public without a requirement for secrecy or confidentiality. Ex. 1049 ¶ 21. As with the earlier AgentWeb newsletters, the newsletter containing links to FIPA 97 Version 1.0 was sent to more than 1,300 subscribers. *Id.*

Dr. Finin testifies that in late 1997, "a few weeks after the Munich meeting," he accessed the approved FIPA 97 Version 1.0 posted on the FIPA website. *Id.* ¶¶ 20–21. He specifically recalls accessing the documents in late 1997 to review the first major work product of FIPA and to prepare for FIPA's upcoming January 1998 meeting in Palo Alto, which he attended. *Id.* ¶ 21 (citing Ex. 1074). Dr. Lieberman also testifies that he recalls FIPA 97 Version 1.0 being publicly available on the FIPA website throughout late 1997 and early 1998 and that he accessed it in late 1997 as a member of the interested public. Ex. 1050 ¶ 146.

The release of FIPA 97 Version 1.0 was well publicized in the weeks after the Munich meeting. Ex. 1049 ¶ 22. For example, on October 20, 1997, the EETimes featured an article reporting FIPA's approval of the FIPA 97 specification. Ex. 1095, 22; *see* Ex. 1049 ¶ 22. The article was based on an interview with Leonardo Chiariglione, the president of FIPA. Ex. 1095, 22. The article described the seven parts of the specification: "The first three parts cover different aspects of agent behavior: agent management; agent communication; and agent-software interaction. The four remaining parts, which cover application areas, . . . are: personal travel assistance; personal assistant; audio-visual entertainment and broadcast; and network provision and management." *Id.* After describing FIPA's plans for 1998, including testing of FIPA 97 Version 1.0 to provide input for a further round of standardization, the article referred readers to the FIPA website for information regarding the released specification: "CSELT[4] maintains

---

[4] Centro Studi e Laboratori Telecommunicazioni, Dr. Chiariglione's employer at the time. *See* Ex. 1095, 22.

extensive information on FIPA's activities at www.cselt.stet.it/fipa."[5] *Id.* (emphasis omitted). It concluded with a quote from Dr. Chiariglione regarding the specification's public availability: "'It is our policy to make the standard freely available over the Internet,' Chiariglione said. 'FIPA will retain the copyright but it will be free for others to use.'" *Id.*

The November-December 1997 issue of IEEE Internet Computing also announced the release of the FIPA 97 specification: "The Foundation for Intelligent Physical Agents, a non-profit organization established to promote emerging agent-based applications, has released its first specification. Named FIPA 97, the specification will provide a benchmark for interoperable products." Ex. 1096, 93; Ex. 1049 ¶ 22. The news brief directed readers to the FIPA website for the text of the specification. Ex. 1096, 93 ("The text is available at http://drogo.cselt.stet.it.fipa/."[6]); Ex. 1049 ¶ 22.

Sometime after the Munich meeting, FIPA also produced a hardcopy book version of the FIPA 97 Version 1.0 specification to be sent to FIPA members and various institutions and standards groups. Ex. 1049 ¶ 24; *see* Ex. 1026, 1; Ex. 1063, 1 (Resolution of the Palo Alto meeting, Jan. 29, 1998). At least two copies of the book were available in libraries in January 2019. Ex. 1049 ¶ 24; Ex. 1057, 1 (WorldCat catalog entry for "Fipa specification : Version 1.0"); Ex. 1055 (cover page and table of contents of each part in copy at library in Italy); Ex. 1056 (cover page and table of

---

[5] The record suggests this website (http://www.cselt.stet.it/fipa) was a mirror of the FIPA website (http://drogo.cselt.stet.it/fipa) in 1997. *See* Ex. 1049 ¶ 22; Ex. 1095, 22; Tr. 94:11–14.
[6] The URL provided in the article contains a typographical error. *See* Ex. 1049 ¶ 22 (correcting the URL to http://drogo.cselt.stet.it[/]fipa/).

contents of Part 1 in copy at library in Switzerland). Dr. Finin testifies that the books contain the November 28, 1997, edited version of FIPA 97 Version 1.0, which "only made minor edits (mostly spelling and formatting) over the October 10, 1997 version." Ex. 1049 ¶ 25 (citing Ex. 1055, 5 (Part 2 "publication date" of November 28, 1997); Ex. 1056).

*iv. Publications and Patents*

In late 1997 and 1998, several papers reviewing and outlining the FIPA 97 specification were published and presented at meetings. *See* Ex. 1049 ¶¶ 26–30. A paper dated December 1997 memorializes a presentation made to a meeting on Intelligent Agent Technology organized by the EPSRC[7] Community Club in Advanced Computing Techniques. Ex. 1097, Cover ("Dickinson");[8] *see* Ex. 1049 ¶ 26. This paper outlines the background and rationale for the creation of an agent interoperability standard. Ex. 1097, 1–3. It also describes the development history of the FIPA 97 specification, noting that FIPA's work program "culminated in the publication of an initial draft standard, FIPA 97, at the Munich meeting on October 1997." *Id.* at 3. Dickinson further provides that "[a]ll FIPA documents and meeting outputs are publicly available on the web" at "http://drogo.cselt.stet.it/fipa/," and "comments and review have been sought at each stage of the process." *Id.* at 3, 7 n.9. The paper then describes the

---

[7] "The Engineering and Physical Sciences Research Council (EPSRC) is the main funding body for engineering and physical sciences research in the UK." Engineering and Physical Sciences Research Council, epsrc.ukri.org/about (last visited Sept. 28, 2020).
[8] Ian J. Dickinson, *Agent Standards*, HP Laboratories Bristol, HPL-97-156 (Dec. 1997).

features of the specification's three substantive technical sections, Parts 1–3. *Id.* at 3–6.

Similarly, a 1998 paper titled "Industrial Applications of Multi-Agent Technology" summarizes FIPA's background and presents an overview of the three technical parts (i.e., Parts 1–3) of FIPA 97 Version 1.0 released in October 1997. Ex. 1099, 12–13 ("Steiner");[9] *see* Ex. 1049 ¶ 28. The Steiner paper provides the FIPA website address and explains that the four application parts (i.e., Parts 4–7) will be used in field trials to gather information to be incorporated into a revised version of FIPA 97. Ex. 1099, 13 & n.1.

Likewise, a paper titled "FIPA — towards a standard for software agents" appearing in the July 1998 issue of the BT Technology Journal explains the motivation for an agent standard and provides an overview of FIPA's background and activities. Ex. 1100, 51–52 ("O'Brien");[10] *see* Ex. 1049 ¶ 29. It then describes the different parts of the FIPA 97 Version 1.0 specification issued in October 1997. Ex. 1100, 51–52.[11]

Dr. Finin cites several other publications that reference FIPA's development of an agent communication standard in the 1997–98 timeframe.

---

[9] Donald Steiner, Siemens AG, Industrial Applications of Multi-Agent Technology (IEEE 1998).

[10] P.D. O'Brien & R.C. Nicol, *FIPA — towards a standard for software agents*, BT Tech. J. Vol. 16, No. 3 (July 1998).

[11] Dr. Finin testifies that O'Brien provides public links to FIPA97. Ex. 1049 ¶ 29. The copy of O'Brien entered into the record, however, appears to be missing several pages, including one containing endnotes 10–12 that might provide links to the FIPA website. *See* Ex. 1100, 52 ("FIPA97 (issued in October 1997) [10–12] is the first output from FIPA covering part of the requirements for an agent standard.").

Ex. 1049 ¶ 31 (citing Exs. 1027–29). Dr. Finin also identifies several patent applications in the same timeframe that refer to FIPA's agent communication language. *Id.* ¶ 32 (citing Exs. 1030–33).

*v. FIPA97 Website*

Sometime in 1998, the FIPA website migrated from its original site (http://drogo.cselt.stet.it/fipa) to fipa.org. Ex. 1049 ¶ 23; *see also* Ex. 1026 (Resolution of Munich meeting indicating FIPA's plans for the "redesign of a new FIPA home page"); Ex. 1065, 4 (Resolutions of the Durham meeting in October 1998 indicating the website will be transferred to www.fipa.org). The fipa.org website still exists today even though FIPA is no longer active as a standalone organization. *See* Ex. 1049 ¶¶ 23, 48–49. The current FIPA website maintains a repository of past FIPA documents, including meeting notes, press releases, FIPA resolutions, and different versions of the FIPA specification. *Id.* ¶ 49.

Dr. Finin testifies that the "initial" version of FIPA 97 Version 1.0 (i.e., the specification posted on the FIPA website on October 10, 1997) "remained publicly accessible during all of FIPA's future activities and is still available on FIPA's home page today." *Id.* ¶ 21. According to Dr. Finin, Exhibits 1006–1012 (collectively referred to as FIPA97) are Parts 1–7 of FIPA 97 Version 1.0 as found on the current fipa.org website. *Id.* Based on his personal knowledge, Dr. Finin further testifies that Exhibits 1006–1012 are the "same version" and contain "the same disclosures, content and information" as Parts 1–7 of FIPA 97 Version 1.0 that were publicly available on the FIPA website (http://drogo.cselt.stet.it/fipa) on October 10, 1997, and which Dr. Finin himself accessed in late 1997. *Id.* ¶¶ 21, 34. He also notes that although Exhibit 1006 has a typographical error relating to the version number in the

header of its odd pages,[12] Exhibit 1006 is identical to the version of Part 1 of FIPA 97 Version 1.0 that was released on October 10, 1007. *Id.* ¶ 21. Additionally, as evidence that FIPA 97 Version 1.0 has been continuously available on fipa.org since the website migration, Dr. Finin cites a set of Internet Archive records beginning in 2000 showing where each part of that version of the specification could be accessed. *Id.* (citing Ex. 1054).

Dr. Finin testifies that the original FIPA website, http://drogo.cselt.stet.it/fipa, remained live for several years after the website transitioned to fipa.org. Ex. 1049 ¶ 23. The Internet Archive Wayback Machine contains an archived screen capture of the website http://drogo.cselt.stet.it/fipa from December 1, 1998. *See* Ex. 1051; Ex. 1049 ¶¶ 23, 54. According to Dr. Finin, the archived page shows that the FIPA 97 specification was live and freely available on the FIPA website home page at that time. Ex. 1049 ¶ 23; Ex. 1051, 1 ("FIPA has already developed a seven-part specification called FIPA 97. Implementations of FIPA 97 are undergoing field trials that will last until October 1998 when version 2 of FIPA 97 will be produced."); Ex. 1049 ¶ 23. The home page provided links (i.e., "FIPA 97") to actual specification documents, but those links have not been maintained in the archive. Ex. 1049 ¶ 23. Dr. Finin testifies that the screen capture from the Internet Archive is consistent with the mirror of the former FIPA site hosted by Leonardo Chiariglione. *Id.* ¶ 51 (citing Ex. 1103 (http://leonardo.chiariglione.or/standards/fipa/)). Dr. Chiariglione's mirror is still available, and documents hosted on the

---

[12] The header on odd pages reads "FIPA 1997 Part 1: Version 2.4." *E.g.*, Ex. 1006, 3.

mirror are "accurate and complete copies of FIPA documents that were available to FIPA members." *Id.*

*vi. Analysis*

Petitioner argues that FIPA97 was a publicly accessible printed publication as of October 10, 1997, when it was posted on the FIPA website. Pet. 23; Pet. Reply 15–21. More specifically, Petitioner argues that (1) FIPA 97 Version 1.0 was publicly accessible on October 10, 1997, and (2) the version of the FIPA specification found in Exhibits 1006–1012, referred to herein as FIPA97, is the same specification that was posted on the FIPA website on October 10, 1997, and named FIPA 97 Version 1.0. *See, e.g.*, Pet. 23 (arguing FIPA 97 Version 1.0 was publicly accessible in late 1997); Pet. Reply 15–17 (arguing that Exhibits 1006–1012 are the same documents that were made public as FIPA 97 Version 1.0). Patent Owner addresses the first contention when it argues the evidence does not show any version of FIPA 97 Version 1.0 was available on the FIPA website. *See, e.g.*, Resp. 69. It also challenges the second contention when it argues Petitioner has failed to show that Exhibits 1006–1012 are identical to the version of the FIPA specification that allegedly was publicly accessible before the critical date. *See, e.g., id.* at 62–63. In our analysis below, we address the two questions in turn.

Considering all the facts and circumstances surrounding the development of FIPA 97 Version 1.0 and its publication on the FIPA website, we find that FIPA 97 Version 1.0 was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the art, exercising reasonable diligence, could locate it. *See Jazz Pharm.*, 895 F.3d at 1355–56. First, the uncontested evidence shows that members of the relevant public (i.e., persons of ordinary skill in the field of software

agent-based technology) knew of the release of FIPA 97 Version 1.0 in late 1997, prior to the critical date. As detailed above, FIPA was open to corporations and educational and governmental organizations without restriction. Ex. 1006, iv. FIPA's members included many industry leaders whose employees attended FIPA meetings, including the October 1997 meeting in Munich where FIPA 97 Version 1.0 was approved for publication. *See id.*; Ex. 1095, 22. FIPA meetings and activities were publicized among the larger community of software agent researchers via the AgentWeb website and its associated Software Agents mailing list and AgentWeb newsletter, which had more than 1,300 subscribers. Ex. 1090, 5; Ex. 1088, 1; Ex. 1087, 1; Ex. 1091, 1–2; Ex. 1092, 3; Ex. 1093, 2; Ex. 1094, 1–2; Ex. 1086, 1–2; *see* Ex. 1049 ¶¶ 8, 10, 12, 14, 17, 19. The newsletter in particular informed subscribers of the development of the FIPA specification during 1996 and 1997 and provided detailed information regarding the release of FIPA 97 Version 1.0 in a November issue. Ex. 1086, 1–2. News articles in periodicals published in late 1997 also announced that FIPA had released and published FIPA 97 Version 1.0. Ex. 1095, 22; Ex. 1096, 93; *see* Ex. 1049 ¶ 22. In addition, the record contains several papers published in late 1997 and 1998, prior to the critical date, describing FIPA 97 Version 1.0 and its release in October 1997. *See* Ex. 1097, 1–7; Ex. 1099, 12–13; Ex. 1100, 51–52; Ex. 1049 ¶¶ 26–30; *see also* Ex. 1049 ¶¶ 31–32 (citing Exs. 1027–33 (other publications and patents referring to FIPA specification)).

The evidence of record also demonstrates that members of the relevant public, exercising reasonable diligence, could have located FIPA 97 Version 1.0 in late 1997 on the FIPA website, housed at the time at

http://drogo.cselt.stet.it/fipa. FIPA published FIPA 97 Version 1.0 on its website at the conclusion of the Munich meeting on October 10, 1997, or shortly thereafter. *See* Ex. 1049 ¶ 20. In the several months leading up to the Munich meeting, persons of ordinary skill in the art would have known about the FIPA website through the widely distributed AgentWeb newsletters and the Software Agents mailing list, which provided website information or direct links to drafts of the specification and meeting announcements and reports. *See* Ex. 1091, 1–2; Ex. 1092, 3; Ex. 1093, 2; Ex. 1094; Ex. 1082, 1; Ex. 1083, 1. Therefore, people working in the field would have been sufficiently familiar with FIPA's activities and its website to look for FIPA 97 Version 1.0 on the FIPA website when it was posted after the Munich meeting. Indeed, both Dr. Finin, who was affiliated with FIPA, and Dr. Lieberman, who worked in the software agent field, testify that they accessed FIPA 97 Version 1.0 on the FIPA website in late 1997. *Id.* ¶ 21; Ex. 1050 ¶ 146.

Moreover, the AgentWeb newsletter dated November 18, 1997, provided a link to the FIPA website and individual links to the seven parts of FIPA 97 Version 1.0 published on the website. Ex. 1086, 1–2; *see* Ex. 1049 ¶ 21. Thus, that issue of the newsletter provided more than 1,300 interested members of the public with direct access to FIPA 97 Version 1.0 at least as of November 18, 1997.

News articles and papers published in late 1997 also provided readers with the website address where FIPA 97 Version 1.0 could be found. *See* Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9. The news articles in particular likely reached a very wide audience because they appeared in publications directed to subject matter broader than agent-based technology. *See*

Ex. 1095 (EETimes); Ex. 1096 (IEEE Internet Computing). The EETimes article was dated October 20, 1997, suggesting that FIPA 97 Version 1.0 was available on the FIPA website at least as of that date.

The undisputed evidence also demonstrates that FIPA 97 Version 1.0 was freely available on the FIPA website without a password or any other restrictions and access was not subject to any requirement or expectation of secrecy or confidentiality. *See* Ex. 1049 ¶ 21; Ex. 1095, 22; *see also* Ex. 1006, iv (stating FIPA intended to make its results available to all interested parties). This evidence further supports our finding that FIPA 97 Version 1.0 was publicly accessible in late 1997. *See Jazz Pharm.*, 895 F.3d at 1358–59; *Voter Verified, Inc. v. Premier Election Solutions, Inc.*, 698 F.3d 1374, 1380–81 (Fed. Cir. 2012); *MIT v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985).

Patent Owner's arguments, many of which attack pieces of evidence individually, do not persuade us that Petitioner has failed to show that FIPA 97 Version 1.0 was publicly accessible. First, Patent Owner argues that no evidence shows the original FIPA website (http://drogo.cselt.stet.it/fipa) existed prior to a December 1, 1998, Internet Archive capture. Resp. 68 (citing Ex. 1051). To the contrary, much of the documentary evidence from late 1997 and testimonial evidence identifies that website or its mirror as the FIPA website during the relevant time period. *See* Ex. 1049 ¶ ¶ 20–23; Ex. 1092, 3; Ex. 1093, 2; Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9. Notwithstanding the absence of an Internet Archive capture for the website from a date prior to December 1998, we find that, based on the totality of evidence in the record, the original FIPA website existed in late 1997.

Patent Owner also argues that none of the documents cited by Petitioner provide active links to FIPA 97 Version 1.0 and therefore are insufficient proof of public accessibility. Resp. 69; Sur-reply 30. Again, based on the totality of evidence in the record, including but not limited to the testimony of Dr. Finin that he accessed FIPA 97 Version 1.0 on the FIPA website in late 1997, we find that FIPA 97 Version 1.0 was available on the FIPA website at that time, notwithstanding the lack of active links today, more than twenty years later. Patent Owner finds fault with Dr. Finin's testimony on this point because he does not claim to have used any of the links in the AgentWeb newsletters to access FIPA 97 Version 1.0. Sur-reply 30 (citing Ex. 1049 ¶ 21). Patent Owner, however, overlooks Dr. Finin's testimony that he was the founder and author of the AgentWeb newsletter, implying that he created the links in the newsletter. *See* Ex. 1049 ¶ 8. Therefore, based on Dr. Finin's personal knowledge regarding the links in the AgentWeb newsletter dated November 18, 1997, and the other evidence corroborating his testimony, we find that FIPA 97 Version 1.0 was available on the FIPA website in late 1997.

Patent Owner further asserts that, to the extent the Internet Archive capture from December 1998 provides an operable download link, it links to Version 2.0 of the FIPA 97 specification. Resp. 69 (citing Ex. 1051). It is not surprising, however, that FIPA's website in December 1998 provided links to FIPA 97 Version 2.0, which FIPA released in October 1998 to provide minor updates to two parts of the specification. *See* Ex. 1049 ¶ 35; Ex. 1053, vi. In any event, the December 1998 Internet Archive capture at least shows that the FIPA website was live at that time, which was prior to the critical date. *See* Ex. 1049 ¶ 23 (citing Ex. 1051, 1).

In its Sur-reply, Patent Owner argues for the first time that Petitioner has not demonstrated that a person of ordinary skill in the art in 1997 could have found FIPA 97 Version 1.0 using search tools or that the FIPA website was indexed so the specification could be located. Sur-reply 27–28. Further, Patent Owner argues that the existence of different FIPA websites at various times would have made it even more difficult to find the correct version of the FIPA specification without sufficient indexing or search tools. *Id.* at 29.

Even if we consider this late argument, we find it unpersuasive. As detailed above, the uncontested evidence shows that the address of the FIPA website itself was widely known among those skilled in the art and that FIPA routinely provided links to the FIPA specification on the website's home page. *See* Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9; Ex. 1051, 1; Ex. 1021, 1; Ex. 1025, 1. The November 1997 AgentWeb newsletter also provided direct links to FIPA 97 Version 1.0. Ex. 1086, 1–2. Under these circumstances, we find that a member of the interested public could have found FIPA 97 Version 1.0 without search tools or indexing by using the links in the AgentWeb newsletter or navigating to the well-known FIPA website home page. We also find that the record, including Dr. Finin's testimony, satisfactorily explains the various FIPA websites and website addresses over time and clearly identifies the FIPA website that was being used in late 1997. *See* Ex. 1049 ¶¶ 22–23, 48–49, 51.

Having determined that FIPA 97 Version 1.0 was publicly accessible on the FIPA website in late 1997, as early as October 10 and no later than November 18, we turn to whether Exhibits 1006–1012 (collectively referred to as FIPA97) contain the same version of the FIPA specification that was

available on the FIPA website during that timeframe. Dr. Finin testifies that Exhibits 1006–1012, documents available on the current FIPA website (fipa.org) and identified as FIPA 97 Version 1.0, are the same version with the same content as Parts 1–7 of FIPA 97 Version 1.0 that were released at the FIPA Munich meeting on October 10, 1997, and were publicly available on the FIPA website (http://drogo.cselt.stet.it/fipa) in late 1997. Ex. 1049 ¶¶ 21, 34.

As an initial matter, the October 10, 1997, date on the cover pages of several parts of FIPA97 supports Dr. Finin's testimony that FIPA97 is the same as FIPA 97 Version 1.0 as published on the FIPA website in late 1997. *See* Ex. 1006, Cover; Ex. 1007, Cover; Ex. 1008, Cover; Ex. 1010, Cover; Ex. 1012, Cover; *see also* Ex. 1009, Cover (Part 4 identifying a 1997 copyright date); Ex. 1011, Cover (Part 6 identifying a 1997 copyright date). Patent Owner contends that Petitioner cannot rely on the date stamps or copyright notices on Exhibits 1006–1012 to establish public accessibility because they are hearsay. Resp. 61; Sur-reply 22–24. We agree with Petitioner that Patent Owner has waived this argument because it did not raise an objection on evidentiary grounds pursuant to 37 C.F.R. § 42.64(b)(1). *See* Pet. Reply 15–16. Furthermore, we agree with Petitioner that the dates on the cover pages are not hearsay because they are evidence tending to show that FIPA97 is identical to FIPA 97 Version 1.0, not statements offered to show Exhibits 1006–1012 were published on a certain date. *See id.* at 16 (citing *Apple Inc. v. VirnetX Inc.*, IPR2016-01585, Paper 32 at 58 (PTAB Feb. 20, 2018)).

Patent Owner also argues that Petitioner cannot rely on the cover page dates alone as proof of the documents' public accessibility. Sur-reply 23.

The date stamps, however, are only part of the totality of evidence offered by Petitioner to establish public accessibility. As such, they are relevant evidence supporting a finding that FIPA97 was publicly accessible. *See Hulu*, Paper 29 at 17–18 (citing *Nobel Biocare*, 903 F.3d at 1377).

Patent Owner argues that the existence of multiple versions of FIPA 97 Version 1.0 undercuts Petitioner's position and Dr. Finin's testimony that Exhibits 1006–1012 are the version of FIPA 97 Version 1.0 that was publicly accessible in late 1997. *See* Resp. 62–65; Sur-reply 25. For example, Patent Owner points to Dr. Finin's description of the version released on October 10, 1997, as an "initial" version, after which final minor edits were to be made. Resp. 63–64 (citing Ex. 2068, 86:11–15, 88:9–89:25); *see* Ex. 1049 ¶ 21. Patent Owner cites an Internet Archive capture in the record referring to "FIPA 97 specification ver. 1.0 (Reston meeting)." Resp. 64–65 (citing Ex. 1105, 27). Patent Owner also cites evidence, including Dr. Finin's testimony, that a different version of FIPA 97 Version 1.0 was published in hardcopy books. *Id.* at 65 (citing Exs. 1055, 1056; Ex. 1049 ¶ 25 (stating that "FIPA printed the November 28, 1997, edited version of the specification" in the books)).

Patent Owner argues that because these various versions of FIPA 97 Version 1.0 have not been substantively introduced into evidence so that the differences can be ascertained, Petitioner has not shown that Exhibits 1006–1012 are the version that was publicly accessible on the FIPA website in late 1997. *See* Resp. 66–67. We disagree. Dr. Finin testifies that Exhibits 1006–1012 are the same documents that were released at the conclusion of the FIPA meeting in Munich on October 10, 1997, and were made publicly available at the time. Ex. 1049 ¶¶ 21, 34. Other evidence of

record corroborates Dr. Finin's testimony and adequately explains the multiple versions of the specification. *See* Pet. Reply 17–18. As set forth in detail above, FIPA released a version of FIPA 97 Version 1.0 on October 10, 1997, and made it available on the FIPA website soon thereafter. *See* Ex. 1049 ¶ 21; Ex. 1086, 1–2; Ex. 1095, 22; Ex. 1096, 93. It is clear from the record that any earlier versions of the specification, such as the version made available after the Reston meeting six months before FIPA 97 Version 1.0, were drafts made available for public comment. *See* Pet. Reply 17; Ex. 1049 ¶¶ 16–18; Ex. 1024; Ex. 1061.

The record also shows that the version published in book form is a later version, dated November 28, 1997, containing minor formatting and clerical edits. *See* Ex. 1049 ¶ 25; Ex. 1055, 5. Petitioner does not rely on the book version as a prior art reference or assert that it was publicly accessible. *See* Pet. 23–24; Pet. Reply 17–18. The hardcopy book excerpts in the record merely corroborate Dr. Finin's testimony that FIPA's activities and release of the FIPA specification were known in the art. *See* Ex. 1049 ¶ 24.

Patent Owner also points to the erroneous header on odd pages in Exhibit 1006 as calling into question which version of the specification is in Exhibits 1006–1012. Resp. 66. We credit Dr. Finin's unrebutted testimony that the header on some pages in Exhibit 1006 is a typographical error. *See* Ex. 1049 ¶ 21. Patent Owner has not cited, nor do we see, evidence in the record suggesting a FIPA 97 Version 2.4 was made publicly available. *See* Resp. 66.

Patent Owner finds fault with Exhibits 1006–1012 because they were obtained after the critical date and could not have been obtained from a

website prior to the critical date. *See* Resp. 61–62; Sur-reply 21. In his declaration, Dr. Finin testifies that Exhibits 1006–1012 are available on the FIPA website today (i.e., fipa.org), and the earliest Internet Archive record of the relevant website pages shows the documents were posted in 2000. Ex. 1049 ¶ 21 (citing Ex. 1054). Patent Owner contends that in his deposition Dr. Finin acknowledged that Exhibits 1006–1012 could have been obtained from files saved in the Internet Archive between 2003 and 2004. Resp. 61–62 (citing Ex. 2068, 93:12–94:2, 96:7–20). In either case, Patent Owner argues, the dates are after the critical date of the '560 patent. *Id.* at 62; Sur-reply 21. We agree with Petitioner, however, that the date Exhibits 1006–1012 were obtained is immaterial if they are digital copies of documents that are shown to have been publicly accessible before the critical date. *See* Pet. Reply 16 (citing *In re Wyer*, 655 F.2d at 226–27).

Finally, Patent Owner argues that the testimony of Dr. Finin and Dr. Lieberman is conclusory, unreliable, and uncorroborated and therefore insufficient to establish public accessibility. Resp. 71–74; Sur-reply 20–22. "[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest." *Nobel Biocare*, 903 F.3d at 1377–78 (quoting *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1369 (Fed. Cir. 1999)). This corroboration requirement applies when relying on witness testimony to establish public accessibility of a prior art reference. *See id.* at 1377–81; *Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158–60 (Fed. Cir. 2004). Corroborating evidence may include documentary or testimonial evidence, and circumstantial evidence may provide sufficient corroboration. *Nobel Biocare*, 903 F.3d at 1378. Determining whether testimony has been corroborated "involves an

assessment of the totality of the circumstances including an evaluation of all pertinent evidence." *Id.*

We are not persuaded by Patent Owner's argument regarding the testimony of Dr. Finin and Dr. Lieberman. Dr. Finin's testimony is based on his personal knowledge as someone who was directly involved in FIPA's activities by submitting comments on draft specifications and attending meetings, for example, and providing independent advice as a FIPA Fellow. His testimony that FIPA approved FIPA 97 Version 1.0 at the Munich meeting on October 10, 1997, and posted it to the FIPA website so that it was publicly accessible is corroborated by the evidence in the record of the facts and circumstances surrounding the development and release of the specification as analyzed above. Dr. Lieberman's testimony that as a member of the interested public he accessed FIPA 97 Version 1.0 in late 1997 is corroborated by the same evidence.

As for Dr. Finin's testimony, based on his personal knowledge, that Exhibits 1006–1012 are the same as the version of FIPA 97 Version 1.0 that was publicly accessible on the FIPA website in late 1997, we find it to be credible and corroborated by other evidence of record. We are not persuaded that Dr. Finin's inability to recall many of the details of a 300-page specification more than twenty years after it was created undermines his testimony. *See* Resp. 72–73. Furthermore, we find that the evidence discussed above, including the identification of Exhibits 1006–1012 on their cover pages or elsewhere as FIPA 97 Version 1.0 with a date of October 10, 1997, corroborates Dr. Finin's testimony that the version of the specification in Exhibits 1006–1012 is the version that was publicly

accessible on the FIPA website in late 1997, and not some other version of the FIPA specification.

For these reasons, we find that a preponderance of the evidence shows that Exhibits 1006–1012 are the version of FIPA 97 Version 1.0 released on October 10, 1997, and posted on the FIPA website in late 1997. As discussed above, a preponderance of the evidence shows that the October 10, 1997 version of FIPA 97 Version 1.0 was publicly accessible in late 1997. Accordingly, we find that Petitioner has met is burden to show that FIPA97, submitted as Exhibits 1006–1012 and relied on by Petitioner in its unpatentability challenges, was publicly accessible prior to the critical date of January 5, 1999, and therefore is available as prior art to the ’560 patent under 35 U.S.C. § 102(a).

*4. Obviousness over Kiss and FIPA97*

Petitioner asserts claims 1–3, 11, and 48–60 are unpatentable as obvious under 35 U.S.C. § 103 over the combination of Kiss and FIPA97. Pet. 32–67. Petitioner argues, "FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system." Pet. 28. Petitioner explains, "[t]hese techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging." *Id.* (citing Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1). Petitioner asserts, "[w]here the two systems disclose analogous functionality, such as facilitating cooperation and agent registry, their techniques are combined, as a Skilled Artisan would understand that to be an efficient and common sense way to implement the

combined system in order to obtain the benefits of both, and therefore be motivated to do so." *Id.* (citing Ex. 1003 ¶¶ 217–219).

*5. Motivation to Combine Kiss and FIPA97*

Petitioner argues the proposed combination of Kiss and FIPA97 would have been obvious for several reasons. Petitioner argues Kiss, FIPA97, and the '115 Patent are analogous art, because "each is directed to the same field of endeavor, *i.e.*, distributed computing environments generally and architectures for communication and cooperation among distributed electronic agents specifically." Pet. 28 (citing *e.g.*, Ex. 1001, 1:25–29; Ex. 1005, Abstract; Ex. 1007, Foreword, 1; Ex. 1003 ¶ 220). Petitioner also argues, "FIPA97 and Kiss are reasonably pertinent to the problem addressed by the '115 Patent—*e.g.*, the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 28 (citing Ex. 1001, 4:34–40; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1003 ¶ 221).

Petitioner argues,

> [i]t would have been obvious to make this combination because to do so would have been the arrangement of old elements (*i.e.*, the functionality of FIPA97, and the system of Kiss) with each performing the same function it had been known to perform (communication between distributed agents (FIPA97v1)); cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate to conduct cooperative task completion and problem solving).

Pet. 29 (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1003 ¶ 222).

Petitioner also argues it

> would have been obvious because a Skilled Artisan would have known that agents, such as in Kiss, must use a common

> communications protocol, i.e., an inter-agent communication language, and related management functionality, and therefore would have been motivated to consider and employ one of the available inter-agent communications languages and its related functionality, and because doing so would have been a convenient and efficient way to facilitate effective communication between agents.

Pet. 29 (citing Ex. 1003 ¶ 223; Ex. 1020, 2; Ex. 1046, 50).

Petitioner further argues,

> a Skilled Artisan would also have been motivated based on earlier descriptions of KQML's similar use of an inter-agent communication language, their disclosure that '[t]here are several levels at which agent-based systems must agree, at least in their interfaces, in order to successfully interoperate: Transport … Language … Policy … Architecture,' and their disclosure of the necessity of a robust inter-agent communication language in a system like Kiss.

Pet. 29–30 (citing Ex. 1016, Abstract, 4, 29, 30; Ex. 1006, 7; Ex. 1007, 40–42; Ex. 1005, Abstract; Ex. 1003 ¶¶ 224–226).

Petitioner argues it "would also have been obvious to try this combination because the necessity of a common inter-agent communication language was a known design need in a system such as Kiss, and there were only a small number of identified, predictable solutions to that need, such as FIPA ACL." Pet. 30 (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1035, 1; Ex. 1003 ¶ 227).

Petitioner also argues,

> [a] Skilled Artisan would have been further motivated to make the combination because of the known advantages of FIPA97, including that it specifies, 'key agents necessary for the management of an agent system, the ontology necessary for the interaction between systems, and it defines also the transport level of the protocols.'

*Id.* at 30 (citing Ex. 1035, 1; Ex. 1003 ¶ 229).

Further, Petitioner argues:

> a Skilled Artisan would have been motivated to make the combination because FIPA97 represented a substantial attempt to formulate an industry standard designed to encourage interoperability and uniformity amongst agent systems. A Skilled Artisan would have understood that agent systems that complied with such a standard would be more likely to be interoperable with other systems and would likely have more resources available.

*Id.* at 30–31 (citing Ex. 1007, vii; Ex. 1047; Ex. 1003 ¶ 230).

Petitioner argues, "[a] Skilled Artisan would have been further motivated to include the administrative functionality and exemplary practices described in FIPA97 with Kiss because the description of such functionality and practices in FIPA97 suggests that their use with the FIPA ACL would be advantageous and workable." Pet. 31. Petitioner also argues, "[a] Skilled Artisan would also have been motivated to employ such additional functionality and practices in the combined system in order to obtain the full benefit of using FIPA ACL." *Id.* (citing Ex. 1003 ¶ 231).

Finally, Petitioner argues, "a Skilled Artisan could have made the combination cited above without undue experimentation including because by January 1999 the components parts of this combination were well-known, conventional technology and because others had combined FIPA97v1 technology with agent systems." Pet. 31–32 (citing Ex. 1007; Ex. 1016; Ex. 1030; Ex. 1003 ¶ 228).

Patent Owner asserts that "Petitioner utterly defaults in offering any reason to combine *Kiss* and *FIPA97*." Resp. 116. Patent Owner argues that Petitioner's motivation to combine Kiss and FIPA97 suffers from "hindsight bias" and that Petitioner "offers no reason or explanation that a person of skill in the art looking at *Kiss* would be motivated to find a particular

language with the characteristics of *FIPA97's* ACL." *Id.* Patent Owner also argues that Petitioner does not "explain what 'efficiencies' a person of ordinary skill in the art would be looking for" and "fails to identify how the combination could be achieved." *Id.* at 116–117.

Patent Owner argues that "[e]ven if the combination of the *Kiss* meta-agent and the *FIPA97* Directory Facilitator had disclosed the claimed facilitator agent (it did not), Petitioner fails to offer any reason that a person of ordinary skill in the art would have been motivated to do so." *Id.* at 79. Patent Owner argues, "Petitioner offers no reason that the meta-agent of *Kiss* would need any capability offered by *FIPA97*." *Id.* "Indeed," Patent Owner argues, "*Kiss* itself already includes a registry." *Id.*

Patent Owner also argues that the "Petition says nothing" about how to combine FIPA97's Directory Facilitator and Kiss' meta-agent. *Id.* at 80. Patent Owner argues the "two architectures look quite different," and that "Petitioner offers no articulation of how to add [FIPA Directory Facilitators] to any of the *Kiss* layers." *Id.* at 81.

Patent Owner argues:

> If *Kiss's* meta agents were replaced by or combined with *FIPA's* [Directory Facilitators] in some way, like the Petition suggests, the directory service provided by the [Directory Facilitators] would clash with the duplicate and potentially conflicting services provided by the existing agent service layer. Other agents in *Kiss* would either be unable to obtain the registry services or would receive duplicate and/or contradictory answers, resulting in an inoperative device.

*Id.* at 82 (citations omitted).

Patent Owner also argues that Petitioner's combination of FIPA97, Kiss and Cohen "is emblematic of hindsight bias" because Dr. Lieberman "picks and chooses elements" and "superimposes them into one figure in an

attempt to 'show' the combination." *Id.* at 84. Patent Owner argues that "simply drawing in block diagrams with terminology from other references into one cobbled diagram is insufficient as a matter of law without any explanation of how such a combination could be achieved or, indeed, why." *Id.* at 84–85.

In Reply, Petitioner argues that Patent Owner "ignores the several pages of analysis supported by expert testimony (including citations to evidence in the prior art) articulating the rational underpinning of the combination" of Kiss and FIPA97. Reply 30 (citing Pet. 28–32). Petitioner argues that "while there was no requirement to show that a Skilled Artisan would search for 'a particular language with the characteristics of FIPA97's ACL,'" (Resp. 116), the Petition does explain that "agents, such as in Kiss, must use a common communications protocol," so a Skilled Artisan "would have been motivated to 'employ one of the available inter-agent communications languages . . . because doing so would have been a convenient and efficient way to facilitate effective communication between agents.'" Reply 30–31 (citing Pet. 29–30; Ex. 1003 ¶ 223).

Petitioner also argues that Patent Owner's criticism that "Petitioner fails to identify how the combination could be achieved," (Resp. 117), is "legally irrelevant" (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981), and "also ignores the detailed description in the Petition (supported by Dr. Lieberman) that demonstrates how the combination would work." Reply 31 (citing Pet. 28–32; Ex. 1003 ¶¶ 217–219; Ex. 1005, Figs. 4–6, 21 (annotated)). Petitioner points out that:

> [t]he Petition explains, for example, that FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system, as

> described with specificity below. These techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging, (Ex. 1005, 3:32–36, 3:67-4:1, 6:67–7:1), as well adding functionality that is disclosed in FIPA97.

Reply 34.

In its Sur-reply, Patent Owner argues that Petitioner's evidence of a motivation to combine are simply "[p]ages of boilerplate language" or exhibit "*ex post* reasoning colored by hindsight." Sur-reply 58, 62. Patent Owner argues that the FIPA97 and Kiss protocols are "different" and "mutually exclusive" and that "Petitioner offers no argument or evidence relating to how these completely different components would be reconciled." *Id.* at 59–61. Patent Owner argues that FIPA97 "discouraged interoperability between different and incompatible systems." *Id.* at 61.

Patent Owner also argues that "[t]he Board must disregard" portions of Petitioner's Reply, which discuss "a series of four figures from Dr. Lieberman's declaration," "because it constitutes new argument." *Id.* at 63. Patent Owner argues that "the Petition must contain a 'full statement of the reasons for the relief requested'" and "cannot simply incorporate by reference its expert's declaration." *Id.* (citing 37 C.F.R § 42.6(a)(3)).

In identifying a reason that would have prompted a person of ordinary skill in the relevant field to combine the prior art teachings, the Petitioner "must show some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). A reason to combine teachings from the prior art "may be found in explicit or implicit teachings within the references themselves, from the ordinary knowledge of those skilled in the art, or from the nature of the problem to be solved." *WMS Gaming Inc. v. Int'l Game*

*Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (*citing In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998)).

Here, Petitioner explains that:

> FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system, as described with specificity below. These techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging, Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1, as well adding functionality that is disclosed in FIPA97. Where the two systems disclose analogous functionality, such as facilitating cooperation and agent registry, their techniques are combined, as a Skilled Artisan would understand that to be an efficient and common sense way to implement the combined system in order to obtain the benefits of both, and therefore be motivated to do so.

Pet. 27–28 (citing Ex. 1003 ¶¶ 217–219).

Petitioner provides persuasive evidence that Kiss and FIPA97 are analogous art because "each is directed to the same field of endeavor, *i.e.*, distributed computing environments generally and architectures for communication and cooperation among distributed electronic agents specifically." Pet. 28 (citing Ex. 1001, 1:25–29; Ex. 1005, Abstract; Ex. 1007, Foreword, 1; Ex. 1003 ¶ 220). Petitioner also provides persuasive evidence that FIPA97 and Kiss "are reasonably pertinent to the problem addressed by the 115 Patent—*e.g.,* the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 28 (citing Ex. 1001, 4:34–40; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1003 ¶ 221).

Petitioner argues persuasively that

> [i]t would have been obvious to make this combination because to do so would have been the arrangement of old elements (*i.e.*, the functionality of FIPA97, and the system of Kiss) with each

> performing the same function it had been known to perform (communication between distributed agents (FIPA97v1)); cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate to conduct cooperative task completion and problem solving).

Pet. 29 (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1003 ¶ 222).

Petitioner also argues, and we agree, that it

> would have been obvious because a Skilled Artisan would have known that agents, such as in Kiss, must use a common communications protocol, i.e., an inter-agent communication language, and related management functionality, Ex. 1020, 2; Ex. 1046, 50, and therefore would have been motivated to consider and employ one of the available inter-agent communications languages and its related functionality, and because doing so would have been a convenient and efficient way to facilitate effective communication between agents.

Pet. 29 (citing Ex. 1003 ¶ 223).

Petitioner goes on to argue that "a Skilled Artisan would also have been motivated based on earlier descriptions of KQML's similar use of an inter-agent communication language," (citing Ex. 1016, Abstract) and their disclosure that "[t]here are several levels at which agent-based systems must agree, at least in their interfaces, in order to successfully interoperate: Transport … Language … Policy … Architecture," (citing Ex. 1016, 4, 29, 30) as well as their disclosure of "the necessity of a robust inter-agent communication language in a system like Kiss." Pet. 29–30 (citing Ex. 1006, 7; Ex. 1007, 41, 4–-42; Ex. 1005, Abstract; Ex. 1003 ¶¶ 224–226).

Petitioner further argues that "[s]uch a combination would also have been obvious to try this combination because the necessity of a common inter-agent communication language was a known design need in a system such as Kiss," (citing Ex. 1020, 2; Ex. 1046, 50) and there were only a small

number of identified, predictable solutions to that need, such as FIPA ACL." Pet. 30 (citing Ex. 1035, 1; Ex. 1003 ¶ 227).

Petitioner goes on to argue that a "Skilled Artisan" would also have been motivated to combine FIPA97 and Kiss in the manner described in the Petition "because of the known advantages of FIPA97, including that it specifies, 'key agents necessary for the management of an agent system, the ontology necessary for the interaction between systems, and it defines also the transport level of the protocols'" (citing Ex. 1035, 1; Ex. 1003 ¶ 229), and "because FIPA97 represented a substantial attempt to formulate an industry standard designed to encourage interoperability and uniformity amongst agent systems." Pet. 30 (citing Ex. 1007, vii; Ex. 1047).

Petitioner also explains that:

> [a] Skilled Artisan would have been further motivated to include the administrative functionality and exemplary practices described in FIPA97 with Kiss because the description of such functionality and practices in FIPA97 suggests that their use with the FIPA ACL would be advantageous and workable. A Skilled Artisan would also have been motivated to employ such additional functionality and practices in the combined system in order to obtain the full benefit of using FIPA ACL.

Pet. 31 (citing Ex. 1003 ¶ 231).

In light of the reasons and the explanations Petitioner provides that would have motivated a person of ordinary skill in the art to combine the teachings of FIPA97 and Kiss in the manner Petitioner describes, Patent Owner's argument that "Petitioner utterly defaults in offering *any reason* to combine *Kiss* and *FIPA97*" (*see* Resp. 116) (emphasis added), is directly contrary to the evidence of record and is unpersuasive. So too is Patent Owner's argument that "Petitioner fails to offer *any reason* that a person of ordinary skill in the art would have been motivated" to combine "the *Kiss*

meta-agent and the *FIPA97* Directory Facilitator." *See* Resp. 79 (emphasis added).

Patent Owner also argues that Petitioner "offers no reason or explanation that a person of skill in the art looking at *Kiss* would be motivated to find a particular language with the characteristics of FIPA97's ACL." *Id.* at 116. Patent Owner's argument, however, is misplaced. The test for obviousness is not whether a person of ordinary skill in the art "looking at *Kiss* would be motivated to find a particular language with the characteristics of FIPA97's ACL." Rather, "[u]nder the correct [obviousness] analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007).

Here, Petitioner provides persuasive evidence and argument that FIPA97 and Kiss "are reasonably pertinent to the problem addressed by the 115 Patent—*e.g.*, the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 28 (citing Ex. 1001, 4:34–40; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1003 ¶ 221). This evidence includes the '115 patent's observation that:

> [a]gent-based systems have shown much promise for flexible, fault-tolerant, distributed problem solving. Several agent-based projects have helped to evolve the notion of facilitation. However, existing agent-based technologies and architectures are typically very limited in the extent to which agents can specify complex goals or influence the strategies used by the facilitator.

Ex. 1001, 4:34–40, as well as Kiss' observation that "a need exists for a knowledge management system for dynamic, distributed problem-solving systems. Ex. 1005, 2:39–40. Indeed, Dr. Lieberman notes that the FIPA97

specification "defines a language and supporting tools, such as protocols, to be used by intelligent software agents to communicate with each other," and that "the terms used and the mechanisms used [by FIPA97] support such a higher-level, often *task based*, view of interaction and communication." Ex. 1003 ¶ 221. This evidence support's Petitioner's position that a person of ordinary skill in the art at the time of the claimed invention would have combined FIPA97 and Kiss in the manner described in the Petition to provide a flexible, fault-tolerant, distributed problem solving system using agent-based technologies.

Patent Owner further argues that "Petitioner offers no reason that the meta-agent of *Kiss* would need any capability offered by *FIPA97*." Resp. 79. Patent Owner argues that the "Petition says nothing" about how to combine FIPA97's Directory Facilitator and Kiss' meta-agent. *Id.* at 80. Patent Owner makes the observation that the "two architectures look quite different," and that "Petitioner offers no articulation of how to add [FIPA Directory Facilitators] to any of the *Kiss* layers." *Id.* at 81. Patent Owner argues:

> If *Kiss's* meta agents were replaced by or combined with *FIPA's* [Directory Facilitators] in some way, like the Petition suggests, the directory service provided by the [Directory Facilitators] would clash with the duplicate and potentially conflicting services provided by the existing agent service layer. Other agents in *Kiss* would either be unable to obtain the registry services or would receive duplicate and/or contradictory answers, resulting in an inoperative device.

*Id.* at 82 (citations omitted).

We note that, "the [obviousness] analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of

ordinary skill in the art would employ." *KSR*, 550 U.S. at 418 (2007). The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references. Rather, the test is what *the combined teachings* of the references *would have suggested* to those of ordinary skill in the art. *In re Keller*, 642 F.2d 413, 425 (CCPA 1981).

Here, contrary to Patent Owner's arguments, Petitioner provides a description in the Petition (supported by Dr. Lieberman's Declaration) that explains how a person of ordinary skill in the art would combine FIPA97 and Kiss. *See, e.g.*, Pet. 28–32; Ex. 1003 ¶¶ 217–219. For example, the Petition explains that "FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system." Pet. 27–28. The Petition also explains that "[t]hese techniques are used to implement the functionality described in Kiss, including *facilitating agent collaboration*, agent registry, and inter-agent messaging . . . as well adding functionality that is disclosed in FIPA97." *Id.* at 28 (citing Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1) (*italicized* emphasis added).

Petitioner's proffered combination of FIPA97 and Kiss is amply supported by Dr. Lieberman's testimony. For example, Dr. Lieberman explains that:

> in the combination of Kiss with FIPA97, the "interagent abstract communications facilities" of Kiss, EX1005, 3:32-36, would use the inter-agent communication language of FIPA97 to, for example, "negotiate with each other, conduct joint planning, and to collaborate in the execution of planned tasks," EX1005, 3:32-36. Additionally, *the Agent Service Layer and meta-agent of Kiss would be implemented using* the FIPA97 Agent Management

> System ("FIPA AMS") and *the functionality of the FIPA Directory Facilitator*, described in EX1006. Thus, *the "capabilities, interests, and attributes for the knowledge modules*" EX1005, 6:67-7:1, as stored in the agent registry of Kiss, and the meta agent of Kiss, *would be implemented with the directory facilitator functionality of FIPA97*. Therefore, FIPA AMS would be used to provide a "scalable and modular," EX1005, 3:67-4:1, inter-agent management system and agent registry for the distributed agents of Kiss. Further, the combination of FIPA97 and Kiss would be informed by and include the exemplary practices described in the informative sections of FIPA97 (i.e, Parts 4-7). The following are further annotated figures from Kiss representing exemplary depictions of the combined Kiss/FIPA97 system.

Ex. 1003 ¶ 219 (citing Ex. 1005, Figs. 4–5, 6, 21) (*italicized* emphasis added).

Dr. Lieberman provides an annotated version of Kiss' Figure 21, shown below, illustrating how FIPA97's Directory Facilitator (DF) and Facilitating Agent (FA) would be incorporated into Kiss' Knowledge Management System.




*Fig. 21*

Petitioner's annotated version of Kiss' Figure 21, shown above, depicts how FIPA97's Directory Facilitator (DF) and Facilitating Agent (FA) would be incorporated into the User Interface Layer, Meta-Agent Layer, and Knowledge Agent Layer of Kiss' Knowledge Management System connected to a distributed environment such as the Internet. *See* Ex. 1003, ¶¶ 217–219, pgs. 132–135; Ex. 1005, 10:55–12:28, 14:31–36, Figs. 4–6, 8, 21. Patent Owner's arguments that the Petition "says nothing" about how to combine FIPA97's Directory Facilitator and Kiss' meta-agent and offers "no articulation" of how to add a Directory Facilitator to any of the Kiss layers is simply contrary to the evidence of record. Similarly, Patent Owner's arguments that the FIPA97 and Kiss protocols are "mutually exclusive" and that FIPA97 "discouraged interoperability" between systems

is not adequately supported by the record and is unpersuasive. *See* Sur-reply 59–61.

Patent Owner's argument in its Sur-reply that we must "disregard" portions of Petitioner's Reply discussing Dr. Lieberman's annotated illustrations because it constitutes "new argument" is also unpersuasive. *See* Sur-reply 63. The identified portions of Petitioner's Reply (pgs. 32–33) respond directly to Patent Owner's argument in its Response that "Petitioner fails to identify **how** the combination could be achieved," and do not constitute new argument. *See* Reply 31 (citing Response 117). Similarly, Patent Owner's argument that Dr. Lieberman's annotated illustrations should be disregarded because they do not appear directly in the Petition is misplaced. *See* Sur-reply 63. 37 C.F.R § 42.6(a)(3), cited by Patent Owner, prohibits "arguments" from being incorporated by reference from one document into another document. Dr. Lieberman's Declaration (Ex. 1003) is *testimonial evidence* provided by a witness in support of the Petition—it is not "argument."

Finally, Patent Owner argues Petitioner's motivation to combine Kiss and FIPA97 suffers from "hindsight bias" (Resp. 116) and that Petitioner's combination of FIPA97, Kiss and Cohen "is emblematic of hindsight bias" because Dr. Lieberman "picks and chooses elements" and "superimposes them into one figure in an attempt to 'show' the combination." *Id.* at 84. In particular, Patent Owner argues that "simply drawing in block diagrams with terminology from other references into one cobbled diagram is insufficient as a matter of law without any explanation of how such a combination could be achieved or, indeed, why." *Id.* at 84–85.

We note that "[a]ny judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into

account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper." *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971).

Here, Petitioner provides persuasive evidence that a person of ordinary skill in the art at the time of the invention would have been motivated to combine FIPA97's communications protocol and inter-agent communication language (FIPA ACL) between the agents of Kiss, adding its administrative functionality and practices to the Kiss system. *See, e.g.*, Pet. 27–31; Ex. 1003 ¶¶ 217–232. This is not evidence of hindsight bias. Patent Owner does not identify, and we do discern, any particular knowledge used by Petitioner in its combination of FIPA97 and Kiss that was gleaned from the '115 patent's disclosure and was not within the level of ordinary skill in the art at the time of the invention.

Patent Owner's criticism of Dr. Lieberman's annotation of Kiss' Figure 8 (*see* Resp. 84–85; Ex. 1003, 130) is also misplaced. As Dr. Lieberman explains, the annotated illustration shows *how* a person of ordinary skill in the art at the time of the invention would have combined FIPA97's ACL messaging, Directory Facilitator, and Facilitator Agent with Kiss' Agent Service Layer. *See* Ex. 1003, 130, Fig. 8. Moreover, Dr. Lieberman persuasively explains *why* a person of ordinary skill in the art would have been motivated to combine the teachings of FIPA97 and Kiss in the manner described. *See* Ex. 1003 ¶¶ 217–231.

We find that Petitioner has shown persuasively by a preponderance of the evidence that one of ordinary skill in the art at the time of the invention would have been motivated to combine the teachings of FIPA97 and Kiss in the manner proffered by Petitioner.

*6. Nonobviousness*

In determining whether the challenged claims would have been obvious as Petitioner alleges, we must also weigh secondary considerations of nonobviousness, such as commercial success, long-felt but unmet need, failure of others, and unexpected results. *KSR*, 550 U.S. at 406. A nexus is required between the merits of the claimed invention and any objective evidence of nonobviousness if that evidence is to be given substantial weight in reaching a conclusion on obviousness. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983). Evidence of secondary considerations is only significant if there is a nexus with respect to the claimed invention. *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006).

Nexus is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in the determination of nonobviousness. *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). For instance, commercial success is relevant if it flows from the merits of the claimed invention. *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988). The burden of showing nexus is on the patent owner. *In re Huang*, 100 F.3d 135, 139–40 (Fed. Cir. 1996). Objective evidence of nonobviousness also must be commensurate in scope with the claims for which the evidence is offered to support. *In re Kulling*, 897 F.2d 1147, 1149 (Fed. Cir. 1990).

Patent Owner contends that objective indicia of nonobviousness confirms the novelty of the ’115 patent. Resp. 119–145. Patent Owner argues that industry praise for a software application known as “Siri,” “which was first made available for download to iPhone users on Apple,

Inc.'s App Store on February 4, 2010" (*id.* at 121), "bears a nexus to the claims of the '156 Patent" (*id.* at 141).[13] Patent Owner argues that industry praise for the "personal context awareness and service delegation 'technical components' of the Siri application are made possible by the [] claim limitations of independent claim 1 of the '115 Patent." *Id.* at 136.

Patent Owner asserts that "[t]he '115 Patent was based on SRI International's development of version 2 of the Open Agent Architecture ('OAA')." *Id.* at 135 (citing Ex. 2032; Ex. 1001). For support, Patent Owner relies on Exhibit 2054, an SRI web page, which states, "SRI developed OAA® software, which is designed with intelligent 'agents' that track human interactions and work processes to streamline electronic and computer interchange." Resp. 135 (quoting Ex. 2054). Patent Owner further asserts that "[a]fter version 2 of OAA was developed, SRI International spun out Siri, Inc. as an SRI venture, where the Siri application was created based on an OAA groundwork." Resp. 135 (quoting Ex. 2054 ("OAA laid the groundwork for the DARPA-funded CALO project, from which Siri, the first virtual personal assistant, was born. Siri was spun out into an SRI venture that Apple acquired from SRI."). Apple Inc. apparently acquired Siri, Inc. in April 2010, approximately two months after the Siri application's initial release.[14] Resp. 10, 121, 135.

Patent Owner asserts that "Petitioner proposed a combination of *Kiss* with *FIPA97*, which relies on *FIPA97* as teaching a common

---

13 Although Patent Owner refers to the '156 Patent here, we assume this is a mistake and that Patent Owner actually meant to refer to the patent at issue in this proceeding, the '115 patent.

[14] We note for the record that the filing date for the '115 patent is Jan. 5, 1999, approximately ten years prior to the Siri application's initial release.

communications and protocol language that is combined with *Kiss*'s teachings of electronic agents and their general functions and operations." Resp. 134 (citing Paper 12, 45). To support this assertion, Patent Owner supposedly quotes from the Decision on Institution in this proceeding as follows:

> In its proposed combination of *Kiss* with *FIPA97*, Petitioner relies on *Kiss* as teaching electronic agents and their general functions and operations, including agent collaboration, agent registry, and interagent messaging. Pet. 28. Petitioner acknowledges, however, *Kiss* does not disclose an inter-agent communication language and relies on *FIPA97* to teach a common communications protocol and language (FIPA ACL), which is combined with the teachings of *Kiss* to provide a communication language for inter-agent communication between the agents of *Kiss*. *Id.*

Resp. 134 (citing Paper 12, 45). However, we cannot locate this supposed quotation from the Decision on Institution in this proceeding on page 45, or on any other page of the Decision, for that matter. *See* Paper 12, 45.

Nonetheless, Patent Owner argues a "nexus between the evidence of industry praise of the Siri application [] and the Challenged Claims can be shown if the industry praise has a nexus to the combination of these (allegedly) prior art features, *i.e.*, the teachings of electronic agents and their general functions and operations in *Kiss* and the common communications protocol and language of *FIPA97*." Resp. 134. Patent Owner argues that its "evidence of industry praise [] satisfies the nexus requirement, as it shows praise for the Siri application's integration of personal context awareness into a service-delegating virtual personal assistant." Resp. 136; *see also id.* at 122–133. Patent Owner also argues that "industry journalists recognized that the Siri application filled an unmet need for a true virtual personal assistant." *Id.* at 141; *see also id.* at 141–145.

To establish a nexus between claim 1 of the ’115 patent and the Siri application, Patent Owner provides the following chart. *Id.* at 136–138. Patent Owner relies, in significant part, on the opinion of its declarant, Dr. Medvidovic, to establish a nexus between the Siri application and the claims of the ’115 patent. *See* Ex. 2032 ¶¶ 205–229, App. A, 1–32.

| **Siri’s Description of Technology Feature** | **Claim 1 of the ‘115 Patent** |
|---|---|
| **Personal Context Awareness**<br>A virtual assistant gives different answers depending on individual preferences and personal context (place, time, history), and if you give it permission, learns more about you so that it can shorten your time-to-task. Information you teach Siri in one domain (e.g. movies) is applied automatically to opportunities rising from other domains. Any personal | “registering a description of each active client agent’s functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language, wherein the inter-agent language includes:<br>a layer of conversational protocol defined by event types and parameter lists associated with one or more of the |

| | |
|---|---|
| information you provide Siri is stored in a highly secure, PCI-compliant co-location center, and used only with your explicit permission to accelerate your task completion. | events, wherein the parameter lists further refine the one or more events;<br>a content layer comprising one or more of goals, triggers and data elements associated with the events;" |
| **Service Delegation**<br>An assistant can reason about what specific set of resources or services would best be combined to help you accomplish a particular task. Siri's patented service delegation algorithms combine numerous attributes about each service provider, including quality scores, fine-grained ratings for specific capabilities, speed measures, and geographic constraints, to plan and execute an optimized strategy for handling your request. Live data is pulled fresh from source sites and world-changing actions are handled in a transaction-safe manner. For example, in a restaurant selection task, Siri integrates information from many sources (local business directories, geospatial databases, restaurant guides, restaurant review sources, | "A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents, comprising the acts of:<br>. . .<br>receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrary complex goal expression;<br>dynamically interpreting the arbitrarily complex goal expression, said act of interpreting further comprising:<br>generating one or more sub-goals expressed in the inter-agent language;<br>constructing a goal satisfaction plan wherein the goal satisfaction plan includes:<br>a suitable delegation of sub-goal requests to best complete the requested |

| | |
|---|---|
| menu sites, online reservation services and the user's own favorites) to show results that meet the user's natural language request. | service request-by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and<br>dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent." |

Patent Owner argues that "the Siri application's integration of personal context awareness is made possible because of the claimed inter-agent language limitations." Resp. 138 (citing Ex. 2032 ¶ 222). Patent Owner explains that "[b]y having a layer of conversational protocol that has parameter lists, the '115 Patent describes how agents can then use the parameters in the parameter lists to provide feedback or advice to agents who directly, or indirectly through the facilitating agent, receive the service request." Resp. 138. For example, Patent Owner explains that a "requesting agent can utilize such a parameter to provide context on a user's preference to the facilitator agent and/or the tasking agents. *Id.* at 139 (citing Ex. 2032 ¶ 224). Patent Owner argues that "[t]his same functionality of being able to include individual preferences, for example, was described by Siri, Inc. as representing personal context awareness." Resp. 140 (citing Ex. 2040, 2).

Patent Owner also argues that:

> the Siri application's service delegation corresponds to the claimed dynamic interpretation limitations. Siri, Inc. described the service delegation feature of the Siri application as including "an assistant [that] can reason about what specific set of resources or services would best be combined to help you accomplish a particular task." This is precisely what is claimed in the dynamic interpretation limitations, e.g., "constructing a goal satisfaction plan . . . [including] a suitable delegation of sub-goal requests to best complete the requested service request-by using reasoning."

Resp. 140 (citing Ex. 2032 ¶ 221).

Petitioner argues that Patent Owner's "secondary considerations position rests primarily on an unsubstantiated, conclusory opinion that certain aspects of the '115 Patent are embodied in the Apple product 'Siri.'" Reply 82. Petitioner argues that as "Dr. Medvidovic conceded, the evidence he relied on is 'circumstantial,' or a 'suggestion.'" *Id.* (citing Ex. 1129, 147:12-15). Petitioner argues that Dr. Medvidovic "never reviewed the Siri source code, (Ex. 1129, 146:20-147:6), and indeed never even asked to review that source code (Ex. 1129, 147:22-148:9)." Reply 82–83. Petitioner argues,

> [t]he failure to review the code is fatal, because [Dr. Medvidovic] further testified that an "agent"—an element in every claim—is a "piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer **a clearly identifiable body of code,"** and that to distinguish an "agent" from any other software he "**would have to look inside the code**."

*Id.* at 83 (quoting Ex. 1129, 9:14-11:8).

Petitioner faults Patent Owner for not "not seek[ing] that code through a motion for additional discovery or other means, nor did [Petitioner] seek any other objective evidence (such as specifications) to support its assertions." Reply 83. Petitioner also faults Patent Owner for not seeking

the testimony of Mr. Adam Cheyer, one of the named co-inventor's on the '115 patent and a co-founder of Siri, Inc., on this topic, even though Mr. Cheyer's testimony was apparently obtained in a related proceeding. *Id.* at 83–84 (citing Ex. 2034, 58:15-63:16; Ex. 1127); *see also* Resp. 121. During the Oral Hearing in this proceeding, counsel for Patent Owner was asked about this potential source of evidence:

> JUDGE TROCK: Counsel, this is Judge Trock again.
>
> Do you have any evidence from Mr. Cheyer that this Siri version that you're discussing right now incorporated the claim limitations of the '115 patent?
>
> MS. ABDULLAH: Your Honor, we do not have any direct evidence from Mr. Cheyer. And the reason is because he was never deposed in this proceeding and he is also not a consultant or anybody that's working with IPA at the moment. I know --
>
> JUDGE TROCK: Wasn't he deposed -- sorry. Wasn't he deposed in the Google proceeding?
>
> MS. ABDULLAH: He was, your Honor. And that was pursuant to a subpoena that we had to get permission to serve from the Board because he refused to simply cooperate with us voluntarily.
>
> JUDGE TROCK: Was there a reason why you didn't approach the Board in this case for a subpoena?

MS. ABDULLAH: Your Honor, because we don't believe that his testimony is as probative as the expert testimony that we presented drawing the direct connection as well as the actual industry praise and long-felt need evidence that we --

JUDGE TROCK: But wouldn't he be a witness with personal knowledge of whether or not that original Siri version incorporated the claim limitations of the '115 patent?

MS. ABDULLAH: Your Honor, respectfully, I believe that that was not -- that would not be a question of personal knowledge but rather of expert testimony. And also, your Honor, I would note that I don't believe that we would have the requisite showing under the Garmin factors that he would be able to testify to those aspects.

JUDGE TROCK: But he is the inventor, right? You've told us that.

MS. ABDULLAH: Yes, your Honor, he is the inventor.

TROCK: All right. So he might be a person -- a witness with personal knowledge; isn't that right?

MS. ABDULLAH: Absolutely. And were this a district court case, you know, I'm sure we would have pursued his deposition. I'm sure Microsoft would have as well. But given the high burden for

> us to obtain additional discovery, your Honor, we determined that the probative value of his testimony was not such that it would meet the Garmin factors here.
>
> JUDGE TROCK: But you did pursue that in the Google case though?
>
> MS. ABDULLAH: Your Honor, the Google case was a different issue. The question there had to do with authorship of a prior art reference that Mr. Cheyer was an author of. And it had to do with whether that could be considered the work of another versus the inventor. So inventorship was front and center in the Google proceedings where it is not here. Here this is a 103 analysis for which, you know, obviously I can't pretend to say what the Board would have done. But I think the evidence that we have, that we have been able to present demonstrates that link better than Mr. Cheyer's testimony would be able to.

Paper 42, 114:12–116:26.

Petitioner also points to evidence that potentially undermines a nexus between the challenged claims of the ’115 patent and the Siri application. For example, Petitioner argues that “Adam Cheyer testified that ‘Siri’ did not implement the agent registry functionality described in the ’115 Patent.” Reply 84 (citing Ex. 2034, 46:12-47:5). Likewise, Petitioner argues, “an email authored by Adam Cheyer indicates that as of August 2005 OAAv2 had only been adapted to run on ‘Windows CE’ mobile devices—there is no

mention of iOS, Apple, or any other mobile platforms." Reply 84 (citing Ex. 1137).

Petitioner also argues that Patent Owner's "evidence credits the CALO project with being the progenitor of the ideas that led to Siri—not any version of OAA." Reply 84 (citing Ex. 2042, 1 ("Siri traces its origins to a military-funded artificial-intelligence project called CALO"); Ex. 2044, 1; Ex. 2047, 2; Ex. 2054, 1; Ex. 2001, 2). "Nor is there any evidence in the record," Petitioner argues, "that OAA was ultimately utilized in SRI's CALO project other than that the original OAA (*i.e.*, the version first created in 1994 prior to the '115 Patent work) laid 'groundwork' for what would ultimately become CALO." Reply 84 (citing Ex. 2054). Petitioner argues that "substantial evidence shows that a later agent system named "SPARK" (SRI Procedural Agent Realization Kit) was used as the basis of CALO," but that Patent Owner "ignores this intervening SPARK system and makes no attempt to show it practices the claims, nor does it meaningfully address the CALO project." Reply 85 (citing Ex. 1136 §7).

Petitioner argues that Patent Owner "failed to provide evidence 'that the industry praised a claimed invention or a product that embodies the patent claims.'" Reply 85 (quoting *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016) (emphasis omitted). In particular, Petitioner argues, Patent Owner "failed to 'establish that the evidence relied upon traces its basis to a novel element in the claim and not to something in the prior art.'" Reply 85 (quoting *BioMarin Pharm. Inc. v. Genzyme Therapeutic Prods. LP*, IPR2013-00537, Paper 79, 22 (PTAB Feb. 23, 2015) (emphasis omitted).

"Furthermore," Petitioner argues, Patent Owner "has provided no showing that the Siri App 'embodies the claimed features and is co-

extensive with them,' and accordingly can gain no presumption from any Siri success." Reply 85–86 (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018) (emphasis omitted). "Even assuming portions of Siri embodied the claims," Petitioner argues, "the record is undisputed that Siri provides significant functionality well beyond anything covered by the claims—voice recognition, for example." Reply 86.

Petitioner further argues "the table provided by [Patent Owner] merely lists unrelated claim language and 'examples' of 'personal context awareness' with no further analysis." *Id.* at 87. "For example," Petitioner argues, Patent Owner "provides no explanation about how the alleged 'Personal Context Awareness' feature in Siri practices 'a layer of conversational protocol.'" *Id.* Moreover, Petitioner argues, "despite claiming that 'the Siri application's integration of personal context awareness is made possible because of the claimed inter-agent language limitations,' [Patent Owner] provides no evidence. [Patent Owner] cites only to a single paragraph of Dr. Medvidovic's declaration, which is itself bare *ipse dixit* and further undermined by his failure to examine the source code or any other descriptive technical materials for Siri." *Id.* at 88 (citing Ex. 2032 ¶ 222).

Petitioner argues that Patent Owner's evidence that Siri embodies the ICL limitations of claim 1 "is no better." Reply 88 (citing Resp. 140). Petitioner argues Patent Owner:

> does not discuss the actual limitations of claim 1 nor explain how giving different answers depending on individual preferences embodies the claims. For example, [Patent Owner] does not even attempt to articulate how Siri has a conversational layer, or event types, or how those event types are refined by parameters. Nor does [Patent Owner] address how Siri embodies the claimed

> agent registry limitation, particularly when the testimony of the inventor Mr. Cheyer indicates that it does not.

Reply 88 (citing Ex. 2034, 46:12–47:5).

Petitioner argues that Dr. Medvidovic's testimony should be given no weight. Reply 89. Petitioner argues that:

> Dr. Medvidovic admitted that he would be unable to determine whether a piece of software was an "agent" without examining the source code for that software, and further admitted that he had not reviewed the Siri source code nor ever asked to review such source code. Ex. 1129, 11:9–16. Yet, Dr. Medvidovic opines at length that Siri must embody the claims of the '115 Patent because, for example, "personal context awareness and service delegations are made possible by the functionality claimed in the independent claims of the '115 Patent"—an opinion without any evidentiary support. Ex. 2032 ¶ 220. Indeed, by Dr. Medvidovic's own admission, he lacks the necessary personal knowledge to opine on the architecture of Siri.

Reply 89.

In its Sur-reply, Patent Owner argues that there is "no prohibition against the use of circumstantial evidence in IPR proceedings." Sur-reply 66. Patent Owner argues, "Dr. Medvidovic provided unrebutted testimony, including a lengthy appendix, supported by this evidence, which must be credited. *Id.* at 68 (citing Ex. 2032, §§ 205-229, App. A). Patent Owner also points out that "Dr. Medvidovic testified that looking at the code is not the exclusive means of identifying an agent – other available information can be utilized." Sur-reply 69; *See* Ex. 1129, 10:14–11:16. Moreover, Patent Owner argues, "under the *Garmin* factors, Patent Owner was unable to seek Apple's highly confidential source code in connection with these proceedings." Sur-reply 70 (citing *Garmin Int'l, Inc. v. Cuozzo Speed Techs., LLC,* IPR2012-00001, Paper 26 at 6–7 (PTAB Mar. 5, 2013). With respect to Mr. Cheyer's testimony, Patent Owner explains that "Patent

Owner was only able to depose Mr. Cheyer after the Board granted Patent Owner's motion under 37 C.F.R. § 42.52(a) for leave to serve a subpoena to compel Mr. Cheyer to testify" in a related proceeding. Sur-reply 71.

We agree with Petitioner that Patent Owner does not to provide persuasive evidence that the Siri application is reasonably commensurate with the scope of the challenged claims. Patent Owner's cited evidence attempting to tie the Siri application to the limitations of claim 1 relies substantially on the testimony of Dr. Medvidovic (Ex. 2032) and a web.archive .org Internet page (Ex. 2040) Patent Owner identifies as "Siri, Inc., Technology – "About Siri – Your Virtual Personal Assistant." *See* Resp. 136–140 (citing Ex. 2032 ¶¶ 216–222, 224; Ex. 2040).

We note at the outset that Dr. Medvidovic's opinion does not rely on an examination of the Siri application's source code. During his deposition, Dr. Medvidovic testified as follows:

> [Q] Let me ask you, have you ever reviewed the Siri source code?
>
> [A] I have not.
>
> [Q] So you don't know the details of how Siri is implemented?
>
> [A] Not beyond what I'm stating in the declaration as my sources of information that I'm drawing on.

Ex. 1129, 146:10–17. This is significant because Dr. Medvidovic testified at his deposition that an "agent"—an element in every claim—is a "piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer a clearly identifiable body of code," and that "if there is no accompanying specification language, then we would have to look inside the code [to determine] what kinds of facilities the agent provides." *See* Ex. 1129, 9:13–11:8). As far as we can determine, neither party has provided "accompanying specification language" for the Siri

application source code. Instead, Dr. Medvidovic testified, the evidence he relied upon to form his opinion is "circumstantial," or a "suggestion." *See* Ex. 1129, 147:7–148:9.

In Section XI.B of his declaration, "Nexus of Industry Praise to the Independent Claims of the '115 Patent," Dr. Medvidovic cites to Exhibit 2040 as support for his understanding of how the Siri application works. *See e.g.*, Ex. 2032 ¶¶ 215–216, 218, 226, 229.

Exhibit 2040 describes "Siri" as:

> the first mainstream consumer application of a Virtual Personal Assistant. Siri is an intelligent software agent designed to have a back-and-forth conversational interaction with you as it helps you get tasks done. The three main technical components behind Siri's differentiation correspond to the essential qualities of an assistant: a conversational interface, personal context awareness and service delegation.

Ex. 2040, 1.

In his declaration, Dr. Medvidovic discusses the "personal context awareness" and "service delegation" aspects of Siri in some detail (s*ee, e.g.*, Ex. 2032 ¶¶ 216–220, 222–229). Dr. Medvidovic, however, only mentions Siri's "conversational interface" in passing, even though Exhibit 2040 describes Siri as an intelligent software agent "designed to have a back-and-forth conversational interaction with you as it helps you get tasks done," and lists Siri's "conversational interface" as the first of Siri's "three main technical components." *See* Ex. 2032 ¶ 215; Ex. 2040, 1.

In his declaration, Dr. Medvidovic attempts to link the Siri application and the limitations of the independent claims of the '115 patent. *See* Ex. 2032 ¶¶ 205–229, App. A, 1–32. Dr. Medvidovic does this by first separating the limitations of independent claims 1 and 29 into two categories, an "Inter-agent Communication Layer" (ICL) and "Service

Request Planning and Execution." *See* Ex. 2032, 70–71. Dr. Medvidovic then states that "[i]t is my opinion that the Siri application's integration of personal context awareness is made possible because of the claimed ICL." *Id.* ¶ 222. Dr. Medvidovic explains that "within the conversational protocol layer of the ICL, there are further claimed "parameter lists" that may "further refine the one or more events." *Id.* ¶ 223. Dr. Medvidovic concludes that "[t]he claimed parameter lists are what allows the Siri application to provide 'different answers' depending on the context, as they are able to refine the meaning of a service request." *Id.* ¶ 226. Dr. Medvidovic, however, provides no citation or further support for this conclusion nor does he point to any evidence to show that the Siri application utilizes the claimed parameter lists. *See id.*

In his declaration, Dr. Medvidovic also states that "[i]t is further my opinion that the Siri application's integration of service delegation is made possible because of the claimed service request planning and execution claim limitations." *Id.* ¶ 227. Dr. Medvidovic attempts to support this opinion by comparing the language of claim 1 relating to a goal satisfaction plan that includes "a suitable delegation of sub-goal requests to best complete the requested service request by using reasoning" to language used in Exhibit 2040 to describe the service delegation feature of the Siri application, "Service Delegation. An assistant can reason about what specific sets of resources of services would best be combined to help you accomplish a particular task." *See id.* ¶ 229; Ex. 2040, 2.

In our view, such a comparison is speculative at best to demonstrate that the Siri application utilizes claim 1's "service request planning and execution limitations," as Dr. Medvidovic opines. The limitations of claim 1 that Dr. Medvidovic puts in this category include:

> A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents, comprising the acts of:
>
> registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities,
>
> receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrary complex goal expression;
>
> dynamically interpreting the arbitrarily complex goal expression, said act of interpreting further comprising:
>
> generating one or more sub-goals expressed in the inter-agent language;
>
> constructing a goal satisfaction plan wherein the goal satisfaction plan includes:
>
> a suitable delegation of sub-goal requests to best complete the requested service request-by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and
>
> dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent.

Ex. 2032, 70. Yet, Dr. Medvidovic does not persuasively show that the Siri application "register[s] a description of each active client agent's functional capabilities," "receiv[es] a request for service . . . in the form of an arbitrary complex goal expression," "generat[es] one or more sub-goals expressed in the inter-agent language," "construct[s] a goal satisfaction plan," or "dispatch[es] each of the sub-goals to a selected client agent . . . based on a match between the sub-goal . . . and the registered functional capabilities of the selected client agent." *See id.* ¶¶ 227–229.

In fact, as Petitioner points out, there is evidence of record that the Siri application did not utilize the claimed agent registry functionality as Dr.

Medvidovic opines. According to Petitioner, Mr. Cheyer, the named co-inventor on the ’115 patent and the co-founder of Siri, Inc., “testified that ‘Siri’ did not implement the agent registry functionality described in the ’115 Patent.” Reply 84 (citing Ex. 2034, 46:12-47:5). At a deposition in a related proceeding, Mr. Cheyer testified as follows:

> BY MR. HENDERSHOT:
>
> Q. So you say "it's likely." Are there features in OAA that you think have yet to be implemented in systems today?
>
> MR. HARTSELL: Objection; form.
>
> BY MR. HENDERSHOT:
>
> Q. Commercial voice-assistance systems.
>
> MR. HARTSELL: Objection; form --
>
> THE WITNESS: Yes.
>
> MR. HARTSELL: -- relevance, outside the scope of direct.
>
> THE WITNESS: Yes.
>
> BY MR. HENDERSHOT:
>
> Q. Could you describe those?
>
> MR. HARTSELL: Same objections.
>
> THE WITNESS: Every system is different, but one feature of the original OAA 1 demo was that independent agents -- today we would call them more like web services -- could connect dynamically to the -- to the platform, register new capabilities with that platform, and without knowing about other services on the network, explicitly, the user could

> make a single request that would be -- that would
> involve a collaboration, and sometimes competition,
> among those network ecosystem of services.
> And so one user request would be delegated
> to many services which were independently developed,
> and none of those services knew precisely about each
> other. And that when I look at Siri and Google
> Assistant and Alexa and Bixby, that is not a
> capability that I have seen in any of the services
> today.

Ex. 2034, 45:24–46:2, 46:12–47:5

Petitioner also points out, and we agree, that there is evidence of record that credits the CALO project with being the progenitor of the ideas that led to Siri. *See, e.g.*, Ex. 2042, 1 ("Siri traces its origins to a military-funded artificial-intelligence project called CALO"); *see also* Ex. 2044, 1; Ex. 2047, 2; Ex. 2054, 1; Ex. 2001, 2). Opus Research explains that "Siri is set apart because it applies the depth of knowledge its founders and software specialists have built at SRI and elsewhere in creating a "cognitive assistant that learns and organizes" (CALO). Ex. 2044, 1. Petitioner points out that there is also evidence of record that indicates a later agent system named "SPARK" (SRI Procedural Agent Realization Kit) was used as the basis of CALO. *See* Ex. 1136 § 7. The SPARK-based Personal Assistant is described as follows:

> SPARK provides general-purpose agent technology for a range of domains that require reactive task execution. To date, the driving application for SPARK has been the development of an intelligent personal assistant for a high-level knowledge worker. This assistant, called CALO, will be able to perform routine tasks

> on behalf of its user (e.g., arrange meetings, complete online forms, file email), as well as undertake open-ended processes (e.g., purchasing a computer online), and anticipate future needs of its user.

Ex. 1136 § 7. This evidence, however, does not appear to have been considered or addressed by Dr. Medvidovic. *See* Ex. 2032 ¶¶ 205–229.

We are mindful that objective evidence of nonobviousness need only be "reasonably commensurate with the scope of the claims." *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013). We also bear in mind that "[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process—the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).

Here, Patent Owner relies on industry praise for the Siri application and evidence of an unmet need to establish a nexus between the Siri application and the claimed invention. However, we are concerned that Patent Owner and its declarant, Dr. Medvidovic, pay little attention to one of the "three main technical components behind Siri's differentiation," the "conversational interface," when evaluating the basis for the proffered "industry praise." *See* Ex. 2040, 1.

Petitioner argues, and we agree, that "[e]ven assuming portions of Siri embodied the claims, the record is undisputed that Siri provides significant functionality well beyond anything covered by the claims—voice recognition, for example." Reply 86. The impact of Siri's "conversational interface" on Siri's reviewers is notable. For example, MIT Technology Review explains that with Siri, "[u]sers can type or speak commands in

casual sentences, and the software deciphers their intent from the context." Ex. 2042, 1. Opus Research reports that "I've had [Siri] for a couple of days and here are my initial reactions. My overall experience has been quite positive. The quality of voice recognition (powered by the same "engine" that supports Dragon Dictation and Dragon Search on the iPhone) is quite good." Ex. 2044, 1. Fast Company.Com reports, "Siri, which launches today as a free iPhone app, is a virtual personal assistant that amazingly resembles . . . an actual personal assistant. It understands plain English commands, which can be spoken or typed (e.g. "Get me tickets to that Matt Damon movie"). Ex. 2045, 2.

Further, The Chronicle of Higher Education explains that Siri "takes a multi-step search process and turns it into one, simple, voice-driven request." Ex. 2046, 2. USA Today reported that "[t]here were occasional mistakes in speech recognition, but the overall accuracy [of Siri] was impressive, at least when I spoke slowly and clearly in a quiet environment." Ex. 2047, 2. Spatial Computing Strategy & Research reports that, with Siri, "You ask it to do stuff like 'find me a pizza place near me' or 'tell me the weather in Chicago this weekend,' [w]ith your voice or by typing commands." Ex. 2048, 2. Search Engine Land explains that Siri is "intended to enable you to do more with your voice and your phone in fewer clicks or moves." "[O]ne can speak to Siri in a more natural way. Rather than speaking like a robot and saying 'Open Table' to minimize error, you can say something more elaborate and 'conversational' such as, 'I'd like a reservation tonight around 7:30 at Le Cheval.'" Ex. 2050.

Each of these reported examples indicate that the reviews Patent Owner relies upon to demonstrate "industry praise" for the Siri application considered Siri's conversational interface to be a significant part of its

functionality. Unfortunately, Patent Owner and Dr. Medvidovic give Siri's "conversational interface" little, if any, consideration when evaluating the reasons for the "industry praise" used to try and establish a nexus between the Siri application and the claimed invention. *See, e.g.,* Ex. 2032 ¶ 215. Even if the Siri application incorporated some of the functionality of the claimed invention, the evidence of record relied on by Patent Owner shows that the Siri application, and its attendant "industry praise," is not reasonably commensurate with the scope of the claimed invention. Patent Owner does not argue that the Siri application's "conversational interface" is claimed by the '115 patent.

For these reasons, we are not persuaded that Patent Owner's evidence of industry praise for the Siri application, and evidence of an unresolved need, establishes a sufficient nexus between the Siri application and the challenged claims of the '115 patent. If anything, the evidence of record establishes only a weak or vague connection between the Siri application and the claimed invention.

*7. Independent Claim 1*

Claim 1 is directed to a method for communication and cooperative task completion among distributed electronic agents comprising the steps of registering a description of each active client agent's functional capabilities using an inter-agent language, receiving a request for service as a base goal in the form of an arbitrarily complex goal expression in the inter-agent language, and dynamically interpreting the arbitrarily complex goal expression. Ex. 1001, 29:10–43. Claim 1 also recites that the "inter-agent language" includes a "layer of conversational protocol" and a "content layer." *Id.* at 29:16–24. In addition, claim 1 recites that the step of "dynamically interpreting the arbitrarily complex goal expression"

comprises "generating sub-goals" and "constructing a goal satisfaction plan." *Id.* at 29:28–32. The recited "goal satisfaction plan" in turn includes "a suitable delegation of sub-goal requests" and "dispatching each of the sub-goals to a selected client agent for performance." *Id.* at 29:32–41.

In its proposed combination of Kiss with FIPA97, Petitioner relies on Kiss to teach electronic agents and their general communication and collaboration functions, including the steps recited in claim 1, whereas FIPA97 is relied upon to teach the recited "inter-agent language" and the limitations relating to the inter-agent language, such as "layer of conversational protocol," a "content layer," an "arbitrarily complex goal expression," and "sub-goals expressed in the inter-agent language." Pet. 28, 32–54.

*a. Preamble*

Claim 1 recites a preamble as follows: "A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents."[15] Petitioner asserts that Kiss teaches the recited "distributed electronic agents" because Kiss describes that "[i]nteraction between a user and the knowledge resources is mediated by a collection of cooperative intelligent agents" (Pet. 32 (citing Ex. 1005, 2:43–49, Fig. 1)), where the agents are "distributed" in a "hierarchical architecture." *Id.* (citing Ex. 1005, Abstract, 2:50–55, 4:57–59).

Petitioner contends that Kiss also teaches the recited "communication and cooperative task completion" among the electronic agents because Kiss

---

[15] Because Petitioner shows that the recitations in the preamble are satisfied by Kiss, we need not determine whether the preamble is limiting. *See Vivid Techs.*, 200 F.3d at 803.

describes that "cooperative intelligent agents [that] incorporate generalized automated negotiation and distributed inference (i.e. problem-solving) processes," analyze "problem statements," and reorganize them as "sets of tasks." Pet. 33 (citing Ex. 1005, 2:50–55).

Patent Owner does not specifically dispute that Kiss teaches the preamble of claim 1. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches the preamble of claim 1.[16]

*b. Registering a Description*

The first step recited in claim 1 is "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities." Ex. 1001, 29:13–15. Petitioner asserts that Kiss teaches this limitation because Kiss describes a "registry of agents," which is constructed through "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities." Pet. 34 (citing Ex. 1005, 3:37–45, 6:66–7:19, 8:41–48, 10:32–35, 12:18–20, Fig. 1).

Patent Owner does not specifically dispute that Kiss teaches this "registering a description" limitation. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches

[16] We also find that Patent Owner has waived any argument directed to the preamble of claim 1. *See* Paper 16 (Scheduling Order), 7 ("Patent Owner is cautioned that any arguments for patentability not raised in the response may be deemed waived.").

"registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities," as recited in claim 1.[17]

### *c. An Inter-agent Language Including a Layer of Conversational Protocol and a Content Layer*

Claim 1 recites that "registering a description of each active client agent's functional capabilities" is performed using an "expandable, platform-independent, inter-agent language" (Ex. 1001, 29:13–16) and that the "inter-agent language" includes:

> a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events;
>
> a content layer comprising one or more of goals, triggers and data elements associated with the events.

*Id.* at 29:16–24. Petitioner asserts that FIPA97's ACL teaches each of these limitations relating to an "inter-agent language." Pet. 34–43.

Patent Owner asserts that FIPA97 does not teach "refin[ing] . . . events" and "triggers" recited in the claim. Resp. 97–108. In addition, Patent Owner argues that FIPA ACL is not "expandable" because, among other reasons, FIPA ACL does not have the capability of refining events. *Id.* at 105–106. Patent Owner does not dispute FIPA97 teaches the rest of the limitations relating to an "inter-agent language" recited in clam 1, as set forth above. *See id.* at 95–108.

---

[17] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

*i. Inter-agent Language*

Petitioner relies on Agent Communication Language of FIPA97 (FIPA ACL) as teaching the "inter-agent language" recited in claim 1. Pet. 28 (citing Exs. 1006, 1007, 1008), 35. In particular, Petitioner contends that FIPA97 discloses Agent Communication Language (ACL) "with precisely defined syntax, semantics and pragmatics" for "communication between independently designed and developed software agents." *Id.* at 35 (citing Ex. 1007, 3).

*ii. Platform-independent, Expandable Inter-agent Language*

Petitioner asserts that FIPA ACL is "platform-independent," as recited in claim 1, because it is designed to "maximise interoperability across agent-based applications, services and equipment," and to facilitate the "construction and management of an agent system composed of different agents," even when those systems are "built by different developers." Pet. 35 (citing Ex. 1007, vii, ix). Patent Owner does not dispute that FIPA ACL is "platform-independent," as recited in the claim. *See* Resp. 95–108.

Petitioner also contends that FIPA ACL is "expandable," as recited in claim 1, because in FIPA97 "[a]gents may use communicative acts with other names, not defined" in the specification (Pet. 35 (citing Ex. 1007, 12)) and agents "may choose to implement any subset (including all, though this is unlikely) of the pre-defined message types and protocols" (*id.* (citing Ex. 1007, 12)). In addition, Petitioner asserts that in FIPA97 the "formal basis" of the language is "supplemented with pragmatic extensions" that help "ease the practical implementation of effective inter-agent communications." *Id.* (citing Ex. 1007, 11). Petitioner argues that FIPA97

also discloses possible extensions to the inter-agent communication language, such as MIME header support. *Id.* (citing Ex. 1007, 82).

Patent Owner asserts that FIPA ACL is not "expandable" basically for two reasons. Resp. 105–106. First, citing the prosecution history, Patent Owner argues that "the concept of expandability" relates to the feature of "refin[ing] . . . events" recited in the claim and that FIPA ACL is not "expandable" because FIPA ACL does not have the capability of refining events. *Id.* Second, Patent Owner contends that FIPA ACL is not "expandable" in a general sense, citing various criticism of FIPA ACL from "[r]esearchers in the field" regarding FIPA ACL's alleged rigidity and inflexibility in certain aspects. *Id.* at 106. We address each of these arguments in turn.

Addressing first Patent Owner's argument about "the concept of expandability" as it relates to the feature of "refin[ing] . . . events" recited in the claim, Patent Owner cites the following statement by the Examiner in the Notice of Allowability:

> The disclosed agent communication language [KQML] does not read upon the cited agent language because the layer does not define an event type as well as the parameter lists that further *refines the event*. Nwana's language at best has separate layers for the event and the parameters associated with the event. By Applicant providing these parameters in the same layer as the event such that they further *refine the event*, a standard set of events are *dynamically extensible* based upon the parameter list which is not possible with the teachings of Nwana. Therefore, the claims are allowable over the prior art of record.

Ex. 1002, 14 (emphases added); Resp. 105 (citing Ex. 1002, 14). As indicated in the Amendment submitted before the allowance of the claims, claim 1 was amended to recite "wherein the parameter lists further refine the one or more events" to distinguish the claim from the combination of

Nwana/KQML and Kiss cited by the Examiner. *See* Ex. 1002, 13–14, 18, 28, 51. Patent Owner argues, therefore, that the limitation "expandable" recited in claim 1 relates to the feature of the parameter lists that "refine . . . events," as recited in the claim. Resp. 105. Patent Owner asserts that FIPA ACL is not "expandable," as recited, because FIPA ACL does not teach parameters that further refine events. *Id.*

In response, Petitioner asserts that the claim language "*using an **expandable**, platform-independent, inter-agent language*" was part of the originally filed claims, which were rejected by the Examiner over the combination of Nwana/KQML and Kiss. Reply 59–60 (citing Ex. 1002, 763). Petitioner argues that, therefore, the Examiner's discussion of "dynamically extensible" events resulting from the "refin[ing] . . . events" feature added in the Amendment is unrelated to the "expandable" language that was present in the claim as originally filed. *Id.* at 60. Petitioner also asserts that, even if the "expandable" language relates to the "refin[ing] . . . events" feature, FIPA ACL is "expandable" because FIPA ACL teaches parameter lists that refine events. *Id.*

We need not determine whether the "expandable" language relates to the "refin[ing] . . . events" feature added in the Amendment because, as discussed below, we agree with Petitioner that FIPA ACL teaches "parameter lists" that "further refine the one or more events," as recited in claim 1. Thus, to the extent Patent Owner asserts that the limitation "expandable" recited in claim 1 relates to the feature of the parameter lists "refin[ing] . . . events," Petitioner demonstrates sufficiently that FIPA ACL teaches an "expandable . . . inter-agent language."

Turning to the Specification, the '115 patent describes that "[a]s new agents connect to the facilitator, *registering* capability specifications and

natural language vocabulary, what the user can say and do *dynamically changes*; in other words, the ICL is dynamically *expandable*." Ex. 1001, 8:41–44 (emphases added). That is, the '115 patent suggests that the expandability of the ICL (or "inter-agent language," as recited in claim 1) results from or flows from the ICL's feature of "registering capability specifications and natural language vocabulary."[18] *Id.* As noted in the Institution Decision, this portion of the Specification appears to describe an exemplary embodiment. Inst. Dec. 54 (citing Ex. 1001, 8:40–49).

As discussed above, Petitioner demonstrates sufficiently Kiss teaches "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities," as recited in claim 1. Thus, to the extent the portion of the Specification discussed above describes an embodiment of an "expandable . . . inter-agent language," we are persuaded that the combination of Kiss and FIPA97 teaches "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language," as recited in claim 1 (*see* Pet. 33–35).

Next, Patent Owner asserts that FIPA ACL is not "expandable" in a more general sense, citing various "criticisms" from "[r]esearchers in the field" about FIPA ACL's alleged "rigidity and lack of expandability." Resp. 106 (citing Ex. 2031, 2 ("[i]t is unlikely that a single set of axioms will cover all eventualities because communication is inherently context dependent");

---

[18] As described in the Specification, agents connecting to the facilitator is part of the operation of the system of the '115 patent, not a feature of the ICL. *See* Ex. 1001, 6:24–44; 7:13–32.

Ex. 1081, 2 ("[T]he current FIPA-ACL spec tends to unnecessarily over-constrain the feasibility of communication acts . . . ."). Patent Owner also contends that Petitioner's declarants, Dr. Finin and Dr. Lieberman, made allegedly similar statements. *Id.* (citing Ex. 1082, 2 ("The FIPA proposal only covers the most rudimentary message types."); Ex. 2014, 207:5–20 ("FIPA is a standard, like a miles-per-gallon standard . . . So that doesn't say how you're going to build a car; it just says a car has to get . . . 50 miles a gallon.")).

We are not persuaded by Patent Owner's argument and evidence because Patent Owner does not explain adequately why the cited extrinsic evidence regarding FIPA ACL's alleged "rigidity" or inflexibility in certain aspects shows that FIPA ACL is not "expandable" as recited in the claim. In the Institution Decision, based on the preliminary record, we did not find anything in the intrinsic record that justifies deviating from the plain meaning of the claim term "expandable." Inst. Dec. 54–55. Upon considering the complete record, we discern no reason to depart from our preliminary assessment.[19]

We may "at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any

---

[19] In the Patent Owner Response, Patent Owner does not discuss the Specification or argue that the meaning of "expandable" recited in the claim can be discerned from the Specification, although we invited the parties in the Institution Decision to address the term "expandable" further in their papers during trial. *See* Resp. 105–107 (citing Inst. Dec. 55–56). Thus, Patent Owner has waived its argument regarding the meaning of "expandable" based on any disclosures in the Specification. *See* Paper 16, 7.

definition found in or ascertained by a reading of the patent documents." *Phillips*, 415 F.3d at 1322–23 (citation omitted). Accordingly, in the Institution Decision, finding no readily discernable meaning of "expandable" in the intrinsic record, we consulted a technical dictionary, the 7th edition of the IEEE Dictionary (Ex. 3001).[20] The IEEE Dictionary defines "expandability" as follows: "**expandability (1) (supervisory control, data acquisition, and automatic control)** The capability of a system to be increased in capacity or provided with additional functions. **(2)** *See also:* extendability." Ex. 3001, 3.[21] The same dictionary defines "extensible language" as follows.

> A computer language that can be altered or can alter itself to provide a programmer with additional user-specified functions or capabilities. Examples include Ada, ALGOL, FORTH, and LOGO, because each can be used in a building block fashion to construct increasingly complex functions.

*Id.* at 4. Upon considering the complete record, we determine that these dictionary definitions are consistent with the intrinsic record, including the description of an embodiment in the Specification regarding "the ICL [being] dynamically expandable." *See* Ex. 1001, 8:41–44.

In the Institution Decision, based on the preliminary record, we found that the characteristics of FIPA ACL argued by Petitioner—such as the ability to use communicative acts with other names not defined in the language specification, the pragmatic extensions, and the MIME

---

[20] IEEE 100 THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS (7th ed. 2000) (Ex. 3001).

[21] The page numbers for Exhibit 3001 refer to the page numbers inserted in the bottom, right-hand corner of each page.

extension—appear to fall within the plain meaning of the term "expandable," as defined in the IEEE Dictionary. Inst. Dec. 55; *see* Pet. 35 (citing Ex. 1007, 11, 12, 82). Patent Owner does not argue otherwise. *See* Resp. 105–107. Based on the complete record and for the reasons discussed above, we determine that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language," as recited in claim 1.

*iii. A Layer of Conversational Protocol Defined by Event Types and Parameter Lists Associated With the Events*

Claim 1 recites that the "inter-agent language" includes "a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events." Ex. 1001, 29:16–21. Petitioner contends that FIPA97 teaches each of these limitations. Pet. 36–41. Patent Owner asserts that FIPA97 does not teach "the parameter lists further refine the one or more events," as recited in claim 1. Resp. 97–107.

(1) <u>A Layer of Conversational Protocol</u>

Petitioner asserts that FIPA97 teaches "a layer of conversational protocol" recited in claim 1 because FIPA ACL "defines the semantics of *messages* between agents as including a communicative act, followed by various parameters and parameter expressions," as shown in Figure 1 of Part 2 of FIPA97 reproduced above in the Overview of FIPA97 section (§ III.C.2.). Pet. 36 (emphasis added) (citing Ex. 1007, 2; Ex. 1003 ¶ 235). Petitioner also argues that FIPA97 "discloses a number of different

performatives and rules governing FIPA ACL messages and the meaning of the different parts" and, therefore, discloses "a layer of conversational protocol." *Id.* at 36–37 (citing Ex. 1007, 11–22; Ex. 1003 ¶¶ 236–239).

(2) Events and Event Types

As discussed above in Section III.B. (Claim Construction), we construe "event" to mean "a message or goal communicated between agents" and "event type" to mean "a type of an event" for this Final Written Decision.

Petitioner maps the "event" of claim 1 to FIPA ACL's "message" and asserts that FIPA ACL's "message type" teaches an "event type" recited in claim 1. Pet. 37–38 (citing Ex. 1007, 3, 4, 11–13, 18; Ex. 1003 ¶¶ 243, 246, 247). Petitioner argues that FIPA ACL's "message" is an "event" recited in claim 1 because the FIPA ACL communicative acts "are performed by an agent sending a *message* to another agent." *Id.* at 37 (emphasis added) (citing Ex. 1007, 3, 4, 11; Ex. 1003 ¶ 243).

Referencing Figure 1 of Part 2 of FIPA97 reproduced above, Petitioner asserts that in FIPA ACL, "[t]he first element of the message is a word which identifies the communicative act being communicated, which defines the principal meaning of the message," and "the message's communicative act *type* corresponds to that which in KQML is called the performative." Pet. 37 (emphasis added) (citing Ex. 1007, 12, 13; Ex. 1007 ¶ 244). Petitioner argues that FIPA97 further defines "message type" as corresponding to the "communicative acts/performatives of the FIPA ACL." *Id.* at 38 (citing Ex. 1007, 18; Ex. 1003 ¶ 246).

As discussed above, Petitioner asserts that FIPA97 teaches "a layer of conversational protocol" because FIPA ACL "defines the *semantics of*

*messages* between agents as including a communicative act." Pet. 36 (emphasis added) (citing Ex. 1007, 12). Petitioner contends that FIPA97 teaches the layer of conversational protocol in FIPA ACL is "defined by event types," as recited in claim 1, because in FIPA97, "**[t]he <u>message types</u> are a reference to <u>the semantic acts</u> defined in this specification**." *Id.* at 37–38 (underlined emphases added) (citing Ex. 1007, 11).

(3) <u>Parameter Lists</u>

Claim 1 recites that "a layer of conversational protocol" is also "defined by . . . parameter lists associated with one or more of the events." Petitioner asserts that in FIPA97, FIPA ACL messages may include multiple different parameters ("parameter lists associated with one or more of the events") that can "help the message transport service to deliver the message correctly" or "the receiver to interpret the meaning of the message," or "to respond co-operatively," as shown in Figure 1 of Part 2 of FIPA97 (reproduced above). Pet. 38–39 (citing Ex. 1007, 12, 14, Fig. 1). Petitioner contends that FIPA97 discloses additional parameters in Table 1. *Id.* at 39 (citing Ex. 1007, 13–14).

(4) <u>Refining Events</u>

Claim 1 recites that "the parameter lists further refine the one or more events." Petitioner asserts that this phrase should be construed to mean that "a list of parameters associated with an event can refine the event by affecting the meaning of the event." Pet. 13. Petitioner discusses the disclosures in the Specification and the prosecution history of the '115 patent in support of its proposed construction. *Id.* at 13–16 (citing Ex. 1001, 11:2–37; Ex. 1002, 13–14, 51, 55; Ex. 1020, 5, 6; Ex. 1003 ¶¶ 90, 91, 93–98).

Although Patent Owner discusses constructions for six terms in the Patent Owner Response, Patent Owner does not discuss Petitioner's proposed construction for the claim term "refine . . . events" or proposes its own construction. *See* Resp. 24–38. Instead, Patent Owner argues that FIPA97 does not teach parameters that "refine . . . events" under Petitioner's proposed construction. *See* Resp. 97–98 ("the cited parameters in FIPA97 do not, contrary to Petitioner's assertion, affect the meaning of the message"), 100 ("this parameter **does not** affect the **meaning** of the message"), 102 ("In contrast, the FIPA97 "receiver" parameter **does not affect the meaning of the "inform" communicative act**."). Based on the arguments and evidence presented by Patent Owner, we understand Patent Owner not to dispute Petitioner's proposed construction for the term "the parameter lists further refine the one or more events."[22]

Upon considering the complete record, we agree with Petitioner that the claim term "refine . . . events" encompasses "affecting the meaning of the events." As discussed above, during prosecution, the limitation "wherein the parameter lists further refine the one or more events" was added to claim 1 in an amendment to distinguish the claim from the combination of Nwana/KQML and Kiss cited by the Examiner. *See* Ex. 1002, 13–14, 18, 28, 51; Pet. 14–16 (citing Ex. 1002, 13–14, 51); Resp. 105 (citing Ex. 1002, 14). Citing the disclosures of Nwana/KQML discussed by the Examiner, Petitioner persuasively argues that the parameters of Nwana's KQML message (i.e., the claimed "event") "tell" do not change the meaning of the message, whereas the parameters of an event of the '115 patent's change the

---

[22] We also find that Patent Owner has waived any argument regarding claim construction of this term. *See* Paper 16, 7.

meaning of the event by "refin[ing] the event." Pet. 14–16 (citing Ex. 1002, 13–14, 51, 55; Ex. 1020, 5, 6). In support of its argument, Petitioner cites the following passage from the Specification that distinguishes the '115 patent's ICL (i.e., the recited "inter-agent language") from KQML.

> For example, in KQML, a request to satisfy a query can employ either of the performatives ask_all or ask_one. In ICL, on the other hand, this type of request preferably is expressed **by the event type evost solve, together with the solution_limit(N) parameter--where N can be any positive integer**. (A request for all solutions is indicated by the omission of the solution limit parameter.) [The request can also be accompanied by other parameters, which combine to further refine its semantics.] In KQML, then, this example forces one to choose between two possible conversational options, neither of which may be precisely what is desired. In either case, the performative chosen is a single value that must capture the entire conversational characterization of the communication.

Pet. 13 (alteration and underlined emphasis added) (quoting Ex. 1001, 11:21–37). Petitioner argues that a message having the KQML performative "ask_all" always has the same meaning, requesting all solutions to the request, just as the KQML performative "ask_one" always requests one solution. *Id.* at 14. According to Petitioner, in contrast, the meaning of the '115 patent's event "evost_solve" depends on the value of its parameter "solution_limit(N)"—e.g., an agent may request the identity of three agents capable of translating a document by including "solution_limit(N)" in the message and setting the value of N to 3. *Id.* Thus, Petitioner argues that the parameters of an event of the '115 patent affect the meaning of the event. *Id.* at 13–16.

We are persuaded by Petitioner's argument and evidence that the "parameterized approach" of the '115 patent (Ex. 1001, 11:16–21) can refine an event by changing the meaning of the event. As discussed above in

Section III.B., we construe "event" to mean "a message or goal communicated between agents" and "goal" to mean "a request for service." The '115 patent describes that "[i]n one embodiment, a request for one of an agent's services normally arrives in the form of an *event* from the agent's facilitator." *Id.* at 12:44–46 (emphasis added). In a section titled "Refining Service Requests," the '115 patent describes as follows:

> In a preferred embodiment of the present invention, *parameters* associated with a goal (or sub-goal) can draw on useful features to *refine the request's meaning*. For example, it is frequently preferred to be able to specify whether or not solutions are to be returned synchronously; this is done using the reply parameter, which can take any of the values synchronous, asynchronous, or none. As another example, when the goal is a non-compound query of a data solvable, the cache parameter may preferably be used to request local caching of the facts associated with that solvable.

*Id.* at 15:49–58 (emphases added). Thus, the '115 patent describes that in an embodiment, parameters of a request for service, i.e., an event, can refine the "meaning" of the request or event.

Nonetheless, we note that this passage and all of the disclosures of the '115 patent cited by Petitioner describe exemplary embodiments. *See id.* at 11:25–28 ("In ICL . . . this type of request *preferably* is expressed by the event type evost solve, together with the solution_limit(N) parameter--where N can be any positive integer." (emphasis added)), 15:49–51 ("In a *preferred embodiment* of the present invention, *parameters* associated with a goal (or sub-goal) can draw on useful features to *refine the request's meaning*." (emphases added)). Thus, the term "refine . . . events" recited in claim 1 may encompass but is not necessarily limited to "affecting the meaning of events." *See SuperGuide*, 358 F.3d at 875 ("a particular embodiment appearing in the written description may not be read into a claim when the

claim language is broader than the embodiment"); *WesternGeco*, 889 F.3d at 1323–24 ("It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise."). Indeed, Petitioner's proposed construction of the term "the parameter lists further refine the one or more events" expresses the meaning of the term in a permissive fashion—"an event *can* refine the event by affecting the meaning of the event." Pet. 13 (emphasis added).

Based on the complete record, we determine that the term "the parameter lists further refine the one or more events" encompasses parameters "affecting the meaning of the events."

Petitioner asserts that FIPA97 teaches the limitation "the parameter lists further refine the one or more events" because several of the conversational layer parameters disclosed in FIPA97 affect the meaning of the performative included within the message, and therefore affect the meaning of the message, or event. Pet. 40. According to Petitioner, FIPA97 discloses a parameter ":receiver," which "can alter the meaning [of] an event, such as 'inform,' to be 'inform one'" or "inform a number' of agents, depending on the value of the parameter." *Id.* (citing Ex. 1007, 13). Citing the testimony of Dr. Lieberman, Petitioner asserts that naming a tuple "corresponds to the action of multicasting the message" such that "semantics of this multicast" is refined so that "the message is sent to each agent named in the tuple." *Id.* (citing Ex. 1007, 13; Ex. 1003 ¶ 258). Petitioner also argues, "[t]his 'tuple naming' functionality is analogous to the example provided in the '115 Patent of 'solution_limit(N),' in which 'N' modifies how many solutions are requested, and is not found in the KQML Nwana reference that was before the examiner." *Id.* (citing Ex. 1001, 11:16–42; Ex. 1020; Ex. 1003 ¶ 258). Petitioner also asserts that FIPA97 discloses two

other parameters—“:protocol” when used with the “call for proposals” performative and “:conversation-id”—that affect the meaning of a message. *Id.* at 40–41 (citing Ex. 1007, 13–14, 46–49; Ex. 1003 ¶¶ 261–265).

Patent Owner asserts that FIPA97 does not teach parameters “refin[ing] . . . events,” as recited in the claim, because the parameters of FIPA97 cited by Petitioner does not affect the meaning of the message. Resp. 97–98. In particular, Patent Owner contends that FIPA97’s “:receiver” parameter of the FIPA97 “inform” message relied upon by Petitioner is no different from KQML’s “:receiver” parameter for the KQML “tell” message in that both modify the message but do not affect the meaning of the message. *Id.* at 98–99 (citing Ex. 1007, 12; Ex. 1020, 5). Patent Owner asserts that FIPA97’s “:receiver” parameter does not affect the meaning of the FIPA97 “inform” message because “the result of this parameter is only that the message is multicast; i.e., it is ‘sent to each agent named in the tuple.’” *Id.* at 100. According to Patent Owner, “the content of the message is unchanged; the only thing that changes is who (as in, recipient) receives the message.” *Id.* at 101.

The portion of FIPA97 cited by Petitioner is reproduced below.

| **Message Parameter:** | **Meaning:** |
|---|---|
| `:sender` | Denotes the identity of the sender of the message, i.e. the name of the agent of the communicative act. |
| `:receiver` | Denotes the identity of the intended recipient of the message.<br><br>Note that the recipient may be a single agent name, or a tuple of agent names. This corresponds to the action of multicasting the message. Pragmatically, the semantics of this multicast is that the message is sent to each agent named in the tuple, and that the sender intends each of them to be recipient of the CA encoded in the message. For example, if an agent performs an inform act with a tuple of three agents as receiver, it denotes that the sender intends each of these agent to come to believe the content of the message. |

Ex. 1007, 13. Pointing to this disclosure in FIPA97, Petitioner asserts that the "receiver" parameter affects the meaning of the event by affecting "whether the performative communicates the message to a single agent, a selection of agents, or if [the message is] broadcast to every agent." Reply 56 (citing Ex. 1007, 13). According to Petitioner, "in FIPA97, an event using 'inform' can *mean three or more different things* (i.e., inform (1) one person, (2) a select group of people, (3) everybody) depending on the value of just that parameter." *Id.*

We agree with Petitioner's argument and disagree with Patent Owner's argument. As shown above in the portion of FIPA97 relied on by Petitioner, FIPA97 describes the "meaning" of the message affected by the ":receiver" parameter (under the column heading "Meaning:") as follows:

> Note that the recipient may be a single agent name, or a tuple of agent names. This corresponds to the action of multicasting the message. Pragmatically, the semantics of this multicast is that the message is sent to each agent named in the tuple, and that the sender *intends* each of them to be recipient of the CA encoded in the message. For example, if an agent performs an inform act

> with a tuple of three agents as receiver, it denotes that the sender *intends* each of these agent to come to believe the content of the message.

Ex. 1007, 13 (emphases added). We agree with Petitioner this passage describes, under the column heading "Meaning," the meaning of the message modified or affected by the ":receiver" parameter.

Patent Owner argues that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." Resp. 101. Patent Owner contends that, in contrast, the solution_limit(N) parameter of the '115 patent "modifies the actual request/communicative act/performative itself—i.e., **evost solve**, because it imposes a modification on the limits of **solutions** presented in response to a request." *Id.* at 102 (citing Ex. 2032 ¶161).

We are not persuaded by Patent Owner's argument. First, we disagree with Patent Owner that the FIPA97 ":receiver" parameter changes only "who (as in, recipient) receives the message." As described in FIPA97, the ":receiver" parameter does not merely specify "who receives the message," e.g., agent A as opposed agent B. Rather, as persuasively explained by Petitioner, the ":receiver" parameter affects the qualitative aspect of the message—i.e., whether to inform (1) one agent, (2) a select group of agents, or (3) every known agent. *See* Reply 56.

In addition, Patent Owner does not explain adequately why the solution_limit(N) parameter of the '115 patent specifying the number of agents to be queried "modifies the actual request/communicative act/performative itself" but the ":receiver" parameter of FIPA97 specifying the number of agents to which to send a message does not. *See* Resp. 100–101. We agree with Petitioner that Patent Owner does not identify "a

practical distinction between limiting the number of agents to be queried (solution_limit(N)), and querying a selection of agents (:receiver).” Reply 57.

Next, Patent Owner contends that FIPA97 does not teach parameters “refin[ing] . . . events,” as recited in the claim, because FIPA97’s “:receiver” parameter is the same as or similar to the KQML “:receiver” parameter, which does not modify the meaning of a message. Resp. 98–99 (citing Ex. 1007, 12; Ex. 1020, 5). In support of its argument, Patent Owner cites a page from Dr. Finin’s presentation slides at an unidentified meeting or class, which compares “KQML tell and FIPA ACL inform.” *Id.* 99–100 (citing Ex. 2019, 15; Ex. 2013, 132:6–22.). Patent Owner also cites the testimony from Dr. Finin at his deposition that “the general idea of agent communication language that was embodied in KQML is similar to the one that is embodied in FIPA.” *Id.* at 100 (citing Ex. 2012, 32:10–17).

Patent Owner, however, does not discuss the disclosure of KQML/Nwana (Ex. 1020) sufficiently (other than pointing to the similarity of the format between the “:receiver” parameter of KQML and FIPA97) or explain adequately why KQML’s “:receiver” parameter is similar to the FIPA97 “:receiver” parameter. *See* Resp. 98–100. For example, Patent Owner does not explain whether KQML’s “:receiver” parameter specifies, similar to FIPA97, that “the recipient may be a single agent name, or a tuple of agent names,” that “the message is sent to each agent named in the tuple,” and that “the sender *intends* each of them to be recipient of the message.” *See id.*; Ex. 1007, 13 (emphasis added). The general statements from Dr. Finin (or a slide purportedly from his unidentified presentation) cited by Patent Owner (Resp. 99–100 (citing Ex. 2019, 15; Ex. 2013, 132:6–22, 32:10–17) regarding the alleged similarity between KQML and FIPA97 at a

general level are simply insufficient to override the specific disclosures in FIPA97 cited by Petitioner regarding the meaning of the message modified or affected by the FIPA97 ":receiver" parameter.

Patent Owner also cites testimony from Petitioner's declarant, Dr. Lieberman, as "confirm[ing]" that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." Resp. 101 (citing Ex. 2014, 110:14–111:16, 168:5–12). The cited testimony of Dr. Lieberman, however, discusses FIPA97's messages and multicasting in general (responding to general questions from Patent Owner's counsel) and does not discuss the specific disclosure in FIPA97 cited by Petitioner regarding the meaning of the message modified or affected by the FIPA97 ":receiver" parameter. *See* Ex. 2104, 108:4–111:16, 168:5–12. Thus, we find the testimony of Dr. Lieberman cited by Patent Owner to be unpersuasive (if not misleading) to "confirm" that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." *See* Resp. 101.

Next, Patent Owner cites 9 paragraphs from the Declaration of Dr. Cohen (Ex. 2033) to argue that "FIPA97 does not contain any conversational layer parameters that affect the semantics of FIPA97 messages." Resp. 103 (citing Ex. 2033 ¶¶ 80–89).[23] Patent Owner, however, does not discuss Dr. Cohen's testimony in the Patent Owner Response or explain how Dr. Cohen's testimony supports its contention. *See*

[23] Patent Owner's citation to the Cohen Declaration appears to be mistaken since the last paragraph of Cohen Declaration is paragraph 88.

*id.* Thus, to the extent Petitioner purports to rely on Dr. Cohen's testimony, this amounts to improper incorporation by reference in violation of 37 C.F.R. § 42.6(a)(3). Accordingly, we decline to consider the cited paragraphs from the Cohen Declaration. We note, nonetheless, that Dr. Cohen's testimony appears to dwell in generalities, e.g., citing the works of logicians/philosophers Tarski and Frege (*see* Ex. 2033 ¶¶ 80–81), and discusses tuples and multicasting in general terms (*see id.* ¶¶ 85–88).

Lastly, Patent Owner contends that the limitation "the parameter lists further refine the one or more events" requires "the parameters of an event (or message) can refine the message or goal itself" (Resp. 97) or "change the nature of the communicative act itself" (*id.* at 102). Although it is not entirely clear what Patent Owner argues,[24] to the extent Patent Owner argues "refin[ing]" a messages or goal requires changing the message or goal itself, we disagree with Patent Owner's argument. As discussed above, in a section titled "Refining Service Requests," the '115 patent describes examples of "parameters" associated with a request or goal that "refine the request's meaning," including the "reply parameter" that specifies whether solutions are to be returned synchronously or asynchronously, and the "cache parameter" that specifies local caching of facts related to the request. *See* Ex. 1001, 15:49–58. These parameters do not appear to change the request itself but, rather, specify how the request should be handled—e.g., synchronous response, local caching, etc. Thus, we are not persuaded by Patent Owner's argument that the claim requires the recited "parameters"

[24] As discussed above, Patent Owner does not dispute Petitioner's proposed construction of the term "the parameter lists further refine the one or more events." *See* Resp. 24–38.

"refine the message or goal itself" (Resp. 97) or "change the nature of the communicative act itself" (*id.* at 102). Such an interpretation, which "excludes a [disclosed] embodiment from the scope of the claim is rarely, if ever, correct." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) (quoting *Accent Pkg., Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013)) (citing *Phillips*, 415 F.3d at 1312–13).

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that FIPA97 teaches "wherein the parameter lists further refine the one or more events," as recited in claim 1. Based on the complete record and for the reasons explained by Petitioner, we determine that Petitioner has shown sufficiently that FIPA97 teaches "a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events," as recited in claim 1.

*iv. Content Layer Comprising Goals and Triggers*

Claim 1 recites that the "inter-agent language" includes "a content layer comprising one or more of goals, triggers and data elements associated with the events." Petitioner asserts that FIPA97 teaches the recited "content layer" because FIPA97 describes various rules and standards governing the content that may be embedded within messages ("a content layer"). Pet. 42 (citing Ex. 1007, 3, 9, 14–16). Petitioner argues that the '115 patent consistently explains that the "content layer" of the disclosed ICL "consists of the specific goals, triggers, and data elements that may be *embedded* within various events." *Id.* at 9 (Ex. 1001, 11:13–15).

Petitioner also contends that FIPA97 teaches "a content layer comprising one or more of goals . . . associated with the events" because in

FIPA97 "*goals* can be communicated among agents through the use of an achieve domain-language primitive." Pet. 42 (emphasis added) (citing Ex. 1007, 81).

Petitioner asserts that FIPA97 also teaches "data elements associated with the events" because FIPA ACL supports content expression through objects and other data ("data elements") associated with various performatives. Pet. 43 (citing Ex. 1007, 14).

(1) Triggers

Petitioner asserts that a "trigger" recited in claim 1 is "a general mechanism for requesting some action be taken when one or more conditions is met." Pet. 11 (citing Ex. 1001, 21:21–22:31; Ex. 1003 ¶¶ 80–81). Patent Owner does not dispute Petitioner's proposed meaning of "trigger" (*see* Resp. 24–38) and argues that FIPA97 does not teach triggers under Petitioner's interpretation of the term (*see id.* at 107–108). We adopt this undisputed interpretation of "trigger" for this Final Written Decision because the construction is consistent with the disclosure in the Specification. *See* Ex. 1001, 21:22–24 ("triggers [provide] a general mechanism for requesting some action be taken when a set of conditions is met").

Petitioner asserts that FIPA97 discloses "triggers" for various performative actions within the content layer, including for use with the performative "accept-proposal" which "informs the receiver that it intends that (at some point in the future) the receiving agent will perform the action, once the given *precondition* is, or becomes, true." Pet. 43 (emphasis added) (citing Ex. 1007, 23). Petitioner argues that FIPA97 also discloses that the performative "propose" can be used "to make a proposal or respond to an

existing proposal during a negotiation process by proposing to perform a given action subject to certain *conditions* being true." *Id.* (emphasis added) (citing Ex. 1007, 34; Ex. 1003 ¶¶ 277–279).

Petitioner argues that the '115 patent describes "triggers" as "providing a general mechanism for requesting some action be taken when a set of *conditions* is met," and that such triggers "preferably specif[y] at least a *condition* and an action . . . [t]he *condition indicates under what circumstances the trigger should fire*, and the action indicates what should happen when it fires." Pet. 11 (emphases added) (citing Ex. 1001, 21:21–34).

Patent Owner contends that the portions of FIPA97 cited by Petitioner do not describe "a settable trigger that kicks in when a specified event takes place." Resp. 108. Patent Owner asserts that the communicative acts (or performative actions) cited by Petitioner instead are "performatives that contain parameters dictating what the associated action is." *Id.* at 107 (citing Ex. 2032 ¶¶ 168–169).

Patent Owner also cites 35 paragraphs from the Cohen Declaration in support of its argument. *Id.* at 108 (citing Ex. 2033 ¶¶ 30–64). Patent Owner, however, does not discuss Dr. Cohen's testimony in the Patent Owner Response or explain how Dr. Cohen's testimony supports its contention. *See id.* at 107–108. Thus, to the extent Petitioner purports to rely on Dr. Cohen's testimony, this amounts to improper incorporation by reference in violation of 37 C.F.R. § 42.6(a)(3). Accordingly, we decline to consider the cited paragraphs from the Cohen Declaration.

Petitioner argues that the performative "accept-proposal" "informs the receiver that it intends that (**at some point in the future**) the receiving agent will perform the action, once the given precondition is, **or becomes**, true."

Reply 63 (citing Ex. 1007, 23). Petitioner cites the following testimony from Dr. Lieberman:

> [T]he "precondition" is sent to an agent through the "*content layer*," then at some future point when that "precondition" is met the receiving agent will "*trigger*" and take an action based upon the information encoded in the "*content layer*" of the message. **EX1007, 23**.

*Id.* (citing Ex. 1003 ¶ 276). Pointing to the description in the cited portion of FIPA97, Petitioner argues

> [A]s explained by Dr. Lieberman, and shown in FIPA97, the performative "accept-proposal" ("[a] general mechanism for requesting") will take an action—in this example, streaming a multimedia channel ("some action be taken")—when "the customer is ready" ("when one or more conditions is met"). Further, the example above shows how this trigger information is stored within the "*content layer*."

*Id.* at 64 (reproducing the description of the performative "accept-proposal" in Ex. 1007, 23).

Petitioner contends that Dr. Lieberman and the Petition describe many other possible triggers, including the "propose" performative and the "request-when" performative. *Id.* at 65. Petitioner asserts that the "propose" performative "informs the receiver that the proposer will adopt the intention to **perform the action once the given precondition is met**" (*id.* (citing Ex. 1007, 34; Ex. 1003 ¶¶ 277–279; Pet. 43)) and that the "request-when" performative is used when "[t]he sender wants the receiver to perform some action **when some given proposition becomes true**" (*id.* (citing Ex. 1007, 40; Ex. 1003 ¶ 414; Pet. 63–64)). Petitioner points to the description of the "request-when" performative in FIPA97 and argues that the performative "request-when" ("[a] general mechanism for requesting") will take an action—in this example, sending a message ("some action be taken")—

when "an alarm occurs" ("when one or more conditions is met"). *Id.* at 66. Petitioner concludes that FIPA97, therefore, discloses multiple "triggers" recited in claim 1. *Id.*

Patent Owner does not dispute Petitioner's responsive arguments in the Reply, but instead contends that Petitioner's arguments are presented "too late" and that "Petitioner cannot fix the deficiencies of its Petition on Reply." Sur-reply 54. To the extent Patent Owner argues that Petitioner's arguments in the Reply is improper new arguments outside the scope of a proper reply, we disagree. As discussed above, Petitioner's arguments in the Petitioner's Reply on whether FIPA97 teaches the "triggers" recited in the claim are directly responsive to Patent Owner's arguments raised in the Patent Owner Response.

Based on the complete record, we determine that Petitioner has shown sufficiently that FIPA97 teaches "triggers" recited in claim 1.

In sum, based on the complete record, we determine that Petitioner has demonstrated sufficiently that FIPA97 teaches the claimed "expandable, platform-independent, inter-agent language" including "a layer of conversational protocol" and "a content layer," notwithstanding these arguments from Patent Owner.

*d. Receiving a Request for Service in an Arbitrarily Complex Goal Expression*

The second step of claim 1 recites "receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression." Ex. 1001, 29:25–27. Petitioner relies on Kiss to teach the "receiving a request for service" step and combines Kiss's teaching with FIPA97's ACL to teach "a request for service . . . in the form of an arbitrarily complex goal expression." Pet. 43–47.

*i. Receiving a Request for Service*

Petitioner asserts that Kiss teaches "receiving a request for service" because the reference describes that a "user agent" receives a "query" from a user, and then "parses the user inquiry and directs the parsed inquiry to a metaagent 119 for action." Pet. 44 (citing Ex. 1005, 8:28–34). Petitioner points to the example process depicted in Figures 8–20 of Kiss as showing how a "problem presented by a user is solved through distributed inferencing." *Id.* (citing Ex. 1005, 12:21–22). Petitioner asserts that the initial request illustrated in Figure 8 (not reproduced herein) "when the user asks of the user agent 705 'what is the effect of increasing sales by 20%'? (FIG.8)" is a "base goal" because it is the basic request initiated by the user that inspires a number of additional, more particular requests in order to be satisfied. *Id.* at 44–45 (citing Ex. 1005, 12:23–26, Fig. 8).

*ii. Arbitrarily Complex Goal Expression*

As discussed above in Section III.B. and the Institution Decision, based on the definitions provided in the '115 patent, we construe "arbitrarily complex goal expression" to mean "a goal expressed in a language or syntax that allows an expression, when appropriate or when desired, that expresses multiple sub-goals and can potentially include more than one type of logical connector (e.g., AND, OR, NOT), and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent, although not every goal is itself necessarily complex." Inst. Dec. 35–37. Petitioner argues that this definition of "arbitrarily complex goal expression" does not require multiple sub-goals to be expressed within the request, but instead requires only that the goal be expressed in a language "that *allows* the expression of multiple sub-goals . . . ." Pet. 45.

Petitioner asserts that FIPA ACL allows the expression of multiple sub-goals, which can potentially include more than one type of logical connector and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent, because FIPA97 "allows the construction of s-expressions of arbitrary depth and complexity." *Id.* (citing Ex. 1007, 15). Petitioner argues that FIPA97 also discloses complex "goal expressions" that "express multiple sub-goals" and which may also include "logical nesting" using parentheses. *Id.* at 46 (citing Ex. 1007, 40, 41).

Petitioner contends that, in the combined system of Kiss and FIPA97, the request discussed above— "What is the effect of increasing sales by 20%?"—is an "arbitrary complex goal expression" because it is a goal expressed in FIPA ACL. *Id.*

Patent Owner does not specifically dispute that Kiss teaches this "receiving a request for service" limitation. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches "receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression," as recited in claim 1.[25]

*e. Dynamically Interpreting the Arbitrarily Complex Goal Expression*

Claim 1 recites "dynamically interpreting the arbitrarily complex goal expression," the act of interpreting comprising "generating one or more sub-goals expressed in the inter-agent language," "constructing a goal

---

[25] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

satisfaction plan," and "dispatching each of the sub-goals to a selected client agent for performance." Ex. 1001, 29:28–44.

Petitioner contends that Kiss teaches "dynamically interpreting the arbitrarily complex goal expression," as recited in claim 1. Pet. 47–49. Petitioner argues

> Kiss discloses that, in response to a request for service, the "meta agent 119 formulates a goal statement for the problem-solving phase of the process, then formulates a solution plan for the problem" and "*dynamically* assesses the problem and its solution states (between users and the knowledge agents 121), divides the problem, and assigns the appropriate knowledge agents 121 to work on the solution."

*Id.* at 47–48 (emphasis added) (citing Ex. 1005, 8:32–48).

In addition, Petitioner explains how Kiss interprets the exemplary "arbitrary complex goal expression" discussed above—"What is the effect of increasing sales by 20%?"—including the meta agent formulating a plan to respond to the request, identifying other agents and knowledge modules that could assist in the response, and doing both dynamically as additional information is obtained. *Id.* at 48 (citing Ex. 1005, 12:21–14:29, Figs. 8–20). Petitioner further provides a detailed description of how this example goal expression is dynamically interpreted in Kiss. *Id.* at 48–49 (citing Ex. 1005, 12:29–14:30, Figs. 9–11, 13–20).

Patent Owner does not specifically dispute that Kiss teaches this "dynamically interpreting the arbitrarily complex goal expression" limitation. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has

demonstrated sufficiently that Kiss teaches "dynamically interpreting the arbitrarily complex goal expression," as recited in claim 1.[26]

### *f. Generating One or More Sub Goals Expressed in the Inter-agent Language*

Petitioner contends that Kiss teaches "generating one or more sub-goals expressed in the inter-agent language," as recited in claim 1, because Kiss discloses, in the example "What is the effect of increasing sales by 20%?" discussed above, that the process of responding to the user's request includes several additional requests for service ("sub-goals") to various agents, including two sub-requests each from the sales agent and the meta agent, and three sub-requests from the production agent, where each of the sub-requests is made in FIPA ACL. Pet. 49–50 (citing Ex. 1005, 12:54–56, 13:25–27, 13:37–39, 13:56–57, 14:3–5). According Petitioner, each of these sub-requests is a "sub-goal" because each is a subset of the process of responding to the user's base request—"base goal"—of "what is the effect of increasing sales by 20%?" *Id.* at 50. Petitioner also argues that Kiss's meta-agent is capable of "formulating a sub-problem query." *Id.* (citing Ex. 1005, 11:15–16).

Patent Owner does not specifically dispute that Kiss teaches this "generating one or more sub-goals expressed in the inter-agent language" limitation. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has

---

[26] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

demonstrated sufficiently that Kiss teaches "generating one or more sub-goals expressed in the inter-agent language," as recited in claim 1.[27]

*g. Constructing a Goal Satisfaction Plan Including Delegation of Sub-goal Requests*

Claim 1 recites "constructing a goal satisfaction plan," the goal satisfaction plan including "a suitable delegation of sub-goal requests" and "dispatching each of the sub-goals to a selected client agent for performance." Ex. 1001, 29:32–43. Petitioner contends that Kiss teaches each of these limitations. Pet. 50–54.

*i. Goal Satisfaction Plan*

As discussed above in Section III.B.1., we construe the term "a goal satisfaction plan" to mean "a plan for satisfying a goal" for this Final Written Decision.

Petitioner asserts that Kiss teaches "constructing a goal satisfaction plan" because Kiss describes that the meta-agent "formulates a goal statement for the problem-solving phase of the process," then "formulates a solution plan for the problem." Pet. 50 (citing Ex. 1005, 8:33–34, 5:30–64, 12:25–40, Figs. 8–20). Petitioner contends that Figures 8–20 of Kiss illustrate adding tasks to an agenda, i.e., constructing a plan, to satisfy the user request (i.e., a "goal") "what is the effect of increasing sales by 20%?" *Id.* at 50–51 (citing Ex. 1005, 13:27–29, Figs. 8–20).

Patent Owner contends that Kiss does not teach the claim "goal satisfaction plan" because Kiss does not disclose "the use of any reasoning, optimization, or taking into account any advice parameters or constraints."

---

[27] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

Resp. 89. Patent Owner also argues that Kiss "does not have the capability of formulating an 'optimal or near-optimal' 'goal satisfaction plan' utilizing reasoning as described in the '115 patent." *Id.* at 91 (citing Ex. 2032 ¶ 141). These arguments are predicated on Patent Owner's proposed construction of "goal satisfaction plan" to mean "a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints." *See id.* at 28. As discussed above in Section III.B.1., we disagree with Patent Owner that the claim term "goal satisfaction plan" is limited as Patent Owner contends. Thus, for the reasons explained above in Section III.B.1., we disagree with Patent Owner's argument that Kiss does not disclose the "goal satisfaction plan" recited in claim 1.

Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches "constructing a goal satisfaction plan," as recited in claim 1.

*iii. Delegation of Sub-goal Requests Using Reasoning*

Claim 1 recites that "the goal satisfaction includes: a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms." Ex. 1001, 29:32–39.

(1) <u>Delegation of Sub-goal Requests</u>

Petitioner asserts that Kiss teaches a meta-agent that makes "a suitable delegation of sub-goal requests to best complete the requested service request," as recited in claim 1, because Kiss identifies and queries various

agents (e.g., sales agent, production agent) "who best to respond" to new sub-requests for specific information as they arrive. Pet. 51 (citing Ex. 1005, 12:21–14:30, Figs. 8–20). Petitioner contends that in Kiss, the meta-agent "contains knowledge of problem solving methodologies and distributed inferencing procedures" and is further responsible for allocating "tasks to the knowledge agent layer." *Id.* (citing Ex. 1005, 5:24–27, 3:26–27). Petitioner asserts that Kiss's meta-agent uses these methodologies in conjunction with the agent registry "to dynamically bring available knowledge resources together" ("suitable delegation") by identifying "those other resources capable of furthering the problem-solving process" ("best complete the requested service request"). *Id.* (citing Ex. 1005, 5:27–29).

Patent Owner contends that Kiss does not teach "optimization of any kind." Resp. 89. Patent Owner asserts that Kiss's meta agent employs a trial and error method—it jumps into "executing the solution plan even before the plan is complete" and when errors are encountered, it backtracks or takes a new action. *Id.* at 90–91 (citing Ex. 1005 5:39–46). Patent Owner argues that Kiss is "forced" to go through this trial-and-error process because it does not have the capability of formulating an "optimal or near-optimal" "goal satisfaction plan." *Id.* at 91.

As discussed above in Section III.B., claim 1 does not recite an "optimal or near-optimal" "goal satisfaction plan." Instead, claim 1 recites "a suitable delegation of sub-goal requests to *best complete* the requested service request," which may relate to the "optimal or near-optimal" limiting feature argued by Patent Owner. As discussed in the same section, Patent Owner asserts that the term "optimal" and "near optimal" has a well-established meaning in the context of computer engineering, citing a technical dictionary, which defines "optimization" as "[t]he process of

finding *the best solution* to some problem, where 'best' accords to prestated criteria." Sur-reply 6 (emphasis added) (citing Ex. 2078, 3). Thus, contrary to Patent Owner's argument, the trial and error process of Kiss is a "process of finding *the best solution*" to a problem under Patent Owner's definition of "optimization." *See* Ex. 1005, 5:21–29 ("The meta agent 119 contains knowledge of how to dynamically bring available knowledge resources together as and when needed to provide a response to the inquiry."), 5:32–45 ("The meta agent 119 is responsible for formulating a *dynamic "solution plan"* for the distributed inferencing to be performed by the system 100, and *allocates tasks* to the knowledge agent layer 109 in furtherance of the solution plan. The planning capability of the meta agent 119 includes the ability to formulate parallel *sub-plans* and perform *iterative and recursive procedures*. . . . The meta agent 119 is capable of backtracking or replanning to permit escape during plan execution from dead-end or *otherwise unproductive search paths*." (emphases added)); Pet. 51 (citing Ex. 1005, 5:24–29).

We note that claim 1 does *not* recite "to *best complete* the requested service request *at the very first try*." Thus, Kiss's formulation of a dynamic "solution plan" (and allocation of tasks) that includes "sub-plans" to perform the trial and error process for finding the best solution to a problem satisfies "delegation of sub-goal requests to *best complete* the requested service request," as recited in claim 1.

Patent Owner also argues that it explained during prosecution how the facilitating engine is able to use reasoning to delegate the sub-goals to service providing agents in such a way as "to best complete the requested service request," as follows:

> For example, assume that several agents are able to roast coffee. The facilitating engine is able to use reasoning to delegate the sub-goal task of roasting coffee to the service-providing agent that can roast beans in the least amount of time because the facilitating engine has reasoned that *the least amount of time* taken to make coffee is *the best way* to accomplish the base goal of making coffee.

Resp. 90 (citing Ex. 1002, 173).

In response, Petitioner argues that Kiss similarly optimizes its solution plan based on time. Reply 49–50. Petitioner asserts that Kiss explains that as part of its matchmaking functionality (which is utilized in the solution plan), the agent service layer will create "mappings for each knowledge module 123 relating the capabilities to interests" and that these mappings are used "to optimize problem solutions." *Id.* at 49 (citing Ex. 1005, 7:8–11). According to Petitioner, Kiss describes that when utilizing "real time" inferencing, the meta-agent "may deactivate the knowledge agent whose responses do not meet time delay" or prioritize "knowledge agents that have a history of rapid response or that can tailor their problem solving to real time." *Id.* at 49–50 (citing Ex. 1005, 7:65–84). We agree with Petitioner that Kiss's delegation and prioritization of agents based on their speed of response satisfies "delegation of sub-goal requests to best complete the requested service request," as recited in claim 1.

(2) Using Reasoning

Claim 1 recites that "a suitable delegation of sub-goal requests" is accomplished "by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms." Petitioner asserts that the '115 patent describes speech recognition, natural

language processing, and email as "domain-independent technologies," and travel planning and reservations agents as "domain specific." Pet. 52 (citing Ex. 1001, 6:51–55).

Citing the testimony of Dr. Lieberman, Petitioner argues that the operations disclosed in Kiss with respect to Figures 8–20 represent "reasoning that includes one or more of domain-independent coordination strategies" because the meta agent, by identifying and querying several different specialized (i.e., domain-specific) agents, is carrying out a strategy that is domain independent (i.e., is not limited to a particular area of knowledge but instead seeks information regarding sales, production, marketing, facilities, and materials) and coordinates the action of those different domain-specific agents across several domains. Pet. 52 (citing Ex. 1003 ¶¶ 331–332). Petitioner argues that Kiss's meta-agent can employ a distributed inferencing scheme that "assembles a problem-specific rule network as a distributed object under control by a meta agent." *Id.* at 52–53 (citing Ex. 1005, 7:21–26). Petitioner contends that application of such a problem-specific set of rules to a request constitutes both "domain-specific reasoning" (because the problem is the domain) and "application-specific reasoning" (because the problem is the application). *Id.* at 53 (citing Ex. 1003 ¶ 333).

As noted above, claim 1 recites that "the goal satisfaction plan includes: a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning . . . ." In view of this claim language, Kiss's inference process using inferencing schemes may be considered part of a "suitable delegation" which is a recited element of the claimed "goal satisfaction plan."

We additionally note that the portion of Kiss cited by Petitioner describes that distributed inferencing schemes are based on the use of "first-order logic." Ex. 1005, 7:21–23. The same paragraph also describes using a "theorem-proving engine." *Id.* at 7:26–28. We note that both "first-order logic" and "theorem-proving engine" may be considered "domain-independent technologies," similar to speech recognition and natural language processing technologies described in the '115 patent.

Patent Owner contends that the "solution plan" of Kiss is not constructed by "using reasoning" because Kiss's inferencing schemes is used only "[a]fter the solution plan is formulated . . . to perform the search and execution phases." Resp. 89 (citing Ex. 1005, 8:58–60). In response, Petitioner asserts that in the Petition it argued that it would have been obvious to utilize inferencing strategies when constructing the goal satisfaction plan. Reply 48 (citing Pet. 53). Thus, Patent Owner's argument is inapposite because it does not address the combination proposed by Petitioner. *See ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1219 (Fed. Cir. 2016) ("*KSR* does not require that a combination only unite old elements without changing their respective functions.").

As Petitioner also persuasively argues, Petitioner in the Petition additionally relies on several other ways in which Kiss utilizes reasoning to construct its solution plan, such as "problem solving methodologies and distributed inferencing procedures," how the meta-agent "assigns the **appropriate** knowledge agents 121 to work on the solution," and how the meta-agent "executes the solution plan by maintaining an agenda, commitment table, task queue, knowledge manager or **equivalent dynamic control service**." Reply 48 (citing Pet. 50–51; Ex. 1003 ¶¶ 322–325, 331–335). Petitioner further argues that Kiss's "iterative and recursive" planning

is another example of how reasoning is used to construct the solution plan of Kiss. *Id.* (citing Pet. 50; Ex. 1003 ¶ 322).

Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches "a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms," as recited in claim 1, notwithstanding the arguments by Patent Owner.

*h. Dispatching Each of the Sub-goals*

Claim 1 recites "dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent." Ex. 1001, 29:32–43.

Petitioner asserts that in Kiss

> the meta agent dispatches queries ("*sub-goals*") to various specialized agents based on a determination that the targeted agent possesses a knowledge module appropriate for the query ("*based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent*.")

Pet. 54 (citing Ex. 1005, 12:21–14:29, Figs. 8–20). Petitioner argues that Kiss's specialized agents are not facilitators (and, therefore, are "client agents") because they are not responsible for matching requests, from users and agents, with descriptions of the capabilities of other agents. *Id.* (citing Ex. 1001, 4:64–66, 6:41–43).

Patent Owner does not specifically dispute that Kiss teaches this "dispatching each of the sub-goals" limitation. *See generally* Resp. Based

on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches "dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent," as recited in claim 1.[28]

*i. Conclusion as to Claim 1*

In consideration of the foregoing and based on the complete record, we are persuaded by Petitioner's arguments and evidence, notwithstanding Patent Owner's arguments, addressed above. Having weighed each of the *Graham* factors, including the scope and content of the prior art, the differences between the prior art and the challenged claim, and the objective evidence of nonobviousness, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss and FIPA97.

*8. Independent Claim 48*

Independent claim 48 is directed to an Interagent Communication Language (ICL) providing a basis for facilitated cooperative task completion within a distributed computing environment having a facilitator agent and a plurality of autonomous service-providing electronic agents. Ex. 1001, 34:9–34. Claim 48 reads as follows.

> 48. [(a)] An Interagent Communication Language (ICL) providing a basis for facilitated cooperative task completion within a distributed computing environment having a facilitator agent and a plurality of autonomous service-providing electronic agents, wherein:
>
> [(b)] the ICL having: a layer of conversational protocol defined by event types and parameter lists associated with one or more of the

[28] We also find that Patent Owner has waived any argument directed to this claim limitation. *See* Paper 16, 7.

events, wherein the parameter lists further refine the one or more events; and a content layer comprising one or more of goals, triggers and data elements associated with the events;
[(c)(i)] the ICL having one or more features from a set of features comprising: enabling agents perform queries of other agents;
[(c)(ii)] enabling agents to exchange information with other [a]gents; and
[(c)(iii)] enabling agents to set triggers within other agents; and
[(d)] the ICL having a syntax supporting compound goal expressions
[(e)] wherein said compound goal expressions are such that goals within a single request provided according to the ICL syntax may be coupled by one or more operators from a set of operators comprising: a conditional execution operator; and a parallel disjunctive operation that indicates that disjunct goals are to be performed by different agents.

Ex. 1001, 29:10–44 (numbering and formatting designated by Petitioner; *see* Pet. Att. C).

*a. Preamble*

As noted above, the preamble of claim 48 recites "[a]n Interagent Communication Language (ICL) providing a basis for facilitated cooperative task completion within a distributed computing environment having a facilitator agent and a plurality of autonomous service-providing electronic agents."[29]

Petitioner asserts the combined teachings of Kiss and FIPA97 satisfy the recited "Interagent Communication Language (ICL) providing a basis for facilitated cooperative task completion within a distributed computing environment" portion of the preamble for the reasons stated in its Petition at §§ V.C, VI.A.1.a, VI.A.1.b(ii). Pet. 58. These portions of the Petition refer

[29] Because Petitioner shows that the recitations in the preamble are satisfied by Kiss, we need not determine whether the preamble is limiting. *See Vivid Techs.*, 200 F.3d at 803.

to Petitioner's arguments and evidence with respect to: 1) Petitioner's proposed combination of Kiss and FIPA97v1 (*see* Pet. 27–31 (§§ V.C)); 2) the preamble of independent claim 1 (*see* Pet. 32–33 (§§ VI.A.1.a)); and 3) the inter-agent language of claim 1 (*see* Pet. 34–35 (§§ VI.A.1.b(ii)).

Based upon our consideration and analysis of the parties' arguments and evidence presented with respect to these portions of the Petition (*see, e.g.*, §§ II.C.4), as well as our consideration of the parties' arguments and evidence presented with respect to similar claim language recited in independent claim 1 (*see, e.g.*, §§ II.C.6.c), we find that the combined teachings of Kiss and FIPA97 satisfy this portion of the preamble of claim 48.

With respect to the remaining portion of claim 48's preamble, Petitioner asserts Kiss discloses "a facilitator agent and a plurality of autonomous service-providing electronic agents," because Kiss describes a "hierarchical knowledge management system having three general layers: a user interface layer, a meta-agent layer, and a knowledge agent layer." *Id.* (citing Ex. 1005, 3:17–20). Petitioner relies on Kiss' description that "[e]ach layer in the system includes one or more intelligent agents responsible for one portion of the distributed problem-solving inferencing process." Pet. 58–59 (citing Ex. 1005, 3:20–22). Petitioner points out that Kiss describes a meta-agent layer that "analyzes user queries or problem formulations from the user interface layer, allocates tasks to the knowledge agent layer, resolves conflicts arising from the knowledge agent layer, and consolidates (including fusing and deconflicting) results provided by the knowledge agent layer." Pet. 59 (citing Ex. 1005, 3:25–29. Petitioner argues that the "meta agent operates with an agent serviced layer to identify

relevant capabilities of service providing agents in the system." Pet. 59 (citing Ex.1005, 3:36–47, 12:1–14:30).

Petitioner argues that "the agent service layer combined with the meta-agent of Kiss constitutes 'a facilitator agent' because it facilitates cooperation in resolving requests by bi-directionally communicating with knowledge agents and assigning tasks (sub-goals) to them in order to coordinate the cooperative completion of tasks." Pet. 59 (citing Ex. 1005, 12:21–14:30, Figs. 8–20). Petitioner argues that "FIPA97 also discloses a Directory Facilitator ('facilitator agent'), which provides analogous functionality," and argues that "in the combined system" it would "be implemented in the meta agent." Pet. 59 (citing Ex. 1003 ¶¶ 347–351; Ex. 1006, 6–7). Therefore, Petitioner argues, "Kiss discloses a system composed into meta-agents (facilitator agents) and knowledge agents (service-providing agents)." Pet. 59 (citing Ex. 1003 ¶ 570).

Patent Owner argues "*Kiss* and *FIPA97* either alone or in combination **do not** disclose the specialized functionality and operation of the claimed '115 Patent's "facilitator agent."" Resp. 72. Patent Owner first argues that "The *Kiss* meta-agent is **not** a facilitator." *Id.* Patent Owner argues that "meta-agents are described in the '115 Patent itself as part of the OAA architecture and **distinct** from facilitator agents." *Id.* Patent Owner argues that "[m]eta-agents in the '115 Patent are client agents as opposed to facilitating agents." *Id.* at 73 (citing Ex. 1001, 6:41–45). Patent Owner argues, "[t]he *Kiss* meta-agent is similar to the meta-agent of the '115 Patent, and does not perform the role of the claimed facilitator." *Id.* at 74 (citing Ex. 2032 ¶ 86). Patent Owner asserts that "[t]he *Kiss* meta-agent, at best, is a controller that routes queries through the system and presents results, and it lacks the sophistication and intelligent planning that the

claimed facilitator performs." Resp. 74 (citing Ex. 1001, 19:52–53; Ex. 2032 ¶ 88).

Patent Owner further argues that "[t]he claimed facilitator in the '115 Patent is described as 'preferably involving three types of processing: delegation, optimization, and interpretation.'" Resp. 75 (citing Ex. 1001, 19:2–4). *"Kiss,"* Patent Owner argues, "does not disclose a meta-agent capable of these processes." Resp. 75.

Patent Owner argues:

> First, the Kiss meta-agent, while it breaks down queries into questions and passes them to knowledge agents, does not apply "selective application of global and local constraint and advice parameters onto the specific sub-goals." (Ex. 1001, 19:9–10.) The meta-agent's processing is a simple decomposition, listing of tasks on an agenda, and request for execution of the individual tasks.

Resp. 75 (citing Ex. 2032 ¶ 92).

Second, Patent Owner argues:

> *Kiss* contains no disclosure of optimization— "result[ing] in a goal whose interpretation will require as few exchanges as possible, between the facilitator and the satisfying agents, and can exploit parallel efforts of the satisfying agents." (Ex. 1001, 19:15–18.) There is no mechanism for the meta-agent to consider efficiencies or other factors that would result in returning results in an optimized way. (Ex. 2032 ¶¶ 93–96.) Indeed, the meta-agent simply relies on the agent service layer to tell it which of the agents has the knowledge necessary to answer the question, and then submits to that self-identifying agent.

Resp. 75 (citing Ex. 1005, 12:29–36; Ex. 2032 ¶ 94).

Third, Patent Owner argues:

> *Kiss's* meta-agent does not use an intelligent method or its own knowledge resources to interpret capabilities or use strategies or advice in the coordination of requests to and assembly of results from satisfying agents. (*See* Ex. 1001, 19:24–27 ("facilitator uses

> its knowledge of the capabilities of its client agents" and/or "strategies or advice specified by the requester" when coordinating requests and assembling responses to interpret and satisfy a goal); Ex. 2032 ¶ 96.) While there is some mechanism of deconflicting, there is no disclosure in Kiss that the meta agent does any processing other than applying rule-driven criteria to sort through the results.

Resp. 76 (citing Ex. 2032 ¶ 97). "Indeed," Patent Owner argues, "*Kiss* describes a system that the '115 Patent classifies as the prior art "Distributed Object Approach," depicted in Figure 2 of the patent." Resp. 77 (citing Ex. 2032 ¶ 98).

Patent Owner then goes on to argue that "*FIPA97*'s Directory Facilitator is no more than a directory of agent capabilities." Resp. 78. Patent Owner argues that while FIPA97's Directory Facilitator "may provide agent registry-type functions within a facilitator (*see, e.g.*, Ex. 1001, Fig. 7), *FIPA97* does not disclose any of the robust facilitator functions described in the '115 Patent and which are missing from *Kiss*'s meta-agent." Resp. 78 (citing Ex. 2032 ¶¶ 101–105).

In its Reply, Petitioner argues that Patent Owner "ignores the actual Kiss/FIPA97 combination and instead attacks the references individually." Reply 35. Petitioner also argues "the **combined** system of Kiss/FIPA97 discloses all **the claimed features** of a facilitator agent, so what Kiss chose to name his facilitator [i.e. "meta-agent"] is plainly immaterial." Resp. 36 (internal citations omitted).

Petitioner also argues Patent Owner's "list of the various optional features of the facilitator agent, (Response, 65–71), are simply not relevant to the "*facilitator agent*" as claimed—and in fact, the record evidence suggests a much broader understanding of that term." Reply 36. Petitioner points out that Patent Owner's expert, Dr. Medividovic defined a facilitator

agent as "a specialized server agent responsible for coordinating agent communications and cooperative problem solving." Reply 36 (quoting Ex. 1129, 79:7–9).

Petitioner argues that the "delegation, optimization, and interpretation" functionalities Patent Owner claims are missing from the Kiss meta-agent are limited to a preferred embodiment in the '115 patent, and therefore are not relevant to an obviousness analysis. Reply 37 (citing Resp. 74–75). Petitioner argues that Dr. Medvidovic confirmed these were functionalities of a preferred embodiment. *See* Reply 37 (citing Ex. 1129, 54:2–9). In any event, Petitioner argues, the Kiss/FIPA97 combination teaches delegation under the ordinary meaning of that term. Reply 38 (citing Ex. 1005, 3:25–27, 12:21–14:30, Figs. 8–20, 5:24–27. Petitioner takes similar positions with respect to "optimization" and "interpretation." *See* Reply 38–39 (citing Ex. 1005, 7:8–11, 7:65–8:4, 8:5–8, 8:17–23.

With respect to Patent Owner's criticisms of FIPA97, Petitioner again points out that Patent Owner is arguing against the references separately instead of the combination of FIPA97's Facilitator Agent with Kiss' meta-agent described by Petitioner. Reply 39–40. Petitioner also argues that "FIPA97 does disclose 'facilitation primitives,'" despite Patent Owner's arguments to the contrary. Reply 40.

In its Sur-reply, Patent Owner argues that it is not attacking the prior art references individually, but rather, it "addresses the disclosures within each reference, matching what the Petition does." Sur-reply 36.

With respect to Patent Owner's argument that "[t]he *Kiss* meta-agent is **not** a facilitator (Resp. 72), Patent Owner argues that "**none** of Patent Owner's arguments rest on the fact that the same words are or are not used in the asserted references and the '115 Patent." Sur-reply 37 (citing Reply

36). Patent Owner argues that "Dr. Lieberman, relies on similar portions of the specification to describe his interpretation of the "facilitator agent," as Patent Owner used to show facilitator agent functionality in the '115 patent. Sur-reply 38.

Patent Owner also argues "the Board must disregard [Petitioner's] arguments and evidence" based on any "new citations in Petitioner's Reply" "to the Kiss patent that were not cited in support of the facilitator limitation in the Petition," and that "even if the Board did consider it, the new evidence is not on point." *Id.* at 40.

We agree with Petitioner. "[One] cannot show non-obviousness by attacking references individually where . . . the rejections are based on combinations of references." *Boundary Solns. Inc. v. Corelogic, Inc.*, 711 Fed. Appx. 627, 631–632 (Fed. Cir. 2017) (quoting *In re Keller*, 642 F.2d 413, 425 (CCPA 1981).

Petitioner makes clear that it is "the agent service layer [of Kiss] combined with the meta-agent of Kiss [that] constitutes '*a facilitator agent*' because it facilitates cooperation in resolving requests by bi-directionally communicating with knowledge agents and assigning tasks (sub-goals) to them in order to coordinate the cooperative completion of tasks." Pet. 59 (citing Ex. 1005, 12:21–14:30, Figs. 8–20). Petitioner explains that:

> The meta-agent layer "analyzes user queries or problem formulations from the user interface layer, allocates tasks to the knowledge agent layer, resolves conflicts arising from the knowledge agent layer, and consolidates (including fusing and deconflicting) results provided by the knowledge agent layer." Ex. 1005, 3:25–29. The meta agent operates with an agent serviced layer to identify relevant capabilities of service providing agents in the system. Ex. 1005, 3:36–47, 12:1–14:30.

Pet. 59.

Given Petitioner's articulation that it is the *combination* of "the agent service layer [of Kiss] combined with the meta-agent of Kiss [that] constitutes '*a facilitator agent*,'" Patent Owner argument that "[t]he *Kiss* meta-agent is **not** a facilitator," is unavailing because it fails to respond to Petitioner's combination of the Kiss agent service layer and the Kiss meta-agent as the recited "facilitator agent." *See* Resp. 72. Similarly, Patent Owner's argument that "[t]he *Kiss* meta-agent is similar to the meta-agent of the '115 Patent, and does not perform the role of the claimed facilitator," is equally unavailing for the same reason. *See id.* at 74.

Patent Owner makes additional arguments in support of its position that the Kiss meta-agent is not a facilitator. For example, Patent Owner argues, "[t]he claimed facilitator in the '115 Patent is described as 'preferably involving three types of processing: delegation, optimization, and interpretation.' (Ex. 1001, 19:2–4.) *Kiss* does not disclose a meta-agent capable of these processes." *See* Resp. 75. In addition to being nonresponsive to Petitioner's proffered combination, these arguments fail for another reason—they improperly attempt to read exemplary characteristics from preferred embodiments in the specification into the claims. Indeed, as this section of the'115 patent makes clear, "[a] further *preferred embodiment of the present invention incorporates* facilitator handling of compound goals, preferably involving *three types of processing: delegation, optimization and interpretation.* Ex. 1001, 19:1–4.

Perhaps more helpful in understanding the nature of a "facilitator agent" is Patent Owner's expert, Dr. Medvidovic's, observation in reference to Figure 4 of the '115 patent that "facilitator agent 402" is "a specialized server agent that is responsible for coordinating agent communications and cooperative problem-solving." *See* Ex. 2032 ¶ 32 (citing Ex. 1001, 6:32–35,

Fig. 4).[30] Indeed, at his deposition, Dr. Medvidovic confirmed that this was his understanding of a "facilitator agent." There, Dr. Medvidovic testified, "if you were asking me define a facilitator agent, I might say it's a specialized server agent responsible for coordinating agent communications and cooperative problem solving. That is a definition." Ex. 1129, 79:15–19.

Based on this understanding of a facilitator agent, Petitioner's proposed combination of "the agent service layer combined with the meta-agent of Kiss constitutes 'a facilitator agent' because it facilitates cooperation in resolving requests by bi-directionally communicating with knowledge agents and assigning tasks (sub-goals) to them in order to coordinate the cooperative completion of tasks," meets the recited "facilitator agent and a plurality of autonomous service-providing electronic agents," because the proposed combination coordinates communications with agents and the cooperative completion of tasks (problem-solving). *See* Pet. 59 (citing Ex. 1005, 12:21–14:30, Figs. 8–20).

*b. layer of conversational protocol*

Claim 48 also recites, "the ICL having: a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events; and a content layer comprising one or more of goals, triggers and data elements associated with the events." Petitioner argues the combination of Kiss and FIPA97 satisfies this limitation for the reasons stated in the Petition with respect to claim 1 at §§ VI.A.1.b(ii) (Pet. 34–35), VI.A.1.c (Pet. 35–41), and VI.A.1.d (Pet. 42–43). Pet. 60.

[30] We note for the record that neither party proposed a construction for the term, "facilitator agent."

The recitation of these limitations in claim 48 relating to a layer of conversational protocol defined by event types and parameter lists, a content layer, goals, triggers, and data elements are virtually identical to those recited in claim 1. *See* Ex. 1001, 29:18–24. For the same reasons set forth, *supra,* with respect to our analysis of claim 1's limitations in Section II.C.7.c.iii and iv, we determine that Petitioner has shown sufficiently that the combination of Kiss/FIPA97 teaches an "ICL having: a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events; and a content layer comprising one or more of goals, triggers and data elements associated with the events" as recited in claim 48.

*c. ICL Features*

Claim 48 also recites, "the ICL having one or more features from a set of features comprising: enabling agents perform [sic] queries of other agents; enabling agents to exchange information with other agents; and enabling agents to set triggers within other agents." *Id.*

*i. Agent Queries*

Petitioner argues the agents in Kiss are able to "perform queries of other agents" using each agent's "inter-agent abstract communications facilities." Pet. 60 (citing Ex. 1005, 3:34–36). Petitioner argues Kiss teaches that the "abstract communication facilities" ("ICL") allows agent's to "negotiate with each other, conduct joint planning, and to collaborate in the execution of planned tasks." Pet. 60 (citing Ex. 1005, 3:34–36). Petitioner argues a Skilled Artisan would understand that to conduct joint planning and negotiate agents must be able to "perform queries of other agents." Pet. 60. Petitioner also argues that Kiss' agents can communicate through the agent service layer that facilitates "agent-to-agent interaction."

*Id.* (citing Ex. 1005, 7:13). Petitioner argues that "[i]n a system designed to facilitate query processing and task completion amongst agents, this 'agent-to-agent interaction' must necessarily include the ability to '*perform queries of other agents.*'" Pet. 60 (citing Ex. 1003 ¶ 580).

Petitioner also argues Kiss teaches a meta-agent who "analyzes user queries" and "allocates tasks" to knowledge agents. Pet. 61 (citing Ex. 1005, 3:25–30. Petitioner argues a "Skilled Artisan would understand that allocating tasks in a knowledge management system is analogous to 'queries of other agents.'" *Id.* (citing Ex. 1003 ¶ 581). Petitioner further argues "the example of Figures 8 through 20 of Kiss shows the meta agent both sending queries to and receiving queries from the sales agent and the production agent." Pet. 61 (citing Ex. 1005, 12:21–14:29, Figs. 8–20; Ex. 1003 ¶ 581).

*ii. Information Exchange*

Petitioner argues the agents in Kiss are able to "exchange information with other agents" using each agent's "inter-agent abstract communications facilities." Pet. 61 (citing Ex. 1005, 3:34–36). Petitioner relies on Figures 7–20 in Kiss that teach agents who "exchange information" with other agents. Pet. 61 (citing Ex. 1005, Figs. 7–20; Ex. 1003 ¶ 583).

Petitioner argues a Skilled Artisan would understand that each communication utilizes the agent's "inter-agent abstract communications facilities." Pet. 62 (citing Ex. 1005, 3:34–36). Petitioner also argues a Skilled Artisan would understand that in a "knowledge management system" the communication protocol between agents must be able to facilitate the ability to "exchange information." Pet. 62 (citing Ex. 1003 ¶ 584).

*iii. Triggers*

Petitioner asserts FIPA97 teaches the use of content parameters to "set triggers within other agents." Pet. 62. Petitioner argues FIPA97 teaches a performative accept-proposal; this performative, Petitioner argues, "informs the receiver" that the "receiving agent" ("other agent") should "perform the action," (i.e., action that takes place in response) once a "given precondition is, or becomes, true" (i.e., occurrence or failure of a precondition). Pet. 62–63 (citing Ex. 1007, 23). Therefore, Petitioner argues, the "precondition" is sent to an agent through the content layer, then at some future point, when that "precondition" is met the receiving agent will trigger and take an action based upon the information encoded in the content layer of the message. Pet. 63 (citing Ex. 1007, 23). In this way, Petitioner argues, "the content layer and the content parameter can be used to '*set triggers within other agents*.'" *Id.*

Patent Owner does not specifically dispute many Petitioner's arguments and evidence provided with respect to claim 48 that the combination of Kiss/FIPA97 teaches an "ICL having one or more features from a set of features comprising: enabling agents perform [sic] queries of other agents; enabling agents to exchange information with other agents; and enabling agents to set triggers within other agents." *See generally* Resp. To the extent that Patent Owner did not respond to Petitioner's arguments and evidence with respect to this claim limitation, we find that Patent Owner has waived any such argument. *See* paper 17, 7. To the extent that Patent Owner responded to Petitioner's arguments and evidence concerning "triggers" as recited in claim 1, we refer to our analysis, *supra,* of the parties' arguments and evidence in Section II.C.7.c.iv.

Based on the complete record and for the reasons explained by Petitioner with respect to this limitation in claim 48 and for the reasons set forth, *supra*, with respect to our analysis of similar limitations in claim 1, we are persuaded that Petitioner has demonstrated sufficiently that the combined teaching of Kiss/FIPA97 teach the recited limitation of claim 48.

*d. Compound Goal Expression*

Claim 48 also recites, "the ICL having a syntax supporting compound goal expressions." Petitioner asserts the combined teachings of Kiss and FIPA97 satisfy this claim limitation for the reasons it stated in the Petition at § VI.A.1.e(ii) (Pet. 45–47), concerning claim 1's recitation of the limitation "*arbitrarily complex goal expression*." *See* Pet. 63.

Patent Owner does not specifically provide any arguments or evidence directed to this limitation of claim 48. *See generally* Resp. To the extent Patent Owner did not respond to Petitioner's arguments and evidence with respect to this limitation of claim 48, we find that Patent Owner has waived any such argument. *See* paper 17, 7.

With respect to the parties' arguments and evidence provided for claim 1's recitation of an "*arbitrarily complex goal expression*," we refer to our analysis, *supra*, in Section II.C.7.d and e. Based on the complete record and for the reasons set forth, *supra*, with respect to our analysis of a similar limitation in claim 1, we are persuaded that Petitioner has demonstrated sufficiently that the combined teachings of Kiss/FIPA97 meet the recited limitation of claim 48.

*e. Syntax Operators*

Claim 48 also recites, "wherein said compound goal expressions are such that goals within a single request provided according to the ICL syntax

may be coupled by one or more operators from a set of operators comprising: a conditional execution operator; and a parallel disjunctive operation that indicates that disjunct goals are to be performed by different agents."

*i. Sub-goals separated by operators*

Petitioner asserts the combined teachings of Kiss and FIPA97 satisfy the recited "wherein said compound goal expressions are such that goals within a single request provided according to the ICL syntax may be coupled by one or more operators" for the reasons stated in the Petition at § VI.A.1.e(ii) (Pet. 45–47). Pet. 63.

Petitioner also argues it would have been obvious to include a base goal that is a compound goal having sub-goals separated by operators in the system of Kiss and FIPA97 based on the teachings of FIPA97, and, alternatively, on the teachings of Kiss. *Id.* at 63–64 (citing Ex. 1003 ¶¶ 166, 286–287, 341–344, 479).

*ii. A conditional execution operator*

Petitioner argues the teachings of Kiss and FIPA97 disclose that operators can include "a conditional execution operator." Pet. 64. Petitioner point out that FIPA97 explains that the performative "request-when" can be used as a "conditional execution operator." *Id.* (citing Ex. 1003 ¶ 486). Petitioner also points to FIPA97's explanation that request-when takes an action "when some given proposition becomes true." *Id.* Therefore, Petitioner argues, a performative ("operator") indicates that an action should be taken when a conditional test becomes true ("task is executed if a given condition is true"). *Id.*

*iii. A parallel disjunctive operation*

Petitioner asserts the teachings of Kiss and FIPA97 also show that operators can include a "parallel disjuncti[ve] operator" in the form of an operator that is able to query multiple disjunct agents in a single expression. Pet. 65. Petitioner asserts FIPA97's disclosed content language (SL2) supports grammars for "quantifying-in inside modal operators." *Id.* (citing Ex. 1007, 78).

Patent Owner does not specifically provide any arguments or evidence directed to the syntax operator limitations of claim 48. *See generally* Resp. To the extent Patent Owner did not respond to Petitioner's arguments and evidence with respect to this limitation of claim 48, we find that Patent Owner has waived any such arguments. *See* paper 17, 7.

With respect to the parties' arguments and evidence provided for claim 1's recitation of an "*arbitrarily complex goal expression,*" we refer to our analysis, *supra*, in Section II.C.7.d and e. Based on the complete record and for the reasons explained by Petitioner with respect to these limitations in claim 48, and for the reasons we set forth, *supra*, with respect to our analysis of similar limitations in claim 1, we are persuaded that Petitioner has demonstrated sufficiently that the combined teachings of Kiss/FIPA97 meet the recited limitation of claim 48 "wherein said compound goal expressions are such that goals within a single request provided according to the ICL syntax may be coupled by one or more operators from a set of operators comprising: a conditional execution operator; and a parallel disjunctive operation that indicates that disjunct goals are to be performed by different agents."

*f. Conclusion as to Claim 48*

In consideration of the foregoing and based on the complete record, we are persuaded by Petitioner's arguments and evidence, notwithstanding Patent Owner's arguments, addressed above. Having weighed each of the *Graham* factors, including the scope and content of the prior art, the differences between the prior art and the challenged claim, and the objective evidence of nonobviousness, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 48 is unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss and FIPA97.

*9. Dependent Claims 2, 3, 11, and 49–60*

Petitioner argues the combination of Kiss and FIPA97 teaches or suggests the recited limitations of dependent claims 2, 3, 11, and 49–60. Pet. 54–85.

*a. Claim 2*

Claim 2 recites, "[a] computer-implemented method as recited in claim 1, further including the following acts of: receiving a new request for service as a base goal using the inter-agent language, in the form of another arbitrarily complex goal expression, from at least one of the selected client agents in response to the sub-goal dispatched to said agent; and recursively applying the step of dynamically interpreting the arbitrarily complex goal expression in order to perform the new request for service."

Petitioner argues that Kiss/FIPA97 satisfies the "receiving a request" limitation of claim 2 because:

> [t]he meta-agent in Kiss dispatches a sub-request (*"sub-goal"*) to the Production Agent ("*at least one of the selected client agents"*) requesting confirmation of the cost per-unit of a specified number of units. Ex. 1005, 13:22-35, Figs. 8–20. In

> response, the meta-agent receives from the Production Agent a request to "identify the cost of a sufficient number of production lines to produce the specified number of units," Ex. 1005, 13:36–39, which is both a *new request for service"*—it had not been previously received by the meta-agent—and a "*base goal"*—it is a basic request needed by the Production Agent to perform its task. The request is "*using the inter-agent language in the form of another arbitrarily complex goal expression"* because, as demonstrated above, all communications between agents in the Kiss/FIPA97 are made using the FIPA ACL, and a request in the FIPA ACL satisfies the inventors' express definition of "*arbitrarily complex goal expression."*

Pet. 55 (citing *id.* § VI.A.1.e(ii); Ex. 1003 ¶ 340).

Petitioner also argues that Kiss/FIPA97 satisfies the "recursively interpreting the goal expression" limitation of claim 2 because:

> [i]n responding to the Production Agent requested noted above, the meta-agent receives two additional requests (*i.e.*, cost of materials and labor), each relating to the original sub-request sent to the Production Agent. Ex. 1005, 13:56–58, 14:3–5. In responding to those additional requests, the meta-agent is "*recursively . . . dynamically interpreting"* Production Agent request by determining the appropriate agent to respond, placing the task on the agenda, and issuing another sub-request.

Pet. 55–56 (citing Ex. 1005, 5:33–39; Ex. 1003 ¶ 342).

Petitioner further argues that for the reasons set forth in its Petition at Section VI.A.1.e(ii), it would have been obvious for the Production Agent to combine its three sub-requests into a single request because it needed the three types of requested information and because FIPA ACL permits such compound service requests. Pet. 56 (citing Ex. 1003 ¶¶ 343–345).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 2. *See, e.g.,* Resp. 65–119.[31] Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the proffered combination of Kiss/FIPA97 teaches or suggests "a computer-implemented method as recited in claim 1, further including the following acts of: receiving a new request for service as a base goal using the inter-agent language, in the form of another arbitrarily complex goal expression, from at least one of the selected client agents in response to the sub-goal dispatched to said agent; and recursively applying the step of dynamically interpreting the arbitrarily complex goal expression in order to perform the new request for service," as recited in claim 2.

*b. Claim 3*

Claim 3 recites, "[a] computer-implemented method as recited in claim 2 wherein the act of registering a specific agent further includes: invoking the specific agent in order to activate the specific agent; instantiating an instance of the specific agent; and transmitting the new agent profile from the specific agent to a facilitator agent in response to the instantiation of the specific agent."

Petitioner argues:

> FIPA97 discloses the initiation of the creation of an agent to play a specific role in the system ("*invoking the specific agent in order to activate the specific agent*"), a responsibility of the Agent Management System and part of the registration process. Ex. 1006, 2, 7, 11, 17, Fig. 3. That functionality results in the

---

[31] To the extent Patent Owner has not responded to Petitioner's arguments and evidence with respect to this claim limitation, we find that Patent Owner has waived any such argument. *See* paper 17, 7.

> activation of a new agent ("*instantiating an instance of the specific agent*"). Ex. 1006, 16, 17, 18, Fig. 3. Moreover, in the combined system, the details concerning the interests and capabilities of that new agent ("*new agent profile from the specific* agent") are provided ("*transmitting*") to the agent service layer, which combined with the meta-agent of Kiss constitutes "*a facilitator agent*" because it is responsible for matching requests, from users and agents, with descriptions of the capabilities of other agents, (Ex. 1001, 4:64–66). Ex. 1005, 12:21–14:30, Figs. 8–20. FIPA97 also discloses a Directory Facilitator ("*facilitator agent*"), which provides analogous functionality, Ex. 1006, 6–7, and for that reason would in the combined system be implemented in the meta agent.

Pet. 56–57 (citing Ex. 1003 ¶ ¶ 217–219, 348.

Petitioner also argues,

> it would have been obvious to include this claim element in the combined system. Ex. 1003 ¶ 349. It would have been obvious to include, as part of the registration process, a process that initiates the creation of an agent to play a specific role in the system ("*invoking the specific agent in order to activate the specific agent*") because a Skilled Artisan would have understood that new agents would at times have to be added to the system, so she would have been motivated to include a process for doing so. Indeed, the Production Agent of Kiss would necessarily have to be created by the system before it could provide the functionality described in Kiss. Initiating that creation process would be obvious from the disclosures of Kiss and FIPA97 because it was a necessary prerequisite to providing the described functionality of the Production Agent.

Pet. 57 (citing Ex. 1003 ¶ 350).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 3. *See, e.g.,* Resp. 65–119. To the extent Patent Owner has not responded to Petitioner's arguments and evidence with respect to this claim limitation, we find that Patent Owner has waived any such argument. *See* paper 17, 7.

Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the proffered combination of Kiss/FIPA97 teaches or suggests "[a] computer-implemented method as recited in claim 2 wherein the act of registering a specific agent further includes: invoking the specific agent in order to activate the specific agent; instantiating an instance of the specific agent; and transmitting the new agent profile from the specific agent to a facilitator agent in response to the instantiation of the specific agent," as recited in claim 3.

*c. Claim 11*

Claim 11 recites, "[a] computer-implemented method as recited in claim 1 further comprising the act of establishing communication between the plurality of distributed agents."

Petitioner argues, "Kiss discloses "*establishing communication between the plurality of distributed agents"* through the use of "**inter-agent abstract communications facilities**" which allow agents to "negotiate with each other, conduct joint planning, and to collaborate in the execution of planned tasks." Ex. 1005, 3:32–36. The system in Kiss facilitates "agent-to-agent interaction."

Pet. 58 (citing Ex. 1005, 7:13, 12:21–14:33; Figs. 8–21; Ex. 1003 ¶¶ 385, 386).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 11. *See, e.g.*, Resp. 65–119. To the extent Patent Owner has not responded to Petitioner's arguments and evidence with respect to this claim limitation, we find that Patent Owner has waived any such argument. *See* paper 17, 7.

Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the proffered combination of Kiss/FIPA97 teaches or suggests "[a] computer-implemented method as recited in claim 1 further comprising the act of establishing communication between the plurality of distributed agents," as recited in claim 11.

*d. Claims 51, 52*

Claim 51 recites, "[a]n ICL as recited in claim 48 wherein the ICL syntax supports explicit task completion constraints include use of specific agent constraints and response time constraints."

Claim 52 recites, "[a]n ICL as recited in claim 51, wherein possible types of task completion constraints include use of specific agent constraints and response time constraints."

Petitioner argues that:

> [i]n Kiss, when using the "Real Time" inferencing method the user may specify "I am willing to wait ten minutes for a response," at which point the meta-agent may "deactivate" any knowledge agents who "do not meet time delay." Ex. 1005, 7:65–8:2. Because these "*constraints*" effect how the inferencing process is carried out and can result in "partial information from the incomplete knowledge agent," Ex. 1005, 8:1–2, they are "*task completion constraints.*"

Pet. 68–69 (citing Ex. 1003 ¶ 517).

Petitioner argues that:

> Kiss also discloses the use of "*specific agent constraints*." Partitioned inferencing, which is a type of constraint on task completion, is used where the "problem domain is easily divided into distinct subfields," in this case the meta-agent should have the "available subfield and query division possibilities." Ex. 1005, 7:53–58. Therefore, the meta-agent could divide the

> problem based upon specific agent constraints such as the subfields and problem domain.

Pet. 69 (citing Ex. 1003 ¶ 603).

Petitioner argues:

> Kiss further discloses "*response time constraints*" in the inferencing method called "Real Time." When using the "Real Time" inferencing, which is a type of constraint on task completion, method the user may specify, "I am willing to wait ten minutes for a response," at which point the meta-agent may "deactivate" any knowledge agents who "do not meet time delay."

Pet. 69 (citing Ex. 1005, 7:65–8:2; Ex. 1003 ¶¶ 604, 605).

In the alternative, Petitioner argues:

> FIPA97 also discloses "task completion constraints." FIPA97 discloses the use of the performative "request-when," which causes an agent to "inform" another agent that a certain action should be performed "as soon as a given precondition, expressed as a proposition, becomes true." Ex. 1007, 40; Ex. 1003 ¶ 518. Therefore, FIPA97 disclose a performative which applies an *"explicit . . . constraint"* (wait until alarm) on "task completion" (before completing the action in the performative).

Pet. 69–70 (citing Ex. 1003 ¶¶ 519–520).

Petitioner argues that:

> FIPA97 also discloses "*specific agent constraints*," such as the "Quality of Service" parameter, which is a type of constraint on task completion that allows the user to specify which networks can be used in a VPN connection, such as "Constant Bit Rate (CBR) traffic for voice ATM network." Ex. 1012, 46. Therefore, FIPA ACL supports constraints based on the functional capabilities of specific agents.

Pet. 70 (citing Ex. 1003 ¶¶ 600–601).

Petitioner argues:

> FIPA97 also discloses *"response time constraints"* in the form of "Response Time," which is a type of constraint on task

> completion, as a negotiation metric between agents. Ex. 1012, 30. FIPA97 describes how FIPA ACL can support response time based conditions through the specification of a special parameter "respond-by" which "[d]enotes a time interval or event(s) when a response to a request is desired."

Pet. 70 (citing Ex. 1012, 47; Ex. 1003 ¶ 602).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claims 51 and 52. *See, e.g.*, Resp. 65–119. To the extent Patent Owner has not responded to Petitioner's arguments and evidence with respect to this claim limitation, we find that Patent Owner has waived any such argument. *See* paper 17, 7.

Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the proffered combination of Kiss/FIPA97 teaches or suggests "[a]n ICL as recited in claim 48 wherein the ICL syntax supports explicit task completion constraints include use of specific agent constraints and response time constraints," and "[a]n ICL as recited in claim 51, wherein possible types of task completion constraints include use of specific agent constraints and response time constraints," as recited in claims 51 and 52, respectively.

*e. Claims 53, 54*

Claim 53 recites, "[a]n ICL as recited in claim 51 wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions."

Claim 54 recites, "[a]n ICL as recited in claim 48 wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions."

Petitioner argues, "FIPA97 discloses 'Advice Parameters' in the form of searches within the 'Directory Facilitator.' Agents may use the directory

performative 'search' to search local or remote directories for relevant resources." Pet. 71 (citing Ex. 1006, 20; Ex. 1003 ¶ 610). Petitioner argues "FIPA97 discloses two possible 'constraints;' Directory Facilitator Depth ('df-depth') and Required Number of Records ('recs-req')." Pet 71 (citing Ex. 1006, 21–22). "The Directory Facilitator Depth constraint," Petitioner argues, "is similar to the level_limit 'Advice Parameter' disclosed in the '115 Patent; both define how many directory facilitators should be searched to locate specific agents." Pet. 71–72 (citing Ex. 1006, 21–22).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claims 53 and 54. *See, e.g.,* Resp. 65–119. To the extent Patent Owner has not responded to Petitioner's arguments and evidence with respect to this claim limitation, we find that Patent Owner has waived any such argument. *See* paper 17, 7.

Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the proffered combination of Kiss/FIPA97 teaches or suggests "[a]n ICL as recited in claim 51 wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions," and "[a]n ICL as recited in claim 48 wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions," as recited in claims 53 and 54, respectively.

*f. Claim 55*

Claim 55 recites, "[a]n ICL as recited in claim 48 wherein each autonomous service-providing electronic agent defines and publishes a set of capability declarations or solvables, expressed in ICL, that describes services provided by such electronic agent."

Petitioner argues that "Kiss discloses a published set of "capability declarations or solvables" by "maintaining a registry of agents in the system," Ex. 1005, 3:37–38, such as the agent registry." Pet. 72 (citing Ex. 1005, 3:40–43, 12:1–17; Ex. 1003 ¶ 618).

Petitioner argues:

> [t]he registry "identifies each agent's capabilities and interests, and contains knowledge about the relationships between them," Ex. 1005, 3:40–43. ("each autonomous service-providing electronic agent" / "set of capability declarations or solvables"). Further, Kiss discloses that each agent is responsible for defining and publishing these "capability declarations or solvables." Kiss explains that each knowledge module is associated with a knowledge agent; in a one-to-one or many-to-one configuration. Ex. 1005, 6:39–45. Further, each knowledge agents keeps "summaries" ("solvables") of the "domain features and methods," ("set of capability declarations"/ "services") of its associated knowledge modules, therefore the Knowledge Agent "defines . . . a set of capability declarations or solvables."

Pet. 73 (citing Ex. 1005, 6:46–48).

Petitioner also argues, "'the capabilities, interests, and attributes' ('set of capability declarations') for each module is registered ('publishes') in the agent service layer by its associated agent. Ex. 1005, 6:48–51. Thus, each associated Knowledge agent 'defines and publishes a set of capability declarations or solvables.'" Pet. 73–74 (citing Ex. 1003 ¶ 619).

In the alternative, Petitioner argues, "[a]lternatively, FIPA97 discloses a 'Directory Facilitator' (DF) which provides 'yellow pages' services to other agents. ('a set of capability declarations or solvables, . . . that describes services provided by such electronic agent.'). Ex. 1006, 6 ('Agents may register their services with the DF or query the DF to find out what services are offered by which agents.')." Pet. 74 (citing Ex. 1003 ¶ 621).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 55. *See, e.g.*, Resp. 65–119. To the extent Patent Owner has not responded to Petitioner's arguments and evidence with respect to this claim limitation, we find that Patent Owner has waived any such argument. *See* paper 17, 7.

Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the proffered combination of Kiss/FIPA97 teaches or suggests "[a]n ICL as recited in claim 48 wherein each autonomous service-providing electronic agent defines and publishes a set of capability declarations or solvables, expressed in ICL, that describes services provided by such electronic agent," as recited in claim 55.

*g. Claim 56*

Claim 56 recites, "[a]n ICL as recited in claim 55 wherein an electronic agent's solvables define an interface for the electronic agent."

Petitioner argues, "FIPA97 further discloses that the solvable may 'define an interface.' FIPA97 discloses various interface parameters ('define an interface') which are included in the initial agent registration process ('solvables'). As part of registration each agent provides information on the conditions and ontologies it accepts when processing a request." Pet. 76 (citing Ex. 1006, 35; Ex. 1003 ¶ 626). Petitioner also argues, "these parameters can define the language and syntax of communication between the two agents ("interface for the electronic agent.") and the conditions that must be meet when processing a service request." Pet. 77 (citing Ex. 1003 ¶ 627).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 56. *See, e.g.*, Resp. 65–119.

To the extent Patent Owner has not responded to Petitioner's arguments and evidence with respect to this claim limitation, we find that Patent Owner has waived any such argument. *See* paper 17, 7.

Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the proffered combination of Kiss/FIPA97 teaches or suggests "[a]n ICL as recited in claim 55 wherein an electronic agent's solvables define an interface for the electronic agent," as recited in claim 56.

*h. Claim 57*

Claim 57 recites, "[a]n ICL as recited in claim 56 wherein the facilitator agent maintains an agent registry making available plurality of electronic agent interfaces."

Petitioner argues, "[e]ach agent in the system must register with a directory facilitator agent. As part of this registration, the agent provides a listing of its available 'agent-services' ('agent interfaces'). Each of the 'agent-services' are part of the agent's registration and are stored within the agent registry." Pet. 78 (citing Ex. 1003 ¶ 630).

"Therefore," Petitioner argues, "the Directory Facilitator agent ('the facilitator agent') manages and stores each agent's registration including each agent's services ('interface') within the agent registry ('maintains an agent registry'). In the combined system, the Directory Facilitator would be implemented in the meta agent of Kiss." Pet. 79 (citing Ex. 1003 ¶¶ 348–351,631.

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 57. *See, e.g.,* Resp. 65–119. To the extent Patent Owner has not responded to Petitioner's arguments and

evidence with respect to this claim limitation, we find that Patent Owner has waived any such argument. *See* paper 17, 7.

Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the proffered combination of Kiss/FIPA97 teaches or suggests "[a]n ICL as recited in claim 56 wherein the facilitator agent maintains an agent registry making available plurality of electronic agent interfaces," as recited in claim 57.

*i. Claim 58*

Claim 58 recites, "[a]n ICL as recited in claim 57 wherein the possible types of solvables includes procedure solvables, a procedure solvable operable to implement a procedure such as a test or an action."

Petitioner argues, "FIPA97 discloses a 'solvable' in the form of an agent registration parameter that defines a test or action. As part of agent registration, agent can provide a listing of their available 'agent-services' including a 'service-type' for each service that the agent provides." Pet. 81 (citing Ex. 1006, 20; Ex. 1003 ¶ 636).

Petitioner argues, "the 'service-type' is used to '[d]enote[] the unique service type' (i.e., the actions the agent can take) on offer by the agent. Ex. 1006, 35. Therefore, the 'service-type' parameter represents a 'solvable' that characterizes an action or test that is performed by the agent, and is thus a 'procedure solvable.'" Pet. 82 (citing Ex. 1003 ¶ 638).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claim 58. *See, e.g.,* Resp. 65–119. To the extent Patent Owner has not responded to Petitioner's arguments and evidence with respect to this claim limitation, we find that Patent Owner has waived any such argument. *See* paper 17, 7.

Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the proffered combination of Kiss/FIPA97 teaches or suggests "[a]n ICL as recited in claim 57 wherein the possible types of solvables includes procedure solvables, a procedure solvable operable to implement a procedure such as a test or an action," as recited in claim 58.

*j. Claims 59, 60*

Claim 59 recites, "[a]n ICL as recited in claim 58 wherein the possible types of solvables further includes data solvables, a data solvable operable to provide access to a collection of data."

Claim 60 recites, "[a]n ICL as recited in claim 58 wherein the possible types of solvables further includes data solvables, a data solvable operable to provide access to a collection of data."

Petitioner argues, "FIPA97 discloses a WRAPPER agent ontology that can be used to define and provide access to a data source. A wrapper agent is used to integrate non-agent software, databases, and systems into a community of agents by creating an agent that translates between the agents and the non-agent software." Pet. 82–83 (citing Ex. 1008, 5–6; Ex. 1003 ¶ 641. Petitioner argues, "a wrapper agent can be used to connect a data source into the community of agent by translating between the data query language of the data source and the agent communication language. Pet. 83 (citing Ex. 1008, 6; Ex. 1003 ¶ 642). Petitioner argues, "[b]y registering this functionality with the directory facilitator, the wrapper agent 'will allow client agents to invoke commands on the underlying software system, translating the commands contained in ACL messages into operations on the underlying software system.'" Pet. 84 (citing Ex. 1008, 9; Ex. 1003 ¶ 643). "Therefore," Petitioner argues, "when a wrapper agent registers with the

directory facilitator it will discloses that it provides access to a data source through this 'service-type' parameter ('data solvable')." Pet. 85 (citing Ex. 1003 ¶ 644).

Patent Owner does not respond specifically to Petitioner's evidence and arguments presented with respect to claims 59 and 60. *See, e.g.*, Resp. 65–119. To the extent Patent Owner has not responded to Petitioner's arguments and evidence with respect to this claim limitation, we find that Patent Owner has waived any such argument. *See* paper 17, 7.

Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the proffered combination of Kiss/FIPA97 teaches or suggests "[a]n ICL as recited in claim 58 wherein the possible types of solvables further includes data solvables, a data solvable operable to provide access to a collection of data," and "[a]n ICL as recited in claim 58 wherein the possible types of solvables further includes data solvables, a data solvable operable to provide access to a collection of data," as recited in claims 59 and 60, respectively.

*D. Motion to Exclude*

Patent Owner filed a Motion to Exclude (Paper 35, "Motion") certain "a portion of Exhibit 1129, as well as related testimony relied on by [Petitioner]." Paper 35, 1. Exhibit 1129 is the deposition transcript of Patent Owner's expert Dr. Medvidovic, taken on May 19, 2020. Patent Owner seeks to exclude Petitioner's reliance "on portions of Dr. Medvidovic's deposition testimony that should be excluded because the question on which the testimony is based is vague, ambiguous, confusing,

lacks foundation and calls for a legal conclusion. And any testimony elicited from this improper question is irrelevant, prejudicial, and misleading." *Id.*

In particular, Patent Owner seeks to exclude lines 53:19–54:21 of Exhibit 1129, which reads as follows:

> Q: If that's true, then it's your opinion these three things, these three types of processing are required to teach '115's facilitator, correct?
>
> MS. ABDULLAH: Objection.
>
> BY THE WITNESS:
>
> A: I think that the authors of the patent, the inventors were very careful to specify that this is is an embodiment. It's a preferred embodiment. There are other embodiments that they discuss. For this particular embodiment that deals with compound goals, delegation, optimization and interpretation are preferably involved. So this is the preferred embodiment. This is a legal thing, not a technical thing. What a preferred embodiment is, that's something that appears in patents, pretty much every patent I've ever read, software patent, anyway. It is something that has a particular meaning. So if you want to handle compound goals, you need to have three types of processing preferably, delegation, optimization and interpretation. So it is my opinion that anybody who tries or, sorry, anybody who is claiming, purporting to be solving the same kinds of problems needs to show an embodiment that matches those three.

Ex. 1129, 53:19–54:21.

Patent Owner argues that Petitioner "attempts to use this improper testimony to support its incorrect conclusion that 'delegation, optimization, and interpretation' are 'functionalities [] limited to a preferred embodiment, (EX1001, 19:1-4), so they are not relevant to the claims.' Paper 35, 3 (citing Reply 37). Patent Owner argues that Petitioner's "Microsoft's "question was vague, ambiguous, confusing, lacked foundation and called for a legal

conclusion." Paper 35, 3–4. Patent Owner also argues "the testimony is irrelevant, prejudicial, and misleading. *Id.* at 4.

Petitioner opposes the motion (Paper 36), arguing that the testimony is admissible and that Petitioner's counsel "failed to object to this question with sufficient specificity at the appropriate time." Paper 36, 1 (citing PTAB Consolidated Trial Practice Guide, pg. 128 (November 2019) ("An objection must be stated concisely in a non-argumentative and non-suggestive manner."). Petitioner points out that Patent Owner's counsel "only said 'Objection' but failed to indicate what type of objection—i.e., form, relevance, etc." Paper 36, 1. Petitioner argues that for the first time, Patent Owner "now attempts to assert multiple grounds for exclusion which were not previously raised—objections which it has waived." *Id.* "Furthermore," Petitioner argues, Patent Owner "does not explain how the question is "vague, ambiguous, and confusing," and that "summarily saying it is without more is insufficient to challenge admissibility." *Id.* at 1–2 (citing 37 CFR § 42.20 (c); *Samsung Electronics America, Inc. v. Uniloc 2017 LLC*, IPR2017-01798, Paper 32, 103 (PTAB Jan. 31, 2019)).

Petitioner also points out that:

> the party proffering a witness for cross-examination has the opportunity to conduct redirect examination of the witness immediately following the cross-examination to cure any perceived deficiency or to provide a more complete answer. *See* 37 CFR § 42.53(c)(2); *CBS Interactive Inc. v. Helferich Patent Licensing, LLC*, IPR2013-00033, Paper 101 (Oct. 7, 2013); *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, IPR2012-00001, Paper 50 (July 18, 2013). Here, IPA did not avail themselves of this opportunity. Ex. 1129, 164:15-16 ("MS. ABDULLAH: IPA does not have any redirect").

Paper 36, 2.

In its Reply (Paper 38), Patent Owner argues "[t]he vague, ambiguous, confusing, lack of foundation, and legal conclusion nature of questions asked by Microsoft's counsel in Exhibit 1129 is clear both on its face and by Dr. Medvidovic's deposition response," and that "[Patent Owner's] counsel properly and timely objected." Paper 38, 1.

We are not persuaded by Patent Owner's arguments that Dr. Medvidovic's testimony should be excluded from evidence in this proceeding. Although Patent Owner's counsel did state the word "Objection" in response to Petitioner's question to Dr. Medvidovic, Patent Owner's counsel did not state the nature of objection, thus depriving Petitioner's counsel of the opportunity to cure the objection by rephrasing the question.

In its Motion to Exclude, Patent Owner now takes the position that the question is "vague, ambiguous, confusing, lacks foundation and calls for a legal conclusion." Paper 35, 1. Patent Owner, however, does not explain adequately how the question is vague, ambiguous or confusing, other than to state that "Dr. Medvidovic['s] testimony highlights the vague, ambiguous, and confusing nature of Microsoft's question." *Id.* at 2. Nor does Patent Owner explain adequately how the question lacks foundation or calls for a legal conclusion aside from pointing to Dr. Medvidovic's response that "[t]his is a legal thing, not a technical thing" in reference to the term "preferred embodiment." *Id.*

Patent Owner also argues that Dr. Medvidovic's response to the question is "irrelevant, prejudicial, and misleading." *Id.* at 4. Dr. Medvidovic's testimony, however, concerns his understanding of a preferred embodiment described in the '115 patent and his opinion of whether the prior art, in particular, Kiss, teaches a "facilitator." *See, e.g.,* Ex. 1129,

52:15–54:21. We find it difficult to see how Dr. Medvidovic's testimony is "irrelevant," since it goes to his understanding of the '115 patent, the asserted prior art, and the nature of his opinion in this proceeding.

It is also relevant to note, as Petitioner points out, that Patent Owner's counsel had "the opportunity to conduct redirect examination of the witness immediately following the cross-examination to cure any perceived deficiency or to provide a more complete answer." Paper 36, 2 (citing 37 CFR § 42.53(c)(2); *CBS Interactive Inc. v. Helferich Patent Licensing, LLC*, IPR2013-00033, Paper 101 (Oct. 7, 2013); *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, IPR2012-00001, Paper 50 (July 18, 2013). Patent Owner's counsel, however, declined to redirect any questions to Dr. Medvidovic. *See* Ex. 1129, 164:15–16.

As for Dr. Medvidovic's testimony being prejudicial or misleading, the Board, sitting as a non-jury tribunal with particular administrative and technical expertise, is not as vulnerable to being misled or prejudiced as a jury might, and is well-positioned to determine and assign appropriate credibility and weight to the evidence presented at trial, without resorting to a formal exclusion of evidence that might later be held to be reversible error. *See, e.g., Liberty Mutual Insurance Co. v Progressive Casualty Insurance Co.*, Case CBM2012- 00002, slip op. at 70 (PTAB, Jan, 23, 2014) (Paper 66), *Gnosis S.P.A., et al. v S. Alabama Medical Science Foundation*, Case IPR2013-00118, slip op. at 43 (PTAB June 20, 2014) (Paper 64).

For these reasons, we deny Patent Owner's Motion.

## III. CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1–3, 11, and 48–60 of the '115 patent are unpatentable on the bases set forth in the following table.[32]

| **Claims** | **35 U.S.C. §** | **References** | **Claims Shown Unpatentable** | **Claims Not shown Unpatentable** |
|---|---|---|---|---|
| 1–3, 11, 48–60 | 103 | Kiss, FIPA97 | 1–3, 11, 48–60 | |
| **Overall Outcome** | | | 1–3, 11, 48–60 | |

[32] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Final Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

## IV. ORDER

In consideration of the foregoing, it is hereby

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 1–3, 11, 48–60 of U.S. Patent No. Patent 6,851,115 B1 are *unpatentable*; and

FURTHER ORDERED that Patent Owner's Motion to Exclude is *denied*; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Joseph Micallef
Scott Border
Ethan Plail
SIDLEY AUSTIN LLP
jmicallef@sidley.com
sborder@sidley.com
eplail@sidley.com

PATENT OWNER:

Steven Hartsell
Sadaf Abdullah
Alexander Gasser
Sarah Spires
SKIERMONT DERBY LLP
shartsell@skiermontderby.com
sabdullah@skiermontderby.com
agasser@skiermontderby.com
sspires@skiermontderby.com

Trials@uspto.gov
571.272.7822

Paper No. 44
Entered: November 5, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MICROSOFT CORPORATION,
Petitioner,

v.

IPA TECHNOLOGIES, INC.,
Patent Owner.

---

Case IPR2019-00814
Patent 6,851,115 B1

---

Before LYNNE E. PETTIGREW, MINN CHUNG, and KEVIN C. TROCK, *Administrative Patent Judges.*

TROCK, *Administrative Patent Judge*.

# JUDGMENT
## Final Written Decision
## Determining Some Challenged Claims Unpatentable
## Denying Patent Owner's Motion to Exclude
*35 U.S.C. § 318(a); 37 C.F.R. § 42.64*

# I. INTRODUCTION

We have authority to hear this *inter partes* review under 35 U.S.C. § 6. This Final Written Decision issues pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed herein, we determine that Microsoft Corporation ("Petitioner") has shown by a preponderance of the evidence that claims 61, 62, and 64–85 of U.S. Patent No. 6,851,115 B1 (Ex. 1001, "the '115 patent") are unpatentable, but has not shown by a preponderance of the evidence that claim 63 of the '115 patent is unpatentable. *See* 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

## *A. Procedural History*

Petitioner filed a request for *inter partes* review of claims 61–85 (the "challenged claims") of the '115 patent. Paper 1 ("Pet." or "Petition"). IPA Technologies, Inc. ("Patent Owner") filed a Preliminary Response, Paper 6 ("Prelim. Resp."), contending the Petition should be denied as to all challenged claims.

On November 5, 2019, the Board entered a decision instituting an *inter partes* review of all claims and all grounds presented in the Petition. Paper 12 ("Inst. Dec.").

After institution, Patent Owner filed a Response to the Petition. Paper 22 ("Resp."). Petitioner thereafter filed a Reply to Patent Owner's Response. Paper 30 ("Reply"). Patent Owner filed a corrected Sur-reply to Petitioner's Reply. Paper 40 ("Sur-reply"). An oral hearing was held on July 27 and 28, 2020. A transcript of the hearing is included in the record. Paper 43 ("Tr.").

*B. Related Proceedings*

Petitioner states that the '115 patent is the subject of the following actions: *IPA Technologies Inc. v. Google LLC*, 1-18-cv-00318 (D. Del.) filed February 26, 2018; *IPA Technologies Inc. v. Microsoft Corporation*, 1-18-cv-00001 (D. Del.) filed January 2, 2018; and *IPA Technologies Inc. v. Amazon.com, Inc. et al.*, 1-16-cv-01266 (D. Del.) filed December 19, 2016. Pet. 2–3.

Petitioner lists four other petitions (IPR2019-00810, IPR2019-00811, IPR2019-00812, IPR2019-00813) filed by Petitioner against the '115 patent. *Id.*

Petitioner also lists IPR petitions it has filed against other family members of the '115 patent (IPR2019-00835, IPR2019-00836, and IPR2019-00837 (U.S. Patent No. 7,069,560 B1); IPR2019-00838, IPR2019-00839, and IPR2019-00840 (U.S. Patent No. 7,036,128 B1)). *Id.* at 3.

Petitioner also identifies numerous IPR petitions filed by Google against the '115 patent and family members of the '115 patent (IPR2019-00728, IPR2019-00729, IPR2019-00730, IPR2019-00731, IPR2019-00732, IPR2019-00733, IPR2019-00734, IPR2019-00735, IPR2019-00736). *Id.* at 2–3.

*C. The '115 Patent (Ex. 1001)*

The '115 patent describes software-based architectures for communication and cooperation among distributed electronic agents. Ex. 1001, 1:28–29. The '115 patent describes an architecture that supports cooperative task completion by flexible, dynamic configurations of autonomous electronic agents. *Id.* at 4:60–62. Service-providing agents declare their capabilities, and facilitator's broker communication and

cooperation between the agents, such as by matching requests with descriptions of capabilities. *Id.* at 4:63–66, 5:6–7.

Figure 3 of the '115 patent, shown below, depicts a distributed agent system in accordance with one embodiment.




Fig. 3

Figure 3, above, shows a distributed agent system 300 that includes a plurality of agents 320 based around a facilitator agent 310. *Id.* at 6:3–6. "The agents 320 forward service requests to the facilitator agent 310," which "interprets these requests, organizing a set of goals which are then delegated to appropriate agents for task completion." *Id.* at 6:10–13.

Figure 4 of the '115 patent is reproduced below.




Fig. 4

Figure 4, above, depicts the structure of a small system 400 including user interface agents 408, several application agents 404 and meta-agents 406, organized as a community of peers by their common relationship to a facilitator agent 402. *Id.* at 6:25–30. The facilitator 402 is a specialized server agent that is responsible for coordinating agent communications and cooperative problem-solving and may also provide a global data store for its client agents, allowing them to adopt a blackboard style of interaction. *Id.* at 6:32–37. Agents register with a parent facilitator a specification of the capabilities and services that the agent can provide. *Id.* at 7:18–20. During task completion, when a facilitator determines that the registered services 416 of one of its client agents will help satisfy a goal, the facilitator sends that client a request expressed in the Interagent Communication Language (ICL) 418. *Id.* at 7:25–30. The agent parses the request, processes it, and returns answers or status reports to the facilitator. *Id.* at 7:30–32.

The Specification provides an express definition for "Interagent Communication Language": "Interagent Communication Language ('ICL') 418 refers to an interface, communication, and task coordination language

preferably shared by all agents, regardless of what platform they run on or what computer language they are programmed in." *Id.* at 10:48–53.

Figure 7 of the '115 patent is reproduced below.




Fig. 7

Figure 7, above, shows data structures 700 internal to a facilitator including an agent registry 702. Each registered agent may be optionally associated with one or more capabilities, which have associated Capability Declaration fields 708. The '115 patent discloses that "[t]hese capabilities may define not just functionality, but may further provide a utility parameter indicating, in some manner (e.g., speed, accuracy, etc.), how effective the agent is at providing the declared capability." *Id.* at 16:65–17:2.

*D. Challenged Claims*

Petitioner challenges claims 61–85 of the '115 patent. Pet. 3. Claims 61 and 71 are independent. Claim 61 is illustrative.

> 61. [(a)] A facilitator agent arranged to coordinate cooperative task completion within a distributed computing environment having a plurality of autonomous service-providing electronic agents, the facilitator agent comprising:

> [(b)] an agent registry that declares capabilities of service-providing electronic agents currently active within the distributed computing environment; and
>
> [(c)] a facilitating engine operable to parse a service requesting order to interpret a compound goal set forth therein,
>
> [(d)] the compound goal including both local and global constraints and control parameters, the service request formed according to an Interagent Communication Language (ICL),
>
> [(e)] wherein the ICL includes: a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events; and a content layer comprising one or more of goals, triggers and data elements associated with the events; and
>
> [(f)] the facilitating engine further operable to construct a goal satisfaction plan
>
> [(g)] by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms.

Ex. 1001, 35:4–28 (numbering and formatting designated by Petitioner; *see* Pet. Att. C).

*E. Prior Art References*

Petitioner relies upon the following prior art references:

(1) U.S. Patent No. 6,484,155, issued Nov. 19, 2002 ("Kiss") (Ex. 1005);

(2) 1997 FIPA v. 1.0 Specification ("FIPA97") (Ex. 1006–1012);

(3) Cohen et al., *An Open Agent Architecture*, 1994 Association for the Advancement of Artificial Intelligence Spring Symposia on March 21-23, 1994. ("Cohen") (Ex. 1014).

*F. Asserted Grounds of Unpatentability*

| Ground | Reference(s) | Basis | Claims Challenged |
|---|---|---|---|
| 1 | Kiss, FIPA97 | § 103 | 61–63, 70–85 |
| 2 | Kiss, FIPA97, Cohen | § 103 | 64–70, 84, 85 |

*G. Testimonial Evidence*

In support of the unpatentability contentions in its Petition, Petitioner relies on a declaration of Dr. Henry Lieberman (Ex. 1003, "Lieberman Decl.") and a declaration of Dr. Timothy Finin (Ex. 1049, "Finin Decl."). Patent Owner cross-examined Dr. Lieberman and Dr. Finin via deposition. *See* Ex. 2014 ("Lieberman Dep."); Ex. 2013 ("Finin Dep.").

In support of its Patent Owner Response, Patent Owner relies on a declaration of Dr. Nenad Medvidovic (Ex. 2032, "Medvidovic Decl.") and a Declaration of Dr. Philip R. Cohen (Ex. 2033, "Cohen Decl."). Petitioner cross-examined Dr. Medvidovic via deposition. *See* Ex. 1129 ("Medvidovic Dep.").

## II. ANALYSIS

### *A. Level of Ordinary Skill*

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham v. John Deere Co.,* 383 U.S. 1, 17 (1966). "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).

Petitioner describes a person of ordinary skill in the art as "someone familiar with the principles and conventions of computer science and computer networking, and also with multi-agent systems and inter-agent communication languages as documented in agent-centered literature by 1999." Pet. 4. Petitioner also explains that a person of ordinary skill in the art "may have been a graduate student in mathematics, engineering, or computer science, and may have had an advanced degree in one of these disciplines, and would also have had at least two years of experience working in the field of computer science, or a related field, and may have worked in academia, either as a professor or a graduate student, for a technology company, or for a government." Pet. 4–5 (citing Ex. 1003 ¶ 34).

In its Response, Patent Owner asserts that a person of ordinary skill in the art at the time of the '115 patent's filing date would have had "a Bachelor's degree in Computer Science or equivalent field and at least two years of work experience in design and development of distributed systems, software specification languages, or a related area." Resp. 23 (citing Ex. 2032 ¶ 37). Patent Owner criticizes Petitioner's description of the level of ordinary skill in the art as being "vague and uncertain" as to render it

"meaningless" because of the use of the word "may" in its description. *Id.* Patent Owner contends that Petitioner's proposed description is "particularly problematic here, where Petitioner claims that it would have been obvious to create an agent system that is very complex and advanced in its facilitation, goal processing, and inter-agent communication capacities." *Id.* at 24 (citing Ex. 2032 ¶ 40).

In its Reply, Petitioner argues that its proposal "simply (and realistically) expresses alternatives—*i.e.*, that a Skilled Artisan would have been at least a graduate student in several relevant fields (*e.g*, 'mathematics, engineering, or computer science'), and would have had at least two years of work experience in those fields." Reply 13–14 (citing Pet. 4–5). Petitioner also argues that Patent Owner does not articulate how any differences between the parties' proposals that would alter or even affect the outcome of this proceeding. Reply 14.

In its Sur-reply, Patent Owner argues that it has "identified how the difference between the proposals would affect this proceeding" because Patent Owner has pointed out that "it is Petitioner's burden under the law to address each *Graham* factor and Petitioner has failed to proffer a coherent level of ordinary skill in the art, Petitioner's obviousness assertion fails for that reason alone." Sur-reply 15 (citing Resp. 24).

Patent Owner, however, does not identify any "meaningful differences" between the parties' proposed definitions or how "the outcome of [this proceeding] would have been different" if we adopted Patent Owner's proposed description, as opposed to Petitioner's proposal. *See ESIP Series 2, LLC v. Puzhen Life USA, LLC*, 958 F.3d 1378, 1385 (Fed. Cir. 2020) (citing *Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1371–72 (Fed. Cir. 2016)). For example,

Patent Owner does not argue the challenged claims are not unpatentable under Patent Owner's proposed description of the level of ordinary skill in the art, nor does Patent Owner identify any claim limitation that would have been taught by the asserted prior art under Petitioner's proposal, but *not* under Patent Owner's proposal. *See* Resp. 23–24; Sur-reply 14–16.

In our view, the parties' proposals are not materially different despite the differences in wording between them (e.g., the education level of a Bachelor's degree in Computer Science or equivalent field under Patent Owner's proposal, as opposed to a graduate student's level of education with or without a Bachelor's degree under Petitioner's proposal). For purposes of this Final Written Decision, we find no meaningful differences between the parties' respective proposals that would materially alter the outcome of this Decision. These proposals are similar for all purposes relevant to this Final Written Decision, and both are consistent with the level of ordinary skill in the art reflected in the disclosure of the '115 patent and the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

Nonetheless, for this Final Written Decision, we adopt Patent Owner's description of a person of ordinary skill in the art at the time of the claimed invention. That is, a person of ordinary skill in the art at the time of the claimed invention would have had "a Bachelor's degree in Computer Science or equivalent field and at least two years of work experience in design and development of distributed systems, software specification languages, or a related area." Resp. 23. Our analysis and conclusions in this Final Written Decision would be the same regardless of whether Petitioner's or Patent Owner's description of the level of ordinary skill in the art is adopted.

*B. Claim Construction*

In an *inter partes* review, we apply the same claim construction standard that would be used in a civil action under 35 U.S.C. § 282(b), following the standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. § 42.100(b) (2019). In applying such standard, claim terms are generally given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art, at the time of the invention and in the context of the entire patent disclosure. *Phillips*, 415 F.3d at 1312–13. "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

In our Decision on Institution, we preliminarily interpreted certain claim terms as follows.

| Term | Construction |
|---|---|
| "event" | "a message or goal communicated between agents" |
| "event type" | "a type of an event" |
| "goal" | "a request for service" |

| Term | Construction |
|---|---|
| "arbitrarily complex goal expression" | "a goal expressed in a language or syntax that allows an expression, when appropriate or when desired, that expresses multiple sub-goals and can potentially include more than one type of logical connector (e.g., AND, OR, NOT), and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent, although not every goal is itself necessarily complex" |
| "compound goal" | "a single goal expression that specifies multiple sub-goals to be performed" |

Inst. Dec. 26–37.

The parties do not dispute the constructions of these terms in the Patent Owner Response or Petitioner Reply. *See* Resp. 25–27; Reply 1. Upon considering the complete record, we discern no reason to deviate from our preliminary constructions and, therefore, adopt the constructions of the claim terms "event," "event type," "goal," "arbitrarily complex goal expression," and "compound goal" as set forth above for this Final Written Decision.

In the Petition, Petitioner discusses constructions for additional claim terms, including "goal satisfaction plan," "layer of conversational protocol," "content layer," "trigger," "symbolic name," and "parameter lists further refine the one or more events." Pet. 8–16. Patent Owner disputes Petitioner's proposed construction for "goal satisfaction plan." *See* Resp. 27–38. We discuss the disputed constructions below.

Patent Owner does not address Petitioner's proposed construction for the claim term "parameter lists further refine the one or more events." *See*

*id.* at 24–38. Nonetheless, Patent Owner discusses the meaning of this term in the context of Patent Owner's arguments that FIAP97 does not teach the Inter-Agent Communication Language ("ICL") limitations. *See id.* at 97–107. Although Patent Owner's arguments raise an issue of claim construction, Patent Owner's arguments are closely related to and interspersed with Patent Owner's arguments that FIPA97 does not teach an "inter-agent language" recited in claims 61 and 71. Thus, for efficiency and completeness, we address this issue in the context of the patentability discussion below.

No other claim terms need to be construed expressly for purposes of this Final Written Decision. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that only terms that are in controversy need to be construed, and "only to the extent necessary to resolve the controversy"); *see also Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (applying *Vivid Techs.* in the context of an *inter partes* review).

*1. "goal satisfaction plan"*

The claim term "goal satisfaction plan" is recited in independent claims 61 and 71. *See* Ex. 1001, 35:24–29 (claim 61), 36:17–23 (claim 71). "[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning." *Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 904 (Fed. Cir. 2018) (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003). The parties do not contend that the term "goal satisfaction plan" has different meanings in different claims of the '115 patent.

Petitioner contends that a "goal satisfaction plan" is a "procedure for sending one or more requests for service to one or more agents in order to satisfy a goal." Pet. 9. Patent Owner disagrees and asserts that the claim term "goal satisfaction plan" should be construed to mean "a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints." Resp. 28.

*a. Claim Language*

We begin our claim construction analysis by considering the language of the claims themselves. *Phillips*, 415 F.3d at 1314. Addressing the claim language of the disputed term, we note that the claim language "a goal satisfaction plan" indicates that the term's plain meaning is "a plan for satisfying a goal."

In the challenged independent claims, the term "goal satisfaction plan" is further limited. For example, independent claims 61 and 71 recite:

> the facilitating engine further operable to construct *a goal satisfaction plan* by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms;

Ex. 1001, 35:23–28, 36:15–22 (emphasis added).

The "optimal or near-optimal" limiting feature argued by Patent Owner is recited in claim 1 ("a suitable delegation of sub-goal requests to *best complete* the requested service request"), but is not recited in either claim 61 or 71. This shows that the patentee knew how to restrict the "goal satisfaction plan" to "best complete the requested service request," i.e., satisfy a goal "in an optimal or near-optimal manner." If the patentee had intended to similarly restrict "goal satisfaction plan" in claims 61 and 71, it

could have done so using the language of claim 1, but did not. *See Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1379 (Fed. Cir. 2018) (citing *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1359 (Fed. Cir. 2016)).

Thus, Patent Owner's proposed construction that generally requires a "goal satisfaction plan" to satisfy a goal "in an optimal or near-optimal manner" would have the effect of obfuscating the material differences in the claim language discussed above.

In addition, Patent Owner's proposed construction would render the limitation "suitable delegation of sub-goal requests to best complete the requested service request" as recited in claim 1, for example, superfluous.[1] Such a construction is presumed improper. *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1274–75 (Fed. Cir. 2012) (rejecting the district court's construction narrowing a term by a superfluous limitation when the claims explicitly recited the narrowing limitation, and discussing the "well-established rule that 'claims are interpreted with an eye toward giving effect to all terms in the claim'") (quoting *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)) (internal quotation marks omitted); *LSI Indus., Inc. v. ImagePoint, Inc.*, 279 F. App'x 964, 972 (Fed. Cir. 2008) (nonprecedential) (rejecting the district court's construction of "display device" as necessarily including the superfluous limitation of "internal illumination" because other claim terms specifically recited an "illuminated display device"); *but cf. ERBE Elektromedizin GmbH v.*

---

[1] The patentability of independent claims 1 and 29 is not challenged in this proceeding.

*Canady Tech. LLC*, 629 F.3d 1278, 1286 (Fed. Cir. 2010) ("no canon of [claim] construction is absolute in its application") (citation omitted).

Patent Owner also argues that "a goal satisfaction plan" should be construed to include the limitation of satisfying a goal "consistent with any advice parameters or constraints." This language is not recited in independent claims 1 and 71, but is recited in independent claims 29 and 61. For example, claim 29 recites "the act of interpreting including the sub-acts of: determining any task completion *advice* provided by the base goal, and determining any task completion *constraints* provided by the base goal." Ex. 1001, 32:4–8 (emphases added). Similarly, claim 61 recites "the compound goal including both local and global *constraints* and control *parameters*." *Id.* at 35:12–14 (emphases added). Claims 1 and 71, however, do not recite "advice" or "constraint." Thus, Patent Owner's proposed construction is disfavored because it would blur material differences in claim language.

Finally, Patent Owner's proposed construction replaces "goal" with "complex goal expression." This feature is recited in claim 1, but not in claim 29. Claim 1 recites "receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression; and dynamically interpreting the arbitrarily complex goal expression" (Ex. 1001, 29:25–30), whereas claim 29 recites "interpreting a service request in order to determine a base goal that *may be* a compound, arbitrarily complex base goal" (*id.* at 31:59–61) (emphasis added). Because of the permissive language "may be" used in claim 29, a "goal" is not necessarily required to be in the form of an arbitrarily complex goal expression in claim 29. Again, Patent Owner's proposed construction is disfavored because it would blur the material differences in claim language.

Thus, at least based on the claim language, it is not appropriate to limit "goal satisfaction plan" as Patent Owner contends. As discussed above, the meaning and the scope of "goal satisfaction plan" is clear on the face of each claim because claims 61 and 71 each recite specifically what a "goal satisfaction plan" includes or comprises in different claims. Therefore, absent compelling evidence to the contrary, it is neither necessary nor appropriate to limit the meaning of the term "goal satisfaction plan" beyond the plain meaning indicated by the claim language—i.e., "a plan for satisfying a goal."

*b. Written Description*

Turning to the Specification, Patent Owner cites the following statement in the "Summary of the Invention" section:

> [e]xtreme flexibility is achieved through an architecture organized around the declaration of capabilities by service-providing agents, the construction of arbitrarily complex goals by users and service-requesting agents, and the **role of facilitators in delegating and coordinating the satisfaction of these goals, subject to advice and constraints** that may accompany them.

Resp. 31 (quoting Ex. 1001, 5:3–9). The very first sentence of the paragraph cited by Patent Owner states, however, "[a] first *embodiment* of the present invention discloses a highly flexible, software-based architecture for constructing distributed systems." Ex. 1001, 4:58–60 (emphasis added). Indeed, all of the portions of the Specification cited by Patent Owner, including the passage reproduced above, describe various embodiments of the '115 patent. *See* Resp. 30–33 (citing Ex. 1001, 5:3–9, 5:48–49, 15:37–39, 15:66–16:1, 16:11–21, 16:38–46, 18:35–48, 28:47–54, Fig. 11).

In general, "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (citation omitted). As discussed above, the challenged independent claims 61 and 71 do not recite all of the limiting features required by Patent Owner's proposed construction of "goal satisfaction plan." Thus, unless one of the established exceptions, such as lexicography or disavowal, applies, the challenged claims are not restricted as Patent Owner contends. *See, e.g.*, *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("the specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal") (citation omitted).

Here, Patent Owner does not argue lexicography or disavowal. Nor does Patent Owner explain any other reason why the Specification limits "goal satisfaction plan" as it contends. Thus, claim construction in this case is governed by the general principle that "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." *SuperGuide*, 358 F.3d at 875; *see also WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1323–24 (Fed. Cir. 2018) ("It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise." (citing *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) ("[T]his court has repeatedly cautioned against limiting claims to a preferred embodiment."))). Accordingly, none of the embodiments in the Specification cited by Patent Owner limits "goal satisfaction plan" as Patent Owner contends.

*c. Prosecution History*

Turning next to the prosecution history, Patent Owner asserts that "examples in the file history confirm the elements of 'goal satisfaction plan' reflected in Patent Owner's proposed construction." Resp. 35–36. Patent Owner argues, during the prosecution of the application for the '115 patent,

> Applicant further stated that "the facilitating engine is able to use reasoning to delegate the sub-goals to service providing agents in such a way as '**to best complete the requested service request**.'…The facilitating engine is able to use reasoning to delegate the sub-goal task of roasting coffee to the service-providing agent that can roast beans in the least amount of time because the facilitating engine has reasoned that the least amount of time taken to make coffee is the best way to accomplish the base goal of making coffee." Applicant concluded that "the base goal is carried out **not by merely parsing the request into sub-goals**" but rather "the facilitating engine used reasoning to decide upon using **competing** message transfer agents to reminding Bob of lunch, in lieu of delegating the task to just one message transfer agent."

*Id.* at 35 (citing Ex. 1002, 172–173). As discussed above, however, the limiting feature argued by Patent Owner is not recited in either claim 61 or claim 71. Thus, Patent Owner's argument is unpersuasive for the same reasons discussed above.

*d. Extrinsic Evidence*

Patent Owner also cites the testimony of its declarant, Dr. Medvidovic, in support of Patent Owner's proposed construction of "goal satisfaction plan." Resp. 36–37 (citing Ex. 2032 ¶¶ 51–52, 54–59, 129). We have reviewed the cited testimony from Dr. Medvidovic, but do not find anything in his testimony that would change our analysis based on intrinsic record discussed above. *See Phillips*, 415 F.3d at 1318 (authorizing

the consideration of extrinsic evidence in determining the meaning of claims but noting that it is "in general . . . less reliable than the patent and its prosecution history in determining how to read claim terms").

*e. Other Arguments*

The parties dispute whether Petitioner's use of "procedure" (in place of a "plan") and "sending one or more requests for service" in Petitioner's proposed construction is appropriate. *See* Resp. 37–38; Reply 2–4, 11–12; Sur-reply 3, 13. We need not address these arguments in detail because, for the reasons discussed above, we see no reason to depart from the plain meaning of the term "goal satisfaction plan."

*f. Conclusion*

Based on the complete record and after examining the claims as a whole, the Specification, and the prosecution history, we construe the term "a goal satisfaction plan" according to its plain meaning—"a plan for satisfying a goal."

*C. Patentability Challenges*

Petitioner presents two grounds challenging the patentability of the '115 patent claims under 35 U.S.C. §103. First, Petitioner challenges the patentability of claims 61–63 and 70–85 as obvious over the combined teachings of Kiss and FIPA97. Second, Petitioner challenges the patentability of claims 64–70, 84, and 85 as obvious over the combined teachings of Kiss, FIPA97, and Cohen.

*1. Principles of Law on Obviousness*

To prevail in challenging Patent Owner's claims, Petitioner must demonstrate by a preponderance of the evidence that the claims are

unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring inter partes review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

Section 103(a) forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Obviousness is a question of law based on underlying factual findings, including: (1) the level of ordinary skill in the art; (2) the scope and content of the prior art; (3) the differences between the claims and the prior art; and (4) secondary considerations of nonobviousness, such as commercial success, long-felt but unmet needs, failure of others, and unexpected results. *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007); *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966).

The Supreme Court has made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions.

*Id.* Reaching this conclusion, however, "requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention. *Id.*

2. *Prior Art*

a. *Kiss (Ex. 1005)*

Kiss describes "a knowledge management system that supports inquiries of distributed knowledge resources," as illustrated in Figure 1 below. Ex. 1005, 2:44–45.




*Fig. 1*

Kiss' Figure 1, above, is a conceptual overview of one embodiment of a knowledge management system. *Id.* at 5:1–2. Kiss' knowledge

management system 100 includes a presentation layer 103, a user interface layer 105, a meta agent layer 107, a knowledge agent layer 109, a knowledge module layer 111, and an agent service layer 113. *Id.* at 5:3–7.

The meta agent layer 107 includes one or more meta agents 119 that are responsible for analyzing queries or problem formulations provided by the user interface layer 105 and constructing a plan for finding a solution to the problem. *Id.* at 5:20–24. More specifically, "meta agent 119 is responsible for formulating a dynamic 'solution plan' for the distributed inferencing to be performed by the system 100, and allocates tasks to the knowledge agent layer 109 in furtherance of the solution plan." *Id.* at 5:33–37. "The meta agent solution plan attempts to employ all elements of information contained in the parsed inquiry in the development of search-space constraints." *Id.* at 8:34–37.

The knowledge agent layer 109 includes multiple knowledge agents 121, each of which may be associated with one or more knowledge modules 123 in the knowledge module layer 111. *Id.* at 6:31–35. The knowledge agent 121 is configured to accept from a meta agent 119 a problem statement and convert that problem statement into a format appropriate for the knowledge module 123 associated with the knowledge agent 121. *Id.* at 6:35–38.

*b. FIPA97 (Ex. 1006–1012)*

FIPA97 (Exs. 1006–1012) is a specification created by the Foundation for Intelligent Physical Agents (FIPA) beginning in 1996 with an official release date in October 1997. Ex. 1006, Cover, iv (identifying specification as FIPA 97 Version 1.0 issued on October 10, 1997). FIPA97 is a "specification of basic agent technologies that can be integrated by agent systems developers to make complex systems with a high degree of

interoperability." *Id.* at v. The specification comprises seven parts: three parts for basic agent technologies (Parts 1–3 relating to agent management, agent communication language, and agent/software integration) and four informative applications providing examples of how the technologies can be applied (Parts 4–7 describing personal travel assistance, personal assistant, audio-visual entertainment, and broadcasting and network management and provisioning applications). *Id.* at v–vii; *see generally* Exs. 1006–1008 (Parts 1–3); Exs. 1009–1012 (Parts 4–7).

Part 1 of FIPA97 "provides a normative framework within which FIPA compliant agents can exist, operate and be managed." Ex. 1006, vi. Part 2 of FIPA97 describes an "Agent Communication Language (ACL)" that "is based on speech act theory: messages are actions, or communicative acts, as they are intended to perform some action by virtue of being sent." *Id.* The ACL specification "consists of a set of message types and the description of their pragmatics, [i.e.,] the effects on the mental attitudes of the sender and receiver agents." *Id.* The ACL specification "also provides the normative description of a set of high-level interaction protocols, including requesting an action, contract net and several kinds of auctions." *Id.*

Part 2 of FIPA97 discloses a "simple abstract model of inter-agent communication" including ACL messages having components as illustrated in Figure 1 below. Ex. 1007, 7, 12.




**Figure 1 — Components of a message**

Figure 1, above, illustrates the main structural elements of an ACL message in FIPA97. *Id.* at 12. "The first element of the message is a word which identifies the communicative act being communicated, which defines the principal meaning of the message." *Id.* Each ACL message contains a set of one or more parameters, including a mandatory "*:receiver*" parameter that identifies the intended recipient of the message. *Id.* at 13.

Petitioner asserts that FIPA97 was made publicly available as a single document and relies on FIPA97 as a single printed publication for purposes of 35 U.S.C. § 102(a). *See* Pet. 22; Reply 26. As discussed below in the section addressing the status of FIPA97 as a printed publication, FIPA approved and released FIPA 97 Version 1.0 as a single specification. *See infra* § II.E; Ex. 1026, 5; Ex. 1003 ¶ 165. Thus, although sometimes the seven parts are referred to as "documents," a person of ordinary skill in the art would have considered FIPA97 to be a single reference. *See* Ex. 1003 ¶¶ 164–165. Patent Owner does not dispute that FIPA97 is one reference for

purposes of §§ 102 and 103. *See* Resp. 117–119.[2] Because FIPA and skilled artisans considered FIPA97 to be a single specification, we agree that FIPA97 constitutes a single prior art reference, and we treat it as such for purposes of our unpatentability analysis.

*c. Cohen (Ex. 1014)*

Cohen describes an "open agent architecture and accompanying user interface for networked desktop and handheld machines." Ex. 1014, Abst. Cohen discloses that "the Open Agent Architecture is a blackboard-based framework allowing individual software 'client' agents to communicate by means of goals posted on a blackboard controlled by a 'Server' process." *Id.* at 2. "The Server is responsible both for storing data that is global to the agents, for identifying agents that can achieve various goals, and for scheduling and maintaining the flow of communication during distributed computation." *Id.* Cohen also discloses a distributed blackboard architecture as depicted in Figure 1 below. *Id.* at 3.

---

[2] Contrary to Patent Owner's argument (Resp. 117–119), Petitioner did not argue in another case, and the Board did not find, that FIPA97 is seven separate prior art references. *See Microsoft Corp. v. IPA Techs. Inc.*, IPR2019-00838, Paper 13 at 3–5 (PTAB Apr. 3, 2020) (Decision Denying Petitioner Request for Rehearing), Paper 10 at 4–9 (Petitioner's Request for Rehearing, filed Dec. 6, 2019).




Figure 1: Hierarchy of Blackboard Servers

Cohen's Figure 1, above, shows "an architecture in which a server may itself be a client in a hierarchy of servers; if none of its client agents can solve a particular goal, this goal may be passed further along in the hierarchy." *Id.*

3. *Prior Art Status Issues*

Patent Owner challenges the prior art status of both Kiss and FIPA97.

a. *Status of Kiss*

Petitioner relies on Kiss as a prior art reference in all of the asserted grounds of unpatentability presented in the Petition. *See* Pet. 3–4. "[P]etitioner has the burden of persuasion to prove unpatentability by a preponderance of the evidence. *Dynamic Drinkware,* 800 F.3d at 1379. Petitioner also has the initial burden of production to show that a reference is prior art to the challenged claims under a relevant section of 35 U.S.C. § 102. *See id.* Once Petitioner has met that initial burden, the burden of

production shifts to Patent Owner to argue or produce evidence that the asserted reference is not prior art to the claims. *Id.* at 1380. Once Patent Owner has met that burden of production, the burden of production returns to Petitioner. *Id.*

The filing date of the '115 patent is January 5, 1999. Ex. 1001, code (22). As noted above, Kiss is a United States patent that arose from an application filed July 21, 1999, claiming the benefit of priority to a provisional application filed July 21, 1998. Ex. 1005, codes (22), (60).

Petitioner asserts that Kiss is prior art to the '115 patent under 35 U.S.C. § 102(e) because Kiss is entitled to the benefit of priority to the filing date of its provisional application (Ex. 1036, "Kiss Provisional Application"). Pet. 16–20. "A reference patent is only entitled to claim the benefit of the filing date of its provisional application if the disclosure of the provisional application provides support for the claims in the reference patent in compliance with § 112, ¶ 1." *Dynamic Drinkware*, 800 F.3d at 1381.

In *Ex parte Mann*, the Board held that "under *Dynamic Drinkware*, a non-provisional child can be entitled to the benefit of a provisional application's filing date if the provisional application provides sufficient support for *at least one claim* in the child." 2016 WL 7487271, at *6 (PTAB Dec. 21, 2016) (emphasis added) (discussing whether *Dynamic Drinkware* requires "support in the provisional . . . for *all* claims, *any* claim, or something in between"). In addition, the Board held that a "subject matter test" is also required—that is, "the [party claiming priority] also must show that the subject matter relied upon in the non-provisional is sufficiently supported in the provisional application [and that t]his subject matter test is

in addition to the comparison of claims required by *Dynamic Drinkware.*" *Id.* at *5.

Recognizing these requirements, Petitioner asserts that "each element of [claim 1 of Kiss] has written description support in the Kiss Provisional," providing detailed citations to the supporting disclosures from the Kiss Provisional Application for each limitation of claim 1 of Kiss. Pet. 16–18. Addressing the "subject matter test," Petitioner asserts that "the teachings that Petitioner relies upon were carried forward from the Kiss Provisional to Kiss" and provides a detailed mapping of the relied-upon portions of Kiss to the corresponding portions of the Kiss Provisional Application. *Id.* at 18–20.

In the Institution Decision, we determined, based on the preliminary record, that Petitioner has presented sufficient argument and evidence to meet its initial burden of production on the issue of whether Kiss is entitled to the benefit of the filing date of the Kiss Provisional Application so as to shift the burden of production to Patent Owner to argue or produce evidence that Kiss is not prior art to the challenged claims. Inst. Dec. 23.

In its Preliminary Response, Patent Owner asserted that Kiss is not entitled to the priority date of its provisional application. Prelim. Resp. 66–67. In the Institution Decision, we determined, based on the preliminary record, the argument and evidence presented by Patent Owner was insufficient to shift the burden of production back to Petitioner. *Id.* at 25. We noted that Petitioner had made a threshold showing that it is reasonably likely to prevail in proving that Kiss is entitled to the benefit of the filing date of the Kiss Provisional Application. *Id.*

During the trial, however, Patent Owner did not present any argument or evidence on this issue, nor did it dispute Kiss qualifies as prior art in this proceeding. *See generally* Resp.

Based on the complete record, we determine that Petitioner has established by a preponderance of the evidence that Kiss is prior art to the ’115 patent under 35 U.S.C. § 102(e) because Kiss is entitled to the benefit of priority to the filing date of its provisional application.

*b. Status of FIPA97*

Before reaching the merits of Petitioner’s obviousness contentions, all of which are based in part on FIPA97 (Exhibits 1006–1012), we must determine as a threshold matter whether FIPA97 is a prior art printed publication under 35 U.S.C. § 102(a) or § 102(b). *See* Pet. 22–24. Petitioner bears the burden of establishing by a preponderance of the evidence that FIPA97 is a printed publication. *See* 35 U.S.C. § 316(e); *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1375 (Fed. Cir. 2018); *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29 at 11 (PTAB Dec. 20, 2019) (precedential) (citing *Nobel Biocare*, 903 F.3d at 1375).

For purposes of instituting an *inter partes* review we accepted Petitioner’s contention, unchallenged in Patent Owner’s Preliminary Response, that FIPA97 was available as prior art as of October 1997, more than one year before January 5, 1999, the effective filing date of the ’115 patent. Inst. Dec. 39–41. Patent Owner, however, challenges that contention in its Patent Owner Response, and the parties further address the issue in Petitioner’s Reply and Patent Owner’s Sur-reply. *See* Resp. 45–65; Reply 17–29; Sur-reply 20–35.

The determination of whether a document is a "printed publication" under 35 U.S.C. § 102 "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' . . . ." *Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1355 (Fed. Cir. 2018) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). A reference is considered publicly accessible if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it.'" *Id.* at 1355–56 (quoting *In re Wyer*, 655 F.2d 221, 226 (CCPA 1981)).

In the discussion below, we begin with background information regarding FIPA and an overview of the evidence submitted by Petitioner in support of its contention that FIPA97 was publicly accessible in October 1997. The evidence includes extensive testimony from Dr. Finin, a professor who has personal knowledge of FIPA's activities and the development process of FIPA97. *See* Ex. 1049 ¶¶ 1–55 (Finin Decl.). Dr. Finin was one of the first two FIPA Fellows invited to provide "high quality and independent advice to FIPA." *Id.* ¶ 18 (quoting Ex. 1076, 1); Ex. 1025, 1; Ex. 1062, 1. The evidence also includes testimony from Petitioner's expert witness, Dr. Lieberman, and more than sixty documentary exhibits on which Petitioner relies to show that FIPA97 was

publicly accessible in late 1997 and early 1998. *See* Ex. 1003 ¶¶ 142–149 (Lieberman Decl.); Exs. 1021–1033, 1047, 1051–1105.

After providing an overview of the evidence, we consider the parties' arguments as to whether FIPA97 was publicly accessible before the January 5, 1999, critical date. For the reasons explained below, we determine that Petitioner has met its burden to show that FIPA97 was publicly accessible before the critical date.

*i. FIPA*

FIPA was a non-profit association based in Geneva, Switzerland, created to promote agent-based technology and develop open standards. Ex. 1006, iv (FIPA 97 Specification Version 1.0, Part 1, Foreword); Ex. 1049 ¶ 3. Founded in 1996, FIPA's membership included numerous technology companies, educational institutions, and governmental entities. Ex. 1049 ¶ 3. As of October 1997, FIPA had thirty-five corporate members representing twelve countries.[3] Ex. 1006, iv. According to FIPA documentation, membership was "open to any corporation and individual firm, partnership, governmental body or international organi[z]ation without restriction." *Id.* FIPA stated its intent "to make the results of its activities available to all interested parties." *Id.* Throughout its tenure, FIPA produced standards designed to promote and advance agent-based technology. Ex. 1049 ¶ 3. In 2005, FIPA was incorporated into the Institute of Electrical and Electronics Engineers (IEEE) as one of its standards committees. *Id.*

---

[3] The corporate members included Alcatel, British Telecommunications, Deutsche Telekom, France Telecom, Hitachi, Hewlett-Packard, IBM, NEC, NTT, Nortel, Siemens, and Toshiba. *See* Ex. 1095, 22.

*ii. Development of FIPA97*

The process of drafting the FIPA 97 specification began with FIPA's first meeting in London in April 1996. Ex. 1049 ¶ 6; Ex. 1058 (Main results of London meeting); Ex. 1066 (Resolutions of London meeting). Representatives from twenty-six companies and organizations attended. Ex. 1066, 1. At the meeting, the members agreed on FIPA's mission, drafted statutes and operational principles, and produced a work plan for a specification that would become FIPA 97. Ex. 1058, 1; Ex. 1066, 1–3; Ex. 1049 ¶ 6. The work plan set a December 1997 target for producing a first completed specification. Ex. 1066, 2–3; Ex. 1049 ¶ 7.

FIPA subsequently held several meetings in 1996 and 1997. At the second meeting in June 1996 in Yorktown Heights, NY, FIPA approved several documents, including a framework for FIPA activity and a list of requirements for FIPA-specified agent capabilities. Ex. 1067, 1 (Resolutions of Yorktown meeting); Ex. 1060, 1 (Results of Yorktown meeting); Ex. 1049 ¶ 9. At the third meeting in October 1996 in Tokyo, FIPA approved a final work plan calling for production of a FIPA specification in October 1997. Ex. 1049 ¶ 11; Ex. 1070, 1 (work plan); Ex. 1023 (Results of Tokyo meeting). Also at the Tokyo meeting, FIPA produced its First Call for Proposals, which outlined in detail three technology parts (corresponding to Parts 1–3 of FIPA 97) and four application parts (corresponding to Parts 4–7 of FIPA 97). Ex. 1069, 1–27 (First Call for Proposals); Ex. 1049 ¶ 12.

In 1997, FIPA began to produce draft specifications. At the fourth meeting in January 1997 in Turin, Italy, FIPA publicly released drafts of Parts 1–4 and posted them on the FIPA home page

(http://drogo.cselt.stet.it/fipa). Ex. 1021, 1 (Results of Turin meeting); Ex. 1049 ¶ 13. Additionally, FIPA released a Second Call for Proposals at the Turin meeting. Ex. 1071, 1–3 (Second Call for Proposals); Ex. 1049 ¶ 13. At the fifth meeting in April 1997 in Reston, VA, FIPA produced drafts of Parts 1–7, which were publicly released and posted on the FIPA home page. Ex. 1024 (Results of Reston meeting); Ex. 1061 (Resolutions of Reston meeting); Ex. 1049 ¶ 17. At the sixth meeting in June 1997 in Cheju Island, South Korea, FIPA publicly released revised drafts of Parts 1–7 and posted them on the FIPA home page. Ex. 1025, 1 (Results of Cheju meeting); Ex. 1062, 5 (Resolutions of Cheju meeting); Ex. 1049 ¶ 19. According to Dr. Finin, the Reston Draft and Cheju Draft were substantially complete versions of what would become FIPA 97. Ex. 1049 ¶¶ 17, 19.

Dr. Finin testifies that news of FIPA and its standardization efforts "spread quickly throughout the relatively small community of software agent researchers." Ex. 1049 ¶ 8. For instance, the AgentWeb website, "a meeting place for researchers in agent-based technology from 1995–2000," was home to a "Software Agents" mailing list and a newsletter that had more than 1,300 subscribers in 1996. *Id.*; Ex. 1089, 5. Dr. Finin was "the founder, author, and a subscriber" of the AgentWeb newsletter. Ex. 1049 ¶ 8. The widely distributed AgentWeb newsletters announced upcoming FIPA meetings, reported results of previous meetings, including calls for proposals, and provided links to the specification drafts posted on the FIPA home page. *See id.* ¶¶ 8, 10, 12, 14, 17, 19.

For example, the AgentWeb newsletter dated May 11, 1996, announced the upcoming FIPA June 1996 Yorktown meeting, described as the "FIPA Opening Forum." Ex. 1090, 5; Ex. 1049 ¶ 8. The purpose of the

meeting, as stated in the newsletter, was to "refine the list of basic agent capabilities candidate for FIPA specification; compile a first list of agent capabilities intended for specification by end 1997; and establish the first working groups." Ex. 1090, 5. Likewise, the AgentWeb newsletter dated August 12, 1996, advertised the FIPA October 1996 Tokyo meeting. Ex. 1088, 1; Ex. 1049 ¶ 10. Thereafter, the AgentWeb newsletter dated October 14, 1996, publicized the Call for Proposals issued at the October 1996 Tokyo meeting and provided the deadline for submission of proposals to be considered at the Turin meeting in January 1997. Ex. 1087, 1; Ex. 1049 ¶ 12. FIPA had decided that respondents who submitted proposals would be invited to the January 1997 meeting to present their proposals even if they were not FIPA members. Ex. 1023, 1; *see* Ex. 1069, 27.

Once FIPA began to produce drafts of the specification, AgentWeb newsletters announced those drafts and provided links to access them. The AgentWeb newsletter dated February 2, 1997, reported that "[i]nitial specifications for three technology parts (Agent Management, Agent Communication and Agent/Software Interaction) and one application part (Personal Travel Assistance) have been produced" at the recent Turin meeting. Ex. 1091, 1; Ex. 1049 ¶ 14. The newsletter included a freely accessible and public link to access the draft. Ex. 1049 ¶ 14 (citing Ex. 1091, 1–2). It also indicated that drafts of the remaining three specification parts would be generated at the FIPA meeting to be held in April 1997 in Reston. Ex. 1091, 1–2. A subsequent AgentWeb newsletter dated April 13, 1997, advertised the upcoming Reston meeting and

contained links to information about the meeting on the FIPA website. Ex. 1092, 3; Ex. 1049 ¶ 17.

On May 5, 1997, following the Reston meeting, an AgentWeb newsletter reported that attendees of that meeting produced a revised draft including all seven parts of the specification. Ex. 1093, 2; Ex. 1049 ¶ 17. The newsletter contained individual public links to the seven parts and invited "both members and non-members" to comment, providing an email address for submission. Ex. 1093, 2; Ex. 1049 ¶ 17. Additionally, the newsletter announced the dates and locations of the next two meetings—the June 1997 Cheju meeting and the seventh meeting to take place in Munich on October 6–10, 1997. Ex. 1093, 2. Similarly, the AgentWeb newsletter dated June 30, 1997, announced that the Cheju meeting resulted in revised versions of the FIPA specification documents and provided direct links to the seven parts. Ex. 1094, 1–2; Ex. 1049 ¶ 19. Again, the newsletter stated that FIPA invited comments and that non-members making substantial comments would be invited to attend the October 1997 Munich meeting. Ex. 1094, 2. Dr. Finin was among those who submitted comments on the Cheju draft. Ex. 1073; Ex. 1049 ¶ 20.

Meanwhile, the AgentWeb Software Agents mailing list also provided information regarding FIPA's efforts to the community of software agent researchers. *See* Ex. 1049 ¶ 8. Dr. Finin was an organizer of and contributor to the Software Agents mailing list. *Id.* On May 2, 1996, a posting to the mailing list referenced the upcoming June 1996 FIPA meeting in Yorktown Heights, New York. Ex. 1079, 1; Ex. 1049 ¶ 8. Members of the Software Agents mailing list posted comments regarding the Turin draft after it was released publicly. Exs. 1078, 1081, 1082; *see* Ex. 1049 ¶¶ 14–

15. Dr. Finin was among those who shared their thoughts. *See* Ex. 1082; Ex. 1049 ¶ 15. A posting after the Reston meeting included a public and open link to access the Reston draft and invited comments from the mailing list. Ex. 1083, 1; Ex. 1049 ¶ 17.

*iii. Public Release of FIPA97*

FIPA's seventh meeting took place in Munich on October 6–10, 1997. Ex. 1026 (Resolution of Munich meeting); Ex. 1049 ¶ 20. At this meeting, FIPA incorporated final edits and comments and approved the FIPA 97 specification for publication. Ex. 1026, 1, 5; Ex. 1049 ¶ 20. The specification as approved at the meeting was called "FIPA 97 ver. 1.0," or FIPA 97 Version 1.0. Ex. 1026, 5. Working groups for various parts of the specification were given about one month to check for consistency and make minor edits. *Id.* at 2; Ex. 1049 ¶ 20.

An "initial" version of FIPA 97 Version 1.0, approved at the Munich meeting and dated October 10, 1997, was posted to the FIPA website, housed at the time at http://drogo.cselt.stet.it/fipa. Ex. 1049 ¶¶ 20–21. According to Dr. Finin, the specification documents were available online and free for anybody to access by sometime in October 1997. *Id.* ¶ 21. On November 18, 1997, an AgentWeb newsletter announced completion of FIPA 97 Version 1.0 and its publication on the FIPA website. Ex. 1086, 1–2; Ex. 1049 ¶ 21. The newsletter provided individual, direct links to the seven parts of the specification on the FIPA website. Ex. 1086, 1–2. The links were not password protected and were open to the public without a requirement for secrecy or confidentiality. Ex. 1049 ¶ 21. As with the earlier AgentWeb newsletters, the newsletter containing links to FIPA 97 Version 1.0 was sent to more than 1,300 subscribers. *Id.*

Dr. Finin testifies that in late 1997, "a few weeks after the Munich meeting," he accessed the approved FIPA 97 Version 1.0 posted on the FIPA website. *Id.* ¶¶ 20–21. He specifically recalls accessing the documents in late 1997 to review the first major work product of FIPA and to prepare for FIPA's upcoming January 1998 meeting in Palo Alto, which he attended. *Id.* ¶ 21 (citing Ex. 1074). Dr. Lieberman also testifies that he recalls FIPA 97 Version 1.0 being publicly available on the FIPA website throughout late 1997 and early 1998 and that he accessed it in late 1997 as a member of the interested public. Ex. 1003 ¶ 146.

The release of FIPA 97 Version 1.0 was well publicized in the weeks after the Munich meeting. Ex. 1049 ¶ 22. For example, on October 20, 1997, the EETimes featured an article reporting FIPA's approval of the FIPA 97 specification. Ex. 1095, 22; *see* Ex. 1049 ¶ 22. The article was based on an interview with Leonardo Chiariglione, the president of FIPA. Ex. 1095, 22. The article described the seven parts of the specification: "The first three parts cover different aspects of agent behavior: agent management; agent communication; and agent-software interaction. The four remaining parts, which cover application areas . . . are: personal travel assistance; personal assistant; audio-visual entertainment and broadcast; and network provision and management." *Id.* After describing FIPA's plans for 1998, including testing of FIPA 97 Version 1.0 to provide input for a further round of standardization, the article referred readers to the FIPA website for information regarding the released specification: "CSELT[4] maintains

---

[4] Centro Studi e Laboratori Telecommunicazioni, Dr. Chiariglione's employer at the time. *See* Ex. 1095, 22.

extensive information on FIPA's activities at www.cselt.stet.it/fipa."[5] *Id.* (emphasis omitted). It concluded with a quote from Dr. Chiariglione regarding the specification's public availability: "'It is our policy to make the standard freely available over the Internet,' Chiariglione said. 'FIPA will retain the copyright but it will be free for others to use.'" *Id.*

The November-December 1997 issue of IEEE Internet Computing also announced the release of the FIPA 97 specification: "The Foundation for Intelligent Physical Agents, a non-profit organization established to promote emerging agent-based applications, has released its first specification. Named FIPA 97, the specification will provide a benchmark for interoperable products." Ex. 1096, 93; Ex. 1049 ¶ 22. The news brief directed readers to the FIPA website for the text of the specification. Ex. 1096, 93 ("The text is available at http://drogo.cselt.stet.it.fipa/."[6]); Ex. 1049 ¶ 22.

Sometime after the Munich meeting, FIPA also produced a hardcopy book version of the FIPA 97 Version 1.0 specification to be sent to FIPA members and various institutions and standards groups. Ex. 1049 ¶ 24; *see* Ex. 1026, 1; Ex. 1063, 1 (Resolution of the Palo Alto meeting, Jan. 29, 1998). At least two copies of the book were available in libraries in January 2019. Ex. 1049 ¶ 24; Ex. 1057, 1 (WorldCat catalog entry for "Fipa specification : Version 1.0"); Ex. 1055 (cover page and table of contents of each part in copy at library in Italy); Ex. 1056 (cover page and table of

---

[5] The record suggests this website (http://www.cselt.stet.it/fipa) was a mirror of the FIPA website (http://drogo.cselt.stet.it/fipa) in 1997. *See* Ex. 1049 ¶ 22; Ex. 1095, 22; Tr. 94:11–14.
[6] The URL provided in the article contains a typographical error. *See* Ex. 1049 ¶ 22 (correcting the URL to http://drogo.cselt.stet.it[/]fipa/).

contents of Part 1 in copy at library in Switzerland). Dr. Finin testifies that the books contain the November 28, 1997, edited version of FIPA 97 Version 1.0, which "only made minor edits (mostly spelling and formatting) over the October 10, 1997 version." Ex. 1049 ¶ 25 (citing Ex. 1055, 5 (Part 2 "Publication date" of November 28, 1997); Ex. 1056).

*iv. Publications and Patents*

In late 1997 and 1998, several papers reviewing and outlining the FIPA 97 specification were published and presented at meetings. *See* Ex. 1049 ¶¶ 26–30. A paper dated December 1997 memorializes a presentation made to a meeting on Intelligent Agent Technology organized by the EPSRC[7] Community Club in Advanced Computing Techniques. Ex. 1097, Cover ("Dickinson");[8] *see* Ex. 1049 ¶ 26. This paper outlines the background and rationale for the creation of an agent interoperability standard. Ex. 1097, 1–3. It also describes the development history of the FIPA 97 specification, noting that FIPA's work program "culminated in the publication of an initial draft standard, FIPA 97, at the Munich meeting in October 1997." *Id.* at 3. Dickinson further provides that "[a]ll FIPA documents and meeting outputs are publicly available on the web" at "http://drogo.cselt.stet.it/fipa/," and "comments and review have been sought at each stage of the process." *Id.* at 3, 7 n.9. The paper then describes the

---

[7] "The Engineering and Physical Sciences Research Council (EPSRC) is the main funding body for engineering and physical sciences research in the UK." Engineering and Physical Sciences Research Council, epsrc.ukri.org/about (last visited Sept. 28, 2020).
[8] Ian J. Dickinson, *Agent Standards*, HP Laboratories Bristol, HPL-97-156 (Dec. 1997).

features of the specification's three substantive technical sections, Parts 1–3. *Id.* at 3–6.

Similarly, a 1998 paper titled "Industrial Applications of Multi-Agent Technology" summarizes FIPA's background and presents an overview of the three technical parts (i.e., Parts 1–3) of FIPA 97 Version 1.0 released in October 1997. Ex. 1099, 12–13 ("Steiner");[9] *see* Ex. 1049 ¶ 28. The Steiner paper provides the FIPA website address and explains that the four application parts (i.e., Parts 4–7) will be used in field trials to gather information to be incorporated into a revised version of FIPA 97. Ex. 1099, 13 & n.1.

Likewise, a paper titled "FIPA — towards a standard for software agents" appearing in the July 1998 issue of the BT Technology Journal explains the motivation for an agent standard and provides an overview of FIPA's background and activities. Ex. 1100, 51–52 ("O'Brien");[10] *see* Ex. 1049 ¶ 29. It then describes the different parts of the FIPA 97 Version 1.0 specification issued in October 1997. Ex. 1100, 51–52.[11]

Dr. Finin cites several other publications that reference FIPA's development of an agent communication standard in the 1997–98 timeframe.

---

[9] Donald Steiner, Siemens AG, *Industrial Applications of Multi-Agent Technology* (IEEE 1998).
[10] P.D. O'Brien & R.C. Nicol, *FIPA — towards a standard for software agents*, BT Tech. J. Vol. 16, No. 3 (July 1998).
[11] Dr. Finin testifies that O'Brien provides public links to FIPA97. Ex. 1049 ¶ 29. The copy of O'Brien entered into the record, however, appears to be missing several pages, including one containing endnotes 10–12 that might provide links to the FIPA website. *See* Ex. 1100, 52 ("FIPA97 (issued in October 1997) [10–12] is the first output from FIPA covering part of the requirements for an agent standard.").

Ex. 1049 ¶ 31 (citing Exs. 1027–29). Dr. Finin also identifies several patent applications in the same timeframe that refer to FIPA's agent communication language. *Id.* ¶ 32 (citing Exs. 1030–1033).

*v. FIPA97 Website*

Sometime in 1998, the FIPA website migrated from its original site (http://drogo.cselt.stet.it/fipa) to fipa.org. Ex. 1049 ¶ 23; *see also* Ex. 1026 (Resolution of Munich meeting indicating FIPA's plans for the "redesign of a new FIPA home page"); Ex. 1065, 4 (Resolutions of the Durham meeting in October 1998 indicating the website will be transferred to www.fipa.org). The fipa.org website still exists today even though FIPA is no longer active as a standalone organization. *See* Ex. 1049 ¶¶ 23, 48–49. The current FIPA website maintains a repository of past FIPA documents, including meeting notes, press releases, FIPA resolutions, and different versions of the FIPA specification. *Id.* ¶ 49.

Dr. Finin testifies that the "initial" version of FIPA 97 Version 1.0 (i.e., the specification posted on the FIPA website on October 10, 1997) "remained publicly accessible during all of FIPA's future activities and is still available on FIPA's home page today." *Id.* ¶ 21. According to Dr. Finin, Exhibits 1006–1012 (collectively referred to as FIPA97) are Parts 1–7 of FIPA 97 Version 1.0 as found on the current fipa.org website. *Id.* Based on his personal knowledge, Dr. Finin further testifies that Exhibits 1006–1012 are the "same version" and contain "the same disclosures, content and information" as Parts 1–7 of FIPA 97 Version 1.0 that were publicly available on the FIPA website (http://drogo.cselt.stet.it/fipa) on October 10, 1997, and which Dr. Finin himself accessed in late 1997. *Id.* ¶¶ 21, 34. He also notes that although Exhibit 1006 has a typographical error relating to the version number in the

header of its odd pages,[12] Exhibit 1006 is identical to the version of Part 1 of FIPA 97 Version 1.0 that was released on October 10, 1007. *Id.* ¶ 21. Additionally, as evidence that FIPA 97 Version 1.0 has been continuously available on fipa.org since the website migration, Dr. Finin cites a set of Internet Archive records beginning in 2000 showing where each part of that version of the specification could be accessed. *Id.* (citing Ex. 1054).

Dr. Finin testifies that the original FIPA website, http://drogo.cselt.stet.it/fipa, remained live for several years after the website transitioned to fipa.org. Ex. 1049 ¶ 23. The Internet Archive Wayback Machine contains an archived screen capture of the website http://drogo.cselt.stet.it/fipa from December 1, 1998. *See* Ex. 1051; Ex. 1049 ¶¶ 23, 54. According to Dr. Finin, the archived page shows that the FIPA 97 specification was live and freely available on the FIPA website home page at that time. Ex. 1049 ¶ 23; Ex. 1051, 1 ("FIPA has already developed a seven-part specification called FIPA 97. Implementations of FIPA 97 are undergoing field trials that will last until October 1998 when version 2 of FIPA 97 will be produced."). The home page provided links (i.e., "FIPA 97") to actual specification documents, but those links have not been maintained in the archive. Ex. 1049 ¶ 23. Dr. Finin testifies that the screen capture from the Internet Archive is consistent with the mirror of the former FIPA site hosted by Leonardo Chiariglione. *Id.* ¶ 51 (citing Ex. 1103 (http://leonardo.chiariglione.or/standards/fipa/)). Dr. Chiariglione's mirror is still available, and documents hosted on the mirror are "accurate and

---

[12] The header on odd pages reads "FIPA 1997 Part 1: Version 2.4." *E.g.*, Ex. 1006, 3.

complete copies of FIPA documents that were available to FIPA members." *Id.*

*vi. Analysis*

Petitioner argues that FIPA97 was a publicly accessible printed publication as of October 10, 1997, when it was posted on the FIPA website. Pet. 23; Reply 15–21. More specifically, Petitioner argues that (1) FIPA 97 Version 1.0 was publicly accessible on October 10, 1997, and (2) the version of the FIPA specification found in Exhibits 1006–1012, referred to herein as FIPA97, is the same specification that was posted on the FIPA website on October 10, 1997, and named FIPA 97 Version 1.0. *See, e.g.*, Pet. 23 (arguing FIPA 97 Version 1.0 was publicly accessible in late 1997); Reply 15–17 (arguing that Exhibits 1006–1012 are the same documents that were made public as FIPA 97 Version 1.0). Patent Owner addresses the first contention when it argues the evidence does not show any version of FIPA 97 Version 1.0 was available on the FIPA website. *See, e.g.*, Resp. 69. It also challenges the second contention when it argues Petitioner has failed to show that Exhibits 1006–1012 are identical to the version of the FIPA specification that allegedly was publicly accessible before the critical date. *See, e.g.*, *id.* at 62–63. In our analysis below, we address the two questions in turn.

Considering all the facts and circumstances surrounding the development of FIPA 97 Version 1.0 and its publication on the FIPA website, we find that FIPA 97 Version 1.0 was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the art, exercising reasonable diligence, could locate it. *See Jazz Pharm.*, 895 F.3d at 1355–56. First, the uncontested evidence shows that members of the relevant public (i.e., persons of ordinary skill in the field of software

agent-based technology) knew of the release of FIPA 97 Version 1.0 in late 1997, prior to the critical date. As detailed above, FIPA was open to corporations and educational and governmental organizations without restriction. Ex. 1006, iv. FIPA's members included many industry leaders whose employees attended FIPA meetings, including the October 1997 meeting in Munich where FIPA 97 Version 1.0 was approved for publication. *See id.*; Ex. 1095, 22. FIPA meetings and activities were publicized among the larger community of software agent researchers via the AgentWeb website and its associated Software Agents mailing list and AgentWeb newsletter, which had more than 1,300 subscribers. Ex. 1090, 5; Ex. 1088, 1; Ex. 1087, 1; Ex. 1091, 1–2; Ex. 1092, 3; Ex. 1093, 2; Ex. 1094, 1–2; Ex. 1086, 1–2; *see* Ex. 1049 ¶¶ 8, 10, 12, 14, 17, 19. The newsletter in particular informed subscribers of the development of the FIPA specification during 1996 and 1997 and provided detailed information regarding the release of FIPA 97 Version 1.0 in a November issue. Ex. 1086, 1–2. News articles in periodicals published in late 1997 also announced that FIPA had released and published FIPA 97 Version 1.0. Ex. 1095, 22; Ex. 1096, 93; *see* Ex. 1049 ¶ 22. In addition, the record contains several papers published in late 1997 and 1998, prior to the critical date, describing FIPA 97 Version 1.0 and its release in October 1997. *See* Ex. 1097, 1–7; Ex. 1099, 12–13; Ex. 1100, 51–52; Ex. 1049 ¶¶ 26–30; *see also* Ex. 1049 ¶¶ 31–32 (citing Exs. 1027–1033 (other publications and patents referring to FIPA specification)).

The evidence of record also demonstrates that members of the relevant public, exercising reasonable diligence, could have located FIPA 97 Version 1.0 in late 1997 on the FIPA website, housed at the time at

http://drogo.cselt.stet.it/fipa. FIPA published FIPA 97 Version 1.0 on its website at the conclusion of the Munich meeting on October 10, 1997, or shortly thereafter. *See* Ex. 1049 ¶ 20. In the several months leading up to the Munich meeting, persons of ordinary skill in the art would have known about the FIPA website through the widely distributed AgentWeb newsletters and the Software Agents mailing list, which provided website information or direct links to drafts of the specification and meeting announcements and reports. *See* Ex. 1091, 1–2; Ex. 1092, 3; Ex. 1093, 2; Ex. 1094; Ex. 1082, 1; Ex. 1083, 1. Therefore, people working in the field would have been sufficiently familiar with FIPA's activities and its website to look for FIPA 97 Version 1.0 on the FIPA website when it was posted after the Munich meeting. Indeed, both Dr. Finin, who was affiliated with FIPA, and Dr. Lieberman, who worked in the software agent field, testify that they accessed FIPA 97 Version 1.0 on the FIPA website in late 1997. Ex. 1049 ¶ 21; Ex. 1003 ¶ 146.

Moreover, the AgentWeb newsletter dated November 18, 1997, provided a link to the FIPA website and individual links to the seven parts of FIPA 97 Version 1.0 published on the website. Ex. 1086, 1–2; *see* Ex. 1049 ¶ 21. Thus, that issue of the newsletter provided more than 1,300 interested members of the public with direct access to FIPA 97 Version 1.0 at least as of November 18, 1997.

News articles and papers published in late 1997 also provided readers with the website address where FIPA 97 Version 1.0 could be found. *See* Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9. The news articles in particular likely reached a very wide audience because they appeared in publications directed to subject matter broader than agent-based technology. *See*

Ex. 1095 (EETimes); Ex. 1096 (IEEE Internet Computing). The EETimes article was dated October 20, 1997, suggesting that FIPA 97 Version 1.0 was available on the FIPA website at least as of that date.

The undisputed evidence also demonstrates that FIPA 97 Version 1.0 was freely available on the FIPA website without a password or any other restrictions and access was not subject to any requirement or expectation of secrecy or confidentiality. *See* Ex. 1049 ¶ 21; Ex. 1095, 22; *see also* Ex. 1006, iv (stating FIPA intended to make its results available to all interested parties). This evidence further supports our finding that FIPA 97 Version 1.0 was publicly accessible in late 1997. *See Jazz Pharm.*, 895 F.3d at 1358–59; *Voter Verified, Inc. v. Premier Election Solutions, Inc.*, 698 F.3d 1374, 1380–81 (Fed. Cir. 2012); *MIT v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985).

Patent Owner's arguments, many of which attack pieces of evidence individually, do not persuade us that Petitioner has failed to show that FIPA 97 Version 1.0 was publicly accessible. First, Patent Owner argues that no evidence shows the original FIPA website (http://drogo.cselt.stet.it/fipa) existed prior to a December 1, 1998, Internet Archive capture. Resp. 54–55 (citing Ex. 1051). To the contrary, much of the documentary evidence from late 1997 and testimonial evidence identifies that website or its mirror as the FIPA website during the relevant time period. *See* Ex. 1049 ¶¶ 20–23; Ex. 1092, 3; Ex. 1093, 2; Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9. Notwithstanding the absence of an Internet Archive capture for the website from a date prior to December 1998, we find that, based on the totality of evidence in the record, the original FIPA website existed in late 1997.

Patent Owner also argues that none of the documents cited by Petitioner provide active links to FIPA 97 Version 1.0 and therefore are insufficient proof of public accessibility. Resp. 55–57; Sur-reply 30–33. Again, based on the totality of evidence in the record, including but not limited to the testimony of Dr. Finin that he accessed FIPA 97 Version 1.0 on the FIPA website in late 1997, we find that FIPA 97 Version 1.0 was available on the FIPA website at that time, notwithstanding the lack of active links today, more than twenty years later. Patent Owner finds fault with Dr. Finin's testimony on this point because he does not claim to have used any of the links in the AgentWeb newsletters to access FIPA 97 Version 1.0. Sur-reply 35 (citing Ex. 1049 ¶ 21). Patent Owner, however, overlooks Dr. Finin's testimony that he was the founder and author of the AgentWeb newsletter, implying that he created the links in the newsletter. *See* Ex. 1049 ¶ 8. Therefore, based on Dr. Finin's personal knowledge regarding the links in the AgentWeb newsletter dated November 18, 1997, and the other evidence corroborating his testimony, we find that FIPA 97 Version 1.0 was available on the FIPA website in late 1997.

Patent Owner further asserts that, to the extent the Internet Archive capture from December 1998 provides an operable download link, it links to Version 2.0 of the FIPA 97 specification. Resp. 55–56 (citing Ex. 1051). It is not surprising, however, that FIPA's website in December 1998 provided links to FIPA 97 Version 2.0, which FIPA released in October 1998 to provide minor updates to two parts of the specification. *See* Ex. 1049 ¶ 35; Ex. 1053, vi. In any event, the December 1998 Internet Archive capture at least shows that the FIPA website was live at that time, which was prior to the critical date. *See* Ex. 1049 ¶ 23 (citing Ex. 1051, 1).

In its Sur-reply, Patent Owner argues for the first time that Petitioner has not demonstrated that a person of ordinary skill in the art in 1997 could have found FIPA 97 Version 1.0 using search tools or that the FIPA website was indexed so the specification could be located. Sur-reply 30–33. Further, Patent Owner argues that the existence of different FIPA websites at various times would have made it even more difficult to find the correct version of the FIPA specification without sufficient indexing or search tools. *Id.* at 32–33.

Even if we consider this late argument, we find it unpersuasive. As detailed above, the uncontested evidence shows that the address of the FIPA website itself was widely known among those skilled in the art and that FIPA routinely provided links to the FIPA specification on the website's home page. *See* Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9; Ex. 1051, 1; Ex. 1021, 1; Ex. 1025, 1. The November 1997 AgentWeb newsletter also provided direct links to FIPA 97 Version 1.0. Ex. 1086, 1–2. Under these circumstances, we find that a member of the interested public could have found FIPA 97 Version 1.0 without search tools or indexing by using the links in the AgentWeb newsletter or navigating to the well-known FIPA website home page. We also find that the record, including Dr. Finin's testimony, satisfactorily explains the various FIPA websites and website addresses over time and clearly identifies the FIPA website that was being used in late 1997. *See* Ex. 1049 ¶¶ 22–23, 48–49, 51.

Having determined that FIPA 97 Version 1.0 was publicly accessible on the FIPA website in late 1997, as early as October 10 and no later than November 18, we turn to whether Exhibits 1006–1012 (collectively referred to as FIPA97) contain the same version of the FIPA specification that was

available on the FIPA website during that timeframe. Dr. Finin testifies that Exhibits 1006–1012, documents available on the current FIPA website (fipa.org) and identified as FIPA 97 Version 1.0, are the same version with the same content as Parts 1–7 of FIPA 97 Version 1.0 that were released at the FIPA Munich meeting on October 10, 1997, and were publicly available on the FIPA website (http://drogo.cselt.stet.it/fipa) in late 1997. Ex. 1049 ¶¶ 21, 34.

As an initial matter, the October 10, 1997, date on the cover pages of several parts of FIPA97 supports Dr. Finin's testimony that FIPA97 is the same as FIPA 97 Version 1.0 as published on the FIPA website in late 1997. *See* Ex. 1006, Cover; Ex. 1007, Cover; Ex. 1008, Cover; Ex. 1010, Cover; Ex. 1012, Cover; *see also* Ex. 1009, Cover (Part 4 identifying a 1997 copyright date); Ex. 1011, Cover (Part 6 identifying a 1997 copyright date). Patent Owner contends that Petitioner cannot rely on the date stamps or copyright notices on Exhibits 1006–1012 to establish public accessibility because they are hearsay. Resp. 47. We agree with Petitioner that Patent Owner has waived this argument because it did not raise an objection on evidentiary grounds pursuant to 37 C.F.R. § 42.64(b)(1). *See* Reply 18. Furthermore, we agree with Petitioner that the dates on the cover pages are not hearsay because they are evidence tending to show that FIPA97 is identical to FIPA 97 Version 1.0, not statements offered to show Exhibits 1006–1012 were published on a certain date. *See id.* (citing *Apple Inc. v. VirnetX Inc.*, IPR2016-01585, Paper 32 at 58 (PTAB Feb. 20, 2018)).

Patent Owner also argues that Petitioner cannot rely on the cover page dates alone as proof of the documents' public accessibility. Sur-reply 23–26. The date stamps, however, are only part of the totality of evidence

offered by Petitioner to establish public accessibility. As such, they are relevant evidence supporting a finding that FIPA97 was publicly accessible. *See Hulu*, Paper 29 at 17–18 (citing *Nobel Biocare*, 903 F.3d at 1377).

Patent Owner argues that the existence of multiple versions of FIPA 97 Version 1.0 undercuts Petitioner's position and Dr. Finin's testimony that Exhibits 1006–1012 are the version of FIPA 97 Version 1.0 that was publicly accessible in late 1997. *See* Resp. 50–53. For example, Patent Owner points to Dr. Finin's description of the version released on October 10, 1997, as an "initial" version, after which final minor edits were to be made. Resp. 49–50 (citing Ex. 2013, 86:11–15, 88:9–89:25); *see* Ex. 1049 ¶ 21. Patent Owner cites an Internet Archive capture in the record referring to "FIPA 97 specification ver. 1.0 (Reston meeting)." Resp. 50–51 (citing Ex. 1105, 27). Patent Owner also cites evidence, including Dr. Finin's testimony, that a different version of FIPA 97 Version 1.0 was published in hardcopy books. *Id.* at 51 (citing Exs. 1055, 1056; Ex. 1049 ¶ 25 (stating that "FIPA printed the November 28, 1997, edited version of the specification" in the books)).

Patent Owner argues that because these various versions of FIPA 97 Version 1.0 have not been substantively introduced into evidence so that the differences can be ascertained, Petitioner has not shown that Exhibits 1006–1012 are the version that was publicly accessible on the FIPA website in late 1997. *See* Resp. 52–53. We disagree. Dr. Finin testifies that Exhibits 1006–1012 are the same documents that were released at the conclusion of the FIPA meeting in Munich on October 10, 1997, and were made publicly available at the time. Ex. 1049 ¶¶ 21, 34. Other evidence of record corroborates Dr. Finin's testimony and adequately explains the

multiple versions of the specification. *See* Reply 17–21. As set forth in detail above, FIPA released a version of FIPA 97 Version 1.0 on October 10, 1997, and made it available on the FIPA website soon thereafter. *See* Ex. 1049 ¶ 21; Ex. 1086, 1–2; Ex. 1095, 22; Ex. 1096, 93. It is clear from the record that any earlier versions of the specification, such as the version made available after the Reston meeting six months before FIPA 97 Version 1.0, were drafts made available for public comment. *See* Reply 17; Ex. 1049 ¶¶ 16–18; Ex. 1024; Ex. 1061.

The record also shows that the version published in book form is a later version, dated November 28, 1997, containing minor formatting and clerical edits. *See* Ex. 1049 ¶ 25; Ex. 1055, 5. Petitioner does not rely on the book version as a prior art reference or assert that it was publicly accessible. The hardcopy book excerpts in the record merely corroborate Dr. Finin's testimony that FIPA's activities and release of the FIPA specification were known in the art. *See* Ex. 1049 ¶ 24.

Patent Owner also points to the erroneous header on odd pages in Exhibit 1006 as calling into question which version of the specification is in Exhibits 1006–1012. Resp. 52. We credit Dr. Finin's unrebutted testimony that the header on some pages in Exhibit 1006 is a typographical error. *See* Ex. 1049 ¶ 21. Patent Owner has not cited, nor do we see, evidence in the record suggesting a FIPA 97 Version 2.4 was made publicly available.

Patent Owner finds fault with Exhibits 1006–1012 because they were obtained after the critical date and could not have been obtained from a website prior to the critical date. In his declaration, Dr. Finin testifies that Exhibits 1006–1012 are available on the FIPA website today (i.e., fipa.org), and the earliest Internet Archive record of the relevant website pages shows

the documents were posted in 2000. Ex. 1049 ¶ 21 (citing Ex. 1054). Patent Owner contends that in his deposition Dr. Finin acknowledged that Exhibits 1006–1012 could have been obtained from files saved in the Internet Archive between 2003 and 2004. Resp. 61–62. In either case, Patent Owner argues, the dates are after the critical date of the '115 patent. We agree with Petitioner, however, that the date Exhibits 1006–1012 were obtained is immaterial if they are digital copies of documents that are shown to have been publicly accessible before the critical date. *See* Reply 19 (citing *In re Wyer*, 655 F.2d at 226–27).

Finally, Patent Owner argues that the testimony of Dr. Finin and Dr. Lieberman is conclusory, unreliable, and uncorroborated and therefore insufficient to establish public accessibility. Resp. 57–60. "[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest." *Nobel Biocare*, 903 F.3d at 1377–78 (quoting *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1369 (Fed. Cir. 1999)). This corroboration requirement applies when relying on witness testimony to establish public accessibility of a prior art reference. *See id.* at 1377–81; *Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158–60 (Fed. Cir. 2004). Corroborating evidence may include documentary or testimonial evidence, and circumstantial evidence may provide sufficient corroboration. *Nobel Biocare*, 903 F.3d at 1378. Determining whether testimony has been corroborated "involves an assessment of the totality of the circumstances including an evaluation of all pertinent evidence." *Id.*

We are not persuaded by Patent Owner's argument regarding the testimony of Dr. Finin and Dr. Lieberman. Dr. Finin's testimony is based on

his personal knowledge as someone who was directly involved in FIPA's activities by submitting comments on draft specifications and attending meetings, for example, and providing independent advice as a FIPA Fellow. His testimony that FIPA approved FIPA 97 Version 1.0 at the Munich meeting on October 10, 1997, and posted it to the FIPA website so that it was publicly accessible is corroborated by the evidence in the record of the facts and circumstances surrounding the development and release of the specification as analyzed above. Dr. Lieberman's testimony that as a member of the interested public he accessed FIPA 97 Version 1.0 in late 1997 is corroborated by the same evidence.

As for Dr. Finin's testimony, based on his personal knowledge, that Exhibits 1006–1012 are the same as the version of FIPA 97 Version 1.0 that was publicly accessible on the FIPA website in late 1997, we find it to be credible and corroborated by other evidence of record. We are not persuaded that Dr. Finin's inability to recall many of the details of a 300-page specification more than twenty years after it was created undermines his testimony. Furthermore, we find that the evidence discussed above, including the identification of Exhibits 1006–1012 on their cover pages or elsewhere as FIPA 97 Version 1.0 with a date of October 10, 1997, corroborates Dr. Finin's testimony that the version of the specification in Exhibits 1006–1012 is the version that was publicly accessible on the FIPA website in late 1997, and not some other version of the FIPA specification.

For these reasons, we find that a preponderance of the evidence shows that Exhibits 1006–1012 are the version of FIPA 97 Version 1.0 released on October 10, 1997, and posted on the FIPA website in late 1997. As discussed above, a preponderance of the evidence shows that the October 10,

1997 version of FIPA 97 Version 1.0 was publicly accessible in late 1997. Accordingly, we find that Petitioner has met is burden to show that FIPA97, submitted as Exhibits 1006–1012 and relied on by Petitioner in its unpatentability challenges, was publicly accessible prior to the critical date of January 5, 1999, and therefore is available as prior art to the ’115 patent under 35 U.S.C. § 102(a).

*4. Obviousness over Kiss and FIPA97*

Petitioner asserts claims 61–63 and 70–85 are unpatentable as obvious under 35 U.S.C. § 103 over the combination of Kiss and FIPA97. Pet. 31–72. Petitioner argues, "FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system." Pet. 27. Petitioner explains, "[t]hese techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging." *Id.* (citing Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1). Petitioner asserts, "[w]here the two systems disclose analogous functionality, such as facilitating cooperation and agent registry, their techniques are combined, as a Skilled Artisan would understand that to be an efficient and common sense way to implement the combined system in order to obtain the benefits of both, and therefore be motivated to do so." *Id.* (citing Ex. 1003 ¶¶ 217–219).

*5. Motivation to Combine Kiss and FIPA97*

Petitioner argues the proposed combination of Kiss and FIPA97 would have been obvious for several reasons. Petitioner argues Kiss, FIPA97, and the ’115 Patent are analogous art, because "each is directed to the same field of endeavor, *i.e.,* distributed computing environments generally and architectures for communication and cooperation among

distributed electronic agents specifically." Pet. 28 (citing *e.g.,* Ex. 1001, 1:25–29; Ex. 1005, Abstract; Ex. 1007, Foreword, 1; Ex. 1003 ¶ 220). Petitioner also argues, "FIPA97 and Kiss are reasonably pertinent to the problem addressed by the '115 Patent—*e.g.,* the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 28 (citing Ex. 1001, 4:34–40; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1003 ¶ 221).

Petitioner argues,

> [i]t would have been obvious to make this combination because to do so would have been the arrangement of old elements (*i.e.*, the functionality of FIPA97, and the system of Kiss) with each performing the same function it had been known to perform (communication between distributed agents (FIPA97v1)); cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate to conduct cooperative task completion and problem solving).

Pet. 28 (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1003 ¶ 222).

Petitioner also argues it

> would have been obvious because a Skilled Artisan would have known that agents, such as in Kiss, must use a common communications protocol, i.e., an inter-agent communication language, and related management functionality, and therefore would have been motivated to consider and employ one of the available inter-agent communications languages and its related functionality, and because doing so would have been a convenient and efficient way to facilitate effective communication between agents.

Pet. 28–29 (citing Ex. 1003 ¶ 223; Ex. 1020, 2; Ex. 1046, 50).

Petitioner further argues,

> a Skilled Artisan would also have been motivated based on earlier descriptions of KQML's similar use of an inter-agent

> communication language, their disclosure that '[t]here are several levels at which agent-based systems must agree, at least in their interfaces, in order to successfully interoperate: Transport … Language … Policy … Architecture,' and their disclosure of the necessity of a robust inter-agent communication language in a system like Kiss.

Pet. 29 (citing Ex. 1016, Abstract, 4, 29, 30; Ex. 1006, 7; Ex. 1007, 40–42; Ex. 1005, Abstract; Ex. 1003 ¶¶ 224–226).

Petitioner argues it "would also have been obvious to try this combination because the necessity of a common inter-agent communication language was a known design need in a system such as Kiss, and there were only a small number of identified, predictable solutions to that need, such as FIPA ACL." Pet. 29 (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1035, 1; Ex. 1003 ¶ 227).

Petitioner also argues,

> [a] Skilled Artisan would have been further motivated to make the combination because of the known advantages of FIPA97, including that it specifies, 'key agents necessary for the management of an agent system, the ontology necessary for the interaction between systems, and it defines also the transport level of the protocols.'

Pet. 29–30 (citing Ex. 1035, 1; Ex. 1003 ¶ 229).

"Further," Petitioner argues:

> a Skilled Artisan would have been motivated to make the combination because FIPA97 represented a substantial attempt to formulate an industry standard designed to encourage interoperability and uniformity amongst agent systems. A Skilled Artisan would have understood that agent systems that complied with such a standard would be more likely to be interoperable with other systems and would likely have more resources available.

Pet. 30 (citing Ex. 1007, vii; Ex. 1047; Ex. 1003 ¶ 230).

Petitioner argues,

> [a] Skilled Artisan would have been further motivated to include the administrative functionality and exemplary practices described in FIPA97 with Kiss because the description of such functionality and practices in FIPA97 suggests that their use with the FIPA ACL would be advantageous and workable. [A] Skilled Artisan would also have been motivated to employ such additional functionality and practices in the combined system in order to obtain the full benefit of using FIPA ACL.

Pet. 30 (citing Ex. 1003 ¶ 231).

Finally, Petitioner argues, "a Skilled Artisan could have made the combination cited above without undue experimentation including because by January 1999 the components parts of this combination were well-known, conventional technology and because others had combined FIPA97v1 technology with agent systems." Pet. 30–31 (citing Ex. 1007; Ex. 1016; Ex. 1030; Ex. 1003 ¶ 228).

Patent Owner asserts that "Petitioner utterly defaults in offering any reason to combine *Kiss* and *FIPA97*." Resp. 116. Patent Owner argues that Petitioner's motivation to combine Kiss and FIPA97 suffers from "hindsight bias" and that Petitioner "offers no reason or explanation that a person of skill in the art looking at *Kiss* would be motivated to find a particular language with the characteristics of *FIPA97's* ACL." *Id.* Patent Owner also argues that Petitioner does not "explain what 'efficiencies' a person of ordinary skill in the art would be looking for" and "fails to identify **how** the combination could be achieved." *Id.* at 116–117.

Patent Owner argues that "[e]ven if the combination of the *Kiss* meta-agent and the *FIPA97* Directory Facilitator had disclosed the claimed facilitator agent (it did not), Petitioner fails to offer any reason that a person of ordinary skill in the art would have been motivated to do so." *Id.* at 79. Patent Owner argues, "Petitioner offers no reason that the meta-agent of *Kiss*

would need any capability offered by *FIPA97*." *Id.* "Indeed," Patent Owner argues, "*Kiss* itself already includes a registry." *Id.*

Patent Owner also argues that the "Petition says nothing" about how to combine FIPA97's Directory Facilitator and Kiss' meta-agent. *Id.* at 80. Patent Owner argues the "two architectures look quite different," and that "Petitioner offers no articulation of how to add [FIPA Directory Facilitators] to any of the *Kiss* layers." *Id.* at 81.

Patent Owner argues:

> If *Kiss's* meta agents were replaced by or combined with *FIPA's* [Directory Facilitators] in some way, like the Petition suggests, the directory service provided by the [Directory Facilitators] would clash with the duplicate and potentially conflicting services provided by the existing agent service layer. Other agents in *Kiss* would either be unable to obtain the registry services or would receive duplicate and/or contradictory answers, resulting in an inoperative device.

*Id.* at 82 (citations omitted).

Patent Owner also argues that Petitioner's combination of FIPA97, Kiss and Cohen "is emblematic of hindsight bias" because Dr. Lieberman "picks and chooses elements" and "superimposes them into one figure in an attempt to 'show' the combination." *Id.* at 84. Patent Owner argues that "simply drawing in block diagrams with terminology from other references into one cobbled diagram is insufficient as a matter of law without any explanation of how such a combination could be achieved or, indeed, why." *Id.* at 84–85.

In Reply, Petitioner argues that Patent Owner "ignores the several pages of analysis supported by expert testimony (including citations to evidence in the prior art) articulating the rational underpinning of the combination" of Kiss and FIPA97. Reply 30 (citing Pet. 28–32). Petitioner

argues that "while there was no requirement to show that a Skilled Artisan would search for 'a particular language with the characteristics of FIPA97's ACL,'" (Resp. 116), the Petition does explain that "agents, such as in Kiss, must use a common communications protocol," so a Skilled Artisan "would have been motivated to 'employ one of the available inter-agent communications languages . . . because doing so would have been a convenient and efficient way to facilitate effective communication between agents.'" Reply 30–31 (citing Pet. 29–30; Ex. 1003 ¶ 223).

Petitioner also argues that Patent Owner's criticism that "Petitioner fails to identify **how** the combination could be achieved," (Resp. 117), is "legally irrelevant" (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981), and "also ignores the detailed description in the Petition (supported by Dr. Lieberman) that demonstrates how the combination would work." Reply 31 (citing Pet. 28–32; Ex. 1003 ¶¶ 217–219; Ex. 1005, Figs. 4–6, 21 (annotated)). Petitioner points out that:

> [t]he Petition explains, for example, that "FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system, as described with specificity below. These techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging, (Ex. 1005, 3:32–36, 3:67-4:1, 6:67–7:1), as well adding functionality that is disclosed in FIPA97."

Reply 34.

In its Sur-reply, Patent Owner argues that Petitioner's evidence of a motivation to combine are simply "[p]ages of boilerplate language" or exhibit "*ex post* reasoning colored by hindsight." Sur-reply 58, 62. Patent Owner argues that the FIPA97 and Kiss protocols are "different" and

"mutually exclusive" and that "Petitioner offers no argument or evidence relating to how these completely different components would be reconciled." *Id.* at 59–61. Patent Owner argues that FIPA97 "discouraged interoperability between different and incompatible systems." *Id.* at 61.

Patent Owner also argues that "[t]he Board must disregard" portions of Petitioner's Reply, which discuss "a series of four figures from Dr. Lieberman's declaration," "because it constitutes new argument." *Id.* at 63. Patent Owner argues that "the Petition must contain a 'full statement of the reasons for the relief requested'" and "cannot simply incorporate by reference its expert's declaration." *Id.* (citing 37 C.F.R § 42.6(a)(3)).

In identifying a reason that would have prompted a person of ordinary skill in the relevant field to combine the prior art teachings, the Petitioner must show "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418. A reason to combine teachings from the prior art "may be found in explicit or implicit teachings within the references themselves, from the ordinary knowledge of those skilled in the art, or from the nature of the problem to be solved." *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (*citing In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998)).

Here, Petitioner explains that:

> FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system, as described with specificity below. These techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging, Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1, as well adding functionality that is disclosed in FIPA97. Where the two systems disclose analogous functionality, such as facilitating cooperation and agent registry, their techniques are

> combined, as a Skilled Artisan would understand that to be an efficient and common sense way to implement the combined system in order to obtain the benefits of both, and therefore be motivated to do so.

Pet. 27 (citing Ex. 1003 ¶¶ 217–219).

Petitioner provides persuasive evidence that Kiss and FIPA97 are analogous art because "each is directed to the same field of endeavor, *i.e.,* distributed computing environments generally and architectures for communication and cooperation among distributed electronic agents specifically." Pet. 28 (citing Ex. 1001, 1:25–29; Ex. 1005, Abstract; Ex. 1007, Foreword, 1; Ex. 1003 ¶ 220). Petitioner also provides persuasive evidence that FIPA97 and Kiss "are reasonably pertinent to the problem addressed by the 115 Patent—*e.g.,* the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 28 (citing Ex. 1001, 4:34–40; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1003 ¶ 221).

Petitioner argues persuasively that

> [i]t would have been obvious to make this combination because to do so would have been the arrangement of old elements (*i.e.*, the functionality of FIPA97, and the system of Kiss) with each performing the same function it had been known to perform (communication between distributed agents (FIPA97v1)); cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate to conduct cooperative task completion and problem solving).

Pet. 28 (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1003 ¶ 222).

Petitioner also argues, and we agree, that it

> would have been obvious because a Skilled Artisan would have known that agents, such as in Kiss, must use a common communications protocol, i.e., an inter-agent communication language, and related management functionality, Ex. 1020, 2;

> Ex. 1046, 50, and therefore would have been motivated to consider and employ one of the available inter-agent communications languages and its related functionality, and because doing so would have been a convenient and efficient way to facilitate effective communication between agents.

Pet. 28–29 (citing Ex. 1003 ¶ 223).

Petitioner goes on to argue that "a Skilled Artisan would also have been motivated based on earlier descriptions of KQML's similar use of an inter-agent communication language," (citing Ex. 1016, Abstract) and their disclosure that "[t]here are several levels at which agent-based systems must agree, at least in their interfaces, in order to successfully interoperate: Transport … Language … Policy … Architecture," (citing Ex. 1016, 4, 29, 30) as well as their disclosure of "the necessity of a robust inter-agent communication language in a system like Kiss." Pet. 29 (citing Ex. 1006, 7; Ex. 1007, 41, 40–42; Ex. 1005, Abstract; Ex. 1003 ¶¶ 224–226).

Petitioner further argues that "[s]uch a combination would also have been obvious to try this combination because the necessity of a common inter-agent communication language was a known design need in a system such as Kiss," (citing Ex. 1020, 2; Ex. 1046, 50) and there were only a small number of identified, predictable solutions to that need, such as FIPA ACL." Pet. 29 (citing Ex. 1035, 1; Ex. 1003 ¶ 227).

Petitioner goes on to argue that a "Skilled Artisan" would also have been motivated to combine FIPA97 and Kiss in the manner described in the Petition "because of the known advantages of FIPA97, including that it specifies, 'key agents necessary for the management of an agent system, the ontology necessary for the interaction between systems, and it defines also the transport level of the protocols'" (citing Ex. 1035, 1; Ex. 1003 ¶ 229), and "because FIPA97 represented a substantial attempt to formulate an

industry standard designed to encourage interoperability and uniformity amongst agent systems." Pet. 29–30 (citing Ex. 1007, vii; Ex. 1047).

Petitioner also explains that:

> [a] Skilled Artisan would have been further motivated to include the administrative functionality and exemplary practices described in FIPA97 with Kiss because the description of such functionality and practices in FIPA97 suggests that their use with the FIPA ACL would be advantageous and workable. A Skilled Artisan would also have been motivated to employ such additional functionality and practices in the combined system in order to obtain the full benefit of using FIPA ACL.

Pet. 30 (citing Ex. 1003 ¶ 231).

In light of the reasons and the explanations Petitioner provides that would have motivated a person of ordinary skill in the art to combine the teachings of FIPA97 and Kiss in the manner Petitioner describes, Patent Owner's argument that "Petitioner utterly defaults in offering *any reason* to combine *Kiss* and *FIPA97*" (*see* Resp. 116) (emphasis added), is directly contrary to the evidence of record and is unpersuasive. So too is Patent Owner's argument that "Petitioner fails to offer *any reason* that a person of ordinary skill in the art would have been motivated" to combine "the *Kiss* meta-agent and the *FIPA97* Directory Facilitator." *See* Resp. 79 (emphasis added).

Patent Owner also argues that Petitioner "offers no reason or explanation that a person of skill in the art looking at *Kiss* would be motivated to find a particular language with the characteristics of *FIPA97's* ACL." *Id.* at 116. Patent Owner's argument, however, is misplaced. The test for obviousness is not whether a person of ordinary skill in the art "looking at *Kiss* would be motivated to find a particular language with the characteristics of *FIPA97's* ACL." Rather, "[u]nder the correct

[obviousness] analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420.

Here, Petitioner provides persuasive evidence and argument that FIPA97 and Kiss "are reasonably pertinent to the problem addressed by the 115 Patent—*e.g.,* the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 28 (citing Ex. 1001, 4:34–40; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1003 ¶ 221). This evidence includes the '115 patent's observation that:

> [a]gent-based systems have shown much promise for flexible, fault-tolerant, distributed problem solving. Several agent-based projects have helped to evolve the notion of facilitation. However, existing agent-based technologies and architectures are typically very limited in the extent to which agents can specify complex goals or influence the strategies used by the facilitator.

Ex. 1001, 4:34–40, as well as Kiss' observation that "a need exists for a knowledge management system for dynamic, distributed problem-solving systems." Ex. 1005, 2:39–40. Indeed, Dr. Lieberman notes that the FIPA97 specification "defines a language and supporting tools, such as protocols, to be used by *intelligent software agents* to communicate with each other," and that "the terms used and the mechanisms used [by FIPA97] support such a higher-level, often *task based*, view of interaction and communication." Ex. 1003 ¶ 221. This evidence support's Petitioner's position that a person of ordinary skill in the art at the time of the claimed invention would have combined FIPA97 and Kiss in the manner described in the Petition to provide a flexible, fault-tolerant, distributed problem solving system using agent-based technologies.

Patent Owner further argues that "Petitioner offers no reason that the meta-agent of *Kiss* would need any capability offered by *FIPA97*." Resp. 79. Patent Owner argues that the "Petition says nothing" about how to combine FIPA97's Directory Facilitator and Kiss' meta-agent. *Id.* at 80. Patent Owner makes the observation that the "two architectures look quite different," and that "Petitioner offers no articulation of how to add [FIPA Directory Facilitators] to any of the *Kiss* layers." *Id.* at 81. Patent Owner argues:

> If *Kiss's* meta agents were replaced by or combined with FIPA's [Directory Facilitators] in some way, like the Petition suggests, the directory service provided by the [Directory Facilitators] would clash with the **duplicate** and potentially conflicting services provided by the existing agent service layer. Other agents in *Kiss* would either be unable to obtain the registry services or would receive duplicate and/or contradictory answers, resulting in an inoperative device.

*Id.* at 82 (citations omitted).

We note that, "the [obviousness] analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418 (2007). The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references. Rather, the test is what *the combined teachings* of the references *would have suggested* to those of ordinary skill in the art. *Keller*, 642 F.2d at 425.

Here, contrary to Patent Owner's arguments, Petitioner provides a description in the Petition (supported by Dr. Lieberman's Declaration) that

explains how a person of ordinary skill in the art would combine FIPA97 and Kiss. *See, e.g.,* Pet. 27–31; Ex. 1003 ¶¶ 217–219. For example, the Petition explains that "FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system." Pet. 27. The Petition also explains that "[t]hese techniques are used to implement the functionality described in Kiss, including *facilitating agent collaboration*, agent registry, and inter-agent messaging . . . as well adding functionality that is disclosed in FIPA97." *Id.* (citing Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1) (*italicized* emphasis added).

Petitioner's proffered combination of FIPA97 and Kiss is amply supported by Dr. Lieberman's testimony. For example, Dr. Lieberman explains that:

> in the combination of Kiss with FIPA97, the "interagent abstract communications facilities" of Kiss, EX1005, 3:32-36, would use the inter-agent communication language of FIPA97 to, for example, "negotiate with each other, conduct joint planning, and to collaborate in the execution of planned tasks," EX1005, 3:32-36. Additionally, *the Agent Service Layer and meta-agent of Kiss would be implemented using* the FIPA97 Agent Management System ("FIPA AMS") and *the functionality of the FIPA Directory Facilitator*, described in EX1006. Thus, *the "capabilities, interests, and attributes for the knowledge modules*" EX1005, 6:67-7:1, as stored in the agent registry of Kiss, and the meta agent of Kiss*, would be implemented with the directory facilitator functionality of FIPA97*. Therefore, FIPA AMS would be used to provide a "scalable and modular," EX1005, 3:67-4:1, inter-agent management system and agent registry for the distributed agents of Kiss. Further, the combination of FIPA97 and Kiss would be informed by and include the exemplary practices described in the informative sections of FIPA97 (i.e, Parts 4-7). The following are further

> annotated figures from Kiss representing exemplary depictions of the combined Kiss/FIPA97 system.

Ex. 1003 ¶ 219 (citing Ex. 1005, Figs. 4–5, 6, 21) (*italicized* emphasis added).

Dr. Lieberman provides an annotated version of Kiss' Figure 21, shown below, illustrating how FIPA97's Directory Facilitator (DF) and Facilitating Agent (FA) would be incorporated into Kiss' Knowledge Management System.



*Fig. 21*

Petitioner's annotated version of Kiss' Figure 21, shown above, depicts how FIPA97's Directory Facilitator (DF) and Facilitating Agent (FA) would be incorporated into the User Interface Layer, Meta-Agent Layer, and Knowledge Agent Layer of Kiss' Knowledge Management System connected to a distributed environment such as the Internet. *See*

Ex. 1003, ¶¶ 217–219, pgs. 132–135; Ex. 1005, 10:55–12:28, 14:31–36, Figs. 4–6, 8, 21. Patent Owner's arguments that the Petition "says nothing" about how to combine FIPA97's Directory Facilitator and Kiss' meta-agent and offers "no articulation" of how to add a Directory Facilitator to any of the Kiss layers is simply contrary to the evidence of record. Similarly, Patent Owner's arguments that the FIPA97 and Kiss protocols are "mutually exclusive" and that FIPA97 "discouraged interoperability" between systems is not adequately supported by the record and is unpersuasive. *See* Sur-reply 59–61.

Patent Owner's argument in its Sur-reply that we must "disregard" portions of Petitioner's Reply discussing Dr. Lieberman's annotated illustrations because it constitutes "new argument" is also unpersuasive. *See* Sur-reply 63. The identified portions of Petitioner's Reply (pgs. 32–33) respond directly to Patent Owner's argument in its Response that "Petitioner fails to identify **how** the combination could be achieved," and do not constitute new argument. *See* Reply 31 (citing Response 117). Similarly, Patent Owner's argument that Dr. Lieberman's annotated illustrations should be disregarded because they do not appear directly in the Petition is misplaced. *See* Sur-reply 63. 37 C.F.R § 42.6(a)(3), cited by Patent Owner, prohibits "arguments" from being incorporated by reference from one document into another document. Dr. Lieberman's Declaration (Ex. 1003) is *testimonial evidence* provided by a witness in support of the Petition—it is not "argument."

Finally, Patent Owner argues Petitioner's motivation to combine Kiss and FIPA97 suffers from "hindsight bias" (Resp. 116) and that Petitioner's combination of FIPA97, Kiss and Cohen "is emblematic of hindsight bias" because Dr. Lieberman "picks and chooses elements" and "superimposes

them into one figure in an attempt to 'show' the combination." *Id.* at 84. In particular, Patent Owner argues that "simply drawing in block diagrams with terminology from other references into one cobbled diagram is insufficient as a matter of law without any explanation of how such a combination could be achieved or, indeed, why." *Id.* at 84–85.

We note that "[a]ny judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper." *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971).

Here, Petitioner provides persuasive evidence that a person of ordinary skill in the art at the time of the invention would have been motivated to combine FIPA97's communications protocol and inter-agent communication language (FIPA ACL) between the agents of Kiss, adding its administrative functionality and practices to the Kiss system. *See, e.g.,* Pet. 27–31; Ex. 1003 ¶¶ 217–232. This is not evidence of hindsight bias. Patent Owner does not identify, and we do discern, any particular knowledge used by Petitioner in its combination of FIPA97 and Kiss that was gleaned from the '115 patent's disclosure and was not within the level of ordinary skill in the art at the time of the invention.

Patent Owner's criticism of Dr. Lieberman's annotation of Kiss' Figure 8 (*see* Resp. 84–85; Ex. 1003, 130) is also misplaced. As Dr. Lieberman explains, the annotated illustration shows *how* a person of ordinary skill in the art at the time of the invention would have combined FIPA97's ACL messaging, Directory Facilitator, and Facilitator Agent with Kiss' Agent Service Layer. *See* Ex. 1003, 130, Fig. 8. Moreover, Dr.

Lieberman persuasively explains *why* a person of ordinary skill in the art would have been motivated to combine the teachings of FIPA97 and Kiss in the manner described. *See* Ex. 1003 ¶¶ 217–231.

We find that Petitioner has shown persuasively by a preponderance of the evidence that one of ordinary skill in the art at the time of the invention would have been motivated to combine the teachings of FIPA97 and Kiss in the manner proffered by Petitioner.

*6. Nonobviousness*

Before determining whether a claim is obvious in light of the prior art, we consider any relevant evidence of secondary considerations of non-obviousness. *See Graham*, 383 U.S. at 17. Notwithstanding what the teachings of the prior art would have suggested to one of ordinary skill in the art at the time of the invention, the totality of the evidence submitted, including objective evidence of non-obviousness, may lead to a conclusion that the challenged claims would not have been obvious to one of ordinary skill. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984). Patent Owner presents evidence of two such considerations: (1) industry praise (Resp. 120–141) and (2) long-felt but unresolved need (*id.* at 141–145), both involving a software product called "Siri" from Apple Inc. For the reasons explained below, we determine that Patent Owner's proffered evidence of secondary considerations is not entitled much weight because Patent Owner does not establish a sufficient nexus between the evidence of non-obviousness and the challenged claims of the '115 patent.

A nexus is required between the merits of the claimed invention and any objective evidence of nonobviousness if that evidence is to be given substantial weight in reaching a conclusion on obviousness. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983). Evidence of

secondary considerations is only significant if there is a nexus with respect to the claimed invention. *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006).

Nexus is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in the determination of nonobviousness. *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). For instance, commercial success is relevant if it flows from the merits of the claimed invention. *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988). The burden of showing nexus is on the patent owner. *In re Huang*, 100 F.3d 135, 139–40 (Fed. Cir. 1996). Objective evidence of nonobviousness also must be commensurate in scope with the claims for which the evidence is offered to support. *In re Kulling*, 897 F.2d 1147, 1149 (Fed. Cir. 1990).

Patent Owner contends that objective indicia of nonobviousness confirms the nonobviousness of the '115 patent. Resp. 119–145. Patent Owner argues that industry praise for a software application known as "Siri," "which was first made available for download to iPhone users on Apple, Inc.'s App Store on February 4, 2010" (*id.* at 121), "bears a nexus to the claims of the '156 Patent" (*id.* at 141).[13] Patent Owner argues that industry praise for the "personal context awareness and service delegation 'technical components' of the Siri application are made possible by the claim[s]" of the '115 Patent. *Id.* at 136.

---

[13] Although Patent Owner refers to the '156 Patent here, we assume this is a mistake and that Patent Owner actually meant to refer to the patent at issue in this proceeding, the '115 patent.

Patent Owner asserts that "[t]he '115 Patent was based on SRI International's development of version 2 of the Open Agent Architecture ('OAA')." *Id.* at 135 (citing Ex. 2032; Ex. 1001). For support, Patent Owner relies on Exhibit 2054, an SRI web page, which states, "SRI developed OAA® software, which is designed with intelligent 'agents' that track human interactions and work processes to streamline electronic and computer interchange." Resp. 135 (quoting Ex. 2054). Patent Owner further asserts that "[a]fter version 2 of OAA was developed, SRI International spun out Siri, Inc. as an SRI venture, where the Siri application was created based on an OAA groundwork." Resp. 135 (quoting Ex. 2054 ("OAA laid the groundwork for the DARPA-funded CALO project, from which Siri, the first virtual personal assistant, was born. Siri was spun out into an SRI venture that Apple acquired from SRI."). Apple Inc. apparently acquired Siri, Inc. in April 2010, approximately two months after the Siri application's initial release.[14] Resp. 10, 121, 135.

Patent Owner asserts that "Petitioner proposed a combination of *Kiss* with *FIPA97*, which relies on *FIPA97* as teaching a common communications and protocol language that is combined with *Kiss*'s teachings of electronic agents and their general functions and operations." Resp. 134 (citing Paper 12, 45). To support this assertion, Patent Owner supposedly quotes from the Decision on Institution in this proceeding as follows:

> In its proposed combination of *Kiss* with *FIPA97*, Petitioner relies on *Kiss* as teaching electronic agents and their general functions and operations, including agent collaboration, agent

---

[14] We note for the record that the filing date for the '115 patent is Jan. 5, 1999, approximately ten years prior to the Siri application's initial release.

> registry, and interagent messaging. Pet. 28. Petitioner acknowledges, however, *Kiss* does not disclose an inter-agent communication language and relies on *FIPA97* to teach a common communications protocol and language (FIPA ACL), which is combined with the teachings of *Kiss* to provide a communication language for inter-agent communication between the agents of *Kiss*. *Id.*

Resp. 134 (citing Paper 12, 45). However, we cannot locate this supposed quotation from the Decision on Institution in this proceeding on page 45, or on any other page of the Decision, for that matter. *See* Paper 12, 45.

Nonetheless, Patent Owner argues a "nexus between the evidence of industry praise of the Siri application [] and the Challenged Claims can be shown if the industry praise has a nexus to the combination of these (allegedly) prior art features, *i.e.,* the teachings of electronic agents and their general functions and operations in *Kiss* and the common communications protocol and language of *FIPA97*." Resp. 134. Patent Owner argues that its "evidence of industry praise [] satisfies the nexus requirement, as it shows praise for the Siri application's integration of personal context awareness into a service-delegating virtual personal assistant." Resp. 136; *see also id.* at 122–133. Patent Owner also argues that "industry journalists recognized that the Siri application filled an unmet need for a true virtual personal assistant." *Id.* at 141; *see also id.* at 141–145.

To establish a nexus between claim 1[15] of the '115 patent and the Siri application, Patent Owner provides the following chart. *Id.* at 136–138. Patent Owner relies, in significant part, on the opinion of its declarant, Dr.

---

[15] We note that the patentability of independent claim 1 is not contested in this proceeding.

Medvidovic, to establish a nexus between the Siri application and the claims of the '115 patent. *See* Ex. 2032 ¶¶ 205–229, App. A, 1–32.

| **Siri's Description of Technology Feature** | **Claim 1 of the '115 Patent** |
|---|---|
| **Personal Context Awareness** A virtual assistant gives different answers depending on individual preferences and personal context (place, time, history), and if you give it permission, learns more about you so that it can shorten your time-to-task. Information you teach Siri in one domain (e.g. movies) is applied automatically to opportunities rising from other domains. Any personal | "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language, wherein the inter-agent language includes: a layer of conversational protocol defined by event types and parameter lists associated with one or more of the |

| | |
|---|---|
| information you provide Siri is stored in a highly secure, PCI-compliant co-location center, and used only with your explicit permission to accelerate your task completion. | events, wherein the parameter lists further refine the one or more events;<br>a content layer comprising one or more of goals, triggers and data elements associated with the events;" |
| **Service Delegation**<br>An assistant can reason about what specific set of resources or services would best be combined to help you accomplish a particular task. Siri's patented service delegation algorithms combine numerous attributes about each service provider, including quality scores, fine-grained ratings for specific capabilities, speed measures, and geographic constraints, to plan and execute an optimized strategy for handling your request. Live data is pulled fresh from source sites and world-changing actions are handled in a transaction-safe manner. For example, in a restaurant selection task, Siri integrates information from many sources (local business directories, geospatial databases, restaurant guides, restaurant review sources, | "A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents, comprising the acts of:<br>. . .<br>receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrary complex goal expression;<br>dynamically interpreting the arbitrarily complex goal expression, said act of interpreting further comprising:<br>generating one or more sub-goals expressed in the inter-agent language;<br>constructing a goal satisfaction plan wherein the goal satisfaction plan includes:<br>a suitable delegation of sub-goal requests to best complete the requested |

| | |
|---|---|
| menu sites, online reservation services and the user's own favorites) to show results that meet the user's natural language request. | service request-by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and<br>dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent." |

Patent Owner argues that "the Siri application's integration of personal context awareness is made possible because of the claimed inter-agent language limitations." Resp. 138 (citing Ex. 2032 ¶ 222). Patent Owner explains that "[b]y having a layer of conversational protocol that has parameter lists, the '115 Patent describes how agents can then use the parameters in the parameter lists to provide feedback or advice to agents who directly, or indirectly through the facilitating agent, receive the service request." Resp. 138. For example, Patent Owner explains that a "requesting agent can utilize such a parameter to provide context on a user's preference to the facilitator agent and/or the tasking agents. *Id.* at 139 (citing Ex. 2032 ¶ 224). Patent Owner argues that "[t]his same functionality of being able to include individual preferences, for example, was described by Siri, Inc. as representing personal context awareness." Resp. 140 (citing Ex. 2040, 2).

Patent Owner also argues that:

> the Siri application's service delegation corresponds to the claimed dynamic interpretation limitations. Siri, Inc. described the service delegation feature of the Siri application as including "an assistant [that] can reason about what specific set of resources or services would best be combined to help you accomplish a particular task." This is precisely what is claimed in the dynamic interpretation limitations, e.g., "constructing a goal satisfaction plan . . . [including] a suitable delegation of sub-goal requests to best complete the requested service request-by using reasoning."

Resp. 140 (citing Ex. 2032 ¶ 221).

Petitioner argues that Patent Owner's "secondary considerations position rests primarily on an unsubstantiated, conclusory opinion that certain aspects of the '115 Patent are embodied in the Apple product 'Siri.'" Reply 82. Petitioner argues that as "Dr. Medvidovic conceded, the evidence he relied on is 'circumstantial,' or a 'suggestion.'" *Id.* (citing Ex. 1129, 147:12–15). Petitioner argues that Dr. Medvidovic "never reviewed the Siri source code, (Ex. 1129, 146:20-147:6), and indeed never even asked to review that source code (Ex. 1129, 147:22-148:9)." Reply 82–83. Petitioner argues,

> [t]he failure to review the code is fatal, because [Dr. Medvidovic] further testified that an "agent"—an element in every claim—is a "piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer **a clearly identifiable body of code,"** and that to distinguish an "agent" from any other software he "**would have to look inside the code**."

*Id.* at 83 (quoting Ex. 1129, 9:14–11:8).

Petitioner faults Patent Owner for not "not seek[ing] that code through a motion for additional discovery or other means, nor did [Petitioner] seek any other objective evidence (such as specifications) to support its assertions." Reply 83. Petitioner also faults Patent Owner for not seeking

the testimony of Mr. Adam Cheyer, one of the named co-inventor's on the '115 patent and a co-founder of Siri, Inc., on this topic, even though Mr. Cheyer's testimony was apparently obtained in a related proceeding. *Id.* at 83–84 (citing Ex. 2034, 58:15–63:16; Ex. 1127); *see also* Resp. 121. During the Oral Hearing in this proceeding, counsel for Patent Owner was asked about this potential source of evidence:

> JUDGE TROCK: Counsel, this is Judge Trock again.
>
> Do you have any evidence from Mr. Cheyer that this Siri version that you're discussing right now incorporated the claim limitations of the '115 patent?
>
> MS. ABDULLAH: Your Honor, we do not have any direct evidence from Mr. Cheyer. And the reason is because he was never deposed in this proceeding and he is also not a consultant or anybody that's working with IPA at the moment. I know --
>
> JUDGE TROCK: Wasn't he deposed -- sorry. Wasn't he deposed in the Google proceeding?
>
> MS. ABDULLAH: He was, your Honor. And that was pursuant to a subpoena that we had to get permission to serve from the Board because he refused to simply cooperate with us voluntarily.
>
> JUDGE TROCK: Was there a reason why you didn't approach the Board in this case for a subpoena?

MS. ABDULLAH: Your Honor, because we don't believe that his testimony is as probative as the expert testimony that we presented drawing the direct connection as well as the actual industry praise and long-felt need evidence that we --

JUDGE TROCK: But wouldn't he be a witness with personal knowledge of whether or not that original Siri version incorporated the claim limitations of the '115 patent?

MS. ABDULLAH: Your Honor, respectfully, I believe that that was not -- that would not be a question of personal knowledge but rather of expert testimony. And also, your Honor, I would note that I don't believe that we would have the requisite showing under the Garmin factors that he would be able to testify to those aspects.

JUDGE TROCK: But he is the inventor, right? You've told us that.

MS. ABDULLAH: Yes, your Honor, he is the inventor.

TROCK: All right. So he might be a person -- a witness with personal knowledge; isn't that right?

MS. ABDULLAH: Absolutely. And were this a district court case, you know, I'm sure we would have pursued his deposition. I'm sure Microsoft would have as well. But given the high burden for

> us to obtain additional discovery, your Honor, we determined that the probative value of his testimony was not such that it would meet the Garmin factors here.
>
> JUDGE TROCK: But you did pursue that in the Google case though?
>
> MS. ABDULLAH: Your Honor, the Google case was a different issue. The question there had to do with authorship of a prior art reference that Mr. Cheyer was an author of. And it had to do with whether that could be considered the work of another versus the inventor. So inventorship was front and center in the Google proceedings where it is not here. Here this is a 103 analysis for which, you know, obviously I can't pretend to say what the Board would have done. But I think the evidence that we have, that we have been able to present demonstrates that link better than Mr. Cheyer's testimony would be able to.

Paper 43, 114:12–116:26.

Petitioner also points to evidence that potentially undermines a nexus between the challenged claims of the '115 patent and the Siri application. For example, Petitioner argues that "Adam Cheyer testified that 'Siri' did not implement the agent registry functionality described in the '115 Patent." Reply 84 (citing Ex. 2034, 46:12–47:5). Likewise, Petitioner argues, "an email authored by Adam Cheyer indicates that as of August 2005 OAAv2 had only been adapted to run on 'Windows CE' mobile devices—there is no

mention of iOS, Apple, or any other mobile platforms." Reply 84 (citing Ex. 1137).

Petitioner also argues that Patent Owner's "evidence credits the CALO project with being the progenitor of the ideas that led to Siri—not any version of OAA." Reply 84 (citing Ex. 2042, 1 ("Siri traces its origins to a military-funded artificial-intelligence project called CALO"); Ex. 2044, 1; Ex. 2047, 2; Ex. 2054, 1; Ex. 2001, 2). "Nor is there any evidence in the record," Petitioner argues, "that OAA was ultimately utilized in SRI's CALO project other than that the original OAA (*i.e.,* the version first created in 1994 prior to the '115 Patent work) laid 'groundwork' for what would ultimately become CALO." Reply 84 (citing Ex. 2054). Petitioner argues that "substantial evidence shows that a later agent system named "SPARK" (SRI Procedural Agent Realization Kit) was used as the basis of CALO," but that Patent Owner "ignores this intervening SPARK system and makes no attempt to show it practices the claims, nor does it meaningfully address the CALO project." Reply 85 (citing Ex. 1136 §7).

Petitioner argues that Patent Owner "failed to provide evidence 'that the industry praised a claimed invention or a product that embodies the patent claims.'" Reply 85 (quoting *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016) (emphasis omitted)). In particular, Petitioner argues, Patent Owner "failed to 'establish that the evidence relied upon traces its basis to a novel element in the claim and not to something in the prior art.'" Reply 85 (quoting *BioMarin Pharm. Inc. v. Genzyme Therapeutic Prods. LP*, IPR2013-00537, Paper 79, 22 (PTAB Feb. 23, 2015) (emphasis omitted)).

"Furthermore," Petitioner argues, Patent Owner "has provided no showing that the Siri App 'embodies the claimed features and is co-

extensive with them,' and accordingly can gain no presumption from any Siri success." Reply 85–86 (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.,* 882 F.3d 1056, 1072 (Fed. Cir. 2018) (emphasis omitted). "Even assuming portions of Siri embodied the claims," Petitioner argues, "the record is undisputed that Siri provides significant functionality well beyond anything covered by the claims—voice recognition, for example." Reply 86.

Petitioner further argues "the table provided by [Patent Owner] merely lists unrelated claim language and 'examples' of 'personal context awareness' with no further analysis." *Id.* at 87. "For example," Petitioner argues, Patent Owner "provides no explanation about how the alleged 'Personal Context Awareness' feature in Siri practices 'a layer of conversational protocol.'" *Id.* Moreover, Petitioner argues, "despite claiming that 'the Siri application's integration of personal context awareness is made possible because of the claimed inter-agent language limitations,' [Patent Owner] provides no evidence. [Patent Owner] cites only to a single paragraph of Dr. Medvidovic's declaration, which is itself bare *ipse dixit* and further undermined by his failure to examine the source code or any other descriptive technical materials for Siri." *Id.* at 88 (citing Ex. 2032 ¶ 222).

Petitioner argues that Patent Owner's evidence that Siri embodies the ICL limitations of claim 1 "is no better." Reply 88 (citing Resp. 140). Petitioner argues Patent Owner:

> does not discuss the actual limitations of claim 1 nor explain how giving different answers depending on individual preferences embodies the claims. For example, [Patent Owner] does not even attempt to articulate how Siri has a conversational layer, or event types, or how those event types are refined by parameters. Nor does [Patent Owner] address how Siri embodies the claimed

> agent registry limitation, particularly when the testimony of the inventor Mr. Cheyer indicates that it does not.

Reply 88 (citing Ex. 2034, 46:12–47:5).

Petitioner argues that Dr. Medvidovic's testimony should be given no weight. Reply 89. Petitioner argues that:

> Dr. Medvidovic admitted that he would be unable to determine whether a piece of software was an "agent" without examining the source code for that software, and further admitted that he had not reviewed the Siri source code nor ever asked to review such source code. Ex. 1129, 11:9–16. Yet, Dr. Medvidovic opines at length that Siri must embody the claims of the '115 Patent because, for example, "personal context awareness and service delegations are made possible by the functionality claimed in the independent claims of the '115 Patent"—an opinion without any evidentiary support. Ex. 2032 ¶ 220. Indeed, by Dr. Medvidovic's own admission, he lacks the necessary personal knowledge to opine on the architecture of Siri.

Reply 89.

In its Sur-reply, Patent Owner argues that there is "no prohibition against the use of circumstantial evidence in IPR proceedings." Sur-reply 66. Patent Owner argues, "Dr. Medvidovic provided unrebutted testimony, including a lengthy appendix, supported by this evidence, which must be credited. *Id.* at 68 (citing Ex. 2032, §§ 205–229, App. A). Patent Owner also points out that "Dr. Medvidovic testified that looking at the code is not the exclusive means of identifying an agent – other available information can be utilized." Sur-reply 69; *see* Ex. 1129, 10:14–11:16. Moreover, Patent Owner argues, "under the *Garmin* factors, Patent Owner was unable to seek Apple's highly confidential source code in connection with these proceedings." Sur-reply 70 (citing *Garmin Int'l, Inc. v. Cuozzo Speed Techs., LLC*, IPR2012-00001, Paper 26 at 6–7 (PTAB Mar. 5, 2013). With respect to Mr. Cheyer's testimony, Patent Owner explains that "Patent

Owner was only able to depose Mr. Cheyer after the Board granted Patent Owner's motion under 37 C.F.R. § 42.52(a) for leave to serve a subpoena to compel Mr. Cheyer to testify" in a related proceeding. Sur-reply 71.

We agree with Petitioner that Patent Owner does not provide persuasive evidence that the Siri application is reasonably commensurate with the scope of the challenged claims. Patent Owner's cited evidence attempting to tie the Siri application to the limitations of claim 1 relies substantially on the testimony of Dr. Medvidovic (Ex. 2032) and a web.archive .org Internet page (Ex. 2040) Patent Owner identifies as "Siri, Inc., Technology – "About Siri – Your Virtual Personal Assistant." *See* Resp. 136–140 (citing Ex. 2032 ¶¶ 216–222, 224; Ex. 2040).

We note at the outset that Dr. Medvidovic's opinion does not rely on an examination of the Siri application's source code. During his deposition, Dr. Medvidovic testified as follows:

> [Q] Let me ask you, have you ever reviewed the Siri source code?
>
> [A] I have not.
>
> [Q] So you don't know the details of how Siri is implemented?
>
> [A] Not beyond what I'm stating in the declaration as my sources of information that I'm drawing on.

Ex. 1129, 146:10–17. This is significant because Dr. Medvidovic testified at his deposition that an "agent"—an element in every claim—is a "piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer a clearly identifiable body of code," and that "if there is no accompanying specification language, then we would have to look inside the code [to determine] what kinds of facilities the agent provides." *See* Ex. 1129, 9:13–11:8. As far as we can determine, neither party has provided "accompanying specification language" for the Siri

application source code. Instead, Dr. Medvidovic testified, the evidence he relied upon to form his opinion is "circumstantial," or a "suggestion." *See* Ex. 1129, 147:7–148:9.

In Section XI.B of his declaration, "Nexus of Industry Praise to the Independent Claims of the '115 Patent," Dr. Medvidovic cites to Exhibit 2040 as support for his understanding of how the Siri application works. *See e.g.,* Ex. 2032 ¶¶ 215–216, 218, 226, 229.

Exhibit 2040 describes "Siri" as:

> the first mainstream consumer application of a Virtual Personal Assistant. Siri is an intelligent software agent designed to have a back-and-forth conversational interaction with you as it helps you get tasks done. The three main technical components behind Siri's differentiation correspond to the essential qualities of an assistant: a conversational interface, personal context awareness and service delegation.

Ex. 2040, 1.

In his declaration, Dr. Medvidovic discusses the "personal context awareness" and "service delegation" aspects of Siri in some detail (*see, e.g.,* Ex. 2032 ¶¶ 216–220, 222–229). Dr. Medvidovic, however, only mentions Siri's "conversational interface" in passing, even though Exhibit 2040 describes Siri as an intelligent software agent "designed to have a back-and-forth conversational interaction with you as it helps you get tasks done," and lists Siri's "conversational interface" as the first of Siri's "three main technical components." *See* Ex. 2032 ¶ 215; Ex. 2040, 1.

In his declaration, Dr. Medvidovic attempts to link the Siri application and the limitations of the independent claims of the '115 patent. *See* Ex. 2032 ¶¶ 205–229, App. A, 1–32. Dr. Medvidovic does this by first separating the limitations of independent claims 1 and 29 into two categories, an "Inter-agent Communication Layer" (ICL) and "Service

Request Planning and Execution." *See* Ex. 2032 ¶ 221 (pgs. 70–71). Dr. Medvidovic then states that "[i]t is my opinion that the Siri application's integration of personal context awareness is made possible because of the claimed ICL." *Id.* ¶ 222. Dr. Medvidovic explains that "[w]ithin the conversational protocol layer of the ICL, there are further claimed "parameter lists" that may "further refine the one or more events." *Id.* ¶ 223. Dr. Medvidovic concludes that "[t]he claimed parameter lists are what allows the Siri application to provide 'different answers' depending on [the] context, as they are able to refine the meaning of a service request." *Id.* ¶ 226. Dr. Medvidovic, however, provides no citation or further support for this conclusion nor does he point to any evidence to show that the Siri application utilizes the claimed parameter lists. *See id.*

In his declaration, Dr. Medvidovic also states that "[i]t is further my opinion that the Siri application's integration of service delegation is made possible because of the claimed service request planning and execution claim limitations." *Id.* ¶ 227. Dr. Medvidovic attempts to support this opinion by comparing the language of claim 1 relating to a goal satisfaction plan that includes "a suitable <u>delegation</u> of sub-goal requests to <u>best complete</u> the requested service request by using <u>reasoning</u>" to language used in Exhibit 2040 to describe the service delegation feature of the Siri application, "Service <u>Delegation</u>. An assistant can <u>reason</u> about what specific sets of resources of <u>services</u> would <u>best</u> be combined to help you <u>accomplish</u> a particular task." *See id.* ¶ 229; Ex. 2040, 2.

In our view, such a comparison is speculative at best to demonstrate that the Siri application utilizes claim 1's "service request planning and execution limitations," as Dr. Medvidovic opines. The limitations of claim 1 that Dr. Medvidovic puts in this category include:

> A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents, comprising the acts of:
>
> registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities,
>
> receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrary complex goal expression;
>
> dynamically interpreting the arbitrarily complex goal expression, said act of interpreting further comprising:
>
> generating one or more sub-goals expressed in the inter-agent language;
>
> constructing a goal satisfaction plan wherein the goal satisfaction plan includes:
>
> a suitable delegation of sub-goal requests to best complete the requested service request-by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and
>
> dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent.

Ex. 2032 ¶ 221 (pg. 70). Yet, Dr. Medvidovic does not persuasively show that the Siri application "register[s] a description of each active client agent's functional capabilities," "receiv[es] a request for service . . . in the form of an arbitrary complex goal expression," "generat[es] one or more sub-goals expressed in the inter-agent language," "construct[s] a goal satisfaction plan," or "dispatch[es] each of the sub-goals to a selected client agent . . . based on a match between the sub-goal . . . and the registered functional capabilities of the selected client agent." *See id.* ¶¶ 227–229.

In fact, as Petitioner points out, there is evidence of record that the Siri application did not utilize the claimed agent registry functionality as Dr.

Medvidovic opines. According to Petitioner, Mr. Cheyer, the named co-inventor on the '115 patent and the co-founder of Siri, Inc., "testified that 'Siri' did not implement the agent registry functionality described in the '115 Patent." Reply 84 (citing Ex. 2034, 46:12-47:5). At a deposition in a related proceeding, Mr. Cheyer testified as follows:

> BY MR. HENDERSHOT:
> Q. So you say "it's likely." Are there
> features in OAA that you think have yet to be
> implemented in systems today?
> MR. HARTSELL: Objection; form.
> BY MR. HENDERSHOT:
> Q. Commercial voice-assistance systems.
> MR. HARTSELL: Objection; form --
> THE WITNESS: Yes.
> MR. HARTSELL: -- relevance, outside the
> scope of direct.
> THE WITNESS: Yes.
> BY MR. HENDERSHOT:
> Q. Could you describe those?
> MR. HARTSELL: Same objections.
> THE WITNESS: Every system is different,
> but one feature of the original OAA 1 demo was that
> independent agents -- today we would call them more
> like web services -- could connect dynamically to
> the -- to the platform, register new capabilities
> with that platform, and without knowing about other
> services on the network, explicitly, the user could

> make a single request that would be -- that would involve a collaboration, and sometimes competition, among those network ecosystem of services. And so one user request would be delegated to many services which were independently developed, and none of those services knew precisely about each other. And that when I look at Siri and Google Assistant and Alexa and Bixby, that is not a capability that I have seen in any of the services today.

Ex. 2034, 45:24–46:2, 46:12–47:5

Petitioner also points out, and we agree, that there is evidence of record that credits the CALO project with being the progenitor of the ideas that led to Siri. *See, e.g.,* Ex. 2042, 1 ("Siri traces its origins to a military-funded artificial-intelligence project called CALO"); *see also* Ex. 2044, 1; Ex. 2047, 2; Ex. 2054, 1; Ex. 2001, 2. Opus Research explains that "Siri is set apart because it applies the depth of knowledge its founders and software specialists have built at SRI and elsewhere in creating a "cognitive assistant that learns and organizes" (CALO). Ex. 2044, 1. Petitioner points out that there is also evidence of record that indicates a later agent system named "SPARK" (SRI Procedural Agent Realization Kit) was used as the basis of CALO. *See* Ex. 1136 § 7. The SPARK-based Personal Assistant is described as follows:

> SPARK provides general-purpose agent technology for a range of domains that require reactive task execution. To date, the driving application for SPARK has been the development of an intelligent personal assistant for a high-level knowledge worker. This assistant, called CALO, will be able to perform routine tasks

> on behalf of its user (e.g., arrange meetings, complete online forms, file email), as well as undertake open-ended processes (e.g., purchasing a computer online), and anticipate future needs of its user.

Ex. 1136 § 7. This evidence, however, does not appear to have been considered or addressed by Dr. Medvidovic. *See* Ex. 2032 ¶¶ 205–229.

We are mindful that objective evidence of nonobviousness need only be "reasonably commensurate with the scope of the claims." *Rambus Inc. v. Rea,* 731 F.3d 1248, 1257 (Fed. Cir. 2013). We also bear in mind that "[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process—the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold." *Demaco Corp.*, 851 F.2d at 1392.

Here, Patent Owner relies on industry praise for the Siri application and evidence of an unmet need to establish a nexus between the Siri application and the claimed invention. However, we are concerned that Patent Owner and its declarant, Dr. Medvidovic, pay little attention to one of the "three main technical components behind Siri's differentiation," the "conversational interface," when evaluating the basis for the proffered "industry praise." *See* Ex. 2040, 1.

Petitioner argues, and we agree, that "[e]ven assuming portions of Siri embodied the claims, the record is undisputed that Siri provides significant functionality well beyond anything covered by the claims—voice recognition, for example." Reply 86. The impact of Siri's "conversational interface" on Siri's reviewers is notable. For example, MIT Technology Review explains that with Siri, "[u]sers can type or speak commands in casual sentences, and the software deciphers their intent from the context."

Ex. 2042, 1. Opus Research reports that "I've had [Siri] for a couple of days and here are my initial reactions. My overall experience has been quite positive. The quality of voice recognition (powered by the same "engine" that supports Dragon Dictation and Dragon Search on the iPhone) is quite good." Ex. 2044, 1. Fast Company.Com reports, "Siri, which launches today as a free iPhone app, is a virtual personal assistant that amazingly resembles . . . an actual personal assistant. It understands plain English commands, which can be spoken or typed (e.g. "Get me tickets to that Matt Damon movie"). Ex. 2045, 2.

Further, The Chronicle of Higher Education explains that Siri "takes a multi-step search process and turns it into one, simple, voice-driven request." Ex. 2046, 2. USA Today reported that "[t]here were occasional mistakes in speech recognition, but the overall accuracy [of Siri] was impressive, at least when I spoke slowly and clearly in a quiet environment." Ex. 2047, 2. Spatial Computing Strategy & Research reports that, with Siri, "You ask it to do stuff like 'find me a pizza place near me' or 'tell me the weather in Chicago this weekend,' [w]ith your voice or by typing commands." Ex. 2048, 2. Search Engine Land explains that Siri is "intended to enable you to do more with your voice and your phone in fewer clicks or moves." "[O]ne can speak to Siri in a more natural way. Rather than speaking like a robot and saying 'Open Table' to minimize error, you can say something more elaborate and 'conversational' such as, 'I'd like a reservation tonight around 7:30 at Le Cheval.'" Ex. 2050, 2.

Each of these reported examples indicate that the reviews Patent Owner relies upon to demonstrate "industry praise" for the Siri application considered Siri's conversational interface to be a significant part of its functionality. Unfortunately, Patent Owner and Dr. Medvidovic give Siri's

"conversational interface" little, if any, consideration when evaluating the reasons for the "industry praise" used to try and establish a nexus between the Siri application and the claimed invention. *See, e.g.,* Ex. 2032 ¶ 215. Even if the Siri application incorporated some of the functionality of the claimed invention, the evidence of record relied on by Patent Owner shows that the Siri application, and its attendant "industry praise," is not reasonably commensurate with the scope of the claimed invention. Patent Owner does not argue that the Siri application's "conversational interface" is claimed by the '115 patent.

For these reasons, we are not persuaded that Patent Owner's evidence of industry praise for the Siri application, and evidence of an unresolved need, establishes a sufficient nexus between the Siri application and the challenged claims of the '115 patent. If anything, the evidence of record establishes only a weak or vague connection between the Siri application and the claimed invention.

*7. Independent Claim 61*

Claim 61 is directed to "[a] facilitator agent arranged to coordinate cooperative task completion within a distributed computing environment having a [number] of autonomous service-providing electronic agents." Ex. 1001, 35:4–7.

In its proposed combination of Kiss with FIPA97, Petitioner relies on Kiss to teach electronic agents and their general communication and collaboration functions, whereas FIPA97 is relied upon to teach the inter-agent language (FIPA ACL) and other administrative functionality and practices. Pet. 27.

*a. Preamble*

Claim 61 recites the following preamble: "A facilitator agent arranged to coordinate cooperative task completion within a distributed computing environment having a plurality of autonomous service-providing electronic agents, the facilitator agent comprising."[16] Petitioner asserts that Kiss teaches "a computerized knowledge management system in which '[i]nteraction between a user and the knowledge resources is mediated by a collection of cooperative intelligent agents.'" Pet. 31 (citing Ex. 1005, 2:43–49, Fig. 1). Petitioner asserts the Kiss "system 'integrates established knowledge-based environments or other software based knowledge,' such that the agents can provide different services." Pet. 31 (citing Ex. 1005, 3:1–36).

Petitioner argues Kiss's electronic agents are "autonomous" because they operate independently. Pet. 32 (citing Ex. 1005, 12:21–14:29). Petitioner argues Kiss's agents are "distributed" in a "hierarchical architecture," because they have "knowledge modules" that define their capabilities and permit the agents to provide services, and "may be interconnected via available network services, such as the Internet, with other, similar systems to form a large scale, global system." Pet. 32 (citing Ex. 1005, Abstract, 2:50–55, 4:57–59, 11:51–14: 33, Figs. 8–21).

Petitioner argues Kiss's system is for "cooperative task completion" in the form of "cooperative intelligent agents" that "incorporate generalized automated negotiation and distributed inference (i.e., problem-solving)

[16] Because Petitioner shows that Kiss teaches the recitations in the preamble, we need not determine whether the preamble is limiting. *See Vivid Techs.*, 200 F.3d at 803.

processes," analyze "problem statements," and reorganize them as "sets of tasks." Pet. 32 (citing Ex. 1005, 2:48–55). The agents of Kiss, Petitioner argues, "solicit[] accessible knowledge repositories" ("communication") and "analyze[] and integrate[] responses from those knowledge repositories," in order to "provide the responses to a human user or a using process" ("cooperative task completion"). Pet. 32 (citing Ex. 1005, 2:55–60, 5:21–62, Fig. 1; Ex. 1003 ¶¶ 202–205).

Petitioner argues,

> [i]n the combined system of Kiss and FIPA97, the agent service layer, combined with the meta-agent of Kiss constitutes "*a facilitator agent*" because, it is responsible for matching requests, from users and agents, with descriptions of the capabilities of other agents, (Ex. 1001, 4:64–66), and in that capacity facilitates the coordination and cooperation of distributed agents in resolving requests by bi-directionally communicating with knowledge agents and assigning tasks (sub-goals) to them in order to coordinate the completion of tasks ("*arranged to coordinate cooperative task completion*"), as demonstrated by the example of Figure 8–20 of Kiss.

Pet. 32–33.

Petitioner further argues that "FIPA97 also discloses a Directory Facilitator, which provides analogous functionality, Ex. 1006, 6–7, and for that reason would in the combined system be implemented in the meta-agent." Pet. 33 (citing Ex. 1005, 12:21–14:30. Figs. 8–20; Ex. 1003 ¶¶ 118–122, 348, 456–458).

Patent Owner does not specifically dispute that the combination of Kiss and FIPA97 teaches the preamble of claim 61. *See generally* Resp. Patent Owner does, however, argue more generally that Petitioner's proposed combination of Kiss and FIPA97 does not teach a "facilitator." *See* Resp. 71–84.

Patent Owner first argues that "*Kiss* and *FIPA97* either alone or in combination **do not** disclose the specialized functionality and operation of the claimed '115 Patent's 'facilitator agent.'" Resp. 72. Patent Owner argues that "[t]he *Kiss* meta-agent is **not** a facilitator." *Id.* Patent Owner argues that "meta-agents are described in the '115 Patent itself as part of the OAA architecture and **distinct** from facilitator agents." *Id.* Patent Owner argues that "[m]eta-agents in the '115 Patent are client agents as opposed to facilitating agents." *Id.* at 73 (citing Ex. 1001, 6:41–45). Patent Owner argues, "[t]he *Kiss* meta-agent is similar to the meta-agent of the '115 Patent, and does not perform the role of the claimed facilitator." Resp. 74 (citing Ex. 2032 ¶ 86). Patent Owner asserts that "[t]he *Kiss* meta-agent, at best, is a controller that routes queries through the system and presents results, and it lacks the sophistication and intelligent planning that the claimed facilitator performs." Resp. 74 (citing Ex. 1001, 19:52–53; Ex. 2032 ¶ 88).

Patent Owner further argues that "[t]he claimed facilitator in the '115 Patent is described as 'preferably involving three types of processing: delegation, optimization, and interpretation.'" Resp. 75 (citing Ex. 1001, 19:2–4). *"Kiss,"* Patent Owner argues, "does not disclose a meta-agent capable of these processes." Resp. 75.

Patent Owner argues:

> First, the Kiss meta-agent, while it breaks down queries into questions and passes them to knowledge agents, does not apply "selective application of global and local constraint and advice parameters onto the specific sub-goals." (Ex. 1001, 19:9–10.) The meta-agent's processing is a simple decomposition, listing of tasks on an agenda, and request for execution of the individual tasks.

Resp. 75 (citing Ex. 2032 ¶ 92).

Second, Patent Owner argues:

> *Kiss* contains no disclosure of optimization— "result[ing] in a goal whose interpretation will require as few exchanges as possible, between the facilitator and the satisfying agents, and can exploit parallel efforts of the satisfying agents." (Ex. 1001, 19:15–18.) There is no mechanism for the meta-agent to consider efficiencies or other factors that would result in returning results in an optimized way. (Ex. 2032 ¶¶ 93–96.) Indeed, the meta-agent simply relies on the agent service layer to tell it which of the agents has the knowledge necessary to answer the question, and then submits to that self-identifying agent.

Resp. 75 (citing Ex. 1005, 12:29–36; Ex. 2032 ¶ 94).

Third, Patent Owner argues:

> *Kiss's* meta-agent does not use an intelligent method or its own knowledge resources to interpret capabilities or use strategies or advice in the coordination of requests to and assembly of results from satisfying agents. (*See* Ex. 1001, 19:24–27 ("facilitator uses its knowledge of the capabilities of its client agents" and/or "strategies or advice specified by the requester" when coordinating requests and assembling responses to interpret and satisfy a goal); Ex. 2032 ¶ 96.) While there is some mechanism of deconflicting, there is no disclosure in Kiss that the meta agent does any processing other than applying rule-driven criteria to sort through the results.

Resp. 76 (citing Ex. 2032 ¶ 97). "Indeed," Patent Owner argues, "*Kiss* describes a system that the '115 Patent classifies as the prior art 'Distributed Object Approach,'" depicted in Figure 2 of the patent." Resp. 77 (citing Ex. 2032 ¶ 98).

Patent Owner then goes on to argue that "*FIPA97*'s Directory Facilitator is no more than a directory of agent capabilities." Resp. 78. Patent Owner argues that while FIPA97's Directory Facilitator "may provide agent registry-type functions within a facilitator (*see*, *e.g.*, Ex. 1001, Fig. 7), *FIPA97* does not disclose any of the robust facilitator functions described in

the '115 Patent and which are missing from *Kiss*'s meta-agent." Resp. 78 (citing Ex. 2032 ¶¶ 101–105).

In its Reply, Petitioner argues that Patent Owner "ignores the actual Kiss/FIPA97 combination and instead attacks the references individually." Reply 35. Petitioner also argues "the **combined** system of Kiss/FIPA97 discloses all **the claimed features** of a facilitator agent, so what Kiss chose to name his facilitator [i.e. "meta-agent"] is plainly immaterial." Reply 36 (internal citations omitted).

Petitioner also argues Patent Owner's "list of the various optional features of the facilitator agent, (Response, 65–71), are simply not relevant to the '*facilitator agent'* as claimed—and in fact, the record evidence suggests a much broader understanding of that term." Reply 36. Petitioner points out that Patent Owner's expert, Dr. Medvidovic, defined a facilitator agent as "a specialized server agent responsible for coordinating agent communications and cooperative problem solving." *Id.* (quoting Ex. 1129, 79:7–9).

Petitioner further argues that the "delegation, optimization, and interpretation" functionalities Patent Owner claims are missing from the Kiss meta-agent are limited to a preferred embodiment in the '115 patent, and therefore are not relevant to an obviousness analysis. Reply 37 (citing Resp. 74–75). Petitioner argues that Dr. Medvidovic confirmed these were functionalities of a preferred embodiment. Reply 37 (citing Ex. 1129, 54:2–9). In any event, Petitioner argues, the Kiss/FIPA97 combination teaches delegation under the ordinary meaning of that term. Reply 38 (citing Ex. 1005, 3:25–27, 12:21–14:30, Figs. 8–20, 5:24–27. Petitioner takes similar positions with respect to "optimization" and "interpretation." *See* Reply 38–39 (citing Ex. 1005, 7:8–11, 7:65–8:4, 8:5–8, 8:17–23).

With respect to Patent Owner's criticisms of FIPA97, Petitioner again points out that Patent Owner is arguing against the references separately instead of the combination of FIPA97's Facilitator Agent with Kiss' meta-agent described by Petitioner. Reply 39–40. Petitioner also argues that "FIPA97 does disclose 'facilitation primitives,'" despite Patent Owner's arguments to the contrary. Reply 40.

In its Sur-reply, Patent Owner argues that it is not attacking the prior art references individually, but rather, it "addresses the disclosures within each reference, matching what the Petition does." Sur-reply 36.

With respect to Patent Owner's argument that "[t]he *Kiss* meta-agent is **not** a facilitator (Resp. 72), Patent Owner argues that "**none** of Patent Owner's arguments rest on the fact that the same words are or are not used in the asserted references and the '115 Patent." Sur-reply 37 (citing Reply 36). Patent Owner argues that "Dr. Lieberman, relies on similar portions of the specification to describe his interpretation of the 'facilitator agent,'" as Patent Owner used to show facilitator agent functionality in the '115 patent. Sur-reply 38.

Patent Owner also argues "the Board must disregard [Petitioner's] arguments and evidence" based on any "new citations in Petitioner's Reply" "to the Kiss patent that were not cited in support of the facilitator limitation in the Petition," and that "even if the Board did consider it, the new evidence is not on point." *Id.* at 40.

We agree with Petitioner. "[One] cannot show non-obviousness by attacking references individually where . . . the rejections are based on combinations of references." *Boundary Solns. Inc. v. Corelogic, Inc.,* 711 Fed. Appx. 627, 631–632 (Fed. Cir. 2017) (quoting *Keller*, 642 F.2d at 426).

Petitioner makes clear that

> [i]n the combined system of Kiss and FIPA97, the agent service layer combined with the meta-agent of Kiss constitutes "*a facilitator agent*" because it is responsible for matching requests, from users and agents, with descriptions of the capabilities of other agents, and in that capacity facilitates the coordination and cooperation of distributed agents in resolving requests by bidirectionally communicating with knowledge agents and assigning tasks (subgoals) to them in order to coordinate the completion of tasks.

Pet. 32–33 (citing Ex. 1001, 4:64–66).

Given Petitioner's articulation that it is "the agent service layer *combined* with the meta-agent of Kiss" that constitutes "*a facilitator agent,*" Patent Owner's argument that "[t]he *Kiss* meta-agent is **not** a facilitator," is unavailing because it fails to respond to Petitioner's combination of the agent service layer and the Kiss meta-agent as the recited "facilitator agent." *See* Resp. 72. Similarly, Patent Owner's argument that "[t]he *Kiss* meta-agent is similar to the meta-agent of the '115 Patent, and does not perform the role of the claimed facilitator," is equally unavailing for the same reason. *See id.* at 74.

Patent Owner makes additional arguments in support of its position that the Kiss meta-agent is not a facilitator. For example, Patent Owner argues, "[t]he claimed facilitator in the '115 Patent is described as 'preferably involving three types of processing: delegation, optimization, and interpretation.' (Ex. 1001, 19:2–4.) *Kiss* does not disclose a meta-agent capable of these processes." *See* Resp. 75. In addition to being nonresponsive to Petitioner's proffered combination, these arguments fail for another reason—they improperly attempt to read exemplary characteristics from preferred embodiments in the specification into the claims. Indeed, as this section of the'115 patent makes clear, "[a] further *preferred embodiment*

*of the present invention incorporates* facilitator handling of compound goals, preferably involving *three types of processing: delegation, optimization and interpretation.* Ex. 1001, 19:1–4.

Perhaps more helpful in understanding the nature of a "facilitator agent" is Patent Owner's expert, Dr. Medvidovic's, observation in reference to Figure 4 of the '115 patent that "facilitator agent 402" is "a specialized server agent that is responsible for coordinating agent communications and cooperative problem-solving." *See* Ex. 2032 ¶ 32 (citing Ex. 1001, 6:32–35, Fig. 4).[17] Indeed, at his deposition, Dr. Medvidovic confirmed that this was his understanding of a "facilitator agent." There, Dr. Medvidovic testified, "if you were asking me define a facilitator agent, I might say it's a specialized server agent responsible for coordinating agent communications and cooperative problem solving. That is a definition." Ex. 1129, 79:15–19.

With this understanding of a facilitator agent, Petitioner's proposed "agent service layer, combined with the meta-agent of Kiss," amounts to "a facilitator agent" because the proposed combination coordinates communications with agents and the cooperative completion of tasks. *See* Pet. 32–33.[18]

Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the combination Kiss and FIPA97 teaches the preamble of claim 61.

---

[17] We note for the record that neither party proposed a construction for the term, "facilitator agent."

[18] Other aspects of Patent Owner's arguments relating to a "facilitator agent," such as the motivation to combine and combination of FIPA97 and Kiss, are considered in Section II.C.5 *supra.*

*b. Agent Registry*

Claim 61 also requires "an agent registry that declares capabilities of service-providing electronic agents currently active within the distributed computing environment." Petitioner asserts that Kiss teaches this limitation because Kiss describes a "registry of agents," that declares capabilities of service-providing electronic agents currently active within the distributed computing environment. Pet. 33 (citing Ex. 1005, 3:37–45, 6:66–7:19, 8:41–48, 10:32–35, 11:51–12:20, Figs. 1, 6). Each knowledge agent, Petitioner contends, "is combined with an associated knowledge module that includes capabilities and interests associated with that particular agent." *Id.* (citing Ex. 1005, 3:4–11, 11:1–17, 11:53–12:17; Ex. 1003 ¶¶ 206–210).

In its Response, Patent Owner does not specifically dispute that Kiss teaches this limitation as recited in claim 61. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches "an agent registry that declares capabilities of service-providing electronic agents currently active within the distributed computing environment," as recited in claim 61.

*c. Facilitating Engine*

Claim 61 requires "a facilitating engine operable to parse a service requesting order to interpret a compound goal set forth therein." Petitioner contends the '115 patent "does not disclose a 'facilitating engine,' but from how it is used in this claim, it refers to some portion of a facilitator agent capable of processing a service request." Pet. 34 (citing Ex. 1003 ¶ 652).

Petitioner asserts Kiss teaches "that the meta-agent parses service requests to interpret goals 'set forth therein.'" Pet. 34 (citing Ex. 1003 ¶ 653). Petitioner also asserts FIPA97 teaches "that service requests can

include a 'compound goal.'" Pet. 34. For example, Petitioner argues, "FIPA ACL allows the expression of multiple sub-goals, and which can potentially include more than one type of logical connector and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent." *Id.* (citing Ex. 1003 ¶ 293). FIPA97, Petitioner argues, "allows the construction of s-expressions of arbitrary depth and complexity," discloses a "Semantic Language" or "SL content language" as one type of encoding language that can be used with FIPA ACL, and explains that "communicative acts" (or proposed actions) exist in two classes in SL: "primitive acts" and "composite acts." Pet. 34 (citing Ex. 1007, 15, 16, 64, 75; Ex. 1003 ¶ 294). Petitioner argues "[c]omposite communicative acts" are described in FIPA7 as being "defined in terms of other acts," and can be composed using a number of operators, including a composite operator "whose meaning is that of action a followed by action b." Pet. 34–35 (citing Ex. 1007, 16–17, 57; Ex. 1003 ¶¶ 295–296).

Petitioner argues FIPA97 "also discloses more complex 'goal expressions' that 'express multiple sub-goals' and which may also include, for example, 'logical nesting' using parentheses." Pet. 35 (citing Ex. 1007, 40, 41; Ex. 1003 ¶¶ 298–299). Petitioner argues FIPA97 "also discloses that a goal expression can be composed of smaller expressions chained with operators or logical connectives." Pet. 35 (citing Ex. 1007, 69, 75, 78; Ex. 1003 ¶¶ 300–301).

Further, Petitioner argues, FIPA97 "discloses agents with the ability to nest a sub-goal within a single command without using the need of a 'sequencing operator.'" Pet. 35 (citing Ex. 1007, 31; Ex. 1003 ¶¶ 302–303). Thus, Petitioner argues, "the meta-agent of Kiss/FIPA97 would include the ability ('operable') . . . 'to parse a service requesting order to interpret a

compound goal set forth therein' so that it could interpret service requests expressed in FIPA ACL, such as compound goal requests." Pet. 35 (citing Ex. 1003 ¶ 653).

Patent Owner does not specifically dispute that the combination of Kiss and FIPA97 teaches this limitation as recited in claim 61. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the combination of Kiss and FIPA97 teaches "a facilitating engine operable to parse a service requesting order to interpret a compound goal set forth therein," as recited in claim 61.

*d. Local and Global Constraints*

Claim 61 also recites, "the compound goal including both local and global constraints and control parameters."

Petitioner argues the ordinary meaning of a "local constraint" is a limitation that applies to a local domain or search, whereas a "global constraint" is a limitation that applies to all agents and search domains in the system. Pet. 36 (citing Ex. 1034, 217–218, 287). Petitioner also argues the ordinary meaning of a "control parameter" is a factor that dictates the flow of execution for a process. Pet. 36 (citing Ex. 1034, 118; Ex. 1003 ¶ 655).

Petitioner argues, the "meta-agent of Kiss 'attempts to employ all elements of information contained in the parsed inquiry in the development of search-space constraints.'" Pet. 36 (citing Ex. 1005, 8:35–37). Petitioner argues, a "Skilled Artisan would understand 'search-space constraints' to be comparable to 'global constraints.'" Pet. 36 (citing Ex. 1003 ¶ 656).

Petitioner argues Figure 13 of Kiss shows "that the meta-agent may apply 'local constraints' to a specific service request asking the meta-agent to 'identify the cost of a sufficient number of production lines to produce the

specified number of units,' (Ex. 1005, 13:37–39, Fig. 13; Ex. 1003 ¶ 657), which is forwarded to a facilities agent in order to calculate 'the cost of the specified number of production lines.'" Pet. 36–37 (citing Ex. 1005, 13:46–47). Petitioner argues, a "Skilled Artisan would understand this request contains [] 'local constraints' because the facilities agent must respond to the query as it relates to a 'specified number of production lines.'" Pet. 37 (citing Ex. 1005, 13:46–47; Ex. 1003 ¶ 658).

Petitioner asserts Kiss further discloses goals that contain "control parameters." Among them, Petitioner argues, is "real time" where a "[u]ser may express time quantity for the query, e.g. 'I am willing to wait ten minutes for a response.'" Pet. 37 (citing Ex. 1005, 7:65-8:4). Petitioner argues a "Skilled Artisan would recognize that this request contains a 'control parameter' dictating the amount of time the inferencing should take." Pet. 37 (citing Ex. 1003 ¶ 659).

Additionally, Petitioner argues, "<u>FIPA</u> discloses two kind[s] of auction procedures—Dutch and English—that make use of global and local constraints. In a Dutch Auction, like in an English Auction, a seller is attempting to determine the price of a good by proposing different prices for a good." Pet. 37 (citing Ex. 1007, 49; Ex. 1003 ¶ 660).

Petitioner also argues FIPA97 "discloses the use of 'control parameters' through the definition of the term 'Iota.'" Pet. 38. In FIPA ACL, Petitioner explains, "[t]he iota operator is a constructor for terms which denote objects in the domain of discourse." *Id.* Essentially, Petitioner argues, "Iota helps define the scope of a question." *Id.* (citing Ex. 1007, 15). Where an expression may be overbroad, Petitioner argues, "Iota may be used to limit the possible solutions of a question." Pet. 38 (citing Ex. 1007, 15, 32; Ex. 1003 ¶¶ 662–664).

Patent Owner does not specifically dispute that the combination of Kiss and FIPA97 teaches this limitation as recited in claim 61. *See generally* Resp.

We agree with Petitioner that the ordinary meaning of a "local constraint" is a limitation that applies to a local domain or search, a "global constraint" is a limitation that applies to all agents and search domains in the system, and a "control parameter" is a factor that dictates the flow of execution for a process, for the reasons articulated by Petitioner. *See* Pet. 36. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the combination of Kiss and FIPA97 teaches "the compound goal including both local and global constraints and control parameters," as recited in claim 61.

*e. Interagent Communication Language (ICL)*

Claim 61 recites, "an Interagent Communication Language (ICL), wherein the ICL includes: a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events; and a content layer comprising one or more of goals, triggers and data elements associated with the events." Ex. 1001, 35:14–22.

Petitioner contends that FIPA97 teaches each of these limitations. Pet. 38–46. Patent Owner asserts that FIPA97 does not teach "refining events" and "triggers." *See* Resp. 97–108.

*i. Conversational Protocol*

Petitioner asserts that FIPA97 teaches "a layer of conversational protocol" recited in claim 61 because FIPA ACL "defines the semantics of messages between agents as including a communicative act, followed by

various parameters and parameter expressions." Pet. 39 (citing Ex. 1007, Fig. 1; Ex. 1003 ¶ 235). Petitioner also argues that FIPA97 "discloses a number of different performatives and rules governing FIPA ACL messages and the meaning of the different parts" and, therefore, discloses "*a layer of conversational protocol*." Pet. 39 (citing Ex. 1007, 11–22; Ex. 1003 ¶¶ 236–239).

*ii. Events and Event Types*

As discussed above in Section II.B. (Claim Construction), we construe "event" to mean "a message or goal communicated between agents" and "event type" to mean "a type of an event" for this Final Written Decision.

Petitioner maps the "event" of claim 61 to FIPA ACL's "message" and asserts that FIPA ACL's "message type" teaches an "event type" recited in claim 61. Pet. 40–41 (citing Ex. 1007, 3, 4, 11–13; Ex. 1003 ¶¶ 243, 244). Petitioner argues that FIPA ACL's "message" is an "event" because the FIPA ACL communicative acts "are performed by an agent sending a *message* to another agent." *Id.* at 40 (emphasis added) (citing Ex. 1007, 3, 4, 11; Ex. 1003 ¶ 243).

Referencing Figure 1 of Part 2 of FIPA97, Petitioner asserts that in FIPA ACL, "[t]he first element of the message is a word which identifies the communicative act being communicated, which defines the principal meaning of the message," and "the message's communicative act *type* corresponds to that which in KQML is called the performative." Pet. 40 (emphasis added) (citing Ex. 1007, 13; Ex. 1003 ¶ 244). Petitioner argues that FIPA97 further defines "message type" as corresponding to the "communicative acts/performatives of the FIPA ACL." *Id.* at 38 (citing Ex. 1007, 18; Ex. 1003 ¶ 246).

As discussed above, Petitioner asserts that FIPA97 teaches "a layer of conversational protocol" because FIPA ACL "defines the *semantics of messages* between agents as including a communicative act." Pet. 39 (emphasis added) (citing Ex. 1007, 12, Fig. 1). Petitioner contends that FIPA97 teaches the layer of conversational protocol in FIPA ACL is "defined by event types," because in FIPA97, "**[t]he <u>message types</u> are a reference to <u>the semantic acts</u> defined in this specification**." *Id.* at 40 (underlined emphases added) (citing Ex. 1007, 11).

*iii. Parameter Lists*

Claim 61 recites that "a layer of conversational protocol" is also "defined by . . . parameter lists associated with one or more of the events." Petitioner asserts that in FIPA97, "FIPA ACL messages may include multiple different parameters ('*parameter lists associated with one or more of the events*') that can 'help the message transport service to deliver the message correctly' or 'the receiver to interpret the meaning of the message,' or 'to respond co-operatively.'" Pet. 41–42 (citing Ex. 1007, 12–14, Fig. 1, Table 1; Ex. 1003 ¶ 251).

*iv. Refining Events*

Claim 61 recites that "the parameter lists further refine the one or more events." Petitioner asserts that this phrase should be construed to mean that "a list of parameters associated with an event can refine the event by affecting the meaning of the event." Pet. 12. Petitioner discusses the disclosures in the Specification and the prosecution history of the '115 patent in support of its proposed construction. *Id.* at 12–15 (citing Ex. 1001, 11:2–37; Ex. 1002, 13–14, 51, 55; Ex. 1020, 5, 6; Ex. 1003 ¶¶ 90, 91, 93–98).

Although Patent Owner discusses constructions for several terms in the Patent Owner Response, Patent Owner does not discuss Petitioner's proposed construction for the claim term "refine . . . events" or proposes its own construction. *See* Resp. 24–38. Instead, Patent Owner argues that FIPA97 does not teach parameters that "refine . . . events" under Petitioner's proposed construction. *See* Resp. 97–98 ("the cited parameters in FIPA97 do not, contrary to Petitioner's assertion, affect the meaning of the message"), 100 ("this parameter **does not** affect the **meaning** of the message"), 102 ("In contrast, the FIPA97 'receiver' parameter **does not affect the meaning of the "inform" communicative act**."). Based on the arguments and evidence presented by Patent Owner, we understand Patent Owner not to dispute Petitioner's proposed construction for the term "the parameter lists further refine the one or more events."

Upon considering the complete record, we agree with Petitioner that the claim term "refine . . . events" encompasses "affecting the meaning of the events." As discussed above, during prosecution, the limitation "wherein the parameter lists further refine the one or more events" was added in an amendment to distinguish the combination of Nwana/KQML and Kiss cited by the Examiner. *See* Ex. 1002, 13–14, 18, 28, 51. Citing the disclosures of Nwana/KQML discussed by the Examiner, Petitioner persuasively argues that the parameters of Nwana's KQML message (i.e., the claimed "event") "tell" do not change the meaning of the message, whereas the parameters of an event of the '115 patent's change the meaning of the event by "refin[ing] the event." Pet. 12–15 (citing Ex. 1002, 13–14, 51, 55; Ex. 1020, 5, 6). In support of its argument, Petitioner cites the following passage from the Specification that distinguishes the '115 patent's ICL (i.e., the recited "inter-agent language") from KQML.

> For example, in KQML, a request to satisfy a query can employ either of the performatives ask_all or ask_one. In ICL, on the other hand, this type of request preferably is expressed **by the event type evost solve, together with the solution_limit(N) parameter--where N can be any positive integer**. (A request for all solutions is indicated by the omission of the solution limit parameter.) [The request can also be accompanied by other parameters, which combine to <u>further refine</u> its semantics.] In KQML, then, this example forces one to choose between two possible conversational options, neither of which may be precisely what is desired. In either case, the performative chosen is a single value that must capture the entire conversational characterization of the communication.

Pet. 12 (alteration and underlined emphasis added) (quoting Ex. 1001, 11:21–37).

Petitioner argues that a message having the KQML performative "ask_all" always has the same meaning, requesting all solutions to the request, just as the KQML performative "ask_one" always requests one solution. Pet. 13. According to Petitioner, in contrast, the meaning of the '115 patent's event "evost_solve" depends on the value of its parameter "solution_limit(N)"—e.g., an agent may request the identity of three agents capable of translating a document by including "solution_limit(N)" in the message and setting the value of N to 3. *Id.* Thus, Petitioner argues that the parameters of an event of the '115 patent affect the meaning of the event. *Id.* at 13–15.

We are persuaded by Petitioner's argument and evidence that the "parameterized approach" of the '115 patent (Ex. 1001, 11:16–21) can refine an event by changing the meaning of the event. As discussed above in Section II.B., we construe "event" to mean "a message or goal communicated between agents" and "goal" to mean "a request for service." The '115 patent describes that "[i]n one embodiment, a request for one of an

agent's services normally arrives in the form of an *event* from the agent's facilitator." Ex. 1001, 12:44–46 (emphasis added). In a section titled "Refining Service Requests," the '115 patent describes as follows:

> In a preferred embodiment of the present invention, *parameters* associated with a goal (or sub-goal) can draw on useful features to *refine the request's meaning*. For example, it is frequently preferred to be able to specify whether or not solutions are to be returned synchronously; this is done using the reply parameter, which can take any of the values synchronous, asynchronous, or none. As another example, when the goal is a non-compound query of a data solvable, the cache parameter may preferably be used to request local caching of the facts associated with that solvable.

*Id.* at 15:49–58 (emphases added). Thus, the '115 patent describes that in an embodiment, parameters of a request for service, i.e., an event, can refine the "meaning" of the request or event.

Nonetheless, we note that this passage and all of the disclosures of the '115 patent cited by Petitioner describe exemplary embodiments. *See id.* at 11:25–28 ("In ICL . . . this type of request *preferably* is expressed by the event type evost solve, together with the solution_limit(N) parameter--where N can be any positive integer." (emphasis added)), 15:49–51 ("In a *preferred embodiment* of the present invention, *parameters* associated with a goal (or sub-goal) can draw on useful features to *refine the request's meaning*." (emphases added)). Thus, the term "refine . . . events" recited in claim 1 may encompass but is not necessarily limited to "affecting the meaning of events." *See SuperGuide*, 358 F.3d at 875 ("a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment"); *WesternGeco*, 889 F.3d at 1323–24 ("It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise.").

Indeed, Petitioner's proposed construction of the term "the parameter lists further refine the one or more events" expresses the meaning of the term in a permissive fashion—"an event *can* refine the event by affecting the meaning of the event." Pet. 12 (emphasis added).

Based on the complete record, we determine that the term "the parameter lists further refine the one or more events" encompasses parameters "affecting the meaning of the events."

Petitioner asserts that FIPA97 teaches the limitation "the parameter lists further refine the one or more events" because several of the conversational layer parameters disclosed in FIPA97 affect the meaning of the performative included within the message, and therefore affect the meaning of the message, or event. Pet. 39. According to Petitioner, FIPA97 discloses a parameter ":receiver," which "can alter the meaning [of] an event, such as 'inform,' to be 'inform one'" or "inform a number' of agents, depending on the value of the parameter." *Id.* at 43 (citing Ex. 1007, 13). Citing the testimony of Dr. Lieberman, Petitioner asserts that naming a tuple "corresponds to the action of multicasting the message" such that "semantics of this multicast" is refined so that "the message is sent to each agent named in the tuple." *Id.* (citing Ex. 1007, 13; Ex. 1003 ¶ 258). Petitioner also argues, "[t]his 'tuple naming' functionality is analogous to the example provided in the '115 Patent of 'solution_limit(N),' in which 'N' modifies how many solutions are requested, and is not found in the KQML Nwana reference that was before the examiner." *Id.* (citing Ex. 1001, 11:16–42; Ex. 1020; Ex. 1003 ¶ 258). Petitioner also asserts that FIPA97 discloses two other parameters—":protocol" when used with the "call for proposals" performative and ":conversation-id"—that affect the meaning of a message. *Id.* at 43–44 (citing Ex. 1007, 13–14, 46–49; Ex. 1003 ¶¶ 261–265).

Patent Owner asserts that FIPA97 does not teach parameters "refin[ing] . . . events," because the parameters of FIPA97 cited by Petitioner does not affect the meaning of the message. Resp. 97–98. In particular, Patent Owner contends that FIPA97's ":receiver" parameter of the FIPA97 "inform" message relied upon by Petitioner is no different from KQML's ":receiver" parameter for the KQML "tell" message in that both modify the message but do not affect the meaning of the message. *Id.* at 98–99 (citing Ex. 1007, 12; Ex. 1020, 5). Patent Owner asserts that FIPA97's ":receiver" parameter does not affect the meaning of the FIPA97 "inform" message because "the result of this parameter is only that the message is multicast; i.e., it is 'sent to each agent named in the tuple.'" Resp. 100. According to Patent Owner, "the content of the message is unchanged; the only thing that changes is who (as in, recipient) receives the message." *Id.* at 101.

Petitioner asserts that the "receiver" parameter in FIPA97 affects the meaning of the event by affecting "whether the performative communicates the message to a single agent, a selection of agents, or if [the message is] broadcast to every agent." Reply 56 (citing Ex. 1007, 13). According to Petitioner, "in <u>FIPA97</u>, an event using 'inform' can *mean three or more different things* (i.e., inform (1) one person, (2) a select group of people, (3) everybody) depending on the value of just that parameter." *Id.*

We agree with Petitioner. FIPA97 describes the "meaning" of the message affected by the ":receiver" parameter as follows:

> Note that the recipient may be a single agent name, or a tuple of agent names. This corresponds to the action of multicasting the message. Pragmatically, the semantics of this multicast is that the message is sent to each agent named in the tuple, and that the sender *intends* each of them to be recipient of the CA encoded in

> the message. For example, if an agent performs an inform act with a tuple of three agents as receiver, it denotes that the sender *intends* each of these agent to come to believe the content of the message.

Ex. 1007, 13 (emphases added). We agree with Petitioner that this passage describes the meaning of the message modified or affected by the ":receiver" parameter.

Patent Owner argues that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." Resp. 101. Patent Owner contends that, in contrast, the solution_limit(N) parameter of the '115 patent "modifies the actual request/communicative act/performative itself—i.e., **evost solve**, because it imposes a modification on the limits of **solutions** presented in response to a request." *Id.* at 102 (citing Ex. 2032 ¶161).

We are not persuaded by Patent Owner's argument. First, we disagree with Patent Owner that the FIPA97 ":receiver" parameter changes only "who (as in, recipient) receives the message." As described in FIPA97, the ":receiver" parameter does not merely specify "who receives the message," e.g., agent A as opposed agent B. Rather, as persuasively explained by Petitioner, the ":receiver" parameter affects the qualitative aspect of the message—i.e., whether to inform (1) one agent, (2) a select group of agents, or (3) every known agent. *See* Reply 56.

In addition, Patent Owner does not explain adequately why the solution_limit(N) parameter of the '115 patent specifying the number of agents to be queried "modifies the actual request/communicative act/performative itself" but the ":receiver" parameter of FIPA97 specifying the number of agents to which to send a message does not. *See* Resp. 100–101. We agree with Petitioner that Patent Owner does not identify "a

practical distinction between limiting the number of agents to be queried (solution_limit(N)), and querying a selection of agents (:receiver).” Reply 57.

Next, Patent Owner contends that FIPA97 does not teach parameters “refin[ing] . . . events,” as recited in the claim, because FIPA97’s “:receiver” parameter is the same as or similar to the KQML “:receiver” parameter, which does not modify the meaning of a message. Resp. 98–99 (citing Ex. 1007, 12; Ex. 1020, 5). In support of its argument, Patent Owner cites a page from Dr. Finin’s presentation slides at an unidentified meeting or class, which compares “KQML tell and FIPA ACL inform.” Resp. 99–100 (citing Ex. 2019, 15; Ex. 2013, 132:6–22.). Patent Owner also cites the testimony from Dr. Finin at his deposition that “the general idea of agent communication language that was embodied in KQML is similar to the one that is embodied in FIPA.” Resp. 100 (citing Ex. 2012, 32:10–17).

Patent Owner, however, does not discuss the disclosure of KQML/Nwana (Ex. 1020) sufficiently (other than pointing to the similarity of the format between the “:receiver” parameter of KQML and FIPA97) or explain adequately why KQML’s “:receiver” parameter is similar to the FIPA97 “:receiver” parameter. *See* Resp. 98–100. For example, Patent Owner does not explain whether KQML’s “:receiver” parameter specifies, similar to FIPA97, that “the recipient may be a single agent name, or a tuple of agent names,” that “the message is sent to each agent named in the tuple,” and that “the sender *intends* each of them to be recipient of the message.” *See id.*; Ex. 1007, 13 (emphasis added). The general statements from Dr. Finin (or a slide purportedly from his unidentified presentation) cited by Patent Owner (Resp. 99–100 (citing Ex. 2019, 15; Ex. 2013, 132:6–22; Ex. 2012, 32:10–17) regarding the alleged similarity between KQML and

FIPA97 at a general level are simply insufficient to override the specific disclosures in FIPA97 cited by Petitioner regarding the meaning of the message modified or affected by the FIPA97 ":receiver" parameter.

Patent Owner also cites testimony from Petitioner's declarant, Dr. Lieberman, as "confirm[ing]" that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." Resp. 101 (citing Ex. 2014, 110:14–111:16, 168:5–12). The cited testimony of Dr. Lieberman, however, discusses FIPA97's messages and multicasting in general (responding to general questions from Patent Owner's counsel) and does not discuss the specific disclosure in FIPA97 cited by Petitioner regarding the meaning of the message modified or affected by the FIPA97 ":receiver" parameter. *See* Ex. 2104, 108:4–111:16, 168:5–12. Thus, we find Patent Owner's citation to the testimony of Dr. Lieberman to be unpersuasive (if not misleading) to "confirm" that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." *See* Resp. 101.

Next, Patent Owner cites 9 paragraphs from the Declaration of Dr. Cohen (Ex. 2033) to argue that "FIPA97 does not contain any conversational layer parameters that affect the semantics of FIPA97 messages." Resp. 103 (citing Ex. 2033 ¶¶ 80–89).[19] Patent Owner, however, does not discuss Dr. Cohen's testimony in the Patent Owner Response or explain how Dr. Cohen's testimony supports its contention. *See*

[19] Patent Owner's citation to the Cohen Declaration appears to be mistaken since the last paragraph of Cohen Declaration is paragraph 88.

*id.* Thus, to the extent Patent Owner purports to rely on Dr. Cohen's testimony, this amounts to improper incorporation by reference in violation of 37 C.F.R. § 42.6(a)(3). Accordingly, we decline to consider the cited paragraphs from the Cohen Declaration. We note, nonetheless, that Dr. Cohen's testimony appears to dwell in generalities, e.g., citing the works of logicians/philosophers Tarski and Frege (*see* Ex. 2033 ¶¶ 80–81), and discusses tuples and multicasting in general terms (*see id.* ¶¶ 85–88).

Lastly, Patent Owner contends that the limitation "the parameter lists further refine the one or more events" requires "the parameters of an event (or message) can refine the message or goal itself" (Resp. 97) or "change the nature of the communicative act itself" (*id.* at 102). Although it is not entirely clear what Patent Owner argues,[20] to the extent Patent Owner argues "refin[ing]" a messages or goal requires changing the message or goal itself, we disagree with Patent Owner's argument. As discussed above, in a section titled "Refining Service Requests," the '115 patent describes examples of "parameters" associated with a request or goal that "refine the request's meaning," including the "reply parameter" that specifies whether solutions are to be returned synchronously or asynchronously, and the "cache parameter" that specifies local caching of facts related to the request. *See* Ex. 1001, 15:49–58. These parameters do not appear to change the request itself but, rather, specify how the request should be handled—e.g., synchronous response, local caching, etc. Thus, we are not persuaded by Patent Owner's argument that the claim requires the recited "parameters"

[20] As discussed above, Patent Owner does not dispute Petitioner's proposed construction of the term "the parameter lists further refine the one or more events." *See* Resp. 24–38.

"refine the message or goal itself" (Resp. 97) or "change the nature of the communicative act itself" (*id.* at 102). Such an interpretation, which "excludes a [disclosed] embodiment from the scope of the claim is rarely, if ever, correct." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) (quoting *Accent Pkg., Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013)) (citing *Phillips*, 415 F.3d at 1312–13).

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that FIPA97 teaches "wherein the parameter lists further refine the one or more events," as recited in claim 61. We also determine that Petitioner has shown sufficiently that FIPA97 teaches "a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events," as recited in claim 61.

*v. Content layer*

Claim 61 recites "a content layer comprising one or more of goals, triggers and data elements associated with the events." Petitioner asserts that FIPA97 teaches the recited "content layer" because FIPA97 describes various rules and standards governing the content that may be embedded within messages ("a content layer"). Pet. 45 (citing Ex. 1007, 3, 9, 14–16). Petitioner argues that the '115 patent consistently explains that the "content layer" of the disclosed ICL "consists of the specific goals, triggers, and data elements that may be *embedded* within various events." Pet. 8 (Ex. 1001, 11:13–15).

Petitioner also contends that FIPA97 teaches "the use of 'goals' within the 'content layer,' explaining that 'goals can be communicated among agents through the use of an achieve domain-language primitive,'

and that 'it is common to embed [a] goal in an expression in the chosen content language.'" Pet. 45 (citing Ex. 1007, 68–69, 81; Ex. 1003 ¶¶ 273–274).

Petitioner asserts that FIPA97 also teaches "data elements associated with the events" because FIPA ACL supports content expression through objects and other data ("data elements") associated with various performatives. Pet. 43 (citing Ex. 1007, 14).

*vi. Triggers*

Petitioner asserts that a "trigger" is "a general mechanism for requesting some action be taken when one or more conditions is met." Pet. 10 (citing Ex. 1001, 21:21–22:31; Ex. 1003 ¶¶ 80–81). Patent Owner does not dispute Petitioner's proposed meaning of "trigger" (*see* Resp. 24–38) but argues that FIPA97 does not teach triggers under Petitioner's interpretation of the term (*see id.* at 107–108). We adopt this undisputed interpretation of "trigger" for this Final Written Decision because the construction is consistent with the disclosure in the Specification. *See* Ex. 1001, 21:22–24 ("triggers [provide] a general mechanism for requesting some action be taken when a set of conditions is met").

Petitioner asserts that FIPA97 discloses "triggers" for various performative actions within the content layer, including for use with the performative "accept-proposal" which "informs the receiver that it intends that (at some point in the future) the receiving agent will perform the action, once the given precondition is, or becomes, true." Pet. 45 (citing Ex. 1007, 23; Ex. 1003 ¶ 276). Petitioner argues that FIPA97 teaches the performative "propose" can be used "to make a proposal or respond to an existing proposal during a negotiation process by proposing to perform a given action

subject to certain conditions being true." Pet. 45–46 (citing Ex. 1007, 34; Ex. 1003 ¶¶ 277–279).

Petitioner argues that the '115 patent describes "triggers" as "providing a general mechanism for requesting some action be taken when a set of *conditions* is met," and that such triggers "preferably specif[y] at least a *condition* and an action . . . [t]he *condition indicates under what circumstances the trigger should fire*, and the action indicates what should happen when it fires." Pet. 10 (emphases added) (citing Ex. 1001, 21:21–34, 21:35–22:31).

Patent Owner contends that the portions of FIPA97 cited by Petitioner do not describe "a settable trigger that kicks in when a specified event takes place." Resp. 108. Patent Owner asserts that the communicative acts (or performative actions) cited by Petitioner instead are "performatives that contain parameters dictating what the associated action is." *Id.* at 107 (citing Ex. 2032 ¶¶ 168–169).

Patent Owner also cites 35 paragraphs from the Cohen Declaration in support of its argument. *Id.* at 108 (citing Ex. 2033 ¶¶ 30–64). Patent Owner, however, does not discuss Dr. Cohen's testimony in the Patent Owner Response or explain how Dr. Cohen's testimony supports its contention. *See id.* at 107–108. Thus, to the extent Patent Owner purports to rely on Dr. Cohen's testimony, this amounts to improper incorporation by reference in violation of 37 C.F.R. § 42.6(a)(3). Accordingly, we decline to consider the cited paragraphs from the Cohen Declaration.

Petitioner argues that the performative "accept-proposal" "informs the receiver that it intends that (**at some point in the future**) the receiving agent will perform the action, once the given precondition is, **or becomes**, true."

Reply 63 (citing Ex. 1007, 23). Petitioner cites the following testimony from Dr. Lieberman:

> [T]he "precondition" is sent to an agent through the "*content layer*," then at some future point when that "precondition" is met the receiving agent will "*trigger*" and take an action based upon the information encoded in the "*content layer*" of the message. **EX1007, 23**.

Reply 63 (citing Ex. 1003 ¶ 276).

Pointing to the description in the cited portion of FIPA97, Petitioner argues:

> [A]s explained by Dr. Lieberman, and shown in FIPA97, the performative "accept-proposal" ("[a] general mechanism for requesting") will take an action—in this example, streaming a multimedia channel ("some action be taken")—when "the customer is ready" ("when one or more conditions is met"). Further, the example above shows how this trigger information is stored within the "*content layer*."

Reply 64 (reproducing the description of the performative "accept-proposal" in Ex. 1007, 23).

Petitioner contends that Dr. Lieberman and the Petition describe many other possible triggers, including the "propose" performative and the "request-when" performative. Reply 65. Petitioner asserts that the "propose" performative "informs the receiver that the proposer will adopt the intention to **perform the action once the given precondition is met**" (*id.* (citing Ex. 1007, 34; Ex. 1003 ¶¶ 277–279; Pet. 43)) and that the "request-when" performative is used when "[t]he sender wants the receiver to perform some action **when some given proposition becomes true**" (*id.* (citing Ex. 1007, 40; Ex. 1003 ¶ 414; Pet. 63–64)). Petitioner points to the description of the "request-when" performative in FIPA97 and argues that the performative "request-when" ("[a] general mechanism for requesting")

will take an action—in this example, sending a message ("some action be taken")—when "an alarm occurs" ("when one or more conditions is met"). Reply 66. Petitioner concludes that FIPA97, therefore, discloses multiple "triggers" recited in claim 61. *Id.*

Patent Owner does not dispute Petitioner's responsive arguments in the Reply, but instead contends that Petitioner's arguments are presented "too late" and that "Petitioner cannot fix the deficiencies of its Petition on Reply." Sur-reply 54. To the extent Patent Owner argues that Petitioner's arguments in the Reply is improper new arguments outside the scope of a proper reply, we disagree. As discussed above, Petitioner's arguments in the Petitioner's Reply on whether FIPA97 teaches the "triggers" recited in the claim are directly responsive to Patent Owner's arguments raised in the Patent Owner Response.

Based on the complete record, we determine that Petitioner has shown sufficiently that FIPA97 teaches "triggers" recited in claim 61.

In sum, based on the complete record, we determine that Petitioner has demonstrated sufficiently that FIPA97 teaches the claimed "Interagent Communication Language" including "a layer of conversational protocol" and "a content layer," notwithstanding the arguments from Patent Owner.

*f. Goal Satisfaction Plan*

Claim 61 recites "the facilitating engine further operable to construct a goal satisfaction plan." As discussed above in Section II.B.1., we construe the term "a goal satisfaction plan" to mean "a plan for satisfying a goal" for this Final Written Decision.

Petitioner asserts that Kiss teaches "constructing a goal satisfaction plan" because Kiss describes that the meta-agent "formulates a goal statement for the problem-solving phase of the process," then "formulates a

solution plan for the problem." Pet. 46 (citing Ex. 1005, 8:33–34, 5:30–64, 12:25–40, Figs. 8–20). Petitioner contends that Figures 8–20 of Kiss illustrate adding tasks to an agenda, i.e., constructing a plan, to satisfy the user request (i.e., a "goal"), namely, "what is the effect of increasing sales by 20%?" *Id.* at 46–47 (citing Ex. 1005, 13:27–29, Figs. 8–20; Ex. 1003 ¶ 320).

Patent Owner contends that Kiss does not teach the claim "goal satisfaction plan" because Kiss does not disclose "the use of any reasoning, optimization, or taking into account any advice parameters or constraints." Resp. 89. Patent Owner also argues that Kiss "does not have the capability of formulating an 'optimal or near-optimal' 'goal satisfaction plan' utilizing reasoning as described in the '115 patent." *Id.* at 91 (citing Ex. 2032 ¶ 141). These arguments are predicated on Patent Owner's proposed construction of "goal satisfaction plan" to mean "a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints." *See* Resp. 28. As discussed above in Section II.B.1., we disagree with Patent Owner that the claim term "goal satisfaction plan" is limited as Patent Owner contends. Thus, for the reasons explained above in Section II.B.1., we disagree with Patent Owner's argument that Kiss does not disclose a "goal satisfaction plan."

Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches "constructing a goal satisfaction plan," as recited in claim 61.

*g. Using Reasoning*

Claim 61 recites "using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms."

Petitioner asserts that the '115 patent describes speech recognition, natural language processing, and email as "domain-independent technologies," and travel planning and reservations agents as "domain specific." Pet. 47 (citing Ex. 1005, 6:51–55; Ex. 1003 ¶ 330).

Citing the testimony of Dr. Lieberman, Petitioner argues that the operations disclosed in Kiss with respect to Figures 8–20 represent "*reasoning that includes one or more of domain-independent coordination strategies*" because the meta-agent, by identifying and querying several different specialized (i.e., domain-specific) agents, is carrying out a strategy that is domain independent (i.e., is not limited to a particular area of knowledge but instead seeks information regarding sales, production, marketing, facilities, and materials) and coordinates the action of those different domain-specific agents across several domains. Pet. 47 (citing Ex. 1003 ¶¶ 331–332). Petitioner argues that Kiss's meta-agent can employ a distributed inferencing scheme that "assembles a problem-specific rule network as a distributed object under control by a meta agent." Pet. 48 (citing Ex. 1005, 7:21–26). Petitioner contends that application of such a problem-specific set of rules to a request constitutes both "*domain-specific reasoning*" (because the problem is the domain) and "*application-specific reasoning*" (because the problem is the application). Pet. 53 (citing Ex. 1003 ¶ 333).

Patent Owner contends that the "solution plan" of Kiss is not constructed by "using reasoning" because Kiss's inferencing schemes is used only "[a]fter the solution plan is formulated . . . to perform the search and execution phases." Resp. 89 (citing Ex. 1005, 8:58–60). In its Reply, Petitioner asserts that in the Petition it argued that "it would have been obvious to utilize inferencing strategies when constructing the goal

satisfaction plan." Reply 48 (citing Pet. 53). Thus, Patent Owner's argument is inapposite because it does not address the combination proposed by Petitioner. *See ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1219 (Fed. Cir. 2016) ("*KSR* does not require that a combination only unite old elements without changing their respective functions.").

As Petitioner also persuasively argues, Petitioner in the Petition additionally relies on several other ways in which Kiss utilizes reasoning to construct its solution plan, such as "problem solving methodologies and distributed inferencing procedures," how the meta-agent "assigns the **appropriate** knowledge agents 121 to work on the solution," and how the meta-agent "executes the solution plan by maintaining an agenda, commitment table, task queue, knowledge manager or **equivalent dynamic control service**." Reply 48 (citing Pet. 50–51; Ex. 1003 ¶¶ 322–325, 331–335). Petitioner further argues that Kiss's "iterative and recursive" planning is another example of how reasoning is used to construct the solution plan of Kiss. Reply 48 (citing Pet. 50; Ex. 1003 ¶ 322).

Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches "using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms," as recited in claim 61, notwithstanding the arguments by Patent Owner.

*h. Conclusion on Claim 61*

Based upon consideration of the entire record, we are persuaded by Petitioner's arguments and evidence, notwithstanding Patent Owner's arguments, addressed above. Having weighed each of the *Graham* factors, including the scope and content of the prior art, the differences between the prior art and the challenged claim, and the objective evidence of

nonobviousness, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 61 is unpatentable under 35 U.S.C. § 103(a) as obvious over the combined teachings of Kiss and FIPA97.

*8. Independent Claim 71*

Many of the limitations recited in claims 61 and 71 are similar. There are, however, some differences in claim language. For example, the preamble of claim 71 recites "[a] software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture contemplating a distributed computing system comprising: a plurality of service-providing electronic agents." Ex. 1001, 35:61–63.

Other differences include claim 71 reciting a facilitator agent "in bi-directional communications with the plurality of service-providing electronic agents," and a goal satisfaction plan "including the coordination of a suitable delegation of sub-goal requests to best complete the requested service by using reasoning." *Id.* at 36:9–8, 16–19.

*a. Preamble*

Petitioner asserts the combination of Kiss and FIPA97 satisfies claim 71's preamble for the reasons stated with respect to claim 61's preamble. Pet. 54.[21] Petitioner also asserts "the combination of Kiss and FIPA97 includes a 'flexible computer architecture' in that distributed electronic agents with different capabilities can be accessed to cooperatively address a task, and which can provide different services can be added or removed from

[21] Petitioner cites to "§VI.1.a," of the Petition as support, but the Petition does not have such a section. We believe this is a typographical error and Petitioner meant to cite to Section "VI.A.1.a," which deals with claim 61's preamble. *See* Pet. 54, 31.

the system." *Id.* (citing Ex. 1003 ¶ 717; Ex. 1005, 12:21–14:30; Ex. 1006, 2, 7, 11, 16–18, Fig. 3).

Patent Owner does not specifically dispute that the combination of Kiss and FIPA97 teaches the preamble of claim 61. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the combination of Kiss and FIPA97 teaches the preamble of claim 71.

*b. Facilitator Agent in Bi-directional Communications*

As noted above, claim 71 recites "a facilitator agent in bi-directional communications with the plurality of service-providing electronic agents." Petitioner asserts the combination of Kiss and FIPA97 satisfies this limitation for the reasons it provided with respect to claim 61's preamble. Pet. 54 (citing Ex. 1003 ¶¶ 200–205, 347–351). Petitioner also asserts that Kiss discloses communication between meta-agents and service providing agents is bi-directional. Pet. 54 (citing Ex. 1005, Figs. 8–20, 11:51–14:30; Ex. 1003 ¶ 727).

Patent Owner does not specifically dispute that the combination of Kiss and FIPA97 teaches this limitation. *See generally* Resp.

Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the combination Kiss and FIPA97 teaches the recited "facilitator agent in bi-directional communications with the plurality of service-providing electronic agents" of claim 71.

*c. Delegating Sub-goal Requests*

As noted above, claim 71 recites a goal satisfaction plan "including the coordination of a suitable delegation of sub-goal requests to best complete the requested service by using reasoning."

Petitioner asserts that the goal satisfaction plan taught in Kiss with respect to Figures 8–20 includes "the delegation of sub-requests to those agents identified by the agent service layer as having knowledge relevant to the task, and therefore discloses '*the coordination of a suitable delegation of sub-goal requests to best complete the requested service'*." Pet 55 (citing Ex. 1005, 12:21–14:30). Petitioner also argues the "reasoning" requirements of this limitation are satisfied by the combination of Kiss/FIPA97 for the reasons Petitioner argued with respect to claim 61. *Id.* (citing Ex. 1003 ¶ 735); s*ee also id.* at 47–49.

Patent Owner does not specifically dispute that the combination of Kiss and FIPA97 teaches this limitation. *See generally* Resp.

Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the combination of Kiss and FIPA97 teaches the recited goal satisfaction plan "including the coordination of a suitable delegation of sub-goal requests to best complete the requested service by using reasoning," of claim 71.

*d. Conclusion on Claim 71*

Based upon consideration of the entire record, we are persuaded by Petitioner's arguments and evidence, notwithstanding Patent Owner's arguments, addressed above. Having weighed each of the *Graham* factors, including the scope and content of the prior art, the differences between the prior art and the challenged claim, and the objective evidence of nonobviousness, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 71 is unpatentable under 35 U.S.C. § 103(a) as obvious over the combined teachings of Kiss and FIPA97.

*9. Dependent Claims 62, 63, 70, 72–85*

Petitioner argues the combination of Kiss and FIPA97 teaches or suggests the recited limitations of dependent claims 62, 63, 70, and 72–85. Pet. 49–72. Claims 62, 63, and 70 depend directly from independent claim 61. Claims 72–85 depend, directly or indirectly, from independent claim 71.

*a. Claim 62*

Claim 62 recites "A facilitator agent as recited in claim 61, wherein the facilitating engine is capable of modifying the goal satisfaction plan during execution, the modifying initiated by events such as new agent declarations within the agent registry, decisions made by remote agents, and information, provided to the facilitating engine by remote agents."

Petitioner argues that Kiss discloses a *"facilitating engine is capable of modifying the goal satisfaction plan during execution"* in the form of the internal mechanism of a meta-agent which "is responsible for formulating a dynamic 'solution plan.'" Pet. 49 (citing Ex. 1005, 5:33–36). Petitioner argues "[t]he meta-agent is able 'to formulate parallel sub-plans and perform iterative and recursive procedures,' Ex. 1005, 5:38–39, 'begin executing the solution plan even before the plan is complete, with further plan development dependent on the dynamics of intermediate results obtained during the plan execution,' Ex. 1005, 5:39–42, and to 'backtrack[] or replan[] to permit escape during plan execution from dead-end or otherwise unproductive search paths.'" Pet. 49 (citing Ex. 1005, 5:43–46; Ex. 1003 ¶ 679.

Petitioner argues, "Kiss further discloses a meta-agent capable of '*modifying the goal satisfaction plan*' in response to an '*event[] such as new agent declarations within the agent registry.*'" Pet. 50. Petitioner argues,

"[t]he solution plan in Kiss can 'adaptively and dynamically synthesizes problem-specific knowledge interfaces and reasoning procedures as the problem-solving process moves forward.'" *Id.* (citing Ex. 1005, 2:61–67).

"This allow[s]," Petitioner argues, "the meta-agent to interface with a 'large number of knowledge sources of different types, in different locations, and covering different domains of expertise.'" Pet. 50 (citing Ex. 1005, 2:61–67, 12:21–14:29; Ex. 1003 ¶¶ 680–681). Petitioner argues, "Kiss likewise discloses '*modifying the goal satisfaction plan during execution*' based on '*decisions made by remote agents, and information, provided to the facilitating engine by remote agents.*'" Pet. 50 (citing Ex. 1005, Fig. 9, 12:51–57).

Petitioner also argues that "[t]o the extent one might argue that such functionality is not sufficiently disclosed in Kiss, it would have been obvious to include it in Kiss/FIPA97 based on the functionality cited above." Pet. 50. In particular, Petitioner argues, "Kiss discloses that new agents in the system must register their capabilities, and also a discloses a facilitator (meta agent) that periodically consults the registry for assistance in responding to a user request." *Id.* "The use of that functionality to modify an agenda in the process of being constructed," Petitioner argues, "would have been a natural extension of the operations disclosed in Kiss and would have been motivated by the desire to provide the meta agent access to the most up-to-date list of capabilities available in the system." *Id.* at 50–51 (citing Ex. 1003 ¶ 682).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that Kiss or the combination of Kiss and FIPA97 teaches the recited limitations of claim 62. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that

Petitioner has demonstrated sufficiently that Kiss, or the combination Kiss and FIPA97, teaches "a facilitator agent as recited in claim 61, wherein the facilitating engine is capable of modifying the goal satisfaction plan during execution, the modifying initiated by events such as new agent declarations within the agent registry, decisions made by remote agents, and information, provided to the facilitating engine by remote agents" as recited in claim 62.

*b. Claim 63*

Claim 63 recites "[a] facilitator agent as recited in claim 61 wherein the agent registry includes a symbolic name, a unique address, data declarations, trigger declarations, task declarations, and process characteristics for each active agent."

Petitioner argues that "Kiss/FIPA97 discloses the requirements of claim 63 'for each active agent.'" Pet. 51. Petitioner argues, "it would have been obvious to combine the agent registry functionality from each reference in the combined agent registry." *Id.* (citing Ex. 1003 ¶¶ 217–219).

Petitioner argues, "Table 1 of Kiss depicts an 'agent registry' that includes a 'symbolic name,' such as 'Labor' or 'Marketing,' for each registered agent which are non-unique and can identify the agent." Pet. 51 (citing Ex. 1005, 3:40–43, 12:1–18).

Petitioner also argues, "FIPA97 requires support IIOP (Internet Inter-Orb Operability Protocol) 'as a default method of communication.'" Pet. 51 (citing Ex. 1006, 12). "Under IIOP," Petitioner argues, "each agent has a 'unique identifier also known as it's GUID. An agent name is a concatenation of its HAP communication address and a unique name within that AP.'" Pet. 51 (citing Ex. 1006, 13; Ex. 1003 ¶ 539).

"The 'agent registry' in Kiss," Petitioner argues, "identifies each agent's capabilities and interests," Ex. 1005, 3:40–43, "and includes a 'data

declaration' in the form of the 'Interests' column." Pet. 51 (citing Ex. 1005, 12:1–18). "Each 'Interest,'" Petitioner argues, "relates to the characteristics of a specific set of data that the agent can access and is therefore a 'declaration' of that characteristic within the entire system." Pet. 51–52. "This disclosure," Petitioner argues, "is analogous to the disclosure of the '115 Patent, which uses the phrase 'data declaration' to refer to the type of data the agent registry indicates an agent can handle." Pet. 52 (citing Ex. 1001, 17:2–5, Fig. 7; Ex. 1003 ¶ 366).

Petitioner also argues that "FIPA97 discloses a Control Agent capable of setting a trigger with a precondition ('preconditions2') within the GA ('agent registry')." Pet. 52 (citing Ex. 1011, 21). "The GA," Petitioner argues, "will monitor for changes over a given time period ('Deadline') and inform the CA of any changes that conform to the precondition within that period." Pet. 52 (citing Ex. 1011, 21). "Therefore," Petitioner argues, "FIPA97 discloses a 'trigger declaration' ('preconditions2') available for every active agent that can be set within the 'agent registry' ('GA')." Pet. 52. "This," Petitioner argues, "is analogous to the 'trigger declaration' disclosure in the '115 Patent." *Id.* (citing Ex. 1001, 17:5–9, Fig. 7; Ex. 1011, 10, 11, 21; Ex. 1007, 46; Ex. 1003 ¶¶ 372–376).

Petitioner also argues that "[i]n Kiss, the agent service layer ('agent registry') includes a 'task declaration' in the 'Capabilities' column—each element characterizes the tasks each agents is capable of performing." Pet. 52 (citing Ex. 1005, 12:1–18; Ex. 1003 ¶¶ 378–379).

Petitioner argues that "[w]hen registering an agent in FIPA97, various 'process characteristics' may be included in the registration." Pet. 52. "For, example," Petitioner argues, "FIPA97 discloses the Agent Management Object 'fipa-man-df-agent-description' which contains a registry parameter

'interaction-protocols' which '[c]haracterises the protocols supported by the agent. This can include both standardized and/or non-standard protocols.'" Pet. 52–53 (citing Ex. 1006, 33). Petitioner argues, "The 'protocols' refine how the interactions with a given agent are conducted." Pet. 53 (citing Ex. 1003 ¶ 380).

Patent Owner argues, "[c]laim 63 combines the claim elements above for Claims 5-10 and requires that the agent registry include 'a symbolic name, a unique address, data declarations, trigger declarations, task declarations, and process characteristics for each active agent.' Therefore, for the same reasons that Petitioner failed to prove that Claims 5–10 are obvious, Petitioner fails to meet its burden with regard to Claim 63." Resp. 114 (citing Ex. 2032 ¶ 196).

Although Patent Owner's argument addresses claim 63, it does so by relying on arguments and evidence directed to claims 5–10, none of which are challenged in this proceeding. *See* Resp. 114; Pet. 3–4. Moreover, claim 5 depends from independent claim 1, which is not challenged in this proceeding either.[22] *See* Pet. 3–4. Claim 5 relates to "an agent registry data structure," which is not recited by claim 63. *See* Ex. 1001, 30:1–3. Claims 6–10 relate to a "symbolic name," a "data declaration," a "trigger declaration," a "task declaration," and a "process characteristic" for each active agent, respectively. *See id.* at 30:4–20. To the extent Patent Owner's

---

[22] Claim 1 is a method claim directed to a "computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents," whereas claim 61, from which claim 63 depends, is directed to a "facilitator agent arranged to coordinate cooperative task completion within a distributed computing environment having a plurality of autonomous service-providing electronic agents." *See* Ex. 1001, 30:10–12, 35:4–7.

arguments and evidence directed to claims 5–10 address similar limitations recited by claim 63, we consider Patent Owner's arguments and evidence directed thereto. *See* Resp. 108–114.

Patent Owner argues that Petitioner jumps from Kiss to FIPA97 for some limitations of the claimed "agent registry" without explaining why a person of ordinary skill in the art would have been motivated to incorporate various alleged features of FIPA97 into Kiss's agent registry. Resp. 113. We agree with Patent Owner. With the support of Dr. Lieberman's testimony, Petitioner asserts generally that in the combination of FIPA97 with Kiss, FIPA97's "administrative functionality and exemplary practices" would be added to Kiss to implement the functionality described in Kiss, "including facilitating agent collaboration, agent registry, and inter-agent messaging." Pet. 27–28 (citing Ex. 1003 ¶¶ 217–219). Although Dr. Lieberman provides details of how FIPA97's facilitating agent (i.e., Directory Facilitator) and messaging would be combined with Kiss's teachings, Petitioner and Dr. Lieberman do not explain adequately how or why a person of ordinary skill in the art would have implemented the alleged agent registry functionalities taken from different parts of the FIPA97 specification in Kiss's agent registry. *See* Pet. 27–31; Ex. 1003 ¶¶ 217–231.

Accordingly, based on the complete record, we determine Petitioner does not demonstrate sufficiently that the combination of Kiss and FIPA97 teaches the "agent registry" limitation as recited in claim 63.

c. *Claim 70*

Claim 70 recites "[a] facilitator agent as recited in claim 61, the facilitator agent further including a global database accessible to at least one of the service-providing electronic agents."

Petitioner argues "FIPA97 discloses a 'facilitator agent further including a global database' in the form of a Directory Facilitator ('DF') which stores 'descriptions of the agents and the services they offer.'" Pet. 53 (citing Ex. 1006, 2). Petitioner argues "FIPA97 explains that the directory facilitator 'must strive to maintain an accurate, complete and timely list of agents including their life-cycle state' (i.e., complete via the entire system in which it resides)." Pet. 53. "Therefore," Petitioner argues, "the Directory Facilitator defines the bounds of the domain, and contains a globally significant database of all agents within the domain ('global database')." *Id.* (citing Ex. 1006, 6, 19, 20; Ex. 1003 ¶¶ 705–706). "In the combined system of Kiss/FIPA97," Petitioner argues, "the facilitator functionality of each would be combined." Pet. 53 (citing Ex. 1003 ¶¶ 456–458, 652, 686).

Petitioner also argues "FIPA97 further discloses 'a global database accessible to at least one of the service-providing electronic agents' because other agents within the agent domain can utilize the service parameters within the Directory Facilitator to search for services." Pet. 53 (citing Ex. 1006, 22; Ex. 1003 ¶¶ 707–708).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that FIPA97 teaches the recited limitations of claim 70. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that FIPA97 teaches "[a] facilitator agent as recited in claim 61, the facilitator agent further including a global database accessible to at least one of the service-providing electronic agents," as recited in claim 70.

*d. Claim 72*

Claim 72 recites "[a] computer architecture as recited in claim 71, wherein the Interagent Communication Language (ICL) is for enabling

agents to perform queries of other agents, exchange Information with other agents, and set triggers within other agents, the ICL further defined by an ICL syntax supporting compound goal expressions such that goals within single request provided according to the ICL syntax may be coupled by a conjunctive operator, a disjunctive operator, a conditional execution operator, and a parallel disjunctive operator parallel disjunctive operator that indicates that disjunct goals are to be performed by different agents."

Referring to § V.D of the Petition ("Kiss/FIPA97"), Petitioner asserts that "in the combination of Kiss and FIPA97 the below communications would be expressed in FIPA ACL." Pet. 55. Petitioner argues that "Kiss discloses agent communication facilities and various types of interaction between agents, which a Skilled Artisan would understand to include '*queries.*'" *Id.* (citing Ex. 1005, 3:25–36, 7:13; Ex. 1003 ¶ 580). "Furthermore," Petitioner argues, "the example of Figure 8 through 20 of Kiss shows the meta agent both sending queries to and receiving queries from the sales agent and the production agent." Pet. 55–56 (citing Ex. 1005, 12:21–14:29, Figs. 8–20; Ex. 1003 ¶¶ 581–582).

"The agents in Kiss," Petitioner argues, "also '*exchange information with other agents*' using each agent's 'inter-agent abstract communications facilities.'" Pet. 56 (citing Ex. 1005, 3:34–36, 12:21–14:29, Figs. 8–20; Ex. 1003 ¶¶ 583–584).

Petitioner argues "FIPA97 discloses the use of content parameters to '*set triggers within other agents.*'" Pet. 56. Petitioner argues:

> [a] "trigger" is an action that takes place in response to the occurrence or failure of a precondition. FIPA97 discloses the performative accept-proposal; this performative "informs the receiver" that the "receiving agent" (*"other agent"*) should "perform the action," ("action that takes place in response") once

> a "given precondition is, or becomes, true" ("occurrence or failure of a precondition"). Ex. 1007, 23. Therefore, the "precondition" is sent to an agent through the content layer, then at some future point, when that "precondition" is met the receiving agent will trigger and take an action based upon the information encoded in the content layer of the message.

Pet. 56 (citing Ex. 1007, 23; Ex. 1003 ¶¶ 585–586.

Petitioner argues "Kiss/FIPA97 satisfies '*an ICL syntax supporting compound goal expressions*' for the reasons stated [in the Petition] in §VI.1.c."[23] Pet. 57 (citing Ex. 1003 ¶¶ 291–306, 739). Petitioner argues, "FIPA97 discloses operators for composing base goals including a '*conjunction operator.*' FIPA97 discloses the operator formula '(and <SLWff0> <SLWff1>)' which in FIPA97 is defined as a 'Conjunction.'" Pet. 57 (citing Ex. 1007, 73; Ex. 1034, 112–13; Ex. 1003 ¶¶ 481–483).

"Further," Petitioner argues:

> FIPA97 discloses a "*disjunction operator*" as claimed here. FIPA97 discloses the operator formula "(or <SLWff0> <SLWff1>)" which in FIPA97 is defined as "Disjunction." Ex. 1007, 73; Ex. 1003 ¶¶ 484, 485.
>
> FIPA97 also discloses a *"conditional execution operator."* FIPA97 explains that the performative "request-when" can be used as a *"conditional execution operator."* Ex. 1007, 40; Ex. 1003 ¶¶ 486–488.
>
> FIPA discloses a "*parallel disjunction operator*" in the form of a content layer operator that is able to query multiple disjunct agents in a single expression. FIPA's disclosed content language (SL2) supports grammars for "quantifying-in inside modal operators." Ex. 1007, 78. Thus, FIPA97 discloses "*a parallel*

[23] There is no section § VI.1.c. in the Petition. We assume this is a mistake and that Petitioner instead meant to refer to Section VI.A.1.c ("Facilitating Engine") of the Petitioner dealing with claim 61. *See* Pet. 34.

> *disjunction operator that indicates that disjunct goals are to be performed by different agents."* Ex. 1003 ¶¶ 490–491.

Pet. 57–58.

Patent Owner does not specifically dispute Petitioner's arguments and evidence that the combination of Kiss and FIPA97 teaches the recited limitations of claim 72. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the combination Kiss and FIPA97 teaches "[a] computer architecture as recited in claim 71, wherein the Interagent Communication Language (ICL) is for enabling agents to perform queries of other agents, exchange Information with other agents, and set triggers within other agents, the ICL further defined by an ICL syntax supporting compound goal expressions such that goals within single request provided according to the ICL syntax may be coupled by a conjunctive operator, a disjunctive operator, a conditional execution operator, and a parallel disjunctive operator parallel disjunctive operator that indicates that disjunct goals are to be performed by different agents," as recited in claim 72.

*e. Claim 73*

Claim 73 recites "[a] computer architecture as recited in claim 72, wherein the ICL is computer platform independent."

Petitioner argues that "FIPA ACL is 'platform-independent.'" Pet. 58 (citing Ex. 1003 ¶ 215). Petitioner argues, "FIPA97 discloses the specifications for a software language 'with precisely defined syntax, semantics and pragmatics' for 'communication between **independently designed and developed software agents**.'" Pet. 58 (citing Ex. 1007, 3). "The specification," Petitioner argues, "is designed to 'maximise [sic] interoperability across agent-based applications, services and equipment,'

and to facilitate the 'construction and management of an agent system composed of different agents,' even when those systems are 'built by different developers.'" Pet. 58 (citing Ex. 1007, vii, ix).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that FIPA97 teaches the recited limitations of claim 73. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that FIPA97 teaches "[a] computer architecture as recited in claim 72, wherein the ICL is computer platform independent," as recited in claim 73.

*f. Claim 74*

Claim 74 recites "[a] computer architecture as recited in claim 73 wherein the ICL is independent of computer programming languages in which the plurality of agents are programmed."

Petitioner argues:

> [t]he requirement that the ICL be 'independent of computer programming languages in which the plurality of agents are programmed' is a negative limitation because it precludes such a dependence; such limitations are satisfied by silence in the prior art, and neither Kiss nor FIPA97 disclose any such dependence. This claim element is therefore satisfied by such silence.

Pet. 58–59 (citing Ex. 1003 ¶ 594).

Petitioner also argues:

> FIPA97 was designed to allow agents to communicate regardless of what programming language the agent is programmed in. Ex. 1007, viii; Ex. 1003 ¶ 595. The agents of FIPA97 can communicate with each other "independently of the specific agent implementations," Ex. 1007, 1, and thus FIPA ACL operates *"independent[ly] of [the] computer programming languages"* of the agents. FIPA ACL is designed to "maximise [*sic*] interoperability across agent-based applications, services and equipment," Ex. 1007, vii, and to facilitate the "construction

> and management of an agent system composed of different agents", even when those systems are "built by different developers."

Pet. 59 (citing Ex. 1007, ix; Ex. 1003 ¶ 596).

Petitioner further argues:

> FIPA97 further explains that to support emerging technologies, such as "CORBA, DCOM and Java / Java –RMI," Ex. 1008, 5, and to provide "freedom to agent-programmers," Ex. 1008, 5, FIPA ACL supports software integration at the agent-communication level and not the agent level. Thus, the language of the underlying agent is not important, because all actions and communication between agents are supported by the ACL, not the programming language. Ex. 1006, 10 n2. Thus, FIPA97 discloses this claim element.

Pet. 59 (citing Ex. 1003 ¶ 597).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that FIPA97 teaches the recited limitations of claim 74. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that FIPA97 teaches "[a] computer architecture as recited in claim 73 wherein the ICL is independent of computer programming languages in which the plurality of agents are programmed," as recited in claim 74.

*g. Claims 75, 76*

Claim 75 recites "[a] computer architecture as recited in claim 73 wherein the ICL syntax supports explicit task completion constraints within goal expressions." Claim 76 recites "[a] computer architecture as recited in claim 75 wherein possible types of task completion constraints include use of specific agent constraints and response time constraints."

Petitioner argues "[b]oth Kiss and FIPA97 disclose such constraints for goal expressions." Pet. 60.

Petitioner argues:

> In Kiss, when using the "Real Time" inferencing method the user may specify "I am willing to wait ten minutes for a response," at which point the metaagent may "deactivate" any knowledge agents who "do not meet time delay." Ex. 1005, 7:65–8:2. Because these "constraints" effect how the inferencing process is carried out and can result in "partial information from the incomplete knowledge agent," Ex. 1005, 8:1–2, they are "task completion constraints."

Pet. 60 (citing Ex. 1003 ¶ 517).

Petitioner also argues:

> Kiss also discloses the use of "specific agent constraints". Partitioned inferencing, which is a type of constraint on task completion, is used where the "problem domain is easily divided into distinct subfields," in this case the metaagent should have the "available subfield and query division possibilities." Ex. 1005, 7:53–58. Therefore, the meta-agent could divide the problem based upon specific agent constraints such as the subfields and problem domain.

Pet. 60–61 (citing Ex. 1003 ¶ 603).

Petitioner further argues:

> Kiss further discloses *"response time constraints"* in the inferencing method called "Real Time." When using the "Real Time" inferencing, which is a type of constraint on task completion, method the user may specify, "I am willing to wait ten minutes for a response," at which point the meta-agent may "deactivate" any knowledge agents who "do not meet time delay."

Pet. 61 (citing Ex. 1005, 7:65-2; Ex. 1003 ¶¶ 604–605).

With respect to FIPA97, Petitioner argues:

> FIPA97 also discloses "*task completion constraints.*" FIPA97 discloses the use of the performative "request-when," which causes an agent to "inform" another agent that a certain action should be performed "as soon as a given precondition, expressed as a proposition, becomes true." Ex. 1007, 40; Ex. 1003 ¶ 518. Therefore, FIPA97 disclose a performative which applies an

> *"explicit . . . constraint"* (wait until alarm) on "task completion" (before completing the action in the performative).

Pet. 61 (citing Ex. 1003 ¶¶ 519–520).

> FIPA97 also discloses *"specific agent constraints*," such as the "Quality of Service" parameter, which is a type of constraint on task completion that allows the user to specify which networks can be used in a VPN connection, such as "Constant Bit Rate (CBR) traffic for voice ATM network." Ex. 1012, 46. Therefore, FIPA ACL supports constraints based on the functional capabilities of specific agents.

Pet. 61–62 (citing Ex. 1003 ¶¶ 600–601).

> FIPA97 also discloses *"response time constraints"* in the form of "Response Time," which is a type of constraint on task completion, as a negotiation metric between agents. Ex. 1012, 30. FIPA97 describes how FIPA ACL can support response time based conditions through the specification of a special parameter "respond-by" which "[d]enotes a time interval or event(s) when a response to a request is desired."

Pet. 62 (citing Ex. 1012, 47; Ex. 1003 ¶ 602).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that Kiss and FIPA97 teach the recited limitations of claims 75 and 76. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss and FIPA97 teach "[a] computer architecture as recited in claim 73 wherein the ICL syntax supports explicit task completion constraints within goal expressions," as recited in claim 75 and "[a] computer architecture as recited in claim 75 wherein possible types of task completion constraints include use of specific agent constraints and response time constraints," as recited in claim 76.

*h. Claims 77, 78*

Claims 77 recites "[a] computer architecture as recited in claim 75 wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions." Claim 78 recites "[a] computer architecture as recited in claim 73 wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions."

Petitioner argues, "[t]he 115 Patent defines 'Advice Parameters' as 'constraints or guidance to the facilitator in completing and interpreting the goal.'" Pet. 62 (citing Ex. 1001, 15:66–16:1). "For example," Petitioner argues, "a time_limit is used to indicate 'how long the requester is willing to wait for Solutions,' or a level_limit may be used to define how many remote facilitators can be utilized to find a solution." Pet. 62 (citing Ex. 1001, 16:2–10). "Therefore," Petitioner argues, "'Advice Parameters' are ICL syntax which support 'explicit task completion advisory suggestions.'" Pet. 62 (citing Ex. 1003 ¶ 609).

Petitioner also argues, "<u>FIPA97</u> discloses 'Advice Parameters' in the form of searches within the 'Directory Facilitator.'" Pet. 62. Petitioner argues, "[a]gents may use the directory performative 'search' to search local or remote directories for relevant resources." Pet. 62–63 (citing Ex. 1006, 20; Ex. 1003 ¶ 610). "Moreover," Petitioner argues, "the 'search' performative contains possible 'Constraints+'". Pet. 63 (citing Ex. 1006, 20; Ex. 1003 ¶ 611). "<u>FIPA97</u>," Petitioner argues, "discloses two possible 'constraints;' Directory Facilitator Depth ('df-depth') and Required Number of Records ('recs-req')." Pet. 63 (citing Ex. 1006, 21–22). "The Directory Facilitator Depth constraint," Petitioner argues, "is similar to the level_limit 'Advice Parameter' disclosed in the 115 Patent; both define how many directory facilitators should be searched to locate specific agents." Pet. 63

(citing Ex. 1006, 21–22). "Therefore," Petitioner argues, "FIPA97 supports parameters that act as 'constraints or guidance' in 'interpreting the goal.' FIPA97 discloses 'Advice Parameters' and thus discloses '*explicit task completion advisory suggestions.*'" Pet. 63 (citing Ex. 1003 ¶¶ 612–612).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that FIPA97 teaches the recited limitations of claims 77 and 78. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that FIPA97 teaches "[a] computer architecture as recited in claim 75 wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions," as recited in claim 77 and "[a] computer architecture as recited in claim 73 wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions," as recited in claim 78.

*i. Claim 79*

Claim 79 recites "[a] computer architecture as recited in claim 73 wherein each autonomous service-providing electronic agent defines and publishes a set of capability declarations or solvables, expressed in ICL, that describes services provided by such electronic agent."

Petitioner argues, "[t]he ordinary meaning of a 'solvable' is a set of published capabilities, expressed in some inter-agent communication language, which are used to assist in delegating service requests." Pet. 63 (citing Pet. §IV.D.12). Petitioner argues, "Kiss discloses a published set of *'capability declarations or solvables'* by 'maintaining a registry of agents in the system,' Ex. 1005, 3:37–38, such as the agent registry disclosed in Table 1." Pet. 64 (citing Ex. 1005, 12:1–17; Ex. 1003 ¶ 618).

Petitioner argues:

> The registry "identifies each agent's capabilities and interests, and contains knowledge about the relationships between them," Ex. 1005, 3:40–43. (*"each autonomous service-providing electronic agent" / "set of capability declarations or solvables"*). Further, Kiss discloses that each agent is responsible for defining and publishing these *"capability declarations or solvables."* Kiss explains that each knowledge module is associated with a knowledge agent; in a one-to-one or many-to-one configuration. Ex. 1005, 6:39–45. Further, each knowledge agents keeps "summaries" (*"solvables"*) of the "domain features and methods," (*"set of capability declarations"/ "services")* of its associated knowledge modules, therefore the Knowledge Agent *"defines . . . a set of capability declarations or solvables."* Ex. 1005, 6:46–48. Moreover, "the capabilities, interests, and attributes" ("set of capability declarations") for each module is registered (*"publishes"*) in the agent service layer by its associated agent.

Pet. 64–65 (citing Ex. 1005, 6:48–51; Ex. 1003 ¶ 619).

"Moreover," Petitioner argues, "each agent in Kiss provides its capabilities to the agent service layer." Pet. 65 (citing Ex. 1005, 6:66–7:4). Petitioner argues, "in the obvious combination of Kiss and FIPA97 analyzed here, the communications used to provide those capabilities would be expressed in FIPA ACL, and therefore '*expressed in ICL.*'" Pet. 65 (citing Ex. 1003 ¶ 620).

"Moreover," Petitioner argues, "FIPA97 discloses the construction of a 'Directory Facilitator' (DF) which provides 'yellow pages services to other agents' ('*a set of capability declarations . . . that describes services provided by such electronic agent.*')." Pet. 65 (citing Ex. 1006, 6; Ex. 1003 ¶ 621). "Each agent within a given agent domain," Petitioner argues, "registers with the DF, and FIPA97 shows that as part of the registration process the agent provides '*a set of capability declarations or solvables*' in the 'agent-

services' parameter which includes such definitions as ':service-type video-on-demand.'" Pet. 65 (citing Ex. 1006, 19; Ex. 1003 ¶ 622).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that Kiss and FIPA97 teach the recited limitations of claim 79. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss and FIPA97 teach "[a] computer architecture as recited in claim 73 wherein each autonomous service-providing electronic agent defines and publishes a set of capability declarations or solvables, expressed in ICL, that describes services provided by such electronic agent," as recited in claim 79.

*j. Claim 80*

Claim 80 recites "[a] computer architecture as recited in claim 79 wherein an electronic agent's solvables define an interface for the electronic agent."

Petitioner argues "<u>FIPA97</u> discloses various interface parameters (*'define an interface'*) which are included in the initial agent registration process (*'solvables'*). As part of registration each agent provides information on the conditions and ontologies it accepts when processing a request." Pet. 66 (citing Ex. 1006, 35; Ex. 1034, 257; Ex. 1003 ¶¶ 625–626).

"By utilizing [these] parameters," Petitioner argues, "agents are able to define an robust interface, and advertise to other agent the ways in which a service can be called and utilized." Pet. 67 (citing Ex. 1006, 35). "Therefore," Petitioner argues, "these parameters can define the language and syntax of communication between the two agents (*'interface for the electronic agent'*) and the conditions that must be meet when processing a service request." Pet. 67 (citing Ex. 1003 ¶ 627).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that FIPA97 teaches the recited limitations of claim 80. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that FIPA97 teaches "[a] computer architecture as recited in claim 79 wherein an electronic agent's solvables define an interface for the electronic agent," as recited in claim 80.

*k. Claim 81*

Claim 81 recites "[a] computer architecture as recited in claim 80 wherein the possible types of solvables includes procedure solvables, a procedure solvable operable to implement a procedure such as a test or an action."

Petitioner argues, "FIPA97 discloses a '*procedure solvable'* in the form of an agent registration parameter that defines a test or action. As part of agent registration, agent can provide a listing of their available 'agent-services' including a 'service-type' for each service that the agent provides." Pet. 67 (citing Ex. 1006, 20; Ex. 1001, 12:15–17; Ex. 1003 ¶¶ 635–636).

"The 'service-type,'" Petitioner argues, "helps define what actions the agent can take." Pet. 68 (citing Ex. 1006, 35). "For example," Petitioner argues, "an agent that provides video on demand services would register with the directory facilitator with the 'service-type' set to 'video-on-demand.'" Pet. 68 (citing Ex. 1006, 22; Ex. 1003 ¶ 637).

"Thus," Petitioner argues, "the 'service-type' is used to '[d]enote[] the unique service type' (i.e., the actions the agent can take) on offer by the agent." Pet. 69 (citing Ex. 1006, 35). "Therefore," Petitioner argues, "the 'service-type' parameter represents a '*solvable'* that characterizes an action

or test that is performed by the agent, and is thus a '*procedure solvable.*'" Pet. 69 (citing Ex. 1003 ¶ 638).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that FIPA97 teaches the recited limitations of claim 81. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that FIPA97 teaches "[a] computer architecture as recited in claim 80 wherein the possible types of solvables includes procedure solvables, a procedure solvable operable to implement a procedure such as a test or an action," as recited in claim 81.

*l. Claims 82, 83*

Claims 82 recites "[a] computer architecture as recited in claim 81 wherein the possible types of solvables further includes data solvables, a data solvable operable to provide access to a collection of data." Claim 83 recites "[a] computer architecture as recited in claim 82 wherein the possible types of solvables includes a data solvable operable to provide access to modify a collection of data."

Petitioner argues, "FIPA97 discloses a WRAPPER agent ontology that can be used to define and provide access to a data source, and is a *"data solvable"*. A wrapper agent is used to integrate non-agent software, databases, and systems into a community of agents by creating an agent that translates between the agents and the non-agent software." Pet. 70 (citing Ex. 1008, 5–6; Ex. 1001, 12:15–17; Ex. 1003 ¶¶ 640–641).

"Therefore," Petitioner argues, "a wrapper agent can be used to connect a data source into the community of agent by translating between the data query language of the data source and the agent communication language." Pet. 71 (citing Ex. 1008, 6; Ex. 1003 ¶¶ 642–644).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that the combination of Kiss and FIPA97 teaches the recited limitations of claims 82 and 83. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that FIPA97 teaches "[a] computer architecture as recited in claim 81 wherein the possible types of solvables further includes data solvables, a data solvable operable to provide access to a collection of data" as recited in claim 82, and "[a] computer architecture as recited in claim 82 wherein the possible types of solvables includes a data solvable operable to provide access to modify a collection of data," as recited in claim 83.

*m. Claim 84*

Claim 84 recites "[a] computer architecture as recited in claim 71 wherein a planning component of the facilitating engine are distributed across at least two computer processes."

Petitioner argues, "Kiss discloses a 'knowledge management system' having a meta-agent (denoted by 'MA') on multiple systems remotely located from each other. Pet. 71 (citing Ex. 1005, 14:30–33, Fig. 21; Ex. 1003 ¶ 763). Petitioner argues, "[t]he meta agent includes programming that 'formulat[es] a dynamic solution plan' for the distributed inferencing to be performed by the system 100, and allocates tasks to the knowledge agent layer 109 in furtherance of the solution plan." Pet. 71 (citing Ex. 1005, 5:33–37). "That programming," Petitioner argues, "constitutes a *'planning component'* because it is a component of the meta agents that carries out planning." Pet. 71 (citing Ex. 1005, 2:61–67, 14:30–33, Figs. 1, 21; Ex. 1003 ¶¶ 766–775). Petitioner argues, "[a] Skilled Artisan would understand the two meta-agents divided on separate and remote systems

have their respective *'planning components'* likewise distribute[d], at least across different computer processes." Pet. 71 (citing Ex. 1003 ¶¶ 765–766).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that Kiss teaches the recited limitations of claim 84. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches "[a] computer architecture as recited in claim 71 wherein a planning component of the facilitating engine are distributed across at least two computer processes," as recited in claim 84.

*n. Claim 85*

Claim 85 recites "[a] computer architecture as recited in claim 71 wherein an execution component of the facilitating engine is distributed across at least two computer process."

Petitioner argues, "Kiss discloses a distributed 'knowledge management system,' including globally distributed meta agents." Pet. 72 (citing Ex. 1005, 14:30–33, Fig. 21; Ex. 1003 ¶ 773). Petitioner points out that, "[t]he meta agent 119 executes the solution plan by maintaining an agenda, commitment table, task queue, knowledge manager, or equivalent dynamic control service." Pet. 72 (quoting Ex. 1005, 5:46–49). "Therefore," Petitioner argues, "two meta-agents divided on separate and remote systems include an '*execution component,'* Ex. 1005, 2:61–67, 5:65, 14:30–33, Figs. 1, 21; Ex. 1003 ¶¶ 775–777, which is likewise distributed, at least across different computer processes." Pet. 72 (citing Ex. 1003 ¶ 774).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that Kiss teaches the recited limitations of claim 85. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently

that Kiss teaches "[a] computer architecture as recited in claim 71 wherein an execution component of the facilitating engine is distributed across at least two computer process," as recited in claim 85.

*o. Conclusion on Dependent Claims 62, 63, 70, and 72–85*

Based upon consideration of the entire record, we determine that Petitioner has demonstrated by a preponderance of the evidence that each of dependent claims 62, 70, and 72–85 is unpatentable under 35 U.S.C. § 103(a) as obvious over the combined teachings of Kiss and FIPA97. With respect to claim 63, however, for the reasons explained above, we determine that Petitioner has not shown by a preponderance of the evidence that claim 63 of the '115 patent is unpatentable over the combination of Kiss and FIPA97.

*10. Obviousness over Kiss, FIPA97, and Cohen*

Petitioner argues the combination of Kiss, FIPA97, and Cohen, teaches or suggests the recited limitations of dependent claims 64–70, 84, and 85. Pet. 72–74. Petitioner argues that Cohen discloses facilitator agent functionality relating to its Blackboard server that, when combined with the teachings of Kiss and FIPA97, satisfies the requirements of those claims. *Id.* at 72. Petitioner argues that in combination with Kiss and FIPA97, "Cohen's Blackboard server functionality would be added to the meta server/agent registry of Kiss/FIPA97." *Id.*

Petitioner asserts Cohen describes the same OAA architecture as the '115 patent, so it is analogous art to Kiss, FIPA97 and the '115 Patent. *Id.* at 73 (citing Ex. 1003 ¶¶ 220–221, 437–438; Ex. 1014, 1). The combination of Cohen, Kiss, and FIPA97, Petitioner argues:

> would have been the arrangement of old elements (i.e., Blackboard server functionality of Cohen, the functionality of

> FIPA97, and the system of Kiss) with each performing the same function it had been known to perform (e.g., methods of complex trigger implementation (Cohen); implementing communication between distributed agents (FIPA97V1); distributed agents conducting cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate and set triggers to conduct cooperative task completion and problem solving).

Pet. 73 (citing Ex. 1003 ¶ 439).

Petitioner also argues:

> A Skilled Artisan would have been motivated to combine Cohen with Kiss/FIPA97 in this manner because Cohen encourages the incorporation of components from other systems and seeks to 'support distributed execution of a user's requests' (Ex. 1014, 1), as does FIPA97 (Ex. 1007, vii), and Kiss (Ex. 1005, 3:1–4), which would have a led a Skilled Artisan to consider these agents-based technologies in combination. Ex. 1003 ¶ 440. Moreover, the Cohen Blackboard server operates as a 'facilitator agent,' (Ex. 1014, 2; Ex. 1003 ¶¶ 456, 652, 686), as does the meta-agent/agent registry of Kiss/FIPA97 (Ex. 1005, 12:21–14:30, Figs. 8–20; Ex. 1006, 6–7; Ex. 1003 ¶¶ 348–351), providing additional motivation to combine such similar functionality of these systems in order to achieve the benefits of each.

Pet. 73–74.

Petitioner further argues, "Cohen discloses several characteristics of his disclosed agents that would have motivated a Skilled Artisan to adopt his teachings." *Id.* at 74 (citing Ex. 1014, 1).

Patent Owner argues "[t]he '115 Patent [] distinguishes between the facilitator and prior art 'blackboard architectures.'" Resp. 83. According to Patent Owner, "[t]he specification then points out the major disadvantage of the blackboard system – one that introduction of the '115 Patent's facilitation directly solves: 'the [blackboard] framework does not provide

programmatic control for doing so in cases where this would be practical.'" *Id.* at 84 (citing Ex. 1001, 4:14–16).

Patent Owner argues:

> it is clear that blackboard architecture does not embody the claimed facilitation of the '115 Patent. (Ex. 2032 ¶¶ 120–122.) As Dr. Medvidovic explains, a blackboard system is simply a way for multiple agents to share knowledge about what tasks need completion. It is completely devoid of any kind of centralized control or planning aspects that are critical to the facilitator agent limitations of the '115 Patent.

Resp. 84 (citing Ex. 2032 ¶¶ 123–124).

In its Reply, Petitioner points out that Patent Owner "attacks Cohen individually, but does not address the combination [of Kiss/FIPA97] including Cohen," even though the Petition "[n]ever argue[d] that the Blackboard by itself discloses the claimed facilitator agent. Reply 46. Petitioner argues that the Petition "shows how a Skilled Artisan would borrow some functionality from previously known Blackboard systems, such as Cohen. Specifically, trigger management and other distributed server techniques that are calculated to improve the system." *Id.* (citing Pet. 72–74).

In its Sur-reply, Patent Owner points out that "Petitioner does not argue that *Cohen* discloses any functionality associated with the facilitator agent, except that a Skilled Artisan 'may borrow' some concepts, such as 'trigger management' or 'distributed server techniques.'" Sur-reply 46 (citing Reply 46). These statements, Patent Owner argues, "fail to tie the reference to any particular claim elements." Sur-reply at 46–47.

We agree with Petitioner. "[One] cannot show non-obviousness by attacking references individually where . . . the rejections are based on

combinations of references." *Boundary Solns.,* 711 Fed. Appx. at 631–632 (quoting *Keller*, 642 F.2d at 425).

Petitioner makes clear that in combination with Kiss and FIPA97, "Cohen's Blackboard server functionality would be *added* to the meta server/agent registry of Kiss/FIPA97." Pet. 72 (emphasis added). Petitioner explains that the proposed combination may include "methods of complex trigger implementation (Cohen); implementing communication between distributed agents (FIPA97V1); [and] distributed agents conducting cooperative task competition and problem solving (Kiss)" to yield "a system of distributed agents, able to communicate and set triggers to conduct cooperative task completion and problem solving." Pet. 73 (citing Ex. 1003 ¶ 439). Petitioner's position is supported by Dr. Lieberman's declaration. *See, e.g.,* Ex. 1003 ¶¶ 428–440.

Given Petitioner's proposed combination of Kiss/FIPA97/Cohen, Patent Owner's arguments that Cohen's "blackboard architecture is simply a way for agents to share communication and contains no disclosure of facilitation," and "that blackboard architecture does not embody the claimed facilitation of the '115 Patent," are nonresponsive to the proposed combination, and therefore, unavailing. *See* Resp. 83–84.

*11. Dependent Claims 64–70, 84, 85*

Petitioner argues the combination of Kiss, FIPA97, and Cohen teaches or suggests the recited limitations of dependent claims 64–70, 84, 85. Pet. 72–74. Claims 64–70 depend, directly or indirectly, from independent claim 61. Claims 84 and 85 depend directly from independent claim 71.

*a. Claim 64*

Claim 64 recites "[a] facilitator agent as recited in claim 61 wherein the facilitating engine is operable to install a trigger mechanism requesting that a certain action be taken when a certain set of conditions are met."

Petitioner argues, "Cohen discloses a 'Blackboard server' that Cohen teaches shares analogous functionality to a *'facilitator agent;'* the internal programming of that server directing to facilitating agent communication is a *'facilitating engine.'*" Pet. 74 (citing Ex. 1001, 6:32–37; Ex. 1014, 2; Ex. 1003 ¶¶ 456–458, 652, 686). "Cohen also discloses, Petitioner argues, "that the Blackboard server is *'operable to install a trigger mechanism,'* which is the processing for handling a conditional request ('When mail arrives for me about a security break, get it to me') on a service-providing agent, or itself, or other Blackboard servers." Pet. 74 (citing Ex. 1014, 2, 4). "When processing the request," Petitioner argues, "the 'blackboard server' determines that a 'trigger should be installed on, [for example,] the mail agent' (*'operable to install a trigger mechanism'*). Ex. 1014, 4, Fig. 2; Ex. 1003 ¶ 687).

Petitioner argues:

> Cohen's processing for handling the conditional request is a *"trigger mechanism requesting that a certain action be taken when a certain set of conditions are met.*" When executed on the mail agent, for example, the request will cause the action of informing the user, i.e., "get it to me" (*"certain action"*) when "a message matching the requested topic has arrived" (i.e., *"a certain set of conditions are met"*). Ex. 1014, 4. Once the *"trigger mechanism"* has determined that a matching message has been received it will take a number of actions, as shown in figure 2 above, and eventually will "read the message to the user" ("*a certain action*"). Ex. 1014, 4. Moreover, the "conditional" part of the example trigger, contains three separate conditions

> (i.e., (1) "mail," (2) "arrives," and (3) "about a security break") and is therefore a "*set of conditions.*"

Pet. 74–75 (citing Ex. 1014, 4; Ex. 1003 ¶¶ 435–440, 456–458, 688).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that Cohen teaches the recited limitation of claim 64. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Cohen teaches "[a] facilitator agent as recited in claim 61 wherein the facilitating engine is operable to install a trigger mechanism requesting that a certain action be taken when a certain set of conditions are met," as recited in claim 64.

*b. Claim 65*

Claim 65 recites "[a] facilitator agent as recited in claim 64 wherein the trigger mechanism is a communication trigger that monitors communication events and performs the certain action when a certain communication event occurs."

Petitioner argues:

> In the example cited with respect to claim 64, the example *"trigger mechanism"* is further a "communication trigger," because it is monitoring a channel of communication for a specific conforming message (i.e., "[w]hen mail arrives for me about a security break"). Ex. 1014, 4. Likewise, email messages are a *"communication event"* because they necessarily require some type of messaging. ("communication"). Ex. 1014, 4. Moreover, Cohen further discloses the step of *"monitor[ing] communication events and perform[ing] the certain action when a certain communication event occurs."* The mail agent in Cohen is capable of "monitor[ing] incoming electronic messages" (*"monitor[ing] communication events"*) to determine if a "message matching the requested topic has arrived." Ex. 1014, 3–4. Then, as shown above in claim 64, the mail agent will take *"the certain action"* (i.e., "get it to me") when a "message

> matching" (i.e., a *"communication event"*) the set of conditions is received.

Pet. 76 (citing Ex. 1003 ¶ 690).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that Cohen teaches the recited limitations of claim 65. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Cohen teaches "[a] facilitator agent as recited in claim 64 wherein the trigger mechanism is a communication trigger that monitors communication events and performs the certain action when a certain communication event occurs," as recited in claim 65.

*c. Claim 66*

Claim 66 recites "[a] facilitator agent as recited in claim 64 wherein the trigger mechanism is a data trigger that monitors a state of a data repository and performs the certain action when a certain data state is obtained."

Petitioner argues:

> In the example above for claim 64, the "trigger mechanism" monitors for new entries to a "mail database" ("a certain data state is obtained"); new entries that are concerning "a security break" trigger a notification to the user (*"the certain action"*). Ex. 1014, 4. The "mail database" is a *"data repository"* because it is a place mail entries can be stored and queried. Ex. 1014, 4, 6. Further, the trigger mechanism is a *"data trigger"* because it is defined in terms of both data (*i.e.*, when a new entry matches a set of conditions, Ex. 1014, 3) and the data depository (i.e., in terms of changes to the mail database). <u>Cohen</u> therefore discloses this claim element.

Pet. 76–77 (citing Ex. 1003 ¶ 693).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that Cohen teaches the recited limitations of claim 66. *See*

*generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Cohen teaches "[a] facilitator agent as recited in claim 64 wherein the trigger mechanism is a data trigger that monitors a state of a data repository and performs the certain action when a certain data state is obtained," as recited in claim 66.

*d. Claim 67*

Claim 67 recites "[a] facilitator agent as recited in claim 66 wherein the data repository is local to the facilitator agent."

Petitioner argues:

> The ordinary meaning of "local" in this context is running on the same machine. Ex. 1003 ¶ 695. Cohen does not explicitly state whether the mail database is stored locally, but it would have been obvious to do so in the combined system of Cohen with Kiss/FIPA97. Kiss, for example, discloses a meta-agent (facilitator agent) stored locally with a knowledge module, which Kiss states could comprise a database (*"data depository"*). Ex. 1005, 6:55-61, Fig. 21. It would have been obvious to place the database hosting functionality of Cohen's Blackboard server (facilitator agent) in the knowledge module locally stored with Kiss' meta agent. A Skilled Artisan would have been motivated to do so because, at least in some circumstances, local storage of information that is to be managed by the meta agent would have used fewer network resources than remote storage, which would have to be accessed via network communications. Moreover, it would have been obvious to try local storage because, at the level of generality of this claim language, there are only two possibilities – local and remote.

Pet. 77–78 (citing Ex. 1003 ¶ 696).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that the combination of Kiss, FIPA97, and Cohen teaches the recited limitation of claim 67. *See generally* Resp. Based on the complete

record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the combination Kiss, FIPA97, and Cohen teaches "[a] facilitator agent as recited in claim 66 wherein the data repository is local to the facilitator agent," as recited in claim 67.

*e. Claim 68*

Claim 68 recites "[a] facilitator agent as recited in claim 66 wherein the data repository is remote from the facilitator agent."

Petitioner argues:

> The ordinary meaning of "remote" in this context is files, devices and other resources that are on different machines. Ex. 1003 ¶ 698. Cohen does not explicitly state whether the mail database is stored locally or remotely, but it would have been obvious in the combination of Kiss/FIPA97 and Cohen to store them remotely. For example, Kiss discloses a meta-agent (facilitator agent) located remotely from a knowledge module, which Kiss states could comprise a database (*"data depository"*). Ex. 1005, 6:55–61, Fig. 21. In combination, it would have been obvious to place the Blackboard server functionality in the meta agent of Kiss, since both are facilitators, as demonstrated above. And it would have been obvious to try remote storage because, at the level of generality of this claim language, there are only two possibilities – local and remote. Moreover, a Skilled Artisan would have been motivated to employ a remote database, at least in some circumstances, because distributed processing systems can provide the advantages of flexibility, fault tolerance and security. Ex. 1003 ¶ 699. Further motivation is found in FIPA97, which divides agent management functionality into multiple sub-domains, Ex. 1006, 10, allowing a single agent platform to advantageously host multiple agent domains, or an agent domain to be split over multiple platforms.

Pet. 78–79 Ex. 1006, 10, Fig. 2; Ex. 1003 ¶¶ 700–701.

Patent Owner does not specifically dispute Petitioner's arguments and evidence that the combination of Kiss, FIPA97, and Cohen teaches the recited limitations of claim 68. *See generally* Resp. Based on the complete

record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the combination Kiss, FIPA97, and Cohen teaches "[a] facilitator agent as recited in claim 66 wherein the data repository is remote from the facilitator agent," as recited in claim 68.

*f. Claim 69*

Claim 69 recites "[a] facilitator agent as recited in claim 64 wherein the trigger mechanism is a task trigger having a set of conditions."

Petitioner argues:

> In the example cited with respect to claim 64, the "trigger mechanism" monitors for email messages that contain specific content (i.e., "about a security break"); then when an email pertaining to a "security break" is received, the system informs the user. Ex. 1014, 4. Further, the example of a *"task trigger"* used in the 115 Patent is the same example trigger discussed in Cohen and above in claim 64. Ex. 1001, 22:1-3 ("When mail arrives for me about Security, notify me immediately.") (internal quotation marks omitted); *compare* Ex. 1014, 4. Therefore, the example trigger disclosed in Cohen and claim 64 is a *"task trigger."* Further, as shown above in claim 64, the example trigger contains a *"set of conditions."*

Pet. 79 (citing Ex. 1014, 3; Ex. 1003 ¶ 703).

Patent Owner does not specifically dispute Petitioner's arguments and evidence that Cohen teaches the recited limitations of claim 69. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Cohen teaches "[a] facilitator agent as recited in claim 64 wherein the trigger mechanism is a task trigger having a set of conditions," as recited in claim 69.

*g. Claim 70*

Claim 70 recites "[a] facilitator agent as recited in claim 61, the facilitator agent further including a global database accessible to at least one of the service-providing electronic agents."

Petitioner argues:

> Cohen discloses a "facilitator agent further including a global database" in the form of a Database agent directly linked to a blackboard server, and it would have been obvious to include that structure in the combined system for the reasons stated above. Ex. 1003 ¶¶ 235, 435, 715. In Figure 2, Cohen shows a database agent linked directly through the blackboard server. Ex. 1014, 5. Cohen explains that the Blackboard server manages updates and commitments to the database agent. Ex. 1014, 3. Therefore, Cohen discloses a blackboard server (i.e., facilitator agent) that manages and updates ("*including*") a database agent ("*global database*"). Ex. 1003 ¶¶ 710–711.
>
> Further, the disclosed database agent is a *"global database."* Cohen explains that the "[d]atabase agent, . . . interacts with a remote X.500 Directory System Agent database containing directory information." Ex. 1014, 3. The database therefore contains "directory information" for the entire system that can be utilized by agents to facilitate task completion. Ex. 1014, 3–6; Ex. 1003 ¶ 712.
>
> Cohen further discloses that the *"global database [is] accessible to at least one of the service-providing electronic agents,"* such as a mail agent (*"service-providing electronic agent"*) forwarding a request for "phone num [sic] of room 17" through the blackboard agent to access the database agent. Ex. 1014, 5, Fig. 2. The database then responds with the relevant information ("x1234"). EX1003 ¶¶ 713–714.

Pet. 79–80.

Patent Owner does not specifically dispute Petitioner's arguments and evidence that Cohen teaches the recited limitations of claim 70. *See generally* Resp. Based on the complete record and for the reasons explained

by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Cohen teaches "[a] facilitator agent as recited in claim 61, the facilitator agent further including a global database accessible to at least one of the service-providing electronic agents," as recited in claim 70.

*h. Claim 84*

Claim 84 recites "[a] computer architecture as recited in claim 71 wherein a planning component of the facilitating engine are distributed across at least two computer processes."

Petitioner argues:

> To the extent one might argue Kiss and FIPA97 do not disclose this claim element, it would have been obvious to include it in that combined system in view of Cohen. Cohen discloses a "hierarchy" of distributed blackboard servers, each of which would instantiated as different computer processes. Ex. 1014, 2; Ex. 1003 ¶ 769. In Cohen each system contains "one blackboard 'server' process, and many client agents." Ex. 1014, 2 Further, client agents "are permitted to execute on different host machines." Ex. 1014, 2. By placing the blackboard servers into the hierarchy, the "server may itself be a client in a hierarchy of servers." Ex. 1014, 2. Once a client, that server would be able to "execute on different host machines." Ex. 1014, 2. However, the client blackboard would also be able to split its *"planning component"* over multiple systems. Ex. 1014, 2; Ex. 1003 ¶ 770. Therefore, when BB1 (i.e., *"the facilitating engine"*) "determines that none of its child agents has the requisite capabilities" (*i.e.*, planning) it can escalate to another blackboard (BB4), that can carry on the planning. Ex. 1014, 2; Ex. 1003 ¶ 771.

Pet. 80–81.

Patent Owner does not specifically dispute Petitioner's arguments and evidence that the combination of Kiss, FIPA97, and Cohen teaches the recited limitations of claim 84. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that

Petitioner has demonstrated sufficiently that the combination Kiss, FIPA97, and Cohen teaches "[a] computer architecture as recited in claim 71 wherein a planning component of the facilitating engine are distributed across at least two computer processes," as recited in claim 84.

*i. Claim 85*

Claim 85 recites "[a] computer architecture as recited in claim 71 wherein an execution component of the facilitating engine is distributed across at least two computer process."

Petitioner argues:

> Similarly, it would have been obvious to include this claim element in the combined system in view of Cohen. As noted above, Cohen discloses a "hierarchy" of distributed blackboard servers, each of which would instantiate as different computer processes, Ex. 1014, 2; Ex. 1003 ¶ 778, each system containing "one blackboard 'server' process, and many client agents," Ex. 1014, 2, and client agents "are permitted to execute on different host machines," Ex. 1014, 2. By placing the blackboard servers into the hierarchy shown above, the "server may itself be a client in a hierarchy of servers." Ex. 1014, 2. Once a client of another blackboard that server would be able to "execute on different host machines." Ex. 1014, 2. Cohen therefore discloses that the client blackboard splits its *"execution component"* over multiple systems. Ex. 1014, 2; Ex. 1003 ¶¶ 779–780.

Pet. 81–82.

Patent Owner does not specifically dispute Petitioner's arguments and evidence that the combination of Kiss, FIPA97, and Cohen teaches the recited limitations of claim 85. *See generally* Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the combination of Kiss, FIPA97, and Cohen teaches "[a] computer architecture as recited in claim 71

wherein an execution component of the facilitating engine is distributed across at least two computer process," as recited in claim 85.

*j. Conclusion on Dependent Claims 64–70, 84, 85*

Based upon consideration of the entire record, we determine that Petitioner has demonstrated by a preponderance of the evidence that each of dependent claims 64–70, 84, and 85 is unpatentable under 35 U.S.C. § 103(a) as obvious over the combined teachings of Kiss, FIPA97, and Cohen.

*D. Motion to Exclude*

Patent Owner filed a Motion to Exclude (Paper 35, "Motion") "a portion of Exhibit 1129, as well as related testimony relied on by [Petitioner]." Paper 35, 1. Exhibit 1129 is the deposition transcript of Patent Owner's expert Dr. Medvidovic, taken on May 19, 2020. Patent Owner seeks to exclude Petitioner's reliance "on portions of Dr. Medvidovic's deposition testimony that should be excluded because the question on which the testimony is based is vague, ambiguous, confusing, lacks foundation and calls for a legal conclusion. And any testimony elicited from this improper question is irrelevant, prejudicial, and misleading." *Id.*

In particular, Patent Owner seeks to exclude lines 53:19–54:21 of Exhibit 1129, which reads as follows:

> Q: If that's true, then it's your opinion these three things, these three types of processing are required to teach '115's facilitator, correct?
>
> MS. ABDULLAH: Objection.
>
> BY THE WITNESS:
>
> A: I think that the authors of the patent, the inventors were very careful to specify that this is is an embodiment. It's a preferred embodiment. There are other embodiments that they discuss. For this particular embodiment that deals with compound goals, delegation, optimization and interpretation are preferably

> involved. So this is the preferred embodiment. This is a legal thing, not a technical thing. What a preferred embodiment is, that's something that appears in patents, pretty much every patent I've ever read, software patent, anyway. It is something that has a particular meaning. So if you want to handle compound goals, you need to have three types of processing preferably, delegation, optimization and interpretation. So it is my opinion that anybody who tries or, sorry, anybody who is claiming, purporting to be solving the same kinds of problems needs to show an embodiment that matches those three.

Ex. 1129, 53:19–54:21.

Patent Owner argues that Petitioner "attempts to use this improper testimony to support its incorrect conclusion that 'delegation, optimization, and interpretation' are 'functionalities [] limited to a preferred embodiment, (EX1001, 19:1-4), so they are not relevant to the claims." Paper 35, 3 (citing Reply 37). Patent Owner argues that Petitioner's "question was vague, ambiguous, confusing, lacked foundation and called for a legal conclusion." Paper 35, 3–4. Patent Owner also argues "the testimony is irrelevant, prejudicial, and misleading. *Id.* at 4.

Petitioner opposes the motion (Paper 36), arguing that the testimony is admissible and that Petitioner's counsel "failed to object to this question with sufficient specificity at the appropriate time." Paper 36, 1 (citing PTAB Consolidated Trial Practice Guide, pg. 128 (November 2019) ("An objection must be stated concisely in a non-argumentative and non-suggestive manner."). Petitioner points out that Patent Owner's counsel "only said 'Objection' but failed to indicate what type of objection—*i.e.*, form, relevance, etc." Paper 36, 1. Petitioner argues that for the first time, Patent Owner "now attempts to assert multiple grounds for exclusion which were not previously raised—objections which it has waived." *Id.* "Furthermore," Petitioner argues, Patent Owner "does not explain how the

question is 'vague, ambiguous, and confusing,'" and that "summarily saying it is without more is insufficient to challenge admissibility." *Id.* at 1–2 (citing 37 CFR § 42.20 (c); *Samsung Electronics America, Inc. v. Uniloc 2017 LLC,* IPR2017-01798, Paper 32, 103 (PTAB Jan. 31, 2019)).

Petitioner also points out that:

> the party proffering a witness for cross-examination has the opportunity to conduct redirect examination of the witness immediately following the cross-examination to cure any perceived deficiency or to provide a more complete answer. *See* 37 CFR § 42.53(c)(2); *CBS Interactive Inc. v. Helferich Patent Licensing, LLC*, IPR2013-00033, Paper 101 (Oct. 7, 2013); *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, IPR2012-00001, Paper 50 (July 18, 2013). Here, IPA did not avail themselves of this opportunity. Ex. 1129, 164:15-16 ("MS. ABDULLAH: IPA does not have any redirect").

Paper 36, 2.

In its Reply (Paper 38), Patent Owner argues "[t]he vague, ambiguous, confusing, lack of foundation, and legal conclusion nature of questions asked by Microsoft's counsel in Exhibit 1129 is clear both on its face and by Dr. Medvidovic's deposition response," and that "[Patent Owner's] counsel properly and timely objected." Paper 38, 1.

We are not persuaded by Patent Owner's arguments that Dr. Medvidovic's testimony should be excluded from evidence in this proceeding. Although Patent Owner's counsel did state the word "Objection" in response to Petitioner's question to Dr. Medvidovic, Patent Owner's counsel did not state the nature of objection, thus depriving Petitioner's counsel of the opportunity to cure the objection by rephrasing the question.

In its Motion to Exclude, Patent Owner now takes the position that the question is "vague, ambiguous, confusing, lacks foundation and calls for a

legal conclusion." Paper 35, 1. Patent Owner, however, does not explain adequately how the question is vague, ambiguous or confusing, other than to state that "Dr. Medvidovic['s] testimony highlights the vague, ambiguous, and confusing nature of Microsoft's question." *Id.* at 2. Nor does Patent Owner explain adequately how the question lacks foundation or calls for a legal conclusion aside from pointing to Dr. Medvidovic's response that "[t]his is a legal thing, not a technical thing" in reference to the term "preferred embodiment." *Id.*

Patent Owner also argues that Dr. Medvidovic's response to the question is "irrelevant, prejudicial, and misleading." *Id.* at 4. Dr. Medvidovic's testimony, however, concerns his understanding of a preferred embodiment described in the '115 patent and his opinion of whether the prior art, in particular, Kiss, teaches a "facilitator." *See, e.g.,* Ex. 1129, 52:15–54:21. We find it difficult to see how Dr. Medvidovic's testimony is "irrelevant," since it goes to his understanding of the '115 patent, the asserted prior art, and the nature of his opinion in this proceeding.

It is also relevant to note, as Petitioner points out, that Patent Owner's counsel had "the opportunity to conduct redirect examination of the witness immediately following the cross-examination to cure any perceived deficiency or to provide a more complete answer." Paper 36, 2 (citing 37 CFR § 42.53(c)(2); *CBS Interactive Inc. v. Helferich Patent Licensing, LLC*, IPR2013-00033, Paper 101 (Oct. 7, 2013); *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, IPR2012-00001, Paper 50 (July 18, 2013). Patent Owner's counsel, however, declined to redirect any questions to Dr. Medvidovic. *See* Ex. 1129, 164:15–16.

As for Dr. Medvidovic's testimony being prejudicial or misleading, the Board, sitting as a non-jury tribunal with particular administrative and

technical expertise, is not as vulnerable to being misled or prejudiced as a jury might, and is well-positioned to determine and assign appropriate credibility and weight to the evidence presented at trial, without resorting to a formal exclusion of evidence that might later be held to be reversible error. *See, e.g., Liberty Mutual Insurance Co. v Progressive Casualty Insurance Co.,* Case CBM2012- 00002, slip op. at 70 (PTAB, Jan, 23, 2014) (Paper 66), *Gnosis S.P.A., et al. v S. Alabama Medical Science Foundation,* Case IPR2013-00118, slip op. at 43 (PTAB June 20, 2014) (Paper 64).

For these reasons, we deny Patent Owner's Motion to Exclude.

*E. Constitutional Challenges*

Patent Owner raises two constitutional challenges. First, Patent Owner argues that subjecting a pre-AIA patent, such as the '115 patent, retroactively to *inter partes* review violates the Takings and Due Process Clauses of the Fifth Amendment. Resp. 146. Second, Patent Owner asserts that *inter partes* reviews violate the Appointments Clause of the U.S. Constitution when conducted by administrative patent judges not nominated by the President and confirmed by the Senate. *Id.*

Addressing first Patent Owner's Appointments Clause challenge, we are bound by the Federal Circuit's decision in *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019), *cert. granted sub nom. United States v. Arthrex, Inc.*, 2020 WL 6037206 (Oct. 13, 2020), which addressed this issue. *See* 941 F.3d at 1337 ("This as-applied severance . . . cures the constitutional violation."); *see also Arthrex, Inc. v. Smith & Nephew, Inc.*, 953 F.3d 760, 764 (Fed. Cir. 2020) (Moore, J., concurring in denial of rehearing) ("Because the APJs were constitutionally appointed as of the implementation of the severance, *inter partes* review decisions going

forward were no longer rendered by unconstitutional panels.”). Accordingly, we decline to consider this issue.

With regard to the Takings and Due Process Clause challenge, we note that challenges to retroactive application of IPRs to pre-AIA patents have been addressed by the Federal Circuit in *Celgene Corp. v. Peter*, 931 F.3d 1342, 1357–1363 (Fed. Cir. 2019), *cert. denied* 2020 WL 3405867 (June 22, 2020) (Takings Clause), and *Sound View Innovations, LLC v. Hulu, LLC*, Nos. 2019-1865, 2019-1867, 2020 WL 3583556, *3 (Fed. Cir. July 2, 2020) (non-precedential) (Due Process Clause). Accordingly, we decline to consider this issue.

## III. CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 61, 62, and 64–85 of the ’115 patent are unpatentable on the bases set forth in the following table, but has not shown that claim 63 of the ’115 patent is unpatentable.[24]

| **Claims** | **35 U.S.C. §** | **References** | **Claims Shown Unpatentable** | **Claims Not shown Unpatentable** |
|---|---|---|---|---|
| 61–63, 70–85 | 103 | Kiss, FIPA97 | 61, 62, 70–85 | 63 |
| 64–70, 84, 85 | 103 | Kiss, FIPA97, Cohen | 64–70, 84, 85 | |
| **Overall Outcome** | | | 61, 62, 64–85 | 63 |

[24] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Final Decision, we draw Patent Owner’s attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

## IV. ORDER

In consideration of the foregoing, it is hereby

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 61, 62, and 64–85 of U.S. Patent No. 6,851,115 B1 are *unpatentable*; and

FURTHER ORDERED that claim 63 of the ’115 patent has not been shown to be unpatentable;

FURTHER ORDERED that Patent Owner’s Motion to Exclude is *denied*; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Joseph Micallef
Scott Border
SIDLEY AUSTIN LLP
jmicallef@sidley.com
sborder@sidley.com

PATENT OWNER:

Steven Hartsell
Alexander Gasser
Sarah Spires
SKIERMONT DERBY LLP
shartsell@skiermontderby.com
agasser@skiermontderby.com
sspires@skiermontderby.com

Trials@uspto.gov
571-272-7822

Paper 42
Date: October 15, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MICROSOFT CORPORATION,
Petitioner,

v.

IPA TECHNOLOGIES INC.,
Patent Owner.

---

IPR2019-00835
Patent 7,069,560 B1

---

Before LYNNE E. PETTIGREW, MINN CHUNG, and KEVIN C. TROCK, *Administrative Patent Judges.*

PETTIGREW, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
Denying in Part and Dismissing in Part Patent Owner's Motion to Exclude
*35 U.S.C. § 318(a); 37 C.F.R. § 42.64*

# I. INTRODUCTION

In this *inter partes* review, instituted pursuant to 35 U.S.C. § 314, Microsoft Corporation ("Petitioner") challenges claims 1, 20, 21, 26–35, and

45–49 of U.S. Patent No. 7,069,560 B1 (Ex. 1001, "the '560 patent"), owned by IPA Technologies Inc. ("Patent Owner"). This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed below, Petitioner has shown by a preponderance of the evidence that claims 1, 20, 21, 26, 27, 29–35, and 45–49 of the '560 patent are unpatentable, but has not shown by a preponderance of the evidence that claim 28 of the '560 patent is unpatentable.

### *A. Procedural History*

Petitioner filed a Petition for *inter partes* review of claims 1, 20, 21, 26–35, and 45–49 of the '560 patent. Paper 1 ("Pet."). Patent Owner filed a Preliminary Response. Paper 6 ("Prelim. Resp."). Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we instituted an *inter partes* review of the challenged claims. Paper 9 ("Inst. Dec.").

Following institution, Patent Owner filed a Patent Owner Response (Paper 19, "PO Resp."), Petitioner filed a Reply (Paper 27, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 32, "PO Sur-reply"). Patent Owner filed a Motion to Exclude (Paper 33, "PO Mot."), Petitioner filed an Opposition to Patent Owner's Motion to Exclude (Paper 34, "Pet. Opp. to Mot."), and Patent Owner filed a Reply in Further Support of Its Motion to Exclude (Paper 36, "PO Mot. Reply"). An oral hearing was held on July 27 and 28, 2020, and a copy of the hearing transcript has been entered into the record.[1] Paper 41 ("Tr.").

[1] A single hearing was held for eight related cases—IPR2019-00810, IPR2019-00811, IPR2019-00812, IPR2019-00813, and IPR2019-00814,

*B. Real Parties in Interest*

Petitioner identifies Microsoft Corporation as the real party in interest for the Petition. Pet. 3. Patent Owner names as the real party in interest IPA Technologies Inc., which is a wholly owned subsidiary of Wi-LAN Technologies Inc., which is a wholly owned subsidiary of Wi-LAN Inc., which is a wholly owned subsidiary of Quarterhill Inc. Paper 3, 2.

*C. Related Matters*

The parties inform us that the ’560 patent is the subject of the following district court proceedings: *IPA Technologies Inc. v. Microsoft Corp.*, 1:18-cv-00001 (D. Del.); *IPA Technologies Inc. v. Google LLC*, 1:18-cv-00318 (D. Del.); *IPA Technologies Inc. v. Amazon.com*, 1:16-cv-1266 (D. Del.). Pet. 3; Paper 3, 2.

*Inter partes* reviews in IPR2019-00836 and IPR2019-00837, based on petitions filed by Petitioner and respectively challenging claims 1, 5–13, 22–25, and 50–55, and claims 1–4, 14–19, 26, and 36–44 of the ’560 patent, are pending. The ’560 patent was the subject of two *inter partes* reviews in which the Board determined that claims of the ’560 patent had not been shown to be unpatentable: *Google LLC v. IPA Technologies Inc.*, IPR2019-00730, Paper 72 (PTAB Sept. 16, 2020) (Final Written Decision); *Google LLC v. IPA Technologies Inc.*, IPR2019-00731, Paper 73 (PTAB Sept. 16, 2020) (Final Written Decision).

The ’560 patent is a continuation of U.S. Patent No. 6,851,115 B1 (Ex. 1122, “the ’115 patent”), which is the subject of other *inter partes* reviews (IPR2019-00810, IPR2019-00811, IPR2019-00812, IPR2019-

---

challenging claims of U.S. Patent No. 6,851,115 B1; and IPR2019-00835, IPR2019-00836, and IPR2019-00837, challenging claims of the ’560 patent.

00813, and IPR2019-00814) involving the same parties as this proceeding. *See* Ex. 1001, code (63).

*D. Overview of the '560 Patent*

The '560 patent describes "software-based architectures for communication and cooperation among distributed electronic agents" using "interagent communication languages enabling client agents to make requests in the form of arbitrarily complex goal expressions that are solved through facilitation by a facilitator agent." Ex. 1001, 1:20–25. Figure 4 of the '560 patent is reproduced below.




Fig. 4

Figure 4 depicts the structure of an exemplary distributed agent system of the '560 patent. *Id.* at 6:38–44. Figure 4 shows that system 400 includes facilitator agent 402, user interface agents 408, application agents 404, and meta-agents 406. *Id.* The '560 patent discloses that system 400 is organized

"as a community of peers by their common relationship" to facilitator agent 402, which is "a specialized server agent that is responsible for coordinating agent communications and cooperative problem-solving." *Id.* at 6:41–43, 6:46–48.

The '560 patent discloses that cooperation among agents is structured around the following three-part approach: (1) providers of services register their capabilities specifications with a facilitator; (2) requesters of services construct goals and relay them to the facilitator; and (3) the facilitator coordinates the efforts of the appropriate service providers in satisfying these goals. *Id.* at 10:53–61. Such cooperation among agents is achieved via messages expressed in a common language, referred to as the Interagent Communication Language ("ICL"). *Id.* at 10:61–11:7.

Referencing Figure 3 (not reproduced herein) and Figure 4, the '560 patent describes a preferred embodiment for the operation of a distributed agent system. *Id.* at 7:24–50. The '560 patent describes that, when invoked, a client agent makes a connection to a facilitator, e.g., facilitator agent 402, and registers with the facilitator a specification of the capabilities and services it can provide. *Id.* at 7:26–32. For example, a natural language agent may register the characteristics of its available natural language vocabulary. *Id.* at 7:32–34. When facilitator agent 402 receives a service request and determines that registered services 416 of one of its client agents will help satisfy a goal of the request, the facilitator sends that client a request expressed in ICL 418. *Id.* at 7:36–40. The client agent parses this request, processes it, and returns answers or status reports to the facilitator. *Id.* at 7:41–43.

Referencing Figures 5 and 6 (not reproduced herein), the '560 patent describes an exemplary embodiment in which user interface agent 408 runs

on a user's laptop, accepting user input, sending requests to facilitator agent 402 for delegation to appropriate agents, and displaying the results of the distributed computation. *Id*. at 7:64–8:14. For instance, when the question "What is my schedule?" is entered on user interface (UI) 408, UI 408 sends the request to facilitator agent 402, which in turn asks natural language (NL) agent 426 to translate the query into ICL. *Id*. at 8:15–25. The translated ICL expression then is routed by facilitator agent 402 to appropriate agents, e.g., calendar agent 434, to execute the request. *Id*. at 8:25–27. Finally, results are sent back to UI agent 408 for display. *Id*. at 8:27–28.

*E. Illustrative Claims*

Of the claims challenged in the Petition, claims 1, 26, and 47 are independent. Claims 20 and 21 depend directly or indirectly from claim 1; claims 27–35, 45, and 46 depend directly or indirectly from claim 26; and claims 48 and 49 depend directly or indirectly from claim 47. Claims 1 and 47 are illustrative and reproduced below.

> 1. A software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture contemplating a distributed computing system comprising:
>
> a plurality of service-providing electronic agents;
>
> a distributed facilitator agent functionally distributed across at least two computer processes, the facilitator agent capable of bi-directional communications with the plurality of service-providing electronic agents, the facilitator agent including:
>
> an agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the distributed computing environment; and
>
> a facilitating engine operable to interpret a service request as a base goal, the facilitating engine further operable for

generating a goal satisfaction plan associated with the base goal, wherein the goal satisfaction plan involves:

using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal; and

wherein the plurality of service-providing electronic agents and the distributed facilitator agent communicate using an interagent Communication Language (ICL), wherein the ICL includes:

a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events.

47. A facilitator agent for coordinating cooperative task completion within a distributed computing environment having a plurality of autonomous service-providing electronic agents, the facilitator agent comprising:

a registry of capabilities of the service-providing electronic agents; and

a facilitating engine operable to determine a set of sub goals necessary to accomplish a base goal, and then allocate such sub-goals to those agents capable of accomplishing the sub-goals as determined by the registry, said facilitating agent further capable of initiating a direct peer to peer communication between a service-requesting agent and a service-providing agent of at least one sub-goal, and said facilitating agent being distinct from service-providing agents; and

wherein the service-providing agent and the service-requesting agent communicate using an Interagent Communication Language (ICL), the ICL includes a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events.

Ex. 1001, 29:56–30:23, 34:18–40.

### *F. Asserted Grounds of Unpatentability*

Petitioner asserts that the challenged claims are unpatentable based on the following grounds (Pet. 4):

| Claim(s) Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1, 20, 21, 26–28, 45–49 | 103(a)[2] | Kiss,[3] FIPA97[4] |
| 20, 21, 29–35 | 103(a) | Kiss, FIPA97, Cohen[5] |
| 28 | 103(a) | Kiss, FIPA97, Cheyer[6] |

### *G. Testimonial Evidence*

In support of the unpatentability contentions in its Petition, Petitioner relies on a declaration of Dr. Henry Lieberman (Ex. 1050, "Lieberman Decl.") and a declaration of Dr. Timothy Finin (Ex. 1049, "Finin Decl."). Patent Owner cross-examined Dr. Lieberman and Dr. Finin via deposition. *See* Ex. 2069 ("Lieberman Dep."); Ex. 2068 ("Finin Dep.").

In support of its Patent Owner Response, Patent Owner relies on a declaration of Dr. Nenad Medvidovic (Ex. 2032, "Medvidovic Decl.") and a

---

[2] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. §§ 102 and 103. Because the '560 patent has an effective filing date prior to the effective date of the applicable AIA amendments, we refer to the pre-AIA versions of §§ 102 and 103.

[3] U.S. Patent No. 6,484,155 B1, issued Nov. 19, 2002, filed July 21, 1999 (Ex. 1005, "Kiss").

[4] Foundation for Intelligent Physical Agents, *FIPA 97 Specification Version 1.0*, published Oct. 10, 1997 (Exs. 1006–1012, collectively "FIPA97").

[5] Cohen et al., *An Open Agent Architecture*, AAAI Technical Report SS-94-03 (1994) (Ex. 1014, "Cohen").

[6] Adam Cheyer and Luc Julia, *MVIEWS: Multimodal Tools for the Video Analyst*, 1998 International Conference on Intelligent User Interfaces, 55–62 (Ex. 1015, "Cheyer").

Declaration of Dr. Philip R. Cohen (Ex. 2033, "Cohen Decl."). Petitioner cross-examined Dr. Medvidovic via deposition. *See* Ex. 1129 ("Medvidovic Dep.").

## II. DISCUSSION

### *A. Legal Principles*

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective indicia of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

To prevail on its challenges to Patent Owner's claims, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC. v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir.

2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

### *B. Level of Ordinary Skill in the Art*

We begin our analysis by addressing the level of ordinary skill in the art. Petitioner's declarant, Dr. Lieberman, opines that a person of ordinary skill in the art at the time of the invention of the '560 patent would have been someone familiar with the principles and conventions of computer science and computer networking, and also with multi-agent systems and inter-agent communication languages as documented in agent-centered literature by 1999. Ex. 1050 ¶ 32; *see* Pet. 5 (citing Ex. 1050 ¶ 32). Dr. Lieberman also testifies that a person of ordinary skill in the art may have been a graduate student in mathematics, engineering, or computer science, and may have had an advanced degree in one of these disciplines, and would also have had at least two years of experience working in the field of computer science, or a related field, and may have worked in academia, either as a professor or a graduate student, for a technology company, or for a government. Ex. 1050 ¶ 32.

Citing the testimony of its declarant, Dr. Medvidovic, Patent Owner asserts that a person of ordinary skill in the art at the time of the '560 patent's effective filing date would have had "a Bachelor's degree in Computer Science or equivalent field and at least two years of work experience in design and development of distributed systems, software specification languages, or a related area." PO Resp. 28 (citing Ex. 2032 ¶ 41). Patent Owner criticizes Petitioner's articulation of the level of ordinary skill in the art as being "vague and uncertain" due to Petitioner's and Dr. Lieberman's use of the word "may" in their proposed definition. *Id.* at 28–29. Patent Owner contends that Petitioner's proposed definition

"leav[es] every aspect of the level of skill 'fluid,'" which is "particularly problematic here, where Petitioner claims that it would have been obvious to create an agent system that is very complex and advanced in its facilitation, goal processing, and inter-agent communication capacities." *Id.* at 29 (citing Ex. 2032 ¶ 44).

Petitioner responds that its proposal "realistically expresses alternatives—*i.e.*, that a Skilled Artisan would have been at least a graduate student in several relevant fields, and would have had at least two years of work experience in those fields." Pet. Reply 12 (citing Pet. 5). Petitioner also argues that Patent Owner does not articulate how any differences between the parties' proposals that would alter or even affect the outcome of this proceeding. *Id.*

Patent Owner asserts that it has "identified how the difference between the proposals would affect this proceeding" because Patent Owner has pointed out that "it is Petitioner's burden under the law to address each *Graham* factor and Petitioner has failed to proffer a coherent level of ordinary skill in the art, [and] Petitioner's obviousness assertion fails for that reason alone." PO Sur-reply 16–17 (citing PO Resp. 29).

But Patent Owner does not identify any "meaningful differences" between the parties' proposed definitions or how "the outcome of [this proceeding] would have been different" if we adopted Patent Owner's proposed definition, as opposed to Petitioner's proposal. *See ESIP Series 2, LLC v. Puzhen Life USA, LLC*, 958 F.3d 1378, 1385 (Fed. Cir. 2020) (citing *Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1371–72 (Fed. Cir. 2016)). For example, Patent Owner does not argue the challenged claims are not unpatentable under Patent Owner's proposed definition of the level of ordinary skill in the art, nor does it identify any

claim limitation that would have been taught by the asserted prior art under Petitioner's proposed definition, but *not* under Patent Owner's proposal. *See* PO Resp. 28–29; PO Sur-reply 16–17.

In our view, the parties' proposals are not materially different despite the differences in wording between them (e.g., the education level of a Bachelor's degree in Computer Science or equivalent field under Patent Owner's proposal, as opposed to a graduate student's level of education with or without a Bachelor's degree under Petitioner's proposed definition). *See* Pet. 5; Pet. Reply 12; PO Resp. 28. For purposes of this Final Written Decision, we find no meaningful differences between the parties' respective definitions that would materially alter the outcome of this Decision. These proposals are similar for all purposes relevant to this Final Written Decision, and both are consistent with the level of ordinary skill in the art reflected in the disclosure of the '560 patent and the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

Nonetheless, for this Final Written Decision, we adopt Patent Owner's definition of a person of ordinary skill in the art at the time of the claimed invention. That is, a person of ordinary skill in the art at the time of the claimed invention would have had "a Bachelor's degree in Computer Science or equivalent field and at least two years of work experience in design and development of distributed systems, software specification languages, or a related area." Our analysis and conclusions in this Final Written Decision would be the same regardless of whether Petitioner's or Patent Owner's definition of the level of ordinary skill in the art is adopted.

*C. Claim Construction*

In an *inter partes* review, we apply the same claim construction standard that would be used in a civil action under 35 U.S.C. § 282(b), following the standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. § 42.100(b) (2019). In applying such standard, claim terms are generally given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art, at the time of the invention and in the context of the entire patent disclosure. *Phillips*, 415 F.3d at 1312–13. "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

In our Decision on Institution, we preliminarily interpreted several claim terms as follows:

| Term | Construction |
|---|---|
| "event" | "a message or goal communicated between agents" |
| "event type" | "a type of an event" |
| "goal" | "a request for service" |
| "compound goal" | "a single goal expression that specifies multiple sub-goals to be performed" |
| "non-syntactic decomposition of the base goal" | "generation of a sub-request (sub-goal/sub-delegation) based on factors other than the syntax of how the goal was received or made" |

Inst. Dec. 28–36.

The parties do not dispute the constructions of these five terms in the Patent Owner Response or Petitioner Reply. *See* PO Resp. 30–31, 43; Pet. Reply 1. Upon considering the complete record, we see no reason to deviate from our preliminary constructions and, therefore, adopt the constructions of the claim terms "event," "event type," "goal," "compound goal," and "non-syntactic decomposition of the base goal" as set forth above for this Final Written Decision.

In the Petition, Petitioner discusses constructions for six additional claim terms: "goal satisfaction plan," "layer of conversational protocol," "single process facilitator agent," "trigger," "symbolic name," and "parameter lists further refine the one or more events." Pet. 8–15. In addition, Petitioner discusses constructions of "computer process(es)" and "process characteristics" in the Reply. Pet. Reply 9–12. Patent Owner disputes constructions for the following terms: "goal satisfaction plan," "computer process(es)," and "process characteristics." PO Resp. 32–47, 50–52; PO Sur-reply 2–11, 14–16. We discuss constructions for the disputed terms below.

No other disputed claim terms need to be construed expressly for purposes of this Final Written Decision. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that only terms that are in controversy need to be construed, and "only to the extent necessary to resolve the controversy"); *see also Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (applying *Vivid Technologies.* in the context of an *inter partes* review). To the extent it is necessary for us to consider the meaning of any other claim term, we do so in the context of our unpatentability analysis.

*1. "goal satisfaction plan"*

The claim term "goal satisfaction plan" is recited in challenged independent claims 1 and 26 of the '560 patent. Ex. 1001, 30:7–15 (claim 1), 32:43–51 (claim 26). It is also recited in independent claim 50 of the '560 patent, not challenged in this proceeding. *Id.* at 35:1–10. Petitioner contends that a "goal satisfaction plan" is a "procedure for sending one or more requests for service to one or more agents in order to satisfy a goal." Pet. 9. Patent Owner disagrees and asserts that the claim term "goal satisfaction plan" should be construed to mean "a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints." PO Resp. 32.

*a. Claim Language*

We begin our claim construction analysis by considering the language of the claims themselves. *Phillips*, 415 F.3d at 1314. Addressing the claim language of the disputed term, we note that the claim language "a goal satisfaction plan" indicates that the term's plain meaning is "a plan for satisfying a goal."

In independent claims 1 and 26, the recited "goal satisfaction plan" is further constrained by specific limitations recited in the claims. Claim 1 recites:

> a facilitating engine . . . further operable for generating a *goal satisfaction plan* associated with the base goal, wherein the goal satisfaction plan involves:
>
> using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal.

Ex. 1001, 30:5–15 (emphasis added). Claim 26 recites substantially similar language:

> a facilitating engine . . . further operable to generate a *goal satisfaction plan* associated with the compound goal, wherein the goal satisfaction plan involves:
>
> using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal.

*Id.* at 32:35–51 (emphasis added).

Patent Owner argues that additional claim limitations specify that the goal satisfaction plan is designed for optimal goal satisfaction and takes into account advice parameters. PO Resp. 34–35 (citing Ex. 2032 ¶ 50). Patent Owner, however, only identifies limitations that do not appear in the claims of the '560 patent. *Id.* (erroneously citing claim 1 as reciting "a suitable delegation," "dispatching . . . based on a match," and "domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and . . . a match between the subgoal being dispatched and the registered functional capabilities"). Therefore, Patent Owner does not show persuasively that any claim language in the '560 patent requires the narrow construction it proposes.

Thus, at least based on the claim language, it is not appropriate to limit "goal satisfaction plan" as Patent Owner contends. As discussed above, the meaning and the scope of "goal satisfaction plan" is clear on the face of each claim because claims 1 and 26 each recite specifically what a "goal satisfaction plan" includes or comprises. Therefore, absent compelling evidence to the contrary, it is neither necessary nor appropriate to limit the

meaning of the term "goal satisfaction plan" beyond the plain meaning indicated by the claim language—i.e., "a plan for satisfying a goal."

*b. Written Description*

Patent Owner cites the following statement in the "Summary of the Invention" section:

> [e]xtreme flexibility is achieved through an architecture organized around the declaration of capabilities by service-providing agents, the construction of arbitrarily complex goals by users and service-requesting agents, and the role of facilitators in delegating and coordinating the satisfaction of these goals, subject to advice and constraints that may accompany them.

PO Resp. 35–36 (quoting Ex. 1001, 4:67–5:6). The very first sentence of the paragraph cited by Patent Owner states, however, "[a] first *embodiment* of the present invention discloses a highly flexible, software-based architecture for constructing distributed systems." Ex. 1001, 4:55–57 (emphasis added). Indeed, all of the portions of the Specification cited by Patent Owner, including the passage reproduced above, describe various embodiments of the '560 patent. *See* PO Resp. 35–38 (citing Ex. 1001, 4:67–5:6, 5:48–49, 15:60–62, 16:22–24, 16:34–44, 16:62–17:2, 18:60–19:6, 29:25–33, Fig. 11).

In general, "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (citation omitted). As discussed above, challenged independent claims 1 and 26 do not recite all of the limiting features required by Patent Owner's proposed construction of "goal satisfaction plan." Thus, unless one of the established exceptions, such as lexicography or disavowal, applies, the challenged claims are not restricted as Patent Owner contends. *See, e.g.*, *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750

F.3d 1304, 1309 (Fed. Cir. 2014) ("the specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal") (citation omitted). Here, Patent Owner does not argue lexicography or disavowal. Nor does Patent Owner explain any other reason why the Specification limits "goal satisfaction plan" as it contends. Thus, claim construction in this case is governed by the general principle that "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." *SuperGuide*, 358 F.3d at 875; *see also WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1323–24 (Fed. Cir. 2018) ("It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise." (citing *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) ("[T]his court has repeatedly cautioned against limiting claims to a preferred embodiment."))). Accordingly, none of the embodiments in the Specification cited by Patent Owner limits "goal satisfaction plan" as Patent Owner contends.

*c. Prosecution History*

Turning next to the prosecution history, Patent Owner asserts that "examples in the file history confirm the elements of 'goal satisfaction plan' reflected in Patent Owner's proposed construction." PO Resp. 40. Patent Owner argues that, during the prosecution of the application for the '115 patent (i.e., the parent of the '560 patent),

> [a]pplicant further stated that "the facilitating engine is able to use reasoning to delegate the sub-goals to service providing agents in such a way as '**to best complete the requested service request**.'…The facilitating engine is able to use reasoning to delegate the sub-goal task of roasting coffee to the service-providing agent that can roast beans in the least amount of time because the facilitating engine has reasoned that the least amount

> of time taken to make coffee is the best way to accomplish the base goal of making coffee." Applicant concluded that "the base goal is carried out **not by merely parsing the request into sub-goals**" but rather "the facilitating engine used reasoning to decide upon using competing message transfer agents to reminding Bob of lunch, in lieu of delegating the task to just one message transfer agent."

*Id.* (citing Ex. 1002, 172–73). Patent Owner argues that similar language appears in Applicant's remarks during prosecution of the '560 patent. *Id.* (citing Ex. 1120, 171–72); *see* Ex. 1120, 172 ("The reasoning includes 'one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms.").

Similar to its arguments based on the language of the claims, Patent Owner's contentions regarding the prosecution history refer to claim language that does not appear in the claims of the '560 patent (e.g., "to best complete the requested service request" and "one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms"). Patent Owner does not explain persuasively why prosecution statements directed to language not in the claims of the '560 patent should limit the construction of "goal satisfaction plan" as Patent Owner contends.

*d. Extrinsic Evidence*

Patent Owner also cites the testimony of its declarant, Dr. Medvidovic, in support of Patent Owner's proposed construction of "goal satisfaction plan." PO Resp. 40–41 (citing Ex. 2032 ¶¶ 55–56, 58–63, 200). We have reviewed the cited testimony from Dr. Medvidovic, but do not find anything in his testimony that would change our analysis based on intrinsic record discussed above. *See Phillips*, 415 F.3d at 1318 (authorizing

the consideration of extrinsic evidence in determining the meaning of claims but noting that it is "in general . . . less reliable than the patent and its prosecution history in determining how to read claim terms").

*e. Other Arguments*

The parties dispute whether Petitioner's use of "procedure" (in place of a "plan") and "sending one or more requests for service" in Petitioner's proposed construction is appropriate. *See* PO Resp. 41–43; Pet. Reply 2, 5–6; PO Sur-reply 3, 10. We need not address these arguments in detail because, for the reasons discussed above, we see no reason to depart from the plain meaning of the term "goal satisfaction plan."

*f. Conclusion*

Based on the complete record and after examining the claims as a whole, the Specification, and the prosecution history, we construe the term "a goal satisfaction plan" according to its plain meaning—"a plan for satisfying a goal."

*2. "computer process"*

The claim term "computer processes" is recited in independent claims 1 and 26 in the limitation "a distributed facilitator agent functionally distributed across at least two computer processes." Ex. 1001, 29:63–64 (claim 1), 32:26–27 (claim 26). Various dependent claims recite the term "computer process." *See, e.g.*, Ex. 1001, 31:50–53 (claim 20 reciting "the distributed facilitator agent includes a planning component executing within a first computer process and an execution component executing within a second computer process"). Petitioner contends that a "computer process" is "a program, a part of a program, or a list of steps to be completed by the computer." Pet. 33 (citing Ex. 1034, 383 (computer dictionary defining "process" as "[a] program or part of a program; a coherent sequence of steps

undertaken by a program”). Patent Owner disagrees and asserts that a “computer process” is “an operating system process within a computer’s architecture that represents one or more running programs and their activities.” PO Resp. 44; *see* Ex. 2032 ¶ 69. In its Reply, Petitioner argues that because Patent Owner does not assert any different outcome based on its proposed construction, and Petitioner shows how the prior art discloses “computer processes” under either party’s construction, the term need not be construed to resolve any controversy. Pet. Reply 11–12. Patent Owner disagrees, asserting that the construction of the term affects the merits of Petitioner’s arguments. PO Sur-reply 16.

The terms “computer process” and “computer processes” are recited repeatedly in the claims of the ’560 patent, and many of Patent Owner’s arguments responding to Petitioner’s unpatentability contentions relate to claim limitations involving “computer processes.” Accordingly, we construe the term “computer process” to assist us in resolving the parties’ dispute regarding unpatentability.

*a. Claim Language*

We begin our claim construction analysis by considering the language of the claims themselves. *Phillips*, 415 F.3d at 1314. Patent Owner notes that the term “computer process” appears in the claims in the context of “at least two” or “separate” computer processes relating to a distributed facilitator agent. PO Resp. 44–45 (citing claims 1, 2, 20, and 21). Patent Owner argues that in the context of those claims, having a distributed facilitator agent as a separate “program” (under Petitioner’s construction) does not necessarily allow for the degree of separation contemplated by the claims because multiple programs may be run on the same processes. *Id.* at

45 (citing Ex. 2032 ¶ 71). Petitioner does not reply to this argument. *See* Pet. Reply 11–12.

Patent Owner essentially argues, with the support of Dr. Medvidovic, that a "process" is not limited to a "program" because multiple programs may be executed in the same computer process. Ex. 2032 ¶ 71. Patent Owner does not explain persuasively how claim language involving the distributed facilitator agent and separate computer processes necessarily suggests that a process is not a program.

The same paragraph in Dr. Medvidovic's declaration also states that "[a] process is not [a] program because a program is a static notion . . . while a process is what actually occurs in a computer when a program is executed." *Id.* The claim language does provide some support for the concept that a computer process involves running or executing a program, which is part of Patent Owner's proposed construction. For instance, claim 20 requires "a planning component *executing* within a first computer process and an execution component *executing* within a second computer process." Ex. 1001, 31:50–53 (emphases added).

*b. Written Description*

As Patent Owner points out, the written description of the '560 patent does not use the term "computer process." PO Resp. 45. Instead, it describes a facilitator agent with functionality "distributed across several different computer platforms." *Id.* (quoting Ex. 1001, 6:31–33). Patent Owner cites a passage describing an embodiment allegedly corresponding to claims 20 and 21 that explains some benefits of separating the facilitator agent's planning and execution components. *Id* at 45–46 (quoting Ex. 1001, 29:8–28). As with the claim language, Patent Owner does not persuasively show how this description informs the construction of "computer process."

*c. Extrinsic Evidence*

Petitioner's proposed construction is based directly on a computer dictionary definition of a "process" as "[a] program or part of a program; a coherent sequence of steps undertaken by a program." Ex. 1034, 383. Patent Owner and Dr. Medvidovic cite an electronics dictionary providing one definition of a "process" as "[t]he basic unit of computation within an operating system." Ex. 2070, 590; *see* PO Resp. 46; Ex. 2032 ¶ 69. They also cite a general purpose dictionary defining "process" in the context of computers as "to carry out operations on (data or programs)." Ex. 2071, 1542; *see* PO Resp. 46; Ex. 2032 ¶ 69. Dr. Medvidovic explains that a process is not the same thing as a program because, for example, a process can run many programs or parts of programs. Ex. 2032 ¶¶ 71–72.

*d. Analysis*

In the context of the claim language, the only intrinsic evidence that sheds light on the meaning of "computer process," we find Patent Owner's extrinsic evidence in the form of Dr. Medvidovic's testimony and dictionary definitions to be more persuasive than Petitioner's proffered dictionary definition. Thus, we agree with Patent Owner that a "computer process" is a process that runs or executes one or more computer programs. We are not persuaded that the other portions of Patent Owner's proposed construction are necessary or materially affect the meaning of the claim term.

For these reasons, based on the complete record, including the intrinsic and extrinsic evidence of record, we construe the term "computer process" as "a process that runs or executes one or more computer programs."

*3. "process characteristics"*

The claim term "process characteristics" is recited in claim 28, which depends from independent claim 26 and further recites "wherein the agent registry includes a symbolic name, a unique address, data declarations, trigger declarations, task declarations, and process characteristics for each active agent." Ex. 1001, 32:58–61.

Petitioner's declarant, Dr. Lieberman, opines that the ordinary meaning of "process characteristics" is "additional information that may refine how a process is conducted." Ex. 1050 ¶ 586. In the Institution Decision, we found that neither Petitioner nor Dr. Lieberman explained the basis for this construction or cited any supporting evidence. Inst. Dec. 61 (citing Ex. 1050 ¶ 586; Pet. 65). We noted that Petitioner's proposed "ordinary meaning" of "process characteristics" does not appear to track the plain language of the claim term. *Id.* For example, it is not apparent from the words "process" and "characteristics" why "process characteristics" require "additional information" or "refin[ing]" how a process is conducted. *Id.* We found that, without explanations or citations to record evidence from Petitioner why the term "process characteristics" should be construed as Petitioner proposes, we were unable to determine if the proposed "ordinary meaning" construction is correct. *Id.*

In the Petitioner Reply, Petitioner argues the Specification describes that process characteristics "may include one or more of the following: Machine Type (specifying what type of computer may run the agent), [and] Language (both computer and human interface)." Pet. Reply 9–10 (citing Ex. 1001, 17:35–44). Citing the testimony of Dr. Lieberman, Petitioner further asserts that the process characteristic "Language (both computer and human interface)" refines the process because an "interface" is the "point at

which a connection is made between two elements so that they can work with each other" and the process may refine its implementation based on these points of "connection"—for example, by routing requests to agents that have a registered interface with one another, thus allowing them to more effectively "work with each other." *Id.* at 10–11 (citing Ex. 1050 ¶ 447).

Patent Owner disagrees with Petitioner's proposed construction and argues that the term "process characteristics" instead should be construed to mean "characteristics of the computer process that may run an agent." PO Resp. 50. In particular, Patent Owner asserts that the use of "refine" in Petitioner's proposed definition is inappropriate because the two examples of process characteristics in the Specification cited by Petitioner— "Machine Type (specifying what type of computer may run the agent), Language (both computer and human interface)"—do not provide any indication that they refine the process. PO Sur-reply 15 (citing Ex. 1001, 17:41–44).

We note, as an initial matter, that it was Petitioner's affirmative duty to explain in the Petition how the challenged claims should be construed and how, as so construed, they are unpatentable. *See* 37 C.F.R. § 42.104(b)(3)–(4). Even if we were to accept Petitioner's belated argument and explanation of its proposed construction of "process characteristics" presented for the first time in the Petitioner Reply, we are not persuaded that the term should be given a meaning beyond its plain meaning indicated by the claim language.

The portion of the Specification relied upon by Petitioner is reproduced below.

> Each registered agent *may be optionally* associated with one or more Process Characteristics, which *preferably* could be referenced through their associated Process Characteristics Declaration fields 716 in the parent facilitator Agent Registry

> 702. Note that these characteristics in certain *preferred embodiments* of the present invention *may include* one or more of the following: Machine Type (Specifying what type of computer may run the agent), Language (both computer and human interface).

Ex. 1001, 17:35–44 (emphases added). As shown above, the portion of the Specification relied upon by Petitioner describes optional or exemplary embodiments. Petitioner, however, does not explain adequately why these embodiments described in the Specification restrict the type of "process" recited in the claim. *See SuperGuide*, 358 F.3d at 875 ("a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment"); *WesternGeco*, 889 F.3d at 1323–24 ("It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise.").

We are also not persuaded by Patent Owner's argument that the term "process characteristics" means "characteristics of the computer *process* that may run an agent" (*see* PO Resp. 50–51 (emphasis added) (citing Ex. 1001, 17:35–44)) because the cited passage of the Specification states that "Machine Type" specifies "what type of computer may run the agent," not "what type of computer *process* may run the agent" (*see* Ex. 1001, 17:42–44).

As noted above, claim 28 recites "the agent registry includes a symbolic name, a unique address, data declarations, trigger declarations, task declarations, and process characteristics for each active agent." Ex. 1001, 32:58–61. Accordingly, we construe "process characteristics" according to its plain meaning indicated by the claim language—"characteristics of a process for an agent."

*D. Prior Art Overview*

We provide an overview of Kiss and FIPA97, the main prior art references asserted against the challenged claims, to provide context for the discussion that follows.

*1. Kiss (Ex. 1005)*

Kiss describes "a knowledge management system that supports inquiries of distributed knowledge resources," in which "[i]nteraction between a user and the knowledge resources is mediated by a collection of cooperative intelligent agents." Ex. 1005, 2:44–45, 2:46–48. Figure 1, reproduced below, is a conceptual overview of one embodiment of a knowledge management system described in Kiss:




*Fig. 1*

*Id.* at 5:1–3. As shown in Figure 1 above, Kiss's knowledge management system 100 includes presentation layer 103, user interface layer 105, meta agent layer 107, knowledge agent layer 109, knowledge module layer 111, and agent service layer 113. *Id.* at 5:3–7. Each of user interface layer 105, meta agent layer 107, and knowledge agent layer 109 in Kiss's hierarchical knowledge management system includes one or more intelligent agents responsible for one portion of the distributed problem-solving inferencing process. *Id.* at 3:17–22.

Meta agent layer 107 includes one or more meta agents 119 that are responsible for analyzing queries or problem formulations provided by user interface layer 105 and constructing a plan for finding a solution to the problem. *Id.* at 5:20–24. Each meta agent 119 contains knowledge of problem solving methodologies and distributed inferencing procedures. *Id.* at 5:24–26. More specifically, "meta agent 119 is responsible for formulating a dynamic 'solution plan' for the distributed inferencing to be performed by the system 100, and allocates tasks to the knowledge agent layer 109 in furtherance of the solution plan." *Id.* at 5:33–37. "The meta agent dynamically assesses the problem and its solution states (between users and the knowledge agents 121), divides the problem, and assigns the appropriate knowledge agents 121 to work on the solution." *Id.* at 8:37–40.

Knowledge agent layer 109 includes multiple knowledge agents 121, each of which may be associated with one or more knowledge modules 123 in knowledge module layer 111. *Id.* at 6:31–35. Each knowledge agent 121 is configured to accept from meta agent 119 a problem statement and convert that problem statement into a format appropriate for the knowledge module 123 associated with the knowledge agent 121. *Id.* at 6:35–38.

Knowledge agents register their capabilities and interests with registry 114 in agent service layer 113. *Id.* at 3:37–42, 12:18–20.

Kiss describes various distributed inferencing schemes that may be used to address problems to be solved. *Id.* at 7:20–8:19. One scheme uses a "planner-based dynamic inferencing approach." *Id.* at 7:29–30. In this scheme, "inferencing proceeds within an agent until an intermediate goal is achieved." *Id.* at 7:30–32. The next step of the inferencing process begins after the intermediate goal is achieved, and inferencing continues in a stepwise manner until the initial problem is solved. *Id.* at 7:35–37. "[M]eta agent 119 manages the dynamic distributed inferencing scheme, using an agenda mechanism or commitment table to assign and schedule portions of the inferencing procedures to the participating agents during execution." *Id.* at 7:37–41.

Other distributed inferencing schemes disclosed by Kiss include a "problem-specific rule network," as well as "linear," "partitioned," "replicated," "real time," "preemptive," and "qualitative" inferencing modes. *Id.* at 7:23–28, 7:47–8:16. In the partitioned inference scheme, for example, the "user query or problem domain is easily divided into distinct subfields, phases or sub-problems that share limited initial data." *Id.* at 7:53–55.

Figures 8–20 of Kiss (not reproduced herein) illustrate an example of using distributed inferencing to solve the problem "what is the effect of increasing sales by 20%?" *Id.* at 12:21–14:30. As shown in Figure 9, the meta agent begins formulating a solution plan by asking the agent service layer to identify a knowledge agent that has registered a capability to answer a question related to "sales." *Id.* at 12:29–32. Once the service layer identifies a sales agent, the meta agent pushes a task onto an agenda to query the sales agent for the effect of increasing sales by 20% and then issues that

query. *Id.* at 12:32–36. Distributed inferencing proceeds with the meta agent pushing tasks associated with agent queries onto the agenda and removing them after they are completed, until the sales agent has enough information to address the user's original query. *Id.* at 12:37–14:30.

### *2. FIPA97 (Exs. 1006–1012)*

FIPA97 (Exs. 1006–1012) is a specification created by the Foundation for Intelligent Physical Agents (FIPA) beginning in 1996 with an official release date in October 1997. Ex. 1006, Cover, iv (identifying specification as FIPA 97 Version 1.0 issued on October 10, 1997). FIPA97 is a "specification of basic agent technologies that can be integrated by agent systems developers to make complex systems with a high degree of interoperability." *Id.* at v. The specification comprises seven parts: three parts for basic agent technologies (Parts 1–3 relating to agent management, agent communication language, and agent/software integration) and four informative applications providing examples of how the technologies can be applied (Parts 4–7 describing personal travel assistance, personal assistant, audio-visual entertainment, and broadcasting and network management and provisioning applications). *Id.* at v–vii; *see generally* Exs. 1006–1008 (Parts 1–3); Exs. 1009–1012 (Parts 4–7).

Part 1 of FIPA97, the FIPA Agent Management specification (FIPA AMS) "provides a normative framework within which FIPA compliant agents can exist, operate and be managed." Ex. 1006, vi. The FIPA AMS

model is defined through the intersection of Agent Platforms (APs) and Agent Domains (ADs), as illustrated in Figure 2 below. *Id.* at 10, Fig. 2.




**Figure 2 — Agent Platform Reference Model Fragment**

Each AD in Figure 2 of FIPA Part 1, above, is defined by a Directory Facilitator (DF). *Id.* at 6. Agents register their services with DFs. *Id.* For example, agents A and B have registered their services with $DF_x$, agents B, C, and D have registered their services with $DF_y$, and agents D and E have registered their services with $DF_z$. *Id.* at 10.

Part 2 of FIPA97 describes an "Agent Communication Language (ACL)" that "is based on speech act theory: messages are actions, or communicative acts, as they are intended to perform some action by virtue of being sent." Ex. 1007, ix. The ACL specification "consists of a set of message types and the description of their pragmatics, [i.e.,] the effects on the mental attitudes of the sender and receiver agents." *Id.* The ACL specification "also provides the normative description of a set of high-level interaction protocols, including requesting an action, contract net and several kinds of auctions." *Id.*

Part 2 of FIPA97 discloses a “simple abstract model of inter-agent communication” including ACL messages having components as illustrated in Figure 1 below. *Id.* at 7, 12.




**Figure 1 — Components of a message**

Figure 1, above, illustrates the main structural elements of an ACL message in FIPA97. *Id.* at 12. “The first element of the message is a word which identifies the communicative act being communicated, which defines the principal meaning of the message.” *Id.* Each ACL message contains a set of one or more parameters, including a mandatory “*:receiver*” parameter that identifies the intended recipient of the message. *Id.* at 13.

Petitioner asserts that FIPA97 was made publicly available as a single document and relies on FIPA97 as a single printed publication for purposes of 35 U.S.C. § 102(a). *See* Pet. 22; Pet. Reply 26. As discussed below in the section addressing the status of FIPA97 as a printed publication, FIPA approved and released FIPA 97 Version 1.0 as a single specification. *See infra* § II.F; Ex. 1026, 5; Ex. 1050 ¶ 165. Thus, although sometimes the seven parts are referred to as “documents,” a person of ordinary skill in the art would have considered FIPA97 to be a single reference. *See* Ex. 1050 ¶¶ 164–165. Patent Owner does not dispute that FIPA97 is one reference for

purposes of §§ 102 and 103. *See* PO Resp. 138–40.[7] Because FIPA and skilled artisans considered FIPA97 to be a single specification, we agree that FIPA97 constitutes a single prior art reference, and we treat it as such for purposes of our unpatentability analysis.

*E. Prior Art Status of Kiss*

Before reaching the merits of Petitioner's obviousness contentions, we address as a threshold issue whether Kiss (Ex. 1005) qualifies as prior art in this proceeding. As indicated above, Petitioner relies on Kiss as a prior art reference in all of the asserted grounds of unpatentability presented in the Petition. *See* Pet. 4.

Petitioner has the burden of persuasion to prove unpatentability by a preponderance of the evidence. *Dynamic Drinkware,* 800 F.3d at 1378. Petitioner has the initial burden of production to show that a reference is prior art to the challenged claims under a relevant section of 35 U.S.C. § 102. *See id.* at 1379. Once Petitioner has met that initial burden, the burden of production shifts to Patent Owner to argue or produce evidence that the asserted reference is not prior art to the claims. *Id.* at 1380. Once Patent Owner has met that burden of production, the burden of production returns to Petitioner. *Id.*

The effective filing date of the '560 patent is January 5, 1999, the filing date of the '115 patent, which is the parent of the '560 patent. Ex. 1001, code (63). Kiss is a United States patent that arose from an

---

[7] Contrary to Patent Owner's argument (PO Resp. 138–40), Petitioner did not argue in another case, and the Board did not find, that FIPA97 is seven separate prior art references. *See Microsoft Corp. v. IPA Techs. Inc.*, IPR2019-00838, Paper 13 at 3–5 (PTAB Apr. 3, 2020) (Decision Denying Petitioner Request for Rehearing), Paper 10 at 4–9 (Petitioner's Request for Rehearing, filed Dec. 6, 2019).

application filed July 21, 1999, claiming the benefit of priority to a provisional application filed July 21, 1998. Ex. 1005, codes (22), (60).

Petitioner asserts that Kiss is prior art to the ’560 patent under 35 U.S.C. § 102(e) because Kiss is entitled to the benefit of priority to the filing date of its provisional application (Ex. 1036, “Kiss Provisional Application”). Pet. 15–19. “A reference patent is only entitled to claim the benefit of the filing date of its provisional application if the disclosure of the provisional application provides support for the claims in the reference patent in compliance with § 112, ¶ 1.” *Dynamic Drinkware*, 800 F.3d at 1381.

In *Ex parte Mann*, the Board determined that “under *Dynamic Drinkware*, a non-provisional child [application] can be entitled to the benefit of a provisional application’s filing date if the provisional application provides sufficient support for *at least one claim* in the child.” 2016 WL 7487271, at *6 (PTAB Dec. 21, 2016) (emphasis added) (discussing whether *Dynamic Drinkware* requires “support in the provisional . . . for all claims, any claim, or something in between”). In addition, the Board determined that a “subject matter test” is also required—that is, “the [party claiming priority] also must show that the subject matter relied upon in the non-provisional is sufficiently supported in the provisional application [and that t]his subject matter test is in addition to the comparison of claims required by *Dynamic Drinkware*.” *Id.* at *5.

Recognizing these requirements, Petitioner asserts that “each element of [claim 1 of Kiss] has written description support in the Kiss Provisional,” providing detailed citations to the supporting disclosures from the Kiss Provisional Application for each limitation of claim 1 of Kiss. Pet. 15–17. Addressing the “subject matter test,” Petitioner asserts that “the teachings

that Petitioner relies upon were carried forward from the Kiss Provisional to Kiss" and provides a detailed mapping of the relied-upon portions of Kiss to the corresponding portions of the Kiss Provisional Application. *Id.* at 17–19.

In its Preliminary Response, Patent Owner asserted that Kiss is not entitled to the priority date of its provisional application. Prelim. Resp. 69. In the Institution Decision, we determined, based on the preliminary record, the argument and evidence presented by Patent Owner were insufficient to shift the burden of production back to Petitioner. Inst. Dec. 25–26. We noted, however, that a final determination on this particular issue would be made based on a full record developed during the course of trial. *Id.* at 26.

During the trial, Patent Owner did not present any argument or evidence on this issue, nor did it dispute that Kiss qualifies as prior art in this proceeding. *See generally* PO Resp.

Based on the complete record, we determine that Petitioner has established by a preponderance of the evidence that Kiss is prior art to the '560 patent under 35 U.S.C. § 102(e) because Kiss is entitled to the benefit of priority to the filing date of its provisional application.

*F. Status of FIPA97 as a Prior Art Printed Publication*

We also must determine as a threshold matter whether FIPA97 (Exs. 1006–1012) is a prior art printed publication under 35 U.S.C. § 102(a) or § 102(b). *See* Pet. 22–24; PO Resp. 59–78. Petitioner bears the burden of establishing by a preponderance of the evidence that FIPA97 is a printed publication. *See* 35 U.S.C. § 316(e); *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1375 (Fed. Cir. 2018); *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29 at 11 (PTAB Dec. 20, 2019) (precedential) (citing *Nobel Biocare*, 903 F.3d at 1375). For purposes of

instituting an *inter partes* review we accepted Petitioner's contention, unchallenged in Patent Owner's Preliminary Response, that FIPA97 was available as prior art as of October 1997, more than one year before January 5, 1999, the effective filing date of the '560 patent. Inst. Dec. 8 n.3 (citing Pet. 23–24 (citing Ex. 1049 ¶¶ 6, 11, 12, 20–34; Ex. 1050 ¶¶ 143, 146–149)). Patent Owner, however, challenges that contention in its Patent Owner Response, and the parties further address the issue in Petitioner's Reply and Patent Owner's Sur-reply. *See* PO Resp. 59–78; Pet. Reply 15–21; PO Sur-reply 20–31.

The determination of whether a document is a "printed publication" under 35 U.S.C. § 102 "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' . . . ." *Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1355 (Fed. Cir. 2018) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). A reference is considered publicly accessible if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it.'" *Id.* at 1355–56 (quoting *In re Wyer*, 655 F.2d 221, 226 (CCPA 1981)).

In the discussion below, we begin with background information regarding FIPA and an overview of the evidence submitted by Petitioner in support of its contention that FIPA97 was publicly accessible in October 1997. The evidence includes extensive testimony from Dr. Finin, a

professor who has personal knowledge of FIPA's activities and the development process of FIPA97. *See* Ex. 1049 ¶¶ 1–55 (Finin Decl.). Dr. Finin was one of the first two FIPA Fellows invited to provide "high quality and independent advice to FIPA." *Id.* ¶ 18 (quoting Ex. 1076, 1); Ex. 1025, 1; Ex. 1062, 1. The evidence also includes testimony from Petitioner's expert witness, Dr. Lieberman, and more than sixty documentary exhibits on which Petitioner relies to show that FIPA97 was publicly accessible in late 1997 and early 1998. *See* Ex. 1050 ¶¶ 142–149 (Lieberman Decl.); Exs. 1021–33, 1047, 1051–1105.

After providing an overview of the evidence, we consider the parties' arguments as to whether FIPA97 was publicly accessible before the January 5, 1999, critical date. For the reasons explained below, we determine that Petitioner has met its burden to show that FIPA97 was publicly accessible before the critical date.

*1. FIPA*

FIPA was a non-profit association based in Geneva, Switzerland, created to promote agent-based technology and develop open standards. Ex. 1006, iv (FIPA 97 Specification Version 1.0, Part 1, Foreword); Ex. 1049 ¶ 3. Founded in 1996, FIPA's membership included numerous technology companies, educational institutions, and governmental entities. Ex. 1049 ¶ 3. As of October 1997, FIPA had thirty-five corporate members representing twelve countries.[8] Ex. 1006, iv. According to FIPA documentation, membership was "open to any corporation and individual firm, partnership, governmental body or international organi[z]ation without

[8] The corporate members included Alcatel, British Telecommunications, Deutsche Telekom, France Telecom, Hitachi, Hewlett-Packard, IBM, NEC, NTT, Nortel, Siemens, and Toshiba. *See* Ex. 1095, 22.

restriction." *Id.* FIPA stated its intent "to make the results of its activities available to all interested parties." *Id.* Throughout its tenure, FIPA produced standards designed to promote and advance agent-based technology. Ex. 1049 ¶ 3. In 2005, FIPA was incorporated into the Institute of Electrical and Electronics Engineers (IEEE) as one of its standards committees. *Id.*

*2. Development of FIPA97*

The process of drafting the FIPA 97 specification began with FIPA's first meeting in London in April 1996. Ex. 1049 ¶ 6; Ex. 1058 (Main results of London meeting); Ex. 1066 (Resolutions of London meeting). Representatives from twenty-six companies and organizations attended. Ex. 1066, 1. At the meeting, the members agreed on FIPA's mission, drafted statutes and operational principles, and produced a work plan for a specification that would become FIPA 97. Ex. 1058, 1; Ex. 1066, 1–3; Ex. 1049 ¶ 6. The work plan set a December 1997 target for producing a first completed specification. Ex. 1066, 2–3; Ex. 1049 ¶ 7.

FIPA subsequently held several meetings in 1996 and 1997. At the second meeting in June 1996 in Yorktown Heights, NY, FIPA approved several documents, including a framework for FIPA activity and a list of requirements for FIPA-specified agent capabilities. Ex. 1067, 1 (Resolutions of Yorktown meeting); Ex. 1060, 1 (Results of Yorktown meeting); Ex. 1049 ¶ 9. At the third meeting in October 1996 in Tokyo, FIPA approved a final work plan calling for production of a FIPA specification in October 1997. Ex. 1049 ¶ 11; Ex. 1070, 1 (work plan); Ex. 1023 (Results of Tokyo meeting). Also at the Tokyo meeting, FIPA produced its First Call for Proposals, which outlined in detail three technology parts (corresponding to Parts 1–3 of FIPA 97) and four

application parts (corresponding to Parts 4–7 of FIPA 97). Ex. 1069, 1–27 (First Call for Proposals); Ex. 1049 ¶ 12.

In 1997, FIPA began to produce draft specifications. At the fourth meeting in January 1997 in Turin, Italy, FIPA publicly released drafts of Parts 1–4 and posted them on the FIPA home page (http://drogo.cselt.stet.it/fipa). Ex. 1021, 1 (Results of Turin meeting); Ex. 1049 ¶ 13. Additionally, FIPA released a Second Call for Proposals at the Turin meeting. Ex. 1071, 1–3 (Second Call for Proposals); Ex. 1049 ¶ 13. At the fifth meeting in April 1997 in Reston, VA, FIPA produced drafts of Parts 1–7, which were publicly released and posted on the FIPA home page. Ex. 1024 (Results of Reston meeting); Ex. 1061 (Resolutions of Reston meeting); Ex. 1049 ¶ 17. At the sixth meeting in June 1997 in Cheju Island, South Korea, FIPA publicly released revised drafts of Parts 1–7 and posted them on the FIPA home page. Ex. 1025, 1 (Results of Cheju meeting); Ex. 1062, 5 (Resolutions of Cheju meeting); Ex. 1049 ¶ 19. According to Dr. Finin, the Reston Draft and Cheju Draft were substantially complete versions of what would become FIPA 97. Ex. 1049 ¶¶ 17, 19.

Dr. Finin testifies that news of FIPA and its standardization efforts "spread quickly throughout the relatively small community of software agent researchers." Ex. 1049 ¶ 8. For instance, the AgentWeb website, "a meeting place for researchers in agent-based technology from 1995–2000," was home to a "Software Agents" mailing list and a newsletter that had more than 1,300 subscribers in 1996. *Id.*; Ex. 1089, 5. Dr. Finin was "the founder, author, and a subscriber" of the AgentWeb newsletter. Ex. 1049 ¶ 8. The widely distributed AgentWeb newsletters announced upcoming FIPA meetings, reported results of previous meetings, including calls for

proposals, and provided links to the specification drafts posted on the FIPA home page. *See id.* ¶¶ 8, 10, 12, 14, 17, 19.

For example, the AgentWeb newsletter dated May 11, 1996, announced the upcoming FIPA June 1996 Yorktown meeting, described as the "FIPA Opening Forum." Ex. 1090, 5; Ex. 1049 ¶ 8. The purpose of the meeting, as stated in the newsletter, was to "refine the list of basic agent capabilities candidate for FIPA specification; compile a first list of agent capabilities intended for specification by end 1997; and establish the first working groups." Ex. 1090, 5. Likewise, the AgentWeb newsletter dated August 12, 1996, advertised the FIPA October 1996 Tokyo meeting. Ex. 1088, 1; Ex. 1049 ¶ 10. Thereafter, the AgentWeb newsletter dated October 14, 1996, publicized the Call for Proposals issued at the October 1996 Tokyo meeting and provided the deadline for submission of proposals to be considered at the Turin meeting in January 1997. Ex. 1087, 1; Ex. 1049 ¶ 12. FIPA had decided that respondents who submitted proposals would be invited to the January 1997 meeting to present their proposals even if they were not FIPA members. Ex. 1023, 1; *see* Ex. 1069, 27.

Once FIPA began to produce drafts of the specification, AgentWeb newsletters announced those drafts and provided links to access them. The AgentWeb newsletter dated February 2, 1997, reported that "[i]nitial specifications for three technology parts (Agent Management, Agent Communication and Agent/Software Interaction) and one application part (Personal Travel Assistance) have been produced" at the recent Turin meeting. Ex. 1091, 1; Ex. 1049 ¶ 14. The newsletter included a freely accessible and public link to access the draft. Ex. 1049 ¶ 14 (citing Ex. 1091, 1–2). It also indicated that drafts of the remaining three

specification parts would be generated at the FIPA meeting to be held in April 1997 in Reston. Ex. 1091, 1–2. A subsequent AgentWeb newsletter dated April 13, 1997, advertised the upcoming Reston meeting and contained links to information about the meeting on the FIPA website. Ex. 1092, 3; Ex. 1049 ¶ 17.

On May 5, 1997, following the Reston meeting, an AgentWeb newsletter reported that attendees of that meeting produced a revised draft including all seven parts of the specification. Ex. 1093, 2; Ex. 1049 ¶ 17. The newsletter contained individual public links to the seven parts and invited "both members and non-members" to comment, providing an email address for submission. *Id.*; Ex. 1049 ¶ 17. Additionally, the newsletter announced the dates and locations of the next two meetings—the June 1997 Cheju meeting and the seventh meeting to take place in Munich on October 6–10, 1997. *Id.* Similarly, the AgentWeb newsletter dated June 30, 1997, announced that the Cheju meeting resulted in revised versions of the FIPA specification documents and provided direct links to the seven parts. Ex. 1094, 1–2; Ex. 1049 ¶ 19. Again, the newsletter stated that FIPA invited comments and that non-members making substantial comments would be invited to attend the October 1997 Munich meeting. Ex. 1094, 2. Dr. Finin was among those who submitted comments on the Cheju draft. Ex. 1073; Ex. 1049 ¶ 20.

Meanwhile, the AgentWeb Software Agents mailing list also provided information regarding FIPA's efforts to the community of software agent researchers. *See* Ex. 1049 ¶ 8. Dr. Finin was an organizer of and contributor to the Software Agents mailing list. *Id.* On May 2, 1996, a posting to the mailing list referenced the upcoming June 1996 FIPA meeting in Yorktown Heights, New York. Ex. 1079, 1; Ex. 1049 ¶ 8. Members of

the Software Agents mailing list posted comments regarding the Turin draft after it was released publicly. Exs. 1078, 1081, 1082; *see* Ex. 1049 ¶¶ 14–15. Dr. Finin was among those who shared their thoughts. *See* Ex. 1082; Ex. 1049 ¶ 15. A posting after the Reston meeting included a public and open link to access the Reston draft and invited comments from the mailing list. Ex. 1083, 1; Ex. 1049 ¶ 17.

*3. Public Release of FIPA97*

FIPA's seventh meeting took place in Munich on October 6–10, 1997. Ex. 1026 (Resolution of Munich meeting); Ex. 1049 ¶ 20. At this meeting, FIPA incorporated final edits and comments and approved the FIPA 97 specification for publication. Ex. 1026, 1, 5; Ex. 1049 ¶ 20. The specification as approved at the meeting was called "FIPA 97 ver. 1.0," or FIPA 97 Version 1.0. Ex. 1026, 5. Working groups for various parts of the specification were given about one month to check for consistency and make minor edits. *Id.* at 2; Ex. 1049 ¶ 20.

An "initial" version of FIPA 97 Version 1.0, approved at the Munich meeting and dated October 10, 1997, was posted to the FIPA website, housed at the time at http://drogo.cselt.stet.it/fipa. Ex. 1049 ¶¶ 20–21. According to Dr. Finin, the specification documents were available online and free for anybody to access by sometime in October 1997. *Id.* ¶ 21. On November 18, 1997, an AgentWeb newsletter announced completion of FIPA 97 Version 1.0 and its publication on the FIPA website. Ex. 1086, 1–2; Ex. 1049 ¶ 21. The newsletter provided individual, direct links to the seven parts of the specification on the FIPA website. Ex. 1086, 1–2. The links were not password protected and were open to the public without a requirement for secrecy or confidentiality. Ex. 1049 ¶ 21. As with the

earlier AgentWeb newsletters, the newsletter containing links to FIPA 97 Version 1.0 was sent to more than 1,300 subscribers. *Id.*

Dr. Finin testifies that in late 1997, "a few weeks after the Munich meeting," he accessed the approved FIPA 97 Version 1.0 posted on the FIPA website. *Id.* ¶¶ 20–21. He specifically recalls accessing the documents in late 1997 to review the first major work product of FIPA and to prepare for FIPA's upcoming January 1998 meeting in Palo Alto, which he attended. *Id.* ¶ 21 (citing Ex. 1074). Dr. Lieberman also testifies that he recalls FIPA 97 Version 1.0 being publicly available on the FIPA website throughout late 1997 and early 1998 and that he accessed it in late 1997 as a member of the interested public. Ex. 1050 ¶ 146.

The release of FIPA 97 Version 1.0 was well publicized in the weeks after the Munich meeting. Ex. 1049 ¶ 22. For example, on October 20, 1997, the EETimes featured an article reporting FIPA's approval of the FIPA 97 specification. Ex. 1095, 22; *see* Ex. 1049 ¶ 22. The article was based on an interview with Leonardo Chiariglione, the president of FIPA. Ex. 1095, 22. The article described the seven parts of the specification: "The first three parts cover different aspects of agent behavior: agent management; agent communication; and agent-software interaction. The four remaining parts, which cover application areas, . . . are: personal travel assistance; personal assistant; audio-visual entertainment and broadcast; and network provision and management." *Id.* After describing FIPA's plans for 1998, including testing of FIPA 97 Version 1.0 to provide input for a further round of standardization, the article referred readers to the FIPA website for

information regarding the released specification: "CSELT[9] maintains extensive information on FIPA's activities at www.cselt.stet.it/fipa."[10] *Id.* (emphasis omitted). It concluded with a quote from Dr. Chiariglione regarding the specification's public availability: "'It is our policy to make the standard freely available over the Internet,' Chiariglione said. 'FIPA will retain the copyright but it will be free for others to use.'" *Id.*

The November-December 1997 issue of IEEE Internet Computing also announced the release of the FIPA 97 specification: "The Foundation for Intelligent Physical Agents, a non-profit organization established to promote emerging agent-based applications, has released its first specification. Named FIPA 97, the specification will provide a benchmark for interoperable products." Ex. 1096, 93; Ex. 1049 ¶ 22. The news brief directed readers to the FIPA website for the text of the specification. Ex. 1096, 93 ("The text is available at http://drogo.cselt.stet.it.fipa/."[11]); Ex. 1049 ¶ 22.

Sometime after the Munich meeting, FIPA also produced a hardcopy book version of the FIPA 97 Version 1.0 specification to be sent to FIPA members and various institutions and standards groups. Ex. 1049 ¶ 24; *see* Ex. 1026, 1; Ex. 1063, 1 (Resolution of the Palo Alto meeting, Jan. 29, 1998). At least two copies of the book were available in libraries in January 2019. Ex. 1049 ¶ 24; Ex. 1057, 1 (WorldCat catalog entry for "Fipa

---

[9] Centro Studi e Laboratori Telecommunicazioni, Dr. Chiariglione's employer at the time. *See* Ex. 1095, 22.
[10] The record suggests this website (http://www.cselt.stet.it/fipa) was a mirror of the FIPA website (http://drogo.cselt.stet.it/fipa) in 1997. *See* Ex. 1049 ¶ 22; Ex. 1095, 22; Tr. 94:11–14.
[11] The URL provided in the article contains a typographical error. *See* Ex. 1049 ¶ 22 (correcting the URL to http://drogo.cselt.stet.it[/]fipa/).

specification : Version 1.0"); Ex. 1055 (cover page and table of contents of each part in copy at library in Italy); Ex. 1056 (cover page and table of contents of Part 1 in copy at library in Switzerland). Dr. Finin testifies that the books contain the November 28, 1997, edited version of FIPA 97 Version 1.0, which "only made minor edits (mostly spelling and formatting) over the October 10, 1997 version." Ex. 1049 ¶ 25 (citing Ex. 1055, 5 (Part 2 "publication date" of November 28, 1997); Ex. 1056).

*4. Publications and Patents Referring to FIPA97 and FIPA Activities*

In late 1997 and 1998, several papers reviewing and outlining the FIPA 97 specification were published and presented at meetings. *See* Ex. 1049 ¶¶ 26–30. A paper dated December 1997 memorializes a presentation made to a meeting on Intelligent Agent Technology organized by the EPSRC[12] Community Club in Advanced Computing Techniques. Ex. 1097, Cover ("Dickinson");[13] *see* Ex. 1049 ¶ 26. This paper outlines the background and rationale for the creation of an agent interoperability standard. Ex. 1097, 1–3. It also describes the development history of the FIPA 97 specification, noting that FIPA's work program "culminated in the publication of an initial draft standard, FIPA 97, at the Munich meeting on October 1997." *Id.* at 3. Dickinson further provides that "[a]ll FIPA documents and meeting outputs are publicly available on the web" at "http://drogo.cselt.stet.it/fipa/," and "comments and review have been sought at each stage of the process." *Id.* at 3, 7 n.9. The paper then describes the

[12] "The Engineering and Physical Sciences Research Council (EPSRC) is the main funding body for engineering and physical sciences research in the UK." Engineering and Physical Sciences Research Council, epsrc.ukri.org/about (last visited Sept. 28, 2020).

[13] Ian J. Dickinson, *Agent Standards*, HP Laboratories Bristol, HPL-97-156 (Dec. 1997).

features of the specification's three substantive technical sections, Parts 1–3. *Id.* at 3–6.

Similarly, a 1998 paper titled "Industrial Applications of Multi-Agent Technology" summarizes FIPA's background and presents an overview of the three technical parts (i.e., Parts 1–3) of FIPA 97 Version 1.0 released in October 1997. Ex. 1099, 12–13 ("Steiner");[14] *see* Ex. 1049 ¶ 28. The Steiner paper provides the FIPA website address and explains that the four application parts (i.e., Parts 4–7) will be used in field trials to gather information to be incorporated into a revised version of FIPA 97. Ex. 1099, 13 & n.1.

Likewise, a paper titled "FIPA — towards a standard for software agents" appearing in the July 1998 issue of the BT Technology Journal explains the motivation for an agent standard and provides an overview of FIPA's background and activities. Ex. 1100, 51–52 ("O'Brien");[15] *see* Ex. 1049 ¶ 29. It then describes the different parts of the FIPA 97 Version 1.0 specification issued in October 1997. Ex. 1100, 51–52.[16]

Dr. Finin cites several other publications that reference FIPA's development of an agent communication standard in the 1997–98 timeframe. Ex. 1049 ¶ 31 (citing Exs. 1027–29). Dr. Finin also identifies several patent

---

[14] Donald Steiner, Siemens AG, *Industrial Applications of Multi-Agent Technology* (IEEE 1998).

[15] P.D. O'Brien & R.C. Nicol, *FIPA — towards a standard for software agents*, BT Tech. J. Vol. 16, No. 3 (July 1998).

[16] Dr. Finin testifies that O'Brien provides public links to FIPA97. Ex. 1049 ¶ 29. The copy of O'Brien entered into the record, however, appears to be missing several pages, including one containing endnotes 10–12 that might provide links to the FIPA website. *See* Ex. 1100, 52 ("FIPA97 (issued in October 1997) [10–12] is the first output from FIPA covering part of the requirements for an agent standard.").

applications in the same timeframe that refer to FIPA's agent communication language. *Id.* ¶ 32 (citing Exs. 1030–33).

*5. The FIPA Website and Exhibits 1006–1012*

Sometime in 1998, the FIPA website migrated from its original site (http://drogo.cselt.stet.it/fipa) to fipa.org. Ex. 1049 ¶ 23; *see also* Ex. 1026 (Resolution of Munich meeting indicating FIPA's plans for the "redesign of a new FIPA home page"); Ex. 1065, 4 (Resolutions of the Durham meeting in October 1998 indicating the website will be transferred to www.fipa.org). The fipa.org website still exists today even though FIPA is no longer active as a standalone organization. *See* Ex. 1049 ¶¶ 23, 48–49. The current FIPA website maintains a repository of past FIPA documents, including meeting notes, press releases, FIPA resolutions, and different versions of the FIPA specification. *Id.* ¶ 49.

Dr. Finin testifies that the "initial" version of FIPA 97 Version 1.0 (i.e., the specification posted on the FIPA website on October 10, 1997) "remained publicly accessible during all of FIPA's future activities and is still available on FIPA's home page today." *Id.* ¶ 21. According to Dr. Finin, Exhibits 1006–1012 (collectively referred to as FIPA97) are Parts 1–7 of FIPA 97 Version 1.0 as found on the current fipa.org website. *Id.* Based on his personal knowledge, Dr. Finin further testifies that Exhibits 1006–1012 are the "same version" and contain "the same disclosures, content and information" as Parts 1–7 of FIPA 97 Version 1.0 that were publicly available on the FIPA website (http://drogo.cselt.stet.it/fipa) on October 10, 1997, and which Dr. Finin himself accessed in late 1997. *Id.* ¶¶ 21, 34. He also notes that although Exhibit 1006 has a typographical error relating to the version number in the

header of its odd pages,[17] Exhibit 1006 is identical to the version of Part 1 of FIPA 97 Version 1.0 that was released on October 10, 1007. *Id.* ¶ 21. Additionally, as evidence that FIPA 97 Version 1.0 has been continuously available on fipa.org since the website migration, Dr. Finin cites a set of Internet Archive records beginning in 2000 showing where each part of that version of the specification could be accessed. *Id.* (citing Ex. 1054).

Dr. Finin testifies that the original FIPA website, http://drogo.cselt.stet.it/fipa, remained live for several years after the website transitioned to fipa.org. Ex. 1049 ¶ 23. The Internet Archive Wayback Machine contains an archived screen capture of the website http://drogo.cselt.stet.it/fipa from December 1, 1998. *See* Ex. 1051; Ex. 1049 ¶¶ 23, 54. According to Dr. Finin, the archived page shows that the FIPA 97 specification was live and freely available on the FIPA website home page at that time. Ex. 1049 ¶ 23; Ex. 1051, 1 ("FIPA has already developed a seven-part specification called FIPA 97. Implementations of FIPA 97 are undergoing field trials that will last until October 1998 when version 2 of FIPA 97 will be produced."); Ex. 1049 ¶ 23. The home page provided links (i.e., "FIPA 97") to actual specification documents, but those links have not been maintained in the archive. Ex. 1049 ¶ 23. Dr. Finin testifies that the screen capture from the Internet Archive is consistent with the mirror of the former FIPA site hosted by Leonardo Chiariglione. *Id.* ¶ 51 (citing Ex. 1103 (http://leonardo.chiariglione.or/standards/fipa/)). Dr. Chiariglione's mirror is still available, and documents hosted on the

[17] The header on odd pages reads "FIPA 1997 Part 1: Version 2.4." *E.g.*, Ex. 1006, 3.

mirror are "accurate and complete copies of FIPA documents that were available to FIPA members." *Id.*

*6. Analysis*

Petitioner argues that FIPA97 was a publicly accessible printed publication as of October 10, 1997, when it was posted on the FIPA website. Pet. 23; Pet. Reply 15–21. More specifically, Petitioner argues that (1) FIPA 97 Version 1.0 was publicly accessible on October 10, 1997, and (2) the version of the FIPA specification found in Exhibits 1006–1012, referred to herein as FIPA97, is the same specification that was posted on the FIPA website on October 10, 1997, and named FIPA 97 Version 1.0. *See, e.g.*, Pet. 23 (arguing FIPA 97 Version 1.0 was publicly accessible in late 1997); Pet. Reply 15–17 (arguing that Exhibits 1006–1012 are the same documents that were made public as FIPA 97 Version 1.0). Patent Owner addresses the first contention when it argues the evidence does not show any version of FIPA 97 Version 1.0 was available on the FIPA website. *See, e.g.*, PO Resp. 69. It also challenges the second contention when it argues Petitioner has failed to show that Exhibits 1006–1012 are identical to the version of the FIPA specification that allegedly was publicly accessible before the critical date. *See, e.g.*, *id.* at 62–63. In our analysis below, we address the two questions in turn.

Considering all the facts and circumstances surrounding the development of FIPA 97 Version 1.0 and its publication on the FIPA website, we find that FIPA 97 Version 1.0 was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the art, exercising reasonable diligence, could locate it. *See Jazz Pharm.*, 895 F.3d at 1355–56. First, the uncontested evidence shows that members of the relevant public (i.e., persons of ordinary skill in the field of software

agent-based technology) knew of the release of FIPA 97 Version 1.0 in late 1997, prior to the critical date. As detailed above, FIPA was open to corporations and educational and governmental organizations without restriction. Ex. 1006, iv. FIPA's members included many industry leaders whose employees attended FIPA meetings, including the October 1997 meeting in Munich where FIPA 97 Version 1.0 was approved for publication. *See id.*; Ex. 1095, 22. FIPA meetings and activities were publicized among the larger community of software agent researchers via the AgentWeb website and its associated Software Agents mailing list and AgentWeb newsletter, which had more than 1,300 subscribers. Ex. 1090, 5; Ex. 1088, 1; Ex. 1087, 1; Ex. 1091, 1–2; Ex. 1092, 3; Ex. 1093, 2; Ex. 1094, 1–2; Ex. 1086, 1–2; *see* Ex. 1049 ¶¶ 8, 10, 12, 14, 17, 19. The newsletter in particular informed subscribers of the development of the FIPA specification during 1996 and 1997 and provided detailed information regarding the release of FIPA 97 Version 1.0 in a November issue. Ex. 1086, 1–2. News articles in periodicals published in late 1997 also announced that FIPA had released and published FIPA 97 Version 1.0. Ex. 1095, 22; Ex. 1096, 93; *see* Ex. 1049 ¶ 22. In addition, the record contains several papers published in late 1997 and 1998, prior to the critical date, describing FIPA 97 Version 1.0 and its release in October 1997. *See* Ex. 1097, 1–7; Ex. 1099, 12–13; Ex. 1100, 51–52; Ex. 1049 ¶¶ 26–30; *see also* Ex. 1049 ¶¶ 31–32 (citing Exs. 1027–33 (other publications and patents referring to FIPA specification)).

The evidence of record also demonstrates that members of the relevant public, exercising reasonable diligence, could have located FIPA 97 Version 1.0 in late 1997 on the FIPA website, housed at the time at http://drogo.cselt.stet.it/fipa. FIPA published FIPA 97 Version 1.0 on its

website at the conclusion of the Munich meeting on October 10, 1997, or shortly thereafter. *See* Ex. 1049 ¶ 20. In the several months leading up to the Munich meeting, persons of ordinary skill in the art would have known about the FIPA website through the widely distributed AgentWeb newsletters and the Software Agents mailing list, which provided website information or direct links to drafts of the specification and meeting announcements and reports. *See* Ex. 1091, 1–2; Ex. 1092, 3; Ex. 1093, 2; Ex. 1094; Ex. 1082, 1; Ex. 1083, 1. Therefore, people working in the field would have been sufficiently familiar with FIPA's activities and its website to look for FIPA 97 Version 1.0 on the FIPA website when it was posted after the Munich meeting. Indeed, both Dr. Finin, who was affiliated with FIPA, and Dr. Lieberman, who worked in the software agent field, testify that they accessed FIPA 97 Version 1.0 on the FIPA website in late 1997. Ex. 1049 ¶ 21; Ex. 1050 ¶ 146.

Moreover, the AgentWeb newsletter dated November 18, 1997, provided a link to the FIPA website and individual links to the seven parts of FIPA 97 Version 1.0 published on the website. Ex. 1086, 1–2; *see* Ex. 1049 ¶ 21. Thus, that issue of the newsletter provided more than 1,300 interested members of the public with direct access to FIPA 97 Version 1.0 at least as of November 18, 1997.

News articles and papers published in late 1997 also provided readers with the website address where FIPA 97 Version 1.0 could be found. *See* Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9. The news articles in particular likely reached a very wide audience because they appeared in publications directed to subject matter broader than agent-based technology. *See* Ex. 1095 (EETimes); Ex. 1096 (IEEE Internet Computing). The EETimes

article was dated October 20, 1997, suggesting that FIPA 97 Version 1.0 was available on the FIPA website at least as of that date.

The undisputed evidence also demonstrates that FIPA 97 Version 1.0 was freely available on the FIPA website without a password or any other restrictions and access was not subject to any requirement or expectation of secrecy or confidentiality. *See* Ex. 1049 ¶ 21; Ex. 1095, 22; *see also* Ex. 1006, iv (stating FIPA intended to make its results available to all interested parties). This evidence further supports our finding that FIPA 97 Version 1.0 was publicly accessible in late 1997. *See Jazz Pharm.*, 895 F.3d at 1358–59; *Voter Verified, Inc. v. Premier Election Solutions, Inc.*, 698 F.3d 1374, 1380–81 (Fed. Cir. 2012); *MIT v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985).

Patent Owner's arguments, many of which attack pieces of evidence individually, do not persuade us that Petitioner has failed to show that FIPA 97 Version 1.0 was publicly accessible. First, Patent Owner argues that no evidence shows the original FIPA website (http://drogo.cselt.stet.it/fipa) existed prior to a December 1, 1998, Internet Archive capture. PO Resp. 68 (citing Ex. 1051). To the contrary, much of the documentary evidence from late 1997 and testimonial evidence identifies that website or its mirror as the FIPA website during the relevant time period. *See* Ex. 1049 ¶ ¶ 20–23; Ex. 1092, 3; Ex. 1093, 2; Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9. Notwithstanding the absence of an Internet Archive capture for the website from a date prior to December 1998, we find that, based on the totality of evidence in the record, the original FIPA website existed in late 1997.

Patent Owner also argues that none of the documents cited by Petitioner provide active links to FIPA 97 Version 1.0 and therefore are

insufficient proof of public accessibility. PO Resp. 69; PO Sur-reply 30. Again, based on the totality of evidence in the record, including but not limited to the testimony of Dr. Finin that he accessed FIPA 97 Version 1.0 on the FIPA website in late 1997, we find that FIPA 97 Version 1.0 was available on the FIPA website at that time, notwithstanding the lack of active links today, more than twenty years later. Patent Owner finds fault with Dr. Finin's testimony on this point because he does not claim to have used any of the links in the AgentWeb newsletters to access FIPA 97 Version 1.0. PO Sur-reply 30 (citing Ex. 1049 ¶ 21). Patent Owner, however, overlooks Dr. Finin's testimony that he was the founder and author of the AgentWeb newsletter, implying that he created the links in the newsletter. *See* Ex. 1049 ¶ 8. Therefore, based on Dr. Finin's personal knowledge regarding the links in the AgentWeb newsletter dated November 18, 1997, and the other evidence corroborating his testimony, we find that FIPA 97 Version 1.0 was available on the FIPA website in late 1997.

Patent Owner further asserts that, to the extent the Internet Archive capture from December 1998 provides an operable download link, it links to Version 2.0 of the FIPA 97 specification. PO Resp. 69 (citing Ex. 1051). It is not surprising, however, that FIPA's website in December 1998 provided links to FIPA 97 Version 2.0, which FIPA released in October 1998 to provide minor updates to two parts of the specification. *See* Ex. 1049 ¶ 35; Ex. 1053, vi. In any event, the December 1998 Internet Archive capture at least shows that the FIPA website was live at that time, which was prior to the critical date. *See* Ex. 1049 ¶ 23 (citing Ex. 1051, 1).

In its Sur-reply, Patent Owner argues for the first time that Petitioner has not demonstrated that a person of ordinary skill in the art in 1997 could have found FIPA 97 Version 1.0 using search tools or that the FIPA website

was indexed so the specification could be located. PO Sur-reply 27–28. Further, Patent Owner argues that the existence of different FIPA websites at various times would have made it even more difficult to find the correct version of the FIPA specification without sufficient indexing or search tools. *Id.* at 29.

Even if we consider this late argument, we find it unpersuasive. As detailed above, the uncontested evidence shows that the address of the FIPA website itself was widely known among those skilled in the art and that FIPA routinely provided links to the FIPA specification on the website's home page. *See* Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9; Ex. 1051, 1; Ex. 1021, 1; Ex. 1025, 1. The November 1997 AgentWeb newsletter also provided direct links to FIPA 97 Version 1.0. Ex. 1086, 1–2. Under these circumstances, we find that a member of the interested public could have found FIPA 97 Version 1.0 without search tools or indexing by using the links in the AgentWeb newsletter or navigating to the well-known FIPA website home page. We also find that the record, including Dr. Finin's testimony, satisfactorily explains the various FIPA websites and website addresses over time and clearly identifies the FIPA website that was being used in late 1997. *See* Ex. 1049 ¶¶ 22–23, 48–49, 51.

Having determined that FIPA 97 Version 1.0 was publicly accessible on the FIPA website in late 1997, as early as October 10 and no later than November 18, we turn to whether Exhibits 1006–1012 (collectively referred to as FIPA97) contain the same version of the FIPA specification that was available on the FIPA website during that timeframe. Dr. Finin testifies that Exhibits 1006–1012, documents available on the current FIPA website (fipa.org) and identified as FIPA 97 Version 1.0, are the same version with the same content as Parts 1–7 of FIPA 97 Version 1.0 that were released at

the FIPA Munich meeting on October 10, 1997, and were publicly available on the FIPA website (http://drogo.cselt.stet.it/fipa) in late 1997. Ex. 1049 ¶¶ 21, 34.

As an initial matter, the October 10, 1997, date on the cover pages of several parts of FIPA97 supports Dr. Finin's testimony that FIPA97 is the same as FIPA 97 Version 1.0 as published on the FIPA website in late 1997. *See* Ex. 1006, Cover; Ex. 1007, Cover; Ex. 1008, Cover; Ex. 1010, Cover; Ex. 1012, Cover; *see also* Ex. 1009, Cover (Part 4 identifying a 1997 copyright date); Ex. 1011, Cover (Part 6 identifying a 1997 copyright date). Patent Owner contends that Petitioner cannot rely on the date stamps or copyright notices on Exhibits 1006–1012 to establish public accessibility because they are hearsay. PO Resp. 61; PO Sur-reply 22–24. We agree with Petitioner that Patent Owner has waived this argument because it did not raise an objection on evidentiary grounds pursuant to 37 C.F.R. § 42.64(b)(1). *See* Pet. Reply 15–16. Furthermore, we agree with Petitioner that the dates on the cover pages are not hearsay because they are evidence tending to show that FIPA97 is identical to FIPA 97 Version 1.0, not statements offered to show Exhibits 1006–1012 were published on a certain date. *See id.* at 16 (citing *Apple Inc. v. VirnetX Inc.*, IPR2016-01585, Paper 32 at 58 (PTAB Feb. 20, 2018)).

Patent Owner also argues that Petitioner cannot rely on the cover page dates alone as proof of the documents' public accessibility. PO Sur-reply 23. The date stamps, however, are only part of the totality of evidence offered by Petitioner to establish public accessibility. As such, they are relevant evidence supporting a finding that FIPA97 was publicly accessible. *See Hulu*, Paper 29 at 17–18 (citing *Nobel Biocare*, 903 F.3d at 1377).

Patent Owner argues that the existence of multiple versions of FIPA 97 Version 1.0 undercuts Petitioner's position and Dr. Finin's testimony that Exhibits 1006–1012 are the version of FIPA 97 Version 1.0 that was publicly accessible in late 1997. *See* PO Resp. 62–65; PO Sur-reply 25. For example, Patent Owner points to Dr. Finin's description of the version released on October 10, 1997, as an "initial" version, after which final minor edits were to be made. PO Resp. 63–64 (citing Ex. 2068, 86:11–15, 88:9–89:25); *see* Ex. 1049 ¶ 21. Patent Owner cites an Internet Archive capture in the record referring to "FIPA 97 specification ver. 1.0 (Reston meeting)." PO Resp. 64–65 (citing Ex. 1105, 27). Patent Owner also cites evidence, including Dr. Finin's testimony, that a different version of FIPA 97 Version 1.0 was published in hardcopy books. *Id.* at 65 (citing Exs. 1055, 1056; Ex. 1049 ¶ 25 (stating that "FIPA printed the November 28, 1997, edited version of the specification" in the books)).

Patent Owner argues that because these various versions of FIPA 97 Version 1.0 have not been substantively introduced into evidence so that the differences can be ascertained, Petitioner has not shown that Exhibits 1006–1012 are the version that was publicly accessible on the FIPA website in late 1997. *See* PO Resp. 66–67. We disagree. Dr. Finin testifies that Exhibits 1006–1012 are the same documents that were released at the conclusion of the FIPA meeting in Munich on October 10, 1997, and were made publicly available at the time. Ex. 1049 ¶¶ 21, 34. Other evidence of record corroborates Dr. Finin's testimony and adequately explains the multiple versions of the specification. *See* Pet. Reply 17–18. As set forth in detail above, FIPA released a version of FIPA 97 Version 1.0 on October 10, 1997, and made it available on the FIPA website soon thereafter. *See* Ex. 1049 ¶ 21; Ex. 1086, 1–2; Ex. 1095, 22; Ex. 1096, 93. It is clear from

the record that any earlier versions of the specification, such as the version made available after the Reston meeting six months before FIPA 97 Version 1.0, were drafts made available for public comment. *See* Pet. Reply 17; Ex. 1049 ¶¶ 16–18; Ex. 1024; Ex. 1061.

The record also shows that the version published in book form is a later version, dated November 28, 1997, containing minor formatting and clerical edits. *See* Ex. 1049 ¶ 25; Ex. 1055, 5. Petitioner does not rely on the book version as a prior art reference or assert that it was publicly accessible. *See* Pet. 23–24; Pet. Reply 17–18. The hardcopy book excerpts in the record merely corroborate Dr. Finin's testimony that FIPA's activities and release of the FIPA specification were known in the art. *See* Ex. 1049 ¶ 24.

Patent Owner also points to the erroneous header on odd pages in Exhibit 1006 as calling into question which version of the specification is in Exhibits 1006–1012. PO Resp. 66. We credit Dr. Finin's unrebutted testimony that the header on some pages in Exhibit 1006 is a typographical error. *See* Ex. 1049 ¶ 21. Patent Owner has not cited, nor do we see, evidence in the record suggesting a FIPA 97 Version 2.4 was made publicly available. *See* PO Resp. 66.

Patent Owner finds fault with Exhibits 1006–1012 because they were obtained after the critical date and could not have been obtained from a website prior to the critical date. *See* PO Resp. 61–62; PO Sur-reply 21. In his declaration, Dr. Finin testifies that Exhibits 1006–1012 are available on the FIPA website today (i.e., fipa.org), and the earliest Internet Archive record of the relevant website pages shows the documents were posted in 2000. Ex. 1049 ¶ 21 (citing Ex. 1054). Patent Owner contends that in his deposition Dr. Finin acknowledged that Exhibits 1006–1012 could have

been obtained from files saved in the Internet Archive between 2003 and 2004. PO Resp. 61–62 (citing Ex. 2068, 93:12–94:2, 96:7–20). In either case, Patent Owner argues, the dates are after the critical date of the ’560 patent. *Id.* at 62; PO Sur-reply 21. We agree with Petitioner, however, that the date Exhibits 1006–1012 were obtained is immaterial if they are digital copies of documents that are shown to have been publicly accessible before the critical date. *See* Pet. Reply 16 (citing *In re Wyer*, 655 F.2d at 226–27).

Finally, Patent Owner argues that the testimony of Dr. Finin and Dr. Lieberman is conclusory, unreliable, and uncorroborated and therefore insufficient to establish public accessibility. PO Resp. 71–74; PO Sur-reply 20–22. “[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest.” *Nobel Biocare*, 903 F.3d at 1377–78 (quoting *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1369 (Fed. Cir. 1999)). This corroboration requirement applies when relying on witness testimony to establish public accessibility of a prior art reference. *See id.* at 1377–81; *Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158–60 (Fed. Cir. 2004). Corroborating evidence may include documentary or testimonial evidence, and circumstantial evidence may provide sufficient corroboration. *Nobel Biocare*, 903 F.3d at 1378. Determining whether testimony has been corroborated “involves an assessment of the totality of the circumstances including an evaluation of all pertinent evidence.” *Id.*

We are not persuaded by Patent Owner’s argument regarding the testimony of Dr. Finin and Dr. Lieberman. Dr. Finin’s testimony is based on his personal knowledge as someone who was directly involved in FIPA’s activities by submitting comments on draft specifications and attending

meetings, for example, and providing independent advice as a FIPA Fellow. His testimony that FIPA approved FIPA 97 Version 1.0 at the Munich meeting on October 10, 1997, and posted it to the FIPA website so that it was publicly accessible is corroborated by the evidence in the record of the facts and circumstances surrounding the development and release of the specification as analyzed above. Dr. Lieberman's testimony that as a member of the interested public he accessed FIPA 97 Version 1.0 in late 1997 is corroborated by the same evidence.

As for Dr. Finin's testimony, based on his personal knowledge, that Exhibits 1006–1012 are the same as the version of FIPA 97 Version 1.0 that was publicly accessible on the FIPA website in late 1997, we find it to be credible and corroborated by other evidence of record. We are not persuaded that Dr. Finin's inability to recall many of the details of a 300-page specification more than twenty years after it was created undermines his testimony. *See* PO Resp. 72–73. Furthermore, we find that the evidence discussed above, including the identification of Exhibits 1006–1012 on their cover pages or elsewhere as FIPA 97 Version 1.0 with a date of October 10, 1997, corroborates Dr. Finin's testimony that the version of the specification in Exhibits 1006–1012 is the version that was publicly accessible on the FIPA website in late 1997, and not some other version of the FIPA specification.

For these reasons, we find that a preponderance of the evidence shows that Exhibits 1006–1012 are the version of FIPA 97 Version 1.0 released on October 10, 1997, and posted on the FIPA website in late 1997. As discussed above, a preponderance of the evidence shows that the October 10, 1997 version of FIPA 97 Version 1.0 was publicly accessible in late 1997. Accordingly, we find that Petitioner has met is burden to show that FIPA97,

submitted as Exhibits 1006–1012 and relied on by Petitioner in its unpatentability challenges, was publicly accessible prior to the critical date of January 5, 1999, and therefore is available as prior art to the '560 patent under 35 U.S.C. § 102(a).

*G. Asserted Obviousness over Kiss and FIPA97*

Petitioner contends that claims 1, 20, 21, 26–28, and 45–49 of the '560 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss and FIPA97. Pet. 31–72. We have reviewed the parties' arguments in the Petition, Patent Owner Response, Reply, and Sur-reply, as well as the relevant evidence discussed in those papers and other record papers, including the declarations of Dr. Lieberman and Dr. Medvidovic. For the reasons that follow, we determine Petitioner has shown by a preponderance of the evidence that claims 1, 20, 21, 26, 27, and 45–49 are unpatentable as obvious over the combined teachings of Kiss and FIPA97, but has not shown by a preponderance of the evidence that claim 28 is unpatentable as obvious over the combined teachings of Kiss and FIPA97.

*1. Proposed Combination of Kiss and FIPA97*

In its proposed combination of Kiss with FIPA97, Petitioner relies on Kiss for teaching electronic agents and their general functions and operations, including agent collaboration, agent registry, and inter-agent messaging. Pet. 27. Petitioner acknowledges, however, that Kiss does not disclose an inter-agent communication language and relies on FIPA97 to teach a common communications protocol and language (FIPA ACL), which is combined with the teachings of Kiss to provide a communication language for inter-agent communication between the agents of Kiss and add administrative functionality and exemplary practices to the Kiss system. *Id.* Petitioner explains that "[FIPA97's] techniques are used to implement the

functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging, as well as adding functionality that is disclosed in FIPA97." *Id.* (citing Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1). Petitioner asserts that "[w]here the two systems disclose analogous functionality, such as facilitating cooperation and agent registry, their techniques are combined." *Id.* (citing Ex. 1050 ¶¶ 204–206).

In identifying a reason that would have prompted a person of ordinary skill in the relevant field to combine the prior art teachings, Petitioner "must show some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418. A reason to combine teachings from the prior art "may be found in explicit or implicit teachings within the references themselves, from the ordinary knowledge of those skilled in the art, or from the nature of the problem to be solved." *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (*citing In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998)).

Petitioner argues the proposed combination of Kiss and FIPA97 would have been obvious for several reasons. First, Petitioner argues that Kiss, FIPA97, and the '560 patent are analogous art, because "each is directed to the same field of endeavor, *i.e.*, distributed computing environments generally and architectures for communication and cooperation among distributed electronic agents specifically." Pet. 28 (citing Ex. 1001, 1:17–21; Ex. 1005, Abstract; Ex. 1007, Foreword, 1; Ex. 1050 ¶ 207). Petitioner also argues that FIPA97 and Kiss are reasonably pertinent to the problem addressed by the '560 patent—"the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" *Id.* (citing Ex. 1001, 4:30–36; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1050 ¶ 208).

Next, Petitioner argues the combination of Kiss and FIPA97

> would have been the arrangement of old elements (*i.e.*, the functionality of FIPA97, and the system of Kiss) with each performing the same function it had been known to perform (communication between distributed agents (FIPA97)); cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate to conduct cooperative task completion and problem solving).

*Id.* (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1050 ¶ 209).

Petitioner also argues that a skilled artisan

> would have known that agents, such as in Kiss, must use a common communications protocol, i.e., an inter-agent communication language, and related management functionality, and therefore would have been motivated to consider and employ one of the available inter-agent communications languages and its related functionality, and because doing so would have been a convenient and efficient way to facilitate effective communication between agents.

*Id.* at 29 (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1050 ¶ 210).

Petitioner further argues that a skilled artisan would have been motivated based on earlier descriptions of KQML's similar use of an inter-agent communication language to use FIPA ACL in a system like Kiss. *Id.* (citing Ex. 1016, Abstract; Ex. 1016, 4, 29, 30; Ex. 1006, 7; Ex. 1007, 41, 40–42; Ex. 1005, Abstract; Ex. 1050 ¶¶ 211–213). According to Petitioner, a skilled artisan "would have been further motivated to make the combination because of the known advantages of FIPA97, including that it specifies, 'key agents necessary for the management of an agent system, the ontology necessary for the interaction between systems, and it defines also the transport level of the protocols.'" *Id.* at 30 (citing Ex. 1035, 1; Ex. 1050 ¶ 217).

Additionally, Petitioner argues that "FIPA97 represented a substantial attempt to formulate an industry standard designed to encourage interoperability and uniformity amongst agent systems" and a person of ordinary skill in the art "would have understood that agent systems that complied with such a standard would be more likely to be interoperable with other systems and would likely have more resources available." *Id.* (citing Ex. 1007, vii; Ex. 1047; Ex. 1050 ¶ 218). Moreover, Petitioner argues, the description of the administrative functionality and exemplary practices in FIPA97 "suggests that their use with the FIPA ACL would be advantageous and workable," and a person of ordinary skill in the art would have been motivated to employ such additional functionality and practices in the combined system "in order to obtain the full benefit of using FIPA ACL." *Id.* at 30–31 (citing Ex. 1050 ¶ 219).

Finally, Petitioner argues that a skilled artisan could have made the combination without undue experimentation because by January 1999 the component parts of the combination were well-known, conventional technology and because others had combined FIPA97 technology with agent systems. *Id.* at 31 (citing Ex. 1007; Ex. 1016; Ex. 1030; Ex. 1050 ¶ 216).

In response, Patent Owner asserts that "Petitioner utterly defaults in offering any reason to combine" Kiss and FIPA97 and that Petitioner's arguments contain boilerplate language. PO Resp. 137; PO Sur-reply 51. Patent Owner argues that Petitioner's motivation to combine Kiss and FIPA97 suffers from "hindsight bias" and that Petitioner "offers no reason or explanation that a person of skill in the art looking at Kiss would be motivated to find a particular language with the characteristics of FIPA97's ACL." PO Resp. 137. Patent Owner also argues that Petitioner fails to identify how the combination of Kiss and FIPA97 could be achieved. *Id.* at

138. Specifically, Patent Owner argues that the FIPA97 and Kiss protocols are "different" and "mutually exclusive" and that FIPA97 "discouraged interoperability between different and incompatible systems." PO Sur-reply 51–54. Patent Owner also argues that the Kiss and FIPA97 architectures "look quite different" and "Petitioner offers no articulation of how to add the [FIPA97 Directory Facilitator (DF)] to any of the Kiss layers." PO Resp. 95.

We agree with Petitioner that Patent Owner "ignores the several pages of analysis supported by expert testimony (including citations to evidence in the prior art) articulating the rational underpinning of the combination" of Kiss and FIPA97. Pet. Reply 22 (citing Pet. 27–31). As summarized above, Petitioner provides ample reasoning and explanation for why person of ordinary skill in the art would have combined the teachings of FIPA97 and Kiss in the manner Petitioner describes. Thus, Patent Owner's argument that Petitioner fails to offer *any reason* to combine *Kiss* and FIPA97 is directly contrary to the evidence of record and is unpersuasive. *See* PO Resp. 137.

We also agree with Petitioner that a showing of obviousness does not require a person of ordinary skill in the art to have been motivated to find the particular ACL language in FIPA97, as Patent Owner contends. *See* Pet. Reply 22 (citing PO Resp. 137). Under the correct obviousness analysis, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420. Here, Petitioner provides persuasive evidence and argument that FIPA97 and Kiss are reasonably pertinent to the problem addressed by the 560 patent—"the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 28 (citing Ex. 1001, 4:30–36; Ex. 1005, 2:33–40;

Ex. 1007, 1; Ex. 1050 ¶ 208). For instance, Kiss observes that "a need exists for a knowledge management system for dynamic, distributed problem-solving systems." Ex. 1005, 2:39–40. And as Dr. Lieberman notes, the FIPA97 specification "defines a language and supporting tools, such as protocols, to be used by intelligent software agents to communicate with each other," and "the terms used and the mechanisms used [by FIPA97] support such a higher-level, often task based, view of interaction and communication." Ex. 1050 ¶ 208 (emphasis omitted). This evidence support's Petitioner's position that a person of ordinary skill in the art at the time of the claimed invention would have combined FIPA97 and Kiss in the manner described in the Petition to provide a flexible, fault-tolerant, distributed problem solving system using agent-based technologies.

Petitioner further argues, and we agree, that Patent Owner's criticism that Petitioner fails to identify how the combination could be achieved "ignores the detailed description in the Petition (supported by Dr. Lieberman) that demonstrates how the combination would work." Pet. Reply 23 (quoting PO Resp. 138) (citing Pet. 27–31; Ex. 1050 ¶¶ 204–206). For example, the Petition explains that "FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system." Pet. 27. The Petition also explains that "[t]hese techniques are used to implement the functionality described in Kiss, including *facilitating agent collaboration*, agent registry, and inter-agent messaging . . . as well adding functionality that is disclosed in FIPA97." *Id.* (citing Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1) (emphasis added).

Petitioner's proffered combination of FIPA97 and Kiss is amply supported by Dr. Lieberman's testimony. For instance, Dr. Lieberman explains that:

> in the combination of Kiss with FIPA97, the "interagent abstract communications facilities" of Kiss, [Ex. 1005], 3:32-36, would use the inter-agent communication language of FIPA97 to, for example, "negotiate with each other, conduct joint planning, and to collaborate in the execution of planned tasks," [Ex. 1005], 3:32-36. Additionally, the Agent Service Layer and meta-agent of Kiss would be implemented using the FIPA97 Agent Management System ("FIPA-AMS") and the functionality of the FIPA Directory Facilitator, described in [Exhibit 1006]. Thus, the "capabilities, interests, and attributes for the knowledge modules," [Ex. 1005], 6:67-7:1, as stored in the agent registry of Kiss, and the meta agent of Kiss, would be implemented with the directory facilitator functionality of FIPA97. Therefore, FIPA-AMS would be used to provide a "scalable and modular" inter-agent management system and agent registry for the distributed agents of Kiss. [Ex. 1005, 3:67-4:1]. Further, the combination of FIPA97 and Kiss would be informed by and include the exemplary practices described in the informative sections of FIPA97 (i.e, Parts 4-7).

Ex. 1050 ¶ 206. Dr. Lieberman provides annotated versions of several of Kiss's figures representing exemplary depictions of the combined Kiss/FIPA97 system. *Id.* at ¶ ¶ 205–206 (presenting annotated Figures 4–6, 8, and 21 of Kiss).

In one example, Dr. Lieberman provides an annotated version of Kiss's Figure 8 showing how FIPA97's communications protocol (FIPA

ACL) and Directory Facilitator would be incorporated into Kiss in the combined Kiss/FIPA97 system:




Ex. 1050 ¶¶ 205–206. In annotated Figure 8 above, Dr. Lieberman illustrates how Kiss's agents would use FIPA ACL to "negotiate with each other, conduct joint planning, and . . . collaborate in the execution of planned tasks." *Id.* ¶ 206 (quoting Ex. 1005, 3:32–36). Annotated Figure 8 also shows at a high level how Kiss's Agent Service Layer and meta-agent (MA) would include the functionality of FIPA97's Directory Facilitator. *Id.*

In another example, Dr. Lieberman provides an annotated version of Kiss's Figure 21, shown below, illustrating how FIPA97's Directory

Facilitator (DF) would be incorporated into Kiss's knowledge management system:



*Fig. 21*

Ex. 1050 ¶ 206. Petitioner's annotated version of Kiss's Figure 21, shown above, depicts how FIPA97's Directory Facilitator (DF) would be incorporated into the user interface layer, meta-agent layer, and knowledge agent layer of Kiss's knowledge management system connected to a distributed environment such as the Internet. *See* Ex. 1050 ¶¶ 204–206; Ex. 1005, 10:55–12:28, 14:31–36, Figs. 4–6, 8, 21.

In view of Dr. Lieberman's testimony, we find Patent Owner's arguments that the Petition says nothing about how to combine FIPA97's Directory Facilitator and Kiss's meta-agent and offers "no articulation" of how to add a Directory Facilitator to any of the Kiss layers to be contrary to the evidence of record. *See* PO Resp. 94–95. Similarly, Patent Owner's arguments that the FIPA97 and Kiss protocols are "mutually exclusive" and that FIPA97 "discouraged interoperability" between systems are

unpersuasive and not supported adequately by the record. *See* PO Sur-reply 51–54.

Finally, Patent Owner argues Petitioner's combination of references "is emblematic of hindsight bias" because Dr. Lieberman "picks and chooses elements" and "superimposes them into one figure in an attempt to 'show' the combination." PO Resp. 98. In particular, Patent Owner argues that "simply drawing in block diagrams with terminology from other references into one cobbled diagram is insufficient as a matter of law without any explanation of how such a combination could be achieved or, indeed, why." *Id.* at 98–99.

We note that "[a]ny judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper." *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971).

Here, Petitioner provides persuasive evidence that a person of ordinary skill in the art at the time of the invention would have had reason to use FIPA97's communications protocol and inter-agent communication language (FIPA ACL) between the agents of Kiss, adding FIPA97's administrative functionality and practices to the Kiss system. *See, e.g.*, Pet. 27–31; Ex. 1050 ¶ 204–219. This is not evidence of hindsight bias. Patent Owner does not identify, and we do discern, any particular knowledge used by Petitioner in its combination of FIPA97 and Kiss that was gleaned from the '560 patent's disclosure and was not within the level of ordinary skill in the art at the time of the invention.

For the reasons discussed, we find that Petitioner has articulated sufficient reasoning with rational underpinning for why a person of ordinary skill in the art at the time of the invention would have combined the teachings of Kiss and FIPA97 in the manner proffered by Petitioner.

*2. Independent Claim 1*

Claim 1 is directed to a software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture contemplating a distributed computing system comprising service-providing electronic agents and a distributed facilitator agent including an agent registry and a facilitating engine, the service-providing electronic agents and the distributed facilitator agent communicating using an interagent communication language (ICL) including a layer of conversational protocol. Ex. 1001, 29:57–30:23. Claim 1 also requires the facilitating engine to be operable to interpret a service request as a base goal for generating a goal satisfaction plan, where the goal satisfaction plan involves using reasoning to determine sub-goal requests and to coordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests. *Id.* at 30:5–15.

In its proposed combination of Kiss with FIPA97, Petitioner relies on Kiss to teach electronic agents and their general communication and collaboration functions as recited in claim 1, FIPA97 to teach the recited ICL, and a combination of Kiss and FIPA97 to teach the claimed distributed facilitator agent. Pet. 31–52. Patent Owner argues that the proposed combination of Kiss and FIPA97 does not teach the "distributed facilitator agent functionally distributed across at least two computer processes" or the "goal satisfaction plan" recited in the claim. PO Resp. 78–102, 111–18. Patent Owner also asserts that FIPA97 does not teach the "inter-agent

language" (or Interagent Communication Language (ICL)) and related limitations. *Id.* at 118–33. In the following discussion, we analyze the limitations of claim 1 in more detail, addressing Petitioner's contentions and, where applicable, Patent Owner's responsive arguments.

*a. Preamble*

The preamble of claim 1 recites: "A software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture contemplating a distributed computing system."[18] Ex. 1001, 29:57–60. Petitioner contends that Kiss teaches a "software-based, flexible computer architecture" because it discloses a computerized knowledge management system in which interaction between a user and knowledge resources is mediated by a collection of cooperative intelligent agents. Pet. 31–32 (citing Ex. 1005, 2:43–49, 3:1–3, Fig. 1). Petitioner further contends that Kiss's agents are "distributed" in a "hierarchical" architecture. *Id.* at 32 (citing Ex. 1005, Abstract, 2:50–55, 4:57–59). Petitioner also contends that Kiss teaches the recited "communication and cooperation among distributed electronic agents" in the form of "cooperative intelligent agents [that] incorporate generalized automated negotiation and distributed inference (i.e. problem-solving) processes," analyze "problem statements," and reorganize them as "sets of tasks." *Id.* (citing Ex. 1005, 2:50–55).

Patent Owner does not specifically dispute that Kiss teaches the preamble of claim 1. *See generally* PO Resp. Based on the complete record

[18] Because Petitioner has shown that Kiss teaches the recitations in the preamble, we need not determine whether the preamble is limiting. *See Vivid Techs.*, 200 F.3d at 803.

and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches the preamble of claim 1.

*b. "plurality of service-providing electronic agents"*

Petitioner contends that Kiss teaches "a plurality of service-providing agents," as recited in claim 1, because Kiss discloses a plurality of agents responding to requests for service by providing information such as market price and cost information. *Id.* at 33 (citing Ex. 1005, 12:21–14:30, Figs. 8–20). Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches a "plurality of service-providing electronic agents," as recited in claim 1.

*c. "distributed facilitator agent"*

Claim 1 recites "a distributed facilitator agent functionally distributed across at least two computer processes." Ex. 1001, 29:63–67. Petitioner contends that Kiss and FIPA97 teach a "facilitator agent" that is "functionally distributed across at least two computer processes." Pet. 33–35. Patent Owner disputes Petitioner's contentions. PO Resp. 78–102. We address both parts of this limitation below.

*(i) "facilitator agent"*

Petitioner contends that the agent service layer of Kiss combined with Kiss's meta-agent constitutes a "facilitator agent" because it is responsible for matching requests from users and agents with descriptions of the capabilities of other agents. Pet. 33 (citing Ex. 1005, 12:21–14:30, Figs. 8–20). Petitioner argues that FIPA97 also discloses a Directory Facilitator, which provides analogous functionality, so that in the combined system

FIPA97's Directory Facilitator would be implemented in Kiss's meta-agent. *Id.* at 33–34 (citing Ex. 1006, 6–7; Ex. 1050 ¶ 233).

Patent Owner argues that Kiss and FIPA97 either alone or in combination do not disclose "the specialized functionality and operation" of the claimed "facilitator agent." PO Resp. 86. Patent Owner first argues that Kiss's meta-agent is not a facilitator. *Id.* Patent Owner argues that "meta-agents are described in the '560 Patent itself as part of the [Open Agent Architecture] architecture and distinct from facilitator agents," and the facilitator agent and meta-agents are shown separately in Figure 4 of the '560 patent. *Id.* at 86–87 (citing Ex. 1005, Fig. 4). Patent Owner argues that meta-agents in the '560 patent are "client agents as opposed to facilitating agents." *Id.* at 87 (citing Ex. 1001, 6:54–56 ("All agents that are not facilitators are referred to herein generally as client agents . . . ."); *id.* at 6:60–62 ("Some typical categories of client agents would include . . . meta-agents . . . .")). Thus, Patent Owner argues, Kiss's meta-agent is similar to the meta-agent of the '560 patent and does not perform the role of the claimed facilitator. *Id.* at 88 (citing Ex. 2032 ¶ 117). Patent Owner asserts that Kiss's meta-agent is at best "a controller that routes queries through the system and presents results, and it lacks the sophistication and intelligent planning that the claimed facilitator performs." *Id.* (citing Ex. 1001, 20:11–12; Ex. 2032 ¶ 119).

Patent Owner further argues that Kiss does not disclose a meta-agent capable of the three types of processing performed by the claimed facilitator in the '560 patent—delegation, optimization, and interpretation. *Id.* at 89 (citing Ex. 1001, 19:27–29). First, Patent Owner Patent Owner argues that although Kiss's meta-agent "breaks down queries into questions and passes them to knowledge agents," it "does not apply 'selective application of

global and local constraint and advice parameters onto the specific sub-goals.'" *Id.* (quoting Ex. 1001, 19:34–35). Second, Patent Owner argues that Kiss "contains no disclosure of optimization—'result[ing] in a goal whose interpretation will require as few exchanges as possible, between the facilitator and the satisfying agents, and can exploit parallel efforts of the satisfying agents.'" *Id.* (quoting Ex. 1001, 19:40–43). Third, Patent Owner argues that Kiss's meta-agent "does not use an intelligent method or its own knowledge resources to interpret capabilities or use strategies or advice in the coordination of requests to and assembly of results from satisfying agents." *Id.* at 90 (citing Ex. 1001, 19:49–52).

With regard to FIPA97's Directory Facilitator, Patent Owner argues it "is no more than a directory of agent capabilities." *Id.* at 92. Patent Owner argues that while FIPA97's Directory Facilitator "may provide agent registry-type functions within a facilitator, FIPA97 does not disclose any of the robust facilitator functions described in the '560 Patent and which are missing from Kiss's meta-agent." *Id.* (citing Ex. 1001, Fig. 7; Ex. 2032 ¶¶ 132–136).

In its Reply, Petitioner argues that Patent Owner "ignores the actual Kiss/FIPA97 combination and instead attacks the references individually." Pet. Reply 27; *see id.* at 30. Responding to Patent Owner's argument that Kiss's meta-agent is similar to the meta-agent of the '560 patent and thus cannot be the claimed facilitator agent, Petitioner argues "the combined system of Kiss/FIPA97 discloses all the claimed features of a facilitator agent, so what Kiss chose to name his facilitator is plainly immaterial." *Id.* (emphasis omitted).

Petitioner also argues Patent Owner's "list of the various optional features of the facilitator agent are simply not relevant to the "*facilitator*

*agent*" as claimed—and in fact, the record evidence suggests a much broader understanding of that term." *Id.* (citing PO Resp. 84–93). Petitioner points out that Patent Owner's expert, Dr. Medvidovic, defined a "facilitator agent" as "a specialized server agent responsible for coordinating agent communications and cooperative problem solving." *Id.* at 28 (quoting Ex. 1129, 79:7–9).

Petitioner further argues that the "delegation, optimization, and interpretation" functionalities Patent Owner claims are missing from the Kiss meta-agent are limited to a preferred embodiment in the '560 patent, and therefore are not relevant to an obviousness analysis. *Id.* (citing PO Resp. 88). Petitioner contends that Dr. Medvidovic confirmed these were functionalities of a preferred embodiment. *See id.* (citing Ex. 1129, 54:2–9). In any event, Petitioner argues, the Kiss/FIPA97 combination teaches delegation under the ordinary meaning of that term. *Id.* at 28–29 (citing Ex. 1005, 3:25–27, 5:24–27, 12:21–14:30, Figs. 8–20). Petitioner takes similar positions with respect to "optimization" and "interpretation." *See id.* at 29–30 (citing Ex. 1005, 7:8–11, 7:65–8:8, 9:17–23).

In its Sur-reply, Patent Owner argues it is not attacking the prior art references individually, but rather it "addresses the disclosures within each reference, matching what the Petition does." PO Sur-reply 31. With respect to Patent Owner's argument that Kiss's meta-agent is not a facilitator, Patent Owner argues that "none of Patent Owner's arguments rest on the fact that the same words are or are not used in the asserted references and the '560 Patent." *Id.* at 31–32 (citing Pet. Reply 27). Patent Owner argues that Dr. Lieberman relies on similar portions of the specification to describe his interpretation of the "facilitator agent" as Patent Owner uses to show facilitator agent functionality in the '560 patent. *Id.* at 33.

We are persuaded that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches a "facilitator agent." Petitioner asserts that it is "the agent service layer [of Kiss] combined with the meta-agent of Kiss [that] constitutes 'a facilitator agent' because it is responsible for matching requests, from users and agents, with descriptions of the capabilities of other agents." Pet. 33 (citing Ex. 1005, 12:21–14:30, Figs. 8–20). Kiss also provides that its meta-agent layer "analyzes user queries or problem formulations from the user interface layer, allocates tasks to the knowledge agent layer, resolves conflicts arising from the knowledge agent layer, and consolidates (including fusing and deconflicting) results provided by the knowledge agent layer." Ex. 1005, 3:25–29. Kiss's meta-agent also operates with an agent service layer to identify relevant capabilities of service providing agents in the system. *See id.* at 3:36–47, 12:1–14:30.

Given Petitioner's articulation that the *combination* of the agent service layer and the meta-agent of Kiss constitutes a "facilitator agent," Patent Owner's argument that Kiss's meta-agent is not a facilitator is unavailing because it fails to respond to Petitioner's assertion that the recited "facilitator agent" includes the combination of the Kiss agent service layer and the Kiss meta-agent. *See* PO Resp. 86. Similarly, Patent Owner's argument that the Kiss meta-agent cannot be part of a "facilitator agent" in the combined Kiss/FIPA97 system because the '560 patent identifies a meta-agent as a separate component from the facilitator agent is unavailing for at least the same reason, i.e., that Patent Owner does not address the functionality of Kiss's meta-agent and agent service layer combined. *See id.* at 87. Moreover, with respect to Petitioner's showing how FIPA97's Director Facilitator would be implemented in Kiss in the combined Kiss/FIPA97 system that uses FIPA ACL, we determined above that

Petitioner has presented sufficient rationale for combining the references in the manner asserted. *See* § II.G.1.

As for Patent Owner's arguments that Kiss does not teach a facilitator agent capable of performing delegation, optimization, and interpretation, they are unpersuasive because they improperly attempt to read exemplary characteristics from preferred embodiments of the '560 patent into the claims. *See* PO Resp. 89–91. Indeed, as the '560 patent makes clear, "[a] further *preferred embodiment of the present invention incorporates* facilitator handling of compound goals, preferably involving *three types of processing: delegation, optimization and interpretation.* Ex. 1001, 19:26–26.

Also helpful in understanding the nature of a "facilitator agent" is the observation of Patent Owner's expert, Dr. Medvidovic, in reference to Figure 4 of the '560 patent that "facilitator agent 402" is "a specialized server agent that is responsible for coordinating agent communications and cooperative problem-solving." Ex. 2032 ¶ 32 (citing Ex. 1001, 6:46–48, Fig. 4).[19] Indeed, at his deposition, Dr. Medvidovic confirmed that this was his understanding of a "facilitator agent." There, Dr. Medvidovic testified, "if you were asking me [to] define a facilitator agent, I might say it's a specialized server agent responsible for coordinating agent communications and cooperative problem solving. That is a definition." Ex. 1129, 79:15–19.

Based on this understanding of a facilitator agent, Petitioner's proposed combination of Kiss's meta-agent and agent service layer is a "facilitator agent" that is responsible for analyzing user queries or problem

---

[19] We also note for the record that neither party has proposed a construction for the term "facilitator agent."

formulations, allocating tasks to knowledge agents, resolving conflicts that arise, and consolidating (including fusing and deconflicting) results. *See* Ex. 1005, 12:21–14:30, Figs. 8–20.

*(ii) "functionally distributed across at least two computer processes"*

As discussed above in § II.C.2, we construe the term "computer process" as "a process that runs or executes one or more computer programs" for this Final Written Decision.

Petitioner contends that Kiss discloses a facilitator agent distributed across at least two computer processes because Figure 21 of Kiss shows meta-agents on multiple systems remotely located from each other and provides that meta-agents can accept problem inputs from other meta-agents. Pet. 34 (citing Ex. 1005, Fig. 21). Figure 21 of Kiss is reproduced below:




*Fig. 21*

Figure 21 above shows Kiss's meta-agents (MAs) on multiple systems remote from each other.

Petitioner contends that a person of ordinary skill in the art would have understood that two meta-agents on separate systems operate together as part of a "facilitator agent" to facilitate the cooperative satisfaction of goals. *Id.* at 35 (citing Ex. 1005, 5:20–64; Ex. 1050 ¶ 235). Petitioner contends "Kiss further discloses that a meta-agent 'adaptively and dynamically synthesizes problem-specific knowledge interfaces' over multiple distributed knowledge sources." *Id.* (citing Ex. 1005, 2:61–67, Fig. 1). Therefore, Petitioner concludes, the two meta-agents divided on separate and remote systems operate cooperatively as a "distributed facilitator agent across at least two computer processes" to achieve the goals of the system. *Id.* (citing Ex. 1050 ¶¶ 235–236).

Petitioner argues that FIPA97 likewise teaches that its Directory Facilitator can manage distributed agents over multiple processes. *Id.* (citing Ex. 1006, 10, Fig. 2; Ex. 1050 ¶ 237). According to Petitioner, a person of ordinary skill in the art would have understood the agent platforms shown in Figure 2 to be separate computer processes because each agent platform provides the physical infrastructure in which agents can be deployed, and therefore represents a distinct program. *Id.* (citing Ex. 1006, 10, Fig. 2; Ex. 1050 ¶¶ 238–239).

Patent Owner argues the combination of Kiss and FIPA97 does not teach a facilitator agent "distributed across at least two computer processes." PO Resp. 100–102. Patent Owner asserts there is no support for Petitioner's "assumption" that distributed agents must be distributed across separate computer processes. *Id.* at 101 (citing Ex. 2032 ¶ 160). Rather, Patent Owner argues, a distributed facilitator could use a single computer process. *Id.* (citing Ex. 2032 ¶ 161). Patent Owner also argues that Petitioner's

citation to Figure 2 of FIPA97 does not disclose any information about what agents are involved. *Id.* at 101–02 (citing Ex. 2032 ¶ 41).

We are persuaded that Petitioner, with support from Dr. Lieberman, has shown sufficiently that Kiss teaches or at least suggests that its meta-agents on separate and remote systems, operating together as part of a facilitator agent, are "functionally distributed across at least two computer processes," as recited in claim 1. As Petitioner points out, the '560 patent provides no detail as to what computer processes may be running. Pet. Reply 36. Dr. Lieberman's testimony supports Petitioner's contention that a person of ordinary skill in the art generally would have understood Kiss to teach at least one computer process running on each separate host computer. Pet. 34–35; Ex. 1050 ¶¶ 235–36; Pet. Reply 36. Indeed, Patent Owner itself acknowledges that a person of ordinary skill in the art would have recognized that meta-agents distributed on different systems are executing on "separate processes." PO Resp. 105.

We agree with Patent Owner that Petitioner does not cite sufficient detail in FIPA97 to demonstrate that the distributed agents in FIPA97 it relies upon are part of a distributed facilitator agent as claimed. *See* PO Resp. 101–02. Nevertheless, we find Petitioner's reliance on Kiss sufficient to teach or suggest a facilitator agent "functionally distributed across at least two computer processes."

In summary, based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the combination of Kiss and FIPA97 teaches or suggests "a distributed facilitator agent functionally distributed across at least two computer processes," as recited in claim 1.

*d. "bi-directional communications"*

Claim 1 also requires the facilitator agent to be "capable of bi-directional communications with the plurality of service-providing electronic agents." Ex. 1001, 29:65–67. For this limitation, Petitioner points to Figure 10 of Kiss (not reproduced herein), which shows a meta-agent receiving a question from a knowledge agent and then communicating the question to a different knowledge agent. Pet. 36 (citing Ex. 1005, Fig. 10).

Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches "the facilitator agent capable of bi-directional communications with the plurality of service-providing electronic agents," as recited in claim 1.

*e. "agent registry"*

Claim 1 requires the facilitator agent to include "an agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the distributed computing environment." Ex. 1001, 30:1–4. Petitioner asserts that Kiss teaches this limitation because Kiss describes a "registry of agents," which is constructed through "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities." Pet. 37 (citing Ex. 1005, 3:37–45, 6:66–7:19, 8:41–48, 10:32–35, 12:18–20, Fig. 1).

Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has

demonstrated sufficiently that Kiss teaches this "agent registry" limitation of claim 1.

*f. "facilitating engine" limitations*

Claim 1 recites "a facilitating engine operable to interpret a service request as a base goal [and] further operable for generating a goal satisfaction plan associated with the base goal." Ex. 1001, 30:5–8. The claimed "goal satisfaction plan" involves "using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal." *Id.* at 30:10–15. Petitioner contends that Kiss teaches each of these limitations. Pet. 38–45.

*(i) "facilitating engine"*

Petitioner contends that the meta-agent in Kiss includes a "facilitating engine" because it is capable of analyzing user queries, allocating tasks, resolving conflicts, and consolidating results" and applying various inferencing methods to allocate tasks to knowledge agents in order to solve problems. Pet. 38 (citing Ex. 1005, 3:25–30). Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches a "facilitating engine," as recited in claim 1.

*(ii) "operable to interpret a service request as a base goal"*

As set forth above in § II.C, we have construed "goal" as "a request for service." Petitioner contends that Kiss's meta-agent (the claimed "facilitating engine") receives a query (a "service request") via a user agent requesting "either a solution to a problem, such as predicting the outcome of

a course of treatment, or the retrieval of information, such as the side effects of a medication." Pet. 39 (citing Ex. 1005, 8:26–29). Petitioner asserts that the meta-agent interprets the request as a "base goal" because "it is the basic request initiated by the user that the system seeks to satisfy and which inspired a number of additional, more particular requests in order to be satisfied." *Id.* (citing Ex. 1005, 12:21–14:20, Figs. 8–20). Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches a facilitating engine "operable to interpret a service request as a base goal," as recited in claim 1.

*(iii) "goal satisfaction plan"*

Petitioner asserts that Kiss teaches "generating a goal satisfaction plan" because Kiss describes that the meta-agent "formulates a goal statement for the problem-solving phase of the process," then "formulates a solution plan for the problem." Pet. 40 (citing Ex. 1005, 8:32–34, 5:33–64, 12:29–64, Figs. 8–20). Petitioner contends that Figures 8–20 of Kiss illustrate adding tasks to an agenda, i.e., constructing a plan, to satisfy the user request (i.e., a "goal") "what is the effect of increasing sales by 20%?" *Id.* (citing Ex. 1005, 13:27–29, Figs. 8–20).

Patent Owner contends that Kiss does not teach the claimed "goal satisfaction plan" because Kiss does not disclose "the use of any reasoning, optimization, or taking into account any advice parameters or constraints." *Id.* at 115. Patent Owner also argues that Kiss "does not have the capability of formulating an 'optimal or near-optimal' 'goal satisfaction plan' utilizing reasoning as described in the '560 patent." *Id.* at 117 (citing Ex. 2032 ¶ 212). These arguments are predicated on Patent Owner's proposed

construction of "goal satisfaction plan" to mean "a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints." *See id.* at 32. As discussed above in § II.C.1, we disagree with Patent Owner that the claim term "goal satisfaction plan" is limited as Patent Owner contends. Thus, for the reasons explained above, we disagree with Patent Owner's argument that Kiss does not disclose the "goal satisfaction plan" recited in claim 1.

Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches "constructing a goal satisfaction plan," as recited in claim 1.

*(iv) "sub-goal requests based on non-syntactic decomposition of the base goal"*

The "goal satisfaction plan" recited in claim 1 involves "using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal." Ex. 1001, 30:10–12. As set forth above in § II.C, we have construed "non-syntactic decomposition" as "generation of a sub-request (sub-goal/sub-delegation) based on factors other than the syntax of how the goal was received or made." For this limitation, Petitioner cites Kiss's disclosure of a meta-agent responding to the user's request of "what is the effect of increasing sales by 20%?" by generating sub-requests based on the registered capabilities of agents active in the system. Pet. 40–41 (citing Ex. 1005, 8:32–48, 12:54–56, 13:25–27, 13:37–39, 13:56–57, 14:3–5). Because the tasks or sub-requests are formulated based on knowledge of the capabilities of underlying knowledge systems, Petitioner asserts, they are not based on the syntax of the request. *Id.* at 41–42. As an example, Petitioner points out that the sub-request asking for confirmation that "the cost per unit at the specified number of units does not exceed the market

price plus an acceptable profit" does not relate to the syntax of the base goal ("what is the effect of increasing sales by 20%?"). *Id.* at 41 (citing Ex. 1005, 13:25–27).

Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches this limitation.

*(v) "co-ordinate and schedule efforts by the service-providing agents"*

The "goal satisfaction plan" in claim 1 also involves "using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal." Ex. 1001, 30:12–15. For this limitation, Petitioner refers to the example in Figures 8–20 of Kiss. Pet. 43–44. For instance, Petitioner asserts that Kiss's meta agent coordinates and schedules efforts by the service-providing agents when it pushes a task onto an agenda to query a sales agent. *Id.* (citing Ex. 1005, 12:29–36). Petitioner also asserts that Kiss teaches "fulfilling the sub-goal requests in a cooperative completion of the base goal" because Kiss's meta agent asks the agent registry to identify a knowledge agent that has registered a capability to answer a question related to sales. *Id.* at 43 (citing Ex. 1005, 12:29–36).

Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches this limitation.

*(vi) "using reasoning"*

In claim 1, both aspects of the goal satisfaction plan—determining sub-goal requests and coordinating and scheduling efforts by agents—must be accomplished "using reasoning." Ex. 1001, 30:10–15. In addition to citing the example in Figures 8–20 of Kiss, Petitioner contends that the various inferencing schemes disclosed in Kiss to formulate dynamic solution plans and to allocate tasks to agents constitute "reasoning" to determine and fulfill sub-goal requests. Pet. 40, 42–45 (citing Ex. 1005, 5:24–36, 7:28–41, 7:53–56, 7:65–7:4).

Patent Owner contends that the "solution plan" of Kiss is not constructed by "using reasoning" because Kiss's inferencing schemes are used only "[a]fter the solution plan is formulated . . . to perform the search and execution phases." PO Resp. 115 (citing Ex. 1005, 8:58–60). In response, Petitioner persuasively argues that the Petition additionally relies on several other ways in which Kiss utilizes reasoning to formulate a solution plan "using various types of reasoning and allocating tasks to different agents." Pet. Reply 56 (citing Pet. 40; Ex. 1005, 5:33–64; Ex. 1050 ¶¶ 266–267). For example, Kiss describes how the meta-agent can "formulate parallel sub-plans and perform iterative and recursive procedures." *Id.* (quoting Ex. 1005, 5:37–39); *see* Pet. 40, 61; Ex. 1050 ¶¶ 266–267.

Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches "using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal," as recited in claim 1.

*g. "interagent communication language" limitations (MC)*

Claim 1 recites that the plurality of service-providing electronic agents and the distributed facilitator agent communicate using an interagent communication language (ICL). Ex. 1001, 30:18–19. The ICL includes "a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events." *Id.* at 30:19–23. Petitioner asserts that Kiss teaches communication among agents, and that communication in the proposed combination of references occurs via the Agent Communication Language of FIPA97 (FIPA ACL). Pet. 45 (citing Ex. 1007, vii, ix, 51, Fig. 10). Specifically, Petitioner contends that FIPA ACL employs multi-layer messaging for communication between distributed agents. *Id.* at 46 (citing Ex. 1007, 51).

Patent Owner asserts that FIPA97 does not teach "refin[ing] . . . events" as recited in claim 1. PO Resp. 121–30. Patent Owner does not dispute that FIPA97 teaches the rest of the limitations relating to an interagent communication language as recited in clam 1. *See id.* at 121–33.

As we explain below, Petitioner has demonstrated sufficiently that FIPA97 teaches these limitations reciting elements of the claimed ICL.

*(i) "layer of conversational protocol"*

Petitioner asserts that FIPA97 teaches "a layer of conversational protocol" recited in claim 1 because FIPA ACL "defines the semantics of *messages* between agents as including a communicative act, followed by various parameters and parameter expressions," as shown in Figure 1 of Part 2 of FIPA97 reproduced above in § II.D.2. Pet. 46 (emphasis added) (citing Ex. 1007, 2; Ex. 1050 ¶ 291). Petitioner also argues that FIPA97 "discloses a number of different performatives and rules governing FIPA

ACL messages and the meaning of the different parts" and, therefore, discloses "a layer of conversational protocol." *Id.* at 47 (citing Ex. 1007, 11–22; Ex. 1050 ¶¶ 292–295).

*(ii) "events" and "event types"*

As discussed above in § II.C, we construe "event" to mean "a message or goal communicated between agents" and "event type" to mean "a type of an event" for this Final Written Decision.

Petitioner maps the "event" of claim 1 to FIPA ACL's "message" and asserts that FIPA ACL's "message type" teaches an "event type" recited in claim 1. *Id.* at 47–48 (citing Ex. 1007, 3, 4, 11–13, 18). Petitioner argues that FIPA ACL's "message" is an "event" recited in claim 1 because the FIPA ACL communicative acts "are performed by an agent sending a *message* to another agent." *Id.* at 47 (emphasis added) (citing Ex. 1007, 3, 4, 11).

Referencing Figure 1 of Part 2 of FIPA97 reproduced above, Petitioner asserts that in FIPA ACL, "[t]he first element of the message is a word which identifies the communicative act being communicated, which defines the principal meaning of the message," and "the message's communicative act *type* corresponds to that which in KQML is called the performative." Pet. 47 (emphasis added) (citing Ex. 1007, 12, 13). Petitioner argues that FIPA97 further defines "message type" as corresponding to the "communicative acts/performatives of the FIPA ACL." *Id.* at 48 (citing Ex. 1007, 18).

As discussed above, Petitioner asserts that FIPA97 teaches "a layer of conversational protocol" because FIPA ACL "defines the *semantics of messages* between agents as including a communicative act." Pet. 46 (emphasis added) (citing Ex. 1007, 2). Petitioner contends that FIPA97

teaches that the layer of conversational protocol in FIPA ACL is "defined by event types," as recited in claim 1, because in FIPA97, "[t]he *message types* are a reference to *the semantic acts* defined in this specification." *Id.* at 48 (emphases added) (citing Ex. 1007, 11).

*(iii) "parameter list"*

Claim 1 recites that "a layer of conversational protocol" is also "defined by . . . parameter lists associated with one or more of the events." Petitioner asserts that in FIPA97, FIPA ACL messages may include multiple different parameters ("parameter lists associated with one or more of the events") that can "help the message transport service to deliver the message correctly" or "the receiver to interpret the meaning of the message," or "to respond co-operatively," as shown in Figure 1 of Part 2 of FIPA97 (reproduced above). Pet. 49 (citing Ex. 1007, 12, 14, Fig. 1). Petitioner contends that FIPA97 discloses additional parameters in Table 1. *Id.* (citing Ex. 1007, 13–14).

*(iv) "refining events"*

Claim 1 recites that "the parameter lists further refine the one or more events." Petitioner asserts that this phrase should be construed to mean that "a list of parameters associated with an event can refine the event by affecting the meaning of the event." Pet. 12. Petitioner discusses the disclosures in the Specification and the prosecution history of the '560 patent in support of its proposed construction. *Id.* at 12–16 (citing Ex. 1001, 11:16–48; Ex. 1002, 13–14, 51, 55; Ex. 1020, 5, 6; Ex. 1050 ¶¶ 111–118).

Although Patent Owner discusses constructions for several terms in the Patent Owner Response, Patent Owner does not discuss Petitioner's proposed construction for the claim term "refine . . . events" or propose its

own construction. *See* PO Resp. 29–52. Instead, Patent Owner argues that FIPA97 does not teach parameters that "refine . . . events" under Petitioner's proposed construction. *See id.* at 121 ("the cited parameters in FIPA97 do not, contrary to Petitioner's assertion, affect the meaning of the message"), 124 ("this parameter **does not** affect the **meaning** of the message"), 125 ("In contrast, the FIPA97 "receiver" parameter **does not affect the meaning of the "inform" communicative act**."). Based on the arguments and evidence presented by Patent Owner, we understand Patent Owner not to dispute Petitioner's proposed construction for the term "the parameter lists further refine the one or more events."

Upon considering the complete record, we agree with Petitioner that the claim term "refine . . . events" encompasses "affecting the meaning of the events." As discussed above, during prosecution, the limitation "wherein the parameter lists further refine the one or more events" was added to claim 1 of the parent '115 patent in an amendment to distinguish the claim from the combination of Nwana/KQML and Kiss cited by the Examiner. *See* Ex. 1002, 13–14, 18, 28, 51; Pet. 13–15 (citing Ex. 1002, 13–14, 51). Citing the disclosures of Nwana/KQML discussed by the Examiner, Petitioner persuasively argues that the parameters of Nwana's KQML "tell" message (i.e., the claimed "event") do not change the meaning of the message, whereas the parameters of an event in the '560 patent change the meaning of the event by "refin[ing] the event." Pet. 12–15 (citing Ex. 1002, 13–14, 51, 55; Ex. 1020, 5, 6). In support of its argument, Petitioner cites the following passage from the Specification that distinguishes the '560 patent's ICL (i.e., the recited "interagent communication language") from KQML:

> For example, in KQML, a request to satisfy a query can employ either of the performatives ask_all or ask_one. In ICL, on the other hand, this type of request preferably is expressed **by the event type ev_post_solve, together with the solution_limit(N) parameter--where N can be any positive integer**. (A request for all solutions is indicated by the omission of the solution limit parameter.) [The request can also be accompanied by other parameters, which combine to <u>further refine</u> its semantics.] In KQML, then, this example forces one to choose between two possible conversational options, neither of which may be precisely what is desired. In either case, the performative chosen is a single value that must capture the entire conversational characterization of the communication.

Pet. 12–13 (quoting Ex. 1001, 11:38–53). Petitioner argues that a message having the KQML performative "ask_all" always has the same meaning, requesting all solutions to the request, just as the KQML performative "ask_one" always requests one solution. *Id.* at 13. According to Petitioner, in contrast, the meaning of the '560 patent's event "ev_post_solve" depends on the value of its parameter "solution_limit(N)"—e.g., an agent may request the identity of three agents capable of translating a document by including "solution_limit(N)" in the message and setting the value of N to 3. *Id.* Thus, Petitioner argues that the parameters of an event of the '560 patent affect the meaning of the event. *Id.* at 13–15.

We are persuaded by Petitioner's argument and evidence that the "parameterized approach" of the '560 patent (Ex. 1001, 11:38–53) can refine an event by changing the meaning of the event. As discussed above in § II.C, we construe "event" to mean "a message or goal communicated between agents" and "goal" to mean "a request for service." The '560 patent describes that "[i]n one embodiment, a request for one of an agent's services normally arrives in the form of an *event* from the agent's

facilitator." *Id.* at 12:61–63 (emphasis added). In a section titled "Refining Service Requests," the '560 patent describes as follows:

> In a preferred embodiment of the present invention, *parameters* associated with a goal (or sub-goal) can draw on useful features to *refine the request's meaning*. For example, it is frequently preferred to be able to specify whether or not solutions are to be returned synchronously; this is done using the reply parameter, which can take any of the values synchronous, asynchronous, or none. As another example, when the goal is a non-compound query of a data solvable, the cache parameter may preferably be used to request local caching of the facts associated with that solvable.

*Id.* at 16:5–15 (emphases added). Thus, the '560 patent describes that in an embodiment, parameters of a request for service, i.e., an event, can refine the "meaning" of the request or event.

Nonetheless, we note that this passage and all of the disclosures of the '560 patent cited by Petitioner describe exemplary embodiments. *See id.* at 11:42–45 ("In ICL . . . this type of request *preferably* is expressed by the event type ev_post_solve, together with the solution_limit(N) parameter--where N can be any positive integer." (emphasis added)), 16:6–8 ("In a *preferred embodiment* of the present invention, *parameters* associated with a goal (or sub-goal) can draw on useful features to *refine the request's meaning*." (emphases added)). Thus, the term "refine . . . events" recited in claim 1 may encompass but is not necessarily limited to "affecting the meaning of events." *See SuperGuide*, 358 F.3d at 875 ("a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment"); *WesternGeco*, 889 F.3d at 1323–24 ("It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise."). Indeed, Petitioner's proposed construction of the term "the

parameter lists further refine the one or more events" expresses the meaning of the term in a permissive fashion—"an event *can* refine the event by affecting the meaning of the event." Pet. 12 (emphasis added).

Based on the complete record, we determine that the term "the parameter lists further refine the one or more events" encompasses parameters "affecting the meaning of the events."

Petitioner asserts that FIPA97 teaches "the parameter lists further refine the one or more events" because several of the conversational layer parameters disclosed in FIPA97 affect the meaning of the performative included within the message, and therefore affect the meaning of the message, or event. Pet. 50. According to Petitioner, FIPA97 discloses a parameter ":receiver," which "can alter the meaning [of] an event, such as 'inform,' to be 'inform one'" or "inform a number' of agents, depending on the value of the parameter." *Id.* (citing Ex. 1007, 13). Citing the testimony of Dr. Lieberman, Petitioner asserts that naming a tuple "corresponds to the action of multicasting the message" such that "semantics of this multicast" is refined so that "the message is sent to each agent named in the tuple." *Id.* (citing Ex. 1007, 13; Ex. 1050 ¶ 314). Petitioner argues that "[t]his 'tuple naming' functionality is analogous to the example provided in the ['560 patent] of 'solution_limit(N),' in which 'N' modifies how many solutions are requested, and is not found in the KQML Nwana reference that was before the examiner." *Id.* (citing Ex. 1001, 11:32–48; Ex. 1020; Ex. 1050 ¶ 314). Petitioner also asserts that FIPA97 discloses two other parameters—":protocol" (when used with the "call for proposals" performative) and ":conversation-id"—that affect the meaning of a message. *Id.* at 51–52 (citing Ex. 1007, 13–14, 46–49; Ex. 1050 ¶¶ 316–321).

Patent Owner asserts that FIPA97 does not teach parameters "refin[ing] . . . events," as recited in the claim, because the parameters of FIPA97 cited by Petitioner do not affect the meaning of the message. PO Resp. 121. In particular, Patent Owner contends that FIPA97's ":receiver" parameter of the FIPA97 "inform" message relied upon by Petitioner is no different from KQML's ":receiver" parameter for the KQML "tell" message in that both modify the message but do not affect the meaning of the message. *Id.* at 122 (citing Ex. 1007, 12; Ex. 1020, 5). Patent Owner asserts that FIPA97's ":receiver" parameter does not affect the meaning of the FIPA97 "inform" message because "the result of this parameter is only that the message is multicast; i.e., it is 'sent to each agent named in the tuple.'" *Id.* at 124. According to Patent Owner, "the content of the message is unchanged; the only thing that changes is who (as in, recipient) receives the message." *Id.*

The portion of FIPA97 cited by Petitioner is reproduced below.

| **Message Parameter:** | **Meaning:** |
|---|---|
| `:sender` | Denotes the identity of the sender of the message, i.e. the name of the agent of the communicative act. |
| `:receiver` | Denotes the identity of the intended recipient of the message.<br><br>Note that the recipient may be a single agent name, or a tuple of agent names. This corresponds to the action of multicasting the message. Pragmatically, the semantics of this multicast is that the message is sent to each agent named in the tuple, and that the sender intends each of them to be recipient of the CA encoded in the message. For example, if an agent performs an inform act with a tuple of three agents as receiver, it denotes that the sender intends each of these agent to come to believe the content of the message. |

Ex. 1007, 13. Pointing to this disclosure in FIPA97, Petitioner asserts that the "receiver" parameter affects the meaning of the event by affecting "whether the performative communicates the message to a single agent, a selection of agents, or if [the message is] broadcast to every agent." Pet. Reply 62 (citing Ex. 1007, 13). According to Petitioner, "in FIPA97, an event using 'inform' can *mean three or more different things* (i.e., inform (1) one person, (2) a select group of people, (3) everybody) depending on the value of just that parameter." *Id.* at 63.

We agree with Petitioner's argument and disagree with Patent Owner's argument. As shown above in the portion of FIPA97 relied on by Petitioner, FIPA97 describes the "meaning" of the message affected by the ":receiver" parameter (under the column heading "Meaning:") as follows:

> Note that the recipient may be a single agent name, or a tuple of agent names. This corresponds to the action of multicasting the message. Pragmatically, the semantics of this multicast is that the message is sent to each agent named in the tuple, and that the sender *intends* each of them to be recipient of the CA encoded in the message. For example, if an agent performs an inform act with a tuple of three agents as receiver, it denotes that the sender *intends* each of these agent to come to believe the content of the message.

Ex. 1007, 13 (emphases added). We agree with Petitioner this passage describes, under the column heading "Meaning," the meaning of the message modified or affected by the ":receiver" parameter.

Patent Owner argues that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." PO Resp. 124. Patent Owner contends that, in contrast, the solution_limit(N) parameter of the '560 patent "modifies the actual request/communicative act/performative itself—i.e.,

[**ev_post_solve**], because it imposes a modification on the limits of **solutions** presented in response to a request." *Id.* at 125 (citing Ex. 2032 ¶ 262).

We are not persuaded by Patent Owner's argument. First, we disagree with Patent Owner that the FIPA97 ":receiver" parameter changes only "who (as in, recipient) receives the message." As described in FIPA97, the ":receiver" parameter does not merely specify "who receives the message," e.g., agent A as opposed agent B. Rather, as persuasively explained by Petitioner, the ":receiver" parameter affects the qualitative aspect of the message—i.e., whether to inform (1) one agent, (2) a select group of agents, or (3) every known agent. *See* Pet. Reply 63.

In addition, Patent Owner does not explain adequately why the solution_limit(N) parameter of the '560 patent specifying the number of agents to be queried "modifies the actual request/communicative act/performative itself" but the ":receiver" parameter of FIPA97 specifying the number of agents to which to send a message does not. *See* PO Resp. 125. We agree with Petitioner that Patent Owner does not identify "a practical distinction between limiting the number of agents to be queried (solution_limit(N)), and querying a selection of agents (:receiver)." Pet. Reply 63.

Next, Patent Owner contends that FIPA97 does not teach parameters "refin[ing] . . . events," as recited in the claim, because FIPA97's ":receiver" parameter is the same as or similar to the KQML ":receiver" parameter, which does not modify the meaning of a message. PO Resp. 122 (citing Ex. 1007, 12; Ex. 1020, 5). In support of its argument, Patent Owner cites a page from Dr. Finin's presentation slides at an unidentified meeting or class, which compares "KQML tell and FIPA ACL inform." *Id.* at 123 (citing

Ex. 2019, 15; Ex. 2068, 132:6–22.). Patent Owner also cites the testimony from Dr. Finin at his deposition that "the general idea of agent communication language that was embodied in KQML is similar to the one that is embodied in FIPA." *Id.* (citing Ex. 2068, 32:10–17).

Patent Owner, however, does not discuss the disclosure of KQML/Nwana (Ex. 1020) sufficiently (other than pointing to the similarity of the format between the ":receiver" parameter of KQML and FIPA97) or explain adequately why KQML's ":receiver" parameter is similar to the FIPA97 ":receiver" parameter. *See* PO Resp. 122–24. For example, Patent Owner does not explain whether KQML's ":receiver" parameter specifies, similar to FIPA97, that "the recipient may be a single agent name, or a tuple of agent names," that "the message is sent to each agent named in the tuple," and that "the sender *intends* each of them to be recipient of the message." *See id.*; Ex. 1007, 13 (emphasis added). The general statements from Dr. Finin (or a slide purportedly from his unidentified presentation) cited by Patent Owner (PO Resp. 123 (citing Ex. 2019, 15; Ex. 2068, 132:6–22, 32:10–17)) regarding the alleged similarity between KQML and FIPA97 at a general level are simply insufficient to override the specific disclosures in FIPA97 cited by Petitioner regarding the meaning of the message modified or affected by the FIPA97 ":receiver" parameter.

Patent Owner also cites testimony from Petitioner's declarant, Dr. Lieberman, as "confirm[ing]" that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." PO Resp. 124 (citing Ex. 2069, 110:14–111:16, 168:5–12). The cited testimony of Dr. Lieberman, however, discusses FIPA97's messages and multicasting in general (responding to general questions from Patent Owner's counsel) and

does not discuss the specific disclosure in FIPA97 cited by Petitioner regarding the meaning of the message modified or affected by the FIPA97 ":receiver" parameter. *See* Ex. 2069, 108:4–111:16, 168:5–12. Thus, we find the testimony of Dr. Lieberman cited by Patent Owner to be unpersuasive (if not misleading) to "confirm" that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." *See* PO Resp. 124.

Next, Patent Owner cites 23 paragraphs from the Declaration of Dr. Cohen (Ex. 2033) to argue that "FIPA97 does not contain any conversational layer parameters that affect the semantics of FIPA97 messages." PO Resp. 127 (citing Ex. 2033 ¶¶ 70–92). Patent Owner, however, does not discuss Dr. Cohen's testimony in the Patent Owner Response or explain how Dr. Cohen's testimony supports its contention. *See id.* Thus, to the extent Petitioner purports to rely on Dr. Cohen's testimony, this amounts to improper incorporation by reference in violation of 37 C.F.R. § 42.6(a)(3). Accordingly, we decline to consider the cited paragraphs from the Cohen Declaration.[20]

Lastly, Patent Owner contends that the limitation "the parameter lists further refine the one or more events" requires "the parameters of an event (or message) can refine the message or goal itself" (PO Resp. 121) or "change the nature of the communicative act itself" (*id.* at 126). Although it

[20] Nonetheless, we note that Dr. Cohen's testimony appears to dwell in generalities, e.g., citing the works of logicians/philosophers Tarski and Frege (*see* Ex. 2033 ¶¶ 84–85), and discusses tuples and multicasting in general terms (*see id.* ¶¶ 88–92).

is not entirely clear what Patent Owner argues,[21] to the extent Patent Owner argues "refin[ing]" a message or goal requires changing the message or goal itself, we disagree with Patent Owner's argument. As discussed above, in a section titled "Refining Service Requests," the '560 patent describes examples of "parameters" associated with a request or goal that "refine the request's meaning," including the "reply parameter" that specifies whether solutions are to be returned synchronously or asynchronously, and the "cache parameter" that specifies local caching of facts related to the request. *See* Ex. 1001, 16:5–15. These parameters do not appear to change the request itself but, rather, specify how the request should be handled—e.g., synchronous response, local caching, etc. Thus, we are not persuaded by Patent Owner's argument that the claim requires the recited "parameters" "refine the message or goal itself" (PO Resp. 121) or "change the nature of the communicative act itself" (*id.* at 126). Such an interpretation, which "excludes a [disclosed] embodiment from the scope of the claim is rarely, if ever, correct." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) (quoting *Accent Pkg., Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013)) (citing *Phillips*, 415 F.3d at 1312–13).

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that FIPA97 teaches "wherein the parameter lists further refine the one or more events," as recited in claim 1. Based on the complete record and for the reasons explained by Petitioner, we determine that Petitioner has shown sufficiently that FIPA97 teaches "a layer of conversational protocol defined by event

---

[21] As discussed above, Patent Owner does not dispute Petitioner's proposed construction of the term "the parameter lists further refine the one or more events." *See* PO Resp. 29–52.

types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events," as recited in claim 1.

*h. Conclusion for Claim 1*

On the full record now before us, we are persuaded that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests all the limitations of claim 1 and that a person of ordinary skill in the art would have combined the references in the manner asserted in the Petition. We weigh this evidence of obviousness together with Patent Owner's evidence of objective indicia of nonobviousness, *infra* § II.G.12, before reaching our final determination as to patentability of claim 1.

*3. Dependent Claim 20*

Claim 20 depends directly from claim 1 and further recites "wherein the distributed facilitator agent includes a planning component executing within a first computer process and an execution component executing within a second computer process." Ex. 1001, 31:49–53. Petitioner relies on Kiss for teaching these limitations. Pet. 52–57.

Petitioner asserts that each meta-agent in Kiss includes programming that formulates "a dynamic 'solution plan' for the distributed inferencing to be performed" and "allocates tasks to the knowledge agent layer . . . in furtherance of the solution plan." *Id.* at 53 (quoting Ex. 1005, 5:33–36). Petitioner argues that such programming constitutes a "planning component" as claimed because it is a component of the meta-agent that carries out planning. *Id.* (citing Ex. 1050 ¶ 493). Petitioner also asserts that each meta-agent has an "execution component" for executing a plan. *Id.* at 56 (citing Ex. 1005, 2:61–62; Ex. 1050 ¶ 501).

Petitioner argues that a person of ordinary skill in the art would have understood that two meta-agents divided on separate and remote systems have their planning component and executing component likewise distributed. *Id.* at 54–57 (citing Ex. 1050 ¶¶ 494, 501). Specifically, Petitioner contends that a skilled artisan would have understood distributed meta-agents (together part of the claimed "distributed facilitator agent") to be "different instances of the same agent, meaning that they have the same functionality and their planning [and executing] capabilities are distributed, at least across different computer processes." *Id.* at 54; *see id.* at 57. Petitioner argues that a skilled artisan also would have understood that a single meta-agent may be functionally distributed across multiple computer processes. *Id.* at 54 (citing Ex. 1050 ¶ 494).

In response, Patent Owner argues that the disclosures relied on by Petitioner merely establish that Kiss uses a distributed agent approach, and do not show an agent with a planning component within a first computer process and an executing component within a second computer. PO Resp. 105. Patent Owner agrees that two meta-agents on separate systems are different instances of the same agent with the same capabilities. *Id.* (citing Pet. 54; Ex. 2032 ¶ 174). But Patent Owner contends that because each meta-agent has both a planning component and an executing component within the same process, Kiss does not teach separating the two components into separate computer processes for the same agent. *Id.* at 105–06 (citing Ex. 2032 ¶¶ 174–175).

We are not persuaded by Patent Owner's argument that Kiss satisfies the claim language only if one of Kiss's meta-agents itself has planning and executing components within different processes. Claim 20 requires the "distributed facilitator agent" to have a planning component within one

computer process and an executing component within a second computer process. Petitioner contends that two of Kiss's meta-agents on separate and remote systems operate cooperatively as the "distributed facilitator agent" recited in independent claim 1. Pet. 35. This distributed facilitator agent includes a planning component on one meta-agent within a first computer process and an executing component on a second meta-agent within a second computer process, thereby satisfying the claim language. *See id.* at 54–57.

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches a distributed facilitator agent including planning component within a first computer process and an executing component within a second computer process as recited in claim 20.

*4. Dependent Claim 21*

Claim 21 depends directly from claim 20 and further recites "the planning component is one of a plurality of synchronized planning components each executing with separate computer processes, whereby the computer architecture provides a more robust operating environment due to redundancy of the planning component functionality of the distributed facilitator agent." Ex. 1001, 31:54–60. Petitioner contends it would have been obvious to a person of ordinary skill in the art to implement the planning components of Kiss's meta-agents in a "synchronized" fashion to obtain benefits such as "preventing duplicated work, fault-tolerance, version control, etc." and that it was well known to do so at the time of the '560 patent. Pet. 57–58 (citing Ex. 1124, 226; Ex. 1050 ¶ 507). Petitioner also contends that Kiss teaches "redundancy" of planning component functionality because the examples in Kiss show multiple planning

components throughout the distributed facilitator agent, which includes multiple meta-agents. *Id.* at 58 (citing Ex. 1050 ¶ 510). Petitioner further contends that a person of ordinary skill would have understood that this redundancy "provides a more robust operating environment." *Id.* (citing Ex. 1050 ¶¶ 511–512). Petitioner argues that it would have been obvious to implement more planning components to achieve the benefits of a more robust system, such as fault-tolerance, distributed processing, and resource dedication. *Id.* (citing Ex. 1050 ¶ 513).

Patent Owner argues in response that Dr. Lieberman "contradicts himself" by stating that a person of ordinary skill in the art would want to synchronize in order to prevent duplicated work, but that redundancy would have been beneficial for robustness. PO Resp. 106–07. We are persuaded by Petitioner's argument in reply that Dr. Lieberman's testimony is consistent and "makes sense intuitively." Pet. Reply 45. We agree that a system may have synchronized components to prevent duplicative work but at the same time have redundant, back-up components to achieve robustness. *See id.* at 45–46. Patent Owner offers no response to Petitioner in its Sur-reply. *See generally* PO Sur-reply.

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches or suggests the limitations of claim 21.

*5. Independent Claim 26*

Independent claim 26 is directed to a "distributed facilitator agent" and contains many limitations that are the same as or similar to those in independent claim 1. For those limitations, Petitioner refers back to its analysis for claim 1. Pet. 59–61. For the reasons discussed above, notwithstanding Patent Owner's arguments, Petitioner has shown

sufficiently that the combination of Kiss and FIPA97 teaches or suggests those limitations.

Claim 26 additionally requires the facilitating engine to be "operable to parse a service request in order to interpret a compound goal." Ex. 1001, 32:35–36. As set forth in § II.C, a "compound goal" is a single goal expression that specifies multiple sub-goals to be performed. Petitioner provides a detailed explanation and specific citations showing that FIPA ACL allows the expression of multiple sub-goals. Pet. 59–60 (citing Ex. 1007, 15–17, 31, 40, 41, 53, 69, 75, 78). Petitioner also contends FIPA97's Directory Facilitator and Kiss's meta-agent both are facilitators that include internal mechanisms for parsing a service request in order to interpret a compound goal. *Id.* at 60 (citing Ex. 1005, 12:21–14:30; Ex. 1007, 15). Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches a facilitating engine "operable to parse a service request in order to interpret a compound goal," as recited in claim 26.

Patent Owner does not respond specifically to Petitioner's challenge to claim 26 beyond Patent Owner's arguments advanced with respect to claim 1 discussed above. On the full record now before us, we are persuaded that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests all the limitations of claim 26.

*6. Dependent Claim 27*

Claim 27 depends directly from independent claim 26 and further recites "wherein the facilitating engine is capable of modifying the goal satisfaction plan during execution, the modifying initiated by events such as

new agent declarations within the agent registry, decisions made by remote agents, and information provided to the facilitating engine by remote agents." Ex. 1001, 32:52–57. Petitioner asserts that Kiss teaches or suggests this limitation. Pet. 61–63.

First, Petitioner asserts that Kiss teaches a facilitating agent "capable of modifying the goal satisfaction plan during execution" in the form of the internal mechanism of a meta-agent that "is responsible for formulating a dynamic 'solution plan.'" *Id.* at 61 (quoting Ex. 1005, 5:33–36). As Petitioner notes, Kiss's meta-agent is able "to formulate parallel sub-plans and perform iterative and recursive procedures," "begin executing the solution plan even before the plan is complete, with further plan development dependent on the dynamics of intermediate results obtained during the plan execution," and "backtrack[] or replan[] to permit escape during plan execution from dead-end or otherwise unproductive search paths." Ex. 1005, 5:38–46; *see* Pet. 61–62 (citing Ex. 1050 ¶ 563).

Petitioner contends that Kiss further teaches a meta-agent "capable of modifying the goal satisfaction plan" in response to an "event[] such as new agent declarations within the agent registry" because Kiss's solution plan can "adaptively and dynamically synthesize[] problem-specific knowledge interfaces and reasoning procedures as the problem-solving process moves forward." Pet. 62 (quoting Ex. 1005, 2:61–63). This allows "the meta-agent to interface with a 'large number of knowledge sources of different types, in different locations, and veering different domains of expertise.'" *Id.* (quoting Ex. 1005, 2:64–67) (citing Ex. 1005, 12:31–14:29; Ex. 1050 ¶ 566). To the extent Kiss does not explicitly describe such functionality, Petitioner argues that it would have been obvious to modify an agenda in the process of being constructed when a meta-agent periodically consults the agent

registry and determines that a new agent has registered its capabilities. *Id.* at 62–63 (citing Ex. 1050 ¶ 567).

Petitioner has shown sufficiently that Kiss teaches or at least suggests a "facilitating engine capable of modifying the goal satisfaction plan during execution," in response to an event such as a new agent declaration.

Patent Owner does not specifically dispute that Kiss teaches the limitations of claim 27. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches or suggests the limitations of claim 27.

*7. Dependent Claim 28*

Claim 28 depends directly from independent claim 26 and further recites that the agent registry recited in claim 26 includes "a symbolic name, a unique address, data declarations, trigger declarations, task declarations, and process characteristics for each active agent." Ex. 1001, 32:58–61. As set forth in § II.C.3, we construe "process characteristics" as "characteristics of a process for an agent" for this Final Written Decision.

Petitioner relies on a combination of Kiss and FIPA97 for teaching the features recited in claim 28. Pet. 63–65. Petitioner contends that Kiss teaches an agent registry including a "symbolic name," such as "Labor" or "Marketing," for reach registered agent. *Id.* at 63 (citing Ex. 1005, 3:40–43, 12:1–18 (Table 1); Ex. 1050 ¶¶ 570–571). Petitioner contends that Kiss teaches that its agent registry identifies each agent's capabilities and interests and includes a "data declaration" in the form of the "Interests" column. *Id.* (citing Ex. 1005, 3:40–43, 12:1–18 (Table 1)). Because each "Interest" relates to characteristics of a set of data the agent can access, Petitioner asserts it is a "declaration" of the characteristic within the entire

system and is analogous to the "data declaration" in the '560 patent that refers to the type of data an agent can handle. *Id.* at 63–64 (citing Ex. 1001, 17:25–28; Ex. 1050 ¶ 573). Petitioner also contends that Kiss's "Capabilities" column is a "task declaration" that characterizes the tasks each agent is capable of performing. *Id.* at 66 (citing Ex. 1005, 12:1–18; Ex. 1050 ¶¶ 584–585).

Petitioner cites FIPA97 for the remaining agent registry items recited in the claim. Petitioner contends that FIPA97 requires Internet Inter-Orb Operability Protocol (IIOP) as a default method of communication, and that under IIOP each agent has a unique identifier, known as its GUID. Pet. 63 (citing Ex. 1006, 13; Ex. 1050 ¶ 572). For the recited "trigger declaration" for each active agent, Petitioner refers to Part 6 of FIPA97 describing an Audio/Video Entertainment and Broadcasting application. *Id.* at 64 (citing Ex. 1011, 10, 11, 21). Petitioner contends this part of FIPA97 discloses that the Control Agent of a FIPA-AVEB-Request-Notification contract-net, used to get notifications about the status and service of a specific program, will set a trigger with a precondition ("preconditions2") within the GA (Guide Agent, alleged to be an "agent registry"). *Id.* (citing Ex. 1011, 10, 11, 21; Ex. 1007, 46; Ex. 1050 ¶¶ 578–579). According to Petitioner, the GA will then monitor for changes over a given time period ("Deadline") and inform the Control Agent of any changes that conform to the precondition within that period. *Id.* at 64–65 (citing Ex. 1011, 21). Therefore, Petitioner argues, FIPA97 teaches a "trigger declaration" ("preconditions2") set within the "agent registry" ("GA") that relates to the status of "each active agent." *Id.* at 65 (citing Ex. 1050 ¶¶ 580–582).

For the recited "process characteristics" for each active agent, Petitioner contends that FIPA97 describes including various "process

characteristics" in an agent registration. *Id.* For example, Petitioner cites FIPA97's disclosure of an Agent Management Object "fipa-man-df-agent-description" that contains a registry parameter "interaction-protocols" that "[c]haracterises the protocols supported by the agent," which "can include both standardized and/or non-standard protocols." *Id.* (citing Ex. 1006, 33). Citing the testimony of Dr. Lieberman, Petitioner argues that the "protocols" refine how the interactions with a given agent are conducted. *Id.* (citing Ex. 1050 ¶ 586).

In response, Patent Owner argues that Petitioner jumps from Kiss to FIPA97 for some elements of the claimed "agent registry" without explaining why a person of ordinary skill in the art would have been motivated to incorporate various alleged features of FIPA97 into Kiss's agent registry. PO Resp. 133, 135. We agree with Patent Owner. With the support of Dr. Lieberman's testimony, Petitioner asserts generally that in the combination of FIPA97 with Kiss, FIPA97's "administrative functionality and exemplary practices" would be added to Kiss to implement the functionality described in Kiss, "including facilitating agent collaboration, agent registry, and inter-agent messaging." Pet. 27–28, 63 (citing Ex. 1050 ¶¶ 204–206); Pet. Reply 71 (citing Ex. 1050 ¶¶ 210–211). Although Dr. Lieberman provides details of how FIPA97's facilitating agent (i.e., Directory Facilitator) and messaging would be combined with Kiss's teachings, Petitioner and Dr. Lieberman do not explain how or why a person of ordinary skill in the art would have implemented the alleged agent registry functionalities taken from different parts of the FIPA97 specification in Kiss's agent registry. *See* Pet. 27–31; Ex. 1050 ¶¶ 204–206.

Accordingly, based on the complete record, we determine Petitioner does not demonstrate sufficiently that the combination of Kiss and FIPA97 teaches the "agent registry" limitation as recited in claim 28.

*8. Dependent Claims 45 and 46*

Claim 45 depends directly from independent claim 26, and claim depends directly from claim 45. Claim 45 recites substantially the same limitation as claim 20, and claim 46 recites substantially the same limitation as claim 21. *Compare* Ex. 1001, 34:7–17, *with id.* at 31:49–60. Petitioner refers back to its analysis for claims 20 and 21, and Patent Owner advances the same arguments as it does for claims 20 and 21. Pet. 65–66; PO Resp. 104–08. For the same reasons set forth above respect to claims 20 and 21, Petitioner has shown sufficiently that Kiss teaches or suggests the limitations of claims 45 and 46. Accordingly, on the full record now before us, we are persuaded that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests all the limitations of claims 45 and 46.

*9. Independent Claim 47*

Similar to independent claim 26, independent claim 47 is directed to a "facilitator agent" and contains many limitations that are the same as or similar to those in independent claim 1. For those limitations, Petitioner refers back to its analysis for claim 1. Pet. 66–70. For the reasons discussed above, Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests those limitations.[22]

---

[22] Patent Owner points out that for the preamble of claim 47, which recites a "facilitator agent," the Petition refers back to its analysis of the preamble of claim 1, which does not recite a "facilitator agent." PO Resp. 85 (citing Pet. 66). Nonetheless, in its analysis of independent claim 26's preamble, which is similar to claim 47's preamble and recites a "facilitator agent," and

Claim 47 additionally requires the facilitating agent to be "capable of initiating a direct peer to peer communication between a service-requesting agent and a service-providing agent of at least one sub–goal, and said facilitating agent being distinct from service–providing agents." Petitioner contends that the ordinary meaning of "peer to peer communication" is "a communication between agents without an intermediary." Pet. 66 (citing Ex. 1034, 359 (dictionary defining "peer-to-peer communications" as "[i]nteraction between devices that operate on the same communications level on a network based on a layered architecture"); Ex. 1050 ¶ 531).

In the Patent Owner Preliminary Response, Patent Owner argued that the claim term "peer to peer communication" should be construed to require that "devices in the same level of a hierarchy can share information and resources directly without relying on a dedicated central server." *Id.* at 64–65 (citing, e.g., Ex. 2010, 2 (dictionary defining "peer to peer" as "relating to, using, or being a network by which computers operated by individuals can share information and resources directly without relying on a dedicated central server")).

In the Institution Decision, we determined it was unnecessary for us to construe "peer to peer communication" explicitly because Petitioner had shown sufficiently for purposes of that Decision that the prior art teaches the limitation under either party's definition. Inst. Dec. 63. We noted that the dictionary definition provided by Petitioner appears to support Patent

in its analysis of claim 48, which depends from claim 47 and also recites a "facilitator agent," Petitioner refers back to its analysis of the "facilitator agent" in the body of claim 1. *See* Pet. 59, 70. Accordingly, we determine that Petitioner has sufficiently identified where the prior art teaches the "facilitator agent" recited in claim 47.

Owner's proposed construction rather than Petitioner's construction and that neither party construed the term based on its use in the claims, written description, or prosecution history of the '560 patent. *Id.* We encouraged the parties to address the construction of the term "peer to peer communication" during the trial, but neither party did. *Id.*; *see generally* PO Resp.; Pet. Reply.

The term "peer to peer communication" appears in the written description of the '560 patent only in the following sentence referring to Figure 3: "The agents 320 may engage in interagent communication (also called *peer to peer communication*[])." Ex. 1001, 6:33–34. This statement supports Petitioner's construction of the term as "a communication between agents without an intermediary" and does not suggest that communicating peer agents be "in the same level of a hierarchy," as Patent Owner contends. *See* Pet. 66; Prelim. Resp. 64–65. With no other argument from the parties, and notwithstanding the parties' competing dictionary definitions, which are extrinsic evidence, we adopt Petitioner's construction, which is supported by the intrinsic evidence of record (i.e., the written description of the '560 patent).

Petitioner contends that Kiss teaches a facilitating agent "capable of initiating a direct peer to peer communication between a service-requesting agent and a service-providing agent of at least one sub–goal" and "said facilitating agent being distinct from service-providing agents," as recited in claim 47. Pet. 67–68. Kiss discloses that "[e]ach agent in the system includes inter-agent abstract communications facilities with the capability to negotiate with each other, conduct joint planning, and to collaborate in the execution of planned tasks." Ex. 1005, 3:33–36; *see* Pet. 67. Petitioner cites Figure 17 of Kiss (not reproduced herein) as an example showing peer to

peer communication. Pet. 67–68 (citing Ex. 1050 ¶¶ 532–533). In that figure, Petitioner argues, a meta-agent directly makes a service request for information (corresponding to the claimed "sub-goal") to a knowledge agent, which request meets the claimed "peer to peer communication." *Id.* (citing Ex. 1005, Fig. 17); *see* Ex. 1001, 14:11–13. Petitioner also points out that claims 22 and 25 together show that a service-requesting agent making a request via peer to peer communication to a service-providing agent may be a facilitator agent. Pet. 68; *see* Ex. 1001, 32:13–15 (claim 22 reciting "at least one service-requesting agent capable of making a request directly to a service-providing agent as a peer to peer communication"); *id.* at 32:24–25 (claim 25 reciting that "the agent operable to make said peer to peer service request" in claim 22 "is said facilitator agent"). Thus, Petitioner argues, in Kiss's Figure 17, the meta-agent (which is part of the claimed "facilitator agent") is the claimed "service-requesting agent" and the knowledge agent is the claimed "service-providing agent." *See* Pet. 68 (citing Ex. 1005, Fig. 17; Ex. 1050 ¶ 533). The "facilitating agent" (including the meta-agent in Figure 17) is also "distinct from service-providing agents," as required by claim 47.

Alternatively, Petitioner relies on FIPA97 for teaching "peer to peer communication." Pet. 69 (citing Ex. 1007, 24; Ex. 1050 ¶ 534). Specifically, Petitioner cites an example from FIPA97 of communication between two client agents—agent i (a job-shop scheduler) and agent j (a robot). *Id.* (citing Ex. 1007, 24). In the example, agent i is the claimed "service-requesting agent" that requests agent j (the claimed "service-providing agent") to move a box. *Id.* (citing Ex. 1007, 24). FIPA97 explains that "if the agent is able to support direct communication then it is free to use a direct address when registering." Ex. 1006, 13. Thus,

Petitioner argues the communication occurs "directly" and is "peer to peer." Pet. 69 (citing Ex. 1050 ¶ 535).

Patent Owner does not specifically dispute that Kiss or FIPA97 teaches this limitation of claim 47. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss and FIPA97 teach a facilitating agent "capable of initiating a direct peer to peer communication between a service-requesting agent and a service-providing agent of at least one sub–goal, and said facilitating agent being distinct from service–providing agents," as recited in claim 47.

Therefore, on the full record now before us, we are persuaded that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests all the limitations of claim 47.

*10. Dependent Claim 48*

Claim 48 depends directly from claim 47 and further recites "wherein the facilitator agent is functionally distributed across at least two electronic agents." Ex. 1001, 34:41–43. For this limitation, Petitioner refers back to its analysis of claim 1's distributed facilitator agent. Pet. 70. As with the distributed facilitator agent of claim 1, Petitioner cites Kiss's Figure 21 showing two meta-agents distributed over remote computer systems and utilizing two separate meta-agent instances to form a distributed facilitator. *Id.* (citing Ex. 1050 ¶ 682); *see* Ex. 1005, 5:20–64, Fig. 21. Petitioner has shown sufficiently that Kiss's two distributed meta-agents together are part of a facilitator agent functionally distributed across at least two electronic agents (i.e., across the two meta-agents).

Patent Owner does not specifically dispute that Kiss teaches this limitation of claim 48. *See generally* PO Resp. Based on the complete

record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches or suggests the limitations of claim 48.

*11. Dependent Claim 49*

Claim 49 depends directly from claim 48 and further recites "wherein the peer to peer communication is between said distributed facilitator agents." Ex. 1001, 34:44–46. Petitioner contends that Kiss's meta-agents distributed across two electronic agents, satisfying the distributed facilitator agent recited in claim 48, may be in direct peer to peer communication with each other because Kiss teaches that a meta-agent can accept problem inputs from other meta agents. Pet. 71 (citing Ex. 1005, 8:64–64; Ex. 1050 ¶ 684). Petitioner has shown sufficiently that Kiss teaches or suggests two meta-agents (i.e., facilitator agents that are part of the claimed distributed facilitator agent) communicating without an intermediary, thereby satisfying the limitation that "peer to peer communication is between said distributed facilitator agents."

Patent Owner does not specifically dispute that Kiss teaches this limitation of claim 49. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches or suggests the limitations of claim 49.

*12. Objective Indicia of Nonobviousness*

In determining whether the challenged claims would have been obvious as Petitioner alleges, we must also weigh secondary considerations of nonobviousness, such as commercial success, long-felt but unmet need, failure of others, and unexpected results. *KSR,* 550 U.S. at 406. A nexus is required between the merits of the claimed invention and any objective

evidence of nonobviousness if that evidence is to be given substantial weight in reaching a conclusion on obviousness. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983). Evidence of secondary considerations is only significant if there is a nexus with respect to the claimed invention. *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006).

Nexus is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in the determination of nonobviousness. *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). For instance, commercial success is relevant if it flows from the merits of the claimed invention. *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988). The burden of showing nexus is on the patent owner. *In re Huang*, 100 F.3d 135, 139–40 (Fed. Cir. 1996). Objective evidence of nonobviousness also must be commensurate in scope with the claims that the evidence is offered to support. *In re Kulling*, 897 F.2d 1147, 1149 (Fed. Cir. 1990).

Patent Owner contends that objective indicia of nonobviousness confirm the nonobviousness of the ’560 patent. PO Resp 140–63. Patent Owner argues that industry praise for a software application known as “Siri,” “which was first made available for download to iPhone users on Apple, Inc.’s App Store on February 4, 2010,” bears a nexus to the claims of the ’560 patent. *Id.* at 142, 163. Patent Owner argues that the “personal context awareness and service delegation ‘main technical components’ of the Siri application are made possible by the claims of the ’560 Patent.” *Id.* at 154.

Patent Owner asserts that the ’560 patent “was based on SRI International’s development of version 2 of the Open Agent Architecture (‘OAA’).” *Id.* at 153 (citing Ex. 2032, App’x A; Ex. 1001, 23:35–36). For support, Patent Owner relies on Exhibit 2054, an SRI web page, which states, “SRI developed OAA® software, which is designed with intelligent ‘agents’ that track human interactions and work processes to streamline electronic and computer interchange.” *Id.* at 153–54 (quoting Ex. 2054). Patent Owner further asserts that “[a]fter version 2 of OAA was developed, SRI International spun out Siri, Inc. as an SRI venture, where the Siri application was created based on an OAA groundwork.” *Id.* at 154 (citing Ex. 2054 (“OAA laid the groundwork for the DARPA-funded CALO project, from which Siri, the first virtual personal assistant, was born. Siri was spun out into an SRI venture that Apple acquired from SRI.”)). Apple Inc. apparently acquired Siri, Inc. in April 2010, approximately two months after the Siri application’s initial release.[23] *See id.* at 9, 142, 154.

Patent Owner argues that its “evidence of industry praise . . . satisfies the nexus requirement, as it shows praise for the Siri application’s integration of personal context awareness into a service-delegating virtual personal assistant.” *Id.* at 154; *see id.* at 143–54. Patent Owner also argues that “industry journalists recognized that the Siri application filled an unmet need for a true virtual personal assistant.” *Id.* at 159; *see id.* at 159–63.

To establish a nexus between claim 1 of the ’560 patent and the Siri application, Patent Owner provides the chart below. *Id.* at 155–57. Patent Owner relies, in significant part, on the opinion of its declarant,

---

[23] We note for the record that the effective filing date for the ’560 patent is Jan. 5, 1999, approximately ten years prior to the Siri application’s initial release.

Dr. Medvidovic, to establish a nexus between the Siri application and the claims of the ’560 patent. *See* Ex. 2032 ¶¶ 282–290.

| Siri’s Description of Technology Feature | Claim 1 of the ‘560 Patent |
|---|---|
| **Personal Context Awareness**<br>A virtual assistant gives different answers depending on individual preferences and personal context (place, time, history), and if you give it permission, learns more about you so that it can shorten your time-to-task. Information you teach Siri in one domain (e.g. movies) is applied automatically to opportunities rising from other domains. Any personal information you provide Siri is stored in a highly secure, PCI-compliant co-location center, and used only with your explicit permission to accelerate your task completion. | “wherein the plurality of service-providing electronic agents and the distributed facilitator agent communicate using an interagent Communication Language (ICL), wherein the ICL includes:<br>a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events.” |
| **Service Delegation**<br>An assistant can reason about what specific set of resources or services would best be combined to help you | “1. A software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture |

| | |
|---|---|
| accomplish a particular task. Siri's patented service delegation algorithms combine numerous attributes about each service provider, including quality scores, fine-grained ratings for specific capabilities, speed measures, and geographic constraints, to plan and execute an optimized strategy for handling your request. Live data is pulled fresh from source sites and world-changing actions are handled in a transaction-safe manner. For example, in a restaurant selection task, Siri integrates information from many sources (local business directories, geospatial databases, restaurant guides, restaurant review sources, menu sites, online reservation services and the user's own favorites) to show results that meet the user's natural language request. | contemplating a distributed computing system comprising: a plurality of service-providing electronic agents; a distributed facilitator agent functionally distributed across at least two computer processes, the facilitator agent capable of bi-directional communications with the plurality of service-providing electronic agents, the facilitator agent including: an agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the distributed computing environment; and a facilitating engine operable to interpret a service request as a base goal, the facilitating engine further operable for generating a goal satisfaction plan associated with the base goal, wherein the goal satisfaction plan involves: using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and |

| | |
|---|---|
| | using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal; and" |

Patent Owner argues that "the Siri application's integration of personal context awareness is made possible because of the claimed inter-agent language limitations." PO Resp. 157 (citing Ex. 2032 ¶ 288). Patent Owner explains that "[b]y having a layer of conversational protocol that has parameter lists, the ['560 patent] describes how agents can then use the parameters in the parameter lists to provide feedback or advice to agents who directly, or indirectly through the facilitating agent, receive the service request." *Id.* (citing Ex. 1001, 16:15–25). For example, Patent Owner explains that a "requesting agent can utilize such a parameter to provide context on a user's preference to the facilitator agent and/or the tasking agents." *Id.* (citing Ex. 2032 ¶ 290). Patent Owner argues that "[t]his same functionality of being able to include individual preferences, for example, was described by Siri, Inc. as representing personal context awareness." *Id.* at 158 (citing Ex. 2040, 2).

Patent Owner also argues that:

> the Siri application's service delegation corresponds to the claimed dynamic interpretation limitations. Siri, Inc. described the service delegation feature of the Siri application as including "an assistant [that] can reason about what specific set of resources or services would best be combined to help you accomplish a particular task." This is precisely what is claimed in the dynamic interpretation limitations, *e.g.*, "generating a

> goal satisfaction plan associated with the base goal . . . using reasoning . . . to coordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal."

*Id.* (citing Ex. 2032 ¶ 287).

Petitioner argues that Patent Owner's "secondary considerations position rests primarily on an unsubstantiated, conclusory opinion that certain aspects of the ['560 patent] are embodied in the Apple product 'Siri.'" Pet. Reply 76. Petitioner argues that as "Dr. Medvidovic conceded, the evidence he relied on is 'circumstantial,' or a 'suggestion.'" *Id.* (citing Ex. 1129, 147:12–15). Petitioner argues that Dr. Medvidovic "never reviewed the Siri source code, and indeed never even asked to review that source code." *Id.* (citing Ex. 1129, 146:20–147:6, 147:22–148:9). Petitioner argues,

> [t]he failure to review the code is fatal, because [Dr. Medvidovic] further testified that an "agent"—an element in every claim—is a "piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer a clearly identifiable body of code," and that to distinguish an "agent" from any other software he "would have to look inside the code."

*Id.* (quoting Ex. 1129, 9:14–11:8).

Petitioner faults Patent Owner for "not seek[ing] that code through a motion for additional discovery or other means, [or] seek[ing] any other objective evidence (such as specifications) to support its assertions." *Id.* at 77. Petitioner also faults Patent Owner for not seeking the testimony of Mr. Adam Cheyer, one of the named co-inventor's on the '560 patent and a co-founder of Siri, Inc. *Id.*; *see* PO Resp. 142. During the oral hearing in this proceeding, counsel for Patent Owner was asked about this potential source of evidence:

JUDGE TROCK: Counsel, this is Judge Trock again.

Do you have any evidence from Mr. Cheyer that this Siri version that you're discussing right now incorporated the claim limitations of the '115 patent?

MS. ABDULLAH: Your Honor, we do not have any direct evidence from Mr. Cheyer. And the reason is because he was never deposed in this proceeding and he is also not a consultant or anybody that's working with IPA at the moment. I know --

JUDGE TROCK: Wasn't he deposed -- sorry. Wasn't he deposed in the Google proceeding?

MS. ABDULLAH: He was, your Honor. And that was pursuant to a subpoena that we had to get permission to serve from the Board because he refused to simply cooperate with us voluntarily.

JUDGE TROCK: Was there a reason why you didn't approach the Board in this case for a subpoena?

MS. ABDULLAH: Your Honor, because we don't believe that his testimony is as probative as the expert testimony that we presented drawing the direct connection as well as the actual industry praise and long-felt need evidence that we --

JUDGE TROCK: But wouldn't he be a witness with personal knowledge of whether or not that original Siri version incorporated the claim

limitations of the '115 patent?

MS. ABDULLAH: Your Honor, respectfully, I believe that that was not -- that would not be a question of personal knowledge but rather of expert testimony. And also, your Honor, I would note that I don't believe that we would have the requisite showing under the Garmin factors that he would be able to testify to those aspects.

JUDGE TROCK: But he is the inventor, right? You've told us that.

MS. ABDULLAH: Yes, your Honor, he is the inventor.

JUDGE TROCK: All right. So he might be a person -- a witness with personal knowledge; isn't that right?

MS. ABDULLAH: Absolutely. And were this a district court case, you know, I'm sure we would have pursued his deposition. I'm sure Microsoft would have as well. But given the high burden for us to obtain additional discovery, your Honor, we determined that the probative value of his testimony was not such that it would meet the Garmin factors here.

JUDGE TROCK: But you did pursue that in the Google case though?

MS. ABDULLAH: Your Honor, the Google case was a different issue. The question there had to do with authorship of a prior art reference that Mr. Cheyer was an author of. And it had to do with

> whether that could be considered the work of another versus the inventor. So inventorship was front and center in the Google proceedings where it is not here. Here this is a 103 analysis for which, you know, obviously I can't pretend to say what the Board would have done. But I think the evidence that we have, that we have been able to present demonstrates that link better than Mr. Cheyer's testimony would be able to.

Tr. 114:12–116:26.

Petitioner also points to evidence that potentially undermines a nexus between the challenged claims of the ’560 patent and the Siri application. For example, Petitioner argues that “Adam Cheyer testified that ‘Siri’ did not implement the agent registry functionality described in the [’115 and ’560 patents].” Pet. Reply 77–78 (citing Ex. 2034, 46:12–47:5).

Petitioner also argues that Patent Owner’s “evidence credits the CALO project with being the progenitor of the ideas that led to Siri—not any version of OAA.” *Id.* at 78 (citing Ex. 2042, 1 (“Siri traces its origins to a military-funded artificial-intelligence project called CALO”); Ex. 2044, 1; Ex. 2047, 2; Ex. 2054, 1; Ex. 2001, 2). “Nor is there any evidence in the record,” Petitioner argues, “that OAA was ultimately utilized in SRI’s CALO project other than that the original OAA (*i.e.,* the version first created in 1994 prior to the ’560 Patent work) laid ‘groundwork’ for what would ultimately become CALO.” *Id.* (citing Ex. 2054). Petitioner argues that “substantial evidence shows that a later agent system named ‘SPARK’ (SRI Procedural Agent Realization Kit) was used as the basis of CALO,” but that Patent Owner “ignores this intervening SPARK system and makes no

attempt to show it practices the claims, nor does it meaningfully address the CALO project." *Id.* (citing Ex. 1136 § 7).

Petitioner argues that Patent Owner "failed to provide evidence 'that the industry praised a claimed invention or a product that embodies the patent claims.'" *Id.* at 78–79 (quoting *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016)) (emphasis omitted). In particular, Petitioner argues, Patent Owner "failed to 'establish that the evidence relied upon traces its basis to a novel element in the claim and not to something in the prior art.'" *Id.* at 79 (quoting *BioMarin Pharm. Inc. v. Genzyme Therapeutic Prods. LP*, IPR2013-00537, Paper 79 at 22 (PTAB Feb. 23, 2015)) (emphasis omitted).

"Furthermore," Petitioner argues, Patent Owner "has provided no showing that the Siri App 'embodies the claimed features and is co-extensive with them,' and accordingly can gain no presumption from any Siri success." *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)) (emphasis omitted). "Even assuming portions of Siri embodied the claims," Petitioner argues, "the record is undisputed that Siri provides significant functionality well beyond anything covered by the claims—voice recognition, for example." *Id.* at 79–80.

Petitioner further argues "the table provided by [Patent Owner] merely lists unrelated claim language and 'examples' of 'personal context awareness' with no further analysis." *Id.* at 80. "For example," Petitioner argues, Patent Owner "provides no explanation about how the alleged 'Personal Context Awareness' feature in Siri practices 'a layer of conversational protocol.'" *Id.* (emphasis omitted). Moreover, Petitioner argues, "despite claiming that 'the Siri application's integration of personal context awareness is made possible because of the claimed inter-agent

language limitations,' [Patent Owner] provides no evidence." *Id.* at 81. Rather, Petitioner continues, Patent Owner "cites only to a single paragraph of Dr. Medvidovic's declaration, which is itself bare *ipse dixit* and further undermined by his failure to examine the source code or any other descriptive technical materials for Siri." *Id.* (citing Ex. 2032 ¶ 288).

Petitioner argues that Patent Owner's evidence that Siri embodies the ICL limitations of claim 1 "is no better." *Id.* at 81–82 (citing PO Resp. 158). Petitioner argues Patent Owner:

> does not discuss the actual limitations of claim 1 nor explain how giving different answers depending on individual preferences embodies the claims. For example, [Patent Owner] does not even attempt to articulate how Siri has a conversational layer, or event types, or how those event types are refined by parameters. Nor does [Patent Owner] address how Siri embodies the claimed agent registry limitation, particularly when the testimony of the inventor Mr. Cheyer indicates that it does not.

*Id.* at 82 (citing Ex. 2034, 46:12–47:5).

Petitioner also argues that Dr. Medvidovic's testimony should be given no weight. *Id.* Petitioner argues that:

> Dr. Medvidovic admitted that he would be unable to determine whether a piece of software was an "agent" without examining the source code for that software, and further admitted that he had not reviewed the Siri source code nor ever asked to review such source code. Yet, Dr. Medvidovic opines at length that Siri must embody the claims of the ['560 patent] because, for example, "personal context awareness and service delegations are made possible by the functionality claimed in the independent claims of the ['560 patent]"—an opinion without any evidentiary support. Indeed, by Dr. Medvidovic's own admission, he lacks the necessary personal knowledge to opine on the architecture of Siri.

*Id.* (quoting Ex. 2032 ¶ 286) (citing Ex. 1129, 11:9–16).

We agree with Petitioner that Patent Owner does not provide persuasive evidence that the Siri application is reasonably commensurate with the scope of the challenged claims. Patent Owner's cited evidence attempting to tie the Siri application to the limitations of claim 1 relies substantially on the opinion testimony of Dr. Medvidovic (Ex. 2032) and a web.archive.org Internet page (Ex. 2040) Patent Owner identifies as "Siri, Inc., Technology – "About Siri – Your Virtual Personal Assistant." *See* PO Resp. 155–57 (citing Ex. 2032 ¶¶ 282–286, 288; Ex. 2040, 1–2).

We note at the outset that Dr. Medvidovic's opinion does not rely on an examination of the Siri application's source code. During his deposition, Dr. Medvidovic testified as follows:

> [Q] Let me ask you, have you ever reviewed the Siri source code?
>
> [A] I have not.
>
> [Q] So you don't know the details of how Siri is implemented?
>
> [A] Not beyond what I'm stating in the declaration as my sources of information that I'm drawing on.

Ex. 1129, 146:10–17. This is significant because Dr. Medvidovic testified at his deposition that an "agent"—an element in every claim—is a "piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer a clearly identifiable body of code," and that "if there is no accompanying specification language, then we would have to look inside the code [to determine] what kinds of facilities the agent provides." *See id.* at 9:13–11:8. Instead, Dr. Medvidovic testified, the evidence he relied upon to form his opinion is "circumstantial," or a "suggestion." *Id.* at 147:7–148:9.

In Section XII.B of his declaration, "Nexus of Industry Praise to the Independent Claims of the '560 Patent," Dr. Medvidovic cites to Exhibit 2040 as support for his understanding of how the Siri application works. *See e.g.*, Ex. 2032 ¶¶ 281–282, 284, 292, 295.

Exhibit 2040 describes "Siri" as:

> the first mainstream consumer application of a Virtual Personal Assistant. Siri is an intelligent software agent designed to have a back-and-forth conversational interaction with you as it helps you get tasks done. The three main technical components behind Siri's differentiation correspond to the essential qualities of an assistant: a conversational interface, personal context awareness and service delegation.

Ex. 2040, 1.

In his declaration, Dr. Medvidovic discusses the "personal context awareness" and "service delegation" aspects of Siri in some detail. *See, e.g.*, Ex. 2032 ¶¶ 284–286. Dr. Medvidovic, however, only mentions Siri's "conversational interface" in passing, even though Exhibit 2040 describes Siri as an intelligent software agent "designed to have a back-and-forth conversational interaction with you as it helps you get tasks done," and lists Siri's "conversational interface" as the first of Siri's "three main technical components." *See* Ex. 2032 ¶ 281; Ex. 2040, 1.

In his declaration, Dr. Medvidovic attempts to link the Siri application and the limitations of the independent claims of the '560 patent. Dr. Medvidovic does this by first separating the limitations of the independent claims of the '560 patent into two categories, an "Inter-agent Communication Layer" (ICL) and "Service Request Planning and Execution." *See* Ex. 2032 ¶ 287. Dr. Medvidovic then states that "[i]t is my opinion that the Siri application's integration of personal context awareness is made possible because of the claimed ICL limitations above." *Id.* ¶ 288.

Dr. Medvidovic explains that "within the conversational protocol layer of the ICL, there are further claimed 'parameter lists' that may 'further refine the one or more events.'" *Id.* ¶ 289. Dr. Medvidovic concludes that "[t]he claimed parameter lists are what allows the Siri application to provide 'different answers' depending on the context, as they are able to refine the meaning of a service request." *Id.* ¶ 292. Dr. Medvidovic, however, provides no citation or further support for this conclusion, nor does he point to any evidence to show that the Siri application utilizes the claimed parameter lists. *See id.*

In his declaration, Dr. Medvidovic also states that "[i]t is further my opinion that the Siri application's integration of service delegation is made possible because of the claimed service request planning and execution claim limitations." *Id.* ¶ 293. Dr. Medvidovic attempts to support this opinion by comparing the language of claim of the '560 patent to language used in Exhibit 2040 to describe the service delegation feature of the Siri application. *Id.* ¶ 295. The claim language he quotes, however, does not appear in claim 1 (or any claim) of the '560 patent. *See id.* (erroneously asserting that claim 1 recites "a suitable <u>delegation</u> of sub-goal requests to <u>best complete</u> the requested service request by using <u>reasoning</u>"). Thus, Dr. Medvidovic's testimony on this point is unpersuasive with respect to the '560 patent.

Petitioner also points out, and we agree, that there is evidence of record that credits the CALO project with being the progenitor of the ideas that led to Siri. *See, e.g.*, Ex. 2042, 1 ("Siri traces its origins to a military-funded artificial-intelligence project called CALO"); *see also* Ex. 2044, 1; Ex. 2047, 2; Ex. 2054, 1; Ex. 2001, 2. Opus Research explains that "Siri is set apart because it applies the depth of knowledge its founders and software

specialists have built at SRI and elsewhere in creating a 'cognitive assistant that learns and organizes' (CALO)." Ex. 2044, 1. Petitioner points out that there is also evidence of record that indicates a later agent system named "SPARK" was used as the basis of CALO. *See* Pet. Reply 78 (citing Ex. 1136 § 7). The SPARK-based Personal Assistant is described as follows:

> SPARK provides general-purpose agent technology for a range of domains that require reactive task execution. To date, the driving application for SPARK has been the development of an intelligent personal assistant for a high-level knowledge worker. This assistant, called CALO, will be able to perform routine tasks on behalf of its user (e.g., arrange meetings, complete online forms, file email), as well as undertake open-ended processes (e.g., purchasing a computer online), and anticipate future needs of its user.

Ex. 1136 § 7. This evidence, however, does not appear to have been considered or addressed by Dr. Medvidovic. *See* Ex. 2032 ¶¶ 271–295.

We are mindful that objective evidence of nonobviousness need only be "reasonably commensurate with the scope of the claims." *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013). We also bear in mind that "[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process—the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco*, 851 F.2d at 1392).

Here, Patent Owner relies on industry praise for the Siri application and evidence of an unmet need to establish a nexus between the Siri application and the claimed invention. However, we are concerned that

Patent Owner and its declarant, Dr. Medvidovic, pay little attention to one of the "three main technical components behind Siri's differentiation," the "conversational interface," when evaluating the proffered industry praise. *See* Ex. 2040, 1.

Petitioner argues, and we agree, that "[e]ven assuming portions of Siri embodied the claims, the record is undisputed that Siri provides significant functionality well beyond anything covered by the claims—voice recognition, for example." Pet. Reply 86. The impression made by Siri's conversational interface on reviewers is notable. For example, MIT Technology Review explains that with Siri, "[u]sers can type or speak commands in casual sentences, and the software deciphers their intent from the context." Ex. 2042, 1. A reviewer in Opus Research reports: "I've had [Siri] for a couple of days and here are my initial reactions. My overall experience has been quite positive. The quality of voice recognition (powered by the same 'engine' that supports Dragon Dictation and Dragon Search on the iPhone) is quite good." Ex. 2044, 1. Fast Company.Com reports, "Siri, which launches today as a free iPhone app, is a virtual personal assistant that amazingly resembles . . . an actual personal assistant. It understands plain English commands, which can be spoken or typed (e.g. 'Get me tickets to that Matt Damon movie')." Ex. 2045, 2.

Further, The Chronicle of Higher Education explains that Siri "takes a multi-step search process and turns it into one, simple, voice-driven request." Ex. 2046, 2. A USA Today reviewer reported that "[t]here were occasional mistakes in speech recognition, but the overall accuracy [of Siri] was impressive, at least when I spoke slowly and clearly in a quiet environment." Ex. 2047, 2. Spatial Computing Strategy & Research reports that, with Siri, "You ask it to do stuff like 'find me a pizza place near me' or

'tell me the weather in Chicago this weekend,' [w]ith your voice or by typing commands." Ex. 2048, 2. Search Engine Land explains that Siri is "intended to enable you to do more with your voice and your phone in fewer clicks or moves." Ex. 1050, 1. It further explains that "one can speak to Siri in a more natural way. Rather than speaking like a robot and saying 'Open Table' to minimize error, you can say something more elaborate and 'conversational' such as, 'I'd like a reservation tonight around 7:30 at Le Cheval.'" *Id.* at 2.

Each of these reported examples indicate that the reviews Patent Owner relies upon to demonstrate industry praise for the Siri application considered Siri's conversational interface to be a significant part of its functionality. Unfortunately, Patent Owner and Dr. Medvidovic give Siri's conversational functionality little consideration when evaluating the reasons for the "industry praise" used to try and establish a nexus between the Siri application and the claimed invention. *See, e.g.*, Ex. 2032 ¶ 276. Even if the Siri application incorporated some of the functionality of the claimed invention, the evidence of record relied on by Patent Owner shows that the Siri application, and its attendant "industry praise," is not coextensive with the patented invention. Patent Owner does not argue that the Siri application's "conversational interface" is claimed by the '560 patent.

For these reasons, we are not persuaded that Patent Owner's evidence of industry praise for the Siri application, and evidence of an unresolved need, establishes a sufficient nexus between the Siri application and the challenged claims of the '560 patent. If anything, the evidence of record establishes only a weak or vague connection between the Siri application and the claimed invention. Accordingly, we determine that Patent Owner's

secondary considerations evidence does not weigh in favor of nonbviousness.

*13. Conclusion*

Having considered the *Graham* factors, including the scope and content of the prior art, the differences between the prior art and the challenged claims, and the evidence of secondary considerations, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 20, 21, 26, 27, and 45–49 of the ’560 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss and FIPA97, but has not shown by a preponderance of the evidence that claim 28 is unpatentable as obvious over the combined teachings of Kiss and FIPA97.

*H. Asserted Obviousness over Kiss, FIPA97, and Cohen*

Petitioner adds the teachings of Cohen (Ex. 1014) to the basic combination of Kiss and FIPA97 in an asserted ground of obviousness as to dependent claims 20, 21, and 29–35. Pet. 72–84. Generally, Petitioner cites Cohen as teaching additional claimed features of the facilitator agent. *Id.*

We have reviewed the parties’ arguments in the Petition, Patent Owner Response, Reply, and Sur-reply, as well as the relevant evidence discussed in those papers and other record papers, including the declarations of Dr. Lieberman and Dr. Medvidovic. For the reasons that follow, we determine Petitioner has shown by a preponderance of the evidence that claims 20, 21, and 29–35 are unpatentable as obvious over the combined teachings of Kiss, FIPA97, and Cohen.

*1. Cohen (Ex. 1014)*

Cohen describes SRI International’s Open Agent Architecture (OAA), which is mentioned in the ’560 patent as a starting point for the subject matter described in the patent. *See* Ex. 1014, 1; Ex. 1001, 4:40–51. Cohen

describes an "open agent architecture and accompanying user interface for networked desktop and handheld machines." Ex. 1014, 1 (Abstract). Cohen's Open Agent Architecture "is a blackboard-based framework allowing individual software 'client' agents to communicate by means of goals posted on a blackboard controlled by a 'Server' process." *Id.* at 2. "The Server is responsible both for storing data that is global to the agents, for identifying agents that can achieve various goals, and for scheduling and maintaining the flow of communication during distributed computation." *Id.*

Cohen's distributed blackboard architecture is depicted in Figure 1 below.




Figure 1: Hierarchy of Blackboard Servers

*Id.* at 3. Cohen's Figure 1, above, shows "an architecture in which a server may itself be a client in a hierarchy of servers." *Id.* at 2. If none of the server's "client agents can solve a particular goal, this goal may be passed further along in the hierarchy." *Id.*

Petitioner cites evidence showing that, among other things, Cohen was published in 1994 in conjunction with the Association for the Advancement of Artificial Intelligence Spring Symposia that took place in March 1994, was available to conference attendees in March 1994, was received by libraries in 1997 and 1998, and was heavily cited in patents and academic papers between 1994 and 1998. Pet. 26 (citing, e.g., Ex. 1041, i; Ex. 1045; Ex. 1050 ¶¶ 170–173, 175–179). Patent Owner does not dispute Petitioner's contention that Cohen is available as prior art. *See* PO Resp. 57–58. In view of the evidence submitted by Petitioner, we find that Petitioner has demonstrated that Cohen qualifies as prior art to the '560 patent at least under 35 U.S.C. § 102(a).

*2. Proposed Combination of Kiss, FIPA97, and Cohen*

Petitioner argues that Cohen discloses facilitator agent functionality relating to its blackboard server that, when combined with the teachings of Kiss and FIPA97, satisfies the limitations of claims 20, 21, and 29–35. Pet. 72. In Petitioner's proposed combination, Cohen's blackboard functionality would be added to the meta-agent/agent registry in the combined Kiss/FIPA97 system. *Id.*

Petitioner argues that Cohen is analogous art to Kiss, FIPA97, and the '560 patent because it describes the same OAA architecture as the '560 patent. *Id.* (citing Ex. 1014, 1; Ex. 1050 ¶¶ 207–208, 331–332). The combination, Petitioner argues,

> would have been the arrangement of old elements (i.e., Blackboard server functionality of Cohen, the functionality of FIPA97, and the system of Kiss) with each performing the same function it had been known to perform (e.g., methods of complex trigger implementation (Cohen); implementing communication between distributed agents (FIPA97); distributed agents conducting cooperative task competition and

> problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate and set triggers to conduct cooperative task completion and problem solving).

*Id.* at 73 (citing Ex. 1050 ¶ 333). Petitioner also argues a

> Skilled Artisan would have been motivated to combine Cohen with Kiss/FIPA97 in this manner because Cohen encourages the incorporation of components from other systems and seeks to 'support distributed execution of a user's requests,' as does FIPA97 and Kiss, which would have . . . led a Skilled Artisan to consider these agents-based technologies in combination. Moreover, the Cohen Blackboard server operates as a 'facilitator agent,' as does the meta-agent/agent registry of Kiss/FIPA97, providing additional motivation to combine such similar functionality of these systems in order to achieve the benefits of each.

*Id.* (citing Ex. 1014, 1, 2; Ex. 1005, 3:1–4, 12:21–14:30, Figs. 8–20; Ex. 1006, 6–7; Ex. 1007, vii; Ex. 1050 ¶¶ 328, 334, 589). Petitioner further argues that Cohen discloses several agent characteristics that would have motivated a person of ordinary skill in the art to adopt Cohen's teachings, including delegation capabilities, data-directed execution, communication, reasoning, and planning. *Id.* at 73–74 (citing Ex. 1014, 1).

With respect to the reason a person of ordinary skill in the art would have combined the teachings of Cohen with those of Kiss and FIPA97, Patent Owner argues only that Dr. Lieberman's annotated figures showing that Cohen's blackboard functionality would be added to Kiss's meta-agent demonstrate hindsight bias. *See* PO Resp. 98–99. We disagree with Patent Owner on this point for essentially the same reasons discussed above with respect to the combination of Kiss and FIPA97. *See* § II.G.1. Petitioner provides persuasive evidence that a person of ordinary skill in the art would have had reason to incorporate aspects of Cohen's blackboard server into

Kiss's meta-agent as part of a "facilitator agent" and apply Cohen's agent characteristics to agents in the combined system. *See, e.g.*, Pet. 72–74; Ex. 1050 ¶¶ 328–334.

For these reasons, we find that Petitioner has articulated sufficient reasoning with rational underpinning for why a person of ordinary skill in the art at the time of the invention would have combined the teachings of Kiss, FIPA97, and Cohen in the manner proffered by Petitioner.

*3. Claim 20*

As noted previously, claim 20 depends directly from claim 1 and further recites "wherein the distributed facilitator agent includes a planning component executing within a first computer process and an execution component executing within a second computer process." Ex. 1001, 31:49–53. Petitioner asserts that Cohen teaches the additionally recited limitations of claim 20. *Id.* at 74–76.

In Petitioner's proposed combination of Cohen with Kiss and FIPA97, the functionality of Cohen's blackboard servers is combined with that of Kiss's meta-agents, so that Cohen's blackboards and Kiss's meta-agents form part of the claimed "distributed facilitator agent." *See* Pet. 73. Petitioner asserts that in Cohen, each system contains "one blackboard 'server' process, and many client agents," which may execute on different host machines. *Id.* at 75 (citing Ex. 1014, 2). When a server becomes a "client in a hierarchy of servers," Petitioner contends that the server would be able to "execute on different host machines." *Id.* (citing Ex. 1014, 2). Because of their independence and distributed nature, Petitioner asserts that a person of ordinary skill in the art would have considered each blackboard server to be a separate computer process. *Id.* (citing Ex. 1050 ¶ 498).

With reference to Figure 1 reproduced above, Cohen describes an example using its distributed blackboard architecture in which a first blackboard (BB1) determines that none of its child agents has the requisite capabilities to achieve a requested goal, so it propagates the goal to a more senior blackboard (BB4) in the hierarchy. Ex. 1014, 2. Petitioner contends that in this example, BB1 (i.e., part of the claimed "distributed facilitator agent") is executing a planning component in BB1's computer process (i.e., "within a first computer process") while the planning component of BB4 is executing within BB4's computer process. Pet. 75 (citing Ex. 1050 ¶ 499).

Cohen's example continues with BB4 propagating the goal up to BB5, which passes the goal down through the hierarchy to BB6, which passes it to BB9, a blackboard that can execute the problem. *Id.* at 76 (citing Ex. 1014, 2; Ex. 1050 ¶ 503). At this point, Petitioner contends, the execution component of BB9, which also is part of the distributed facilitator agent in the combination of Kiss, FIPA97, and Cohen, is executed in BB9's computer process (i.e., "within a second process"). *Id.* (citing Ex. 1014, 2; Ex. 1050 ¶ 504).

Patent Owner argues that Cohen's "blackboard server is not the claimed 'facilitator agent.'" PO Resp. 107. As discussed above, however, Petitioner has shown sufficiently that a person of ordinary skill in the art would have combined Cohen's blackboard functionality with that of Kiss's meta-agents to form part of the claimed distributed facilitator agent. Patent Owner also presents arguments similar to those made for claim 20 with respect to the combination of Kiss and FIPA97. *Id.* As discussed previously in § II.G.3, we are not persuaded by those arguments.

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that Cohen, in combination

with Kiss and FIPA97, teaches a distributed facilitator agent including a planning component within a first computer process and an executing component within a second computer process as recited in claim 20.

*4. Claim 21*

As noted previously, claim 21 depends directly from claim 20 and further recites "the planning component is one of a plurality of synchronized planning components each executing with separate computer processes, whereby the computer architecture provides a more robust operating environment due to redundancy of the planning component functionality of the distributed facilitator agent." Ex. 1001, 31:54–60. Similar to its arguments with respect to the combination of Kiss and FIPA97 alone, Petitioner contends it would have been obvious to a person of ordinary skill in the art to implement the planning components of Cohen's blackboards in a "synchronized" fashion to obtain benefits such as "preventing duplicated work, fault-tolerance, version control, etc." and that it was well known to do so at the time of the '560 patent. Pet. 77 (citing Ex. 1124, 226; Ex. 1050 ¶ 507). Petitioner also contends that Cohen teaches "redundancy" of planning component functionality because Cohen's examples show multiple planning components throughout the distributed facilitator agent, which includes multiple blackboards. *Id.* (citing Ex. 1050 ¶ 510). Petitioner further contends that a person of ordinary skill would have understood that this redundancy "provides a more robust operating environment." *Id.* (citing Ex. 1050 ¶ 511). Cohen explains, for example, that the distributed blackboard "should support distributed execution of a user's requests, interoperability of multiple application subsystems, addition of new agents, and incorporation of existing applications." *Id.* (quoting Ex. 1014, 1). Therefore, Petitioner reasons, by creating a multi-blackboard system Cohen

allows such interoperability and distributed execution of a user's request, i.e., the system becomes more "robust." *Id.* at 78 (citing Ex. 1050 ¶ 511).

Patent Owner also presents arguments similar to those made for claim 21 with respect to the combination of Kiss and FIPA97. *Id.* As discussed previously in § II.G.4, we are not persuaded by those arguments.

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that Cohen, in combination with Kiss and FIPA97, teaches or suggests the limitations of claim 21.

*5. Claims 29–31 and 34*

Claim 29 depends directly from independent claim 26 and further recites "wherein the facilitating engine is operable to install a trigger mechanism requesting that a certain action be taken when a certain set of conditions are met." Ex. 1001, 32:62–65. Claims 30, 31, and 34 each depend directly from claim 29 and further require the "trigger mechanism" to be "a communication trigger that monitors communication events and performs the certain action when a certain communication event occurs" (claim 30), "a data trigger that monitors a state of a data repository and performs the certain action when a certain data state is obtained" (claim 31), and "a task trigger having a set of conditions" (claim 34). *Id.* at 32:66–33:6, 33:11–13.

Petitioner contends that Cohen teaches these limitations. For claim 29, Petitioner cites Cohen's example scenario describing the handling of a conditional request ("When mail arrives for me about a security break, get it to me."). Pet. 78–80 (citing Ex. 1014, 4). Petitioner asserts that when processing the request, Cohen's blackboard server, with analogous functionality to a facilitator agent, "determines that a trigger should be installed on the mail agent," and thus is "operable to install a trigger

mechanism" as recited in claim 29. *Id.* at 78 (citing Ex. 1014, Fig. 2; Ex. 1050 ¶ 590). The request will cause the action of informing the user (i.e., a "certain action") when "a message matching the requested topic has arrived" (i.e., "a certain set of conditions"). *Id.* at 79 (citing Ex. 1014, 4). Once the trigger mechanism determines a matching message has been received, it will take several actions (shown in Figure 2) and eventually will "read the message to the user" (a "certain action"). *Id.* (citing Ex. 1014, 4, Fig. 2). Petitioner contends that the example contains three conditions (i.e., "mail," "arrives," and "about a security break"), which is a "set of conditions" as claimed. *Id.* at 79–80 (citing Ex. 1014, 4; Ex. 1050 ¶ 591).

Petitioner argues that in Cohen's example, the "trigger mechanism" is a "communication trigger," as recited in claim 30, because it monitors a channel of communication for a specific conforming message." *Id.* at 80 (citing Ex. 1014, 4). Likewise, Petitioner argues, email messages are a "certain communication event" as claimed. *Id.* (citing Ex. 1014, 4). Cohen's mail agent is capable of "monitor[ing] incoming electronic messages" (i.e., "communication events") to determine if a message matching the requested topic has arrived, after which it will inform the user (i.e., "perform[] the certain action") when a message matching the set of conditions (i.e., a "certain communication event") occurs. *Id.* (citing Ex. 1014, 4; Ex. 1050 ¶ 593).

Petitioner argues that in Cohen's example, the "trigger mechanism" is a "data trigger," as recited in claim 31, that monitors for new entries (i.e., "a certain data state is obtained") to a mail database (i.e., a "data repository"), and new entries concerning a security break trigger a notification to the user (i.e., "a certain action"). *Id.* at 80–81 (citing Ex. 1014, 4).

Petitioner argues that in Cohen's example, the "trigger mechanism" is a "task trigger," as recited in claim 34, that monitors for email messages containing specific content (i.e., about a security break) and informs the user when such an email is received. *Id.* at 83 (citing Ex. 1014, 4). As in claim 29, the example trigger contains a "set of conditions" as claimed. *Id.* (citing Ex. 1014, 3; Ex. 1050 ¶ 606).

Patent Owner does not specifically dispute that Cohen teaches these limitations. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Cohen teaches the limitations of claims 29–31 and 34.

*6. Claims 32 and 33*

Claims 32 and 33 depend directly from claim 31 and further require the "data depository" to be "local to the facilitator agent" and "remote from the facilitator agent," respectively. Ex. 1001, 33:7–10. Petitioner asserts that Cohen does not explicitly state whether the mail database in Cohen's example is stored locally (i.e., on the same machine) or remotely (on a different machine). Pet. 81–82. Petitioner points to Kiss as disclosing a meta-agent (i.e., facilitator agent) stored locally with a knowledge module or stored remotely from a knowledge module. *Id.* (citing Ex. 1005, 6:55–61, Fig. 21). Petitioner contends it would have been obvious to place the database hosting the functionality of Cohen's blackboard server in the knowledge module locally stored with Kiss's meta-agent because, at least in some circumstances, local storage would have used fewer network resources than remote storage, which would have been accessed via network communications. *Id.* at 81 (citing Ex. 1050 ¶ 599). Petitioner contends it would have been obvious to use a remote database because, at least in some

circumstances, distributed processing systems can provide advantages such as flexibility, fault tolerance, and security. *Id.* at 82 (citing Ex. 1050 ¶ 602). Moreover, Petitioner contends, it would have been obvious to try both local and remote storage because those are the only two possibilities. *Id.* at 81–82 (citing Ex. 1050 ¶ 599).

Patent Owner does not specifically dispute that Cohen would have suggested these limitations to a person of ordinary skill in the art. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Cohen teaches or suggests the limitations of claims 32 and 33.

*7. Claim 35*

Claim 35 depends directly from independent claim 26 and further recites "the facilitator agent further including a global database accessible to at least one of the service-providing electronic agents." Ex. 1001, 33:18–23. Petitioner contends that Cohen teaches a database agent (i.e., a "global database") linked to a blackboard server (part of the facilitator agent in the combined Kiss/FIPA97/Cohen system). Pet. 83 (citing Ex. 1014, 3, 5, Fig. 2; Ex. 1050 ¶ 618). Because the blackboard server updates and manages the database agent, Petitioner contends that the blackboard server includes the database agent for purposes of claim 35. *Id.* at 83–84 (citing Ex. 1050 ¶¶ 613–614). Petitioner also contends that the database agent is a "global database" because it contains directory information for the entire system that can be used by agents to facilitate task completion. *Id.* at 84 (citing Ex. 1014, 3–6; Ex. 1050 ¶ 615). Petitioner contends the database also is "accessible to at least one of the service-providing agents," e.g., a mail agent forwarding a request for a phone number through the blackboard

server to the database agent. *Id.* (citing Ex. 1014, 5, Fig. 2; Ex. 1050 ¶¶ 616–617).

Patent Owner does not specifically dispute that Cohen teaches these limitations. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Cohen teaches or suggests the limitations of claim 35.

*8. Conclusion*

Having considered the *Graham* factors, including the scope and content of the prior art, the differences between the prior art and the challenged claims, and the evidence of secondary considerations (*see* § II.G.12), we determine that Petitioner has shown by a preponderance of the evidence that claims 20, 21, and 29–35 of the '560 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss, FIPA97, and Cohen.

*I. Asserted Obviousness over Kiss, FIPA97, and Cheyer*

Petitioner contends that claim 28 is unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss, FIPA97, and Cheyer. Pet. 84–86. In this combination, Petitioner relies on Cheyer for teaching an "agent registry" that includes "data declarations" and "trigger declarations," as recited in claim 28.

*1. Cheyer (Ex. 1015)*

Cheyer describes an implementation of SRI International's Open Agent Architecture (OAA), which is mentioned in the '560 patent as a starting point for the subject matter described in the patent. Ex. 1015, 55 (Abstract); Ex. 1001, 40–51. Cheyer describes a distributed multiagent framework that enables rapid integration of component technologies, such as

pen and voice recognition and interpretation, image processing and object tracking, geo-referenced interactive maps, multimedia databases, and human collaborative tools. Ex. 1015, 55. The implementation disclosed in Cheyer is designed to support "[m]ilitary and intelligence analysts," by "annotating, indexing, extracting, and disseminating information from video streams for surveillance and intelligence applications." *Id.*

Petitioner asserts that Cheyer was published in 1998 in conjunction with the 1998 International Conference on Intelligent User Interfaces ("IUI98") that took place on January 6–9, 1998. Pet. 27 (citing Ex. 1015, ii (evidencing receipt by libraries on March 17, 1998)). We note that Cheyer was published by Association for Computing Machinery (ACM) and bears the Copyright date of 1998 from ACM. Ex. 1015, ii. Like IEEE publications, ACM publications, such as the one in which Cheyer appeared, are distributed widely and intended to be accessible to the public. The wide distribution of publications from IEEE and ACM distinguishes them from academic papers such as masters and doctoral theses, which in some cases may not be well catalogued or indexed. The Board has accepted the copyright date of an IEEE publication as evidence of its public availability. *Ericsson, Inc. v. Intellectual Ventures I LLC*, Case IPR2014-00527, Paper 41 at 10 (PTAB May 18, 2015).

Patent Owner does not dispute Petitioner's contention that Cheyer is available as prior art. *See* PO Resp. 58–59. In view of the reliability of ACM publications and their wide distribution, as well as the evidence provided by Petitioner that the publication containing the Cheyer article was provided to libraries for circulation to the public, we find that Petitioner has demonstrated that Cheyer qualifies as applicable prior art under 35 U.S.C. § 102(a).

*2. Claim 28*

In the proposed combination of Cheyer with Kiss and FIPA97, Petitioner modifies its earlier analysis of claim 28 by relying on Cheyer instead of Kiss for teaching "data declarations" and relying on Cheyer instead of FIPA97 for teaching "trigger declarations" for each active agent. Pet. 85–86; *see id.* at 63–65 (Petitioner's obvious analysis of claim 28 based on Kiss and FIPA97). Petitioner contends that Cheyer teaches the use of "data declarations" in an agent registry. *Id.* (citing Ex. 1015, 58 ("In the same way that agents register the tasks they are capable of performing, agents also declare descriptions of the data they manage."). Petitioner also contends that Cheyer teaches "trigger declarations" because its triggers can be declared within the database (i.e., agent registry) in the same many as other entries. *Id.* (citing Ex. 1015, 59 ("Triggers are stored using the data management facilities, so they can be added, deleted, inspected, protected, and automatically distributed like any other database predicate."); Ex. 1050 ¶ 583).

Petitioner argues that using Cheyer's data declarations and trigger declarations in the combined Kiss/FIPA97 system would have been the arrangement of old elements with each performing the same function it had been known to perform and yielding no more than what one would expect from such an arrangement. *Id.* (citing Ex. 1050 ¶ 575). Petitioner contends a person of ordinary skill in the art would have been motivated to use Cheyer's techniques to provide more information as to the type or characteristics of data a particular agent would be able to handle. *Id.* (citing Ex. 1050 ¶ 576).

Patent Owner does not respond specifically to Petitioner's contentions that Cheyer teaches the "data declarations" and "trigger declarations"

limitations of claim 28. *See* PO Resp. 133–35. However, Petitioner's analysis continues to rely on alleged "agent registry" functionalities in FIPA97 for some features recited in claim 28 without adequately explaining the reasoning for doing so. *See* Pet. 63–65, 85–86.

Accordingly, based on the complete record, we determine Petitioner has not demonstrated sufficiently that the combination of Kiss, FIPA97, and Cheyer teaches the "agent registry" limitation as recited in claim 28. Having considered the *Graham* factors, including the scope and content of the prior art, the differences between the prior art and the challenged claims, and the evidence of secondary considerations (*see* § II.G.12), we determine that Petitioner has not shown by a preponderance of the evidence that claim 28 of the '560 patent is unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss, FIPA97, and Cheyer.

*J. Patent Owner's Motion to Exclude*

Patent Owner filed a Motion to Exclude Exhibits 1127, 1137, 1141, 1145, 2034, and a portion of Exhibit 1129. PO Mot. 1–11. We address each of these exhibits below.

*1. Exhibit 1129*

Exhibit 1129 is the deposition transcript of Patent Owner's expert Dr. Medvidovic, taken on May 19, 2020. Patent Owner seeks to exclude Petitioner's reliance "on portions of Dr. Medvidovic's deposition testimony that should be excluded because the question on which the testimony is based is vague, ambiguous, confusing, lacks foundation and calls for a legal conclusion. And any testimony elicited from this improper question is irrelevant, prejudicial, and misleading." *Id.* at 8.

In particular, Patent Owner seeks to exclude lines 53:19–54:21 of Exhibit 1129, which read as follows:

> Q: If that's true, then it's your opinion these three things, these three types of processing are required to teach '115's facilitator, correct?
>
> MS. ABDULLAH: Objection.
>
> BY THE WITNESS:
>
> A: I think that the authors of the patent, the inventors were very careful to specify that this is is an embodiment. It's a preferred embodiment. There are other embodiments that they discuss. For this particular embodiment that deals with compound goals, delegation, optimization and interpretation are preferably involved. So this is the preferred embodiment. This is a legal thing, not a technical thing. What a preferred embodiment is, that's something that appears in patents, pretty much every patent I've ever read, software patent, anyway. It is something that has a particular meaning. So if you want to handle compound goals, you need to have three types of processing preferably, delegation, optimization and interpretation. So it is my opinion that anybody who tries or, sorry, anybody who is claiming, purporting to be solving the same kinds of problems needs to show an embodiment that matches those three.

Ex. 1129, 53:19–54:21.

Patent Owner argues that Petitioner "attempts to use this improper testimony to support its incorrect conclusion that 'delegation, optimization, and interpretation' are 'functionalities [] limited to a preferred embodiment, so they are not relevant to the claims.' PO Mot. 9–10 (citing Ex. 1001, 19:26–29; Ex. 1129, 54:2–9; Pet. Reply 28). Patent Owner argues that Petitioner's "question was vague, ambiguous, confusing, lacked foundation and called for a legal conclusion." *Id.* at 10. Patent Owner also argues "the testimony is irrelevant, prejudicial, and misleading. *Id.*

Petitioner opposes the motion, arguing that the testimony is admissible and that Petitioner's counsel "failed to object to this question with sufficient specificity at the appropriate time." Pet. Opp. to Mot. 13

(citing PTAB Consolidated Trial Practice Guide, 128 (Nov. 2019) ("An objection must be stated concisely in a non-argumentative and non-suggestive manner . . . .")). Petitioner points out that Patent Owner's counsel "only said 'Objection' but failed to indicate what type of objection—*i.e.*, form, relevance, etc." *Id.* Petitioner argues that for the first time, Patent Owner "now attempts to assert multiple grounds for exclusion which were not previously raised—objections which it has waived." *Id.* "Furthermore," Petitioner argues, Patent Owner "does not explain how the question is "vague, ambiguous, and confusing," and that "summarily saying it is without more is insufficient to challenge admissibility." *Id.* (citing 37 C.F.R. § 42.20 (c); *Samsung Elecs. Am., Inc. v. Uniloc 2017 LLC*, IPR2017-01798, Paper 32 at 103 (PTAB Jan. 31, 2019)).

Petitioner also points out that:

> the party proffering a witness for cross-examination has the opportunity to conduct redirect examination of the witness immediately following the cross-examination to cure any perceived deficiency or to provide a more complete answer. Here, IPA did not avail themselves of this opportunity.

*Id.* at 14 (citing 37 CFR § 42.53(c)(2); *CBS Interactive Inc. v. Helferich Patent Licensing, LLC*, IPR2013-00033, Paper 101 (Oct. 7, 2013); *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, IPR2012-00001, Paper 50 (July 18, 2013); Ex. 1129, 164:15–16 (MS. ABDULLAH: IPA does not have any redirect.)).

In its Reply, Patent Owner argues "[t]he vague, ambiguous, confusing, lack of foundation, and legal conclusion nature of questions asked by Microsoft's counsel in Exhibit 1129 is clear both on its face and by Dr. Medvidovic's deposition response," and that "[Patent Owner's] counsel properly and timely objected." PO Mot. Reply 5.

We are not persuaded by Patent Owner's arguments that Dr. Medvidovic's testimony should be excluded from evidence in this proceeding. Although Patent Owner's counsel did state the word "Objection" in response to Petitioner's question to Dr. Medvidovic, Patent Owner's counsel did not state the nature of objection, thus depriving Petitioner's counsel of the opportunity to cure the objection by rephrasing the question.

In its Motion to Exclude, Patent Owner now takes the position that the question is "vague, ambiguous, confusing, lacks foundation and calls for a legal conclusion." PO Mot. 10. Patent Owner, however, does not explain adequately how the question is vague, ambiguous or confusing, other than to state that "Dr. Medvidovic['s] testimony highlights the vague, ambiguous, and confusing nature of Microsoft's question." *Id.* at 8. Nor does Patent Owner explain adequately how the question lacks foundation or calls for a legal conclusion aside from pointing to Dr. Medvidovic's response that "[t]his is a legal thing, not a technical thing" in reference to the term "preferred embodiment." *Id.* at 9.

Patent Owner also argues that Dr. Medvidovic's response to the question is "irrelevant, prejudicial, and misleading." *Id.* at 8. Dr. Medvidovic's testimony, however, concerns his understanding of a preferred embodiment described in the '115 patent (and the '560 patent) and his opinion of whether the prior art, particularly Kiss, teaches a "facilitator." *See, e.g.*, Ex. 1129, 52:15–54:21. We find it difficult to see how Dr. Medvidovic's testimony is "irrelevant," since it goes to his understanding of the challenged patent, the asserted prior art, and the nature of his opinion in this proceeding.

It is also relevant to note, as Petitioner points out, that Patent Owner's counsel had "the opportunity to conduct redirect examination of the witness immediately following the cross-examination to cure any perceived deficiency or to provide a more complete answer." Pet. Opp. to Mot. 13. Patent Owner's counsel, however, declined to redirect any questions to Dr. Medvidovic. *See* Ex. 1129, 164:15–16.

As for Dr. Medvidovic's testimony being prejudicial or misleading, the Board, sitting as a non-jury tribunal with particular administrative and technical expertise, is not as vulnerable to being misled or prejudiced as a jury might, and is well-positioned to determine and assign appropriate credibility and weight to the evidence presented at trial, without resorting to a formal exclusion of evidence that might later be held to be reversible error. *See, e.g.*, *Liberty Mut. Ins. Co. v Progressive Cas. Ins. Co.*, CBM2012-00002, Paper 66 at 70 (PTAB Jan, 23, 2014); *Gnosis S.P.A. v. S. Alabama Med. Sci. Found.,,* IPR2013-00118, Paper 64 at 43 (PTAB June 20, 2014).

For these reasons, we deny Patent Owner's Motion to Exclude the identified testimony of Dr. Medvidovic.

*2. Exhibit 2034*

Patent Owner moves to exclude portions of Exhibit 2034, the transcript of a deposition of Mr. Adam Cheyer taken in a set of different proceedings involving the '560 patent and '115 patent, *Google LLC v. IPA Technologies Inc.*, including IPR2019-00730 and IPR2019-00731. *See* PO Mot. 10–11. Specifically, Patent Owner seeks to exclude portions of Mr. Cheyer's cross-examination testimony (46:12–47:5, 58:15–63:16) as beyond the scope of his direct testimony in those proceedings. *Id.*

Petitioner argues that Patent Owner never objected in this proceeding to Exhibit 2034, an exhibit submitted by Patent Owner itself to support its

arguments. Pet. Opp. to Mot. 14. Petitioner argues that Patent Owner did not make any objections to the testimony on the record in this proceeding and therefore its argument is waived. *Id.* at 14–15. Petitioner also argues that Patent Owner has not explained why the portions it seeks to exclude were outside the scope of direct testimony. *Id.* at 15.

We agree with Petitioner that Patent Owner's motion summarily asserts that the portions of testimony it seeks to exclude are outside the scope of Mr. Cheyer's direct testimony without sufficient explanation. *See id.*; PO Mot. 10–11. Although Patent Owner identifies the topics addressed in those portions, the motion provides no details regarding the scope of direct testimony in a deposition that was taken in a different proceeding. PO Mot. 11. Thus, we are unable to determine whether Mr. Cheyer's cross-examination testimony was beyond the scope of his direct testimony, and Patent Owner has not shown it is entitled to the requested relief. *See* 37 C.F.R. § 42.20(c).

For at least this reason, we deny Patent Owner's Motion to Exclude the identified deposition testimony of Mr. Cheyer.

*3. Exhibits 1127, 1137, 1141, and 1145*

Patent Owner moves to exclude Exhibit 1127 as irrelevant, prejudicial, misleading, and outside the scope of direct examination. PO Mot. 1–4. Patent Owner moves to exclude Exhibit 1137 on hearsay, lack of authentication, misleading, undue prejudice, and lack of relevance grounds. *Id.* at 4–6. Patent Owner moves to Exclude Exhibits 1141 and 1145 on grounds of hearsay, lack of authentication, and lack of relevance. *Id.* at 6–8. Because we do not rely on the cited evidence in this Final Written Decision, we dismiss Petitioner's Motion to Exclude Exhibits 1127, 1137, 1141, and 1145 as moot.

*K. Constitutional Challenges*

Patent Owner raises two constitutional challenges. First, Patent Owner argues that subjecting a pre-AIA patent, such as the'560 patent, retroactively to *inter partes* review violates the Takings and Due Process Clauses of the Fifth Amendment. PO Resp. 164. Second, Patent Owner asserts that *inter partes* reviews violate the Appointments Clause of the U.S. Constitution when conducted by administrative patent judges not nominated by the President and confirmed by the Senate. *Id.*

Addressing first Patent Owner's Appointments Clause challenge, we are bound by the Federal Circuit's decision in *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019), *cert. granted sub nom. United States v. Arthrex, Inc.*, 2020 WL 6037206 (Oct. 13, 2020), which addressed this issue. *See* 941 F.3d at 1337 ("This as-applied severance . . . cures the constitutional violation."); *see also Arthrex, Inc. v. Smith & Nephew, Inc.*, 953 F.3d 760, 764 (Fed. Cir. 2020) (Moore, J., concurring in denial of rehearing) ("Because the APJs were constitutionally appointed as of the implementation of the severance, *inter partes* review decisions going forward were no longer rendered by unconstitutional panels."). Accordingly, we do not consider this issue any further.

With regard to the Takings and Due Process Clause challenge, we note that challenges to retroactive application of IPRs to pre-AIA patents have been addressed by the Federal Circuit in *Celgene Corp. v. Peter*, 931 F.3d 1342, 1357–1363 (Fed. Cir. 2019), *cert. denied* 2020 WL 3405867 (June 22, 2020) (Takings Clause), and *Sound View Innovations, LLC v. Hulu, LLC*, Nos. 2019-1865, 2019-1867, 2020 WL 3583556, *3 (Fed. Cir. July 2, 2020) (non-precedential) (Due Process Clause). Accordingly, we do not consider this issue any further.

## III. CONCLUSION

For the foregoing reasons, we determine Petitioner has shown by a preponderance of the evidence that claims 1, 20, 21, 26, 27, 29–35, and 45–49 of the ’560 patent are unpatentable, but has not shown that claim 28 of the ’560 patent is unpatentable. The chart below summarizes our conclusions:

| **Claim(s)** | **35 U.S.C. §** | **Reference)** | **Claims Shown Unpatentable** | **Claims Not Shown Unpatentable** |
|---|---|---|---|---|
| 1, 20, 21, 26–28, 45–49 | 103(a) | Kiss, FIPA97 | 1, 20, 21, 26, 27, 45–49 | 28 |
| 20, 21, 29–35 | 103(a) | Kiss, FIPA97, Cohen | 20, 21, 29–35 | |
| 28 | 103(a) | Kiss, FIPA97, Cheyer | | 28 |
| **Overall Outcome** | | | 1, 20, 21, 26, 27, 29–35, 45–49 | 28 |

## IV. ORDER

Accordingly, it is

ORDERED that claims 1, 20, 21, 26, 27, 29–35, and 45–49 of the ’560 patent have been shown to be unpatentable;

FURTHER ORDERED that claim 28 of the ’560 patent has not been shown to be unpatentable;

FURTHER ORDERED that Patent Owner’s Motion to Exclude is denied in part and dismissed in part; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

Joseph Micallef
Scott Border
SIDLEY AUSTIN LLP
jmicallef@sidley.com
sborder@sidley.com

For PATENT OWNER:

Steven Hartsell
Alexander Gasser
Sarah Spires
SKIERMONT DERBY LLP
shartsell@skiermontderby.com
agasser@skiermontderby.com
sspires@skiermontderby.com

Trials@uspto.gov
571-272-7822

Paper 42
Date: October 22, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MICROSOFT CORPORATION,
Petitioner,

v.

IPA TECHNOLOGIES INC.,
Patent Owner.

---

IPR2019-00836
Patent 7,069,560 B1

---

Before LYNNE E. PETTIGREW, MINN CHUNG, and KEVIN C. TROCK, *Administrative Patent Judges.*

PETTIGREW, *Administrative Patent Judge*.

# JUDGMENT
## Final Written Decision
## Determining Some Challenged Claims Unpatentable
## Denying in Part and Dismissing in Part Patent Owner's Motion to Exclude
*35 U.S.C. § 318(a); 37 C.F.R. § 42.64*

## I. INTRODUCTION

In this *inter partes* review, instituted pursuant to 35 U.S.C. § 314, Microsoft Corporation ("Petitioner") challenges claims 1, 5–13, 22–25, and

50–55 of U.S. Patent No. 7,069,560 B1 (Ex. 1001, "the '560 patent"), owned by IPA Technologies Inc. ("Patent Owner"). This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed below, Petitioner has shown by a preponderance of the evidence that claims 1, 5–9, 12, 13, 22–25, and 52 of the '560 patent are unpatentable, but has not shown by a preponderance of the evidence that claims 10, 11, 50, 51, and 53–55 of the '560 patent are unpatentable.

### *A. Procedural History*

Petitioner filed a Petition for *inter partes* review of claims 1, 5–13, 22–25, and 50–55 of the '560 patent. Paper 1 ("Pet."). Patent Owner filed a Preliminary Response. Paper 6 ("Prelim. Resp."). Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we instituted an *inter partes* review of the challenged claims. Paper 9 ("Inst. Dec.").

Following institution, Patent Owner filed a Patent Owner Response (Paper 19, "PO Resp."), Petitioner filed a Reply (Paper 27, "Pet. Reply"), and Patent Owner filed a Corrected Sur-reply (Paper 38, "PO Sur-reply"). Patent Owner filed a Motion to Exclude (Paper 33, "PO Mot."), Petitioner filed an Opposition to Patent Owner's Motion to Exclude (Paper 34, "Pet. Opp. to Mot."), and Patent Owner filed a Reply in Further Support of Its Motion to Exclude (Paper 36, "PO Mot. Reply"). An oral hearing was held on July 27 and 28, 2020, and a copy of the hearing transcript has been entered into the record.[1] Paper 41 ("Tr.").

[1] A single hearing was held for eight related cases—IPR2019-00810, IPR2019-00811, IPR2019-00812, IPR2019-00813, and IPR2019-00814,

*B. Real Parties in Interest*

Petitioner identifies Microsoft Corporation as the real party in interest for the Petition. Pet. 3. Patent Owner names as the real party in interest IPA Technologies Inc., which is a wholly owned subsidiary of Wi-LAN Technologies Inc., which is a wholly owned subsidiary of Wi-LAN Inc., which is a wholly owned subsidiary of Quarterhill Inc. Paper 3, 2.

*C. Related Matters*

The parties inform us that the '560 patent is the subject of the following district court proceedings: *IPA Technologies Inc. v. Microsoft Corp.*, 1:18-cv-00001 (D. Del.); *IPA Technologies Inc. v. Google LLC*, 1:18-cv-00318 (D. Del.); *IPA Technologies Inc. v. Amazon.com*, 1:16-cv-1266 (D. Del.). Pet. 3; Paper 3, 2.

In addition to the present proceeding, we instituted two other *inter partes* reviews based on petitions filed by Petitioner challenging claims of the '560 patent. In IPR2019-00835, the Board determined that claims 1, 20, 21, 26, 27, 28–35, and 45–49 of the '560 patent had been shown to be unpatentable and that claim 28 had not been shown to be unpatentable. *Microsoft Corp. v. IPA Techs. Inc.*, IPR2019-00835, Paper 42 (PTAB Oct. 15, 2020) (Final Written Decision). In IPR2019-00837, in a decision issued concurrently with this one, we determine that Petitioner has shown claims 1–4, 14–19, 26, and 36–44 of the '560 patent to be unpatentable.

The '560 patent was the subject of two *inter partes* reviews in which the Board determined that claims of the '560 patent had not been shown to be unpatentable: *Google LLC v. IPA Technologies Inc.*, IPR2019-00730, Paper 72 (PTAB Sept. 16, 2020) (Final Written Decision); *Google LLC v.*

---

challenging claims of U.S. Patent No. 6,851,115 B1; and IPR2019-00835, IPR2019-00836, and IPR2019-00837, challenging claims of the '560 patent.

*IPA Technologies Inc.*, IPR2019-00731, Paper 73 (PTAB Sept. 16, 2020) (Final Written Decision).

The '560 patent is a continuation of U.S. Patent No. 6,851,115 B1 (Ex. 1122, "the '115 patent"), which is the subject of other *inter partes* reviews (IPR2019-00810, IPR2019-00811, IPR2019-00812, IPR2019-00813, and IPR2019-00814) involving the same parties as this proceeding. *See* Ex. 1001, code (63).

*D. Overview of the '560 Patent*

The '560 patent describes "software-based architectures for communication and cooperation among distributed electronic agents" using "interagent communication languages enabling client agents to make requests in the form of arbitrarily complex goal expressions that are solved through facilitation by a facilitator agent." Ex. 1001, 1:20–25. Figure 4 of the '560 patent is reproduced below.




Fig. 4

Figure 4 depicts the structure of an exemplary distributed agent system of the ’560 patent. *Id.* at 6:38–44. Figure 4 shows that system 400 includes facilitator agent 402, user interface agents 408, application agents 404, and meta-agents 406. *Id.* The ’560 patent discloses that system 400 is organized “as a community of peers by their common relationship” to facilitator agent 402, which is “a specialized server agent that is responsible for coordinating agent communications and cooperative problem-solving.” *Id.* at 6:41–43, 6:46–48.

The ’560 patent discloses that cooperation among agents is structured around the following three-part approach: (1) providers of services register their capabilities specifications with a facilitator; (2) requesters of services construct goals and relay them to the facilitator; and (3) the facilitator coordinates the efforts of the appropriate service providers in satisfying these goals. *Id.* at 10:53–61. Such cooperation among agents is achieved via messages expressed in a common language, referred to as the Interagent Communication Language (“ICL”). *Id.* at 10:61–11:7.

Referencing Figure 3 (not reproduced herein) and Figure 4, the ’560 patent describes a preferred embodiment for the operation of a distributed agent system. *Id.* at 7:24–50. The ’560 patent describes that, when invoked, a client agent makes a connection to a facilitator, e.g., facilitator agent 402, and registers with the facilitator a specification of the capabilities and services it can provide. *Id.* at 7:26–32. For example, a natural language agent may register the characteristics of its available natural language vocabulary. *Id.* at 7:32–34. When facilitator agent 402 receives a service request and determines that registered services 416 of one of its client agents will help satisfy a goal of the request, the facilitator sends that client a request expressed in ICL 418. *Id.* at 7:36–40. The client agent

parses this request, processes it, and returns answers or status reports to the facilitator. *Id.* at 7:41–43.

Referencing Figures 5 and 6 (not reproduced herein), the '560 patent describes an exemplary embodiment in which user interface agent 408 runs on a user's laptop, accepting user input, sending requests to facilitator agent 402 for delegation to appropriate agents, and displaying the results of the distributed computation. *Id.* at 7:64–8:14. For instance, when the question "What is my schedule?" is entered on user interface (UI) 408, UI 408 sends the request to facilitator agent 402, which in turn asks natural language (NL) agent 426 to translate the query into ICL. *Id.* at 8:15–25. The translated ICL expression then is routed by facilitator agent 402 to appropriate agents, e.g., calendar agent 434, to execute the request. *Id.* at 8:25–27. Finally, results are sent back to UI agent 408 for display. *Id.* at 8:27–28.

*E. Challenged Claims*

Of the claims challenged in the Petition, claims 1, 22, 50, 52, and 53 are independent. Claims 5–13 depend directly or indirectly from claim 1; claims 23–25 depend directly from claim 22; claim 51 depends directly from claim 50; and claims 54 and 55 depend directly claim 53. Claim 1 is illustrative and reproduced below.

> 1. A software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture contemplating a distributed computing system comprising:
>
> a plurality of service-providing electronic agents;
>
> a distributed facilitator agent functionally distributed across at least two computer processes, the facilitator agent capable of bi-directional communications with the plurality of service-providing electronic agents, the facilitator agent including:

> an agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the distributed computing environment; and
>
> a facilitating engine operable to interpret a service request as a base goal, the facilitating engine further operable for generating a goal satisfaction plan associated with the base goal, wherein the goal satisfaction plan involves:
>
> > using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal; and
>
> wherein the plurality of service-providing electronic agents and the distributed facilitator agent communicate using an interagent Communication Language (ICL), wherein the ICL includes:
>
> > a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events.

Ex. 1001, 29:56–30:23.

*F. Asserted Ground of Unpatentability*

Petitioner asserts that the challenged claims are unpatentable based on the following ground (Pet. 4):

| Claim(s) Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1, 5–13, 22–25, 50–55 | 103(a)[2] | Kiss,[3] FIPA97[4] |

*G. Testimonial Evidence*

In support of the unpatentability contentions in its Petition, Petitioner relies on a declaration of Dr. Henry Lieberman (Ex. 1050, "Lieberman Decl.") and a declaration of Dr. Timothy Finin (Ex. 1049, "Finin Decl."). Patent Owner cross-examined Dr. Lieberman and Dr. Finin via deposition. *See* Ex. 2069 ("Lieberman Dep."); Ex. 2068 ("Finin Dep.").

In support of its Patent Owner Response, Patent Owner relies on a declaration of Dr. Nenad Medvidovic (Ex. 2032, "Medvidovic Decl.") and a Declaration of Dr. Philip R. Cohen (Ex. 2033, "Cohen Decl."). Petitioner cross-examined Dr. Medvidovic via deposition. *See* Ex. 1129 ("Medvidovic Dep.").

---

[2] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. §§ 102 and 103. Because the '560 patent has an effective filing date prior to the effective date of the applicable AIA amendments, we refer to the pre-AIA versions of §§ 102 and 103.

[3] U.S. Patent No. 6,484,155 B1, issued Nov. 19, 2002, filed July 21, 1999 (Ex. 1005, "Kiss").

[4] Foundation for Intelligent Physical Agents, *FIPA 97 Specification Version 1.0*, published Oct. 10, 1997 (Exs. 1006–1012, collectively "FIPA97").

## II. DISCUSSION

### *A. Legal Principles*

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective indicia of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

To prevail on its challenges to Patent Owner's claims, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC. v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

### *B. Level of Ordinary Skill in the Art*

We begin our analysis by addressing the level of ordinary skill in the art. Petitioner's declarant, Dr. Lieberman, opines that a person of ordinary

skill in the art at the time of the invention of the ’560 patent would have been someone familiar with the principles and conventions of computer science and computer networking, and also with multi-agent systems and inter-agent communication languages as documented in agent-centered literature by 1999. Ex. 1050 ¶ 32; *see* Pet. 4–5 (citing Ex. 1050 ¶ 32). Dr. Lieberman also testifies that a person of ordinary skill in the art may have been a graduate student in mathematics, engineering, or computer science, and may have had an advanced degree in one of these disciplines, and would also have had at least two years of experience working in the field of computer science, or a related field, and may have worked in academia, either as a professor or a graduate student, for a technology company, or for a government. Ex. 1050 ¶ 32.

Citing the testimony of its declarant, Dr. Medvidovic, Patent Owner asserts that a person of ordinary skill in the art at the time of the ’560 patent’s effective filing date would have had “a Bachelor’s degree in Computer Science or equivalent field and at least two years of work experience in design and development of distributed systems, software specification languages, or a related area.” PO Resp. 28 (citing Ex. 2032 ¶ 41). Patent Owner criticizes Petitioner’s articulation of the level of ordinary skill in the art as being “vague and uncertain” due to Petitioner’s and Dr. Lieberman’s use of the word “may” in their proposed definition. *Id.* at 28–29. Patent Owner contends that Petitioner’s proposed definition “leav[es] every aspect of the level of skill ‘fluid,’” which is “particularly problematic here, where Petitioner claims that it would have been obvious to create an agent system that is very complex and advanced in its facilitation, goal processing, and inter-agent communication capacities.” *Id.* at 29 (citing Ex. 2032 ¶ 44).

Petitioner responds that its proposal "realistically expresses alternatives—*i.e.*, that a Skilled Artisan would have been at least a graduate student in several relevant fields, and would have had at least two years of work experience in those fields." Pet. Reply 12; *see* Pet. 5. Petitioner also argues that Patent Owner does not articulate how any differences between the parties' proposals that would alter or even affect the outcome of this proceeding. Pet. Reply 12.

Patent Owner asserts that it has "identified how the difference between the proposals would affect this proceeding" because Patent Owner has pointed out that "it is Petitioner's burden under the law to address each *Graham* factor and Petitioner has failed to proffer a coherent level of ordinary skill in the art, [and] Petitioner's obviousness assertion fails for that reason alone." PO Sur-reply 16–17 (citing PO Resp. 29).

But Patent Owner does not identify any "meaningful differences" between the parties' proposed definitions or how "the outcome of [this proceeding] would have been different" if we adopted Patent Owner's proposed definition, as opposed to Petitioner's proposal. *See ESIP Series 2, LLC v. Puzhen Life USA, LLC*, 958 F.3d 1378, 1385 (Fed. Cir. 2020) (citing *Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1371–72 (Fed. Cir. 2016)). For example, Patent Owner does not argue the challenged claims are not unpatentable under Patent Owner's proposed definition of the level of ordinary skill in the art, nor does it identify any claim limitation that would have been taught by the asserted prior art under Petitioner's proposed definition, but *not* under Patent Owner's proposal. *See* PO Resp. 28–29; PO Sur-reply 16–17.

In our view, the parties' proposals are not materially different despite the differences in wording between them (e.g., the education level of a

Bachelor's degree in Computer Science or equivalent field under Patent Owner's proposal, as opposed to a graduate student's level of education with or without a Bachelor's degree under Petitioner's proposed definition). *See* Pet. 4–5; Pet. Reply 12; PO Resp. 28. For purposes of this Final Written Decision, we find no meaningful differences between the parties' respective definitions that would materially alter the outcome of this Decision. These proposals are similar for all purposes relevant to this Final Written Decision, and both are consistent with the level of ordinary skill in the art reflected in the disclosure of the '560 patent and the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

Nonetheless, for this Final Written Decision, we adopt Patent Owner's definition of a person of ordinary skill in the art at the time of the claimed invention. That is, a person of ordinary skill in the art at the time of the claimed invention would have had "a Bachelor's degree in Computer Science or equivalent field and at least two years of work experience in design and development of distributed systems, software specification languages, or a related area." Our analysis and conclusions in this Final Written Decision would be the same regardless of whether Petitioner's or Patent Owner's definition of the level of ordinary skill in the art is adopted.

*C. Claim Construction*

In an *inter partes* review, we apply the same claim construction standard that would be used in a civil action under 35 U.S.C. § 282(b), following the standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. § 42.100(b) (2019). In applying such standard, claim terms are generally given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art, at

the time of the invention and in the context of the entire patent disclosure. *Phillips*, 415 F.3d at 1312–13. "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

In our Decision on Institution, we preliminarily interpreted several claim terms as follows:

| Term | Construction |
|---|---|
| "event" | "a message or goal communicated between agents" |
| "event type" | "a type of an event" |
| "goal" | "a request for service" |
| "compound goal" | "a single goal expression that specifies multiple sub-goals to be performed" |
| "non-syntactic decomposition of the base goal" | "generation of a sub-request (sub-goal/sub-delegation) based on factors other than the syntax of how the goal was received or made" |

Inst. Dec. 28–35.

The parties do not dispute the constructions of these five terms in the Patent Owner Response or Petitioner Reply. *See* PO Resp. 30–31, 43; Pet. Reply 1. Upon considering the complete record, we see no reason to deviate from our preliminary constructions and, therefore, adopt the constructions of the claim terms "event," "event type," "goal," "compound goal," and "non-syntactic decomposition of the base goal" as set forth above for this Final Written Decision.

In the Petition, Petitioner discusses constructions for several additional claim terms: "goal satisfaction plan," "layer of conversational protocol," "arbitrarily complex goal expression," "single process facilitator agent," "trigger," "symbolic name," "parameter lists further refine the one or more events," "solvable," "procedure solvable," and "data solvable." Pet. 8–16. In addition, Petitioner discusses the construction of "computer process(es)" in the Reply. Pet. Reply 11–12. Patent Owner disputes constructions for the following terms: "goal satisfaction plan" and "computer process(es)." PO Resp. 32–47; PO Sur-reply 2–11, 15–16. We discuss constructions for the disputed terms below.

No other disputed claim terms need to be construed expressly for purposes of this Final Written Decision. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that only terms that are in controversy need to be construed, and "only to the extent necessary to resolve the controversy"); *see also Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (applying *Vivid Technologies* in the context of an *inter partes* review). To the extent it is necessary for us to consider the meaning of any other claim term, we do so in the context of our unpatentability analysis.

*1. "goal satisfaction plan"*

The claim term "goal satisfaction plan" is recited in challenged independent claims 1 and 50 of the '560 patent. Ex. 1001, 30:7–15 (claim 1), 35:1–10 (claim 50). It is also recited in independent claim 26 of the '560 patent, not challenged in this proceeding. *Id.* at 32:43–51. Petitioner contends that a "goal satisfaction plan" is a "procedure for sending one or more requests for service to one or more agents in order to satisfy a goal." Pet. 9. Patent Owner disagrees and asserts that the claim term "goal

satisfaction plan" should be construed to mean "a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints." PO Resp. 32.

*a. Claim Language*

We begin our claim construction analysis by considering the language of the claims themselves. *Phillips*, 415 F.3d at 1314. Addressing the claim language of the disputed term, we note that the claim language "a goal satisfaction plan" indicates that the term's plain meaning is "a plan for satisfying a goal."

In independent claims 1 and 50, the recited "goal satisfaction plan" is further constrained by specific limitations recited in the claims. Claim 1 recites:

> a facilitating engine . . . further operable for generating a *goal satisfaction plan* associated with the base goal, wherein the goal satisfaction plan involves:
>
> using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal.

Ex. 1001, 30:5–15 (emphasis added). Claim 50 recites similar language:

> determining a *goal satisfaction plan* that is associated with the base goal;
>
> wherein the goal satisfaction plan involves:
>
> using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal; and
>
> implementing the base goal satisfaction plan.

*Id.* at 35:1–10 (emphasis added).

Patent Owner argues that additional claim limitations specify that the goal satisfaction plan is designed for optimal goal satisfaction and takes into account advice parameters. PO Resp. 34–35 (citing Ex. 2032 ¶ 50). Patent Owner, however, only identifies limitations that do not appear in the claims of the '560 patent. *Id.* (erroneously citing claim 1 as reciting "a suitable delegation," "dispatching . . . based on a match," and "domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and . . . a match between the subgoal being dispatched and the registered functional capabilities"). Therefore, Patent Owner does not show persuasively that any claim language in the '560 patent requires the narrow construction it proposes.

Thus, at least based on the claim language, it is not appropriate to limit "goal satisfaction plan" as Patent Owner contends. As discussed above, the meaning and the scope of "goal satisfaction plan" is clear on the face of each claim because claims 1 and 50 each recite specifically what a "goal satisfaction plan" includes or comprises. Therefore, absent compelling evidence to the contrary, it is neither necessary nor appropriate to limit the meaning of the term "goal satisfaction plan" beyond the plain meaning indicated by the claim language—i.e., "a plan for satisfying a goal."

*b. Written Description*

Patent Owner cites the following statement in the "Summary of the Invention" section:

> [e]xtreme flexibility is achieved through an architecture organized around the declaration of capabilities by service-providing agents, the construction of arbitrarily complex goals by users and service-requesting agents, and the **role of**

> **facilitators in delegating and coordinating the satisfaction of these goals, subject to advice and constraints** that may accompany them.

PO Resp. 35–36 (quoting Ex. 1001, 4:67–5:6). The very first sentence of the paragraph cited by Patent Owner states, however, "[a] first *embodiment* of the present invention discloses a highly flexible, software-based architecture for constructing distributed systems." Ex. 1001, 4:55–57 (emphasis added). Indeed, all of the portions of the Specification cited by Patent Owner, including the passage reproduced above, describe various embodiments of the '560 patent. *See* PO Resp. 35–38 (citing Ex. 1001, 4:67–5:6, 5:48–49, 15:60–62, 16:22–24, 16:34–44, 16:62–17:2, 18:60–19:6, 29:25–33, Fig. 11).

In general, "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (citation omitted). As discussed above, challenged independent claims 1 and 50 do not recite all of the limiting features required by Patent Owner's proposed construction of "goal satisfaction plan." Thus, unless one of the established exceptions, such as lexicography or disavowal, applies, the challenged claims are not restricted as Patent Owner contends. *See, e.g.*, *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("the specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal") (citation omitted). Here, Patent Owner does not argue lexicography or disavowal. Nor does Patent Owner explain any other reason why the Specification limits "goal satisfaction plan" as it contends. Thus, claim construction in this case is governed by the general principle that "a particular embodiment appearing in the written description

may not be read into a claim when the claim language is broader than the embodiment." *SuperGuide*, 358 F.3d at 875; *see also WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1323–24 (Fed. Cir. 2018) ("It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise." (citing *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) ("[T]his court has repeatedly cautioned against limiting claims to a preferred embodiment."))). Accordingly, none of the embodiments in the Specification cited by Patent Owner limits "goal satisfaction plan" as Patent Owner contends.

*c. Prosecution History*

Turning next to the prosecution history, Patent Owner asserts that "examples in the file history confirm the elements of 'goal satisfaction plan' reflected in Patent Owner's proposed construction." PO Resp. 40. Patent Owner argues that, during the prosecution of the application for the '115 patent (i.e., the parent of the '560 patent),

> [a]pplicant further stated that "the facilitating engine is able to use reasoning to delegate the sub-goals to service providing agents in such a way as '**to best complete the requested service request**.'…The facilitating engine is able to use reasoning to delegate the sub-goal task of roasting coffee to the service-providing agent that can roast beans in the least amount of time because the facilitating engine has reasoned that the least amount of time taken to make coffee is the best way to accomplish the base goal of making coffee." Applicant concluded that "the base goal is carried out **not by merely parsing the request into sub-goals**" but rather "the facilitating engine used reasoning to decide upon using competing message transfer agents to reminding Bob of lunch, in lieu of delegating the task to just one message transfer agent."

*Id.* (citing Ex. 1002, 172–73). Patent Owner argues that similar language appears in Applicant's remarks during prosecution of the '560 patent. *Id.*

(citing Ex. 1120, 171–72); *see* Ex. 1120, 172 ("The reasoning includes 'one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms.").

Similar to its arguments based on the language of the claims, Patent Owner's contentions regarding the prosecution history refer to claim language that does not appear in the claims of the '560 patent (e.g., "to best complete the requested service request" and "one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms"). Patent Owner does not explain persuasively why prosecution statements directed to language not in the claims of the '560 patent should limit the construction of "goal satisfaction plan" as Patent Owner contends.

*d. Extrinsic Evidence*

Patent Owner also cites the testimony of its declarant, Dr. Medvidovic, in support of Patent Owner's proposed construction of "goal satisfaction plan." PO Resp. 40–41 (citing Ex. 2032 ¶¶ 55–56, 58–63, 200). We have reviewed the cited testimony from Dr. Medvidovic, but do not find anything in his testimony that would change our analysis based on intrinsic record discussed above. *See Phillips*, 415 F.3d at 1318 (authorizing the consideration of extrinsic evidence in determining the meaning of claims but noting that it is "in general . . . less reliable than the patent and its prosecution history in determining how to read claim terms").

*e. Other Arguments*

The parties dispute whether Petitioner's use of "procedure" (in place of a "plan") and "sending one or more requests for service" in Petitioner's proposed construction is appropriate. *See* PO Resp. 41–43; Pet. Reply 2, 5–

6; PO Sur-reply 3, 10. We need not address these arguments in detail because, for the reasons discussed above, we see no reason to depart from the plain meaning of the term "goal satisfaction plan."

*f. Conclusion*

Based on the complete record and after examining the claims as a whole, the written description, and the prosecution history, we construe the term "a goal satisfaction plan" according to its plain meaning—"a plan for satisfying a goal."

*2. "computer process"*

The claim term "computer processes" is recited in independent claim 1 in the limitation "a distributed facilitator agent functionally distributed across at least two computer processes." Ex. 1001, 29:63–64. It is also recited in independent claim 50 in the limitation "the plurality of synchronized agent registries each resident within a separate computer process" and in a similar limitation in independent claim 53. *Id.* at 34:57–59 (claim 50), 36:11–12. Petitioner contends that a "computer process" is "a program, a part of a program, or a list of steps to be completed by the computer." Pet. 34 (citing Ex. 1034, 383 (computer dictionary defining "process" as "[a] program or part of a program; a coherent sequence of steps undertaken by a program")). Patent Owner disagrees and asserts that a "computer process" is "an operating system process within a computer's architecture that represents one or more running programs and their activities." PO Resp. 44; *see* Ex. 2032 ¶ 69. In its Reply, Petitioner argues that because Patent Owner does not assert any different outcome based on its proposed construction, and Petitioner shows how the prior art discloses "computer processes" under either party's construction, the term need not be construed to resolve any controversy. Pet. Reply 11–12. Patent Owner

disagrees, asserting that the construction of the term affects the merits of Petitioner's arguments. PO Sur-reply 16.

The terms "computer process" and "computer processes" are recited repeatedly in the claims of the '560 patent, and many of Patent Owner's arguments responding to Petitioner's unpatentability contentions relate to claim limitations involving "computer processes." Accordingly, we construe the term "computer process" to assist us in resolving the parties' dispute regarding unpatentability.

*a. Claim Language*

We begin our claim construction analysis by considering the language of the claims themselves. *Phillips*, 415 F.3d at 1314. Patent Owner notes that the term "computer process" appears in the claims in the context of "at least two" or "separate" computer processes relating to a distributed facilitator agent. PO Resp. 44–45 (citing claims 1, 2, 20, and 21). Patent Owner argues that in the context of those claims, having a distributed facilitator agent as a separate "program" (under Petitioner's construction) does not necessarily allow for the degree of separation contemplated by the claims because multiple programs may be run on the same processes. *Id.* at 45 (citing Ex. 2032 ¶ 71). Petitioner does not reply to this argument. *See* Pet. Reply 11–12.

Patent Owner essentially argues, with the support of Dr. Medvidovic, that a "process" is not limited to a "program" because multiple programs may be executed in the same computer process. Ex. 2032 ¶ 71. Patent Owner does not explain persuasively how claim language involving the distributed facilitator agent and separate computer processes necessarily suggests that a process is not a program.

The same paragraph in Dr. Medvidovic's declaration also states that "[a] process is not [a] program because a program is a static notion . . . while a process is what actually occurs in a computer when a program is executed." *Id.* The claim language does provide some support for the concept that a computer process involves running or executing a program, which is part of Patent Owner's proposed construction. For instance, claim 20 requires "a planning component *executing* within a first computer process and an execution component *executing* within a second computer process." Ex. 1001, 31:50–53 (emphases added).

*b. Written Description*

As Patent Owner points out, the written description of the '560 patent does not use the term "computer process." PO Resp. 45. Instead, it describes a facilitator agent with functionality "distributed across several different computing platforms." *Id.* (quoting Ex. 1001, 6:31–33). Patent Owner cites a passage describing an embodiment allegedly corresponding to dependent claims 20 and 21 that explains some benefits of separating the facilitator agent's planning and execution components. *Id* at 45–46 (quoting Ex. 1001, 29:8–38). As with the claim language, Patent Owner does not persuasively show how this description informs the construction of "computer process."

*c. Extrinsic Evidence*

Petitioner's proposed construction is based directly on a computer dictionary definition of a "process" as "[a] program or part of a program; a coherent sequence of steps undertaken by a program." Ex. 1034, 383. Patent Owner and Dr. Medvidovic cite an electronics dictionary providing one definition of a "process" as "[t]he basic unit of computation within an operating system." Ex. 2070, 590; *see* PO Resp. 46; Ex. 2032 ¶ 69. They

also cite a general purpose dictionary defining "process" in the context of computers as "to carry out operations on (data or programs)." Ex. 2071, 1542; *see* PO Resp. 46; Ex. 2032 ¶ 69. Dr. Medvidovic explains that a process is not the same thing as a program because, for example, a process can run many programs or parts of programs. Ex. 2032 ¶¶ 71–72.

*d. Analysis*

In the context of the claim language, the only intrinsic evidence that sheds light on the meaning of "computer process," we find Patent Owner's extrinsic evidence in the form of Dr. Medvidovic's testimony and dictionary definitions to be more persuasive than Petitioner's proffered dictionary definition. Thus, we agree with Patent Owner that a "computer process" is a process that runs or executes one or more computer programs. We are not persuaded that the other portions of Patent Owner's proposed construction are necessary or materially affect the meaning of the claim term.

For these reasons, based on the complete record, including the intrinsic and extrinsic evidence of record, we construe the term "computer process" as "a process that runs or executes one or more computer programs."

*D. Prior Art Overview*

We provide an overview of Kiss and FIPA97, the main prior art references asserted against the challenged claims, to provide context for the discussion that follows.

*1. Kiss (Ex. 1005)*

Kiss describes "a knowledge management system that supports inquiries of distributed knowledge resources," in which "[i]nteraction between a user and the knowledge resources is mediated by a collection of cooperative intelligent agents." Ex. 1005, 2:44–45, 2:46–48. Figure 1,

reproduced below, is a conceptual overview of one embodiment of a knowledge management system described in Kiss:




*Fig. 1*

*Id.* at 5:1–3. As shown in Figure 1 above, Kiss's knowledge management system 100 includes presentation layer 103, user interface layer 105, meta agent layer 107, knowledge agent layer 109, knowledge module layer 111, and agent service layer 113. *Id.* at 5:3–7. Each of user interface layer 105, meta agent layer 107, and knowledge agent layer 109 in Kiss's hierarchical knowledge management system includes one or more intelligent agents responsible for one portion of the distributed problem-solving inferencing process. *Id.* at 3:17–22.

Meta agent layer 107 includes one or more meta agents 119 that are responsible for analyzing queries or problem formulations provided by user interface layer 105 and constructing a plan for finding a solution to the problem. *Id.* at 5:20–24. Each meta agent 119 contains knowledge of problem solving methodologies and distributed inferencing procedures. *Id.* at 5:24–26. More specifically, "meta agent 119 is responsible for formulating a dynamic 'solution plan' for the distributed inferencing to be performed by the system 100, and allocates tasks to the knowledge agent layer 109 in furtherance of the solution plan." *Id.* at 5:33–37. "The meta agent dynamically assesses the problem and its solution states (between users and the knowledge agents 121), divides the problem, and assigns the appropriate knowledge agents 121 to work on the solution." *Id.* at 8:37–40.

Knowledge agent layer 109 includes multiple knowledge agents 121, each of which may be associated with one or more knowledge modules 123 in knowledge module layer 111. *Id.* at 6:31–35. Each knowledge agent 121 is configured to accept from meta agent 119 a problem statement and convert that problem statement into a format appropriate for the knowledge module 123 associated with the knowledge agent 121. *Id.* at 6:35–38. Knowledge agents register their capabilities and interests with registry 114 in agent service layer 113. *Id.* at 3:37–42, 12:18–20.

Kiss describes various distributed inferencing schemes that may be used to address problems to be solved. *Id.* at 7:20–8:19. One scheme uses a "planner-based dynamic inferencing approach." *Id.* at 7:29–30. In this scheme, "inferencing proceeds within an agent until an intermediate goal is achieved." *Id.* at 7:30–32. The next step of the inferencing process begins after the intermediate goal is achieved, and inferencing continues in a stepwise manner until the initial problem is solved. *Id.* at 7:35–37. "[M]eta

agent 119 manages the dynamic distributed inferencing scheme, using an agenda mechanism or commitment table to assign and schedule portions of the inferencing procedures to the participating agents during execution." *Id.* at 7:37–41.

Other distributed inferencing schemes disclosed by Kiss include a "problem-specific rule network," as well as "linear," "partitioned," "replicated," "real time," "preemptive," and "qualitative" inferencing modes. *Id.* at 7:23–28, 7:47–8:16. In the partitioned inference scheme, for example, the "user query or problem domain is easily divided into distinct subfields, phases or sub-problems that share limited initial data." *Id.* at 7:53–55.

Figures 8–20 of Kiss (not reproduced herein) illustrate an example of using distributed inferencing to solve the problem "what is the effect of increasing sales by 20%?" *Id.* at 12:21–14:30. As shown in Figure 9, the meta agent begins formulating a solution plan by asking the agent service layer to identify a knowledge agent that has registered a capability to answer a question related to "sales." *Id.* at 12:29–32. Once the service layer identifies a sales agent, the meta agent pushes a task onto an agenda to query the sales agent for the effect of increasing sales by 20% and then issues that query. *Id.* at 12:32–36. Distributed inferencing proceeds with the meta agent pushing tasks associated with agent queries onto the agenda and removing them after they are completed, until the sales agent has enough information to address the user's original query. *Id.* at 12:37–14:30.

*2. FIPA97 (Exs. 1006–1012)*

FIPA97 (Exs. 1006–1012) is a specification created by the Foundation for Intelligent Physical Agents (FIPA) beginning in 1996 with an official release date in October 1997. Ex. 1006, Cover, iv (identifying specification as FIPA 97 Version 1.0 issued on October 10, 1997). FIPA97 is a

"specification of basic agent technologies that can be integrated by agent systems developers to make complex systems with a high degree of interoperability." *Id.* at v. The specification comprises seven parts: three parts for basic agent technologies (Parts 1–3 relating to agent management, agent communication language, and agent/software integration) and four informative applications providing examples of how the technologies can be applied (Parts 4–7 describing personal travel assistance, personal assistant, audio-visual entertainment, and broadcasting and network management and provisioning applications). *Id.* at v–vii; *see generally* Exs. 1006–1008 (Parts 1–3); Exs. 1009–1012 (Parts 4–7).

Part 1 of FIPA97, the FIPA Agent Management specification (FIPA AMS) "provides a normative framework within which FIPA compliant agents can exist, operate and be managed." Ex. 1006, vi. The FIPA AMS model is defined through the intersection of Agent Platforms (APs) and Agent Domains (ADs), as illustrated in Figure 2 below. *Id.* at 10, Fig. 2.




**Figure 2 — Agent Platform Reference Model Fragment**

Each AD in Figure 2 of FIPA Part 1, above, is defined by a Directory Facilitator (DF). *Id.* at 6. Agents register their services with DFs. *Id.* For example, agents A and B have registered their services with $DF_x$, agents B, C, and D have registered their services with $DF_y$, and agents D and E have registered their services with $DF_z$. *Id.* at 10.

Part 2 of FIPA97 describes an "Agent Communication Language (ACL)" that "is based on speech act theory: messages are actions, or communicative acts, as they are intended to perform some action by virtue of being sent." Ex. 1007, ix. The ACL specification "consists of a set of message types and the description of their pragmatics, [i.e.,] the effects on the mental attitudes of the sender and receiver agents." *Id.* The ACL specification "also provides the normative description of a set of high-level interaction protocols, including requesting an action, contract net and several kinds of auctions." *Id.*

Part 2 of FIPA97 discloses a "simple abstract model of inter-agent communication" including ACL messages having components as illustrated in Figure 1 below. *Id.* at 7, 12.




**Figure 1 — Components of a message**

Figure 1, above, illustrates the main structural elements of an ACL message in FIPA97. *Id.* at 12. "The first element of the message is a word which identifies the communicative act being communicated, which defines the

principal meaning of the message." *Id.* Each ACL message contains a set of one or more parameters, including a mandatory "*:receiver*" parameter that identifies the intended recipient of the message. *Id.* at 13.

Petitioner asserts that FIPA97 was made publicly available as a single document and relies on FIPA97 as a single printed publication for purposes of 35 U.S.C. § 102(a). *See* Pet. 22–23; Pet. Reply 26. As discussed below in the section addressing the status of FIPA97 as a printed publication, FIPA approved and released FIPA 97 Version 1.0 as a single specification. *See infra* § II.F; Ex. 1026, 5; Ex. 1050 ¶ 165. Thus, although sometimes the seven parts are referred to as "documents," a person of ordinary skill in the art would have considered FIPA97 to be a single reference. *See* Ex. 1050 ¶¶ 164–165. Patent Owner does not dispute that FIPA97 is one reference for purposes of §§ 102 and 103. *See* PO Resp. 138–140.[5] Because FIPA and skilled artisans considered FIPA97 to be a single specification, we agree that FIPA97 constitutes a single prior art reference, and we treat it as such for purposes of our unpatentability analysis.

*E. Prior Art Status of Kiss*

Before reaching the merits of Petitioner's obviousness contentions, we address as a threshold issue whether Kiss (Ex. 1005) qualifies as prior art in this proceeding. Petitioner has the burden of persuasion to prove unpatentability by a preponderance of the evidence. *Dynamic Drinkware,* 800 F.3d at 1378. Petitioner has the initial burden of production to show

[5] Contrary to Patent Owner's argument (PO Resp. 138–140), Petitioner did not argue in another case, and the Board did not find, that FIPA97 is seven separate prior art references. *See Microsoft Corp. v. IPA Techs. Inc.*, IPR2019-00838, Paper 13 at 3–5 (PTAB Apr. 3, 2020) (Decision Denying Petitioner Request for Rehearing), Paper 10 at 4–9 (Petitioner's Request for Rehearing, filed Dec. 6, 2019).

that a reference is prior art to the challenged claims under a relevant section of 35 U.S.C. § 102. *See id.* at 1379. Once Petitioner has met that initial burden, the burden of production shifts to Patent Owner to argue or produce evidence that the asserted reference is not prior art to the claims. *Id.* at 1380. Once Patent Owner has met that burden of production, the burden of production returns to Petitioner. *Id.*

The effective filing date of the ’560 patent is January 5, 1999, the filing date of the ’115 patent, which is the parent of the ’560 patent. Ex. 1001, code (63). Kiss is a United States patent that arose from an application filed July 21, 1999, claiming the benefit of priority to a provisional application filed July 21, 1998. Ex. 1005, codes (22), (60).

Petitioner asserts that Kiss is prior art to the ’560 patent under 35 U.S.C. § 102(e) because Kiss is entitled to the benefit of priority to the filing date of its provisional application (Ex. 1036, "Kiss Provisional Application"). Pet. 16–20. "A reference patent is only entitled to claim the benefit of the filing date of its provisional application if the disclosure of the provisional application provides support for the claims in the reference patent in compliance with § 112, ¶ 1." *Dynamic Drinkware*, 800 F.3d at 1381.

In *Ex parte Mann*, the Board determined that "under *Dynamic Drinkware*, a non-provisional child [application] can be entitled to the benefit of a provisional application's filing date if the provisional application provides sufficient support for *at least one claim* in the child." 2016 WL 7487271, at *6 (PTAB Dec. 21, 2016) (emphasis added) (discussing whether *Dynamic Drinkware* requires "support in the provisional . . . for all claims, any claim, or something in between"). In addition, the Board determined that a "subject matter test" is also required—that is, "the [party claiming

priority] also must show that the subject matter relied upon in the non-provisional is sufficiently supported in the provisional application [and that t]his subject matter test is in addition to the comparison of claims required by *Dynamic Drinkware*." *Id.* at *5.

Recognizing these requirements, Petitioner asserts that "each element of [claim 1 of Kiss] has written description support in the Kiss Provisional," providing detailed citations to the supporting disclosures from the Kiss Provisional Application for each limitation of claim 1 of Kiss. Pet. 16–18. Addressing the "subject matter test," Petitioner asserts that "the teachings that Petitioner relies upon were carried forward from the Kiss Provisional to Kiss" and provides a detailed mapping of the relied-upon portions of Kiss to the corresponding portions of the Kiss Provisional Application. *Id.* at 18–20.

In its Preliminary Response, Patent Owner asserted that Kiss is not entitled to the priority date of its provisional application. Prelim. Resp. 67. In the Institution Decision, we determined, based on the preliminary record, the argument and evidence presented by Patent Owner were insufficient to shift the burden of production back to Petitioner. Inst. Dec. 24–25. We noted, however, that a final determination on this particular issue would be made based on a full record developed during the course of trial. *Id.* at 25.

During the trial, Patent Owner did not present any argument or evidence on this issue, nor did it dispute that Kiss qualifies as prior art in this proceeding. *See generally* PO Resp.

Based on the complete record, we determine that Petitioner has established by a preponderance of the evidence that Kiss is prior art to the ’560 patent under 35 U.S.C. § 102(e) because Kiss is entitled to the benefit of priority to the filing date of its provisional application.

*F. Status of FIPA97 as a Prior Art Printed Publication*

We also must determine as a threshold matter whether FIPA97 (Exs. 1006–1012) is a prior art printed publication under 35 U.S.C. § 102(a) or § 102(b). *See* Pet. 22–24; PO Resp. 59–78. Petitioner bears the burden of establishing by a preponderance of the evidence that FIPA97 is a printed publication. *See* 35 U.S.C. § 316(e); *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1375 (Fed. Cir. 2018); *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29 at 11 (PTAB Dec. 20, 2019) (precedential) (citing *Nobel Biocare*, 903 F.3d at 1375). For purposes of instituting an *inter partes* review we accepted Petitioner's contention, unchallenged in Patent Owner's Preliminary Response, that FIPA97 was available as prior art as of October 1997, more than one year before January 5, 1999, the effective filing date of the '560 patent. Inst. Dec. 8 n.3 (citing Pet. 22–24 (citing Ex. 1049 ¶¶ 6, 11, 12, 20–34; Ex. 1050 ¶¶ 143, 146–149)). Patent Owner, however, challenges that contention in its Patent Owner Response, and the parties further address the issue in Petitioner's Reply and Patent Owner's Sur-reply. *See* PO Resp. 59–78; Pet. Reply 15–21; PO Sur-reply 20–31.

The determination of whether a document is a "printed publication" under 35 U.S.C. § 102 "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' . . . ." *Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1355 (Fed. Cir. 2018) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). A

reference is considered publicly accessible if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it.'" *Id.* at 1355–56 (quoting *In re Wyer*, 655 F.2d 221, 226 (CCPA 1981)).

In the discussion below, we begin with background information regarding FIPA and an overview of the evidence submitted by Petitioner in support of its contention that FIPA97 was publicly accessible in October 1997. The evidence includes extensive testimony from Dr. Finin, a professor who has personal knowledge of FIPA's activities and the development process of FIPA97. *See* Ex. 1049 ¶¶ 1–55 (Finin Decl.). Dr. Finin was one of the first two FIPA Fellows invited to provide "high quality and independent advice to FIPA." *Id.* ¶ 18 (quoting Ex. 1076, 1); Ex. 1025, 1; Ex. 1062, 1. The evidence also includes testimony from Petitioner's expert witness, Dr. Lieberman, and more than sixty documentary exhibits on which Petitioner relies to show that FIPA97 was publicly accessible in late 1997 and early 1998. *See* Ex. 1050 ¶¶ 142–149 (Lieberman Decl.); Exs. 1021–33, 1047, 1051–1105.

After providing an overview of the evidence, we consider the parties' arguments as to whether FIPA97 was publicly accessible before the January 5, 1999, critical date. For the reasons explained below, we determine that Petitioner has met its burden to show that FIPA97 was publicly accessible before the critical date.

*1. FIPA*

FIPA was a non-profit association based in Geneva, Switzerland, created to promote agent-based technology and develop open standards. Ex. 1006, iv (FIPA 97 Specification Version 1.0, Part 1, Foreword);

Ex. 1049 ¶ 3. Founded in 1996, FIPA's membership included numerous technology companies, educational institutions, and governmental entities. Ex. 1049 ¶ 3. As of October 1997, FIPA had thirty-five corporate members representing twelve countries.[6] Ex. 1006, iv. According to FIPA documentation, membership was "open to any corporation and individual firm, partnership, governmental body or international organi[z]ation without restriction." *Id.* FIPA stated its intent "to make the results of its activities available to all interested parties." *Id.* Throughout its tenure, FIPA produced standards designed to promote and advance agent-based technology. Ex. 1049 ¶ 3. In 2005, FIPA was incorporated into the Institute of Electrical and Electronics Engineers (IEEE) as one of its standards committees. *Id.*

*2. Development of FIPA97*

The process of drafting the FIPA 97 specification began with FIPA's first meeting in London in April 1996. Ex. 1049 ¶ 6; Ex. 1058 (Main results of London meeting); Ex. 1066 (Resolutions of London meeting). Representatives from twenty-six companies and organizations attended. Ex. 1066, 1. At the meeting, the members agreed on FIPA's mission, drafted statutes and operational principles, and produced a work plan for a specification that would become FIPA 97. Ex. 1058, 1; Ex. 1066, 1–3; Ex. 1049 ¶ 6. The work plan set a December 1997 target for producing a first completed specification. Ex. 1066, 2–3; Ex. 1049 ¶ 7.

FIPA subsequently held several meetings in 1996 and 1997. At the second meeting in June 1996 in Yorktown Heights, NY, FIPA approved

[6] The corporate members included Alcatel, British Telecommunications, Deutsche Telekom, France Telecom, Hitachi, Hewlett-Packard, IBM, NEC, NTT, Nortel, Siemens, and Toshiba. *See* Ex. 1095, 22.

several documents, including a framework for FIPA activity and a list of requirements for FIPA-specified agent capabilities. Ex. 1067, 1 (Resolutions of Yorktown meeting); Ex. 1060, 1 (Results of Yorktown meeting); Ex. 1049 ¶ 9. At the third meeting in October 1996 in Tokyo, FIPA approved a final work plan calling for production of a FIPA specification in October 1997. Ex. 1049 ¶ 11; Ex. 1070, 1 (work plan); Ex. 1023 (Results of Tokyo meeting). Also at the Tokyo meeting, FIPA produced its First Call for Proposals, which outlined in detail three technology parts (corresponding to Parts 1–3 of FIPA 97) and four application parts (corresponding to Parts 4–7 of FIPA 97). Ex. 1069, 1–27 (First Call for Proposals); Ex. 1049 ¶ 12.

In 1997, FIPA began to produce draft specifications. At the fourth meeting in January 1997 in Turin, Italy, FIPA publicly released drafts of Parts 1–4 and posted them on the FIPA home page (http://drogo.cselt.stet.it/fipa). Ex. 1021, 1 (Results of Turin meeting); Ex. 1049 ¶ 13. Additionally, FIPA released a Second Call for Proposals at the Turin meeting. Ex. 1071, 1–3 (Second Call for Proposals); Ex. 1049 ¶ 13. At the fifth meeting in April 1997 in Reston, VA, FIPA produced drafts of Parts 1–7, which were publicly released and posted on the FIPA home page. Ex. 1024 (Results of Reston meeting); Ex. 1061 (Resolutions of Reston meeting); Ex. 1049 ¶ 17. At the sixth meeting in June 1997 in Cheju Island, South Korea, FIPA publicly released revised drafts of Parts 1–7 and posted them on the FIPA home page. Ex. 1025, 1 (Results of Cheju meeting); Ex. 1062, 5 (Resolutions of Cheju meeting); Ex. 1049 ¶ 19. According to Dr. Finin, the Reston Draft and Cheju Draft were substantially complete versions of what would become FIPA 97. Ex. 1049 ¶¶ 17, 19.

Dr. Finin testifies that news of FIPA and its standardization efforts "spread quickly throughout the relatively small community of software agent researchers." Ex. 1049 ¶ 8. For instance, the AgentWeb website, "a meeting place for researchers in agent-based technology from 1995–2000," was home to a "Software Agents" mailing list and a newsletter that had more than 1,300 subscribers in 1996. *Id.*; Ex. 1089, 5. Dr. Finin was "the founder, author, and a subscriber" of the AgentWeb newsletter. Ex. 1049 ¶ 8. The widely distributed AgentWeb newsletters announced upcoming FIPA meetings, reported results of previous meetings, including calls for proposals, and provided links to the specification drafts posted on the FIPA home page. *See id.* ¶¶ 8, 10, 12, 14, 17, 19.

For example, the AgentWeb newsletter dated May 11, 1996, announced the upcoming FIPA June 1996 Yorktown meeting, described as the "FIPA Opening Forum." Ex. 1090, 5; Ex. 1049 ¶ 8. The purpose of the meeting, as stated in the newsletter, was to "refine the list of basic agent capabilities candidate for FIPA specification; compile a first list of agent capabilities intended for specification by end 1997; and establish the first working groups." Ex. 1090, 5. Likewise, the AgentWeb newsletter dated August 12, 1996, advertised the FIPA October 1996 Tokyo meeting. Ex. 1088, 1; Ex. 1049 ¶ 10. Thereafter, the AgentWeb newsletter dated October 14, 1996, publicized the Call for Proposals issued at the October 1996 Tokyo meeting and provided the deadline for submission of proposals to be considered at the Turin meeting in January 1997. Ex. 1087, 1; Ex. 1049 ¶ 12. FIPA had decided that respondents who submitted proposals would be invited to the January 1997 meeting to present their proposals even if they were not FIPA members. Ex. 1023, 1; *see* Ex. 1069, 27.

Once FIPA began to produce drafts of the specification, AgentWeb newsletters announced those drafts and provided links to access them. The AgentWeb newsletter dated February 2, 1997, reported that "[i]nitial specifications for three technology parts (Agent Management, Agent Communication and Agent/Software Interaction) and one application part (Personal Travel Assistance) have been produced" at the recent Turin meeting. Ex. 1091, 1; Ex. 1049 ¶ 14. The newsletter included a freely accessible and public link to access the draft. Ex. 1049 ¶ 14 (citing Ex. 1091, 1–2). It also indicated that drafts of the remaining three specification parts would be generated at the FIPA meeting to be held in April 1997 in Reston. Ex. 1091, 1–2. A subsequent AgentWeb newsletter dated April 13, 1997, advertised the upcoming Reston meeting and contained links to information about the meeting on the FIPA website. Ex. 1092, 3; Ex. 1049 ¶ 17.

On May 5, 1997, following the Reston meeting, an AgentWeb newsletter reported that attendees of that meeting produced a revised draft including all seven parts of the specification. Ex. 1093, 2; Ex. 1049 ¶ 17. The newsletter contained individual public links to the seven parts and invited "both members and non-members" to comment, providing an email address for submission. Ex. 1093, 2; Ex. 1049 ¶ 17. Additionally, the newsletter announced the dates and locations of the next two meetings—the June 1997 Cheju meeting and the seventh meeting to take place in Munich on October 6–10, 1997. Ex. 1093, 2; Ex. 1049 ¶ 17. Similarly, the AgentWeb newsletter dated June 30, 1997, announced that the Cheju meeting resulted in revised versions of the FIPA specification documents and provided direct links to the seven parts. Ex. 1094, 1–2; Ex. 1049 ¶ 19. Again, the newsletter stated that FIPA invited comments and that non-

members making substantial comments would be invited to attend the October 1997 Munich meeting. Ex. 1094, 2. Dr. Finin was among those who submitted comments on the Cheju draft. Ex. 1073; Ex. 1049 ¶ 20.

Meanwhile, the AgentWeb Software Agents mailing list also provided information regarding FIPA's efforts to the community of software agent researchers. *See* Ex. 1049 ¶ 8. Dr. Finin was an organizer of and contributor to the Software Agents mailing list. *Id.* On May 2, 1996, a posting to the mailing list referenced the upcoming June 1996 FIPA meeting in Yorktown Heights, New York. Ex. 1079, 1; Ex. 1049 ¶ 8. Members of the Software Agents mailing list posted comments regarding the Turin draft after it was released publicly. Exs. 1078, 1081, 1082; *see* Ex. 1049 ¶¶ 14–15. Dr. Finin was among those who shared their thoughts. *See* Ex. 1082; Ex. 1049 ¶ 15. A posting after the Reston meeting included a public and open link to access the Reston draft and invited comments from the mailing list. Ex. 1083, 1; Ex. 1049 ¶ 17.

*3. Public Release of FIPA97*

FIPA's seventh meeting took place in Munich on October 6–10, 1997. Ex. 1026 (Resolution of Munich meeting); Ex. 1049 ¶ 20. At this meeting, FIPA incorporated final edits and comments and approved the FIPA 97 specification for publication. Ex. 1026, 1, 5; Ex. 1049 ¶ 20. The specification as approved at the meeting was called "FIPA 97 ver. 1.0," or FIPA 97 Version 1.0. Ex. 1026, 5. Working groups for various parts of the specification were given about one month to check for consistency and make minor edits. *Id.* at 2; Ex. 1049 ¶ 20.

An "initial" version of FIPA 97 Version 1.0, approved at the Munich meeting and dated October 10, 1997, was posted to the FIPA website, housed at the time at http://drogo.cselt.stet.it/fipa. Ex. 1049 ¶¶ 20–21.

According to Dr. Finin, the specification documents were available online and free for anybody to access by sometime in October 1997. *Id.* ¶ 21. On November 18, 1997, an AgentWeb newsletter announced completion of FIPA 97 Version 1.0 and its publication on the FIPA website. Ex. 1086, 1–2; Ex. 1049 ¶ 21. The newsletter provided individual, direct links to the seven parts of the specification on the FIPA website. Ex. 1086, 1–2. The links were not password protected and were open to the public without a requirement for secrecy or confidentiality. Ex. 1049 ¶ 21. As with the earlier AgentWeb newsletters, the newsletter containing links to FIPA 97 Version 1.0 was sent to more than 1,300 subscribers. *Id.*

Dr. Finin testifies that in late 1997, "a few weeks after the Munich meeting," he accessed the approved FIPA 97 Version 1.0 posted on the FIPA website. *Id.* ¶¶ 20–21. He specifically recalls accessing the documents in late 1997 to review the first major work product of FIPA and to prepare for FIPA's upcoming January 1998 meeting in Palo Alto, which he attended. *Id.* ¶ 21 (citing Ex. 1074). Dr. Lieberman also testifies that he recalls FIPA 97 Version 1.0 being publicly available on the FIPA website throughout late 1997 and early 1998 and that he accessed it in late 1997 as a member of the interested public. Ex. 1050 ¶ 146.

The release of FIPA 97 Version 1.0 was well publicized in the weeks after the Munich meeting. Ex. 1049 ¶ 22. For example, on October 20, 1997, the EETimes featured an article reporting FIPA's approval of the FIPA 97 specification. Ex. 1095, 22; *see* Ex. 1049 ¶ 22. The article was based on an interview with Leonardo Chiariglione, the president of FIPA. Ex. 1095, 22. The article described the seven parts of the specification: "The first three parts cover different aspects of agent behavior: agent management; agent communication; and agent-software interaction. The

four remaining parts, which cover application areas, . . . are: personal travel assistance; personal assistant; audio-visual entertainment and broadcast; and network provision and management." *Id.* After describing FIPA's plans for 1998, including testing of FIPA 97 Version 1.0 to provide input for a further round of standardization, the article referred readers to the FIPA website for information regarding the released specification: "CSELT[7] maintains extensive information on FIPA's activities at www.cselt.stet.it/fipa."[8] *Id.* (emphasis omitted). It concluded with a quote from Dr. Chiariglione regarding the specification's public availability: "'It is our policy to make the standard freely available over the Internet,' Chiariglione said. 'FIPA will retain the copyright but it will be free for others to use.'" *Id.*

The November-December 1997 issue of IEEE Internet Computing also announced the release of the FIPA 97 specification: "The Foundation for Intelligent Physical Agents, a non-profit organization established to promote emerging agent-based applications, has released its first specification. Named FIPA 97, the specification will provide a benchmark for interoperable products." Ex. 1096, 93; Ex. 1049 ¶ 22. The news brief directed readers to the FIPA website for the text of the specification. Ex. 1096, 93 ("The text is available at http://drogo.cselt.stet.it.fipa/."[9]); Ex. 1049 ¶ 22.

---

[7] Centro Studi e Laboratori Telecommunicazioni, Dr. Chiariglione's employer at the time. *See* Ex. 1095, 22.
[8] The record suggests this website (http://www.cselt.stet.it/fipa) was a mirror of the FIPA website (http://drogo.cselt.stet.it/fipa) in 1997. *See* Ex. 1049 ¶ 22; Ex. 1095, 22; Tr. 94:11–14.
[9] The URL provided in the article contains a typographical error. *See* Ex. 1049 ¶ 22 (correcting the URL to http://drogo.cselt.stet.it[/]fipa/).

Sometime after the Munich meeting, FIPA also produced a hardcopy book version of the FIPA 97 Version 1.0 specification to be sent to FIPA members and various institutions and standards groups. Ex. 1049 ¶ 24; *see* Ex. 1026, 1; Ex. 1063, 1 (Resolution of the Palo Alto meeting, Jan. 29, 1998). At least two copies of the book were available in libraries in January 2019. Ex. 1049 ¶ 24; Ex. 1057, 1 (WorldCat catalog entry for "Fipa specification : Version 1.0"); Ex. 1055 (cover page and table of contents of each part in copy at library in Italy); Ex. 1056 (cover page and table of contents of Part 1 in copy at library in Switzerland). Dr. Finin testifies that the books contain the November 28, 1997, edited version of FIPA 97 Version 1.0, which "only made minor edits (mostly spelling and formatting) over the October 10, 1997 version." Ex. 1049 ¶ 25 (citing Ex. 1055, 5 (Part 2 "publication date" of November 28, 1997); Ex. 1056).

*4. Publications and Patents Referring to FIPA97 and FIPA Activities*

In late 1997 and 1998, several papers reviewing and outlining the FIPA 97 specification were published and presented at meetings. *See* Ex. 1049 ¶¶ 26–30. A paper dated December 1997 memorializes a presentation made to a meeting on Intelligent Agent Technology organized by the EPSRC[10] Community Club in Advanced Computing Techniques. Ex. 1097, Cover ("Dickinson");[11] *see* Ex. 1049 ¶ 26. This paper outlines the background and rationale for the creation of an agent interoperability standard. Ex. 1097, 1–3. It also describes the development history of the

[10] "The Engineering and Physical Sciences Research Council (EPSRC) is the main funding body for engineering and physical sciences research in the UK." Engineering and Physical Sciences Research Council, epsrc.ukri.org/about (last visited Sept. 28, 2020).
[11] Ian J. Dickinson, *Agent Standards*, HP Laboratories Bristol, HPL-97-156 (Dec. 1997).

FIPA 97 specification, noting that FIPA's work program "culminated in the publication of an initial draft standard, FIPA 97, at the Munich meeting on October 1997." *Id.* at 3. Dickinson further provides that "[a]ll FIPA documents and meeting outputs are publicly available on the web" at "http://drogo.cselt.stet.it/fipa/," and "comments and review have been sought at each stage of the process." *Id.* at 3, 7 n.9. The paper then describes the features of the specification's three substantive technical sections, Parts 1–3. *Id.* at 3–6.

Similarly, a 1998 paper titled "Industrial Applications of Multi-Agent Technology" summarizes FIPA's background and presents an overview of the three technical parts (i.e., Parts 1–3) of FIPA 97 Version 1.0 released in October 1997. Ex. 1099, 12–13 ("Steiner");[12] *see* Ex. 1049 ¶ 28. The Steiner paper provides the FIPA website address and explains that the four application parts (i.e., Parts 4–7) will be used in field trials to gather information to be incorporated into a revised version of FIPA 97. Ex. 1099, 13 & n.1.

Likewise, a paper titled "FIPA — towards a standard for software agents" appearing in the July 1998 issue of the BT Technology Journal explains the motivation for an agent standard and provides an overview of FIPA's background and activities. Ex. 1100, 51–52 ("O'Brien");[13] *see* Ex. 1049 ¶ 29. It then describes the different parts of the FIPA 97 Version 1.0 specification issued in October 1997. Ex. 1100, 51–52.[14]

---

[12] Donald Steiner, Siemens AG, *Industrial Applications of Multi-Agent Technology* (IEEE 1998).
[13] P.D. O'Brien & R.C. Nicol, *FIPA — towards a standard for software agents*, BT Tech. J. Vol. 16, No. 3 (July 1998).
[14] Dr. Finin testifies that O'Brien provides public links to FIPA97. Ex. 1049 ¶ 29. The copy of O'Brien entered into the record, however, appears to be

Dr. Finin cites several other publications that reference FIPA's development of an agent communication standard in the 1997–98 timeframe. Ex. 1049 ¶ 31 (citing Exs. 1027–29). Dr. Finin also identifies several patent applications in the same timeframe that refer to FIPA's agent communication language. *Id.* ¶ 32 (citing Exs. 1030–33).

*5. The FIPA Website and Exhibits 1006–1012*

Sometime in 1998, the FIPA website migrated from its original site (http://drogo.cselt.stet.it/fipa) to fipa.org. Ex. 1049 ¶ 23; *see also* Ex. 1026 (Resolution of Munich meeting indicating FIPA's plans for the "redesign of a new FIPA home page"); Ex. 1065, 4 (Resolutions of the Durham meeting in October 1998 indicating the website will be transferred to www.fipa.org). The fipa.org website still exists today even though FIPA is no longer active as a standalone organization. *See* Ex. 1049 ¶¶ 23, 48–49. The current FIPA website maintains a repository of past FIPA documents, including meeting notes, press releases, FIPA resolutions, and different versions of the FIPA specification. *Id.* ¶ 49.

Dr. Finin testifies that the "initial" version of FIPA 97 Version 1.0 (i.e., the specification posted on the FIPA website on October 10, 1997) "remained publicly accessible during all of FIPA's future activities and is still available on FIPA's home page today." *Id.* ¶ 21. According to Dr. Finin, Exhibits 1006–1012 (collectively referred to as FIPA97) are Parts 1–7 of FIPA 97 Version 1.0 as found on the current fipa.org website. *Id.* Based on his personal knowledge, Dr. Finin further testifies that

missing several pages, including one containing endnotes 10–12 that might provide links to the FIPA website. *See* Ex. 1100, 52 ("FIPA97 (issued in October 1997) [10–12] is the first output from FIPA covering part of the requirements for an agent standard.").

Exhibits 1006–1012 are the "same version" and contain "the same disclosures, content and information" as Parts 1–7 of FIPA 97 Version 1.0 that were publicly available on the FIPA website (http://drogo.cselt.stet.it/fipa) on October 10, 1997, and which Dr. Finin himself accessed in late 1997. *Id.* ¶¶ 21, 34. He also notes that although Exhibit 1006 has a typographical error relating to the version number in the header of its odd pages,[15] Exhibit 1006 is identical to the version of Part 1 of FIPA 97 Version 1.0 that was released on October 10, 1007. *Id.* ¶ 21. Additionally, as evidence that FIPA 97 Version 1.0 has been continuously available on fipa.org since the website migration, Dr. Finin cites a set of Internet Archive records beginning in 2000 showing where each part of that version of the specification could be accessed. *Id.* (citing Ex. 1054).

Dr. Finin testifies that the original FIPA website, http://drogo.cselt.stet.it/fipa, remained live for several years after the website transitioned to fipa.org. Ex. 1049 ¶ 23. The Internet Archive Wayback Machine contains an archived screen capture of the website http://drogo.cselt.stet.it/fipa from December 1, 1998. *See* Ex. 1051; Ex. 1049 ¶¶ 23, 54. According to Dr. Finin, the archived page shows that the FIPA 97 specification was live and freely available on the FIPA website home page at that time. Ex. 1049 ¶ 23; Ex. 1051, 1 ("FIPA has already developed a seven-part specification called FIPA 97. Implementations of FIPA 97 are undergoing field trials that will last until October 1998 when version 2 of FIPA 97 will be produced."); Ex. 1049 ¶ 23. The home page provided links (i.e., "FIPA 97") to actual specification documents, but those

---

[15] The header on odd pages reads "FIPA 1997 Part 1: Version 2.4." *E.g.*, Ex. 1006, 3.

links have not been maintained in the archive. Ex. 1049 ¶ 23. Dr. Finin testifies that the screen capture from the Internet Archive is consistent with the mirror of the former FIPA site hosted by Leonardo Chiariglione. *Id.* ¶ 51 (citing Ex. 1103 (http://leonardo.chiariglione.or/standards/fipa/)). Dr. Chiariglione's mirror is still available, and documents hosted on the mirror are "accurate and complete copies of FIPA documents that were available to FIPA members." *Id.*

*6. Analysis*

Petitioner argues that FIPA97 was a publicly accessible printed publication as of October 10, 1997, when it was posted on the FIPA website. Pet. 23; Pet. Reply 15–21. More specifically, Petitioner argues that (1) FIPA 97 Version 1.0 was publicly accessible on October 10, 1997, and (2) the version of the FIPA specification found in Exhibits 1006–1012, referred to herein as FIPA97, is the same specification that was posted on the FIPA website on October 10, 1997, and named FIPA 97 Version 1.0. *See, e.g.*, Pet. 23 (arguing FIPA 97 Version 1.0 was publicly accessible in late 1997); Pet. Reply 15–17 (arguing that Exhibits 1006–1012 are the same documents that were made public as FIPA 97 Version 1.0). Patent Owner addresses the first contention when it argues the evidence does not show any version of FIPA 97 Version 1.0 was available on the FIPA website. *See, e.g.*, PO Resp. 69. It also challenges the second contention when it argues Petitioner has failed to show that Exhibits 1006–1012 are identical to the version of the FIPA specification that allegedly was publicly accessible before the critical date. *See, e.g.*, *id.* at 62–63. In our analysis below, we address the two questions in turn.

Considering all the facts and circumstances surrounding the development of FIPA 97 Version 1.0 and its publication on the FIPA

website, we find that FIPA 97 Version 1.0 was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the art, exercising reasonable diligence, could locate it. *See Jazz Pharm.*, 895 F.3d at 1355–56. First, the uncontested evidence shows that members of the relevant public (i.e., persons of ordinary skill in the field of software agent-based technology) knew of the release of FIPA 97 Version 1.0 in late 1997, prior to the critical date. As detailed above, FIPA was open to corporations and educational and governmental organizations without restriction. Ex. 1006, iv. FIPA's members included many industry leaders whose employees attended FIPA meetings, including the October 1997 meeting in Munich where FIPA 97 Version 1.0 was approved for publication. *See id.*; Ex. 1095, 22. FIPA meetings and activities were publicized among the larger community of software agent researchers via the AgentWeb website and its associated Software Agents mailing list and AgentWeb newsletter, which had more than 1,300 subscribers. Ex. 1090, 5; Ex. 1088, 1; Ex. 1087, 1; Ex. 1091, 1–2; Ex. 1092, 3; Ex. 1093, 2; Ex. 1094, 1–2; Ex. 1086, 1–2; *see* Ex. 1049 ¶¶ 8, 10, 12, 14, 17, 19. The newsletter in particular informed subscribers of the development of the FIPA specification during 1996 and 1997 and provided detailed information regarding the release of FIPA 97 Version 1.0 in a November issue. Ex. 1086, 1–2. News articles in periodicals published in late 1997 also announced that FIPA had released and published FIPA 97 Version 1.0. Ex. 1095, 22; Ex. 1096, 93; *see* Ex. 1049 ¶ 22. In addition, the record contains several papers published in late 1997 and 1998, prior to the critical date, describing FIPA 97 Version 1.0 and its release in October 1997. *See* Ex. 1097, 1–7; Ex. 1099, 12–13; Ex. 1100, 51–52; Ex. 1049 ¶¶ 26–30; *see also* Ex. 1049 ¶¶ 31–32

(citing Exs. 1027–33 (other publications and patents referring to FIPA specification)).

The evidence of record also demonstrates that members of the relevant public, exercising reasonable diligence, could have located FIPA 97 Version 1.0 in late 1997 on the FIPA website, housed at the time at http://drogo.cselt.stet.it/fipa. FIPA published FIPA 97 Version 1.0 on its website at the conclusion of the Munich meeting on October 10, 1997, or shortly thereafter. *See* Ex. 1049 ¶ 20. In the several months leading up to the Munich meeting, persons of ordinary skill in the art would have known about the FIPA website through the widely distributed AgentWeb newsletters and the Software Agents mailing list, which provided website information or direct links to drafts of the specification and meeting announcements and reports. *See* Ex. 1091, 1–2; Ex. 1092, 3; Ex. 1093, 2; Ex. 1094; Ex. 1082, 1; Ex. 1083, 1. Therefore, people working in the field would have been sufficiently familiar with FIPA's activities and its website to look for FIPA 97 Version 1.0 on the FIPA website when it was posted after the Munich meeting. Indeed, both Dr. Finin, who was affiliated with FIPA, and Dr. Lieberman, who worked in the software agent field, testify that they accessed FIPA 97 Version 1.0 on the FIPA website in late 1997. Ex. 1049 ¶ 21; Ex. 1050 ¶ 146.

Moreover, the AgentWeb newsletter dated November 18, 1997, provided a link to the FIPA website and individual links to the seven parts of FIPA 97 Version 1.0 published on the website. Ex. 1086, 1–2; *see* Ex. 1049 ¶ 21. Thus, that issue of the newsletter provided more than 1,300 interested members of the public with direct access to FIPA 97 Version 1.0 at least as of November 18, 1997.

News articles and papers published in late 1997 also provided readers with the website address where FIPA 97 Version 1.0 could be found. *See* Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9. The news articles in particular likely reached a very wide audience because they appeared in publications directed to subject matter broader than agent-based technology. *See* Ex. 1095 (EETimes); Ex. 1096 (IEEE Internet Computing). The EETimes article was dated October 20, 1997, suggesting that FIPA 97 Version 1.0 was available on the FIPA website at least as of that date.

The undisputed evidence also demonstrates that FIPA 97 Version 1.0 was freely available on the FIPA website without a password or any other restrictions and access was not subject to any requirement or expectation of secrecy or confidentiality. *See* Ex. 1049 ¶ 21; Ex. 1095, 22; *see also* Ex. 1006, iv (stating FIPA intended to make its results available to all interested parties). This evidence further supports our finding that FIPA 97 Version 1.0 was publicly accessible in late 1997. *See Jazz Pharm.*, 895 F.3d at 1358–59; *Voter Verified, Inc. v. Premier Election Solutions, Inc.*, 698 F.3d 1374, 1380–81 (Fed. Cir. 2012); *MIT v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985).

Patent Owner's arguments, many of which attack pieces of evidence individually, do not persuade us that Petitioner has failed to show that FIPA 97 Version 1.0 was publicly accessible. First, Patent Owner argues that no evidence shows the original FIPA website (http://drogo.cselt.stet.it/fipa) existed prior to a December 1, 1998, Internet Archive capture. PO Resp. 68 (citing Ex. 1051). To the contrary, much of the documentary evidence from late 1997 and testimonial evidence identifies that website or its mirror as the FIPA website during the relevant time period. *See* Ex. 1049 ¶ ¶ 20–23; Ex. 1092, 3; Ex. 1093, 2; Ex. 1095, 22;

Ex. 1096, 93; Ex. 1097, 7 n.9. Notwithstanding the absence of an Internet Archive capture for the website from a date prior to December 1998, we find that, based on the totality of evidence in the record, the original FIPA website existed in late 1997.

Patent Owner also argues that none of the documents cited by Petitioner provide active links to FIPA 97 Version 1.0 and therefore are insufficient proof of public accessibility. PO Resp. 69; PO Sur-reply 30. Again, based on the totality of evidence in the record, including but not limited to the testimony of Dr. Finin that he accessed FIPA 97 Version 1.0 on the FIPA website in late 1997, we find that FIPA 97 Version 1.0 was available on the FIPA website at that time, notwithstanding the lack of active links today, more than twenty years later. Patent Owner finds fault with Dr. Finin's testimony on this point because he does not claim to have used any of the links in the AgentWeb newsletters to access FIPA 97 Version 1.0. PO Sur-reply 30 (citing Ex. 1049 ¶ 21). Patent Owner, however, overlooks Dr. Finin's testimony that he was the founder and author of the AgentWeb newsletter, implying that he created the links in the newsletter. *See* Ex. 1049 ¶ 8. Therefore, based on Dr. Finin's personal knowledge regarding the links in the AgentWeb newsletter dated November 18, 1997, and the other evidence corroborating his testimony, we find that FIPA 97 Version 1.0 was available on the FIPA website in late 1997.

Patent Owner further asserts that, to the extent the Internet Archive capture from December 1998 provides an operable download link, it links to Version 2.0 of the FIPA 97 specification. PO Resp. 69 (citing Ex. 1051). It is not surprising, however, that FIPA's website in December 1998 provided links to FIPA 97 Version 2.0, which FIPA released in October 1998 to provide minor updates to two parts of the specification. *See* Ex. 1049 ¶ 35;

Ex. 1053, vi. In any event, the December 1998 Internet Archive capture at least shows that the FIPA website was live at that time, which was prior to the critical date. *See* Ex. 1049 ¶ 23 (citing Ex. 1051, 1).

In its Sur-reply, Patent Owner argues for the first time that Petitioner has not demonstrated that a person of ordinary skill in the art in 1997 could have found FIPA 97 Version 1.0 using search tools or that the FIPA website was indexed so the specification could be located. PO Sur-reply 27–28. Further, Patent Owner argues that the existence of different FIPA websites at various times would have made it even more difficult to find the correct version of the FIPA specification without sufficient indexing or search tools. *Id.* at 29.

Even if we consider this late argument, we find it unpersuasive. As detailed above, the uncontested evidence shows that the address of the FIPA website itself was widely known among those skilled in the art and that FIPA routinely provided links to the FIPA specification on the website's home page. *See* Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9; Ex. 1051, 1; Ex. 1021, 1; Ex. 1025, 1. The November 1997 AgentWeb newsletter also provided direct links to FIPA 97 Version 1.0. Ex. 1086, 1–2. Under these circumstances, we find that a member of the interested public could have found FIPA 97 Version 1.0 without search tools or indexing by using the links in the AgentWeb newsletter or navigating to the well-known FIPA website home page. We also find that the record, including Dr. Finin's testimony, satisfactorily explains the various FIPA websites and website addresses over time and clearly identifies the FIPA website that was being used in late 1997. *See* Ex. 1049 ¶¶ 22–23, 48–49, 51.

Having determined that FIPA 97 Version 1.0 was publicly accessible on the FIPA website in late 1997, as early as October 10 and no later than

November 18, we turn to whether Exhibits 1006–1012 (collectively referred to as FIPA97) contain the same version of the FIPA specification that was available on the FIPA website during that timeframe. Dr. Finin testifies that Exhibits 1006–1012, documents available on the current FIPA website (fipa.org) and identified as FIPA 97 Version 1.0, are the same version with the same content as Parts 1–7 of FIPA 97 Version 1.0 that were released at the FIPA Munich meeting on October 10, 1997, and were publicly available on the FIPA website (http://drogo.cselt.stet.it/fipa) in late 1997. Ex. 1049 ¶¶ 21, 34.

As an initial matter, the October 10, 1997, date on the cover pages of several parts of FIPA97 supports Dr. Finin's testimony that FIPA97 is the same as FIPA 97 Version 1.0 as published on the FIPA website in late 1997. *See* Ex. 1006, Cover; Ex. 1007, Cover; Ex. 1008, Cover; Ex. 1010, Cover; Ex. 1012, Cover; *see also* Ex. 1009, Cover (Part 4 identifying a 1997 copyright date); Ex. 1011, Cover (Part 6 identifying a 1997 copyright date). Patent Owner contends that Petitioner cannot rely on the date stamps or copyright notices on Exhibits 1006–1012 to establish public accessibility because they are hearsay. PO Resp. 61; PO Sur-reply 22–24. We agree with Petitioner that Patent Owner has waived this argument because it did not raise an objection on evidentiary grounds pursuant to 37 C.F.R. § 42.64(b)(1). *See* Pet. Reply 15–16. Furthermore, we agree with Petitioner that the dates on the cover pages are not hearsay because they are evidence tending to show that FIPA97 is identical to FIPA 97 Version 1.0, not statements offered to show Exhibits 1006–1012 were published on a certain date. *See id.* at 16 (citing *Apple Inc. v. VirnetX Inc.*, IPR2016-01585, Paper 32 at 58 (PTAB Feb. 20, 2018)).

Patent Owner also argues that Petitioner cannot rely on the cover page dates alone as proof of the documents' public accessibility. PO Sur-reply 23. The date stamps, however, are only part of the totality of evidence offered by Petitioner to establish public accessibility. As such, they are relevant evidence supporting a finding that FIPA97 was publicly accessible. *See Hulu*, Paper 29 at 17–18 (citing *Nobel Biocare*, 903 F.3d at 1377).

Patent Owner argues that the existence of multiple versions of FIPA 97 Version 1.0 undercuts Petitioner's position and Dr. Finin's testimony that Exhibits 1006–1012 are the version of FIPA 97 Version 1.0 that was publicly accessible in late 1997. *See* PO Resp. 62–65; PO Sur-reply 25. For example, Patent Owner points to Dr. Finin's description of the version released on October 10, 1997, as an "initial" version, after which final minor edits were to be made. PO Resp. 63–64 (citing Ex. 2068, 86:11–15, 88:9–89:25); *see* Ex. 1049 ¶ 21. Patent Owner cites an Internet Archive capture in the record referring to "FIPA 97 specification ver. 1.0 (Reston meeting)." PO Resp. 64–65 (citing Ex. 1105, 27). Patent Owner also cites evidence, including Dr. Finin's testimony, that a different version of FIPA 97 Version 1.0 was published in hardcopy books. *Id.* at 65 (citing Exs. 1055, 1056; Ex. 1049 ¶ 25 (stating that "FIPA printed the November 28, 1997, edited version of the specification" in the books)).

Patent Owner argues that because these various versions of FIPA 97 Version 1.0 have not been substantively introduced into evidence so that the differences can be ascertained, Petitioner has not shown that Exhibits 1006–1012 are the version that was publicly accessible on the FIPA website in late 1997. *See* PO Resp. 66–67. We disagree. Dr. Finin testifies that Exhibits 1006–1012 are the same documents that were released at the conclusion of the FIPA meeting in Munich on October 10, 1997, and were

made publicly available at the time. Ex. 1049 ¶¶ 21, 34. Other evidence of record corroborates Dr. Finin's testimony and adequately explains the multiple versions of the specification. *See* Pet. Reply 17–18. As set forth in detail above, FIPA released a version of FIPA 97 Version 1.0 on October 10, 1997, and made it available on the FIPA website soon thereafter. *See* Ex. 1049 ¶ 21; Ex. 1086, 1–2; Ex. 1095, 22; Ex. 1096, 93. It is clear from the record that any earlier versions of the specification, such as the version made available after the Reston meeting six months before FIPA 97 Version 1.0, were drafts made available for public comment. *See* Pet. Reply 17; Ex. 1049 ¶¶ 16–18; Ex. 1024; Ex. 1061.

The record also shows that the version published in book form is a later version, dated November 28, 1997, containing minor formatting and clerical edits. *See* Ex. 1049 ¶ 25; Ex. 1055, 5. Petitioner does not rely on the book version as a prior art reference or assert that it was publicly accessible. *See* Pet. 23; Pet. Reply 17–18. The hardcopy book excerpts in the record merely corroborate Dr. Finin's testimony that FIPA's activities and release of the FIPA specification were known in the art. *See* Ex. 1049 ¶ 24.

Patent Owner also points to the erroneous header on odd pages in Exhibit 1006 as calling into question which version of the specification is in Exhibits 1006–1012. PO Resp. 66. We credit Dr. Finin's unrebutted testimony that the header on some pages in Exhibit 1006 is a typographical error. *See* Ex. 1049 ¶ 21. Patent Owner has not cited, nor do we see, evidence in the record suggesting a FIPA 97 Version 2.4 was made publicly available. *See* PO Resp. 66.

Patent Owner finds fault with Exhibits 1006–1012 because they were obtained after the critical date and could not have been obtained from a

website prior to the critical date. *See* PO Resp. 61–62; PO Sur-reply 21. In his declaration, Dr. Finin testifies that Exhibits 1006–1012 are available on the FIPA website today (i.e., fipa.org), and the earliest Internet Archive record of the relevant website pages shows the documents were posted in 2000. Ex. 1049 ¶ 21 (citing Ex. 1054). Patent Owner contends that in his deposition Dr. Finin acknowledged that Exhibits 1006–1012 could have been obtained from files saved in the Internet Archive between 2003 and 2004. PO Resp. 61–62 (citing Ex. 2068, 93:12–94:2, 96:7–20). In either case, Patent Owner argues, the dates are after the critical date of the '560 patent. *Id.* at 62; PO Sur-reply 21. We agree with Petitioner, however, that the date Exhibits 1006–1012 were obtained is immaterial if they are digital copies of documents that are shown to have been publicly accessible before the critical date. *See* Pet. Reply 16 (citing *In re Wyer*, 655 F.2d at 226–27).

Finally, Patent Owner argues that the testimony of Dr. Finin and Dr. Lieberman is conclusory, unreliable, and uncorroborated and therefore insufficient to establish public accessibility. PO Resp. 71–74; PO Sur-reply 20–22. "[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest." *Nobel Biocare*, 903 F.3d at 1377–78 (quoting *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1369 (Fed. Cir. 1999)). This corroboration requirement applies when relying on witness testimony to establish public accessibility of a prior art reference. *See id.* at 1377–81; *Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158–60 (Fed. Cir. 2004). Corroborating evidence may include documentary or testimonial evidence, and circumstantial evidence may provide sufficient corroboration. *Nobel Biocare*, 903 F.3d at 1378. Determining whether testimony has been

corroborated "involves an assessment of the totality of the circumstances including an evaluation of all pertinent evidence." *Id.*

We are not persuaded by Patent Owner's argument regarding the testimony of Dr. Finin and Dr. Lieberman. Dr. Finin's testimony is based on his personal knowledge as someone who was directly involved in FIPA's activities by submitting comments on draft specifications and attending meetings, for example, and providing independent advice as a FIPA Fellow. His testimony that FIPA approved FIPA 97 Version 1.0 at the Munich meeting on October 10, 1997, and posted it to the FIPA website so that it was publicly accessible is corroborated by the evidence in the record of the facts and circumstances surrounding the development and release of the specification as analyzed above. Dr. Lieberman's testimony that as a member of the interested public he accessed FIPA 97 Version 1.0 in late 1997 is corroborated by the same evidence.

As for Dr. Finin's testimony, based on his personal knowledge, that Exhibits 1006–1012 are the same as the version of FIPA 97 Version 1.0 that was publicly accessible on the FIPA website in late 1997, we find it to be credible and corroborated by other evidence of record. We are not persuaded that Dr. Finin's inability to recall many of the details of a 300-page specification more than twenty years after it was created undermines his testimony. *See* PO Resp. 72–73. Furthermore, we find that the evidence discussed above, including the identification of Exhibits 1006–1012 on their cover pages or elsewhere as FIPA 97 Version 1.0 with a date of October 10, 1997, corroborates Dr. Finin's testimony that the version of the specification in Exhibits 1006–1012 is the version that was publicly accessible on the FIPA website in late 1997, and not some other version of the FIPA specification.

For these reasons, we find that a preponderance of the evidence shows that Exhibits 1006–1012 are the version of FIPA 97 Version 1.0 released on October 10, 1997, and posted on the FIPA website in late 1997. As discussed above, a preponderance of the evidence shows that the October 10, 1997 version of FIPA 97 Version 1.0 was publicly accessible in late 1997. Accordingly, we find that Petitioner has met is burden to show that FIPA97, submitted as Exhibits 1006–1012 and relied on by Petitioner in its unpatentability challenges, was publicly accessible prior to the critical date of January 5, 1999, and therefore is available as prior art to the ’560 patent under 35 U.S.C. § 102(a).

### *G. Asserted Obviousness over Kiss and FIPA97*

Petitioner contends that claims 1, 5–13, 22–25, and 50–55 of the ’560 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss and FIPA97. Pet. 32–87. We have reviewed the parties’ arguments in the Petition, Patent Owner Response, Reply, and Sur-reply, as well as the relevant evidence discussed in those papers and other record papers, including the declarations of Dr. Lieberman and Dr. Medvidovic. For the reasons that follow, we determine Petitioner has shown by a preponderance of the evidence that claims 1, 5–9, 12, 13, 22–25, and 52 are unpatentable as obvious over the combined teachings of Kiss and FIPA97, but has not shown by a preponderance of the evidence that claims 10, 11, 50, 51, and 53–55 are unpatentable as obvious over the combined teachings of Kiss and FIPA97.

#### *1. Proposed Combination of Kiss and FIPA97*

In its proposed combination of Kiss with FIPA97, Petitioner relies on Kiss for teaching electronic agents and their general functions and operations, including agent collaboration, agent registry, and inter-agent

messaging. Pet. 27–28. Petitioner acknowledges, however, that Kiss does not disclose an inter-agent communication language and relies on FIPA97 to teach a common communications protocol and language (FIPA ACL), which is combined with the teachings of Kiss to provide a communication language for inter-agent communication between the agents of Kiss and add administrative functionality and exemplary practices to the Kiss system. *Id.* Petitioner explains that "[FIPA97's] techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging, as well as adding functionality that is disclosed in FIPA97." *Id.* at 28 (citing Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1). Petitioner asserts that "[w]here the two systems disclose analogous functionality, such as facilitating cooperation and agent registry, their techniques are combined." *Id.* (citing Ex. 1050 ¶¶ 204–206).

In identifying a reason that would have prompted a person of ordinary skill in the relevant field to combine the prior art teachings, Petitioner "must show some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418. A reason to combine teachings from the prior art "may be found in explicit or implicit teachings within the references themselves, from the ordinary knowledge of those skilled in the art, or from the nature of the problem to be solved." *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (*citing In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998)).

Petitioner argues the proposed combination of Kiss and FIPA97 would have been obvious for several reasons. First, Petitioner argues that Kiss, FIPA97, and the '560 patent are analogous art, because "each is directed to the same field of endeavor, *i.e.*, distributed computing environments generally and architectures for communication and

cooperation among distributed electronic agents specifically." Pet. 28 (citing Ex. 1001, 1:17–21; Ex. 1005, Abstract; Ex. 1007, Foreword, 1; Ex. 1050 ¶ 207). Petitioner also argues that FIPA97 and Kiss are reasonably pertinent to the problem addressed by the '560 patent—"the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" *Id.* at 28–29 (citing Ex. 1001, 4:30–36; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1050 ¶ 208).

Next, Petitioner argues the combination of Kiss and FIPA97

> would have been the arrangement of old elements (*i.e.*, the functionality of FIPA97, and the system of Kiss) with each performing the same function it had been known to perform (communication between distributed agents (FIPA97)); cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate to conduct cooperative task completion and problem solving).

*Id.* at 29 (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1050 ¶ 209).

Petitioner also argues that a skilled artisan

> would have known that agents, such as in Kiss, must use a common communications protocol, i.e., an inter-agent communication language, and related management functionality, and therefore would have been motivated to consider and employ one of the available inter-agent communications languages and its related functionality, and because doing so would have been a convenient and efficient way to facilitate effective communication between agents.

*Id.* (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1050 ¶ 210).

Petitioner further argues that a skilled artisan would have been motivated based on earlier descriptions of KQML's similar use of an inter-agent communication language to use FIPA ACL in a system like Kiss. *Id.* at 29–30 (citing Ex. 1016, Abstract, 4, 29, 30; Ex. 1006, 7; Ex. 1007, 40–

42; Ex. 1005, Abstract; Ex. 1050 ¶¶ 211–213). According to Petitioner, a skilled artisan "would have been further motivated to make the combination because of the known advantages of FIPA97, including that it specifies, 'key agents necessary for the management of an agent system, the ontology necessary for the interaction between systems, and it defines also the transport level of the protocols.'" *Id.* at 30 (citing Ex. 1035, 1; Ex. 1050 ¶ 217).

Additionally, Petitioner argues that "FIPA97 represented a substantial attempt to formulate an industry standard designed to encourage interoperability and uniformity amongst agent systems" and a person of ordinary skill in the art "would have understood that agent systems that complied with such a standard would be more likely to be interoperable with other systems and would likely have more resources available." *Id.* at 30–31 (citing Ex. 1007, vii; Ex. 1047; Ex. 1050 ¶ 218). Moreover, Petitioner argues, the description of the administrative functionality and exemplary practices in FIPA97 "suggests that their use with the FIPA ACL would be advantageous and workable," and a person of ordinary skill in the art would have been motivated to employ such additional functionality and practices in the combined system "in order to obtain the full benefit of using FIPA ACL." *Id.* at 31 (citing Ex. 1050 ¶ 219).

Finally, Petitioner argues that a skilled artisan could have made the combination without undue experimentation because by January 1999 the component parts of the combination were well-known, conventional technology and because others had combined FIPA97 technology with agent systems. *Id.* (citing Ex. 1007; Ex. 1016; Ex. 1030; Ex. 1050 ¶ 216).

In response, Patent Owner asserts that "Petitioner utterly defaults in offering any reason to combine" Kiss and FIPA97 and that Petitioner's

arguments contain boilerplate language. PO Resp. 137; PO Sur-reply 51. Patent Owner argues that Petitioner's motivation to combine Kiss and FIPA97 suffers from "hindsight bias" and that Petitioner "offers no reason or explanation that a person of skill in the art looking at Kiss would be motivated to find a particular language with the characteristics of FIPA97's ACL." PO Resp. 137. Patent Owner also argues that Petitioner fails to identify how the combination of Kiss and FIPA97 could be achieved. *Id.* at 138. Specifically, Patent Owner argues that the FIPA97 and Kiss protocols are "different" and "mutually exclusive" and that FIPA97 "discouraged interoperability between different and incompatible systems." PO Sur-reply 51–54. Patent Owner also argues that the Kiss and FIPA97 architectures "look quite different" and "Petitioner offers no articulation of how to add the [FIPA97 Directory Facilitator (DF)] to any of the Kiss layers." PO Resp. 95.

We agree with Petitioner that Patent Owner "ignores the several pages of analysis supported by expert testimony (including citations to evidence in the prior art) articulating the rational underpinning of the combination" of Kiss and FIPA97. Pet. Reply 22; *see* Pet. 27–31. As summarized above, Petitioner provides ample reasoning and explanation for why person of ordinary skill in the art would have combined the teachings of FIPA97 and Kiss in the manner Petitioner describes. Thus, Patent Owner's argument that Petitioner fails to offer *any reason* to combine *Kiss* and FIPA97 is directly contrary to the evidence of record and is unpersuasive. *See* PO Resp. 137.

We also agree with Petitioner that a showing of obviousness does not require a person of ordinary skill in the art to have been motivated to find the particular ACL language in FIPA97, as Patent Owner contends. *See* Pet. Reply 22 (citing PO Resp. 137). Under the correct obviousness analysis,

"any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420. Here, Petitioner provides persuasive evidence and argument that FIPA97 and Kiss are reasonably pertinent to the problem addressed by the 560 patent—"the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 28–29 (citing Ex. 1001, 4:30–36; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1050 ¶ 208). For instance, Kiss observes that "a need exists for a knowledge management system for dynamic, distributed problem-solving systems." Ex. 1005, 2:39–40. And as Dr. Lieberman notes, the FIPA97 specification "defines a language and supporting tools, such as protocols, to be used by intelligent software agents to communicate with each other," and "the terms used and the mechanisms used [by FIPA97] support such a higher-level, often task based, view of interaction and communication." Ex. 1050 ¶ 208 (emphasis omitted). This evidence support's Petitioner's position that a person of ordinary skill in the art at the time of the claimed invention would have combined FIPA97 and Kiss in the manner described in the Petition to provide a flexible, fault-tolerant, distributed problem solving system using agent-based technologies.

Petitioner further argues, and we agree, that Patent Owner's criticism that Petitioner fails to identify how the combination could be achieved "ignores the detailed description in the Petition (supported by Dr. Lieberman) that demonstrates how the combination would work." Pet. Reply 23 (quoting PO Resp. 138) (citing Pet. 27–31; Ex. 1050 ¶¶ 204–206). For example, the Petition explains that "FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices

to the Kiss system." Pet. 28. The Petition also explains that "[t]hese techniques are used to implement the functionality described in Kiss, including *facilitating agent collaboration*, agent registry, and inter-agent messaging . . . as well adding functionality that is disclosed in FIPA97." *Id.* (citing Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1) (emphasis added).

Petitioner's proffered combination of FIPA97 and Kiss is amply supported by Dr. Lieberman's testimony. For instance, Dr. Lieberman explains that:

> in the combination of Kiss with FIPA97, the "interagent abstract communications facilities" of Kiss, [Ex. 1005], 3:32-36, would use the inter-agent communication language of FIPA97 to, for example, "negotiate with each other, conduct joint planning, and to collaborate in the execution of planned tasks," [Ex. 1005], 3:32-36. Additionally, the Agent Service Layer and meta-agent of Kiss would be implemented using the FIPA97 Agent Management System ("FIPA-AMS") and the functionality of the FIPA Directory Facilitator, described in [Exhibit 1006]. Thus, the "capabilities, interests, and attributes for the knowledge modules," [Ex. 1005], 6:67-7:1, as stored in the agent registry of Kiss, and the meta agent of Kiss, would be implemented with the directory facilitator functionality of FIPA97. Therefore, FIPA-AMS would be used to provide a "scalable and modular" inter-agent management system and agent registry for the distributed agents of Kiss. [Ex. 1005, 3:67-4:1]. Further, the combination of FIPA97 and Kiss would be informed by and include the exemplary practices described in the informative sections of FIPA97 (*i.e,* Parts 4-7).

Ex. 1050 ¶ 206. Dr. Lieberman provides annotated versions of several of Kiss's figures representing exemplary depictions of the combined Kiss/FIPA97 system. *Id.* at ¶¶ 205–206 (presenting annotated Figures 4–6, 8, and 21 of Kiss).

In one example, Dr. Lieberman provides an annotated version of Kiss's Figure 8 showing how FIPA97's communications protocol (FIPA

ACL) and Directory Facilitator would be incorporated into Kiss in the combined Kiss/FIPA97 system:



*Fig. 8*

Ex. 1050 ¶¶ 205–206. In annotated Figure 8 above, Dr. Lieberman illustrates how Kiss's agents would use FIPA ACL to "negotiate with each other, conduct joint planning, and . . . collaborate in the execution of planned tasks." *Id.* ¶ 206 (quoting Ex. 1005, 3:32–36). Annotated Figure 8 also shows at a high level how Kiss's Agent Service Layer and meta-agent (MA) would include the functionality of FIPA97's Directory Facilitator. *Id.*

In another example, Dr. Lieberman provides an annotated version of Kiss's Figure 21, shown below, illustrating how FIPA97's Directory

Facilitator (DF) would be incorporated into Kiss's knowledge management system:



Fig. 21

Ex. 1050 ¶ 206. Petitioner's annotated version of Kiss's Figure 21, shown above, depicts how FIPA97's Directory Facilitator (DF) would be incorporated into the user interface layer, meta-agent layer, and knowledge agent layer of Kiss's knowledge management system connected to a distributed environment such as the Internet. *See* Ex. 1050 ¶¶ 204–206; Ex. 1005, 10:55–12:28, 14:31–36, Figs. 4–6, 8, 21.

In view of Dr. Lieberman's testimony, we find Patent Owner's arguments that the Petition says nothing about how to combine FIPA97's Directory Facilitator and Kiss's meta-agent and offers "no articulation" of how to add a Directory Facilitator to any of the Kiss layers to be contrary to the evidence of record. *See* PO Resp. 94–95. Similarly, Patent Owner's arguments that the FIPA97 and Kiss protocols are "mutually exclusive" and that FIPA97 "discouraged interoperability" between systems are unavailing and not supported adequately by the record. *See* PO Sur-reply 51–54.

Finally, Patent Owner argues Petitioner's combination of references "is emblematic of hindsight bias" because Dr. Lieberman "picks and chooses elements" and "superimposes them into one figure in an attempt to 'show' the combination." PO Resp. 98. In particular, Patent Owner argues that "simply drawing in block diagrams with terminology from other references into one cobbled diagram is insufficient as a matter of law without any explanation of how such a combination could be achieved or, indeed, why." *Id.* at 98–99.

We note that "[a]ny judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper." *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971).

Here, Petitioner provides persuasive evidence that a person of ordinary skill in the art at the time of the invention would have had reason to use FIPA97's communications protocol and inter-agent communication language (FIPA ACL) between the agents of Kiss, adding FIPA97's administrative functionality and practices to the Kiss system. *See, e.g.*, Pet. 27–31; Ex. 1050 ¶¶ 204–219. This is not evidence of hindsight bias. Patent Owner does not identify, and we do not discern, any particular knowledge used by Petitioner in its combination of FIPA97 and Kiss that was gleaned from the '560 patent's disclosure and was not within the level of ordinary skill in the art at the time of the invention.

For the reasons discussed, we find that Petitioner has articulated sufficient reasoning with rational underpinning for why a person of ordinary

skill in the art at the time of the invention would have combined the teachings of Kiss and FIPA97 in the manner proffered by Petitioner.

*2. Independent Claim 1*

Claim 1 is directed to a software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture contemplating a distributed computing system comprising service-providing electronic agents and a distributed facilitator agent including an agent registry and a facilitating engine, the service-providing electronic agents and the distributed facilitator agent communicating using an interagent communication language (ICL) including a layer of conversational protocol. Ex. 1001, 29:57–30:23. Claim 1 also requires the facilitating engine to be operable to interpret a service request as a base goal for generating a goal satisfaction plan, where the goal satisfaction plan involves using reasoning to determine sub-goal requests and to coordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests. *Id.* at 30:5–15.

In its proposed combination of Kiss with FIPA97, Petitioner relies on Kiss to teach electronic agents and their general communication and collaboration functions as recited in claim 1, FIPA97 to teach the recited ICL, and a combination of Kiss and FIPA97 to teach the claimed distributed facilitator agent. Pet. 32–53. Patent Owner argues that the proposed combination of Kiss and FIPA97 does not teach the "distributed facilitator agent functionally distributed across at least two computer processes" or the "goal satisfaction plan" recited in the claim. PO Resp. 78–102, 111–118. Patent Owner also asserts that FIPA97 does not teach the "inter-agent language" (or Interagent Communication Language (ICL)) and related limitations. *Id.* at 118–133. In the following discussion, we analyze the

limitations of claim 1 in more detail, addressing Petitioner's contentions and, where applicable, Patent Owner's responsive arguments.

*a. Preamble*

The preamble of claim 1 recites: "A software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture contemplating a distributed computing system."[16] Ex. 1001, 29:57–60. Petitioner contends that Kiss teaches a "software-based, flexible computer architecture" because it discloses a computerized knowledge management system in which interaction between a user and knowledge resources is mediated by a collection of cooperative intelligent agents. Pet. 32 (citing Ex. 1005, 2:43–49, 3:1–3, Fig. 1). Petitioner further contends that Kiss's agents are "distributed" in a "hierarchical" architecture. *Id.* (citing Ex. 1005, Abstract, 2:50–55, 4:57–59). Petitioner also contends that Kiss teaches the recited "communication and cooperation among distributed electronic agents" in the form of "cooperative intelligent agents [that] incorporate generalized automated negotiation and distributed inference (i.e. problem-solving) processes," analyze "problem statements," and reorganize them as "sets of tasks." *Id.* at 33 (citing Ex. 1005, 2:50–55).

Patent Owner does not specifically dispute that Kiss teaches the preamble of claim 1. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches the preamble of claim 1.

[16] Because Petitioner has shown that Kiss teaches the recitations in the preamble, we need not determine whether the preamble is limiting. *See Vivid Techs.*, 200 F.3d at 803.

*b. "plurality of service-providing electronic agents"*

Petitioner contends that Kiss teaches "a plurality of service-providing agents," as recited in claim 1, because Kiss discloses a plurality of agents responding to requests for service by providing information such as market price and cost information. Pet. 33 (citing Ex. 1005, 12:21–14:30, Figs. 8–20). Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches a "plurality of service-providing electronic agents," as recited in claim 1.

*c. "distributed facilitator agent"*

Claim 1 recites "a distributed facilitator agent functionally distributed across at least two computer processes." Ex. 1001, 29:63–67. Petitioner contends that Kiss and FIPA97 teach a "facilitator agent" that is "functionally distributed across at least two computer processes." Pet. 33–36. Patent Owner disputes Petitioner's contentions. PO Resp. 78–102. We address both parts of this limitation below.

*(i) "facilitator agent"*

Petitioner contends that the agent service layer of Kiss combined with Kiss's meta-agent constitutes a "facilitator agent" because it is responsible for matching requests from users and agents with descriptions of the capabilities of other agents. Pet. 34 (citing Ex. 1005, 12:21–14:30, Figs. 8–20). Petitioner argues that FIPA97 also discloses a Directory Facilitator, which provides analogous functionality, so that in the combined system FIPA97's Directory Facilitator would be implemented in Kiss's meta-agent. *Id.* (citing Ex. 1006, 6–7; Ex. 1050 ¶ 233).

Patent Owner argues that Kiss and FIPA97 either alone or in combination do not disclose "the specialized functionality and operation" of the claimed "facilitator agent." PO Resp. 86. Patent Owner first argues that Kiss's meta-agent is not a facilitator. *Id.* Patent Owner argues that "meta-agents are described in the '560 Patent itself as part of the [Open Agent Architecture] architecture and distinct from facilitator agents," and the facilitator agent and meta-agents are shown separately in Figure 4 of the '560 patent. *Id.* at 86–87 (citing Ex. 1005, Fig. 4). Patent Owner argues that meta-agents in the '560 patent are "client agents as opposed to facilitating agents." *Id.* at 87 (citing Ex. 1001, 6:54–56 ("All agents that are not facilitators are referred to herein generally as client agents . . . ."); *id.* at 6:60–62 ("Some typical categories of client agents would include . . . meta-agents . . . ."). Thus, Patent Owner argues, Kiss's meta-agent is similar to the meta-agent of the '560 patent and does not perform the role of the claimed facilitator. *Id.* at 88 (citing Ex. 2032 ¶ 117). Patent Owner asserts that Kiss's meta-agent is at best "a controller that routes queries through the system and presents results, and it lacks the sophistication and intelligent planning that the claimed facilitator performs." *Id.* (citing Ex. 1001, 20:11–12; Ex. 2032 ¶ 119).

Patent Owner further argues that Kiss does not disclose a meta-agent capable of the three types of processing performed by the claimed facilitator in the '560 patent—delegation, optimization, and interpretation. *Id.* at 89 (citing Ex. 1001, 19:27–29). First, Patent Owner Patent Owner argues that although Kiss's meta-agent "breaks down queries into questions and passes them to knowledge agents," it "does not apply 'selective application of global and local constraint and advice parameters onto the specific sub-goals.'" *Id.* (quoting Ex. 1001, 19:34–35). Second, Patent Owner argues

that Kiss "contains no disclosure of optimization—'result[ing] in a goal whose interpretation will require as few exchanges as possible, between the facilitator and the satisfying agents, and can exploit parallel efforts of the satisfying agents.'" *Id.* (quoting Ex. 1001, 19:40–43). Third, Patent Owner argues that Kiss's meta-agent "does not use an intelligent method or its own knowledge resources to interpret capabilities or use strategies or advice in the coordination of requests to and assembly of results from satisfying agents." *Id.* at 90 (citing Ex. 1001, 19:49–52).

With regard to FIPA97's Directory Facilitator, Patent Owner argues it "is no more than a directory of agent capabilities." *Id.* at 92. Patent Owner argues that while FIPA97's Directory Facilitator "may provide agent registry-type functions within a facilitator, FIPA97 does not disclose any of the robust facilitator functions described in the '560 Patent and which are missing from Kiss's meta-agent." *Id.* (citing Ex. 1001, Fig. 7; Ex. 2032 ¶¶ 132–136).

In its Reply, Petitioner argues that Patent Owner "ignores the actual Kiss/FIPA97 combination and instead attacks the references individually." Pet. Reply 27; *see id.* at 30. Responding to Patent Owner's argument that Kiss's meta-agent is similar to the meta-agent of the '560 patent and thus cannot be the claimed facilitator agent, Petitioner argues "the combined system of Kiss/FIPA97 discloses all the claimed features of a facilitator agent, so what Kiss chose to name his facilitator is plainly immaterial." *Id.* at 27 (emphasis omitted).

Petitioner also argues Patent Owner's "list of the various optional features of the facilitator agent are simply not relevant to the '*facilitator agent*' as claimed—and in fact, the record evidence suggests a much broader understanding of that term." *Id.* (citing PO Resp. 84–93). Petitioner points

out that Patent Owner's expert, Dr. Medvidovic, defined a "facilitator agent" as "a specialized server agent responsible that is for coordinating agent communications and cooperative problem solving." *Id.* at 28 (quoting Ex. 1129, 79:7–9).

Petitioner further argues that the "delegation, optimization, and interpretation" functionalities Patent Owner claims are missing from the Kiss meta-agent are limited to a preferred embodiment in the '560 patent, and therefore are not relevant to an obviousness analysis. *Id.* (citing PO Resp. 88). Petitioner contends that Dr. Medvidovic confirmed these were functionalities of a preferred embodiment. *See id.* (citing Ex. 1129, 54:2–9). In any event, Petitioner argues, the Kiss/FIPA97 combination teaches delegation under the ordinary meaning of that term. *Id.* at 28–29 (citing Ex. 1005, 3:25–27, 5:24–27, 12:21–14:30, Figs. 8–20). Petitioner takes similar positions with respect to "optimization" and "interpretation." *See id.* at 29–30 (citing Ex. 1005, 7:8–11, 7:65–8:8, 9:17–23).

In its Sur-reply, Patent Owner argues it is not attacking the prior art references individually, but rather it "addresses the disclosures within each reference, matching what the Petition does." PO Sur-reply 31. With respect to Patent Owner's argument that Kiss's meta-agent is not a facilitator, Patent Owner argues that "none of Patent Owner's arguments rest on the fact that the same words are or are not used in the asserted references and the '560 Patent." *Id.* at 31–32 (citing Pet. Reply 27). Patent Owner argues that Dr. Lieberman relies on similar portions of the specification to describe his interpretation of the "facilitator agent" as Patent Owner uses to show facilitator agent functionality in the '560 patent. *Id.* at 33.

We are persuaded that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches a "facilitator agent." Petitioner

asserts that it is "[t]he agent service layer [of Kiss] combined with the meta-agent of Kiss [that] constitutes 'a facilitator agent' because it is responsible for matching requests, from users and agents, with descriptions of the capabilities of other agents." Pet. 34 (citing Ex. 1005, 12:21–14:30, Figs. 8–20). Kiss also provides that its meta-agent layer "analyzes user queries or problem formulations from the user interface layer, allocates tasks to the knowledge agent layer, resolves conflicts arising from the knowledge agent layer, and consolidates (including fusing and deconflicting) results provided by the knowledge agent layer." Ex. 1005, 3:25–29. Kiss's meta-agent also operates with an agent service layer to identify relevant capabilities of service providing agents in the system. *See id.* at 3:36–47, 12:1–14:30.

Given Petitioner's articulation that the *combination* of the agent service layer and the meta-agent of Kiss constitutes a "facilitator agent," Patent Owner's argument that Kiss's meta-agent is not a facilitator is unavailing because it fails to respond to Petitioner's assertion that the recited "facilitator agent" includes the combination of the Kiss agent service layer and the Kiss meta-agent. *See* PO Resp. 86. Similarly, Patent Owner's argument that the Kiss meta-agent cannot be part of a "facilitator agent" in the combined Kiss/FIPA97 system because the '560 patent identifies a meta-agent as a separate component from the facilitator agent is unavailing for at least the same reason, i.e., that Patent Owner does not address the functionality of Kiss's meta-agent and agent service layer combined. *See id.* at 87. Moreover, with respect to Petitioner's showing how FIPA97's Director Facilitator would be implemented in Kiss in the combined Kiss/FIPA97 system that uses FIPA ACL, we determined above that Petitioner has presented sufficient rationale for combining the references in the manner asserted. *See* § II.G.1.

As for Patent Owner's arguments that Kiss does not teach a facilitator agent capable of performing delegation, optimization, and interpretation, we disagree with Patent Owner's arguments because they improperly attempt to read exemplary characteristics from preferred embodiments of the '560 patent into the claims. *See* PO Resp. 89–91. Indeed, as the '560 patent makes clear, "[a] further *preferred embodiment of the present invention incorporates* facilitator handling of compound goals, preferably involving *three types of processing: delegation, optimization and interpretation.* Ex. 1001, 19:26–29.

Also helpful in understanding the nature of a "facilitator agent" is the observation of Patent Owner's expert, Dr. Medvidovic, in reference to Figure 4 of the '560 patent that "facilitator agent 402" is "a specialized server agent that is responsible for coordinating agent communications and cooperative problem-solving." Ex. 2032 ¶ 32 (citing Ex. 1001, 6:46–48, Fig. 4).[17] Indeed, at his deposition, Dr. Medvidovic confirmed that this was his understanding of a "facilitator agent." There, Dr. Medvidovic testified, "if you were asking me [to] define a facilitator agent, I might say it's a specialized server agent responsible for coordinating agent communications and cooperative problem solving. That is a definition." Ex. 1129, 79:15–19.

Based on this understanding of a facilitator agent, Petitioner's proposed combination of Kiss's meta-agent and agent service layer is a "facilitator agent" that is responsible for analyzing user queries or problem formulations, allocating tasks to knowledge agents, resolving conflicts that

[17] We also note for the record that neither party has proposed a construction for the term "facilitator agent."

arise, and consolidating (including fusing and deconflicting) results. *See* Ex. 1005, 12:21–14:30, Figs. 8–20.

*(ii) "functionally distributed across at least two computer processes"*

As discussed above in § II.C.2, we construe the term "computer process" as "a process that runs or executes one or more computer programs" for this Final Written Decision.

Petitioner contends that Kiss discloses a facilitator agent distributed across at least two computer processes because Figure 21 of Kiss shows meta-agents on multiple systems remotely located from each other and provides that meta-agents can accept problem inputs from other meta-agents. Pet. 34 (citing Ex. 1005, Fig. 21). Figure 21 of Kiss is reproduced below:




*Fig. 21*

Figure 21 above shows Kiss's meta-agents (MAs) on multiple systems remote from each other.

Petitioner contends that a person of ordinary skill in the art would have understood that two meta-agents on separate systems operate together as part of a "facilitator agent" to facilitate the cooperative satisfaction of goals. Pet. 35 (citing Ex. 1005, 5:20–64; Ex. 1050 ¶ 235). Petitioner contends "Kiss further discloses that a meta-agent 'adaptively and dynamically synthesizes problem-specific knowledge interfaces' over multiple distributed knowledge sources." *Id.* (citing Ex. 1005, 2:61–67, Fig. 1). Therefore, Petitioner concludes, the two meta-agents divided on separate and remote systems operate cooperatively as a "distributed facilitator agent functionally distributed across at least two computer processes" to achieve the goals of the system. *Id.* at 35–36 (citing Ex. 1050 ¶¶ 235–236).

Petitioner argues that FIPA97 likewise teaches that its Directory Facilitator "can manage distributed agent[s] over multiple computer processes." *Id.* at 36 (citing Ex. 1006, 10, Fig. 2; Ex. 1050 ¶ 237). According to Petitioner, a person of ordinary skill in the art would have understood the agent platforms shown in Figure 2 to be separate computer processes because each agent platform provides the physical infrastructure in which agents can be deployed, and therefore represents a distinct program. *Id.* (citing Ex. 1006, 10, Fig. 2; Ex. 1050 ¶¶ 238–239).

Patent Owner argues the combination of Kiss and FIPA97 does not teach a facilitator agent "distributed across at least two computer processes." PO Resp. 100–102. Patent Owner asserts there is no support for Petitioner's "assumption" that distributed agents must be distributed across separate computer processes. *Id.* at 101 (citing Ex. 2032 ¶ 160). Rather, Patent Owner argues, a distributed facilitator could use a single computer process. *Id.* (citing Ex. 2032 ¶ 161). Patent Owner also argues that Petitioner's

citation to Figure 2 of FIPA97 does not disclose any information about what agents are involved. *Id.* at 101–102 (citing Ex. 2032 ¶ 41).

We are persuaded that Petitioner, with support from Dr. Lieberman, has shown sufficiently that Kiss teaches or at least suggests that its meta-agents on separate and remote systems, operating together as part of a facilitator agent, are "functionally distributed across at least two computer processes," as recited in claim 1. As Petitioner points out, the '560 patent provides no detail as to what computer processes may be running. Pet. Reply 36. Dr. Lieberman's testimony supports Petitioner's contention that a person of ordinary skill in the art generally would have understood Kiss to teach at least one computer process running on each separate host computer. Pet. 34–36; Ex. 1050 ¶¶ 235–36; Pet. Reply 36. Indeed, Patent Owner itself acknowledges that a person of ordinary skill in the art would have recognized that meta-agents distributed on different systems are executing on "separate processes." PO Resp. 105.

As for Petitioner's reliance on FIPA97, we are not persuaded that Petitioner's analysis of claim 1 explains in sufficient detail how or why FIPA97's Directory Facilitator that allegedly "can manage distributed agent[s] over multiple computer processes" shows that the Directory Facilitator is itself "distributed across at least two computer processes," as recited in the claim. *See* Pet. 36. Nevertheless, we find Petitioner's reliance on Kiss sufficient to teach or suggest a facilitator agent "functionally distributed across at least two computer processes."

In summary, based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the combination of Kiss and FIPA97 teaches or suggests "a

distributed facilitator agent functionally distributed across at least two computer processes," as recited in claim 1.

*d. "bi-directional communications"*

Claim 1 also requires the facilitator agent to be "capable of bi-directional communications with the plurality of service-providing electronic agents." Ex. 1001, 29:65–67. For this limitation, Petitioner points to Figure 10 of Kiss (not reproduced herein), which shows a meta-agent receiving a question from a knowledge agent and then communicating the question to a different knowledge agent. Pet. 36–37 (citing Ex. 1005, Fig. 10).

Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches "the facilitator agent capable of bi-directional communications with the plurality of service-providing electronic agents," as recited in claim 1.

*e. "agent registry"*

Claim 1 requires the facilitator agent to include "an agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the distributed computing environment." Ex. 1001, 30:1–4. Petitioner asserts that Kiss teaches this limitation because Kiss describes a "registry of agents," which is constructed through "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities." Pet. 38 (citing Ex. 1005, 3:37–45, 6:66–7:19, 8:41–48, 10:32–35, 12:18–20, Fig. 1).

Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for

the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches this "agent registry" limitation of claim 1.

*f. "facilitating engine" limitations*

Claim 1 recites "a facilitating engine operable to interpret a service request as a base goal [and] further operable for generating a goal satisfaction plan associated with the base goal." Ex. 1001, 30:5–8. The claimed "goal satisfaction plan" involves "using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal." *Id.* at 30:10–15. Petitioner contends that Kiss teaches each of these limitations. Pet. 38–46.

*(i) "facilitating engine"*

Petitioner contends that the meta-agent in Kiss "includes a 'facilitating engine' because it is capable of analyzing user queries, allocating tasks, resolving conflicts, and consolidating results" and applying various inferencing methods to allocate tasks to knowledge agents in order to solve problems. Pet. 39 (citing Ex. 1005, 3:25–30). Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches a "facilitating engine," as recited in claim 1.

*(ii) "operable to interpret a service request as a base goal"*

As set forth above in § II.C, we have construed "goal" as "a request for service." Petitioner contends that Kiss's meta-agent (the claimed "facilitating engine") receives a query (a "service request") via a user agent

requesting "either a solution to a problem, such as predicting the outcome of a course of treatment, or the retrieval of information, such as the side effects of a medication." Pet. 39–40 (citing Ex. 1005, 8:26–29). Petitioner asserts that the meta-agent interprets the request as a "base goal" because "it is the basic request initiated by the user that the system seeks to satisfy and which inspired a number of additional, more particular requests in order to be satisfied." *Id.* at 40 (citing Ex. 1005, 12:21–14:20, Figs. 8–20). Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches a facilitating engine "operable to interpret a service request as a base goal," as recited in claim 1.

*(iii) "goal satisfaction plan"*

Petitioner asserts that Kiss teaches "generating a goal satisfaction plan" because Kiss describes that the meta-agent "formulates a goal statement for the problem-solving phase of the process," then "formulates a solution plan for the problem." Pet. 41 (citing Ex. 1005, 8:32–34, 5:33–64, 12:29–64, Figs. 8–20). Petitioner contends that Figures 8–20 of Kiss illustrate adding tasks to an agenda, i.e., constructing a plan, to satisfy the user request (i.e., a "goal") "what is the effect of increasing sales by 20%?" *Id.* at 40 (citing Ex. 1005, 13:27–29, Figs. 8–20).

Patent Owner contends that Kiss does not teach the claimed "goal satisfaction plan" because Kiss does not disclose "the use of any reasoning, optimization, or taking into account any advice parameters or constraints." PO Resp. 115. Patent Owner also argues that Kiss "does not have the capability of formulating an 'optimal or near-optimal' 'goal satisfaction plan' utilizing reasoning as described in the '560 patent." *Id.* at 117 (citing

Ex. 2032 ¶ 212). These arguments are predicated on Patent Owner's proposed construction of "goal satisfaction plan" to mean "a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints." *See id.* at 32. As discussed above in § II.C.1, we disagree with Patent Owner that the claim term "goal satisfaction plan" is limited as Patent Owner contends. Thus, for the reasons explained above, we disagree with Patent Owner's argument that Kiss does not disclose the "goal satisfaction plan" recited in claim 1.

Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches "constructing a goal satisfaction plan," as recited in claim 1.

*(iv) "sub-goal requests based on non-syntactic decomposition of the base goal"*

The "goal satisfaction plan" recited in claim 1 involves "using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal." Ex. 1001, 30:10–12. As set forth above in § II.C, we have construed "non-syntactic decomposition" as "generation of a sub-request (sub-goal/sub-delegation) based on factors other than the syntax of how the goal was received or made." For this limitation, Petitioner cites Kiss's disclosure of a meta-agent responding to the user's request of "what is the effect of increasing sales by 20%?" by generating sub-requests based on the registered capabilities of agents active in the system. Pet. 41 (citing Ex. 1005, 12:54–56, 13:25–27, 13:37–39, 13:56–57, 14:3–5). Because the tasks or sub-requests are formulated based on knowledge of the capabilities of underlying knowledge systems, Petitioner asserts, they are not based on the syntax of the request. *Id.* at 42 (citing Ex. 1005, 8:32–48). As an

example, Petitioner points out that the sub-request asking for confirmation that "the cost per unit at the specified number of units does not exceed the market price plus an acceptable profit" does not relate to the syntax of the base goal ("what is the effect of increasing sales by 20%?"). *Id.* (citing Ex. 1005, 13:25–27).

Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches this limitation.

*(v) "co-ordinate and schedule efforts by the service-providing agents"*

The "goal satisfaction plan" in claim 1 also involves "using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal." Ex. 1001, 30:12–15. For this limitation, Petitioner refers to the example in Figures 8–20 of Kiss. Pet. 44–45. For instance, Petitioner asserts that Kiss's meta-agent coordinates and schedules efforts by the service-providing agents when it pushes a task onto an agenda to query a sales agent. *Id.* (citing Ex. 1005, 12:29–36, Fig. 9). Petitioner also asserts that Kiss teaches "fulfilling the sub-goal requests in a cooperative completion of the base goal" because Kiss's meta agent asks the agent registry to identify a knowledge agent that has registered a capability to answer a question related to sales. *Id.* at 44–45 (citing Ex. 1005, 12:29–36).

Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for

the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches this limitation.

*(vi) "using reasoning"*

In claim 1, both aspects of the goal satisfaction plan—determining sub-goal requests and coordinating and scheduling efforts by agents—must be accomplished "using reasoning." Ex. 1001, 30:10–15. In addition to citing the example in Figures 8–20 of Kiss, Petitioner contends that the various inferencing schemes disclosed in Kiss to formulate dynamic solution plans and to allocate tasks to agents constitute "reasoning" to determine and fulfill sub-goal requests. Pet. 43–46 (citing Ex. 1005, 5:24–40, 7:20–41, 7:53–56, 7:65–8:4, 12:29–36).

Patent Owner contends that the "solution plan" of Kiss is not constructed by "using reasoning" because Kiss's inferencing schemes are used only "[a]fter the solution plan is formulated . . . to perform the search and execution phases." PO Resp. 115 (citing Ex. 1005, 8:58–60). In response, Petitioner persuasively argues that the Petition additionally relies on several other ways in which Kiss utilizes reasoning to formulate a solution plan "using various types of reasoning and allocating tasks to different agents." Pet. Reply 56 (citing Pet. 40; Ex. 1005, 5:33–64; Ex. 1050 ¶¶ 266–267). For example, Kiss describes how the meta-agent can "formulate parallel sub-plans and perform iterative and recursive procedures." *Id.* (quoting Ex. 1005, 5:37–39); *see* Pet. 40, 61; Ex. 1050 ¶¶ 266–267.

Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches "using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing

electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal," as recited in claim 1.

*g. "interagent communication language" limitations*

Claim 1 recites that "the plurality of service-providing electronic agents and the distributed facilitator agent communicate using an interagent Communication Language (ICL)." Ex. 1001, 30:16–19. The ICL includes "a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events." *Id.* at 30:19–23. Petitioner asserts that Kiss teaches communication among agents, and that communication in the proposed combination of references occurs via the Agent Communication Language of FIPA97 (FIPA ACL). Pet. 46–47 (citing Ex. 1007, vii, ix, 51, Fig. 10). Specifically, Petitioner contends that FIPA ACL employs multi-layer messaging for communication between distributed agents. *Id.* (citing Ex. 1007, 51).

Patent Owner asserts that FIPA97 does not teach "refin[ing] . . . events" as recited in claim 1. PO Resp. 121–130. Patent Owner does not dispute that FIPA97 teaches the rest of the limitations relating to an interagent communication language as recited in clam 1. *See id.* at 121–133.

As we explain below, Petitioner has demonstrated sufficiently that FIPA97 teaches these limitations reciting elements of the claimed ICL.

*(i) "layer of conversational protocol"*

Petitioner asserts that FIPA97 teaches "a layer of conversational protocol" recited in claim 1 because FIPA ACL "defines the semantics of *messages* between agents as including a communicative act, followed by various parameters and parameter expressions," as shown in Figure 1 of Part 2 of FIPA97 reproduced above in § II.D.2. Pet. 47 (emphasis added)

(citing Ex. 1007, 12; Ex. 1050 ¶ 291). Petitioner also argues that FIPA97 "discloses a number of different performatives and rules governing FIPA ACL messages and the meaning of the different parts" and, therefore, discloses "a layer of conversational protocol." *Id.* at 48 (citing Ex. 1007, 11–22; Ex. 1050 ¶¶ 292–295).

*(ii) "events" and "event types"*

As discussed above in § II.C, we construe "event" to mean "a message or goal communicated between agents" and "event type" to mean "a type of an event" for this Final Written Decision.

Petitioner maps the "event" of claim 1 to FIPA ACL's "message" and asserts that FIPA ACL's "message type" teaches an "event type" recited in claim 1. Pet. 48–49 (citing Ex. 1007, 3, 4, 11–13, 18). Petitioner argues that FIPA ACL's "message" is an "event" recited in claim 1 because the FIPA ACL communicative acts "are performed by an agent sending a *message* to another agent." *Id.* at 48 (emphasis added) (citing Ex. 1007, 3, 4, 11).

Referencing Figure 1 of Part 2 of FIPA97 reproduced above, Petitioner asserts that in FIPA ACL, "[t]he first element of the message is a word which identifies the communicative act being communicated, which defines the principal meaning of the message," and "the message's communicative act *type* corresponds to that which in KQML is called the performative." Pet. 48 (emphasis added) (citing Ex. 1007, 12, 13). Petitioner argues that FIPA97 further defines "message type" as corresponding to the "communicative acts/performatives of the FIPA ACL." *Id.* at 49 (citing Ex. 1007, 18).

As discussed above, Petitioner asserts that FIPA97 teaches "a layer of conversational protocol" because FIPA ACL "defines the *semantics of messages* between agents as including a communicative act." Pet. 47

(emphasis added) (citing Ex. 1007, 2). Petitioner contends that FIPA97 teaches that the layer of conversational protocol in FIPA ACL is "defined by event types," as recited in claim 1, because in FIPA97, "[t]he *message types* are a reference to *the semantic acts* defined in this specification." *Id.* at 49 (emphases added) (citing Ex. 1007, 11).

*(iii) "parameter list"*

Claim 1 recites that "a layer of conversational protocol" is also "defined by . . . parameter lists associated with one or more of the events." Petitioner asserts that in FIPA97, FIPA ACL messages may include multiple different parameters ("parameter lists associated with one or more of the events") that can "help the message transport service to deliver the message correctly" or "the receiver to interpret the meaning of the message," or "to respond co-operatively," as shown in Figure 1 of Part 2 of FIPA97 (reproduced above). Pet. 50 (citing Ex. 1007, 12, 14, Fig. 1). Petitioner contends that FIPA97 discloses additional parameters in Table 1. *Id.* (citing Ex. 1007, 13–14).

*(iv) "refining events"*

Claim 1 recites that "the parameter lists further refine the one or more events." Petitioner asserts that this phrase should be construed to mean that "a list of parameters associated with an event can refine the event by affecting the meaning of the event." Pet. 12. Petitioner discusses the disclosures in the Specification and the prosecution history of the '560 patent in support of its proposed construction. *Id.* at 12–15 (citing Ex. 1001, 11:16–48; Ex. 1002, 13–14, 51, 55; Ex. 1020, 5, 6; Ex. 1050 ¶¶ 111–118).

Although Patent Owner discusses constructions for several terms in the Patent Owner Response, Patent Owner does not discuss Petitioner's

proposed construction for the claim term "refine . . . events" or propose its own construction. *See* PO Resp. 29–52. Instead, Patent Owner argues that FIPA97 does not teach parameters that "refine . . . events" under Petitioner's proposed construction. *See id.* at 121 ("the cited parameters in FIPA97 do not, contrary to Petitioner's assertion, affect the meaning of the message"), 124 ("this parameter **does not** affect the **meaning** of the message"), 125 ("In contrast, the FIPA97 'receiver' parameter **does not affect the meaning of the 'inform' communicative act**."). Based on the arguments and evidence presented by Patent Owner, we understand Patent Owner not to dispute Petitioner's proposed construction for the term "the parameter lists further refine the one or more events."

Upon considering the complete record, we agree with Petitioner that the claim term "refine . . . events" encompasses "affecting the meaning of the events." As discussed above, during prosecution, the limitation "wherein the parameter lists further refine the one or more events" was added to claim 1 of the parent '115 patent in an amendment to distinguish the claim from the combination of Nwana/KQML and Kiss cited by the Examiner. *See* Ex. 1002, 13–14, 18, 28, 51; Pet. 13–15 (citing Ex. 1002, 13–14, 51). Citing the disclosures of Nwana/KQML discussed by the Examiner, Petitioner persuasively argues that the parameters of Nwana's KQML "tell" message (i.e., the claimed "event") do not change the meaning of the message, whereas the parameters of an event in the '560 patent change the meaning of the event by "refin[ing] the event." Pet. 12–15 (citing Ex. 1002, 13–14, 51, 55; Ex. 1020, 5, 6). In support of its argument, Petitioner cites the following passage from the Specification that distinguishes the '560 patent's ICL (i.e., the recited "interagent communication language") from KQML:

> For example, in KQML, a request to satisfy a query can employ either of the performatives ask_all or ask_one. In ICL, on the other hand, this type of request preferably is expressed **by the event type ev_post_solve, together with the solution_limit(N) parameter--where N can be any positive integer**. (A request for all solutions is indicated by the omission of the solution limit parameter.) [The request can also be accompanied by other parameters, which combine to <u>further refine</u> its semantics.] In KQML, then, this example forces one to choose between two possible conversational options, neither of which may be precisely what is desired. In either case, the performative chosen is a single value that must capture the entire conversational characterization of the communication.

Pet. 12–13 (quoting Ex. 1001, 11:38–53). Petitioner argues that a message having the KQML performative "ask_all" always has the same meaning, requesting all solutions to the request, just as the KQML performative "ask_one" always requests one solution. *Id.* at 13. According to Petitioner, in contrast, the meaning of the '560 patent's event "ev_post_solve" depends on the value of its parameter "solution_limit(N)"—e.g., an agent may request the identity of three agents capable of translating a document by including "solution_limit(N)" in the message and setting the value of N to 3. *Id.* Thus, Petitioner argues that the parameters of an event of the '560 patent affect the meaning of the event. *Id.* at 13–15.

We are persuaded by Petitioner's argument and evidence that the "parameterized approach" of the '560 patent (Ex. 1001, 11:38–53) can refine an event by changing the meaning of the event. As discussed above in § II.C, we construe "event" to mean "a message or goal communicated between agents" and "goal" to mean "a request for service." The '560 patent describes that "[i]n one embodiment, a request for one of an agent's services normally arrives in the form of an *event* from the agent's

facilitator." *Id.* at 12:61–63 (emphasis added). In a section titled "Refining Service Requests," the '560 patent describes as follows:

> In a preferred embodiment of the present invention, *parameters* associated with a goal (or sub-goal) can draw on useful features to *refine the request's meaning*. For example, it is frequently preferred to be able to specify whether or not solutions are to be returned synchronously; this is done using the reply parameter, which can take any of the values synchronous, asynchronous, or none. As another example, when the goal is a non-compound query of a data solvable, the cache parameter may preferably be used to request local caching of the facts associated with that solvable.

*Id.* at 16:5–15 (emphases added). Thus, the '560 patent describes that in an embodiment, parameters of a request for service, i.e., an event, can refine the "meaning" of the request or event.

Nonetheless, we note that this passage and all of the disclosures of the '560 patent cited by Petitioner describe exemplary embodiments. *See id.* at 11:42–45 ("In ICL . . . this type of request *preferably* is expressed by the event type ev_post_solve, together with the solution_limit(N) parameter--where N can be any positive integer." (emphasis added)), 16:6–8 ("In a *preferred embodiment* of the present invention, *parameters* associated with a goal (or sub-goal) can draw on useful features to *refine the request's meaning*." (emphases added)). Thus, the term "refine . . . events" recited in claim 1 may encompass but is not necessarily limited to "affecting the meaning of events." *See SuperGuide*, 358 F.3d at 875 ("a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment"); *WesternGeco*, 889 F.3d at 1323–24 ("It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise."). Indeed, Petitioner's proposed construction of the term "the

parameter lists further refine the one or more events" expresses the meaning of the term in a permissive fashion—"an event *can* refine the event by affecting the meaning of the event." Pet. 12 (emphasis added).

Based on the complete record, we determine that the term "the parameter lists further refine the one or more events" encompasses parameters "affecting the meaning of the events."

Petitioner asserts that FIPA97 teaches "the parameter lists further refine the one or more events" because several of the conversational layer parameters disclosed in FIPA97 affect the meaning of the performative included within the message, and therefore affect the meaning of the message, or event. Pet. 51. According to Petitioner, FIPA97 discloses a parameter ":receiver," which "can alter the meaning [of] an event, such as 'inform,' to be 'inform one'" or "inform a number' of agents, depending on the value of the parameter." *Id.* (citing Ex. 1007, 13). Citing the testimony of Dr. Lieberman, Petitioner asserts that naming a tuple "corresponds to the action of multicasting the message" such that "semantics of this multicast" is refined so that "the message is sent to each agent named in the tuple." *Id.* (citing Ex. 1007, 13; Ex. 1050 ¶ 314). Petitioner argues that "[t]his 'tuple naming' functionality is analogous to the example provided in the ['560 patent] of 'solution_limit(N),' in which 'N' modifies how many solutions are requested, and is not found in the KQML Nwana reference that was before the examiner." *Id.* (citing Ex. 1001, 11:32–48; Ex. 1020; Ex. 1050 ¶ 314). Petitioner also asserts that FIPA97 discloses two other parameters—":protocol" (when used with the "call for proposals" performative) and ":conversation-id"—that affect the meaning of a message. *Id.* at 52–53 (citing Ex. 1007, 13–14, 46–49; Ex. 1050 ¶¶ 316–321).

Patent Owner asserts that FIPA97 does not teach parameters "refin[ing] . . . events," as recited in the claim, because the parameters of FIPA97 cited by Petitioner do not affect the meaning of the message. PO Resp. 121. In particular, Patent Owner contends that FIPA97's ":receiver" parameter of the FIPA97 "inform" message relied upon by Petitioner is no different from KQML's ":receiver" parameter for the KQML "tell" message in that both modify the message but do not affect the meaning of the message. *Id.* at 122 (citing Ex. 1007, 12; Ex. 1020, 5). Patent Owner asserts that FIPA97's ":receiver" parameter does not affect the meaning of the FIPA97 "inform" message because "the result of this parameter is only that the message is multicast; i.e., it is 'sent to each agent named in the tuple.'" *Id.* at 124. According to Patent Owner, "the content of the message is unchanged; the only thing that changes is who (as in, recipient) receives the message." *Id.*

The portion of FIPA97 cited by Petitioner is reproduced below:

| Message Parameter: | Meaning: |
|---|---|
| :sender | Denotes the identity of the sender of the message, i.e. the name of the agent of the communicative act. |
| :receiver | Denotes the identity of the intended recipient of the message.<br><br>Note that the recipient may be a single agent name, or a tuple of agent names. This corresponds to the action of multicasting the message. Pragmatically, the semantics of this multicast is that the message is sent to each agent named in the tuple, and that the sender intends each of them to be recipient of the CA encoded in the message. For example, if an agent performs an inform act with a tuple of three agents as receiver, it denotes that the sender intends each of these agent to come to believe the content of the message. |

Ex. 1007, 13. Pointing to this disclosure in FIPA97, Petitioner asserts that the "receiver" parameter affects the meaning of the event by affecting "whether the performative communicates the message to a single agent, a selection of agents, or if [the message is] broadcast to every agent." Pet. Reply 62 (citing Ex. 1007, 13). According to Petitioner, "in FIPA97, an event using 'inform' can *mean three or more different things* (i.e., inform (1) one person, (2) a select group of people, (3) everybody) depending on the value of just that parameter." *Id.* at 63.

We agree with Petitioner's argument and disagree with Patent Owner's argument. As shown above in the portion of FIPA97 relied on by Petitioner, FIPA97 describes the "meaning" of the message affected by the ":receiver" parameter (under the column heading "Meaning:") as follows:

> Note that the recipient may be a single agent name, or a tuple of agent names. This corresponds to the action of multicasting the message. Pragmatically, the semantics of this multicast is that the message is sent to each agent named in the tuple, and that

> the sender *intends* each of them to be recipient of the CA encoded in the message. For example, if an agent performs an inform act with a tuple of three agents as receiver, it denotes that the sender *intends* each of these agent to come to believe the content of the message.

Ex. 1007, 13 (emphases added). We agree with Petitioner this passage describes, under the column heading "Meaning," the meaning of the message modified or affected by the ":receiver" parameter.

Patent Owner argues that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." PO Resp. 124. Patent Owner contends that, in contrast, the solution_limit(N) parameter of the '560 patent "modifies the actual request/communicative act/performative itself—i.e., [**ev_post_solve**], because it imposes a modification on the limits of **solutions** presented in response to a request." *Id.* at 125 (citing Ex. 2032 ¶ 262).

We disagree with Patent Owner's argument. First, we disagree with Patent Owner that the FIPA97 ":receiver" parameter changes only "who (as in, recipient) receives the message." As described in FIPA97, the ":receiver" parameter does not merely specify "who receives the message," e.g., agent A as opposed to agent B. Rather, as persuasively explained by Petitioner, the ":receiver" parameter affects the qualitative aspect of the message—i.e., whether to inform (1) one agent, (2) a select group of agents, or (3) every known agent. *See* Pet. Reply 63.

In addition, Patent Owner does not explain adequately why the solution_limit(N) parameter of the '560 patent specifying the number of agents to be queried "modifies the actual request/communicative act/performative itself" but the ":receiver" parameter of FIPA97 specifying

the number of agents to which to send a message does not. *See* PO Resp. 125. We agree with Petitioner that Patent Owner does not identify "a practical distinction between limiting the number of agents to be queried (solution_limit(N)), and querying a selection of agents (:receiver)." Pet. Reply 63.

Next, Patent Owner contends that FIPA97 does not teach parameters "refin[ing] . . . events," as recited in the claim, because FIPA97's ":receiver" parameter is the same as or similar to the KQML ":receiver" parameter, which does not modify the meaning of a message. PO Resp. 122 (citing Ex. 1007, 12; Ex. 1020, 5). In support of its argument, Patent Owner cites a page from Dr. Finin's presentation slides at an unidentified meeting or class, which compares "KQML tell and FIPA ACL inform." *Id.* at 123 (citing Ex. 2019, 15; Ex. 2068, 132:6–22). Patent Owner also cites the testimony from Dr. Finin at his deposition that "the general idea of agent communication language that was embodied in KQML is similar to the one that is embodied in FIPA." *Id.* (citing Ex. 2068, 32:10–17).

Patent Owner, however, does not discuss the disclosure of KQML/Nwana (Ex. 1020) sufficiently (other than pointing to the similarity of the format between the ":receiver" parameter of KQML and FIPA97) or explain adequately why KQML's ":receiver" parameter is similar to the FIPA97 ":receiver" parameter. *See* PO Resp. 122–124. For example, Patent Owner does not explain whether KQML's ":receiver" parameter specifies, similar to FIPA97, that "the recipient may be a single agent name, or a tuple of agent names," that "the message is sent to each agent named in the tuple," and that "the sender *intends* each of them to be recipient of the message." *See id.*; Ex. 1007, 13 (emphasis added). The general statements from Dr. Finin (or a slide purportedly from his unidentified presentation) cited by

Patent Owner (PO Resp. 123 (citing Ex. 2019, 15; Ex. 2068, 132:6–22, 32:10–17)) regarding the alleged similarity between KQML and FIPA97 at a general level are simply insufficient to override the specific disclosures in FIPA97 cited by Petitioner regarding the meaning of the message modified or affected by the FIPA97 ":receiver" parameter.

Patent Owner also cites testimony from Petitioner's declarant, Dr. Lieberman, as "confirm[ing]" that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." PO Resp. 124 (citing Ex. 2069, 110:14–111:16, 168:5–12). The cited testimony of Dr. Lieberman, however, discusses FIPA97's messages and multicasting in general (responding to general questions from Patent Owner's counsel) and does not discuss the specific disclosure in FIPA97 cited by Petitioner regarding the meaning of the message modified or affected by the FIPA97 ":receiver" parameter. *See* Ex. 2069, 108:4–111:16, 168:5–12. Thus, we disagree with Patent Owner that the testimony of Dr. Lieberman cited by Patent Owner "confirm[s]" that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." *See* PO Resp. 124.

Next, Patent Owner cites 23 paragraphs from the Declaration of Dr. Cohen (Ex. 2033) to argue that "FIPA97 does not contain any conversational layer parameters that affect the semantics of FIPA97 messages." PO Resp. 127 (citing Ex. 2033 ¶¶ 70–92). Patent Owner, however, does not discuss Dr. Cohen's testimony in the Patent Owner Response or explain how Dr. Cohen's testimony supports its contention. *See id.* Thus, to the extent Patent Owner purports to rely on Dr. Cohen's testimony, this amounts to improper incorporation by reference in violation

of 37 C.F.R. § 42.6(a)(3). Accordingly, we decline to consider the cited paragraphs from the Cohen Declaration.[18]

Lastly, Patent Owner contends that the limitation "the parameter lists further refine the one or more events" requires "the parameters of an event (or message) can refine the message or goal itself" (PO Resp. 121) or "change the nature of the communicative act itself" (*id.* at 126). Although it is not entirely clear what Patent Owner argues,[19] to the extent Patent Owner argues "refin[ing]" a message or goal requires changing the message or goal itself, we disagree with Patent Owner's argument. As discussed above, in a section titled "Refining Service Requests," the '560 patent describes examples of "parameters" associated with a request or goal that "refine the request's meaning," including the "reply parameter" that specifies whether solutions are to be returned synchronously or asynchronously, and the "cache parameter" that specifies local caching of facts related to the request. *See* Ex. 1001, 16:5–15. These parameters do not appear to change the request itself but, rather, specify how the request should be handled—e.g., synchronous response, local caching, etc. Thus, we disagree with Patent Owner's argument that the claim requires the recited "parameters" "refine the message or goal itself" (PO Resp. 121) or "change the nature of the communicative act itself" (*id.* at 126). Such an interpretation, which "excludes a [disclosed] embodiment from the scope of the claim is rarely, if

[18] Nonetheless, we note that Dr. Cohen's testimony appears to dwell in generalities, e.g., citing the works of logicians/philosophers Tarski and Frege (*see* Ex. 2033 ¶¶ 84–85), and discusses tuples and multicasting in general terms (*see id.* ¶¶ 88–92).

[19] As discussed above, Patent Owner does not dispute Petitioner's proposed construction of the term "the parameter lists further refine the one or more events." *See* PO Resp. 29–52.

ever, correct." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) (quoting *Accent Pkg., Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013)) (citing *Phillips*, 415 F.3d at 1312–13).

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that FIPA97 teaches "wherein the parameter lists further refine the one or more events," as recited in claim 1. Based on the complete record and for the reasons explained by Petitioner, we determine that Petitioner has shown sufficiently that FIPA97 teaches "a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events," as recited in claim 1.

*h. Conclusion for Claim 1*

On the full record now before us, we are persuaded that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests all the limitations of claim 1 and that a person of ordinary skill in the art would have combined the references in the manner asserted in the Petition. We weigh this evidence of obviousness together with Patent Owner's evidence of objective indicia of nonobviousness, *infra* § II.G.14, before reaching our final determination as to patentability of claim 1.

*3. Dependent Claim 5*

Claim 5 depends directly from claim 1 and further recites:

> wherein the ICL enables agents to perform queries of other agents, exchange information with other agents, and set triggers within other agents, the ICL further defined by an ICL syntax supporting compound goal expressions such that goals within a single request provided according to the ICL syntax may be coupled by a conjunctive operator, a disjunctive operator, a conditional execution operator, and a parallel disjunctive

operator that indicates that disjunctive goals are to be performed by different agents.

Ex. 1001, 30:56–65.

Petitioner relies on a combination of Kiss and FIPA97 for teaching the limitations of claim 5. Pet. 53–57. Patent Owner argues that FIPA97 does not teach that the ICL enables agents "to set triggers within other agents" but does not dispute that Kiss and FIPA97 together teach the rest of the limitations of claim 5. PO Resp. 130–131.

Based on the complete record, as discussed below, we determine that Petitioner has demonstrated sufficiently that the combination of Kiss and FIPA97 teaches these limitations of claim 5 relating to the claimed ICL.

*(i) "perform queries"*

Petitioner asserts that Kiss teaches that its agents are enabled to "perform queries of other agents," as recited in claim 5, because Kiss describes "abstract communication facilities" that allow agents to "negotiate with each other, conduct joint planning, and to collaborate in the execution of planned tasks." Pet. 53 (quoting Ex. 1005, 3:34–36). Petitioner further contends that Kiss's agents can communicate through the agent service layer that facilitates agent-to-agent interactions. *Id.* (citing Ex. 1005, 7:13). Petitioner cites the example in Figures 8–20 of Kiss showing a meta agent sending queries to and receiving queries from the sales agent and production agent. *Id.* (citing Ex. 1005, 12:21–14:29, Figs. 8–20; Ex. 1050 ¶ 376). Petitioner also cites Kiss's disclosure of a meta-agent that "analyzes user queries" and "allocates tasks" to knowledge agents. *Id.* (quoting Ex. 1005, 3:25–30) (citing Ex. 1050 ¶ 376).

*(ii) "exchange information"*

Petitioner asserts that Figures 8–20 of Kiss also show that Kiss's agents are able to "exchange information with other agents," as recited in claim 5. *Id.* at 54 (citing Ex. 1005, 12:21–14:29, Figs. 8–20; Ex. 1050 ¶ 378). In the combined system with FIPA97, Petitioner contends, such communication would be performed using FIPA ACL. *Id.* (citing Ex. 1050 ¶ 379).

*(iii) "set triggers within other agents"*

Petitioner asserts that a "trigger" is "a general mechanism for requesting some action be taken when one or more conditions is met." Pet. 10–11 (citing Ex. 1001, 21:51–22:62; Ex. 1050 ¶¶ 101–102). Patent Owner does not dispute Petitioner's proposed meaning of "trigger" (*see* PO Resp. 29–52). We adopt this undisputed interpretation of "trigger" for this Final Written Decision because the construction is consistent with the disclosure in the '560 patent. *See* Ex. 1001, 21:52–54 ("triggers [provide] a general mechanism for requesting some action be taken when a set of conditions is met").

Petitioner asserts that FIPA97 discloses the use of content parameters to "set triggers within other agents," as recited in claim 5, specifically citing FIPA97's performative "accept-proposal," which "informs the receiver" that the "receiving agent" (i.e., the claimed "other agent") should "perform the action" (i.e., the action that takes place in response) once a "given precondition is, or becomes, true" (i.e., the occurrence or failure of a precondition). Pet. 54 (citing Ex. 1007, 23). Therefore, Petitioner contends, the "precondition" is sent to another agent, and then at some point in the future, when the precondition is met, the receiving agent will trigger and

take an action based on the information in the message. *Id.* (citing Ex. 1007, 23; Ex. 1050 ¶ 380).

Patent Owner contends as an initial matter that FIPA97 "lacks disclosure of triggers altogether." PO Resp. 130. Patent Owner contends that the description of the "accept-proposal" performative in FIPA97 "offer[s] no support for a settable trigger that kicks in when a specified event takes place" and "offers no explanation of what the preconditions or resulting requested actions are." *Id.* at 130–131 (citing Ex. 2032 ¶¶ 239, 241). Patent Owner asserts that the performative "contain[s] parameters dictating what the associated action is" and "the performative is simply that the proposal is to be accepted in accordance with certain parameters." *Id.* at (citing Ex. 2032 ¶ 240).

Patent Owner also cites 39 paragraphs from the Cohen Declaration in support of its argument. *Id.* at 131 (citing Ex. 2033 ¶¶ 30–68). Patent Owner, however, does not discuss Dr. Cohen's testimony in the Patent Owner Response or explain how Dr. Cohen's testimony supports its contention. *See id.* Thus, to the extent Patent Owner purports to rely on Dr. Cohen's testimony, this amounts to improper incorporation by reference in violation of 37 C.F.R. § 42.6(a)(3). Accordingly, we decline to consider the cited paragraphs from the Cohen Declaration.

Responding to Patent Owner's argument that the Petition does not explain what the preconditions or resulting requested actions are, Petitioner asserts that the "accept-proposal" performative "informs the receiver that it intends that (**at some point in the future**) the receiving agent will perform the action, once the given precondition is, **or becomes**, true." Pet. Reply 67 (quoting Ex. 1007, 23; Pet. 54). Petitioner further provides details of an example in FIPA97 of the performative "accept-proposal" that "will take an

action—in this example, streaming a multimedia channel ('some action be taken')—when 'the customer is ready' ('when one or more conditions is met')." *Id.* at 68 (citing Ex. 1007, 23).

Patent Owner does not dispute Petitioner's responsive argument in the Reply, but instead contends that Petitioner's argument is presented "too late." PO Sur-reply 48. We disagree. Petitioner's Reply responds directly to Patent Owner's argument by emphasizing details of FIPA97's description of the performative "accept-proposal," which the Petition cites for teaching "triggers." Pet. Reply 67–68 (citing Ex. 1007, 23; Pet. 54).

Patent Owner also argues in its Response that nothing in the cited portion of FIPA97 shows that one agent would be able to set a trigger within another agent. PO Resp. 131. Petitioner again cites the detail of FIPA97's example of the "accept-proposal" performative in which one agent (i.e., agent i) uses "accept-proposal" to set a condition within another agent (i.e., agent j). Pet. Reply 69 (citing Ex. 1007, 23; Pet. 54). Patent Owner does not respond to Petitioner's argument on this point. *See* PO Sur-reply 48.

Based on the complete record, we determine that Petitioner has shown sufficiently that FIPA97 teaches "set[ting] triggers within other agents," as recited in claim 5.

*(iv) "compound goal expression"*

As discussed above in § II.C, we construe "a compound goal expression" as "a single goal expression that specifies multiple sub-goals to be performed" for this Final Written Decision.

Petitioner contends that FIPA97's FIPA ACL "allows the expression of multiple sub-goals, . . . which can potentially include more than one type of logical connector and/or more than one level of logical nesting (*e.g.*, use of parentheses), or the substantive equivalent." Pet. 55 (citing Ex. 1050

¶ 384). For example, Petitioner contends, FIPA97 "allows the construction of s-expressions of arbitrary depth and complexity," discloses complex "goal expressions" that "express multiple sub-goals" and which may also include "logical nesting" using parentheses, and discloses that a goal expression can be composed of smaller expressions chained with operators or logical connectives. *Id.* (citing Ex. 1007, 15–17, 40, 41, 69, 75, 78; Ex. 1050 ¶¶ 385–392). Therefore, Petitioner asserts, FIPA ACL is "defined by an ICL syntax supporting compound goal expressions," as recited in claim 5. *Id.* at 56.

*(v) "operators"*

Petitioner contends that FIPA97 discloses operators for composing base goals including a "conjunctive operator" and a "disjunctive operator." Pet. 56 (citing Ex. 1007, 73 (describing "Conjunction" and "Disjunction" formulas); Ex. 1050 ¶¶ 395–397, 399–400). Petitioner points out that FIPA97 explains that the performative "request-when" can be used as a "conditional execution operator." *Id.* (citing Ex. 1050 ¶ 402). Petitioner also asserts that FIPA97 discloses a "parallel disjuncti[ve] operator" in the form of an operator that is able to query multiple disjunct agents in a single expression. *Id.* Petitioner asserts FIPA97's disclosed content language (SL2) supports grammars for "quantifying-in inside modal operators." *Id.* at 56–57 (citing Ex. 1007, 78; Ex. 1050 ¶¶ 404–406).

*4. Dependent Claims 6–9*

Claim 6 depends from claim 5 and further requires the ICL to be "computer platform independent." Ex. 1001, 30:66–67. Petitioner contends that FIPA97 teaches or suggests this limitation because it provides specifications for a software language for "communication between independently designed and developed software agents" that is designed to

facilitate the "construction and management of an agent system composed of different agents," even when systems are "built by different developers." Pet. 58 (quoting Ex. 1007, vii, ix, 3).

Claim 7 depends from claim 6 and further requires the ICL to be "independent of computer programming languages in which the plurality of agents are programmed." Ex. 1001, 31:1–3. Petitioner asserts that FIPA97 "does not comment on how an agent is constructed and focuses only on the interaction between and the interfaces of the agents." Pet. 58–59 (citing Ex. 1007, viii; Ex. 1050 ¶ 412). Petitioner further asserts that "FIPA ACL supports software integration at the agent-communication level and not the agent level" to support emerging technologies, such a CORBA, DCOM, and Java, and to provide "freedom to agent-programmers." *Id.* at 59 (citing Ex. 1008, 5). Thus, Petitioner asserts, "the programming language of the underlying agent is not important, because all actions and communication between agents are supported by the ACL, not the programming language." *Id.* (citing Ex. 1006, 10 n.2; Ex. 1050 ¶ 413).

Claim 8 depends from claim 7 and further recites "wherein the ICL syntax supports explicit task completion constraints within goal expressions." Ex. 1001, 31:4–6. Claim 9 depends from claim 8 and further recites "wherein possible types of task completion constraints includes use of specific agent constraints and response time constraints." *Id.* at 32:7–9.

Petitioner asserts that in Kiss's "Real Time" inferencing method, the user may specify "I am willing to wait ten minutes for a response," at which point the meta-agent may "deactivate" any knowledge agents who "do not meet time delay." Pet. 60 (citing Ex. 1005, 7:65–8:2). Petitioner argues that these "constraints" effect how the inferencing process is carried out and can result in "partial information from the incomplete knowledge agent," and,

therefore, are "task completion constraints," as recited in claim 8, and "response time constraints," as recited in claim 9. *Id.* at 60–61 (quoting Ex. 1005, 8:1–2) (citing Ex. 1050 ¶¶ 417, 425).

Petitioner also points to Kiss's partitioned inferencing, used when the problem domain easily can be divided into distinct subfields. Pet. 61 (citing Ex. 1005, 7:53–58). The meta-agent has available subfield and query division possibilities, and thus Petitioner asserts that the meta-agent could divide the problem based on "specific agent constraints" such as subfields and problem domain. *Id.* (citing Ex. 1005, 7:53–58; Ex. 1050 ¶ 424).

Petitioner also relies on FIPA97 for teaching the limitations of claims 8 and 9. Petitioner asserts that FIPA97's performative "request-when" causes an agent to inform another agent that a certain action should be performed as soon as a given precondition becomes true. *Id.* at 60 (citing Ex. 1007, 40). According to Petitioner, this performative applies an "explicit task completion constraint" (wait until alarm before completing the action in the performative). *Id.* (citing Ex. 1050 ¶ 418).

Petitioner also contends that FIPA97 teaches "specific agent constraints," such as the "Quality of Service" parameter, which is "a type of constraint on task completion that allows the user to specify which networks can be used in a VPN connection, such as 'Constant Bit Rate (CBR) traffic for voice ATM network.'" *Id.* at 61–62 (citing Ex. 1012, 46). Therefore, Petitioner asserts FIPA ACL supports constraints based on a specific agent's functional capabilities. *Id.* at 62 (citing Ex. 1050 ¶¶ 423–426).

Petitioner also argues that FIPA97 teaches "response time constraints" in the form of "Response Time" as a negotiation metric between agents. *Id.* (citing Ex. 1012, 30). In particular, Petitioner points to a "respond-by"

parameter that "denotes a time interval or event(s) when a response to a request is desired." *Id.* (quoting Ex. 1012, 47) (citing Ex. 1050 ¶ 427).

Patent Owner does not specifically dispute that the combination of Kiss and FIPA97 teaches or suggests these further limitations on the claimed ICL. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the combination of Kiss and FIPA97 teaches or suggests the limitations of claims 6–9.

*5. Dependent Claims 10 and 11*

Claim 10 depends directly from claim 8, and claim 11 depends directly from claim 5. Ex. 1001, 31:10–15. Each of claims 10 and 11 further recites "wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions." *Id.* Petitioner relies on FIPA97 for teaching this limitation. Pet. 62–63. Patent Owner argues that FIPA97 does not teach a syntax supporting explicit task completion advisory suggestions. PO Resp. 131–133.

The term "advisory suggestions" does not appear in the '560 patent except in claims 10 and 11. *See generally* Ex. 1001. Neither party proposes a construction of the term," but both parties refer to the following passage in the written description of the '560 patent:

> *Advice parameters preferably give constraints or guidance* to the facilitator in completing and interpreting the goal. For example, a solution_limit parameter preferably allows the requester to say how many solutions it is interested in; the facilitator and/or service providers are free to use this information in optimizing their efforts. Similarly, a time_limit is preferably used to say how long the requester is willing to wait for solutions to its request, and, in a multiple facilitator system, a level_limit may preferably be used to say how remote the facilitators may be that are consulted in the search for

> solutions. A priority parameter is preferably used to indicate that a request is more urgent than previous requests that have not yet been satisfied. Other preferred advice parameters include but are not limited to parameters used to tell the facilitator whether parallel satisfaction of the parts of a goal is appropriate, how to combine and filter results arriving from multiple solver agents, and whether the requester itself may be considered a candidate solver of the sub-goals of a request.

Ex. 1001, 16:22–41 (emphasis added); *see* PO Resp. 132; Pet. Reply 70; *see also* Pet. 62–63 (referring to the level_limit advice parameter in the ’560 patent).

In arguing that FIPA97 teaches “advisory suggestions,” Petitioner cites FIPA97’s directory performative “search,” which is used to search local or remote directories for relevant resources. Pet. 62 (citing Ex. 1006, 20). The “search” performative may contain “Constraints+”), such as Directory Facilitator Depth (“df-depth”) and Required Number of Records (“recs-req”). *Id.* (citing Ex. 1006, 21–22). Petitioner contends that Directory Facilitator Depth is similar to the level_limit advice parameter disclosed in the ’560 patent because both indicate how many directory facilitators should be searched. *Id.* at 62–63 (citing Ex. 1006, 21–22).

Patent Owner argues that Petitioner improperly equates “advisory suggestions” with “constraints” and points to certain “constraints” disclosed in FIPA97. PO Resp. 131. Patent Owner contends it is clear from the quoted passage above that the claim term “advisory suggestions” refers to the “guidance” type of advice parameter described in the ’560 patent, as distinct from “constraints.” *Id.* at 132. Patent Owner further contends that the language of claims shows that “constraints” and “advisory suggestions” have different meanings. *Id.* at 132–133 (citing *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000)).

Because Petitioner does not explain how FIPA97's Directory Facilitator Depth and Required Number of Records are "guidance" or "advisory suggestions" rather than "constraints," Patent Owner argues that Petitioner has failed to show that FIPA97 teaches the recited claim limitation.

In its Reply, Petitioner argues that Patent Owner does not explain any differences between "guidance" and "constraints" or explain why the parameters that Petitioner identifies are "constraints" but not "guidance." Pet. Reply 69–70. Petitioner also contends that the quoted passage from the '560 patent does not explain which parameters are "constraints" and which are "guidance." *Id.* at 70. Because Petitioner relies on a FIPA97 parameter that is analogous to the level_limit parameter described in the '560 patent, and in connection with other limitations points to FIPA97 functionality that allegedly is analogous to the solution_limit and time_limit parameters, Petitioner contends FIPA97 teaches several examples of advice parameters that provide "explicit task completion advisory suggestions." *Id.*

We agree with Patent Owner that Petitioner has not met its burden of showing that FIPA97 teaches the claimed "advisory suggestions." Although the '560 patent could more clearly differentiate "constraints" from "guidance" or "advisory suggestions," the quoted passage from the '560 patent first describes some parameters that are quantitative in nature (i.e., solution_limit, time_limit, and level_limit) and then describes some that are not (i.e., priority, whether parallel satisfaction is appropriate, how to combine and filter results). *See* Ex. 1001, 6:22–41. In the context of the quoted passage, solution_limit, time_limit, and level_limit, which require numerical values, are more likely than the other parameters to be considered "constraints" rather than "guidance." *See id.* Petitioner asserts that FIPA97 teaches solution_limit, time_limit, and level_limit parameters, but Petitioner

does not attempt to explain why these are disclosed examples of "advisory suggestions" rather than "constraints." *See* Pet. 62–63; Pet. Reply 69–70. Under these circumstances, Petitioner has not met its burden to show that the prior art teaches the "advisory suggestions" limitation. *See Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) ("In an IPR, the petitioner has the burden from the onset to show *with particularity* why the patent it challenges is unpatentable." (emphasis added)) (citing 35 U.S.C. § 312(a)(3)); *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016) (requiring that "the initial petition identify '*with particularity*' the 'evidence that supports the grounds for the challenge to each claim.'" (emphasis added)).

Accordingly, based on the complete record, we determine Petitioner does not demonstrated sufficiently that the combination of Kiss and FIPA97 teaches the limitations of claims 10 and 11.

*6. Dependent Claims 12 and 13*

Claim 12 depends from claim 5 and further recites "wherein each autonomous service-providing electronic agent defines and publishes a set of capability declarations or solvables, expressed in ICL, that describes services provided by such electronic agent." Ex. 1001, 31:16–20. Claim 13 depends from claim 12 and further requires the solvables to "define an interface for the electronic agent." *Id.* at 31:21–23.

Petitioner asserts that the term "solvable" means "a declaration of capabilities describing the services and agent provides." Pet. 15 (citing Ex. 1001, 12:19–31; Ex. 1050 ¶ 120). Patent Owner does not dispute Petitioner's proposed meaning of "solvable" (*see* PO Resp. 29–52). We adopt this undisputed interpretation of "solvable" for this Final Written Decision because the construction is consistent with the disclosure in the

’560 patent. *See* Ex. 1001, 21:19–31 (“[E]very participating agent defines and publishes a set of capability declarations, expressed in ICL, describing the services that it provides. . . . [T]hese capability declarations are referred [to] as solvables.”).

Petitioner asserts that Kiss discloses a published set of “capability declarations or solvables” by “maintaining a registry of agents in the system,” such as the agent registry. Pet. 63 (citing Ex. 1005, 3:38–39, 3:40–43, 12:1–17; Ex. 1050 ¶ 440). Petitioner asserts that Kiss’s registry “identifies each agent's capabilities and interests, and contains knowledge about the relationships between them.” *Id.* (citing Ex. 1005, 3:40–43). Petitioner further asserts that Kiss discloses that each agent is responsible for and defining these “capability declarations or solvables.” Specifically, Petitioner contends that each knowledge agent keeps summaries of the domain features and methods of its associated knowledge modules (i.e., “defin[ing] capability declarations”). *Id.* at 64 (citing Ex. 1005, 6:46–48). Further, Petitioner asserts that the set of capabilities for each module is registered (i.e., “publishe[d]”) in the agent service layer by its associated agent. *Id.* (citing Ex. 1005, 6:48–51). Moreover, Petitioner contends, each agent in Kiss provides its capabilities to the agent services layer, and in the combination of Kiss with FIPA97, the communications to provide those capabilities would be expressed in FIPA ACL (i.e., “expressed in ICL”). *Id.* at 64 (citing Ex. 1050 ¶ 442).

In the alternative, Petitioner contends, FIPA97 discloses a “Directory Facilitator” (DF) that provides “yellow pages” services to other agents (i.e., “a set of capability declarations or solvables, . . . that describes services provided by such electronic agent”). Pet. 64 (citing Ex. 1006, 6; Ex. 1050 ¶ 443). Petitioner asserts that each agent within an agent domain registers

with the DF using the "register" performative and the "agent-services" parameters can include definitions such as "service-type," "service-ontology," and "service-conditions." *Id.* at 65 (citing Ex. 1006, 19). Thus, Petitioner contends, each agent "defines and publishes a set of capability declarations or solvables," expressed in ICL. *Id.* at 65–66 (citing Ex. 1006, 6, 19; Ex. 1050 ¶¶ 444–445).

Petitioner also cites FIPA97 for teaching that a "solvable" may "define an interface," as recited in claim 13. *Id.* at 66. Petitioner contends, for example, that the "service-ontology" and "service-conditions" parameters define the language and syntax of communication between two agents, which is an "interface" between two agents. *Id.* (citing Ex. 1006, 35; Ex. 1050 ¶ 449–452).

Patent Owner does not specifically dispute that the combination of Kiss and FIPA97 teaches or suggests these limitations of claims 12 and 13. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the combination of Kiss and FIPA97 teaches or suggests the limitations of claims 12 and 13.

*7. Independent Claim 22*

Like claim 1, independent claim 22 is directed to a software-based, flexible computer architecture for communication and cooperation among distributed electronic agents. Ex. 1001, 31:61–63. Claim 22 contains many limitations that are the same as or similar to those in claim 1, and Petitioner refers back to its analysis for claim 1 in addressing those limitations. Pet. 68–71. For the reasons discussed above, Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests those limitations.

Claim 22 additionally requires "at least one service-requesting agent capable of making a request directly to a service-providing agent as a peer to peer communication for accomplishment of at least one of the sub-goals." Ex. 1001, 32:13–16. Petitioner contends that the ordinary meaning of "peer to peer communication" is "a communication between agents without an intermediary." Pet. 71 (citing Ex. 1034, 359 (dictionary defining "peer-to-peer communications" as "[i]nteraction between devices that operate on the same communications level on a network based on a layered architecture"); Ex. 1050 ¶ 531).

In the Patent Owner Preliminary Response, Patent Owner argued that the claim term "peer to peer communication" should be construed to require that "devices in the same level of a hierarchy can share information and resources directly without relying on a dedicated central server." Prelim. Resp. 63 (citing, e.g., Ex. 2010, 2 (dictionary defining "peer to peer" as "relating to, using, or being a network by which computers operated by individuals can share information and resources directly without relying on a dedicated central server")).

In the Institution Decision, we determined it was unnecessary for us to construe "peer to peer communication" explicitly because Petitioner had shown sufficiently for purposes of that Decision that the prior art teaches the limitation under either party's definition. Inst. Dec. 58–59. We noted that the dictionary definition provided by Petitioner appears to support Patent Owner's proposed construction rather than Petitioner's construction and that neither party construed the term based on its use in the claims, written description, or prosecution history of the '560 patent. *Id.* at 59. We encouraged the parties to address the construction of the term "peer to peer

communication" during the trial, but neither party did. *Id.*; *see generally* PO Resp.; Pet. Reply.

The term "peer to peer communication" appears in the written description of the '560 patent only in the following sentence referring to Figure 3: "The agents 320 may engage in interagent communication (also called *peer to peer communication*[])." Ex. 1001, 6:33–34. This statement supports Petitioner's construction of the term as "a communication between agents without an intermediary" and does not suggest that communicating peer agents be "in the same level of a hierarchy," as Patent Owner contends. *See* Pet. 71; Prelim. Resp. 63. With no other argument from the parties, and notwithstanding the parties' competing dictionary definitions, which are extrinsic evidence, we adopt Petitioner's construction, which is supported by the intrinsic evidence of record (i.e., the written description of the '560 patent).

Petitioner contends that Kiss teaches "at least one service-requesting agent capable of making a request directly to a service-providing agent as a peer to peer communication for accomplishment of at least one of the sub-goals," as recited in claim 22. Pet. 71–75. Kiss discloses that "[e]ach agent in the system includes inter-agent abstract communications facilities with the capability to negotiate with each other, conduct joint planning, and to collaborate in the execution of planned tasks." Ex. 1005, 3:33–36; *see* Pet. 72. Petitioner cites Figure 17 of Kiss (not reproduced herein) as an example showing peer to peer communication. Pet. 72–73 (citing Ex. 1050 ¶¶ 532–533). In that figure, Petitioner argues, a meta-agent directly makes a service request for information (corresponding to the claimed "sub-goal") to a knowledge agent, which request meets the claimed "peer to peer communication." *Id.* at 72–73 (citing Ex. 1005, Fig. 17); *see* Ex. 1001,

14:11–13. Petitioner also points out that claims 22 and 25 together show that a service-requesting agent making a request via peer to peer communication to a service-providing agent may be a facilitator agent. Pet. 73; *see* Ex. 1001, 32:13–15 (claim 22 reciting "at least one service-requesting agent capable of making a request directly to a service-providing agent as a peer to peer communication"); *id.* at 32:24–25 (claim 25 reciting that "the agent operable to make said peer to peer service request" in claim 22 "is said facilitator agent"). Thus, Petitioner argues, in Kiss's Figure 17, the meta-agent (which is part of the claimed "facilitator agent") is the claimed "service-requesting agent" and the knowledge agent is the claimed "service-providing agent." *See* Pet. 73 (citing Ex. 1005, Fig. 17; Ex. 1050 ¶ 533).

Alternatively, Petitioner relies on FIPA97 for teaching "peer to peer communication." Pet. 74 (citing Ex. 1007, 24; Ex. 1050 ¶ 534). Specifically, Petitioner cites an example from FIPA97 of communication between two client agents—agent i (a job-shop scheduler) and agent j (a robot). *Id.* (citing Ex. 1007, 24). In the example, agent i is the claimed "service-requesting agent" that requests agent j (the claimed "service-providing agent") to move a box. *Id.* (citing Ex. 1007, 24). FIPA97 explains that "if the agent is able to support direct communication then it is free to use a direct address when registering." Ex. 1006, 13. Thus, Petitioner argues the communication occurs "directly" and is "peer to peer." Pet. 74 (citing Ex. 1050 ¶ 535).

Patent Owner does not specifically dispute that Kiss or FIPA97 teaches this limitation of claim 22. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss and FIPA97

teach "at least one service-requesting agent capable of making a request directly to a service-providing agent as a peer to peer communication for accomplishment of at least one of the sub-goals," as recited in claim 22.

Patent Owner does not present any arguments regarding claim 22 other than those made respect to claim 1 and addressed above. Therefore, on the full record now before us, and for the reasons discussed previously, we are persuaded that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests all the limitations of claim 22.

*8. Dependent Claims 23–25*

Claim 23 depends directly from independent claim 22 and further requires the peer to peer communication to be "in a language other than an interagent communication language." Ex. 1001, 32:17–19. Petitioner asserts that FIPA97 teaches or suggests this limitation. Pet. 75–76. With the support of Dr. Lieberman, Petitioner asserts that FIPA97 describes a wrapper agents that "allows other client agents in the system to 'invoke commands on the underlying software system, translating the commands contained in ACL messages into operations on the underlying software system.'" *Id.* at 75 (quoting Ex. 1008, 9) (citing Ex. 1006 (Fig. 2); Ex. 1050 ¶ 538). Thus, Petitioner contends that the wrapper agents sends a peer to peer communication using the language of the underlying system, which is "a language other than an interagent communication language." *Id.* at 76 (citing Ex. 1050 ¶ 539).

Claim 24 depends from independent claim 22 and further recites "the peer to peer communication is bi-directional." Ex. 1001, 32:20–22. Petitioner asserts that the peer to peer communication between agent i and agent j in FIPA97 discussed above with respect to claim 22 is bi-directional

because agent j responds to agent i that it agrees to the request. Pet. 76–77 (citing Ex. 1007, 24; Ex. 1050 ¶¶ 542–543).

Claim 25 depends from independent claim 22 and further recites that "the agent operable to make said peer to peer service request is said facilitator agent." Ex. 1001, 32:23–25. Referring back to its analysis of claim 1's "facilitator agent," Petitioner asserts that the service-requesting agent in Kiss's Figure 17 example of peer to peer communication, discussed above with respect to claim 22, is a meta-agent, which also is a facilitator agent. Pet. 77 (citing Ex. 1050 ¶ 545).

Patent Owner does not specifically dispute that Kiss and FIPA97 teach or suggest these limitations of claims 23–25. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the combination of Kiss and FIPA97 teaches or suggests the limitations of claims 23–25.

*9. Independent Claim 50*

Independent claim 50 is directed to a "computer-implemented method for providing cooperative task completion within a distributed computing environment" and contains many limitations that are the same as or similar to those in independent claim 1. For those limitations, Petitioner refers back to its analysis for claim 1. Pet. 77–78, 81–82. For the reasons discussed above, Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests those limitations.

Claim 50 additionally recites "providing a plurality of synchronized agent registries each declaring capabilities of service-providing electronic agents currently active within the distributed computing environment, the plurality of synchronized agent registries each resident within a separate

computer process." Petitioner contends that FIPA97's Directory Facilitators (DFs) meet this limitation in the combined Kiss and FIPA97 system because they are distributed over multiple agent domains and platforms. *Id.* at 78–79 (citing Ex. 1006, 10, Fig. 2). Petitioner asserts that each DF contains a directory that "lists all Agents in the DF domain and is used to advertise agent existence, services, capabilities, protocols, etc." (i.e., "declaring capabilities of service-providing electronic agents," as recited in claim 50), and that agents A–E are "currently active within the distributed computing environment," as recited in claim 50. *Id.* at 79–80 (citing Ex. 1006, 10, 18; Ex. 1050 ¶ 694).

Petitioner also contends that FIPA97's registries are "synchronized" because the timing of search operations is coordinated, and "the same information can be retrieved from any point in the system." *Id.* at 80 (citing Ex. 1006, 18 ("Agent domains can be structured where a DF registers with other DFs. Agents can query information on agents in other domains through its DF escalating the query to a level at which it can be resolved. The querying agent can interact either directly with DFs . . . or indirectly [such that] the response to the query is passed through the hierarchy to the agent which originated the query.")). Moreover, Petitioner contends that it would have been obvious to implement DFs in a synchronized fashion to obtain benefits such as "local agent management, increased responsiveness, preventing duplicated work, fault-tolerance, version control, etc." *Id.* (citing Ex. 1050 ¶ 695).

Claim 50 also requires "each" of "the plurality of synchronized agent registries" to be "resident within a separate computer process." Under the Petition subheading "Remote Agent Registry," Petitioner contends that a person of ordinary skill in the art "would understand the Agent Platforms

shown in Figure 2 to be separate computer processes because each agent platform 'provides the physical infrastructure in which agents can be deployed,' and therefore represents a distinct program, or a part of a program." *Id.* at 80–81 (citing Ex. 1006; Ex. 1050 ¶ 697). Petitioner's argument depends on its proposed construction of "computer process," which we have not adopted. *See supra* § II.C.2. Even under Petitioner's proposed construction, however, the Petition fails to address the language of claim 50, which recites "*the plurality of agent registries* each resident within a separate computer process." Ex. 1001, 34:57–59 (emphasis added); *see* Pet. 80–81. Without providing a detailed explanation tying its argument to the claim language, Petitioner has not met its burden of showing how the prior art teaches the recited limitation. *See Harmonic*, 815 F.3d at 1363 ("In an IPR, the petitioner has the burden from the onset to show *with particularity* why the patent it challenges is unpatentable." (emphasis added) (citing 35 U.S.C. § 312(a)(3))); *Intelligent Bio-Systems*, 821 F.3d at 1369 (requiring that "the initial petition identify '*with particularity*' the 'evidence that supports the grounds for the challenge to each claim.'" (emphasis added)).

For at least this reason, based on the complete record, we determine Petitioner has not shown sufficiently that the combination of Kiss and FIPA97 teaches all the limitations of claim 50.

*10. Dependent Claim 51*

Claim 51 depends directly from claim 50. Petitioner's arguments and evidence with respect to this claim only address the additionally recited limitation of claim 51 and, therefore, do not remedy the deficiencies in Petitioner's analysis of claim 50. Therefore, for the same reasons discussed

above with respect to claim 50, Petitioner has not shown sufficiently that the combination of Kiss and FIPA97 teaches all the limitations of claim 51.

*11. Independent Claim 52*

Independent claim 52 is directed to a "computer implemented process for providing coordinated task completion within a distributed computing environment," and its limitations are the same as or similar to those in independent claims 1 and 22. Ex. 1001, 35:16–39. Petitioner refers back to portions of its analysis for claims 1 and 22. Pet. 82–84.

Patent Owner does not present any arguments regarding claim 52 other than those made respect to claim 1 and addressed above. Therefore, on the full record now before us, and for the reasons discussed previously, we are persuaded that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests all the limitations of claim 52.

*12. Independent Claim 53*

Independent claim 53 is directed to a "computer-implemented process for providing coordinated task completion within a distributed computing environment," and its limitations are the same as or similar to those in independent claims 1, 22, and 50. Ex. 1001, 35:16–39. Petitioner refers back to portions of its analysis for claims 1, 22, and 50. Pet. 84–85.

Critically, claim 53 recites "providing a plurality of synchronized agent registries each declaring a set of functional capabilities for one or more of the autonomous service-providing electronic, each of the agent registries being resident within a separate computer process," which is substantially similar to the limitation in independent claim 50 discussed above in § II.G.9. For the same reasons discussed with respect to claim 50, Petitioner has not shown sufficiently that FIPA97 teaches "each of the agent registries being resident within a separate computer process."

Accordingly, based on the complete record, we determine Petitioner has not shown sufficiently that the combination of Kiss and FIPA97 teaches all the limitations of claim 53.

*13. Dependent Claims 54 and 55*

Claims 54 and 55 depend directly from claim 53. Petitioner's arguments and evidence with respect to these claims only address the additionally recited limitations of claims 54 and 55 and, therefore, do not remedy the deficiencies in Petitioner's analysis of claim 53, which refers back to its analysis of claim 50. Therefore, for the same reasons discussed above with respect to claim 50, Petitioner has not shown sufficiently that the combination of Kiss and FIPA97 teaches all the limitations of claims 54 and 55.

*14. Objective Indicia of Nonobviousness*

In determining whether the challenged claims would have been obvious as Petitioner alleges, we must also weigh secondary considerations of nonobviousness, such as commercial success, long-felt but unmet need, failure of others, and unexpected results. *KSR,* 550 U.S. at 406. A nexus is required between the merits of the claimed invention and any objective evidence of nonobviousness if that evidence is to be given substantial weight in reaching a conclusion on obviousness. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983). Evidence of secondary considerations is only significant if there is a nexus with respect to the claimed invention. *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006).

Nexus is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in the determination of nonobviousness. *See*

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). For instance, commercial success is relevant if it flows from the merits of the claimed invention. *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988). The burden of showing nexus is on the patent owner. *In re Huang*, 100 F.3d 135, 139–40 (Fed. Cir. 1996). Objective evidence of nonobviousness also must be commensurate in scope with the claims that the evidence is offered to support. *In re Kulling*, 897 F.2d 1147, 1149 (Fed. Cir. 1990).

Patent Owner contends that objective indicia of nonobviousness confirm the nonobviousness of the ’560 patent. PO Resp. 140–63. Patent Owner argues that industry praise for a software application known as “Siri,” “which was first made available for download to iPhone users on Apple, Inc.’s App Store on February 4, 2010,” bears a nexus to the claims of the ’560 patent. *Id.* at 142, 163. Patent Owner argues that the “personal context awareness and service delegation ‘main technical components’ of the Siri application are made possible by the claims of the ’560 Patent.” *Id.* at 154.

Patent Owner asserts that the ’560 patent “was based on SRI International’s development of version 2 of the Open Agent Architecture (‘OAA’).” *Id.* at 153 (citing Ex. 2032, App’x A; Ex. 1001, 23:35–36). For support, Patent Owner relies on Exhibit 2054, an SRI web page, which states, “SRI developed OAA® software, which is designed with intelligent ‘agents’ that track human interactions and work processes to streamline electronic and computer interchange.” *Id.* at 153–54 (quoting Ex. 2054). Patent Owner further asserts that “[a]fter version 2 of OAA was developed, SRI International spun out Siri, Inc. as an SRI venture, where the Siri application was created based on an OAA groundwork.” *Id.* at 154 (citing

Ex. 2054 ("OAA laid the groundwork for the DARPA-funded CALO project, from which Siri, the first virtual personal assistant, was born. Siri was spun out into an SRI venture that Apple acquired from SRI.")). Apple Inc. apparently acquired Siri, Inc. in April 2010, approximately two months after the Siri application's initial release.[20] *See id.* at 9, 142, 154.

Patent Owner argues that its "evidence of industry praise . . . satisfies the nexus requirement, as it shows praise for the Siri application's integration of personal context awareness into a service-delegating virtual personal assistant." *Id.* at 154; *see id.* at 143–54. Patent Owner also argues that "industry journalists recognized that the Siri application filled an unmet need for a true virtual personal assistant." *Id.* at 159; *see id.* at 159–63.

To establish a nexus between claim 1 of the '560 patent and the Siri application, Patent Owner provides the chart below. *Id.* at 155–57. Patent Owner relies, in significant part, on the opinion of its declarant, Dr. Medvidovic, to establish a nexus between the Siri application and the claims of the '560 patent. *See* Ex. 2032 ¶¶ 282–290.

[20] We note for the record that the effective filing date for the '560 patent is Jan. 5, 1999, approximately ten years prior to the Siri application's initial release.

| Siri's Description of Technology Feature | Claim 1 of the '560 Patent |
|---|---|
| **Personal Context Awareness** A virtual assistant gives different answers depending on individual preferences and personal context (place, time, history), and if you give it permission, learns more about you so that it can shorten your time-to-task. Information you teach Siri in one domain (e.g. movies) is applied automatically to opportunities rising from other domains. Any personal information you provide Siri is stored in a highly secure, PCI-compliant co-location center, and used only with your explicit permission to accelerate your task completion. | "wherein the plurality of service-providing electronic agents and the distributed facilitator agent communicate using an interagent Communication Language (ICL), wherein the ICL includes: a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events." |
| **Service Delegation** An assistant can reason about what specific set of resources or services would best be combined to help you | "1. A software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture |

| | |
|---|---|
| accomplish a particular task. Siri's patented service delegation algorithms combine numerous attributes about each service provider, including quality scores, fine-grained ratings for specific capabilities, speed measures, and geographic constraints, to plan and execute an optimized strategy for handling your request. Live data is pulled fresh from source sites and world-changing actions are handled in a transaction-safe manner. For example, in a restaurant selection task, Siri integrates information from many sources (local business directories, geospatial databases, restaurant guides, restaurant review sources, menu sites, online reservation services and the user's own favorites) to show results that meet the user's natural language request. | contemplating a distributed computing system comprising:<br>a plurality of service-providing electronic agents;<br>a distributed facilitator agent functionally distributed across at least two computer processes, the facilitator agent capable of bi-directional communications with the plurality of service-providing electronic agents, the facilitator agent including:<br>an agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the distributed computing environment; and<br>a facilitating engine operable to interpret a service request as a base goal, the facilitating engine further operable for generating a goal satisfaction plan associated with the base goal, wherein the goal satisfaction plan involves:<br>using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and |

| | |
|---|---|
| | using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal; and" |

PO Resp. 155–157.

Patent Owner argues that "the Siri application's integration of personal context awareness is made possible because of the claimed inter-agent language limitations." PO Resp. 157 (citing Ex. 2032 ¶ 288). Patent Owner explains that "[b]y having a layer of conversational protocol that has parameter lists, the ['560 patent] describes how agents can then use the parameters in the parameter lists to provide feedback or advice to agents who directly, or indirectly through the facilitating agent, receive the service request." *Id.* (citing Ex. 1001, 16:15–25). For example, Patent Owner explains that a "requesting agent can utilize such a parameter to provide context on a user's preference to the facilitator agent and/or the tasking agents." *Id.* (citing Ex. 2032 ¶ 290). Patent Owner argues that "[t]his same functionality of being able to account for individual preferences, for example, was described by Siri, Inc. as representing personal context awareness." *Id.* at 158 (citing Ex. 2040, 2).

Patent Owner also argues that:

> the Siri application's service delegation corresponds to the claimed dynamic interpretation limitations. Siri, Inc. described the service delegation feature of the Siri application as including "an assistant [that] can reason about what specific set of resources or services would best be combined to help you

> accomplish a particular task." This is precisely what is claimed in the dynamic interpretation limitations, *e.g.*, "generating a goal satisfaction plan associated with the base goal . . . using reasoning . . . to coordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal."

*Id.* (citing Ex. 2032 ¶ 287).

Petitioner argues that Patent Owner's "secondary considerations position rests primarily on an unsubstantiated, conclusory opinion that certain aspects of the ['560 patent] are embodied in the Apple product 'Siri.'" Pet. Reply 76. Petitioner argues that as "Dr. Medvidovic conceded, the evidence he relied on is 'circumstantial,' or a 'suggestion.'" *Id.* (citing Ex. 1129, 147:12–15). Petitioner argues that Dr. Medvidovic "never reviewed the Siri source code, and indeed never even asked to review that source code." *Id.* (citing Ex. 1129, 146:20–147:6, 147:22–148:9). Petitioner argues,

> [t]he failure to review the code is fatal, because [Dr. Medvidovic] further testified that an "agent"—an element in every claim—is a "piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer a clearly identifiable body of code," and that to distinguish an "agent" from any other software he "would have to look inside the code."

*Id.* (quoting Ex. 1129, 9:14–11:8).

Petitioner faults Patent Owner for "not seek[ing] that code through a motion for additional discovery or other means, [or] seek[ing] any other objective evidence (such as specifications) to support its assertions." *Id.* at 77. Petitioner also faults Patent Owner for not seeking the testimony of Mr. Adam Cheyer, one of the named co-inventor's on the '560 patent and a co-founder of Siri, Inc. *Id.*; *see* PO Resp. 142. During the oral hearing in

this proceeding, counsel for Patent Owner was asked about this potential source of evidence:

> JUDGE TROCK: Counsel, this is Judge Trock again.
>
> Do you have any evidence from Mr. Cheyer that this Siri version that you're discussing right now incorporated the claim limitations of the '115 patent?
>
> MS. ABDULLAH: Your Honor, we do not have any direct evidence from Mr. Cheyer. And the reason is because he was never deposed in this proceeding and he is also not a consultant or anybody that's working with IPA at the moment. I know --
>
> JUDGE TROCK: Wasn't he deposed -- sorry. Wasn't he deposed in the Google proceeding?
>
> MS. ABDULLAH: He was, your Honor. And that was pursuant to a subpoena that we had to get permission to serve from the Board because he refused to simply cooperate with us voluntarily.
>
> JUDGE TROCK: Was there a reason why you didn't approach the Board in this case for a subpoena?
>
> MS. ABDULLAH: Your Honor, because we don't believe that his testimony is as probative as the expert testimony that we presented drawing the direct connection as well as the actual industry praise and long-felt need evidence that we --
>
> JUDGE TROCK: But wouldn't he be a witness

with personal knowledge of whether or not that original Siri version incorporated the claim limitations of the '115 patent?

MS. ABDULLAH: Your Honor, respectfully, I believe that that was not -- that would not be a question of personal knowledge but rather of expert testimony. And also, your Honor, I would note that I don't believe that we would have the requisite showing under the Garmin factors that he would be able to testify to those aspects.

JUDGE TROCK: But he is the inventor, right? You've told us that.

MS. ABDULLAH: Yes, your Honor, he is the inventor.

JUDGE TROCK: All right. So he might be a person -- a witness with personal knowledge; isn't that right?

MS. ABDULLAH: Absolutely. And were this a district court case, you know, I'm sure we would have pursued his deposition. I'm sure Microsoft would have as well. But given the high burden for us to obtain additional discovery, your Honor, we determined that the probative value of his testimony was not such that it would meet the Garmin factors here.

JUDGE TROCK: But you did pursue that in the Google case though?

MS. ABDULLAH: Your Honor, the Google case was a different issue. The question there had to do

> with authorship of a prior art reference that Mr. Cheyer was an author of. And it had to do with whether that could be considered the work of another versus the inventor. So inventorship was front and center in the Google proceedings where it is not here. Here this is a 103 analysis for which, you know, obviously I can't pretend to say what the Board would have done. But I think the evidence that we have, that we have been able to present demonstrates that link better than Mr. Cheyer's testimony would be able to.

Tr. 114:12–116:26.

Petitioner also points to evidence that potentially undermines a nexus between the challenged claims of the ’560 patent and the Siri application. For example, Petitioner argues that “Adam Cheyer testified that ‘Siri’ did not implement the agent registry functionality described in the [’115 and ’560 patents].” Pet. Reply 77–78 (citing Ex. 2034, 46:12–47:5).

Petitioner also argues that Patent Owner’s “evidence credits the CALO project with being the progenitor of the ideas that led to Siri—not any version of OAA.” *Id.* at 78 (citing Ex. 2042, 1 (“Siri traces its origins to a military-funded artificial-intelligence project called CALO”); Ex. 2044, 1; Ex. 2047, 2; Ex. 2054, 1; Ex. 2001, 2). “Nor is there any evidence in the record,” Petitioner argues, “that OAA was ultimately utilized in SRI’s CALO project other than that the original OAA (*i.e.,* the version first created in 1994 prior to the ’560 Patent work) laid ‘groundwork’ for what would ultimately become CALO.” *Id.* (citing Ex. 2054). Petitioner argues that “substantial evidence shows that a later agent system named ‘SPARK’ (SRI Procedural Agent Realization Kit) was used as the basis of CALO,” but that

Patent Owner "ignores this intervening SPARK system and makes no attempt to show it practices the claims, nor does it meaningfully address the CALO project." *Id.* (citing Ex. 1136 § 7).

Petitioner argues that Patent Owner "failed to provide evidence 'that the industry praised a claimed invention or a product that embodies the patent claims.'" *Id.* at 78–79 (quoting *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016)) (emphasis omitted). In particular, Petitioner argues, Patent Owner "failed to 'establish that the evidence relied upon traces its basis to a novel element in the claim and not to something in the prior art.'" *Id.* at 79 (quoting *BioMarin Pharm. Inc. v. Genzyme Therapeutic Prods. LP*, IPR2013-00537, Paper 79 at 22 (PTAB Feb. 23, 2015)) (emphasis omitted).

"Furthermore," Petitioner argues, Patent Owner "has provided no showing that the Siri App 'embodies the claimed features and is co-extensive with them,' and accordingly can gain no presumption from any Siri success." *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)) (emphasis omitted). "Even assuming portions of Siri embodied the claims," Petitioner argues, "the record is undisputed that Siri provides significant functionality well beyond anything covered by the claims—voice recognition, for example." *Id.* at 79–80.

Petitioner further argues "the table provided by [Patent Owner] merely lists unrelated claim language and 'examples' of 'personal context awareness' with no further analysis." *Id.* at 80. "For example," Petitioner argues, Patent Owner "provides no explanation about how the alleged 'Personal Context Awareness' feature in Siri practices 'a layer of conversational protocol.'" *Id.* (emphasis omitted). Moreover, Petitioner argues, "despite claiming that 'the Siri application's integration of personal

context awareness is made possible because of the claimed inter-agent language limitations,' [Patent Owner] provides no evidence." *Id.* at 81. Rather, Petitioner continues, Patent Owner "cites only to a single paragraph of Dr. Medvidovic's declaration, which is itself bare *ipse dixit* and further undermined by his failure to examine the source code or any other descriptive technical materials for Siri." *Id.* (citing Ex. 2032 ¶ 288).

Petitioner argues that Patent Owner's evidence that Siri embodies the ICL limitations of claim 1 "is no better." *Id.* at 81–82 (citing PO Resp. 158). Petitioner argues Patent Owner:

> does not discuss the actual limitations of claim 1 nor explain how giving different answers depending on individual preferences embodies the claims. For example, [Patent Owner] does not even attempt to articulate how Siri has a conversational layer, or event types, or how those event types are refined by parameters. Nor does [Patent Owner] address how Siri embodies the claimed agent registry limitation, particularly when the testimony of the inventor Mr. Cheyer indicates that it does not.

*Id.* at 82 (citing Ex. 2034, 46:12–47:5).

Petitioner also argues that Dr. Medvidovic's testimony should be given no weight. *Id.* Petitioner argues that:

> Dr. Medvidovic admitted that he would be unable to determine whether a piece of software was an "agent" without examining the source code for that software, and further admitted that he had not reviewed the Siri source code nor ever asked to review such source code. Yet, Dr. Medvidovic opines at length that Siri must embody the claims of the ['560 patent] because, for example, "personal context awareness and service delegations are made possible by the functionality claimed in the independent claims of the ['560 patent]"—an opinion without any evidentiary support. Indeed, by Dr. Medvidovic's own admission, he lacks the necessary personal knowledge to opine on the architecture of Siri.

*Id.* at 82–83 (quoting Ex. 2032 ¶ 286) (citing Ex. 1129, 11:9–16).

We agree with Petitioner that Patent Owner does not provide persuasive evidence that the Siri application is reasonably commensurate with the scope of the challenged claims. Patent Owner's cited evidence attempting to tie the Siri application to the limitations of claim 1 relies substantially on the opinion testimony of Dr. Medvidovic (Ex. 2032) and a web.archive.org Internet page (Ex. 2040) Patent Owner identifies as "Siri, Inc., Technology – 'About Siri – Your Virtual Personal Assistant.'" *See* PO Resp. 155–157 (citing Ex. 2032 ¶¶ 282–286, 288; Ex. 2040, 1–2), 174.

We note at the outset that Dr. Medvidovic's opinion does not rely on an examination of the Siri application's source code. During his deposition, Dr. Medvidovic testified as follows:

> [Q] Let me ask you, have you ever reviewed the Siri source code?
>
> [A] I have not.
>
> [Q] So you don't know the details of how Siri is implemented?
>
> [A] Not beyond what I'm stating in the declaration as my sources of information that I'm drawing on.

Ex. 1129, 146:10–17. This is significant because Dr. Medvidovic testified at his deposition that an "agent"—an element in every claim—is a "piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer a clearly identifiable body of code," and that "if there is no accompanying specification language, then we would have to look inside the code [to determine] what kinds of facilities the agent provides." *See id.* at 9:13–11:8. Instead, Dr. Medvidovic testified, the evidence he relied upon to form his opinion is "circumstantial," or a "suggestion." *Id.* at 147:7–148:9.

In Section XII.B of his declaration, "Nexus of Industry Praise to the Independent Claims of the '560 Patent," Dr. Medvidovic cites to Exhibit 2040 as support for his understanding of how the Siri application works. *See e.g.*, Ex. 2032 ¶¶ 281–282, 284, 292, 295.

Exhibit 2040 describes "Siri" as:

> the first mainstream consumer application of a Virtual Personal Assistant. Siri is an intelligent software agent designed to have a back-and-forth conversational interaction with you as it helps you get tasks done. The three main technical components behind Siri's differentiation correspond to the essential qualities of an assistant: a conversational interface, personal context awareness and service delegation.

Ex. 2040, 1.

In his declaration, Dr. Medvidovic discusses the "personal context awareness" and "service delegation" aspects of Siri in some detail. *See, e.g.*, Ex. 2032 ¶¶ 284–286. Dr. Medvidovic, however, only mentions Siri's "conversational interface" in passing, even though Exhibit 2040 describes Siri as an intelligent software agent "designed to have a back-and-forth conversational interaction with you as it helps you get tasks done," and lists Siri's "conversational interface" as the first of Siri's "three main technical components." *See* Ex. 2032 ¶ 281; Ex. 2040, 1.

In his declaration, Dr. Medvidovic attempts to link the Siri application and the limitations of the independent claims of the '560 patent. Dr. Medvidovic does this by first separating the limitations of the independent claims of the '560 patent into two categories, an "Inter-agent Communication Layer" (ICL) and "Service Request Planning and Execution." *See* Ex. 2032 ¶ 287. Dr. Medvidovic then states that "[i]t is my opinion that the Siri application's integration of personal context awareness is made possible because of the claimed ICL limitations above." *Id.* ¶ 288.

Dr. Medvidovic explains that "within the conversational protocol layer of the ICL, there are further claimed 'parameter lists' that may 'further refine the one or more events.'" *Id.* ¶ 289. Dr. Medvidovic concludes that "[t]he claimed parameter lists are what allows the Siri application to provide 'different answers' depending on the context, as they are able to refine the meaning of a service request." *Id.* ¶ 292. Dr. Medvidovic, however, provides no citation or further support for this conclusion, nor does he point to any evidence to show that the Siri application utilizes the claimed parameter lists. *See id.*

In his declaration, Dr. Medvidovic also states that "[i]t is further my opinion that the Siri application's integration of service delegation is made possible because of the claimed service request planning and execution claim limitations." *Id.* ¶ 293. Dr. Medvidovic attempts to support this opinion by comparing the language of claim of the '560 patent to language used in Exhibit 2040 to describe the service delegation feature of the Siri application. *Id.* ¶ 295. The claim language he quotes, however, does not appear in claim 1 (or any claim) of the '560 patent. *See id.* (erroneously asserting that claim 1 recites "a suitable <u>delegation</u> of sub-goal requests to <u>best complete</u> the requested service request by using <u>reasoning</u>"). Thus, Dr. Medvidovic's testimony on this point is unpersuasive with respect to the '560 patent.

Petitioner also points out, and we agree, that there is evidence of record that credits the CALO project with being the progenitor of the ideas that led to Siri. *See, e.g.*, Ex. 2042, 1 ("Siri traces its origins to a military-funded artificial-intelligence project called CALO"); *see also* Ex. 2044, 1; Ex. 2047, 2; Ex. 2054, 1; Ex. 2001, 2. Opus Research explains that "Siri is set apart because it applies the depth of knowledge its founders and software

specialists have built at SRI and elsewhere in creating a 'cognitive assistant that learns and organizes' (CALO)." Ex. 2044, 1. Petitioner points out that there is also evidence of record that indicates a later agent system named "SPARK" was used as the basis of CALO. *See* Pet. Reply 78 (citing Ex. 1136 § 7). The SPARK-based Personal Assistant is described as follows:

> SPARK provides general-purpose agent technology for a range of domains that require reactive task execution. To date, the driving application for SPARK has been the development of an intelligent personal assistant for a high-level knowledge worker. This assistant, called CALO, will be able to perform routine tasks on behalf of its user (e.g., arrange meetings, complete online forms, file email), as well as undertake open-ended processes (e.g., purchasing a computer online), and anticipate future needs of its user.

Ex. 1136 § 7. This evidence, however, does not appear to have been considered or addressed by Dr. Medvidovic. *See* Ex. 2032 ¶¶ 271–295.

We are mindful that objective evidence of nonobviousness need only be "reasonably commensurate with the scope of the claims." *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013). We also bear in mind that "[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process"—the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold. *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco*, 851 F.2d at 1392).

Here, Patent Owner relies on industry praise for the Siri application and evidence of an unmet need to establish a nexus between the Siri application and the claimed invention. However, we are concerned that

Patent Owner and its declarant, Dr. Medvidovic, pay little attention to one of the "three main technical components behind Siri's differentiation," the "conversational interface," when evaluating the proffered industry praise. *See* Ex. 2040, 1.

Petitioner argues, and we agree, that "[e]ven assuming portions of Siri embodied the claims, the record is undisputed that Siri provides significant functionality well beyond anything covered by the claims—voice recognition, for example." Pet. Reply 79–80. The impression made by Siri's conversational interface on reviewers is notable. For example, MIT Technology Review explains that with Siri, "[u]sers can type or speak commands in casual sentences, and the software deciphers their intent from the context." Ex. 2042, 1. A reviewer in Opus Research reports: "I've had [Siri] for a couple of days and here are my initial reactions. My overall experience has been quite positive. The quality of voice recognition (powered by the same 'engine' that supports Dragon Dictation and Dragon Search on the iPhone) is quite good." Ex. 2044, 1. Fast Company.Com reports, "Siri, which launches today as a free iPhone app, is a virtual personal assistant that amazingly resembles . . . an actual personal assistant. It understands plain English commands, which can be spoken or typed (e.g. 'Get me tickets to that Matt Damon movie')." Ex. 2045, 2.

Further, The Chronicle of Higher Education explains that Siri "takes a multi-step search process and turns it into one, simple, voice-driven request." Ex. 2046, 2. A USA Today reviewer reported that "[t]here were occasional mistakes in speech recognition, but the overall accuracy [of Siri] was impressive, at least when I spoke slowly and clearly in a quiet environment." Ex. 2047, 2. Spatial Computing Strategy & Research reports that, with Siri, "You ask it to do stuff like 'find me a pizza place near me' or

'tell me the weather in Chicago this weekend,' [w]ith your voice or by typing commands." Ex. 2048, 2. Search Engine Land explains that Siri is "intended to enable you to do more with your voice and your phone in fewer clicks or moves." Ex. 1050, 1. It further explains that "one can speak to Siri in a more natural way. Rather than speaking like a robot and saying 'Open Table' to minimize error, you can say something more elaborate and 'conversational' such as, 'I'd like a reservation tonight around 7:30 at Le Cheval.'" *Id.* at 2.

Each of these reported examples indicate that the reviews Patent Owner relies upon to demonstrate industry praise for the Siri application considered Siri's conversational interface to be a significant part of its functionality. Unfortunately, Patent Owner and Dr. Medvidovic give Siri's conversational functionality little consideration when evaluating the reasons for the "industry praise" used to try and establish a nexus between the Siri application and the claimed invention. *See, e.g.*, Ex. 2032 ¶ 276. Even if the Siri application incorporated some of the functionality of the claimed invention, the evidence of record relied on by Patent Owner shows that the Siri application, and its attendant "industry praise," is not coextensive with the patented invention. Patent Owner does not argue that the Siri application's "conversational interface" is claimed by the '560 patent.

For these reasons, we are not persuaded that Patent Owner's evidence of industry praise for the Siri application, and evidence of an unresolved need, establishes a sufficient nexus between the Siri application and the challenged claims of the '560 patent. If anything, the evidence of record establishes only a weak or vague connection between the Siri application and the claimed invention. Accordingly, we determine that Patent Owner's

secondary considerations evidence does not weigh in favor of nonbviousness.

*15. Conclusion*

Having considered the *Graham* factors, including the scope and content of the prior art, the differences between the prior art and the challenged claims, and the evidence of secondary considerations, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 5–9, 12, 13, 22–25, and 52 of the ’560 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss and FIPA97, but has not shown by a preponderance of the evidence that claims 10, 11, 50, 51, and 53–55 are unpatentable as obvious over the combination of Kiss and FIPA97.

*H. Patent Owner’s Motion to Exclude*

Patent Owner filed a Motion to Exclude Exhibits 1127, 1137, 1141, 1145, 2034, and a portion of Exhibit 1129. PO Mot. 1–11. We address each of these exhibits below.

*1. Exhibit 1129*

Exhibit 1129 is the deposition transcript of Patent Owner’s expert Dr. Medvidovic, taken on May 19, 2020. Patent Owner seeks to exclude Petitioner’s reliance “on portions of Dr. Medvidovic’s deposition testimony that should be excluded because the question on which the testimony is based is vague, ambiguous, confusing, lacks foundation and calls for a legal conclusion. And any testimony elicited from this improper question is irrelevant, prejudicial, and misleading.” *Id.* at 8.

In particular, Patent Owner seeks to exclude lines 53:19–54:21 of Exhibit 1129, which read as follows:

> Q: If that's true, then it's your opinion these three things, these three types of processing are required to teach '115's facilitator, correct?
>
> MS. ABDULLAH: Objection.
>
> BY THE WITNESS:
>
> A: I think that the authors of the patent, the inventors were very careful to specify that this is is an embodiment. It's a preferred embodiment. There are other embodiments that they discuss. For this particular embodiment that deals with compound goals, delegation, optimization and interpretation are preferably involved. So this is the preferred embodiment. This is a legal thing, not a technical thing. What a preferred embodiment is, that's something that appears in patents, pretty much every patent I've ever read, software patent, anyway. It is something that has a particular meaning. So if you want to handle compound goals, you need to have three types of processing preferably, delegation, optimization and interpretation. So it is my opinion that anybody who tries or, sorry, anybody who is claiming, purporting to be solving the same kinds of problems needs to show an embodiment that matches those three.

Ex. 1129, 53:19–54:21.

Patent Owner argues that Petitioner "attempts to use this improper testimony to support its incorrect conclusion that 'delegation, optimization, and interpretation' are 'functionalities [] related to a preferred embodiment, so they are not relevant to the claims.'" PO Mot. 9–10 (citing Ex. 1001, 19:26–29; Ex. 1129, 54:2–9; Pet. Reply 28). Patent Owner argues that Petitioner's "question was vague, ambiguous, confusing, lacked foundation and called for a legal conclusion." *Id.* at 10. Patent Owner also argues "the testimony is irrelevant, prejudicial, and misleading." *Id.*

Petitioner opposes the motion, arguing that the testimony is admissible and that Petitioner's counsel "failed to object to this question with sufficient specificity at the appropriate time." Pet. Opp. to Mot. 13

(citing PTAB Consolidated Trial Practice Guide, 128 (Nov. 2019) ("An objection must be stated concisely in a non-argumentative and non-suggestive manner . . . .")). Petitioner points out that Patent Owner's counsel "only said 'Objection' but failed to indicate what type of objection—*i.e.*, form, relevance, etc." *Id.* Petitioner argues that for the first time, Patent Owner "now attempts to assert multiple grounds for exclusion which were not previously raised—objections which it has waived." *Id.* "Furthermore," Petitioner argues, Patent Owner "does not explain how the question is "vague, ambiguous, and confusing," and that "summarily saying it is without more is insufficient to challenge admissibility." *Id.* (citing 37 C.F.R. § 42.20 (c); *Samsung Elecs. Am., Inc. v. Uniloc 2017 LLC*, IPR2017-01798, Paper 32 at 103 (PTAB Jan. 31, 2019)).

Petitioner also points out that:

> the party proffering a witness for cross-examination has the opportunity to conduct redirect examination of the witness immediately following the cross-examination to cure any perceived deficiency or to provide a more complete answer. Here, IPA did not avail themselves of this opportunity.

*Id.* at 14 (citing 37 CFR § 42.53(c)(2); *CBS Interactive Inc. v. Helferich Patent Licensing, LLC*, IPR2013-00033, Paper 101 (Oct. 7, 2013); *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, IPR2012-00001, Paper 50 (July 18, 2013); Ex. 1129, 164:15–16 (MS. ABDULLAH: IPA does not have any redirect.)).

In its Reply, Patent Owner argues "[t]he vague, ambiguous, confusing, lack of foundation, and legal conclusion nature of questions asked by Microsoft's counsel in Exhibit 1129 is clear both on its face and by Dr. Medvidovic's deposition response," and that "[Patent Owner's] counsel properly and timely objected." PO Mot. Reply 5.

We are not persuaded by Patent Owner's arguments that Dr. Medvidovic's testimony should be excluded from evidence in this proceeding. Although Patent Owner's counsel did state the word "Objection" in response to Petitioner's question to Dr. Medvidovic, Patent Owner's counsel did not state the nature of objection, thus depriving Petitioner's counsel of the opportunity to cure the objection by rephrasing the question.

In its Motion to Exclude, Patent Owner now takes the position that the question is "vague, ambiguous, confusing, lacks foundation and calls for a legal conclusion." PO Mot. 8. Patent Owner, however, does not explain adequately how the question is vague, ambiguous or confusing, other than to state that "Dr. Medvidovic['s] testimony highlights the vague, ambiguous, and confusing nature of Microsoft's question." *Id.* at 8. Nor does Patent Owner explain adequately how the question lacks foundation or calls for a legal conclusion aside from pointing to Dr. Medvidovic's response that "[t]his is a legal thing, not a technical thing" in reference to the term "preferred embodiment." *Id.* at 9.

Patent Owner also argues that Dr. Medvidovic's response to the question is "irrelevant, prejudicial, and misleading." *Id.* at 8. Dr. Medvidovic's testimony, however, concerns his understanding of a preferred embodiment described in the '115 patent (and the '560 patent) and his opinion of whether the prior art, particularly Kiss, teaches a "facilitator." *See, e.g.*, Ex. 1129, 52:15–54:21. We find it difficult to see how Dr. Medvidovic's testimony is "irrelevant," since it goes to his understanding of the challenged patent, the asserted prior art, and the nature of his opinion in this proceeding.

It is also relevant to note, as Petitioner points out, that Patent Owner's counsel had "the opportunity to conduct redirect examination of the witness immediately following the cross-examination to cure any perceived deficiency or to provide a more complete answer." Pet. Opp. to Mot. 13. Patent Owner's counsel, however, declined to redirect any questions to Dr. Medvidovic. *See* Ex. 1129, 164:15–16.

As for Dr. Medvidovic's testimony being prejudicial or misleading, the Board, sitting as a non-jury tribunal with particular administrative and technical expertise, is not as vulnerable to being misled or prejudiced as a jury might, and is well-positioned to determine and assign appropriate credibility and weight to the evidence presented at trial, without resorting to a formal exclusion of evidence that might later be held to be reversible error. *See, e.g.*, *Liberty Mut. Ins. Co. v Progressive Cas. Ins. Co.*, CBM2012-00002, Paper 66 at 70 (PTAB Jan. 23, 2014); *Gnosis S.P.A. v. S. Alabama Med. Sci. Found.*,, IPR2013-00118, Paper 64 at 43 (PTAB June 20, 2014).

For these reasons, we deny Patent Owner's Motion to Exclude the identified testimony of Dr. Medvidovic.

*2. Exhibit 2034*

Patent Owner moves to exclude portions of Exhibit 2034, the transcript of a deposition of Mr. Adam Cheyer taken in a set of different proceedings involving the '560 patent and '115 patent, *Google LLC v. IPA Technologies Inc.*, including IPR2019-00728, IPR2019-00730, and IPR2019-00731. *See* PO Mot. 10–11. Specifically, Patent Owner seeks to exclude portions of Mr. Cheyer's cross-examination testimony (Ex. 2034, 46:12–47:5, 58:15–63:16) as beyond the scope of his direct testimony in those proceedings. PO Mot. 10–11.

Petitioner argues that Patent Owner never objected in this proceeding to Exhibit 2034, an exhibit submitted by Patent Owner itself to support its arguments. Pet. Opp. to Mot. 14. Petitioner argues that Patent Owner did not make any objections to the testimony on the record in this proceeding and therefore its argument is waived. *Id.* at 14–15. Petitioner also argues that Patent Owner has not explained why the portions it seeks to exclude were outside the scope of direct testimony. *Id.* at 15.

We agree with Petitioner that Patent Owner's motion summarily asserts that the portions of testimony it seeks to exclude are outside the scope of Mr. Cheyer's direct testimony without sufficient explanation. *See id.*; PO Mot. 10–11. Although Patent Owner identifies the topics addressed in those portions, the motion provides no details regarding the scope of direct testimony in a deposition that was taken in a different proceeding. PO Mot. 11. Thus, we are unable to determine whether Mr. Cheyer's cross-examination testimony was beyond the scope of his direct testimony, and Patent Owner has not shown it is entitled to the requested relief. *See* 37 C.F.R. § 42.20(c).

For at least this reason, we deny Patent Owner's Motion to Exclude the identified deposition testimony of Mr. Cheyer.

*3. Exhibits 1127, 1137, 1141, and 1145*

Patent Owner moves to exclude Exhibit 1127 as irrelevant, prejudicial, misleading, and outside the scope of direct examination. PO Mot. 1–4. Patent Owner moves to exclude Exhibit 1137 on hearsay, lack of authentication, misleading, undue prejudice, and lack of relevance grounds. *Id.* at 4–6. Patent Owner moves to Exclude Exhibits 1141 and 1145 on grounds of hearsay, lack of authentication, and lack of relevance. *Id.* at 6–8. Because we do not rely on the cited evidence in this Final Written Decision,

we dismiss Petitioner's Motion to Exclude Exhibits 1127, 1137, 1141, and 1145 as moot.

*I. Constitutional Challenges*

Patent Owner raises two constitutional challenges. First, Patent Owner argues that subjecting a pre-AIA patent, such as the '560 patent, retroactively to *inter partes* review violates the Takings and Due Process Clauses of the Fifth Amendment. PO Resp. 164. Second, Patent Owner asserts that *inter partes* reviews violate the Appointments Clause of the U.S. Constitution when conducted by administrative patent judges not nominated by the President and confirmed by the Senate. *Id.*

Addressing first Patent Owner's Appointments Clause challenge, we are bound by the Federal Circuit's decision in *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019), *cert. granted sub nom. United States v. Arthrex, Inc.*, 2020 WL 6037206 (Oct. 13, 2020), which addressed this issue. *See* 941 F.3d at 1337 ("This as-applied severance . . . cures the constitutional violation."); *see also Arthrex, Inc. v. Smith & Nephew, Inc.*, 953 F.3d 760, 764 (Fed. Cir. 2020) (Moore, J., concurring in denial of rehearing) ("Because the APJs were constitutionally appointed as of the implementation of the severance, *inter partes* review decisions going forward were no longer rendered by unconstitutional panels."). Accordingly, we do not consider this issue any further.

With regard to the Takings and Due Process Clause challenge, we note that challenges to retroactive application of IPRs to pre-AIA patents have been addressed by the Federal Circuit in *Celgene Corp. v. Peter*, 931 F.3d 1342, 1357–1363 (Fed. Cir. 2019), *cert. denied* 2020 WL 3405867 (June 22, 2020) (Takings Clause), and *Sound View Innovations, LLC v. Hulu, LLC*, Nos. 2019-1865, 2019-1867, 2020 WL 3583556, *3 (Fed. Cir.

July 2, 2020) (non-precedential) (Due Process Clause). Accordingly, we do not consider this issue any further.

## III. CONCLUSION

For the foregoing reasons, we determine Petitioner has shown by a preponderance of the evidence that claims 1, 5–9, 12, 13, 22–25, and 52 of the ’560 patent are unpatentable, but has not shown by a preponderance of the evidence that claims 10, 11, 50, 51, and 53–55 of the ’560 patent are unpatentable. The chart below summarizes our conclusions:

| **Claims** | **35 U.S.C. §** | **References** | **Claims Shown Unpatentable** | **Claims Not Shown Unpatentable** |
|---|---|---|---|---|
| 1, 5–13, 22–25, 50–55 | 103(a) | Kiss, FIPA97 | 1, 5–9, 12, 13, 22–25, 52 | 10, 11, 50, 51, 53–55 |
| **Overall Outcome** | | | 1, 5–9, 12, 13, 22–25, 52 | 10, 11, 50, 51, 53–55 |

## IV. ORDER

Accordingly, it is

ORDERED that claims 1, 5–9, 12, 13, 22–25, and 52 of the ’560 patent have been shown to be unpatentable;

FURTHER ORDERED that claims 10, 11, 50, 51, and 53–55 of the ’560 patent have not been shown to be unpatentable;

FURTHER ORDERED that Patent Owner’s Motion to Exclude is denied in part and dismissed in part; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Joseph A. Micallef
Scott M. Border
SIDLEY AUSTIN LLP
jmicallef@sidley.com
sborder@sidley.com

PATENT OWNER:

Steven W. Hartsell
Alexander E. Gasser
Sarah E. Spires
SKIERMONT DERBY LLP
shartsell@skiermontderby.com
agasser@skiermontderby.com
sspires@skiermontderby.com

Trials@uspto.gov
571-272-7822

Paper 42
Date: October 22, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MICROSOFT CORPORATION,
Petitioner,

v.

IPA TECHNOLOGIES INC.,
Patent Owner.

---

IPR2019-00837
Patent 7,069,560 B1

---

Before LYNNE E. PETTIGREW, MINN CHUNG, and KEVIN C. TROCK, *Administrative Patent Judges.*

PETTIGREW, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Denying in Part and Dismissing in Part Patent Owner's Motion to Exclude
*35 U.S.C. § 318(a); 37 C.F.R. § 42.64*

# I. INTRODUCTION

In this *inter partes* review, instituted pursuant to 35 U.S.C. § 314, Microsoft Corporation ("Petitioner") challenges claims 1–4, 14–19, 26, and

36–44 of U.S. Patent No. 7,069,560 B1 (Ex. 1001, "the '560 patent"), owned by IPA Technologies Inc. ("Patent Owner"). This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed below, Petitioner has shown by a preponderance of the evidence that claims 1–4, 14–19, 26, and 36–44 of the '560 patent are unpatentable.

### *A. Procedural History*

Petitioner filed a Petition for *inter partes* review of claims 1–4, 14–19, 26, and 36–44 of the '560 patent. Paper 1 ("Pet."). Patent Owner filed a Preliminary Response. Paper 6 ("Prelim. Resp."). Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we instituted an *inter partes* review of the challenged claims. Paper 9 ("Inst. Dec.").

Following institution, Patent Owner filed a Patent Owner Response (Paper 19, "PO Resp."), Petitioner filed a Reply (Paper 27, "Pet. Reply"), and Patent Owner filed a Corrected Sur-reply (Paper 38, "PO Sur-reply"). Patent Owner filed a Motion to Exclude (Paper 33, "PO Mot."), Petitioner filed an Opposition to Patent Owner's Motion to Exclude (Paper 34, "Pet. Opp. to Mot."), and Patent Owner filed a Reply in Further Support of Its Motion to Exclude (Paper 36, "PO Mot. Reply"). An oral hearing was held on July 27 and 28, 2020, and a copy of the hearing transcript has been entered into the record.[1] Paper 41 ("Tr.").

---

[1] A single hearing was held for eight related cases—IPR2019-00810, IPR2019-00811, IPR2019-00812, IPR2019-00813, and IPR2019-00814, challenging claims of U.S. Patent No. 6,851,115 B1; and IPR2019-00835, IPR2019-00836, and IPR2019-00837, challenging claims of the '560 patent.

*B. Real Parties in Interest*

Petitioner identifies Microsoft Corporation as the real party in interest for the Petition. Pet. 3. Patent Owner names as the real party in interest IPA Technologies Inc., which is a wholly owned subsidiary of Wi-LAN Technologies Inc., which is a wholly owned subsidiary of Wi-LAN Inc., which is a wholly owned subsidiary of Quarterhill Inc. Paper 3, 2.

*C. Related Matters*

The parties inform us that the ’560 patent is the subject of the following district court proceedings: *IPA Technologies Inc. v. Microsoft Corp.*, 1:18-cv-00001 (D. Del.); *IPA Technologies Inc. v. Google LLC*, 1:18-cv-00318 (D. Del.); *IPA Technologies Inc. v. Amazon.com*, 1:16-cv-1266 (D. Del.). Pet. 3; Paper 3, 2.

In addition to the present proceeding, we instituted two other *inter partes* reviews based on petitions filed by Petitioner challenging claims of the ’560 patent. In IPR2019-00835, the Board determined that claims 1, 20, 21, 26, 27, 28–35, and 45–49 of the ’560 patent had been shown to be unpatentable and that claim 28 had not been shown to be unpatentable. *Microsoft Corp. v. IPA Techs. Inc.*, IPR2019-00835, Paper 42 (PTAB Oct. 15, 2020) (Final Written Decision). In IPR2019-00836, in a decision issued concurrently with this one, we determine that Petitioner has shown claims 1, 5–9, 12, 13, 22–25, and 52 of the ’560 patent to be unpatentable but has not shown claims 10, 11, 50, 51, and 53–55 to be unpatentable.

The ’560 patent was the subject of two *inter partes* reviews in which the Board determined that claims of the ’560 patent had not been shown to be unpatentable: *Google LLC v. IPA Technologies Inc.*, IPR2019-00730, Paper 72 (PTAB Sept. 16, 2020) (Final Written Decision); *Google LLC v.*

*IPA Technologies Inc.*, IPR2019-00731, Paper 73 (PTAB Sept. 16, 2020) (Final Written Decision).

The '560 patent is a continuation of U.S. Patent No. 6,851,115 B1 (Ex. 1122, "the '115 patent"), which is the subject of other *inter partes* reviews (IPR2019-00810, IPR2019-00811, IPR2019-00812, IPR2019-00813, and IPR2019-00814) involving the same parties as this proceeding. *See* Ex. 1001, code (63).

### *D. Overview of the '560 Patent*

The '560 patent describes "software-based architectures for communication and cooperation among distributed electronic agents" using "interagent communication languages enabling client agents to make requests in the form of arbitrarily complex goal expressions that are solved through facilitation by a facilitator agent." Ex. 1001, 1:20–25. Figure 4 of the '560 patent is reproduced below.




Fig. 4

Figure 4 depicts the structure of an exemplary distributed agent system of the ’560 patent. *Id.* at 6:38–44. Figure 4 shows that system 400 includes facilitator agent 402, user interface agents 408, application agents 404, and meta-agents 406. *Id.* The ’560 patent discloses that system 400 is organized “as a community of peers by their common relationship” to facilitator agent 402, which is “a specialized server agent that is responsible for coordinating agent communications and cooperative problem-solving.” *Id.* at 6:41–43, 6:46–48.

The ’560 patent discloses that cooperation among agents is structured around the following three-part approach: (1) providers of services register their capabilities specifications with a facilitator; (2) requesters of services construct goals and relay them to the facilitator; and (3) the facilitator coordinates the efforts of the appropriate service providers in satisfying these goals. *Id.* at 10:53–61. Such cooperation among agents is achieved via messages expressed in a common language, referred to as the Interagent Communication Language (“ICL”). *Id.* at 10:61–11:7.

Referencing Figure 3 (not reproduced herein) and Figure 4, the ’560 patent describes a preferred embodiment for the operation of a distributed agent system. *Id.* at 7:24–50. The ’560 patent describes that, when invoked, a client agent makes a connection to a facilitator, e.g., facilitator agent 402, and registers with the facilitator a specification of the capabilities and services it can provide. *Id.* at 7:26–32. For example, a natural language agent may register the characteristics of its available natural language vocabulary. *Id.* at 7:32–34. When facilitator agent 402 receives a service request and determines that registered services 416 of one of its client agents will help satisfy a goal of the request, the facilitator sends that client a request expressed in ICL 418. *Id.* at 7:36–40. The client agent

parses this request, processes it, and returns answers or status reports to the facilitator. *Id.* at 7:41–43.

Referencing Figures 5 and 6 (not reproduced herein), the '560 patent describes an exemplary embodiment in which user interface agent 408 runs on a user's laptop, accepting user input, sending requests to facilitator agent 402 for delegation to appropriate agents, and displaying the results of the distributed computation. *Id.* at 7:64–8:14. For instance, when the question "What is my schedule?" is entered on user interface (UI) 408, UI 408 sends the request to facilitator agent 402, which in turn asks natural language (NL) agent 426 to translate the query into ICL. *Id.* at 8:15–25. The translated ICL expression then is routed by facilitator agent 402 to appropriate agents, e.g., calendar agent 434, to execute the request. *Id.* at 8:25–27. Finally, results are sent back to UI agent 408 for display. *Id.* at 8:27–28.

*E. Challenged Claims*

Of the claims challenged in the Petition, claims 1 and 26 are independent. Claims 2–4 and 14–19 depend directly or indirectly from claim 1, and claims 36–44 depend directly or indirectly from claim 26. Claim 1 is illustrative and reproduced below.

> 1. A software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture contemplating a distributed computing system comprising:
>
> a plurality of service-providing electronic agents;
>
> a distributed facilitator agent functionally distributed across at least two computer processes, the facilitator agent capable of bi-directional communications with the plurality of service-providing electronic agents, the facilitator agent including:

an agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the distributed computing environment; and

a facilitating engine operable to interpret a service request as a base goal, the facilitating engine further operable for generating a goal satisfaction plan associated with the base goal, wherein the goal satisfaction plan involves:

using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal; and

wherein the plurality of service-providing electronic agents and the distributed facilitator agent communicate using an interagent Communication Language (ICL), wherein the ICL includes:

a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events.

Ex. 1001, 29:56–30:23.

*F. Asserted Grounds of Unpatentability*

Petitioner asserts that the challenged claims are unpatentable based on the following grounds (Pet. 4):

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–4, 14–19, 26, 36–44 | 103(a)[2] | Kiss,[3] FIPA97[4] |
| 2–4, 14–17, 39–42 | 103(a) | Kiss, FIPA97, Cohen[5] |

*G. Testimonial Evidence*

In support of the unpatentability contentions in its Petition, Petitioner relies on a declaration of Dr. Henry Lieberman (Ex. 1050, "Lieberman Decl.") and a declaration of Dr. Timothy Finin (Ex. 1049, "Finin Decl."). Patent Owner cross-examined Dr. Lieberman and Dr. Finin via deposition. *See* Ex. 2069 ("Lieberman Dep."); Ex. 2068 ("Finin Dep.").

In support of its Patent Owner Response, Patent Owner relies on a declaration of Dr. Nenad Medvidovic (Ex. 2032, "Medvidovic Decl.") and a Declaration of Dr. Philip R. Cohen (Ex. 2033, "Cohen Decl."). Petitioner cross-examined Dr. Medvidovic via deposition. *See* Ex. 1129 ("Medvidovic Dep.").

---

[2] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. §§ 102 and 103. Because the '560 patent has an effective filing date prior to the effective date of the applicable AIA amendments, we refer to the pre-AIA versions of §§ 102 and 103.

[3] U.S. Patent No. 6,484,155 B1, issued Nov. 19, 2002, filed July 21, 1999 (Ex. 1005, "Kiss").

[4] Foundation for Intelligent Physical Agents, *FIPA 97 Specification Version 1.0*, published Oct. 10, 1997 (Exs. 1006–1012, collectively "FIPA97").

[5] Cohen et al., *An Open Agent Architecture*, AAAI Technical Report SS-94-03 (1994) (Ex. 1014, "Cohen").

## II. DISCUSSION

### *A. Legal Principles*

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective indicia of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

To prevail on its challenges to Patent Owner's claims, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC. v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

### *B. Level of Ordinary Skill in the Art*

We begin our analysis by addressing the level of ordinary skill in the art. Petitioner's declarant, Dr. Lieberman, opines that a person of ordinary

skill in the art at the time of the invention of the ’560 patent would have been someone familiar with the principles and conventions of computer science and computer networking, and also with multi-agent systems and inter-agent communication languages as documented in agent-centered literature by 1999. Ex. 1050 ¶ 32; *see* Pet. 5 (citing Ex. 1050 ¶ 32). Dr. Lieberman also testifies that a person of ordinary skill in the art may have been a graduate student in mathematics, engineering, or computer science, and may have had an advanced degree in one of these disciplines, and would also have had at least two years of experience working in the field of computer science, or a related field, and may have worked in academia, either as a professor or a graduate student, for a technology company, or for a government. Ex. 1050 ¶ 32.

Citing the testimony of its declarant, Dr. Medvidovic, Patent Owner asserts that a person of ordinary skill in the art at the time of the ’560 patent’s effective filing date would have had “a Bachelor’s degree in Computer Science or equivalent field and at least two years of work experience in design and development of distributed systems, software specification languages, or a related area.” PO Resp. 28 (citing Ex. 2032 ¶ 41). Patent Owner criticizes Petitioner’s articulation of the level of ordinary skill in the art as being “vague and uncertain” due to Petitioner’s and Dr. Lieberman’s use of the word “may” in their proposed definition. *Id.* at 28–29. Patent Owner contends that Petitioner’s proposed definition “leav[es] every aspect of the level of skill ‘fluid,’” which is “particularly problematic here, where Petitioner claims that it would have been obvious to create an agent system that is very complex and advanced in its facilitation, goal processing, and inter-agent communication capacities.” *Id.* at 29 (citing Ex. 2032 ¶ 44).

Petitioner responds that its proposal "realistically expresses alternatives—*i.e.*, that a Skilled Artisan would have been at least a graduate student in several relevant fields, and would have had at least two years of work experience in those fields." Pet. Reply 12; *see* Pet. 5. Petitioner also argues that Patent Owner does not articulate how any differences between the parties' proposals that would alter or even affect the outcome of this proceeding. Pet. Reply 12.

Patent Owner asserts that it has "identified how the difference between the proposals would affect this proceeding" because Patent Owner has pointed out that "it is Petitioner's burden under the law to address each *Graham* factor and Petitioner has failed to proffer a coherent level of ordinary skill in the art, [and] Petitioner's obviousness assertion fails for that reason alone." PO Sur-reply 16–17 (citing PO Resp. 29).

But Patent Owner does not identify any "meaningful differences" between the parties' proposed definitions or how "the outcome of [this proceeding] would have been different" if we adopted Patent Owner's proposed definition, as opposed to Petitioner's proposal. *See ESIP Series 2, LLC v. Puzhen Life USA, LLC*, 958 F.3d 1378, 1385 (Fed. Cir. 2020) (citing *Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1371–72 (Fed. Cir. 2016)). For example, Patent Owner does not argue the challenged claims are not unpatentable under Patent Owner's proposed definition of the level of ordinary skill in the art, nor does it identify any claim limitation that would have been taught by the asserted prior art under Petitioner's proposed definition, but *not* under Patent Owner's proposal. *See* PO Resp. 28–29; PO Sur-reply 16–17.

In our view, the parties' proposals are not materially different despite the differences in wording between them (e.g., the education level of a

Bachelor's degree in Computer Science or equivalent field under Patent Owner's proposal, as opposed to a graduate student's level of education with or without a Bachelor's degree under Petitioner's proposed definition). *See* Pet. 5; Pet. Reply 12; PO Resp. 28. For purposes of this Final Written Decision, we find no meaningful differences between the parties' respective definitions that would materially alter the outcome of this Decision. These proposals are similar for all purposes relevant to this Final Written Decision, and both are consistent with the level of ordinary skill in the art reflected in the disclosure of the '560 patent and the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

Nonetheless, for this Final Written Decision, we adopt Patent Owner's definition of a person of ordinary skill in the art at the time of the claimed invention. That is, a person of ordinary skill in the art at the time of the claimed invention would have had "a Bachelor's degree in Computer Science or equivalent field and at least two years of work experience in design and development of distributed systems, software specification languages, or a related area." Our analysis and conclusions in this Final Written Decision would be the same regardless of whether Petitioner's or Patent Owner's definition of the level of ordinary skill in the art is adopted.

*C. Claim Construction*

In an *inter partes* review, we apply the same claim construction standard that would be used in a civil action under 35 U.S.C. § 282(b), following the standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. § 42.100(b) (2019). In applying such standard, claim terms are generally given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art, at

the time of the invention and in the context of the entire patent disclosure. *Phillips*, 415 F.3d at 1312–13. "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

In our Decision on Institution, we preliminarily interpreted several claim terms as follows:

| Term | Construction |
|---|---|
| "event" | "a message or goal communicated between agents" |
| "event type" | "a type of an event" |
| "goal" | "a request for service" |
| "compound goal" | "a single goal expression that specifies multiple sub-goals to be performed" |
| "non-syntactic decomposition of the base goal" | "generation of a sub-request (sub-goal/sub-delegation) based on factors other than the syntax of how the goal was received or made" |

Inst. Dec. 27–35.

The parties do not dispute the constructions of these five terms in the Patent Owner Response or Petitioner Reply. *See* PO Resp. 30–31, 43; Pet. Reply 1. Upon considering the complete record, we see no reason to deviate from our preliminary constructions and, therefore, adopt the constructions of the claim terms "event," "event type," "goal," "compound goal," and "non-syntactic decomposition of the base goal" as set forth above for this Final Written Decision.

In the Petition, Petitioner discusses constructions for several additional claim terms: "goal satisfaction plan," "layer of conversational protocol," "arbitrarily complex goal expression," "single process facilitator agent," and "parameter lists further refine the one or more events." Pet. 8–16. In addition, Petitioner discusses the constructions of "computer process(es)" and "hierarchical topology" in the Reply. Pet. Reply 6–9, 11–12. Patent Owner disputes constructions for the following terms: "goal satisfaction plan," "computer process(es)," and "hierarchical topology." PO Resp. 32–50; PO Sur-reply 2–16. We discuss constructions for the disputed terms below.

No other disputed claim terms need to be construed expressly for purposes of this Final Written Decision. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that only terms that are in controversy need to be construed, and "only to the extent necessary to resolve the controversy"); *see also Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (applying *Vivid Technologies.* in the context of an *inter partes* review). To the extent it is necessary for us to consider the meaning of any other claim term, we do so in the context of our unpatentability analysis.

*1. "goal satisfaction plan"*

The claim term "goal satisfaction plan" is recited in challenged independent claims 1 and 26 of the '560 patent. Ex. 1001, 30:7–15 (claim 1), 32:43–51 (claim 26). It is also recited in independent claim 50 of the '560 patent, not challenged in this proceeding. *Id.* at 35:1–10. Petitioner contends that a "goal satisfaction plan" is a "procedure for sending one or more requests for service to one or more agents in order to satisfy a goal." Pet. 9. Patent Owner disagrees and asserts that the claim term "goal

satisfaction plan" should be construed to mean "a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints." PO Resp. 32.

*a. Claim Language*

We begin our claim construction analysis by considering the language of the claims themselves. *Phillips*, 415 F.3d at 1314. Addressing the claim language of the disputed term, we note that the claim language "a goal satisfaction plan" indicates that the term's plain meaning is "a plan for satisfying a goal."

In independent claims 1 and 26, the recited "goal satisfaction plan" is further constrained by specific limitations recited in the claims. Claim 1 recites:

> a facilitating engine . . . further operable for generating a *goal satisfaction plan* associated with the base goal, wherein the goal satisfaction plan involves:
>
> using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal.

Ex. 1001, 30:5–15 (emphasis added). Claim 26 recites substantially similar language:

> a facilitating engine . . . further operable to generate a *goal satisfaction plan* associated with the compound goal, wherein the goal satisfaction plan involves:
>
> using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal.

*Id.* at 32:35–51 (emphasis added).

Patent Owner argues that additional claim limitations specify that the goal satisfaction plan is designed for optimal goal satisfaction and takes into account advice parameters. PO Resp. 34–35 (citing Ex. 2032 ¶ 50). Patent Owner, however, only identifies limitations that do not appear in the claims of the ’560 patent. *Id.* (erroneously citing claim 1 as reciting “a suitable delegation,” “dispatching . . . based on a match,” and “domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and . . . a match between the subgoal being dispatched and the registered functional capabilities”). Therefore, Patent Owner does not show persuasively that any claim language in the ’560 patent requires the narrow construction it proposes.

Thus, at least based on the claim language, it is not appropriate to limit “goal satisfaction plan” as Patent Owner contends. As discussed above, the meaning and the scope of “goal satisfaction plan” is clear on the face of each claim because claims 1 and 26 each recite specifically what a “goal satisfaction plan” includes or comprises. Therefore, absent compelling evidence to the contrary, it is neither necessary nor appropriate to limit the meaning of the term “goal satisfaction plan” beyond the plain meaning indicated by the claim language—i.e., “a plan for satisfying a goal.”

*b. Written Description*

Patent Owner cites the following statement in the “Summary of the Invention” section:

> [e]xtreme flexibility is achieved through an architecture organized around the declaration of capabilities by service-providing agents, the construction of arbitrarily complex goals by users and service-requesting agents, and the **role of facilitators in delegating and coordinating the satisfaction of**

> **these goals, subject to advice and constraints** that may accompany them.

PO Resp. 35–36 (quoting Ex. 1001, 4:67–5:6). The very first sentence of the paragraph cited by Patent Owner states, however, "[a] first *embodiment* of the present invention discloses a highly flexible, software-based architecture for constructing distributed systems." Ex. 1001, 4:55–57 (emphasis added). Indeed, all of the portions of the Specification cited by Patent Owner, including the passage reproduced above, describe various embodiments of the '560 patent. *See* PO Resp. 35–38 (citing Ex. 1001, 4:67–5:6, 5:48–49, 15:60–62, 16:22–24, 16:34–44, 16:62–17:2, 18:60–19:6, 29:25–33, Fig. 11).

In general, "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (citation omitted). As discussed above, challenged independent claims 1 and 26 do not recite all of the limiting features required by Patent Owner's proposed construction of "goal satisfaction plan." Thus, unless one of the established exceptions, such as lexicography or disavowal, applies, the challenged claims are not restricted as Patent Owner contends. *See, e.g.*, *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("the specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal") (citation omitted). Here, Patent Owner does not argue lexicography or disavowal. Nor does Patent Owner explain any other reason why the Specification limits "goal satisfaction plan" as it contends. Thus, claim construction in this case is governed by the general principle that "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the

embodiment." *SuperGuide*, 358 F.3d at 875; *see also WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1323–24 (Fed. Cir. 2018) ("It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise." (citing *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) ("[T]his court has repeatedly cautioned against limiting claims to a preferred embodiment."))). Accordingly, none of the embodiments in the Specification cited by Patent Owner limits "goal satisfaction plan" as Patent Owner contends.

*c. Prosecution History*

Turning next to the prosecution history, Patent Owner asserts that "examples in the file history confirm the elements of 'goal satisfaction plan' reflected in Patent Owner's proposed construction." PO Resp. 40. Patent Owner argues that, during the prosecution of the application for the '115 patent (i.e., the parent of the '560 patent),

> [a]pplicant further stated that "the facilitating engine is able to use reasoning to delegate the sub-goals to service providing agents in such a way as '**to best complete the requested service request**.'…The facilitating engine is able to use reasoning to delegate the sub-goal task of roasting coffee to the service-providing agent that can roast beans in the least amount of time because the facilitating engine has reasoned that the least amount of time taken to make coffee is the best way to accomplish the base goal of making coffee." Applicant concluded that "the base goal is carried out **not by merely parsing the request into sub-goals**" but rather "the facilitating engine used reasoning to decide upon using competing message transfer agents to reminding Bob of lunch, in lieu of delegating the task to just one message transfer agent."

*Id.* (citing Ex. 1002, 172–73). Patent Owner argues that similar language appears in Applicant's remarks during prosecution of the '560 patent. *Id.* (citing Ex. 1120, 171–72); *see* Ex. 1120, 172 ("The reasoning includes 'one

or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms.").

Similar to its arguments based on the language of the claims, Patent Owner's contentions regarding the prosecution history refer to claim language that does not appear in the claims of the '560 patent (e.g., "to best complete the requested service request" and "one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms"). Patent Owner does not explain persuasively why prosecution statements directed to language not in the claims of the '560 patent should limit the construction of "goal satisfaction plan" as Patent Owner contends.

*d. Extrinsic Evidence*

Patent Owner also cites the testimony of its declarant, Dr. Medvidovic, in support of Patent Owner's proposed construction of "goal satisfaction plan." PO Resp. 40–41 (citing Ex. 2032 ¶¶ 55–56, 58–63, 200). We have reviewed the cited testimony from Dr. Medvidovic, but do not find anything in his testimony that would change our analysis based on intrinsic record discussed above. *See Phillips*, 415 F.3d at 1318 (authorizing the consideration of extrinsic evidence in determining the meaning of claims but noting that it is "in general . . . less reliable than the patent and its prosecution history in determining how to read claim terms").

*e. Other Arguments*

The parties dispute whether Petitioner's use of "procedure" (in place of a "plan") and "sending one or more requests for service" in Petitioner's proposed construction is appropriate. *See* PO Resp. 41–43; Pet. Reply 2, 5–6; PO Sur-reply 3, 10. We need not address these arguments in detail

because, for the reasons discussed above, we see no reason to depart from the plain meaning of the term "goal satisfaction plan."

*f. Conclusion*

Based on the complete record and after examining the claims as a whole, the written description, and the prosecution history, we construe the term "a goal satisfaction plan" according to its plain meaning—"a plan for satisfying a goal."

*2. "computer process"*

The claim term "computer processes" is recited in independent claims 1 and 26 in the limitation "a distributed facilitator agent functionally distributed across at least two computer processes." Ex. 1001, 29:63–64 (claim 1), 32:26–27 (claim 26). Various dependent claims recite the term "computer process." *See, e.g.*, Ex. 1001, 30:24–27 (claim 2 reciting "the distributed facilitator agent includes a plurality of single process facilitator agents each executing within a separate computer process"). Petitioner contends that a "computer process" is "a program, a part of a program, or a list of steps to be completed by the computer." Pet. 32 (citing Ex. 1034, 383 (computer dictionary defining "process" as "[a] program or part of a program; a coherent sequence of steps undertaken by a program")). Patent Owner disagrees and asserts that a "computer process" is "an operating system process within a computer's architecture that represents one or more running programs and their activities." PO Resp. 44; *see* Ex. 2032 ¶ 69. In its Reply, Petitioner argues that because Patent Owner does not assert any different outcome based on its proposed construction, and Petitioner shows how the prior art discloses "computer processes" under either party's construction, the term need not be construed to resolve any controversy. Pet.

Reply 11–12. Patent Owner disagrees, asserting that the construction of the term affects the merits of Petitioner's arguments. PO Sur-reply 16.

The terms "computer process" and "computer processes" are recited repeatedly in the claims of the '560 patent, and many of Patent Owner's arguments responding to Petitioner's unpatentability contentions relate to claim limitations involving "computer processes." Accordingly, we construe the term "computer process" to assist us in resolving the parties' dispute regarding unpatentability.

*a. Claim Language*

We begin our claim construction analysis by considering the language of the claims themselves. *Phillips*, 415 F.3d at 1314. Patent Owner notes that the term "computer process" appears in the claims in the context of "at least two" or "separate" computer processes relating to a distributed facilitator agent. PO Resp. 44–45 (citing claims 1, 2, 20, and 21). Patent Owner argues that in the context of those claims, having a distributed facilitator agent as a separate "program" (under Petitioner's construction) does not necessarily allow for the degree of separation contemplated by the claims because multiple programs may be run on the same processes. *Id.* at 45 (citing Ex. 2032 ¶ 71). Petitioner does not reply to this argument. *See* Pet. Reply 11–12.

Patent Owner essentially argues, with the support of Dr. Medvidovic, that a "process" is not limited to a "program" because multiple programs may be executed in the same computer process. Ex. 2032 ¶ 71. Patent Owner does not explain persuasively how claim language involving the distributed facilitator agent and separate computer processes necessarily suggests that a process is not a program.

The same paragraph in Dr. Medvidovic's declaration also states that "[a] process is not [a] program because a program is a static notion . . . while a process is what actually occurs in a computer when a program is executed." *Id.* The claim language does provide some support for the concept that a computer process involves running or executing a program, which is part of Patent Owner's proposed construction. For instance, claim 20 requires "a planning component *executing* within a first computer process and an execution component *executing* within a second computer process." Ex. 1001, 31:50–53 (emphases added).

*b. Written Description*

As Patent Owner points out, the written description of the '560 patent does not use the term "computer process." PO Resp. 45. Instead, it describes a facilitator agent with functionality "distributed across several different computing platforms." *Id.* (quoting Ex. 1001, 6:31–33). Patent Owner cites a passage describing an embodiment allegedly corresponding to dependent claims 20 and 21 that explains some benefits of separating the facilitator agent's planning and execution components. *Id* at 45–46 (quoting Ex. 1001, 29:8–38). As with the claim language, Patent Owner does not persuasively show how this description informs the construction of "computer process."

*c. Extrinsic Evidence*

Petitioner's proposed construction is based directly on a computer dictionary definition of a "process" as "[a] program or part of a program; a coherent sequence of steps undertaken by a program." Ex. 1034, 383. Patent Owner and Dr. Medvidovic cite an electronics dictionary providing one definition of a "process" as "[t]he basic unit of computation within an operating system." Ex. 2070, 590; *see* PO Resp. 46; Ex. 2032 ¶ 69. They

also cite a general purpose dictionary defining "process" in the context of computers as "to carry out operations on (data or programs)." Ex. 2071, 1542; *see* PO Resp. 46; Ex. 2032 ¶ 69. Dr. Medvidovic explains that a process is not the same thing as a program because, for example, a process can run many programs or parts of programs. Ex. 2032 ¶¶ 71–72.

*d. Analysis*

In the context of the claim language, the only intrinsic evidence that sheds light on the meaning of "computer process," we find Patent Owner's extrinsic evidence in the form of Dr. Medvidovic's testimony and dictionary definitions to be more persuasive than Petitioner's proffered dictionary definition. Thus, we agree with Patent Owner that a "computer process" is a process that runs or executes one or more computer programs. We are not persuaded that the other portions of Patent Owner's proposed construction are necessary or materially affect the meaning of the claim term.

For these reasons, based on the complete record, including the intrinsic and extrinsic evidence of record, we construe the term "computer process" as "a process that runs or executes one or more computer programs."

*3. "hierarchical topology"*

The claim term "hierarchical topology" is recited in dependent claims 14 and 39 in the limitation "wherein the distributed facilitator agent is formed in a hierarchical topology." Ex. 1001, 31:24–26, 33:49–51. Claims 15 and 40 further recite "wherein the hierarchical topology includes a top level facilitator agent and at least one other facilitator agent registered within the top level facilitator agent." *Id.* at 31:27–30, 33:52–55.

Petitioner asserts that the ordinary meaning of "hierarchical topology" is "a type of organization that, like a tree, branches into more specific units."

Pet. 61 (citing Ex. 1034, 232 (computer dictionary defining "hierarchy" as "[a] type of organization that, like a tree, branches into more specific units, each of which is 'owned' by the higher-level unit immediately above")). Patent Owner disagrees and asserts that the claim term "hierarchical topology" should be construed as "an arrangement of constituent parts according to their rank." PO Resp. 47.

*a. Claim Language*

Beginning with the claim language, Patent Owner argues that "[t]he existence of a 'top level' facilitator [in claim 15] makes it clear that there are multiple levels to the hierarchy where at least one facilitator has ownership over another." PO Resp. 48. Petitioner contends that a "tree-like shape would . . . allow for 'multiple levels' of facilitators." Pet. Reply 8 (citing Ex. 1141, 1). Petitioner also contends that Patent Owner's argument that "one facilitator has ownership over another" is inconsistent with the claims. *Id.* In its Sur-reply, Patent Owner does not further urge that the claim term has an "ownership" aspect. *See* PO Sur-reply 11–14.

Both parties appear to agree that a "hierarchical topology" includes multiple levels. *See* PO Resp. 48; Pet. Reply 8. We agree that in view of the language of claim 15 in which a hierarchical topology includes a "top level" facilitator agent and another facilitator agent, the claim term "hierarchical topology" contemplates multiple levels. The claim language, however, does not suggest that one facilitator agent must have "ownership" over another.

*b. Written Description*

Turning to the written description of the '560 patent, Patent Owner cites a description of Figure 15 as a "hierarchical topology" in which "a top level Facilitator manages collections of both client agents 1508 and other

Facilitators, 1504 and 1506." PO Resp. 48 (quoting Ex. 1001, 28:60–65). Figure 15 of the '560 patent is reproduced below:




Fig. 15

Ex. 1001, Fig. 15. As shown in Figure 15 above, Facilitator 1502 is a top level facilitator and manages client agents 1508 and other facilitators 1504 and 1506. *Id.* at 28:60–65. Consistent with the claim language, Figure 15 illustrates a hierarchical topology of facilitator agents at multiple levels.

*c. Extrinsic Evidence*

Each party submits one or more dictionary definitions in support of its respective proposed construction. As noted above, Petitioner cites a definition of "hierarchy" but omits the portion providing that each unit "is 'owned' by the higher-level unit immediately above." Pet. 61 (citing Ex. 1034, 232). Patent Owner combines definitions of "hierarchical" and "topology" to obtain its proposed construction. PO Resp. 49 (citing Exs. 2070–72). Patent Owner argues that its construction is consistent with the patent's references to a top level facilitator "because it allows varying

levels or rank among the facilitators." *Id.* (citing Ex. 2032 ¶ 79). Thus, Patent Owner equates "level" with "rank."

*d. Analysis*

Ultimately, the parties' proposed constructions of "hierarchical topology" do not differ significantly. Both parties agree that the term encompasses the concept of units or parts at different levels. Patent Owner's use of the word "arrangement" takes into account the "topology" aspect of "hierarchical topology." Based on the intrinsic evidence (claims and written description) and extrinsic evidence (dictionary definitions), and combining relevant portions of the parties' proposed constructions, we construe the claim term "hierarchical topology" as "an arrangement of units or parts having multiple levels."

*D. Prior Art Overview*

We provide an overview of Kiss and FIPA97, the main prior art references asserted against the challenged claims, to provide context for the discussion that follows.

*1. Kiss (Ex. 1005)*

Kiss describes "a knowledge management system that supports inquiries of distributed knowledge resources," in which "[i]nteraction between a user and the knowledge resources is mediated by a collection of cooperative intelligent agents." Ex. 1005, 2:44–45, 2:46–48. Figure 1,

reproduced below, is a conceptual overview of one embodiment of a knowledge management system described in Kiss:




*Fig. 1*

*Id.* at 5:1–3. As shown in Figure 1 above, Kiss's knowledge management system 100 includes presentation layer 103, user interface layer 105, meta agent layer 107, knowledge agent layer 109, knowledge module layer 111, and agent service layer 113. *Id.* at 5:3–7. Each of user interface layer 105, meta agent layer 107, and knowledge agent layer 109 in Kiss's hierarchical knowledge management system includes one or more intelligent agents responsible for one portion of the distributed problem-solving inferencing process. *Id.* at 3:17–22.

Meta agent layer 107 includes one or more meta agents 119 that are responsible for analyzing queries or problem formulations provided by user interface layer 105 and constructing a plan for finding a solution to the problem. *Id.* at 5:20–24. Each meta agent 119 contains knowledge of problem solving methodologies and distributed inferencing procedures. *Id.* at 5:24–26. More specifically, "meta agent 119 is responsible for formulating a dynamic 'solution plan' for the distributed inferencing to be performed by the system 100, and allocates tasks to the knowledge agent layer 109 in furtherance of the solution plan." *Id.* at 5:33–37. "The meta agent dynamically assesses the problem and its solution states (between users and the knowledge agents 121), divides the problem, and assigns the appropriate knowledge agents 121 to work on the solution." *Id.* at 8:37–40.

Knowledge agent layer 109 includes multiple knowledge agents 121, each of which may be associated with one or more knowledge modules 123 in knowledge module layer 111. *Id.* at 6:31–35. Each knowledge agent 121 is configured to accept from meta agent 119 a problem statement and convert that problem statement into a format appropriate for the knowledge module 123 associated with the knowledge agent 121. *Id.* at 6:35–38. Knowledge agents register their capabilities and interests with registry 114 in agent service layer 113. *Id.* at 3:37–42, 12:18–20.

Kiss describes various distributed inferencing schemes that may be used to address problems to be solved. *Id.* at 7:20–8:19. One scheme uses a "planner-based dynamic inferencing approach." *Id.* at 7:29–30. In this scheme, "inferencing proceeds within an agent until an intermediate goal is achieved." *Id.* at 7:30–32. The next step of the inferencing process begins after the intermediate goal is achieved, and inferencing continues in a stepwise manner until the initial problem is solved. *Id.* at 7:35–37. "[M]eta

agent 119 manages the dynamic distributed inferencing scheme, using an agenda mechanism or commitment table to assign and schedule portions of the inferencing procedures to the participating agents during execution." *Id.* at 7:37–41.

Other distributed inferencing schemes disclosed by Kiss include a "problem-specific rule network," as well as "linear," "partitioned," "replicated," "real time," "preemptive," and "qualitative" inferencing modes. *Id.* at 7:23–28, 7:47–8:16. In the partitioned inference scheme, for example, the "user query or problem domain is easily divided into distinct subfields, phases or sub-problems that share limited initial data." *Id.* at 7:53–55.

Figures 8–20 of Kiss (not reproduced herein) illustrate an example of using distributed inferencing to solve the problem "what is the effect of increasing sales by 20%?" *Id.* at 12:21–14:30. As shown in Figure 9, the meta agent begins formulating a solution plan by asking the agent service layer to identify a knowledge agent that has registered a capability to answer a question related to "sales." *Id.* at 12:29–32. Once the service layer identifies a sales agent, the meta agent pushes a task onto an agenda to query the sales agent for the effect of increasing sales by 20% and then issues that query. *Id.* at 12:32–36. Distributed inferencing proceeds with the meta agent pushing tasks associated with agent queries onto the agenda and removing them after they are completed, until the sales agent has enough information to address the user's original query. *Id.* at 12:37–14:30.

*2. FIPA97 (Exs. 1006–1012)*

FIPA97 (Exs. 1006–1012) is a specification created by the Foundation for Intelligent Physical Agents (FIPA) beginning in 1996 with an official release date in October 1997. Ex. 1006, Cover, iv (identifying specification as FIPA 97 Version 1.0 issued on October 10, 1997). FIPA97 is a

"specification of basic agent technologies that can be integrated by agent systems developers to make complex systems with a high degree of interoperability." *Id.* at v. The specification comprises seven parts: three parts for basic agent technologies (Parts 1–3 relating to agent management, agent communication language, and agent/software integration) and four informative applications providing examples of how the technologies can be applied (Parts 4–7 describing personal travel assistance, personal assistant, audio-visual entertainment, and broadcasting and network management and provisioning applications). *Id.* at v–vii; *see generally* Exs. 1006–1008 (Parts 1–3); Exs. 1009–1012 (Parts 4–7).

Part 1 of FIPA97, the FIPA Agent Management specification (FIPA AMS) "provides a normative framework within which FIPA compliant agents can exist, operate and be managed." Ex. 1006, vi. The FIPA AMS model is defined through the intersection of Agent Platforms (APs) and Agent Domains (ADs), as illustrated in Figure 2 below. *Id.* at 10, Fig. 2.




**Figure 2 — Agent Platform Reference Model Fragment**

Each AD in Figure 2 of FIPA Part 1, above, is defined by a Directory Facilitator (DF). *Id.* at 6. Agents register their services with DFs. *Id.* For

example, agents A and B have registered their services with $DF_x$, agents B, C, and D have registered their services with $DF_y$, and agents D and E have registered their services with $DF_z$. *Id.* at 10.

Part 2 of FIPA97 describes an "Agent Communication Language (ACL)" that "is based on speech act theory: messages are actions, or communicative acts, as they are intended to perform some action by virtue of being sent." Ex. 1007, ix. The ACL specification "consists of a set of message types and the description of their pragmatics, [i.e.,] the effects on the mental attitudes of the sender and receiver agents." *Id.* The ACL specification "also provides the normative description of a set of high-level interaction protocols, including requesting an action, contract net and several kinds of auctions." *Id.*

Part 2 of FIPA97 discloses a "simple abstract model of inter-agent communication" including ACL messages having components as illustrated in Figure 1 below. *Id.* at 7, 12.




**Figure 1 — Components of a message**

Figure 1, above, illustrates the main structural elements of an ACL message in FIPA97. *Id.* at 12. "The first element of the message is a word which identifies the communicative act being communicated, which defines the principal meaning of the message." *Id.* Each ACL message contains a set of

one or more parameters, including a mandatory "*:receiver*" parameter that identifies the intended recipient of the message. *Id.* at 13.

Petitioner asserts that FIPA97 was made publicly available as a single document and relies on FIPA97 as a single printed publication for purposes of 35 U.S.C. § 102(a). *See* Pet. 21; Pet. Reply 26. As discussed below in the section addressing the status of FIPA97 as a printed publication, FIPA approved and released FIPA 97 Version 1.0 as a single specification. *See infra* § II.F; Ex. 1026, 5; Ex. 1050 ¶ 165. Thus, although sometimes the seven parts are referred to as "documents," a person of ordinary skill in the art would have considered FIPA97 to be a single reference. *See* Ex. 1050 ¶¶ 164–165. Patent Owner does not dispute that FIPA97 is one reference for purposes of §§ 102 and 103. *See* PO Resp. 138–140.[6] Because FIPA and skilled artisans considered FIPA97 to be a single specification, we agree that FIPA97 constitutes a single prior art reference, and we treat it as such for purposes of our unpatentability analysis.

*E. Prior Art Status of Kiss*

Before reaching the merits of Petitioner's obviousness contentions, we address as a threshold issue whether Kiss (Ex. 1005) qualifies as prior art in this proceeding. Petitioner has the burden of persuasion to prove unpatentability by a preponderance of the evidence. *Dynamic Drinkware,* 800 F.3d at 1378. Petitioner has the initial burden of production to show that a reference is prior art to the challenged claims under a relevant section

---

[6] Contrary to Patent Owner's argument (PO Resp. 138–140), Petitioner did not argue in another case, and the Board did not find, that FIPA97 is seven separate prior art references. *See Microsoft Corp. v. IPA Techs. Inc.*, IPR2019-00838, Paper 13 at 3–5 (PTAB Apr. 3, 2020) (Decision Denying Petitioner Request for Rehearing), Paper 10 at 4–9 (Petitioner's Request for Rehearing, filed Dec. 6, 2019).

of 35 U.S.C. § 102. *See id.* at 1379. Once Petitioner has met that initial burden, the burden of production shifts to Patent Owner to argue or produce evidence that the asserted reference is not prior art to the claims. *Id.* at 1380. Once Patent Owner has met that burden of production, the burden of production returns to Petitioner. *Id.*

The effective filing date of the ’560 patent is January 5, 1999, the filing date of the ’115 patent, which is the parent of the ’560 patent. Ex. 1001, code (63). Kiss is a United States patent that arose from an application filed July 21, 1999, claiming the benefit of priority to a provisional application filed July 21, 1998. Ex. 1005, codes (22), (60).

Petitioner asserts that Kiss is prior art to the ’560 patent under 35 U.S.C. § 102(e) because Kiss is entitled to the benefit of priority to the filing date of its provisional application (Ex. 1036, “Kiss Provisional Application”). Pet. 14–18. “A reference patent is only entitled to claim the benefit of the filing date of its provisional application if the disclosure of the provisional application provides support for the claims in the reference patent in compliance with § 112, ¶ 1.” *Dynamic Drinkware*, 800 F.3d at 1381.

In *Ex parte Mann*, the Board determined that “under *Dynamic Drinkware*, a non-provisional child [application] can be entitled to the benefit of a provisional application’s filing date if the provisional application provides sufficient support for *at least one claim* in the child.” 2016 WL 7487271, at *6 (PTAB Dec. 21, 2016) (emphasis added) (discussing whether *Dynamic Drinkware* requires “support in the provisional . . . for all claims, any claim, or something in between”). In addition, the Board determined that a “subject matter test” is also required—that is, “the [party claiming priority] also must show that the subject matter relied upon in the non-

provisional is sufficiently supported in the provisional application [and that t]his subject matter test is in addition to the comparison of claims required by *Dynamic Drinkware*." *Id.* at *5.

Recognizing these requirements, Petitioner asserts that "each element of [claim 1 of Kiss] has written description support in the Kiss Provisional," providing detailed citations to the supporting disclosures from the Kiss Provisional Application for each limitation of claim 1 of Kiss. Pet. 14–16. Addressing the "subject matter test," Petitioner asserts that "the teachings that Petitioner relies upon were carried forward from the Kiss Provisional to Kiss" and provides a detailed mapping of the relied-upon portions of Kiss to the corresponding portions of the Kiss Provisional Application. *Id.* at 16-18.

In its Preliminary Response, Patent Owner asserted that Kiss is not entitled to the priority date of its provisional application. Prelim. Resp. 65. In the Institution Decision, we determined, based on the preliminary record, the argument and evidence presented by Patent Owner were insufficient to shift the burden of production back to Petitioner. Inst. Dec. 25. We noted, however, that a final determination on this particular issue would be made based on a full record developed during the course of trial. *Id.*

During the trial, Patent Owner did not present any argument or evidence on this issue, nor did it dispute that Kiss qualifies as prior art in this proceeding. *See generally* PO Resp.

Based on the complete record, we determine that Petitioner has established by a preponderance of the evidence that Kiss is prior art to the '560 patent under 35 U.S.C. § 102(e) because Kiss is entitled to the benefit of priority to the filing date of its provisional application.

*F. Status of FIPA97 as a Prior Art Printed Publication*

We also must determine as a threshold matter whether FIPA97 (Exs. 1006–1012) is a prior art printed publication under 35 U.S.C. § 102(a) or § 102(b). *See* Pet. 21–23; PO Resp. 59–78. Petitioner bears the burden of establishing by a preponderance of the evidence that FIPA97 is a printed publication. *See* 35 U.S.C. § 316(e); *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1375 (Fed. Cir. 2018); *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29 at 11 (PTAB Dec. 20, 2019) (precedential) (citing *Nobel Biocare*, 903 F.3d at 1375). For purposes of instituting an *inter partes* review we accepted Petitioner's contention, unchallenged in Patent Owner's Preliminary Response, that FIPA97 was available as prior art as of October 1997, more than one year before January 5, 1999, the effective filing date of the '560 patent. Inst. Dec. 8 n.3 (citing Pet. 21–23 (citing Ex. 1049 ¶¶ 6, 11, 12, 20–34; Ex. 1050 ¶¶ 143, 146–149)). Patent Owner, however, challenges that contention in its Patent Owner Response, and the parties further address the issue in Petitioner's Reply and Patent Owner's Sur-reply. *See* PO Resp. 59–78; Pet. Reply 15–21; PO Sur-reply 20–31.

The determination of whether a document is a "printed publication" under 35 U.S.C. § 102 "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' . . . ." *Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1355 (Fed. Cir. 2018) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). A

reference is considered publicly accessible if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it.'" *Id.* at 1355–56 (quoting *In re Wyer*, 655 F.2d 221, 226 (CCPA 1981)).

In the discussion below, we begin with background information regarding FIPA and an overview of the evidence submitted by Petitioner in support of its contention that FIPA97 was publicly accessible in October 1997. The evidence includes extensive testimony from Dr. Finin, a professor who has personal knowledge of FIPA's activities and the development process of FIPA97. *See* Ex. 1049 ¶¶ 1–55 (Finin Decl.). Dr. Finin was one of the first two FIPA Fellows invited to provide "high quality and independent advice to FIPA." *Id.* ¶ 18 (quoting Ex. 1076, 1); Ex. 1025, 1; Ex. 1062, 1. The evidence also includes testimony from Petitioner's expert witness, Dr. Lieberman, and more than sixty documentary exhibits on which Petitioner relies to show that FIPA97 was publicly accessible in late 1997 and early 1998. *See* Ex. 1050 ¶¶ 142–149 (Lieberman Decl.); Exs. 1021–33, 1047, 1051–1105.

After providing an overview of the evidence, we consider the parties' arguments as to whether FIPA97 was publicly accessible before the January 5, 1999, critical date. For the reasons explained below, we determine that Petitioner has met its burden to show that FIPA97 was publicly accessible before the critical date.

*1. FIPA*

FIPA was a non-profit association based in Geneva, Switzerland, created to promote agent-based technology and develop open standards. Ex. 1006, iv (FIPA 97 Specification Version 1.0, Part 1, Foreword);

Ex. 1049 ¶ 3. Founded in 1996, FIPA's membership included numerous technology companies, educational institutions, and governmental entities. Ex. 1049 ¶ 3. As of October 1997, FIPA had thirty-five corporate members representing twelve countries.[7] Ex. 1006, iv. According to FIPA documentation, membership was "open to any corporation and individual firm, partnership, governmental body or international organi[z]ation without restriction." *Id.* FIPA stated its intent "to make the results of its activities available to all interested parties." *Id.* Throughout its tenure, FIPA produced standards designed to promote and advance agent-based technology. Ex. 1049 ¶ 3. In 2005, FIPA was incorporated into the Institute of Electrical and Electronics Engineers (IEEE) as one of its standards committees. *Id.*

*2. Development of FIPA97*

The process of drafting the FIPA 97 specification began with FIPA's first meeting in London in April 1996. Ex. 1049 ¶ 6; Ex. 1058 (Main results of London meeting); Ex. 1066 (Resolutions of London meeting). Representatives from twenty-six companies and organizations attended. Ex. 1066, 1. At the meeting, the members agreed on FIPA's mission, drafted statutes and operational principles, and produced a work plan for a specification that would become FIPA 97. Ex. 1058, 1; Ex. 1066, 1–3; Ex. 1049 ¶ 6. The work plan set a December 1997 target for producing a first completed specification. Ex. 1066, 2–3; Ex. 1049 ¶ 7.

FIPA subsequently held several meetings in 1996 and 1997. At the second meeting in June 1996 in Yorktown Heights, NY, FIPA approved

[7] The corporate members included Alcatel, British Telecommunications, Deutsche Telekom, France Telecom, Hitachi, Hewlett-Packard, IBM, NEC, NTT, Nortel, Siemens, and Toshiba. *See* Ex. 1095, 22.

several documents, including a framework for FIPA activity and a list of requirements for FIPA-specified agent capabilities. Ex. 1067, 1 (Resolutions of Yorktown meeting); Ex. 1060, 1 (Results of Yorktown meeting); Ex. 1049 ¶ 9. At the third meeting in October 1996 in Tokyo, FIPA approved a final work plan calling for production of a FIPA specification in October 1997. Ex. 1049 ¶ 11; Ex. 1070, 1 (work plan); Ex. 1023 (Results of Tokyo meeting). Also at the Tokyo meeting, FIPA produced its First Call for Proposals, which outlined in detail three technology parts (corresponding to Parts 1–3 of FIPA 97) and four application parts (corresponding to Parts 4–7 of FIPA 97). Ex. 1069, 1–27 (First Call for Proposals); Ex. 1049 ¶ 12.

In 1997, FIPA began to produce draft specifications. At the fourth meeting in January 1997 in Turin, Italy, FIPA publicly released drafts of Parts 1–4 and posted them on the FIPA home page (http://drogo.cselt.stet.it/fipa). Ex. 1021, 1 (Results of Turin meeting); Ex. 1049 ¶ 13. Additionally, FIPA released a Second Call for Proposals at the Turin meeting. Ex. 1071, 1–3 (Second Call for Proposals); Ex. 1049 ¶ 13. At the fifth meeting in April 1997 in Reston, VA, FIPA produced drafts of Parts 1–7, which were publicly released and posted on the FIPA home page. Ex. 1024 (Results of Reston meeting); Ex. 1061 (Resolutions of Reston meeting); Ex. 1049 ¶ 17. At the sixth meeting in June 1997 in Cheju Island, South Korea, FIPA publicly released revised drafts of Parts 1–7 and posted them on the FIPA home page. Ex. 1025, 1 (Results of Cheju meeting); Ex. 1062, 5 (Resolutions of Cheju meeting); Ex. 1049 ¶ 19. According to Dr. Finin, the Reston Draft and Cheju Draft were substantially complete versions of what would become FIPA 97. Ex. 1049 ¶¶ 17, 19.

Dr. Finin testifies that news of FIPA and its standardization efforts "spread quickly throughout the relatively small community of software agent researchers." Ex. 1049 ¶ 8. For instance, the AgentWeb website, "a meeting place for researchers in agent-based technology from 1995–2000," was home to a "Software Agents" mailing list and a newsletter that had more than 1,300 subscribers in 1996. *Id.*; Ex. 1089, 5. Dr. Finin was "the founder, author, and a subscriber" of the AgentWeb newsletter. Ex. 1049 ¶ 8. The widely distributed AgentWeb newsletters announced upcoming FIPA meetings, reported results of previous meetings, including calls for proposals, and provided links to the specification drafts posted on the FIPA home page. *See id.* ¶¶ 8, 10, 12, 14, 17, 19.

For example, the AgentWeb newsletter dated May 11, 1996, announced the upcoming FIPA June 1996 Yorktown meeting, described as the "FIPA Opening Forum." Ex. 1090, 5; Ex. 1049 ¶ 8. The purpose of the meeting, as stated in the newsletter, was to "refine the list of basic agent capabilities candidate for FIPA specification; compile a first list of agent capabilities intended for specification by end 1997; and establish the first working groups." Ex. 1090, 5. Likewise, the AgentWeb newsletter dated August 12, 1996, advertised the FIPA October 1996 Tokyo meeting. Ex. 1088, 1; Ex. 1049 ¶ 10. Thereafter, the AgentWeb newsletter dated October 14, 1996, publicized the Call for Proposals issued at the October 1996 Tokyo meeting and provided the deadline for submission of proposals to be considered at the Turin meeting in January 1997. Ex. 1087, 1; Ex. 1049 ¶ 12. FIPA had decided that respondents who submitted proposals would be invited to the January 1997 meeting to present their proposals even if they were not FIPA members. Ex. 1023, 1; *see* Ex. 1069, 27.

Once FIPA began to produce drafts of the specification, AgentWeb newsletters announced those drafts and provided links to access them. The AgentWeb newsletter dated February 2, 1997, reported that "[i]nitial specifications for three technology parts (Agent Management, Agent Communication and Agent/Software Interaction) and one application part (Personal Travel Assistance) have been produced" at the recent Turin meeting. Ex. 1091, 1; Ex. 1049 ¶ 14. The newsletter included a freely accessible and public link to access the draft. Ex. 1049 ¶ 14 (citing Ex. 1091, 1–2). It also indicated that drafts of the remaining three specification parts would be generated at the FIPA meeting to be held in April 1997 in Reston. Ex. 1091, 1–2. A subsequent AgentWeb newsletter dated April 13, 1997, advertised the upcoming Reston meeting and contained links to information about the meeting on the FIPA website. Ex. 1092, 3; Ex. 1049 ¶ 17.

On May 5, 1997, following the Reston meeting, an AgentWeb newsletter reported that attendees of that meeting produced a revised draft including all seven parts of the specification. Ex. 1093, 2; Ex. 1049 ¶ 17. The newsletter contained individual public links to the seven parts and invited "both members and non-members" to comment, providing an email address for submission. Ex. 1093, 2; Ex. 1049 ¶ 17. Additionally, the newsletter announced the dates and locations of the next two meetings—the June 1997 Cheju meeting and the seventh meeting to take place in Munich on October 6–10, 1997. Ex. 1093, 2. Similarly, the AgentWeb newsletter dated June 30, 1997, announced that the Cheju meeting resulted in revised versions of the FIPA specification documents and provided direct links to the seven parts. Ex. 1094, 1–2; Ex. 1049 ¶ 19. Again, the newsletter stated that FIPA invited comments and that non-members making substantial

comments would be invited to attend the October 1997 Munich meeting. Ex. 1094, 2. Dr. Finin was among those who submitted comments on the Cheju draft. Ex. 1073; Ex. 1049 ¶ 20.

Meanwhile, the AgentWeb Software Agents mailing list also provided information regarding FIPA's efforts to the community of software agent researchers. *See* Ex. 1049 ¶ 8. Dr. Finin was an organizer of and contributor to the Software Agents mailing list. *Id.* On May 2, 1996, a posting to the mailing list referenced the upcoming June 1996 FIPA meeting in Yorktown Heights, New York. Ex. 1079, 1; Ex. 1049 ¶ 8. Members of the Software Agents mailing list posted comments regarding the Turin draft after it was released publicly. Exs. 1078, 1081, 1082; *see* Ex. 1049 ¶¶ 14–15. Dr. Finin was among those who shared their thoughts. *See* Ex. 1082; Ex. 1049 ¶ 15. A posting after the Reston meeting included a public and open link to access the Reston draft and invited comments from the mailing list. Ex. 1083, 1; Ex. 1049 ¶ 17.

*3. Public Release of FIPA97*

FIPA's seventh meeting took place in Munich on October 6–10, 1997. Ex. 1026 (Resolution of Munich meeting); Ex. 1049 ¶ 20. At this meeting, FIPA incorporated final edits and comments and approved the FIPA 97 specification for publication. Ex. 1026, 1, 5; Ex. 1049 ¶ 20. The specification as approved at the meeting was called "FIPA 97 ver. 1.0," or FIPA 97 Version 1.0. Ex. 1026, 5. Working groups for various parts of the specification were given about one month to check for consistency and make minor edits. *Id.* at 2; Ex. 1049 ¶ 20.

An "initial" version of FIPA 97 Version 1.0, approved at the Munich meeting and dated October 10, 1997, was posted to the FIPA website, housed at the time at http://drogo.cselt.stet.it/fipa. Ex. 1049 ¶¶ 20–21.

According to Dr. Finin, the specification documents were available online and free for anybody to access by sometime in October 1997. *Id.* ¶ 21. On November 18, 1997, an AgentWeb newsletter announced completion of FIPA 97 Version 1.0 and its publication on the FIPA website. Ex. 1086, 1–2; Ex. 1049 ¶ 21. The newsletter provided individual, direct links to the seven parts of the specification on the FIPA website. Ex. 1086, 1–2. The links were not password protected and were open to the public without a requirement for secrecy or confidentiality. Ex. 1049 ¶ 21. As with the earlier AgentWeb newsletters, the newsletter containing links to FIPA 97 Version 1.0 was sent to more than 1,300 subscribers. *Id.*

Dr. Finin testifies that in late 1997, "a few weeks after the Munich meeting," he accessed the approved FIPA 97 Version 1.0 posted on the FIPA website. *Id.* ¶¶ 20–21. He specifically recalls accessing the documents in late 1997 to review the first major work product of FIPA and to prepare for FIPA's upcoming January 1998 meeting in Palo Alto, which he attended. *Id.* ¶ 21 (citing Ex. 1074). Dr. Lieberman also testifies that he recalls FIPA 97 Version 1.0 being publicly available on the FIPA website throughout late 1997 and early 1998 and that he accessed it in late 1997 as a member of the interested public. Ex. 1050 ¶ 146.

The release of FIPA 97 Version 1.0 was well publicized in the weeks after the Munich meeting. Ex. 1049 ¶ 22. For example, on October 20, 1997, the EETimes featured an article reporting FIPA's approval of the FIPA 97 specification. Ex. 1095, 22; *see* Ex. 1049 ¶ 22. The article was based on an interview with Leonardo Chiariglione, the president of FIPA. Ex. 1095, 22. The article described the seven parts of the specification: "The first three parts cover different aspects of agent behavior: agent management; agent communication; and agent-software interaction. The

four remaining parts, which cover application areas, . . . are: personal travel assistance; personal assistant; audio-visual entertainment and broadcast; and network provision and management." *Id.* After describing FIPA's plans for 1998, including testing of FIPA 97 Version 1.0 to provide input for a further round of standardization, the article referred readers to the FIPA website for information regarding the released specification: "CSELT[8] maintains extensive information on FIPA's activities at www.cselt.stet.it/fipa."[9] *Id.* (emphasis omitted). It concluded with a quote from Dr. Chiariglione regarding the specification's public availability: "'It is our policy to make the standard freely available over the Internet,' Chiariglione said. 'FIPA will retain the copyright but it will be free for others to use.'" *Id.*

The November-December 1997 issue of IEEE Internet Computing also announced the release of the FIPA 97 specification: "The Foundation for Intelligent Physical Agents, a non-profit organization established to promote emerging agent-based applications, has released its first specification. Named FIPA 97, the specification will provide a benchmark for interoperable products." Ex. 1096, 93; Ex. 1049 ¶ 22. The news brief directed readers to the FIPA website for the text of the specification. Ex. 1096, 93 ("The text is available at http://drogo.cselt.stet.it.fipa/."[10]); Ex. 1049 ¶ 22.

---

[8] Centro Studi e Laboratori Telecommunicazioni, Dr. Chiariglione's employer at the time. *See* Ex. 1095, 22.
[9] The record suggests this website (http://www.cselt.stet.it/fipa) was a mirror of the FIPA website (http://drogo.cselt.stet.it/fipa) in 1997. *See* Ex. 1049 ¶ 22; Ex. 1095, 22; Tr. 94:11–14.
[10] The URL provided in the article contains a typographical error. *See* Ex. 1049 ¶ 22 (correcting the URL to http://drogo.cselt.stet.it[/]fipa/).

Sometime after the Munich meeting, FIPA also produced a hardcopy book version of the FIPA 97 Version 1.0 specification to be sent to FIPA members and various institutions and standards groups. Ex. 1049 ¶ 24; *see* Ex. 1026, 1; Ex. 1063, 1 (Resolution of the Palo Alto meeting, Jan. 29, 1998). At least two copies of the book were available in libraries in January 2019. Ex. 1049 ¶ 24; Ex. 1057, 1 (WorldCat catalog entry for "Fipa specification : Version 1.0"); Ex. 1055 (cover page and table of contents of each part in copy at library in Italy); Ex. 1056 (cover page and table of contents of Part 1 in copy at library in Switzerland). Dr. Finin testifies that the books contain the November 28, 1997, edited version of FIPA 97 Version 1.0, which "only made minor edits (mostly spelling and formatting) over the October 10, 1997 version." Ex. 1049 ¶ 25 (citing Ex. 1055, 5 (Part 2 "publication date" of November 28, 1997); Ex. 1056).

*4. Publications and Patents Referring to FIPA97 and FIPA Activities*

In late 1997 and 1998, several papers reviewing and outlining the FIPA 97 specification were published and presented at meetings. *See* Ex. 1049 ¶¶ 26–30. A paper dated December 1997 memorializes a presentation made to a meeting on Intelligent Agent Technology organized by the EPSRC[11] Community Club in Advanced Computing Techniques. Ex. 1097, Cover ("Dickinson");[12] *see* Ex. 1049 ¶ 26. This paper outlines the background and rationale for the creation of an agent interoperability standard. Ex. 1097, 1–3. It also describes the development history of the

[11] "The Engineering and Physical Sciences Research Council (EPSRC) is the main funding body for engineering and physical sciences research in the UK." Engineering and Physical Sciences Research Council, epsrc.ukri.org/about (last visited Sept. 28, 2020).
[12] Ian J. Dickinson, *Agent Standards*, HP Laboratories Bristol, HPL-97-156 (Dec. 1997).

FIPA 97 specification, noting that FIPA's work program "culminated in the publication of an initial draft standard, FIPA 97, at the Munich meeting on October 1997." *Id.* at 3. Dickinson further provides that "[a]ll FIPA documents and meeting outputs are publicly available on the web" at "http://drogo.cselt.stet.it/fipa/," and "comments and review have been sought at each stage of the process." *Id.* at 3, 7 n.9. The paper then describes the features of the specification's three substantive technical sections, Parts 1–3. *Id.* at 3–6.

Similarly, a 1998 paper titled "Industrial Applications of Multi-Agent Technology" summarizes FIPA's background and presents an overview of the three technical parts (i.e., Parts 1–3) of FIPA 97 Version 1.0 released in October 1997. Ex. 1099, 12–13 ("Steiner");[13] *see* Ex. 1049 ¶ 28. The Steiner paper provides the FIPA website address and explains that the four application parts (i.e., Parts 4–7) will be used in field trials to gather information to be incorporated into a revised version of FIPA 97. Ex. 1099, 13 & n.1.

Likewise, a paper titled "FIPA — towards a standard for software agents" appearing in the July 1998 issue of the BT Technology Journal explains the motivation for an agent standard and provides an overview of FIPA's background and activities. Ex. 1100, 51–52 ("O'Brien");[14] *see* Ex. 1049 ¶ 29. It then describes the different parts of the FIPA 97 Version 1.0 specification issued in October 1997. Ex. 1100, 51–52.[15]

---

[13] Donald Steiner, Siemens AG, *Industrial Applications of Multi-Agent Technology* (IEEE 1998).
[14] P.D. O'Brien & R.C. Nicol, *FIPA — towards a standard for software agents*, BT Tech. J. Vol. 16, No. 3 (July 1998).
[15] Dr. Finin testifies that O'Brien provides public links to FIPA97. Ex. 1049 ¶ 29. The copy of O'Brien entered into the record, however, appears to be

Dr. Finin cites several other publications that reference FIPA's development of an agent communication standard in the 1997–98 timeframe. Ex. 1049 ¶ 31 (citing Exs. 1027–29). Dr. Finin also identifies several patent applications in the same timeframe that refer to FIPA's agent communication language. *Id.* ¶ 32 (citing Exs. 1030–33).

*5. The FIPA Website and Exhibits 1006–1012*

Sometime in 1998, the FIPA website migrated from its original site (http://drogo.cselt.stet.it/fipa) to fipa.org. Ex. 1049 ¶ 23; *see also* Ex. 1026 (Resolution of Munich meeting indicating FIPA's plans for the "redesign of a new FIPA home page"); Ex. 1065, 4 (Resolutions of the Durham meeting in October 1998 indicating the website will be transferred to www.fipa.org). The fipa.org website still exists today even though FIPA is no longer active as a standalone organization. *See* Ex. 1049 ¶¶ 23, 48–49. The current FIPA website maintains a repository of past FIPA documents, including meeting notes, press releases, FIPA resolutions, and different versions of the FIPA specification. *Id.* ¶ 49.

Dr. Finin testifies that the "initial" version of FIPA 97 Version 1.0 (i.e., the specification posted on the FIPA website on October 10, 1997) "remained publicly accessible during all of FIPA's future activities and is still available on FIPA's home page today." *Id.* ¶ 21. According to Dr. Finin, Exhibits 1006–1012 (collectively referred to as FIPA97) are Parts 1–7 of FIPA 97 Version 1.0 as found on the current fipa.org website. *Id.* Based on his personal knowledge, Dr. Finin further testifies that

---

missing several pages, including one containing endnotes 10–12 that might provide links to the FIPA website. *See* Ex. 1100, 52 ("FIPA97 (issued in October 1997) [10–12] is the first output from FIPA covering part of the requirements for an agent standard.").

Exhibits 1006–1012 are the "same version" and contain "the same disclosures, content and information" as Parts 1–7 of FIPA 97 Version 1.0 that were publicly available on the FIPA website (http://drogo.cselt.stet.it/fipa) on October 10, 1997, and which Dr. Finin himself accessed in late 1997. *Id.* ¶¶ 21, 34. He also notes that although Exhibit 1006 has a typographical error relating to the version number in the header of its odd pages,[16] Exhibit 1006 is identical to the version of Part 1 of FIPA 97 Version 1.0 that was released on October 10, 1007. *Id.* ¶ 21. Additionally, as evidence that FIPA 97 Version 1.0 has been continuously available on fipa.org since the website migration, Dr. Finin cites a set of Internet Archive records beginning in 2000 showing where each part of that version of the specification could be accessed. *Id.* (citing Ex. 1054).

Dr. Finin testifies that the original FIPA website, http://drogo.cselt.stet.it/fipa, remained live for several years after the website transitioned to fipa.org. Ex. 1049 ¶ 23. The Internet Archive Wayback Machine contains an archived screen capture of the website http://drogo.cselt.stet.it/fipa from December 1, 1998. *See* Ex. 1051; Ex. 1049 ¶¶ 23, 54. According to Dr. Finin, the archived page shows that the FIPA 97 specification was live and freely available on the FIPA website home page at that time. Ex. 1049 ¶ 23; Ex. 1051, 1 ("FIPA has already developed a seven-part specification called FIPA 97. Implementations of FIPA 97 are undergoing field trials that will last until October 1998 when version 2 of FIPA 97 will be produced."); Ex. 1049 ¶ 23. The home page provided links (i.e., "FIPA 97") to actual specification documents, but those

[16] The header on odd pages reads "FIPA 1997 Part 1: Version 2.4." *E.g.*, Ex. 1006, 3.

links have not been maintained in the archive. Ex. 1049 ¶ 23. Dr. Finin testifies that the screen capture from the Internet Archive is consistent with the mirror of the former FIPA site hosted by Leonardo Chiariglione. *Id.* ¶ 51 (citing Ex. 1103 (http://leonardo.chiariglione.or/standards/fipa/)). Dr. Chiariglione's mirror is still available, and documents hosted on the mirror are "accurate and complete copies of FIPA documents that were available to FIPA members." *Id.*

*6. Analysis*

Petitioner argues that FIPA97 was a publicly accessible printed publication as of October 10, 1997, when it was posted on the FIPA website. Pet. 22; Pet. Reply 15–21. More specifically, Petitioner argues that (1) FIPA 97 Version 1.0 was publicly accessible on October 10, 1997, and (2) the version of the FIPA specification found in Exhibits 1006–1012, referred to herein as FIPA97, is the same specification that was posted on the FIPA website on October 10, 1997, and named FIPA 97 Version 1.0. *See, e.g.*, Pet. 22 (arguing FIPA 97 Version 1.0 was publicly accessible in late 1997); Pet. Reply 15–17 (arguing that Exhibits 1006–1012 are the same documents that were made public as FIPA 97 Version 1.0). Patent Owner addresses the first contention when it argues the evidence does not show any version of FIPA 97 Version 1.0 was available on the FIPA website. *See, e.g.*, PO Resp. 69. It also challenges the second contention when it argues Petitioner has failed to show that Exhibits 1006–1012 are identical to the version of the FIPA specification that allegedly was publicly accessible before the critical date. *See, e.g.*, *id.* at 62–63. In our analysis below, we address the two questions in turn.

Considering all the facts and circumstances surrounding the development of FIPA 97 Version 1.0 and its publication on the FIPA

website, we find that FIPA 97 Version 1.0 was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the art, exercising reasonable diligence, could locate it. *See Jazz Pharm.*, 895 F.3d at 1355–56. First, the uncontested evidence shows that members of the relevant public (i.e., persons of ordinary skill in the field of software agent-based technology) knew of the release of FIPA 97 Version 1.0 in late 1997, prior to the critical date. As detailed above, FIPA was open to corporations and educational and governmental organizations without restriction. Ex. 1006, iv. FIPA's members included many industry leaders whose employees attended FIPA meetings, including the October 1997 meeting in Munich where FIPA 97 Version 1.0 was approved for publication. *See id.*; Ex. 1095, 22. FIPA meetings and activities were publicized among the larger community of software agent researchers via the AgentWeb website and its associated Software Agents mailing list and AgentWeb newsletter, which had more than 1,300 subscribers. Ex. 1090, 5; Ex. 1088, 1; Ex. 1087, 1; Ex. 1091, 1–2; Ex. 1092, 3; Ex. 1093, 2; Ex. 1094, 1–2; Ex. 1086, 1–2; *see* Ex. 1049 ¶¶ 8, 10, 12, 14, 17, 19. The newsletter in particular informed subscribers of the development of the FIPA specification during 1996 and 1997 and provided detailed information regarding the release of FIPA 97 Version 1.0 in a November issue. Ex. 1086, 1–2. News articles in periodicals published in late 1997 also announced that FIPA had released and published FIPA 97 Version 1.0. Ex. 1095, 22; Ex. 1096, 93; *see* Ex. 1049 ¶ 22. In addition, the record contains several papers published in late 1997 and 1998, prior to the critical date, describing FIPA 97 Version 1.0 and its release in October 1997. *See* Ex. 1097, 1–7; Ex. 1099, 12–13; Ex. 1100, 51–52; Ex. 1049 ¶¶ 26–30; *see also* Ex. 1049 ¶¶ 31–32

(citing Exs. 1027–33 (other publications and patents referring to FIPA specification)).

The evidence of record also demonstrates that members of the relevant public, exercising reasonable diligence, could have located FIPA 97 Version 1.0 in late 1997 on the FIPA website, housed at the time at http://drogo.cselt.stet.it/fipa. FIPA published FIPA 97 Version 1.0 on its website at the conclusion of the Munich meeting on October 10, 1997, or shortly thereafter. *See* Ex. 1049 ¶ 20. In the several months leading up to the Munich meeting, persons of ordinary skill in the art would have known about the FIPA website through the widely distributed AgentWeb newsletters and the Software Agents mailing list, which provided website information or direct links to drafts of the specification and meeting announcements and reports. *See* Ex. 1091, 1–2; Ex. 1092, 3; Ex. 1093, 2; Ex. 1094; Ex. 1082, 1; Ex. 1083, 1. Therefore, people working in the field would have been sufficiently familiar with FIPA's activities and its website to look for FIPA 97 Version 1.0 on the FIPA website when it was posted after the Munich meeting. Indeed, both Dr. Finin, who was affiliated with FIPA, and Dr. Lieberman, who worked in the software agent field, testify that they accessed FIPA 97 Version 1.0 on the FIPA website in late 1997. Ex. 1049 ¶ 21; Ex. 1050 ¶ 146.

Moreover, the AgentWeb newsletter dated November 18, 1997, provided a link to the FIPA website and individual links to the seven parts of FIPA 97 Version 1.0 published on the website. Ex. 1086, 1–2; *see* Ex. 1049 ¶ 21. Thus, that issue of the newsletter provided more than 1,300 interested members of the public with direct access to FIPA 97 Version 1.0 at least as of November 18, 1997.

News articles and papers published in late 1997 also provided readers with the website address where FIPA 97 Version 1.0 could be found. *See* Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9. The news articles in particular likely reached a very wide audience because they appeared in publications directed to subject matter broader than agent-based technology. *See* Ex. 1095 (EETimes); Ex. 1096 (IEEE Internet Computing). The EETimes article was dated October 20, 1997, suggesting that FIPA 97 Version 1.0 was available on the FIPA website at least as of that date.

The undisputed evidence also demonstrates that FIPA 97 Version 1.0 was freely available on the FIPA website without a password or any other restrictions and access was not subject to any requirement or expectation of secrecy or confidentiality. *See* Ex. 1049 ¶ 21; Ex. 1095, 22; *see also* Ex. 1006, iv (stating FIPA intended to make its results available to all interested parties). This evidence further supports our finding that FIPA 97 Version 1.0 was publicly accessible in late 1997. *See Jazz Pharm.*, 895 F.3d at 1358–59; *Voter Verified, Inc. v. Premier Election Solutions, Inc.*, 698 F.3d 1374, 1380–81 (Fed. Cir. 2012); *MIT v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985).

Patent Owner's arguments, many of which attack pieces of evidence individually, do not persuade us that Petitioner has failed to show that FIPA 97 Version 1.0 was publicly accessible. First, Patent Owner argues that no evidence shows the original FIPA website (http://drogo.cselt.stet.it/fipa) existed prior to a December 1, 1998, Internet Archive capture. PO Resp. 68 (citing Ex. 1051). To the contrary, much of the documentary evidence from late 1997 and testimonial evidence identifies that website or its mirror as the FIPA website during the relevant time period. *See* Ex. 1049 ¶ ¶ 20–23; Ex. 1092, 3; Ex. 1093, 2; Ex. 1095, 22;

Ex. 1096, 93; Ex. 1097, 7 n.9. Notwithstanding the absence of an Internet Archive capture for the website from a date prior to December 1998, we find that, based on the totality of evidence in the record, the original FIPA website existed in late 1997.

Patent Owner also argues that none of the documents cited by Petitioner provide active links to FIPA 97 Version 1.0 and therefore are insufficient proof of public accessibility. PO Resp. 69; PO Sur-reply 30. Again, based on the totality of evidence in the record, including but not limited to the testimony of Dr. Finin that he accessed FIPA 97 Version 1.0 on the FIPA website in late 1997, we find that FIPA 97 Version 1.0 was available on the FIPA website at that time, notwithstanding the lack of active links today, more than twenty years later. Patent Owner finds fault with Dr. Finin's testimony on this point because he does not claim to have used any of the links in the AgentWeb newsletters to access FIPA 97 Version 1.0. PO Sur-reply 30 (citing Ex. 1049 ¶ 21). Patent Owner, however, overlooks Dr. Finin's testimony that he was the founder and author of the AgentWeb newsletter, implying that he created the links in the newsletter. *See* Ex. 1049 ¶ 8. Therefore, based on Dr. Finin's personal knowledge regarding the links in the AgentWeb newsletter dated November 18, 1997, and the other evidence corroborating his testimony, we find that FIPA 97 Version 1.0 was available on the FIPA website in late 1997.

Patent Owner further asserts that, to the extent the Internet Archive capture from December 1998 provides an operable download link, it links to Version 2.0 of the FIPA 97 specification. PO Resp. 69 (citing Ex. 1051). It is not surprising, however, that FIPA's website in December 1998 provided links to FIPA 97 Version 2.0, which FIPA released in October 1998 to provide minor updates to two parts of the specification. *See* Ex. 1049 ¶ 35;

Ex. 1053, vi. In any event, the December 1998 Internet Archive capture at least shows that the FIPA website was live at that time, which was prior to the critical date. *See* Ex. 1049 ¶ 23 (citing Ex. 1051, 1).

In its Sur-reply, Patent Owner argues for the first time that Petitioner has not demonstrated that a person of ordinary skill in the art in 1997 could have found FIPA 97 Version 1.0 using search tools or that the FIPA website was indexed so the specification could be located. PO Sur-reply 27–28. Further, Patent Owner argues that the existence of different FIPA websites at various times would have made it even more difficult to find the correct version of the FIPA specification without sufficient indexing or search tools. *Id.* at 29.

Even if we consider this late argument, we find it unpersuasive. As detailed above, the uncontested evidence shows that the address of the FIPA website itself was widely known among those skilled in the art and that FIPA routinely provided links to the FIPA specification on the website's home page. *See* Ex. 1095, 22; Ex. 1096, 93; Ex. 1097, 7 n.9; Ex. 1051, 1; Ex. 1021, 1; Ex. 1025, 1. The November 1997 AgentWeb newsletter also provided direct links to FIPA 97 Version 1.0. Ex. 1086, 1–2. Under these circumstances, we find that a member of the interested public could have found FIPA 97 Version 1.0 without search tools or indexing by using the links in the AgentWeb newsletter or navigating to the well-known FIPA website home page. We also find that the record, including Dr. Finin's testimony, satisfactorily explains the various FIPA websites and website addresses over time and clearly identifies the FIPA website that was being used in late 1997. *See* Ex. 1049 ¶¶ 22–23, 48–49, 51.

Having determined that FIPA 97 Version 1.0 was publicly accessible on the FIPA website in late 1997, as early as October 10 and no later than

November 18, we turn to whether Exhibits 1006–1012 (collectively referred to as FIPA97) contain the same version of the FIPA specification that was available on the FIPA website during that timeframe. Dr. Finin testifies that Exhibits 1006–1012, documents available on the current FIPA website (fipa.org) and identified as FIPA 97 Version 1.0, are the same version with the same content as Parts 1–7 of FIPA 97 Version 1.0 that were released at the FIPA Munich meeting on October 10, 1997, and were publicly available on the FIPA website (http://drogo.cselt.stet.it/fipa) in late 1997. Ex. 1049 ¶¶ 21, 34.

As an initial matter, the October 10, 1997, date on the cover pages of several parts of FIPA97 supports Dr. Finin's testimony that FIPA97 is the same as FIPA 97 Version 1.0 as published on the FIPA website in late 1997. *See* Ex. 1006, Cover; Ex. 1007, Cover; Ex. 1008, Cover; Ex. 1010, Cover; Ex. 1012, Cover; *see also* Ex. 1009, Cover (Part 4 identifying a 1997 copyright date); Ex. 1011, Cover (Part 6 identifying a 1997 copyright date). Patent Owner contends that Petitioner cannot rely on the date stamps or copyright notices on Exhibits 1006–1012 to establish public accessibility because they are hearsay. PO Resp. 61; PO Sur-reply 22–24. We agree with Petitioner that Patent Owner has waived this argument because it did not raise an objection on evidentiary grounds pursuant to 37 C.F.R. § 42.64(b)(1). *See* Pet. Reply 15–16. Furthermore, we agree with Petitioner that the dates on the cover pages are not hearsay because they are evidence tending to show that FIPA97 is identical to FIPA 97 Version 1.0, not statements offered to show Exhibits 1006–1012 were published on a certain date. *See id.* at 16 (citing *Apple Inc. v. VirnetX Inc.*, IPR2016-01585, Paper 32 at 58 (PTAB Feb. 20, 2018)).

Patent Owner also argues that Petitioner cannot rely on the cover page dates alone as proof of the documents' public accessibility. PO Sur-reply 23. The date stamps, however, are only part of the totality of evidence offered by Petitioner to establish public accessibility. As such, they are relevant evidence supporting a finding that FIPA97 was publicly accessible. *See Hulu*, Paper 29 at 17–18 (citing *Nobel Biocare*, 903 F.3d at 1377).

Patent Owner argues that the existence of multiple versions of FIPA 97 Version 1.0 undercuts Petitioner's position and Dr. Finin's testimony that Exhibits 1006–1012 are the version of FIPA 97 Version 1.0 that was publicly accessible in late 1997. *See* PO Resp. 62–65; PO Sur-reply 25. For example, Patent Owner points to Dr. Finin's description of the version released on October 10, 1997, as an "initial" version, after which final minor edits were to be made. PO Resp. 63–64 (citing Ex. 2068, 86:11–15, 88:9–89:25); *see* Ex. 1049 ¶ 21. Patent Owner cites an Internet Archive capture in the record referring to "FIPA 97 specification ver. 1.0 (Reston meeting)." PO Resp. 64–65 (citing Ex. 1105, 27). Patent Owner also cites evidence, including Dr. Finin's testimony, that a different version of FIPA 97 Version 1.0 was published in hardcopy books. *Id.* at 65 (citing Exs. 1055, 1056; Ex. 1049 ¶ 25 (stating that "FIPA printed the November 28, 1997, edited version of the specification" in the books)).

Patent Owner argues that because these various versions of FIPA 97 Version 1.0 have not been substantively introduced into evidence so that the differences can be ascertained, Petitioner has not shown that Exhibits 1006–1012 are the version that was publicly accessible on the FIPA website in late 1997. *See* PO Resp. 66–67. We disagree. Dr. Finin testifies that Exhibits 1006–1012 are the same documents that were released at the conclusion of the FIPA meeting in Munich on October 10, 1997, and were

made publicly available at the time. Ex. 1049 ¶¶ 21, 34. Other evidence of record corroborates Dr. Finin's testimony and adequately explains the multiple versions of the specification. *See* Pet. Reply 17–18. As set forth in detail above, FIPA released a version of FIPA 97 Version 1.0 on October 10, 1997, and made it available on the FIPA website soon thereafter. *See* Ex. 1049 ¶ 21; Ex. 1086, 1–2; Ex. 1095, 22; Ex. 1096, 93. It is clear from the record that any earlier versions of the specification, such as the version made available after the Reston meeting six months before FIPA 97 Version 1.0, were drafts made available for public comment. *See* Pet. Reply 17; Ex. 1049 ¶¶ 16–18; Ex. 1024; Ex. 1061.

The record also shows that the version published in book form is a later version, dated November 28, 1997, containing minor formatting and clerical edits. *See* Ex. 1049 ¶ 25; Ex. 1055, 5. Petitioner does not rely on the book version as a prior art reference or assert that it was publicly accessible. *See* Pet. 22; Pet. Reply 17–18. The hardcopy book excerpts in the record merely corroborate Dr. Finin's testimony that FIPA's activities and release of the FIPA specification were known in the art. *See* Ex. 1049 ¶ 24.

Patent Owner also points to the erroneous header on odd pages in Exhibit 1006 as calling into question which version of the specification is in Exhibits 1006–1012. PO Resp. 66. We credit Dr. Finin's unrebutted testimony that the header on some pages in Exhibit 1006 is a typographical error. *See* Ex. 1049 ¶ 21. Patent Owner has not cited, nor do we see, evidence in the record suggesting a FIPA 97 Version 2.4 was made publicly available. *See* PO Resp. 66.

Patent Owner finds fault with Exhibits 1006–1012 because they were obtained after the critical date and could not have been obtained from a

website prior to the critical date. *See* PO Resp. 61–62; PO Sur-reply 21. In his declaration, Dr. Finin testifies that Exhibits 1006–1012 are available on the FIPA website today (i.e., fipa.org), and the earliest Internet Archive record of the relevant website pages shows the documents were posted in 2000. Ex. 1049 ¶ 21 (citing Ex. 1054). Patent Owner contends that in his deposition Dr. Finin acknowledged that Exhibits 1006–1012 could have been obtained from files saved in the Internet Archive between 2003 and 2004. PO Resp. 61–62 (citing Ex. 2068, 93:12–94:2, 96:7–20). In either case, Patent Owner argues, the dates are after the critical date of the '560 patent. *Id.* at 62; PO Sur-reply 21. We agree with Petitioner, however, that the date Exhibits 1006–1012 were obtained is immaterial if they are digital copies of documents that are shown to have been publicly accessible before the critical date. *See* Pet. Reply 16 (citing *In re Wyer*, 655 F.2d at 226–27).

Finally, Patent Owner argues that the testimony of Dr. Finin and Dr. Lieberman is conclusory, unreliable, and uncorroborated and therefore insufficient to establish public accessibility. PO Resp. 71–74; PO Sur-reply 20–22. "[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest." *Nobel Biocare*, 903 F.3d at 1377–78 (quoting *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1369 (Fed. Cir. 1999)). This corroboration requirement applies when relying on witness testimony to establish public accessibility of a prior art reference. *See id.* at 1377–81; *Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158–60 (Fed. Cir. 2004). Corroborating evidence may include documentary or testimonial evidence, and circumstantial evidence may provide sufficient corroboration. *Nobel Biocare*, 903 F.3d at 1378. Determining whether testimony has been

corroborated "involves an assessment of the totality of the circumstances including an evaluation of all pertinent evidence." *Id.*

We are not persuaded by Patent Owner's argument regarding the testimony of Dr. Finin and Dr. Lieberman. Dr. Finin's testimony is based on his personal knowledge as someone who was directly involved in FIPA's activities by submitting comments on draft specifications and attending meetings, for example, and providing independent advice as a FIPA Fellow. His testimony that FIPA approved FIPA 97 Version 1.0 at the Munich meeting on October 10, 1997, and posted it to the FIPA website so that it was publicly accessible is corroborated by the evidence in the record of the facts and circumstances surrounding the development and release of the specification as analyzed above. Dr. Lieberman's testimony that as a member of the interested public he accessed FIPA 97 Version 1.0 in late 1997 is corroborated by the same evidence.

As for Dr. Finin's testimony, based on his personal knowledge, that Exhibits 1006–1012 are the same as the version of FIPA 97 Version 1.0 that was publicly accessible on the FIPA website in late 1997, we find it to be credible and corroborated by other evidence of record. We are not persuaded that Dr. Finin's inability to recall many of the details of a 300-page specification more than twenty years after it was created undermines his testimony. *See* PO Resp. 72–73. Furthermore, we find that the evidence discussed above, including the identification of Exhibits 1006–1012 on their cover pages or elsewhere as FIPA 97 Version 1.0 with a date of October 10, 1997, corroborates Dr. Finin's testimony that the version of the specification in Exhibits 1006–1012 is the version that was publicly accessible on the FIPA website in late 1997, and not some other version of the FIPA specification.

For these reasons, we find that a preponderance of the evidence shows that Exhibits 1006–1012 are the version of FIPA 97 Version 1.0 released on October 10, 1997, and posted on the FIPA website in late 1997. As discussed above, a preponderance of the evidence shows that the October 10, 1997 version of FIPA 97 Version 1.0 was publicly accessible in late 1997. Accordingly, we find that Petitioner has met is burden to show that FIPA97, submitted as Exhibits 1006–1012 and relied on by Petitioner in its unpatentability challenges, was publicly accessible prior to the critical date of January 5, 1999, and therefore is available as prior art to the '560 patent under 35 U.S.C. § 102(a).

### *G. Asserted Obviousness over Kiss and FIPA97*

Petitioner contends that claims 1–4, 14–19, 26, and 36–44 of the '560 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss and FIPA97. Pet. 30–76. We have reviewed the parties' arguments in the Petition, Patent Owner Response, Reply, and Sur-reply, as well as the relevant evidence discussed in those papers and other record papers, including the declarations of Dr. Lieberman and Dr. Medvidovic. For the reasons that follow, we determine Petitioner has shown by a preponderance of the evidence that claims 1–4, 14–19, 26, and 36–44 are unpatentable as obvious over the combined teachings of Kiss and FIPA97.

#### *1. Proposed Combination of Kiss and FIPA97*

In its proposed combination of Kiss with FIPA97, Petitioner relies on Kiss for teaching electronic agents and their general functions and operations, including agent collaboration, agent registry, and inter-agent messaging. Pet. 26. Petitioner acknowledges, however, that Kiss does not disclose an inter-agent communication language and relies on FIPA97 to

teach a common communications protocol and language (FIPA ACL), which is combined with the teachings of Kiss to provide a communication language for inter-agent communication between the agents of Kiss and add administrative functionality and exemplary practices to the Kiss system. *Id.* Petitioner explains that "[FIPA97's] techniques are used to implement the functionality described in Kiss, including facilitating agent collaboration, agent registry, and inter-agent messaging, as well as adding functionality that is disclosed in FIPA97." *Id.* (citing Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1). Petitioner asserts that "[w]here the two systems disclose analogous functionality, such as facilitating cooperation and agent registry, their techniques are combined." *Id.* (citing Ex. 1050 ¶¶ 204–206).

In identifying a reason that would have prompted a person of ordinary skill in the relevant field to combine the prior art teachings, Petitioner "must show some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418. A reason to combine teachings from the prior art "may be found in explicit or implicit teachings within the references themselves, from the ordinary knowledge of those skilled in the art, or from the nature of the problem to be solved." *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (*citing In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998)).

Petitioner argues the proposed combination of Kiss and FIPA97 would have been obvious for several reasons. First, Petitioner argues that Kiss, FIPA97, and the '560 patent are analogous art, because "each is directed to the same field of endeavor, *i.e.*, distributed computing environments generally and architectures for communication and cooperation among distributed electronic agents specifically." Pet. 26–27 (citing Ex. 1001, 1:17–21; Ex. 1005, Abstract; Ex. 1007, Foreword, 1;

Ex. 1050 ¶ 207). Petitioner also argues that FIPA97 and Kiss are reasonably pertinent to the problem addressed by the '560 patent—"the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" *Id.* at 27 (citing Ex. 1001, 4:30–36; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1050 ¶ 208).

Next, Petitioner argues the combination of Kiss and FIPA97

> would have been the arrangement of old elements (*i.e.*, the functionality of FIPA97, and the system of Kiss) with each performing the same function it had been known to perform (communication between distributed agents (FIPA97)); cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of distributed agents, able to communicate to conduct cooperative task completion and problem solving).

*Id.* (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1050 ¶ 209).

Petitioner also argues that a skilled artisan

> would have known that agents, such as in Kiss, must use a common communications protocol, i.e., an inter-agent communication language, and related management functionality, and therefore would have been motivated to consider and employ one of the available inter-agent communications languages and its related functionality, and because doing so would have been a convenient and efficient way to facilitate effective communication between agents.

*Id.* at 27–28 (citing Ex. 1020, 2; Ex. 1046, 50; Ex. 1050 ¶ 210).

Petitioner further argues that a skilled artisan would have been motivated based on earlier descriptions of KQML's similar use of an inter-agent communication language to use FIPA ACL in a system like Kiss. *Id.* at 28 (citing Ex. 1016, Abstract, 4, 29, 30; Ex. 1006, 7; Ex. 1007, 40–42; Ex. 1005, Abstract; Ex. 1050 ¶¶ 211–213). According to Petitioner, a skilled artisan "would have been further motivated to make the combination

because of the known advantages of FIPA97, including that it specifies, 'key agents necessary for the management of an agent system, the ontology necessary for the interaction between systems, and it defines also the transport level of the protocols.'" *Id.* (citing Ex. 1035, 1; Ex. 1050 ¶ 217).

Additionally, Petitioner argues that "FIPA97 represented a substantial attempt to formulate an industry standard designed to encourage interoperability and uniformity amongst agent systems" and a person of ordinary skill in the art "would have understood that agent systems that complied with such a standard would be more likely to be interoperable with other systems and would likely have more resources available." *Id.* at 29 (citing Ex. 1007, vii; Ex. 1047; Ex. 1050 ¶ 218). Moreover, Petitioner argues, the description of the administrative functionality and exemplary practices in FIPA97 "suggests that their use with the FIPA ACL would be advantageous and workable," and a person of ordinary skill in the art would have been motivated to employ such additional functionality and practices in the combined system "in order to obtain the full benefit of using FIPA ACL." *Id.* (citing Ex. 1050 ¶ 219).

Finally, Petitioner argues that a skilled artisan could have made the combination without undue experimentation because by January 1999 the component parts of the combination were well-known, conventional technology and because others had combined FIPA97 technology with agent systems. *Id.* (citing Ex. 1007; Ex. 1016; Ex. 1030; Ex. 1050 ¶ 216).

In response, Patent Owner asserts that "Petitioner utterly defaults in offering any reason to combine" Kiss and FIPA97 and that Petitioner's arguments contain boilerplate language. PO Resp. 137; PO Sur-reply 51. Patent Owner argues that Petitioner's motivation to combine Kiss and FIPA97 suffers from "hindsight bias" and that Petitioner "offers no reason or

explanation that a person of skill in the art looking at Kiss would be motivated to find a particular language with the characteristics of FIPA97's ACL." PO Resp. 137. Patent Owner also argues that Petitioner fails to identify how the combination of Kiss and FIPA97 could be achieved. *Id.* at 138. Specifically, Patent Owner argues that the FIPA97 and Kiss protocols are "different" and "mutually exclusive" and that FIPA97 "discouraged interoperability between different and incompatible systems." PO Sur-reply 51–54. Patent Owner also argues that the Kiss and FIPA97 architectures "look quite different" and "Petitioner offers no articulation of how to add the [FIPA97 Directory Facilitator (DF)] to any of the Kiss layers." PO Resp. 95.

We agree with Petitioner that Patent Owner "ignores the several pages of analysis supported by expert testimony (including citations to evidence in the prior art) articulating the rational underpinning of the combination" of Kiss and FIPA97. Pet. Reply 22; *see* Pet. 26–29. As summarized above, Petitioner provides ample reasoning and explanation for why person of ordinary skill in the art would have combined the teachings of FIPA97 and Kiss in the manner Petitioner describes. Thus, Patent Owner's argument that Petitioner fails to offer *any reason* to combine *Kiss* and FIPA97 is directly contrary to the evidence of record and is unpersuasive. *See* PO Resp. 137.

We also agree with Petitioner that a showing of obviousness does not require a person of ordinary skill in the art to have been motivated to find the particular ACL language in FIPA97, as Patent Owner contends. *See* Pet. Reply 22 (citing PO Resp. 137). Under the correct obviousness analysis, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420. Here, Petitioner provides

persuasive evidence and argument that FIPA97 and Kiss are reasonably pertinent to the problem addressed by the 560 patent—"the need for 'flexible, fault-tolerant, distributed problem solving' using 'agent-based technologies.'" Pet. 27 (citing Ex. 1001, 4:30–36; Ex. 1005, 2:33–40; Ex. 1007, 1; Ex. 1050 ¶ 208). For instance, Kiss observes that "a need exists for a knowledge management system for dynamic, distributed problem-solving systems." Ex. 1005, 2:39–40. And as Dr. Lieberman notes, the FIPA97 specification "defines a language and supporting tools, such as protocols, to be used by intelligent software agents to communicate with each other," and "the terms used and the mechanisms used [by FIPA97] support such a higher-level, often task based, view of interaction and communication." Ex. 1050 ¶ 208 (emphasis omitted). This evidence support's Petitioner's position that a person of ordinary skill in the art at the time of the claimed invention would have combined FIPA97 and Kiss in the manner described in the Petition to provide a flexible, fault-tolerant, distributed problem solving system using agent-based technologies.

Petitioner further argues, and we agree, that Patent Owner's criticism that Petitioner fails to identify how the combination could be achieved "ignores the detailed description in the Petition (supported by Dr. Lieberman) that demonstrates how the combination would work." Pet. Reply 23 (quoting PO Resp. 138); *see* Pet. 26–29; Ex. 1050 ¶¶ 204–206. For example, the Petition explains that "FIPA97 provides a common communications protocol and language (FIPA ACL) between the agents of Kiss, and also adds its administrative functionality and exemplary practices to the Kiss system." Pet. 26. The Petition also explains that "[t]hese techniques are used to implement the functionality described in Kiss, including *facilitating agent collaboration*, agent registry, and inter-agent

messaging . . . as well adding functionality that is disclosed in FIPA97." *Id.* (citing Ex. 1005, 3:32–36, 3:67–4:1, 6:67–7:1) (emphasis added).

Petitioner's proffered combination of FIPA97 and Kiss is amply supported by Dr. Lieberman's testimony. For instance, Dr. Lieberman explains that:

> in the combination of Kiss with FIPA97, the "interagent abstract communications facilities" of Kiss, [Ex. 1005], 3:32-36, would use the inter-agent communication language of FIPA97 to, for example, "negotiate with each other, conduct joint planning, and to collaborate in the execution of planned tasks," [Ex. 1005], 3:32-36. Additionally, the Agent Service Layer and meta-agent of Kiss would be implemented using the FIPA97 Agent Management System ("FIPA-AMS") and the functionality of the FIPA Directory Facilitator, described in [Exhibit 1006]. Thus, the "capabilities, interests, and attributes for the knowledge modules," [Ex. 1005], 6:67-7:1, as stored in the agent registry of Kiss, and the meta agent of Kiss, would be implemented with the directory facilitator functionality of FIPA97. Therefore, FIPA-AMS would be used to provide a "scalable and modular" inter-agent management system and agent registry for the distributed agents of Kiss. [Ex. 1005, 3:67-4:1]. Further, the combination of FIPA97 and Kiss would be informed by and include the exemplary practices described in the informative sections of FIPA97 (*i.e,* Parts 4-7).

Ex. 1050 ¶ 206. Dr. Lieberman provides annotated versions of several of Kiss's figures representing exemplary depictions of the combined Kiss/FIPA97 system. *Id.* at ¶¶ 205–206 (presenting annotated Figures 4–6, 8, and 21 of Kiss).

In one example, Dr. Lieberman provides an annotated version of Kiss's Figure 8 showing how FIPA97's communications protocol (FIPA

ACL) and Directory Facilitator would be incorporated into Kiss in the combined Kiss/FIPA97 system:




Ex. 1050 ¶¶ 205–206. In annotated Figure 8 above, Dr. Lieberman illustrates how Kiss's agents would use FIPA ACL to "negotiate with each other, conduct joint planning, and . . . collaborate in the execution of planned tasks." *Id.* ¶ 206 (quoting Ex. 1005, 3:32–36). Annotated Figure 8 also shows at a high level how Kiss's Agent Service Layer and meta-agent (MA) would include the functionality of FIPA97's Directory Facilitator. *Id.*

In another example, Dr. Lieberman provides an annotated version of Kiss's Figure 21, shown below, illustrating how FIPA97's Directory

Facilitator (DF) would be incorporated into Kiss's knowledge management system:



*Fig. 21*

Ex. 1050 ¶ 206. Petitioner's annotated version of Kiss's Figure 21, shown above, depicts how FIPA97's Directory Facilitator (DF) would be incorporated into the user interface layer, meta-agent layer, and knowledge agent layer of Kiss's knowledge management system connected to a distributed environment such as the Internet. *See* Ex. 1050 ¶¶ 204–206; Ex. 1005, 10:55–12:28, 14:31–36, Figs. 4–6, 8, 21.

In view of Dr. Lieberman's testimony, we find Patent Owner's arguments that the Petition says nothing about how to combine FIPA97's Directory Facilitator and Kiss's meta-agent and offers "no articulation" of how to add a Directory Facilitator to any of the Kiss layers to be contrary to the evidence of record. *See* PO Resp. 94–95. Similarly, Patent Owner's arguments that the FIPA97 and Kiss protocols are "mutually exclusive" and that FIPA97 "discouraged interoperability" between systems are unavailing and not supported adequately by the record. *See* PO Sur-reply 51–54.

Finally, Patent Owner argues Petitioner's combination of references "is emblematic of hindsight bias" because Dr. Lieberman "picks and chooses elements" and "superimposes them into one figure in an attempt to 'show' the combination." PO Resp. 98. In particular, Patent Owner argues that "simply drawing in block diagrams with terminology from other references into one cobbled diagram is insufficient as a matter of law without any explanation of how such a combination could be achieved or, indeed, why." *Id.* at 98–99.

We note that "[a]ny judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper." *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971).

Here, Petitioner provides persuasive evidence that a person of ordinary skill in the art at the time of the invention would have had reason to use FIPA97's communications protocol and inter-agent communication language (FIPA ACL) between the agents of Kiss, adding FIPA97's administrative functionality and practices to the Kiss system. *See, e.g.*, Pet. 26–29; Ex. 1050 ¶¶ 204–219. This is not evidence of hindsight bias. Patent Owner does not identify, and we do not discern, any particular knowledge used by Petitioner in its combination of FIPA97 and Kiss that was gleaned from the '560 patent's disclosure and was not within the level of ordinary skill in the art at the time of the invention.

For the reasons discussed, we find that Petitioner has articulated sufficient reasoning with rational underpinning for why a person of ordinary

skill in the art at the time of the invention would have combined the teachings of Kiss and FIPA97 in the manner proffered by Petitioner.

*2. Independent Claim 1*

Claim 1 is directed to a software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture contemplating a distributed computing system comprising service-providing electronic agents and a distributed facilitator agent including an agent registry and a facilitating engine, the service-providing electronic agents and the distributed facilitator agent communicating using an interagent communication language (ICL) including a layer of conversational protocol. Ex. 1001, 29:57–30:23. Claim 1 also requires the facilitating engine to be operable to interpret a service request as a base goal for generating a goal satisfaction plan, where the goal satisfaction plan involves using reasoning to determine sub-goal requests and to coordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests. *Id.* at 30:5–15.

In its proposed combination of Kiss with FIPA97, Petitioner relies on Kiss to teach electronic agents and their general communication and collaboration functions as recited in claim 1, FIPA97 to teach the recited ICL, and a combination of Kiss and FIPA97 to teach the claimed distributed facilitator agent. Pet. 30–50. Patent Owner argues that the proposed combination of Kiss and FIPA97 does not teach the "distributed facilitator agent functionally distributed across at least two computer processes" or the "goal satisfaction plan" recited in the claim. PO Resp. 78–102, 111–118. Patent Owner also asserts that FIPA97 does not teach the "inter-agent language" (or Interagent Communication Language (ICL)) and related limitations. *Id.* at 118–133. In the following discussion, we analyze the

limitations of claim 1 in more detail, addressing Petitioner's contentions and, where applicable, Patent Owner's responsive arguments.

*a. Preamble*

The preamble of claim 1 recites: "A software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture contemplating a distributed computing system."[17] Ex. 1001, 29:57–60. Petitioner contends that Kiss teaches a "software-based, flexible computer architecture" because it discloses a computerized knowledge management system in which interaction between a user and knowledge resources is mediated by a collection of cooperative intelligent agents. Pet. 30 (citing Ex. 1005, 2:43–49, 3:1–3, Fig. 1). Petitioner further contends that Kiss's agents are "distributed" in a "hierarchical" architecture. *Id.* (citing Ex. 1005, Abstract, 2:50–55, 4:57–59). Petitioner also contends that Kiss teaches the recited "communication and cooperation among distributed electronic agents" in the form of "cooperative intelligent agents [that] incorporate generalized automated negotiation and distributed inference (i.e. problem-solving) processes," analyze "problem statements," and reorganize them as "sets of tasks." *Id.* at 31 (citing Ex. 1005, 2:50–55).

Patent Owner does not specifically dispute that Kiss teaches the preamble of claim 1. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches the preamble of claim 1.

---

[17] Because Petitioner has shown that Kiss teaches the recitations in the preamble, we need not determine whether the preamble is limiting. *See Vivid Techs.*, 200 F.3d at 803.

*b. "plurality of service-providing electronic agents"*

Petitioner contends that Kiss teaches "a plurality of service-providing agents," as recited in claim 1, because Kiss discloses a plurality of agents responding to requests for service by providing information such as market price and cost information. Pet. 31 (citing Ex. 1005, 12:21–14:30, Figs. 8–20). Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches a "plurality of service-providing electronic agents," as recited in claim 1.

*c. "distributed facilitator agent"*

Claim 1 recites "a distributed facilitator agent functionally distributed across at least two computer processes." Ex. 1001, 29:63–67. Petitioner contends that Kiss and FIPA97 teach a "facilitator agent" that is "functionally distributed across at least two computer processes." Pet. 32–34. Patent Owner disputes Petitioner's contentions. PO Resp. 78–102. We address both parts of this limitation below.

*(i) "facilitator agent"*

Petitioner contends that the agent service layer of Kiss combined with Kiss's meta-agent constitutes a "facilitator agent" because it is responsible for matching requests from users and agents with descriptions of the capabilities of other agents. Pet. 32 (citing Ex. 1005, 12:21–14:30, Figs. 8–20). Petitioner argues that FIPA97 also discloses a Directory Facilitator, which provides analogous functionality, so that in the combined system FIPA97's Directory Facilitator would be implemented in Kiss's meta-agent. *Id.* (citing Ex. 1006, 6–7; Ex. 1050 ¶ 233).

Patent Owner argues that Kiss and FIPA97 either alone or in combination do not disclose "the specialized functionality and operation" of the claimed "facilitator agent." PO Resp. 86. Patent Owner first argues that Kiss's meta-agent is not a facilitator. *Id.* Patent Owner argues that "meta-agents are described in the '560 Patent itself as part of the [Open Agent Architecture] architecture and distinct from facilitator agents," and the facilitator agent and meta-agents are shown separately in Figure 4 of the '560 patent. *Id.* at 86–87 (citing Ex. 1005, Fig. 4). Patent Owner argues that meta-agents in the '560 patent are "client agents as opposed to facilitating agents." *Id.* at 87 (citing Ex. 1001, 6:54–56 ("All agents that are not facilitators are referred to herein generally as client agents . . . ."); *id.* at 6:60–62 ("Some typical categories of client agents would include . . . meta-agents . . . ."")). Thus, Patent Owner argues, Kiss's meta-agent is similar to the meta-agent of the '560 patent and does not perform the role of the claimed facilitator. *Id.* at 88 (citing Ex. 2032 ¶ 117). Patent Owner asserts that Kiss's meta-agent is at best "a controller that routes queries through the system and presents results, and it lacks the sophistication and intelligent planning that the claimed facilitator performs." *Id.* (citing Ex. 1001, 20:11–12; Ex. 2032 ¶ 119).

Patent Owner further argues that Kiss does not disclose a meta-agent capable of the three types of processing performed by the claimed facilitator in the '560 patent—delegation, optimization, and interpretation. *Id.* at 89 (citing Ex. 1001, 19:27–29). First, Patent Owner Patent Owner argues that although Kiss's meta-agent "breaks down queries into questions and passes them to knowledge agents," it "does not apply 'selective application of global and local constraint and advice parameters onto the specific sub-goals.'" *Id.* (quoting Ex. 1001, 19:34–35). Second, Patent Owner argues

that Kiss "contains no disclosure of optimization—'result[ing] in a goal whose interpretation will require as few exchanges as possible, between the facilitator and the satisfying agents, and can exploit parallel efforts of the satisfying agents.'" *Id.* (quoting Ex. 1001, 19:40–43). Third, Patent Owner argues that Kiss's meta-agent "does not use an intelligent method or its own knowledge resources to interpret capabilities or use strategies or advice in the coordination of requests to and assembly of results from satisfying agents." *Id.* at 90 (citing Ex. 1001, 19:49–52).

With regard to FIPA97's Directory Facilitator, Patent Owner argues it "is no more than a directory of agent capabilities." *Id.* at 92. Patent Owner argues that while FIPA97's Directory Facilitator "may provide agent registry-type functions within a facilitator, FIPA97 does not disclose any of the robust facilitator functions described in the '560 Patent and which are missing from Kiss's meta-agent." *Id.* (citing Ex. 1001, Fig. 7; Ex. 2032 ¶¶ 132–136).

In its Reply, Petitioner argues that Patent Owner "ignores the actual Kiss/FIPA97 combination and instead attacks the references individually." Pet. Reply 27; *see id.* at 30. Responding to Patent Owner's argument that Kiss's meta-agent is similar to the meta-agent of the '560 patent and thus cannot be the claimed facilitator agent, Petitioner argues "the combined system of Kiss/FIPA97 discloses all the claimed features of a facilitator agent, so what Kiss chose to name his facilitator is plainly immaterial." *Id.* at 27 (emphasis omitted).

Petitioner also argues Patent Owner's "list of the various optional features of the facilitator agent are simply not relevant to the '*facilitator agent*' as claimed—and in fact, the record evidence suggests a much broader understanding of that term." *Id.* (citing PO Resp. 84–93). Petitioner points

out that Patent Owner's expert, Dr. Medvidovic, defined a "facilitator agent" as "a specialized server agent that is responsible for coordinating agent communications and cooperative problem solving." *Id.* at 28 (quoting Ex. 1129, 79:7–9).

Petitioner further argues that the "delegation, optimization, and interpretation" functionalities Patent Owner claims are missing from the Kiss meta-agent are limited to a preferred embodiment in the '560 patent, and therefore are not relevant to an obviousness analysis. *Id.* (citing PO Resp. 88). Petitioner contends that Dr. Medvidovic confirmed these were functionalities of a preferred embodiment. *See id.* (citing Ex. 1129, 54:2–9). In any event, Petitioner argues, the Kiss/FIPA97 combination teaches delegation under the ordinary meaning of that term. *Id.* at 28–29 (citing Ex. 1005, 3:25–27, 5:24–27, 12:21–14:30, Figs. 8–20). Petitioner takes similar positions with respect to "optimization" and "interpretation." *See id.* at 29–30 (citing Ex. 1005, 7:8–11, 7:65–8:8, 9:17–23).

In its Sur-reply, Patent Owner argues it is not attacking the prior art references individually, but rather it "addresses the disclosures within each reference, matching what the Petition does." PO Sur-reply 31. With respect to Patent Owner's argument that Kiss's meta-agent is not a facilitator, Patent Owner argues that "none of Patent Owner's arguments rest on the fact that the same words are or are not used in the asserted references and the '560 Patent." *Id.* at 31–32 (citing Pet. Reply 27). Patent Owner argues that Dr. Lieberman relies on similar portions of the specification to describe his interpretation of the "facilitator agent" as Patent Owner uses to show facilitator agent functionality in the '560 patent. *Id.* at 33.

We are persuaded that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches a "facilitator agent." Petitioner

asserts that it is "[t]he agent service layer [of Kiss] combined with the meta-agent of Kiss [that] constitutes 'a facilitator agent' because it is responsible for matching requests, from users and agents, with descriptions of the capabilities of other agents." Pet. 32 (citing Ex. 1005, 12:21–14:30, Figs. 8–20). Kiss also provides that its meta-agent layer "analyzes user queries or problem formulations from the user interface layer, allocates tasks to the knowledge agent layer, resolves conflicts arising from the knowledge agent layer, and consolidates (including fusing and deconflicting) results provided by the knowledge agent layer." Ex. 1005, 3:25–29. Kiss's meta-agent also operates with an agent service layer to identify relevant capabilities of service providing agents in the system. *See id.* at 3:36–47, 12:1–14:30.

Given Petitioner's articulation that the *combination* of the agent service layer and the meta-agent of Kiss constitutes a "facilitator agent," Patent Owner's argument that Kiss's meta-agent is not a facilitator is unavailing because it fails to respond to Petitioner's assertion that the recited "facilitator agent" includes the combination of the Kiss agent service layer and the Kiss meta-agent. *See* PO Resp. 86. Similarly, Patent Owner's argument that the Kiss meta-agent cannot be part of a "facilitator agent" in the combined Kiss/FIPA97 system because the '560 patent identifies a meta-agent as a separate component from the facilitator agent is unavailing for at least the same reason, i.e., that Patent Owner does not address the functionality of Kiss's meta-agent and agent service layer combined. *See id.* at 87. Moreover, with respect to Petitioner's showing how FIPA97's Director Facilitator would be implemented in Kiss in the combined Kiss/FIPA97 system that uses FIPA ACL, we determined above that Petitioner has presented sufficient rationale for combining the references in the manner asserted. *See* § II.G.1.

As for Patent Owner's arguments that Kiss does not teach a facilitator agent capable of performing delegation, optimization, and interpretation, we disagree with Patent Owner's arguments because they improperly attempt to read exemplary characteristics from preferred embodiments of the '560 patent into the claims. *See* PO Resp. 89–91. Indeed, as the '560 patent makes clear, "[a] further *preferred embodiment of the present invention incorporates* facilitator handling of compound goals, preferably involving *three types of processing: delegation, optimization and interpretation.* Ex. 1001, 19:26–29.

Also helpful in understanding the nature of a "facilitator agent" is the observation of Patent Owner's expert, Dr. Medvidovic, in reference to Figure 4 of the '560 patent that "facilitator agent 402" is "a specialized server agent that is responsible for coordinating agent communications and cooperative problem-solving." Ex. 2032 ¶ 32 (citing Ex. 1001, 6:46–48, Fig. 4).[18] Indeed, at his deposition, Dr. Medvidovic confirmed that this was his understanding of a "facilitator agent." There, Dr. Medvidovic testified, "if you were asking me [to] define a facilitator agent, I might say it's a specialized server agent responsible for coordinating agent communications and cooperative problem solving. That is a definition." Ex. 1129, 79:15–19.

Based on this understanding of a facilitator agent, Petitioner's proposed combination of Kiss's meta-agent and agent service layer is a "facilitator agent" that is responsible for analyzing user queries or problem formulations, allocating tasks to knowledge agents, resolving conflicts that

[18] We also note for the record that neither party has proposed a construction for the term "facilitator agent."

arise, and consolidating (including fusing and deconflicting) results. *See* Ex. 1005, 12:21–14:30, Figs. 8–20.

*(ii) "functionally distributed across at least two computer processes"*

As discussed above in § II.C.2, we construe the term "computer process" as "a process that runs or executes one or more computer programs" for this Final Written Decision.

Petitioner contends that Kiss discloses a facilitator agent distributed across at least two computer processes because Figure 21 of Kiss shows meta-agents on multiple systems remotely located from each other and provides that meta-agents can accept problem inputs from other meta-agents. Pet. 32 (citing Ex. 1005, Fig. 21). Figure 21 of Kiss is reproduced below:




*Fig. 21*

Figure 21 above shows Kiss's meta-agents (MAs) on multiple systems remote from each other.

Petitioner contends that a person of ordinary skill in the art would have understood that two meta-agents on separate systems operate together as part of a "facilitator agent" to facilitate the cooperative satisfaction of goals. Pet. 33 (citing Ex. 1005, 5:20–64; Ex. 1050 ¶ 235). Petitioner contends "Kiss further discloses that a meta-agent 'adaptively and dynamically synthesizes problem-specific knowledge interfaces' over multiple distributed knowledge sources." *Id.* (citing Ex. 1005, 2:61–67, Fig. 1). Therefore, Petitioner concludes, the two meta-agents divided on separate and remote systems operate cooperatively as a "distributed facilitator agent functionally distributed across at least two computer processes" to achieve the goals of the system. *Id.* at 33–34 (citing Ex. 1050 ¶¶ 235–236).

Petitioner argues that FIPA97 likewise teaches that its Directory Facilitator "can manage distributed agent[s] over multiple computer processes." *Id.* at 34 (citing Ex. 1006, 10, Fig. 2; Ex. 1050 ¶ 237). According to Petitioner, a person of ordinary skill in the art would have understood the agent platforms shown in Figure 2 to be separate computer processes because each agent platform provides the physical infrastructure in which agents can be deployed, and therefore represents a distinct program. *Id.* (citing Ex. 1006, 10, Fig. 2; Ex. 1050 ¶¶ 238–239).

Patent Owner argues the combination of Kiss and FIPA97 does not teach a facilitator agent "distributed across at least two computer processes." PO Resp. 100–102. Patent Owner asserts there is no support for Petitioner's "assumption" that distributed agents must be distributed across separate computer processes. *Id.* at 101 (citing Ex. 2032 ¶ 160). Rather, Patent Owner argues, a distributed facilitator could use a single computer process. *Id.* (citing Ex. 2032 ¶ 161). Patent Owner also argues that Petitioner's

citation to Figure 2 of FIPA97 does not disclose any information about what agents are involved. *Id.* at 101–102 (citing Ex. 2032 ¶ 41).

We are persuaded that Petitioner, with support from Dr. Lieberman, has shown sufficiently that Kiss teaches or at least suggests that its meta-agents on separate and remote systems, operating together as part of a facilitator agent, are "functionally distributed across at least two computer processes," as recited in claim 1. As Petitioner points out, the '560 patent provides no detail as to what computer processes may be running. Pet. Reply 36. Dr. Lieberman's testimony supports Petitioner's contention that a person of ordinary skill in the art generally would have understood Kiss to teach at least one computer process running on each separate host computer. Pet. 34–36; Ex. 1050 ¶¶ 235–36; Pet. Reply 36. Indeed, Patent Owner itself acknowledges that a person of ordinary skill in the art would have recognized that meta-agents distributed on different systems are executing on "separate processes." PO Resp. 105.

As for Petitioner's reliance on FIPA97, we are not persuaded that Petitioner's analysis of claim 1 explains in sufficient detail how or why FIPA97's disclosure of a Directory Facilitator that allegedly "can manage distributed agent[s] over multiple computer processes" shows that the Directory Facilitator is itself "distributed across at least two computer processes," as recited in the claim. *See* Pet. 34. Nevertheless, we find Petitioner's reliance on Kiss sufficient to teach or suggest a facilitator agent "functionally distributed across at least two computer processes."

In summary, based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that the combination of Kiss and FIPA97 teaches or suggests "a

distributed facilitator agent functionally distributed across at least two computer processes," as recited in claim 1.

*d. "bi-directional communications"*

Claim 1 also requires the facilitator agent to be "capable of bi-directional communications with the plurality of service-providing electronic agents." Ex. 1001, 29:65–67. For this limitation, Petitioner points to Figure 10 of Kiss (not reproduced herein), which shows a meta-agent receiving a question from a knowledge agent and then communicating the question to a different knowledge agent. Pet. 34–35 (citing Ex. 1005, Fig. 10).

Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches "the facilitator agent capable of bi-directional communications with the plurality of service-providing electronic agents," as recited in claim 1.

*e. "agent registry"*

Claim 1 requires the facilitator agent to include "an agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the distributed computing environment." Ex. 1001, 30:1–4. Petitioner asserts that Kiss teaches this limitation because Kiss describes a "registry of agents," which is constructed through "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities." Pet. 36 (citing Ex. 1005, 3:37–45, 6:66–7:19, 8:41–48, 10:32–35, 12:18–20, Fig. 1).

Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for

the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches this "agent registry" limitation of claim 1.

*f. "facilitating engine" limitations*

Claim 1 recites "a facilitating engine operable to interpret a service request as a base goal [and] further operable for generating a goal satisfaction plan associated with the base goal." Ex. 1001, 30:5–8. The claimed "goal satisfaction plan" involves "using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal." *Id.* at 30:10–15. Petitioner contends that Kiss teaches each of these limitations. Pet. 36–44.

*(i) "facilitating engine"*

Petitioner contends that the meta-agent in Kiss "includes a 'facilitating engine' because it is capable of analyzing user queries, allocating tasks, resolving conflicts, and consolidating results" and applying various inferencing methods to allocate tasks to knowledge agents in order to solve problems. Pet. 37 (citing Ex. 1005, 3:25–30). Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches a "facilitating engine," as recited in claim 1.

*(ii) "operable to interpret a service request as a base goal"*

As set forth above in § II.C, we have construed "goal" as "a request for service." Petitioner contends that Kiss's meta-agent (the claimed "facilitating engine") receives a query (a "service request") via a user agent

requesting "either a solution to a problem, such as predicting the outcome of a course of treatment, or the retrieval of information, such as the side effects of a medication." Pet. 37–38 (citing Ex. 1005, 8:26–29). Petitioner asserts that the meta-agent interprets the request as a "base goal" because "it is the basic request initiated by the user that the system seeks to satisfy and which inspired a number of additional, more particular requests in order to be satisfied." *Id.* at 38 (citing Ex. 1005, 12:21–14:20, Figs. 8–20). Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches a facilitating engine "operable to interpret a service request as a base goal," as recited in claim 1.

*(iii) "goal satisfaction plan"*

Petitioner asserts that Kiss teaches "generating a goal satisfaction plan" because Kiss describes that the meta-agent "formulates a goal statement for the problem-solving phase of the process," then "formulates a solution plan for the problem." Pet. 38–39 (citing Ex. 1005, 8:32–34, 5:33–64, 12:29–64, Figs. 8–20). Petitioner contends that Figures 8–20 of Kiss illustrate adding tasks to an agenda, i.e., constructing a plan, to satisfy the user request (i.e., a "goal") "what is the effect of increasing sales by 20%?" *Id.* at 38 (citing Ex. 1005, 13:27–29, Figs. 8–20).

Patent Owner contends that Kiss does not teach the claimed "goal satisfaction plan" because Kiss does not disclose "the use of any reasoning, optimization, or taking into account any advice parameters or constraints." PO Resp. 115. Patent Owner also argues that Kiss "does not have the capability of formulating an 'optimal or near-optimal' 'goal satisfaction plan' utilizing reasoning as described in the '560 patent." *Id.* at 117 (citing

Ex. 2032 ¶ 212). These arguments are predicated on Patent Owner's proposed construction of "goal satisfaction plan" to mean "a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints." *See id.* at 32. As discussed above in § II.C.1, we disagree with Patent Owner that the claim term "goal satisfaction plan" is limited as Patent Owner contends. Thus, for the reasons explained above, we disagree with Patent Owner's argument that Kiss does not disclose the "goal satisfaction plan" recited in claim 1.

Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches "constructing a goal satisfaction plan," as recited in claim 1.

*(iv) "sub-goal requests based on non-syntactic decomposition of the base goal"*

The "goal satisfaction plan" recited in claim 1 involves "using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal." Ex. 1001, 30:10–12. As set forth above in § II.C, we have construed "non-syntactic decomposition" as "generation of a sub-request (sub-goal/sub-delegation) based on factors other than the syntax of how the goal was received or made." For this limitation, Petitioner cites Kiss's disclosure of a meta-agent responding to the user's request of "what is the effect of increasing sales by 20%?" by generating sub-requests based on the registered capabilities of agents active in the system. Pet. 39 (citing Ex. 1005, 12:54–56, 13:25–27, 13:37–39, 13:56–57, 14:3–5). Because the tasks or sub-requests are formulated based on knowledge of the capabilities of underlying knowledge systems, Petitioner asserts, they are not based on the syntax of the request. *Id.* at 40 (citing Ex. 1005, 8:32–48). As an

example, Petitioner points out that the sub-request asking for confirmation that "the cost per unit at the specified number of units does not exceed the market price plus an acceptable profit" does not relate to the syntax of the base goal ("what is the effect of increasing sales by 20%?"). *Id.* (citing Ex. 1005, 13:25–27).

Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches this limitation.

*(v) "co-ordinate and schedule efforts by the service-providing agents"*

The "goal satisfaction plan" in claim 1 also involves "using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal." Ex. 1001, 30:12–15. For this limitation, Petitioner refers to the example in Figures 8–20 of Kiss. Pet. 42–43. For instance, Petitioner asserts that Kiss's meta-agent coordinates and schedules efforts by the service-providing agents when it pushes a task onto an agenda to query a sales agent. *Id.* at 42 (citing Ex. 1005, 12:29–36; Fig. 9). Petitioner also asserts that Kiss teaches "fulfilling the sub-goal requests in a cooperative completion of the base goal" because Kiss's meta agent asks the agent registry to identify a knowledge agent that has registered a capability to answer a question related to sales. *Id.* (citing Ex. 1005, 12:29–36).

Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches this limitation.

*(vi) "using reasoning"*

In claim 1, both aspects of the goal satisfaction plan—determining sub-goal requests and coordinating and scheduling efforts by agents—must be accomplished "using reasoning." Ex. 1001, 30:10–15. In addition to citing the example in Figures 8–20 of Kiss, Petitioner contends that the various inferencing schemes disclosed in Kiss to formulate dynamic solution plans and to allocate tasks to agents constitute "reasoning" to determine and fulfill sub-goal requests. Pet. 42–44 (citing Ex. 1005, 5:29–40, 7:20–41, 7:53–56, 7:65–8:4, 12:29–36).

Patent Owner contends that the "solution plan" of Kiss is not constructed by "using reasoning" because Kiss's inferencing schemes are used only "[a]fter the solution plan is formulated . . . to perform the search and execution phases." PO Resp. 115 (citing Ex. 1005, 8:58–60). In response, Petitioner persuasively argues that the Petition additionally relies on several other ways in which Kiss utilizes reasoning to formulate a solution plan "using various types of reasoning and allocating tasks to different agents." Pet. Reply 56 (citing Pet. 40; Ex. 1005, 5:33–64; Ex. 1050 ¶¶ 266–267). For example, Kiss describes how the meta-agent can "formulate parallel sub-plans and perform iterative and recursive procedures." *Id.* (quoting Ex. 1005, 5:37–39); *see* Pet. 38–39, 42–44; Ex. 1050 ¶¶ 266–267.

Based on the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches "using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal," as recited in claim 1.

*g. "interagent communication language" limitations*

Claim 1 recites that "the plurality of service-providing electronic agents and the distributed facilitator agent communicate using an interagent Communication Language (ICL)." Ex. 1001, 30:16–19. The ICL includes "a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events." *Id.* at 30:19–23. Petitioner asserts that Kiss teaches communication among agents, and that communication in the proposed combination of references occurs via the Agent Communication Language of FIPA97 (FIPA ACL). Pet. 44 (citing Ex. 1007, vii, ix, 51, Fig. 10). Specifically, Petitioner contends that FIPA ACL employs multi-layer messaging for communication between distributed agents. *Id.* (citing Ex. 1007, 51).

Patent Owner asserts that FIPA97 does not teach "refin[ing] . . . events" as recited in claim 1. PO Resp. 121–130. Patent Owner does not dispute that FIPA97 teaches the rest of the limitations relating to an interagent communication language as recited in clam 1. *See id.* at 121–133.

As we explain below, Petitioner has demonstrated sufficiently that FIPA97 teaches these limitations reciting elements of the claimed ICL.

*(i) "layer of conversational protocol"*

Petitioner asserts that FIPA97 teaches "a layer of conversational protocol" recited in claim 1 because FIPA ACL "defines the semantics of *messages* between agents as including a communicative act, followed by various parameters and parameter expressions," as shown in Figure 1 of Part 2 of FIPA97 reproduced above in § II.D.2. Pet. 45 (emphasis added) (citing Ex. 1007, 12; Ex. 1050 ¶ 291). Petitioner also argues that FIPA97 "discloses a number of different performatives and rules governing FIPA

ACL messages and the meaning of the different parts" and, therefore, discloses "a layer of conversational protocol." *Id.* (citing Ex. 1007, 11–22; Ex. 1050 ¶¶ 292–295).

*(ii) "events" and "event types"*

As discussed above in § II.C, we construe "event" to mean "a message or goal communicated between agents" and "event type" to mean "a type of an event" for this Final Written Decision.

Petitioner maps the "event" of claim 1 to FIPA ACL's "message" and asserts that FIPA ACL's "message type" teaches an "event type" recited in claim 1. Pet. 46–47 (citing Ex. 1007, 3, 4, 11–13, 18). Petitioner argues that FIPA ACL's "message" is an "event" recited in claim 1 because the FIPA ACL communicative acts "are performed by an agent sending a *message* to another agent." *Id.* at 46 (emphasis added) (citing Ex. 1007, 3, 4, 11).

Referencing Figure 1 of Part 2 of FIPA97 reproduced above, Petitioner asserts that in FIPA ACL, "[t]he first element of the message is a word which identifies the communicative act being communicated, which defines the principal meaning of the message," and "the message's communicative act *type* corresponds to that which in KQML is called the performative." *Id.* (emphasis added) (citing Ex. 1007, 12, 13). Petitioner argues that FIPA97 further defines "message type" as corresponding to the "communicative acts/performatives of the FIPA ACL." *Id.* at 46–47 (citing Ex. 1007, 18).

As discussed above, Petitioner asserts that FIPA97 teaches "a layer of conversational protocol" because FIPA ACL "defines the *semantics of messages* between agents as including a communicative act." Pet. 45 (emphasis added) (citing Ex. 1007, 2). Petitioner contends that FIPA97 teaches that the layer of conversational protocol in FIPA ACL is "defined by

event types," as recited in claim 1, because in FIPA97, "[t]he *message types* are a reference to *the semantic acts* defined in this specification." *Id.* at 46 (emphases added) (citing Ex. 1007, 11).

*(iii) "parameter list"*

Claim 1 recites that "a layer of conversational protocol" is also "defined by . . . parameter lists associated with one or more of the events." Petitioner asserts that in FIPA97, FIPA ACL messages may include multiple different parameters ("parameter lists associated with one or more of the events") that can "help the message transport service to deliver the message correctly" or "the receiver to interpret the meaning of the message," or "to respond co-operatively," as shown in Figure 1 of Part 2 of FIPA97 (reproduced above). Pet. 47–48 (citing Ex. 1007, 12, 14, Fig. 1). Petitioner contends that FIPA97 discloses additional parameters in Table 1. *Id.* at 48 (citing Ex. 1007, 13–14).

*(iv) "refining events"*

Claim 1 recites that "the parameter lists further refine the one or more events." Petitioner asserts that this phrase should be construed to mean that "a list of parameters associated with an event can refine the event by affecting the meaning of the event." Pet. 11. Petitioner discusses the disclosures in the Specification and the prosecution history of the '560 patent in support of its proposed construction. *Id.* at 11–14 (citing Ex. 1001, 11:16–48; Ex. 1002, 13–14, 51, 55; Ex. 1020, 5, 6; Ex. 1050 ¶¶ 111–118).

Although Patent Owner discusses constructions for several terms in the Patent Owner Response, Patent Owner does not discuss Petitioner's proposed construction for the claim term "refine . . . events" or propose its own construction. *See* PO Resp. 29–52. Instead, Patent Owner argues that

FIPA97 does not teach parameters that "refine . . . events" under Petitioner's proposed construction. *See id.* at 121 ("the cited parameters in FIPA97 do not, contrary to Petitioner's assertion, affect the meaning of the message"), 124 ("this parameter **does not** affect the **meaning** of the message"), 125 ("In contrast, the FIPA97 'receiver' parameter **does not affect the meaning of the 'inform' communicative act**."). Based on the arguments and evidence presented by Patent Owner, we understand Patent Owner not to dispute Petitioner's proposed construction for the term "the parameter lists further refine the one or more events."

Upon considering the complete record, we agree with Petitioner that the claim term "refine . . . events" encompasses "affecting the meaning of the events." As discussed above, during prosecution, the limitation "wherein the parameter lists further refine the one or more events" was added to claim 1 of the parent '115 patent in an amendment to distinguish the claim from the combination of Nwana/KQML and Kiss cited by the Examiner. *See* Ex. 1002, 13–14, 18, 28, 51; Pet. 13–15 (citing Ex. 1002, 13–14, 51). Citing the disclosures of Nwana/KQML discussed by the Examiner, Petitioner persuasively argues that the parameters of Nwana's KQML "tell" message (i.e., the claimed "event") do not change the meaning of the message, whereas the parameters of an event in the '560 patent change the meaning of the event by "refin[ing] the event." Pet. 11–14 (citing Ex. 1002, 13–14, 51, 55; Ex. 1020, 5, 6).

The following passage from the Specification distinguishes the '560 patent's ICL (i.e., the recited "interagent communication language") from KQML:

> For example, in KQML, a request to satisfy a query can employ either of the performatives ask_all or ask_one. In ICL, on the

> other hand, this type of request preferably is expressed **by the event type ev_post_solve, together with the solution_limit(N) parameter--where N can be any positive integer**. (A request for all solutions is indicated by the omission of the solution limit parameter.) The request can also be accompanied by other parameters, which combine to further refine its semantics. In KQML, then, this example forces one to choose between two possible conversational options, neither of which may be precisely what is desired. In either case, the performative chosen is a single value that must capture the entire conversational characterization of the communication.

Ex. 1001, 11:38–53. Petitioner argues that a message having the KQML performative "ask_all" always has the same meaning, requesting all solutions to the request, just as the KQML performative "ask_one" always requests one solution. Pet. 12. According to Petitioner, in contrast, the meaning of the '560 patent's event "ev_post_solve" depends on the value of its parameter "solution_limit(N)"—e.g., an agent may request the identity of three agents capable of translating a document by including "solution_limit(N)" in the message and setting the value of N to 3. *Id.* Thus, Petitioner argues that the parameters of an event of the '560 patent affect the meaning of the event. *Id.* at 12–14.

We are persuaded by Petitioner's argument and evidence that the "parameterized approach" of the '560 patent (Ex. 1001, 11:38–53) can refine an event by changing the meaning of the event. As discussed above in § II.C, we construe "event" to mean "a message or goal communicated between agents" and "goal" to mean "a request for service." The '560 patent describes that "[i]n one embodiment, a request for one of an agent's services normally arrives in the form of an *event* from the agent's facilitator." *Id.* at 12:61–63 (emphasis added). In a section titled "Refining Service Requests," the '560 patent describes as follows:

> In a preferred embodiment of the present invention, *parameters* associated with a goal (or sub-goal) can draw on useful features to *refine the request's meaning*. For example, it is frequently preferred to be able to specify whether or not solutions are to be returned synchronously; this is done using the reply parameter, which can take any of the values synchronous, asynchronous, or none. As another example, when the goal is a non-compound query of a data solvable, the cache parameter may preferably be used to request local caching of the facts associated with that solvable.

*Id.* at 16:5–15 (emphases added). Thus, the '560 patent describes that in an embodiment, parameters of a request for service, i.e., an event, can refine the "meaning" of the request or event.

Nonetheless, we note that this passage and all of the disclosures of the '560 patent cited by Petitioner describe exemplary embodiments. *See id.* at 11:42–45 ("In ICL . . . this type of request *preferably* is expressed by the event type ev_post_solve, together with the solution_limit(N) parameter--where N can be any positive integer." (emphasis added)), 16:6–8 ("In a *preferred embodiment* of the present invention, *parameters* associated with a goal (or sub-goal) can draw on useful features to *refine the request's meaning*." (emphases added)). Thus, the term "refine . . . events" recited in claim 1 may encompass but is not necessarily limited to "affecting the meaning of events." *See SuperGuide*, 358 F.3d at 875 ("a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment"); *WesternGeco*, 889 F.3d at 1323–24 ("It is well established that claims are not limited to preferred embodiments, unless the specification clearly indicates otherwise."). Indeed, Petitioner's proposed construction of the term "the parameter lists further refine the one or more events" expresses the meaning

of the term in a permissive fashion—"an event *can* refine the event by affecting the meaning of the event." Pet. 11 (emphasis added).

Based on the complete record, we determine that the term "the parameter lists further refine the one or more events" encompasses parameters "affecting the meaning of the events."

Petitioner asserts that FIPA97 teaches "the parameter lists further refine the one or more events" because several of the conversational layer parameters disclosed in FIPA97 affect the meaning of the performative included within the message, and therefore affect the meaning of the message, or event. Pet. 49. According to Petitioner, FIPA97 discloses a parameter ":receiver," which "can alter the meaning [of] an event, such as 'inform,' to be 'inform one'" or "inform a number' of agents, depending on the value of the parameter." *Id.* (citing Ex. 1007, 13). Citing the testimony of Dr. Lieberman, Petitioner asserts that naming a tuple "corresponds to the action of multicasting the message" such that "semantics of this multicast" is refined so that "the message is sent to each agent named in the tuple." *Id.* (citing Ex. 1007, 13; Ex. 1050 ¶ 314). Petitioner argues that "[t]his 'tuple naming' functionality is analogous to the example provided in the ['560 patent] of 'solution_limit(N),' in which 'N' modifies how many solutions are requested, and is not found in the KQML Nwana reference that was before the examiner." *Id.* (citing Ex. 1001, 11:32–48; Ex. 1020; Ex. 1050 ¶ 314). Petitioner also asserts that FIPA97 discloses two other parameters—":protocol" (when used with the "call for proposals" performative) and ":conversation-id"—that affect the meaning of a message. *Id.* at 49–50 (citing Ex. 1007, 13–14, 46–49; Ex. 1050 ¶¶ 316–321).

Patent Owner asserts that FIPA97 does not teach parameters "refin[ing] . . . events," as recited in the claim, because the parameters of

FIPA97 cited by Petitioner do not affect the meaning of the message. PO Resp. 121. In particular, Patent Owner contends that FIPA97's ":receiver" parameter of the FIPA97 "inform" message relied upon by Petitioner is no different from KQML's ":receiver" parameter for the KQML "tell" message in that both modify the message but do not affect the meaning of the message. *Id.* at 122 (citing Ex. 1007, 12; Ex. 1020, 5). Patent Owner asserts that FIPA97's ":receiver" parameter does not affect the meaning of the FIPA97 "inform" message because "the result of this parameter is only that the message is multicast; i.e., it is 'sent to each agent named in the tuple.'" *Id.* at 124. According to Patent Owner, "the content of the message is unchanged; the only thing that changes is who (as in, recipient) receives the message." *Id.*

The portion of FIPA97 cited by Petitioner is reproduced below:

| Message Parameter: | Meaning: |
|---|---|
| `:sender` | Denotes the identity of the sender of the message, i.e. the name of the agent of the communicative act. |
| `:receiver` | Denotes the identity of the intended recipient of the message.<br><br>Note that the recipient may be a single agent name, or a tuple of agent names. This corresponds to the action of multicasting the message. Pragmatically, the semantics of this multicast is that the message is sent to each agent named in the tuple, and that the sender intends each of them to be recipient of the CA encoded in the message. For example, if an agent performs an inform act with a tuple of three agents as receiver, it denotes that the sender intends each of these agent to come to believe the content of the message. |

Ex. 1007, 13. Pointing to this disclosure in FIPA97, Petitioner asserts that the "receiver" parameter affects the meaning of the event by affecting "whether the performative communicates the message to a single agent, a

selection of agents, or if [the message is] broadcast to every agent." Pet. Reply 62 (citing Ex. 1007, 13). According to Petitioner, "in FIPA97, an event using 'inform' can *mean three or more different things* (i.e., inform (1) one person, (2) a select group of people, (3) everybody) depending on the value of just that parameter." *Id.* at 63.

We agree with Petitioner's argument and disagree with Patent Owner's argument. As shown above in the portion of FIPA97 relied on by Petitioner, FIPA97 describes the "meaning" of the message affected by the ":receiver" parameter (under the column heading "Meaning:") as follows:

> Note that the recipient may be a single agent name, or a tuple of agent names. This corresponds to the action of multicasting the message. Pragmatically, the semantics of this multicast is that the message is sent to each agent named in the tuple, and that the sender *intends* each of them to be recipient of the CA encoded in the message. For example, if an agent performs an inform act with a tuple of three agents as receiver, it denotes that the sender *intends* each of these agent to come to believe the content of the message.

Ex. 1007, 13 (emphases added). We agree with Petitioner this passage describes, under the column heading "Meaning," the meaning of the message modified or affected by the ":receiver" parameter.

Patent Owner argues that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." PO Resp. 124. Patent Owner contends that, in contrast, the solution_limit(N) parameter of the '560 patent "modifies the actual request/communicative act/performative itself—i.e., [**ev_post_solve**], because it imposes a modification on the limits of **solutions** presented in response to a request." *Id.* at 125 (citing Ex. 2032 ¶ 262).

We disagree with Patent Owner's argument. First, we disagree with Patent Owner that the FIPA97 ":receiver" parameter changes only "who (as in, recipient) receives the message." As described in FIPA97, the ":receiver" parameter does not merely specify "who receives the message," e.g., agent A as opposed to agent B. Rather, as persuasively explained by Petitioner, the ":receiver" parameter affects the qualitative aspect of the message—i.e., whether to inform (1) one agent, (2) a select group of agents, or (3) every known agent. *See* Pet. Reply 63.

In addition, Patent Owner does not explain adequately why the solution_limit(N) parameter of the '560 patent specifying the number of agents to be queried "modifies the actual request/communicative act/performative itself" but the ":receiver" parameter of FIPA97 specifying the number of agents to which to send a message does not. *See* PO Resp. 125. We agree with Petitioner that Patent Owner does not identify "a practical distinction between limiting the number of agents to be queried (solution_limit(N)), and querying a selection of agents (:receiver)." Pet. Reply 63.

Next, Patent Owner contends that FIPA97 does not teach parameters "refin[ing] . . . events," as recited in the claim, because FIPA97's ":receiver" parameter is the same as or similar to the KQML ":receiver" parameter, which does not modify the meaning of a message. PO Resp. 122 (citing Ex. 1007, 12; Ex. 1020, 5). In support of its argument, Patent Owner cites a page from Dr. Finin's presentation slides at an unidentified meeting or class, which compares "KQML tell and FIPA ACL inform." *Id.* at 123 (citing Ex. 2019, 15; Ex. 2068, 132:6–22.). Patent Owner also cites the testimony from Dr. Finin at his deposition that "the general idea of agent

communication language that was embodied in KQML is similar to the one that is embodied in FIPA." *Id.* (citing Ex. 2068, 32:10–17).

Patent Owner, however, does not discuss the disclosure of KQML/Nwana (Ex. 1020) sufficiently (other than pointing to the similarity of the format between the ":receiver" parameter of KQML and FIPA97) or explain adequately why KQML's ":receiver" parameter is similar to the FIPA97 ":receiver" parameter. *See* PO Resp. 122–124. For example, Patent Owner does not explain whether KQML's ":receiver" parameter specifies, similar to FIPA97, that "the recipient may be a single agent name, or a tuple of agent names," that "the message is sent to each agent named in the tuple," and that "the sender *intends* each of them to be recipient of the message." *See id.*; Ex. 1007, 13 (emphasis added). The general statements from Dr. Finin (or a slide purportedly from his unidentified presentation) cited by Patent Owner (PO Resp. 123 (citing Ex. 2019, 15; Ex. 2068, 132:6–22, 32:10–17)) regarding the alleged similarity between KQML and FIPA97 at a general level are simply insufficient to override the specific disclosures in FIPA97 cited by Petitioner regarding the meaning of the message modified or affected by the FIPA97 ":receiver" parameter.

Patent Owner also cites testimony from Petitioner's declarant, Dr. Lieberman, as "confirm[ing]" that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." PO Resp. 124 (citing Ex. 2069, 110:14–111:16, 168:5–12). The cited testimony of Dr. Lieberman, however, discusses FIPA97's messages and multicasting in general (responding to general questions from Patent Owner's counsel) and does not discuss the specific disclosure in FIPA97 cited by Petitioner regarding the meaning of the message modified or affected by the FIPA97

":receiver" parameter. *See* Ex. 2069, 108:4–111:16, 168:5–12. Thus, we disagree with Patent Owner that the testimony of Dr. Lieberman cited by Patent Owner "confirm[s]" that the FIPA97 ":receiver" parameter does not change "the content of the message" and that "the only thing that changes is who (as in, recipient) receives the message." *See* PO Resp. 124.

Next, Patent Owner cites 23 paragraphs from the Declaration of Dr. Cohen (Ex. 2033) to argue that "FIPA97 does not contain any conversational layer parameters that affect the semantics of FIPA97 messages." PO Resp. 127 (citing Ex. 2033 ¶¶ 70–92). Patent Owner, however, does not discuss Dr. Cohen's testimony in the Patent Owner Response or explain how Dr. Cohen's testimony supports its contention. *See id.* Thus, to the extent Patent Owner purports to rely on Dr. Cohen's testimony, this amounts to improper incorporation by reference in violation of 37 C.F.R. § 42.6(a)(3). Accordingly, we decline to consider the cited paragraphs from the Cohen Declaration.[19]

Lastly, Patent Owner contends that the limitation "the parameter lists further refine the one or more events" requires "the parameters of an event (or message) can refine the message or goal itself" (PO Resp. 121) or "change the nature of the communicative act itself" (*id.* at 126). Although it is not entirely clear what Patent Owner argues,[20] to the extent Patent Owner argues "refin[ing]" a message or goal requires changing the message or goal

---

[19] Nonetheless, we note that Dr. Cohen's testimony appears to dwell in generalities, e.g., citing the works of logicians/philosophers Tarski and Frege (*see* Ex. 2033 ¶¶ 84–85), and discusses tuples and multicasting in general terms (*see id.* ¶¶ 88–92).

[20] As discussed above, Patent Owner does not dispute Petitioner's proposed construction of the term "the parameter lists further refine the one or more events." *See* PO Resp. 29–52.

itself, we disagree with Patent Owner's argument. As discussed above, in a section titled "Refining Service Requests," the '560 patent describes examples of "parameters" associated with a request or goal that "refine the request's meaning," including the "reply parameter" that specifies whether solutions are to be returned synchronously or asynchronously, and the "cache parameter" that specifies local caching of facts related to the request. *See* Ex. 1001, 16:5–15. These parameters do not appear to change the request itself but, rather, specify how the request should be handled—e.g., synchronous response, local caching, etc. Thus, we disagree with Patent Owner's argument that the claim requires the recited "parameters" "refine the message or goal itself" (PO Resp. 121) or "change the nature of the communicative act itself" (*id.* at 126). Such an interpretation, which "excludes a [disclosed] embodiment from the scope of the claim is rarely, if ever, correct." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) (quoting *Accent Pkg., Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013)) (citing *Phillips*, 415 F.3d at 1312–13).

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that FIPA97 teaches "wherein the parameter lists further refine the one or more events," as recited in claim 1. Based on the complete record and for the reasons explained by Petitioner, we determine that Petitioner has shown sufficiently that FIPA97 teaches "a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events," as recited in claim 1.

*h. Conclusion for Claim 1*

On the full record now before us, we are persuaded that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests all the limitations of claim 1 and that a person of ordinary skill in the art would have combined the references in the manner asserted in the Petition. We weigh this evidence of obviousness together with Patent Owner's evidence of objective indicia of nonobviousness, *infra* § II.G.14, before reaching our final determination as to patentability of claim 1.

*3. Dependent Claim 2*

Claim 2 depends from claim 1 and further recites "wherein the distributed facilitator agent includes a plurality of single process facilitator agents each executing within a separate computer process, each of the single process facilitator agents being bi-directionally coupled with at least one other single process facilitator agent." Ex. 1001, 30:24–30.

Petitioner contends that a "single process facilitator agent" within the context of the '560 patent is a "facilitator agent executing within a single computer process." Pet. 10 (citing Ex. 1050 ¶¶ 99–100). The term "single process facilitator agent" appears only in the claims of the '560 patent and is not substantively discussed in the prosecution history. *See* Ex. 1050 ¶ 100. *See generally* Ex. 1001; Ex. 1120. Patent Owner does not address Petitioner's proposed construction or propose its own. *See* PO Resp. 29–52, 102–104. Upon considering the complete record, we adopt Petitioner's proposed construction because it is consistent with the language of claim 1 requiring "a distributed facilitator agent functionally distributed across at least two computer processes" and the language of claim 2 reciting that this "distributed facilitator agent includes a plurality of single process facilitator

agents *each executing within a separate computer process*." Ex. 1001, 29:63–64, 30:25–27 (emphasis added).

As discussed in connection with claim 1, Petitioner adequately shows that Kiss's meta-agents may be functionally distributed across multiple computer processes. Petitioner contends that each of Kiss's meta-agents is additionally a "single process facilitator agent," as recited in claim 2, because each is responsible for matching requests with agent capabilities and is executing on a separate system, and thus executing within a separate computer process. Pet. 51–52 (citing Ex. 1005, 6:66–7:4, Fig. 21). Petitioner argues that Figure 21 of Kiss shows multiple meta-agents distributed across the Internet on separate systems. *Id.* (citing Ex. 1005, Fig. 21; Ex. 1050 ¶ 336). Petitioner argues that Kiss describes a knowledge management system that can be networked across the Internet with other similar systems to create a large scale, global system and that Kiss's meta-agent layer supports scalability such that multiple independent meta-agents (i.e., "single process facilitator agents") can coordinate and solve problems over distributed systems (i.e., "each executing within a separate computer process"). *Id.* at 52 (citing Ex. 1005, 14:30–35, Fig. 21; Ex. 1050 ¶ 337). Petitioner also contends that Kiss's distributed meta-agents are "bi-directionally coupled," as recited in claim 2, because they are interconnected over the Internet, allowing them to communicate with each other. *Id.* at 54 (citing Ex. 1005, 14:32–33; Ex. 1050 ¶ 342).

In its response to Petitioner's analysis of claim 2, Patent Owner argues that the disclosures of Kiss relied on by Petitioner merely establish that Kiss's system can have multiple meta-agents. PO Resp. 103. Patent Owner, however, acknowledges elsewhere that a person of ordinary skill in the art would have recognized that two of Kiss's meta-agents on separate systems

are different instances of the same agent with the same capabilities, each operating within separate computer processes. *Id.* at 105 (citing Ex. 2032 ¶ 174). Therefore, we are persuaded that Petitioner has shown sufficiently, with support from Dr. Lieberman, that Kiss teaches or suggests "a plurality of single process facilitator agents each executing within a separate computer process" and each "being bi-directionally coupled with at least one other single process facilitator agent," as recited in claim 2.

Petitioner also argues that FIPA97 teaches its Directory Facilitator may be distributed over multiple computer processes and is further operable to be "executing within a separate computer process." Pet. 53 (citing Ex. 1006, Fig. 2). Patent Owner disagrees with Petitioner's argument. PO Resp. 103. As explained above with respect to claim 1, we find Petitioner's reliance on Kiss sufficient to teach or suggest a "distributed facilitator agent functionally distributed across at least two computer processes." *See supra* § II.G.2.c.ii. Similarly, we find Petitioner's reliance on Kiss sufficient to teach or suggest that the distributed facilitator agent further includes a plurality of single process facilitator agents, as required by claim 2.

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that Kiss teaches or suggests that the distributed facilitator agent of claim 1 further includes "a plurality of single process facilitator agents each executing within a separate computer process" and each "being bi-directionally coupled with at least one other single process facilitator agent," as recited in claim 2.

*4. Dependent Claim 3*

Claim 3 depends directly from claim 2 and further requires "each single process facilitator agent" to have "any necessary facilitating functionality." Ex. 1001, 30:34–35. Claim 3 also recites:

> a specific single process facilitator including:
>
> > a specific agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the process wherein the specific single process is executing, the specific agent registry further declaring capabilities made available to the specific single process facilitator agent through the at least one other single process facilitator agent bi-directionally coupled with the specific single process facilitator agent; and
> >
> > a specific facilitating engine operable to interpret a service request as a base goal, the specific facilitating engine further operable to determine sub goals required to complete the base goal; the specific facilitating engine further operable to select service providing agents best capable of completing the sub goal and assigning the sub goals thereto.

Ex. 1001, 3:36–51. We address these limitations in turn.

*(i) "necessary facilitating functionality"*

Petitioner asserts that the facilitator agents identified in Kiss and FIPA97 in its analysis of claim 1 "are operable to manage agent registries, conduct collaborative task completion, generate solution[] plans, delegate tasks, and conduct distributed inferencing and utilize problem solving techniques—along with other facilitator functionality." Pet. 56. Therefore, although the '560 patent provides little guidance as to what the claim language means, Petitioner contends that the combination of Kiss and FIPA97 teaches a facilitator agent with any "necessary facilitating functionality."

*(ii) "specific agent registry"*

Petitioner asserts that, as discussed with respect to claims 1 and 2, the combination of Kiss's meta-agent and agent service layer is a "single process facilitator" that includes an "agent registry." Pet. 56 (citing

Ex. 1050 ¶ 352). Petitioner also asserts that the claim language "service-providing electronic agents currently active within the process" refers to the process in which the associated "single process facilitator" is executing. *Id.* (citing Ex. 1050 ¶ 351). Petitioner further cites Kiss's description of knowledge agents in a system registering its capabilities and interests with the agent service layer. *Id.* at 56–57 (citing Ex. 1005, 6:45–7:9, 12:1–17 (Table 1), 12:18–20; Ex. 1050 ¶ 353). Therefore, according to Petitioner, Kiss's agent registry maintains a list of the capabilities of all service-providing agents active within a given specific single process. *Id.* at 57. Thus, Petitioner argues, Kiss teaches "a specific agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the process wherein the specific single process is executing," as recited in claim 3. *Id.* at 56.

*(iii) "capabilities made available" between "bi-directionally coupled" facilitator agents*

Petitioner relies on the FIPA97 directory performative "search" for teaching that a Directory Facilitator (part of a facilitator agent in the combined Kiss/FIPA97 system) "make[s] available" the capabilities of an agent in its agent registry to another Directory Facilitator (i.e., another facilitator agent) that is requesting information. Pet. 59 (citing Ex. 1006, 18, 25; Ex. 1050 ¶ 362). Petitioner contends that the Directory Facilitators are "bi-directionally coupled" facilitator agents because they communicate over FIPA97's Agent Communication Channel using FIPA ACL. *Id.* (citing Ex. 1050 ¶ 362); *see* Ex. 1006, 2. We find Petitioner has shown sufficiently that the asserted combination of Kiss and FIPA97, with Kiss's single process facilitator agents communicating via FIPA ACL and using FIPA97's "search" performative, teaches or suggests "the specific agent registry

further declaring capabilities made available to the specific single process facilitator agent through the at least one other single process facilitator agent bi-directionally coupled with the specific single process facilitator agent," as recited in claim 3.

*(iv) "determine sub goals"*

Petitioner contends that in the combination of Kiss and FIPA97, Kiss teaches a "specific facilitating engine operable to interpret a service request as a base goal . . . and further operable to determine subgoals required to complete the base goal," as recited in claim 3, for the same reasons it teaches "a facilitating engine operable to interpret a service request as a base goal . . . and using reasoning to determine sub-goal requests," as recited in claim 1. Pet. 60; *see supra* §§ II.G.2.f.ii, iv.

*(v) "assigning sub goals"*

Referring to the examples in Figures 8–20 of Kiss, Petitioner contends that Kiss's meta-agent dispatches queries (i.e., "sub goals") to various specialized agents based on a determination that the targeted agent has a knowledge module appropriate for the query (i.e., "operable to select service providing agents best capable of completing the sub goal and assigning the sub goals thereto"). Pet. 60 (citing Ex. 1050 ¶ 275).

*(vi) Conclusion for Claim 3*

Patent Owner does not specifically dispute that the combination of Kiss and FIPA97 teaches or suggestions the limitations of claim 3 beyond its arguments advanced with respect to claim 2 discussed above. *See* PO Resp. 102–103. Based on the complete record, and for the reasons explained by Petitioner, we determine that Petitioner has demonstrated sufficiently that the combination of Kiss and FIPA97 teaches all the limitations of claim 3.

*5. Dependent Claim 4*

Claim 4 depends directly from claim 3 and further recites "wherein at least two of the plurality of single process facilitator agents reside upon separate computer systems." Ex. 1001, 30:53–55. Petitioner contends that Kiss teaches this limitation for the same reasons it teaches "a plurality of single process facilitator agents each executing within a separate computer process," as recited in claim 2. Pet. 61. As discussed in in § II.G.3, Kiss shows two meta-agents distributed across separate computer processes on "separate computer systems."

Patent Owner does not specifically dispute that the combination of Kiss and FIPA97 teaches or suggestions the limitations of claim 4 beyond its arguments advanced with respect to claim 2 discussed above. *See* PO Resp. 102–103. Based on the complete record, and for the reasons explained by Petitioner, we determine that Petitioner has demonstrated sufficiently that the combination of Kiss and FIPA97 teaches all the limitations of claim 4.

*6. Dependent Claim 14*

Claim 14 depends from claim 1 and further recites "wherein the distributed facilitator agent is formed in a hierarchical topology." Ex. 1001, 31:24–26. As discussed above in § II.C.3, we construe the term "hierarchical topology" as "an arrangement of units or parts having multiple levels."

Under this asserted ground of obviousness, Petitioner relies on FIPA97 for teaching the limitations of claim 14. Pet. 61–63. Petitioner asserts that FIPA97 describes Directory Facilitators (DFs) "formed in a

hierarchical topology." Pet. 61–62 (citing Ex. 1006, 18; Ex. 1050 ¶ 456). Figure 4 of Part 1 of FIPA97 is reproduced below:




**Figure 4 — Agent Domains**

Figure 4 above illustrates agent domains in FIPA97. Ex. 1006, 18. As shown in Figure 4, $DF_x$ is the Directory Facilitator for Domain X, which includes agents A and B and $DF_y$, which is the Directory Facilitator for Domain Y. *Id.* FIPA97 provides that "[a]gent domains can be structured where a DF registers with other DFs[, and] [a]gents can query information on agents in other domains through its DF *escalating the query to a level* at which it can be resolved." *Id.* (emphasis added). In such a case, FIPA97 explains, "the response to the query is passed through the *hierarchy* to the agent which originated the query." *Id.* (emphasis added). Petitioner contends that FIPA97 teaches a "distributed facilitator agent . . . formed in a hierarchical topology" because $DF_x$ supports connections to $DF_y$, a lower level directory. PO Resp. 62.

Petitioner additionally cites details of the Personal Travel Assistance application in Part 4 of FIPA97, a specific implementation of FIPA97's agent management architecture. *Id.* at 63. Figure 3 of Part 4 of FIPA97 is reproduced below:




**Figure 3. PTA Architecture**

Figure 3 above depicts the architecture of FIPA97's Personal Travel Assistance application. Ex. 1009, 10. Petitioner contends that in this example, the Personal Travel Assistant (PTA) contains the functionality of a facilitator agent, as it includes a DF named "CompanyXYZ.df." Pet. 63 (citing Ex. 1009, 13). Petitioner also contends that the PTA's capability of using "Dutch auctions as well as contract net for conversation – with brokers or with service providers directly" demonstrates facilitator functionality. *Id.*; Ex. 1009, 11. Petitioner contends that travel broker agents are also facilitators. Pet. 64. Petitioner argues that Figure 3 shows a "distributed facilitator agent . . . formed in a hierarchical topology." *Id.* at 63.

Patent Owner argues that Petitioner "purports to stitch . . . together" "two completely different disclosures" within FIPA97—Part 1 (Agent Management) and Part 4 (Personal Travel Assistance)—without any explanation of how or why the combination would work. PO Resp. 108–109 (citing Pet. 62–63). We disagree with Patent Owner. The Petition makes clear that Part 4 of FIPA97 describes an *application* of FIPA97's agent management system, and that the PTA architecture in Figure 3 of FIPA97 Part 4 is an *example* showing how the hierarchical topology of Figure 4 of FIPA97 Part 1 is implemented in the PTA application. *See* Pet. 63; *see also* Ex. 1006, v (explaining that FIPA97's informative application descriptions, including the Personal Travel Assistance application, are "examples" of how the normative specifications (i.e., Parts 1–3) can be applied). Thus, Petitioner cites FIPA97's Personal Travel Assistance disclosure as an alternative example of a "hierarchical topology," not as something to be combined with Figure 4 of FIPA97 Part 1. *See* Pet. 63; Pet. Reply 48.

Patent Owner also argues that Petitioner fails to show "any true hierarchy within the system whereby one facilitator agent out-ranks another." PO Resp. 109 (citing Pet. 62–63; Ex. 2032 ¶ 188). As indicated in § II.C.3, Patent Owner equates "rank" with "level" in its claim construction argument. Moreover, FIPA97 describes the topology in Figure 4 as a "hierarchy" and explains how one Directory Facilitator (e.g., $DF_x$) "escalate[s]" a query to a different "level." Ex. 1006, 18. Accordingly, we disagree with Patent Owner's argument and find that the FIPA97 figures cited by Petitioner show a "hierarchical topology" as claimed.

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that in the combined system

of Kiss and FIPA97, FIPA97 teaches or suggests a distributed facilitator agent "formed in a hierarchical topology," as recited in claim 14.

*7. Dependent Claim 15*

Claim 15 depends from claim 14 and further recites:

> wherein the hierarchical topology includes a top level facilitator agent and at least one other facilitator agent registered within the top level facilitator agent, the top level facilitator agent operable to directly manage those service-providing agents registered within the top level facilitator agent and indirectly manage those service-providing agents registered within the at least one other agent registered with the top level facilitator agent.

Ex. 1001, 31:27–35. Petitioner contends that in Figure 4 of FIPA97 Part 1, reproduced in the previous section, Directory Facilitator $DF_x$ is a "top level facilitator agent" and $DF_y$ is "at least one other facilitator agent registered within the top level facilitator agent." Pet. 64–65 (citing Ex. 1006, 18; Ex. 1050 ¶ 464). Petitioner contends that $DF_x$ is "operable to directly manage those service-providing agents registered within the top level facilitator agent" (e.g., agents A and B in Figure 4) and to "indirectly manage those service-providing agents registered within the at least one other agent registered within the top level facilitator agent" (e.g., agent C in Figure 4 registered with $DF_y$). *Id.* at 65–66 (citing Ex. 1006, 18; Ex. 1050 ¶ 469).

Petitioner alternatively contends that in Figure 3 of FIPA97 Part 4, reproduced in the previous section, the PTA is a "top level facilitator agent" and a travel broker is "at least one other facilitator agent registered within the top level facilitator agent" as required by claim 15. *Id.* at 64 (citing Ex. 1050 ¶ 464). Petitioner contends that the PTA manages travel broker agents (i.e., other facilitators) and services such as location and web servers

(i.e., client agents). *Id.* Petitioner also contends that the PTA satisfies the limitations of claim 15 because it "is a specific implementation of the general FIPA97 directory facilitator [and] likewise contains this functionality." *Id.* at 66 (citing Ex. 1050 ¶ 470).

As Petitioner points out, Patent Owner does not dispute that $DF_x$ in Figure 4 is a "top level facilitator agent" that meets all the limitations of claim 15. *See* PO Resp. 108–110; *see* Pet. Reply 50. For the reasons presented by Petitioner and discussed above, Petitioner has shown sufficiently that $DF_x$ in Figure 4 of FIPA97 Part 1 meets all the requirements of a "top level facilitator agent" set forth in claim 15.

Patent Owner argues that Petitioner fails to show that the PTA in Figure 3 of FIPA97 Part 4 is a "top level facilitator agent" as recited in claim 15. PO Resp. 109–110. Although Petitioner relies on the PTA example as an alternative for teaching the limitations of claim 15, we address the parties' arguments because Petitioner cites that disclosure for teaching the limitations of claims 16–19, which depend from claim 15. *See* Pet. 66–70.

Patent Owner argues that the PTA does not manage travel brokers because a table in FIPA97 listing capabilities of different agent types "contains no hint of PTA managing 'travel broker agents,' as Petitioner suggests." PO Resp. 109 (citing Ex. 1009, 9; Ex. 2032 ¶ 191). But that table provides "internal" capabilities of different agent types and does not purport to describe the PTA's interactions with other agents. *See* Ex. 1009, 9. Patent Owner also contends that the PTA does not manage travel brokers when it conducts Dutch auctions. PO Resp. 109–110. In its Reply, Petitioner points out that the "PTA handle[s] the PTA ontology for making regular travel arrangements" and reiterates that the PTA interacts with travel

brokers through Dutch auctions and contract net. Pet. Reply 53 (citing Pet. 64; Ex. 1009, 11; Ex. 1148, 2; Ex. 1050 ¶¶ 464, 466). PO also argues that a travel broker is not a facilitator agent. PO Resp. 110. We agree with Petitioner, however, that a travel broker operates as a facilitator when it negotiates and consolidate services. *See* Pet. Reply 53 (citing Ex. 1009, 8, 9 ("Travel Broker Agents are probably the most complex agents.")).

For the reasons provided by Petitioner, and upon considering the complete record, we determine that Petitioner has shown sufficiently that in the combined system of Kiss and FIPA97, FIPA97 teaches or suggests a "top level facilitator agent" meeting the limitations of claim 15.

*8. Dependent Claims 16–19*

Claims 16–19 each depend directly from claim 15 and place further limitations on the "top level facilitator agent" or the "at least one other facilitator agent." Ex. 1001, 31:36–48. For each of these claims, Petitioner relies on the PTA example in FIPA97 Part 4 discussed above. Pet. 66–70.

Claim 16 requires the "top level facilitator agent" and the "at least one other facilitator agent" to be "executing on different computer systems." Ex. 1001, 31:36–39. Petitioner asserts that the PTA (i.e., the top level facilitator agent) and the travel broker (i.e., the other facilitator agent) execute within different domains and have physical addresses indicating they reside on different servers. Pet. 66–67 (citing Ex. 1009, 10–11).

Claim 17 requires the "other facilitator agent" to be "installed for a specific computer user." Ex. 1001, 31:40–42. Petitioner points to the Mini-PTA (MPTA) in Figure 2 as a smaller, compact implementation of the PTA, and therefore a facilitator agent, that is implemented for a small company or single user. Pet. 68–69 (citing Ex. 1009, 11).

Claim 18 requires the "other facilitator agent" to be "installed for a specific group of users." Ex. 1001, 21:43–45. Petitioner contends that a person of ordinary skill in the art would have understood multiple instances of the PTA could be installed for multiple users, e.g., a company's entire staff. Pet. 69–70.

Claim 19 requires the "other facilitator agent" to be "installed for a specific computer application." Ex. 1001, 31:46–48. Petitioner contends that the PTA system is operable to install a Flight Service Provider that maintains a number of agents for domestic and international travel and makes reservations or accepts purchases for flights. Pet. 70 (citing Ex. 1009, 12). Petitioner contends the Flight Service Provider is a facilitator agent because it is responsible for matching requests from users and agents with descriptions of other agents' capabilities. *Id.* (citing Ex. 1009, 12). Petitioner further contends the Flight Service Provider is for a specific computer application because it is installed to provide a specific task—making and accepting reservations for flights. *Id.* (citing Ex. 1009, 12).

Patent Owner does not specifically dispute that FIPA97 teaches or suggests the limitations of claims 16–19 beyond its arguments advanced with respect to claims 14 and 15 discussed above. *See* PO Resp. 108–110. Based on the complete record, and for the reasons explained by Petitioner, we determine that Petitioner has demonstrated sufficiently that in the combined system of Kiss and FIPA97, FIPA97 teaches or suggests the additional limitations of claims 16–19.

*9. Independent Claim 26*

Independent claim 26 is directed to a "distributed facilitator agent" and contains many limitations that are the same as or similar to those in independent claim 1. For those limitations, Petitioner refers back to its

analysis for claim 1. Pet. 71–73. For the reasons discussed above, notwithstanding Patent Owner's arguments, Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests those limitations.

Claim 26 additionally requires the facilitating engine to be "operable to parse a service request in order to interpret a compound goal." Ex. 1001, 32:35–36. As set forth in § II.C, a "compound goal" is a single goal expression that specifies multiple sub-goals to be performed. Petitioner provides a detailed explanation and specific citations showing that FIPA ACL allows the expression of multiple sub-goals. Pet. 71–72 (citing Ex. 1007, 15–17, 31, 40, 41, 53, 69, 75, 78). Petitioner also contends FIPA97's Directory Facilitator and Kiss's meta-agent both are facilitators that include internal mechanisms for parsing a service request in order to interpret a compound goal. *Id.* at 72 (citing Ex. 1005, 12:21–14:30; Ex. 1007, 15). Patent Owner does not specifically dispute that Kiss teaches this limitation. *See generally* PO Resp. Based on the complete record and for the reasons explained by Petitioner, we are persuaded that Petitioner has demonstrated sufficiently that Kiss teaches a facilitating engine "operable to parse a service request in order to interpret a compound goal," as recited in claim 26.

Patent Owner does not respond specifically to Petitioner's challenge to claim 26 beyond Patent Owner's arguments advanced with respect to claim 1 discussed above. On the full record now before us, we are persuaded that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests all the limitations of claim 26.

*10. Dependent Claim 36*

Claim 36 depends directly from independent claim 26 and further recites substantially the same limitations as dependent claim 2. Petitioner refers back to its analysis for claim 2, and Patent Owner advances the same arguments as it does for claim 2. Pet. 73; PO Resp. 103. For the same reasons set forth above respect to claim 2, Petitioner has shown sufficiently that Kiss teaches or suggests the limitations of claim 36. Accordingly, based on the complete record, and for the reasons explained by Petitioner, we are persuaded that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests all the limitations of claim 36.

*11. Dependent Claim 37*

Claim 37 depends directly from claim 36 and contains many limitations that are the same as or similar to those in dependent claim 3. For those limitations, Petitioner refers back to its analysis for claim 3. Pet. 73–74.

Claim 37 also requires "a specific facilitating engine operable to parse a service request in order to interpret an arbitrarily complex goal set forth therein." Ex. 1001, 33:36–38. As Petitioner asserts, the '560 patent defines "arbitrarily complex goal expression" or "arbitrarily complex goal" as a "goal expressed in a language or syntax that allows the expression of multiple sub-goals and can potentially include more than one type of logical connector (e.g., AND, OR, NOT), and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent, although not every goal is itself necessarily complex." Pet. 74 (citing Ex. 1001, 14:62–15:10); *see id.* at 10. Petitioner argues that this definition does not require multiple sub-goals to be expressed within the request, but instead requires only that the goal be expressed in a language "that allows the expression of

multiple sub-goals." *Id.* at 74. Petitioner contends that in the combined system of Kiss and FIPA97, the request "What is the effect of increasing sales by 20%?" is an "arbitrarily complex goal" because it is a goal expressed in FIPA ACL, which allows the expression of multiple sub-goals and can potentially include more than one type of logical connector and more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent. *Id.* at 74–75.

Claim 37 further requires the specific facilitating engine to be "operable to construct a goal satisfaction plan using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal." Ex. 1001, 33:39–45. Petitioner asserts that the combination of Kiss and FIPA97 teaches this limitation for the same reasons discussed with respect to claim 1, which recites virtually identical claim language. Pet. 75; *see supra* § II.G.2.f.vi.

Patent Owner does not present arguments beyond those discussed above with respect to claim 2. Based on the complete record, and for the reasons explained by Petitioner, we are persuaded that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests all the limitations of claim 37.

*12. Dependent Claim 38*

Claim 38 depends directly from claim 37 and further recites substantially the same limitations as dependent claim 4. Petitioner refers back to its analysis for claim 4, and Patent Owner does not present arguments beyond those discussed above with respect to claim 2. Based on the complete record, and for the reasons explained by Petitioner, we are

persuaded that Petitioner has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests all the limitations of claim 38.

*13. Dependent Claims 39–44*

Claims 39–44 depend directly or indirectly from claim 38 and further recite substantially the same limitations as dependent claims 14–19. Ex. 1001, 33:49–34:6. Petitioner refers back to its analysis for claims 14–19 (Pet. 75–76), and Patent Owner does not present arguments beyond those discussed above with respect to claims 14 and 15. Based on the complete record, and for the reasons explained by Petitioner, we are persuaded that Petitioner has shown sufficiently that in the combined system of Kiss and FIPA97, FIPA97 teaches or suggests the limitations of claims 39–44.

*14. Objective Indicia of Nonobviousness*

In determining whether the challenged claims would have been obvious as Petitioner alleges, we must also weigh secondary considerations of nonobviousness, such as commercial success, long-felt but unmet need, failure of others, and unexpected results. *KSR,* 550 U.S. at 406. A nexus is required between the merits of the claimed invention and any objective evidence of nonobviousness if that evidence is to be given substantial weight in reaching a conclusion on obviousness. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983). Evidence of secondary considerations is only significant if there is a nexus with respect to the claimed invention. *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006).

Nexus is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in the determination of nonobviousness. *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392

(Fed. Cir. 1988). For instance, commercial success is relevant if it flows from the merits of the claimed invention. *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988). The burden of showing nexus is on the patent owner. *In re Huang*, 100 F.3d 135, 139–40 (Fed. Cir. 1996). Objective evidence of nonobviousness also must be commensurate in scope with the claims that the evidence is offered to support. *In re Kulling*, 897 F.2d 1147, 1149 (Fed. Cir. 1990).

Patent Owner contends that objective indicia of nonobviousness confirm the nonobviousness of the '560 patent. PO Resp. 140–163. Patent Owner argues that industry praise for a software application known as "Siri," "which was first made available for download to iPhone users on Apple, Inc.'s App Store on February 4, 2010," bears a nexus to the claims of the '560 patent. *Id.* at 142, 163. Patent Owner argues that the "personal context awareness and service delegation 'main technical components' of the Siri application are made possible by the claims of the '560 Patent." *Id.* at 154.

Patent Owner asserts that the '560 patent "was based on SRI International's development of version 2 of the Open Agent Architecture ('OAA')." *Id.* at 153 (citing Ex. 2032, App'x A; Ex. 1001, 23:35–36). For support, Patent Owner relies on Exhibit 2054, an SRI web page, which states, "SRI developed OAA® software, which is designed with intelligent 'agents' that track human interactions and work processes to streamline electronic and computer interchange." *Id.* at 153–54 (quoting Ex. 2054). Patent Owner further asserts that "[a]fter version 2 of OAA was developed, SRI International spun out Siri, Inc. as an SRI venture, where the Siri application was created based on an OAA groundwork." *Id.* at 154 (citing Ex. 2054 ("OAA laid the groundwork for the DARPA-funded CALO

project, from which Siri, the first virtual personal assistant, was born. Siri was spun out into an SRI venture that Apple acquired from SRI.")). Apple Inc. apparently acquired Siri, Inc. in April 2010, approximately two months after the Siri application's initial release.[21] *See id.* at 9, 142, 154.

Patent Owner argues that its "evidence of industry praise . . . satisfies the nexus requirement, as it shows praise for the Siri application's integration of personal context awareness into a service-delegating virtual personal assistant." *Id.* at 154; *see id.* at 143–54. Patent Owner also argues that "industry journalists recognized that the Siri application filled an unmet need for a true virtual personal assistant." *Id.* at 159; *see id.* at 159–63.

To establish a nexus between claim 1 of the '560 patent and the Siri application, Patent Owner provides the chart below. *Id.* at 155–57. Patent Owner relies, in significant part, on the opinion of its declarant, Dr. Medvidovic, to establish a nexus between the Siri application and the claims of the '560 patent. *See* Ex. 2032 ¶¶ 282–290.

[21] We note for the record that the effective filing date for the '560 patent is Jan. 5, 1999, approximately ten years prior to the Siri application's initial release.

| **Siri's Description of Technology Feature** | **Claim 1 of the '560 Patent** |
|---|---|
| **Personal Context Awareness** A virtual assistant gives different answers depending on individual preferences and personal context (place, time, history), and if you give it permission, learns more about you so that it can shorten your time-to-task. Information you teach Siri in one domain (e.g. movies) is applied automatically to opportunities rising from other domains. Any personal information you provide Siri is stored in a highly secure, PCI-compliant co-location center, and used only with your explicit permission to accelerate your task completion. | "wherein the plurality of service-providing electronic agents and the distributed facilitator agent communicate using an interagent Communication Language (ICL), wherein the ICL includes: a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events." |
| **Service Delegation** An assistant can reason about what specific set of resources or services would best be combined to help you | "1. A software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture |

| | |
|---|---|
| accomplish a particular task. Siri's patented service delegation algorithms combine numerous attributes about each service provider, including quality scores, fine-grained ratings for specific capabilities, speed measures, and geographic constraints, to plan and execute an optimized strategy for handling your request. Live data is pulled fresh from source sites and world-changing actions are handled in a transaction-safe manner. For example, in a restaurant selection task, Siri integrates information from many sources (local business directories, geospatial databases, restaurant guides, restaurant review sources, menu sites, online reservation services and the user's own favorites) to show results that meet the user's natural language request. | contemplating a distributed computing system comprising:<br>a plurality of service-providing electronic agents;<br>a distributed facilitator agent functionally distributed across at least two computer processes, the facilitator agent capable of bi-directional communications with the plurality of service-providing electronic agents, the facilitator agent including:<br>an agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the distributed computing environment; and<br>a facilitating engine operable to interpret a service request as a base goal, the facilitating engine further operable for generating a goal satisfaction plan associated with the base goal, wherein the goal satisfaction plan involves:<br>using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and |

| | |
|---|---|
| | using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal; and" |

PO Resp. 155–157.

Patent Owner argues that "the Siri application's integration of personal context awareness is made possible because of the claimed inter-agent language limitations." PO Resp. 157 (citing Ex. 2032 ¶ 288). Patent Owner explains that "[b]y having a layer of conversational protocol that has parameter lists, the ['560 patent] describes how agents can then use the parameters in the parameter lists to provide feedback or advice to agents who directly, or indirectly through the facilitating agent, receive the service request." *Id.* (citing Ex. 1001, 16:15–25). For example, Patent Owner explains that a "requesting agent can utilize such a parameter to provide context on a user's preference to the facilitator agent and/or the tasking agents." *Id.* (citing Ex. 2032 ¶ 290). Patent Owner argues that "[t]his same functionality of being able to account for individual preferences, for example, was described by Siri, Inc. as representing personal context awareness." *Id.* at 158 (citing Ex. 2040, 2).

Patent Owner also argues that:

> the Siri application's service delegation corresponds to the claimed dynamic interpretation limitations. Siri, Inc. described the service delegation feature of the Siri application as including "an assistant [that] can reason about what specific set of resources or services would best be combined to help you

> accomplish a particular task." This is precisely what is claimed in the dynamic interpretation limitations, *e.g.*, "generating a goal satisfaction plan associated with the base goal . . . using reasoning . . . to coordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal."

*Id.* (citing Ex. 2032 ¶ 287).

Petitioner argues that Patent Owner's "secondary considerations position rests primarily on an unsubstantiated, conclusory opinion that certain aspects of the ['560 patent] are embodied in the Apple product 'Siri.'" Pet. Reply 76. Petitioner argues that as "Dr. Medvidovic conceded, the evidence he relied on is 'circumstantial,' or a 'suggestion.'" *Id.* (citing Ex. 1129, 147:12–15). Petitioner argues that Dr. Medvidovic "never reviewed the Siri source code, and indeed never even asked to review that source code." *Id.* (citing Ex. 1129, 146:20–147:6, 147:22–148:9). Petitioner argues,

> [t]he failure to review the code is fatal, because [Dr. Medvidovic] further testified that an "agent"—an element in every claim—is a "piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer a clearly identifiable body of code," and that to distinguish an "agent" from any other software he "would have to look inside the code."

*Id.* (quoting Ex. 1129, 9:14–11:8).

Petitioner faults Patent Owner for "not seek[ing] that code through a motion for additional discovery or other means, [or] seek[ing] any other objective evidence (such as specifications) to support its assertions." *Id.* at 77. Petitioner also faults Patent Owner for not seeking the testimony of Mr. Adam Cheyer, one of the named co-inventor's on the '560 patent and a co-founder of Siri, Inc. *Id.*; *see* PO Resp. 142. During the oral hearing in

this proceeding, counsel for Patent Owner was asked about this potential source of evidence:

> JUDGE TROCK: Counsel, this is Judge Trock again.
>
> Do you have any evidence from Mr. Cheyer that this Siri version that you're discussing right now incorporated the claim limitations of the '115 patent?
>
> MS. ABDULLAH: Your Honor, we do not have any direct evidence from Mr. Cheyer. And the reason is because he was never deposed in this proceeding and he is also not a consultant or anybody that's working with IPA at the moment. I know --
>
> JUDGE TROCK: Wasn't he deposed -- sorry. Wasn't he deposed in the Google proceeding?
>
> MS. ABDULLAH: He was, your Honor. And that was pursuant to a subpoena that we had to get permission to serve from the Board because he refused to simply cooperate with us voluntarily.
>
> JUDGE TROCK: Was there a reason why you didn't approach the Board in this case for a subpoena?
>
> MS. ABDULLAH: Your Honor, because we don't believe that his testimony is as probative as the expert testimony that we presented drawing the direct connection as well as the actual industry praise and long-felt need evidence that we --
>
> JUDGE TROCK: But wouldn't he be a witness

with personal knowledge of whether or not that original Siri version incorporated the claim limitations of the '115 patent?

MS. ABDULLAH: Your Honor, respectfully, I believe that that was not -- that would not be a question of personal knowledge but rather of expert testimony. And also, your Honor, I would note that I don't believe that we would have the requisite showing under the Garmin factors that he would be able to testify to those aspects.

JUDGE TROCK: But he is the inventor, right? You've told us that.

MS. ABDULLAH: Yes, your Honor, he is the inventor.

JUDGE TROCK: All right. So he might be a person -- a witness with personal knowledge; isn't that right?

MS. ABDULLAH: Absolutely. And were this a district court case, you know, I'm sure we would have pursued his deposition. I'm sure Microsoft would have as well. But given the high burden for us to obtain additional discovery, your Honor, we determined that the probative value of his testimony was not such that it would meet the Garmin factors here.

JUDGE TROCK: But you did pursue that in the Google case though?

MS. ABDULLAH: Your Honor, the Google case was a different issue. The question there had to do

> with authorship of a prior art reference that Mr. Cheyer was an author of. And it had to do with whether that could be considered the work of another versus the inventor. So inventorship was front and center in the Google proceedings where it is not here. Here this is a 103 analysis for which, you know, obviously I can't pretend to say what the Board would have done. But I think the evidence that we have, that we have been able to present demonstrates that link better than Mr. Cheyer's testimony would be able to.

Tr. 114:12–116:26.

Petitioner also points to evidence that potentially undermines a nexus between the challenged claims of the ’560 patent and the Siri application. For example, Petitioner argues that “Adam Cheyer testified that ‘Siri’ did not implement the agent registry functionality described in the [’115 and ’560 patents].” Pet. Reply 77–78 (citing Ex. 2034, 46:12–47:5).

Petitioner also argues that Patent Owner’s “evidence credits the CALO project with being the progenitor of the ideas that led to Siri—not any version of OAA.” *Id.* at 78 (citing Ex. 2042, 1 (“Siri traces its origins to a military-funded artificial-intelligence project called CALO”); Ex. 2044, 1; Ex. 2047, 2; Ex. 2054, 1; Ex. 2001, 2). “Nor is there any evidence in the record,” Petitioner argues, “that OAA was ultimately utilized in SRI’s CALO project other than that the original OAA (*i.e.,* the version first created in 1994 prior to the ’560 Patent work) laid ‘groundwork’ for what would ultimately become CALO.” *Id.* (citing Ex. 2054). Petitioner argues that “substantial evidence shows that a later agent system named ‘SPARK’ (SRI Procedural Agent Realization Kit) was used as the basis of CALO,” but that

Patent Owner "ignores this intervening SPARK system and makes no attempt to show it practices the claims, nor does it meaningfully address the CALO project." *Id.* (citing Ex. 1136 § 7).

Petitioner argues that Patent Owner "failed to provide evidence 'that the industry praised a claimed invention or a product that embodies the patent claims.'" *Id.* at 78–79 (quoting *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016)) (emphasis omitted). In particular, Petitioner argues, Patent Owner "failed to 'establish that the evidence relied upon traces its basis to a novel element in the claim and not to something in the prior art.'" *Id.* at 79 (quoting *BioMarin Pharm. Inc. v. Genzyme Therapeutic Prods. LP*, IPR2013-00537, Paper 79 at 22 (PTAB Feb. 23, 2015)) (emphasis omitted).

"Furthermore," Petitioner argues, Patent Owner "has provided no showing that the Siri App 'embodies the claimed features and is co-extensive with them,' and accordingly can gain no presumption from any Siri success." *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)) (emphasis omitted). "Even assuming portions of Siri embodied the claims," Petitioner argues, "the record is undisputed that Siri provides significant functionality well beyond anything covered by the claims—voice recognition, for example." *Id.* at 79–80.

Petitioner further argues "the table provided by [Patent Owner] merely lists unrelated claim language and 'examples' of 'personal context awareness' with no further analysis." *Id.* at 80. "For example," Petitioner argues, Patent Owner "provides no explanation about how the alleged 'Personal Context Awareness' feature in Siri practices 'a layer of conversational protocol.'" *Id.* (emphasis omitted). Moreover, Petitioner argues, "despite claiming that 'the Siri application's integration of personal

context awareness is made possible because of the claimed inter-agent language limitations,' [Patent Owner] provides no evidence." *Id.* at 81. Rather, Petitioner continues, Patent Owner "cites only to a single paragraph of Dr. Medvidovic's declaration, which is itself bare *ipse dixit* and further undermined by his failure to examine the source code or any other descriptive technical materials for Siri." *Id.* (citing Ex. 2032 ¶ 288).

Petitioner argues that Patent Owner's evidence that Siri embodies the ICL limitations of claim 1 "is no better." *Id.* at 81–82 (citing PO Resp. 158). Petitioner argues Patent Owner:

> does not discuss the actual limitations of claim 1 nor explain how giving different answers depending on individual preferences embodies the claims. For example, [Patent Owner] does not even attempt to articulate how Siri has a conversational layer, or event types, or how those event types are refined by parameters. Nor does [Patent Owner] address how Siri embodies the claimed agent registry limitation, particularly when the testimony of the inventor Mr. Cheyer indicates that it does not.

*Id.* at 82 (citing Ex. 2034, 46:12–47:5).

Petitioner also argues that Dr. Medvidovic's testimony should be given no weight. *Id.* Petitioner argues that:

> Dr. Medvidovic admitted that he would be unable to determine whether a piece of software was an "agent" without examining the source code for that software, and further admitted that he had not reviewed the Siri source code nor ever asked to review such source code. Yet, Dr. Medvidovic opines at length that Siri must embody the claims of the ['560 patent] because, for example, "personal context awareness and service delegations are made possible by the functionality claimed in the independent claims of the ['560 patent]"—an opinion without any evidentiary support. Indeed, by Dr. Medvidovic's own admission, he lacks the necessary personal knowledge to opine on the architecture of Siri.

*Id.* at 82–83 (quoting Ex. 2032 ¶ 286) (citing Ex. 1129, 11:9–16).

We agree with Petitioner that Patent Owner does not provide persuasive evidence that the Siri application is reasonably commensurate with the scope of the challenged claims. Patent Owner's cited evidence attempting to tie the Siri application to the limitations of claim 1 relies substantially on the opinion testimony of Dr. Medvidovic (Ex. 2032) and a web.archive.org Internet page (Ex. 2040) Patent Owner identifies as "Siri, Inc., Technology – 'About Siri – Your Virtual Personal Assistant.'" *See* PO Resp. 155–57 (citing Ex. 2032 ¶¶ 282–286, 288; Ex. 2040, 1–2), 174.

We note at the outset that Dr. Medvidovic's opinion does not rely on an examination of the Siri application's source code. During his deposition, Dr. Medvidovic testified as follows:

> [Q] Let me ask you, have you ever reviewed the Siri source code?
>
> [A] I have not.
>
> [Q] So you don't know the details of how Siri is implemented?
>
> [A] Not beyond what I'm stating in the declaration as my sources of information that I'm drawing on.

Ex. 1129, 146:10–17. This is significant because Dr. Medvidovic testified at his deposition that an "agent"—an element in every claim—is a "piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer a clearly identifiable body of code," and that "if there is no accompanying specification language, then we would have to look inside the code [to determine] what kinds of facilities the agent provides." *See id.* at 9:13–11:8. Instead, Dr. Medvidovic testified, the evidence he relied upon to form his opinion is "circumstantial," or a "suggestion." *Id.* at 147:7–148:9.

In Section XII.B of his declaration, "Nexus of Industry Praise to the Independent Claims of the '560 Patent," Dr. Medvidovic cites to Exhibit 2040 as support for his understanding of how the Siri application works. *See e.g.*, Ex. 2032 ¶¶ 281–282, 284, 292, 295.

Exhibit 2040 describes "Siri" as:

> the first mainstream consumer application of a Virtual Personal Assistant. Siri is an intelligent software agent designed to have a back-and-forth conversational interaction with you as it helps you get tasks done. The three main technical components behind Siri's differentiation correspond to the essential qualities of an assistant: a conversational interface, personal context awareness and service delegation.

Ex. 2040, 1.

In his declaration, Dr. Medvidovic discusses the "personal context awareness" and "service delegation" aspects of Siri in some detail. *See, e.g.*, Ex. 2032 ¶¶ 284–286. Dr. Medvidovic, however, only mentions Siri's "conversational interface" in passing, even though Exhibit 2040 describes Siri as an intelligent software agent "designed to have a back-and-forth conversational interaction with you as it helps you get tasks done," and lists Siri's "conversational interface" as the first of Siri's "three main technical components." *See* Ex. 2032 ¶ 281; Ex. 2040, 1.

In his declaration, Dr. Medvidovic attempts to link the Siri application and the limitations of the independent claims of the '560 patent. Dr. Medvidovic does this by first separating the limitations of the independent claims of the '560 patent into two categories, an "Inter-agent Communication Layer" (ICL) and "Service Request Planning and Execution." *See* Ex. 2032 ¶ 287. Dr. Medvidovic then states that "[i]t is my opinion that the Siri application's integration of personal context awareness is made possible because of the claimed ICL limitations above." *Id.* ¶ 288.

Dr. Medvidovic explains that "within the conversational protocol layer of the ICL, there are further claimed 'parameter lists' that may 'further refine the one or more events.'" *Id.* ¶ 289. Dr. Medvidovic concludes that "[t]he claimed parameter lists are what allows the Siri application to provide 'different answers' depending on the context, as they are able to refine the meaning of a service request." *Id.* ¶ 292. Dr. Medvidovic, however, provides no citation or further support for this conclusion, nor does he point to any evidence to show that the Siri application utilizes the claimed parameter lists. *See id.*

In his declaration, Dr. Medvidovic also states that "[i]t is further my opinion that the Siri application's integration of service delegation is made possible because of the claimed service request planning and execution claim limitations." *Id.* ¶ 293. Dr. Medvidovic attempts to support this opinion by comparing the language of claim of the '560 patent to language used in Exhibit 2040 to describe the service delegation feature of the Siri application. *Id.* ¶ 295. The claim language he quotes, however, does not appear in claim 1 (or any claim) of the '560 patent. *See id.* (erroneously asserting that claim 1 recites "a suitable delegation of sub-goal requests to best complete the requested service request by using reasoning"). Thus, Dr. Medvidovic's testimony on this point is unpersuasive with respect to the '560 patent.

Petitioner also points out, and we agree, that there is evidence of record that credits the CALO project with being the progenitor of the ideas that led to Siri. *See, e.g.*, Ex. 2042, 1 ("Siri traces its origins to a military-funded artificial-intelligence project called CALO"); *see also* Ex. 2044, 1; Ex. 2047, 2; Ex. 2054, 1; Ex. 2001, 2. Opus Research explains that "Siri is set apart because it applies the depth of knowledge its founders and software

specialists have built at SRI and elsewhere in creating a 'cognitive assistant that learns and organizes' (CALO)." Ex. 2044, 1. Petitioner points out that there is also evidence of record that indicates a later agent system named "SPARK" was used as the basis of CALO. *See* Pet. Reply 78 (citing Ex. 1136 § 7). The SPARK-based Personal Assistant is described as follows:

> SPARK provides general-purpose agent technology for a range of domains that require reactive task execution. To date, the driving application for SPARK has been the development of an intelligent personal assistant for a high-level knowledge worker. This assistant, called CALO, will be able to perform routine tasks on behalf of its user (e.g., arrange meetings, complete online forms, file email), as well as undertake open-ended processes (e.g., purchasing a computer online), and anticipate future needs of its user.

Ex. 1136 § 7. This evidence, however, does not appear to have been considered or addressed by Dr. Medvidovic. *See* Ex. 2032 ¶¶ 271–295.

We are mindful that objective evidence of nonobviousness need only be "reasonably commensurate with the scope of the claims." *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013). We also bear in mind that "[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process"—the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco*, 851 F.2d at 1392).

Here, Patent Owner relies on industry praise for the Siri application and evidence of an unmet need to establish a nexus between the Siri application and the claimed invention. However, we are concerned that

Patent Owner and its declarant, Dr. Medvidovic, pay little attention to one of the "three main technical components behind Siri's differentiation," the "conversational interface," when evaluating the proffered industry praise. *See* Ex. 2040, 1.

Petitioner argues, and we agree, that "[e]ven assuming portions of Siri embodied the claims, the record is undisputed that Siri provides significant functionality well beyond anything covered by the claims—voice recognition, for example." Pet. Reply 79–80. The impression made by Siri's conversational interface on reviewers is notable. For example, MIT Technology Review explains that with Siri, "[u]sers can type or speak commands in casual sentences, and the software deciphers their intent from the context." Ex. 2042, 1. A reviewer in Opus Research reports: "I've had [Siri] for a couple of days and here are my initial reactions. My overall experience has been quite positive. The quality of voice recognition (powered by the same 'engine' that supports Dragon Dictation and Dragon Search on the iPhone) is quite good." Ex. 2044, 1. Fast Company.Com reports, "Siri, which launches today as a free iPhone app, is a virtual personal assistant that amazingly resembles . . . an actual personal assistant. It understands plain English commands, which can be spoken or typed (e.g. 'Get me tickets to that Matt Damon movie')." Ex. 2045, 2.

Further, The Chronicle of Higher Education explains that Siri "takes a multi-step search process and turns it into one, simple, voice-driven request." Ex. 2046, 2. A USA Today reviewer reported that "[t]here were occasional mistakes in speech recognition, but the overall accuracy [of Siri] was impressive, at least when I spoke slowly and clearly in a quiet environment." Ex. 2047, 2. Spatial Computing Strategy & Research reports that, with Siri, "You ask it to do stuff like 'find me a pizza place near me' or

'tell me the weather in Chicago this weekend,' [w]ith your voice or by typing commands." Ex. 2048, 2. Search Engine Land explains that Siri is "intended to enable you to do more with your voice and your phone in fewer clicks or moves." Ex. 1050, 1. It further explains that "one can speak to Siri in a more natural way. Rather than speaking like a robot and saying 'Open Table' to minimize error, you can say something more elaborate and 'conversational' such as, 'I'd like a reservation tonight around 7:30 at Le Cheval.'" *Id.* at 2.

Each of these reported examples indicate that the reviews Patent Owner relies upon to demonstrate industry praise for the Siri application considered Siri's conversational interface to be a significant part of its functionality. Unfortunately, Patent Owner and Dr. Medvidovic give Siri's conversational functionality little consideration when evaluating the reasons for the "industry praise" used to try and establish a nexus between the Siri application and the claimed invention. *See, e.g.*, Ex. 2032 ¶ 276. Even if the Siri application incorporated some of the functionality of the claimed invention, the evidence of record relied on by Patent Owner shows that the Siri application, and its attendant "industry praise," is not coextensive with the patented invention. Patent Owner does not argue that the Siri application's "conversational interface" is claimed by the '560 patent.

For these reasons, we are not persuaded that Patent Owner's evidence of industry praise for the Siri application, and evidence of an unresolved need, establishes a sufficient nexus between the Siri application and the challenged claims of the '560 patent. If anything, the evidence of record establishes only a weak or vague connection between the Siri application and the claimed invention. Accordingly, we determine that Patent Owner's

secondary considerations evidence does not weigh in favor of nonbviousness.

*15. Conclusion*

Having considered the *Graham* factors, including the scope and content of the prior art, the differences between the prior art and the challenged claims, and the evidence of secondary considerations, we determine that Petitioner has shown by a preponderance of the evidence that claims 1–4, 14–19, 26, and 36–44 of the '560 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss and FIPA97.

*H. Asserted Obviousness over Kiss, FIPA97, and Cohen*

Petitioner adds the teachings of Cohen (Ex. 1014) to the basic combination of Kiss and FIPA97 in an asserted ground of obviousness as to dependent claims 2–4, 14–17, and 39–42. Pet. 76–92. Generally, Petitioner cites Cohen as teaching additional claimed features of facilitator agents. *Id.*

We have reviewed the parties' arguments in the Petition, Patent Owner Response, Reply, and Sur-reply, as well as the relevant evidence discussed in those papers and other record papers, including the declarations of Dr. Lieberman and Dr. Medvidovic. For the reasons that follow, we determine Petitioner has shown by a preponderance of the evidence that claims 2–4, 14–17, and 39–42 are unpatentable as obvious over the combined teachings of Kiss, FIPA97, and Cohen.

*1. Cohen (Ex. 1014)*

Cohen describes SRI International's Open Agent Architecture (OAA), which is mentioned in the '560 patent as a starting point for the subject matter described in the patent. *See* Ex. 1014, 1; Ex. 1001, 4:40–51. Cohen describes an "open agent architecture and accompanying user interface for networked desktop and handheld machines." Ex. 1014, 1 (Abstract).

Cohen's Open Agent Architecture "is a blackboard-based framework allowing individual software 'client' agents to communicate by means of goals posted on a blackboard controlled by a 'Server' process." *Id.* at 2. "The Server is responsible both for storing data that is global to the agents, for identifying agents that can achieve various goals, and for scheduling and maintaining the flow of communication during distributed computation." *Id.*

Cohen's distributed blackboard architecture is depicted in Figure 1 below.




Figure 1: Hierarchy of Blackboard Servers

*Id.* at 3. Cohen's Figure 1, above, shows "an architecture in which a server may itself be a client in a hierarchy of servers." *Id.* at 2. If none of the server's "client agents can solve a particular goal, this goal may be passed further along in the hierarchy." *Id.*

Petitioner cites evidence showing that, among other things, Cohen was published in 1994 in conjunction with the Association for the

Advancement of Artificial Intelligence Spring Symposia that took place in March 1994, was available to conference attendees in March 1994, was received by libraries in 1997 and 1998, and was heavily cited in patents and academic papers between 1994 and 1998. Pet. 25 (citing, e.g., Ex. 1041, i; Ex. 1045; Ex. 1050 ¶¶ 170–173, 175–179). Patent Owner does not dispute Petitioner's contention that Cohen is available as prior art. *See* PO Resp. 57–58. In view of the evidence submitted by Petitioner, we find that Petitioner has demonstrated that Cohen qualifies as prior art to the '560 patent at least under 35 U.S.C. § 102(a).

*2. Proposed Combination of Kiss, FIPA97, and Cohen*

Petitioner argues that Cohen discloses facilitator agent functionality relating to its blackboard server that, when combined with the teachings of Kiss and FIPA97, satisfies the limitations of claims 2–4, 14–17, and 39–42. Pet. 76–78. In Petitioner's proposed combination, Cohen's blackboard functionality would be added to the meta-agent/agent registry in the combined Kiss/FIPA97 system. *Id.* at 78.

Petitioner argues that Cohen is analogous art to Kiss, FIPA97, and the '560 patent because it describes the same OAA architecture as the '560 patent. *Id.* at 77 (citing Ex. 1014, 1; Ex. 1050 ¶¶ 207–208, 331–332). The combination, Petitioner argues,

> would have been the arrangement of old elements (i.e., Blackboard server functionality of Cohen, the functionality of FIPA97, and the system of Kiss) with each performing the same function it had been known to perform (e.g., methods of complex trigger implementation (Cohen); implementing communication between distributed agents (FIPA97); distributed agents conducting cooperative task competition and problem solving (Kiss)) and yielding no more than what one would expect from such an arrangement (a system of

> distributed agents, able to communicate and set triggers to conduct cooperative task completion and problem solving).

*Id.* (citing Ex. 1050 ¶ 333). Petitioner also argues a

> Skilled Artisan would have been motivated to combine Cohen with Kiss/FIPA97 in this manner because Cohen encourages the incorporation of components from other systems and seeks to 'support distributed execution of a user's requests,' as does FIPA97 and Kiss, which would have . . . led a Skilled Artisan to consider these agents-based technologies in combination. Moreover, the Cohen Blackboard server operates as a 'facilitator agent,' as does the meta-agent/agent registry of Kiss/FIPA97, providing additional motivation to combine such similar functionality of these systems in order to achieve the benefits of each.

*Id.* at 77–78 (citing Ex. 1014, 1, 2; Ex. 1005, 3:1–4, 12:21–14:30, Figs. 8–20; Ex. 1006, 6–7; Ex. 1007, vii; Ex. 1050 ¶¶ 328, 334, 589). Petitioner further argues that Cohen discloses several agent characteristics that would have motivated a person of ordinary skill in the art to adopt Cohen's teachings, including delegation capabilities, data-directed execution, communication, reasoning, and planning. *Id.* at 78 (citing Ex. 1014, 1).

With respect to the reason a person of ordinary skill in the art would have combined the teachings of Cohen with those of Kiss and FIPA97, Patent Owner argues that Dr. Lieberman's annotated figures showing that Cohen's blackboard functionality would be added to Kiss's meta-agent demonstrate hindsight bias. *See* PO Resp. 98–99. We disagree with Patent Owner on this point for essentially the same reasons discussed above with respect to the combination of Kiss and FIPA97. *See* § II.G.1. Petitioner provides persuasive evidence that a person of ordinary skill in the art would have had reason to incorporate aspects of Cohen's blackboard server into Kiss's meta-agent as part of a "facilitator agent" and apply Cohen's agent

characteristics to agents in the combined system. *See, e.g.*, Pet. 77–78; Ex. 1050 ¶¶ 328–334.

For these reasons, we find that Petitioner has articulated sufficient reasoning with rational underpinning for why a person of ordinary skill in the art at the time of the invention would have combined the teachings of Kiss, FIPA97, and Cohen in the manner proffered by Petitioner.

*3. Dependent Claim 2*

Claim 2 depends directly from claim 1 and further recites "wherein the distributed facilitator agent includes a plurality of single process facilitator agents each executing within a separate computer process, each of the single process facilitator agents being bi-directionally coupled with at least one other single process facilitator agent." Ex. 1001, 30:24–30. As explained in § II.G.3, we adopt Petitioner's proposed construction of a "single process facilitator agent" as a "facilitator agent executing within a single computer process."

In Petitioner's proposed combination of Cohen with Kiss and FIPA97, the functionality of Cohen's blackboard servers is combined with that of Kiss's meta-agents, so that Cohen's blackboards and Kiss's meta-agents form part of the claimed "distributed facilitator agent." *See* Pet. 78. Petitioner asserts that in Cohen, each blackboard system contains "one blackboard 'server' process, and many client agents," and "the individual client agents communicate with each other by 'means of goals posted on a blackboard controlled by a "Server" process.'" *Id.* at 78–79 (citing Ex. 1014, 2; Ex. 1050 ¶¶ 328–329). Petitioner contends that each blackboard becomes a "single process facilitator agent" in a network of facilitator agents (i.e., a "distributed facilitator agent") because "each blackboard is relegated to a distinct sub-process of the larger distributed

network, and is responsible for matching requests, from users and agents, with descriptions of the capabilities of other agents." *Id.* (citing Ex. 1050 ¶ 330).

Petitioner contends that Cohen's distributed blackboard hierarchy is "distributed over a network" and that each blackboard executes on a different host machine. Pet. 80 (citing Ex. 1014, 2). Petitioner asserts, therefore, that Cohen's blackboard servers communicate and cooperatively solve problems while each is "executing within a separate computer process." *Id.* (citing Ex. 1050 ¶ 340).

Petitioner also contends that each blackboard server in Cohen is able to communicate and interoperate with at least one other server in the hierarchy and propagates a query through the network until an agent capable of solving the goal is found. *Id.* at 81 (citing Ex. 1014, 2). Petitioner contends that this communication is bi-directional because following a query, a solution is routed to the originating blackboard. *Id.* (citing Ex. 1014, 2). Thus, Petitioner contends, Cohen's blackboard servers are single process facilitator agents that are "bi-directionally coupled." *Id.* (citing Ex. 1050 ¶ 347).

Patent Owner argues that Cohen's blackboard system is not a facilitator system. PO Resp. 104. As discussed above, however, Petitioner has shown sufficiently that a person of ordinary skill in the art would have combined Cohen's blackboard functionality with that of Kiss's meta-agents to form part of the claimed distributed facilitator agent. *See* Pet. Reply 42. Patent Owner also argues that Cohen does not disclose separate computer processes. PO Resp. 104 (citing Ex. 2032 ¶ 171). Petitioner persuasively shows, however, that a person of ordinary skill in the art would have understood each blackboard server to represent an independent computer

process. *See* Pet. 79; Pet. Reply 43; Ex. 1050 ¶ 328; *see also* Ex. 1050 ¶ 498 ("Because of their independence and distributed nature a Skilled Artisan would consider each Blackboard server to be a separate computer process.").

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that Cohen, in combination with Kiss and FIPA97, teaches or suggests a plurality of single process facilitator agents, each executing within a separate computer process and bi-directionally coupled with at least one other single process facilitator agent, as recited in claim 2.

*4. Dependent Claim 3*

As noted previously, claim 3 depends from claim 2 and further recites:

> a specific single process facilitator including:
>
> a specific agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the process wherein the specific single process is executing, the specific agent registry further declaring capabilities made available to the specific single process facilitator agent through the at least one other single process facilitator agent bi-directionally coupled with the specific single process facilitator agent; and
>
> a specific facilitating engine operable to interpret a service request as a base goal, the specific facilitating engine further operable to determine sub goals required to complete the base goal; the specific facilitating engine further operable to select service providing agents best capable of completing the sub goal and assigning the sub goals thereto.

Ex. 1001, 3:36–51.

Petitioner contends that Cohen in combination with Kiss and FIPA97 teaches or suggestions the "specific agent registry" and "specific facilitating engine" limitations of claim 3. First, Petitioner contends that Cohen teaches

as part of new agent registration, a client library "provides methods for defining an agent's capabilities (used by the blackboard to determine when this agent should participate in the solving of a subgoal)." Pet. 82 (quoting Ex. 1014, 2). Petitioner argues that such methods are functionally the same as an agent registry because they facilitate identification of agents in the process and delegation of subgoals to appropriate agents. *Id.* Further, Petitioner contends it would have been obvious to implement this functionality as an agent registry in the combination of Cohen with Kiss and FIPA97 to make available the agent registrations of those agents active within the process. *Id.* (citing Ex. 1050 ¶ 358).

Petitioner contends that this functionality in Cohen records the agents "currently active within the process wherein the specific single process is executing," as recited in claim 3. Specifically, Petitioner asserts that each blackboard server "maintains a knowledge base of the predicates that its lower level blackboards can evaluate." Pet. 83 (quoting Ex. 1014, 2). During query processing, a goal may be posted to a local blackboard (i.e., "the specific single process") that checks whether any of its child agents has the capabilities to achieve the goal. *Id.* (citing Ex. 1014, 2). If not, then it propagates the goal to a more senior blackboard server. *Id.* (citing Ex. 1014, 2). Petitioner contends a person of ordinary skill in the art would have recognized this functionality as agent registry functionality within a specialized domain, limited to only those agents active within the "specific single process." *Id.* (citing Ex. 1050 ¶ 359).

Petitioner asserts that Cohen discloses that a higher level blackboard server "maintains a knowledge base of the predicates that its lower level blackboards can evaluate" (i.e., "capabilities for each of the plurality of service-providing electronic agents," as recited in claim 3). Pet. 83 (citing

Ex. 1014, 2). Petitioner contends that the disclosed "knowledge base" is an agent registry of all agents accessible to the higher level blackboard and it would have been obvious for a blackboard (i.e., a single process facilitator agent) to access the agent registry via a bi-directional communication channel. *Id.* at 84 (citing Ex. 1050 ¶ 363).

Turning to the "facilitating engine" limitation, Petitioner contends that the blackboard servers of Cohen in combination with Kiss and FIPA97 contain a facilitating engine that can "determine sub goals required to complete the base goal" and "select service providing agents best capable of completing the sub goal and assigning the sub goals thereto." Pet. 84–85 (citing Ex. 1014, 2, 4; Ex. 1050 ¶¶ 368, 371). In particular, Petitioner argues, Cohen explains that "[t]he primary job of the Server is to decompose ICL expressions and route them to agents who have indicated a capability in resolving them." *Id.* at 84 (quoting Ex. 1014, 2). Petitioner further contends that Cohen's agents are "service-providing agents" because they provide services, such as mail, database, and telephone services. *Id.* at 85 (citing Ex. 1014, 4).

Patent Owner does not specifically dispute that the combination of Cohen with Kiss and FIPA97 teaches or suggestions the limitations of claim 3 beyond its arguments advanced with respect to claim 2 discussed above. *See* PO Resp. 104. Based on the complete record, and for the reasons explained by Petitioner, we determine that Petitioner has demonstrated sufficiently that the combination of Cohen with Kiss and FIPA97 teaches or suggests all the limitations of claim 3.

*5. Dependent Claim 4*

Claim 4 depends directly from claim 3 and further recites "wherein at least two of the plurality of single process facilitator agents reside upon

separate computer systems." Ex. 1001, 30:53–55. Petitioner contends that Cohen teaches this limitation for the same reasons it teaches "a plurality of single process facilitator agents each executing within a separate computer process," as recited in claim 2. Pet. 85.

Patent Owner does not specifically dispute that the combination of Cohen with Kiss and FIPA97 teaches or suggestions the limitations of claim 4 beyond its arguments advanced with respect to claim 2 discussed above. *See* PO Resp. 104. Based on the complete record, and for the reasons explained by Petitioner, we determine that Petitioner has demonstrated sufficiently that the combination of Cohen with Kiss and FIPA97 teaches or suggests all the limitations of claim 4.

*6. Dependent Claim 14*

Claim 14 depends from claim 1 and further recites "wherein the distributed facilitator agent is formed in a hierarchical topology." Ex. 1001, 31:24–26. Petitioner contends that Cohen teaches a series of blackboard servers (i.e., a "distributor facilitator agent") that can be structured in a hierarchy distributed over a network (i.e., "formed in a hierarchical topology").

Patent Owner argues that Cohen's blackboard system is not a facilitator system. PO Resp. 110. As discussed above, however, Petitioner has shown sufficiently that a person of ordinary skill in the art would have combined Cohen's blackboard functionality with that of Kiss's meta-agents to form part of the claimed distributed facilitator agent. *See* Pet. Reply 54.

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that Cohen, in combination with Kiss and FIPA97, teaches or suggests a distributed facilitator agent "formed in a hierarchical topology," as recited in claim 14.

*7. Dependent Claim 15*

As noted previously, claim 15 depends from claim 14 and further recites:

> wherein the hierarchical topology includes a top level facilitator agent and at least one other facilitator agent registered within the top level facilitator agent, the top level facilitator agent operable to directly manage those service-providing agents registered within the top level facilitator agent and indirectly manage those service-providing agents registered within the at least one other agent registered with the top level facilitator agent.

*Id.* at 31:27–35.

With reference to Cohen's Figure 1, reproduced in § II.H.1, Petitioner contends that any of blackboard servers BB4, BB5, and BB6 is a "top level facilitator agent" because it manages collections of both client agents and other facilitators (e.g., BB5 manages BB4 and BB6, which themselves manage BB1–BB3 and BB7–BB9). Pet. 86 (citing Ex. 1050 ¶ 465). Petitioner contends that lower level agents (e.g., BB1–BB4 and BB6–BB9) are "at least one other facilitator agent registered within the top level facilitator agent." *Id.* (citing Ex. 1050 ¶ 466).

Petitioner argues that Cohen teaches a "top level facilitator" (e.g., BB4 in an example provided in Cohen) that is capable of "directly manag[ing] those service-providing agents registered within the top level facilitator agent." *Id.* at 87. Specifically, Petitioner points out that when a blackboard server receives a goal, it first determines whether a client agent (i.e., one of its local collection of "service-providing agents") can satisfy the goal. *Id.* at 87–88 (citing Ex. 1014, 2). Thus, Petitioner argues, Cohen teaches a "top level facilitator agent operable to directly manage those

service-providing agents registered within the top level facilitator agent." *Id.* at 88 (citing Ex. 1014, 2; Ex. 1050 ¶ 471).

Petitioner also contends that Cohen teaches a "top level facilitator" that "indirectly manage[s] those service-providing agents registered within the at least one other agent registered with the top level facilitator agent." *Id.* (citing Ex. 1014, 2). Petitioner contends that each blackboard in Cohen maintains a knowledge base of the predicates its lower level blackboards can evaluate. *Id.* (citing Ex. 1014, 2). When a blackboard (e.g., BB4) determines that a subsidiary server (e.g., BB1) can handle a request, it will delegate the request to the server, which then delegates it to a client agent. *Id.* (citing Ex. 1014, 2). In this way, Petitioner argues, BB4 "indirectly manages" BB1's client agents, which are "service-providing agents registered with the at least one other agent" (i.e., BB1). *Id.* (citing Ex. 1014, 2; Ex. 1050 ¶ 473).

Patent Owner argues there is no evidence in Cohen of a "top level facilitator" that is able to manage agents registered through another facilitator agent. PO Resp. 110 (citing Ex. 2032 ¶ 194). Instead, Patent Owner argues, Cohen "describes how the goal is essentially passed from server to server in hopes that it hits upon a server that has agents registered that will be able to complete the goal." *Id.* (citing Ex. 1014, 2).

In its Reply, Petitioner argues that each blackboard maintains a knowledge base of the predicates its lower level blackboards can evaluate, and when the goal is at the top of the hierarchy in Cohen's Figure 1, BB5 has a larger knowledge base of predicates and can respond to a request by propagating it down to its subsidiary servers. Pet. Reply 54 (citing Ex. 1014, 2). Therefore, Petitioner contends, at least BB5 is a top level facilitator agent that manages subsidiary servers and client agents. *Id.*

(citing Ex. 1014, 2); *see* Pet. 86 (identifying BB5 as a top level facilitator). We are persuaded by Petitioner's argument that BB5 in Cohen teaches a "top level facilitator agent" capable of indirectly managing another facilitator's agents as claimed. Patent Owner does not further address Petitioner's contentions regarding Cohen in its Sur-reply. *See generally* PO Sur-reply.

Based on the foregoing and upon considering the complete record, we determine that Petitioner has shown sufficiently that Cohen, in combination with Kiss and FIPA97, teaches or suggests a "top level facilitator agent" meeting the limitations of claim 15.

*8. Dependent Claims 16 and 17*

Claims 16 and 17 each depend directly from claim 15 and place further limitations on the "top level facilitator agent" or the "at least one other facilitator agent." Ex. 1001, 31:36–42. Petitioner contends that Cohen teaches these limitations in the combined system of Cohen with Kiss and FIPA97. Pet. 88–90.

Claim 16 requires the "top level facilitator agent" and the "at least one other facilitator agent" to be "executing on different computer systems." Ex. 1001, 31:36–39. Petitioner asserts that Cohen's blackboard servers, executing on distinct host machines, are "executing on different computer systems." Pet. 89–90 (citing Ex. 1014, 2; Ex. 1050 ¶ 478).

Claim 17 requires the "other facilitator agent" to be "installed for a specific computer user." Ex. 1001, 31:40–42. Petitioner contends that a person of ordinary skill in the art would have been motivated to combine Cohen's mail management system with Kiss and FIPA97 and install it for a specific computer user because Cohen's mail management system includes a

single blackboard server personalized to a particular user. Pet. 90 (citing Ex. 1014, 4–5; Ex. 1050 ¶ 484).

Patent Owner does not specifically dispute that Cohen teaches or suggests the limitations of claims 16 and 17 beyond its arguments advanced with respect to claims 14 and 15 discussed above. *See* PO Resp. 110. Based on the complete record, and for the reasons explained by Petitioner, we determine that Petitioner has demonstrated sufficiently that Cohen, in combination with Kiss and FIPA97, teaches or suggests the additional limitations of claims 16 and 17.

*9. Dependent Claims 39–42*

Claims 39–42 depend directly or indirectly from claim 38 and further recite substantially the same limitations as dependent claims 14–17. Ex. 1001, 33:49–65. Petitioner refers back to its analysis for claims 14–17 (Pet. 91–92), and Patent Owner does not present arguments beyond those discussed above with respect to claims 14 and 15. Based on the complete record, and for the reasons explained by Petitioner, we are persuaded that Petitioner has shown sufficiently that Cohen, in combination with Kiss and FIPA97, teaches or suggests the limitations of claims 39–42.

*10. Conclusion*

Having considered the *Graham* factors, including the scope and content of the prior art, the differences between the prior art and the challenged claims, and the evidence of secondary considerations (*see* § II.G.14), we determine that Petitioner has shown by a preponderance of the evidence that claims 2–4, 14–17, and 39–42 of the ’560 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kiss, FIPA97, and Cohen.

*I. Patent Owner's Motion to Exclude*

Patent Owner filed a Motion to Exclude Exhibits 1127, 1137, 1141, 1145, 2034, and a portion of Exhibit 1129. PO Mot. 1–11. We address each of these exhibits below.

*1. Exhibit 1129*

Exhibit 1129 is the deposition transcript of Patent Owner's expert Dr. Medvidovic, taken on May 19, 2020. Patent Owner seeks to exclude Petitioner's reliance "on portions of Dr. Medvidovic's deposition testimony that should be excluded because the question on which the testimony is based is vague, ambiguous, confusing, lacks foundation and calls for a legal conclusion. And any testimony elicited from this improper question is irrelevant, prejudicial, and misleading." *Id.* at 8.

In particular, Patent Owner seeks to exclude lines 53:19–54:21 of Exhibit 1129, which read as follows:

> Q: If that's true, then it's your opinion these three things, these three types of processing are required to teach '115's facilitator, correct?
>
> MS. ABDULLAH: Objection.
>
> BY THE WITNESS:
>
> A: I think that the authors of the patent, the inventors were very careful to specify that this is is an embodiment. It's a preferred embodiment. There are other embodiments that they discuss. For this particular embodiment that deals with compound goals, delegation, optimization and interpretation are preferably involved. So this is the preferred embodiment. This is a legal thing, not a technical thing. What a preferred embodiment is, that's something that appears in patents, pretty much every patent I've ever read, software patent, anyway. It is something that has a particular meaning. So if you want to handle compound goals, you need to have three types of processing preferably, delegation, optimization and interpretation. So it is my opinion that anybody who tries or, sorry, anybody who is

> claiming, purporting to be solving the same kinds of problems needs to show an embodiment that matches those three.

Ex. 1129, 53:19–54:21.

Patent Owner argues that Petitioner "attempts to use this improper testimony to support its incorrect conclusion that 'delegation, optimization, and interpretation' are 'functionalities [] related to a preferred embodiment, so they are not relevant to the claims.'" PO Mot. 9–10 (citing Ex. 1001, 19:26–29; Ex. 1129, 54:2–9; Pet. Reply 28). Patent Owner argues that Petitioner's "question was vague, ambiguous, confusing, lacked foundation and called for a legal conclusion." *Id.* at 10. Patent Owner also argues "the testimony is irrelevant, prejudicial, and misleading." *Id.*

Petitioner opposes the motion, arguing that the testimony is admissible and that Petitioner's counsel "failed to object to this question with sufficient specificity at the appropriate time." Pet. Opp. to Mot. 13 (citing PTAB Consolidated Trial Practice Guide, 128 (Nov. 2019) ("An objection must be stated concisely in a non-argumentative and non-suggestive manner . . . .")). Petitioner points out that Patent Owner's counsel "only said 'Objection' but failed to indicate what type of objection—*i.e.*, form, relevance, etc." *Id.* Petitioner argues that for the first time, Patent Owner "now attempts to assert multiple grounds for exclusion which were not previously raised—objections which it has waived." *Id.* "Furthermore," Petitioner argues, Patent Owner "does not explain how the question is "vague, ambiguous, and confusing," and that "summarily saying it is without more is insufficient to challenge admissibility." *Id.* (citing 37 C.F.R. § 42.20 (c); *Samsung Elecs. Am., Inc. v. Uniloc 2017 LLC*, IPR2017-01798, Paper 32 at 103 (PTAB Jan. 31, 2019)).

Petitioner also points out that:

> the party proffering a witness for cross-examination has the opportunity to conduct redirect examination of the witness immediately following the cross-examination to cure any perceived deficiency or to provide a more complete answer. Here, IPA did not avail themselves of this opportunity.

*Id.* at 14 (citing 37 CFR § 42.53(c)(2); *CBS Interactive Inc. v. Helferich Patent Licensing, LLC*, IPR2013-00033, Paper 101 (Oct. 7, 2013); *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, IPR2012-00001, Paper 50 (July 18, 2013); Ex. 1129, 164:15–16 (MS. ABDULLAH: IPA does not have any redirect.)).

In its Reply, Patent Owner argues "[t]he vague, ambiguous, confusing, lack of foundation, and legal conclusion nature of questions asked by Microsoft's counsel in Exhibit 1129 is clear both on its face and by Dr. Medvidovic's deposition response," and that "[Patent Owner's] counsel properly and timely objected." PO Mot. Reply 5.

We are not persuaded by Patent Owner's arguments that Dr. Medvidovic's testimony should be excluded from evidence in this proceeding. Although Patent Owner's counsel did state the word "Objection" in response to Petitioner's question to Dr. Medvidovic, Patent Owner's counsel did not state the nature of objection, thus depriving Petitioner's counsel of the opportunity to cure the objection by rephrasing the question.

In its Motion to Exclude, Patent Owner now takes the position that the question is "vague, ambiguous, confusing, lacks foundation and calls for a legal conclusion." PO Mot. 8. Patent Owner, however, does not explain adequately how the question is vague, ambiguous or confusing, other than to state that "Dr. Medvidovic['s] testimony highlights the vague, ambiguous, and confusing nature of Microsoft's question." *Id.* at 8. Nor does Patent

Owner explain adequately how the question lacks foundation or calls for a legal conclusion aside from pointing to Dr. Medvidovic's response that "[t]his is a legal thing, not a technical thing" in reference to the term "preferred embodiment." *Id.* at 9.

Patent Owner also argues that Dr. Medvidovic's response to the question is "irrelevant, prejudicial, and misleading." *Id.* at 8. Dr. Medvidovic's testimony, however, concerns his understanding of a preferred embodiment described in the '115 patent (and the '560 patent) and his opinion of whether the prior art, particularly Kiss, teaches a "facilitator." *See, e.g.*, Ex. 1129, 52:15–54:21. We find it difficult to see how Dr. Medvidovic's testimony is "irrelevant," since it goes to his understanding of the challenged patent, the asserted prior art, and the nature of his opinion in this proceeding.

It is also relevant to note, as Petitioner points out, that Patent Owner's counsel had "the opportunity to conduct redirect examination of the witness immediately following the cross-examination to cure any perceived deficiency or to provide a more complete answer." Pet. Opp. to Mot. 13. Patent Owner's counsel, however, declined to redirect any questions to Dr. Medvidovic. *See* Ex. 1129, 164:15–16.

As for Dr. Medvidovic's testimony being prejudicial or misleading, the Board, sitting as a non-jury tribunal with particular administrative and technical expertise, is not as vulnerable to being misled or prejudiced as a jury might, and is well-positioned to determine and assign appropriate credibility and weight to the evidence presented at trial, without resorting to a formal exclusion of evidence that might later be held to be reversible error. *See, e.g.*, *Liberty Mut. Ins. Co. v Progressive Cas. Ins. Co.*, CBM2012-

00002, Paper 66 at 70 (PTAB Jan. 23, 2014); *Gnosis S.P.A. v. S. Alabama Med. Sci. Found.*„ IPR2013-00118, Paper 64 at 43 (PTAB June 20, 2014).

For these reasons, we deny Patent Owner's Motion to Exclude the identified testimony of Dr. Medvidovic.

*2. Exhibit 2034*

Patent Owner moves to exclude portions of Exhibit 2034, the transcript of a deposition of Mr. Adam Cheyer taken in a set of different proceedings involving the '560 patent and '115 patent, *Google LLC v. IPA Technologies Inc.*, including IPR2019-00728, IPR2019-00730, and IPR2019-00731. *See* PO Mot. 10–11. Specifically, Patent Owner seeks to exclude portions of Mr. Cheyer's cross-examination testimony (Ex. 2034, 46:12–47:5, 58:15–63:16) as beyond the scope of his direct testimony in those proceedings. PO Mot. 10–11.

Petitioner argues that Patent Owner never objected in this proceeding to Exhibit 2034, an exhibit submitted by Patent Owner itself to support its arguments. Pet. Opp. to Mot. 14. Petitioner argues that Patent Owner did not make any objections to the testimony on the record in this proceeding and therefore its argument is waived. *Id.* at 14–15. Petitioner also argues that Patent Owner has not explained why the portions it seeks to exclude were outside the scope of direct testimony. *Id.* at 15.

We agree with Petitioner that Patent Owner's motion summarily asserts that the portions of testimony it seeks to exclude are outside the scope of Mr. Cheyer's direct testimony without sufficient explanation. *See id.*; PO Mot. 10–11. Although Patent Owner identifies the topics addressed in those portions, the motion provides no details regarding the scope of direct testimony in a deposition that was taken in a different proceeding. PO Mot. 11. Thus, we are unable to determine whether Mr. Cheyer's cross-

examination testimony was beyond the scope of his direct testimony, and Patent Owner has not shown it is entitled to the requested relief. *See* 37 C.F.R. § 42.20(c).

For at least this reason, we deny Patent Owner's Motion to Exclude the identified deposition testimony of Mr. Cheyer.

*3. Exhibits 1127, 1137, 1141, and 1145*

Patent Owner moves to exclude Exhibit 1127 as irrelevant, prejudicial, misleading, and outside the scope of direct examination. PO Mot. 1–4. Patent Owner moves to exclude Exhibit 1137 on hearsay, lack of authentication, misleading, undue prejudice, and lack of relevance grounds. *Id.* at 4–6. Patent Owner moves to Exclude Exhibits 1141 and 1145 on grounds of hearsay, lack of authentication, and lack of relevance. *Id.* at 6–8. Because we do not rely on the cited evidence in this Final Written Decision, we dismiss Petitioner's Motion to Exclude Exhibits 1127, 1137, 1141, and 1145 as moot.

*J. Constitutional Challenges*

Patent Owner raises two constitutional challenges. First, Patent Owner argues that subjecting a pre-AIA patent, such as the '560 patent, retroactively to *inter partes* review violates the Takings and Due Process Clauses of the Fifth Amendment. PO Resp. 164. Second, Patent Owner asserts that *inter partes* reviews violate the Appointments Clause of the U.S. Constitution when conducted by administrative patent judges not nominated by the President and confirmed by the Senate. *Id.*

Addressing first Patent Owner's Appointments Clause challenge, we are bound by the Federal Circuit's decision in *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019), *cert. granted sub nom. United States v. Arthrex, Inc.*, 2020 WL 6037206 (Oct. 13, 2020), which addressed

this issue. *See* 941 F.3d at 1337 ("This as-applied severance . . . cures the constitutional violation."); *see also Arthrex, Inc. v. Smith & Nephew, Inc.*, 953 F.3d 760, 764 (Fed. Cir. 2020) (Moore, J., concurring in denial of rehearing) ("Because the APJs were constitutionally appointed as of the implementation of the severance, *inter partes* review decisions going forward were no longer rendered by unconstitutional panels."). Accordingly, we do not consider this issue any further.

With regard to the Takings and Due Process Clause challenge, we note that challenges to retroactive application of IPRs to pre-AIA patents have been addressed by the Federal Circuit in *Celgene Corp. v. Peter*, 931 F.3d 1342, 1357–1363 (Fed. Cir. 2019), *cert. denied* 2020 WL 3405867 (June 22, 2020) (Takings Clause), and *Sound View Innovations, LLC v. Hulu, LLC*, Nos. 2019-1865, 2019-1867, 2020 WL 3583556, *3 (Fed. Cir. July 2, 2020) (non-precedential) (Due Process Clause). Accordingly, we do not consider this issue any further.

## III. CONCLUSION

For the foregoing reasons, we determine Petitioner has shown by a preponderance of the evidence that claims 1–4, 14–19, 26, and 36–44 of the '560 patent are unpatentable. The chart below summarizes our conclusions:

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–4, 14–19, 26, 36–44 | 103(a) | Kiss, FIPA97 | 1–4, 14–19, 26, 36–44 | |
| 2–4, 14–17, 39–42 | 103(a) | Kiss, FIPA97, Cohen | 2–4, 14–17, 39–42 | |
| **Overall Outcome** | | | 1–4, 14–19, 26, 36–44 | |

## IV. ORDER

Accordingly, it is

ORDERED that claims 1–4, 14–19, 26, and 36–44 of the ’560 patent have been shown to be unpatentable;

FURTHER ORDERED that Patent Owner’s Motion to Exclude is denied in part and dismissed in part; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Joseph A. Micallef
Scott M. Border
SIDLEY AUSTIN LLP
jmicallef@sidley.com
sborder@sidley.com

PATENT OWNER:

Steven W. Hartsell
Alexander E. Gasser
Sarah E. Spires
SKIERMONT DERBY LLP
shartsell@skiermontderby.com
agasser@skiermontderby.com
sspires@skiermontderby.com

US006851115B1

(12) **United States Patent**
**Cheyer et al.**

(10) **Patent No.: US 6,851,115 B1**
(45) **Date of Patent: Feb. 1, 2005**

(54) **SOFTWARE-BASED ARCHITECTURE FOR COMMUNICATION AND COOPERATION AMONG DISTRIBUTED ELECTRONIC AGENTS**

(75) Inventors: **Adam J. Cheyer**, Palo Alto, CA (US); **David L. Martin**, Santa Clara, CA (US)

(73) Assignee: **SRI International**, Menlo Park, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/225,198**

(22) Filed: **Jan. 5, 1999**

(51) **Int. Cl.**[7] .................................................. **G06F 9/54**
(52) **U.S. Cl.** ........................ **719/317**; 709/202; 717/114
(58) **Field of Search** .......................... 719/317; 709/202, 709/207, 317; 717/114

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,638,494 | A | * | 6/1997 | Pinard et al. | 709/202 |
| 5,802,396 | A | * | 9/1998 | Gray | 710/20 |
| 5,960,404 | A | * | 9/1999 | Chaar et al. | 705/11 |
| 6,047,053 | A | | 4/2000 | Miner et al. | |
| 6,212,649 | B1 | * | 4/2001 | Yalowitz et al. | 714/31 |
| 6,216,173 | B1 | * | 4/2001 | Jones et al. | 135/77 |
| 6,256,771 | B1 | | 7/2001 | O'Neil et al. | |
| 6,338,081 | B1 | * | 1/2002 | Furusawa et al. | 709/202 |
| 6,411,684 | B1 | | 6/2002 | Cohn et al. | |
| 6,484,155 | B1 | * | 11/2002 | Kiss et al. | 706/46 |
| 2001/0039562 | A1 | * | 11/2001 | Sato | 709/202 |
| 2003/0167247 | A1 | * | 9/2003 | Masuoka | 706/46 |

OTHER PUBLICATIONS

Cheyer, Adam. "Mechanisms of Cooperation." Oct. 19, 1998.*

DeVoe, Deborah. "SRI distributed agents promise flexibility." InfoWorld. Dec. 30, 1996.*

Sycara, Katia et al. "Distributed Intelligent Agents." IEEE. Dec. 1996.*

Nwana, Hyacinth et al. "Software Agent Technologies". BT Technology Journal. 1996.*

Busetta, Paolo et al. "The BDIM Agent Toolkit Design." 1997.*

Mayfield, James et al. "Desiderata for Agent Communication Languages." Mar. 27–29, 1995.*

Khedro, Taha et al. Concurrent Endineering through Interoperable Software Agents. Aug. 1994.*

Moran et al. "Multimodal User Interfaces in the Open Agent Architecture." Proceedings of the International Conference on Intelligent User Interfaces. 6–9/1997.*

Martin, David et al. "The Open Agent Architecture: A Framework for Building Distributed Software Systems." Oct. 19, 1998.*

Wilkins, David et al. "Multiagent Planning Architecture." SRI International. Dec. 8, 1997.*

Moran, Douglas B. and Cheyer, Adam J., "Intelligent Agent–based User Interfaces", Article Intelligence center, SRI International.

Martin, David L., Cheyer, Adam J. and Moran, Douglas B., "Building Distributed Software Systems with the Open Agent Architecture".

(List continued on next page.)

*Primary Examiner*—Lewis A. Bullock, Jr.
(74) *Attorney, Agent, or Firm*—Perkins Coie LLP

(57) **ABSTRACT**

A highly flexible, software-based architecture is disclosed for constructing distributed systems. The architecture supports cooperative task completion by flexible and autonomous electronic agents. One or more facilitators are used to broker communication and cooperation among the agents. The architecture provides for the construction of arbitrarily complex goals by users and service-requesting agents. Additional features include agent-based provision of multi modal interfaces, including natural language.

**89 Claims, 16 Drawing Sheets**



OTHER PUBLICATIONS

Cohen, Philip R. and Cheyer, Adam, SRI International, Wang, Michelle, Stanford University, BAEG, Soon Cheol, ETRI, "An Open Agent Architecture".

Julia, Luc E. and Cheyer, Adam J., SRI International "Cooperative Agents and Recognition Systems (CARS) for Drivers and Passengers".

Moran, Douglas B., Cheyer, Adam J., Julia, Luc E., Martin, David L., SRI International, and Park, Sangkyu, Electronics and Telecommunications Research Institute, "Multimodal User Interfaces in the Open Agent Architecture".

Cheyer, Adam and Lulia, Luc, SRI International "Multimodal Maps: An Agent–based Approach".

Cutkosky, Mark R., Engelmore, Robert S., Fikes, Richard E., Genesereth, Michael R., Gruber, Thomas R., Stanford University, Mark, William, Lockheed Palo Alto Research Labs, Tenenbaum, Jay M., Weber, Jay C., Enterprise Integration Technologies, "An Experiment in Integrating Concurrent Engineering Systems".

Martin, David L., Cheyer, Adam, SRI International, LEE, Gowang–Lo, ETRI, "Development Tools for the Open Agent Architecture", The Practical Application of Intelligent Agents and Multi–Agent Technology (PAAM96), London, Apr. 1996.

Cheyer, Adam, Martin, David and Moran, Douglas, "The Open Agent architecture™", SRI International, AI Center.

Dejima, Inc., http://www.dejima.com/.

Cohen, Philip R, Cheyer, Adam, Wang, Michelle, Stanford University, BAEG, Soon Cheol ETRI: "An Open Agent Architecture," AAAI Spring Symposium, pp. 1–8, Mar. 1994.

Martin, David; Oohama, Hiroki; Moran, Douglas; Cheyer, Adam; "Information Brokering in an Agent Architecture," Proceeding of the 2nd International Conference on Practical Application of Intelligent Agents & Multi–Agent Technology, London, Apr. 1997.

* cited by examiner




Fig. 1
(Prior Art)




Fig. 2
(Prior Art)


300
310
Facilitator Agent
Agent
320
Agent
320
Agent
320
Agent
320
Agent
320
Agent
320
Agent
320
Agent
320
Agent
320
Agent
320

Fig. 3


400
402
Facilitator Agent
416
Registry
418
Interagent Communication Language (ICL)
User Interface Agent
NL to ICL Agent
Application Agent
Meta Agent
408
410
404
406
API
Application
412
Modality Agents
414

Fig. 4


Open Agent Architecture
CHEYER
Addresses
16:19
MAIL
ADAM CHEYER
Connected to server. Agents are now active. Adam Cheyer
When mail arrives for me about "security" get it to me by telephone.
Do It

Fig. 5


FACILITATOR AGENT
402
Fax Agent
Printer Agent
1204
Telephone Agent
452
Text To Speech Agent
454
Database Agent
450
Calender Agent
432
Web Agent
Notify Agent
446
Electronic Mail Agent
442
User Preferences
448
424
Natural Language Parser Agent
426
Speaker ID Agent
1202
Gen-NL Agent
Voicemail Agent
Speech Recognition Agent
408
User Interface Agents
438
420

Fig. 6


Agent Registry
702
Symbolic Name
704
Unique Address
706
Capability Declarations
708
Data Declarations
710
Trigger Declarations
712
Task Declarations
714
Process Characteristics (Machine Type Language, etc.
716
Global Persistent Database
720
700

Fig. 7



Start Agent Registration
800
Installer Invokes New Client Agent
802
System Instantiates New Client Agent
804
Facilitator And New Client Agent Establish Communications Link
806
Client Agent Transmits Profile To Facilitator
808
Facilitator Registers Client Agent
810
Cone
812


Fig. 8


Start
900
Determine A Goal
902
Construct Goal Into ICL
904
Transmit Goal To Parent Facilitator
906
Receive Results
908
Done
910

Fig. 9


Start
1000
Receive Request For Service
1002
Parse Request For Request
1004
No
Service Available?
1006
Yes
Return Status Report
1008
Perform Service
1010
Return Results And/Or Status Report
1012
Done
1014

Fig. 10



Start
1100
Receive Goal Request
1102
Parse And Interpret Goal Request
1104
Construct Goal Satisfaction Plan
1106
Determine Required Sub-Goals
1108
Select Agents Suitable For Performing Required Sub-Goals
1110
Transmit Requests To Selected Agents
1112
Receive Results
1114
No
Original Goal Completed?
1116
Yes
Return Results
1118
Done
1120


Fig. 11


FACILITATOR AGENT
402
Fax Agent
Printer Agent
1204
452
Telephone Agent
454
Text To Speech Agent
450
Database Agent
432
Calender Agent
Web Agent
446
Notify Agent
442
Electronic Mail Agent
448
User Preferences
Natural Language Parser Agent
426
1202
Speaker ID Agent
Gen-NL Agent
Voicemail Agent
Speech Recognition Agent
408
User Interface Agents
420

Fig. 12



[San Francisco, CA:12]
File Edit Action Collaboration Window Help
STOP
[San Francisco, CA:12]
Atherton
Menlo Park
Historic Tree
Stanford University
[San Francisco, CA:12]
San Francisco Bay
Pier 48
North Beach
Chinatown
comfort


Fig. 13


1400
1402
1404
Facilitator Agent 1
Facilitator Agent 2
Agent
Agent
Agent
Agent
1406
1408
1410
1412

Fig. 14


1500
1502
Facilitator
1508
1506
1504
Facilitator
Facilitator
1512
1516
1510
1514

Fig. 15


1600
Replicated
1616
1614
1618
1604
Registry &
Planner
1610
Agent
E
1612

Figure 16

# SOFTWARE-BASED ARCHITECTURE FOR COMMUNICATION AND COOPERATION AMONG DISTRIBUTED ELECTRONIC AGENTS

A compact disk containing a computer program listing has been provided in duplicate (copy 1 and copy 2 of the compact disk are identical). The computer program listing in the compact disk is incorporated by reference herein. The compact disk contains files with their names, size and date of creation as follow:

| File Name | Size | Creation Date | Last Date |
|---|---|---|---|
| oaa.pl | 159,613 bytes | 1996/10/08 | 1998/12/23 |
| fac.pl | 52,733 bytes | 1997/04/24 | 1998/05/06 |
| compound.pl | 42,937 bytes | 1996/12/11 | 1998/04/10 |
| com_tcp.pl | 18,010 bytes | 1998/02/10 | 1998/05/06 |
| translations.pl | 19,583 bytes | 1998/01/29 | 1998/12/23 |

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention is related to distributed computing environments and the completion of tasks within such environments. In particular, the present invention teaches a variety of software-based architectures for communication and cooperation among distributed electronic agents. Certain embodiments teach interagent communication languages enabling client agents to make requests in the form of arbitrarily complex goal expressions that are solved through facilitation by a facilitator agent.

Context and Motivation for Distributed Software Systems

The evolution of models for the design and construction of distributed software systems is being driven forward by several closely interrelated trends: the adoption of a networked computing model, rapidly rising expectations for smarter, longer-lived, more autonomous software applications and an ever increasing demand for more accessible and intuitive user interfaces.

Prior Art FIG. **1** illustrates a networked computing model **100** having a plurality of client and server computer systems **120** and **122** coupled together over a physical transport mechanism **140**. The adoption of the networked computing model **100** has lead to a greatly increased reliance on distributed sites for both data and processing resources. Systems such as the networked computing model **100** are based upon at least one physical transport mechanism **140** coupling the multiple computer systems **120** and **122** to support the transfer of information between these computers.

Some of these computers basically support using the network and are known as client computers (clients). Some of these computers provide resource to other computers and are known as server computers (servers). The servers **122** can vary greatly in the resources they possess, access they provide and services made available to other computers across a network. Servers may service other servers as well as clients.

The Internet is a computing system based upon this network computing model. The Internet is continually growing, stimulating a paradigm shift for computing away from requiring all relevant data and programs to reside on the user's desktop machine. The data now routinely accessed from computers spread around the world has become increasingly rich in format, comprising multimedia documents, and audio and video streams. With the popularization of programming languages such as JAVA, data transported between local and remote machines may also include programs that can be downloaded and executed on the local machine. There is an ever increasing reliance on networked computing, necessitating software design approaches that allow for flexible composition of distributed processing elements in a dynamically changing and relatively unstable environment.



In an increasing variety of domains, application designers and users are coming to expect the deployment of smarter, longer-lived, more autonomous, software applications. Push technology, persistent monitoring of information sources, and the maintenance of user models, allowing for personalized responses and sharing of preferences, are examples of the simplest manifestations of this trend. Commercial enterprises are introducing significantly more advanced approaches, in many cases employing recent research results from artificial intelligence, data mining, machine learning, and other fields.

More than ever before, the increasing complexity of systems, the development of new technologies, and the availability of multimedia material and environments are creating a demand for more accessible and intuitive user interfaces. Autonomous, distributed, multi-component systems providing sophisticated services will no longer lend themselves to the familiar "direct manipulation" model of interaction, in which an individual user masters a fixed selection of commands provided by a single application. Ubiquitous computing, in networked environments, has brought about a situation in which the typical user of many software services is likely to be a non-expert, who may access a given service infrequently or only a few times. Accommodating such usage patterns calls for new approaches, fortunately, input modalities now becoming widely available, such as speech recognition and pen-based handwriting/gesture recognition, and the ability to manage the presentation of systems' responses by using multiple media provide an opportunity to fashion a style of human-computer interaction that draws much more heavily on our experience with human-human interactions.

2. Prior Related Art

Existing approaches and technologies for distributed computing include to distributed objects, mobile objects, blackboard-style architectures, and agent-based software engineering.

The Distributed Object Approach

Object-oriented languages, such as C++ or JAVA, provide significant advances over standard procedural languages with respect to the reusability and modularity of code: encapsulation, inheritance and polymorhpism. Encapsulation encourages the creation of library interfaces that minimize dependencies on underlying algorithms or data structures. Changes to programming internals can be made at a later date with requiring modifications to the code that uses the library. Inheritance permits the extension and modification of a library of routines and data without requiring source code to the original library. Polymorphism allows one body of code to work on an arbitrary number of data types. For the sake of simplicity traditional objects may be seen to contain both methods and data. Methods provide the mechanisms by which the internal state of an object may be modified or by which communication may occur with another object or by which the instantiation or removal of objects may be directed.

With reference to FIG. **2**, a distributed object technology based around an Object Request Broker will now be

described. Whereas "standard" object-oriented programming (OOP) languages can be used to build monolithic programs out of many object building blocks, distributed object technologies (DOOP) allow the creation of programs whose components may be spread across multiple machines. As shown in FIG. 2, an object system **200** includes client objects **210** and server objects **220**. To implement a client-server relationship between objects, the distributed object system **200** uses a registry mechanism (CORBA's registry is called an object Request Broker, or ORB) **230** to store the interface descriptions of available objects. Through the services of the ORB **230**, a client can transparently invoke a method on a remote server object. The ORB **230** is then responsible for finding the object **220** that can implement the request, passing it the parameters, invoking its method, and returning the results. In the most sophisticated systems, the client **210** does not have to be aware of where the object is located, its programming language, its operating system, or any other system aspects that are not part of the server object's interface.

Although distributed objects offer a powerful paradigm for creating networked applications, certain aspects of the approach are not perfectly tailored to the constantly changing environment of the Internet. A major restriction of the DOOP approach is that the interactions among objects are fixed through explicitly coded instructions by the application developer. It is often difficult to reuse an object in a new application without bringing along all its inherent dependencies on other objects (embedded interface definitions and explicit method calls). Another restriction of the DOOP approach is the result of its reliance on a remote procedure call (RPC) style of communication. Although easy to debug, this single thread of execution model does not facilitate programming to exploit the potential for parallel computation that one would expect in a distributed environment. In addition, RPC uses a blocking (synchronous) scheme that does not scale well for high-volume transactions.

Mobile Objects

Mobile objects, sometimes called mobile agents, are bits of code that can move to another execution site (presumably on a different machine) under their own programmatic control, where they can then interact with the local environment. For certain types of problems, the mobile object paradigm offers advantages over more traditional distributed object approaches. These advantages include network bandwidth and parallelism. Network bandwidth advantages exist for some database queries or electronic commerce applications, where it is more efficient to perform tests on data by bringing the tests to the data than by bringing large amounts of data to the testing program. Parallelism advantages include situations in which mobile agents can be spawned in parallel to accomplish many tasks at once.

Some of the disadvantages and inconveniences of the mobile agent approach include the programmatic specificity of the agent interactions, lack of coordination support between participant agents and execution environment irregularities regarding specific programming languages supported by host processors upon which agents reside. In a fashion similar to that of DOOP programming, an agent developer must programmatically specify where to go and how to interact with the target environment. There is generally little coordination support to encourage interactions among multiple (mobile) participants. Agents must be written in the programming language supported by the execution environment, whereas many other distributed technologies support heterogeneous communities of components, written in diverse programming languages.

Blackboard Architectures

Blackboard architectures typically allow multiple processes to communicate by reading and writing tuples from a global data store. Each process can watch for items of interest, perform computations based on the state of the blackboard, and then add partial results or queries that other processes can consider. Blackboard architectures provide a flexible framework for problem solving by a dynamic community of distributed processes. A blackboard architecture provides one solution to eliminating the tightly bound interaction links that some of the other distributed technologies require during interprocess communication. This advantage can also be a disadvantage: although a programmer does not need to refer to a specific process during computation, the framework does not provide programmatic control for doing so in cases where this would be practical.

Agent-based Software Engineering

Several research communities have approached distributed computing by casting it as a problem of modeling communication and cooperation among autonomous entities, or agents. Effective communication among independent agents requires four components: (1) a transport mechanism carrying messages in an asynchronous fashion, (2) an interaction protocol defining various types of communication interchange and their social implications (for instance, a response is expected of a question), (3) a content language permitting the expression and interpretation of utterances, and (4) an agreed-upon set of shared vocabulary and meaning for concepts often called an ontology). Such mechanisms permit a much richer style of interaction among participants than can be expressed using a distributed object's RPC model or a blackboard architecture's centralized exchange approach.

Agent-based systems have shown much promise for flexible, fault-tolerant, distributed problem solving. Several agent-based projects have helped to evolve the notion of facilitation. However, existing agent-based technologies and architectures are typically very limited in the extent to which agents can specify complex goals or influence the strategies used by the facilitator. Further, such prior systems are not sufficiently attuned to the importance of integrating human agents (i.e., users) through natural language and other human-oriented user interface technologies.

The initial version of SRI International's Open Agent Architecture™ ("OAA®") technology provided only a very limited mechanism for dealing with compound goals. Fixed formats were available for specifying a flat list of either conjoined (AND) sub-goals or disjoined (OR) sub-goals; in both cases, parallel goal solving was hard-wired in, and only a single set of parameters for the entire list could be specified. More complex goal expressions involving (for example) combinations of different boolean connectors, nested expressions, or conditionally interdependent ("IF . . . THEN") goals were not supported. Further, system scalability was not adequately addressed in this prior work.

## SUMMARY OF INVENTION

A first embodiment of the present invention discloses a highly flexible, software-based architecture for constructing distributed systems. The architecture supports cooperative task completion by flexible, dynamic configurations of autonomous electronic agents. Communication and cooperation between agents are brokered by one or more facilitators, which are responsible for matching requests, from users and agents, with descriptions of the capabilities of other agents. It is not generally required that a user or agent know the identities, locations, or number of other

agents involved in satisfying a request, and relatively minimal effort is involved in incorporating new agents and "wrapping" legacy applications. Extreme flexibility is achieved through an architecture organized around the declaration of capabilities by service-providing agents, the construction of arbitrarily complex goals by users and service-requesting agents, and the role of facilitators in delegating and coordinating the satisfaction of these goals, subject to advice and constraints that may accompany them. Additional mechanisms and features include facilities for creating and maintaining shared repositories of data; the use of triggers to instantiate commitments within and between agents; agent-based provision of multi-modal user interfaces, including natural language; and built-in support for including the user as a privileged member of the agent community. Specific embodiments providing enhanced scalability are also described.

## BRIEF DESCRIPTION OF THE DRAWINGS

Prior Art

Prior Art FIG. **1** depicts a networked computing model;

Prior Art FIG. **2** depicts a distributed object technology based around an Object Resource Broker;

Examples of the Invention

FIG. **3** depicts a distributed agent system based around a facilitator agent;

FIG. **4** presents a structure typical of one small system of the present invention;

FIG. **5** depicts an Automated Office system implemented in accordance with an example embodiment of the present invention supporting a mobile user with a laptop computer and a telephone;

FIG. **6** schematically depicts an Automated Office system implemented as a network of agents in accordance with a preferred embodiment of the present invention;

FIG. **7** schematically shows data structures internal to a facilitator in accordance with a preferred embodiment of the present invention;

FIG. **8** depicts operations involved in instantiating a client agent with its parent facilitator in accordance with a preferred embodiment of the present invention;

FIG. **9** depicts operations involved in a client agent initiating a service request and receiving the response to that service request in accordance with a certain preferred embodiment of the present invention;

FIG. **10** depicts operations involved in a client agent responding to a service request in accordance with another preferable embodiment of the present invention;

FIG. **11** depicts operations involved in a facilitator agent response to a service request in accordance with a preferred embodiment of the present invention;

FIG. **12** depicts an Open Agent Architecture™ based system of agents implementing a unified messaging application in accordance with a preferred embodiment of the present invention;

FIG. **13** depicts a map oriented graphical user interface display as might be displayed by a multi-modal map application in accordance with a preferred embodiment of the present invention;

FIG. **14** depicts a peer to peer multiple facilitator based agent system supporting distributed agents in accordance with a preferred embodiment of the present invention;

FIG. **15** depicts a multiple facilitator agent system supporting at least a limited form of a hierarchy of facilitators in accordance with a preferred embodiment of the present invention; and

FIG. **16** depicts a replicated facilitator architecture in accordance with one embodiment of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. **3** illustrates a distributed agent system **300** in accordance with one embodiment of the present invention. The agent system **300** includes a facilitator agent **310** and a plurality of agents **320**. The illustration of FIG. **3** provides a high level view of one simple system structure contemplated by the present invention. The facilitator agent **310** is in essence the "parent" facilitator for its "children" agents **320**. The agents **320** forward service requests to the facilitator agent **310**. The facilitator agent **310** interprets these requests, organizing a set of goals which are then delegated to appropriate agents for task completion.

The system **300** of FIG. **3** can be expanded upon and modified in a variety of ways consistent with the present invention. For example, the agent system **300** can be distributed across a computer network such as that illustrated in FIG. **1**. The facilitator agent **310** may itself have its functionality distributed across several different computing platforms. The agents **320** may engage in interagent communication (also called peer to peer communications). Several different systems **300** may be coupled together for enhanced performance. These and a variety of other structural configurations are described below in greater detail.

FIG. **4** presents the structure typical of a small system **400** in one embodiment of the present invention, showing user interface agents **408**, several application agents **404** and meta-agents **406**, the system **400** organized as a community of peers by their common relationship to a facilitator agent **402**. As will be appreciated, FIG. **4** places more structure upon the system **400** than shown in FIG. **3**, but both are valid representations of structures of the present invention. The facilitator **402** is a specialized server agent that is responsible for coordinating agent communications and cooperative problem-solving. The facilitator **402** may also provide a global data store for its client agents, allowing them to adopt a blackboard style of interaction. Note that certain advantages are found in utilizing two or more facilitator agents within the system **400**. For example, larger systems can be assembled from multiple facilitator/client groups, each having the sort of structure shown in FIG. **4**. All agents that are not facilitators are referred to herein generically as client agents—so called because each acts (in some respects) as a client of some facilitator, which provides communication and other essential services for the client.

The variety of possible client agents is essentially unlimited. Some typical categories of client agents would include application agents **404**, meta-agents **406**, and user interface agents **408**, as depicted in FIG. **4**. Application agents **404** denote specialists that provide a collection of services of a particular sort. These services could be domain-independent technologies (such as speech recognition, natural language processing **410**, email, and some forms of data retrieval and data mining) or user-specific or domain-specific (such as a travel planning and reservations agent). Application agents may be based on legacy applications or libraries, in which case the agent may be little more than a wrapper that calls a pre-existing API **412**, for example. Meta-agents **406** are agents whose role is to assist the facilitator agent **402** in coordinating the activities of other agents. While the facilitator **402** possesses domain-independent coordination strategies, meta-agents **406** can augment these by using domain- and application-specific knowledge or reasoning (including but not limited to rules, learning algorithms and planning).

With further reference to FIG. **4**, user interface agents **408** can play an extremely important and interesting role in

certain embodiments of the present invention. By way of explanation, in some systems, a user interface agent can be implemented as a collection of "micro-agents", each monitoring a different input modality (point-and-click, handwriting, pen gestures, speech), and collaborating to produce the best interpretation of the current inputs. These micro-agents are depicted in FIG. **4**, for example, as Modality Agents **414**. While describing such subcategories of client agents is useful for purposes of illustration and understanding, they need not be formally distinguished within the system in preferred implementations of the present invention.

The operation of one preferred embodiment of the present invention will be discussed in greater detail below, but may be briefly outlined as follows. When invoked, a client agent makes a connection to a facilitator, which is known as its parent facilitator. These connections are depicted as a double headed arrow between the client agent and the facilitator agent in FIGS. **3** and **4**, for example. Upon connection, an agent registers with its parent facilitator a specification of the capabilities and services it can provide. For example, a natural language agent may register the characteristics of its available natural language vocabulary. (For more details regarding client agent connections, see the discussion of FIG. **8** below.) Later during task completion, when a facilitator determines that the registered services **416** of one of its client agents will help satisfy a goal, the facilitator sends that client a request expressed in the Interagent Communication Language (ICL) **418**. (See FIG. **11** below for a more detailed discussion of the facilitator operations involved.) The agent parses this request, processes it, and returns answers or status reports to the facilitator. In processing a request, the client agent can make use of a variety of infrastructure capabilities provided in the preferred embodiment. For example, the client agent can use ICL **418** to request services of other agents, set triggers, and read or write shared data on the facilitator or other client agents that maintain shared data. (See the discussion of FIGS. **9**–**11** below for a more detailed discussion of request processing.)

The functionality of each client agent are made available to the agent community through registration of the client agent's capabilities with a facilitator **402**. A software "wrapper" essentially surrounds the underlying application program performing the services offered by each client. The common infrastructure for constructing agents is preferably supplied by an agent library. The agent library is preferably accessible in the runtime environment of several different programming languages. The agent library preferably minimizes the effort required to construct a new system and maximizes the ease with which legacy systems can be "wrapped" and made compatible with the agent-based architecture of the present invention.

By way of further illustration, a representative application is now briefly presented with reference to FIGS. **5** and **6**. In the Automated Office system depicted in FIG. **5**, a mobile user with a telephone and a laptop computer can access and task commercial applications such as calendars, databases, and email systems running back at the office. A user interface (UI) agent **408**, shown in FIG. **6**, runs on the user's local laptop and is responsible for accepting user input, sending requests to the facilitator **402** for delegation to appropriate agents, and displaying the results of the distributed computation. The user may interact directly with a specific remote application by clicking on active areas in the interface, calling up a form or window for that application, and making queries with standard interface dialog mechanisms. Conversely, a user may express a task to be executed by using typed, handwritten, or spoken (over the telephone) English sentences, without explicitly specifying which agent or agents should perform the task.

For instance, if the question "What is my schedule?" is written **420** in the user interface **408**, this request will be sent **422** by the UI **408** to the facilitator **402**, which in turn will ask **424** a natural language (NL) agent **426** to translate the query into JCL **18**. To accomplish this task, the NL agent **426** may itself need to make requests of the agent community to resolve unknown words such as "me" **428** (the UI agent **408** can respond **430** with the name of the current user) or "schedule" **432** (the calendar agent **434** defines this word **436**). The resulting ICL expression is then routed by the facilitator **402** to appropriate agents (in this case, the calendar agent **434**) to execute the request. Results are sent back **438** to the UI agent **408** for display.

The spoken request "When mail arrives for me about security, notify me immediately." produces a slightly more complex example involving communication among all agents in the system. After translation into ICL as described above, the facilitator installs a trigger **440** on the mail agent **442** to look for new messages about security. When one such message does arrive in its mail spool, the trigger fires, and the facilitator matches the action part of the trigger to capabilities published by the notification agent **446**. The notification agent **446** is a meta-agent, as it makes use of rules concerning the optimal use of different output modalities (email, fax, speech generation over the telephone) plus information about an individual user's preferences **448** to determine the best way of relaying a message through available media transfer application agents. After some competitive parallelism to locate the user (the calendar agent **434** and database agent **450** may have different guesses as to where to find the user) and some cooperative parallelism to produce required information (telephone number of location, user password, and an audio file containing a text-to-speech representation of the email message), a telephone agent **452** calls the user, verifying its identity through touchtones, and then play the message.

The above example illustrates a number of inventive features. As new agents connect to the facilitator, registering capability specifications and natural language vocabulary, what the user can say and do dynamically changes; in other words, the ICL is dynamically expandable. For example, adding a calendar agent to the system in the previous example and registering its capabilities enables users to ask natural language questions about their "schedule" without any need to revise code for the facilitator, the natural language agents, or any other client agents. In addition, the interpretation and execution of a task is a distributed process, with no single agent defining the set of possible inputs to the system. Further, a single request can produce cooperation and flexible communication among many agents, written in different programming languages and spread across multiple machines.

Design Philosophy and Considerations

One preferred embodiment provides an integration mechanism for heterogeneous applications in a distributed infrastructure, incorporating some of the dynamism and extensibility of blackboard approaches, the efficiency associated with mobile objects, plus the rich and complex interactions of communicating agents. Design goals for preferred embodiments of the present invention may be categorized under the general headings of interoperation and cooperation, user interfaces, and software engineering. These design goals are not absolute requirements, nor will they necessarily be satisfied by all embodiments of the

present invention, but rather simply reflect the inventor's currently preferred design philosophy.

Versatile Mechanisms of Interoperation and Cooperation

Interoperation refers to the ability of distributed software components—agents—to communicate meaningfully. While every system-building framework must provide mechanisms of interoperation at some level of granularity, agent-based frameworks face important new challenges in this area. This is true primarily because autonomy, the hallmark of individual agents, necessitates greater flexibility in interactions within communities of agents. Coordination refers to the mechanisms by which a community of agents is able to work together productively on some task. In these areas, the goals for our framework are to provide flexibility in assembling communities of autonomous service providers, provide flexibility in structuring cooperative interactions, impose the right amount of structure, as well as include legacy and "owned-elsewhere" applications.

Provide flexibility in assembling communities of autonomous service providers—both at development time and at runtime. Agents that conform to the linguistic and ontological requirements for effective communication should be able to participate in an agent community, in various combinations, with minimal or near minimal prerequisite knowledge of the characteristics of the other players. Agents with duplicate and overlapping capabilities should be able to coexist within the same community, with the system making optimal or near optimal use of the redundancy.

Provide flexibility in structuring cooperative interactions among the members of a community of agents. A framework preferably provides an economical mechanism for setting up a variety of interaction patterns among agents, without requiring an inordinate amount of complexity or infrastructure within the individual agents. The provision of a service should be independent or minimally dependent upon a particular configuration of agents.

Impose the right amount of structure on individual agents. Different approaches to the construction of multi-agent systems impose different requirements on the individual agents. For example, because KQML is neutral as to the content of messages, it imposes minimal structural requirements on individual agents. On the other hand, the BDI paradigm tends to impose much more demanding requirements, by making assumptions about the nature of the programming elements that are meaningful to individual agents. Preferred embodiments of the present invention should fall somewhere between the two, providing a rich set of interoperation and coordination capabilities, without precluding any of the software engineering goals defined below.

Include legacy and "owned-elsewhere" applications. Whereas legacy usually implies reuse of an established system fully controlled by the agent-based system developer, owned-elsewhere refers to applications to which the developer has partial access, but no control. Examples of owned-elsewhere applications include data sources and services available on the World Wide Web, via simple form-based interfaces, and applications used cooperatively within a virtual enterprise, which remain the properties of separate corporate entities. Both classes of application must preferably be able to interoperate, more or less as full-fledged members of the agent community, without requiring an overwhelming integration effort.

Human-Oriented User Interfaces

Systems composed of multiple distributed components, and possibly dynamic configurations of components, require the crafting of intuitive user interfaces to provide conceptually natural interaction mechanisms, treat users as privileged members of the agent community and support collaboration.

Provide conceptually natural interaction mechanisms with multiple distributed components. When there are numerous disparate agents, and/or complex tasks implemented by the system, the user should be able to express requests without having detailed knowledge of the individual agents. With speech recognition, handwriting recognition, and natural language technologies becoming more mature, agent architectures should preferably support these forms of input playing increased roles in the tasking of agent communities.

Preferably treat users as privileged members of the agent community by providing an appropriate level of task specification within software agents, and reusable translation mechanisms between this level and the level of human requests, supporting constructs that seamlessly incorporate interactions between both human-interface and software types of agents.

Preferably support collaboration (simultaneous work over shared data and processing resources) between users and agents.

Realistic Software Engineering Requirements

System-building frameworks should preferably address the practical concerns of real-world applications by the specification of requirements which preferably include: Minimize the effort required to create new agents, and to wrap existing applications. Encourage reuse, both of domain-independent and domain-specific components. The concept of agent orientation, like that of object orientation, provides a natural conceptual framework for reuse, so long as mechanisms for encapsulation and interaction are structured appropriately. Support lightweight mobile platforms. Such platforms should be able to serve as hosts for agents, without requiring the installation of a massive environment. It should also be possible to construct individual agents that are relatively small and modest in their processing requirements. Minimize platform and language barriers. Creation of new agents, as well as wrapping of existing applications, should not require the adoption of a new language or environment.

Mechanisms of Cooperation

Cooperation among agents in accordance with the present invention is preferably achieved via messages expressed in a common language, ICL. Cooperation among agent is further preferably structured around a three-part approach: providers of services register capabilities specifications with a facilitator, requesters of services construct goals and relay them to a facilitator, and facilitators coordinate the efforts of the appropriate service providers in satisfying these goals.

The Interagent Communication Language (ICL)

Interagent Communication Language ("ICL") **418** refers to an interface, communication, and task coordination language preferably shared by all agents, regardless of what platform they run on or what computer language they are programmed in. ICL may be used by an agent to task itself or some subset of the agent community. Preferably, ICL allows agents to specify explicit control parameters while simultaneously supporting expression of goals in an underspecified, loosely constrained manner. In a further preferred embodiment, agents employ ICL to perform queries, execute actions, exchange information, set triggers, and manipulate data in the agent community.

In a further preferred embodiment, a program element expressed in ICL is the event. The activities of every agent, as well as communications between agents, are preferably structured around the transmission and handling of events. In communications, events preferably serve as messages between agents; in regulating the activities of individual agents, they may preferably be thought of as goals to be

satisfied. Each event preferably has a type, a set of parameters, and content. For example, the agent library procedure oaa_Solve can be used by an agent to request services of other agents. A call to oaa_Solve, within the code of agent A, results in an event having the form

ev_post_solve(Goal, Params)

going from A to the facilitator, where ev_post_solve is the type, Goal is the content, and Params is a list of parameters. The allowable content and parameters preferably vary according to the type of the event.

The ICL preferably includes a layer of conversational protocol and a content layer. The conversational layer of ICL is defined by the event types, together with the parameter lists associated with certain of these event types. The content layer consists of the specific goals, triggers, and data elements that may be embedded within various events.

The ICL conversational protocol is preferably specified using an orthogonal, parameterized approach, where the conversational aspects of each element of an interagent conversation are represented by a selection of an event type and a selection of values from at least one orthogonal set of parameters. This approach offers greater expressiveness than an approach based solely on a fixed selection of speech acts, such as embodied in KQML. For example, in KQML, a request to satisfy a query can employ either of the performatives ask_all or ask_one. In ICL, on the other hand, this type of request preferably is expressed by the event type evost solve, together with the solution_limit(N) parameter—where N can be any positive integer. (A request for all solutions is indicated by the omission of the solution_ limit parameter.) The request can also be accompanied by other parameters, which combine to further refine its semantics. In KQML, then, this example forces one to choose between two possible conversational options, neither of which may be precisely what is desired. In either case, the performative chosen is a single value that must capture the entire conversational characterization of the communication. This requirement raises a difficult challenge for the language designer, to select a set of performatives that provides the desired functionality without becoming unmanageably large. Consequently, the debate over the right set of performatives has consumed much discussion within the KQML community.

The content layer of the ICL preferably supports unification and other features found in logic programming language environments such as PROLOG. In some embodiments, the content layer of the ICL is simply an extension of at least one programming language. For example, the Applicants have found that PROLOG is suitable for implementing and extending into the content layer of the ICL. The agent libraries preferably provide support for constructing, parsing, and manipulating ICL expressions. It is possible to embed content expressed in other languages within an ICL event. However, expressing content in ICL simplifies the facilitator's access to the content, as well as the conversational layer, in delegating requests. This gives the facilitator more information about the nature of a request and helps the facilitator decompose compound requests and delegate the sub-requests.

Further, ICL expressions preferably include, in addition to events, at least one of the following: capabilities declarations, requests for services, responses to requests, trigger specifications, and shared data elements. A further preferred embodiment of the present invention incorporates ICL expressions including at least all of the following: events, capabilities declarations, requests for services, responses to requests, trigger specifications, and shared data elements.



Providing Services: Specifying "Solvables"

In a preferred embodiment of the present invention, every participating agent defines and publishes a set of capability declarations, expressed in ICL, describing the services that it provides. These declarations establish a high-level interface to the agent. This interface is used by a facilitator in communicating with the agent, and, most important, in delegating service requests (or parts of requests) to the agent. Partly due to the use of PROLOG as a preferred basis for ICL, these capability declarations are referred as solvables. The agent library preferably provides a set of procedures allowing an agent to add, remove, and modify its solvables, which it may preferably do at any time after connecting to its facilitator.

There are preferably at least two major types of solvables: procedure solvables and data solvables. Intuitively, a procedure solvable performs a test or action, whereas a data solvable provides access to a collection of data. For example, in creating an agent for a mail system, procedure solvables might be defined for sending a message to a person, testing whether a message about a particular subject has arrived in the mail queue, or displaying a particular message onscreen. For a database wrapper agent, one might define a distinct data solvable corresponding to each of the relations present in the database. Often, a data solvable is used to provide a shared data store, which may be not only queried, but also updated, by various agents having the required permissions.

There are several primary technical differences between these two types of solvables. First, each procedure solvable must have a handler declared and defined for it, whereas this is preferably not necessary for a data solvable. The handling of requests for a data solvable is preferably provided transparently by the agent library. Second, data solvables are preferably associated with a dynamic collection of facts (or clauses), which may be further preferably modified at runtime, both by the agent providing the solvable, and by other agents (provided they have the required permissions). Third, special features, available for use with data solvables, preferably facilitate maintaining the associated facts. In spite of these differences, it should be noted that the mechanism of use by which an agent requests a service is the same for the two types of solvables.

In one embodiment, a request for one of an agent's services normally arrives in the form of an event from the agent's facilitator. The appropriate handler then deals with this event. The handler may be coded in whatever fashion is most appropriate, depending on the nature of the task, and the availability of task-specific libraries or legacy code, if any. The only hard requirement is that the handler return an appropriate response to the request, expressed in ICL. Depending on the nature of the request, this response could be an indication of success or failure, or a list of solutions (when the request is a data query).

A solvable preferably has three parts: a goal, a list of parameters, and a list of permissions, which are declared using the format:

solvable(Goal, Parameters, Permissions)

The goal of a solvable, which syntactically takes the preferable form of an ICL structure, is a logical representation of the service provided by the solvable. (An ICL structure consists of a functor with 0 or more arguments. For example, in the structure a(b,c), 'a' is the functor, and 'b' and 'c' the arguments.) As with a PROLOG structure, the goal's arguments themselves may preferably be structures.

Various options can be included in the parameter list, to refine the semantics associated with the solvable. The type

parameter is preferably used to say whether the solvable is data or procedure. When the type is procedure, another parameter may be used to indicate the handler to be associated with the solvable. Some of the parameters appropriate for a data solvable are mentioned elsewhere in this application. In either case (procedure or data solvable), the private parameter may be preferably used to restrict the use of a solvable to the declaring agent when the agent intends the solvable to be solely for its internal use but wishes to take advantage of the mechanisms in accordance with the present invention to access it, or when the agent wants the solvable to be available to outside agents only at selected times. In support of the latter case, it is preferable for the agent to change the status of a solvable from private to non-private at any time.

The permissions of a solvable provide mechanisms by which an agent may preferably control access to its services allowing the agent to restrict calling and writing of a solvable to itself and/or other selected agents. (Calling means requesting the service encapsulated by a solvable, whereas Writing means modifying the collection of facts associated with a data solvable.) The default permission for every solvable in a further preferred embodiment of the present invention is to be callable by anyone, and for data solvables to be writable by anyone. A solvable's permissions can preferably be changed at any time, by the agent providing the solvable.

For example, the solvables of a simple email agent might include:

```
solvable(send_message(email, +ToPerson, +Params),
    [type(procedure), callback(send_mail)],
        [ ]
solvable(last_message(email, –MessageId),
    [type(data), single_value(true)],
    [write(true)]),
solvable (get_message (email, +MessageId, –Msg),
    [type(procedure), callback(get_mail)], [ ])
```

The symbols '+' and '–', indicating input and output arguments, are at present used only for purposes of documentation. Most parameters and permissions have default values, and specifications of default values may be omitted from the parameters and permissions lists.

Defining an agent's capabilities in terms of solvable declarations effectively creates a vocabulary with which other agents can communicate with the new agent. Ensuring that agents will speak the same language and share a common, unambiguous semantics of the vocabulary involves ontology. Agent development tools and services (automatic translations of solvables by the facilitator) help address this issue; additionally, a preferred embodiment of the present invention will typically rely on vocabulary from either formally engineered ontologies for specific domains or from ontologies constructed during the incremental development of a body of agents for several applications or from both specific domain ontologies and incrementally developed ontologies. Several example tools and services are described in Cheyer et al.'s paper entitled "Development Tools for the Open Agent Architecture," as presented at the Practical Application of Intelligent Agents and Multi-Agent Technology (PAAM 96), London, April 1996.

Although the present invention imposes no hard restrictions on the form of solvable declarations, two common usage conventions illustrate some of the utility associated with solvables.

Classes of services are often preferably tagged by a particular type. For instance, in the example above, the "last_message" and "get_message" solvables are specialized for email, not by modifying the names of the services, but rather by the use of the 'email' parameter, which serves during the execution of an ICL request to select (or not) a specific type of message.

Actions are generally written using an imperative verb as the functor of the solvable in a preferred embodiment of the present invention, the direct object (or item class) as the first argument of the predicate, required arguments following, and then an extensible parameter list as the last argument. The parameter list can hold optional information usable by the function. The ICL expression generated by a natural language parser often makes use of this parameter list to store prepositional phrases and adjectives.

As an illustration of the above two points, "Send mail to Bob about lunch" will be translated into an ICL request send message(email, 'Bob Jones', [subject(lunch)]), whereas "Remind Bob about lunch" would leave the transport unspecified (send_message(KIND, 'Bob Jones', [subject (lunch)])), enabling an available message transfer agents (e.g., fax, phone, mail, pager) to compete for the opportunity to carry out the request.

Requesting Services

An agent preferably requests services of the community of agent by delegating tasks or goals to its facilitator. Each request preferably contains calls to one or more agent solvables, and optionally specifies parameters containing advice to help the facilitator determine how to execute the task. Calling a solvable preferably does not require that the agent specify (or even know of) a particular agent or agents to handle the call. While it is possible to specify one or more agents using an address parameter (and there are situations in which this is desirable), in general it is advantageous to leave this delegation to the facilitator. This greatly reduces the hard-coded component dependencies often found in other distributed frameworks. The agent libraries of a preferred embodiment of the present invention provide an agent with a single, unified point of entry for requesting services of other agents: the library procedure oaa_Solve. In the style of logic programming, oaa_Solve may preferably be used both to retrieve data and to initiate actions, so that calling a data solvable looks the same as calling a procedure solvable.

Complex Goal Expressions

A powerful feature provided by preferred embodiments of the present invention is the ability of a client agent (or a user) to submit compound goals of an arbitrarily complex nature to a facilitator. A compound goal is a single goal expression that specifies multiple sub-goals to be performed. In speaking of a "complex goal expression" we mean that a single goal expression that expresses multiple sub-goals can potentially include more than one type of logical connector (e.g., AND, OR, NOT), and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent. By way of further clarification, we note that when speaking of an "arbitrarily complex goal expression" we mean that goals are expressed in a language or syntax that allows expression of such complex goals when appropriate or when desired, not that every goal is itself necessarily complex.

It is contemplated that this ability is provided through an interagent communication language having the necessary syntax and semantics. In one example, the goals may take the form of compound goal expressions composed using operators similar to those employed by PROLOG, that is, the comma for conjunction, the semicolon for disjunction, the arrow for conditional execution, etc. The present invention also contemplates significant extensions to PROLOG

syntax and semantics. For example, one embodiment incorporates a "parallel disjunction" operator indicating that the disjuncts are to be executed by different agents concurrently. A further embodiment supports the specification of whether a given sub-goal is to be executed breadth-first or depth-first.

A further embodiment supports each sub-goal of a compound goal optionally having an address and/or a set of parameters attached to it. Thus, each sub-goal takes the form

Address:Goal::Parameters

where both Address and Parameters are optional.

An address, if present, preferably specifies one or more agents to handle the given goal, and may employ several different types of referring expression: unique names, symbolic names, and shorthand names. Every agent has preferably a unique name, assigned by its facilitator, which relies upon network addressing schemes to ensure its global uniqueness. Preferably, agents also have self-selected symbolic names (for example, "mail"), which are not guaranteed to be unique. When an address includes a symbolic name, the facilitator preferably takes this to mean that all agents having that name should be called upon. Shorthand names include 'self' and 'parent' (which refers to the agent's facilitator). The address associated with a goal or sub-goal is preferably always optional. When an address is not present, it is the facilitator's job to supply an appropriate address.

The distributed execution of compound goals becomes particularly powerful when used in conjunction with natural language or speech-enabled interfaces, as the query itself may specify how functionality from distinct agents will be combined. As a simple example, the spoken utterance "Fax it to Bill Smith's manager." can be translated into the following compound ICL request:

oaa_Solve((manager('Bill Smith', M), fax(it,M,[ ])), [strategy(action)])

Note that in this ICL request there are two sub-goals, "manager('Bill Smith',M)" and "fax(it,M,[ ])," and a single global parameter "strategy(action)." According to the present invention, the facilitator is capable of mapping global parameters in order to apply the constraints or advice across the separate sub-goals in a meaningful way. In this instance, the global parameter strategy(action) implies a parallel constraint upon the first sub-goal; i.e., when there are multiple agents that can respond to the manager sub-goal, each agent should receive a request for service. In contrast, for the second sub-goal, parallelism should not be inferred from the global parameter strategy(action) because such an inference would possibly result in the transmission of duplicate facsimiles.

Refining Service Requests

In a preferred embodiment of the present invention, parameters associated with a goal (or sub-goal) can draw on useful features to refine the request's meaning. For example, it is frequently preferred to be able to specify whether or not solutions are to be returned synchronously; this is done using the reply parameter, which can take any of the values synchronous, asynchronous, or none. As another example, when the goal is a non-compound query of a data solvable, the cache parameter may preferably be used to request local caching of the facts associated with that solvable.

Many of the remaining parameters fall into two categories: feedback and advice. Feedback parameters allow a service requester to receive information from the facilitator about how a goal was handled. This feedback can include such things as the identities of the agents involved in satisfying the goal, and the amount of time expended in the satisfaction of the goal.

Advice parameters preferably give constraints or guidance to the facilitator in completing and interpreting the goal. For example, a solution_limit parameter preferably allows the requester to say how many solutions it is interested in; the facilitator and/or service providers are free to use this information in optimizing their efforts. Similarly, a time_limit is preferably used to say how long the requester is willing to wait for solutions to its request, and, in a multiple facilitator system, a level_limit may preferably be used to say how remote the facilitators may be that are consulted in the search for solutions. A priority parameter is preferably used to indicate that a request is more urgent than previous requests that have not yet been satisfied. Other preferred advice parameters include but are not limited to parameters used to tell the facilitator whether parallel satisfaction of the parts of a goal is appropriate, how to combine and filter results arriving from multiple solver agents, and whether the requester itself may be considered a candidate solver of the sub-goals of a request.

Advice parameters preferably provide an extensible set of low-level, orthogonal parameters capable of combining with the ICL goal language to fully express how information should flow among participants. In certain preferred embodiments of the present invention, multiple parameters can be grouped together and given a group name. The resulting high-level advice parameters can preferably be used to express concepts analogous to KQML's performatives, as well as define classifications of problem types. For instance, KQML's "ask_all" and "ask_one" performatives would be represented as combinations of values given to the parameters reply, parallel ok, and solution_limit. As an example of a higher-level problem type, the strategy "math_problem" might preferably send the query to all appropriate math solvers in parallel, collect their responses, and signal a conflict if different answers are returned. The strategy "essay_question" might preferably send the request to all appropriate participants, and signal a problem (i.e., cheating) if any of the returned answers are identical.

Facilitation

In a preferred embodiment of the present invention, when a facilitator receives a compound goal, its job is to construct a goal satisfaction plan and oversee its satisfaction in an optimal or near optimal manner that is consistent with the specified advice. The facilitator of the present invention maintains a knowledge base that records the capabilities of a collection of agents, and uses that knowledge to assist requesters and providers of services in making contact.

FIG. **7** schematically shows data structures **700** internal to a facilitator in accordance with one embodiment of the present invention. Consider the function of a Agent Registry **702** in the present invention. Each registered agent may be seen as associated with a collection of fields found within its parent facilitator such as shown in the figure. Each registered agent may optionally possess a Symbolic Name which would be entered into field **704**. As mentioned elsewhere, Symbolic Names need not be unique to each instance of an agent. Note that an agent may in certain preferred embodiments of the present invention possess more than one Symbolic Name. Such Symbolic Names would each be found through their associations in the Agent Registry entries. Each agent, when registered, must possess a Unique Address, which is entered into the Unique Address field **706**.

With further reference to FIG. **7**, each registered agent may be optionally associated with one or more capabilities, which have associated Capability Declaration fields **708** in the parent facilitator Agent Registry **702**. These capabilities may define not just functionality, but may further provide a utility parameter indicating, in some manner (e.g., speed,

accuracy, etc), how effective the agent is at providing the declared capability. Each registered agent may be optionally associated with one or more data components, which have associated Data Declaration fields **710** in the parent facilitator Agent Registry **702**. Each registered agent may be optionally associated with one or more triggers, which preferably could be referenced through their associated Trigger Declaration fields **712** in the parent facilitator Agent Registry **702**. Each registered agent may be optionally associated with one or more tasks, which preferably could be referenced through their associated Task Declaration fields **714** in the parent facilitator Agent Registry **702**. Each registered agent may be optionally associated with one or more Process Characteristics, which preferably could be referenced through their associated Process Characteristics Declaration fields **716** in the parent facilitator Agent Registry **702**. Note that these characteristics in certain preferred embodiments of the present invention may include one or more of the following: Machine Type (specifying what type of computer may run the agent), Language (both computer and human interface).

A facilitator agent in certain preferred embodiments of the present invention further includes a Global Persistent Database **720**. The database **720** is composed of data elements which do not rely upon the invocation or instantiation of client agents for those data elements to persist. Examples of data elements which might be present in such a database include but are not limited to the network address of the facilitator agent's server, facilitator agent's server accessible network port list, firewalls, user lists, and security options regarding the access of server resources accessible to the facilitator agent.

A simplified walk through of operations involved in creating a client agent, a client agent initiating a service request, a client agent responding to a service request and a facilitator agent responding to a service request are including hereafter by way of illustrating the use of such a system. These figures and their accompanying discussion are provided by way of illustration of one preferred embodiment of the present invention and are not intended to limit the scope of the present invention.

FIG. **8** depicts operations involved in instantiating a client agent with its parent facilitator in accordance with a preferred embodiment of the present invention. The operations begin with starting the Agent Registration in a step **800**. In a next step **802**, the Installer, such as a client or facilitator agent, invokes a new client agent. It will be appreciated that any computer entity is capable of invoking a new agent. The system then instantiates the new client agent in a step **804**. This operation may involve resource allocations somewhere in the network on a local computer system for the client agent, which will often include memory as well as placement of references to the newly instantiated client agent in internal system lists of agents within that local computing system. Once instantiated, the new client and its parent facilitator establish a communications link in a step **806**. In certain preferred embodiments, this communications link involves selection of one or more physical transport mechanisms for this communication. Once established, the client agent transmits it profile to the parent facilitator in a step **808**. When received, the parent facilitator registers the client agent in a step **810**. Then, at a step **812**, a client agent has been instantiated in accordance with one preferred embodiment of the present invention.

FIG. **9** depicts operations involved in a client agent initiating a service request and receiving the response to that service request in accordance with a preferred embodiment of the present invention. The method of FIG. **9** begins in a step **900**, wherein any initialization or other such procedures may be performed. Then, in a step **902**, the client agent determines a goal to be achieved (or solved). This goal is then translated in a step **904** into ICL, if it is not already formulated in it. The goal, now stated in ICL, is then transmitted to the client agent's parent facilitator in a step **906**. The parent facilitator responds to this service request and at a later time, the client agent receives the results of the request in a step **908**, operations of FIG. **9** being complete in a done step **910**.

FIG. **10** depicts operations involved in a client agent responding to a service request in accordance with a preferred embodiment of the present invention. Once started in a step **1000**, the client agent receives the service request in a step **1002**. In a next step **1004**, the client agent parses the received request from ICL. The client agent then determines if the service is available in a step **1006**. If it is not, the client agent returns a status report to that effect in a step **1008**. If the service is available, control is passed to a step **1010** where the client performs the requested service. Note that in completing step **1010** the client may form complex goal expressions, requesting results for these solvables from the facilitator agent. For example, a fax agent might fax a document to a certain person only after requesting and receiving a fax number for that person. Subsequently, the client agent either returns the results of the service and/or a status report in a step **1012**. The operations of FIG. **10** are complete in a done step **1014**.

FIG. **11** depicts operations involved in a facilitator agent response to a service request in accordance with a preferred embodiment of the present invention. The start of such operations in step **1100** leads to the reception of a goal request in a step **1102** by the facilitator. This request is then parsed and interpreted by the facilitator in a step **1104**. The facilitator then proceeds to construct a goal satisfaction plan in a next step **1106**. In steps **1108** and **1110**, respectively, the facilitator determines the required sub-goals and then selects agents suitable for performing the required sub-goals. The facilitator then transmits the sub-goal requests to the selected agents in a step **1112** and receives the results of these transmitted requests in a step **1114**. It should be noted that the actual implementation of steps **1112** and **1114** are dependent upon the specific goal satisfaction plan. For instance, certain sub-goals may be sent to separate agents in parallel, while transmission of other sub-goals may be postponed until receipt of particular answers. Further, certain requests may generate multiple responses that generate additional sub-goals. Once the responses have been received, the facilitator determines whether the original requested goal has been completed in a step **1118**. If the original requested goal has not been completed, the facilitator recursively repeats the operations **1106** through **1116**. Once the original requested goal is completed, the facilitator returns the results to the requesting agent **1118** and the operations are done at **1120**.

A further preferred embodiment of the present invention incorporates transparent delegation, which means that a requesting agent can generate a request, and a facilitator can manage the satisfaction of that request, without the requester needing to have any knowledge of the identities or locations of the satisfying agents. In some cases, such as when the request is a data query, the requesting agent may also be oblivious to the number of agents involved in satisfying a request. Transparent delegation is possible because agents' capabilities (solvables) are treated as an abstract description of a service, rather than as an entry point into a library or body of code.

A further preferred embodiment of the present invention incorporates facilitator handling of compound goals, preferably involving three types of processing: delegation, optimization and interpretation.

Delegation processing preferably supports facilitator determination of which specific agents will execute a compound goal and how such a compound goal's sub-goals will be combined and the sub-goal results routed. Delegation involves selective application of global and local constraint and advice parameters onto the specific sub-goals. Delegation results in a goal that is unambiguous as to its meaning and as to the agents that will participate in satisfying it.

Optimization processing of the completed goal preferably includes the facilitator using sub-goal parallelization where appropriate. Optimization results in a goal whose interpretation will require as few exchanges as possible, between the facilitator and the satisfying agents, and can exploit parallel efforts of the satisfying agents, wherever this does not affect the goal's meaning.

Interpretation processing of the optimized goal. Completing the addressing of a goal involves the selection of one or more agents to handle each of its sub-goals (that is, each sub-goal for which this selection has not been specified by the requester). In doing this, the facilitator uses its knowledge of the capabilities of its client agents (and possibly of other facilitators, in a multi-facilitator system). It may also use strategies or advice specified by the requester, as explained below. The interpretation of a goal involves the coordination of requests to the satisfying agents, and assembling their responses into a coherent whole, for return to the requester.

A further preferred embodiment of present invention extends facilitation so the facilitator can employ strategies and advice given by the requesting agent, resulting in a variety of interaction patterns that may be instantiated in the satisfaction of a request.

A further preferred embodiment of present invention handles the distribution of both data update requests and requests for installation of triggers, preferably using some of the same strategies that are employed in the delegation of service requests.

Note that the reliance on facilitation is not absolute; that is, there is no hard requirement that requests and services be matched up by the facilitator, or that interagent communications go through the facilitator. There is preferably support in the agent library for explicit addressing of requests. However, a preferred embodiment of the present invention encourages employment the paradigm of agent communities, minimizing their development effort, by taking advantage of the facilitator's provision of transparent delegation and handling of compound goals.

A facilitator is preferably viewed as a coordinator, not a controller, of cooperative task completion. A facilitator preferably never initiates an activity. A facilitator preferably responds to requests to manage the satisfaction of some goal, the update of some data repository, or the installation of a trigger by the appropriate agent or agents. All agents can preferably take advantage of the facilitator's expertise in delegation, and its up-to-date knowledge about the current membership of a dynamic community. The facilitator's coordination services often allows the developer to lessen the complexity of individual agents, resulting in a more manageable software development process, and enabling the creation of lightweight agents.

Maintaining Data Repositories

The agent library supports the creation, maintenance, and use of databases, in the form of data solvables. Creation of a data solvable requires only that it be declared. Querying a data solvable, as with access to any solvable, is done using oaa_Solve.

A data solvable is conceptually similar to a relation in a relational database. The facts associated with each solvable are maintained by the agent library, which also handles incoming messages containing queries of data solvables. The default behavior of an agent library in managing these facts may preferably be refined, using parameters specified with the solvable's declaration. For example, the parameter single_value preferably indicates that the solvable should only contain a single fact at any given point in time. The parameter unique_values preferably indicates that no duplicate values should be stored.

Other parameters preferably allow data solvables use of the concepts of ownership and persistence. For implementing shared repositories, it is often preferable to maintain a record of which agent created each fact of a data solvable with the creating agent being preferably considered the fact's owner. In many applications, it is preferable to remove an agent's facts when that agent goes offline (for instance, when the agent is no longer participating in the agent community, whether by deliberate termination or by malfunction). When a data solvable is declared to be non-persistent, its facts are automatically maintained in this way, whereas a persistent data solvable preferably retains its facts until they are explicitly removed.

A further preferred embodiment of present invention supports an agent library through procedures by which agents can update (add, remove, and replace) facts belonging to data solvables, either locally or on other agents, given that they have preferably the required permissions. These procedures may preferably be refined using many of the same parameters that apply to service requests. For example, the address parameter preferably specifies one or more particular agents to which the update request applies. In its absence, just as with service requests, the update request preferably goes to all agents providing the relevant data solvable. This default behavior can be used to maintain coordinated "mirror" copies of a data set within multiple agents, and can be useful in support of distributed, collaborative activities.

Similarly, the feedback parameters, described in connection with oaa_Solve, are preferably available for use with data maintenance requests.

A further preferred embodiment of present invention supports ability to provide data solvables not just to client agents, but also to facilitator agents. Data solvables can preferably created, maintained and used by a facilitator. The facilitator preferably can, at the request of a client of the facilitator, create, maintain and share the use of data solvables with all the facilitator's clients. This can be useful with relatively stable collections of agents, where the facilitator's workload is predictable.

Using a Blackboard Style of Communication

In a further preferred embodiment of present invention, when a data solvable is publicly readable and writable, it acts essentially as a global data repository and can be used cooperatively by a group of agents. In combination with the use of triggers, this allows the agents to organize their efforts around a "blackboard" style of communication.

As an example, the "DCG-NL" agent (one of several existing natural language processing agents), provides natural language processing services for a variety of its peer agents, expects those other agents to record, on the facilitator, the vocabulary to which they are prepared to respond, with an indication of each word's part of speech,

and of the logical form (ICL sub-goal) that should result from the use of that word. In a further preferred embodiment of present invention, the NL agent, preferably when it comes online, preferably installs a data solvable for each basic part of speech on its facilitator. For instance, one such solvable would be:

solvable(noun(Meaning, Syntax), [ ], [ ])

Note that the empty lists for the solvable's permissions and parameters are acceptable here, since the default permissions and parameters provide appropriate functionality.

A further preferred embodiment of present invention incorporating an Office Assistant system as discussed herein or similar to the discussion here supports several agents making use of these or similar services. For instance, the database agent uses the following call, to library procedure oaa_AddData, to post the noun 'boss', and to indicate that the "meaning" of boss is the concept 'manager':

oaa_AddData(noun(manager, atom(boss)), [address (parent)])

Autonomous Monitoring with Triggers

A further preferred embodiment of present invention includes support for triggers, providing a general mechanism for requesting some action be taken when a set of conditions is met. Each agent can preferably install triggers either locally, for itself, or remotely, on its facilitator or peer agents. There are preferably at least four types of triggers: communication, data, task, and time. In addition to a type, each trigger preferably specifies at least a condition and an action, both preferably expressed in ICL. The condition indicates under what circumstances the trigger should fire, and the action indicates what should happen when it fires. In addition, each trigger can be set to fire either an unlimited number of times, or a specified number of times, which can be any positive integer.

Triggers can be used in a variety of ways within preferred embodiments of the present invention. For example, triggers can be used for monitoring external sensors in the execution environment, tracking the progress of complex tasks, or coordinating communications between agents that are essential for the synchronization of related tasks. The installation of a trigger within an agent can be thought of as a representation of that agent's commitment to carry out the specified action, whenever the specified condition holds true.

Communication triggers preferably allow any incoming or outgoing event (message) to be monitored. For instance, a simple communication trigger may say something like: "Whenever a solution to a goal is returned from the facilitator, send the result to the presentation manager to be displayed to the user."

Data triggers preferably monitor the state of a data repository (which can be maintained on a facilitator or a client agent). Data triggers' conditions may be tested upon the addition, removal, or replacement of a fact belonging to a data solvable. An example data trigger is: "When 15 users are simultaneously logged on to a machine, send an alert message to the system administrator."

Task triggers preferably contain conditions that are tested after the processing of each incoming event and whenever a timeout occurs in the event polling. These conditions may specify any goal executable by the local ICL interpreter, and most often are used to test when some solvable becomes satisfiable. Task triggers are useful in checking for task-specific internal conditions. Although many cases such conditions are captured by solvables, in other cases they may not be. For example, a mail agent might watch for new incoming mail, or an airline database agent may monitor which flights will arrive later than scheduled. An example task trigger is: "When mail arrives for me about security, notify me immediately."

Time triggers preferably monitor time conditions. For instance, an alarm trigger can be set to fire at a single fixed point in time (e.g., "On December 23rd at 3 pm"), or on a recurring basis (e.g., "Every three minutes from now until noon").

Triggers are preferably implemented as data solvables, declared implicitly for every agent. When requesting that a trigger be installed, an agent may use many of the same parameters that apply to service and data maintenance requests.

A further preferred embodiment of present invention incorporates semantic support, in contrast with most programming methodologies, of the agent on which the trigger is installed only having to know how to evaluate the conditional part of the trigger, not the consequence. When the trigger fires, the action is delegated to the facilitator for execution. Whereas many commercial mail programs allow rules of the form "When mail arrives about XXX, [forward it, delete it, archive it]", the possible actions are hard-coded and the user must select from a fixed set.

A further preferred embodiment of present invention, the consequence of a trigger may be any compound goal executable by the dynamic community of agents. Since new agents preferably define both functionality and vocabulary, when an unanticipated agent (for example, a fax agent) joins the community, no modifications to existing code is required for a user to make use of it—"When mail arrives, fax it to Bill Smith."

The Agent Library

In a preferred embodiment of present invention, the agent library provides the infrastructure for constructing an agent-based system. The essential elements of protocol (involving the details of the messages that encapsulate a service request and its response) are preferably made transparent to simplify the programming applications. This enables the developer to focus functionality, rather than message construction details and communication details. For example, to request a service of another agent, an agent preferably calls the library procedure oaa_Solve. This call results in a message to a facilitator, which will exchange messages with one or more service providers, and then send a message containing the desired results to the requesting agent. These results are returned via one of the arguments of oaa_Solve. None of the messages involved in this scenario is explicitly constructed by the agent developer. Note that this describes the synchronous use of oaa_Solve.

In another preferred embodiment of present invention, an agent library provides both intraagent and interagent infrastructure; that is, mechanisms supporting the internal structure of individual agents, on the one hand, and mechanisms of cooperative interoperation between agents, on the other. Note that most of the infrastructure cuts across this boundary with many of the same mechanisms supporting both agent internals and agent interactions in an integrated fashion. For example, services provided by an agent preferably can be accessed by that agent through the same procedure (oaa_Solve) that it would employ to request a service of another agent (the only difference being in the address parameter accompanying the request). This helps the developer to reuse code and avoid redundant entry points into the same functionality.

Both of the preferred characteristics described above (transparent construction of messages and integration of intraagent with interagent mechanisms) apply to most other

library functionality as well, including but not limited to data management and temporal control mechanisms.

Source Code Appendix

Source code for version 2.0 of the OAA software product is included as an appendix hereto, and is incorporated herein by reference. The code includes an agent library, which provides infrastructure for constructing an agent-based system. The library's several families of procedures provide the functionalities discussed above, as well as others that have not been discussed here but that will be sufficiently clear to the interested practitioner. For example, declarations of an agent's solvables, and their registration with a facilitator, are managed using procedures such as oaa__Declare, oaa__Undeclare, and oaa__Redeclare. Updates to data solvables can be accomplished with a family of procedures including oaa__AddData, oaa__RemoveData, and oaa__ReplaceData. Similarly, triggers are maintained using procedures such as oaa__AddTrigger, oaa__RemoveTrigger, and oaa__ReplaceTrigger. The provided source code also includes source code for an OAA Facilitator Agent.

The source code appendix is offered solely as a means of further helping practitioners to construct a preferred embodiment of the invention. By no means is the source code intended to limit the scope of the present invention.

Illustrative Applications

To further illustrate the technology of the preferred embodiment, we will next present and discuss two sample applications of the present inventions.

Unified Messaging

A further preferred embodiment of present invention incorporates a Unified Messaging application extending the Automated Office application presented previously herein with an emphasis on ubiquitous access and dynamic presentation of the information and services supported by the agent community. The agents used in this application are depicted in FIG. **12**.

A hypothetical example of realistic dialog using a preferred embodiment of the present invention can provide insight into how systems may preferably be built using the present invention. In this scenario, the user, with only a telephone as an interface, is planning a trip to Boston where he will soon give a presentation. Capitalized sentences are phrases spoken by the user into the telephone and processed by a phone agent **452**.

Responses, unless otherwise indicated, are spoken by the system using text-to-speech generation agent **454**.

1.1 Welcome to SRI International. Please enter your user ID and password.

<User enters touchtone ID and password>

Good to see you again Adam Cheyer. I am listening to you.

Every user interface agent **408**, including the telephone agent **452**, should know the identify of its user. This information is used in resolving anaphoric references such as "Me" and "I", and allows multiple user interfaces operated by the same user to work together.

1.2 WHAT IS TODAY'S SCHEDULE?

Here is today's schedule for Adam Cheyer:

At 10 am for 1 hour, meeting with Dave.

At 3 pm for 1 hour, presentation about software agents. End of schedule.

If the user is operating both a graphical user interface and a telephone, as described in conjunction with the Automated Office application, the result of this spoken request is to display a calendar window containing the current schedule. In this case, with no graphical display available, the GEN__NL agent **1202** is tasked to produce a spoken response that can be played over the phone. GEN__NL shares the same dynamic vocabulary and phrasal rules as the natural language parser DCG__NL **426**, and contains strategies for producing responses to queries using either simple or list-based multimedia utterances.

1.3 FIND FRIDAY'S WEATHER IN BOSTON.

The weather in Boston for Friday is as follows:

Sunny in the morning. Partly cloudy in the afternoon with a 20

percent chance of thunderstorms late. Highs in the mid 70s.

In addition to data accessible from legacy applications, content may be retrieved by web-reading agents which provide wrappers around useful websites.

1.4 FIND ALL NEW MAIL MESSAGES.

There are 2 messages available.

Message 1, from Mark Tierny, entitled "OAA meeting."

1.5 NEXT MESSAGE

Message 2, from Jennifer Schwefler, entitled "Presentation Summary."

1.6 PLAY IT.

This message is a multipart MIME-encoded message. There are two parts.

Part **1**. (Voicemail message, not text-to speech):

Thanks for taking part as a speaker in our conference.

The schedule will be posted soon on our homepage.

1.7 NEXT PART

Part **2**. (read using text-to-speech):

The presentation home page is http://www . . .

1.8 PRINT MESSAGE

Command executed.

Mail messages are no longer just simple text documents, but often consist of multiple subparts containing audio files, pictures, webpages, attachments and so forth. When a user asks to play a complex email message over the telephone, many different agents may be implicated in the translation process, which would be quite different given the request "print it." The challenge is to develop a system which will enable agents to cooperate in an extensible, flexible manner that alleviates explicit coding of agent interactions for every possible input/output combination.

In a preferred embodiment of the present invention, each agent concentrates only on what it can do and on what it knows, and leaves other work to be delegated to the agent community. For instance, a printer agent **1204**, defining the solvable print(Object,Parameters), can be defined by the following pseudo-code, which basically says, "If someone can get me a document, in either POSTSCRIPT or text form, I can print it.".

```
print(Object, Parameters) {
   ' If Object is reference to "it", find an appropriate document
   if (Object ="ref(it)")
      oaa__Solve(resolve__reference(the, document, Params, Object),[ ]);
   ' Given a reference to some document, ask for the document in POSTSCRIPT
   if (Object ="id(Pointer)")
      oaa__Solve(resolve__id__as(id(Pointer), postscript, [ ], Object), [ ]);
   ' If Object is of type text or POSTSCRIPT, we can print it.
   if ((Object is of type Text) or (Object is of type Postscript))
      do print (Object);
}
```

In the above example, since an email message is the salient document, the mail agent **442** will receive a request

to produce the message as POSTSCRIPT. Whereas the mail agent **442** may know how to save a text message as POSTSCRIPT, it will not know what to do with a webpage or voicemail message. For these parts of the message, it will simply send oaa_Solve requests to see if another agent knows how to accomplish the task.

Until now, the user has been using only a telephone as user interface. Now, he moves to his desktop, starts a web browser **436**, and accesses the URL referenced by the mail message.

1.9 RECORD MESSAGE

Recording voice message. Start speaking now.

1.10 THIS IS THE UPDATED WEB PAGE CONTAINING THE PRESENTATION SCHEDULE.

Message one recorded.

1.11 IF THIS WEB PAGE CHANGES, GET IT TO ME WITH NOTE ONE.

Trigger added as requested.

In this example, a local agent **436** which interfaces with the web browser can return the current page as a solution to the request "oaa_Solve(resolve_reference(this, web_page, [ ], Ref),[ ])", sent by the NL agent **426**. A trigger is installed on a web agent **436** to monitor changes to the page, and when the page is updated, the notify agent **446** can find the user and transmit the webpage and voicemail message using the most appropriate media transfer mechanism.

This example based on the Unified Messaging application is intended to show how concepts in accordance with the present invention can be used to produce a simple yet extensible solution to a multi-agent problem that would be difficult to implement using a more rigid framework. The application supports adaptable presentation for queries across dynamically changing, complex information; shared context and reference resolution among applications; and flexible translation of multimedia data. In the next section, we will present an application which highlights the use of parallel competition and cooperation among agents during multi-modal fusion.

Multimodal Map

A further preferred embodiment of present invention incorporates the Multimodal Map application. This application demonstrates natural ways of communicating with a community of agents, providing an interactive interface on which the user may draw, write or speak. In a travel-planning domain illustrated by FIG. **13**, available information includes hotel, restaurant, and tourist-site data retrieved by distributed software agents from commercial Internet sites. Some preferred types of user interactions and multimodal issues handled by the application are illustrated by a brief scenario featuring working examples taken from the current system.

Sara is planning a business trip to San Francisco, but would like to schedule some activities for the weekend while she is there. She turns on her laptop PC, executes a map application, and selects San Francisco.

2.1 [Speaking] Where is downtown?

Map scrolls to appropriate area.

2.2 [Speaking and drawing region] Show me all hotels near here.

Icons representing hotels appear.

2.3 [Writes on a hotel] Info?

A textual description (price, attributes, etc.) appears.

2.4 [Speaking] I only want hotels with a pool. Some hotels disappear.

2.5 [Draws a crosscut on a hotel that is too close to a highway)

Hotel disappears

2.6 [Speaking and circling] Show me a photo of this hotel.

Photo appears.

2.7 (Points to another hotel]

Photo appears.

2.8 [Speaking] Price of the other hotel?

Price appears for previous hotel.

2.9 [Speaking and drawing an arrow] Scroll down.

Display adjusted.

2.10 [Speaking and drawing an arrow toward a hotel]

What is the distance from this hotel to Fisherman's Wharf?

Distance displayed.

2.11 [Pointing to another place and speaking] And the distance to here?

Distance displayed.

Sara decides she could use some human advice. She picks up the phone, calls Bob, her travel agent, and writes Start collaboration to synchronize his display with hers. At this point, both are presented with identical maps, and the input and actions of one will be remotely seen by the other.

3.1 [Sara speaks and circles two hotels]

Bob, I'm trying to choose between these two hotels. Any opinions?

3.2 [Bob draws an arrow, speaks, and points]

Well, this area is really nice to visit. You can walk there from

this hotel.

Map scrolls to indicated area. Hotel selected.

3.3 [Sara speaks] Do you think I should visit Alcatraz?

3.4 [Bob speaks] Map, show video of Alcatraz.

Video appears.

3.5 [Bob speaks] Yes, Alcatraz is a lot of fun.

A further preferred embodiment of present invention generates the most appropriate interpretation for the incoming streams of multimodal input. Besides providing a user interface to a dynamic set of distributed agents, the application is preferably built using an agent framework. The present invention also contemplates aiding the coordinate competition and cooperation among information sources, which in turn works in parallel to resolve the ambiguities arising at every level of the interpretation process: low-level processing of the data stream, anaphora resolution, cross-modality influences and addressee.

Low-level processing of the data stream: Pen input may be preferably interpreted as a gesture (e.g., 2.5: cross-out) by one algorithm, or as handwriting by a separate recognition process (e.g., 2.3: "info?"). Multiple hypotheses may preferably be returned by a modality recognition component.

Anaphora resolution: When resolving anaphoric references, separate information sources may contribute to resolving the reference: context by object type, deictic, visual context, database queries, discourse analysis. An example of information provided through context by object type is found in interpreting an utterance such as "show photo of the hotel", where the natural language component can return a list of the last hotels talked about. Deictic information in combination with a spoken utterance like "show photo of this hotel" may preferably include pointing, circling, or arrow gestures which might indicate the desired object (e.g., 2.7). Deictic references may preferably occur before, during, or after an accompanying verbal command. Information provided in a visual context, given for the request "display photo of the hotel" may preferably include the user interface agent might determine that only one hotel

is currently visible on the map, and therefore this might be the desired reference object. Database queries preferably involving information from a database agent combined with results from other resolution strategies. Examples are "show me a photo of the hotel in Menlo Park" and 2.2. Discourse analysis preferably provides a source of information for phrases such as "No, the other one" (or 2.8).

The above list of preferred anaphora resolution mechanisms is not exhaustive. Examples of other preferred resolution methods include but are not limited to spatial reasoning ("the hotel between Fisherman's Wharf and Lombard Street") and user preferences ("near my favorite restaurant").

Cross-modality influences: When multiple modalities are used together, one modality may preferably reinforce or remove or diminish ambiguity from the interpretation of another. For instance, the interpretation of an arrow gesture may vary when accompanied by different verbal commands (e.g., "scroll left" vs. "show info about this hotel"). In the latter example, the system must take into account how accurately and unambiguously an arrow selects a single hotel.

Addressee: With the addition of collaboration technology, humans and automated agents all share the same workspace. A pen doodle or a spoken utterance may be meant for either another human, the system (3.1), or both (3.2).

The implementation of the Multimodal Map application illustrates and exploits several preferred features of the present invention: reference resolution and task delegation by parallel parameters of oaa_Solve, basic multi-user collaboration handled through built-in data management services, additional functionality readily achieved by adding new agents to the community, domain-specific code cleanly separated from other agents.

A further preferred embodiment of present invention provides reference resolution and task delegation handled in a distributed fashion by the parallel parameters of oaa_Solve, with meta-agents encoding rules to help the facilitator make context- or user-specific decisions about priorities among knowledge sources.

A further preferred embodiment of present invention provides basic multi-user collaboration handled through at least one built-in data management service. The map user interface preferably publishes data solvables for elements such as icons, screen position, and viewers, and preferably defines these elements to have the attribute "shareable". For every update to this public data, the changes are preferably automatically replicated to all members of the collaborative session, with associated callbacks producing the visible effect of the data change (e.g., adding or removing an icon).

Functionality for recording and playback of a session is preferably implemented by adding agents as members of the collaborative community. These agents either record the data changes to disk, or read a log file and replicate the changes in the shared environment.

The domain-specific code for interpreting travel planning dialog is preferably separated from the speech, natural language, pen recognition, database and map user interface agents. These components were preferably reused without modification to add multimodal map capabilities to other applications for activities such as crisis management, multi-robot control, and the MVIEWS tools for the video analyst.

Improved Scalability and Fault Tolerance

Implementations of a preferred embodiment of present invention which rely upon simple, single facilitator architectures may face certain limitations with respect to scalability, because the single facilitator may become a communications bottleneck and may also represent a single, critical point for system failure.

Multiple facilitator systems as disclosed in the preferred embodiments to this point can be used to construct peer-to-peer agent networks as illustrated in FIG. **14**. While such embodiments are scalable, they do possess the potential for communication bottlenecks as discussed in the previous paragraph and they further possess the potential for reliability problems as central, critical points of vulnerability to systems failure.

A further embodiment of present invention supports a facilitator implemented as an agent like any other, whereby multiple facilitator network topologies can be readily constructed. One example configuration (but not the only possibility) is a hierarchical topology as depicted in FIG. **15**, where a top level Facilitator manages collections of both client agents **1508** and other Facilitators, **1504** and **1506**. Facilitator agents could be installed for individual users, for a group of users, or as appropriate for the task.

Note further, that network work topologies of facilitators can be seen as graphs where each node corresponds to an instance of a facilitator and each edge connecting two or more nodes corresponds to a transmission path across one or more physical transport mechanisms. Some nodes may represent facilitators and some nodes may represent clients. Each node can be further annotated with attributes corresponding to include triggers, data, capabilities but not limited to these attributes.

A further embodiment of present invention provides enhanced scalability and robustness by separating the planning and execution components of the facilitator. In contrast with the centralized facilitation schemes described above, the facilitator system **1600** of FIG. **16** separates the registry/planning component from the execution component. As a result, no single facilitator agent must carry all communications nor does the failure of a single facilitator agent shut down the entire system.

Turning directly to FIG. **16**, the facilitator system **1600** includes a registry/planner **1602** and a plurality of client agents **1612–1616**. The registry/planner **1604** is typically replicated in one or more locations accessible by the client agents. Thus if the registry/planner **1604** becomes unavailable, the client agents can access the replicated registry/planner(s).

This system operates, for example, as follows. An agent transmits a goal **1610** to the registry planner **1602**. The registry/planner **1604** translates the goal into an unambiguous execution plan detailing how to accomplish any sub-goals developed from the compound goal, as well as specifying the agents selected for performing the sub-goals. This execution plan is provided to the requesting agent which in turn initiates peer-to-peer interactions **1618** in order to implement the detailed execution plan, routing and combining information as specified within the execution plan. Communication is distributed thus decreasing sensitivity of the system to bandwidth limitations of a single facilitator agent. Execution state is likewise distributed thus enabling system operation even when a facilitator agent fails.

Further embodiments of present invention incorporate into the facilitator functionality such as load-balancing, resource management, and dynamic configuration of agent locations and numbers, using (for example) any of the topologies discussed. Other embodiments incorporate into a facilitator the ability to aid agents in establishing peer-to-peer communications. That is, for tasks requiring a sequence of exchanges between two agents, the facilitator assists the agents in finding one another and establishing

communication, stepping out of the way while the agents communicate peer-to-peer over a direct, perhaps dedicated channel.

Further preferred embodiments of the present invention incorporate mechanisms for basic transaction management, such as periodically saving the state of agents (both facilitator and client) and rolling back to the latest saved state in the event of the failure of an agent.

What is claimed is:

**1**. A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents, comprising the acts of:

registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language, wherein the inter-agent language includes:

a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events;

a content layer comprising one or more of goals, triggers and data elements associated with the events;

receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression; and

dynamically interpreting the arbitrarily complex goal expression, said act of interpreting further comprising:

generating one or more sub-goals expressed in the inter-agent language;

constructing a goal satisfaction plan wherein the goal satisfaction plan includes:

a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and

dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent.

**2**. A computer-implemented method as recited in claim **1**, further including the following acts of:

receiving a new request for service as a base goal using the inter-agent language, in the form of another arbitrarily complex goal expression, from at least one of the selected client agents in response to the sub-goal dispatched to said agent; and

recursively applying the step of dynamically interpreting the arbitrarily complex goal expression in order to perform the new request for service.

**3**. A computer-implemented method as recited in claim **2** wherein the act of registering a specific agent further includes:

invoking the specific agent in order to activate the specific agent;

instantiating an instance of the specific agent; and

transmitting the new agent profile from the specific agent to a facilitator agent in response to the instantiation of the specific agent.

**4**. A computer-implemented method as recited in claim **1** further including the act of deactivating a specific client agent no longer available to provide services by deleting the registration of the specific client agent.

**5**. A computer-implemented method as recited in claim **1** further comprising the act of providing an agent registry data structure.

**6**. A computer-implemented method as recited in claim **5** wherein the agent registry data structure includes at least one symbolic name for each active agent.

**7**. A computer-implemented method of recited in claim **5** wherein the agent registry data structure includes at least one data declaration for each active agent.

**8**. A computer-implemented method as recited in claim **5** wherein the agent registry data structure includes at least one trigger declaration for one active agent.

**9**. A computer-implemented method as recited in claim **5** wherein the agent registry data structure includes at least one task declaration, and process characteristics for each active agent.

**10**. A computer-implemented method as recited in claim **5** wherein the agent registry data structure includes at least one process characteristic for each active agent.

**11**. A computer-implemented method as recited in claim **1** further comprising the act of establishing communication between the plurality of distributed agents.

**12**. A computer-implemented method as recited in claim **1** further comprising the acts of:

receiving a request for service in a second language differing from the inter-agent language;

selecting a registered agent capable of converting the second language into the inter-agent language; and

forwarding the request for service in a second language to the registered agent capable of converting the second language into the inter-agent language, implicitly requesting that such a conversion be performed and the results returned.

**13**. A computer-implemented method as recited in claim **12** wherein the request include a natural language query, and the second registered agent capable of converting the second language into the inter-agent language service is a natural language agent.

**14**. A computer-implemented method as recited in claim **13** wherein the natural language query was generated by a user interface agent.

**15**. A computer-implemented method as recited in claim **1**, wherein the base goal requires setting a trigger having conditional functionality and consequential functionality.

**16**. A compute-implemented method as recited in claim **15** wherein the trigger is an outgoing communications trigger, the computer implemented method further including the acts of:

monitoring all outgoing communication events in order to determine whether a specific outgoing communication event has occurred; and

in response to the occurrence of the specific outgoing communication event, performing the particular action defined by the trigger.

**17**. A computer-implemented method as recited in claim **15** wherein the trigger is an incoming communications trigger, the computer implemented method further including the acts of:

monitoring all incoming communication events in order to determine whether a specific incoming communication event has occurred; and

in response to the occurrence of a specific incoming communication event satisfying the trigger conditional functionality, performing the particular consequential functionality defined by the trigger.

**18**. A computer-implemented method as recited in claim **15** wherein the trigger is a data trigger, the computer implemented method further including the acts of:

monitoring a state of a data repository; and

in response to a particular state event satisfying the trigger conditional functionality, performing the particular consequential functionality defined by the trigger.

**19**. A computer-implemented method as recited in claim **15** wherein the trigger is a time trigger, the computer implemented method further including the acts of:

monitoring for the occurrence of a particular time condition; and

in response to the occurrence of a particular time condition satisfying the trigger conditional functionality performing the particular consequential functionality defined by the trigger.

**20**. A computer-implemented method as recited in claim **15** wherein the trigger is installed and executed within the facilitator agent.

**21**. A computer-implemented method as recited in claim **15** wherein the trigger is installed and executed, within a first service-providing agent.

**22**. A computer-implemented method as recited in claim **15** wherein the conditional functionality of the trigger is installed on a facilitator agent.

**23**. A computer-implemented method as recited in claim **22** wherein the consequential functionality is installed on a specific service-providing agent other than a facilitator agent.

**24**. A computer-implemented method as recited in claim **15** wherein the conditional functionality of the trigger is installed on specific service-providing agent other than a facilitator agent.

**25**. A computer-implemented method as recited in claim **15** wherein the consequential functionality of the trigger is installed on a facilitator agent.

**26**. A computer-method as recited in claim **1** wherein the base goal is a compound goal having sub-goals separated by operators.

**27**. A computer-implemented method as recited in claim **26** wherein the type of available operators includes a conjunction operator, a disjunction operator, and a conditional execution operator.

**28**. A computer-implemented method as recited in claim **27** wherein the type of available operators further includes a parallel disjunction operator that indicates that disjunct goals are to be performed by different agents.

**29**. A computer program stored on a computer readable medium, the computer program executable to facilitate cooperative task completion within a distributed computing environment, the distributed computing environment including a plurality of autonomous electronic agents, the distributed computing environment supporting an Interagent Communication Language, the computer program comprising computer executable instructions for:

providing an agent registry that declares capabilities of service-providing electronic agents currently active within the distributed computing environment;

interpreting a service request in order to determine a base goal that may be a compound, arbitrarily complex base goal, the service request adhering to an Interagent Communication Language (ICL), where in the ICL includes:

a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events; and

a content layer comprising one or more of goals, triggers and data elements associated with the events;

the act of interpreting including the sub-acts of:

determining any task completion advice provided by the base goal, and

determining any task completion constraints provided by the base goal;

constructing a base goal satisfaction plan including the sub-acts of:

determining whether the request service is available,

determining sub-goals required in completing the base goal by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms,

selecting service-providing electronic agents from the agent registry suitable for performing the determined sub-goals, and

ordering a delegation of sub-goal requests complete the requested service; and

implementing the base goal satisfaction plan.

**30**. A computer program as recited in claim **29** wherein the computer executable instruction for providing an agent registry includes the following computer executable instructions for registering a specific service-providing electronic agent into the agents registry

establishing a bi-directional communication link between the specific agent and a facilitator agent controlling the agent registry;

providing a new agent profile to the facilitator agent, the new agent profile defining publicly available capabilities of the specific agent; and

registering the specific agent together with the new agent profile within the agent registry, thereby making available to the facilitator agent the capabilities of the specific agent.

**31**. A computer program as recited in claim **30** wherein the computer executable instruction for registering a specific agent further includes:

invoking the specific agent in order to activate the specific agent;

instating an instance of the specific agent; and

transmitting the new agent profile from the specific agent to the facilitator agent in response to the instantiation of the specific agent.

**32**. A computer program as recited in claim **29** wherein the computer executable instruction for providing an agent registry includes a computer executable instruction for removing a specific service-providing electronic agent from the registry upon determining that the specific agent is no longer available to provide services.

**33**. A computer program as recited in claim **29** wherein the provided agent registry includes a symbolic name, a unique address, data declarations, trigger declarations, task declarations, and process characteristics for each active agent.

**34**. Computer program as recited in claim **29** further including computer executable instructions for receiving the service request via a communications link established with a client.

**35**. A computer program as recited in claim **29** wherein the computer executable instruction for providing a service request includes instructions for:

receiving a non-ICL format service request;

selecting an active agent capable of converting the non-ICL format service request into an ICL format service request;

forwarding the non-ICL format service request to the active agent capable of converting the non-ICL format service request, together with at request that such conversion be performed; and

receiving an ICL format service request corresponding to the non-ICL format service request.

**36**. A computer program as recited in claim **35** wherein the non-ICL format service request includes a natural language query, and the active agent capable of converting the non-ICL format service request into an ICL format service request is a natural language agent.

**37**. A computer program as recited in claim **36** wherein the natural language query is generated by a user in the agent.

**38**. A computer program as recited in claim **29**, the computer program further including computer executable instructions for implementing a base goal that requires setting a trigger having conditional and consequential functionality.

**39**. A computer program as recited in claim **38** wherein the trigger is an outgoing communications trigger, the computer program further including computer executable instructions for:

monitoring all outgoing communication events in order to determine whether a specific outgoing communication event has occurred; and

in response to the occurrence of the specific outgoing communication event, performing the particular action defined by the trigger.

**40**. A computer program as recited in claim **38** wherein the trigger is an incoming communications trigger, the computer program further including computer executable instructions for;

monitoring all incoming communication events in order to determine whether a specific incoming communication event has occurred; and

in response to the occurrence of the specific incoming communication event, performing the particular action defined by the trigger.

**41**. A computer program as recited in claim **38** wherein the trigger is a data trigger, the computer program further including computer executable instructions for:

monitoring a state of a data repository; and

in response to a particular state event, performing the particular action defined by the trigger.

**42**. A computer program as recited in claim **38** wherein the trigger is a time trigger, the computer program further including computer executable instructions for:

monitoring for the occurrence of a particular time condition; and

in response to the occurrence of the particular time condition, performing the particular action defined by the trigger.

**43**. A computer program as recited in claim **38** further including computer executable instructions for instating and executing the trigger within the facilitator agent.

**44**. A computer program as recited in claim **38** further including computer executable instructions for instating and executing the trigger within a first service-providing agent.

**45**. A computer program as recited in claim **29** further including computer executable instructions for interpreting compound goals having sub-goals separated by operators.

**46**. A computer program as recited in claim **45** wherein the type of available operators includes a conjunction operator, a disjunction operator, and a conditional execution operator.

**47**. A computer program as recited in claim **46** wherein the type of available operators further includes parallel disjunction operator that indicates that distinct goals are to be performed by different agents.

**48**. An Interagent Communication Language (ICL) providing a basis for facilitated cooperative task completion within a distributed computing environment having a facilitator agent and a plurality of autonomous service-providing electronic agents, wherein:

the ICL having:

a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events; and

a content layer comprising one or more of goals, triggers and data elements associated with the events;

the ICL having one or more features from a set of features comprising:

enabling agents perform queries of other agents;

enabling agents to exchange information with other gents; and

enabling agents to set triggers within other agents; and

the ICL having a syntax supporting compound goal expressions wherein said compound goal expressions are such that goals within a single request provided according to the ICL syntax may be coupled by one or more operators from a set of operators comprising:

a conditional execution operator; and

a parallel disjunctive operation that indicates that disjunct goals are to be performed by different agents.

**49**. An ICL as recited in claim **48**, wherein the ICL is computer platform independent.

**50**. An ICL as recited in claim **48** wherein the ICL is independent of computer programming languages which the plurality of agents are programmed in.

**51**. An ICL as recited in claim **48** wherein the ICL syntax supports explicit task completion constraints include use of specific agent constraints and response time constraints.

**52**. An ICL as recited in claim **51**, wherein possible types of task completion constraints include use of specific agent constraints and response time constraints.

**53**. An ICL as recited in claim **51** wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions.

**54**. An ICL as recited in claim **48** wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions.

**55**. An ICL as recited in claim **48** wherein each autonomous service-providing electronic agent defines and publishes a set of capability declarations or solvables, expressed in ICL, that describes services provided by such electronic agent.

**56**. An ICL as recited in claim **55** wherein an electronic agent's solvables define an interface for the electronic agent.

**57**. An ICL as recited in claim **56** wherein the facilitator agent maintains an agent registry making available plurality of electronic agent interfaces.

**58**. An ICL as recited in claim **57** wherein the possible types of solvables includes procedure solvables, a procedure solvable operable to implement a procedure such as a test or an action.

**59**. An ICL as recited in claim **58** wherein the possible types of solvables further includes data solvables, a data solvable operable to provide access to a collection of data.

**60**. An ICL as recited in claim **58** wherein the possible types of solvables includes data solvables, a data solvable operable to provide access to a collection of data.

**61**. A facilitator agent arranged to coordinate cooperative task completion within a distributed computing environment having a plurality of autonomous service-providing electronic agents, the facilitator agent comprising:

an agent registry that declares capabilities of service-providing electronic agents currently active within the distributed computing environment; and

a facilitating engine operable to parse a service requesting order to interpret a compound goal set forth therein, the compound goal including both local and global constraints and control parameters, the service request formed according to an Interagent Communication Language (ICL), wherein the ICL includes:

a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events; and

a content layer comprising one or more of goals, triggers and data elements associated with the events; and

the facilitating engine further operable to construct a goal satisfaction plan by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms.

**62**. A facilitator agent as recited in claim **61**, wherein the facilitating engine is capable of modifying the goal satisfaction plan during execution, the modifying initiated by events such as new agent declarations within the agent registry, decisions made by remote agents, and information, provided to the facilitating engine by remote agents.

**63**. A facilitator agent as recited in claim **61** wherein the agent registry includes a symbolic name, a unique address, data declarations, trigger declarations, task declarations, and process characteristics for each active agent.

**64**. A facilitator agent as recited in claim **61** wherein the facilitating engine is operable to install a trigger mechanism requesting that a certain action be taken when a certain set of conditions are met.

**65**. A facilitator agent as recited in claim **64** wherein the trigger mechanism is a communication trigger that monitors communication events and performs the certain action when a certain communication event occurs.

**66**. A facilitator agent as recited in claim **64** wherein the trigger mechanism is a data trigger that monitors a state of a data repository and performs the certain action when a certain data state is obtained.

**67**. A facilitator agent as recited in claim **66** wherein the data repository is local to the facilitator agent.

**68**. A facilitator agent as recited in claim **66** wherein the data repository is remote from the facilitator agent.

**69**. A facilitator agent as recited in claim **64** wherein the trigger mechanism is a task trigger having a set of conditions.

**70**. A facilitator agent as recited in claim **61**, the facilitator agent further including a global database accessible to at least one of the service-providing electronic agents.

**71**. A software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture contemplating a distributed computing system comprising:

a plurality of service-providing electronic agents;

an Interagent Communication Language (ICL), wherein the inter-agent language includes:

a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events; and

a content layer comprising one or more of goals, triggers and data elements associated with the events; and

a facilitator agent in bi-directional communications with the plurality of service-providing electronic agents, the facilitator agent including:

an agent registry that declares capabilities of service-providing electronic agents currently active within the distributed computing environment;

a facilitating engine operable to parse a service request in order to interpret an arbitrarily complex goal set forth therein, the facilitating engine further operable to construct a goal satisfaction plan including the coordination of a suitable delegation of sub-goal requests to best complete the requested service by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms.

**72**. A computer architecture as recited in claim **71**, wherein the Interagent Communication Language (ICL) is for enabling agents to perform queries of other agents, exchange Information with other agents, and set triggers within other agents, the ICL further defined by an ICL syntax supporting compound goal expressions such that goals within single request provided according to the ICL syntax may be coupled by a conjunctive operator, a disjunctive operator, a conditional execution operator, and a parallel disjunctive operator parallel disjunctive operator that indicates that disjunct goals are to be performed by different agents.

**73**. A computer architecture as recited in claim **72**, wherein the ICL is computer platform independent.

**74**. A computer architecture as recited in claim **73** wherein the ICL is independent of computer programming languages in which the plurality of agents are programmed.

**75**. A computer architecture as recited in claim **73** wherein the ICL syntax supports explicit task completion constraints within goal expressions.

**76**. A computer architecture as recited in claim **75** wherein possible types of task completion constraints include use of specific agent constraints and response time constraints.

**77**. A computer architecture as recited in claim **75** wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions.

**78**. A computer architecture as recited in claim **73** wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions.

**79**. A computer architecture as recited in claim **73** wherein each autonomous service-providing electronic agent defines and publishes a set of capability declarations or solvables, expressed in ICL, that describes services provided by such electronic agent.

**80**. A computer architecture as recited in claim **79** wherein an electronic agent's solvables define an interface for the electronic agent.

**81**. A computer architecture as recited in claim **80** wherein the possible types of solvables includes procedure solvables, a procedure solvable operable to implement a procedure such as a test or an action.

**82**. A computer architecture as recited in claim **81** wherein the possible types of solvables further includes data solvables, a data solvable operable to provide access to a collection of data.

**83**. A computer architecture as recited in claim **82** wherein the possible types of solvables includes a data solvable operable to provide access to modify a collection of data.

**84**. A computer architecture as recited in claim **71** wherein a planning component of the facilitating engine are distributed across at least two computer processes.

**85**. A computer architecture as recited in claim **71** wherein an execution component of the facilitating engine is distributed across at least two computer process.

**86**. A data wave carrier providing a transport mechanism for information communication in a distributed computing environment having at least one facilitator agent and at least one active client agent, and an Interagent Communication Language (ICL), wherein the ICL includes:

a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events; and

a content layer comprising one or more of goals, triggers and data elements associated with the events;

wherein said at least one facilitator agent is operable to construct a goal satisfaction plan by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms for satisfying one or more requests for service from said at least one active client agent, the data wave carrier comprising a signal representation of an inter-agent language description of an active client agent's functional capabilities.

**87**. A data wave carrier as recited in claim **86**, the data wave carrier further comprising a corresponding signal representation of said one or more requests for service in the inter-agent language from a first agent to a second agent.

**88**. A data wave carrier as recited in claim **86**, the data wave carrier further comprising a signal representation of a goal dispatched to an agent for performance from a facilitator agent.

**89**. A data wave carrier as recited in claim **88** wherein a later state of the data wave carrier comprises a signal representation of a response to the dispatched goal including results and/or a status report from the agent for performance to the facilitator agent.

* * * * *

US007069560B1

(12) **United States Patent**
**Cheyer et al.**

(10) **Patent No.: US 7,069,560 B1**
(45) **Date of Patent: *Jun. 27, 2006**

(54) **HIGHLY SCALABLE SOFTWARE-BASED ARCHITECTURE FOR COMMUNICATION AND COOPERATION AMONG DISTRIBUTED ELECTRONIC AGENTS**

(75) Inventors: **Adam J. Cheyer**, Palo Alto, CA (US); **David L. Martin**, Santa Clara, CA (US)

(73) Assignee: **SRI International**, Menlo Park, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/271,614**

(22) Filed: **Mar. 17, 1999**

**Related U.S. Application Data**

(63) Continuation of application No. 09/225,198, filed on Jan. 5, 1999, now Pat. No. 6,851,115.

(51) **Int. Cl.**
***G06F 9/54*** (2006.01)

(52) **U.S. Cl.** ....................................... **719/317**; 709/202

(58) **Field of Classification Search** ................ 709/317, 709/202; 719/317

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,197,005 A 3/1993 Schwartz et al.
5,386,556 A 1/1995 Hedin et al.
5,434,777 A 7/1995 Luciw
5,519,608 A 5/1996 Kupiec
5,608,624 A 3/1997 Luciw
5,721,938 A 2/1998 Stuckey
5,729,659 A 3/1998 Potter
5,748,974 A 5/1998 Johnson
5,774,859 A 6/1998 Houser et al.
5,794,050 A 8/1998 Dahlgren et al.
5,802,526 A 9/1998 Fawcett et al.
5,805,775 A 9/1998 Eberman et al.
5,855,002 A 12/1998 Armstrong
5,890,123 A 3/1999 Brown et al.
5,963,940 A 10/1999 Liddy et al.
6,003,072 A 12/1999 Gerritsen et al.
6,012,030 A 1/2000 French-St. George et al.
6,021,427 A 2/2000 Spagna et al.
6,026,388 A 2/2000 Liddy et al.
6,049,819 A * 4/2000 Buckle et al. .............. 709/202
6,080,202 A 6/2000 Strickland et al.
6,134,580 A * 10/2000 Tahara et al. ............... 709/202
6,144,989 A 11/2000 Hodjat et al.
6,173,279 B1 1/2001 Levin et al.
6,192,338 B1 2/2001 Haszto et al.

(Continued)

FOREIGN PATENT DOCUMENTS

EP 0 803 826 A2 10/1997

(Continued)

OTHER PUBLICATIONS

Nwana, Hyacinth et al. "Software Agent Technologies". BT Technology Journal. 1996.*

(Continued)

*Primary Examiner*—Lewis A. Bullock, Jr.
(74) *Attorney, Agent, or Firm*—Perkins Coie LLP

(57) **ABSTRACT**

A highly flexible, software-based architecture is disclosed for supporting cooperative task completion by flexible, dynamic configurations of autonomous electronic agents. Communications and cooperation between agents are brokered by one or more facilitators. The facilitators employ strategic reasoning for generating a goal satisfaction plan to fulfill arbitrarily complex goals by users and service requesting agents.

**55 Claims, 16 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,226,666 | B1 | 5/2001 | Chang et al. | |
| 6,338,081 | B1 | 1/2002 | Furusawa et al. | |
| 6,484,155 | B1 * | 11/2002 | Kiss et al. | 706/46 |
| 6,557,025 | B1 * | 4/2003 | Hattori et al. | 709/202 |
| 2001/0039562 | A1 * | 11/2001 | Sato | 709/202 |
| 2003/0167247 | A1 * | 9/2003 | Masuoka | 706/46 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 00/11869 | 3/2000 |

OTHER PUBLICATIONS

Busetta, Paolo et al. "The BDIM Agent Toolkit Design." 1997.*
Mayfield, James et al. "Desiderata for Agent Communication Languages." Mar. 27-29, 1995.*
Khedro, Taha et al. Concurrent Engineering through Interoperable Software Agents. Aug. 1994.*
Dowding, John et al., "Gemini: A Natural Language System For Spoken-Language Understanding", SRI International.
http://www.ai.sri.com/~oaa/infowiz.html, InfoWiz: An Animated Voice Interactive Information System, May 8, 2000.
Dowding, John, "Interleaving Syntax and Semantics in an Efficient Bottom-up Parser", SRI International.
Moore, Robert et al., "Combining Linguistic and Statistical Knowledge Sources in a Natural-Language Processing for ATIS", SRI International.
Stent, Amanda et al., "The CommandTalk Spoken Dialog System", SRI International.
Moore, Robert et al., CommandTalk: A Spoken-Language Interface for Battlefield Simulations:, Oct. 23, 1997, SRI International.
Dowding, John et al., "Interpreting Language in Context in CommandTalk", Feb. 5, 1999, SRI International.
Moran, Douglas B. and Cheyer, Adam J., "Intelligent Agent-based User Interfaces", Article Intelligence center, SRI International.
Martin, David L., Cheyer, Adam J. and Moran, Douglas B., "Building Distributed Software Systems with the Open Agent Architecture".
Cohen, Philip R. and Cheyer, Adam, SRI International, Wang, Michelle, Stanford University, Baeg, Soon Cheol, Etri, "An Open Agent Architecture" AAAI Spring Symposium, pp1-8, Mar. 1994.
Julia, Luc E. and Cheyer, Adam J., SRI International "Cooperative Agents and Recognition Systems (CARS) for Drivers and Passengers".
Moran, Douglas B., Cheyer, Adam J., Julia, Luc E., Martin, David L., SRI International, and Park, Sangkyu, Electronics and Telecommunications Research Institute, "Multimodal User Interfaces in the Open Agent Architecture".
Cheyer, Adam and Lulia, Luc, SRI International "Multimodal Maps: An Agent-based Approach".
Cutkosky, Mark R., Engelmore, Robert S., Fikes, Richard E., Genesereth, Michael R., Gruber, Thomas R., Stanford University, Mark, William, Lockheed Palo Alto Research Labs, Tenenbaum, Jay M., Weber, Jay C., Enterprise Integration Technologies, "An Experiment in Integrating Concurrent Engineering Systems".
Martin, David L., Cheyer, Adam, SRI International, Lee, Gowang-Lo, Etri, "Development Tools for the Open Agent Architecture", The Practical Application of Intelligent Agents and Multi-Agent Technology (PAAM96), London, Apr. 1996.
Cheyer, Adam, Martin, David and Moran, Douglas, "The Open Agent architecture™", SRI International, AI Center.
Dejima, Inc., http://www.dejima.com/.
Martin, David; Oohama, Hiroki; Moran, Douglas; Cheyer, Adam; "Information Brokering in an Agent Architecture," Proceeding of the 2nd International Conference on Practical Application of Intelligent Agents & Multi-Agent Technology, London, Apr. 1997.


* cited by examiner




Fig. 1
(Prior Art)




Fig. 2
(Prior Art)


300
310
Facilitator Agent
Agent
Agent
Agent
Agent
Agent
Agent
Agent
Agent
Agent
Agent
320
320
320
320
320
320
320
320
320
320

Fig. 3


400
402
Facilitator Agent
416
Registry
418
Interagent Communication Language (ICL)
User Interface Agent
NL to ICL Agent
Application Agent
Meta Agent
408
410
404
406
API
Application
412
Modality Agents
414

Fig. 4


Open Agent Architecture
CHEYER
Addresses
16:19
MAIL
ADAM CHEYER
SRI INTERNATIONAL
Connected to server. Agents are now active.
Adam Cheyer
When mail arrives for me about "security" get it to me by telephone.|
Do It

Fig. 5


FACILITATOR AGENT
402
Fax Agent
Printer Agent
1204
Telephone Agent
452
Text To Speech Agent
454
Database Agent
450
Calender Agent
432
Web Agent
Notify Agent
446
Electronic Mail Agent
442
User Preferences
448
424
Natural Language Parser Agent
426
"Me"
428
430
Speaker ID Agent
Gen-NL Agent
1202
Voicemail Agent
Speech Recognition Agent
438
408
User Interface Agents
422
420

Fig. 6


Agent Registry
702
Symbolic Name
Unique Address
Capability Declarations
Data Declarations
Trigger Declarations
Task Declarations
Process Characteristics (Machine Type Language, etc.
704
706
708
710
712
714
716
Global Persistent Database
720
700

Fig. 7


Start Agent Registration
800
Installer Invokes New Client Agent
802
System Instantiates New Client Agent
804
Facilitator And New Client Agent Establish Communications Link
806
Client Agent Transmits Profile To Facilitator
808
Facilitator Registers Client Agent
810
Cone
812

Fig. 8


Start
900
Determine A Goal
902
Construct Goal Into ICL
904
Transmit Goal To Parent Facilitator
906
Receive Results
908
Done
910

Fig. 9



Start
1000
Receive Request For Service
1002
Parse Request For Request
1004
No
Service Available?
1006
Return Status Report
1008
Yes
Perform Service
1010
Return Results And/Or Status Report
1012
Done
1014


Fig. 10


Start
1100
Receive Goal Request
1102
Parse And Interpret Goal Request
1104
Construct Goal Satisfaction Plan
1106
Determine Required Sub-Goals
1108
Select Agents Suitable For Performing Required Sub-Goals
1110
Transmit Requests To Selected Agents
1112
Receive Results
1114
No
Original Goal Completed?
1116
Yes
Return Results
1118
Done
1120

Fig. 11


FACILITATOR AGENT
402
Fax Agent
Printer Agent
1204
Telephone Agent
452
Text To Speech Agent
454
Database Agent
450
Calender Agent
432
Web Agent
Notify Agent
446
Electronic Mail Agent
442
User Preferences
448
Natural Language Parser Agent
426
Speaker ID Agent
Gen-NL Agent
1202
Voicemail Agent
Speech Recognition Agent
User Interface Agents
408
420

Fig. 12


[San Francisco, CA:12]
File Edit Action Collaboration Window Help
STOP
[San Francisco, CA:12]
Atherton
Menlo Park
Historic Tree
Stanford University
[San Francisco, CA:12]
San Francisco Bay
Pier 48
North Beach
Chinatown
comfort

Fig. 13


1400
1402
1404
Facilitator
Agent 1
Facilitator
Agent 2
Agent
Agent
Agent
Agent
1406
1408
1410
1412

Fig. 14


1500
1502
Facilitator
1508
1506
1504
Facilitator
Facilitator
1512
1516
1510
1514

Fig. 15


1600
Replicated
1616
1614
1618
1604
Registry &
Planner
1610
Agent
E
1612

Figure 16

# HIGHLY SCALABLE SOFTWARE-BASED ARCHITECTURE FOR COMMUNICATION AND COOPERATION AMONG DISTRIBUTED ELECTRONIC AGENTS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This is a Continuation application of U.S. patent application Ser. No. 09/225,198, filed Jan. 5, 1999, now U.S. Pat. No. 6,851,115, which application is incorporated herein by reference in its entirety.

## BACKGROUND OF THE INVENTION

Field of the Invention

The present invention is related to distributed computing environments and the completion of tasks within such environments. In particular, the present invention teaches a variety of software-based architectures for communication and cooperation among distributed electronic agents. Certain embodiments teach interagent communication languages enabling client agents to make requests in the form of arbitrarily complex goal expressions that are solved through facilitation by a facilitator agent.

Context and Motivation for Distributed Software Systems

The evolution of models for the design and construction of distributed software systems is being driven forward by several closely interrelated trends: the adoption of a networked computing model, rapidly rising expectations for smarter, longer-lived, more autonomous software applications and an ever increasing demand for more accessible and intuitive user interfaces.

Prior Art FIG. **1** illustrates a networked computing model **100** having a plurality of client and server computer systems **120** and **122** coupled together over a physical transport mechanism **140**. The adoption of the networked computing model **100** has lead to a greatly increased reliance on distributed sites for both data and processing resources. Systems such as the networked computing model **100** are based upon at least one physical transport mechanism **140** coupling the multiple computer systems **120** and **122** to support the transfer of information between these computers. Some of these computers basically support using the network and are known as client computers (clients). Some of these computers provide resources to other computers and are known as server computers (servers). The servers **122** can vary greatly in the resources they possess, access they provide and services made available to other computers across a network. Servers may service other servers as well as clients.

The Internet is a computing system based upon this network computing model. The Internet is continually growing, stimulating a paradigm shift for computing away from requiring all relevant data and programs to reside on the user's desktop machine. The data now routinely accessed from computers spread around the world has become increasingly rich in format, comprising multimedia documents, and audio and video streams. With the popularization of programming languages such as JAVA, data transported between local and remote machines may also include programs that can be downloaded and executed on the local machine. There is an ever increasing reliance on networked computing, necessitating software design approaches that allow for flexible composition of distributed processing elements in a dynamically changing and relatively unstable environment.



In an increasing variety of domains, application designers and users are coming to expect the deployment of smarter, longer-lived, more autonomous, software applications. Push technology, persistent monitoring of information sources, and the maintenance of user models, allowing for personalized responses and sharing of preferences, are examples of the simplest manifestations of this trend. Commercial enterprises are introducing significantly more advanced approaches, in many cases employing recent research results from artificial intelligence, data mining, machine learning, and other fields.

More than ever before, the increasing complexity of systems, the development of new technologies, and the availability of multimedia material and environments are creating a demand for more accessible and intuitive user interfaces. Autonomous, distributed, multi-component systems providing sophisticated services will no longer lend themselves to the familiar "direct manipulation" model of interaction, in which an individual user masters a fixed selection of commands provided by a single application. Ubiquitous computing, in networked environments, has brought about a situation in which the typical user of many software services is likely to be a non-expert, who may access a given service infrequently or only a few times. Accommodating such usage patterns calls for new approaches. Fortunately, input modalities now becoming widely available, such as speech recognition and pen-based handwriting/gesture recognition, and the ability to manage the presentation of systems' responses by using multiple media provide an opportunity to fashion a style of human-computer interaction that draws much more heavily on our experience with human—human interactions.

## PRIOR RELATED ART

Existing approaches and technologies for distributed computing include distributed objects, mobile objects, blackboard-style architectures, and agent-based software engineering.

The Distributed Object Approach

Object-oriented languages, such as C++ or JAVA, provide significant advances over standard procedural languages with respect to the reusability and modularity of code: encapsulation, inheritance and polymorhpism. Encapsulation encourages the creation of library interfaces that minimize dependencies on underlying algorithms or data structures. Changes to programming internals can be made at a later date with requiring modifications to the code that uses the library. Inheritance permits the extension and modification of a library of routines and data without requiring source code to the original library. Polymorphism allows one body of code to work on an arbitrary number of data types. For the sake of simplicity traditional objects may be seen to contain both methods and data. Methods provide the mechanisms by which the internal state of an object may be modified or by which communication may occur with another object or by which the instantiation or removal of objects may be directed.

With reference to FIG. **2**, a distributed object technology based around an Object Request Broker will now be described. Whereas "standard" object-oriented programming (OOP) languages can be used to build monolithic programs out of many object building blocks, distributed object technologies (DOOP) allow the creation of programs whose components may be spread across multiple machines. As shown in FIG. **2**, an object system **200** includes client

objects **210** and server objects **220**. To implement a client-server relationship between objects, the distributed object system **200** uses a registry mechanism (CORBA's registry is called an Object Request Broker, or ORB) **230** to store the interface descriptions of available objects. Through the services of the ORB **230**, a client can transparently invoke a method on a remote server object. The ORB **230** is then responsible for finding the object **220** that can implement the request, passing it the parameters, invoking its method, and returning the results. In the most sophisticated systems, the client **210** does not have to be aware of where the object is located, its programming language, its operating system, or any other system aspects that are not part of the server object's interface. Although distributed objects offer a powerful paradigm for creating networked applications, certain aspects of the approach are not perfectly tailored to the constantly changing environment of the Internet. A major restriction of the DOOP approach is that the interactions among objects are fixed through explicitly coded instructions by the application developer. It is often difficult to reuse an object in a new application without bringing along all its inherent dependencies on other objects (embedded interface definitions and explicit method calls). Another restriction of the DOOP approach is the result of its reliance on a remote procedure call (RPC) style of communication. Although easy to debug, this single thread of execution model does not facilitate programming to exploit the potential for parallel computation that one would expect in a distributed environment. In addition, RPC uses a blocking (synchronous) scheme that does not scale well for high-volume transactions.

Mobile Objects

Mobile objects, sometimes called mobile agents, are bits of code that can move to another execution site (presumably on a different machine) under their own programmatic control, where they can then interact with the local environment. For certain types of problems, the mobile object paradigm offers advantages over more traditional distributed object approaches. These advantages include network bandwidth and parallelism. Network bandwidth advantages exist for some database queries or electronic commerce applications, where it is more efficient to perform tests on data by bringing the tests to the data than by bringing large amounts of data to the testing program. Parallelism advantages include situations in which mobile agents can be spawned in parallel to accomplish many tasks at once.

Some of the disadvantages and inconveniences of the mobile agent approach include the programmatic specificity of the agent interactions, lack of coordination support between participant agents and execution environment irregularities regarding specific programming languages supported by host processors upon which agents reside. In a fashion similar to that of DOOP programming, an agent developer must programmatically specify where to go and how to interact with the target environment. There is generally little coordination support to encourage interactions among multiple (mobile) participants. Agents must be written in the programming language supported by the execution environment, whereas many other distributed technologies support heterogeneous communities of components, written in diverse programming languages.

Blackboard Architectures

Blackboard architectures typically allow multiple processes to communicate by reading and writing tuples from a global data store. Each process can watch for items of interest, perform computations based on the state of the blackboard, and then add partial results or queries that other processes can consider. Blackboard architectures provide a flexible framework for problem solving by a dynamic community of distributed processes. A blackboard architecture provides one solution to eliminating the tightly bound interaction links that some of the other distributed technologies require during interprocess communication. This advantage can also be a disadvantage: although a programmer does not need to refer to a specific process during computation, the framework does not provide programmatic control for doing so in cases where this would be practical.



Agent-Based Software Engineering

Several research communities have approached distributed computing by casting it as a problem of modeling communication and cooperation among autonomous entities, or agents. Effective communication among independent agents requires four components: (1) a transport mechanism carrying messages in an asynchronous fashion, (2) an interaction protocol defining various types of communication interchange and their social implications (for instance, a response is expected of a question), (3) a content language permitting the expression and interpretation of utterances, and (4) an agreed-upon set of shared vocabulary and meaning for concepts (often called an ontology). Such mechanisms permit a much richer style of interaction among participants than can be expressed using a distributed object's RPC model or a blackboard architecture's centralized exchange approach.

Agent-based systems have shown much promise for flexible, fault-tolerant, distributed problem solving. Several agent-based projects have helped to evolve the notion of facilitation. However, existing agent-based technologies and architectures are typically very limited in the extent to which agents can specify complex goals or influence the strategies used by the facilitator. Further, such prior systems are not sufficiently attuned to the importance of integrating human agents (i.e., users) through natural language and other human-oriented user interface technologies.

The initial version of SRI International's Open Agent Architecture™ ("OAA®") technology provided only a very limited mechanism for dealing with compound goals. Fixed formats were available for specifying a flat list of either conjoined (AND) sub-goals or disjoined (OR) sub-goals; in both cases, parallel goal solving was hardwired in, and only a single set of parameters for the entire list could be specified. More complex goal expressions involving (for example) combinations of different boolean connectors, nested expressions, or conditionally interdependent ("IF. THEN") goals were not supported. Further, system scalability was not adequately addressed in this prior work.

## SUMMARY OF INVENTION

A first embodiment of the present invention discloses a highly flexible, software-based architecture for constructing distributed systems. The architecture supports cooperative task completion by flexible, dynamic configurations of autonomous electronic agents. Communication and cooperation between agents are brokered by one or more facilitators, which are responsible for matching requests, from users and agents, with descriptions of the capabilities of other agents. It is not generally required that a user or agent know the identities, locations, or number of other agents involved in satisfying a request, and relatively minimal effort is involved in incorporating new agents and "wrapping" legacy applications. Extreme flexibility is achieved

through an architecture organized around the declaration of capabilities by service-providing agents, the construction of arbitrarily complex goals by users and service-requesting agents, and the role of facilitators in delegating and coordinating the satisfaction of these goals, subject to advice and constraints that may accompany them. Additional mechanisms and features include facilities for creating and maintaining shared repositories of data; the use of triggers to instantiate commitments within and between agents; agent-based provision of multi-modal user interfaces, including natural language; and built-in support for including the user as a privileged member of the agent community. Specific embodiments providing enhanced scalability are also described.

## BRIEF DESCRIPTION OF THE DRAWINGS

Prior Art

Prior Art FIG. **1** depicts a networked computing model;

Prior Art FIG. **2** depicts a distributed object technology based around an Object Resource Broker;

Examples of the Invention

FIG. **3** depicts a distributed agent system based around a facilitator agent;

FIG. **4** presents a structure typical of one small system of the present invention;

FIG. **5** depicts an Automated Office system implemented in accordance with an example embodiment of the present invention supporting a mobile user with a laptop computer and a telephone;

FIG. **6** schematically depicts an Automated Office system implemented as a network of agents in accordance with a preferred embodiment of the present invention;

FIG. **7** schematically shows data structures internal to a facilitator in accordance with a preferred embodiment of the present invention;

FIG. **8** depicts operations involved in instantiating a client agent with its parent facilitator in accordance with a preferred embodiment of the present invention;

FIG. **9** depicts operations involved in a client agent initiating a service request and receiving the response to that service request in accordance with a certain preferred embodiment of the present invention;

FIG. **10** depicts operations involved in a client agent responding to a service request in accordance with another preferable embodiment of the present invention;

FIG. **11** depicts operations involved in a facilitator agent response to a service request in accordance with a preferred embodiment of the present invention;

FIG. **12** depicts an Open Agent Architecture™ based system of agents implementing a unified messaging application in accordance with a preferred embodiment of the present invention;

FIG. **13** depicts a map oriented graphical user interface display as might be displayed by a multi-modal map application in accordance with a preferred embodiment of the present invention;

FIG. **14** depicts a peer to peer multiple facilitator based agent system supporting distributed agents in accordance with a preferred embodiment of the present invention;

FIG. **15** depicts a multiple facilitator agent system supporting at least a limited form of a hierarchy of facilitators in accordance with a preferred embodiment of the present invention; and

FIG. **16** depicts a replicated facilitator architecture in accordance with one embodiment of the present invention.

## BRIEF DESCRIPTION OF THE APPENDICES

The Appendices disclosed in parent application 09/225,198, now U.S. Pat. No. 6,851,115 provide source code for an embodiment of the present invention written in the PROLOG programming language.

APPENDIX A: Source code file named compound.pl.

APPENDIX B: Source code file named fac.pl.

APPENDIX C: Source code file named libcom_tcp.pl.

APPENDIX D: Source code file named liboaa.pl.

APPENDIX E: Source code file named translations.pl.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. **3** illustrates a distributed agent system **300** in accordance with one embodiment of the present invention. The agent system **300** includes a facilitator agent **310** and a plurality of agents **320**. The illustration of FIG. **3** provides a high level view of one simple system structure contemplated by the present invention. The facilitator agent **310** is in essence the "parent" facilitator for its "children" agents **320**. The agents **320** forward service requests to the facilitator agent **310**. The facilitator agent **310** interprets these requests, organizing a set of goals which are then delegated to appropriate agents for task completion.

The system **300** of FIG. **3** can be expanded upon and modified in a variety of ways consistent with the present invention. For example, the agent system **300** can be distributed across a computer network such as that illustrated in FIG. **1**. The facilitator agent **310** may itself have its functionality distributed across several different computing platforms. The agents **320** may engage in interagent communication (also called peer to peer communications). Several different systems **300** may be coupled together for enhanced performance. These and a variety of other structural configurations are described below in greater detail.

FIG. **4** presents the structure typical of a small system **400** in one embodiment of the present invention, showing user interface agents **408**, several application agents **404** and meta-agents **406**, the system **400** organized as a community of peers by their common relationship to a facilitator agent **402**. As will be appreciated, FIG. **4** places more structure upon the system **400** than shown in FIG. **3**, but both are valid representations of structures of the present invention. The facilitator **402** is a specialized server agent that is responsible for coordinating agent communications and cooperative problem-solving. The facilitator **402** may also provide a global data store for its client agents, allowing them to adopt a blackboard style of interaction. Note that certain advantages are found in utilizing two or more facilitator agents within the system **400**. For example, larger systems can be assembled from multiple facilitator/client groups, each having the sort of structure shown in FIG. **4**. All agents that are not facilitators are referred to herein generically as client agents—so called because each acts (in some respects) as a client of some facilitator, which provides communication and other essential services for the client.

The variety of possible client agents is essentially unlimited. Some typical categories of client agents would include application agents **404**, meta-agents **406**, and user interface agents **408**, as depicted in FIG. **4**. Application agents **404** denote specialists that provide a collection of services of a particular sort. These services could be domain-independent technologies (such as speech recognition, natural language processing **410**, email, and some forms of data retrieval and data mining) or user-specific or domain-specific (such as a

travel planning and reservations agent). Application agents may be based on legacy applications or libraries, in which case the agent may be little more than a wrapper that calls a pre-existing API **412**, for example. Meta-agents **406** are agents whose role is to assist the facilitator agent **402** in coordinating the activities of other agents. While the facilitator **402** possesses domain-independent coordination strategies, meta-agents **406** can augment these by using domain- and application-specific knowledge or reasoning (including but not limited to rules, learning algorithms and planning).

With further reference to FIG. **4**, user interface agents **408** can play an extremely important and interesting role in certain embodiments of the present invention. By way of explanation, in some systems, a user interface agent can be implemented as a collection of "micro-agents", each monitoring a different input modality (point-and-click, handwriting, pen gestures, speech), and collaborating to produce the best interpretation of the current inputs. These micro-agents are depicted in FIG. **4**, for example, as Modality Agents **414**. While describing such subcategories of client agents is useful for purposes of illustration and understanding, they need not be formally distinguished within the system in preferred implementations of the present invention.

The operation of one preferred embodiment of the present invention will be discussed in greater detail below, but may be briefly outlined as follows. When invoked, a client agent makes a connection to a facilitator, which is known as its parent facilitator. These connections are depicted as a double headed arrow between the client agent and the facilitator agent in FIGS. **3** and **4**, for example. Upon connection, an agent registers with its parent facilitator a specification of the capabilities and services it can provide. For example, a natural language agent may register the characteristics of its available natural language vocabulary. (For more details regarding client agent connections, see the discussion of FIG. **8** below.) Later during task completion, when a facilitator determines that the registered services **416** of one of its client agents will help satisfy a goal, the facilitator sends that client a request expressed in the Interagent Communication Language (ICL) **418**. (See FIG. **11** below for a more detailed discussion of the facilitator operations involved.) The agent parses this request, processes it, and returns answers or status reports to the facilitator. In processing a request, the client agent can make use of a variety of infrastructure capabilities provided in the preferred embodiment. For example, the client agent can use ICL **418** to request services of other agents, set triggers, and read or write shared data on the facilitator or other client agents that maintain shared data. (See the discussion of FIGS. **9**–**11** below for a more detailed discussion of request processing.)

The functionality of each client agent are made available to the agent community through registration of the client agent's capabilities with a facilitator **402**. A software "wrapper" essentially surrounds the underlying application program performing the services offered by each client. The common infrastructure for constructing agents is preferably supplied by an agent library. The agent library is preferably accessible in the runtime environment of several different programming languages. The agent library preferably minimizes the effort required to construct a new system and maximizes the ease with which legacy systems can be "wrapped" and made compatible with the agent-based architecture of the present invention.

By way of further illustration, a representative application is now briefly presented with reference to FIGS. **5** and **6**. In the Automated Office system depicted in FIG. **5**, a mobile user with a telephone and a laptop computer can access and task commercial applications such as calendars, databases, and email systems running back at the office. A user interface (UI) agent **408**, shown in FIG. **6**, runs on the user's local laptop and is responsible for accepting user input, sending requests to the facilitator **402** for delegation to appropriate agents, and displaying the results of the distributed computation. The user may interact directly with a specific remote application by clicking on active areas in the interface, calling up a form or window for that application, and making queries with standard interface dialog mechanisms. Conversely, a user may express a task to be executed by using typed, handwritten, or spoken (over the telephone) English sentences, without explicitly specifying which agent or agents should perform the task.

For instance, if the question "What is my schedule?" is written **420** in the user interface **408**, this request will be sent **422** by the UI **408** to the facilitator **402**, which in turn will ask **424** a natural language (NL) agent **426** to translate the query into ICL **18**. To accomplish this task, the NL agent **426** may itself need to make requests of the agent community to resolve unknown words such as "me" **428** (the UI agent **408** can respond **430** with the name of the current user) or "schedule" **432** (the calendar agent **434** defines this word **436**). The resulting ICL expression is then routed by the facilitator **402** to appropriate agents (in this case, the calendar agent **434**) to execute the request. Results are sent back **438** to the UI agent **408** for display.

The spoken request "When mail arrives for me about security, notify me immediately." produces a slightly more complex example involving communication among all agents in the system. After translation into ICL as described above, the facilitator installs a trigger **440** on the mail agent **442** to look for new messages about security. When one such message does arrive in its mail spool, the trigger fires, and the facilitator matches the action part of the trigger to capabilities published by the notification agent **446**. The notification agent **446** is a meta-agent, as it makes use of rules concerning the optimal use of different output modalities (email, fax, speech generation over the telephone) plus information about an individual user's preferences **448** to determine the best way of relaying a message through available media transfer application agents. After some competitive parallelism to locate the user (the calendar agent **434** and database agent **450** may have different guesses as to where to find the user) and some cooperative parallelism to produce required information (telephone number of location, user password, and an audio file containing a text-to-speech representation of the email message), a telephone agent **452** calls the user, verifying its identity through touchtones, and then play the message.

The above example illustrates a number of inventive features. As new agents connect to the facilitator, registering capability specifications and natural language vocabulary, what the user can say and do dynamically changes; in other words, the ICL is dynamically expandable. For example, adding a calendar agent to the system in the previous example and registering its capabilities enables users to ask natural language questions about their "schedule" without any need to revise code for the facilitator, the natural language agents, or any other client agents. In addition, the interpretation and execution of a task is a distributed process, with no single agent defining the set of possible inputs to the system. Further, a single request can produce cooperation and flexible communication among many agents, written in different programming languages and spread across multiple machines.

Design Philosophy and Considerations

One preferred embodiment provides an integration mechanism for heterogeneous applications in a distributed infrastructure, incorporating some of the dynamism and extensibility of blackboard approaches, the efficiency associated with mobile objects, plus the rich and complex interactions of communicating agents. Design goals for preferred embodiments of the present invention may be categorized under the general headings of interoperation and cooperation, user interfaces, and software engineering. These design goals are not absolute requirements, nor will they necessarily be satisfied by all embodiments of the present invention, but rather simply reflect the inventor's currently preferred design philosophy.

Versatile Mechanisms of Interoperation and Cooperation

Interoperation refers to the ability of distributed software components—agents—to communicate meaningfully. While every system-building framework must provide mechanisms of interoperation at some level of granularity, agent-based frameworks face important new challenges in this area. This is true primarily because autonomy, the hallmark of individual agents, necessitates greater flexibility in interactions within communities of agents. Coordination refers to the mechanisms by which a community of agents is able to work together productively on some task. In these areas, the goals for our framework are to provide flexibility in assembling communities of autonomous service providers, provide flexibility in structuring cooperative interactions, impose the right amount of structure, as well as include legacy and "owned-elsewhere" applications.

Provide flexibility in assembling communities of autonomous service providers—both at development time and at runtime. Agents that conform to the linguistic and ontological requirements for effective communication should be able to participate in an agent community, in various combinations, with minimal or near minimal prerequisite knowledge of the characteristics of the other players. Agents with duplicate and overlapping capabilities should be able to coexist within the same community, with the system making optimal or near optimal use of the redundancy.

Provide flexibility in structuring cooperative interactions among the members of a community of agents. A framework preferably provides an economical mechanism for setting up a variety of interaction patterns among agents, without requiring an inordinate amount of complexity or infrastructure within the individual agents. The provision of a service should be independent or minimally dependent upon a particular configuration of agents.

Impose the right amount of structure on individual agents. Different approaches to the construction of multi-agent systems impose different requirements on the individual agents. For example, because KQML is neutral as to the content of messages, it imposes minimal structural requirements on individual agents. On the other hand, the BDI paradigm tends to impose much more demanding requirements, by making assumptions about the nature of the programming elements that are meaningful to individual agents. Preferred embodiments of the present invention should fall somewhere between the two, providing a rich set of interoperation and coordination capabilities, without precluding any of the software engineering goals defined below.

Include legacy and "owned-elsewhere" applications. Whereas legacy usually implies reuse of an established system fully controlled by the agent-based system developer, owned-elsewhere refers to applications to which the developer has partial access, but no control. Examples of owned-elsewhere applications include data sources and services available on the World Wide Web, via simple form-based interfaces, and applications used cooperatively within a virtual enterprise, which remain the properties of separate corporate entities. Both classes of application must preferably be able to interoperate, more or less as full-fledged members of the agent community, without requiring an overwhelming integration effort.

Human-Oriented User Interfaces

Systems composed of multiple distributed components, and possibly dynamic configurations of components, require the crafting of intuitive user interfaces to provide conceptually natural interaction mechanisms, treat users as privileged members of the agent community and support collaboration.

Provide conceptually natural interaction mechanisms with multiple distributed components. When there are numerous disparate agents, and/or complex tasks implemented by the system, the user should be able to express requests without having detailed knowledge of the individual agents. With speech recognition, handwriting recognition, and natural language technologies becoming more mature, agent architectures should preferably support these forms of input playing increased roles in the tasking of agent communities.

Preferably treat users as privileged members of the agent community by providing an appropriate level of task specification within software agents, and reusable translation mechanisms between this level and the level of human requests, supporting constructs that seamlessly incorporate interactions between both human-interface and software types of agents.

Preferably support collaboration (simultaneous work over shared data and processing resources) between users and agents. Realistic software engineering requirements System-building frameworks should preferably address the practical concerns of real-world applications by the specification of requirements which preferably include: Minimize the effort required to create new agents, and to wrap existing applications. Encourage reuse, both of domain-independent and domain-specific components. The concept of agent orientation, like that of object orientation, provides a natural conceptual framework for reuse, so long as mechanisms for encapsulation and interaction are structured appropriately. Support lightweight, mobile platforms. Such platforms should be able to serve as hosts for agents, without requiring the installation of a massive environment. It should also be possible to construct individual agents that are relatively small and modest in their processing requirements. Minimize platform and language barriers. Creation of new agents, as well as wrapping of existing applications, should not require the adoption of a new language or environment.

Mechanisms of Cooperation

Cooperation among agents in accordance with the present invention is preferably achieved via messages expressed in a common language, ICL. Cooperation among agent is further preferably structured around a three-part approach: providers of services register capabilities specifications with a facilitator, requesters of services construct goals and relay them to a facilitator, and facilitators coordinate the efforts of the appropriate service providers in satisfying these goals. The Interagent Communication Language (ICL) Interagent Communication Language ("ICL") **418** refers to an interface, communication, and task coordination language preferably shared by all agents, regardless of what platform they run on or what computer language they are programmed in. ICL may be used by an agent to task itself or some subset

of the agent community. Preferably, ICL allows agents to specify explicit control parameters while simultaneously supporting expression of goals in an underspecified, loosely constrained manner. In a further preferred embodiment, agents employ ICL to perform queries, execute actions, exchange information, set triggers, and manipulate data in the agent community.

In a further preferred embodiment, a program element expressed in ICL is the event. The activities of every agent, as well as communications between agents, are preferably structured around the transmission and handling of events. In communications, events preferably serve as messages between agents; in regulating the activities of individual agents, they may preferably be thought of as goals to be satisfied. Each event preferably has a type, a set of parameters, and content. For example, the agent library procedure oaa_Solve can be used by an agent to request services of other agents. A call to oaa_Solve, within the code of agent A, results in an event having the form

ev_post_solve(Goal, Params)

going from A to the facilitator, where ev_post_solve is the type, Goal is the content, and Params is a list of parameters. The allowable content and parameters preferably vary according to the type of the event.

The ICL preferably includes a layer of conversational protocol and a content layer. The conversational layer of ICL is defined by the event types, together with the parameter lists associated with certain of these event types. The content layer consists of the specific goals, triggers, and data elements that may be embedded within various events.

The ICL conversational protocol is preferably specified using an orthogonal, parameterized approach, where the conversational aspects of each element of an interagent conversation are represented by a selection of an event type and a selection of values from at least one orthogonal set of parameters. This approach offers greater expressiveness than an approach based solely on a fixed selection of speech acts, such as embodied in KQML. For example, in KQML, a request to satisfy a query can employ either of the performatives ask_all or ask_one. In ICL, on the other hand, this type of request preferably is expressed by the event type ev_post_solve, together with the solution_limit(N) parameter—where N can be any positive integer. (A request for all solutions is indicated by the omission of the solution_limit parameter.) The request can also be accompanied by other parameters, which combine to further refine its semantics. In KQML, then, this example forces one to choose between two possible conversational options, neither of which may be precisely what is desired. In either case, the performative chosen is a single value that must capture the entire conversational characterization of the communication. This requirement raises a difficult challenge for the language designer, to select a set of performatives that provides the desired functionality without becoming unmanageably large. Consequently, the debate over the right set of performatives has consumed much discussion within the KQML community.

The content layer of the ICL preferably supports unification and other features found in logic programming language environments such as PROLOG. In some embodiments, the content layer of the ICL is simply an extension of at least one programming language. For example, the Applicants have found that PROLOG is suitable for implementing and extending into the content layer of the ICL. The agent libraries preferably provide support for constructing, parsing, and manipulating ICL expressions. It is possible to embed content expressed in other languages within an ICL event. However, expressing content in ICL simplifies the facilitator's access to the content, as well as the conversational layer, in delegating requests. This gives the facilitator more information about the nature of a request and helps the facilitator decompose compound requests and delegate the sub-requests.

Further, ICL expressions preferably include, in addition to events, at least one of the following: capabilities declarations, requests for services, responses to requests, trigger specifications, and shared data elements. A further preferred embodiment of the present invention incorporates ICL expressions including at least all of the following: events, capabilities declarations, requests for services, responses to requests, trigger specifications, and shared data elements.

Providing Services: Specifying "Solvables"

In a preferred embodiment of the present invention, every participating agent defines and publishes a set of capability declarations, expressed in ICL, describing the services that it provides. These declarations establish a high-level interface to the agent. This interface is used by a facilitator in communicating with the agent, and, most important, in delegating service requests (or parts of requests) to the agent. Partly due to the use of PROLOG as a preferred basis for ICL, these capability declarations are referred as solvables. The agent library preferably provides a set of procedures allowing an agent to add, remove, and modify its solvables, which it may preferably do at any time after connecting to its facilitator.

There are preferably at least two major types of solvables: procedure solvables and data solvables. Intuitively, a procedure solvable performs a test or action, whereas a data solvable provides access to a collection of data. For example, in creating an agent for a mail system, procedure solvables might be defined for sending a message to a person, testing whether a message about a particular subject has arrived in the mail queue, or displaying a particular message onscreen. For a database wrapper agent, one might define a distinct data solvable corresponding to each of the relations present in the database. Often, a data solvable is used to provide a shared data store, which may be not only queried, but also updated, by various agents having the required permissions.

There are several primary technical differences between these two types of solvables. First, each procedure solvable must have a handler declared and defined for it, whereas this is preferably not necessary for a data solvable. The handling of requests for a data solvable is preferably provided transparently by the agent library. Second, data solvables are preferably associated with a dynamic collection of facts (or clauses), which may be further preferably modified at runtime, both by the agent providing the solvable, and by other agents (provided they have the required permissions). Third, special features, available for use with data solvables, preferably facilitate maintaining the associated facts. In spite of these differences, it should be noted that the mechanism of use by which an agent requests a service is the same for the two types of solvables.

In one embodiment, a request for one of an agent's services normally arrives in the form of an event from the agent's facilitator. The appropriate handler then deals with this event. The handler may be coded in whatever fashion is most appropriate, depending on the nature of the task, and the availability of task-specific libraries or legacy code, if any. The only hard requirement is that the handler return an

appropriate response to the request, expressed in ICL. Depending on the nature of the request, this response could be an indication of success or failure, or a list of solutions (when the request is a data query).

A solvable preferably has three parts: a goal, a list of parameters, and a list of permissions, which are declared using the format:

solvable(Goal, Parameters, Permissions)

The goal of a solvable, which syntactically takes the preferable form of an ICL structure, is a logical representation of the service provided by the solvable. (An ICL structure consists of a functor with 0 or more arguments. For example, in the structure a(b,c), 'a' is the functor, and 'b' and 'c' the arguments.) As with a PROLOG structure, the goal's arguments themselves may preferably be structures.

Various options can be included in the parameter list, to refine the semantics associated with the solvable. The type parameter is preferably used to say whether the solvable is data or procedure. When the type is procedure, another parameter may be used to indicate the handler to be associated with the solvable. Some of the parameters appropriate for a data solvable are mentioned elsewhere in this application. In either case (procedure or data solvable), the private parameter may be preferably used to restrict the use of a solvable to the declaring agent when the agent intends the solvable to be solely for its internal use but wishes to take advantage of the mechanisms in accordance with the present invention to access it, or when the agent wants the solvable to be available to outside agents only at selected times. In support of the latter case, it is preferable for the agent to change the status of a solvable from private to non-private at any time.

The permissions of a solvable provide mechanisms by which an agent may preferably control access to its services allowing the agent to restrict calling and writing of a solvable to itself and/or other selected agents. (Calling means requesting the service encapsulated by a solvable, whereas writing means modifying the collection of facts associated with a data solvable.) The default permission for every solvable in a further preferred embodiment of the present invention is to be callable by anyone, and for data solvables to be writable by anyone. A solvable's permissions can preferably be changed at any time, by the agent providing the solvable.

For example, the solvables of a simple email agent might include:

```
solvable(send13message(email,+ToPerson,+Params),
   [type(procedure), callback(send_mail)],
 [])
solvable(last_message(email,−MessageId),
   [type(data), single_(true)],
   [write(true)],
solvable(get_message(email,+MessageId,−Msg),
   [type(procedure), callback(get_mail)],
   [])
```

The symbols '+' and '−', indicating input and output arguments, are at present used only for purposes of documentation. Most parameters and permissions have default values, and specifications of default values may be omitted from the parameters and permissions lists.

Defining an agent's capabilities in terms of solvable declarations effectively creates a vocabulary with which other agents can communicate with the new agent. Ensuring that agents will speak the same language and share a common, unambiguous semantics of the vocabulary involves ontology. Agent development tools and services (automatic translations of solvables by the facilitator) help address this issue; additionally, a preferred embodiment of the present invention will typically rely on vocabulary from either formally engineered ontologies for specific domains or from ontologies constructed during the incremental development of a body of agents for several applications or from both specific domain ontologies and incrementally developed ontologies. Several example tools and services are described in Cheyer et al.'s paper entitled "Development Tools for the Open Agent Architecture," as presented at the Practical Application of Intelligent Agents and Multi-Agent Technology (PAAM 96), London, April 1996.

Although the present invention imposes no hard restrictions on the form of solvable declarations, two common usage conventions illustrate some of the utility associated with solvables.

Classes of services are often preferably tagged by a particular type. For instance, in the example above, the "last_message" and "get message" solvables are specialized for email, not by modifying the names of the services, but rather by the use of the 'email' parameter, which serves during the execution of an ICL request to select (or not) a specific type of message.

Actions are generally written using an imperative verb as the functor of the solvable in a preferred embodiment of the present invention, the direct object (or item class) as the first argument of the predicate, required arguments following, and then an extensible parameter list as the last argument. The parameter list can hold optional information usable by the function. The ICL expression generated by a natural language parser often makes use of this parameter list to store prepositional phrases and adjectives.

As an illustration of the above two points, "Send mail to Bob about lunch" will be translated into an ICL request send_message(email, 'Bob Jones', [subject(lunch)]), whereas "Remind Bob about lunch" would leave the transport unspecified (send_message(KIND, 'Bob Jones', [subject(lunch)])), enabling all available message transfer agents (e.g., fax, phone, mail, pager) to compete for the opportunity to carry out the request.

Requesting Services

An agent preferably requests services of the community of agent by delegating tasks or goals to its facilitator. Each request preferably contains calls to one or more agent solvables, and optionally specifies parameters containing advice to help the facilitator determine how to execute the task. Calling a solvable preferably does not require that the agent specify (or even know of) a particular agent or agents to handle the call. While it is possible to specify one or more agents using an address parameter (and there are situations in which this is desirable), in general it is advantageous to leave this delegation to the facilitator. This greatly reduces the hard-coded component dependencies often found in other distributed frameworks. The agent libraries of a preferred embodiment of the present invention provide an agent with a single, unified point of entry for requesting services of other agents: the library procedure oaa_Solve. In the style of logic programming, oaa_Solve may preferably be used both to retrieve data and to initiate actions, so that calling a data solvable looks the same as calling a procedure solvable.

Complex Goal Expressions

A powerful feature provided by preferred embodiments of the present invention is the ability of a client agent (or a user) to submit compound goals of an arbitrarily complex nature to a facilitator. A compound goal is a single goal expression that specifies multiple sub-goals to be performed. In speaking of a "complex goal expression" we mean that a single

goal expression that expresses multiple sub-goals can potentially include more than one type of logical connector (e.g., AND, OR, NOT), and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent. By way of further clarification, we note that when speaking of an "arbitrarily complex goal expression" we mean that goals are expressed in a language or syntax that allows expression of such complex goals when appropriate or when desired, not that every goal is itself necessarily complex.

It is contemplated that this ability is provided through an interagent communication language having the necessary syntax and semantics. In one example, the goals may take the form of compound goal expressions composed using operators similar to those employed by PROLOG, that is, the comma for conjunction, the semicolon for disjunction, the arrow for conditional execution, etc. The present invention also contemplates significant extensions to PROLOG syntax and semantics. For example, one embodiment incorporates a "parallel disjunction" operator indicating that the disjuncts are to be executed by different agents concurrently. A further embodiment supports the specification of whether a given sub-goal is to be executed breadth-first or depth-first.

A further embodiment supports each sub-goal of a compound goal optionally having an address and/or a set of parameters attached to it. Thus, each sub-goal takes the form

```
Address: Goal::Parameters
```

where both Address and Parameters are optional.

An address, if present, preferably specifies one or more agents to handle the given goal, and may employ several different types of referring expression: unique names, symbolic names, and shorthand names. Every agent has preferably a unique name, assigned by its facilitator, which relies upon network addressing schemes to ensure its global uniqueness. Preferably, agents also have self-selected symbolic names (for example, "mail"), which are not guaranteed to be unique. When an address includes a symbolic name, the facilitator preferably takes this to mean that all agents having that name should be called upon. Shorthand names include 'self' and 'parent' (which refers to the agent's facilitator). The address associated with a goal or sub-goal is preferably always optional. When an address is not present, it is the facilitator's job to supply an appropriate address.

The distributed execution of compound goals becomes particularly powerful when used in conjunction with natural language or speech-enabled interfaces, as the query itself may specify how functionality from distinct agents will be combined. As a simple example, the spoken utterance "Fax it to Bill Smith's manager." can be translated into the following compound ICL request:

```
oaa_Solve((manager('Bill Smith', M), fax(it,M,[ ])),
    [strategy(action)])
```

Note that in this ICL request there are two sub-goals, "manager('Bill Smith',M)" and "fax(it,M,[ ])," and a single global parameter "strategy(action)." According to the present invention, the facilitator is capable of mapping global parameters in order to apply the constraints or advice across the separate sub-goals in a meaningful way. In this instance, the global parameter strategy(action) implies a parallel constraint upon the first sub-goal; i.e., when there are multiple agents that can respond to the manager sub-goal, each agent should receive a request for service. In contrast, for the second sub-goal, parallelism should not be inferred from the global parameter strategy(action) because such an inference would possibly result in the transmission of duplicate facsimiles.

Refining Service Requests

In a preferred embodiment of the present invention, parameters associated with a goal (or sub-goal) can draw on useful features to refine the request's meaning. For example, it is frequently preferred to be able to specify whether or not solutions are to be returned synchronously; this is done using the reply parameter, which can take any of the values synchronous, asynchronous, or none. As another example, when the goal is a non-compound query of a data solvable, the cache parameter may preferably be used to request local caching of the facts associated with that solvable. Many of the remaining parameters fall into two categories: feedback and advice.

Feedback parameters allow a service requester to receive information from the facilitator about how a goal was handled. This feedback can include such things as the identities of the agents involved in satisfying the goal, and the amount of time expended in the satisfaction of the goal.

Advice parameters preferably give constraints or guidance to the facilitator in completing and interpreting the goal. For example, a solution_limit parameter preferably allows the requester to say how many solutions it is interested in; the facilitator and/or service providers are free to use this information in optimizing their efforts. Similarly, a time_limit is preferably used to say how long the requester is willing to wait for solutions to its request, and, in a multiple facilitator system, a level_limit may preferably be used to say how remote the facilitators may be that are consulted in the search for solutions. A priority parameter is preferably used to indicate that a request is more urgent than previous requests that have not yet been satisfied. Other preferred advice parameters include but are not limited to parameters used to tell the facilitator whether parallel satisfaction of the parts of a goal is appropriate, how to combine and filter results arriving from multiple solver agents, and whether the requester itself may be considered a candidate solver of the sub-goals of a request.

Advice parameters preferably provide an extensible set of low-level, orthogonal parameters capable of combining with the ICL goal language to fully express how information should flow among participants. In certain preferred embodiments of the present invention, multiple parameters can be grouped together and given a group name. The resulting high-level advice parameters can preferably be used to express concepts analogous to KQML's performatives, as well as define classifications of problem types. For instance, KQML's "ask_all" and "ask_one" performatives would be represented as combinations of values given to the parameters reply, parallel ok, and solution_limit. As an example of a higher-level problem type, the strategy "math_problem" might preferably send the query to all appropriate math solvers in parallel, collect their responses, and signal a conflict if different answers are returned. The strategy "essay_question" might preferably send the request to all appropriate participants, and signal a problem (i.e., cheating) if any of the returned answers are identical.

Facilitation

In a preferred embodiment of the present invention, when a facilitator receives a compound goal, its job is to construct a goal satisfaction plan and oversee its satisfaction in an optimal or near optimal manner that is consistent with the specified advice. The facilitator of the present invention maintains a knowledge base that records the capabilities of

a collection of agents, and uses that knowledge to assist requesters and providers of services in making contact.

FIG. **7** schematically shows data structures **700** internal to a facilitator in accordance with one embodiment of the present invention. Consider the function of a Agent Registry **702** in the present invention. Each registered agent may be seen as associated with a collection of fields found within its parent facilitator such as shown in the figure. Each registered agent may optionally possess a Symbolic Name which would be entered into field **704**. As mentioned elsewhere, Symbolic Names need not be unique to each instance of an agent. Note that an agent may in certain preferred embodiments of the present invention possess more than one Symbolic Name. Such Symbolic Names would each be found through their associations in the Agent Registry entries. Each agent, when registered, must possess a Unique Address, which is entered into the Unique Address field **706**.

With further reference to FIG. **7**, each registered agent may be optionally associated with one or more capabilities, which have associated Capability Declaration fields **708** in the parent facilitator Agent Registry **702**. These capabilities may define not just functionality, but may further provide a utility parameter indicating, in some manner (e.g., speed, accuracy, etc), how effective the agent is at providing the declared capability. Each registered agent may be optionally associated with one or more data components, which have associated Data Declaration fields **710** in the parent facilitator Agent Registry **702**. Each registered agent may be optionally associated with one or more triggers, which preferably could be referenced through their associated Trigger Declaration fields **712** in the parent facilitator Agent Registry **702**. Each registered agent may be optionally associated with one or more tasks, which preferably could be referenced through their associated Task Declaration fields **714** in the parent facilitator Agent Registry **702**. Each registered agent may be optionally associated with one or more Process Characteristics, which preferably could be referenced through their associated Process Characteristics Declaration fields **716** in the parent facilitator Agent Registry **702**. Note that these characteristics in certain preferred embodiments of the present invention may include one or more of the following: Machine Type (specifying what type of computer may run the agent), Language (both computer and human interface).

A facilitator agent in certain preferred embodiments of the present invention further includes a Global Persistent Database **720**. The database **720** is composed of data elements which do not rely upon the invocation or instantiation of client agents for those data elements to persist. Examples of data elements which might be present in such a database include but are not limited to the network address of the facilitator agent's server, facilitator agent's server accessible network port list, firewalls, user lists, and security options regarding the access of server resources accessible to the facilitator agent.

A simplified walk through of operations involved in creating a client agent, a client agent initiating a service request, a client agent responding to a service request and a facilitator agent responding to a service request are including hereafter by way of illustrating the use of such a system. These figures and their accompanying discussion are provided by way of illustration of one preferred embodiment of the present invention and are not intended to limit the scope of the present invention.

FIG. **8** depicts operations involved in instantiating a client agent with its parent facilitator in accordance with a preferred embodiment of the present invention. The operations begin with starting the Agent Registration in a step **800**. In a next step **802**, the Installer, such as a **955** client or facilitator agent, invokes a new client agent. It will be appreciated that any computer entity is capable of invoking a new agent.

The system then instantiates the new client agent in a step **804**. This operation may involve resource allocations somewhere in the network on a local computer system for the client agent, which will often include 960 memory as well as placement of references to the newly instantiated client agent in internal system lists of agents within that local computing system. Once instantiated, the new client and its parent facilitator establish a communications link in a step **806**. In certain preferred embodiments, this communications link involves selection of one or more physical transport mechanisms for this communication. Once established, the client agent transmits it profile to the parent facilitator in a step **808**. When received, the parent facilitator registers the client agent in a step **810**. Then, at a step **812**, a client agent has been instantiated in accordance with one preferred embodiment of the present invention.

FIG. **9** depicts operations involved in a client agent initiating a service request and receiving the response to that service request in accordance with a preferred embodiment of the present invention. The method of FIG. **9** begins in a step **900**, wherein any initialization or other such procedures may be performed. Then, in a step **902**, the client **975** agent determines a goal to be achieved (or solved). This goal is then translated in a step **904** into ICL, if it is not already formulated in it. The goal, now stated in ICL, is then transmitted to the client agent's parent facilitator in a step **906**. The parent facilitator responds to this service request and at a later time, the client agent receives the results of the 980 request in a step **908**, operations of FIG. **9** being complete in a done step **910**.

FIG. **10** depicts operations involved in a client agent responding to a service request in accordance with a preferred embodiment of the present invention. Once started in a step **1000**, the client agent receives the service request in a step **1002**. In a next step **1004**, the client agent parses the received request from ICL. The client agent then determines if the service is available in a step **1006**. If it is not, the client agent returns a status report to that effect in a step **1008**. If the service is available, control is passed to a step **1010** where the client performs the requested service. Note that in completing step **1010** the client may form complex goal expressions, requesting results for these solvables from the facilitator agent. For example, a fax agent might fax a document to a certain person only after requesting and receiving a fax number for that person. Subsequently, the client agent either returns the results of the service and/or a status report in a step **1012**. The operations of FIG. **10** are complete in a done step **1014**.

FIG. **11** depicts operations involved in a facilitator agent response to a service request in accordance with a preferred embodiment of the present invention. The start of such operations in step **1100** leads to the reception of a goal request in a step **1102** by the facilitator. This request is then parsed and interpreted by the facilitator in a step **1104**. The facilitator then proceeds to construct a goal satisfaction plan in a next step **1106**. In steps **1108** and **1110**, respectively, the facilitator determines the required sub-goals and then selects agents suitable for performing the required sub-goals. The facilitator then transmits the sub-goal requests to the selected agents in a step **1112** and receives the results of these transmitted requests in a step **1114**. It should be noted that the actual implementation of steps **1112** and **1114** are

dependent upon the specific goal satisfaction plan. For instance, certain sub-goals may be sent to separate agents in parallel, while transmission of other sub-goals may be postponed until receipt of particular answers. Further, certain requests may generate multiple responses that generate additional sub-goals. Once the responses have been received, the facilitator determines whether the original requested goal has been completed in a step **1118**. If the original requested goal has not been completed, the facilitator recursively repeats the operations **1106** through **1116**. Once the original requested goal is completed, the facilitator returns the results to the requesting agent **1118** and the operations are done at **1120**.

A further preferred embodiment of the present invention incorporates transparent delegation, which means that a requesting agent can generate a request, and a facilitator can manage the satisfaction of that request, without the requester needing to have any knowledge of the identities or locations of the satisfying agents. In some cases, such as when the request is a data query, the requesting agent may also be oblivious to the number of agents involved in satisfying a request. Transparent delegation is possible because agents' capabilities (solvables) are treated as an abstract description of a service, rather than as an entry point into a library or body of code.

A further preferred embodiment of the present invention incorporates facilitator handling of compound goals, preferably involving three types of processing: delegation, optimization and interpretation.

Delegation processing preferably supports facilitator determination of which specific agents will execute a compound goal and how such a compound goal's sub-goals will be combined and the sub-goal results routed. Delegation involves selective application of global and local constraint and advice parameters onto the specific sub-goals. Delegation results in a goal that is unambiguous as to its meaning and as to the agents that will participate in satisfying it.

Optimization processing of the completed goal preferably includes the facilitator using sub-goal parallelization where appropriate. Optimization results in a goal whose interpretation will require as few exchanges as possible, between the facilitator and the satisfying agents, and can exploit parallel efforts of the satisfying agents, wherever this does not affect the goal's meaning.

Interpretation processing of the optimized goal. Completing the addressing of a goal involves the selection of one or more agents to handle each of its sub-goals (that is, each sub-goal for which this selection has not been specified by the requester). In doing this, the facilitator uses its knowledge of the capabilities of its client agents (and possibly of other facilitators, in a multi-facilitator system). It may also use strategies or advice specified by the requester, as explained below. The interpretation of a goal involves the coordination of requests to the satisfying agents, and assembling their responses into a coherent whole, for return to the requester.

A further preferred embodiment of present invention extends facilitation so the facilitator can employ strategies and advice given by the requesting agent, resulting in a variety of interaction patterns that may be instantiated in the satisfaction of a request.

A further preferred embodiment of present invention handles the distribution of both data update requests and requests for installation of triggers, preferably using some of the same strategies that are employed in the delegation of service requests.

Note that the reliance on facilitation is not absolute; that is, there is no hard requirement that requests and services be matched up by the facilitator, or that interagent communications go through the facilitator. There is preferably support in the agent library for explicit addressing of requests. However, a preferred embodiment of the present invention encourages employment the paradigm of agent communities, minimizing their development effort, by taking advantage of the facilitator's provision of transparent delegation and handling of compound goals.

A facilitator is preferably viewed as a coordinator, not a controller, of cooperative task completion. A facilitator preferably never initiates an activity. A facilitator preferably responds to requests to manage the satisfaction of some goal, the update of some data repository, or the installation of a trigger by the appropriate agent or agents. All agents can preferably take advantage of the facilitator's expertise in delegation, and its up-to-date knowledge about the current membership of a dynamic community. The facilitator's coordination services often allows the developer to lessen the complexity of individual agents, resulting in a more manageable software development process, and enabling the creation of lightweight agents.

Maintaining Data Repositories

The agent library supports the creation, maintenance, and use of databases, in the form of data solvables. Creation of a data solvable requires only that it be declared. Querying a data solvable, as with access to any solvable, is done using oaa_Solve.

A data solvable is conceptually similar to a relation in a relational database. The facts associated with each solvable are maintained by the agent library, which also handles incoming messages containing queries of data solvables. The default behavior of an agent library in managing these facts may preferably be refined, using parameters specified with the solvable's declaration. For example, the parameter single_value preferably indicates that the solvable should only contain a single fact at any given point in time. The parameter unique_values preferably indicates that no duplicate values should be stored.

Other parameters preferably allow data solvables use of the concepts of ownership and persistence. For implementing shared repositories, it is often preferable to maintain a record of which agent created each fact of a data solvable with the creating agent being preferably considered the fact's owner. In many applications, it is preferable to remove an agent's facts when that agent goes offline (for instance, when the agent is no longer participating in the agent community, whether by deliberate termination or by malfunction). When a data solvable is declared to be non-persistent, its facts are automatically maintained in this way, whereas a persistent data solvable preferably retains its facts until they are explicitly removed.

A further preferred embodiment of present invention supports an agent library through procedures by which agents can update (add, remove, and replace) facts belonging to data solvables, either locally or on other agents, given that they have preferably the required permissions. These procedures may preferably be refined using many of the same parameters that apply to service requests. For example, the address parameter preferably specifies one or more particular agents to which the update request applies. In its absence, just as with service requests, the update request preferably goes to all agents providing the relevant data solvable. This default behavior can be used to maintain

coordinated "mirror" copies of a data set within multiple agents, and can be useful in support of distributed, collaborative activities.

Similarly, the feedback parameters, described in connection with oaa_Solve, are preferably available for use with data maintenance requests.

A further preferred embodiment of present invention supports ability to provide data solvables not just to client agents, but also to facilitator agents. Data solvables can preferably created, maintained and used by a facilitator. The facilitator preferably can, at the request of a client of the facilitator, create, maintain and share the use of data solvables with all the facilitator's clients. This can be useful with relatively stable collections of agents, where the facilitator's workload is predictable. Using a Blackboard Style of Communication In a further preferred embodiment of present invention, when a data solvable is publicly readable and writable, it acts essentially as a global data repository and can be used cooperatively by a group of agents. In combination with the use of triggers, this allows the agents to organize their efforts around a "blackboard" style of communication.

As an example, the "DCG-NL" agent (one of several existing natural language processing agents), provides natural language processing services for a variety of its peer agents, expects those other agents to record, on the facilitator, the vocabulary to which they are prepared to respond, with an indication of each word's part of speech, and of the logical form (ICL sub-goal) that should result from the use of that word. In a further preferred embodiment of present invention, the NL agent, preferably when it comes online, preferably installs a data solvable for each basic part of speech on its facilitator. For instance, one such solvable would be:

```
solvable(noun(Meaning, Syntax), [ ],[ ])
```

Note that the empty lists for the solvable's permissions and parameters are acceptable here, since the default permissions and parameters provide appropriate functionality.

A further preferred embodiment of present invention incorporating an Office Assistant system as discussed herein or similar to the discussion here supports several agents making use of these or similar services. For instance, the database agent uses the following call, to library procedure oaa_AddData, to post the noun 'boss', and to indicate that the "meaning" of boss is the concept 'manager':

```
oaa_AddData(noun(manager, atom(boss)), [address
    (parent)]) Autonomous Monitoring with Trig-
    gers
```

A further preferred embodiment of present invention includes support for triggers, providing a general mechanism for requesting some action be taken when a set of conditions is met. Each agent can preferably install triggers either locally, for itself, or remotely, on its facilitator or peer agents. There are preferably at least four types of triggers: communication, data, task, and time. In addition to a type, each trigger preferably specifies at least a condition and an action, both preferably expressed in ICL. The condition indicates under what circumstances the trigger should fire, and the action indicates what should happen when it fires. In addition, each trigger can be set to fire either an unlimited number of times, or a specified number of times, which can be any positive integer.

Triggers can be used in a variety of ways within preferred embodiments of the present invention. For example, triggers can be used for monitoring external sensors in the execution environment, tracking the progress of complex tasks, or coordinating communications between agents that are essential for the synchronization of related tasks. The installation of a trigger within an agent can be thought of as a representation of that agent's commitment to carry out the specified action, whenever the specified condition holds true.

Communication triggers preferably allow any incoming or outgoing event (message) to be monitored. For instance, a simple communication trigger may say something like: "Whenever a solution to a goal is returned from the facilitator, send the result to the presentation manager to be displayed to the user."

Data triggers preferably monitor the state of a data repository (which can be maintained on a facilitator or a client agent). Data triggers' conditions may be tested upon the addition, removal, or replacement of a fact belonging to a data solvable. An example data trigger is: "When 15 users are simultaneously logged on to a machine, send an alert message to the system administrator."

Task triggers preferably contain conditions that are tested after the processing of each incoming event and whenever a timeout occurs in the event polling. These conditions may specify any goal executable by the local ICL interpreter, and most often are used to test when some solvable becomes satisfiable. Task triggers are useful in checking for task-specific internal conditions. Although in many cases such conditions are captured by solvables, in other cases they may not be. For example, a mail agent might watch for new incoming mail, or an airline database agent may monitor which flights will arrive later than scheduled. An example task trigger is: "When mail arrives for me about security, notify me immediately."

Time triggers preferably monitor time conditions. For instance, an alarm trigger can be set to fire at a single fixed point in time (e.g., "On December 23rd at 3 pm"), or on a recurring basis (e.g., "Every three minutes from now until noon").

Triggers are preferably implemented as data solvables, declared implicitly for every agent. When requesting that a trigger be installed, an agent may use many of the same parameters that apply to service and data maintenance requests.

A further preferred embodiment of present invention incorporates semantic support, in contrast with most programming methodologies, of the agent on which the trigger is installed only having to know how to evaluate the conditional part of the trigger, not the consequence. When the trigger fires, the action is delegated to the facilitator for execution. Whereas many commercial mail programs allow rules of the form "When mail arrives about XXX, [forward it, delete it, archive it]", the possible actions are hard-coded and the user must select from a fixed set.

A further preferred embodiment of present invention, the consequence of a trigger may be any compound goal executable by the dynamic community of agents. Since new agents preferably define both functionality and vocabulary, when an unanticipated agent (for example, a fax agent) joins the community, no modifications to existing code is required for a user to make use of it—"When mail arrives, fax it to Bill Smith."

The Agent Library

In a preferred embodiment of present invention, the agent library provides the infrastructure for constructing an agent-based system. The essential elements of protocol (involving the details of the messages that encapsulate a service request

and its response) are preferably made transparent to simplify the programming applications. This enables the developer to focus functionality, rather than message construction details and communication details. For example, to request a service of another agent, an agent preferably calls the library procedure oaa_Solve. This call results in a message to a facilitator, which will exchange messages with one or more service providers, and then send a message containing the desired results to the requesting agent. These results are returned via one of the arguments of oaa_Solve. None of the messages involved in this scenario is explicitly constructed by the agent developer. Note that this describes the synchronous use of oaa_Solve.

In another preferred embodiment of present invention, an agent library provides both intraagent and interagent infrastructure; that is, mechanisms supporting the internal structure of individual agents, on the one hand, and mechanisms of cooperative interoperation between agents, on the other. Note that most of the infrastructure cuts across this boundary with many of the same mechanisms supporting both agent internals and agent interactions in an integrated fashion. For example, services provided by an agent preferably can be accessed by that agent through the same procedure (oaa_Solve) that it would employ to request a service of another agent (the only difference being in the address parameter accompanying the request). This helps the developer to reuse code and avoid redundant entry points into the same functionality.

Both of the preferred characteristics described above (transparent construction of messages and integration of intraagent with interagent mechanisms) apply to most other library functionality as well, including but not limited to data management and temporal control mechanisms.

Source Code Appendix

Source code for version 2.0 of the OAA software product is included as an appendix hereto, and is incorporated herein by reference. The code includes an agent library, which provides infrastructure for constructing an agent-based system. The library's several families of procedures provide the functionalities discussed above, as well as others that have not been discussed here but that will be sufficiently clear to the interested practitioner. For example, declarations of an agent's solvables, and their registration with a facilitator, are managed using procedures such as oaa_Declare, oaa_Undeclare, and oaa_Redeclare. Updates to data solvables can be accomplished with a family of procedures including oaa_AddData, oaa_RemoveData, and oaa_ReplaceData. Similarly, triggers are maintained using procedures such as oaa_AddTrigger, oaa_RemoveTrigger, and oaa_ReplaceTrigger. The provided source code also includes source code for an OAA Facilitator Agent.

The source code appendix is offered solely as a means of further helping practitioners to construct a preferred embodiment of the invention. By no means is the source code intended to limit the scope of the present invention.

## ILLUSTRATIVE APPLICATIONS

To further illustrate the technology of the preferred embodiment, we will next present and discuss two sample applications of the present inventions.

Unified Messaging

A further preferred embodiment of present invention incorporates a Unified Messaging application extending the Automated Office application presented previously herein with an emphasis on ubiquitous access and dynamic presentation of the information and services supported by the agent community. The agents used in this application are depicted in FIG. **12**.

A hypothetical example of realistic dialog using a preferred embodiment of the present invention can provide insight into how systems may preferably be built using the present invention. In this scenario, the user, with only a telephone as an interface, is planning a trip to Boston where he will soon give a presentation. Capitalized sentences are phrases spoken by the user into the telephone and processed by a phone agent **452**.

Responses, unless otherwise indicated, are spoken by the system using text-to-speech generation agent **454**.

1.1 Welcome to SRI International. Please enter your user ID and password.

<User enters touchtone ID and password>

Good to see you again Adam Cheyer. I am listening to you.

Every user interface agent **408**, including the telephone agent **452**, should know the identify of its user. This information is used in resolving anaphoric references such as "me" and "I", and allows multiple user interfaces operated by the same user to work together.

1.2 WHAT IS TODAY'S SCHEDULE?

Here is today's schedule for Adam Cheyer:

At 10 am for 1 hour, meeting with Dave.

At 3 ; pm for 1 hour, presentation about software agents.

End of Schedule.

If the user is operating both a graphical user interface and a telephone, as described in conjunction with the Automated Office application, the result of this spoken request is to display a calendar window containing the current schedule. In this case, with no graphical display available, the GEN_NL agent **1202** is tasked to produce a spoken response that can be played over the phone. GEN_NL shares the same dynamic vocabulary and phrasal rules as the natural language parser DCG_NL **426**, and contains strategies for producing responses to queries using either simple or list-based multimedia utterances.

1.3 FIND FRIDAY'S WEATHER IN BOSTON.

The weather in Boston for Friday is as follows:

Sunny in the morning. Partly cloudy in the afternoon with a 20 percent chance of thunderstorms late. Highs in the mid 70s.

In addition to data accessible from legacy applications, content may be retrieved by web-reading agents which provide wrappers around useful websites.

1.4 FIND ALL NEW MAIL MESSAGES.

There are 2 messages available.

Message 1, from Mark Tierny, entitled "OAA meeting."

1.5 NEXT MESSAGE

Message 2, from Jennifer schwefler, entitled "Presentation Summary."

1.6 PLAY IT.

This message is a multipart MIME-encoded message. There are two parts.

Part 1. (Voicemail message, not text-to-speech):

Thanks for taking part as a speaker in our conference.

The schedule will be posed soon on our homepage.

1.7 NEXT PART

Part 2. (read using text-to-speech).

Thanks for taking part as a speaker in our conference.

The schedule will be posted soon on our homepage.

1.8 PRINT MESSAGE

Command executed.

Mail messages are no longer just simple text documents, but often consist of multiple subparts containing audio files, pictures, webpages, attachments and so forth. When a user asks to play a complex email message over the telephone, many different agents may be implicated in the translation process, which would be quite different given the request "print it." The challenge is to develop a system which will enable agents to cooperate in an extensible, flexible manner that alleviates explicit coding of agent interactions for every possible input/output combination.

In a preferred embodiment of the present invention, each agent concentrates only on what it can do and on what it knows, and leaves other work to be delegated to the agent community. For instance, a printer agent **1204**, defining the solvable print(Object,Parameters), can be defined by the following pseudo-code, which basically says, "If someone can get me a document, in either POSTSCRIPT or text form, I can print it.".

```
print(Object, Parameters) {
  'If Object is reference to "it", find an appropriate document
    if (Object="ref(it)")
    oaa_Solve(resolve_reference(the, document, Params, Object),[]);
    'Given a reference to some document, ask for the document in POSTSCRIPT
    if(Object="id(Pointer)")
    oaa_Solve(resolve_id_as(id(Pointer), postscript, [], Object),[]);
  'If Object is of type text or POSTSCRIPT, we can print it.
  if((Object is of type Text) or (Object is of type Postscript))
    do_print(Object);
}
```

In the above example, since an email message is the salient document, the mail agent **442** will receive a request to produce the message as POSTSCRIPT. Whereas the mail agent **442** may know how to save a text message as POSTSCRIPT, it will not know what to do with a webpage or voicemail message. For these parts of the message, it will simply send oaa_Solve requests to see if another agent knows how to accomplish the task.

Until now, the user has been using only a telephone as user interface. Now, he moves to his desktop, starts a web browser **436**, and accesses the URL referenced by the mail message.

1.9 RECORD MESSAGE

Recording voice message. Start speaking now.

1.10 THIS IS THE UPDATED WEB PAGE CONTAINING THE PRESENTATION SCHEDULE

Message one recorded.

1.11 IF THIS WEB PAGE CHANGES, GET IT TO ME WITH NOTE ONE.

Trigger added as requested.

In this example, a local agent **436** which interfaces with the web browser can return the current page as a solution to the request "oaa_Solve(resolve_reference(this, web_page, [ ],Ref),[ ])", sent by the NL agent **426**. A trigger is installed on a web agent **436** to monitor changes to the page, and when the page is updated, the notify agent **446** can find the user and transmit the webpage and voicemail message using the most appropriate media transfer mechanism.

This example based on the Unified Messaging application is intended to show how concepts in accordance with the present invention can be used to produce a simple yet extensible solution to a multi-agent problem that would be difficult to implement using a more rigid framework. The application supports adaptable presentation for queries across dynamically changing, complex information; shared context and reference resolution among applications; and flexible translation of multimedia data. In the next section, we will present an application which highlights the use of parallel competition and cooperation among agents during multi-modal fusion.

Multimodal Map

A further preferred embodiment of present invention incorporates the Multimodal Map application. This application demonstrates natural ways of communicating with a community of agents, providing an interactive interface on which the user may draw, write or speak. In a travel-planning domain illustrated by FIG. **13**, available information includes hotel, restaurant, and tourist-site data retrieved by distributed software agents from commercial Internet sites. Some preferred types of user interactions and multimodal issues handled by the application are illustrated by a brief scenario featuring working examples taken from the current system.

Sara is planning a business trip to San Francisco, but would like to schedule some activities for the weekend while she is there. She turns on her laptop PC, executes a map application, and selects San Francisco.

2.1 [Speaking] Where is downtown?

Map scrolls to appropriate area.

2.2 [Speaking and drawing region] Show me all hotels near here.

Icons representing hotels appear.

2.3 [Writes on a hotel] Info?

A textual description (price, attributes, etc.) appears.

2.4 [Speaking] I only want hotels with a pool.

some hotels disappear.

2.5 [Draws a crossout on a hotel that is too close to a highway]

Hotel disappears

2.6 [Speaking and circling] Show me a photo of his hotel.

Photo appears.

2.7 [Points to another hotel]

Photo appears.

2.8 [Speaking] Price of the other hotel?

Price appears for previous hotel.

2.9 [Speaking and drawing an arrow] Scroll down.

Display adjusted.

2.10 [Speaking and drawing an arrow toward a hotel]

What is the distance from this hotel to Fisherman's Wharf?

Distance displayed.

2.11 [Pointing to another place and speaking] And the distance to here?

Distance displayed.

Sara decides she could use some human advice. She picks up the phone, calls Bob, her travel agent, and writes Start collaboration to synchronize his display with hers. At this point, both are presented with identical maps, and the input and actions of one will be remotely seen by the other.

3.1 [Sara speaks and circles two hotels]

Bob, I'm trying to choose between these two hotels. Any opinions?

3.2 [Bob draws an arrow, speaks, and points]

Well, this area is really nice to visist. You can walk there from this hotel.

Map scrolls to indicated area. Hotel selected.

3.3 [Sara speaks] Do you think I should visit Alcatraz?

3.4 [Bob speaks] Map, show video of Alcatraz.

Video appears.

3.5 [Bob speaks] Yes, Alcatraz is a lot of fun.

A further preferred embodiment of present invention generates the most appropriate interpretation for the incoming streams of multi-modal input. Besides providing a user interface to a dynamic set of distributed agents, the application is preferably built using an agent framework. The present invention also contemplates aiding the coordinate competition and cooperation among information sources, which in turn works in parallel to resolve the ambiguities arising at every level of the interpretation process: low-level processing of the data stream, anaphora resolution, cross-modality influences and addressee.

Low-level processing of the data stream: Pen input may be preferably interpreted as a gesture (e.g., 2.5: cross-out) by one algorithm, or as handwriting by a separate recognition process (e.g., 2.3: "info?"). Multiple hypotheses may preferably be returned by a modality recognition component.

Anaphora resolution: When resolving anaphoric references, separate information sources may contribute to resolving the reference: context by object type, deictic, visual context, database queries, discourse analysis. An example of information provided through context by object type is found in interpreting an utterance such as "show photo of the hotel", where the natural language component can return a list of the last hotels talked about. Deictic information in combination with a spoken utterance like "show photo of this hotel" may preferably include pointing, circling, or arrow gestures which might indicate the desired object (e.g., 2.7). Deictic references may preferably occur before, during, or after an accompanying verbal command. Information provided in a visual context, given for the request "display photo of the hotel" may preferably include the user interface agent might determine that only one hotel is currently visible on the map, and therefore this might be the desired reference object. Database queries preferably involving information from a database agent combined with results from other resolution strategies. Examples are "show me a photo of the hotel in Menlo Park" and 2.2. Discourse analysis preferably provides a source of information for phrases such as "No, the other one" (or 2.8).

The above list of preferred anaphora resolution mechanisms is not exhaustive. Examples of other preferred resolution methods include but are not limited to spatial reasoning ("the hotel between Fisherman's Wharf and Lombard Street") and user preferences ("near my favorite restaurant").

Cross-modality influences: When multiple modalities are used together, one modality may preferably reinforce or remove or diminish ambiguity from the interpretation of another. For instance, the interpretation of an arrow gesture may vary when accompanied by different verbal commands (e.g., "scroll left" vs. "show info about this hotel"). In the latter example, the system must take into account how accurately and unambiguously an arrow selects a single hotel.

Addressee: With the addition of collaboration technology, humans and automated agents all share the same workspace. A pen doodle or a spoken utterance may be meant for either another human, the system (3.1), or both (3.2).

The implementation of the Multimodal Map application illustrates and exploits several preferred features of the present invention: reference resolution and task delegation by parallel parameters of oaa_Solve, basic multi-user collaboration handled through built-in data management services, additional functionality readily achieved by adding new agents to the community, domain-specific code cleanly separated from other agents.

A further preferred embodiment of present invention provides reference resolution and task delegation handled in a distributed fashion by the parallel parameters of oaa_Solve, with meta-agents encoding rules to help the facilitator make context- or user-specific decisions about priorities among knowledge sources.

A further preferred embodiment of present invention provides basic multi-user collaboration handled through at least one built-in data management service. The map user interface preferably publishes data solvables for elements such as icons, screen position, and viewers, and preferably defines these elements to have the attribute "shareable". For every update to this public data, the changes are preferably automatically replicated to all members of the collaborative session, with associated callbacks producing the visible effect of the data change (e.g., adding or removing an icon).

Functionality for recording and playback of a session is preferably implemented by adding agents as members of the collaborative community. These agents either record the data changes to disk, or read a log file and replicate the changes in the shared environment.

The domain-specific code for interpreting travel planning dialog is preferably separated from the speech, natural language, pen recognition, database and map user interface agents. These components were preferably reused without modification to add multimodal map capabilities to other applications for activities such as crisis management, multi-robot control, and the MVIEWS tools for the video analyst.

Improved Scalability and Fault Tolerance

Implementations of a preferred embodiment of present invention which rely upon simple, single facilitator architectures may face certain limitations with respect to scalability, because the single facilitator may become a communications bottleneck and may also represent a single, critical point for system failure.

Multiple facilitator systems as disclosed in the preferred embodiments to this point can be used to construct peer-to-peer agent networks as illustrated in FIG. **14**. While such embodiments are scalable, they do possess the potential for communication bottlenecks as discussed in the previous paragraph and they further possess the potential for reliability problems as central, critical points of vulnerability to systems failure.

A further embodiment of present invention supports a facilitator implemented as an agent like any other, whereby multiple facilitator network topologies can be readily constructed. One example configuration (but not the only possibility) is a hierarchical topology as depicted in FIG. **15**, where a top level Facilitator manages collections of both client agents **1508** and other Facilitators, **1504** and **1506**. Facilitator agents could be installed for individual users, for a group of users, or as appropriate for the task.

Note further, that network work topologies of facilitators can be seen as graphs where each node corresponds to an

instance of a facilitator and each edge connecting two or more nodes corresponds to a transmission path across one or more physical transport mechanisms. Some nodes may represent facilitators and some nodes may represent clients. Each node can be further annotated with attributes corresponding to include triggers, data, capabilities but not limited to these attributes.

A further embodiment of present invention provides enhanced scalability and robustness by separating the planning and execution components of the facilitator. In contrast with the centralized facilitation schemes described above, the facilitator system **1600** of FIG. **16** separates the registry/planning component from the execution component. As a result, no single facilitator agent must carry all communications nor does the failure of a single facilitator agent shut down the entire system.

Turning directly to FIG. **16**, the facilitator system **1600** includes a registry/planner **1602** and a plurality of client agents **1612**–**1616**. The registry/planner **1604** is typically replicated in one or more locations accessible by the client agents. Thus if the registry/planner **1604** becomes unavailable, the client agents can access the replicated registry/planner(s).

This system operates, for example, as follows. An agent transmits a goal **1610** to the registry planner **1602**. The registry/planner **1604** translates the goal into an unambiguous execution plan detailing how to accomplish any subgoals developed from the compound goal, as well as specifying the agents selected for performing the sub-goals. This execution plan is provided to the requesting agent which in turn initiates peer-to-peer interactions **1618** in order to implement the detailed execution plan, routing and combining information as specified within the execution plan. Communication is distributed thus decreasing sensitivity of the system to bandwidth limitations of a single facilitator agent. Execution state is likewise distributed thus enabling system operation even when a facilitator agent fails.

Further embodiments of present invention incorporate into the facilitator functionality such as load-balancing, resource management, and dynamic configuration of agent locations and numbers, using (for example) any of the topologies discussed. Other embodiments incorporate into a facilitator the ability to aid agents in establishing peer-to-peer communications. That is, for tasks requiring a sequence of exchanges between two agents, the facilitator assist the agents in finding one another and establishing communication, stepping out of the way while the agents communicate peer-to-peer over a direct, perhaps dedicated channel.

Further preferred embodiments of the present invention incorporate mechanisms for basic transaction management, such as periodically saving the state of agents (both facilitator and client) and rolling back to the latest saved state in the event of the failure of an agent.

What is claimed is:

**1**. A software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture contemplating a distributed computing system comprising:

a plurality of service-providing electronic agents;

a distributed facilitator agent functionally distributed across at least two computer processes, the facilitator agent capable of bi-directional communications with the plurality of service-providing electronic agents, the facilitator agent including:

an agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the distributed computing environment; and

a facilitating engine operable to interpret a service request as a base goal, the facilitating engine further operable for generating a goal satisfaction plan associated with the base goal, wherein the goal satisfaction plan involves:

using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal; and

wherein the plurality of service-providing electronic agents and the distributed facilitator agent communicate using an interagent Communication Language (ICL), wherein the ICL includes:

a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events.

**2**. A software-based, flexible computer architecture as recited in claim **1** wherein the distributed facilitator agent includes a plurality of single process facilitator agents each executing within a separate computer process, each of the single process facilitator agents being bi-directionally coupled with at least one other single process facilitator agent.

**3**. A software-based, flexible computer architecture as recited in claim **2** wherein each single process facilitator agent has any necessary facilitating functionality, a specific single process facilitator including:

a specific agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the process wherein the specific single process is executing, the specific agent registry further declaring capabilities made available to the specific single process facilitator agent through the at least one other single process facilitator agent bi-directionally coupled with the specific single process facilitator agent; and

a specific facilitating engine operable to interpret a service request as a base goal, the specific facilitating engine further operable to determine sub goals required to complete the base goal; the specific facilitating engine further operable to select service providing agents best capable of completing the sub goal and assigning the sub goals thereto.

**4**. A software-based, flexible computer architecture as recited in claim **3** wherein at least two of the plurality of single process facilitator agents reside upon separate computer systems.

**5**. A computer architecture as recited in claim **1**, wherein the ICL enables agents to perform queries of other agents, exchange information with other agents, and set triggers within other agents, the ICL further defined by an ICL syntax supporting compound goal expressions such that goals within a single request provided according to the ICL syntax may be coupled by a conjunctive operator, a disjunctive operator, a conditional execution operator, and a parallel disjunctive operator that indicates that disjunctive goals are to be performed by different agents.

**6**. A computer architecture as recited in claim **5**, wherein the ICL is computer platform independent.

7. A computer architecture as recited in claim **6** wherein the ICL is independent of computer programming languages in which the plurality of agents are programmed.

8. A computer architecture as recited in claim **7** wherein the ICL syntax supports explicit task completion constraints within goal expressions.

9. A computer architecture as recited in claim **8** wherein possible types of task completion constraints include use of specific agent constraints and response time constraints.

10. A computer architecture as recited in claim **8** wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions.

11. A computer architecture as recited in claim **5** wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions.

12. A computer architecture as recited in claim **5** wherein each autonomous service-providing electronic agent defines and publishes a set of capability declarations or solvables, expressed in ICL, that describes services provided by such electronic agent.

13. A computer architecture as recited in claim **12** wherein an electronic agent's solvables define an interface for the electronic agent.

14. A computer architecture as recited in claim **1** wherein the distributed facilitator agent is formed in a hierarchical topology.

15. A computer architecture as recited in claim **14** wherein the hierarchical topology includes a top level facilitator agent and at least one other facilitator agent registered within the top level facilitator agent, the top level facilitator agent operable to directly manage those service-providing agents registered within the top level facilitator agent and indirectly manage those service-providing agents registered within the at least one other agent registered with the top level facilitator agent.

16. A computer architecture as recited in claim **15** wherein the top level facilitator agent and the at least one other facilitator agent are executing on different computer systems.

17. A computer architecture as recited in claim **15** wherein the at least one other facilitator agent is installed for a specific computer user.

18. A computer architecture as recited in claim **15** wherein the at least one other facilitator agent is installed for a specific group of users.

19. A computer architecture as recited in claim **15** wherein the at least one other facilitator agent is installed for a specific computer application.

20. A computer architecture as recited in claim **1** wherein the distributed facilitator agent includes a planning component executing within a first computer process and an execution component executing within a second computer process.

21. A computer architecture as recited in claim **20** wherein the planning component is one of a plurality of synchronized planning components each executing with separate computer processes, whereby the computer architecture provides a more robust operating environment due to redundancy of the planning component functionality of the distributed facilitator agent.

22. A software-based flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture contemplating a distributed computing system comprising:

a plurality of service providing electronic agents;

at least one facilitator agent capable of receiving a service requests in the form of a base goal from a service-requesting agent in an interagent communication language (ICL) and capable of determining sub goals necessary to accomplish the base goal, the facilitator agent operable to allocate each sub-goal to at least one service-providing agent capable of accomplishing the sub-goal as determined by the registry, the facilitator agent being distinct from service-providing agents, wherein the ICL includes a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events; and

at least one service-requesting agent capable of making a request directly to a service-providing agent as a peer to peer communication for accomplishment of at least one of the sub-goals.

23. A software based, flexible computer system as recited in claim **22** wherein the peer to peer communication is in a language other than an interagent communication language.

24. A software based, flexible computer system as recited in claim **22** wherein the peer to peer communication is bi-directional.

25. A software based, flexible computer system as recited in claim **22** wherein the agent operable to make said peer to peer service request is said facilitator agent.

26. A distributed facilitator agent functionally distributed across at least two computer processes, the distributed facilitator agent arranged to coordinate cooperative task completion within a distributed computing environment having a plurality of autonomous service-providing electronic agents, the distributed facilitator agent comprising:

an agent registry that declares capabilities of service-providing electronic agents currently active within the distributed computing environment; and

a facilitating engine operable to parse a service request in order to interpret a compound goal set forth therein, the service request formed according to an Interagent Communication Language (ICL), the ICL including a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events, the facilitating engine further operable to generate a goal satisfaction plan associated with the compound goal, wherein the goal satisfaction plan involves:

using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal.

27. A facilitator agent as recited in claim **26**, wherein the facilitating engine is capable of modifying the goal satisfaction plan during execution, the modifying initiated by events such as new agent declarations within the agent registry, decisions made by remote agents, and information provided to the facilitating engine by remote agents.

28. A facilitator agent as recited in claim **26** wherein the agent registry includes a symbolic name, a unique address, data declarations, trigger declarations, task declarations, and process characteristics for each active agent.

29. A facilitator agent as recited in claim **26** wherein the facilitating engine is operable to install a trigger mechanism requesting that a certain action be taken when a certain set of conditions are met.

30. A facilitator agent as recited in claim **29** wherein the trigger mechanism is a communication trigger that monitors

communication events and performs the certain action when a certain communication event occurs.

**31**. A facilitator agent as recited in claim **29** wherein the trigger mechanism is a data trigger that monitors a state of a data repository and performs the certain action when a certain data state is obtained.

**32**. A facilitator agent as recited in claim **31** wherein the data repository is local to the facilitator agent.

**33**. A facilitator agent as recited in claim **31** wherein the data repository is remote from the facilitator agent.

**34**. A facilitator agent as recited in claim **29** wherein the trigger mechanism is a task trigger having a set of conditions.

**35**. A facilitator agent as recited in claim **26**, the facilitator agent further including a global database accessible to at least one of the service-providing electronic agents.

**36**. A facilitator agent as recited in claim **26** wherein the distributed facilitator agent includes a plurality of single process facilitator agents each executing within a separate computer process, each of the single process facilitator agents being bi-directionally coupled with at least one other single process facilitator agent.

**37**. A facilitator agent as recited in claim **36** wherein each single process facilitator agent has any necessary facilitating functionality, a specific single process facilitator including:

a specific agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the process wherein the specific single process is executing, the specific agent registry further declaring capabilities made available to the specific single process facilitator agent through the at least one other single process facilitator agent bi-directionally coupled with the specific single process facilitator agent; and

a specific facilitating engine operable to parse a service request in order to interpret an arbitrarily complex goal set forth therein, the specific facilitating engine further operable to construct a goal satisfaction plan using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal.

**38**. A facilitator agent as recited in claim **37** wherein at least two of the plurality of single process facilitator agents reside upon separate computer systems.

**39**. A facilitator agent as recited in claim **38** wherein the distributed facilitator agent is formed in a hierarchical topology.

**40**. A facilitator agent as recited in claim **39** wherein the hierarchical topology includes a top level facilitator agent and at least one other facilitator agent registered within the top level facilitator agent, the top level facilitator agent operable to directly manage those service-providing agents registered within the top level facilitator agent and indirectly manage those service-providing agents registered within the at least one other agent registered with the top level facilitator agent.

**41**. A facilitator agent as recited in claim **40** wherein the top level facilitator agent and the at least one other facilitator agent are executing on different computer systems.

**42**. A facilitator agent as recited in claim **40** wherein the at least one other facilitator agent is installed for a specific computer user.

**43**. A facilitator agent as recited in claim **40** wherein the at least one other facilitator agent is installed for a specific group of users.

**44**. A facilitator agent as recited in claim **40** wherein the at least one other facilitator agent is installed for a specific computer application.

**45**. A facilitator agent as recited in claim **26** wherein the distributed facilitator agent includes a planning component executing within a first computer process and an execution component executing within a second computer process.

**46**. A facilitator agent as recited in claim **45** wherein the planning component is one of a plurality of synchronized planning components each executing with separate computer processes, whereby the computer architecture provides a more robust operating environment due to redundancy of the planning component functionality of the distributed facilitator agent.

**47**. A facilitator agent for coordinating cooperative task completion within a distributed computing environment having a plurality of autonomous service-providing electronic agents, the facilitator agent comprising:

a registry of capabilities of the service-providing electronic agents; and

a facilitating engine operable to determine a set of sub goals necessary to accomplish a base goal, and then allocate such sub-goals to those agents capable of accomplishing the sub-goals as determined by the registry, said facilitating agent further capable of initiating a direct peer to peer communication between a service-requesting agent and a service-providing agent of at least one sub-goal, and said facilitating agent being distinct from service-providing agents; and

wherein the service-providing agent and the service-requesting agent communicate using an Interagent Communication Language (ICL), the ICL includes a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events.

**48**. A facilitator as set forth in claim **47** wherein the facilitator agent is functionally distributed across at least two electronic agents.

**49**. A facilitator as set forth in claim **48** wherein the peer to peer communication is between said distributed facilitator agents.

**50**. A computer-implemented method for providing cooperative task completion within a distributed computing environment, the distributed computing environment including a plurality of autonomous electronic agents, the distributed computing environment supporting an Interagent Communication Language, the computer-implemented method comprising the acts of:

providing a plurality of synchronized agent registries each declaring capabilities of service-providing electronic agents currently active within the distributed computing environment, the plurality of synchronized agent registries each resident within a separate computer process;

interpreting a service request in order to determine a base goal, the service request adhering to the Interagent Communication Language (ICL), the ICL including a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events, the act of interpreting including the sub-acts of:

determining a goal satisfaction plan that is associated with the base goal;

wherein the goal satisfaction plan involves:

using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal; and

implementing the base goal satisfaction plan.

**51**. A computer implemented process as recited in claim **50** wherein the step of interpreting a service request is controlled by a computer process separate from the computer processes wherein the plurality of synchronized agent registries reside.

**52**. A computer implemented process for providing coordinated task completion within a distributed computing environment, the distributed computing environment including a plurality of autonomous electronic agents, the computer implemented method comprising the steps of:

providing at least one agent registry including capabilities of service providing electronic agents;

interpreting a service request in the form of a base goal, the service request being in a interagent communication language (ICL), the ICL including a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the Parameter lists further refine the one or more events;

determining a plurality of sub goals necessary to accomplish the base goal;

selecting from said registry at least one service providing agent capable of completing said sub goals;

delegating at least one sub goal as a peer to peer service request directly from a service requesting agent to a service providing agent; and

delegating any remaining sub goals as service request in the interagent communication language to the selected agents capable of completing the remaining sub-goals.

**53**. A computer-implemented method for providing cooperative task completion within a distributed computing environment, the distributed computing environment including a plurality of autonomous electronic agents, the distributed computing environment supporting a dynamically expandable Interagent Communication Language ("ICL"), the computer implemented method comprising the acts of:

providing a plurality of synchronized agent registries each declaring a set of functional capabilities for one or more of the autonomous service-providing electronic agents, each of the synchronized agent registries being resident within a separate computer process;

receiving a service request adhering to the ICL, the ICL including a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events;

determining a base goal based on the service request;

determining a delegation plan wherein the delegation plan involves:

using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the autonomous service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal; and

implementing the delegation plan.

**54**. A computer implemented method as recited in claim **53** wherein the act of providing a plurality of agent registries further includes replicating at least a portion of one or more of the synchronized agent registries across a plurality of separate computer processes.

**55**. A computer implemented method as recited in claim **53** wherein the act of implementing the delegation plan is controlled by a computer process separate from the computer processes wherein the plurality of synchronized agent registries reside.

* * * * *