**2021-1412, -1413, -1414, -1416, -1417, -1418, -1419, -1420, -1421, -1422, -1423, -1424, -1440, -1442**

# United States Court of Appeals for the Federal Circuit

MICROSOFT CORPORATION,

*Appellant*,

v.

IPA TECHNOLOGIES INC.,

*Cross-Appellant*.

*Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board, in Nos. IPR2019-00810, IPR2019-00811, IPR2019-00812, IPR2019-00813 and IPR2019-00814, IPR2019-00835, IPR2019-00836, and IPR2019-00837.*

## PRINCIPAL AND RESPONSE BRIEF FOR CROSS-APPELLANT IPA TECHNOLOGIES INC.

PAUL J. SKIERMONT
SARAH E. SPIRES
JAIME K. OLIN
STEVEN W. HARTSELL
SKIERMONT DERBY LLP
1601 Elm Street, Suite 4400
Dallas, Texas 75201
Tel: (214) 978-6600
Fax: (214) 978-6601
pskiermont@skiermontderby.com
sspires@skiermontderby.com
jolin@skiermontderby.com
shartsell@skiermontderby.com

MIEKE K. MALMBERG
SKIERMONT DERBY LLP
800 Wilshire Blvd., Suite 1450
Los Angeles, CA 90017
Tel: (213) 788-4502
Fax: (213) 788-4545
mmalmberg@skiermontderby.com

*Counsel for Cross-Appellant, IPA Technologies Inc.* July 1, 2021

## CLAIMS AT ISSUE—U.S. PATENT NO. 6,851,115

1. A computer-implemented method for communication and cooperative task completion among a plurality of distributed electronic agents, comprising the acts of:

registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities, using an expandable, platform-independent, inter-agent language, wherein the inter-agent language includes:

a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events;

a content layer comprising one or more of goals, triggers and data elements associated with the events;

receiving a request for service as a base goal in the inter-agent language, in the form of an arbitrarily complex goal expression; and

dynamically interpreting the arbitrarily complex goal expression, said act of interpreting further comprising:

generating one or more sub-goals expressed in the inter-agent language;

constructing a goal satisfaction plan wherein the goal satisfaction plan includes:

a suitable delegation of sub-goal requests to best complete the requested service request-by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms; and

dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent.

2. A computer-implemented method as recited in claim 1, further including the following acts of:

receiving a new request for service as a base goal using the inter-agent language, in the form of another arbitrarily complex goal expression, from at least one of the selected client agents in response to the sub-goal dispatched to said agent; and

recursively applying the step of dynamically interpreting the arbitrarily complex goal expression in order to perform the new request for service.

3. A computer-implemented method as recited in claim 2 wherein the act of registering a specific agent further includes:

invoking the specific agent in order to activate the specific agent;

instantiating an instance of the specific agent; and

transmitting the new agent profile from the specific agent to a facilitator agent in response to the instantiation of the specific agent.

4. A computer-implemented method as recited in claim 1 further including the act of deactivating a specific client agent no longer available to provide services by deleting the registration of the specific client agent.

5. A computer-implemented method as recited in claim 1 further comprising the act of providing an agent registry data structure.

6. A computer-implemented method as recited in claim 5 wherein the agent registry data structure includes at least one symbolic name for each active agent.

7. A computer-implemented method of recited in claim 5 wherein the agent registry data structure includes at least one data declaration for each active agent.

11. A computer-implemented method as recited in claim 1 further comprising the act of establishing communication between the plurality of distributed agents.

12. A computer-implemented method as recited in claim 1 further comprising the acts of:

receiving a request for service in a second language differing from the inter-agent language;

selecting a registered agent capable of converting the second language into the inter-agent language; and

forwarding the request for service in a second language to the registered agent capable of converting the second language into the inter-agent language, implicitly requesting that such a conversion be performed and the results returned.

13. A computer-implemented method as recited in claim 12 wherein the request include a natural language query, and the second registered agent capable of converting the second language into the inter-agent language service is a natural language agent.

14. A computer-implemented method as recited in claim 13 wherein the natural language query was generated by a user interface agent.

15. A computer-implemented method as recited in claim 1, wherein the base goal requires setting a trigger having conditional functionality and consequential functionality.

16. A compute-implemented method as recited in claim 15 wherein the trigger is an outgoing communications trigger, the computer implemented method further including the acts of:

monitoring all outgoing communication events in order to determine whether a specific outgoing communication event has occurred; and

in response to the occurrence of the specific outgoing communication event, performing the particular action defined by the trigger.

17. A computer-implemented method as recited in claim 15 wherein the trigger is an incoming communications trigger, the computer implemented method further including the acts of:

monitoring all incoming communication events in order to determine whether a specific incoming communication event has occurred; and

in response to the occurrence of a specific incoming communication event satisfying the trigger conditional functionality, performing the particular consequential functionality defined by the trigger.

18. A computer-implemented method as recited in claim 15 wherein the trigger is a data trigger, the computer implemented method further including the acts of:

monitoring a state of a data repository; and

in response to a particular state event satisfying the trigger conditional functionality, performing the particular consequential functionality defined by the trigger.

19. A computer-implemented method as recited in claim 15 wherein the trigger is a time trigger, the computer implemented method further including the acts of:

monitoring for the occurrence of a particular time condition; and

in response to the occurrence of a particular time condition satisfying the trigger conditional functionality performing the particular consequential functionality defined by the trigger.

20. A computer-implemented method as recited in claim 15 wherein the trigger is installed and executed within the facilitator agent.

21. A computer-implemented method as recited in claim 15 wherein the trigger is installed and executed, within a first service-providing agent.

22. A computer-implemented method as recited in claim 15 wherein the conditional functionality of the trigger is installed on a facilitator agent.

23. A computer-implemented method as recited in claim 22 wherein the consequential functionality is installed on a specific service-providing agent other than a facilitator agent.

24. A computer-implemented method as recited in claim 15 wherein the conditional functionality of the trigger is installed on specific service-providing agent other than a facilitator agent.

25. A computer-implemented method as recited in claim 15 wherein the consequential functionality of the trigger is installed on a facilitator agent.

26. A computer-method as recited in claim 1 wherein the base goal is a compound goal having sub-goals separated by operators.

27. A computer-implemented method as recited in claim 26 wherein the type of available operators includes a conjunction operator, a disjunction operator, and a conditional execution operator.

28. A computer-implemented method as recited in claim 27 wherein the type of available operators further includes a parallel disjunction operator that indicates that disjunct goals are to be performed by different agents.

48. An Interagent Communication Language (ICL) providing a basis for facilitated cooperative task completion within a distributed computing environment having a facilitator agent and a plurality of autonomous service-providing electronic agents, wherein:

the ICL having:

a layer of conversational protocol defined by event types and parameter lists associated with one or more

of the events, wherein the parameter lists further refine the one or more events; and

a content layer comprising one or more of goals, triggers and data elements associated with the events;

the ICL having one or more features from a set of features comprising:

enabling agents perform queries of other agents;

enabling agents to exchange information with other agents; and

enabling agents to set triggers within other agents; and

the ICL having a syntax supporting compound goal expressions wherein said compound goal expressions are such that goals within a single request provided according to the ICL syntax may be coupled by one or more operators from a set of operators comprising:

a conditional execution operator; and

a parallel disjunctive operation that indicates that disjunct goals are to be performed by different agents.

49. An ICL as recited in claim 48, wherein the ICL is computer platform independent.

50. An ICL as recited in claim 48 wherein the ICL is independent of computer programming languages which the plurality of agents are programmed in.

51. An ICL as recited in claim 48 wherein the ICL syntax supports explicit task completion constraints include use of specific agent constraints and response time constraints.

52. An ICL as recited in claim 51, wherein possible types of task completion constraints include use of specific agent constraints and response time constraints.

53. An ICL as recited in claim 51 wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions.

54. An ICL as recited in claim 48 wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions.

55. An ICL as recited in claim 48 wherein each autonomous service-providing electronic agent defines and publishes a set of capability declarations or solvables, expressed in ICL, that describes services provided by such electronic agent.

56. An ICL as recited in claim 55 wherein an electronic agent's solvables define an interface for the electronic agent.

57. An ICL as recited in claim 56 wherein the facilitator agent maintains an agent registry making available plurality of electronic agent interfaces.

58. An ICL as recited in claim 57 wherein the possible types of solvables includes procedure solvables, a procedure solvable operable to implement a procedure such as a test or an action.

59. An ICL as recited in claim 58 wherein the possible types of solvables further includes data solvables, a data solvable operable to provide access to a collection of data.

60. An ICL as recited in claim 58 wherein the possible types of solvables includes data solvables, a data solvable operable to provide access to a collection of data.

61. A facilitator agent arranged to coordinate cooperative task completion within a distributed computing environment having a plurality of autonomous service-providing electronic agents, the facilitator agent comprising:

an agent registry that declares capabilities of service-providing electronic agents currently active within the distributed computing environment; and

a facilitating engine operable to parse a service requesting order to interpret a compound goal set forth therein, the compound goal including

both local and global constraints and control parameters, the service request formed according to an Interagent Communication Language (ICL), wherein the ICL includes:

a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events; and

a content layer comprising one or more of goals,

triggers and data elements associated with the events; and

the facilitating engine further operable to construct a goal satisfaction plan by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms.

62. A facilitator agent as recited in claim 61, wherein the facilitating engine is capable of modifying the goal satisfaction plan during execution, the modifying initiated by events such as new agent declarations within the agent registry, decisions made by remote agents, and information, provided to the facilitating engine by remote agents.

64. A facilitator agent as recited in claim 61 wherein the facilitating engine is operable to install a trigger mechanism requesting that a certain action be taken when a certain set of conditions are met.

65. A facilitator agent as recited in claim 64 wherein the trigger mechanism is a communication trigger that monitors communication events and performs the certain action when a certain communication event occurs.

66. A facilitator agent as recited in claim 64 wherein the trigger mechanism is a data trigger that monitors a state of a data repository and performs the certain action when a certain data state is obtained.

67. A facilitator agent as recited in claim 66 wherein the data repository is local to the facilitator agent.

68. A facilitator agent as recited in claim 66 wherein the data repository is remote from the facilitator agent.

69. A facilitator agent as recited in claim 64 wherein the trigger mechanism is a task trigger having a set of conditions.

70. A facilitator agent as recited in claim 61, the facilitator agent further including a global database accessible to at least one of the service-providing electronic agents.

71. A software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture contemplating a distributed computing system comprising:

a plurality of service-providing electronic agents;

an Interagent Communication Language (ICL), wherein the inter-agent language includes:

a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events; and

a content layer comprising one or more of goals, triggers and data elements associated with the

events; and

a facilitator agent in bi-directional communications with the plurality of service-providing electronic agents, the facilitator agent including:

an agent registry that declares capabilities of service-providing electronic agents currently active within the distributed computing environment;

a facilitating engine operable to parse a service request in order to interpret an arbitrarily complex goal set forth therein, the facilitating engine further operable to construct a goal satisfaction plan including the coordination of a suitable delegation of sub-goal requests to best complete the requested service by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms.

72. A computer architecture as recited in claim 71, wherein the Interagent Communication Language (ICL) is for enabling agents to perform queries of other agents, exchange Information with other agents, and set triggers within other agents, the ICL further defined by an ICL syntax supporting compound goal expressions such that goals within single request provided according to the ICL syntax may be coupled by a conjunctive operator, a disjunctive operator, a conditional execution operator, and a parallel disjunctive operator parallel disjunctive operator that indicates that disjunct goals are to be performed by different agents.

73. A computer architecture as recited in claim 72, wherein the ICL is computer platform independent.

74. A computer architecture as recited in claim 73 wherein the ICL is independent of computer programming languages in which the plurality of agents are programmed.

75. A computer architecture as recited in claim 73 wherein the ICL syntax supports explicit task completion constraints within goal expressions.

76. A computer architecture as recited in claim 75 wherein possible types of task completion constraints include use of specific agent constraints and response time constraints.

77. A computer architecture as recited in claim 75 wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions.

78. A computer architecture as recited in claim 73 wherein the ICL syntax supports explicit task completion advisory suggestions within goal expressions.

79. A computer architecture as recited in claim 73 wherein each autonomous service-providing electronic agent defines and publishes a set of capability declarations or solvables, expressed in ICL, that describes services provided by such electronic agent.

80. A computer architecture as recited in claim 79 wherein an electronic agent's solvables define an interface for the electronic agent.

81. A computer architecture as recited in claim 80 wherein the possible types of solvables includes procedure solvables, a procedure solvable operable to implement a procedure such as a test or an action.

82. A computer architecture as recited in claim 81 wherein the possible types of solvables further includes data solvables, a data solvable operable to provide access to a collection of data.

83. A computer architecture as recited in claim 82 wherein the possible types of solvables includes a data solvable operable to provide access to modify a collection of data.

84. A computer architecture as recited in claim 71 wherein a planning component of the facilitating engine are distributed across at least two computer processes.

85. A computer architecture as recited in claim 71 wherein an execution component of the facilitating engine is distributed across at least two computer process.

## CLAIMS AT ISSUE—U.S. PATENT NO. 7,069,560

1. A software-based, flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture contemplating a distributed computing system comprising:

a plurality of service-providing electronic agents;

a distributed facilitator agent functionally distributed across at least two computer processes, the facilitator agent capable of bi-directional communications with the plurality of service-providing electronic agents, the facilitator agent including:

an agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the distributed computing environment; and

a facilitating engine operable to interpret a service request as a base goal, the facilitating engine further operable for generating a goal satisfaction plan associated with the base goal, wherein the goal satisfaction plan involves:

using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal; and

wherein the plurality of service-providing electronic agents and the distributed facilitator agent communicate using an interagent Communication Language (ICL), wherein the ICL includes:

a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events.

2. A software-based, flexible computer architecture as recited in claim 1 wherein the distributed facilitator agent includes a plurality of single process facilitator agents each executing within a separate computer process, each of the single process facilitator agents being bi-directionally coupled with at least one other single process facilitator agent.

3. A software-based, flexible computer architecture as recited in claim 2 wherein each single process facilitator agent has any necessary facilitating functionality, a specific single process facilitator including:

a specific agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the process wherein the specific single process is executing, the specific agent registry further declaring capabilities made available to the specific single process facilitator agent through the at least one other single process

facilitator agent bi-directionally coupled with the specific single process facilitator agent; and

a specific facilitating engine operable to interpret a service request as a base goal, the specific facilitating engine further operable to determine sub goals required to complete the base goal; the specific facilitating engine further operable to select service providing agents best capable of completing the sub goal and assigning the sub goals thereto.

4. A software-based, flexible computer architecture as recited in claim 3 wherein at least two of the plurality of single process facilitator agents reside upon separate computer systems.

5. A computer architecture as recited in claim 1, wherein the ICL enables agents to perform queries of other agents, exchange information with other agents, and set triggers within other agents, the ICL further defined by an ICL syntax supporting compound goal expressions such that goals within a single request provided according to the ICL syntax may be coupled by a conjunctive operator, a disjunctive operator, a conditional execution operator, and a parallel disjunctive operator that indicates that disjunctive goals are to be performed by different agents.

6. A computer architecture as recited in claim 5, wherein the ICL is computer platform independent.

7. A computer architecture as recited in claim 6 wherein the ICL is independent of computer programming languages in which the plurality of agents are programmed.

8. A computer architecture as recited in claim 7 wherein the ICL syntax supports explicit task completion constraints within goal expressions.

9. A computer architecture as recited in claim 8 wherein possible types of task completion constraints include use of specific agent constraints and response time constraints.

12. A computer architecture as recited in claim 5 wherein each autonomous service-providing electronic agent defines and publishes a set of capability declarations or solvables, expressed in ICL, that describes services provided by such electronic agent.

13. A computer architecture as recited in claim 12 wherein an electronic agent's solvables define an interface for the electronic agent.

14. A computer architecture as recited in claim 1 wherein the distributed facilitator agent is formed in a hierarchical topology.

15. A computer architecture as recited in claim 14 wherein the hierarchical topology includes a top level facilitator agent and at least one other facilitator agent registered within the top level facilitator agent, the top level facilitator agent operable to directly manage those service-providing

agents registered within the top level facilitator agent and indirectly manage those service-providing agents registered within the at least one other agent registered with the top level facilitator agent.

16. A computer architecture as recited in claim 15 wherein the top level facilitator agent and the at least one other facilitator agent are executing on different computer systems.

17. A computer architecture as recited in claim 15 wherein the at least one other facilitator agent is installed for a specific computer user.

18. A computer architecture as recited in claim 15 wherein the at least one other facilitator agent is installed for a specific group of users.

19. A computer architecture as recited in claim 15 wherein the at least one other facilitator agent is installed for a specific computer application.

20. A computer architecture as recited in claim 1 wherein the distributed facilitator agent includes a planning component executing within a first computer process and an execution component executing within a second computer process.

21. A computer architecture as recited in claim 20 wherein the planning component is one of a plurality of synchronized planning components each executing with separate computer processes, whereby the computer architecture provides a more robust operating environment due to redundancy of the planning component functionality of the distributed facilitator agent.

22. A software-based flexible computer architecture for communication and cooperation among distributed electronic agents, the architecture contemplating a distributed computing system comprising:

a plurality of service providing electronic agents;

at least one facilitator agent capable of receiving a service requests in the form of a base goal from a service- requesting agent in an interagent communication language (ICL) and capable of determining sub goals necessary to accomplish the base goal, the facilitator agent operable to allocate each sub-goal to at least one service-providing agent capable of accomplishing the sub-goal as determined by the registry, the facilitator agent being distinct from service-providing agents, wherein the ICL includes a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events; and

at least one service-requesting agent capable of making a request directly to a service-providing agent as a peer to peer communication for accomplishment of at least one of the sub-goals.

23. A software based, flexible computer system as recited in claim 22 wherein the peer to peer communication is in a language other than an interagent communication language.

24. A software based, flexible computer system as recited in claim 22 wherein the peer to peer communication is bi-directional.

25. A software based, flexible computer system as recited in claim 22 wherein the agent operable to make said peer to peer service request is said facilitator agent.

26. A distributed facilitator agent functionally distributed across at least two computer processes, the distributed facilitator agent arranged to coordinate cooperative task completion within a distributed computing environment having a plurality of autonomous service-providing electronic agents, the distributed facilitator agent comprising:

an agent registry that declares capabilities of service-providing electronic agents currently active within the distributed computing environment; and

a facilitating engine operable to parse a service request in order to interpret a compound goal set forth therein, the service request formed according to an Interagent Communication Language (ICL), the ICL including a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events, the facilitating engine further operable to generate a goal satisfaction plan associated with the compound goal, wherein the goal satisfaction plan involves:

using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal.

27. A facilitator agent as recited in claim 26, wherein the facilitating engine is capable of modifying the goal satisfaction plan during execution, the modifying initiated by events such as new agent declarations within the agent registry, decisions made by remote agents, and information provided to the facilitating engine by remote agents.

29. A facilitator agent as recited in claim 26 wherein the facilitating engine is operable to install a trigger mechanism requesting that a certain action be taken when a certain set of conditions are met.

30. A facilitator agent as recited in claim 29 wherein the trigger mechanism is a communication trigger that monitors communication events and performs the certain action when a certain communication event occurs.

31. A facilitator agent as recited in claim 29 wherein the trigger mechanism is a data trigger that monitors a state of a data repository and performs the certain action when a certain data state is obtained.

32. A facilitator agent as recited in claim 31 wherein the data repository is local to the facilitator agent.

33. A facilitator agent as recited in claim 31 wherein the data repository is remote from the facilitator agent.

34. A facilitator agent as recited in claim 29 wherein the trigger mechanism is a task trigger having a set of conditions.

35. A facilitator agent as recited in claim 26, the facilitator agent further including a global database accessible to at least one of the service-providing electronic agents.

36. A facilitator agent as recited in claim 26 wherein the distributed facilitator agent includes a plurality of single process facilitator agents each executing within a separate computer process, each of the single process facilitator agents being bi-directionally coupled with at least one other single process facilitator agent.

37. A facilitator agent as recited in claim 36 wherein each single process facilitator agent has any necessary facilitating functionality, a specific single process facilitator including:

a specific agent registry that declares capabilities for each of the plurality of service-providing electronic agents currently active within the process wherein the specific single process is executing, the specific agent registry further declaring capabilities made available to the specific single process facilitator agent through the at least one other single process facilitator agent bi-directionally coupled with the specific single process facilitator agent; and

a specific facilitating engine operable to parse a service request in order to interpret an arbitrarily complex goal set forth therein, the specific facilitating engine further operable to construct a goal satisfaction plan using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal.

38. A facilitator agent as recited in claim 37 wherein at least two of the plurality of single process facilitator agents reside upon separate computer systems.

39. A facilitator agent as recited in claim 38 wherein the distributed facilitator agent is formed in a hierarchical topology.

40. A facilitator agent as recited in claim 39 wherein the hierarchical topology includes a top level facilitator agent and at least one other facilitator agent registered within the top level facilitator agent, the top level facilitator agent operable to directly manage those service-providing agents registered within the top level facilitator agent and indirectly manage those service-providing agents registered within the at least one other agent registered with the top level facilitator agent.

41. A facilitator agent as recited in claim 40 wherein the top level facilitator agent and the at least one other facilitator agent are executing on different computer systems.

42. A facilitator agent as recited in claim 40 wherein the at least one other facilitator agent is installed for a specific computer user.

43. A facilitator agent as recited in claim 40 wherein the at least one other facilitator agent is installed for a specific group of users.

44. A facilitator agent as recited in claim 40 wherein the at least one other facilitator agent is installed for a specific computer application.

45. A facilitator agent as recited in claim 26 wherein the distributed facilitator agent includes a planning component executing within a first computer process and an execution component executing within a second computer process.

46. A facilitator agent as recited in claim 45 wherein the planning component is one of a plurality of synchronized planning components each executing with separate computer processes, whereby the computer architecture provides a more robust operating environment due to redundancy of the planning component functionality of the distributed facilitator agent.

47. A facilitator agent for coordinating cooperative task completion within a distributed computing environment having a plurality of autonomous service-providing electronic agents, the facilitator agent comprising:

a registry of capabilities of the service-providing electronic agents; and

a facilitating engine operable to determine a set of sub goals necessary to accomplish a base goal, and then allocate such sub-goals to those agents capable of accomplishing the sub-goals as determined by the registry, said facilitating agent further capable of initiating a direct peer to peer communication between a service-requesting agent and a service-providing agent of at least one sub-goal, and said facilitating agent being distinct from service-providing agents; and

wherein the service-providing agent and the service-requesting agent communicate using an Interagent Communication Language (ICL), the ICL includes a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events.

48. A facilitator as set forth in claim 47 wherein the facilitator agent is functionally distributed across at least two electronic agents.

49. A facilitator as set forth in claim 48 wherein the peer to peer communication is between said distributed facilitator agents.

52. A computer implemented process for providing coordinated task completion within a distributed computing environment, the distributed computing environment including a plurality of autonomous electronic agents, the computer implemented method comprising the steps of:

providing at least one agent registry including capabilities of service providing electronic agents;

interpreting a service request in the form of a base goal, the service request being in a interagent communication language (ICL), the ICL including a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the Parameter lists further refine the one or more events;

determining a plurality of sub goals necessary to accomplish the base goal;

selecting from said registry at least one service providing agent capable of completing said sub goals;

delegating at least one sub goal as a peer to peer service request directly from a service requesting agent to a service providing agent; and

delegating any remaining sub goals as service request in the interagent communication language to the selected agents capable of completing the remaining sub-goals.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2021-1412, -1413, -1414, -1416, -1417, -1418, -1419, -1420, -1421, -1422, -1423, -1424, -1440, -1442

**Short Case Caption** Microsoft Corporation v. IPA Technologies Inc.

**Filing Party/Entity** IPA Technologies Inc.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/01/2021

Signature: /s/ Sarah E. Spires

Name: Sarah E. Spires

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| IPA Technologies Inc. | | Wi-LAN Technologies Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Alexander E. Gasser | Skiermont Derby LLP | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| See attachment | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## ATTACHMENT

5. Related Cases

- *Google LLC v. IPA Technologies Inc.*, Case 2021-1179 (Fed. Cir.)
- *IPA Technologies Inc. v. Google LLC*, Case 2021-1438 (Fed. Cir.)
- *IPA Technologies Inc. v. Google LLC*, C.A. No. 1:18-cv-00318 (D. Del.)
- *IPA Technologies Inc. v. Microsoft Corporation*, C.A. No. 1:18-cv-00001 (D. Del.)
- *IPA Technologies Inc. v. Amazon.com, et al.*, C.A. No. 1-16-cv-01266 (D. Del.)
- *Google LLC v. IPA Technologies Inc.*, IPR2019-00728 (PTAB Feb. 26, 2019)
- *Google LLC v. IPA Technologies Inc.*, IPR2019-00730 (PTAB Feb. 26, 2019)
- *Google LLC v. IPA Technologies Inc.*, IPR2019-00731 (PTAB Feb. 26, 2019)
- *Google LLC v. IPA Technologies Inc.*, IPR2019-00733 (PTAB Feb. 26, 2019)
- *Google LLC v. IPA Technologies Inc.*, IPR2019-00734 (PTAB Feb. 26, 2019)

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......... XVII
STATEMENT OF RELATED CASES .......... 1
JURISDICTIONAL STATEMENT .......... 2
STATEMENT OF ISSUES .......... 3
STATEMENT OF ISSUES IN RESPONSE TO MICROSOFT'S BRIEF .......... 4
INTRODUCTION .......... 5
STATEMENT OF THE CASE .......... 8
I. The Patented Technology Serves as the Foundation for Siri, Apple's Highly Successful Virtual Assistant .......... 8
A. The '115 and '560 patents are directed to an inventive, flexible computing architecture. .......... 8
B. The patented inventions lead to Apple's "Siri". .......... 13
II. The Alleged Prior Art .......... 14
A. The Kiss patent was considered in depth by the Examiner during several interviews and office actions; the inventive goal satisfaction plan was sufficiently distinguished from Kiss and the claims issued. .......... 14
B. The communication language KQML was distinguished in the specification and considered by the Examiner; features of the inventive ICL were written into the claims prior to allowance. .......... 16
C. FIPA was a well-known foundation publishing specifications relating to agent architecture. .......... 17
III. Procedural History .......... 18
SUMMARY OF ARGUMENT .......... 20
ARGUMENT .......... 22
I. Standard of Review .......... 22
II. The Board Erred in Finding That Exhibits 1006-1012 Are the Version of FIPA97 Version 1.0 Publicly Available Before the Critical Date .......... 23
A. The Board correctly found that the version of FIPA97 contained in Exhibits 1006-1012—which were obtained *after* the critical date—is one

of multiple different versions of the FIPA97 Version 1.0 software specification. ....... 24

B. The Board clearly erred when it found, with no corroborating evidence, that the version of FIPA97 contained in "Exhibits 1006-1012 is the version that was publicly accessible on the FIPA website in late 1997, and not some other version of the FIPA specification." ....... 26

C. All of the Board's invalidity determinations as to the '115 and the '560 patents must be reversed on this basis alone. ....... 35

III. The Board Legally Erred When it Disregarded the Patented Inventions as a Whole ....... 36

A. The Board erred in failing to address IPA's argument that the prior art does not disclose a "goal satisfaction plan" that "uses reasoning" as recited by the claims of the patents-at-issue. ....... 37

B. The Board erred in separating its analysis of the "using reasoning" element from the recited "goal satisfaction plan," and in failing to provide any analysis for why it accepted Microsoft's arguments over IPA's. ....... 42

IV. The Board's Decision Cannot be Reconciled With the Specification and File History of the Patents-at-Issue ....... 44

A. The patents make clear that a meta-agent like that in Kiss cannot be a part of the facilitator recited in the claims. ....... 44

B. The specifications and file histories of the patents make clear that Kiss does not disclose the claimed ICL. ....... 50

V. The Board Legally Erred When it Disregarded IPA's Unrebutted Factual Record Relating to Secondary Considerations ....... 59

RESPONSES TO MICROSOFT'S BRIEF ....... 65

VI. If this Court Reaches Microsoft's Appeal, it Should Affirm the Board's Orders as to Certain Grounds of Patentability ....... 65

VII. The Board's Orders as to Certain Claims are Supported by Substantial Evidence and the Law of Claim Interpretation ....... 66

A. Microsoft failed to demonstrate how or why elements would have been combined in the art. ['115 patent cl.8-10, 63, '560 patent cl.28] ....... 66

B. Microsoft failed to provide its specific alleged basis of unpatentability as to certain claims. ....... 69

a. Claim 29 of the ’115 patent .......... 69

b. Claim 86 of the ’115 patent [IPR2019-00811] .......... 72

C. The Board’s finding that “advisory suggestions” is different from “constraints” and thus not disclosed in FIPA97 is consistent with the law. [’560 patent cl.10-11, IPR2019-00836] .......... 74

VIII. The Board Did Not Err in Rejecting Microsoft’s Waived Claim Construction Argument [’560 patent cl.50-51, 53-55, IPR2019-00836] .......... 76

CONCLUSION AND STATEMENT OF RELIEF SOUGHT .......... 78

CERTIFICATE OF COMPLIANCE .......... 82

# TABLE OF AUTHORITIES

## Cases

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012)....................67

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015)....................22

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
262 F.3d 1258 (Fed. Cir. 2001)....................48

*Crocs, Inc. v. Int'l Trade Comm'n*,
598 F.3d 1294 (Fed. Cir. 2010)....................59

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
800 F.3d 1375 (Fed. Cir. 2015).................... 33, 61

*Finnigan Corp. v. ITC*,
180 F.3d 1354 (Fed. Cir. 1999)....................29

*Harmonic Inc. v. Avid Tech., Inc.*,
815 F.3d 1356 (Fed. Cir. 2016)....................71

*HTC Corp. v. Cellular Commc'ns Equip., LLC*,
877 F.3d 1361 (Fed. Cir. 2017)....................22

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*,
676 F.3d 1063 (Fed. Cir. 2012).................... 42, 65

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016).................... 33, 50, 58

*In re NuVasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016).................... 22, 28, 32, 44, 71

*In re Sang Su Lee*,
277 F.3d 1338 (Fed. Cir. 2002)....................64

*In re Wyer*,
655 F.2d 221 (CCPA 1981) ....................24

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016)........................................................... 71, 74

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.*,
177 F.3d 968 (Fed. Cir. 1999)................................................................70

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*,
628 F.3d 1359 (Fed. Cir. 2010)..............................................................29

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
790 F.3d 1329 (Fed. Cir. 2015)..............................................................77

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ..................................54

*Microsoft Corp. v. FG SRC, LLC*,
No. 2020-1928, 2021 WL 2461862 (Fed. Cir. June 17, 2021)..................... 72, 73

*Novartis AG v. Torrent Pharms. Ltd.*,
853 F.3d 1316 (Fed. Cir. 2017)........................................................... 68, 72

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*,
587 F.3d 1324 (Fed. Cir. 2009)..............................................................76

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)..............................................................75

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018)..............................................................49

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
815 F.3d 734 (Fed. Cir. 2016)................................................................62

*SkinMedica, Inc. v. Histogen Inc.*,
727 F.3d 1187 (Fed. Cir. 2013)..............................................................48

*Stratoflex, Inc. v. Aeroquip Corp.*,
713 F.2d 1530 (Fed. Cir. 1983)..............................................................65

*T. H. Symington Co. v. Nat'l Malleable Castings Co.*,
250 U.S. 383 (1919) ..............................................................................29

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015) ....................22

*TriVascular, Inc. v. Samuels*,
812 F.3d 1056 (Fed. Cir. 2016)....................69

*Typeright Keyboard Corp. v. Microsoft Corp.*,
374 F.3d 1151 (Fed. Cir. 2004)....................32

*United States v. C.H. Robinson Co.*,
760 F.3d 1376 (Fed. Cir. 2014)....................62

*Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.*,
143 U.S. 275 (1892) ....................29

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
853 F.3d 1272 (Fed. Cir. 2017)....................75

**Statutes**

35 U.S.C. § 312(a)(3)....................66

**Regulations**

37 C.F.R. § 42.104(b)(4).................... 66, 71

37 C.F.R. § 42.104(b)(5).................... 66, 71

# TABLE OF ABBREVIATIONS

| Abbreviation | Full Term |
|---|---|
| (xx:yy-zz) | If this format cites to a patent it refers to column xx, lines yy-zz. |
| Appx | Joint Appendix |
| Board | Patent Trial and Appeal Board |
| cl.xx | Claim no.xx [in cited patent] |
| ’115 patent | U.S. Patent No. 6,851,115 [Appx1294-1330] |
| ’560 patent | U.S. Patent No. 7,069,560 [Appx1331-1336] |
| IPA or Cross-Appellant | IPA Technologies Inc. |
| IPR2019-00810, -00811, -00812, -00813 and -00814 | IPRs relating to the ’115 patent<br>Note: Like Microsoft, IPA also cites to IPR2019-00810 as the representative record, unless otherwise noted. |
| IPR2019-00835, -00836, and -00837 | IPRs relating to the ’560 patent. Note: IPA cites to IPR2019-00835 as the representative record, unless otherwise noted. |
| Kiss | U.S. Patent No. 6,484,155 a prior art reference considered in depth by the Examiner during prosecution. [Appx7494-7518] |
| FIPA | Foundation for Intelligent Physical Agents, a well-known non-profit foundation created to promote agent-based technology and develop open standards. |
| ACL | Agent Communication Language discussed in a portion of FIPA97 (Exhibits 1006-1012). |
| ICL | Interagent Communication Language |
| FIPA97 (Exhibits 1006-1012) | A collection of FIPA guideline papers cited by Microsoft in the underlying IPRs at Exhibits 1006-1012. Microsoft alleges that FIPA97 (Exhibits 1006- |

| | |
|---|---|
| | 1012) is the version that was publicly available on the FIPA website in late 1997; IPA alleges that there is no evidence that the publication upon which Microsoft relies is the version that was accessible on FIPA's website. The Board found that there were many versions of FIPA97 Version 1.0 software specification; the only one in evidence is FIPA97 (Exhibits 1006-1012). [Appx7519-7832] |
| Patents-at-Issue | U.S. Patent No. 6,851,115 [Appx1294-1330] and U.S. Patent No. 7,069,560 [Appx1331-1336] |
| POSA | Person of ordinary skill in the art. |
| POR | Patent Owner Response |
| SRI | SRI International, Inc., an independent, non-profit research institute. |
| OAA | Open Agent Architecture—a project developed at SRI in the late 1990's by the inventors and others. |
| Siri | OAA laid the groundwork for Siri. Siri was spun into an SRI venture dubbed "Siri, Inc.", co-founded by named inventor Cheyer. Siri, Inc. was later acquired by Apple and the Siri product was released on Apple devices in 2010 as a conversational personal assistant, garnering much industry acclaim. |
| Dr. Lieberman | Microsoft's expert |
| Dr. Medvidovic | IPA's expert |
| IPA Notices of Appeal | Appx2636-2637; Appx3109-3110; Appx3593-3594; Appx3904-3905; Appx4379-4380; Appx5599-5600; Appx6028-6029; Appx6308-6309 |
| Microsoft Notices of Appeal | Appx2636-2637; Appx3109-3110; Appx3593-3594; Appx3904-3905; Appx4379-4380; Appx5599-5600; Appx6028-6029; Appx6308-6309 |

| | |
|---|---|
| FWD | The Final Written Decision(s) by the Board |

## STATEMENT OF RELATED CASES

This consolidated appeal involves IPR proceedings relating to both U.S. Patent No. 6,851,115 ("the '115 patent") and U.S. Patent No. 7,069,560 ("the '560 patent"). Specifically, IPR2019-00810, IPR2019-00811, IPR2019-00812, IPR2019-00813 and IPR2019-00814 relate to the '115 patent and IPR2019-00835, IPR2019-00836, and IPR2019-00837 relate to the '560 patent.

In addition, several Federal Circuit companion cases have been designated along with this case concerning related U.S. patents. Those companion cases are: (1) *Google LLC v. IPA Technologies Inc.*, No. 21-1179 (Fed. Cir.) concerning related U.S. Patent Nos. 7,069,560 and U.S. Patent No. 6,851,115; and (2) *IPA Technologies Inc. v. Google LLC*, No. 21-1438, 21-1439 concerning related U.S. Patent No. 7,036,128.

The district court cases that will be directly affected by this Court's decision in the pending appeals are: (1) *IPA Technologies Inc. v. Amazon.com, Inc. and Amazon Digital Services, LLC*, No. 1:16-cv-1266 (D. Del.); (2) *IPA Technologies Inc. v. Google LLC*, No. 1:18-cv-318 (D. Del.); and (3) *IPA Technologies Inc. v. Microsoft Corp.*, No. 1:18-cv-001 (D. Del.). The Amazon case is currently actively in the dispositive motion phase. The Google and Microsoft cases are presently stayed pending appeal.

## JURISDICTIONAL STATEMENT

This is a consolidated appeal under 35 U.S.C. § 141(c) from the FWD of the Patent Trial and Appeal Board (the "Board") entered between October 15 and November 5, 2020 in IPR proceedings relating to the '115 patent (IPR2019-00810, -00811, -00812, -00813 and -00814) and the '560 patent (IPR2019-00835, -00836, and -00837). Each of Appellant Microsoft Corporation ("Microsoft") and Cross-Appellant, IPA Technologies, Inc. ("IPA") filed timely Notices of Appeal. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF ISSUES

1. Whether the Board legally erred when it determined that the version of the FIPA97 specification in Exhibits 1006-1012 is the version that was publicly accessible in 1997, despite the fact that it only relied upon unreliable and uncorroborated testimony to support this finding?

2. Whether the Board legally erred by breaking up its invalidity analysis into numerous component parts, analyzing each element separately, and never the invention as a whole?

3. Whether the Board legally erred by failing to consider or address IPA's argument that the prior art does not disclose a "goal satisfaction plan" that "uses reasoning" as recited by claims 1-21, 26-46, and 50-51 of the '560 patent and claims 1-47 and 61-89 of the '115 patent?

4. Whether the Board legally erred in failing to provide any analysis for why it accepted Microsoft's arguments over IPA's that Kiss discloses "using reasoning" as recited by claims 1-21, 26-46, and 50-51 of the '560 patent and claims 1-47 and 61-89 of the '115 patent?

5. Whether substantial evidence supports the Board's finding that Kiss' meta-agent can be a part of the facilitator recited in claims 1-49 of the '560 patent and claims 48-89 of the '115 patent, even though the specification of the patents-at-issue excludes meta-agents from being part of facilitators?

6. Whether the Board legally erred in shifting the burden to IPA of proving that FIPA97 is different from the KQML language that the patents-at-issue and their prosecution histories distinguish from the ICL recited in all asserted claims?

7. Whether the Board legally erred when it disregarded IPA's unrebutted factual record relating to secondary considerations?

## STATEMENT OF ISSUES IN RESPONSE TO MICROSOFT'S BRIEF

8. If this Court finds that FIPA97 (Exhibits 1006-1012) is prior art, should the Board's decisions as to certain claims be reversed where Microsoft failed to specify with particularity where each element of the claim is found in the prior art and the Board's decisions were supported by substantial evidence and the law of claim interpretation?

9. Should the Board's decision as to claims 50-51, 53-55 of the '560 patent be reversed where Microsoft informed the Board the operative claim term was "not relevant" and that it "need not be construed", thus waiving claim construction arguments in the below proceedings, yet now seeks to resurrect those abandoned arguments before this Court?

## INTRODUCTION

IPA's '115 and '560 patents represent breakthrough technology in computing architecture that originated out of the Stanford Research Institute ("SRI"), and specifically version 2 of the Open Agent Architecture ("OAA") Project "from which Siri, the first virtual personal assistant, was born." Microsoft challenged IPA's patents in a total of *eight* IPR Petitions at issue here (and another three non-instituted Petitions directed to a related patent).

In deciding whether the claims of IPA's '115 and '560 patents are valid, the Board repeatedly failed to require that Microsoft prove its case as the law requires. For instance, Microsoft failed to prove that its primary reference—FIPA97 (Exhibits 1006-1012)—upon which each of Microsoft's grounds relies, was publicly available as prior art. Microsoft admits that there were *multiple* versions of FIPA97, and the Board found that *a* FIPA97 reference was available as prior art, but Microsoft failed to provide evidence sufficient to show that the single version of FIPA97 it entered into evidence is *the* version that was available as prior art. To prove that *Microsoft*'s version of FIPA97 was *the* publicly available version, Microsoft submitted *only* the declaration of a paid witness who purported to recall *from memory* that *Microsoft*'s version of FIPA97 was *the* publicly available version—despite admitting that he "was very familiar with [FIPA97] 20 years ago," but does not recall "most of the details" today. Contrary to the law requiring

corroboration of such testimony—of which there was none—the Board found that Microsoft's version of FIPA97 was *the* publicly available version. On this basis alone, Microsoft failed to carry its burden in proving the obviousness of IPA's patents.

The Board also misapplied the law by analyzing claim elements piecemeal instead of viewing the patented inventions as a whole. This caused the Board to read the recited "using reasoning" element out of each of IPA's claims. The Board further erred in failing to credit the patents' lexicography explicitly excluding meta-agents from being the claimed facilitator agents. Had it done so, the Board would have correctly found against Microsoft. The Board also failed to credit the distinctions the patents and their file histories made over the prior art, which is cumulative of art Microsoft asserts, and failed to consider IPA's unrebutted evidence of secondary considerations—based upon the indisputable success of Siri, which embodies IPA's patents.

Finally, although Microsoft's failure to prove FIPA97's prior art status is dispositive of Microsoft's appeal, should this Court reach those issues, it is clear that substantial evidence supports the validity of certain claims. Microsoft takes issue with the Board's faulting Microsoft for failing to "identif[y], in writing and with particularity…the evidence that supports the grounds for the challenge to each claim" in its Petition. Yet this failure belongs only to Microsoft. Accordingly,

Microsoft's appeal has no merit.

# STATEMENT OF THE CASE

## I. The Patented Technology Serves as the Foundation for Siri, Apple's Highly Successful Virtual Assistant

### A. The '115 and '560 patents are directed to an inventive, flexible computing architecture.

Inventors Martin and Cheyer developed the patented inventions while working on the OAA project at SRI, an independent non-profit institute, in the late 1990s. The '115 patent was filed on January 5, 1999 with 137 pages of OAA source code as an Appendix for reference, and issued on February 1, 2005. (Appx1294, Appx6935-7072.) The '560 patent was filed as a continuation on March 17, 1999. (Appx1331.) The '115 patent issued on February 1, 2005, and the '560 patent issued on June 27, 2006. Together, after more than five years of prosecution and a robust prosecution history, the two patents contain 144 issued claims directed to various aspects of an inventive, flexible computing architecture incorporating several novel concepts including: (a) distributed electronic agents coordinated by and communicating with (b) one or more facilitators in a (c) common language to cooperatively accomplish complex user goals consistent with (d) a goal satisfaction plan.

Central to the claimed inventions, "communications and cooperation between agents are brokered by one or more facilitators, which are responsible for matching requests, from users and agents, with descriptions of the capabilities of

other agents." Accordingly, a user or agent did not need to "know the identities, locations, or number of other agents involved in satisfying a request, and relatively minimal effort is involved in incorporating new agents and 'wrapping' legacy applications." (Appx1350 (4:64-67).)[1] The inventive computing framework achieved "extreme flexibility [] through an architecture organized around the declaration of capabilities by service providing agents, the construction of arbitrarily complex goals by users and service-requesting agents, and the role of facilitators in delegating and coordinating the satisfaction of these goals, subject to advice and constraints…" (Appx1350-1351 (4:67-5:6).)

Foundational to the patented inventions is the distributed agent system. Although prior agent-based systems showed promise for "flexible, fault-tolerant, distributed problem solving," they were also "very limited to the extent to which agents can specify complex goals or influence the strategies used by the facilitator." (Appx1350 (4:30-36).) Additionally, prior agent-based technologies were "not sufficiently attuned to the importance of integrating human agents (i.e., users) through natural language and other human-oriented user interface technologies." (Appx1350 (4:36-39).) By utilizing a distributed agent system, an example of which is pictured below in Figure 4, in combination with several other

[1] The '115 and '560 patents share a common specification. (Appx1331.) IPA's citations to the '560 patent are exemplary of both patents.

unique features such as a common language, the inventors overcame the obstacles present in the art. (Appx1351 (5:26-27) (depicting "a structure typical of one small system of the present invention").)




Fig. 4

The specification discloses that the small exemplary system depicted above is made up of the facilitator agent [400]—a specialized server agent that is responsible for coordinating agent communications and cooperative problem solving—and client agents that included at least application agents [404] (e.g., speech recognition or natural language processing, as examples), meta-agents [406] (assisting in coordination) and user interface agents [408]. (Appx1351 (6:38-58).) The disclosure provides that an agent registers with its parent facilitator a specification of the capabilities and services the agent can provide (for example

natural language). (Appx1352 (7:30-32).) The functionality of each client agent is made available to the agent community through the registration of the client agent's capabilities with a facilitator. The common infrastructure is preferably supplied by an agent library, accessible in the runtime environment of several different programming languages. (Appx1352 (7:55-59).) This minimizes the effort required to construct a new system and maximizes the ease with which legacy systems can be "wrapped" or made compatible with the agent-based architecture. (Appx1352 (7:59-63).)

Later, when a facilitator determines that one of its client agents can help satisfy a goal, the facilitator sends that client a request expressed in the common Interagent Communication Language ("ICL"). (Appx1352 (7:30-41).) The agent parses this request, processes it, and returns answers or status reports to the facilitator. (Appx1352 (7:41-43).) ICL also allows a standard set of events to be dynamically extensible based upon a parameter list that refines the event, in a way that was not possible in prior art languages such as KQML. (Appx6324; Appx9403.)

In addition to the novel use of facilitators and common language, the inventive architecture allows for receiving and handling compound goals by constructing and dynamically completing a goal satisfaction plan. (Appx1356 (16:62-66).) The facilitator captures the capabilities of the agents in a knowledge

base and uses that knowledge to delegate and coordinate the satisfaction of these goals, subject to the advice and constraints that may accompany them. (Appx1351 (5:4-6).) There are many ways to accomplish the goal satisfaction plan, but all involve the facilitator's use of a sophisticated reasoning previously unknown in the art. (*See* Appx1363-1366 (cl.1-55); Appx1326-1330 (cl.1-89).) In some instances, certain sub-goals may be sent to separate agents in parallel, while transmission of other sub-goals may be postponed until receipt of particular answers. Additionally, certain requests may generate multiple responses that generate additional sub-goals. (Appx1357-1358 (18:54-19:13).) The facilitator agent's use of dynamic and sophisticated reasoning when delegating sub-goal requests in an effort to best complete the user service request is a key component of the inventive architecture and, when combined with the other novel characteristics including the use of facilitator agents, the agent registry, and the common language, provided a novel computing architecture worthy of several patents.

The inventive architecture of the patents-at-issue is beneficial in a variety of ways. (Appx1352 (8:52-67).) For example, as new agents connect to the facilitator, what users can do dynamically changes with the agent registrations. (Appx1352 (8:53-56.) In addition, the ICL is expandable and achieves cooperation among agents. (Appx1352 (8:55-56).) Thus, a single request can produce cooperation and flexible communication among many agents, written in different programming

languages and spread across multiple machines. (Appx1352 (8:64-67).) Further, a human user can express requests, including compound requests, without having a detailed knowledge of the individual agents. (Appx1353 (10:17-20).)

### B. The patented inventions lead to Apple's "Siri".

It is undisputed among POSAs (including Microsoft's own experts) that the patented inventions lead to the well-known (and successful) Siri conversational agent implemented on Apple devices. (Appx11636-11638 (24:5-25:23); Appx12244 (24:4-23); Appx11874.)

While the genesis of the project that led to the patents-at-issue was the OAA project at SRI, the inventions of the patents-at-issue were developed in connection with the *second* round of the OAA project, which built upon the foundations of OAA to improve upon compound goal processing. (Appx1350 (4:40-51.) "OAA laid the groundwork for the DARPA-funded CALO project, from which Siri, the first virtual personal assistant, was born. Siri was spun out into an SRI venture that Apple acquired from SRI." (Appx11874.) This SRI spin-out company was dubbed Siri, Inc. and co-founded by Mr. Cheyer. (Appx11766.) Mr. Cheyer and his colleagues launched the Siri application on the Apple store in February 2010. (Appx11789; Appx11892.) Just a few months later, they sold Siri, Inc. and the company's rights to the technology for more than $200 million. (*Id.*) Siri, Apple's virtual personal assistant agent, was released to the public in the iPhone 4 in 2010,

and was met with significant praise. (*See* Appx11892.)

## II. The Alleged Prior Art

### A. The Kiss patent was considered in depth by the Examiner during several interviews and office actions; the inventive goal satisfaction plan was sufficiently distinguished from Kiss and the claims issued.

The Kiss patent claims priority to a provisional application filed on July 21, 1998. Kiss discloses "a knowledge management system that supports inquiries of distributed knowledge resources." (Appx7494 (Abstract).) The "inquiries" are referred to as "questions or problem statements presented by the user." (*Id.*) Kiss teaches a decentralized system drawing knowledge from different sources in different locations. (Appx7509 (2:61-67).) Kiss' Figure 1 discloses a conceptual overview of one embodiment of a knowledge management system. (Appx7511 (5:1-2).) Kiss' knowledge management system 100 includes various layers including a presentation layer 103, a user interface layer 105, a meta-agent layer 107, a knowledge agent layer 109, a knowledge module layer 111, and an agent service layer 113. (Appx7511 (5:3-7).)

The Kiss "invention solicits accessible knowledge repositories, represented by knowledge agents, for relevant knowledge, and then analyzes and integrates responses from those knowledge repositories." (Appx7494 (Abstract).) Among the goals of the Kiss invention was to "make use of a large number of knowledge sources of different types, in different locations, and covering different domains of

expertise." (Appx7509 (2:61-67).) Kiss discloses that the meta-agent formulates a "solution plan" and allocates tasks to the knowledge agent layer. (Appx7511 (5:33-37.) Kiss discloses that an advantage of its invention is "that the problem-solving process has been removed from a centrally-located reasoning mechanism and made granular." (Appx7510 (3:50-52).)

In the prosecution of the patents-at-issue, Kiss was the subject of several Office Actions and at least two Examiner interviews. (Appx6360-6361; Appx6383-6387; Appx6419-6423; Appx6436-6454; Appx9450-9464; Appx9485-9487; Appx9499-9507.) Ultimately, Kiss was sufficiently distinguished and the claims were appropriately amended and allowed. (Appx6322-6325; Appx9401-9404.) Applicants successfully explained and distinguished the goal satisfaction plan present in the inventive architecture from the problem-solving process disclosed in Kiss in part by stating that "Kiss did not disclose any intelligent reasoning when formulating a goal satisfaction plan," as recited by the claims, but instead "merely discloses a method of information retrieval from information repositories such as databases." (Appx6383; Appx6419; *see* Appx9461-9462; Appx9485-9486.) Applicants further explained that Kiss does not use inferencing and reasoning schemes in the goal satisfaction plan as recited by the claims. (Appx6360-6361; Appx6387; Appx6423; Appx9463; Appx9486.)

### B. The communication language KQML was distinguished in the specification and considered by the Examiner; features of the inventive ICL were written into the claims prior to allowance.

The specification compares and contrasts the then-known communication language KQML with the inventive ICL, disclosing that ICL preferably includes a layer of conversational protocol (defined by event types and parameter lists) and a content layer (consisting of specific goals, triggers and data elements that may be embedded within various events). (Appx1354 (11:26-31).) The specification distinguishes the inventive ICL from KQML, stating in part that ICL "offers greater expressiveness than an approach based solely on a fixed selection of speech acts such as embodied in KQML." (Appx1354 (11:38-40).) Following an Examiner interview, Applicant, based upon the Examiner's suggestion, expressly imported the specification's disclosure concerning ICL into claim elements. (Appx6383-6391.) An additional interview was conducted, and Applicant amended the claims further to limit the "conversational protocol" layer requirements "wherein the parameter lists further refine the one or more events." (*See* Appx9402-9403.) With this distinction, the Examiner found that, "by Applicant providing these parameters in the same layer as the event such that they further refine the event**,** a standard set of events are dynamically extensible based upon the parameter list which is not possible with the teachings of Nwana"—a prior art reference teaching KQML. (Appx6324; Appx9403.) The claims issued. (*Id.*)

### C. FIPA was a well-known foundation publishing specifications relating to agent architecture.

At the time of invention and throughout prosecution, FIPA was a well-known non-profit foundation created to promote agent-based technology and develop open standards. FIPA97 (Exhibits 1006-1012) is a collection of seven separate documents encompassing guidelines for conformance. For its arguments, Microsoft relies on the version of FIPA97 Version 1.0 that it claims it submitted as Exhibits 1006-1012 to its IPRs.

The Board set forth the factual circumstances under which FIPA97 Version 1.0 was released, finding that *multiple* versions of the FIPA97 Version 1.0 software specification had been released. (Appx881 ("An 'initial' version of FIPA97 Version 1.0, approved at the Munich meeting and dated October 10, 1997, was posted to the FIPA website" after which "[w]orking groups for various parts of the specification were given about one month to check for consistency and make minor edits."), Appx883-884 ("FIPA also produced a hardcopy book version of the FIPA97 Version 1.0 specification…Dr. Finin testifies that the books contain the November 28, 1997, edited version of FIPA97 Version 1.0'").) It is undisputed that Microsoft obtained the version of FIPA97 Version 1.0 upon which it relies here from a website not available prior to the critical date. (*See* Appx896-897; Appx4944; Appx4774-4775.) FIPA97 (Exhibits 1006-1012) is nothing more than a collection of guideline documents allegedly discussed at a privately-held October

1997 FIPA meeting and pulled together by Microsoft almost twenty-two years later for the purposes of these petitions.

## III. Procedural History

In total Microsoft challenged all 89 claims of the ’115 patent, submitting its five IPR Petitions with the expert declaration of Dr. Lieberman. (Appx1391; Appx2639; Appx3112; Appx3596; Appx3907; Appx7092.) Microsoft also challenged all 55 claims of the ‘560 patent, submitting its three IPR Petitions with the expert declaration of Dr. Lieberman. (Appx4382; Appx5602; Appx6031; Appx8605.) Additionally, Microsoft filed three IPR Petitions against U.S. Patent No. 7,036,128, which is a continuation-in-part of the ’115 patent with a specification that adds a column of additional material to the ’115 patent specification, but is otherwise identical. FIPA—one of the two primary references upon which Microsoft relies in its Petitions against the patents-at-issue—is listed as one of the materials considered by the Examiner.

Following institution, IPA filed PORs along with the expert declaration of Dr. Medvidovic. (Appx1744-1915; Appx4704-4892; Appx11435-11571; Appx12782-12949.) IPA additionally filed sur-replies in support of its arguments. (Appx2071-2171; Appx5046-5134.) In addition to opposing the alleged prior art combinations, IPA opposed the IPRs based on secondary considerations of non-obviousness as demonstrated by Apple’s highly successful digital assistant, Siri.

(Appx4853-4876.) During the proceedings, Microsoft's expert acknowledged that OAA and the patented inventions laid the foundation for Apple's Siri. (Appx12244 (24:4-23 ("[Adam Cheyer] was one of the principal researchers on the OAA, Open Agent Architecture Project, which eventually was spun off as a company called 'Siri' and then became--was bought by Apple. So it led to the Siri conversational agent on the iPhone.")).) IPA further provided a thoroughly developed evidentiary record demonstrating (1) significant industry acclaim and (2) long-felt but unmet need for a virtual agent able to effectively and efficiently accomplish complex user tasks delivered through natural language. (Appx4853-4876.) Dr. Medvidovic provided extensive claim charts: (1) linking the claim elements to OAA's version 2, upon which Siri was indisputably based and (2) linking Siri to the patent claims. (Appx11498-11571; Appx12863-12878; Appx12280-12949.) Microsoft provided no response whatsoever to the overwhelming evidence of secondary considerations submitted by IPA. The Board, ignoring the shifting burden, refused to consider IPA's evidence relating to secondary considerations and issued its eight FWDs. (Appx1; Appx170; Appx323; Appx497; Appx667; Appx840; Appx994; Appx1138.) In sum, the Board invalidated 62 of 89 challenged claims in the '115 patent and 47 of 55 challenged claims in the '560 patent, upholding the remainder of the challenged claims as valid.

Each of the invalidated claims was based on a combination of Kiss (which

was considered in depth by the Examiner during prosecution) and the collection of FIPA97 (Exhibits 1006-1012) guidelines. The parties subsequently cross-appealed, which proceeding was consolidated.

## SUMMARY OF ARGUMENT

The patents-at-issue relate to an inventive computing architecture incorporating several novel concepts including facilitators that coordinate agents using an interagent communication language ("ICL") to accomplish user tasks consistent with a goal satisfaction plan. Accordingly, IPA asserts that:

First, the Board's findings appreciate that there were many printed versions of the FIPA97 Version 1.0 software specification, with some that were publicly available and others that may not have been. Yet the Board erred in finding that the 300-page printed FIPA97 collection (Exs. 1006-1012) represents the exact same version of the FIPA97 Version 1.0 software specification that the Board found publicly accessible on October 10, 1997. Microsoft's expert could not remember sufficient details about FIPA97 Version 1.0 to know, from the many versions of FIPA97 Version 1.0, whether the one placed in evidence was the version that was publicly accessible prior to the critical date and so there is no corroborating evidence supporting the Board's findings, contrary to law. This alone warrants a full reversal.

Second, although the patented inventions are composed of several unique

elements, the Board only evaluated each separate element, never analyzing the claims as a whole in view of the specification. In this way, the Board read out key components of the invention, including that the inventive goal satisfaction plan uses reasoning, which was a central argument during prosecution when the claims issued over prior art Kiss rejections.

Additionally, the Board completely ignored the specification and the file history of the patents at issue, which make exceedingly clear that prior art Kiss was considered in depth during prosecution and (1) prior art Kiss' meta-agent cannot be a part of the claimed facilitator and (2) that the claimed ICL was novel and not disclosed in Kiss.

Lastly, IPA provided extensive evidence relating to secondary considerations which Microsoft completely ignored. Nevertheless, the Board failed to properly consider IPA's unrebutted evidence, which is an outright error in law, also warranting reversal.

Should this Court reach Microsoft's opening arguments, they are unavailing. Microsoft failed to demonstrate how the Board's decisions as to certain grounds of patentability are not supported by substantial evidence and the laws of claim interpretation, or were not in fact waived by Microsoft in the record below.

## ARGUMENT

### I. Standard of Review

In an IPR proceeding, the Petitioner bears the burden of proving unpatentability by a "preponderance of the evidence." 35 U.S.C. § 316(e). This Court reviews the Board's underlying factual findings for substantial evidence and its conclusion on obviousness *de novo*. *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1369 (Fed. Cir. 2017). "Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence," meaning that "[i]t is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re NuVasive, Inc.*, 842 F.3d 1376, 1379–80 (Fed. Cir. 2016) (internal quotation marks and citations omitted). This Court also reviews "the Board's compliance with the governing legal standards de novo." *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015). Among these legal standards is the principle that a "patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The Board's claim constructions are reviewed *de novo*, with any subsidiary findings about the extrinsic evidence reviewed for substantial evidence. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318 (2015).

## II. The Board Erred in Finding That Exhibits 1006-1012 Are the Version of FIPA97 Version 1.0 Publicly Available Before the Critical Date

There is one threshold issue that, if decided in IPA's favor, resolves every issue in this consolidated appeal. That is whether the version of FIPA97 (Exhibits 1006-1012) upon which Microsoft relies for its invalidity allegations is the same as the FIPA97 Version 1.0 that the Board found was publicly available prior to the critical date of the patents-at-issue. The Board recognized the importance of this issue to the case, spending a full twenty-five pages of its opinion on the topic. (Appx874-899.)[2] The Board recognized that there are two prongs that Microsoft had to prove with respect to public availability: "that (1) FIPA97 Version 1.0 was publicly accessible on October 10, 1997, and (2) the version of the FIPA specification found in Exhibits 1006-1012…is the same specification that was posted on the FIPA website on October 10, 1997". (Appx888.) However, the Board focused the majority of its attention on the first prong, devoting only two paragraphs of the 25 pages to the second prong. (Appx897-898.) It is on this second prong that the Board erred.

---

[2] Unless otherwise noted, citations to IPR2019-00835 are representative of the record below.

### A. The Board correctly found that the version of FIPA97 contained in Exhibits 1006-1012—which were obtained *after* the critical date—is one of multiple different versions of the FIPA97 Version 1.0 software specification.

It is undisputed that Microsoft obtained the version of FIPA97 Version 1.0 upon which it relies here from a website not available prior to the critical date. (*See* Appx896-897; Appx4944; Appx4774-4775.) However, the Board found "that the date Exhibits 1006-1012 were obtained is immaterial if they are digital copies of documents that are shown to have been publicly accessible before the critical date." (Appx897 (citing *In re Wyer*, 655 F.2d 221, 226-27 (CCPA 1981)).) But this is a truthful irrelevancy, as Microsoft failed to show that Exhibits 1006-1012 are a digital copy of the version of FIPA97 Version 1.0 that was publicly accessible before the critical date.

The Board set forth the factual circumstances under which FIPA97 Version 1.0 was released, correctly finding that *multiple* versions of FIPA97 Version 1.0 specification had been released. (Appx881 ("An 'initial' version of FIPA 97 Version 1.0, approved at the Munich meeting and dated October 10, 1997, was posted to the FIPA website" after which "[w]orking groups for various parts of the specification were given about one month to check for consistency and make minor edits."), 44-45 ("FIPA also produced a hardcopy book version of the FIPA 97 Version 1.0 specification…Dr. Finin testifies that the books contain the November 28, 1997, edited version of FIPA 97 Version 1.0'").) Indeed,

Microsoft's declarant on the public accessibility of FIPA97 characterized Exhibits 1006-1012 as an "initial" version of FIPA 97 Version 1.0. (Appx12162-12163 (88:9-89:25), Appx12167-12168 (93:12-94:2), Appx12160 (86:11-15 (After the initial version, the working groups were going to make "final minor edits.")); Appx8584-8586 ("[B]y following the link, you can find that the "Initial" version of the files are also saved in the Internet Archive, dated between 2003-2004, and are identical to the files available on the FIPA site today and enclosed in Exhibits 1006-1012.")).) Microsoft's own evidence confirmed the existence of multiple versions of FIPA97 Version 1.0. For example, a declaration from the Internet Archive includes a screen capture showing that a different Version 1.0 was made available after the "Reston meeting":

> This is to inform interested parties that
>
> http://drogo.cselt.it/fipa/spec/fipa97reston.htm
>
> contains parts 1 to 7 of FIPA 97 specification ver. 1.0 (Reston meeting).

(Appx9345.) And yet another—and admittedly different—version exists in the form of the hardcopy books of version 1.0 of the FIPA97 specification Microsoft alleges is available at international libraries. (Appx9022-9043; *see* Appx8588-8589 ("A review of the table of contents for the physical book shows that FIPA printed the November 28, 1997, edited version of the specification.")).)

Each of these specifications, although different, characterizes itself as

"FIPA97 version 1.0." (Appx9345; Appx9022; Appx9040.) Moreover, each of the specifications, regardless of its edit date, characterizes itself as having a publication date of October 10, 1997. (Appx9023; Appx9042.) Thus, the Board's finding that "FIPA 97 Version 1.0 was disseminated or otherwise made available…in late 1997, prior to the critical date," is insufficient here because this finding was not specific to the version of FIPA97 Version 1.0 in Exhibits 1006-1012—which is admittedly different from other versions of FIPA97 Version 1.0 also shown to be in existence (but not shown to be publicly available) in late 1997.

### B. The Board clearly erred when it found, with no corroborating evidence, that the version of FIPA97 contained in "Exhibits 1006-1012 is the version that was publicly accessible on the FIPA website in late 1997, and not some other version of the FIPA specification."

The *only* evidence that Microsoft presented attempting to link the version of FIPA97 Version 1.0 found in Exhibits 1006-1012 to the version publicly available before the critical date is the uncorroborated personal recollection of Microsoft's paid declarant—Dr. Finin. Specifically, Microsoft hired Dr. Finin to testify at $400 an hour that he personally recalled accessing Exhibits 1006-1012 specifically in late 1997 (Appx8572, Appx8584-8586) and that "based on his personal knowledge of the document enclosed in Exhibits 1006-1012", "confirm[ed] they are the same documents that were released at the October 10th 1997 FIPA meeting and were available to the public at that time". (Appx8593.) But given the undisputed existence of multiple different versions of FIPA97 Version 1.0 consisting of

multiple separate parts, to be able to distinguish, over twenty years later, which of the multiple versions of FIPA97 Version 1.0 is the set of "documents that were released at the October 10th 1997 FIPA meeting and were available to the public at that time" would have required a photographic memory. And Dr. Finin admitted that his recollection of the FIPA97 Version 1.0 specification was anything but clear. Specifically, Dr. Finin admitted at deposition that he did not recall "most of the details" of the FIPA97 Version 1.0 specification:

> "Q. And can you tell me what Section 6.3 is supposed to concern?...
>
> A. Yeah. This whole document describes in various details all aspects of the agent communication language, and I was very familiar with it back in the day. You know, I'm not necessarily remembering all the details today."

(Appx12190 (116:4-16).)

> "Q. And so if I understand your testimony correctly, you said you were familiar with it back in the day but not necessarily today; is that correct?
>
> A. Yeah. It's been more than 20 years, you know, since this was created. You know, I can't remember all the details in the document as a whole, and this particular section in particular."

(Appx12190-12191 (116:25-117:8).)

> "Q. And I guess specifically for these other sections of 6.3, is it also true that you were familiar with it back in the day but not necessarily today?...

A. Yeah, it's not in the declaration. Generally this document, I was very familiar with it 20 years ago. I don't recall many—most of the details."

(Appx12191-12192 (117:25-118:10).)

Despite Dr. Finin's admission that he did not have the recall of FIPA97 Version 1.0 necessary to closely compare Exhibits 1006-1012 to the version he recalled accessing over twenty years ago, the Board credited Dr. Finin's testimony, finding that "Dr. Finin's inability to recall many of the details of a 300-page specification more than twenty years after it was created" did not "undermine[] his testimony." (Appx898.) This was error, as it fails to account for the existence of multiple versions of FIPA97 Version 1.0. It is simply impossible that Dr. Finin could have determined that Exhibits 1006-1012—as opposed to one of the other versions of FIPA97 Version 1.0 admittedly in existence in late 2017—was the version Dr. Finin recalls being "released at the October 10th 1997 FIPA meeting and [] available to the public at that time," when he could not—as the Board acknowledged—"recall many of the details of a 300-page specification more than 20 years after it was created." (*Compare* Appx898 *with* Appx8593 and Appx12190-12190 (116:4-16, 116:25-117:1, 117:25-118:10, 118:12-17.) This is not substantial evidence. *See NuVasive*, 842 F.3d at 1380.

Further, although "the law has long looked with disfavor upon invalidating patents on the basis of mere testimonial evidence absent other evidence that

corroborates that testimony," the Board erred in finding that, based upon Dr. Finin's admittedly rusty memory 20 years after-the-fact, "a preponderance of the evidence shows that Exhibits 1006-1012 are the version of FIPA97 Version 1.0 released on October 10, 1997, and posted on the FIPA website in late 1997." *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1366 (Fed. Cir. 1999); *see also Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1374 (Fed. Cir. 2010) (explaining corroboration requirement). Indeed, the Supreme Court has held that, as time passes, the reliability and credibility of oral testimony diminishes, and the requirement to provide corroborating materials increases. *See T. H. Symington Co. v. Nat'l Malleable Castings Co.*, 250 U.S. 383, 386 (1919) ("oral testimony tending to show prior invention as against existing letters patent is, in the absence of models, drawings, or kindred evidence, open to grave suspicion, particularly if the testimony be taken after the lapse of years from the time of the alleged invention."); *see also The Barbed Wire Patent*, 143 U.S. 275, 284 (1892) (the "unsatisfactory character" of such testimony "aris[es] from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury...."). (Appx898.)

Although the Board claimed that "the identification of Exhibits 1006-1012 on their cover pages or elsewhere as FIPA97 Version 1.0 with a date of October

10, 1997, corroborates Dr. Finin's testimony that the version of the specification in Exhibits 1006-1012 is the version that was publicly accessible on the FIPA website in late 1997, and not some other version of the FIPA specification," the evidence before the Board did not support this finding. (Appx835 at 59.)[3] Specifically, as shown below, even the hardcopy versions of FIPA97 Version 1.0—which the Board found was published on November 28, 1997, and was different from the version of the FIPA97 Version 1.0 specification found in Exhibits 1006-1012—still identifies itself "as FIPA97 Version 1.0 with a date of October 10, 1997," just like Exhibits 1006-1012. (Appx896; *compare* Appx9022-9043 with Appx7519-7832.)

---

[3] The Board's Final Written Decision also discussed the testimony of Microsoft's expert witness, Dr. Lieberman. However, Dr. Lieberman did not testify as to whether "the version of the specification in Exhibits 1006-1012 is the version that was publicly accessible on the FIPA website in late 1997, and not some other version of the FIPA specification," and the Board made no findings with respect to Dr. Lieberman's testimony on this prong of its analysis. (Appx897-898.)



FOUNDATION FOR INTELLIGENT PHYSICAL AGENTS

FIPA 97 Specification

Part 1

Agent Management

Publication date : 10th October 1997

© 1997 FIPA - Foundation for Intelligent Physical Agents

*Geneva, Switzerland*

Notice

Use of the technologies described in this specification may infringe patents, copyrights or other intellectual property rights of FIPA Members and non-members. Nothing in this specification should be construed as granting permission to use any of the technologies described. Anyone planning to make use of technology covered by the intellectual property rights of others should first obtain permission from the holder(s) of the rights. FIPA strongly encourages anyone implementing any part of this specification to determine first whether part(s) sought to be implemented are covered by the intellectual property of others, and, if so, to obtain appropriate licenses or other permission from the holder(s) of such intellectual property prior to implementation. This FIPA '97 Specification is subject to change without notice. Neither FIPA nor any of its Members accept any responsibility whatsoever for damages or liability, direct or consequential, which may result from the use of this specification.

Petitioner Microsoft Corporation - Ex. 1055, p. 2



FOUNDATION FOR INTELLIGENT PHYSICAL AGENTS

FIPA 97 Specification

Part 1

Agent Management

Publication date : 10th October 1997

©1997 FIPA - Foundation for Intelligent Physical Agents

*Geneva, Switzerland*

Notice

Use of the technologies described in this specification may infringe patents, copyrights or other intellectual property rights of FIPA Members and non-members. Nothing in this specification should be construed as granting permission to use any of the technologies described. Anyone planning to make use of technology covered by the intellectual property rights of others should first obtain permission from the holder(s) of the rights. FIPA strongly encourages anyone implementing any part of this specification to determine first whether part(s) sought to be implemented are covered by the intellectual property of others, and, if so, to obtain appropriate licenses or other permission from the holder(s) of such intellectual property prior to implementation. This FIPA '97 Specification is subject to change without notice. Neither FIPA nor any of its Members accept any responsibility whatsoever for damages or liability, direct or consequential, which may result from the use of this specification.

(Appx9023; Appx9042 (highlighting added).) Thus, the Board clearly erred in viewing "the identification of Exhibits 1006-1012 on their cover pages or elsewhere as FIPA97 Version 1.0 with a date of October 10, 1997" as evidence—and indeed the *only* evidence—sufficient to "corroborate[] Dr. Finin's testimony that the version of the specification in Exhibits 1006-1012 is the version that was publicly accessible on the FIPA website in late 1997, and not some other version of the FIPA specification." (Appx898.) And here, Dr. Finin's status as a paid witness, rather than an ordinary fact witness, made *reliable* corroborating evidence even more essential. *See Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151,

1158-60 (Fed. Cir. 2004) (requiring corroboration for testimony of paid witnesses regarding public accessibility of a reference).

The Board's reliance on "the identification of Exhibits 1006-1012 on their cover pages or elsewhere as FIPA97 Version 1.0 with a date of October 10, 1997," also failed to recognize that Exhibits 1006-1012 were not even consistently identified as such. (Appx898.) Instead, as the Board recognized, every odd page of Exhibit 1006—beginning with page 3—is *not* identified as FIPA97 Version 1.0—but is instead identified as FIPA 1997 Part 1: Version 2.4." (Appx7529; Appx896.) While the Board credited Dr. Finin's conclusory testimony "that the header on some pages in Exhibit 1006 is a typographical error," this meant that the Board was relying exclusively on Dr. Finin's testimony to validate the *only* evidence that the Board purported to rely upon *to corroborate* Dr. Finin's testimony. The circular nature of using Dr. Finin's testimony to corroborate the evidence that was alleged to corroborate *his* testimony compounded the Board's error in this case. *See NuVasive, Inc.*, 842 F.3d at 1382 (requiring the PTAB to "have an adequate evidentiary basis for its findings" "including a rational connection between the facts found and the choice made" and "must articulate logical and rational reasons for its decisions") (citations omitted).)

In addition, the Board faulted IPA for *Microsoft*'s failure of proof, stating: "[IPA] has not cited, nor do we see, evidence in the record suggesting a FIPA 97

Version 2.4 was made publicly available." (Appx896.) But it was never IPA's burden to prove that the version of the specification in Exhibits 1006-1012 is *not* the version that was publicly accessible on the FIPA website in late 1997. Rather, "having the ultimate burden of proving its defense of invalidity based on [allegedly obviating] prior art," Microsoft "also had the initial burden of going forward with evidence that there is such [obviating] prior art." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378-79 (Fed. Cir. 2015) ("In an *inter partes* review, the burden of persuasion is on the petitioner to prove unpatentability by a preponderance of the evidence, and that burden never shifts to the patentee. Failure to prove the matter as required by the applicable standard means that the party with the burden of persuasion loses on that point—thus, if the fact trier of the issue is left uncertain, the party with the burden loses.") (quotations omitted)). By placing this burden on IPA, the Board impermissibly shifted the burden of proving *validity* onto IPA. This alone is an error that warrants reversal. *See In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1378, 1381 (Fed. Cir. 2016) (reversing the Board for "an improper shifting of the burden to Magnum, the patentee, to prove that the claimed invention would not have been obvious.").

To the extent Microsoft attempts to argue that any differences among the various versions of the FIPA97 Version 1.0 specification were inconsequential such that it does not matter if Exhibits 1006-1012 are not *identical* to the version

the Board found to be publicly released before the critical date—a finding the Board did not make—there is no evidence in the record to support this. For example, Dr. Finin testified that the differences in the substance between Exhibits 1006-1012 and the hardcopy version of FIPA97 Version 1.0 were “minor,” yet Dr. Finin admitted at deposition that he came to this conclusion without actually having reviewed a copy of the hardcopy book. (Appx12185 (111:5-11).) Thus, to come to this conclusion, Dr. Finin was again relying on his memory that admittedly prevented him from being able to recall “most of the details” of a 300-page specification with which he was familiar “20 [twenty] years ago.” (Appx12190-12192 (116:24-118:10).) Neither Dr. Finin nor Microsoft provided any evidence to corroborate Dr. Finin’s opinion twenty years after-the-fact.

And neither IPA nor the Board had the ability to evaluate Dr. Finin’s uncorroborated statement that the differences between Exhibits 1006-1012 and the other, different, versions of FIPA97 Version 1.0 were “minor.” Despite knowing of the existence of multiple, *different* versions of FIPA97 Version 1.0, Microsoft chose to only put a single version—that found in Exhibits 1006-1012—into evidence. (*See* Appx7519-7832.) Specifically, the Version 1.0 from the Reston meeting, shown at Appx9345, is no longer available for download from the link provided, and is not included in the case record. Additionally, while Microsoft provided the table of contents for the hardcopy FIPA97 Version 1.0 (which the

Board found Microsoft was not relying on as a prior art reference or to prove public accessibility—Appx896), Microsoft did not place the full hardcopy versions of FIPA97 Version 1.0 into evidence. (Appx9022-9043.) Thus, while IPA can determine—as Microsoft's declarant admitted—that Exhibits 1006-1012 must be different from the hardcopy versions because their tables of contents differ, neither IPA nor the Board had the ability to determine what the differences among the versions are. (*See* Appx8588-8589 ("A review of the table of contents for the physical book shows that FIPA printed the November 28, 1997, edited version of the specification. [Appx9022-9043.] This version only made minor edits (mostly spelling and formatting) over the October 10, 1997 version enclosed in Exhibits 1006-1012.").) Because Microsoft chose not to place any of the other versions of FIPA97 Version 1.0 into evidence, Microsoft failed to meet its burden of demonstrating that Exhibits 1006-1012 are digital copies of documents that are shown to have been publicly accessible before the critical date"—a requirement that the Board acknowledged Microsoft must meet before attempting to use Exhibits 1006-1012 as a basis for arguing invalidity. (Appx897.)

### C. All of the Board's invalidity determinations as to the '115 and the '560 patents must be reversed on this basis alone.

Because each of the Board's invalidity determinations with respect to the '115 and the '560 patents relied on a combination including the version of FIPA97 Version 1.0 found in Exhibits 1006-1012, all of the Board's determinations adverse

to IPA should be reversed on this basis alone. (Appx168; Appx320; Appx494; Appx664; Appx837; Appx992; Appx1136; Appx1291.)

Additionally, each of the issues in Microsoft's appeal also rely on a combination including the version of FIPA97 Version 1.0 found in Exhibits 1006-1012, and so all of the Board's determinations adverse to IPA must also be reversed on this basis alone. (*See id.*) For this reason, all of the Board's determinations in IPA's favor should not be reversed on any basis that Microsoft presented in its Opening Brief.

## III. The Board Legally Erred When it Disregarded the Patented Inventions as a Whole

It is black letter law that a "patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR Int'l Co.*, 550 U.S. at 418. Despite this fact, that is exactly how the Board conducted its analysis of Microsoft's invalidity claims, breaking up its invalidity analysis of the '560 patent's claim 1 into *nineteen* component parts—but never analyzing the claim as a whole. (Appx910-939.) Even worse, the Board split the '115 patent's claim 1 into *twenty-three* component parts, again analyzing each element separately, and never as a whole. (Appx95-137.) As discussed above, this Court reviews errors in the Board's validity analysis *methodology* de novo.

Conducting its analysis in this way, the Board—in contravention to the

Supreme Court's directive in *KSR*—lost sight of the invention of IPA's patents *as a whole*, as demonstrated by the *combination* of the elements of the claims of the '560 and '115 patents. For this reason alone, all of the Board's determinations adverse to IPA should be reversed.

### A. The Board erred in failing to address IPA's argument that the prior art does not disclose a "goal satisfaction plan" that "uses reasoning" as recited by the claims of the patents-at-issue.

The Board's piecemeal analysis of Microsoft's invalidity allegations caused it to lose sight of the invention claimed in the '560 and '115 patents. One such invention is encompassed in the "goal satisfaction plan" recited by the patents-at-issue. A "goal satisfaction plan" is recited in 44 of the 55 claims of the '560 patent—claims 1-21, 26-46, and 50-51. "Goal satisfaction plan" is similarly recited in 76 of the 89 claims of the '115 patent—claims 1-47 and 61-89.

The specification of the patents-at-issue describes the goal satisfaction plan in the context of Figure 11:




It notes that in step 1106, the facilitator constructs the plan, determines the required sub-goals, and selects suitable agents for performing them before transmitting the sub-requests to agents and receiving results. (Appx1357 (18:54-66).) The "actual implementation" of these processes, the patent states, is "dependent upon the specific goal satisfaction plan." (Appx1357-1358 (18:66-19:1).)

The specification in the "Summary of the Invention" section also explains

that, in an improvement over the prior art, "[e]xtreme flexibility is achieved through an architecture organized around the declaration of capabilities by service-providing agents, the construction of arbitrarily complex goals by users and service-requesting agents, and the role of facilitators in delegating and coordinating the **satisfaction of these goals**, subject to advice and constraints that may accompany them." (Appx1350-1351 (4:67-5:6 (emphasis added)).) The specification further states that the facilitator's "job is to construct a goal satisfaction plan and oversee its satisfaction in an optimal or near optimal manner that is consistent with the specified advice." (Appx1356 (16:62-66).) It also notes that "[a]gents with duplicate and overlapping capabilities should be able to coexist within the same community, with the system making optimal or near optimal use of the redundancy." (Appx1353 (9:38-41).)

As the Board found, in both patents-at-issue, "the recited 'goal satisfaction plan' is further constrained by specific limitations recited in the claims." (Appx854; *see* Appx16 ("the term 'goal satisfaction plan' is further limited (in different ways) by specific limitations recited in the claims.").) In all cases, the claims recite that the goal satisfaction plan uses "reasoning" to accomplish certain goals. (*See* Appx1363-1366 (cl.1-55); Appx1326-1330 (cl.1-89).) Despite this fact, the Board separated its analysis of "goal satisfaction plan" from its analysis of "using reasoning." This was error, as the two are part of the same invention.

Microsoft argued that Kiss alone discloses the recited "goal satisfaction plan." (Appx922.) The Board acknowledged that IPA argued Kiss did not teach the claimed "goal satisfaction plan" for three reasons, one of which was because Kiss fails to utilize *reasoning* in creating a "goal satisfaction plan." Specifically, the Board wrote that "[IPA] contends that Kiss does not teach the claimed 'goal satisfaction plan' because Kiss does not disclose 'the use of any [1] **reasoning**, [2] optimization, or [3] taking into account any advice parameters or constraints.'" (Appx922 (emphasis added).) Despite this recognition, the Board explicitly ignored IPA's arguments, finding that they "are predicated on [IPA]'s proposed construction of 'goal satisfaction plan' to mean 'a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints." (Appx922-923.) On this basis, the Board held that, for the reasons discussed in its claim construction analysis, "we disagree with [IPA] that the claim term 'goal satisfaction plan' is limited as [IPA] contends," and so for those same reasons, "we disagree with [IPA]'s argument that Kiss does not disclose the 'goal satisfaction plan' recited in claim 1." (Appx923.)

But "[IPA]'s proposed construction of 'goal satisfaction plan' to mean 'a plan for the satisfaction of a complex goal expression in an optimal or near-optimal manner that is consistent with any advice parameters or constraints" did not discuss "using reasoning," but instead dealt only with two of IPA's arguments: that

Kiss does not disclose the use of any (2) optimization or (3) taking into account any advice parameters or constraints. (Appx922-923.) As the Board acknowledged elsewhere, the claims themselves recite that the goal satisfaction plan uses "reasoning." This is not a matter of claim construction—it is set forth in the specific language of the claims. For example, claim 1 of the '560 patent recites:

> The facilitating engine further operatable for **generating a goal satisfaction plan** associated with the base goal, wherein the **goal satisfaction plan involves**: **using reasoning** to determine sub-goal requests based on non-syntactic decomposition of the base goal and **using said reasoning** to co-ordinate and schedule efforts…

(Appx1363 (cl.1) (emphasis added).) Similarly, claim 1 of the '115 patent recites:

> Constructing a **goal satisfaction plan** wherein the **goal satisfaction plan includes**: a suitable delegation of sub-goal requests to best complete the requested service request—by **using reasoning** that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific **reasoning**…

(Appx1326 (cl.1) (emphasis added).)

But despite the fact that, as the Board acknowledged, IPA argued "that Kiss does not teach the claimed 'goal satisfaction plan' because Kiss does not disclose 'the use of any reasoning," the Board improperly equated IPA's non-obviousness arguments with its claim construction arguments—which did not advocate defining a goal satisfaction plan as "using reasoning" because this language was already in

the claims. (Appx922.) As such, in determining that "[Microsoft] has shown sufficiently that Kiss teaches 'constructing a goal satisfaction plan," the Board failed to consider IPA's arguments "that Kiss does not teach the claimed 'goal satisfaction plan' because Kiss does not disclose 'the use of any reasoning." (Appx922-923.) This was an error that requires reversal. *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063, 1075 (Fed. Cir. 2012) (reversing district court in relevant part for "contravene[ing] this court's precedent requiring that a fact finder consider all evidence relating to obviousness before finding a patent invalid on those grounds.").

**B. The Board erred in separating its analysis of the "using reasoning" element from the recited "goal satisfaction plan," and in failing to provide any analysis for why it accepted Microsoft's arguments over IPA's.**

In contravention to the Supreme Court's directive in *KSR*, *after* the Board had determined that "[Microsoft] has shown sufficiently that Kiss teaches 'constructing a goal satisfaction plan,'" the Board then conducted a perfunctory "analysis" of the "using reasoning" element that the Board acknowledged is a requirement of the claimed "goal satisfaction plan."[4] (Appx925 ("In claim 1, both

---

[4] It is clear that the Board did not consider the "using reasoning" claim element in its "goal satisfaction plan" analysis, as the Board did not indicate it was doing so, in contrast to the conclusion of the Board's claim 1 analysis, where the Board stated: "we are persuaded that [Microsoft] has shown sufficiently that the combination of Kiss and FIPA97 teaches or suggests all the limitations of claim 1

aspects of the goal satisfaction plan—determining sub-goal requests and coordinating and scheduling efforts by agents—must be accomplished 'using reasoning.'") However, the Board's analysis consisted of a one-sentence summary of Microsoft's argument, followed by a one-sentence summary of IPA's argument, and then a two-sentence summary of Microsoft's response. The entirety of the Board's analysis consists of the Board inserting the word "persuasively" into its summary of Microsoft's reply, followed by the Board's conclusion—which omits any mention of the goal satisfaction plan of which "using reasoning" must be a part:

> Based on the complete record, we determine that [Microsoft] has shown sufficiently that Kiss teaches "using reasoning to determine sub-goal requests based on non-syntactic decomposition of the base goal and using said reasoning to co-ordinate and schedule efforts by the service-providing electronic agents for fulfilling the sub-goal requests in a cooperative completion of the base goal,' as recited in claim 1."

(Appx925.) But this Court has repeatedly held that "it is not adequate to summarize and reject arguments without explaining why the [Board] accepts the

---

and…[w]e weigh this evidence of obviousness together with [IPA]'s evidence of objective indicia of nonobvious, *infra* § II.G.12, before reaching our final determination as to patentability of claim 1." (Appx939.)

prevailing argument." *See NuVasive*, 842 F.3d at 1383. Because, in addition to divorcing "using reasoning" from the claimed "goal satisfaction plan," the Board also provided no explanation as to why it accepted Microsoft's arguments over IPA's, other than characterizing Microsoft's arguments with a single word: "persuasive[]," the Board's decision must be reversed.

## IV. The Board's Decision Cannot be Reconciled With the Specification and File History of the Patents-at-Issue

### A. The patents make clear that a meta-agent like that in Kiss cannot be a part of the facilitator recited in the claims.

The specification of the patents-at-issue identifies a need in the field for better agent facilitation. Specifically, the patents explain that "existing agent-based technologies and architectures are typically very limited in the extent to which agents can specify complex goals or influence the strategies used by the facilitator." (Appx1350 (4:33-36).) The patents-at-issue fill this need through an intelligent and sophisticated facilitator ("facilitator agent" in the claims). This facilitator is responsible for constructing the goal satisfaction plan described above, such that "[e]xtreme flexibility is achieved through an architecture organized around the declaration of capabilities by service-providing agents, the construction of arbitrarily complex goals by users and service-requesting agents, and the **role of facilitators in delegating and coordinating the satisfaction of these goals**, subject to advice and constraints that may accompany them." (Appx1350-1351

(4:67-5:6 (emphasis added)).)

Microsoft's expert, Dr. Lieberman, also acknowledged that one of the major innovations of SRI's OAA project—upon which the patents-at-issue are based—was this concept of a facilitator. He testified that among the ideas embodied in the patents that have been "influential" and "picked up by other researchers" include:

> The idea of having an agent which controls other agents and does things like goal sharing and result sharing, so these are the--it was very influential in the field of distributed agents.

(Appx12244-12245 (24:13-25:11).)

For the '560 patent, independent claims 1, 22, 26, and 47 and their dependents (a total of 49 claims) expressly require a facilitator agent. And for the '115 patent, independent claims 48, 61, 71, and 86 and their dependents also expressly require a facilitator agent. In addition, dependent claims 3, 20, 22-25, 30-31, and 43 also include a facilitator agent. As explained below, the Board erred in disregarding IPA's argument that Microsoft's alleged combination of Kiss, which includes the Kiss meta-agent, and FIPA97 cannot disclose the claimed facilitator.

The specification of the patents-at-issue discusses facilitation extensively, and in that discussion, makes clear that the facilitator is separate and distinct from meta-agents. For example, the "facilitator agent" and a "meta-agent" are both separately shown in Figure 4 as 402 and 406, respectively.




Fig. 4

The specification goes on to explain that Figure 4 shows "user interface agents 408, several application agents 404 and **meta-agents 406**, the system 400 organized as a community of peers by their common relationship to a **facilitator agent 402**." (Appx1351 (6:38-43 (emphasis added)).)

Importantly, the specification then specifically defines "meta-agents" (and user interface agents and application agents) as "client agents," stating that "[t]he variety of possible client agents is essentially unlimited[, but s]ome typical categories of **client agents** would include application agents 404, **meta-agents**

406, and user interface agents 408, as depicted in FIG. 4." (Appx1351 (6:59-62 (emphasis added)).) And the specification defines client agents as "[a]ll agents that are **not facilitators**." (Appx1351 (6:54-58 (emphasis added) ("All agents that are not facilitators are referred to herein generically as client agents—so called because each acts (in some respects) as a client of some facilitator, which provides communication and other essential services for the client.")).) Thus, according to the lexicography set forth in the patents-at-issue, client agents—of which meta-agents are a sub-set—are mutually exclusive with facilitator agents.

The patents-at-issue further explain the distinction between meta-agents and facilitators stating:

> Meta-agents 406 are agents whose role is to assist the facilitator agent 402 in coordinating the activities of other agents. While the facilitator 402 possesses domain-independent coordination strategies, meta-agents 406 can augment these by using domain- and application-specific knowledge or reasoning (including but not limited to rules, learning algorithms and planning).

(Appx1352 (7:4-10).)

And IPA demonstrated that the meta-agent in Kiss—upon which Microsoft relies—is analogous to the meta-agent distinguished from the facilitator agent in the patents-at-issue. (Appx4797-4806; Appx11468-11476.) Indeed, IPA showed that the term "meta-agent" was a commonly used term in the field before the

1998/1999 time frame to describe agents—such as those in the patents-at-issue and in Kiss—that sit in an intermediate layer to manage agent resources. (Appx11468 (citing Appx11819-11873).) Neither Microsoft nor the Board disputed IPA's argument that "[t]he *Kiss* meta-agent is similar to the meta-agent of the [patents-at-issue]." (*See* Appx4801.)

However, despite the clear exclusion of "meta-agents" from the category of "facilitator agents" recited by the patents-at-issue, Microsoft argued "that the agent service layer of Kiss **combined with Kiss's meta-agent constitutes a 'facilitator agent'** because it is responsible for matching requests from users and agents with descriptions of the capabilities of other agents." (Appx911 (emphasis added).) But this cannot be the case, because, "[w]hether viewed as a matter of disclaimer or of lexicography, the result is the same: the kind of [facilitator agent] protected by the patent excludes [meta-agents]." *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1194 (Fed. Cir. 2013) (affirming district court claim construction and summary judgment of non-infringement where "[t]he specification clearly proves that the patentees defined the three-dimensional culturing required by the claims to exclude culturing with beads, because the patent expressly confines culturing with beads to two-dimensional culturing."); *see also Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001) (holding that the patentees defined the term "mode" to exclude "rates" because they used "the claim

term 'throughout the entire patent specification, in a manner consistent with only a single meaning,' one that was a 'different and distinct concept[ ]' than 'rate.'"). Thus, IPA's argument—as summarized by the Board—must be correct: "the Kiss meta-agent cannot be part of a 'facilitator agent' in the combined Kiss/FIPA97 system because the [patents-at-issue] identif[y] a meta-agent as a separate component from the facilitator agent…" (Appx915.)

Despite the fact that the patents-at-issue make clear that facilitator agents and meta-agents are mutually exclusive, such that a meta-agent *may not be a part of a facilitator agent*, the Board found for Microsoft because, according to the Board, IPA "fail[ed] to respond to [Microsoft]'s assertion that the recited 'facilitator agent' includes the combination of the Kiss agent service layer and the Kiss meta-agent." (Appx915.) But IPA did respond to this argument; the Board simply ignored IPA's response. Specifically, as the Board recognized, IPA argued that "the Kiss meta-agent cannot be part of a 'facilitator agent'". (Appx915.) That the Board did not even address IPA's argument in finding for Microsoft is legal error. *See Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1069 (Fed. Cir. 2018) (reversing the Board's finding of obviousness because "[t]he Board's treatment of this evidence was deficient" where "[t]he Board's analysis…failed to credit any evidence submitted by [Patent Owner]…The PTAB's own explanation must suffice for us to see that the agency has done its job and must be capable of

being 'reasonably…discerned' from a relatively concise PTAB discussion.") (quotation omitted).

Specifically, Microsoft did not show, and the Board did not find, that Microsoft's alleged "combination of the Kiss agent service layer and the Kiss meta-agent" does not still require the Kiss meta-agent to be *part of the facilitator agent*—in direct contravention of the teachings of the patents-at-issue. (*See* Appx911-917.) Microsoft also did not show, and the Board also did not find, that the Kiss meta-agent is not analogous to the meta-agent that the patents-at-issue define as *separate from* the facilitator agent. (*See* Appx911-917.) Without at least one of these findings, it was error for the Board to disregard IPA's argument that the Kiss meta-agent—no matter what Microsoft tries to combine this meta-agent with—cannot, under the definitions set forth in the patents-at-issue—be a part of the facilitator agent. Because the Board failed to consider the impact that IPA's argument against any combination *including* Kiss' meta-agent in allegedly disclosing the recited facilitator agent, the Board's decision was in error and warrants reversal. *See Magnum Oil*, 829 F.3d at 1376 (reversing the Board for failing to "consider all evidence of obviousness and nonobviousness before reaching a determination.").

### B. The specifications and file histories of the patents make clear that Kiss does not disclose the claimed ICL.

Each claim of the patents-at-issue recites an ICL, which the patents describe

as "an interface, communication, and task coordination language preferably shared by all agents, regardless of what platform they run on or what computer language they are programmed in." (Appx1353 (10:62-66.) Among the advantageous features of ICL is that it potentially "allows agents to specify explicit control parameters while simultaneously supporting expression of goals in an underspecified, loosely constrained manner." (Appx1353 (11:1-4).)

The ICL centers around the concept of the "event." (Appx12848-12849.) The patents-at-issue state that:

> In communications, events preferably serve as messages between agents; in regulating the activities of individual agents, they may preferably be thought of as goals to be satisfied. Each event preferably has a type, a set of parameters, and content.

(Appx1354 (11:12-16.) An example and description of a form of an event is described as:

> ev_post_solve(Goal, Params)
> going from A to the facilitator, where ev_post_solve is the type, Goal is the content, and Params is a list of parameters. The allowable content and parameters preferably vary according to the type of the event.

(Appx1354 (11:21-26).) The claimed ICL consists of two layers, "a layer of conversational protocol" and "a content layer." (Appx1354 (11:27-28).) "The conversational layer…is defined by the event types, together with the parameter lists associated with certain of these event types." "The content layer," on the other

hand, "consists of the specific goals, triggers, and data elements that may be embedded within various events." (Appx1354 (11:28-32).)

An important aspect of the invention is that this ICL structure offers advantages over the prior art languages by allowing greater expressiveness. (Appx12849-12850.) The patents-at-issue explain how the recited ICL uses parameter lists to further refine events by contrasting the ICL with the prior art language KQML, which according to the patents-at-issue avoids the inflexibility resulting from "a fixed selection of speech acts such as embodied in KQML." (Appx1354 (11:38-40); Appx12850-12854.) Specifically, the patents-at-issue distinguish the ICL from KQML explaining:

> For example, in KQML, a request to satisfy a query can employ either of the performatives ask_all or ask_one. In ICL, on the other hand, this type of request preferably is expressed by the event type ev_post_solve, together with the solution_limit(N) parameter—where N can be any positive integer…The request can also be accompanied by other parameters, which combine to further refine its semantics. **In KQML, then, this example forces one to choose between two possible conversational options, neither of which may be precisely what is desired**. In either case, the **performative chosen** is a single value that must capture the entire conversational characterization of the communication. This requirement raises a difficult challenge for the language designer, to **select a set of performatives that provides the desired functionality** without becoming unmanageably large.

> Consequently, the debate over the **right set of performatives** has consumed much discussion within the KQML community.

(Appx929-930 (quoting Appx1354 (11:40-59) (emphasis added)).) In other words, according to the patent, the ICL uses parameter lists to further refine events, creating a multitude of options from which to choose, as opposed to KQML's "fixed selection of speech acts" formed from a "set of formatives"—one of which must be chosen for the communication. (*See* Appx1354 (11:38-59).)

The prosecution history of the patents-at-issue additionally explained how the recited ICL uses parameter lists to further refine events by again contrasting the ICL with KQML. As the Examiner explained during prosecution of both patents-at-issue, Nwana discloses "KQML having a layer of conversational protocol defined by event types, i.e. a type of ask (ask_one or ask_all primitive)" that "at best has separate layers for the event and the parameters associated with the event. By Applicant providing these parameters in the same layer as the event such that they further refine the event, a **standard set of events are dynamically extensible based upon the parameter list** which is not possible with the teachings of Nwana." (Appx6324; Appx9403 (emphasis added); Appx12850.) In other words, according to the Examiner, KQML is limited to "a standard set of events," but the ICL, in contrast, makes these events "dynamically extensible based upon the parameter list." (Appx6324; Appx9403.)

Consistent with the specification and prosecution history of the patents-at-issue, the Board found "that the parameters of Nwana's KQML 'tell' message (i.e., the claimed 'event') do not change the meaning of the message, whereas the parameters of an event in the [patents-at-issue] change the meaning of the event by 'refin[ing] the event.'" (Appx929.)

Despite these disclosures in the patents-at-issue and the prosecution history, Microsoft argued, and the Board agreed, that "FIPA97 describes the 'meaning' of the message affected by the ':receiver' parameter…" (Appx934.) Specifically, the Board accepted Microsoft's argument that "the ':receiver' parameter affects the qualitative aspect of the message—i.e., whether to inform (1) one agent, (2) a select group of agents, or (3) every known agent." (Appx935.)

However, the Board's finding was erroneous, as there is no way to square this finding with the specifications of the patents-at-issue or the Examiner's statements in the prosecution history. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979-80 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). This is illustrated by the image below, which is an "example of an instantiated performative" in KQML disclosed in Nwana.

```
(tell
    : content  "cost(bt, service-4, £5677)"
    : language standard prolog
    : ontology bt-services-domain
    : in-reply-to quote service-4
    : receiver customer-2
    : sender bt-customer-services)
```

(Appx7966.) Nwana—like FIPA97, has a receiver parameter. (*Compare* Appx7966 *with* Appx7586.) But the record contains no evidence that the receiver in Nwana suffers from the problem that the Examiner identified—that it must be selected from a forced choice "between two possible conversational options" or from "a standard set of events" as the patents-at-issue and the Examiner both explain is the case for KQML. Instead, Nwana explains that the receiver in this example is simply "some customer, customer-2." Clearly, this receiver can be any customer (or customers), and so the "receiver" is not a parameter that, according to the patents-at-issue or the Examiner, is limited by "a standard set of events" or "possible conversational options." Thus, as the Examiner necessarily found with respect to Nwana, not all parameters are parameter lists that refine events. (*See* Appx12851-12855.) And the Examiner found that Nwana's parameters—including its receiver parameter—are not parameter lists that refine events. (*See* Appx6324; Appx9403 (emphasis added); Appx12850-12851.)

There is no more evidence in the record that FIPA97's ":receiver" parameter

is a parameter list that refines events than there was for Nwana's analogous receiver parameter. Thus, the fact that in FIPA97 "the recipient may be a single agent name, or a tuple of agent names[, which] corresponds to the action of multicasting the message," does not mean that FIPA97 discloses a "**standard set of events [that] are dynamically extensible based upon the parameter list** which is not possible with the teachings of Nwana," as the Examiner described. (Appx6324; Appx9403 (emphasis added).)

Indeed, FIPA97 does not have the capability to dynamically extend a standard set of events based upon a parameter list. (Appx12852-12854.) Instead, FIPA97 defines ACL as "[a] language with ***precisely defined syntax, semantics and pragmatics*** that is the basis of communication between independently designed and developed software agents." (Appx7577 (emphasis added).) It is "precisely defined," not extensible. (Appx12854; *see also* Appx7626 ("Semantic Language[] is the formal language used to define the semantics of the FIPA ACL" and "has to be precisely defined. In this section, we present the SL language definition and the semantics of the primitive communicative acts.").) And the FIPA documents Microsoft submitted further explain that FIPA limited its own scope for its first specification to a "finite set of basic message types/communication primitives (e.g. speech act vocabulary) for inter-agent communication." (Appx9082.)

Although IPA presented these arguments to the Board, the Board found: "[IPA], however, does not discuss the disclosure of KQML/Nwana [Appx7961-7978] sufficiently (other than pointing to the similarity of the format between the ":receiver" parameter of KQML and FIPA97) or explain adequately why KQML's ":receiver" parameter is similar to the FIPA97 ":receiver" parameter." (Appx936.) But given the fact that Microsoft's own witness admitted the similarity of FIPA97 to KQML, along with the fact that both the patents-at-issue and the Examiner distinguished the claims of the patents-at-issue *over* KQML, it was *Microsoft*'s burden—as the party challenging the validity of the patents-at-issue—to demonstrate that FIPA97 is *different* from KQML/Nwana. (*See* Appx12106 (32:10-17 (Dr. Finin testifying that "the general idea of agent communication language that was embodied in KQML is similar to the one that is embodied in FIPA."")).) Microsoft failed to do this. Indeed, Microsoft never argued that the KQML receiver recipient is limited by "a standard set of events" or "possible conversational options." Rather, Microsoft only argued—without any evidentiary support—that "In KQML, an event using 'tell' always means to communicate something to one recipient, (EX1001, 11:33-59), regardless of the value of the receiver parameter." (Appx4991.) But neither the citation that Microsoft provides, nor any other evidence in the record, supports Microsoft's argument.

By faulting IPA for not proving that FIPA97 is *the same* as the prior art over

which the patents-at-issue were allowed, the Board impermissibly shifted the burden of proving *validity* onto IPA. This alone is an error that warrants reversal. *See Magnum Oil*, 829 F.3d at 1378, 1381 (reversing the Board for "an improper shifting of the burden to Magnum, the patentee, to prove that the claimed invention would not have been obvious.").

The Board similarly erred when it found that "[IPA] does not explain adequately why the solution_limit(N) parameter of the [patents-at-issue] specifying the number of agents to be queried 'modifies the actual request/communicative act/performative itself' but the ':receiver" parameter of FIPA97 specifying the number of agents to which to send a message does not." (Appx935.) IPA did explain that "it is crucial to distinguish between parameters in general and the claimed parameter lists that refine events," and the patents-at-issue explain that their solution_limit(N) parameter *is* a claimed parameter list that refines events, whereas the Examiner found that none of Nwana's parameters—including the receiver parameter—are the claimed parameters that refine events. (Appx12850-12853.) But as above, it was *Microsoft's* burden as the Petitioner to explain adequately why the ':receiver" parameter of FIPA97 *is* a parameter list that refines lists, in contrast to the receiver parameter in Nwana. The Board once again impermissibly shifted this burden to IPA, which alone is an error that warrants reversal. *See Magnum Oil*, 829 F.3d at 1381.

## V. The Board Legally Erred When it Disregarded IPA's Unrebutted Factual Record Relating to Secondary Considerations

Objective evidence of nonobviousness "can be the most probative evidence of non-obviousness in the record, and enables the…court to avert the trap of hindsight." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1310 (Fed. Cir. 2010). IPA presented legions of evidence of two forms of this objective evidence—industry praise and long-felt but unmet need—with respect to Siri—the virtual personal assistant that has roots in the same project as the patents-at-issue, and also embodies the claims at issue. (*See* Appx1872-1898; Appx4853-4876; Appx11498-11512; Appx12863-12878.)

As IPA explained to the Board, the genesis of the project that led to the patents-at-issue was the OAA program at SRI. The inventions of the patents-at-issue were developed in connection with the *second* round of the OAA project. Mr. Cheyer and his co-inventor David Martin built upon the foundations of OAA to improve upon compound goal processing. As they explain in the specification,

> The initial version of [SRI's OAA] technology provided only a very limited mechanism for dealing with compound goals. Fixed formats were available for specifying a flat list of either conjoined (AND) sub-goals or disjoined (OR) sub-goals; in both cases, parallel goal solving was hard-wired in, and only a single set of parameters for the entire list could be specified. More complex goal expressions involving (for example) combinations of different boolean connectors, nested expressions, or conditionally interdependent ("IF…THEN") goals

> were not supported. Further, system scalability was not adequately addressed in this prior work.

(Appx1350 (4:40-51).) Mr. Cheyer and Mr. Martin's inventions addressed these limitations from the first version of OAA.

After version 2 of OAA was developed, SRI formed the spin-off company Siri, Inc. in 2008, which was co-founded by inventor Adam Cheyer. (Appx11766.) Siri, Inc. was formed to bring to market the invention of the patents-at-issue—a distributed agent system capable of complex planning, goal satisfaction, and inter-agent communication that could take the form of a virtual assistant. (Appx11638-11639 (25:24-26:3.)) Mr. Cheyer and his colleagues launched the Siri application on the Apple store in February 2010 and just a few months later, sold Siri, Inc. and the company's rights to the technology for more than $200 million. (Appx11789; Appx11892.)

There is no dispute that Siri was commercially successful and fulfilled a long-felt but unmet need. (*See* Appx4853-4865, Appx4872-4876.) Indeed, despite the fact that IPA's expert presented 15 pages of declaration testimony and 70 pages of claim charts showing objective evidence of the non-obviousness of the patents-at-issue, Microsoft did not question IPA's expert at all about this testimony, and also did not present any expert testimony to rebut IPA's evidence. (*See* Appx11498-11571; Appx12863-12878; Appx12280-12949.) As such, IPA

satisfied any burden of production on the issue of secondary considerations, shifting the issue back to Microsoft, whose Reply failed to respond with counter-evidence. *See Dynamic Drinkware*, 800 F.3d at 1378 (discussing burden-shifting framework).) As such, Microsoft failed to meet its burden of responding to IPA's evidence of objective indicia of nonobviousness.

However, the Board found that IPA did "not provide persuasive evidence that the Siri application is reasonably commensurate with the scope of the alleged claims." (Appx965.) The Board points to three reasons that it came to this conclusion:

- IPA's "cited evidence attempting to tie the Siri application to the limitations of claim 1 relies substantially on the opinion testimony of Dr. Medvidovic" which "does not rely on an examination of the Siri application's source code." (Appx965.)
- "Dr. Medvidovic discusses the 'personal context awareness' and 'service delegation' aspects of Siri in some detail," but "only mentions Siri's 'conversational interface' in passing…" (Appx966.)
- "[T]here is evidence of record that credits the CALO project with being the progenitor of the ideas that led to Siri" and that "a later agent system named 'SPARK' was used as the basis of CALO."

(Appx967-968.)

With respect to the Board's first point, the Board faults IPA's expert for relying on circumstantial evidence that Siri embodies the claims of the patents-at-issue, rather than a review of Siri's source code. (Appx956.) However, "the law makes no distinction between direct and circumstantial evidence; both are valid measures of proof." *United States v. C.H. Robinson Co.*, 760 F.3d 1376, 1382 (Fed. Cir. 2014). And here, Dr. Medvidovic's testimony remains unrebutted by Microsoft. (*See* Appx2035-2042; Appx5003-5011.) "When the patentee has presented undisputed evidence that its product is the invention disclosed in the challenged claims, it is error for the Board to find to the contrary without further explanation." *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734, 747 (Fed. Cir. 2016).

Here, the only fault the Board could find with Dr. Medvidovic's testimony was based on the fact that Dr. Medvidovic did not have the opportunity to review Siri's source code, which the Board found to be "significant because Dr. Medvidovic testified at his deposition that an 'agent'—an element in every claim—is a 'piece of functionality that is capable of performing certain tasks that is embodied in at least for a software engineer a clearly identifiable body of code,' and that 'if there is no accompanying specification language, then we would have to look inside the code [to determine] what kinds of facilities the agent provides.'" (Appx965.) But Dr. Medvidovic testified further: "If somebody just dumps a bunch

of software in front of us, then I don't think we would have any other choice but to examine the code. **If there were additional facilities, models, and specifications provided to us, then that would change the task**." (Appx5111 (quoting Appx9973-9974 (10:14-11:16).) Dr. Medvidovic relied on the additional facilities, models, and specifications related to Siri in performing his unrebutted analysis, and nothing in the record disputes the sufficiency of these resources for the task. (*See* Appx11500-11571; Appx12865-12878; Appx12880-12949.)

Finally, for its third point, the Board drew no conclusion that the OAA Project was not—as IPA's evidence shows—the basis for both Siri and the patents-at-issue. Rather, the Board simply notes that "Petitioner argues that 'Adam Cheyer testified that 'Siri' did not implement the agent registry functionality described in the ['115 and '560 patents]." (Appx962.) However, Mr. Cheyer's full testimony makes clear that he made this statement with respect to OAA version 1, whereas both Siri and the patents-at-issue arise from *OAA version 2*. (Appx11659-11660 (46:15 ("…but one feature of the original OAA 1 demo was that…")); *see* Appx11641-11642 (28:10-13, 29:1-5), Appx11705-11708 (93:15-21); Appx1360 (23:35-37 ("[S]ource code for version 2.0 of the OAA software product is included as an appendix hereto, and is incorporated herein by reference."), 23:52-54 ("The source code appendix is offered solely as a means of further helping practitioners to construct a preferred embodiment of the invention.").)

The Board additionally cited evidence crediting "the CALO project with being the progenitor of the ideas that led to Siri… does not appear to have been considered or addressed by Dr. Medvidovic." (Appx967-968.) First, because the Board drew no conclusion regarding this evidence, this evidence cannot be used to support the Board's decision under the APA. *In re Sang Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("The agency tribunal must set forth its findings and the grounds thereof, as supported by the agency record, and explain its application of the law to the found facts.").

Second, the evidence crediting "the CALO project with being the progenitor of the ideas that led to Siri" is consistent with the OAA project being the progenitor of both Siri and the patents-at-issue. (*See* Appx5114-5115.) Specifically, IPA's evidence shows that "***OAA laid the groundwork for the DARPA-funded CALO project***, from which Siri, the first virtual personal assistant, was born. Siri was spun out into an SRI venture that Apple acquired from SRI." (Appx11874 (emphasis added).) Indeed, Microsoft's own expert testified that "[Adam Cheyer] was one of the principal researchers on the OAA, Open Agent Architecture Project, which eventually was spun off as a company called 'Siri' and then became--was bought by Apple. So it led to the Siri conversational agent on the iPhone." (Appx12244 (24:4-23).)

As this Court has repeatedly held,

> It is jurisprudentially inappropriate to disregard any relevant evidence on any issue in any case, patent cases included. Thus evidence rising out of the so-called "secondary considerations" must always when present be considered en route to a determination of obviousness…Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.

*In re Cyclobenzaprine*, 676 F.3d at 1075–76 (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983)). Because the Board failed to consider all of IPA's evidence supporting objective indicia of nonobviousness, including its expert's unrebutted testimony crediting the success of at least two of the three novel aspects of Siri to the claims of the patents-at-issue, the Board's decision cannot stand.

## RESPONSES TO MICROSOFT'S BRIEF

### VI. If this Court Reaches Microsoft's Appeal, it Should Affirm the Board's Orders as to Certain Grounds of Patentability

For the reasons stated, Microsoft failed to establish that FIPA97 is prior art, and so it may not be considered in these IPRs. Thus, all of the Board's determinations adverse to IPA should be reversed on this basis alone. In the event this Court reaches the grounds in Microsoft's Brief, IPA responds as follows:

## VII. The Board's Orders as to Certain Claims are Supported by Substantial Evidence and the Law of Claim Interpretation

An IPR Petitioner must "identif[y], in writing and with particularity…the evidence that supports the grounds for the challenge to each claim" in its Petition. 35 U.S.C. § 312(a)(3). Petitions must "specify where each element of the claim is found in the prior art patents or printed publications relied upon." 37 C.F.R. §§ 42.104(b)(4), (5). Microsoft ignored these basic tenets in its underlying Petitions and cannot now ask this Court to reverse Microsoft's own errors, particularly when Microsoft's position runs counter to the law of claim interpretation.

### A. Microsoft failed to demonstrate how or why elements would have been combined in the art. ['115 patent cl.8-10, 63, '560 patent cl.28]

Dependent claims 8-10 and 63 of the '115 patent and dependent claim 28 of the '560 patent each require that the claimed agent registry data structure includes specific features. (Appx1326, Appx1329 (cl.8-10, 63); Appx1327 (cl.28).) In its Response, IPA pointed out—and the Board agreed—that Microsoft failed to demonstrate "*how* or *why* Kiss's agent registry data structure would have been combined with FIPA97's Agent Management Object to obtain the subject matter for claims 9 and 10." (Appx147, Appx1866.) Similarly, for claim 8, the Board considered—and rejected—Microsoft's arguments on Reply that there would have been a motivation to combine the two references for convenience, finding that Microsoft's reasoning only disclosed the proposed combination of Kiss' electronic

agents and general functions and operations with FIPA97's ACL and related functionality. (Appx148-149.) The Board found Microsoft's reasoning insufficient because it did not provide a basis for Microsoft's new proposed combination—e.g., combining Kiss' *agent registry data structure* with the "trigger declaration" ("preconditions2") set within FIPA97's agent registry. Thus, "based on the complete record," the Board found that Microsoft had not met its burden. (Appx149.) The Board's decision is correct.

Microsoft's assertion that the Board overlooked its arguments is meritless. (Br.51-57.) Microsoft points to its Petition at Appx1423 as "explaining the details of the agent registries from each reference would be combined." (Br.53; Appx1423.) But this is supplemental attorney argument only. The referenced language from the Petition states only that the "techniques [in Kiss and FIPA97] are combined." (*Id.*) The language Microsoft points to and quotes from the Petition proves the Board's point—that Microsoft does not explain *how or why* the agent registry data structures from the two references would have been combined—just that they "are combined." Microsoft also points to Appx1423-1426 as disclosing the reasons a POSA would have combined the two references (Br.54-55), but the reasons for combining the two references generally do not address the failure to demonstrate the combination of the *agent registry data structures*. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012)

(rejecting testimony that "bears no relation to any specific combination of prior art elements[ and] fails to explain why a person of ordinary skill in the art would have combined elements from specific references in the way the claimed invention does.").

Since IPA pointed this deficiency out in its Response, Microsoft had the opportunity to explain it on Reply. It did not. It is not the Board's job to "piece together a coherent argument on [Microsoft's] behalf." *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1326 n.2 (Fed. Cir. 2017).

Microsoft alleges that the Board's findings are inconsistent, claiming that because the Board found that a POSA would have combined FIPA97 and Kiss, that the agent registry data structures must also be combined. (Br.56.) There is no contradiction. The Board expressly addressed this issue, stating that "[i]n Section III.H.1 above [Appx83-94], we discussed [Microsoft's] proposed combination of Kiss's electronic agents and the general functions…*But, here, [Microsoft] is proposing a different (or additional combination)—that is, combining the registry of Kiss with the registry of FIPA97…*" (Appx145-146 (emphasis added).) Microsoft had the opportunity on Reply to provide the how and why a POSA would have combined the agent registry data structures in the two references to produce the claimed inventions and came up with nothing; the Board's decision should be affirmed. *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1066 (Fed. Cir.

2016) (the Board must be careful not to allow hindsight reconstruction of references without any explanation as to "how or why the references would be combined to produce the claimed invention.").

**B. Microsoft failed to provide its specific alleged basis of unpatentability as to certain claims.**

**a. Claim 29 of the '115 patent**

Claims 1 and 29 of the '115 patent are the only independent claims among the challenged claims. Yet, despite the material differences between the two claims, and ample room to conduct this analysis in one of the *five* Petitions Microsoft filed against the '115 patent, Microsoft did not conduct a separate analysis of claim 29 to demonstrate how and why the combination of references would apply, and instead relied solely on its analysis of claim 1. Accordingly, the Board considered—and rejected—Microsoft's argument that its analysis relating to claim 1 should apply to claim 29 and, by extension, the dependent claims. This decision should remain undisturbed. (Appx152-159.)

The Board evaluated and compared the language of both claims 1 and 29, finding, correctly, that "there exist material differences" between the two claims, ultimately concluding that Microsoft needed to separately evaluate and analyze claim 29. (Appx152.) Although both claims are directed to "constructing a goal satisfaction plan" (or in the case of claim 29, "constructing a base goal satisfaction plan"), it is there that the similarity ends, with the remaining elements differing

materially on their face. (Appx152.) *See Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 972 (Fed. Cir. 1999) ("[D]ifferent words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope…").

The Board found that although the claim elements differed materially between the two claims, Microsoft's "analysis [as to claim 29] consists of a single sentence pointing to its analysis for similar but materially different limitations from claim 1." (Appx153.) Central to the Board's decision was Microsoft's failure to "address the claim language of claim 29 or explain why its analysis for claim 1 is sufficient to demonstrate that the combination of Kiss and FIPA97 teaches the limitations of claim 29." (Appx153.) This failure was also raised in the Institution Decision. (Appx1694-1695.) Nevertheless, on Reply, Microsoft dug in, maintaining that "'there are no 'material differences' between claim 1 and claim 29' and, therefore, 'the evidence relied on in the Petition discloses each and every limitation of Claim 29.'" (Appx153; Appx4995.) Yet despite Microsoft's resolute stance that there are no material differences between the claims such that its analysis of the unpatentability of claim 1 should apply in cookie cutter fashion to claim 29, Microsoft tacitly conceded the material differences by also arguing for the first time on Reply *why* the prior art references read specifically on claim 29.

Microsoft put itself between the proverbial rock and hard place—a

comparison of the claim language between claims 1 and 29 lays bare the material differences between the two, and the Board appropriately rejected attempts by Microsoft to resuscitate on Reply because Microsoft should have raised any basis of invalidity in its original Petition. In fact, IPR Petitioners must "make their case in their petition to institute;" due process and Patent Office Regulations do not permit Microsoft to raise new arguments in Reply. (Appx156-157.) *See Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (petitioner must "show with particularity why the patent it challenges is unpatentable"); *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016) (""[i]t is of the utmost importance that petitioners in the IPR proceedings adhere to the requirement that the initial petition identify 'with particularity' the evidence that supports the grounds for the challenge to each claim."); *NuVasive*, 841 F.3d at 972.

Microsoft takes umbrage at the Board's failure to compare the analysis Microsoft provided for claim 1 to claim 29, but Microsoft has only itself to blame. (Br.58.) The Board found that the claim elements in claim 1 were not analogous to claim 29—in fact, there are material differences that Microsoft continues to ignore. (Br.58-59.) Additionally, Petitions must "specify where each element of the claim is found in the prior art patents or printed publications relied upon." 37 C.F.R. §§ 42.104(b)(4), (5). Microsoft failed this exercise and, on that basis alone, this

Court should affirm. *Novartis AG*, 853 F.3d at 1326 n.2 (stating that Petitioner's argument "amounts to little more than a request that the Board peruse the cited evidence and piece together a coherent argument on [Petitioner's] behalf" as this is "far from sufficient to raise a meaningful challenge…let alone sensitize the Board" to the issue."); *see Microsoft Corp. v. FG SRC, LLC*, 2020-1928, 2021 WL 2461862, at *4 (Fed. Cir. June 17, 2021) (affirming Board's decision where "there is no plausible argument that Microsoft's petition challenged claim 18 based on obviousness over Obelix and Skillen with any particularity whatsoever. Microsoft clearly argued that claim 18 was anticipated by Obelix but relies on an unrelated ground in an unrelated section of its petition to ask us to deduce the existence of an obviousness argument from within its anticipation argument.").

**b. Claim 86 of the '115 patent [IPR2019-00811]**

Microsoft levies a similar challenge to the Board's decision upholding the patentability of claim 86 of the '115 patent, once again claiming that Microsoft's analysis concerning a materially different claim should apply. (Br.64-65.) Microsoft's argument similarly fails.

Claim 86 recites several elements including "wherein said at least one facilitator agent is operable to construct a goal satisfaction plan." (Appx1330 (cl.86).) In its IPR2019-00811 Petition, Microsoft did not analyze each claim element with specificity as required. Instead, despite the fact that Microsoft filed

five separate petitions against the ’115 patent, Microsoft once again took a shortcut, stating simply that “[t]his claim element is satisfied for the same reasons described above in §V1.1.h.” (Appx308.) The Board pointed out that although Microsoft incorporated its analyses of claim 1, the specific elements of claim 1 referenced by Microsoft only refers to “constructing a goal satisfaction plan” with no mention of the “facilitator agent” which appears in claim 86. In fact, as the Board pointed out, “claim 1 does not recite ‘facilitator agent,’ nor does [Microsoft] explain in the context of its analysis of claim 1 how the combination of Kiss and FIPA 97 teaches ‘at least one *facilitator agent* is operable to construct a goal satisfaction plan.’” (Appx308.) Predictably, the Board found that Microsoft’s lack of specificity in its Petition prevented serious consideration of Microsoft’s challenge and denied Microsoft’s challenge.

In its Brief, Microsoft feigns surprise, outright ignoring the very specific obligations of a Petitioner to identify portions of the evidence with particularity that support its challenge in its Petition. But this is not the first time that Microsoft—utilizing the same counsel—has had its tactics of cutting corners backfire. *See Microsoft Corp.*, 2021 WL 2461862 at *4 (affirming Board’s decision where “there is no plausible argument that Microsoft's petition challenged claim 18 based on obviousness over Obelix and Skillen with any particularity whatsoever. Microsoft clearly argued that claim 18 was anticipated by Obelix but

relies on an unrelated ground in an unrelated section of its petition to ask us to deduce the existence of an obviousness argument from within its anticipation argument."); *see also Intelligent Bio-Systems*, 821 F.3d at 1369.

Instead, Microsoft unilaterally imputes an obligation on the Board to compare the claim elements of claim 86 with claim elements that the Board considered in an entirely different IPR proceeding. To that end, Microsoft raises for the first time in its Brief to this Court that the Board should have looked to claim 61—which, by Microsoft's own admission, was not even considered in the same IPR proceeding. (Br.66-67 (pointing to IPR2019-00814).) This suggestion is borderline laughable—the Board has no obligation to scour the record of different proceedings to find evidence where Microsoft's own cited evidence fails. The Board's decision should be affirmed.

### C. The Board's finding that "advisory suggestions" is different from "constraints" and thus not disclosed in FIPA97 is consistent with the law. ['560 patent cl.10-11, IPR2019-00836]

The Board's conclusions that FIPA97 (which discloses "Constraints") does not provide teachings as to the "advisory suggestions" claim element in claims 10 and 11 of the '560 patent is consistent with the law.

Dependent claims 10 and 11 of the '560 patent claim a computer architecture wherein "the ICL syntax supports explicit task completion advisory suggestions within goal expression." (Appx1364 (cl.10-11).) It is undisputed that

the specification discusses this concept of "advisory suggestions within goal expression" concept in only one place, which is cited by both parties and the Board. (Appx1356 (16:22-41).) Although the specific "advisory suggestion" language of the claim is not used in the specification, the specification states that "[a]dvice parameters preferably give constraints ***or*** guidance to the facilitator in completing and interpreting the goal." (Appx1356 (16:22-23) (emphasis added).) Accordingly, the Board correctly found that "guidance" discussed in the specification supports the "advisory suggestions" term in the claim. (Appx4846.) Furthermore, the Board's finding that "constraints" is different from "guidance" (or "advisory suggestions") is supported by the plain language of the specification alone, which clearly distinguishes "constraints" from "guidance" by using the term "or", making clear that the two terms are different. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (the specification "is the single best guide to the meaning of a disputed term."); *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless").

Although the Board found that the '560 patent "could more clearly differentiate 'constraints' from 'guidance' or 'advisory suggestions,'" the Board found that since FIPA97 only discloses parameters referred to as "Constraints", that FIPA97 did not disclose guidance or "advisory suggestions", and found for

IPA. (Appx1099-1100.) Accordingly, substantial evidence (buttressed by well-known tenets of claim construction in *Phillips*) supports the Board's decision.

Microsoft does not dispute the disclosures in the specification, but instead disputes the Board's findings that certain parameters requiring numerical values "are more likely than other parameters to be considered 'constraint' rather than guidance." (Appx1099; Br. 69.) However, the Board is not required to abandon common sense in reading patents, which is what Microsoft advocates here. *See Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1328 (Fed. Cir. 2009) (Noting "[c]ommon sense has long been recognized to inform the analysis of obviousness if explained with sufficient reasoning."). A plain reading of the specification clearly differentiates constraints from guidance, and since FIPA97 discloses only "constraints," the Board's decision should be affirmed.

## VIII. The Board Did Not Err in Rejecting Microsoft's Waived Claim Construction Argument ['560 patent cl.50-51, 53-55, IPR2019-00836]

Although Microsoft initially proposed the construction that it now advocates, Microsoft waived the right to pursue this construction when, on Reply, Microsoft argued that "because IPA does not assert any different outcome based on its proposed construction, and [Microsoft] shows how the prior art discloses "computer process[es]" under either construction, *the term is not relevant to the resolution of any dispute and need not be construed*." (Appx4939-4949 (emphasis added).) *See Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 790 F.3d

1329, 1341 (Fed. Cir. 2015) ("We hold that ULT has waived its right to request a construction of 'connected to' and that ULT implicitly conceded that the meanings of 'connected to' is clear and not in need of construction.").

Nevertheless, the Board correctly found that, "[e]ven under [Microsoft]'s proposed construction, however, the Petition fails to address the language of claim 50, which recites 'the plurality of agent registries each resident within a separate computer process." (Appx1109.) Specifically, the Petition argued that a POSA "would understand the Agent Platforms shown in Figure 2 [copied below] to be separate computer processes because each agent platform 'provides the physical infrastructure in which agents can be deployed,' and therefore represents a distinct program, or a part of a program." (Appx5686-5687.)




**Figure 2 — Agent Platform Reference Model Fragment**

Referring to FIPA's Figure 2 above, Microsoft argues that $DF_x$, $DF_y$, and $DF_z$ are "the plurality of agent registries," while AP1 and AP2 are the "separate computer processes." (Appx5684-5687.) Under Microsoft's argument, then, two of the agent registries—$DF_y$ and $DF_z$—are each resident in *the same computer process*—AP2. Thus, Microsoft has conceded that in Figure 2—upon which its argument is based—the plurality of agent registries, $DF_x$, $DF_y$, and $DF_z$, are *not each* resident within a *separate* computer process as required by claims 50, 51, and 53-55 of the '560 patent.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Because each of Microsoft's challenges relies on a combination including

FIPA97 (Exhibits 1006-1012), which Microsoft failed to prove is prior art, each of the Board's determinations adverse to IPA should be reversed. Because there is no reliable evidence in the available record to conclude that the version of FIPA97 Version 1.0 contained in Exhibits 1006-1012 is prior art, a remand would be fruitless and a full reversal is warranted.

Additionally, the Board committed numerous other legal errors, including (1) breaking up each claim into a multiple parts and analyzing each element separately, never as a whole, (2) failing to consider IPA's argument that the prior art does not disclose a "goal satisfaction plan" that "uses reasoning," (3) failing to provide any analysis for why it accepted Microsoft's arguments over IPA's that Kiss discloses "using reasoning," (4) shifting the burden to IPA of proving that FIPA97 is different from the KQML language that the patents-at-issue and their prosecution histories distinguish from the ICL recited in all asserted claims, and (5) disregarding IPA's unrebutted factual record relating to secondary considerations. Additionally, because the specification of the patents-at-issue excludes meta-agents from being part of facilitators, substantial evidence does not support the Board's finding that Kiss' meta-agent can be a part of the facilitator recited in the claims. For each of these reasons, reversal of each of the Board's determinations adverse to IPA is also warranted.

Finally, should this Board reach Microsoft's arguments on appeal, the

Board's determinations in IPA's favor should be affirmed because the Board's decisions were supported by substantial evidence and the law.

Dated: July 1, 2021

Respectfully submitted:

/s/ Sarah E. Spires
PAUL J. SKIERMONT
STEVEN W. HARTSELL
JAIME K. OLIN
SARAH E. SPIRES
SKIERMONT DERBY LLP
1601 Elm Street, Suite 4400
Dallas, Texas 75201
Tel: (214) 978-6600
Fax: (214) 978-6601
pskiermont@skiermontderby.com
shartsell@skiermontderby.com
jolin@skiermontderby.com
sspires@skiermontderby.com

MIEKE K. MALMBERG
SKIERMONT DERBY LLP
800 Wilshire Blvd., Suite 1450
Los Angeles, CA 90017
Tel: (213) 788-4502
Fax: (213) 788-4500
mmalmberg@skiermontderby.com

*Counsel for Cross-Appellant*
*IPA Technologies Inc.*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2021-1412, -1413, -1414, -1416, -1417, -1418, -1419, -1420, -1421, -1422, -1423, -1424, -1440, -1442

**Short Case Caption:** Microsoft Corporation v. IPA Technologies Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 16,483 words.

- [ ] the filing has been prepared using a monospaced typeface and includes ________ lines of text.

- [ ] the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 07/01/2021

Signature: /s/ Sarah E. Spires

Name: Sarah E. Spires

Save for Filing